**STEPHEN F. HENRY, ESQ.**
**HENRY | LACEY PC**
STATE BAR # 142336
2625 Alcatraz Avenue, # 615
Berkeley, California 94705
Telephone: (510) 898-1883
Facsimile (510) 295-2516
shenry@HenryLacey.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALAN JONES,<br><br>                Plaintiff,<br><br>        vs.<br><br>LIGHT FIELD LAB, INC., JON KARAFIN, BRENDAN BEVENSEE, and Does 1 to 10,<br><br>                Defendant, | Case No.: 3:25-cv-5118 MMC<br><br>**NOTICE OF MOTION AND MOTION TO COMPEL DISCLOSURE OF INTERESTED PARTIES BY DEFENDANT LIGHT FIELD LAB, INC.; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**Date: April 24, 2026**<br>**Time: 9:00 a.m.**<br>**Courtroom: 7**<br><br>**Complaint Filed: June 17, 2025**<br>**Am. Complaint Filed: Sept. 3, 2025** |

# Table of Contents

**MEMORANDUM OF POINTS AND AUTHORITIES** ......................................................... 2

**I. INTRODUCTION** ........................................................................................................ 2

**II. THE COURT'S AUTHORITY TO ORDER DISCLOSURE** ........................................ 3

A. Inherent Authority .......................................................................................................... 3

B. Rule 7.1 and Civil Local Rule 3-15 ............................................................................... 3

**III.  FACTUAL BACKGROUND** .................................................................................... 4

A. The Assignment for the Benefit of Creditors ................................................................ 4

B. The August 29, 2025 Preservation Notice ..................................................................... 5

C. Plaintiff's Creditor Claims and Formal Notices ............................................................ 6

D. The Assignee's Attempt to Redirect Communications Through Plaintiff's Litigation Counsel ........ 6

E. Plaintiff's Formal Demands to the Assignee .................................................................. 7

F. The Sakhai Email — Admission of Patent Portfolio Sale ............................................. 8

G. Plaintiff's Response to the Sakhai Email ..................................................................... 12

H. The Assignee's March 6, 2026 Response — Refusal of Further Communication ........... 13

I. The Unrecorded Patent Assignment ............................................................................. 14

J. The Offer of a Patent for a Release .............................................................................. 17

**VI. THE FUNDING QUESTION** ................................................................................... 18

A. Light Field Lab Cannot Fund Its Own Defense ........................................................... 18

B. The Assignee Cannot Fund This Defense Without Breaching Its Fiduciary Duty ............ 19

C. If the Individual Defendants Are Funding the Corporate Defense, Conflicts Exist ......... 19

D. If Investors or Board Members Are Funding the Defense, They Are Undisclosed Parties Controlling the Litigation ............................................................................................... 20

i

E. The Absence of Financial Interest in the Outcome Is the Point ........................................................ 21

F. The Choice of ABC Over Bankruptcy ................................................................................................ 22

   **V. CONCLUSION** ................................................................................................................................ 23

# Table of Authorities

**Cases**

*Chambers v. NASCO, Inc.* (1991) 501 U.S. 32 ................................................................. 3

*In re Nimitz Technologies LLC*, No. 23-103 (Fed. Cir. 2022) ....................................... 3

**Statutes**

11 U.S.C. § 362 .................................................................................................................. 22

Cal. Civ. Code § 3439.04(b) ............................................................................................ 15

Cal. Code Civ. Proc. § 493.010 ......................................................................................... 9

**Rules**

37 C.F.R. § 1.56 ................................................................................................................ 15

Civil Local Rule 3-15 ......................................................................................................... 3

Federal Rule of Civil Procedure 7.1 ................................................................................. 3

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

     PLEASE TAKE NOTICE that Plaintiff Alan Jones hereby moves the Court for an order requiring Defendants to disclose the identity of all persons or entities funding the defense of this action, including but not limited to the source of all payments to Gordon Rees Scully Mansukhani LLP (counsel of record for Light Field Lab, Inc.) and Warren LLP (counsel of record for the individual defendants), and to file disclosures under Federal Rule of Civil Procedure 7.1 and Civil Local Rule 3-15 identifying all entities and persons with a financial interest in the subject matter of this action or in any party to this action.

     This motion is made on the grounds set forth in the accompanying memorandum of points and authorities and the declaration of Alan Jones filed herewith.

Dated: March 11, 2026

                        HENRY | LACEY PC

                        By /s/ Stephen Henry_____
                        STEPHEN F. HENRY
                        Attorney for Plaintiff

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Since August 15, 2025, a corporation with no assets has been defended at substantial expense. Light Field Lab, Inc. executed a general Assignment for the Benefit of Creditors on that date, transferring all assets to a privately selected assignee.  (Declaration of Alan Jones ("Jones Decl."), para 2).  It has had nothing since. Yet it continues to be represented by Gordon Rees Scully Mansukhani LLP — one of the largest law firms in the United States — with active and substantial motion practice. Nobody has disclosed who is paying for that defense. The shell corporation cannot fund it. The Assignee cannot fund it without breaching its duty to creditors. Someone else is paying. This was perplexing and concerning from the outset.

On March 5, 2026, it became imperative that the funding source be disclosed in order to maintain the judicial integrity of these proceedings. The Assignee's counsel disclosed for the first time that the Light Field Lab patent portfolio has been sold, that the sale was approved by an unidentified "senior secured creditor," and that the Assignee is offering Plaintiff a single patent in exchange for a release of his claims.  (Jones Decl. ¶ 7).  These disclosures — the first substantive written communication from the Assignee after more than six months of silence following a formal preservation demand, and after five formal demands for basic information went unanswered — revealed an Assignee that has taken actions difficult to reconcile with its duty to creditors. The Assignee sold the patent portfolio at the center of this dispute, potentially in contravention of a formal preservation demand. It failed to investigate known assets missing from the asset schedule. It has failed to produce its own Fee Agreement after three requests. And it offered Plaintiff a patent he did not invent and considers worthless in exchange for what it described as a "customary patent assignment and release agreement" — an apparent attempt to extinguish claims potentially worth tens or hundreds of millions or more. These actions independently raise questions about whose interests the ABC is actually serving — and who stands to benefit from the continued defense of a shell corporation that gains nothing from a favorable ruling and loses nothing from an adverse one.

The question of who is funding the defense of this shell corporation was always present. In light of these developments, it is now a matter the Court should not leave unresolved. On March 6, 2026, the

Assignee confirmed as much, stating in writing that it does "not anticipate further correspondence on these issues while your litigation remains pending." (Jones Decl. ¶ 14, Ex. J). The Assignee has told Plaintiff it will not answer his questions. Only the Court can compel the answers this motion seeks.

## II. THE COURT'S AUTHORITY TO ORDER DISCLOSURE

### A. Inherent Authority

Federal courts possess inherent authority to manage their cases and to inquire into matters affecting the integrity of proceedings before them. *Chambers v. NASCO, Inc.* (1991) 501 U.S. 32, 43. The Federal Circuit recently affirmed this authority in the context of litigation funding disclosure. In *In re Nimitz Technologies LLC*, No. 23-103(Fed. Cir. 2022), the Federal Circuit denied a petition for writ of mandamus challenging a district court's orders requiring disclosure of litigation funding arrangements and the identities of entities controlling the litigation. The district court in that case — faced with a shell entity that appeared to be controlled by undisclosed parties — ordered production of retention agreements, financial records, and communications with entities directing the litigation. The Federal Circuit held that the petitioner had not shown "a clear and indisputable right" to preclude the inquiry, and emphasized that the district court's concerns went to "the integrity of our judicial system" and "lack of transparency as to who the real parties before the court are."

The parallel to the present case is direct. There, a plaintiff shell entity was being directed by undisclosed parties. Here, a defendant shell entity is being defended at substantial expense by undisclosed parties. In both cases, the court cannot fulfill its obligation to manage the proceedings without knowing who is actually before it.

### B. Rule 7.1 and Civil Local Rule 3-15

Federal Rule of Civil Procedure 7.1 requires disclosure of parent corporations and entities with significant ownership interests. Civil Local Rule 3-15 goes further, requiring disclosure, "with its first appearance, filing, or other request addressed to the court" of any entity with "a financial interest of any kind in the subject matter in controversy or in a party to the proceeding" or "any other kind of interest that could be substantially affected by the outcome of the proceeding." The rule explicitly states that this "includes an individual or entity (other than a party or its counsel of record) that provides funding for the litigation and that has a financial interest in the outcome of the litigation."  Light Field Lab, having filed

a Motion to Dismiss on October 10, 2025 was, and has been, obligated to provide its disclosure but has not done so to date.

Any entity funding the defense of Light Field Lab has a financial interest in this action. The act of funding a party's defense is itself a financial relationship with that party. Beyond that, the most likely funding sources — as analyzed above — are parties who face direct financial exposure if this litigation proceeds to discovery. A funder who is also a potential Doe defendant has a financial interest in avoiding personal liability that could amount to tens or hundreds of millions or more. A funder who is also the portfolio purchaser has a financial interest in the intellectual property at the center of the dispute. A funder who is also the secured creditor has a financial interest in the estate's assets. In each scenario, the funder is spending money to protect a concrete financial position — whether that is avoiding liability, protecting an asset purchase, or preserving a secured claim. These are financial interests in both the subject matter of the dispute and in the party to this action, squarely within the scope of Civil L.R. 3-15. The failure to disclose any such interest violates the rule. As the Court can verify from its own docket, no supplemental disclosures identifying a litigation funding source have been filed in this action.

## III. FACTUAL BACKGROUND

A. <u>The Assignment for the Benefit of Creditors</u>

On August 15, 2025, Light Field Lab, Inc. executed a general Assignment for the Benefit of Creditors ("ABC"), transferring substantially all assets to CMBG FBC-Light Field Lab LLC, a privately selected assignee. (Jones Decl. ¶ 7, Sakhai Email, Mar. 5, 2026, Ex. F.) CMBG FBC-Light Field Lab LLC is managed by CMBG Advisors, Inc., whose principal, James Kaufmann Baer (State Bar No. 109516), signed the assignment documents. As of the date of the ABC and continuing to the present, the State Bar of California lists Mr. Baer as "Not Eligible to Practice Law" due to noncompliance with the Client Trust Account Protection Program — the regulatory program governing the safekeeping of funds held in trust for clients and others. (Jones Decl. ¶ 16, Ex. K.) Mr. Baer's only registered trust account was closed on January 10, 2024 — more than nineteen months before he assumed fiduciary responsibility for estate assets held in trust for Light Field Lab's creditors. The ABC

was filed on the same day that Gordon Rees entered an appearance as new counsel for Light Field Lab — a coincidence that raises questions about how it came to be that both occurred simultaneously.

Following the ABC, Light Field Lab has no assets, no revenue, and no operations. It is, by any measure, a judgment-proof shell. Yet Light Field Lab continues to be defended by Gordon Rees Scully Mansukhani LLP — one of the largest law firms in the United States — with active and substantial motion practice. Separately, the individual defendants Karafin and Bevensee are represented by Warren LLP, where Patricia Peden — formerly Light Field Lab's patent prosecution counsel — now defends the individuals whose fraudulent patent applications she helped prosecute.

The question of who is paying Gordon Rees to defend the shell corporation is distinct from the individual defendants' representation. Karafin and Bevensee may fund their own defense. But Gordon Rees's client — Light Field Lab — has nothing to pay with, nothing to gain from a favorable ruling, and nothing to lose from an adverse one. Yet the defense continues at substantial expense. Someone other than the client is paying, and the identity of that someone has not been disclosed.

B. The August 29, 2025 Preservation Notice

On August 29, 2025, two weeks after the ABC was filed, Plaintiff's counsel served formal notice on the Assignee demanding immediate cessation of any disposition of estate assets, including patents and source code, and preservation of all employment records and communications. (Jones Decl. ¶ 3, Henry Notice, Aug. 29, 2025, Ex. A.) The notice was accompanied by a copy of Plaintiff's federal complaint. It demanded, among other things:

- Immediate cessation of any sale, licensing, transfer, or disposition of patents and source code;
- Preservation of all source code repositories, version-control logs, and development environments;
- Preservation of all employment records and communications;
- Implementation of a litigation hold;
- A complete inventory of all intellectual property assets within ten business days;
- Written confirmation of compliance by September 9, 2025.

The Assignee never provided the written confirmation of compliance demanded by September 9, 2025. It never provided the requested inventory of intellectual property assets. Plaintiff filed his First

Amended Complaint on September 3, 2025, which expanded the fraud allegations to include the systematic omission of Lytro prior art across the patent portfolio and the UVTA challenge to the ABC transfer. This amended complaint was publicly available on the court docket.

According to the Assignee's own counsel, a phone call was placed to Plaintiff's litigation counsel in October 2025 — after the First Amended Complaint with its expanded allegations was already on the public docket — but no written response was ever provided despite the notice specifically requesting written confirmation. The Assignee's sole response to a formal written demand — accompanied by a federal complaint alleging fraud and deceit, criminal theft, civil RICO, and rescission of the IP assignment agreements — was a verbal conversation that created no record of the Assignee's position or commitments.

C.  Plaintiff's Creditor Claims and Formal Notices

On February 18, 2026, Plaintiff filed comprehensive creditor claims with the Assignee, including three proofs of claim, a proof of interest as an equity holder, and three formal notices. Plaintiff also provided the Assignee with complete copies of the Lytro and Light Field Lab patents at the center of the fraudulent inducement allegations, enabling the Assignee to independently verify the systematic one-for-one terminology alterations between substantially identical inventions that form the basis of the fraud claims. (Jones Decl. ¶ 4; Creditor Claims and Notices, Ex. B; Patent Copies, Ex. C.) These filings put the Assignee on detailed written notice of the fraud allegations, including the Lytro patent overlap, the false inventorship claims, and the UVTA challenge to the ABC transfer itself — and provided the Assignee with the primary source evidence to evaluate those allegations independently.

D.  The Assignee's Attempt to Redirect Communications Through Plaintiff's Litigation Counsel

Beginning February 26, 2026, the Assignee attempted to arrange a phone call between Plaintiff, his litigation counsel Stephen Henry, and the Assignee's counsel Mathew Sakhai. Plaintiff requested a written agenda and written identification of the Assignee's concerns. The Assignee did not provide either. (Jones Decl. ¶ 5; Email correspondence, Ex. D.)

On or about March 5, 2026, the Assignee's counsel contacted Plaintiff's litigation counsel directly, despite Plaintiff having communicated that he was handling his ABC claims directly as a creditor. Plaintiff's counsel informed the Assignee that Plaintiff did not wish for counsel to engage on

the ABC matter and that the Assignee should provide written responses directly to Plaintiff. (Jones Decl. ¶ 7.)

E. Plaintiff's Formal Demands to the Assignee

On February 27, 2026, Plaintiff served five formal demands on the Assignee, each with a seven-day response deadline:

1. **Demand 1**: The Fee Agreement governing the Assignee's compensation — a document previously requested on February 25 and February 26, 2026, with no response;

2. **Demand 2**: A complete asset inventory and disposition report;

3. **Demand 3**: The identity of all purchasers of estate assets and any affiliations with Light Field Lab's principals, investors, or counsel;

4. **Demand 4**: A specific accounting of the disposition of all intellectual property assets, including whether purchasers were informed of Plaintiff's fraud allegations;

5. **Demand 5**: All communications between the Assignee and Light Field Lab's principals, counsel, or investors concerning Plaintiff's claims or the disposition of assets.

(Jones Decl. ¶6, Demands 1-5, Ex. E.)

As of the date of this motion, the Assignee has not substantively responded to any of these demands.

The Assignee's failure to produce the Fee Agreement warrants particular attention. The Fee Agreement is the contract governing the Assignee's own compensation — a document that the Assignee itself drafted or negotiated prior to accepting the assignment. It is a short document that has existed since before the ABC was filed and is in the Assignee's immediate possession. It has now been requested three times: informally on February 25 and February 26, 2026, and formally in Demand 1 on February 27, 2026. No response has been provided to any request.

A creditor is entitled to know how much of the estate's value is being consumed by the Assignee's fees before any distribution to creditors. The Fee Agreement is the most basic disclosure a fiduciary can provide — it tells creditors what the fiduciary is being paid. Its production requires no investigation, no document collection, no privilege review. It requires only that the Assignee share a

document it already has. The failure to produce a document this trivial adds to the pattern of Assignee conduct that is difficult to reconcile with its duty to creditors. That pattern, in turn, heightens the urgency of the separate question this motion raises: who is funding the defense of a shell corporation that stands to gain nothing from prevailing and lose nothing from an adverse judgment? The Assignee's conduct raises questions about whose interests the ABC is serving. The litigation funding question raises a different question — who benefits from defending an entity that has no stake in the outcome. Both questions deserve answers, and the Assignee has now confirmed in writing that those answers will not come voluntarily — stating on March 6, 2026 that it does not anticipate further correspondence while the litigation remains pending. (Jones Decl. ¶ 14, Ex. J.) The Fee Agreement — requested three times, never produced, never even acknowledged — is apparently among the matters the Assignee considers closed. The Assignee's principal has been found noncompliant with the State Bar's trust account regulations since July 2024. The failure to produce the Fee Agreement — the document that would show how estate funds held in trust for creditors are being consumed — is consistent with that regulatory record.

On March 5, 2026, Plaintiff served a sixth formal demand on the Assignee — following Demands 1 through 5 served on February 27 — for production of his complete personnel file and employment records. This demand repeated and provided additional specificity to the demand for employment records first made in the August 29, 2025 notice from Plaintiff's counsel, which the Assignee never responded to. The demand was supported by four independent legal bases. (Jones Decl. ¶ 11, Demand 6, Ex. H.) The Assignee has not responded to this demand either.

F. The Sakhai Email — Admission of Patent Portfolio Sale

On March 5, 2026, the Assignee's counsel Mathew Sakhai sent an email to Plaintiff making several material admissions. (Jones Decl. ¶ 8, Sakhai Email, Ex. F.) Mr. Sakhai stated:

- The Assignee sold the Light Field Lab patent portfolio — the core intellectual property asset of a company that raised approximately $85 million from institutional investors — which the Assignee characterized as "an asset that needed to be liquidated" as part of its fiduciary duties;

- The sale was "approved by the senior secured creditor who had a first-priority lien on all LFL assets";

- The two WO patents identified in Plaintiff's complaint as derived from his work — WO2025042476A1 and WO2024216300A2 — "were not listed on the asset list that was transferred to the Assignee";

- The Assignee's team "looked into" US10488584 and "determined it was not tied to the core LFL technology";

- The Assignee carved out US10488584 and offered to transfer it to Plaintiff "pursuant to a customary patent assignment and release agreement";

- The Assignee "does not have any independent knowledge about what went on between [Plaintiff] and the former LFL officers."

Mr. Sakhai's statement that the WO patents were not on the asset list has significant implications. As Plaintiff explained in his response (Jones Decl. ¶ 10, Ex. G), a general assignment for the benefit of creditors under Cal. Code Civ. Proc. § 493.010 transfers all of the assignor's non-exempt assets — the asset schedule is an administrative disclosure tool, not a limitation on the scope of the transfer. If LFL held rights in those patents, they transferred to the Assignee regardless of whether they appeared on any list. The omission of known assets from the schedule has several possible explanations, none of which is benign: it is a disclosure failure by the assignor — which the Assignee had a duty to investigate; it is evidence that the assignment was limited to specifically enumerated assets, which would raise questions about whether it qualifies as a "general assignment" at all; or the rights in those patents were abandoned or destroyed before the ABC was executed — which, given that these patents were specifically identified in Plaintiff's complaint as evidence supporting his fraud claims, would raise serious questions about spoliation of evidence.

The Assignee acknowledged awareness that these patents existed yet apparently took no steps to determine why they were missing from the asset list, what rights LFL held in them, or whether the omission was an oversight or intentional concealment by the assignor. A fiduciary who knows that the assignor's asset disclosure is incomplete and takes no steps to investigate is not fulfilling its duty to

creditors. If the failure to investigate resulted from direction by other parties, that does not excuse the breach — it compounds it, and raises the question of who gave the direction and why.

Similarly, the Assignee's conclusion that US10488584 is "not tied to the core LFL technology" is difficult to reconcile with the publicly available patent records, which show that it derives from the same provisional applications as much of the rest of the portfolio. Plaintiff's First Amended Complaint — which was on the public docket before the Assignee's October 2025 call with Plaintiff's counsel — explains this connection in detail. The Assignee has not disclosed who conducted this investigation, what they examined, or what qualifications they had to reach this conclusion.

The Assignee's counsel stated that their team "looked into" US10,488,584 and "determined it was not tied to the core LFL technology." But the prosecution record makes this claim impossible to reconcile with any actual investigation. The prosecution file for US10,488,584 is 1,179 pages — but a patent professional need not read all of them to see the problem.  [For the sake of brevity of the courtesy copy, Plaintiff is providing the essential pages of the Exhibit as Exhibit L – the entire file may be accessed at the following Dropbox link:

https://www.dropbox.com/scl/fo/0euzh2dd1a3szb4v16cd2/AAz140w1QBKyCmBsiXglCYw?rlkey=3ve j0rz7hww95effn3bszrko0&st=hw9s4ovw&dl=0

A PPH petition appears at pages 908-910, filed just five days after national stage entry on June 25, 2018. (Ex. L-2 at pp. 908-910.) Any patent professional encountering a PPH petition would immediately examine the Written Opinion of the ISA on which it rests — which found all 31 claims to have novelty, inventive step, and industrial applicability. (Ex. L-2 at pp. 920-925.)

A professional would then check the ISA search report to understand the basis for that favorable opinion — and would find, at Ex. L-1 pages 20-25, that the ISA ran 41 search queries using only the applicant's invented terminology ("energy relay," "energy surface," "energy directing") and zero standard industry terms. The IDS filed the same day as the PPH petition contains exactly four references: the three references identified by the ISA plus the ISA opinion itself — no Lytro, no fiber optic prior art, nothing. (Ex. L-2 at pp. 911-914.)

The PCT application (PCT/US2017/042452) that forms the basis of US10,488,584 was filed using entirely substituted terminology throughout its claims and specification. (Ex. L-1 at pp. 147-153

(claims), pp. 111-146 (specification).) The International Searching Authority ("ISA") — which for this application was the USPTO itself — conducted its search using the terms from the application. It is worth noting that unlike a US non-provisional application, a PCT application can be withdrawn before publication, leaving no public record of its existence. In the context of potential intellectual property misappropriation, this feature is significant: if the ISA search had identified the actual prior art, the applicant could withdraw without the prior art owner ever discovering the attempt.

The ISA conducted its search September 15-21, 2017 — 22 days after Lytro's application US 2017/0243373 A1 had been publicly available (published August 24, 2017; Ex. L-3 at p. 1101) — running 41 queries composed entirely of the applicant's invented terminology. (Ex. L-1 at pp. 20-25.) Not one of the 41 queries used standard optical or fiber optic terminology. Lytro's published application was not surfaced. The ISA issued a favorable Written Opinion on November 17, 2017, finding all claims allowable. (Ex. L-2 at pp. 920-925.)

What followed was precision-timed. The US national stage application was filed on June 20, 2018. (Ex. L-2 at pp. 935-938.) Five days later — on June 25, 2018 — LFL's counsel filed a PPH petition and an IDS containing exactly four references: the three ISA references plus the ISA opinion itself. (Ex. L-2 at pp. 908-910 (PPH petition); pp. 911-914 (IDS).) The five-day gap being small enough to ensure that no US examiner had begun running independent searches and would instead defer to the ISA's opinion under the PPH program. The PPH was granted on August 27, 2018, conferring "SPECIAL" status. (Ex. L-2 at pp. 903-907.) The U.S. examiner allowed all 31 claims on first action on March 20, 2019 — zero office actions and zero rejections. (Ex. L-2 at pp. 870-877.)

The prosecution record thus shows: an application filed using substituted terminology; an ISA search that used only that terminology and failed to find the most material prior art despite its public availability; and a PPH petition filed five days after national stage entry that ensured the US examiner would defer to the ISA's compromised search rather than conduct an independent one. One cannot look at this prosecution history without seeing these facts. The Assignee either did not look — in which case its representation about investigating the patent is false — or it looked and chose not to disclose what it found. In either case its conduct raises questions about whose interests it serves.

Mr. Sakhai also materially mischaracterized the scope of the August 29, 2025 preservation notice. He stated that the notice "referenced two patents" and "asked us only to not dispose of the patents referenced in the letter." In fact, the notice demanded cessation of disposition of all patents where Plaintiff should be listed as inventor, all source code, all employment records, and all related documentation — a far broader demand than Mr. Sakhai represented. (Compare Sakhai Email, Ex. F, with Henry Notice, Ex. A.)

G. <u>Plaintiff's Response to the Sakhai Email</u>

On March 5, 2026, Plaintiff responded to Mr. Sakhai's email in detail. (Jones Response, Ex. G.) Plaintiff's response:

- Attached the complete August 29, 2025 notice and identified the specific demands Mr. Sakhai had mischaracterized;

- Questioned how the Assignee concluded that the senior secured creditor's lien took priority over Plaintiff's constructive trust and crime victim restitution claims, both of which were pled in the federal complaint the Assignee had in hand since August 2025;

- Asked whether the Assignee disclosed Plaintiff's fraud allegations to the purchaser before completing the sale;

- Challenged the Assignee's characterization of US10488584 as "not tied to the core LFL technology," given that it derives from the same provisional applications as most of LFL's other patents and is the patent that most clearly demonstrates the systematic one-for-one terminology alteration from Lytro's US10565734;

- Challenged the Assignee's characterization of the WO patents as not being on the asset list, explaining that a general assignment transfers all assets regardless of the schedule, and demanding to know what investigation was conducted into why known assets were missing;

- Asked who conducted the Assignee's investigation into US10488584, what their qualifications were, what they examined, and whether independent patent counsel was engaged;

- Demanded answers regarding the current status of all source code — which Mr. Sakhai's email conspicuously did not address;

- Asked whether a litigation hold was implemented in response to the August 2025 notice;
- Noted that the five formal demands remained outstanding and unanswered;
- Requested the proposed "release agreement" for review without committing to any negotiation;
- Reserved all rights under the UVTA.

H. <u>The Assignee's March 6, 2026 Response — Refusal of Further Communication</u>

On March 6, 2026, the Assignee responded to Plaintiff's March 5 correspondence. (Assignee Response, Ex. J.) This response is significant for what it says and what it does not say.

The Assignee suggested that "some of the issues raised in your recent correspondence appear inconsistent with the position reflected in the prior letter from your counsel that we have on file." The Assignee did not identify which issues it considers inconsistent. Plaintiff's March 5 correspondence attached the actual August 29, 2025 notice (Ex. A) and demonstrated that Mr. Sakhai had mischaracterized it. The Assignee's suggestion of inconsistency — without identifying any specific inconsistency, and after Plaintiff provided the very document that disproves Mr. Sakhai's characterization — appears to be an attempt to avoid engaging with the substance of Plaintiff's demands.

The Assignee stated that it had "reviewed the submissions and questions" Plaintiff provided and had "responded to the matters we are able to address." It did not identify which matters it considers addressed, nor did it respond to any of Plaintiff's specific questions or demands — including the identity of the purchaser, the sale date, the Fee Agreement, the status of source code, or the identity of the senior secured creditor.

The Assignee characterized Plaintiff's creditor demands as matters that "relate to issues that are the subject of your litigation against the former LFL officers or otherwise involve legal determinations outside the Assignee's role." This characterization is incorrect. The identity of the purchaser of estate assets, the terms of the sale, the Fee Agreement governing the Assignee's own compensation, and the status of estate assets including source code are core ABC administration questions that any creditor is entitled to ask. They are not litigation issues. The Assignee's attempt to conflate creditor demands with the underlying litigation is itself evidence that the Assignee is prioritizing the interests of the litigation defendants over its obligations to creditors.

The Assignee also stated that it "cannot expend estate resources addressing speculative issues while litigation remains pending." Plaintiff's fraud allegations — supported by signed inventor's oaths, publicly available patent records, and detailed analysis provided directly to the Assignee — are not speculative. More importantly, the creditor demands at issue do not ask the Assignee to adjudicate fraud. They ask for documents and information that exist, that the Assignee has, and that any creditor is entitled to receive.

The Assignee then stated that it would be willing to coordinate the transfer of "the three patents referenced" — an apparent expansion of Mr. Sakhai's March 5 offer, which referenced only one patent, US10488584. Whether this reflects a change in the offer or a misunderstanding has not been clarified.

Finally, the Assignee stated: "We do not anticipate further correspondence on these issues while your litigation remains pending." A fiduciary administering an estate for the benefit of creditors has now informed a creditor — in writing — that it will not communicate further. This statement eliminates any argument that court-ordered disclosure is premature or that less intrusive means should be attempted first. The Assignee has closed the door. Only the Court can reopen it.

I. The Unrecorded Patent Assignment

Despite Mr. Sakhai's confirmation that the patent portfolio has been sold, no assignment of any Light Field Lab patent has been recorded at the United States Patent and Trademark Office as of March 6, 2026. Plaintiff has obtained the complete USPTO assignment transaction history for all Light Field Lab patents, which confirms that Light Field Lab, Inc. remains the recorded owner of every patent in the portfolio. (USPTO Transaction History, Ex. M.)

There are in fact two unrecorded assignments. The first is the ABC itself. The general assignment executed on August 15, 2025 transferred all LFL assets — including the patent portfolio — to CMBG FBC-Light Field Lab LLC. Unlike bankruptcy, where property vests in the estate by operation of law, an ABC is a voluntary assignment by written instrument — precisely the type of transfer that 35 U.S.C. § 261 addresses. While recording is not strictly mandatory, an unrecorded assignment is void against subsequent purchasers for value without notice unless recorded within three months. As fiduciary for the estate, the Assignee had a duty to secure estate assets against competing claims, and the standard mechanism for doing so with patent assets is recording the assignment at the USPTO. The

three-month safe harbor expired on or about November 15, 2025. The Assignee never recorded the transfer. As a result, Light Field Lab, Inc. remains the recorded owner at the USPTO, and the estate's interest in the patent portfolio has been unprotected against subsequent purchasers for value without notice since that date.

The second unrecorded assignment is the subsequent sale of the portfolio to the unidentified purchaser. Because the exact date of the sale has not been disclosed despite Plaintiff's formal demand, the precise expiration of the three-month window for this assignment cannot be determined — though it can be no later than June 5, 2026, given the Assignee's counsel's confirmation on March 5, 2026 that the sale had already occurred.

The failure to record either assignment is significant. A bona fide purchaser who paid consideration for a patent portfolio would record the assignment immediately to protect its investment. And a fiduciary administering an estate would record the assignment to secure the estate's assets. Neither happened. The failure to record both assignments is inconsistent with arm's-length transactions and consistent with transfers designed to conceal the parties' identities. Concealment of the transfer of assets is a badge of fraud under the UVTA. Cal. Civ. Code § 3439.04(b).

Notably, Plaintiff has alleged in his First Amended Complaint — filed September 3, 2025, before the Assignee's October 2025 call with Plaintiff's counsel — that the patents in the portfolio are invalid due to the underlying fraud, specifically the systematic omission of material prior art in violation of the duty of candor under 37 C.F.R. § 1.56. Based on status updates published on the Assignee's ABC website, the patent portfolio sale appears to have been finalized in or around January 2026 — well after these allegations were on the public docket. (ABC Status Updates, Ex. I.) The exact date of the sale has not been disclosed despite Plaintiff's formal demand. This raises a direct question: what price did the purchaser pay for a portfolio subject to publicly filed fraud allegations, and does that price reflect a commercially reasonable transaction or a nominal transfer to a related party?

Basic due diligence by any prospective purchaser would have included reviewing the publicly available inventor's oaths filed with the USPTO. Those oaths show Defendants Karafin and Bevensee swearing under penalty of perjury — with express acknowledgment that false statements are punishable under 18 U.S.C. § 1001 — to inventorship of substantially identical technology in both the Lytro and

Light Field Lab patents. (Ex. L-2 at pp. 1011-1014 (LFL oaths); Ex. L-3 at pp. 1140-1144 (Lytro oaths).) The oaths also reveal name variations suggesting an effort to evade detection: Karafin signed the LFL oath as "Jonathan Sean Karafin" but the Lytro oath as "Jon Karafin"; Bevensee added the middle name "Elwood" only on the LFL filing. (Compare Ex. L-2 at pp. 1011-1014 with Ex. L-3 at pp. 1140-1144.) A purchaser who conducted that diligence and proceeded regardless was either uninformed by the Assignee of the fraud allegations, willfully indifferent to the risk, or already aware of the issues because it is an insider, affiliate, or party otherwise connected to those who created the patents.

A purchaser's patent counsel would also have reviewed the assignment chain — the documents establishing who owns the rights being sold. The Lytro assignment agreement, filed with the USPTO and publicly available, contains an express covenant: the inventors represented that they "had not made and would not hereafter make any assignment, grant, mortgage, license, or other agreement affecting the rights, titles, and interests herein conveyed." (Ex. L-3 at pp. 1116-1131.) Karafin and Bevensee signed this covenant in April 2017. Fourteen months later, they assigned the same technology to Light Field Lab. (Ex. L-2 at pp. 1018-1020.) This covenant breach creates a title defect in every LFL patent derived from the same inventions — a defect that any competent title review of the portfolio would have uncovered, and that would have required disclosure to any purchaser acquiring the portfolio in an arm's-length transaction.

The prosecution records further reveal that across five separate Information Disclosure Statement filings — totaling 183 prior art references — LFL never disclosed the existence of Lytro's co-pending application. (Ex. L-2 at pp. 911-914, 633-644, 73-80, 612-623, 20-23.) Lytro's application US 2017/0243373 A1 had been publicly available since August 24, 2017 (Ex. L-3 at p. 1101) — before every one of LFL's IDS filings. The obligation to disclose material prior art to the USPTO is codified at 37 C.F.R. § 1.56, and a co-pending application by the same inventors covering the same technology is among the most clearly material references that could exist. The shared inventors — Karafin and Bevensee — had a personal duty under § 1.56 to disclose each application to the other's prosecution. They failed to do so on either side. This systematic omission is not consistent with inadvertence.

Perhaps most damning is what happened after the initial allowance. When the USPTO flagged one of LFL's IDS filings as procedurally non-compliant (Ex. L-2 at p. 632), LFL's counsel filed a

Request for Continued Examination on June 20, 2019 — nearly twenty-two months after Lytro's application had been publicly available — and submitted 120 additional prior art references across two supplemental IDS filings — paying a $650 fee to cure a paperwork deficiency on a patent that had already been allowed without any rejections. (Ex. L-2 at pp. 624-626 (RCE); pp. 73-80 and pp. 612-623 (IDS #3-4 with 120 references).) Despite this active management of the disclosure record — a direct opportunity to correct any omissions — the Lytro reference was still not included among the 120 new references. This is not a passive failure to disclose. It is active, documented concealment on the government record and no bona fide purchaser would ignore it.

 J. <u>The Offer of a Patent for a Release</u>

 Mr. Sakhai's offer to transfer US10488584 to Plaintiff "pursuant to a customary patent assignment and release agreement" warrants the Court's attention. US10488584 is a patent based on provisional applications filed in 2015-2016 while Defendants Karafin and Bevensee were employed at Lytro. Plaintiff has no inventorship claim to this patent — it is not derived from Plaintiff's work. Plaintiff has identified this patent in his filings as evidence of the foundational fraud, not as his own property, and has stated he considers it invalid and unenforceable.

 The Assignee is offering Plaintiff a patent he did not invent, considers worthless, and has identified as evidence of fraud — described as part of a "customary patent assignment and release agreement." The specific terms of the proposed release were not included with the offer. The term "release" in this context customarily refers to a relinquishment of claims by the receiving party.

 This offer raises questions about the Assignee's compliance with its fiduciary obligations regardless of whether the patent has value:

 If the Assignee investigated US10488584 and determined it has no significant value, then offering it as consideration for a release of Plaintiff's claims — which are potentially worth tens or hundreds of millions or more — without disclosing that assessment is a breach of fiduciary duty. The Assignee's email (Ex. F) contains no disclosure of any valuation or assessment of the patent. A fiduciary owes a duty of full disclosure and utmost good faith in dealings with beneficiaries. Offering something the fiduciary knows to be worthless as consideration for the extinguishment of substantial claims,

without disclosing that assessment, is inconsistent with those duties. The question is not whether the Assignee failed to disclose — it did — but why.

If the Assignee believes the patent has significant value, then a different question arises: why is the Assignee offering a valuable estate asset to one creditor rather than liquidating it for the benefit of all creditors? The Assignee's duty to maximize distributions would ordinarily require selling valuable assets and distributing proceeds according to priority, not transferring them to individual creditors in exchange for releases whose terms were not included with the offer. Without those terms, it is not possible to evaluate who benefits from the arrangement — though given the limited information available, it appears likely to only benefit those whose exposure would be reduced by the extinguishment of Plaintiff's claims.

If the Assignee did not investigate the patent's value before offering it, that is itself a failure of the fiduciary duty of care and prudence. A fiduciary cannot dispose of estate assets without understanding what it is disposing of.

In any of these scenarios, the offer warrants scrutiny. The Assignee is seeking to resolve Plaintiff's claims — the claims of the creditor who has raised fraud allegations and demanded accountability — rather than addressing the substance of those claims. This priority is difficult to reconcile with the interests of creditors, and raises independent questions about whose interests the Assignee is serving in its administration of the estate.

## VI. THE FUNDING QUESTION

### A. Light Field Lab Cannot Fund Its Own Defense

This fact is beyond dispute. Light Field Lab executed a general assignment of all assets. It has nothing. It cannot pay Gordon Rees. Yet Gordon Rees continues to appear, file motions, and actively litigate on behalf of this empty shell.

The individual defendants' representation by Warren LLP raises a separate but related question. Warren LLP is the current firm of Patricia Peden, who served as Light Field Lab's patent prosecution counsel — the very attorney involved in prosecuting the patents Plaintiff alleges were obtained through fraud. Ms. Peden now defends the individuals whose fraudulent patent applications she helped file. The Court may wish to consider whether the same or a related funding source is paying for both the

corporate and individual defenses, and whether the source of Warren LLP's compensation bears on Ms. Peden's conflicts of interest.

B. The Assignee Cannot Fund This Defense Without Breaching Its Fiduciary Duty

The Assignee holds estate assets in trust for the benefit of creditors — including Plaintiff. Using estate funds to defend the corporation against Plaintiff's claims would mean using Plaintiff's own potential recovery to fund the defense against his claims. This is a fundamental conflict. If the Assignee is funding the defense, that fact must be disclosed so that the Court knows who is effectively directing and paying for the defense of the party before it.

C. If the Individual Defendants Are Funding the Corporate Defense, Conflicts Exist

If Defendant Karafin, Defendant Bevensee, any of the Doe defendants identified in Plaintiff's complaint, or any combination thereof are funding the corporate defense through Gordon Rees — whether directly or through proxies such as corporate entities, investors, or former board members — this creates an irreconcilable conflict. They are defendants with personal liability exposure. The corporate defense primarily benefits the individual defendants, not the shell corporation. If Light Field Lab loses, nothing happens to it; it has nothing. If the case proceeds to discovery, everything happens to the individuals, because discovery is the mechanism through which Plaintiff identifies the Doe defendants and substitutes real names.

A corporate defense funded by individual defendants to prevent discovery of the individuals' own conduct would not serve the interests of the corporation. It would constitute a misuse of the corporate form, and it would mean the proceedings before this Court are not what they appear to be — the nominally independent corporate defense would in fact be a mechanism by which the individual defendants obstruct discovery of their own conduct through a party that has no independent stake in the outcome.

The separation of counsel underscores this problem. Light Field Lab is represented by Gordon Rees. The individuals are separately represented by Warren LLP. Separate representation is supposed to reflect independent interests. But if the same, related, or coordinated parties or source of funding is behind both representations, the independence is illusory — and the corporate defense is functioning as

an extension of the individual defense, paid for through a channel that obscures who is actually directing it.

D. <u>If Investors or Board Members Are Funding the Defense, They Are Undisclosed Parties Controlling the Litigation</u>

This is the scenario that the available evidence most strongly supports and that raises the most serious concerns.

As set forth in Section II.F above, the prosecution record for US10,488,584 shows that the application was filed using systematically substituted terminology, that the ISA search used only that terminology and failed to find the most material prior art, and that a PPH petition filed five days after national stage entry ensured the US examiner deferred to the ISA's compromised search rather than conducting an independent one. The question of who funded and directed the prosecution strategy that produced this record — and whether those or affiliated parties are now funding the defense to prevent its exposure — is central to the Court's inquiry.

Light Field Lab raised approximately $85 million from institutional investors including Khosla Ventures, Bosch, Samsung, LG, Comcast, and others. California law requires both board and shareholder approval for transfer of substantially all of a corporation's assets. Who sat on Light Field Lab's board at the time the ABC was approved, and what role the institutional investors or their representatives played in that decision, has not been disclosed. The Assignee's counsel has stated that a "senior secured creditor" approved the patent portfolio sale, but has not identified that creditor despite Plaintiff's formal demand. Given that the institutional investors contributed $85 million in capital to this company, the question of whether they — or entities they control — also hold the senior secured position and influenced the decision to liquidate through an ABC rather than bankruptcy is directly relevant to the Court's inquiry into who is directing this litigation.

Mr. Sakhai's email reveals that the patent portfolio sale was "approved by the senior secured creditor who had a first-priority lien on all LFL assets." (Ex. F.) The identity of this senior secured creditor has not been disclosed despite Plaintiff's formal demand (Demand 3). A first-priority lien on all assets of a venture-backed startup is typically held by venture debt providers or by the venture investors themselves through structured financing arrangements.

If the senior secured creditor is one of the institutional investors — or an entity they control or are affiliated with — several questions arise independently. First, regarding the ABC administration: were the same or related parties who funded the company also positioned to influence the Assignee's conduct, including the decision to sell the portfolio, the failure to investigate missing assets, and the offer of a worthless patent for a release? Second, regarding the litigation: are those or related parties also funding the defense of the shell corporation? These are separate questions, pursued through separate channels. The ABC administration questions will be addressed through Plaintiff's pending demands, subpoenas, and discovery. The litigation funding question is the subject of this motion. But the answers may reveal connections that neither inquiry would uncover alone.

If, as the available evidence suggests, the patent portfolio was purchased by an insider or affiliated party, approved by a secured creditor who is also an insider or aligned party, through an assignee whose conduct raises questions about whose interests it serves — and if, separately, an undisclosed party is simultaneously funding the defense of the corporate shell — then the Court is managing a case in which undisclosed parties may be operating on both sides of the same structure.

As set forth in Section II.I above, neither the ABC assignment nor the subsequent portfolio sale has been recorded at the USPTO. (Ex. M.) The failure to record is consistent with an insider purchase: a party who controls both sides of the transaction has no need to record because there is no risk of a competing claim from within their own structure.

E. The Absence of Financial Interest in the Outcome Is the Point

In typical third-party litigation funding, the funder has a financial interest in the outcome — they expect a share of the recovery or benefit from a favorable judgment. Here, there is no recovery to share. A judgment in favor of Light Field Lab produces nothing of value for the shell corporation. The funder gains nothing from winning.

This absence of any apparent financial interest in the outcome is among the most significant facts before the Court. It is difficult to identify a rational basis for spending substantial sums defending a judgment-proof entity unless the defense serves a purpose other than prevailing on the merits. The most apparent such purpose is preventing the litigation from progressing to the stage where discovery —

through subpoenas, document production, depositions, and Doe defendant substitution — reveals the identity and involvement of the persons funding the defense.

If that is the purpose, then the defense is being funded not to win but to prevent Plaintiff from learning who the real parties in interest are. That motive — suppression of discovery — is precisely the kind of conduct the Court's disclosure rules are designed to prevent and the Court's inherent authority is designed to address.

F. <u>The Choice of ABC Over Bankruptcy</u>

The decision to file an Assignment for the Benefit of Creditors rather than a bankruptcy petition has independent significance for the funding question.

Had Light Field Lab filed for bankruptcy, the automatic stay under 11 U.S.C. § 362 would have immediately halted this litigation. No further defense costs would have been incurred. No motions would need to be briefed. No law firms would need to be paid. The estate would have preserved whatever funds are currently being spent on litigation for distribution to creditors — the stated purpose of any legitimate wind-down.

Bankruptcy would also have provided judicial oversight of asset sales, a court-appointed trustee with duties to all creditors, mandatory disclosure requirements, creditor committees with investigative authority, and court approval before any significant assets could be sold. All of these features protect creditors. All of them were avoided by choosing an ABC.

An ABC provides none of these protections. The assignee is privately selected by the debtor — not appointed by the court. There is no automatic stay — litigation continues. There are no creditor committees. Asset sales require no judicial approval. And disclosure obligations, while they exist as fiduciary duties, have no judicial enforcement mechanism unless a creditor affirmatively seeks court intervention.

Separately, the Assignee's conduct — as detailed above — raises independent questions about whether the ABC is being administered in the interests of creditors. Selling assets potentially over a formal preservation demand, failing to investigate missing assets, failing to produce basic documents despite repeated requests, and offering a worthless patent for a release of substantial claims are actions

inconsistent with fiduciary duty to creditors. The question of whose interests these actions serve stands on its own, regardless of the litigation funding question.

The funding question intersects with the ABC in one specific respect: the ABC created the need for ongoing litigation funding by forgoing the automatic stay. An automatic stay would have halted this litigation at no cost to the estate. Instead, someone is spending substantial sums to defend litigation that could have been stayed for free. The Court is entitled to know who is incurring those costs and why.

## V. CONCLUSION

The question of who is funding the defense of a judgment-proof shell corporation has been present since August 15, 2025. A corporation with no assets, no revenue, and no operations has been defended at substantial expense for over six months by one of the largest law firms in the United States. The shell corporation gains nothing from a favorable ruling and loses nothing from an adverse one. No one has disclosed who is paying.

The Assignee's March 5, 2026 disclosures have made the question urgent. An allegedly independent fiduciary has engaged in a pattern of conduct inconsistent with its duty to creditors. It sold the patent portfolio at the center of this dispute, potentially after receiving a formal preservation demand or within the earliest weeks of the ABC. The assignment remains unrecorded at the USPTO and the buyer's identity has not been disclosed. It failed to investigate known assets missing from the asset schedule. It offered Plaintiff a patent he did not invent and considers worthless in exchange for a release of claims potentially worth tens or hundreds of millions or more. It has failed to produce its own Fee Agreement after three requests. And six formal demands for basic information about the administration of the estate — information any creditor is entitled to — remain unanswered.

The Assignee's conduct does not prove who is funding the litigation. The litigation funding question does not depend on the Assignee's conduct. But both independently point to the same question: who benefits from this structure, and why are they hidden?

On March 6, 2026, the Assignee removed any doubt about whether voluntary disclosure is possible. It stated in writing that it does "not anticipate further correspondence on these issues while your litigation remains pending." (Ex. J.) The Assignee has told a creditor it will no longer

communicate. Less intrusive means have not merely been tried and failed — they have been expressly foreclosed by the party from whom disclosure is sought.

The Court has both the inherent authority and the obligation to require disclosure. Plaintiff respectfully requests that the Court order Defendants to identify all persons and entities funding the defense of this action, the terms of any funding arrangement, and any relationship between the funder and Light Field Lab's officers, directors, investors, or the purchaser of the patent portfolio and any other estate assets.

Dated: March 11, 2026                    HENRY | LACEY PC

                                         By /s/ Stephen Henry_____
                                         STEPHEN F. HENRY
                                         Attorney for Plaintiff