**STEPHEN F. HENRY, ESQ.**
**HENRY | LACEY PC**
STATE BAR # 142336
2625 Alcatraz Avenue, # 615
Berkeley, California 94705
Telephone: (510) 898-1883
Facsimile (510) 295-2516
shenry@HenryLacey.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALAN JONES,<br><br>        Plaintiff,<br><br>    vs.<br><br>LIGHT FIELD LAB, INC., JON KARAFIN,<br>BRENDAN BEVENSEE, and Does 1 to 10,<br><br>        Defendant, | Case No.: 3:25-cv-5118 MMC<br><br>**DECLARATION OF ALAN JONES IN**<br>**SUPPORT OF MOTION TO COMPEL**<br>**DISCLOSURE OF INTERESTED PARTIES**<br>**BY DEFENDANT LIGHT FIELD LAB, INC.**<br><br>**Date: April 24, 2026**<br>**Time: 9:00 a.m.**<br>**Courtroom: 7**<br><br>**Complaint Filed: June 17, 2025**<br>**Am. Complaint Filed: Sept. 3, 2025** |

I, Alan Jones, declare as follows:

1.      I am the Plaintiff in this action. I make this declaration based on my personal knowledge and, if called as a witness, could and would testify competently to the facts stated herein.

2.      On August 15, 2025, Light Field Lab, Inc. filed an Assignment for the Benefit of Creditors, transferring all assets to CMBG FBC-Light Field Lab LLC. I was notified of the ABC by email from the Assignee on August 21, 2025 — six days after the assignment was executed.

3.      On August 29, 2025, my counsel, Stephen F. Henry, served formal notice on the Assignee demanding immediate cessation of disposition of assets and preservation of all records. A true and correct copy of that notice is attached hereto as Exhibit A. To my knowledge, the Assignee never

provided a written response to this notice.  I have received no written confirmation of compliance, no asset inventory, and no written statement of the Assignee's position.

4.      On February 18, 2026, I filed comprehensive creditor claims with the Assignee, including three proofs of claim, a proof of interest, and three formal notices detailing the fraud allegations. I also provided the Assignee with complete copies of the Lytro and Light Field Lab patents at the center of the fraudulent inducement allegations in my complaint, so that the Assignee could independently verify the basis for my claims. True and correct copies of my creditor claims, notices, and the patent copies provided to the Assignee are attached hereto as Exhibits B and C.

5.      Between February 25 and February 26, 2026, I requested the Fee Agreement governing the Assignee's compensation on two occasions within the same email correspondence. Although the Assignee replied to that correspondence, no reply addressed the Fee Agreement request. Beginning February 26, 2026, the Assignee attempted to arrange a phone call between me, my litigation counsel Stephen Henry, and the Assignee's counsel Mathew Sakhai. I informed the Assignee that I had been handling the claims myself and requested a written agenda and written identification of the Assignee's concerns before involving my counsel. The Assignee did not provide either. A true and correct copy of this email correspondence is attached hereto as Exhibit D.

6.      On February 27, 2026, I served five formal demands on the Assignee, each requesting a response within seven days. True and correct copies of these demands are attached hereto as Exhibit E. As of the date of this declaration, the Assignee has not substantively responded to any of these demands.

7.      On or about March 5, 2026, the Assignee's counsel contacted Plaintiff's litigation counsel directly, despite Plaintiff having communicated that he was handling his ABC claims directly as a creditor. Plaintiff's counsel informed the Assignee that Plaintiff did not wish for counsel to engage on the ABC matter and that the Assignee should provide written responses directly to Plaintiff.

8.      On March 5, 2026, I received an email from the Assignee's counsel, Mathew Sakhai. A true and correct copy of this email is attached hereto as Exhibit F. In this email, Mr. Sakhai stated that the Assignee had sold the Light Field Lab patent portfolio, that the sale was approved by the "senior

secured creditor who had a first-priority lien on all LFL assets," and offered to transfer patent US10488584 to me "pursuant to a customary patent assignment and release agreement."

9.    Mr. Sakhai's email materially mischaracterized the August 29, 2025 notice from my counsel, stating that it "referenced two patents" and "asked us only to not dispose of the patents referenced in the letter." As the notice itself demonstrates (Exhibit A), it demanded cessation of disposition of all patents where I should be listed as inventor, all source code, all employment records, and all related documentation.

10.    On March 5, 2026, I sent a detailed response to Mr. Sakhai's email. A true and correct copy of my response is attached hereto as Exhibit G.

11.    On March 5, 2026, I served a sixth formal demand on the Assignee — following Demands 1 through 5 — for production of my complete personnel file and employment records. This demand repeated and provided additional specificity to the request for employment records first made in my counsel's August 29, 2025 notice (Exhibit A), which the Assignee never responded to. A true and correct copy of this demand is attached hereto as Exhibit H. The Assignee has not responded.

12.    On March 6, 2026, I obtained the complete assignment transaction history from the United States Patent and Trademark Office for all Light Field Lab patents. That transaction history confirms that no assignment has been recorded for any patent in the portfolio. Light Field Lab, Inc. remains the recorded owner of every patent despite the Assignee's representation that the portfolio has been sold.

13.    I have also monitored the status updates published on the Assignee's ABC website. Based on those updates, the patent portfolio sale appears to have been finalized in or around January 2026. True and correct copies of the relevant status updates are attached hereto as Exhibit I. The exact date of the sale has not been disclosed despite my formal demand (Demand 2).

14.    On March 6, 2026, I received a response from the Assignee's counsel to my March 5, 2026 correspondence. A true and correct copy of this response is attached hereto as Exhibit J. In this response, the Assignee stated that it had "responded to the matters we are able to address," that many of my requests "involve legal determinations outside the Assignee's role in administering the estate," and that it does "not anticipate further correspondence on these issues while your litigation remains

pending." The Assignee also offered to coordinate the transfer of "the three patents referenced" — an apparent change from Mr. Sakhai's March 5, 2026 email, which offered only one patent, US10488584. None of my specific questions or demands — including the identity of the purchaser, the sale date, the Fee Agreement, or the status of source code — were addressed in this response.

15.     I do not know who is paying for the defense of Light Field Lab, Inc. in this action. Light Field Lab executed a general assignment of all assets on August 15, 2025. No person or entity has identified themselves to me as the source of funding for the defense.

16.     I submitted a request under the California Public Records Act to the State Bar of California for records relating to James Kaufmann Baer, State Bar No. 109516, the principal of CMBG Advisors, Inc. True and correct copies of the following records produced by the State Bar in response to that request are attached hereto as Exhibit K: the Attorney Licensee Search, CTAPP Compliance History Reports for 2023-2025, the CTAPP 30-Day Final Notice, CTAPP noncompliance email reminders, and Mr. Baer's May 2025 support ticket requesting reinstatement.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on March 10, 2026, at Duvall, Washington.



Alan Jones

EXHIBIT A

# HENRY | LACEY

ATTORNEYS AT LAW

August 29, 2025

James K. Baer
CMBG FBC-Light Field Lab LLC
Assignee for the Benefit of Creditors of Light Field Lab, Inc.
3019 Wilshire Blvd, Suite 142
Santa Monica, CA 90403

Email: lightfieldlab@cmbginc.com

Re: Immediate Cessation of Disposition of Fraudulently Obtained Intellectual-Property
Assets – Alan Jones' Source Code & Light Field Lab Patent Portfolio

Dear Mr. Baer:

## I. Background and Summary of Fraudulent Concealment

Our client, Alan Jones ("Jones"), was induced to join Light Field Lab, Inc. (the
"Assignor") in September 2019 on the basis of representations made by the Assignor's officers,
Mr. Jon Karafin and Mr. Brendan Bevensee. Allegations of those misrepresentations are now a
matter of public record in the attached complaint filed in Federal District Court, include claims
for patents WO2025042476A1 and WO2024216300A2, owned by Light Field Lab until the
recent Assignment for Benefit of Creditors, and will be amended to add additional allegations
involving the following patent: US10488584.  The misrepresentations and concealed facts were
material to Jones' decision to accept employment and to execute comprehensive IP-assignment
agreements. Had Jones been aware of the true material facts, he would not have joined the
Company, nor would he have transferred his own source-code and related inventions.

Because Jones' comprehensive IP assignment agreements were procured through
fraudulent concealment of material facts, those agreements are void ab initio. Consequently,
Jones' source code and related technical work never validly transferred to the Assignor and
remain Jones' property. The recent General Assignment for the Benefit of Creditors ("ABC")
dated August 15, 2025, which transferred the Assignor's assets to CMBG FBC-Light Field Lab
LLC (the "Assignee"), therefore includes a fraudulent transfer of Jones' property that Light Field
Lab never validly owned.

## II. Governing Law – UVTA and California Civil Code §§ 3439.01-3439.12

California Uniform Voidable Transactions Act (UVTA) – Cal. Civ. Code §§ 3439.01-
3439.12. Section 3439.04(a) provides that a transfer is voidable as to a creditor when the debtor
made the transfer "with actual intent to hinder, delay, or defraud any creditor" or when the
transfer is made while the debtor is insolvent and no reasonably equivalent value is received.



2625 Alcatraz Avenue, No. 615
Berkeley, California 94705

tel: 510.898.1883
fax: 510.295.2516
www.henrylacey.com



Under § 3439.08(a), a transferee (the Assignee) may assert a good-faith defense only if it did not have actual knowledge of the fraud and gave reasonable value. Once the Assignee receives actual notice that the assets were procured through fraud, that defense is unavailable.

§ 3439.07 authorizes a creditor to recover the full value of the transferred property, interest, and reasonable attorney's fees. § 3439.08 further permits conversion and restitution actions against any transferee who disposes of the assets after actual notice.  See *Nauutilus, Inc. v. Chao Chen Yang*, 11 Cal. App. 5th 33 (2017) (the court held that a transferee who has actual knowledge of the debtor's fraudulent intent cannot invoke the good-faith defense). *Lo v. Lee*, 234 Cal. Rptr. 3d 824 (2018) (a transferee who is a "transfer beneficiary" must return the assets when the transfer is voidable).

Because the Assignee now has actual notice—via the attached complaint and this letter—California law requires the Assignee to cease any disposition of Jones' source code and the related patents described above and to preserve them pending resolution of the UVTA avoidance action.

### III. Demand for Immediate Action

The Assignee must **immediately** upon receipt of this letter:

Cease any sale, licensing, transfer, encumbrance, or other disposition of (a) any patents where Alan Jones should be listed as inventor, and (b) all source-code, software, and related technical documentation created by Alan Jones, which remains his property due to the void IP assignment agreements.

Preserve the aforementioned assets in their current condition, including:

– Maintaining physical and electronic copies of any patents or applications where Jones should be listed as inventor;
– Securing all source-code repositories, version-control logs, and development environments created by Jones;
– Preserving all employment records, communications, and documentation related to Jones' employment, work product, and termination, as these may constitute evidence relevant to ongoing litigation; and
– Implementing a litigation-hold notice to all employees, contractors, and third-party service providers to prevent alteration, deletion, or destruction of any relevant material.

**Additionally, within ten (10) business days of receipt of this letter (i.e., no later than September 12, 2025), the Assignee must:**

Provide an inventory of all intellectual-property assets that have been transferred to the Assignee, together with the location, custodians, and any pending agreements concerning those assets.

Cooperate fully with Jones and his counsel in any UVTA avoidance or restitution action, including but not limited to:



–   Disclosing all communications, emails, and documents relating to the acquisition and handling of Jones' source code;

–   Allowing inspection of the assets and related records; and

–   Refraining from any settlement negotiations with third-party purchasers without prior written consent of Jones' counsel.

## IV. Consequences of Non-Compliance

Should the Assignee fail to comply with the foregoing demands within the specified timeframe, Jones will pursue all available legal remedies, including but not limited to:

• Filing a U.S. District Court action for temporary restraining order, preliminary injunction, and permanent injunction under Cal. Civ. Code §§ 3439.01-3439.12 to prevent any further disposition of Jones' property;

• Seeking damages, interest, and reasonable attorney's fees pursuant to Cal. Civ. Code § 3439.07; and

• Initiating a conversion claim for the value of the assets and any proceeds already received, which may expose the Assignee to personal liability and potential punitive damages under California tort law.

## V. Good-Faith Cooperation Preferred

The parties share an interest in avoiding protracted litigation and preserving the value of the intellectual-property assets for eventual distribution to legitimate creditors and rightful owners. Accordingly, we request that the Assignee confirm in writing—by September 9, 2025—its compliance with the above demands and its willingness to cooperate in the UVTA avoidance process.

Please direct all communications regarding this matter to the undersigned counsel.

Very truly yours,

/s/ Stephen Henry

STEPHEN F. HENRY

Enclosures:

Complaint

**STEPHEN F. HENRY, ESQ.**
**HENRY | LACEY PC**
STATE BAR # 142336
2625 Alcatraz Avenue, # 615
Berkeley, California 94705
Telephone: (510) 898-1883
Facsimile (510) 295-2516
shenry@HenryLacey.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

ALAN JONES,

      Plaintiff,

  vs.

LIGHT FIELD LAB, INC., JON KARAFIN,
BRENDAN BEVENSEE, and Does 1 to 10,

     Defendant,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 3:25-cv-5118

**COMPLAINT FOR DAMAGES**

1. **RETALIATORY TERMINATION
   (Ca. Lab. Code §1102.5)**
2. **WRONGFUL TERMINATION IN
   VIOLATION OF PUBLIC POLICY**
3. **BREACH OF THE IMPLIED
   COVENANT OF GOOD FAITH AND
   FAIR DEALING**
4. **PROMISSORY ESTOPPEL**
5. **FRAUD AND DECEIT**
6. **VIOLATION OF PENAL CODE**
7. **CIVIL RICO**
8. **UNFAIR COMPETITION**
9. **BREACH OF FIDUCIARY DUTY**
10. **RECISSION**

Plaintiff Alan Jones ("Plaintiff") alleges the following against Defendant Light Field Lab Inc. ("LFL"), and Does 1-10 (collectively "Defendants"):

1.    Plaintiff is an individual residing at all times mentioned in the Complaint within the State of Washington, the county in which he performed his duties under the employment contract with Defendant.

2.    Defendant is a company incorporated in Delaware and at all times mentioned in operated in the State of California.

3.    Defendant Jon Karafin is an individual employed by Defendant Light Field Lab in California.

4.    Defendant Brendan Bevensee is an individual employed by Defendant Light Field Lab in California.

5.    In addition to the Defendants named above, Plaintiff sues fictitiously Defendants Does 1 through 10, inclusive, because their names, capacities, status, or facts showing them to be liable are not presently known. Plaintiff is informed and believes, and thereon alleges that Defendants, and each of them, designated herein as Does 1 through 100, are responsible in some manner for the occurrences and happenings herein alleged, and that Plaintiff's damages, as herein alleged, were and are the direct and proximate result of the action of said Defendants, and each of them. Plaintiff will amend this complaint to show their true names and capacities, together with appropriate charging language, when such information has been ascertained.

6.    Plaintiff further alleges that Defendants and Does 1-10, inclusive, are, and at all relevant times were, agents of one another and acting within the course and scope of said agency.

7.    Plaintiff reserves the right to amend his/her charges to plead agency between Defendants and Does 1-10, inclusive, and any of them, at any time that he ascertains facts and supporting agency between such Defendants.

JURISDICTION AND VENUE

8.    Plaintiff incorporates by reference each of the allegations contained in paragraphs 1 through 7 above, as well as facts currently unknown.

**Case No. : 3:25-cv-5118**                                          **COMPLAINT FOR DAMAGES**

9.   Jurisdiction over the defendants, and each of them, exists because each of the defendant entities named in this litigation are present and operating within the jurisdictional limits of the Northern District of California and each of the individual defendants named in this litigation are employed within the jurisdictional limits of the Northern District of California.  Subject matter jurisdiction within the United States District Court exists because the amount in dispute exceeds $75,000.

10. Venue is proper because the employment relationship between Plaintiffs and defendants, and each of them, that gave rise to some of the claims in this litigation existed within this judicial district and most or all of the acts and omissions complained of in this litigation took place here. Venue is also proper because most or all of the acts and omissions that occurred outside of the above employment relationship and are complained of in this litigation took place within this judicial district.

## FACTS COMMON TO MORE THAN ONE CAUSE OF ACTION

11.   Mr. Jones was employed by LFL from September 30, 2019, through June 23, 2023. Mr. Jones initially worked as a Senior Pipeline Software Engineer and was promoted to Principal Engineer on July 27, 2020.

12.   As part of his onboarding, on September 9, 2019, Mr. Jones signed a Confidentiality and Proprietary Rights Agreement that purported to grant rights to patents and other works for hire to LFL.

13.   As part of Mr. Jones' onboarding, and subsequently during his employment, he was informed of the following false statements: During his initial hiring, Jon Karafin informed Mr. Jones about double trigger clauses, whereby on public listing or acquisition all options would instantly vest. Mr. Jones was also informed that the company's product would be delivered to the first theme customer, Universal, for use in a theme park in 2020/2021.  This statement was intended to provide the impression that LFL was much closer to delivery of the product than it actually was and that an early exercise of options was expected.  In reliance on these statement, Mr. Jones gave up Microsoft stock that was vesting in order to join LFL. Subsequently, there was no further discussion of Universal as a customer and no product was delivered to Universal.

14.     Further, during the discussions regarding employment and while Mr. Jones worked for LFL, Jon Karafin also claimed that the number of outstanding shares was highly valuable confidential information and refused to share it with Mr. Jones. Mr. Jones raised the issue during hiring negotiations as it made it very difficult for Mr. Jones to determine the potential value of the options.  As a security holder, Mr. Jones was entitled to books and records to assess his holdings but when he asked Jon Karafin in March 2023, in the context of a financial discussion about the company, "Understood, is there any additional information I'm entitled or required to be given access to as a shareholder?" he responded "Understood and appreciated. There are no current problems to be aware of (e-g- equity ownership and payroll) and can keep you posted- Again, not a political response, just the facts."  Books and records would classify as additional (financial) information Mr. Jones was entitled to be given access to as a shareholder.

15.     Throughout his tenure at LFL, Mr. Jones consistently received positive feedback regarding his job performance, a merit pay increase when he was promoted to Principal Engineer and periodic incentive pay bonuses. He maintained positive personal relationships with his coworkers and management.

16.     Mr. Jones was instrumental in the development of LFL's SolidLight holographic display platform. Mr. Jones worked out of LFL's office from September 30, 2019, through March 7, 2020, and thereafter he worked remotely from his residence in Seattle, WA.

17.     Mr. Jones is Type I Diabetic and suffers from a compromised immune system. Accordingly, Mr. Jones would be susceptible to severe illness and/or death if he were to contract COVID-19.

18.     When LFL management announced that all of its employees would be required to return to in-office work by May 24, 2021, Mr. Jones requested that he be permitted to continue working remotely as an accommodation of his compromised immune system, which is a disability under federal and state law.

19.     Although there does not appear to have been a formal accommodation process, LFL allowed Mr. Jones to continue working remotely and LFL management continued to provide Mr.

**Case No. : 3:25-cv-5118**                                          **COMPLAINT FOR DAMAGES**

Jones with positive feedback regarding his job performance. At no time did anyone in LFL management indicate that in-office work was an essential function of Mr. Jones' job duties.

20.     In December 2022-January 2023, Mr. Jones' supervisor, Mr. Trevor Berninger, Director of Software, began having discussions with Mr. Jones to stop working remotely and return to in-office work at LFL. Mr. Jones was surprised because he had been working remotely since March 7, 2020, and there had been no complaints about his job performance.

21.     When Mr. Jones asked if there were performance issues that would give rise to the request that he return to in-office work, Mr. Berninger indicated that LFL did not have any issues with his job performance. When asked if there was a particular reason as to why LFL wanted him to return to in-office work, Mr. Berninger was very vague and unspecific and indicated that "it would just be better." Again, at no time did anyone at LFL indicate that working in-office was an essential job function of Mr. Jones' position.

22.     Although Mr. Jones was open for discussion as to what would be reasonable accommodations for his return to in-office work, LFL did not engage in an interactive dialogue in this regard. In fact, Mr. Jones made repeated suggestions regarding masking protocol, testing protocol, social distancing and ventilation, but LFL did not respond to Mr. Jones' suggestions.

23.     Mr. Jones understandably began to feel very marginalized by LFL management. He understood that LFL management wanted him to return to in-office work, but management was unwilling to implement a reasonable protocol to minimize his risk of exposure to COVID-19. Mr. Jones sensed that his relationships with LFL management were becoming strained, when he had previously enjoyed very positive relationships with leadership.

24.     In January 2023, Mr. Jones was assigned to work on masking interference for Wavetracing Optics to improve image quality. Mr. Jones was working closely with LFL's CEO Mr. Jon Karafin who was the subject matter expert in this area; Mr. Karafin defined the scope of work and methodology of the work. In March 2023, Mr. Jones advised Mr. Karafin that the methodology was unworkable and was unlikely to result in improved image quality. Mr. Jones suggested a number of alternative approaches to improve image quality, but Mr. Karafin insisted that Mr. Jones continue with the methodology he himself had prescribed.

**COMPLAINT FOR DAMAGES**

25.     The matter came to a head on April 6, 2023, when Mr. Karafin made disparaging remarks regarding Mr. Jones' work on the Wavetracing Optics during a Software Team meeting that was attended by the entire software team of approximately 10 people. Mr. Karafin stated that it had been nearly six months and that Mr. Jones had failed to generate an image and indicated that it was unlikely that Mr. Jones' work would result in improved image quality.

26.     Mr. Jones was absolutely dismayed that Mr. Karafin would publicly trivialize and disparage his work in such an aggressive manner in front of his coworkers. First, Mr. Karafin's statement was untrue; Mr. Jones had in fact generated images in January 2023. It was Mr. Karafin's own methodology that was unworkable, and Mr. Jones had advised Mr. Karafin that the methodology was unlikely to result in substantial image improvement in early March, 2023. Despite Mr. Karafin's knowledge that the methodology he prescribed was unworkable, he refused to change course. Instead, he scapegoated Mr. Jones and implied that the lack of progress in image improvement was due to Mr. Jones work performance, when he was well aware that the lack of progress was due to the fact that his own methodology had proved to be unworkable.  On April 9, 2023, Mr. Jones submitted a rebuttal of Mr. Karafin's disparaging comments and a complaint of hostile work environment.

27.     LFL conducted an investigation of Mr. Jones' hostile work environment complaint. When Mr. Jones was interviewed by the investigator, he explained that he believed that Mr. Karafin's animosity towards him was due to the fact that he was working remotely because of his disability. Mr. Jones also explained that he had been under increased pressure from LFL to return to in-office work, despite his disability.

28.     Mr. Jones continued working on interference masking on the Wavetracing Optics and upon implementation of Mr. Karafin's methodology, it became apparent to LFL that the methodology did not result in substantial image improvement and, in fact resulted in a substantial reduction in the field of view. The technical concerns that Mr. Jones outlined in his complaint of April 9, 2023, were substantiated.

**Case No. : 3:25-cv-5118**                                                    **COMPLAINT FOR DAMAGES**

29.     On June 16, 2023, Mr. Jones received an email indicating that the investigation had been concluded and that his claim of illegal hostile work environment based on disability had not been substantiated.

30.     On June 23, 2023, Mr. Jones' employment was terminated.  During the conference call it was indicated that "things aren't working out" and with the conclusion of the investigation, LFL was terminating Mr. Jones employment. There was no indication in the phone conference that LFL was terminating Mr. Jones for poor performance or unprofessional behavior.  Rather, LFL was clearly terminating Mr. Jones for requesting accommodation and then making a complaint about illegal retaliation related to that request.

31.     Later in the day on June 23, 2023, Mr. Jones received a letter of termination which stated that his employment was being terminated for poor performance and unprofessional behavior. Mr. Jones was shocked; during his nearly four year tenure at LFL, no one had complained about poor performance or unprofessional behavior. Notably, the termination letter falsely stated that the decision to terminate Mr. Jones' employment was made prior to the initiation of his hostile work environment complaint of April 9, 2023.

32.     In this case, Mr. Jones reported conduct that he reasonably believed was motivated by unlawful discrimination. Additionally, the temporal proximity between the conclusion of the investigation on June 16, 2023, and the termination of Mr. Jones' employment a week later on June 23, 2023, indicates that LFL acted with retaliatory intent. The temporal proximity between the conclusion of the investigation and the termination of Mr. Jones employment raises a rebuttable presumption of retaliatory intent.

33.     LFL's claim that it made a decision to terminate Mr. Jones' employment prior to the submission of his hostile work environment claim of April 9, 2023 is unsupported by any evidence.

34.     LFL management never brought any job performance concerns to Mr. Jones either orally or in writing until April 6, 2023. In fact, Mr. Berninger advised Mr. Jones in December 2022, that LFL had no problems with Mr. Jones' job performance.

35.     As a result of the termination based on false representations of poor performance of unprofessional behavior, Mr. Jones was deliberately denied the benefit of vested

7

and unvested stock options which he had earned as a result of his work for Defendant.  Mr. Jones has suffered the loss of 116,458 LFL shares that were vested because he could not afford to exercise those options due to tax liability and the 90-day expiry of his options. Additionally, Mr. Jones suffered the loss of 102,917 unvested shares to which he would have been entitled had LFL not wrongfully terminated his employment.

36.     In connection with Mr. Jones' employment, LFL, Jon Karafin, and Brendan Bevensee also engaged in fraud with respect to patent WO2025042476A1 and WO2024216300A2, patents that, regardless of any purported rights gained by LFL as a work for hire or on assignment pursuant to the Confidentiality and Proprietary Rights Agreement, should have included Mr. Jones' name as an inventor as they are entirely derived from Mr. Jones' work at LFL prior to his termination.

37.     Patent WO2025042476A1 and WO2024216300A2, though fully derived from Mr. Jones' work, did not include Mr. Jones as an inventor, a fact not disclosed to Mr. Jones during or after his employment by LFL.

## FIRST CAUSE OF ACTION

### (Ca. Lab. Code §1102.5)

### (Against Defendant Light Field Lab and Does 1 through 10)

38.     Plaintiff repeats and realleges para. 1 through 37, and incorporates them by reference as though fully reproduced in this cause of action.

39.     At all relevant time periods, Plaintiff was an employee of Defendant.

40.     As alleged above, Plaintiff complained to Defendant's officers, directors, and/or managing agents that certain of Defendant's activities violated the law.

41.     Defendant terminated Plaintiff, substantially motivated by Plaintiff's complaints detailed above.

42.     As a legal and proximate result of Defendants' actions, Plaintiff has suffered special and general damages in an amount to be proven, but in excess of $1,000,000.

43.     Defendants' actions were taken with malice, oppression, and fraud, such that exemplary and punitive damages should be awarded.

Case No. : 3:25-cv-5118                                    COMPLAINT FOR DAMAGES

## SECOND CAUSE OF ACTION

### (Wrongful Termination In Violation Of Public Policy)

### (Against Defendant Light Field Lab)

Plaintiff incorporates by reference each of the allegations contained in paragraphs 1 through 43 above, as well as facts currently unknown.

44.     Plaintiff alleges that Plaintiff's termination was wrongful because it was in violation of the public policy of the State of California and the United States in that Plaintiff's termination was in retaliation for Plaintiff's opposing and reporting illegal activity, as described in preceding allegations.

45.     Plaintiff further alleges that Defendant's termination of Plaintiff was in violation of the public policy as expressed in the Fair Employment and Housing Act.

46.     Plaintiff further alleges that Defendant's termination of Plaintiff was in violation of the public policy as expressed in laws and regulations prohibiting retaliation against individuals who report violations of the law, including, but not limited to, California Labor Code § 1102.5, and in addition was a violation of said statute.

47.     As a direct, foreseeable, and proximate result of defendants' violation of public policy, Plaintiff has suffered and continues to suffer substantial losses in earnings and job benefits, loss of opportunity and advancement, loss of employment prospects, and has suffered and continues to suffer humiliation, embarrassment, mental and emotional distress, and discomfort, all to Plaintiff's damage in an amount in excess of $1,000,000 the precise amount of which will be proven at trial.

48.     Plaintiff claims these amounts, together with prejudgment interest pursuant to Civil Code section 3287, Code of Civil Procedure section 685.010 and pursuant to any other provision of law providing for prejudgment interest.

49.     Because the acts taken toward Plaintiff were carried out by, condoned by and or ratified by managerial employees or managing agents acting in a deliberate, cold, callous, malicious, oppressive, and intentional manner in order to injure and damage Plaintiff, Plaintiff requests the assessment of punitive damages against Defendant in an amount appropriate to punish and make an example of Defendant.

9

### THIRD CAUSE OF ACTION

**(Breach of the Covenant of Good Faith and Fair Dealing)**

**(Against Defendant Light Field Lab)**

Plaintiff hereby incorporates by reference Paragraphs 1 through 49 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

50.     As a result of the contractual relationship that existed between Plaintiff and Defendant, the expressed and implied promises made in connection with that relationship, and the acts, conduct and communications resulting in these implied promises, Defendant promised to act in good faith toward and deal fairly with Plaintiff.  These implied promises required Defendant to:

a.     Give full cooperation to Plaintiff and his performance under the agreements and to refrain from doing any act which would prevent or impede Plaintiff's enjoyment of the fruits of the agreements;

b.     Fairly, honestly and reasonably perform the terms and conditions of the agreements which Plaintiff was obliged to perform; and

c.     Refrain from engaging in any illegal, unethical or unfair activities such as misrepresentation or the conversion of patents, options, stock and monies to which Plaintiff had an interest.

51.     Defendant knowingly breached its agreements with Plaintiff for the purpose of frustrating Plaintiff's enjoyment of the benefits of the agreements.  Further, Defendant did not adhere to its express and implied promises, as highlighted above.  Accordingly, Defendant breached its implied covenant of good faith and fair dealing.

52.     As a direct, foreseeable and proximate result of Defendant's failure to comply with its obligations to Plaintiff, including those outlined above, Plaintiff has suffered and continues to suffer losses in excess of $1,000,000, in an amount to be proven at trial.

53.     Plaintiff claims these amounts, together with prejudgment interest pursuant to Civil Code section 3287, Code of Civil Procedure section 685.010 and pursuant to any other provision of law providing for prejudgment interest.

Case No. : 3:25-cv-5118                                                    COMPLAINT FOR DAMAGES

54.     Based on Defendant's conduct as alleged herein, Defendant is also liable for Plaintiff's attorneys' fees pursuant to Labor Code section 218.5 and prejudgment interest pursuant to Labor Code section 218.6.

## FOURTH CAUSE OF ACTION

### (Promissory Estoppel)

### (Against Defendant Light Field Lab)

Plaintiff hereby incorporates by reference Paragraphs 1 through 54 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

55.     Defendant breached the clear and unambiguous promises described herein.

56.     Plaintiff actually, reasonably and foreseeably relied on these promises to his detriment.

57.     As a direct, proximate and foreseeable result of Defendant's breach of these promises, Plaintiff has suffered and continues to suffer losses in an amount to be proven at trial.

58.     Injustice can only be avoided by enforcement of Defendant's promises.

59.     Plaintiff claims these amounts, together with prejudgment interest pursuant to Civil Code section 3287, Code of Civil Procedure section 685.010 and pursuant to any other provision of law providing for prejudgment interest.

## FIFTH CAUSE OF ACTION

### (Fraud and Deceit)

### (Against Light Field Lab and Jon Karafin)

Plaintiff hereby incorporates by reference Paragraphs 1 through 59 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

60.     Defendants made representations as described in paragraphs 36 to 37 above including false representations regarding Plaintiff's employment, Plaintiff's stock options, and regarding inventorship of Patent WO2025042476A1 and WO2024216300A2.

61.     In connection with Mr. Jones' employment, LFL, Jon Karafin, and Brendan Bevensee engaged in fraud with respect to patent WO2025042476A1 and WO2024216300A2, patents that, regardless of any purported rights gained by LFL as a work for hire or on assignment pursuant to the

Confidentiality and Proprietary Rights Agreement, should have included Mr. Jones' name as an inventor as they are entirely derived from Mr. Jones' work at LFL prior to his termination.

62.     Patent WO2025042476A1 and WO2024216300A2, though fully derived from Mr. Jones' work, did not include Mr. Jones as an inventor, a fact not disclosed to Mr. Jones during or after his employment by LFL.

63.     Further, representations regarding the value of Plaintiff's stock and options were false, and the true information regarding the value of Plaintiff's stock and options was concealed, as identified in paragraphs 13 and 14, Defendants used the misrepresentations to induce Plaintiff to continue his employment, a result Defendants could not have achieved truthfully.

64.     Defendants knew said representations to be false and intended to conceal the true facts from Plaintiff to unlawfully persuade Plaintiff, to his detriment.

65.     Plaintiff relied upon the misrepresentations made to him, and did not know the true facts concealed from him, to his detriment.

66.     Further, Defendants, including Defendant Karafin, had a duty to disclose facts regarding Plaintiff's compensation and possible loss of that compensation as part of the employer employee relationship.

67.     Defendants, including Defendant Karafin, had a duty to disclose that while they were providing stock options as compensation for Plaintiff's services, those stock options could be taken away by denying Plaintiff the ability to exercise those options.

68.     Instead, Defendants, including Defendant Karafin, concealed facts regarding Plaintiff's compensation and possible loss of that compensation, including denying Plaintiff the ability to exercise his earned stock options.

69.     Plaintiff did not discover the fraud and deceit practiced upon him as set forth herein until he started his employment with defendants, attempted to fulfill his responsibilities, continued to provide Defendants with valuable intellectual information (which they kept for themselves), was terminated, and thereby realized that Defendants' representations were false and that Defendants had concealed their true intent, including the intent to misappropriate his intellectual information.

**Case No. : 3:25-cv-5118**                                    **COMPLAINT FOR DAMAGES**

70.     As a proximate result of the representations of Defendants to Plaintiff as set forth herein, Plaintiff has suffered and continues to suffer the loss of stock, wages and benefits in an amount to be proven at trial, as well as stock options, the precise amount of which will be proven at trial.

71.     As a further direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered extreme anguish, humiliation, and emotional distress, the extent of which will be proven at trial.

72.     Because the acts taken toward Plaintiff were carried out by, condoned by and or ratified by managerial employees or managing agents acting in a deliberate, cold, callous, fraudulent, malicious, oppressive, and intentional manner in order to injure and damage Plaintiff, Plaintiff requests the assessment of punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

73.     As a result of the facts above, Plaintiff is entitled to injunctive relief to invalidate WO2025042476A1 and WO2024216300A2, prevent Defendants from using his intellectual property, and the transfer of all intellectual property related to WO2025042476A1 and WO2024216300A2 created by Plaintiff to Plaintiff.

74.     WHEREFORE, Plaintiff requests relief as hereinafter provided.

**SIXTH CAUSE OF ACTION**

**(Violation of Penal Code Sections 484 & 496)**

**(Against Defendant Light Field Lab, Jon Karafin, Brendan Bevensee, and Does 1 through 10)**

Plaintiff hereby incorporates by reference Paragraphs 1 through 74 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

75.     Defendants' misrepresentations to Plaintiff, including fraudulent statements regarding stock options, stock, and inventorship of Patent WO2025042476A1 and WO2024216300A2, constituted theft of personal property, in the form of Plaintiff's right to inventorship of those patents, under Penal Code section 484 insofar as Defendants have "knowingly and designedly, by…false or fraudulent representation or pretense, defraud[ed][Plaintiff] of…personal property."

76.     Defendants' misrepresentations to Plaintiff including fraudulent statements regarding stock options, stock, and inventorship of Patent WO2025042476A1 and WO2024216300A2 constituted

13

theft under Penal Code section 484 insofar as Defendants have "knowingly and designedly, by…false or fraudulent representation or pretense, defraud[ed][Plaintiff] of money…."

77.     Defendants have retained stock options that should have been provided to Plaintiff.

78.     Defendants have retained inventorship of Patent WO2025042476A1 and WO2024216300A2 that should have been provided to Plaintiff.

79.     In so doing, Defendants have knowingly received and deliberately withheld stock options and patent rights from Plaintiff, knowing that Defendants have no right, title, or interest in the stock options or patent rights and that said stock options and patent rights have been stolen from Plaintiff and/or obtained in a manner constituting theft.

80.     As a direct, foreseeable, and proximate result of Defendants' theft, Plaintiff has suffered and continues to suffer a loss of the value of his inventorship, the precise amount of which will be proven at trial.

81.     Plaintiff has been damaged as a result of the theft of his personal property and is entitled to treble damages pursuant to Penal Code section 496(c).

82.     As a result of the acts described above, Plaintiff is entitled to injunctive relief to invalidate WO2025042476A1 and WO2024216300A2, prevent Defendants from using his intellectual property, and the transfer of all intellectual property related to WO2025042476A1 and WO2024216300A2 created by Plaintiff to Plaintiff.

83.     WHEREFORE, Plaintiff requests relief as hereinafter provided.

## SEVENTH CAUSE OF ACTION

### (Civil RICO)

### (Against Defendants Light Field Lab Jon Karafin, Brendan Bevensee, and Does 1 through 10)

Plaintiff hereby incorporates by reference Paragraphs 1 through 83 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

84.     Defendant Light Field Lab is an enterprise engaged in and the activities of which affect interstate commerce, to wit: a corporation incorporated under the laws of the State of Delaware.

85.     Defendant Jon Karafin, as a person within the meaning of 18 U.S.C.A. § 1961(3), and as a person employed by said enterprise, conducted and participated, directly and indirectly, in the conduct

of the affairs of said enterprise through a pattern of racketeering activity in violation of 18 U.S.C.A. § 1962(c).

86.     Defendant Brendan Bevensee, as a person within the meaning of 18 U.S.C.A. § 1961(3), and as a person employed by said enterprise, conducted and participated, directly and indirectly, in the conduct of the affairs of said enterprise through a pattern of racketeering activity in violation of 18 U.S.C.A. § 1962(c).

87.     The predicate acts which constitute this pattern of racketeering activity are: fraudulent communications regarding Patent WO2025042476A1 and WO2024216300A2 using means of interstate communication, including electronic filing, mail and email.

88.     These acts of racketeering, occurring within ten years of one another, constitute a pattern of racketeering activity within the meaning of 18 U.S.C.A. § 1961(5).

89.     Plaintiff was injured in his property by reason of this violation of 18 U.S.C.A. § 1962, in that, as a direct and proximate result of Defendant's complained of acts, Plaintiff suffered damages, including loss of money.

90.     By reason of the Defendants' violation of 18 U.S.C.A. § 1962, Plaintiff is entitled, pursuant to 18 U.S.C.A. § 1964(c), to threefold the damages sustained, with interest thereof at 10% per annum, and a reasonable attorney's fee in connection herewith.

91.     As a result of the acts described above, Plaintiff is entitled to injunctive relief to invalidate WO2025042476A1 and WO2024216300A2, prevent Defendants from using his intellectual property, and the transfer of all intellectual property related to WO2025042476A1 and WO2024216300A2 created by Plaintiff to Plaintiff.

## EIGHTH CAUSE OF ACTION

### (For Unfair Competition)

### (Business & Professions Code § 17200 et seq.)

### (Against Defendant Light Field Lab)

Plaintiff hereby incorporates by reference Paragraphs 1 through 91 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

Case No. : 3:25-cv-5118                                          COMPLAINT FOR DAMAGES

92.     Defendants' violations of laws and regulations as alleged by this complaint, within the last four years, constitute unfair business practices in violation of the Unfair Competition Law, Business & Professions Code § 17200, et seq.

93.     As a result of Defendants' unfair business practices, Defendants have reaped unfair benefits and illegal profits at the expense of Plaintiff, and members of the public.  Defendants' utilization of such unfair business practices constitutes unfair competition and provides an unfair advantage over Defendants' competitors. Defendants should be made to disgorge their ill-gotten gains and restore such monies to Plaintiff.

94.     Defendants' unfair business practices entitle Plaintiff to seek preliminary and permanent injunctive relief, including but not limited to orders that the Defendants account for, disgorge and restore to Plaintiff the compensation unlawfully withheld from them and for which they were unjustly enriched. As a result of the acts described above, Plaintiff is entitled to injunctive relief to invalidate WO2025042476A1 and WO2024216300A2, prevent Defendants from using his intellectual property, and the transfer of all intellectual property related to WO2025042476A1 and WO2024216300A2 created by Plaintiff to Plaintiff.

## NINTH CAUSE OF ACTION

### (Breach of Fiduciary Duty)

### (Against Defendant Light Field Lab)

Plaintiff hereby incorporates by reference Paragraphs 1 through 94 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

95.      Plaintiff is, and at all times relevant to this amended complaint, was a minority option and share holder of Defendant LFL.

96.     Defendant LFL improperly failed to provide necessary information to Plaintiff as an option and share holder.

97.     As a result of the acts of Defendant LFL, Plaintiff was prevented from converting and selling his shares.

98.     As a proximate result of the wrongful acts and omissions of Defendant LFL to Plaintiff as set forth herein, Plaintiff has suffered and continues to suffer the loss of value of his stock, the precise amount of which will be proven at trial.

99.     Defendant LFL committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice and in conscious disregard of Plaintiff's rights, justifying the imposition of punitive damages.

## TENTH CAUSE OF ACTION

### (Rescission)

### (Against Defendant Light Field Lab)

Plaintiff hereby incorporates by reference Paragraphs 1 through 94 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

100.    Prior to September 9, 2019, Plaintiff and Defendant LFL began negotiations concerning an employment contract. During negotiations, Plaintiff and Defendant LFL agreed that Plaintiff would provide his knowledge and skills to Defendant in return for compensation including equity.

101.    On or about September 9, 2019, Plaintiff and Defendant LFL reduced their negotiations to a written agreement which included an assignment of Plaintiff's intellectual property.

102.    The assignment of Plaintiff's intellectual property fails to represent the true intentions of Plaintiff and Defendant, including, but not limited to, whether Plaintiff agreed to assignment of all of Plaintiff's intellectual property to Defendant LFL to the extent that he was denied inventorship of Patent WO2025042476A1 and WO2024216300A2.

103.    This mistake in the purported agreement was the result of fraudulent statements on the part of Defendant to deny Plaintiff inventorship of Patent WO2025042476A1 and WO2024216300A2, and be fully compensated for his contributions to Defendants.

104.    As a result of the mistake in the written agreement, plaintiff is entitled to rescission of the Confidential Agreement and Invention Assignment Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1.      For general damages according to proof;

2.      For special and compensatory damages, including put not limited to, loss of wages, salary, benefits, back pay, front pay, future lost income and benefits, and other economic losses, in an amount according to proof at trial;

3.      For treble damages;

4.      For an award of punitive damages, according to proof;

5.      For attorneys' fees and costs of suit;

6.      For rescission of a contract;

7.      For injunctive relief;

8.      For pre-judgment and post-judgment interest pursuant to Civil Code Sections 3287 and 3289, Code of Civil Procedure Section 685.010 and pursuant to any other provision of law providing for interest;

9.      For such other and further relief that the Court may deem just and proper.

Dated: June 17, 2025

HENRY | LACEY PC

By /s/ Stephen Henry_____
STEPHEN F. HENRY
Attorney for Plaintiff


Plaintiff demands trial by jury in this action.

Dated: June 17, 2025

HENRY | LACEY PC

By /s/ Stephen Henry_____
STEPHEN F. HENRY
Attorney for Plaintiff

Case No. : 3:25-cv-5118                                        COMPLAINT FOR DAMAGES

EXHIBIT B

**Subject:** Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.
**From:** alan@jones.how
**Date:** 2/18/2026, 9:09 AM
**To:** James K. Baer <lightfieldlab@cmbginc.com>

Hi James,

Please find attached my claims, proof of interest, and formal notices in connection with the Assignment for the Benefit of Creditors of Light Field Lab, Inc. (Date of Assignment: August 15, 2025).

The following documents are attached to this email:

**Claims and Statements:**
- Cover Letter
- Proof of Claim #1 -- Crime Victim Claim (Form + Statement)
- Proof of Claim #2 -- Wrongful Termination (Form + Statement)
- Proof of Claim #3 -- Source Code / IP Reclamation (Form + Statement)
- Proof of Interest -- Equity Claim (Form + Statement)

**Formal Notices:**
- Notice A -- Fraud-Tainted Patent Portfolio
- Notice B -- Constructive Trust Over Source Code / IP
- Notice C -- Reserve Funds / Pending Litigation

**Supporting Documentation:**
- Stock Certificates CS-13, CS-14, and CS-15
- First Amended Complaint, Jones v. Light Field Lab Inc., Case No. 3:25-cv-05118-MMC (N.D. Cal.)
- LinkedIn profiles for Jon Karafin and Brendan Bevensee

The cover letter also references two full patents as supporting documentation (US10488584 and US10565734). These are not attached to this email due to file size. A complete copy of all documents including the patents is available at:

https://www.dropbox.com/scl/fi/ueqe19z9ugn8fderjg2vz/LightFieldLab-Claims-AlanJones.zip?rlkey=g0hs7ch1yp21dzh1u9m5a2jwy&dl=0

Alternatively, I can provide instructions for obtaining these patents directly from the USPTO if preferred.

Please acknowledge receipt of this filing promptly.

Regards,

Alan Jones
318-759-7497

# Cover Letter to CMBG FBC-Light Field Lab LLC
## Claims, Interests, and Formal Notices – Alan Jones

February 2026

# COVER LETTER

**FROM:** Alan Jones
16406 270th Pl NE
Duvall, WA 98019
318-759-7497
alan@jones.how

**TO:** CMBG FBC-Light Field Lab LLC
Assignee for the Benefit of Creditors of Light Field Lab, Inc.
3019 Wilshire Blvd Suite 142
Santa Monica, CA 90403
Email: lightfieldlab@cmbginc.com

**DATE:** February 18, 2026

**RE:** Claims, Interest, and Formal Notices – Assignment for the Benefit of Creditors of Light Field Lab, Inc. (Date of Assignment: August 15, 2025)

---

Dear Assignee:

The following documents are submitted in connection with the Assignment for the Benefit of Creditors of Light Field Lab, Inc., executed August 15, 2025:

# ENCLOSED FILINGS

**Proofs of Claim (3):**

1. **Proof of Claim #1 – Crime Victim Claim (Fraudulent Inducement Damages)**
   - Basis: Fraud and deceit; violation of Cal. Penal Code 484 & 496 (treble damages); civil RICO (18 U.S.C. 1962(c)); breach of fiduciary duty; voidable transfer (Cal. Civ. Code 3439.04(a)(1)); crime victim restitution
   - Status: Contingent / Disputed (pending federal litigation, Case No. 3:25-cv-05118-MMC, N.D. Cal.)
   - Classification: Priority – crime victim / constructive trust (Cal. Civ. Code 2224; Cal. Penal Code 496(c); Cal. Const. Art. I, Sec. 28(b))
   - Includes: Detailed Statement About the Debt and Supporting Documentation List
2. **Proof of Claim #2 – Wrongful Termination**
   - Basis: Retaliatory termination (Cal. Lab. Code 1102.5); wrongful termination in violation of public policy
   - Status: Contingent / Disputed (pending federal litigation)

- Classification: Mixed – wage component (back pay, front pay) at 4th priority under Section 5(h)(iv); non-wage damages (emotional distress, punitive) at 6th priority (general unsecured)
- Note: Priority classification subject to potential reclassification as crime victim claim if discovery establishes the termination was in furtherance of the fraud scheme (see POC #2 Section G)
- Includes: Detailed Statement About the Debt

3. **Proof of Claim #3 – Source Code / IP Reclamation (Constructive Trust)**
   - Basis: Return of property obtained through fraud; constructive trust (Cal. Civ. Code 2224); voidable IP assignment agreement
   - Status: Contingent / Disputed
   - Classification: Property claim / Constructive trust – NOT part of the ABC estate
   - Includes: Detailed Statement and Supporting Documentation List

**Proof of Interest (1):**

3. **Proof of Interest – Equity Claim**
   - 80,625 shares Common Stock across three certificates:
     – CS-13: 10,000 shares
     – CS-14: 20,000 shares
     – CS-15: 50,625 shares
   - Supporting documents: Copies of stock certificates CS-13, CS-14, CS-15

**Formal Notices to Assignee (3):**

4. **Notice A – Fraud-Tainted Patent Portfolio**
   - Formal notice that the patent portfolio was procured through fraud
   - Demands investigation before any patent sale
   - Asserts assignee's fiduciary duty to disclose defects to buyers
5. **Notice B – Constructive Trust Over Source Code / IP**
   - Formal demand to segregate IP obtained through fraud
   - Asserts constructive trust under Cal. Civ. Code 2224
   - Demands no sale of Jones's IP pending resolution
6. **Notice C – Reserve Funds / Pending Litigation**
   - Demand to reserve under Section 5(h)(vi) of General Assignment
   - References pending federal case and regulatory complaints
   - Quantifies potential claim exposure including treble damages

---

# PENDING LITIGATION

I am the plaintiff in **Jones v. Light Field Lab Inc., Case No. 3:25-cv-05118-MMC** (United States District Court, Northern District of California). The First Amended Complaint alleges seven causes of action: (1) retaliatory termination (Cal. Lab. Code 1102.5), (2) wrongful termination in violation of public policy, (3) fraud and deceit, (4) violation of Cal. Penal Code 484 & 496 (treble damages), (5) civil RICO (18 U.S.C. 1962(c)), (6) breach of fiduciary duty, and (7) voidable transfer under Cal. Civ. Code 3439.04(a)(1) – specifically challenging the ABC transfer to CMBG as a fraudulent conveyance. Defendants include Light Field Lab, Inc., Jon Karafin, and Brendan Bevensee.

# NOTICE OF REGULATORY REFERRALS

Formal complaints regarding the criminal conduct of Light Field Lab's officers will be filed with at least the following agencies. The complaints are supported by publicly available evidence. Discovery in the pending federal case and the Assignee's response to these claims will provide additional supporting evidence:

| Agency | Subject |
|---|---|
| FBI | False statements (18 U.S.C. 1001), wire fraud (1343), RICO (1962), economic espionage (1831/1832) |
| U.S. Department of Justice, Criminal Division | Wire fraud, false statements, RICO, economic espionage |
| Securities and Exchange Commission (TCR) | Securities fraud, material misrepresentation of patent portfolio to investors |
| USPTO Office of Enrollment and Discipline | Inequitable conduct, duty of disclosure violations |
| California Attorney General | Corporate fraud, securities fraud (Corp. Code 25401), UVTA (Civ. Code 3439), PC 496/531/532 |

These referrals, and any investigations or proceedings that may result, are directly relevant to the Assignee's administration of the estate. The Assignee is hereby on notice that formal complaints will be filed with these agencies before the federal case concludes. The Assignee has a fiduciary duty to account for the potential impact of these proceedings before distributing assets.

## DEMANDS

The Assignee is hereby formally directed to:

1. **Acknowledge receipt** of all enclosed filings and provide confirmation with claim numbers
2. **Reserve** adequate funds for my disputed claims pursuant to Section 5(h)(vi) of the General Assignment, accounting for the full scope of potential damages including treble damages under Cal. Penal Code 496(c), punitive damages under Cal. Civ. Code 3294, and RICO treble damages under 18 U.S.C. 1964(c)
3. **Segregate** all source code and intellectual property created by me during my employment (September 2019 – June 2023) as property subject to a constructive trust claim
4. **Investigate** the patent portfolio's validity before any sale, given the formal notice of fraud and pending regulatory complaints
5. **Disclose** to any potential patent buyers the known defects documented in Notice A
6. **Provide notice** to me before any sale or distribution of assets, particularly the patent portfolio and any source code or IP I created

## SECTION 10 – BAD FAITH EXCEPTION

Section 10 of the General Assignment provides that the Assignee "shall not be subject to any personal liability whatsoever... except for its own misconduct knowingly and intentionally committed in bad faith." This letter, together with the enclosed notices, constitutes formal written notice to the Assignee of: - Fraud in the procurement of the patent portfolio - Pending federal litigation asserting fraud claims - Notice that formal complaints will be filed with at least five federal and state agencies - A constructive trust claim over specific IP assets

Distribution of assets while in possession of this notice, without adequate investigation and reservation, may constitute the type of "misconduct knowingly and intentionally committed in bad faith" that exposes the Assignee to personal liability under Section 10.

Respectfully submitted,

Alan Jones

Date: _2/18/2026_

**Enclosures:** 1. Proof of Claim #1 – Crime Victim Claim / Fraudulent Inducement Damages (with Statement and Supporting Documents) 2. Proof of Claim #2 – Wrongful Termination (with Statement) 3. Proof of Claim #3 – Source Code / IP Reclamation (with Statement and Supporting Documents) 4. Proof of Interest – Equity Claim (with Stock Certificates CS-13, CS-14, CS-15) 5. Notice A – Fraud-Tainted Patent Portfolio 6. Notice B – Constructive Trust Over Source Code / IP 7. Notice C – Reserve Funds / Pending Litigation 8. Copy of First Amended Complaint, Case No. 3:25-cv-05118-MMC 9. Full Patent: US10488584 (Light Field Lab – "energy relay elements" patent) 10. Full Patent: US10565734 (Lytro – "tapered fiber optic bundles" patent, same technology under different names)

| **Assignment for the Benefit of Creditors of:** | **PROOF OF CLAIM** | THIS SPACE IS FOR ASSIGNEE USE ONLY |
|---|---|---|

Name of Assignor: Light Field Lab, Inc.

Name of Assignee: CMBG FBC-Light Field Lab LLC

Date of Assignment: August 15, 2025

Bar Date: February 26, 2026

**\*All fields marked with an asterisk are mandatory.**

DATE RECEIVED:

CLAIM NO.:

---

**\*Name of Creditor:** *(Person or entity to whom Assignor owes money or property):*

**\*Telephone Number:**

**\*Contact Name:**

**\*Email Address:**

---

**\*Name and Address Where Notices Should be Sent:**

**Additional information:** (check box if applicable)

☐ Check box if the address differs from the address on the envelope sent to you on behalf of the Assignee.

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

---

**Account or other number by which claimant identifies claim:**

**Check here if this claim:** ☐ Replaces ☐ Amends a previously filed claim.

Enter date of previously submitted claim:

---

1. **\*Basis for Claim: (check one)**  ☐ Goods sold  ☐ Services performed  ☐ Money loaned  ☐ Equipment leased  ☐ Taxes
☐ Other (Describe briefly):

---

2. **\*Is your claim:**  ☐ Matured  ☐ Unmatured  ☐ Disputed  ☐ Contingent

---

3. **\*Date debt was incurred:**

4. **If Court Judgment, date Judgment obtained:**

---

5. **\*Classification of Claim.** Check the appropriate box(es) that best describe your claim and state the amount for each. (A) Secured, (B) Priority, (C) Unsecured. A claim may be classified as partially secured and partially unsecured, or partially priority and partially unsecured (see definitions for clarification).

**Secured Claim $** _____

Attach evidence of perfection of security interest. Provide a brief description of collateral:

**Priority Claim $** _____

☐ Wages, salaries, or commissions, including vacation, severance and sick leave pay earned within 90 days prior to assignment date (Limited to $4,300. See definitions for clarification)

☐ Taxes or penalties owed to governmental units.

☐ Other. State basis for priority:

**Unsecured Claim $** _____
A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.

6. **\*Supporting Documents**: *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. If the documents are not available, explain. If the documents are voluminous, you may attach a summary.

7. **\*Statement about the debt.** Attach a written detailed explanation of the basis of your claim. Include with your explanation a schedule of calculations showing precisely how you arrive at the total amount of your claim.

8. **Credits and Setoffs:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim, and in filing this claim, claimant has deducted all amounts that claimant owes to debtor.

9. **\*Total Amount of Claim (as of assignment)**

$ _____ Secured

$ _____ Priority

$ _____ Unsecured

$ _____ Total

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

---

10. **Date-stamped copy:** To receive an acknowledgement of the filing of your claim, enclose a self-addressed, stamped envelope and copy of this proof of claim. All claims are subject to review and validation.

---

11. **Signature:** BY MY SIGNATURE BELOW, I DECLARE UNDER PENALTY OF PERJURY, UNDER THE LAWS OF THE STATE OF CALIFORNIA, THAT THE INFORMATION PROVIDED HEREIN AND ATTACHED HERETO IS TRUE AND CORRECT.

**\*Print Name:** _____   **\*Signature:** _____   **\*Date:** _____

# Proof of Claim #1 – Crime Victim Claim (Fraudulent Inducement Damages)

## Statement About the Debt – Alan Jones, Creditor / Crime Victim

February 2026

## DETAILED STATEMENT IN SUPPORT OF PROOF OF CLAIM

**Alan Jones, Creditor / Crime Victim**
**In the Assignment for the Benefit of Creditors of Light Field Lab, Inc.**

---

## A. SUMMARY

This is a crime victim priority claim. It arises from the fraudulent inducement of Alan Jones's employment at Light Field Lab, Inc. ("LFL"), his execution of an intellectual property assignment agreement, and his investment of $56,437.50 in cash to exercise stock options. The individuals who perpetrated the fraud – Jon Karafin (CEO) and Brendan Bevensee (CTO) – concealed material facts about the company's patent portfolio that were directly relevant to Jones's employment and investment decisions.

The underlying conduct constitutes theft by false pretenses (Cal. Penal Code 484) and receipt of stolen property (Cal. Penal Code 496). Criminal conviction is not a prerequisite to crime victim status or to the treble damages remedy under Cal. Penal Code 496(c). *Siry Investment, L.P. v. Farkhondehpour*, 13 Cal.5th 333 (2022) ("A criminal conviction is not a prerequisite to recovery of treble damages."). The standard of proof is preponderance of the evidence. The evidence here – publicly available patent records establishing systematic terminology alteration, false inventor declarations, and technology taken from a prior employer – satisfies this standard and beyond.

This claim is the subject of pending federal litigation: Jones v. Light Field Lab Inc., Case No. 3:25-cv-05118-MMC (N.D. Cal.). The First Amended Complaint ("FAC") alleges seven causes of action: (1) retaliatory termination (Cal. Lab. Code 1102.5), (2) wrongful termination in violation of public policy, (3) fraud and deceit, (4) violation of Cal. Penal Code 484 & 496 (treble damages), (5) civil RICO (18 U.S.C. 1962(c)), (6) breach of fiduciary duty, and (7) voidable transfer under Cal. Civ. Code 3439.04(a)(1) – specifically challenging the ABC transfer to CMBG. This POC covers COAs 3-7 (the fraud and crime-based claims). COAs 1-2 (wrongful termination) are filed as a separate POC.

Formal complaints regarding the underlying criminal conduct will be filed with at least the following agencies. The complaints are supported by publicly available evidence that independently establishes the criminal conduct. Discovery in the pending federal case will provide additional supporting evidence:

- FBI
- U.S. Department of Justice, Criminal Division
- Securities and Exchange Commission (TCR)
- USPTO Office of Enrollment and Discipline
- California Attorney General

## B. THE FRAUDULENT SCHEME

### 1. Technology Taken from Lytro

Jon Karafin and Brendan Bevensee were senior technology leaders at Lytro, Inc. (Karafin: Head of Light Field Video; Bevensee: Lead Engineer who "guided the design and build of Lytro Cinema"). While still employed at Lytro, Karafin and Bevensee filed LFL provisional patent applications (62/362,602 on July 15, 2016; 62/366,076 on July 24, 2016) and the co-founders incorporated LFL in Delaware on November 22, 2016. They left Lytro approximately March 2017.

LFL's patent portfolio was built on technology taken from Lytro with systematically renamed terminology. A comparison of LFL's US10488584 and Lytro's US10565734 reveals six components renamed one-for-one:

| LFL Term | Lytro Term |
|---|---|
| "energy locations" | "image sensors" |
| "energy relay elements" | "tapered fiber optic bundles" |
| "first surface" / "second surface" | "leading end" / "trailing end" |
| "singular seamless energy surface" | "single light-field image unaffected by gaps" |
| "energy propagation paths" | "optical path" |
| "energy waveguide" | "microlens array" |

Both Karafin and Bevensee are named inventors on both the Lytro patents covering these components and the LFL patents covering the identical components under different names.

### 2. False USPTO Declarations

Each LFL patent application contains an inventor declaration under 37 CFR 1.63, signed under penalty of perjury, certifying compliance with the duty of disclosure. Karafin and Bevensee signed these declarations while knowing their own Lytro patents constituted the most material prior art. The terminology appears to be altered specifically to obscure the relationship.

### 3. Concealment from Jones

During recruitment (2019) and throughout employment (2019-2023), Jones was never informed:

- That LFL's patents were built on Lytro technology with renamed terminology
- That the founders filed competing patents while still employed at Lytro
- That patent declarations contained false certifications
- That the patent portfolio was subject to potential unenforceability under *Therasense*
- That the company sought and obtained millions in funding using a patent portfolio the founders knew was tainted by fraud, without disclosing the prior art relationship to investors

### 4. Jones's Reliance

Based on the fraudulent representations and omissions, Jones took two categories of action, each constituting an independently actionable harm:

**Fraud Component 1 – Inducement to Accept Employment:**

- Signed a Confidentiality and Proprietary Rights Agreement (September 9, 2019) assigning all inventions to LFL
- Accepted employment at LFL (September 30, 2019), giving up vesting Microsoft stock from his prior employment
- Was promoted to Principal Engineer (July 27, 2020), consistently received positive performance feedback and merit pay increases, confirming the depth of his commitment to the company based on its representations

**Fraud Component 2 – Inducement to Invest:**

- Exercised stock options, investing $56,437.50 in cash:
    - CS-13: 10,000 shares at ~$0.70/share = $7,000.00 (December 10, 2020)
    - CS-14: 20,000 shares at ~$0.70/share = $14,000.00 (December 28, 2020)
    - CS-15: 50,625 shares at ~$0.70/share = $35,437.50 (April 29, 2021)
- This cash investment was induced by representations about the company's value and IP position
- The equity is now effectively worthless following the ABC

Jones would not have taken any of these actions had the concealed facts been disclosed. The concealed information was material to a reasonable person's employment and investment decisions.

## C. CRIME VICTIM PRIORITY – LEGAL BASIS

### 1. The Conduct Is Criminal

The conduct described above constitutes multiple criminal offenses under California and federal law:

- Theft by false pretenses (Cal. Penal Code 484): Knowingly making false representations to obtain property (Jones's labor, inventions, and cash investment)
- Receipt of stolen property (Cal. Penal Code 496): Receiving and retaining property (Jones's IP, cash) knowing it was obtained through fraudulent means
- False statements (18 U.S.C. 1001): False declarations to the USPTO under penalty of perjury
- Wire fraud (18 U.S.C. 1343): Use of interstate communications to execute the fraudulent scheme
- RICO (18 U.S.C. 1962(c)): Pattern of racketeering activity through systematic patent fraud

This is not a contractual dispute or a mere breach of duty. It is theft. The patent comparison evidence, the false declarations, and the filing timeline establish this as a matter of law.

### 2. Criminal Conviction Is Not Required

California law does not require a criminal conviction to establish that conduct constitutes a crime for purposes of civil remedies and priority mechanisms:

(a) Cal. Penal Code 496(c) provides treble damages and attorney fees for property "obtained in any manner constituting theft." The California Supreme Court has expressly held that "a criminal conviction is not a prerequisite to recovery of treble damages" under this statute. *Siry Investment, L.P. v. Farkhondehpour*, 13 Cal.5th 333 (2022). The court explained that the civil treble damages remedy exists precisely because "[r]equiring a criminal conviction... before an injured person could recover treble damages would not advance the stated goal because civil recovery would be limited to those instances in which law enforcement authority decided to initiate and complete prosecutions." The standard of proof is preponderance of the evidence.

(b) Cal. Civ. Code 2224 (constructive trust) requires only that property was "gained by fraud... or other wrongful act." No criminal conviction is needed. Courts routinely impose constructive trusts based on civil findings of fraud.

(c) The principle that evidence of criminal conduct is sufficient to establish criminality without a conviction is well established in California law. See *Flatley v. Mauro*, 39 Cal.4th 299 (2006) (evidence can "conclusively establish" that conduct is "illegal as a matter of law" without criminal prosecution or conviction).

### 3. The Evidence Conclusively Establishes the Crime

The following evidence is publicly available, uncontroverted, and conclusive:

(a) Patent comparison: LFL's US10488584 and Lytro's US10565734 contain six identical components with systematically altered terminology. This is verifiable by examining the publicly available patent documents.

(b) Shared inventors: Both Jon Karafin and Brendan Bevensee are named inventors on both the Lytro patents (US10565734) and the LFL patents (US10488584) covering the same technology. This is publicly verifiable in USPTO records.

(c) False declarations: Each LFL patent application contains an inventor declaration under 37 CFR 1.63 certifying compliance with the duty of disclosure (37 CFR 1.56). These declarations were signed while the inventors knew their own Lytro patents were the most material prior art. This is a false statement under penalty of perjury.

(d) Filing timeline: LFL provisional applications (62/362,602 and 62/366,076) were filed in July 2016, while Karafin and Bevensee were still employed at Lytro. This is publicly verifiable from USPTO and corporate records.

No reasonable finder of fact could examine this evidence and conclude that the conduct was anything other than deliberate theft of technology through false pretenses.

### 4. Priority Mechanisms

Based on the established criminal nature of the conduct:

**Tier 1 – Constructive Trust (Cal. Civ. Code 2224):** Property obtained through fraud is held in constructive trust for the victim. This removes the property from the ABC estate entirely. The $56,437.50 in cash, the value of Jones's labor, and the IP obtained through the fraudulently induced CPRA are all subject to constructive trust. This is the highest available priority because it removes property from the distribution waterfall altogether.

**Tier 2 – PC 496(c) Treble Damages:** Jones is entitled to three times actual damages plus attorney fees for property obtained through theft. *Siry Investment*, 13 Cal.5th 333. Applied to approximately $2 million in actual damages, treble damages are approximately $6 million.

**Tier 3 – Marsy's Law (Cal. Const. Art. I, Sec. 28(b)):** California's constitutional crime victim protections mandate restitution priority. The evidence establishing the underlying crime is sufficient to trigger these protections regardless of whether criminal proceedings have been initiated.

**Tier 4 – Federal Restitution Lien (18 U.S.C. 3613) (Future):** If federal criminal proceedings result from the regulatory referrals, a Mandatory Victims Restitution Act order would create a lien with the same priority as a perfected IRS tax lien – ahead of all unsecured creditors, state taxes, and priority wages. The Assignee is on notice that formal complaints will be filed with the FBI and DOJ. Discovery will provide additional supporting evidence but is not a prerequisite to filing.

**Tier 5 – State Restitution Lien (Cal. Penal Code 1214) (Future):** If state criminal proceedings follow from the referral to the California Attorney General, a restitution order under Cal. Penal Code 1202.4 is enforceable as a civil money judgment and creates a lien on the defendant's property (Cal. Penal Code 1214).

## D. DAMAGES

### 1. Fraud Component 1 – Employment Inducement Damages

Jones left a senior position at Microsoft to accept employment at LFL based on fraudulent representations about the company's technology, patent portfolio, and legitimacy. The total actual damages from this fraudulently induced career change are approximately $2 million (to be determined at trial), including:

- Lost wages and compensation differential
- Lost Microsoft stock vesting
- Lost benefits
- Career disruption

**2. Fraud Component 2 – Investment Damages**

Jones invested $56,437.50 in cash to exercise stock options:

- CS-13: 10,000 shares at ~$0.70/share = $7,000.00 (December 10, 2020)
- CS-14: 20,000 shares at ~$0.70/share = $14,000.00 (December 28, 2020)
- CS-15: 50,625 shares at ~$0.70/share = $35,437.50 (April 29, 2021)

This investment was induced by representations about the company's value and IP position. The equity is now worthless following the ABC. The $56,437.50 was obtained through fraud and is independently subject to constructive trust and PC 496(c) treble damages.

**3. Lost Value of Equity**

At the time of exercise, the equity had a represented value based on LFL's fundraising valuations. The actual value, considering the fraud-tainted patent portfolio, was materially less.

**4. Intellectual Property Taken Through Fraud**

Jones signed an IP assignment agreement (September 9, 2019) transferring all inventions made during employment to LFL. This agreement was obtained through fraudulent inducement and is voidable. (See companion POC #3 for constructive trust claim over specific IP.)

**5. Emotional Distress**

Jones has suffered emotional distress from the discovery of the fraud, the loss of his investment, the subsequent litigation, and the ABC proceeding.

**6. Treble Damages – Cal. Penal Code 496(c)**

Under *Siry Investment, L.P. v. Farkhondehpour*, 13 Cal.5th 333 (2022), Jones is entitled to three times actual damages for property "obtained in any manner constituting theft." With approximately $2 million in actual damages (to be determined at trial), treble damages are approximately $6 million. The treble multiplier applies to all actual damages components established at trial.

**7. RICO Treble Damages**

If the RICO claim succeeds, Jones is entitled to treble damages under 18 U.S.C. 1964(c), plus attorney fees.

**8. Punitive Damages**

The fraud was committed with malice, oppression, and fraud within the meaning of Cal. Civ. Code 3294.

**9. Attorney Fees**

Jones is entitled to reasonable attorney fees under Cal. Penal Code 496(c).

# E. ASSIGNEE'S OBLIGATION TO RESERVE

Under Section 5(h)(vi) of the General Assignment:

> "No payment shall be made to any creditor whose claim is otherwise disputed until such time as that creditor's claim is resolved. The creditor's otherwise pro-rata share of such distribution shall be fully reserved for by the Assignee until such time as the dispute is resolved."

This claim is disputed (pending federal litigation). The Assignee must reserve Jones's pro-rata share until the federal case is fully resolved, including any appeals. Given the claim for treble damages under PC 496(c), the reserve must account for the enlarged claim amount.

The reserve obligation extends beyond the pending federal case. The Assignee has been formally notified of regulatory referrals to at least five federal and state agencies. These are not speculative – they are supported by the same publicly verifiable evidence described in Section C.3 above. Criminal restitution orders arising from any resulting proceedings are nondischargeable and create super-priority liens (MVRA, 18 U.S.C. 3613). The Assignee's fiduciary duty requires reserving for these reasonably foreseeable claims, not merely for pending litigation.

## F. REGULATORY REFERRALS

| Agency | Subject |
|---|---|
| FBI | 18 U.S.C. 1001, 1343, 1962, 1831/1832 |
| DOJ (Criminal Division) | Wire fraud, false statements, RICO, economic espionage |
| SEC (TCR) | Securities fraud, material misrepresentation of patent portfolio to investors |
| USPTO (OED) | Inequitable conduct, duty of disclosure violations |
| California AG | Corporate fraud, securities fraud, UVTA, PC 496/531/532 |

## G. LEGAL AUTHORITIES

- Cal. Penal Code 484 (theft by false pretenses)
- Cal. Penal Code 496(c) (treble damages for property obtained through theft – no conviction required)
- Cal. Civ. Code 2224 (constructive trust – property obtained through fraud)
- Cal. Civ. Code 1689(b)(1) (rescission of contract obtained by fraud)
- Cal. Civ. Code 3294 (punitive damages)
- Cal. Civ. Code 3439.04(a)(1) (voidable transfers – UVTA)
- Cal. Const. Art. I, Sec. 28(b) (Marsy's Law – crime victim restitution)
- 18 U.S.C. 1962(c) (RICO)
- 18 U.S.C. 1964(c) (RICO treble damages)
- 18 U.S.C. 3613, 3663A (MVRA – federal restitution lien)
- *Siry Investment, L.P. v. Farkhondehpour*, 13 Cal.5th 333 (2022) (PC 496(c) treble damages; no conviction required; preponderance standard)
- *Flatley v. Mauro*, 39 Cal.4th 299 (2006) (evidence can conclusively establish criminality as a matter of law without conviction)
- *Lazar v. Superior Court*, 12 Cal.4th 631 (1996) (fraud voids contract)
- *Heckmann v. Ahmanson*, 168 Cal.App.3d 119, 136 (1985) (constructive trust as remedy for fraud)

---

# SUPPORTING DOCUMENTATION

## Documents Attached to This POC:

1. Copy of FAC from Jones v. Light Field Lab Inc., Case No. 3:25-cv-05118-MMC
2. Stock certificates (CS-13, CS-14, CS-15) – showing $56,437.50 cash investment
3. LinkedIn profile printouts for Jon Karafin and Brendan Bevensee (establishing Lytro employment dates concurrent with LFL patent filings)

2/18/2026 

| Assignment for the Benefit of Creditors of: | PROOF OF CLAIM | THIS SPACE IS FOR ASSIGNEE USE ONLY |
|---|---|---|
| Name of Assignor: Light Field Lab, Inc.<br><br>Name of Assignee: CMBG FBC-Light Field Lab LLC<br><br>Date of Assignment: August 15, 2025<br><br>Bar Date: February 26, 2026 | **\*All fields marked with an asterisk are mandatory.** | DATE RECEIVED:<br><br><br><br><br><br>CLAIM NO.: |

| | |
|---|---|
| **\*Name of Creditor:** *(Person or entity to whom Assignor owes money or property)*: | **\*Telephone Number:**<br><br>**\*Contact Name:**<br><br>**\*Email Address:** |
| **\*Name and Address Where Notices Should be Sent:** | **Additional information:** (check box if applicable)<br><br>☐ Check box if the address differs from the address on the envelope sent to you on behalf of the Assignee.<br><br>☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |
| **Account or other number by which claimant identifies claim:** | **Check here if this claim:** ☐ Replaces ☐ Amends a previously filed claim.<br><br>Enter date of previously submitted claim: |

**1. \*Basis for Claim: (check one)** ☐ Goods sold ☐ Services performed ☐ Money loaned ☐ Equipment leased ☐ Taxes
☐ Other (Describe briefly):

**2. \*Is your claim:** ☐ Matured ☐ Unmatured ☐ Disputed ☐ Contingent

| **3. \*Date debt was incurred:** | **4. If Court Judgment, date Judgment obtained:** |
|---|---|
| **5. \*Classification of Claim.** Check the appropriate box(es) that best describe your claim and state the amount for each. (A) Secured, (B) Priority, (C) Unsecured. A claim may be classified as partially secured and partially unsecured, or partially priority and partially unsecured (see definitions for clarification).<br><br>**Secured Claim $** _____<br><br>Attach evidence of perfection of security interest. Provide a brief description of collateral: | **6. \*Supporting Documents**: *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. If the documents are not available, explain. If the documents are voluminous, you may attach a summary. |
| | **7. \*Statement about the debt.** Attach a written detailed explanation of the basis of your claim. Include with your explanation a schedule of calculations showing precisely how you arrive at the total amount of your claim. |
| **Priority Claim $** _____<br><br>☐ Wages, salaries, or commissions, including vacation, severance and sick leave pay earned within 90 days prior to assignment date (Limited to $4,300. See definitions for clarification)<br><br>☐ Taxes or penalties owed to governmental units.<br><br>☐ Other. State basis for priority: | **8. Credits and Setoffs:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim, and in filing this claim, claimant has deducted all amounts that claimant owes to debtor. |
| | **9. \*Total Amount of Claim (as of assignment)**<br><br>$ _____ Secured<br><br>$ _____ Priority<br><br>$ _____ Unsecured<br><br>$ _____ Total |
| **Unsecured Claim $** _____<br>A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim. | ☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges. |

**10. Date-stamped copy:** To receive an acknowledgement of the filing of your claim, enclose a self-addressed, stamped envelope and copy of this proof of claim. All claims are subject to review and validation.

**11. Signature:** BY MY SIGNATURE BELOW, I DECLARE UNDER PENALTY OF PERJURY, UNDER THE LAWS OF THE STATE OF CALIFORNIA, THAT THE INFORMATION PROVIDED HEREIN AND ATTACHED HERETO IS TRUE AND CORRECT.

**\*Print Name:** _____    **\*Signature:** _____    **\*Date:** _____

# Proof of Claim #2 – Wrongful Termination

## Statement About the Debt – Alan Jones, Creditor / Former Employee

February 2026

## DETAILED STATEMENT IN SUPPORT OF PROOF OF CLAIM

**Alan Jones, Creditor / Former Employee**
**Wrongful Termination Claim**

---

## A. SUMMARY

This claim arises from the retaliatory and wrongful termination of Alan Jones from Light Field Lab, Inc. ("LFL") on June 23, 2023. Jones was employed as a software engineer from September 30, 2019, and was promoted to Principal Engineer on July 27, 2020. He was terminated in retaliation for requesting disability accommodation and filing a hostile work environment complaint.

This claim covers the first two causes of action from the pending federal case (Jones v. Light Field Lab Inc., Case No. 3:25-cv-05118-MMC, N.D. Cal.):

1. Retaliatory termination under Cal. Lab. Code 1102.5
2. Wrongful termination in violation of public policy

The fraud-based causes of action (COAs 3-7) are filed as a separate POC #1 (Crime Victim Claim) because they carry different priority status.

## B. EMPLOYMENT HISTORY

- Hired: September 30, 2019 (CPRA signed September 9, 2019)
- Title: Software Engineer, later promoted to Principal Engineer (July 27, 2020)
- Performance: Consistently received positive performance feedback and merit pay increases
- Terminated: June 23, 2023

## C. THE WRONGFUL TERMINATION

Jones was terminated in retaliation for activities protected under California law. Jones is Type I Diabetic and suffers from a compromised immune system. He requested accommodation to continue working remotely – a request LFL informally granted without ever indicating that in-office work was an essential function of his position. In January 2023, Jones was assigned to work on Wavetracing Optics under CEO Karafin's direct supervision. When Jones advised Karafin that the prescribed methodology was unworkable and suggested alternatives, Karafin publicly disparaged Jones's work in a team meeting. Jones submitted a rebuttal and a complaint of hostile work environment on April 9, 2023, reporting conduct he reasonably believed was motivated by unlawful discrimination related to his disability. The investigation concluded on June 16, 2023; Jones was terminated one week later on June 23, 2023. The temporal proximity raises a rebuttable presumption of retaliatory intent.

Jones's termination also violated public policy. California recognizes a common law cause of action for wrongful termination in violation of public policy where the discharge contravenes fundamental public policy as expressed in constitutional or statutory provisions. The policies violated include the prohibition on retaliation for opposing and reporting illegal activity (Lab. Code 1102.5) and the public policy expressed in the Fair Employment and Housing Act prohibiting retaliation against employees who request disability accommodation or report discrimination.

## D. DAMAGES

### 1. Back Pay (Wage Priority)

Jones is entitled to back pay from the date of termination (June 23, 2023) through the date of judgment or reinstatement. This represents wages that would have been earned but for the wrongful termination.

### 2. Front Pay (Wage Priority)

If reinstatement is not feasible, Jones is entitled to front pay representing future lost earnings.

### 3. Lost Benefits (Wage Priority)

Jones lost employment benefits including health insurance, retirement contributions, and other benefits provided during employment.

### 4. Emotional Distress (Unsecured)

Jones has suffered emotional distress from the wrongful termination and subsequent events.

### 5. Punitive Damages (Unsecured)

The termination was retaliatory and in bad faith, warranting punitive damages under Cal. Civ. Code 3294.

## E. PRIORITY CLASSIFICATION

The wage components of this claim (back pay, front pay, lost benefits) qualify for 4th priority under Section 5(h)(iv) of the General Assignment: "all monies due employees of the Assignor up to the maximum amount entitled to priority under applicable law."

Under California law, employee wages are entitled to priority in ABC proceedings. The non-wage damages (emotional distress, punitive damages) are classified as 6th priority (general unsecured).

However, this classification is subject to reclassification if discovery establishes that the termination was in furtherance of the fraud scheme. See Section G below.

## F. ASSIGNEE'S OBLIGATION TO RESERVE

Under Section 5(h)(vi), the Assignee must fully reserve Jones's pro-rata share of distributions until this disputed claim is resolved. The reservation must be maintained until all pending and reasonably anticipated proceedings are resolved, including the federal case, any regulatory investigations arising from the referrals, and any criminal proceedings that may follow.

## G. NOTICE: TERMINATION MOTIVE RELEVANT TO PRIORITY CLASSIFICATION

Jones places the Assignee on notice that discovery in the pending federal case may establish that his termination was an overt act in furtherance of the fraud scheme – specifically, that Jones was terminated to prevent his discovery of the patent fraud and to enable the continued patenting of his work without his knowledge or interference.

If discovery establishes this nexus, the wrongful termination damages are not merely employment losses – they are consequential damages of the criminal conduct. This would affect priority classification through multiple legal mechanisms:

1. **Cal. Penal Code 496(c)**: The "actual damages" subject to trebling under *Siry Investment, L.P. v. Farkhondehpour*, 13 Cal.5th 333 (2022) extend to all consequential losses flowing from acts in furtherance of the theft scheme, including lost wages from a termination executed to facilitate the theft.

2. **Cal. Const. Art. I, Sec. 28(b) (Marsy's Law)**: Crime victims are entitled to restitution for ALL losses "suffered as a result of" the criminal activity. The California Supreme Court construes "as a result of" broadly to encompass the full scope of consequential harm (*People v. Giordano*, 42 Cal.4th 644, 655-56 (2007)).

3. **Federal Restitution (MVRA, 18 U.S.C. 3663A)**: Federal restitution covers persons "directly and proximately harmed" by the defendant's criminal conduct "in the course of the scheme." A termination executed as part of the fraud scheme places the resulting damages squarely within this coverage.

4. **RICO (18 U.S.C. 1962(c))**: If discovery establishes that the termination was executed to facilitate the continued misappropriation of Jones's work product – including the patenting of his inventions without his knowledge or attribution (see FAC ¶40) – the termination itself becomes an overt act in furtherance of the RICO enterprise's pattern of racketeering activity, connecting the wrongful termination damages to the RICO claims.

The Assignee must account for this possibility when calculating reserves under Section 5(h)(vi). If the wrongful termination damages are reclassified as crime victim damages, they move from wage priority (4th) and general unsecured (6th) to crime victim priority – potentially with treble damages. The reserve calculation must reflect this contingency.

---

# SUPPORTING DOCUMENTATION

## Documents Attached:

1. Copy of FAC from Jones v. Light Field Lab Inc., Case No. 3:25-cv-05118-MMC

2/18/2026

| Assignment for the Benefit of Creditors of: | PROOF OF CLAIM | THIS SPACE IS FOR ASSIGNEE USE ONLY |
|---|---|---|

**Assignment for the Benefit of Creditors of:**

Name of Assignor: Light Field Lab, Inc.

Name of Assignee: CMBG FBC-Light Field Lab LLC

Date of Assignment: August 15, 2025

Bar Date: February 26, 2026

**PROOF OF CLAIM**

*All fields marked with an asterisk are mandatory.*

THIS SPACE IS FOR ASSIGNEE USE ONLY

DATE RECEIVED:

CLAIM NO.:

---

**\*Name of Creditor:** *(Person or entity to whom Assignor owes money or property)*:

**\*Telephone Number:**

**\*Contact Name:**

**\*Email Address:**

---

**\*Name and Address Where Notices Should be Sent:**

**Additional information:** (check box if applicable)

☐ Check box if the address differs from the address on the envelope sent to you on behalf of the Assignee.

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

---

**Account or other number by which claimant identifies claim:**

Check here if this claim:    ☐ Replaces    ☐ Amends a previously filed claim.

Enter date of previously submitted claim:

---

1.  **\*Basis for Claim: (check one)**    ☐ Goods sold    ☐ Services performed    ☐ Money loaned    ☐ Equipment leased    ☐ Taxes
    ☐ Other (Describe briefly):

---

2.  **\*Is your claim:**    ☐ Matured    ☐ Unmatured    ☐ Disputed    ☐ Contingent

---

3.  **\*Date debt was incurred:**

4.  **If Court Judgment, date Judgment obtained:**

---

5.  **\*Classification of Claim.** Check the appropriate box(es) that best describe your claim and state the amount for each. (A) Secured, (B) Priority, (C) Unsecured. A claim may be classified as partially secured and partially unsecured, or partially priority and partially unsecured (see definitions for clarification).

    **Secured Claim $** _____

    Attach evidence of perfection of security interest. Provide a brief description of collateral:

    **Priority Claim $** _____

        Wages, salaries, or commissions, including vacation, severance and sick leave pay earned within 90 days prior to assignment date (Limited to $4,300. See definitions for clarification)

        Taxes or penalties owed to governmental units.

        Other. State basis for priority:

    **Unsecured Claim $** _____
    A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.

6.  **\*Supporting Documents**: *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. If the documents are not available, explain. If the documents are voluminous, you may attach a summary.

7.  **\*Statement about the debt.** Attach a written detailed explanation of the basis of your claim. Include with your explanation a schedule of calculations showing precisely how you arrive at the total amount of your claim.

8.  **Credits and Setoffs:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim, and in filing this claim, claimant has deducted all amounts that claimant owes to debtor.

9.  **\*Total Amount of Claim (as of assignment)**

    $ _____ Secured

    $ _____ Priority

    $ _____ Unsecured

    $ _____ Total

    ☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

---

10. **Date-stamped copy:** To receive an acknowledgement of the filing of your claim, enclose a self-addressed, stamped envelope and copy of this proof of claim. All claims are subject to review and validation.

11. **Signature:** BY MY SIGNATURE BELOW, I DECLARE UNDER PENALTY OF PERJURY, UNDER THE LAWS OF THE STATE OF CALIFORNIA, THAT THE INFORMATION PROVIDED HEREIN AND ATTACHED HERETO IS TRUE AND CORRECT.

**\*Print Name:**    **\*Signature:**    **\*Date:**

# Proof of Claim #3 – Source Code / IP Reclamation (Constructive Trust)

## Statement About the Debt – Alan Jones, Creditor / Equitable Owner

### February 2026

## DETAILED STATEMENT IN SUPPORT OF PROOF OF CLAIM

**Alan Jones, Creditor / Equitable Owner**
**Constructive Trust Over Source Code and Intellectual Property**

---

## A. SUMMARY

This claim seeks the return of intellectual property – source code, inventions, and other work product – created by Alan Jones during his employment at Light Field Lab, Inc. ("LFL") from September 30, 2019 through June 23, 2023. This is a property claim, not a debt claim. The property was obtained by LFL through a fraudulently induced IP assignment agreement (the Confidentiality and Proprietary Rights Agreement ("CPRA"), signed September 9, 2019, three weeks before employment commenced) and is held in constructive trust for Jones under Cal. Civ. Code 2224.

## B. THE VOIDABLE IP ASSIGNMENT

**1. The Agreement**

On September 9, 2019, Jones signed a Confidentiality and Proprietary Rights Agreement ("CPRA") as a condition of employment at LFL. The CPRA assigned to LFL all inventions, developments, improvements, and work product created by Jones during his employment.

**2. The Fraud**

The CPRA was obtained through fraudulent inducement. At the time Jones signed the CPRA, LFL's officers (Karafin and Bevensee) concealed material facts that would have caused Jones to refuse to sign:

- LFL's patent portfolio was built on technology taken from Lytro, Inc. with systematically renamed terminology
- The founders filed competing patents while still employed at Lytro
- Patent declarations contained false certifications of duty-of-disclosure compliance
- The patent portfolio was subject to potential unenforceability under the doctrine of inequitable conduct
- The founders had a documented pattern of dishonest IP practices

These facts are directly material to an IP assignment agreement. A reasonable person would not assign their inventions to individuals who have demonstrated a pattern of:

- Taking technology from a prior employer
- Filing false declarations with the USPTO
- Concealing prior art to obtain patents

- Misrepresenting the provenance of their patent portfolio

### 3. Voidability

Under California law, a contract obtained through fraud is voidable at the election of the defrauded party. *Lazar v. Superior Court*, 12 Cal.4th 631, 638 (1996); Cal. Civ. Code 1689(b)(1). Jones elects to void the CPRA.

When the CPRA is voided, the IP assignments made thereunder are void *ab initio*. The inventions and source code created by Jones during his employment never validly transferred to LFL. Therefore, they never validly transferred to the Assignee (CMBG FBC-Light Field Lab LLC). *Nemo dat quod non habet* – one cannot give what one does not have.

The pending FAC (Case No. 3:25-cv-05118-MMC) already seeks rescission of the CPRA and return of all IP "created by Plaintiff, or derived from Plaintiff's work product, to Plaintiff." This constructive trust claim in the ABC proceeding is consistent with and supported by the relief sought in federal court.

## C. CONSTRUCTIVE TRUST – CAL. CIV. CODE 2224

Cal. Civ. Code 2224 provides:

> "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

LFL gained Jones's intellectual property through fraud (the fraudulently induced CPRA). Under Section 2224, LFL was an involuntary trustee of that IP for Jones's benefit. When LFL transferred all assets to the Assignee via the General Assignment, the Assignee received the IP subject to the same constructive trust.

The constructive trust is the strongest available priority mechanism because property held in constructive trust is not part of the ABC estate. It belongs to the beneficiary (Jones), not to the debtor or its creditors. The Assignee must return it or segregate it pending resolution, rather than distributing it to creditors.

## D. PROPERTY SUBJECT TO THE CONSTRUCTIVE TRUST

The following categories of intellectual property created by Jones during his employment at LFL (September 30, 2019 – June 23, 2023) are subject to the constructive trust:

1. All source code written by Jones during his employment at LFL (September 30, 2019 – June 23, 2023)
2. All derivative works – any source code, modules, libraries, or systems derived from, built upon, or incorporating code written by Jones
3. All rendered imagery, animations, interactive experiences, demos, and visual content produced using Jones's rendering code or derived from his rendering pipeline – Jones developed core rendering software used across LFL's operations, making virtually all rendered output and interactive content a derivative work of his code
4. All art, visual effects, and creative works directly produced by Jones during his employment
5. Inventions and innovations developed by Jones during employment
6. Technical designs, specifications, and documentation created by Jones
7. Any patents or patent applications listing Jones as an inventor or incorporating Jones's work product

The Assignee holds the source code repositories and version control history (e.g., Git) for all LFL software development. However, given the documented pattern of fraud by LFL's principals – systematic terminology alteration in patent filings, false inventor declarations, and concealment of prior art – the attribution records in these repositories cannot be accepted at face value. Repository provenance can be compromised in ways ranging from subtle to total: version control history can be rewritten (e.g., through force push, interactive rebase, filter-branch, or similar tools), commit authors can be changed, files can be moved or renamed to obscure original authorship, and branches can be deleted. At the extreme, entirely new repositories can be created from scratch with fabricated history, with Jones's code re-committed under different authors and no

forensic trace of the original provenance. LFL's principals had both the means and the motive to alter or replace the repository history – they were actively patenting Jones's work while terminating him.

The scope of Jones's constructive trust claim is not limited to what the repository currently attributes to him. It extends to all work he actually performed during his employment, regardless of what the repository records – which were under the exclusive control of the individuals who perpetrated the fraud – may currently show.

Jones does not have access to these repositories following his termination. Jones demands that the Assignee:

(a) Engage an independent forensic software expert – not any engineer, contractor, or consultant previously retained by or in any way connected to LFL, it's executives, board members, counsel, or any other party with ties any such party – to conduct a thorough review of the source code repositories. The expert's analysis must go beyond surface-level attribution records (which may have been fabricated) and include substantive code analysis: coding style and patterns, architecture and design decisions, technical approach and methodology, and comparison with any code samples or technical documentation Jones can provide or identify as his among the repositories. The expert must also examine any available forensic artifacts (e.g., reflogs, backup references, timestamp inconsistencies, server-side logs) that may reveal history manipulation – while recognizing that the absence of such artifacts does not establish integrity, as repositories may have been recreated entirely.

(b) Provide Jones with a complete inventory of all source code repositories, branches, files, and commits in the estate, together with the expert's forensic analysis, to allow Jones to identify his work product and flag any discrepancies between the repository records and the work he actually performed.

(c) Preserve all repository data in its current state, including all reflog entries, backup refs, stash entries, server-side access logs, CI/CD build logs, deployment records, code review records (e.g., pull request history), and any other metadata that may contain evidence of the true authorship or history of the code. Any destruction of this data – whether intentional or through negligence – constitutes spoliation of evidence relevant to the pending federal case and this constructive trust claim.

(d) Produce all backup copies of repositories, including any snapshots, archives, or copies maintained by third-party services (e.g., cloud hosting providers, CI/CD platforms, code review tools), which may contain pre-manipulation versions of the history.

The constructive trust applies to all code authored by Jones and all derivative works based on Jones's code. Under Cal. Civ. Code 2224, property obtained through fraud is held in trust for the victim. If Jones's original code was obtained through a fraudulently induced IP assignment, then derivative works built upon that code are also tainted – the Assignee cannot launder fraudulently obtained property by building upon it.

## E. THE ASSIGNEE'S OBLIGATIONS

The Assignee must:

1. Segregate all IP and source code created by Jones – it is not part of the ABC estate
2. Not sell or distribute Jones's IP to any third party
3. Not include Jones's IP in any patent portfolio sale or IP license agreement
4. Return the IP to Jones upon resolution of the constructive trust claim
5. Engage an independent forensic software expert to review the source code repositories and identify the full scope of Jones's contributions – the expert's analysis must not rely solely on repository attribution records, which may have been altered or fabricated (see Section D above)
6. Immediately identify all third-party purchasers of any IP assets that incorporate or derive from Jones's work product, including the identity of the purchaser, date of sale, terms, and consideration received
7. Cooperate fully in the recovery of any such property from third parties – this is a fiduciary obligation, not a request
8. Provide a complete accounting of all dispositions of IP assets, including dates, prices, purchaser identities, and terms

9. Preserve all records relating to disposed property, including communications with purchasers

These demands are grounded in the Assignee's fiduciary duty to creditors (Probate Code 16060-16061 by analogy), the UVTA remedies available under Cal. Civ. Code 3439.07 (including the catch-all "any other relief the circumstances may require" under 3439.07(a)(3)(C)), and the constructive trust beneficiary's right to trace property and its proceeds.

Jones notes that the 7th Cause of Action in the pending FAC challenges the ABC transfer itself as a voidable transaction under Cal. Civ. Code 3439.04(a)(1). The ABC was initiated after Jones filed his federal lawsuit – satisfying the statutory badge of fraud that the transfer occurred after the debtor was "sued or threatened with suit" (Civ. Code 3439.04(b)(4)). The ABC also transferred substantially all of LFL's assets to the Assignee – satisfying the badge that "the transfer was of substantially all the debtor's assets" (Civ. Code 3439.04(b)(5)). If the ABC was structured to reduce fair market value of the estate's assets to limit recovery by creditors, this constitutes additional evidence of actual intent to defraud. The Assignee's cooperation in identifying purchasers and providing a full accounting is essential to determining whether the assets were sold for reasonably equivalent value (Civ. Code 3439.04(b)(8)) or were instead disposed of at artificially depressed prices.

If the Assignee sells Jones's IP despite notice of the constructive trust claim, the Assignee breaches its fiduciary duty and is personally liable under Section 10 of the General Assignment (bad faith exception to liability limitation).

## F. CONSEQUENCES OF WRONGFUL DISPOSITION

The Assignee does not have the option of converting Jones's property into a monetary claim by selling it. Disposing of constructive trust property is a breach of fiduciary duty, not an alternative remedy.

If the Assignee has already sold, licensed, or otherwise disposed of any of Jones's IP despite this notice, the constructive trust traces into the proceeds of that disposition under established California tracing principles (*Heckmann v. Ahmanson*, 168 Cal.App.3d 119, 136 (1985)). In that event:

1. The proceeds are held in constructive trust for Jones – they are not part of the estate
2. The Assignee is liable for the full fair market value of the property at the time of disposition, plus any profits derived from its use
3. The Assignee is personally liable for breach of fiduciary duty under Section 10 of the General Assignment (bad faith exception)
4. The crime victim priority mechanisms described in POC #1 apply to any monetary recovery, including treble damages under Cal. Penal Code 496(c) (*Siry Investment, L.P. v. Farkhondehpour*, 13 Cal.5th 333 (2022))
5. Jones may pursue the third-party purchaser directly if they are not a bona fide purchaser for value without notice

The Assignee is further obligated to immediately identify any third-party purchasers and cooperate fully in the recovery of the property (see Section E above and Notice B).

## G. LEGAL AUTHORITIES

- Cal. Civ. Code 2224 (constructive trust)
- Cal. Civ. Code 1689(b)(1) (rescission of contract obtained by fraud)
- Cal. Civ. Code 3439.04(a)(1), (b)(4), (b)(5), (b)(8) (voidable transfers – UVTA badges of fraud)
- Cal. Civ. Code 3439.07 (UVTA remedies)
- *Lazar v. Superior Court*, 12 Cal.4th 631 (1996) (fraud voids contract)
- *Siry Investment, L.P. v. Farkhondehpour*, 13 Cal.5th 333 (2022) (PC 496 applies to business fraud; property "obtained in any manner constituting theft")
- *Heckmann v. Ahmanson*, 168 Cal.App.3d 119, 136 (1985) (constructive trust as remedy for fraud)

---

## SUPPORTING DOCUMENTATION

**Documents Attached:**

1. Copy of FAC from Jones v. Light Field Lab Inc., Case No. 3:25-cv-05118-MMC

2/18/2026

| Assignment for the Benefit of Creditors of: | PROOF OF INTEREST | THIS SPACE IS FOR ASSIGNEE USE ONLY |
|---|---|---|
| Name of Assignor: Light Field Lab, Inc.<br><br>Name of Assignee: CMBG FBC-Light Field Lab LLC<br><br>Date of Assignment: August 15, 2025<br><br>Bar Date: February 26, 2026 | | DATE RECEIVED: |

**NOTE: This form SHOULD NOT be used to make a claim against the Debtor for money owed. A separate Proof of Claim form should be used for that purpose. This Form should only be used to assert an Equity Security Interest in the Debtor. An Equity Security Interest is any right arising from any capital stock and any equity security in any of the Debtor. An equity security is defined as (a) a share in a corporation whether or not transferable or denominated stock or similar security, (b) interest of a limited partner in a limited partnership, or (c) warrant or right other than a right to convert, to purchase, sell or subscribe to a share, security or interest of a kind specified in subparagraph (a) or (b) above.**

| Name of Holder of the Equity Security Interest: *(Person or entity holding an Equity Security Interest in the Debtor. Referred to hereinafter as the "Interest Holder"):* | **Telephone Number**:<br><br>**Contact Name:**<br><br>**Email Address:** |
|---|---|
| Name and Address Where Notices Should be Sent: | **Additional information:** (check box if applicable)<br><br>Check box if the address differs from the address on the envelope sent to you on behalf of the Assignee.<br><br>Check box if you are aware that anyone else has filed a proof of interest relating to your interest. Attach copy of statement giving particulars. |
| Account or other number by which Interest Holder identifies Debtor: | Check here if this claim:<br><br>Replaces a previously filed Proof of Interest dated _____.<br><br>Amends a previously filed Proof of Interest dated _____. |
| Name and Address of any person or entity that is the record holder for the Equity Security Interest asserted in this Proof of Interest: | **Record Holder Telephone Number:**<br><br>**Record Holder Contact Name:**<br><br>**Record Holder Email Address:** |

| Class *(Common, Preferred)* | Series *(Pre-Seed, Seed, A, B, C, 1, 2, 3, etc.)* | Number of Shares | Certificate Number |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**Supporting Documents**: *Attach copies of supporting documents*, such as stock certificates, option agreements, warrants, etc. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain.

**Date-stamped copy:** To receive an acknowledgement of the filing of your claim, enclose a self-addressed, stamped envelope, and copy of this proof of claim. All claims are subject to review and validation.

**Signature:** BY MY SIGNATURE BELOW, I DECLARE UNDER PENALTY OF PERJURY, UNDER THE LAWS OF THE STATE OF CALIFORNIA, THAT THE INFORMATION PROVIDED HEREIN AND ATTACHED HERETO IS TRUE AND CORRECT.

Print Name:                    Signature:                    Date:

# Proof of Interest – Equity Claim

## Supporting Statement – Alan Jones, 80,625 Shares Common Stock

February 2026

## EQUITY SECURITY INTEREST

**Alan Jones – 80,625 Shares Common Stock**
**Light Field Lab, Inc. (Assignor)**

---

## Equity Holdings

| Class | Series | Number of Shares | Certificate Number |
|---|---|---|---|
| Common | ISO (Incentive Stock Option) | 10,000 | CS-13 |
| Common | ISO (Incentive Stock Option) | 20,000 | CS-14 |
| Common | ISO (Incentive Stock Option) | 50,625 | CS-15 |

**Total Shares: 80,625 Common Stock**

All shares derive from Option Grant ES-25.

---

## Certificate Details

**CS-13:**

- Class: Common Stock
- Shares: 10,000
- Exercise date: December 10, 2020
- Exercise price: ~$0.70/share
- Cash paid: ~$7,000.00
- Type: ISO (Incentive Stock Option)
- Option grant: ES-25
- Signed by: Jon Karafin (President), Brendan Bevensee (Secretary)

**CS-14:**

- Class: Common Stock
- Shares: 20,000
- Exercise date: December 28, 2020
- Exercise price: ~$0.70/share
- Cash paid: ~$14,000.00
- Type: ISO (Incentive Stock Option)
- Option grant: ES-25

- Signed by: Jon Karafin (President), Brendan Bevensee (Secretary)

**CS-15:**

- Class: Common Stock
- Shares: 50,625
- Exercise date: April 29, 2021
- Exercise price: ~$0.70/share
- Cash paid: ~$35,437.50
- Type: ISO (Incentive Stock Option)
- Option grant: ES-25
- Signed by: Jon Karafin (President), Brendan Bevensee (Secretary)

**Total Cash Invested: $56,437.50**

---

## Supporting Documents Attached

1. **Certificate CS-13** – 10,000 shares Common Stock (copy)
2. **Certificate CS-14** – 20,000 shares Common Stock (copy)
3. **Certificate CS-15** – 50,625 shares Common Stock (copy)

---

Respectfully submitted,

Alan Jones Date: 2/18/2026

**Declaration:** I declare under penalty of perjury under the laws of the State of California that the information provided herein is true and correct.

# Notice A – Fraud-Tainted Patent Portfolio

## Formal Notice to Assignee Regarding Patent Fraud

February 2026

# NOTICE A: FRAUD-TAINTED PATENT PORTFOLIO

# FORMAL NOTICE TO CMBG FBC-LIGHT FIELD LAB LLC

# ASSIGNEE FOR THE BENEFIT OF CREDITORS OF LIGHT FIELD LAB, INC.

---

**FROM:** Alan Jones, Creditor / Claimant

**TO:** CMBG FBC-Light Field Lab LLC 3019 Wilshire Blvd Suite 142, Santa Monica, CA 90403

**DATE:** February 18, 2026

**RE:** Formal Notice of Fraud in Procurement of Patent Portfolio – Demand for Investigation Before Sale

---

## I. PURPOSE

This notice formally advises the Assignee that the patent portfolio of Light Field Lab, Inc. ("LFL") was procured through fraudulent means and may be unenforceable. The Assignee has a fiduciary duty to investigate this notice before selling any patents and to disclose all known defects to potential buyers.

## II. THE FRAUD

LFL's patent portfolio was built by systematically repackaging technology from Lytro, Inc. with altered terminology. The company's CEO (Jon Karafin) and CTO (Brendan Bevensee) – both former senior employees of Lytro – filed patent applications on Lytro's technology under LFL's name while deliberately concealing that their own prior Lytro patents constituted the most material prior art to the LFL claims.

### A. Systematic Terminology Alteration

A comparison of LFL's US10488584 and Lytro's US10565734 reveals six components renamed one-for-one:

| LFL Term | Lytro Term | Function |
|---|---|---|
| "energy locations" | "image sensors" | Display/capture array elements |
| "energy relay elements" | "tapered fiber optic bundles" | Fiber optic gap-bridging bundles |
| "first surface" / "second surface" | "leading end" / "trailing end" | Input/output faces |
| "singular seamless energy surface" | "single light-field image unaffected by gaps" | Seamless combined display |

| LFL Term | Lytro Term | Function |
|---|---|---|
| "energy propagation paths" | "optical path" | Light transmission path |
| "energy waveguide" | "microlens array" | Directional light control |

Both Karafin and Bevensee are named inventors on both the Lytro patents covering these components and the LFL patents covering the same components under different names.

## B. False Inventor Declarations

Each LFL patent application contains an inventor declaration under 37 CFR 1.63, signed under penalty of perjury, certifying that the inventors understand their duty to disclose all information material to patentability (37 CFR 1.56). Karafin and Bevensee signed these declarations while knowing that their own prior Lytro patents constituted the most material prior art. This violates the duty of disclosure and constitutes potential fraud on the USPTO.

## C. Filing While at Competitor

Karafin and Bevensee filed LFL provisional applications (62/362,602 on July 15, 2016; 62/366,076 on July 24, 2016) and incorporated LFL (November 22, 2016) while still employed at Lytro.

## III. LEGAL CONSEQUENCES FOR THE PATENT PORTFOLIO

### A. Inequitable Conduct – Unenforceability

Under *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc), a finding of inequitable conduct renders all claims of the affected patent permanently unenforceable. The standard requires: 1. But-for materiality (the patent would not have issued but for the withheld information) 2. Specific intent to deceive the USPTO

Both elements are present here: the Lytro prior art is the most material prior art to the LFL claims (identical technology with renamed terminology), and the systematic alteration of terminology evidences specific intent to conceal the relationship.

### B. Infectious Unenforceability

Under *Guardant Health, Inc. v. Foundation Medicine, Inc.*, No. 1:17-cv-1616-LPS-CJB (D. Del. 2020), inequitable conduct in one patent can infect related patents in the same family, rendering them all unenforceable. The factors – significant overlap between specifications, shared priority dates, and membership in the same patent family – are all present here.

The FAC in Jones v. Light Field Lab Inc. alleges that "most of Light Field Lab's patent portfolio is tied to these provisional applications either directly or indirectly." If the foundational patents are tainted, the taint could extend across the portfolio.

### C. USPTO Referral

A formal complaint regarding the duty-of-disclosure violations will be filed with the USPTO Office of Enrollment and Discipline. The complaint is supported by publicly available patent records. Discovery in the federal case will provide additional supporting evidence. Any resulting investigation may independently render the patents unenforceable.

## IV. IMPLICATIONS FOR THE ASSIGNEE

### A. Fiduciary Duty to Investigate

The Assignee has a fiduciary duty to all creditors. Selling patents with known fraud defects without investigation would breach that duty. The Assignee cannot rely on the Assignor's representations about the portfolio's value (Section 10(b) of the General Assignment protects reliance on the Assignor's statements only "in the absence of bad faith" – but the Assignee now has actual notice of fraud).

### B. Duty to Disclose to Buyers

If the Assignee proceeds to sell any patents, it must disclose to potential buyers: - The fraud allegations documented in this notice - The pending federal litigation (Case No. 3:25-cv-05118-MMC) - The regulatory referrals to at least the USPTO, FBI, DOJ, SEC, and California AG - The risk of unenforceability under *Therasense* - The risk of infectious unenforceability across the portfolio

Failure to disclose could constitute fraud on the buyers and expose the Assignee to personal liability.

### C. Buyer's Risk

Any buyer of the patent portfolio who has notice of these defects: - Cannot claim bona fide purchaser status - Acquires patents subject to potential unenforceability - May face challenges from Jones under the constructive trust theory (the patents incorporate Jones's work product obtained through fraud) - May face challenges from Lytro/Google (the patents are built on Lytro's prior art)

### D. Assignee's Personal Liability

Section 10 of the General Assignment provides that the Assignee is not liable "except for its own misconduct knowingly and intentionally committed in bad faith." Selling fraud-tainted patents after receiving this formal notice – without investigation and without disclosure to buyers – may constitute bad faith.

## V. DEMAND

Alan Jones hereby demands that the Assignee:

1. **Investigate** the patent portfolio's validity and provenance before any sale
2. **Engage independent patent counsel** (not LFL's prior counsel or any counsel connected with LFL, it's executives, board members, patent prosecutors, or such entity which ever held such a relationship) to evaluate the inequitable conduct allegations
3. **Disclose** this notice and all known defects to any potential patent buyers
4. **Not sell** any patents until the investigation is complete and the results are shared with creditors
5. **Not represent** the patents as valid or enforceable without first addressing the fraud allegations
6. **Preserve** all documents relating to the patent prosecution history, prior art searches, and inventor declarations
7. **Provide notice** to Jones before any patent sale

## VI. RESERVATION OF RIGHTS

Jones reserves all rights, including but not limited to: - The right to seek injunctive relief in federal or state court to prevent the sale of fraud-tainted patents - The right to notify potential buyers directly of the patent defects - The right to seek removal of the Assignee if it fails to act on this notice - The right to file a UVTA challenge to the ABC itself - All rights under the pending federal case, regulatory complaints, and California law

Respectfully submitted,

Alan Jones Date: 2/16/2026

*Notice A – Fraud-Tainted Patent Portfolio*                                     Page 3 of 3

# Notice B – Constructive Trust Over Source Code / IP

## Formal Demand to Segregate IP Obtained Through Fraud

February 2026

## NOTICE B: CONSTRUCTIVE TRUST OVER SOURCE CODE AND IP

## FORMAL NOTICE AND DEMAND TO CMBG FBC-LIGHT FIELD LAB LLC: ASSIGNEE FOR THE BENEFIT OF CREDITORS OF LIGHT FIELD LAB, INC.

---

**FROM:** Alan Jones, Creditor / Equitable Owner

**TO:** CMBG FBC-Light Field Lab LLC
3019 Wilshire Blvd Suite 142, Santa Monica, CA 90403

**DATE:** February 18, 2026

**RE:** Constructive Trust Claim Over Source Code and Intellectual Property Created by Alan Jones – Demand to Segregate and Not Sell

---

## I. PURPOSE

This notice formally asserts a constructive trust under Cal. Civ. Code 2224 over all source code, inventions, and intellectual property created by Alan Jones during his employment at Light Field Lab, Inc. ("LFL") from September 30, 2019 through June 23, 2023. This property was obtained by LFL through a fraudulently induced IP assignment agreement (the Confidentiality and Proprietary Rights Agreement ("CPRA"), signed September 9, 2019). The Assignee holds this property as an involuntary trustee for Jones. It is not part of the ABC estate and must not be sold or distributed to creditors.

## II. LEGAL BASIS

### A. Cal. Civ. Code 2224

> "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

LFL gained Jones's intellectual property through fraud – specifically, through a Confidentiality and Proprietary Rights Agreement ("CPRA") signed September 9, 2019 that was procured through fraudulent inducement. Under Section 2224, LFL held Jones's IP as an involuntary trustee. When LFL transferred all assets to the Assignee, the Assignee received the IP subject to the same constructive trust.

## B. Voidable Contract

Under California law, a contract obtained through fraud is voidable at the election of the defrauded party. Cal. Civ. Code 1689(b)(1); *Lazar v. Superior Court*, 12 Cal.4th 631 (1996). Jones elects to void the CPRA. When voided, the IP assignments made thereunder are void *ab initio* – they never took effect. The inventions and source code never validly transferred to LFL and therefore never validly transferred to the Assignee.

## C. Nemo Dat Quod Non Habet

The Assignee cannot convey greater rights than the Assignor had. If LFL did not validly own Jones's IP (because the assignment was voidable for fraud), the Assignee does not own it either. Any sale of Jones's IP by the Assignee would be selling property it does not own.

## D. Property Not Part of the Estate

Property held in constructive trust is not part of the debtor's estate. The constructive trust beneficiary (Jones) recovers as the equitable owner of specific property, not as a creditor competing for pro-rata distribution. This is the most powerful priority mechanism available because it removes the property from the distribution waterfall entirely.

# III. THE FRAUD

The CPRA was obtained through fraudulent inducement. At the time Jones signed:

1. LFL's officers (Karafin and Bevensee) concealed that LFL's patent portfolio was built on technology taken from Lytro, Inc. with renamed terminology
2. The founders had filed competing patents while still employed at Lytro
3. Patent declarations contained false certifications
4. The patent portfolio was subject to potential unenforceability
5. The company sought and obtained millions in funding using a patent portfolio the founders knew was tainted by fraud, without disclosing the prior art relationship

These facts are directly material to an IP assignment agreement. A reasonable person would not assign inventions to individuals with a documented pattern of dishonest IP practices.

This fraud is the subject of pending federal litigation: Jones v. Light Field Lab Inc., Case No. 3:25-cv-05118-MMC (N.D. Cal.), alleging seven causes of action including fraud and deceit, violation of Cal. Penal Code 484 & 496 (treble damages), civil RICO, breach of fiduciary duty, and voidable transfer under Cal. Civ. Code 3439.04(a)(1) (specifically challenging the ABC transfer to CMBG).

Formal complaints regarding the criminal conduct will be filed with at least the FBI, DOJ, SEC, USPTO, and California Attorney General. Discovery in the federal case will provide additional supporting evidence.

# IV. PROPERTY SUBJECT TO THE CONSTRUCTIVE TRUST

The following intellectual property created by Jones during his employment (September 30, 2019 – June 23, 2023) is subject to the constructive trust:

1. **All source code** authored by Jones during his employment (September 30, 2019 – June 23, 2023), across all repositories
2. **All derivative works** – any source code, modules, libraries, or systems derived from, built upon, or incorporating code authored by Jones
3. **All rendered imagery, animations, interactive experiences, demos, and visual content** produced using Jones's rendering code or derived from his rendering pipeline – Jones developed core rendering software used across LFL's operations, making virtually all rendered output and interactive content a derivative work of his code
4. **All art, visual effects, and creative works** directly produced by Jones during his employment
5. **Inventions and technical innovations** developed by Jones

6. **Technical designs, specifications, and documentation** created by Jones
7. **Any patents or patent applications** listing Jones as inventor or incorporating Jones's work

The Assignee holds the source code repositories and version control history (e.g., Git) for all LFL software development. However, given the documented pattern of fraud by LFL's principals, the attribution records in these repositories cannot be accepted at face value. Repository provenance can be compromised in ways ranging from subtle to total: history can be rewritten, commit authors can be changed, files can be moved or renamed – or, at the extreme, entirely new repositories can be created from scratch with fabricated history, with Jones's code re-committed under different authors and no forensic trace of the original provenance. LFL's principals had both the means and the motive to alter or replace repository history before transferring assets to the estate.

The scope of Jones's constructive trust claim is not limited to what the repository currently attributes to him. It extends to all work he actually performed, regardless of what the potentially tampered or fabricated records may show. Jones does not have access to these repositories following his termination.

Jones demands that the Assignee engage an independent forensic software expert – not any engineer, contractor, or consultant previously retained by LFL – to conduct a thorough review of the repositories and identify the full scope of Jones's contributions. The expert's analysis must go beyond surface-level attribution records (which may have been fabricated) and include substantive code analysis: coding style and patterns, architecture and design decisions, technical approach, and comparison with any samples Jones can provide. The expert must also examine any available forensic artifacts (reflogs, backup references, timestamp inconsistencies, server-side logs) – while recognizing that the absence of such artifacts does not establish integrity, as repositories may have been recreated entirely. The Assignee must preserve all repository data, metadata, backup copies, server-side logs, CI/CD build logs, code review records, and any other data that may contain evidence of true authorship. Any destruction of this data constitutes spoliation of evidence.

The constructive trust extends to all derivative works. Code built upon Jones's original contributions carries the same taint as the original – the Assignee cannot launder fraudulently obtained property by building upon it.

# V. DEMAND

Alan Jones hereby demands that the Assignee immediately:

1. **Segregate** all source code, inventions, and intellectual property created by Jones during his employment at LFL – this property is not part of the ABC estate
2. **Not sell, license, transfer, or distribute** any of Jones's IP to any party
3. **Not include** Jones's IP in any patent portfolio sale, IP license bundle, or asset transfer
4. **Identify** all IP assets that incorporate Jones's work product and provide a list to Jones
5. **Preserve** all source code repositories, version control history, and documentation reflecting Jones's contributions
6. **Engage an independent forensic software expert** – not any engineer, contractor, or consultant previously retained by LFL – to review the source code repositories and identify the full scope of Jones's contributions through substantive code analysis, not relying solely on repository attribution records which may have been altered or fabricated
7. **Provide notice** to Jones before any proposed sale or distribution of IP assets, to allow Jones to identify and assert his property rights
8. **Identify** all third-party purchasers to whom any of Jones's IP has been sold, licensed, or transferred, including the identity of each purchaser, the date, the terms, and the consideration received
9. **Cooperate fully** in the recovery of Jones's IP from any third-party purchasers – this obligation flows from the Assignee's fiduciary duty and the constructive trust (Probate Code 16060-16061 by analogy; Cal. Civ. Code 3439.07(a)(3)(C))
10. **Provide a complete accounting** of all dispositions of IP assets from the estate, sufficient to allow Jones to trace his property and its proceeds
11. **Preserve all records** relating to disposed IP, including communications with purchasers, due diligence materials, and sale agreements

Jones notes that the UVTA (Cal. Civ. Code 3439.07(a)(3)(C)) provides that a court may grant "any other relief the circumstances may require" in an action for voidable transfer. The ABC was initiated after Jones's federal lawsuit was filed, satisfying the statutory badge of fraud under Civ. Code 3439.04(b)(4). If the Assignee has disposed of Jones's IP at prices below fair market value, the Assignee may have participated in a scheme to reduce the estate's value and limit Jones's recovery. The Assignee's full cooperation and disclosure is not optional – it is a legal obligation.

## VI. CONSEQUENCES OF NON-COMPLIANCE

If the Assignee sells, licenses, or distributes Jones's IP despite this notice:

1. **The Assignee breaches its fiduciary duty** to Jones as a claimant and equitable owner
2. **The Assignee may be personally liable** under Section 10 of the General Assignment (bad faith exception) for knowingly selling property it has been notified does not belong to the estate
3. **The buyer acquires subject to the constructive trust** – Jones may pursue the buyer for return of the property or its value
4. **Jones may seek injunctive relief** in federal or state court to prevent or reverse the transfer
5. **The sale may constitute conversion** of Jones's property

**Note on Voidable Transfer (UVTA)**

The 7th Cause of Action in the pending FAC specifically challenges the ABC transfer itself as a voidable transaction under Cal. Civ. Code 3439.04(a)(1). The timing of the ABC – initiated after Jones filed his federal lawsuit alleging fraud – is a statutory badge of fraud (Civ. Code 3439.04(b)(4)). The transfer of substantially all assets is another (3439.04(b)(5)). If the ABC was structured to liquidate assets at artificially depressed prices, this would constitute additional evidence of actual intent to hinder, delay, or defraud creditors. The Assignee should be aware that any fire-sale disposition of Jones's IP will be scrutinized under this standard.

## VII. RESERVATION OF RIGHTS

Jones reserves all rights, including: - Right to seek preliminary or permanent injunction preventing sale of his IP - Right to amend or supplement this notice with additional identification of specific IP - Right to pursue the constructive trust claim in federal court (Case No. 3:25-cv-05118-MMC) - Right to seek removal of the Assignee if it fails to honor this notice - All rights under Cal. Civ. Code 2224, Cal. Penal Code 496(c), and all other applicable law

---

Respectfully submitted,

Alan Jones Date: 2/16/2026

# Notice C – Reserve Funds / Pending Litigation

## Demand to Reserve Under Section 5(h)(vi) of General Assignment

February 2026

## NOTICE C: DEMAND TO RESERVE FUNDS FOR PENDING LITIGATION

## FORMAL DEMAND TO CMBG FBC-LIGHT FIELD LAB LLC

## ASSIGNEE FOR THE BENEFIT OF CREDITORS OF LIGHT FIELD LAB, INC.

---

**FROM:** Alan Jones, Creditor / Claimant

**TO:** CMBG FBC-Light Field Lab LLC 3019 Wilshire Blvd Suite 142, Santa Monica, CA 90403

**DATE:** February 18, 2026

**RE:** Demand to Reserve Funds Under Section 5(h)(vi) of General Assignment – Pending Federal Litigation and Regulatory Referrals

---

## I. PURPOSE

This notice demands that the Assignee reserve adequate funds for Alan Jones's claims pursuant to Section 5(h)(vi) of the General Assignment for the Benefit of Creditors, dated August 15, 2025. Jones's claims are disputed and contingent, and the General Assignment expressly requires the Assignee to "fully reserve" for disputed claims until resolved. Given the potential for treble damages under Cal. Penal Code 496(c), the reserve must be substantial.

## II. CONTRACTUAL OBLIGATION TO RESERVE

Section 5(h)(vi) of the General Assignment provides:

> "No payment shall be made to any creditor whose claim is otherwise disputed until such time as that creditor's claim is resolved. The creditor's otherwise pro-rata share of such distribution shall be fully reserved for by the Assignee until such time as the dispute is resolved."

Jones's claims are disputed (the Assignor contests liability in the pending federal litigation). Under this provision, the Assignee:

1. **Must not distribute** Jones's pro-rata share to other creditors

2. **Must fully reserve** Jones's share until all disputes are resolved – including the pending federal case, any regulatory investigations arising from the referrals described herein, and any criminal proceedings that may follow

3. **Must calculate the reserve** based on the full potential claim amount, including treble damages

## III. PENDING FEDERAL LITIGATION

**Case:** Jones v. Light Field Lab Inc., Case No. 3:25-cv-05118-MMC
**Court:** United States District Court, Northern District of California
**Judge:** Hon. Maxine M. Chesney
**Status:** First Amended Complaint filed.

**Claims (7 Causes of Action):** 1. Retaliatory termination (Cal. Lab. Code 1102.5) 2. Wrongful termination in violation of public policy 3. Fraud and deceit 4. Violation of Cal. Penal Code 484 & 496 (treble damages) 5. Civil RICO (18 U.S.C. 1962(c)) 6. Breach of fiduciary duty 7. Voidable transfer under Cal. Civ. Code 3439.04(a)(1) – specifically challenging the ABC transfer to CMBG as a fraudulent conveyance

**Defendants:** Light Field Lab, Inc., Jon Karafin, Brendan Bevensee

## IV. REGULATORY REFERRALS

Formal complaints regarding the criminal conduct underlying Jones's claims will be filed with at least the following agencies. The complaints are supported by publicly available evidence that independently establishes the conduct. Discovery in the pending federal case and the Assignee's response to these claims will provide additional supporting evidence:

| Agency | Subject | Potential Impact on Estate |
| --- | --- | --- |
| **FBI** | False statements, wire fraud, RICO, economic espionage | Federal investigation may lead to asset forfeiture; MVRA restitution order creates super-priority lien |
| **DOJ** (Criminal Division) | Wire fraud, false statements, RICO, economic espionage | Same as FBI; DOJ Whistleblower Pilot Program applicable |
| **SEC** (TCR) | Securities fraud, material misrepresentation of patent portfolio to investors | SEC investigation may freeze assets or affect distribution |
| **USPTO** (OED) | Inequitable conduct, duty of disclosure violations | Patents may be rendered unenforceable – reducing estate value to zero for patent assets |
| **CA Attorney General** | Corporate fraud, securities fraud, UVTA, PC 496/531/532 | State investigation may enjoin distributions; criminal prosecution under PC 531 (fraudulent conveyance) |

These complaints will be filed before the federal case concludes. Any resulting investigations may result in proceedings that: - Freeze estate assets - Subject patents to forfeiture - Render patents unenforceable (reducing their sale value) - Create super-priority liens (federal restitution under MVRA) - Elevate Jones's claims above general unsecured status

Additionally, the 7th Cause of Action in the FAC (UVTA) specifically challenges the ABC transfer itself as a voidable transaction under Cal. Civ. Code 3439.04(a)(1). The ABC satisfies multiple statutory badges

of fraud: the transfer occurred after the debtor was sued (Civ. Code 3439.04(b)(4)), and the transfer was of substantially all the debtor's assets (Civ. Code 3439.04(b)(5)). If this claim succeeds, the entire transfer to the Assignee may be voided, and the court may order avoidance of the transfer, attachment, injunctive relief, or appointment of a receiver (Civ. Code 3439.07). The Assignee is distributing assets that are the subject of a pending federal court challenge to the transfer itself.

The Assignee must account for these possibilities when calculating the reserve.

## V. POTENTIAL CLAIM EXPOSURE

### A. Direct Damages

| Component | Amount |
| --- | --- |
| Cash invested to exercise options | $56,437.50 |
| Lost compensation from leaving prior employment based on fraudulent representations | Approximately $2 million (to be determined at trial) |
| Lost equity value | TBD (unliquidated) |
| Emotional distress | TBD (unliquidated) |

Jones left a senior position at Microsoft to accept employment at LFL based on representations about the company's technology, patent portfolio, and equity value that were materially false. The total actual damages from this fraudulently induced career change are approximately $2 million (to be determined at trial).

### B. Treble Damages Under Cal. Penal Code 496(c)

Under *Siry Investment, L.P. v. Farkhondehpour*, 13 Cal.5th 333 (2022), Jones is entitled to three times actual damages if the property was "obtained in any manner constituting theft." Applied to the full scope of actual damages:

Approximately $2 million x 3 = approximately $6 million

The treble multiplier applies to all damages components established at trial, not merely the direct cash investment.

### C. Punitive Damages

Punitive damages are also sought in the federal case. Under California law, punitive damages are available where the defendant acted with malice, oppression, or fraud. Cal. Civ. Code 3294.

### D. Attorney Fees

Cal. Penal Code 496(c) provides for reasonable attorney fees in addition to treble damages.

### E. Constructive Trust

Separate from monetary damages, Jones asserts a constructive trust over specific IP and source code (see companion Notice B). If successful, this removes property from the estate entirely – further reducing the assets available for other creditors and increasing the proportional impact of Jones's monetary claim.

### F. RICO

If the RICO claim succeeds, Jones is entitled to treble damages under 18 U.S.C. 1964(c), plus attorney fees.

### G. Wrongful Termination Damages – Potential Reclassification

The wrongful termination claim (POC #2) is currently classified with wage components at 4th priority and non-wage damages at 6th priority (general unsecured). However, discovery in the pending federal case may establish that Jones's termination was an overt act in furtherance of the fraud scheme – executed to prevent his discovery of the patent fraud and to enable the continued patenting of his work. If this nexus is established, the wrongful termination damages become consequential damages of the criminal conduct and are subject to reclassification as crime victim damages with elevated priority, including treble damages under Cal. Penal Code 496(c). See POC #2 Section G for the full legal analysis. The Assignee must account for this contingency when calculating reserves.

### H. Total Potential Exposure

The total potential exposure to the estate from Jones's claims is substantial. With approximately $2 million in actual damages (to be determined at trial), treble damages of approximately $6 million under Cal. Penal Code 496(c), punitive damages up to ten times actual under California law, RICO treble damages under 18 U.S.C. 1964(c), plus emotional distress and attorney fees, the total potential exposure is in the tens of millions of dollars. The Assignee should reserve conservatively for the full scope of potential liability.

## VI. CRIME VICTIM PRIORITY

As established in the companion POC #1 (Crime Victim Claim), Jones asserts crime victim priority based on evidence that conclusively establishes criminal conduct. Criminal conviction is not a prerequisite – Cal. Penal Code 496(c) provides treble damages on a preponderance-of-evidence standard (*Siry Investment, L.P. v. Farkhondehpour*, 13 Cal.5th 333 (2022)), and Cal. Civ. Code 2224 imposes a constructive trust on property "gained by fraud" without requiring conviction. The evidence (patent comparison showing six components renamed one-for-one, false inventor declarations signed under penalty of perjury, filing timeline while still employed at Lytro) establishes theft by false pretenses as a matter of law.

Additionally, multiple legal mechanisms may further elevate Jones's claim priority as proceedings progress:

### Tier 1: Constructive Trust (Cal. Civ. Code 2224)

If a court determines that a constructive trust applies, specific property is removed from the estate entirely. This is available without criminal proceedings.

### Tier 2: Federal Restitution Lien (18 U.S.C. 3613)

If federal criminal proceedings result in an MVRA restitution order, it creates a lien with the same priority as a perfected IRS tax lien – ahead of all unsecured creditors, ahead of state taxes, ahead of priority wages.

### Tier 3: State Restitution Lien (Cal. Penal Code 1214)

If state criminal proceedings result in a restitution order, it is enforceable as a civil money judgment and creates a lien on the defendant's property (Cal. Penal Code 1214).

### Tier 4: Marsy's Law (Cal. Const. Art. I, Sec. 28(b))

Constitutional mandate that all money collected from a convicted wrongdoer go first to victim restitution. Arguably applies to ABC proceedings where the wrongdoer's assets are being liquidated.

The Assignee must reserve not just for the current claim amount, but for the possibility that the claim's priority may be elevated by any of these mechanisms.

## VII. DEMAND

Alan Jones hereby demands that the Assignee:

1. **Fully reserve** Jones's pro-rata share of any distributions pursuant to Section 5(h)(vi) of the General Assignment
2. **Calculate the reserve** based on the total potential claim amount including treble damages (approximately $6 million on approximately $2 million in actual damages, before punitive damages, RICO treble, or attorney fees)
3. **Not distribute** any funds to general unsecured creditors without first ensuring adequate reserves for Jones's disputed claims
4. **Adjust the reserve upward** if criminal proceedings are initiated that may elevate Jones's claim priority
5. **Provide notice** to Jones before any distribution to unsecured creditors
6. **Maintain the reserve** until all pending and reasonably anticipated proceedings are resolved, including:
   - The pending federal case (Case No. 3:25-cv-05118-MMC), including any appeals
   - Any regulatory investigations arising from the referrals to the FBI, DOJ, SEC, USPTO, and California Attorney General
   - Any criminal proceedings that may result from those investigations
   - Any restitution proceedings (federal under MVRA or state under Cal. Penal Code 1202.4) The Assignee has been formally notified of these referrals and the resulting proceedings are not speculative – they are reasonably anticipated. The Assignee's fiduciary duty requires reserving for reasonably foreseeable claims, not merely pending ones
7. **Provide an accounting** of the estate's assets, liabilities, and proposed distribution plan to Jones as a creditor with disputed claims

## VIII. APPLICABLE LAW

The General Assignment (Section 5(h)(ix)) provides:

> "In the event that the language in this General Assignment document is deemed to be inconsistent with applicable law, then applicable law shall govern."

Applicable law includes: - Cal. Civ. Code 2224 (constructive trust – property removed from estate) - Cal. Penal Code 496(c) (treble damages for property obtained through theft) - Cal. Penal Code 1202.4, 1214 (crime victim restitution) - Cal. Const. Art. I, Sec. 28(b) (Marsy's Law – victim restitution priority) - 18 U.S.C. 3613 (federal restitution lien – IRS tax lien priority) - Cal. Civ. Code 3439 (UVTA – voidable transactions)

To the extent any provision of the General Assignment is inconsistent with these statutes and constitutional provisions, applicable law governs.

## IX. ASSIGNEE'S PERSONAL LIABILITY

Section 10 of the General Assignment limits the Assignee's liability "except for its own misconduct knowingly and intentionally committed in bad faith."

The Assignee has now received: - Formal notice of fraud in the patent portfolio (Notice A) - Formal assertion of a constructive trust over specific IP (Notice B) - This demand to reserve funds (Notice C) - Proof of Claim #1 (crime victim claim – fraudulent inducement damages with priority assertion) - Proof of Claim #2 (wrongful termination – wage priority) - Proof of Claim #3 (constructive trust / IP reclamation) - Notice that regulatory complaints will be filed with at least five federal and state agencies

Distributing estate assets without adequate investigation and reservation – while in possession of these notices – constitutes bad faith within the meaning of Section 10.

## X. RESERVATION OF RIGHTS

Jones reserves all rights, including: - Right to seek injunctive relief to prevent distributions that violate the reserve obligation - Right to challenge any distribution made without adequate reservation - Right to amend

claims if criminal proceedings elevate priority - Right to seek removal of the Assignee if it fails to honor its fiduciary obligations - Right to bring a UVTA challenge to the ABC itself - All rights under the pending federal case, regulatory complaints, and applicable law

———————————————————

Respectfully submitted,

Alan Jones Date: 2/18/2026

                
Home    My Network    Jobs    Messaging    Notifications    Me ▾    For Business ▾    Try Premium f



## Brendan Bevensee · 1st
CTO and Co-Founder at Light Field Lab, Inc


- Light Field Lab, Inc.


- University of Pennsylvania

San Francisco Bay Area · Contact info

**500+ connections**

 Jeffrey Todd Barnes, Tommy Furukawa, and 29 other mutual connections

Message    More

## Highlights

 **You both worked at Light Field Lab, Inc.**
You both worked at Light Field Lab, Inc. from September 2019 to June 2023

✈ Message

## About

Real holograms. No headgear.

Light Field Lab is building the world's most innovative holographic ecosystem. The company was founded in 2017 by Jon Karafin, Brendan Bevensee, and Ed Ibe, with...

## Activity
1,697 followers

**Brendan Bevensee** commented on a post • 2mo
Fantastic! Congrats.

**Brendan Bevensee** commented on a post • 6mo
Congrats Ann! 🎉. Great to see!!

**Brendan Bevensee** commented on a post • 7mo
Bravo! Vastly superior.

Show all comments →

## Experience



**CTO and Co-founder**
Light Field Lab, Inc.
Apr 2017 - Present · 8 yrs 3 mos
Silicon Valley, CA

Real holograms. No headgear.
...



**Lytro, Inc**
4 yrs 11 mos
Mountain View, CA

**Lead Engineer, Light Field Video**
Jul 2015 - Mar 2017 · 1 yr 9 mos

Leading a multidisciplinary team that has created Lytro Cinema, the world's highest resolution video camera (755 megapixels) and the world's first ligh...

 

**Member of Technical Staff, Team Lead**
May 2012 - Jun 2015 · 3 yrs 2 mos

Architect of optical calibration and test for the Lytro ILLUM product line. Designed the optical test stations. Authored much of the code base,...

**Principal Electro-Optical Engineer**
Aegis Lightwave
Jun 2008 - Jun 2012 · 4 yrs 1 mo

Developed an Optical Channel Monitor for DWDM networks. Did R&D and scaled production from the prototype stage to full scale production at a C...

**Electro-Optical Engineer**
Photuris (also Mahi / Meriton Networks)
Aug 2000 - May 2008 · 7 yrs 10 mos
Piscataway, NJ

Worked on team that developed the world's first commercially available fully reconfigurable optical add/drop multiplexer (ROADM) for an optical...



**Staff Scientist**
MIT Lincoln Laboratory
1999 - 2000 · 1 yr
Lexington, MA

Constructed an 850-km fiber optic link between Boston and Washington (Bossnet) for DARPA.

Show all 7 experiences →

## Education



**University of Pennsylvania**
PhD, Physics



**University of California, Davis**
BA, Physics, Math

## Skills

**Product Development**

 Endorsed by Paul H. and 1 other who is highly skilled at this

 Endorsed by Jared Perez (mutual connection)



👥 14 endorsements

[ Endorse ]

**Production Management**

Endorsed by Jeffrey Todd Barnes who is highly skilled at this

Endorsed by Jeffrey Todd Barnes (mutual connection)

👥 3 endorsements

[ Endorse ]

Show all 18 skills →

## Recommendations

[ Recommend Brendan ]

**Received**        Given

**Nothing to see for now**
Recommendations that Brendan receives will appear here.

## Interests

**Top Voices**      Companies      Groups      Schools

Natalie (Corporate Natalie) 🔗 · 3rd
2023 LinkedIn Top Voice | Content Creator | CEO of Work-From-Home Jokes | Advisor | Brand Consultant
196,637 followers

[ + Follow ]

Sebastian Winkler 🔗 · 2nd
Yo, we got this! 💪 I help master digital complexity with empathy, speed, & innovation – driving sustainable value creation in corporate culture, technology, and business models.
24,223 followers

[ + Follow ]



**More profiles for you**

Jon Karafin 🔗 · 1st
CEO and Co-Founder at Light Field Lab, Inc.

[ ⟟ Message ]

Jeffrey Todd Barnes 🔗 · 1st
Executive Producer, Creative Development, Business Development, Marketing, Operations, Visual Effects and Immersive Media Production

[ ⟟ Message ]

John Dohm ☑ · 1st
Entrepreneurial C-suite Executive, Kellogg MBA— Leveraging Technology to Deliver Exponential Business Growth | Global Operations, Organization...

[ ⟟ Message ]



**Ed Ibe** · 1st
VP Engineering and Co-founder

⟳ Message

**Jorge Díaz-Amador** · 2nd
Sr. Engineering Technician, Optical Systems and Computer Vision

+ Follow

Show all

**Explore Premium profiles**

**Ameen Tayyebi** 🔳 · 3rd
Architect @ Oracle

⟳ Message

**Kenneth Kegley** 🔳 · 2nd
design director @ deutsch
governor [at] television academy...

⊘ Connect

**David Cottam** 🔳 · 2nd
Lead Character Artist at Visual Concepts

⊘ Connect

**Flora May D.** 🔳 · 3rd
Senior Product Designer at Microsoft

Message

**People you may know**
From Brendan's industry

**Martin Hall** ☑
Visual Effects Supervisor

⊘ Connect

**Steve Joner**
Production Designer at Film Industry

⊘ Connect

**Priscilla Firstenberg**
No Solicitors | CEO & Creative Director

⊘ Connect

**Dan Sumich** ☑
Available for Supervising Director/ Episode Director/ Creative Director/ Art
Director/ Look Dev/ Character Design/ Storyboarding and Animated Series...

⊘ Connect

**Caprice Ridgeway** 🔳
3D Producer/Manager at CBS VFX - Paramount



| Number | | Shares |
|---|---|---|
| CS-13 | | 10,000 |



# Light Field Lab

INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE

This certifies that **Alan Jones** is the stockholder of Ten Thousand (10,000) fully paid and non-assessable shares of Common Stock, par value $ 0.0001, of Light Field Lab, hereinafter designated the "Corporation", transferable on the books of the Corporation in person or by duly authorized attorney upon surrender of the certificate properly endorsed. This Certificate and the shares represented hereby, are issued and shall be held subject to all of the provisions of the Certificate of Incorporation and the bylaws of the Corporation, to all of which each holder, by acceptance hereof, assents, and agrees to be bound.

A statement of the rights, preferences, privileges and restrictions granted to or imposed upon each class or series of shares of stock of the Corporation authorized to be issued and upon the holders thereof as established by the Certificate of Incorporation or by any certificate of amendment may be obtained by any stockholder upon request and without charge at the principal office of the Corporation. TRANSFER OF THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE RESTRICTED. SEE LEGENDS ON REVERSE SIDE.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers, effective as of December 10, 2020.

*Jonathan Karafin*

Jonathan Karafin, President

*Brendan Bevensee*

Brendan Bevensee, Secretary

THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT

RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

THE SECURITIES REFERENCED HEREIN MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY AT NO CHARGE.

## Acceptance agreement

When accepting this certificate on Carta, the share holder agreed to the following:

I hereby acknowledge the receipt of the following electronic certificate:

CS-13 to Alan Jones for 10,000 shares of Common Stock

Executed January 6th, 2021

By: Alan Jones

*Alan Jones*
_____

Alan Jones

01/06/2021    🔒 db02999c-e1af-4ccd-93ab-73014066476b

💡 This certificate was created from the exercise of option grant ES-25 .

📄 **Light Field Lab's account is locked**
Because Light Field Lab's account is locked, the information shown here may be out of date.
For questions about this security, contact the company directly.

## Shareholder

| Name | Alan Jones |
| --- | --- |
| Email | alan@jones.how |
| Status | Canceled |

## Certificate

| Share class | Common (certificated) |
| --- | --- |
| Quantity | 10,000 shares |
| Cash paid ⓘ | $7,000.00 (USD) |
| Price per share ⓘ | $0.70 (USD) |
| Original acquisition date ⓘ | Dec 10, 2020 |
| Cost basis ⓘ | $7,000.00 (USD) |
| Certificate front and back |   |

## Issuer

| Issued by | Light Field Lab |
| --- | --- |
| Issue date | Dec 10, 2020 |
| Original issue date | Dec 10, 2020 |

## Cancellation details

| Date | Jul 13, 2025 |
| --- | --- |
| | 10,000 shares are canceled and do not return to the equity plan. |
| Reason | Other |

## Legend

Transfer restrictions are described by the following legend included on this certificate.

THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT
RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

THE SECURITIES REFERENCED HEREIN MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY AT NO CHARGE.

## Approvals

✓ **Initiated by Alan Jones**
Approved Dec. 28, 2020    🖨 71601e082f4d4ce782ea3e069e30b290

✓ **Signed by Jon Karafin**
Approved Dec. 31, 2020    🖨 f7bedd26f8234532bd207cf488377a72

✓ **Signed by Brendan Bevensee**
Approved Jan. 6, 2021    🖨 502cbc56af8f4a9888662ea66997705a

✓ **Received by Alan Jones**
Approved Jan. 6, 2021    🖨 db02999ce1af4ccd93ab73014066476b

## Documents and notes

| Notes | Canceled due to Offboarding |
|-------|------------------------------|



**Number**
CS-14

**Shares**
20,000



# Light Field Lab

INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE

This certifies that **Alan Jones** is the stockholder of Twenty Thousand (20,000) fully paid and non-assessable shares of Common Stock, par value $ 0.0001, of Light Field Lab, hereinafter designated the "Corporation", transferable on the books of the Corporation in person or by duly authorized attorney upon surrender of the certificate properly endorsed. This Certificate and the shares represented hereby, are issued and shall be held subject to all of the provisions of the Certificate of Incorporation and the bylaws of the Corporation, to all of which each holder, by acceptance hereof, assents, and agrees to be bound.

A statement of the rights, preferences, privileges and restrictions granted to or imposed upon each class or series of shares of stock of the Corporation authorized to be issued and upon the holders thereof as established by the Certificate of Incorporation or by any certificate of amendment may be obtained by any stockholder upon request and without charge at the principal office of the Corporation. TRANSFER OF THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE RESTRICTED. SEE LEGENDS ON REVERSE SIDE.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers, effective as of December 28, 2020.

*Jonathan Karafin*
—————————————
Jonathan Karafin, President

*Brendan Bevensee*
—————————————
Brendan Bevensee, Secretary



THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT

RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

THE SECURITIES REFERENCED HEREIN MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY AT NO CHARGE.

Acceptance agreement

When accepting this certificate on Carta, the share holder agreed to the following:

I hereby acknowledge the receipt of the following electronic certificate:

CS-14 to Alan Jones for 20,000 shares of Common Stock

Executed January 13th, 2021

By: Alan Jones

*Alan Jones*

Alan Jones

01/13/2021   🔒 2e846624-207d-4fa4-8b36-befbfd0401d4

This certificate was created from the exercise of option grant ES-25 .

**Light Field Lab's account is locked**
Because Light Field Lab's account is locked, the information shown here may be out of date.
For questions about this security, contact the company directly.

## Shareholder

| Name | Alan Jones |
|---|---|
| Email | alan@jones.how |
| Status | Canceled |

## Certificate

| Share class | Common (certificated) |
|---|---|
| Quantity | 20,000 shares |
| Cash paid ⓘ | $14,000.00 (USD) |
| Price per share ⓘ | $0.70 (USD) |
| Original acquisition date ⓘ | Dec 28, 2020 |
| Cost basis ⓘ | $14,000.00 (USD) |
| Certificate front and back |   |

## Issuer

| Issued by | Light Field Lab |
|---|---|
| Issue date | Dec 28, 2020 |
| Original issue date | Dec 28, 2020 |

## Cancellation details

| Date | Jul 13, 2025 |
|---|---|
| | 20,000 shares are canceled and do not return to the equity plan. |
| Reason | Other |

## Legend

Transfer restrictions are described by the following legend included on this certificate.

THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT
RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

THE SECURITIES REFERENCED HEREIN MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY AT NO CHARGE.

## Approvals

✓ Initiated by Alan Jones
Approved Jan. 7, 2021    🔒 36cba32f1d17436dbb0c9d78f1ecbea9

✓ Signed by Jon Karafin
Approved Jan. 13, 2021   🔒 8e8f1ef4ed264eb2b0e75444f03f75f2

✓ Signed by Brendan Bevensee
Approved Jan. 7, 2021    🔒 92f52101753a42c39e74ccecfd05e39a

✓ Received by Alan Jones
Approved Jan. 13, 2021   🔒 2e846624207d4fa48b36befbfd0401d4

## Documents and notes

| Notes | Canceled due to Offboarding |
|---|---|



**Number**
CS-15

**Shares**
50,625



# LIGHT FIELD LAB
## Light Field Lab



INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE

This certifies that **Alan Jones** is the stockholder of Fifty Thousand Six Hundred Twenty-Five (50,625) fully paid and non-assessable shares of Common Stock, par value $ 0.0001, of Light Field Lab, hereinafter designated the "Corporation", transferable on the books of the Corporation in person or by duly authorized attorney upon surrender of the certificate properly endorsed. This Certificate and the shares represented hereby, are issued and shall be held subject to all of the provisions of the Certificate of Incorporation and the bylaws of the Corporation, to all of which each holder, by acceptance hereof, assents, and agrees to be bound.

A statement of the rights, preferences, privileges and restrictions granted to or imposed upon each class or series of shares of stock of the Corporation authorized to be issued and upon the holders thereof as established by the Certificate of Incorporation or by any certificate of amendment may be obtained by any stockholder upon request and without charge at the principal office of the Corporation. TRANSFER OF THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE RESTRICTED. SEE LEGENDS ON REVERSE SIDE.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers, effective as of April 29, 2021.

*Jonathan Karafin*
Jonathan Karafin, President

*Brendan Bevensee*
Brendan Bevensee, Secretary

THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT

RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

THE SECURITIES REFERENCED HEREIN MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY AT NO CHARGE.

Acceptance agreement

When accepting this certificate on Carta, the share holder agreed to the following:

I hereby acknowledge the receipt of the following electronic certificate:

CS-15 to Alan Jones for 50,625 shares of Common Stock

Executed July 12th, 2021

By: Alan Jones

*Alan Jones*
Alan Jones
07/12/2021   🖨 d4ff85ac-b2e5-4946-8142-55715b14ff6a

 This certificate was created from the exercise of <u>option grant ES-25</u> .

**Light Field Lab's account is locked**
Because Light Field Lab's account is locked, the information shown here may be out of date.
For questions about this security, contact the company directly.

## Shareholder

| Name | Alan Jones |
|---|---|
| Email | alan@jones.how |
| Status | Canceled |

## Certificate

| Share class | Common (certificated) |
|---|---|
| Quantity | 50,625 shares |
| Cash paid ⓘ | $35,437.50 (USD) |
| Price per share ⓘ | $0.70 (USD) |
| Original acquisition date ⓘ | Apr 29, 2021 |
| Cost basis ⓘ | $35,437.50 (USD) |
| Certificate front and back | |

## Issuer

| Issued by | Light Field Lab |
|---|---|
| Issue date | Apr 29, 2021 |
| Original issue date | Apr 29, 2021 |

## Cancellation details

| Date | Jul 13, 2025 |
|---|---|
| | 50,625 shares are canceled and do not return to the equity plan. |
| Reason | Other |

## Legend

Transfer restrictions are described by the following legend included on this certificate.

THE SECURITIES REFERENCED HEREIN HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT
RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.

THE SECURITIES REFERENCED HEREIN MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY AT NO CHARGE.

## Approvals

✓ Initiated by Alan Jones
Approved May 14, 2021    🔒 5c1459dc178b43ffafedab56f75d3d2d

✓ Signed by Jon Karafin
Approved July 2, 2021    🔒 ca0c9a033ff44ccdb6394c07d5c32908

✓ Signed by Brendan Bevensee
Approved July 12, 2021    🔒 fbade365d1944bbd90ad5d8f0bb43b1a

✓ Received by Alan Jones
Approved July 12, 2021    🔒 d4ff85acb2e54946814255715b14ff6a

## Documents and notes

| Notes | Canceled due to Offboarding |
|-------|------------------------------|

**STEPHEN F. HENRY, ESQ.**
**HENRY | LACEY PC**
STATE BAR # 142336
2625 Alcatraz Avenue, # 615
Berkeley, California 94705
Telephone: (510) 898-1883
Facsimile (510) 295-2516
shenry@HenryLacey.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALAN JONES,<br><br>     Plaintiff,<br><br>  vs.<br><br>LIGHT FIELD LAB, INC., JON KARAFIN,<br>BRENDAN BEVENSEE, and Does 1 to 10,<br><br>    Defendant, | Case No.: 3:25-cv-05118-MMC<br><br>**AMENDED COMPLAINT FOR DAMAGES**<br><br>  1. **RETALIATORY TERMINATION**<br>     **(Ca. Lab. Code §1102.5)**<br>  2. **WRONGFUL TERMINATION IN**<br>     **VIOLATION OF PUBLIC POLICY**<br>  3. **FRAUD AND DECEIT**<br>  4. **VIOLATION OF PENAL CODE**<br>  5. **UNFAIR COMPETITION**<br>  6. **BREACH OF FIDUCIARY DUTY** |

Plaintiff Alan Jones ("Plaintiff") alleges the following against Defendant Light Field Lab Inc. ("LFL"), and Does 1-10 (collectively "Defendants"):

1.    Plaintiff is an individual residing at all times mentioned in the Complaint within the State of Washington, the county in which he performed his duties under the employment contract with Defendant.

2.    Defendant is a company incorporated in Delaware and at all times mentioned in operated in the State of California.

3.    Defendant Jon Karafin is an individual employed by Defendant Light Field Lab in California.

4.    Defendant Brendan Bevensee is an individual employed by Defendant Light Field Lab in California.

5.    In addition to the Defendants named above, Plaintiff sues fictitiously Defendants Does 1 through 10, inclusive, including executives and members of the Board of Directors of Light Field Lab with constructive knowledge of the allegations below, because their names, capacities, status, or facts showing them to be liable are not presently known. Plaintiff is informed and believes, and thereon alleges that Defendants, and each of them, designated herein as Does 1 through 10, are responsible in some manner for the occurrences and happenings herein alleged, and that Plaintiff's damages, as herein alleged, were and are the direct and proximate result of the action of said Defendants, and each of them. Plaintiff will amend this complaint to show their true names and capacities, together with appropriate charging language, when such information has been ascertained.

6.    Plaintiff further alleges that Defendants and Does 1-10, inclusive, are, and at all relevant times were, agents of one another and acting within the course and scope of said agency.

7.    Plaintiff reserves the right to amend his/her charges to plead agency between Defendants and Does 1-10, inclusive, and any of them, at any time that he ascertains facts and supporting agency between such Defendants.

2

**AMENDED COMPLAINT**

**JURISDICTION AND VENUE**

8.   Plaintiff incorporates by reference each of the allegations contained in paragraphs 1 through 7 above, as well as facts currently unknown.

9.   Jurisdiction over the defendants, and each of them, exists because each of the defendant entities named in this litigation are present and operating within the jurisdictional limits of the Northern District of California and each of the individual defendants named in this litigation are employed within the jurisdictional limits of the Northern District of California.  Subject matter jurisdiction within the United States District Court exists because the amount in dispute exceeds $75,000.

10. Venue is proper because the employment relationship between Plaintiffs and defendants, and each of them, that gave rise to some of the claims in this litigation existed within this judicial district and most or all of the acts and omissions complained of in this litigation took place here. Venue is also proper because most or all of the acts and omissions that occurred outside of the above employment relationship and are complained of in this litigation took place within this judicial district.

**FACTS COMMON TO MORE THAN ONE CAUSE OF ACTION**

11.   Mr. Jones was employed by LFL from September 30, 2019, through June 23, 2023. Mr. Jones initially worked as a Senior Pipeline Software Engineer and was promoted to Principal Engineer on July 27, 2020.

**REPRESENTATIONS AND CONCEALMENT TO INDUCE INITIAL AND CONTINUED EMPLOYMENT**

12.   As part of Mr. Jones' interviews on August 28 and 29, 2019. Karafin stated that the company had hundreds of patents and in addition to manufacturing displays their business model relied heavily on comprehensive patent coverage of the holographic space, allowing them to both manufacture displays and license the technology.

13.   On August 28th and 29th, Karafin also stated that Light Field Lab had a large theme park customer, ultimately revealed to be Universal Studios. Karafin stated that Light Field Lab

would have the displays out to market the following year (2020) and it would be in the theme park in that timeframe or soon after.

14.      These statements of alleged but untrue facts regarding the company's intellectual property and customers were intended to provide, and justifiably led to the conclusion that LFL was much closer to delivery of the product than it actually was and that an early exercise of options was expected.  In reliance on these statement, Mr. Jones gave up Microsoft stock that was vesting in order to join LFL. Subsequently, there was no further discussion of Universal Studios as a customer and no product was delivered to Universal Studios.

15.      During the discussions on August 28 and 29, 2019, Karafin also discussed an options double trigger event on which all options would vest if the company was publicly listed or acquired. Upon Mr. Jones' inquiry about the number and value of the options at issue, Karafin concealed that information on the basis that it was highly confidential.

16.       Mr. Jones questioned the lack of disclosure of important information about Light Field Labs' stock and stock options during hiring negotiations, as it made it very difficult for Mr. Jones to determine the potential value of the options, but was refused.

17.      Subsequently, after Mr. Jones became an owner of shares of Light Field Lab, Mr. Jones was entitled to review books and records to assess his holdings but when he asked Jon Karafin in March 2023, in the context of a financial discussion about the company, "… is there any additional information I'm entitled or required to be given access to as a shareholder?" Karafin responded "Understood and appreciated. There are no current problems to be aware of (e-g- equity ownership and payroll) and can keep you posted- Again, not a political response, just the facts." Books and records would classify as additional (financial) information Mr. Jones was entitled to be given access to as a shareholder.  Mr. Karafin continued to refuse to provide, and concealed, the information to Mr. Jones, a stock holder.

18.      As part of his onboarding, on September 9, 2019, Mr. Jones signed a Confidentiality and Proprietary Rights Agreement that purported to grant rights to patents and other works for hire to LFL.  This Agreement was signed without the knowledge of misrepresented and concealed facts,

unknown to Mr. Jones at the time, but which if known, would have dissuaded him from joining Light Filed Lab, providing his source code and other knowledge, and signing the agreements.

19.     Subsequently, in August 2025, Mr. Jones learned that Light Field Lab's foundational patents had been developed while Karafin and Bevnensee worked for a prior employer, Lytro, and were not valid patents held by Light Field Lab but, in fact, were the property of Lytro.  While employed by Lytro, Inc., Mr. Karafin and Mr. Bevensee concealed their patent filing activities that were material to Jones' employment decision. Specifically:

a. Lytro filed U.S. Provisional Application 62/200,804 for "Light Guided Image Plane Tiled Arrays with Dense Fiber Optic Bundles for Light-Field Display" on August 4, 2015, while Karafin and Bevensee were employed there and are named inventors on Lytro patent US10565734 which references that provisional application;

b. Karafin and Bevensee filed provisional applications for the benefit of Light Field Lab while still employed at Lytro (62/362,602 on July 15, 2016; 62/366,076 on July 24, 2016), which are referenced in Light Field Lab's US10488584 and contained substantially identical inventions to patents they filed for Lytro and on which they are named inventors. Most of Light Field Lab's patent portfolio is tied to these provisional applications either directly or indirectly; and

c. Karafin and Bevensee incorporated Light Field Lab on November 22, 2016, while still employed at Lytro, creating a competing company using technology concepts from patents filed during their Lytro employment.

d. In patent applications for the benefit of Light Field Lab, including those related to US10488584, Karafin and Bevensee omitted relevant prior art of their Lytro patent filing activities from their disclosures to the USPTO.

e. Where identical concepts and components existed in both, throughout Light Field Lab's entire patent portfolio's filings Karafin and Bevensee carefully avoided using the same terminology as in Lytro's filings.

These concealed facts were material to Mr. Jones' decision to accept employment and to execute comprehensive IP-assignment agreements. Had Mr. Jones been aware of these material facts, he

would not have joined the Company, nor would he have transferred his own source-code and related inventions. These concealed facts were also material to Mr. Jones' decision to exercise stock options, expending money to do so.

**EMPLOYMENT, FAILURE TO ACCOMMODATE AND MR. JONES' COMPLAINT**

20.  Throughout his tenure at LFL, Mr. Jones consistently received positive feedback regarding his job performance, a merit pay increase when he was promoted to Principal Engineer and periodic incentive pay bonuses. He maintained positive personal relationships with his coworkers and management.

21.  Mr. Jones was instrumental in the development of LFL's SolidLight holographic display platform. Mr. Jones worked out of LFL's office from September 30, 2019, through March 7, 2020, and thereafter he worked remotely from his residence in Seattle, WA.

22.  Mr. Jones is Type I Diabetic and suffers from a compromised immune system. Accordingly, Mr. Jones would be susceptible to severe illness and/or death if he were to contract COVID-19.

23.  When LFL management announced that all of its employees would be required to return to in-office work by May 24, 2021, Mr. Jones requested that he be permitted to continue working remotely as an accommodation of his compromised immune system, which is a disability under federal and state law.

24.  Although there does not appear to have been a formal accommodation process, LFL allowed Mr. Jones to continue working remotely and LFL management continued to provide Mr. Jones with positive feedback regarding his job performance. At no time did anyone in LFL management indicate that in-office work was an essential function of Mr. Jones' job duties.

25.  In December 2022-January 2023, Mr. Jones' supervisor, Mr. Trevor Berninger, Director of Software, began having discussions with Mr. Jones to stop working remotely and return to in-office work at LFL. Mr. Jones was surprised because he had been working remotely since March 7, 2020, and there had been no complaints about his job performance.

Case No.: 3:25-cv-05118-MMC                                    AMENDED COMPLAINT

26.     When Mr. Jones asked if there were performance issues that would give rise to the request that he return to in-office work, Mr. Berninger indicated that LFL did not have any issues with his job performance. When asked if there was a particular reason as to why LFL wanted him to return to in-office work, Mr. Berninger was very vague and unspecific and indicated that "it would just be better." Again, at no time did anyone at LFL indicate that working in-office was an essential job function of Mr. Jones' position.

27.     Although Mr. Jones was open for discussion as to what would be reasonable accommodations for his return to in-office work, LFL did not engage in an interactive dialogue in this regard. In fact, Mr. Jones made repeated suggestions regarding masking protocol, testing protocol, social distancing and ventilation, but LFL did not respond to Mr. Jones' suggestions.

28.     Mr. Jones understandably began to feel very marginalized by LFL management. He understood that LFL management wanted him to return to in-office work, but management was unwilling to implement a reasonable protocol to minimize his risk of exposure to COVID-19. Mr. Jones sensed that his relationships with LFL management were becoming strained, when he had previously enjoyed very positive relationships with leadership.

29.     In January 2023, Mr. Jones was assigned to work on masking interference for Wavetracing Optics to improve image quality. Mr. Jones was working closely with LFL's CEO Mr. Jon Karafin who was the subject matter expert in this area; Mr. Karafin defined the scope of work and methodology of the work. In March 2023, Mr. Jones advised Mr. Karafin that the methodology was unworkable and was unlikely to result in improved image quality. Mr. Jones suggested a number of alternative approaches to improve image quality, but Mr. Karafin insisted that Mr. Jones continue with the methodology he himself had prescribed.

30.     The matter came to a head on April 6, 2023, when Mr. Karafin made disparaging remarks regarding Mr. Jones' work on the Wavetracing Optics during a Software Team meeting that was attended by the entire software team of approximately 10 people. Mr. Karafin stated that it had been nearly six months and that Mr. Jones had failed to generate an image and indicated that it was unlikely that Mr. Jones' work would result in improved image quality.

Case No.: 3:25-cv-05118-MMC                                          AMENDED COMPLAINT

31.     Mr. Jones was absolutely dismayed that Mr. Karafin would publicly trivialize and disparage his work in such an aggressive manner in front of his coworkers. First, Mr. Karafin's statement was untrue; Mr. Jones had in fact generated images in January 2023. It was Mr. Karafin's own methodology that was unworkable, and Mr. Jones had advised Mr. Karafin that the methodology was unlikely to result in substantial image improvement in early March, 2023. Despite Mr. Karafin's knowledge that the methodology he prescribed was unworkable, he refused to change course. Instead, he scapegoated Mr. Jones and implied that the lack of progress in image improvement was due to Mr. Jones work performance, when he was well aware that the lack of progress was due to the fact that his own methodology had proved to be unworkable.  On April 9, 2023, Mr. Jones submitted a rebuttal of Mr. Karafin's disparaging comments and a complaint of hostile work environment.  Mr. Jones observed that he had proven a viable solution to the problem described above, work which was later used in subsequent patents without his knowledge and without attribution.

32.     LFL conducted an investigation of Mr. Jones' hostile work environment complaint. When Mr. Jones was interviewed by the investigator, he explained that he believed that Mr. Karafin's animosity towards him was due to the fact that he was working remotely because of his disability. Mr. Jones also explained that he had been under increased pressure from LFL to return to in-office work, despite his disability.

33.     Mr. Jones continued working on interference masking on the Wavetracing Optics and upon implementation of Mr. Karafin's methodology, it became apparent to LFL that the methodology did not result in substantial image improvement and, in fact resulted in a substantial reduction in the field of view. The technical concerns that Mr. Jones outlined in his complaint of April 9, 2023, were substantiated.

34.     On June 16, 2023, Mr. Jones received an email indicating that the investigation had been concluded and that his claim of illegal hostile work environment based on disability had not been substantiated.

**AMENDED COMPLAINT**

**TERMINATION**

35.     On June 23, 2023, Mr. Jones' employment was terminated.  During the conference call it was indicated that "things aren't working out" and with the conclusion of the investigation, LFL was terminating Mr. Jones employment. There was no indication in the phone conference that LFL was terminating Mr. Jones for poor performance or unprofessional behavior.  Rather, LFL was clearly terminating Mr. Jones for requesting accommodation and then making a complaint about illegal retaliation related to that request.

36.     Later in the day on June 23, 2023, Mr. Jones received a letter of termination which stated that his employment was being terminated for poor performance and unprofessional behavior. Mr. Jones was shocked; during his nearly four year tenure at LFL, no one had complained about poor performance or unprofessional behavior. Notably, the termination letter falsely stated that the decision to terminate Mr. Jones' employment was made prior to the initiation of his hostile work environment complaint of April 9, 2023.

37.     In this case, Mr. Jones reported conduct that he reasonably believed was motivated by unlawful discrimination. Additionally, the temporal proximity between the conclusion of the investigation on June 16, 2023, and the termination of Mr. Jones' employment a week later on June 23, 2023, indicates that LFL acted with retaliatory intent. The temporal proximity between the conclusion of the investigation and the termination of Mr. Jones employment raises a rebuttable presumption of retaliatory intent.

38.     LFL's claim that it made a decision to terminate Mr. Jones' employment prior to the submission of his hostile work environment claim of April 9, 2023 is unsupported by any evidence.

39.     LFL management never brought any job performance concerns to Mr. Jones either orally or in writing until April 6, 2023. In fact, Mr. Berninger advised Mr. Jones in December 2022, that LFL had no problems with Mr. Jones' job performance.

**FAILURE TO NAME JONES AS INVENTOR**

40.     Patent WO2025042476A1 and WO2024216300A2, though fully derived from Mr. Jones' work, did not include Mr. Jones as an inventor, a fact not disclosed to, and concealed from, Mr. Jones by Jon Karafin and Brendan Bevensee during his employment by LFL.

Case No.: 3:25-cv-05118-MMC                    AMENDED COMPLAINT

## FIRST CAUSE OF ACTION

### (Ca. Lab. Code §1102.5)

### (Against Defendant Light Field Lab, Jon Karafin, Brendan Bevensee, and Does 1 through 10)

41.     Plaintiff repeats and realleges para. 1 through 40, and incorporates them by reference as though fully reproduced in this cause of action.

42.     At all relevant time periods, Plaintiff was an employee of Defendant Light Field Lab.

43.     As alleged above, Plaintiff complained to Defendant's officers, directors, and/or managing agents that certain of Defendant's activities violated the law.

44.     Defendants Light Field Lab, Karafin and Bevensee terminated Plaintiff, substantially motivated by Plaintiff's complaints detailed above.

45.     As a legal and proximate result of Defendants' actions, Plaintiff has suffered special and general damages in an amount to be proven, but in excess of $1,000,000.

46.      Defendants' actions were taken with malice, oppression, and fraud, such that exemplary and punitive damages should be awarded.

## SECOND CAUSE OF ACTION

### (Wrongful Termination In Violation Of Public Policy)

### (Against Defendant Light Field Lab)

Plaintiff incorporates by reference each of the allegations contained in paragraphs 1 through 46 above, as well as facts currently unknown.

47.     Plaintiff alleges that Plaintiff's termination was wrongful because it was in violation of the public policy of the State of California and the United States in that Plaintiff's termination was in retaliation for Plaintiff's opposing and reporting illegal activity, as described in preceding allegations.

48.     Plaintiff further alleges that Defendant's termination of Plaintiff was in violation of the public policy as expressed in the Fair Employment and Housing Act.

49.     Plaintiff further alleges that Defendant's termination of Plaintiff was in violation of the public policy as expressed in laws and regulations prohibiting retaliation against individuals who report violations of the law, including, but not limited to, California Labor Code § 1102.5, and in addition was a violation of said statute.

10

50.     As a direct, foreseeable, and proximate result of defendants' violation of public policy, Plaintiff has suffered and continues to suffer substantial losses in earnings and job benefits, loss of opportunity and advancement, loss of employment prospects, and has suffered and continues to suffer humiliation, embarrassment, mental and emotional distress, and discomfort, all to Plaintiff's damage in an amount in excess of $1,000,000 the precise amount of which will be proven at trial.

51.     Plaintiff claims these amounts, together with prejudgment interest pursuant to Civil Code section 3287, Code of Civil Procedure section 685.010 and pursuant to any other provision of law providing for prejudgment interest.

52.     Because the acts taken toward Plaintiff were carried out by, condoned by and or ratified by managerial employees or managing agents acting in a deliberate, cold, callous, malicious, oppressive, and intentional manner in order to injure and damage Plaintiff, Plaintiff requests the assessment of punitive damages against Defendant in an amount appropriate to punish and make an example of Defendant.

### THIRD CAUSE OF ACTION

### (Fraud and Deceit)

### (Against Light Field Lab, Jon Karafin, and Brendan Bevensee)

Plaintiff hereby incorporates by reference Paragraphs 1 through 52 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

53.     Defendants made representations as described in paragraphs 12 to 19 above including false representations as to the commercial application and viability of Defendant's product and concealed information about the financial viability of Light Field Lab.

54.     Defendants made representations as described in paragraphs 12 to 19 regarding ownership of the patents on which the business was reliant and concealed the true ownership of those patents.

55.     Defendants concealed information as described in paragraphs 40 above regarding inventorship of Patent WO2025042476A1 and WO2024216300A2.  Patent WO2025042476A1 and WO2024216300A2, though fully derived from Mr. Jones' work, did not include Mr. Jones as an inventor, a fact not disclosed to Mr. Jones during or after his employment by LFL.

56.     Further, Defendants, including Defendant Karafin, Brendan Bevensee and all corporate officers and board members, though constructive or actual knowledge, had a duty to disclose facts regarding ownership of patents on which the business, and Plaintiff's employment, were based, as part of the employer employee relationship.

57.     Representations regarding the commercial viability of Defendants' product were false as identified above, and the true information regarding the value of Plaintiff's stock was concealed, Defendants used the concealment and misrepresentations to induce Plaintiff to accept and continue his employment, a result Defendants could not have achieved truthfully.

58.     Further, representations regarding the financial stability of Defendant were false as identified above, and the true information regarding the value of Plaintiff's stock was concealed. Defendants used the concealment and misrepresentations to induce Plaintiff to accept and continue his employment, a result Defendants could not have achieved truthfully.

59.     Further, representations regarding the specific value of Plaintiff's stock was concealed as identified above.  Defendants used the concealment and misrepresentations to induce Plaintiff to continue his employment to his detriment, a result Defendants could not have achieved truthfully.

60.     Further, representations regarding the valid ownership of patents by Light Field Lab was concealed as identified above.  Defendants used the concealment and misrepresentations to induce Plaintiff to continue his employment, and to purchase stock options to his detriment, a result Defendants could not have achieved truthfully.

61.     Defendants knew said representations to be false and intended to conceal the true facts from Plaintiff to unlawfully persuade Plaintiff to accept and maintain employment with Defendant, to his detriment.

62.     Plaintiff justifiably relied upon the misrepresentations made to him, and did not know the true facts concealed from him, to his detriment.

63.     Plaintiff did not discover the fraud and deceit practiced upon him as set forth herein until he started his employment with defendants, attempted to fulfill his responsibilities, continued to provide Defendants with valuable intellectual information (which they kept for themselves), was terminated, investigated Defendants' representations and the true fact, and thereby realized that Defendants'

12

representations were false and that Defendants had concealed their true intent, including the intent to misappropriate his intellectual information.

64. As a proximate result of the concealment and representations of Defendants to Plaintiff as set forth herein, Plaintiff has suffered and continues to suffer the loss of value of owned stock, wages and benefits, as well as stock options from his prior employment with Microsoft in an amount to be proven at trial.

65. As a proximate result of the concealment and representations of Defendants to Plaintiff as set forth herein, Plaintiff has suffered the loss of the cost of stock options, now worthless, in an amount to be proven at trial.

66. As a further direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered extreme anguish, humiliation, and emotional distress, the extent of which will be proven at trial.

67. Because the acts taken toward Plaintiff were carried out by, condoned by and or ratified by managerial employees or managing agents acting in a deliberate, cold, callous, fraudulent, malicious, oppressive, and intentional manner in order to injure and damage Plaintiff, Plaintiff requests the assessment of punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

68. As a result of the facts above, and the fact that Confidential Information and Inventions Assignment Agreement was obtained through fraud, Plaintiff is entitled to injunctive relief to rescind the Confidential Information and Inventions Assignment Agreement and invalidate WO2025042476A1 and WO2024216300A2, prevent Defendants from using his intellectual property, and the transfer of all intellectual property, including but not limited to that related to WO2025042476A1 and WO2024216300A2, created by Plaintiff, or derived from Plaintiff's work product, to Plaintiff.

69. WHEREFORE, Plaintiff requests relief as hereinafter provided.

### FOURTH CAUSE OF ACTION

### (Violation of Penal Code Sections 484 & 496)

### (Against Defendant Light Field Lab, Jon Karafin, Brendan Bevensee, and Does 1 through 10)

Plaintiff hereby incorporates by reference Paragraphs 1 through 68 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

13

70.     Defendants' misrepresentations to Plaintiff, including fraudulent statements regarding inventorship of Patent WO2025042476A1 and WO2024216300A2, constituted theft of personal property, in the form of Plaintiff's right to inventorship of those patents, under Penal Code section 484 insofar as Defendants have "knowingly and designedly, by…false or fraudulent representation or pretense, defraud[ed][Plaintiff] of…personal property."

71.     Defendants' misrepresentations to Plaintiff and others regarding the development and invention of the concepts underlying Patent WO2025042476A1 and WO2024216300A2, made at the time that Defendants Karafin and Bevensee applied for the patents, constituted theft under Penal Code section 484 insofar as Defendants have "knowingly and designedly, by…false or fraudulent representation or pretense, defraud[ed][Plaintiff] of" property at the time that property was denied to Plaintiff.

72.     Defendant Light Field Lab has retained ownership and Karafin and Bevensee have retained inventorship of Patent WO2025042476A1 and WO2024216300A2 that should have been provided to Plaintiff.

73.     In so doing, Defendant Light Field Lab have knowingly received and deliberately withheld patent rights from Plaintiff, knowing that it has no exclusive rights, title, or interest in patent rights and that said patent rights have been stolen from Plaintiff and/or obtained in a manner constituting theft.

74.     As a direct, foreseeable, and proximate result of Defendants' theft, Plaintiff has suffered and continues to suffer a loss of the value of his inventorship, as well as a loss of the rights to licensing revenue, the precise amount of which will be proven at trial.

75.     Plaintiff has been damaged as a result of the theft of his personal property and is entitled to treble damages pursuant to Penal Code section 496(c).

76.     As a result of the facts above, and the fact that Confidential Information and Inventions Assignment Agreement was obtained through fraud, Plaintiff is entitled to injunctive relief to rescind the Confidential Information and Inventions Assignment Agreement and invalidate WO2025042476A1 and WO2024216300A2, prevent Defendants from using his intellectual property, and the transfer of all

14

intellectual property, including but not limited to that related to WO2025042476A1 and WO2024216300A2, created by Plaintiff, or derived from Plaintiff's work product, to Plaintiff.

77.     WHEREFORE, Plaintiff requests relief as hereinafter provided.

## FIFTH CAUSE OF ACTION

### (Civil RICO)

**(Against Defendants Light Field Lab Jon Karafin, Brendan Bevensee, and Does 1 through 10)**

Plaintiff hereby incorporates by reference Paragraphs 1 through 76 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

78.     Defendant Light Field Lab is an enterprise engaged in and the activities of which affect interstate commerce, to wit: a corporation incorporated under the laws of the State of Delaware.

79.     Defendant Jon Karafin, as a person within the meaning of 18 U.S.C.A. § 1961(3), and as a person employed by said enterprise, conducted and participated, directly and indirectly, in the conduct of the affairs of said enterprise through a pattern of racketeering activity in violation of 18 U.S.C.A. § 1962(c).

80.     Defendant Brendan Bevensee, as a person within the meaning of 18 U.S.C.A. § 1961(3), and as a person employed by said enterprise, conducted and participated, directly and indirectly, in the conduct of the affairs of said enterprise through a pattern of racketeering activity in violation of 18 U.S.C.A. § 1962(c).

81.     The predicate acts which constitute this pattern of racketeering activity are: multiple fraudulent communications regarding Patent WO2025042476A1 and WO2024216300A2 using means of interstate communication, including electronic filing, mail and email.

82.     These acts of racketeering, occurring within ten years of one another, constitute a pattern of racketeering activity within the meaning of 18 U.S.C.A. § 1961(5).

83.     Plaintiff was injured in his property by reason of this violation of 18 U.S.C.A. § 1962, in that, as a direct and proximate result of Defendant's complained of acts, Plaintiff suffered damages, including loss of money.

84.     By reason of the Defendants' violation of 18 U.S.C.A. § 1962, Plaintiff is entitled, pursuant to 18 U.S.C.A. § 1964(c), to threefold the damages sustained, with interest thereof at 10% per annum, and a reasonable attorney's fee in connection herewith.

85.     As a result of the facts above, and the fact that Confidential Information and Inventions Assignment Agreement was obtained through fraud, Plaintiff is entitled to injunctive relief to rescind the Confidential Information and Inventions Assignment Agreement and invalidate WO2025042476A1 and WO2024216300A2, prevent Defendants from using his intellectual property, and the transfer of all intellectual property, including but not limited to that related to WO2025042476A1 and WO2024216300A2, created by Plaintiff, or derived from Plaintiff's work product, to Plaintiff.

## SIXTH CAUSE OF ACTION

### (Breach of Fiduciary Duty)

### (Against Defendant Light Field Lab and Jon Karafin)

Plaintiff hereby incorporates by reference Paragraphs 1 through 85 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

86.      Plaintiff is, and at all times relevant to this amended complaint, was a minority share holder of Defendant LFL.

87.     Defendant LFL and Jon Karafin improperly failed and refused to provide necessary information to Plaintiff as a share holder.

88.     As a result of the acts of Defendant LFL and Jon Karafin, Plaintiff was prevented from gaining the knowledge necessary to convert and sell his owned shares.

89.     As a proximate result of the wrongful acts and omissions of Defendant LFL and Jon Karafin to Plaintiff as set forth herein, Plaintiff has suffered and continues to suffer the loss of value of his owned stock, the precise amount of which will be proven at trial.

90.     Defendant LFL committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice and in conscious disregard of Plaintiff's rights, justifying the imposition of punitive damages.

## SEVENTH CAUSE OF ACTION

### (Violation of Uniform Fraudulent Transfer Act)

### (Civil Code § 3439.04(a)(1))

### (Against Light Field Lab and Does 1 to 10)

91.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 90 of Plaintiff's Complaint with the same force and effect as though fully set forth herein.

92.     California Civil Code Section 3439.04(a)(1) provides that "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor … if the debtor made the transfer or incurred the obligation … [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor."

93.     Defendants, and each of them, violated Section 3439.04(a)(1), inasmuch as Defendant Light Field Lab transferred the assets of Light Field Lab to CMBG FBC-Light Field Lab LLC, Assignee for the Benefit of Creditors of Light Field Lab, Inc. at a time when Defendant had been threatened with Plaintiff's lawsuit and had in fact been sued by Plaintiff.

94.     Plaintiff is further informed and believes that Defendant retained use and control of the assets, including but not limited to the intellectual property at issue in this lawsuit, after the transfer and that reasonably equivalent value was not paid for the property.

95.     At the time of the transfer, Defendant knew it may be obligated to pay Plaintiff a debt as well as turn over certain intellectual property at issue in this lawsuit. As a result of the transfer, Defendant Light Field Lab was left with insufficient assets to satisfy the potential debt and judgment.

96.     The intellectual property transferred Defendant's principal asset.

97.     As a result of the foregoing, Plaintiff is entitled to the remedies set forth in Civil Code Section 3439.07, including an order setting aside the transfer of the intellectual property and other assets from Defendant Light Field Lab to CMBG FBC-Light Field Lab LLC, Assignee for the Benefit of Creditors of Light Field Lab, Inc.

98.     WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

99.     A declaration that the transfer of the intellectual property and other assets is void and will be set aside; in the alternative, a right of attachment or provisional remedy against the intellectual

AMENDED COMPLAINT

property and other assets; injunctive relief; and/or for lawful interest according to proof at the time of trial;

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1. For general damages according to proof;

2. For special and compensatory damages, including put not limited to, loss of wages, salary, benefits, back pay, front pay, future lost income and benefits, and other economic losses, in an amount according to proof at trial;

3. For treble damages;

4. For an award of punitive damages, according to proof;

5. For attorneys' fees and costs of suit;

6. For rescission of a contract;

7. For a right of attachment;

8. For declaratory relief;

9. For injunctive relief;

10. For pre-judgment and post-judgment interest pursuant to Civil Code Sections 3287 and 3289, Code of Civil Procedure Section 685.010 and pursuant to any other provision of law providing for interest;

11. For such other and further relief that the Court may deem just and proper.

Dated: September 3, 2025

HENRY | LACEY PC

By /s/ Stephen Henry_____
STEPHEN F. HENRY
Attorney for Plaintiff

Case No.: 3:25-cv-05118-MMC                                        AMENDED COMPLAINT

Plaintiff demands trial by jury in this action.

Dated: September 3, 2025

HENRY | LACEY PC

By /s/ Stephen Henry_____
STEPHEN F. HENRY
Attorney for Plaintiff

 



 

## Jon Karafin · 1st

CEO and Co-Founder at Light Field Lab, Inc.


- Light Field Lab, Inc.


- Rochester Institute of Technology

San Jose, California, United States · Contact info

500+ connections

 Danny Braet, Jeffrey Todd Barnes, and 49 other mutual connections

Message    More

---

## Highlights

 **You both worked at Light Field Lab, Inc.**
You both worked at Light Field Lab, Inc. from September 2019 to June 2023

 Message

---

 **3 mutual groups**
You and Jon are both in Visual Effects, Animation and Games Professionals (www.vfxwire.com), The Visual Effects Society, and 1 other

---

## About

Real holograms. No headgear.

Light Field Lab is building the world's most innovative holographic ecosystem. The company was founded in 2017 by Jon Karafin, Brendan Bevensee, and Ed Ibe, with...

---

## Activity
5,081 followers

 **Jon Karafin** · 1st
CEO and Co-Founder at Light Field Lab, Inc.
6mo · 🌐

Dean Takahashi with VentureBeat's alien encounter! Light Field Lab, Inc. and SETI Institute partner to enable First Contact with #SolidLight!

https://lnkd.in/g_Y8QQRZ

 **Jon Karafin** · 1
CEO and Co-Foun
6mo · Edited · 🌐

Michael Kan at PCMag: " indistinguishable from re hazmat suits and military the room."



Light Field Lab launches...
venturebeat.com

👍❤️ 75 · 7 comments · 2 reposts          👍❤️ 91 · 3 comments ·

Show all posts →

## Experience



**CEO and Co-Founder**
Light Field Lab, Inc.
Apr 2017 - Present · 8 yrs 3 mos
Silicon Valley, CA

Real holograms. No headgear.
...



**Head of Light Field Video & Director of Product Management**
Lytro Inc.
Oct 2014 - Mar 2017 · 2 yrs 6 mos
Silicon Valley, CA



**Vice President, Production Technology & Senior Scientist**
RealD
Oct 2012 - Oct 2014 · 2 yrs 1 mo
Beverly Hills, CA and Boulder, CO

**Director of Production, Technology and Operations**
Digital Domain Holdings
Nov 2010 - Oct 2012 · 2 yrs
Santa Monica, CA & Port Saint Lucie, Florida



**Vice President, Production, Technology and Operations**
In-Three Inc.
Aug 2007 - Nov 2010 · 3 yrs 4 mos

## Education

**Rochester Institute of Technology**
MFA, Digital Animation / Computer Graphics

**Rochester Institute of Technology**
MFA, Fine Art Photography

Show all 3 educations →

## Skills



### Live Events

Endorsed by 4 colleagues at Digital Domain

6 endorsements

[ Endorse ]

### Cinematography

Endorsed by 2 colleagues at In-Three Inc.

19 endorsements

[ Endorse ]

Show all 50 skills →

## Recommendations

[ Recommend Jon ]

**Received**    Given

**Nothing to see for now**
Recommendations that Jon receives will appear here.

## Interests

**Top Voices**    Companies    Groups    Newsletters    Schools

**Jeff Weiner** · 2nd
Executive Chairman at LinkedIn / Founding Partner Next Play Ventures
10,407,180 followers
[ + Follow ]

**Oprah Winfrey**
CEO, Producer, Publisher, Actress and Innovator
1,322,411 followers
[ + Follow ]

Show all Top Voices →



## More profiles for you

**Brendan Bevensee** · 1st
CTO and Co-Founder at Light Field Lab, Inc
[ Message ]

**Jeffrey Todd Barnes** · 1st
Executive Producer, Creative Development, Business Development,
Marketing, Operations, Visual Effects and Immersive Media Production
[ Message ]



Ed Ibe · 1st
VP Engineering and Co-founder
✈ Message

Jules U. · 2nd
Founder and CEO at OTOY
+ Follow

Vance Roush · 3rd
Founder at Overflow
Message

Show all

**Explore Premium profiles**

Joseph Bissell · 2nd
Tech Artist | 3D Generalist | @ Meta Reality Labs
+ Follow

Kenneth Kegley · 2nd
design director @ deutsch
governor [at] television academy...
⚇ Connect

Jeremiah Habets · 2nd
Creative Director, Amazon Sumerian
⚇ Connect

Jeff Grebe · 2nd
Technical Art Manager - Meta Reality Labs
⚇ Connect

**People you may know**
From Jon's industry

Martin Hall ⊘
Visual Effects Supervisor
⚇ Connect

Steve Joner
Production Designer at Film Industry
⚇ Connect

Priscilla Firstenberg
No Solicitors | CEO & Creative Director
⚇ Connect

Dan Sumich ⊘
Available for Supervising Director/ Episode Director/ Creative Director/ Art
Director/ Look Dev/ Character Design/ Storyboarding and Animated Series...



Caprice Ridgeway
3D Producer/Manager at CBS VFX - Paramount

Connect

Show all

**You might like**
Pages for you

Games Jobs Direct
Computer Games
251,213 followers

  47 connections follow this page

+ Follow

Riot Games
Computer Games
1,379,999 followers

7 connections work here

+ Follow

Show all

About                          Accessibility           Talent Solutions
Professional Community Policies Careers                Marketing Solutions
Privacy & Terms ▾              Ad Choices              Advertising
Sales Solutions               Mobile                  Small Business
Safety Center

Questions?
Visit our Help Center.

Manage your account and privacy
Go to your Settings.

Recommendation transparency
Learn more about Recommended Content.

Select Language

English (English)

LinkedIn Corporation © 2025

# EXHIBIT C

US010488584B2

(12) **United States Patent**
Karafin et al.

(10) Patent No.: **US 10,488,584 B2**
(45) Date of Patent: **Nov. 26, 2019**

(54) **HIGH DENSITY ENERGY DIRECTING DEVICE**

(71) Applicant: **LIGHT FIELD LAB, INC.**, San Jose, CA (US)

(72) Inventors: **Jonathan Sean Karafin**, San Jose, CA (US); **Brendan Elwood Bevensee**, San Jose, CA (US)

(73) Assignee: **LIGHT FIELD LAB, INC.**, San Jose, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/064,204**

(22) PCT Filed: **Jul. 17, 2017**

(86) PCT No.: **PCT/US2017/042452**
§ 371 (c)(1),
(2) Date: **Jun. 20, 2018**

(87) PCT Pub. No.: **WO2018/014036**
PCT Pub. Date: **Jan. 18, 2018**

(65) **Prior Publication Data**
US 2018/0356591 A1     Dec. 13, 2018

**Related U.S. Application Data**

(60) Provisional application No. 62/362,602, filed on Jul. 15, 2016, provisional application No. 62/366,076,
(Continued)

(51) **Int. Cl.**
G02B 3/00     (2006.01)
G02B 3/08     (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... ***G02B 6/08*** (2013.01); ***G02B 3/0056*** (2013.01); ***G02B 3/08*** (2013.01); ***G02B 5/32*** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .......... G02B 6/08; G02B 3/0056; G02B 3/08; G02B 5/32; G02B 6/023; G02B 6/04;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,143,234 A     3/1979  Johnson et al.
5,004,335 A     4/1991  Montes
(Continued)

FOREIGN PATENT DOCUMENTS

CN     104837003 A    8/2015
CN     205185315 U    4/2016
(Continued)

OTHER PUBLICATIONS

International Search Report and Written Opinion dated Nov. 17, 2017 in International Patent Application No. PCT/US17/42452.
(Continued)

*Primary Examiner* — Nicole M Ippolito
*Assistant Examiner* — Hanway Chang
(74) *Attorney, Agent, or Firm* — Burke, Williams & Sorensen, LLP

(57)     **ABSTRACT**

Disclosed embodiments include an energy directing device having one or more energy relay elements configured to direct energy from one or more energy locations through the device. In an embodiment, surfaces of the one or more energy relay elements may form a singular seamless energy surface where a separation between adjacent energy relay element surfaces is less than a minimum perceptible contour. In disclosed embodiments, energy is produced at energy
(Continued)



US 10,488,584 B2

Page 2

locations having an active energy surface and a mechanical envelope. In an embodiment, the energy directing device is configured to relay energy from the energy locations through the singular seamless energy surface while minimizing separation between energy locations due to their mechanical envelope. In embodiments, the energy relay elements may comprise energy relays utilizing transverse Anderson localization phenomena.

**31 Claims, 16 Drawing Sheets**

**Related U.S. Application Data**

filed on Jul. 24, 2016, provisional application No. 62/507,500, filed on May 17, 2017.

(51) **Int. Cl.**

| | |
|---|---|
| *G02B 5/32* | (2006.01) |
| *G02B 6/02* | (2006.01) |
| *G02B 6/04* | (2006.01) |
| *G02B 6/08* | (2006.01) |
| *G03H 1/00* | (2006.01) |
| *G03H 1/02* | (2006.01) |
| *G03H 1/22* | (2006.01) |
| *G06F 3/01* | (2006.01) |
| *G21K 1/00* | (2006.01) |
| *G02B 25/00* | (2006.01) |
| *G02B 27/01* | (2006.01) |
| *G02B 27/09* | (2006.01) |
| *G02B 27/10* | (2006.01) |
| *G02B 27/22* | (2018.01) |
| *G02B 6/293* | (2006.01) |
| *G10K 11/26* | (2006.01) |
| *H04N 5/225* | (2006.01) |
| *H04N 13/344* | (2018.01) |
| *H04N 13/388* | (2018.01) |

(52) **U.S. Cl.**
CPC .............. *G02B 6/023* (2013.01); *G02B 6/04* (2013.01); *G02B 6/29325* (2013.01); *G02B 25/00* (2013.01); *G02B 25/002* (2013.01); *G02B 27/0103* (2013.01); *G02B 27/0172* (2013.01); *G02B 27/0955* (2013.01); *G02B 27/0994* (2013.01); *G02B 27/1066* (2013.01); *G02B 27/1073* (2013.01); *G02B 27/22* (2013.01); *G02B 27/2292* (2013.01); *G03H 1/0005* (2013.01); *G03H 1/0248* (2013.01); *G03H 1/2202* (2013.01); *G03H 1/2294* (2013.01); *G06F 3/01* (2013.01); *G06F 3/013* (2013.01); *G10K 11/26* (2013.01); *G21K 1/00* (2013.01); *H04N 5/22541* (2018.08); *H04N 13/344* (2018.05); *H04N 13/388* (2018.05); *G02B 6/0229* (2013.01); *G02B 2027/0105* (2013.01); *G02B 2027/0134* (2013.01); *G02B 2027/0174* (2013.01); *G03H 2001/0088* (2013.01); *G03H 2223/19* (2013.01); *Y02E 10/52* (2013.01)

(58) **Field of Classification Search**
CPC .. G02B 6/29325; G02B 25/00; G02B 25/002; G02B 27/0103; G02B 27/0172; G02B 27/0955; G02B 27/0994; G02B 27/1066; G02B 27/1073; G02B 27/2292; G02B 6/0229; G02B 2027/0105; G02B 2027/0174; G03H 1/0005; G03H 1/0248; G03H 1/2202; G03H 2001/0088; G03H 2223/19; G06F 3/01; G06F 3/013; G10K 11/26; G21K 1/00
USPC .......................................... 250/505.1, 507.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,374,976 | A | 12/1994 | Spannenburg |
| 5,822,125 | A | 10/1998 | Meyers |
| 6,680,761 | B1 | 1/2004 | Greene et al. |
| RE39,864 | E | 10/2007 | Athale et al. |
| 7,653,279 | B1 | 1/2010 | Jacobsen |
| 2001/0028485 | A1 | 10/2001 | Kremen |
| 2002/0001128 | A1 | 1/2002 | Moseley et al. |
| 2002/0047893 | A1 | 4/2002 | Kremen |
| 2006/0256415 | A1 | 11/2006 | Holmes et al. |
| 2008/0144174 | A1 | 6/2008 | Lucente et al. |
| 2008/0170293 | A1 | 7/2008 | Lucente et al. |
| 2009/0225380 | A1 | 9/2009 | Schwerdtner et al. |
| 2010/0125356 | A1 | 5/2010 | Shkolnik et al. |
| 2010/0278480 | A1 | 11/2010 | Vasylyev |
| 2011/0114831 | A1 | 5/2011 | Grier |
| 2013/0140916 | A1 | 6/2013 | Dunlap et al. |
| 2014/0104665 | A1 | 4/2014 | Popovich et al. |
| 2014/0132694 | A1 | 5/2014 | Shacham et al. |
| 2015/0002840 | A1 | 1/2015 | Pettersson et al. |
| 2015/0015773 | A1 | 1/2015 | Tulyakov et al. |
| 2015/0197062 | A1 | 7/2015 | Shinar et al. |
| 2015/0227112 | A1 | 8/2015 | Liu et al. |
| 2015/0247976 | A1 | 9/2015 | Abovitz et al. |
| 2015/0288063 | A1 | 10/2015 | Johnson et al. |
| 2016/0042501 | A1 | 2/2016 | Huang et al. |
| 2016/0103419 | A1 | 4/2016 | Callagy et al. |
| 2016/0209657 | A1 | 7/2016 | Popovich et al. |
| 2016/0282808 | A1 | 9/2016 | Smalley |
| 2016/0291328 | A1 | 10/2016 | Popovich et al. |
| 2016/0301430 | A1 | 10/2016 | Mohamadi |
| 2017/0347874 | A1 | 12/2017 | Novik |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | 2015071903 A1 | 5/2015 |
| WO | 2017127897 A1 | 8/2017 |
| WO | 2018014010 A1 | 1/2018 |

OTHER PUBLICATIONS

International Search Report and Written Opinion of PCT/US2019/013310 dated May 13, 2019.
International Search Report and Written Opinion of PCT/US2019/013552 dated May 2, 2019.
International Search Report and Written Opinion of PCT/US2019/013410 dated Apr. 1, 2019.
International Search Report and Written Opinion of PCT/US2019/013539 dated Mar. 22, 2019.
International Search Report and Written Opinion of PCT/US2019/013554 dated Mar. 28, 2019.
International Search Report and Written Opinion of PCT/US2019/013408 dated Apr. 23, 2019.
International Search Report and Written Opinion of PCT/US2019/013556 dated Apr. 18, 2019.
International Search Report and Written Opinion of PCT/US2019/013409 dated Apr. 24, 2019.
NZ-743822 Further Examination Report dated Jun. 11, 2019.
AU-2018256628 Examination Report No. 1 dated Jul. 1, 2019.
NZ-743820 Further Examination Report dated Jul. 9, 2019.



FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5A

FIG. 5B



FIG. 6



SIDE VIEW

*FIG. 7*



SIDE VIEW

*FIG. 8*



FIG. 9



*FIG. 10*



*FIG. 11*



SIDE VIEW

*FIG. 12*



*FIG. 13*



FIG. 14



FIG. 15



FIG. 16



FIG. 17



FIG. 18



FIG. 19

FIG. 20

US 10,488,584 B2

1

# HIGH DENSITY ENERGY DIRECTING DEVICE

## TECHNICAL FIELD

This disclosure is related to energy directing devices, and specifically to energy relays configured to direct high density energy through a mosaic surface with imperceptible seam gaps.

## BACKGROUND

The dream of an interactive virtual world within a "holodeck" chamber as popularized by Gene Roddenberry's Star Trek and originally envisioned by author Alexander Moszkowski in the early 1900s has been the inspiration for science fiction and technological innovation for nearly a century. However, no compelling implementation of this experience exists outside of literature, media, and the collective imagination of children and adults alike.

## SUMMARY

In an embodiment, an energy directing device may comprise one or more energy locations and one or more energy relay elements, each of the one or more energy relay elements further comprising a first surface and a second surface. The second surfaces of each energy relay element may be arranged to form a singular seamless energy surface.

In an embodiment, a separation between edges of any two adjacent second surfaces of the singular seamless energy surface may be less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface, from the singular seamless energy surface.

In an embodiment, the one or more energy relay elements may be configured to direct energy along energy propagation paths which extend between the one or more energy locations and the singular seamless energy surface.

In an embodiment, the singular seamless energy surface may be a virtual surface.

In an embodiment, energy may be directed through the one or more energy relay elements with zero magnification, non-zero magnification, or non-zero minification.

In an embodiment, the singular seamless energy surface may be planar, faceted, or curved.

In an embodiment, a quantity of the one or more energy relay elements and a quantity of the one or more energy locations may define a mechanical dimension of the energy directing device.

In an embodiment, the one or more energy relay elements may be configured to relay accepted focused light, the accepted focused light having a first resolution, while retaining a relayed resolution of the accepted focused light no less than 50% of the first resolution.

In an embodiment, an energy directing device comprises one or more energy locations and one or more energy relay element stacks. Each energy relay element stack comprises one or more energy relay elements, and each energy relay element comprising a first side and a second side. Each energy relay element may be configured to direct energy therethrough.

In an embodiment, the second sides of terminal energy relay elements of each energy relay element stack may be arranged to form a singular seamless energy surface.

2

In an embodiment, the one or more energy relay element stacks may be configured to direct energy along energy propagation paths which extend between the one or more energy locations and the singular seamless energy surfaces.

In an embodiment, a separation between the edges of any two adjacent second surfaces of the terminal energy relay elements may be less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface, from the singular seamless energy surface.

In an embodiment, the energy relay elements of each energy relay element stack arranged in an end-to-end configuration;

In an embodiment, an energy system comprises one or more energy devices, and one or more energy components each made from elements that induce transverse Anderson Localization of energy transport therethrough, and each energy component further comprising a first energy surface and a second energy surface.

In an embodiment, the second energy surface of each energy component may be arranged to form a singular seamless energy surface.

In an embodiment, the one or more energy devices may be operable to at least emit or receive energy through the singular seamless energy surface.

In an embodiment, a separation between edges of any two adjacent second energy surfaces of the one or more energy components may be less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a singular seamless energy surface height or a singular seamless energy surface width, from the singular seamless energy surface.

These and other advantages of the present disclosure will become apparent to those skilled in the art from the following detailed description and the appended claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a schematic diagram illustrating design parameters for an energy directing system;

FIG. **2** is a schematic diagram illustrating an energy system having an active device area with a mechanical envelope;

FIG. **3** is a schematic diagram illustrating an energy relay system;

FIG. **4** is a schematic diagram illustrating an embodiment of energy relay elements adhered together and fastened to a base structure;

FIG. **5**A is a schematic diagram illustrating an example of a relayed image through multi-core optical fibers;

FIG. **5**B is a schematic diagram illustrating an example of a relayed image through an optical relay that exhibits the properties of the Transverse Anderson Localization principle;

FIG. **6** is a schematic diagram showing rays propagated from an energy surface to a viewer;

FIG. **7** illustrates a side view of three display devices which each comprise an active display area dimension and a mechanical envelope;

FIG. **8** features five display devices which each comprise active display areas and mechanical envelopes, used with a beam splitter;

US 10,488,584 B2

3

FIG. **9** is a side view illustration of a methodology where 3 beam splitters are leveraged to accommodate a mechanical envelope;

FIG. **10** highlights this relationship between the mechanical envelope ratio, the minimum focus distance and the maximum image offset as well as the percent of overlap between individual tiled images;

FIG. **11** is a top view illustration of an embodiment with three projection devices arranged in an arc;

FIG. **12** illustrates a tapered energy relay mosaic arrangement;

FIG. **13** illustrates a side view of an energy relay element stack comprising of two compound optical relay tapers in series;

FIG. **14** illustrates a perspective view of an embodiment of an energy directing device where energy relay element stacks are arranged in an 8×4 array to form a singular seamless energy directing surface;

FIG. **15** contains several views of an energy directing device.

FIG. **16** contains a close-up view of the side view from FIG. **15** of the energy directing device;

FIG. **17** illustrates a top view of an embodiment where energy relay element stacks are angled inward to a known point in space;

FIG. **18** is a top view illustration of an embodiment where the seamless energy surface is a display formed by tapered optical relays, while the display devices and the mechanical envelopes for the display electronics are located a distance away from the tapered relays;

FIG. **19** is a side view illustration of an embodiment wherein a seamless display surface is composed of nine tapered optical relays;

FIG. **20** is a top view illustration of an embodiment where a single projection source and a single display panel source are merged with an image combiner.

DETAILED DESCRIPTION

An embodiment of a Holodeck (collectively called "Holodeck Design Parameters") provide sufficient energy stimulus to fool the human sensory receptors into believing that received energy impulses within a virtual, social and interactive environment are real, providing: 1) binocular disparity without external accessories, head-mounted eyewear, or other peripherals; 2) accurate motion parallax, occlusion and opacity throughout a viewing volume simultaneously for any number of viewers; 3) visual focus through synchronous convergence, accommodation and miosis of the eye for all perceived rays of light; and 4) converging energy wave propagation of sufficient density and resolution to exceed the human sensory "resolution" for vision, hearing, touch, taste, smell, and/or balance.

Based upon conventional technology to date, we are decades, if not centuries away from a technology capable of providing for all receptive fields in a compelling way as suggested by the Holodeck Design Parameters including the visual, auditory, somatosensory, gustatory, olfactory, and vestibular systems.

In this disclosure, the terms light field and holographic may be used interchangeably to define the energy propagation for stimulation of any sensory receptor response. While initial disclosures may refer to examples of electromagnetic and mechanical energy propagation through energy surfaces for holographic imagery and volumetric haptics, all forms of sensory receptors are envisioned in this disclosure. Further-

4

more, the principles disclosed herein for energy propagation along propagation paths may be applicable to both energy emission and energy capture.

Many technologies exist today that are often unfortunately confused with holograms including lenticular printing, Pepper's Ghost, glasses-free stereoscopic displays, horizontal parallax displays, head-mounted VR and AR displays (HMD), and other such illusions generalized as "fauxlography." These technologies may exhibit some of the desired properties of a true holographic display, however, lack the ability to stimulate the human visual sensory response in any way sufficient to address at least two of the four identified Holodeck Design Parameters.

These challenges have not been successfully implemented by conventional technology to produce a seamless energy surface sufficient for holographic energy propagation. There are various approaches to implementing volumetric and direction multiplexed light field displays including parallax barriers, hogels, voxels, diffractive optics, multi-view projection, holographic diffusers, rotational mirrors, multilayered displays, time sequential displays, head mounted display, etc., however, conventional approaches may involve a compromise on image quality, resolution, angular sampling density, size, cost, safety, frame rate, etc., ultimately resulting in an unviable technology.

To achieve the Holodeck Design Parameters for the visual, auditory, somatosensory systems, the human acuity of each of the respective systems is studied and understood to propagate energy waves to sufficiently fool the human sensory receptors. The visual system is capable of resolving to approximately 1 arc min, the auditory system may distinguish the difference in placement as little as three degrees, and the somatosensory system at the hands are capable of discerning points separated by 2-12 mm. While there are various and conflicting ways to measure these acuities, these values are sufficient to understand the systems and methods to stimulate perception of energy propagation.

Of the noted sensory receptors, the human visual system is by far the most sensitive given that even a single photon can induce sensation. For this reason, much of this introduction will focus on visual energy wave propagation, and vastly lower resolution energy systems coupled within a disclosed energy waveguide surface may converge appropriate signals to induce holographic sensory perception. Unless otherwise noted, all disclosures apply to all energy and sensory domains.

When calculating for effective design parameters of the energy propagation for the visual system given a viewing volume and viewing distance, a desired energy surface may be designed to include many gigapixels of effective energy location density. For wide viewing volumes, or near field viewing, the design parameters of a desired energy surface may include hundreds of gigapixels or more of effective energy location density. By comparison, a desired energy source may be designed to have 1 to 250 effective megapixels of energy location density for ultrasonic propagation of volumetric haptics or an array of 36 to 3,600 effective energy locations for acoustic propagation of holographic sound depending on input environmental variables. What is important to note is that with a disclosed bidirectional energy surface architecture, all components may be configured to form the appropriate structures for any energy domain to enable holographic propagation.

However, the main challenge to enable the Holodeck today involves available visual technologies and electromagnetic device limitations. Acoustic and ultrasonic devices are less challenging given the orders of magnitude difference

US 10,488,584 B2

5

in desired density based upon sensory acuity in the respective receptive field, although the complexity should not be underestimated. While holographic emulsion exists with resolutions exceeding the desired density to encode interference patterns in static imagery, state-of-the-art display devices are limited by resolution, data throughput and manufacturing feasibility. To date, no singular display device has been able to meaningfully produce a light field having near holographic resolution for visual acuity.

Production of a single silicon-based device capable of meeting the desired resolution for a compelling light field display may not be practical and may involve extremely complex fabrication processes beyond the current manufacturing capabilities. The limitation to tiling multiple existing display devices together involves the seams and gap formed by the physical size of packaging, electronics, enclosure, optics and a number of other challenges that inevitably result in an unviable technology from an imaging, cost and/or a size standpoint.

The embodiments disclosed herein may provide a real-world path to building the Holodeck.

Example embodiments will now be described hereinafter with reference to the accompanying drawings, which form a part hereof, and which illustrate example embodiments which may be practiced. As used in the disclosures and the appended claims, the terms "embodiment", "example embodiment", and "exemplary embodiment" do not necessarily refer to a single embodiment, although they may, and various example embodiments may be readily combined and interchanged, without departing from the scope or spirit of example embodiments. Furthermore, the terminology as used herein is for the purpose of describing example embodiments only and is not intended to be limitations. In this respect, as used herein, the term "in" may include "in" and "on", and the terms "a," "an" and "the" may include singular and plural references. Furthermore, as used herein, the term "by" may also mean "from", depending on the context. Furthermore, as used herein, the term "if" may also mean "when" or "upon", depending on the context. Furthermore, as used herein, the words "and/or" may refer to and encompass any and all possible combinations of one or more of the associated listed items.

Holographic System Considerations: Overview of Light Field Energy Propagation Resolution

Light field and holographic display is the result of a plurality of projections where energy surface locations provide angular, color and intensity information propagated within a viewing volume. The disclosed energy surface provides opportunities for additional information to coexist and propagate through the same surface to induce other sensory system responses. Unlike a stereoscopic display, the viewed position of the converged energy propagation paths in space do not vary as the viewer moves around the viewing volume and any number of viewers may simultaneously see propagated objects in real-world space as if it was truly there. In some embodiments, the propagation of energy may be located in the same energy propagation path but in opposite directions. For example, energy emission and energy capture along an energy propagation path are both possible in some embodiments of the present disclosed.

FIG. 1 is a schematic diagram illustrating variables relevant for stimulation of sensory receptor response. These variables may include surface diagonal 101, surface width 102, surface height 103, a determined target seating distance 118, the target seating field of view field of view from the

6

center of the display 104, the number of intermediate samples demonstrated here as samples between the eyes 105, the average adult inter-ocular separation 106, the average resolution of the human eye in arcmin 107, the horizontal field of view formed between the target viewer location and the surface width 108, the vertical field of view formed between the target viewer location and the surface height 109, the resultant horizontal waveguide element resolution, or total number of elements, across the surface 110, the resultant vertical waveguide element resolution, or total number of elements, across the surface 111, the sample distance based upon the inter-ocular spacing between the eyes and the number of intermediate samples for angular projection between the eyes 112, the angular sampling may be based upon the sample distance and the target seating distance 113, the total resolution Horizontal per waveguide element derived from the angular sampling desired 114, the total resolution Vertical per waveguide element derived from the angular sampling desired 115, device Horizontal is the count of the determined number of discreet energy sources desired 116, and device Vertical is the count of the determined number of discreet energy sources desired 117.

A method to understand the desired minimum resolution may be based upon the following criteria to ensure sufficient stimulation of visual (or other) sensory receptor response: surface size (e.g., 84" diagonal), surface aspect ratio (e.g., 16:9), seating distance (e.g., 128" from the display), seating field of view (e.g., 120 degrees or +/–60 degrees about the center of the display), desired intermediate samples at a distance (e.g., one additional propagation path between the eyes), the average inter-ocular separation of an adult (approximately 65 mm), and the average resolution of the human eye (approximately 1 arcmin). These example values should be considered placeholders depending on the specific application design parameters.

Further, each of the values attributed to the visual sensory receptors may be replaced with other systems to determine desired propagation path parameters. For other energy propagation embodiments, one may consider the auditory system's angular sensitivity as low as three degrees, and the somatosensory system's spatial resolution of the hands as small as 2-12 mm.

While there are various and conflicting ways to measure these sensory acuities, these values are sufficient to understand the systems and methods to stimulate perception of virtual energy propagation. There are many ways to consider the design resolution, and the below proposed methodology combines pragmatic product considerations with the biological resolving limits of the sensory systems. As will be appreciated by one of ordinary skill in the art, the following overview is a simplification of any such system design, and should be considered for exemplary purposes only.

With the resolution limit of the sensory system understood, the total energy waveguide element density may be calculated such that the receiving sensory system cannot discern a single energy waveguide element from an adjacent element, given:

$$\text{Surface Aspect Ratio} = \frac{\text{Width } (W)}{\text{Height } (H)}$$

$$\text{Surface Horizontal Size} = \text{Surface Diagonal} * \left( \frac{1}{\sqrt{\left(1 + \left(\frac{H}{W}\right)^2\right)}} \right)$$

US 10,488,584 B2

7
-continued

$$\text{Surface Vertical Size} = \text{Surface Diagonal} * \left( \frac{1}{\sqrt{\left(1 + \left(\frac{W}{H}\right)^2\right)}} \right)$$

$$\text{Horizontal Field of View} = 2 * \text{atan}\left( \frac{\text{Surface Horizontal Size}}{2 * \text{Seating Distance}} \right)$$

$$\text{Vertical Field of View} = 2 * \text{atan}\left( \frac{\text{Surface Verticle Size}}{2 * \text{Seating Distance}} \right)$$

$$\text{Horizontal Element Resolution} = \text{Horizontal } FoV * \frac{60}{\text{Eye Resolution}}$$

$$\text{Vertical Element Resolution} = \text{Vertical } FoV * \frac{60}{\text{Eye Resolution}}$$

The above calculations result in approximately a 32×18° field of view resulting in approximately 1920×1080 (rounded to nearest format) energy waveguide elements being desired. One may also constrain the variables such that the field of view is consistent for both (u, v) to provide a more regular spatial sampling of energy locations (e.g. pixel aspect ratio). The angular sampling of the system assumes a defined target viewing volume location and additional propagated energy paths between two points at the optimized distance, given:

$$\text{Sample Distance} = \frac{\text{Inter-Ocular Distance}}{(\text{Number of Desired Intermediate Samples} + 1)}$$

$$\text{Angular Sampling} = \text{atan}\left( \frac{\text{Sample Distance}}{\text{Seating Distance}} \right)$$

In this case, the inter-ocular distance is leveraged to calculate the sample distance although any metric may be leveraged to account for appropriate number of samples as a given distance. With the above variables considered, approximately one ray per 0.57° may be desired and the total system resolution per independent sensory system may be determined, given:

$$\text{Locations Per Element}(N) = \frac{\text{Seating } FoV}{\text{Angular Sampling}}$$

$$\text{Total Resolution } H = N * \text{Horizontal Element Resolution}$$

$$\text{Total Resolution } V = N * \text{Vertical Element Resolution}$$

With the above scenario given the size of energy surface and the angular resolution addressed for the visual acuity system, the resultant energy surface may desirably include approximately 400 k×225 k pixels of energy resolution locations, or 90 gigapixels holographic propagation density. These variables provided are for exemplary purposes only and many other sensory and energy metrology considerations should be considered for the optimization of holographic propagation of energy. In an additional embodiment, 1 gigapixel of energy resolution locations may be desired based upon the input variables. In an additional embodiment, 1,000 gigapixels of energy resolution locations may be desired based upon the input variables.

Current Technology Limitations: Active Area,
Device Electronics, Packaging, and the Mechanical
Envelope

FIG. 2 illustrates a device 200 having an active area 220 with a certain mechanical form factor. The device 200 may

8
include drivers 230 and electronics 240 for powering and interface to the active area 220, the active area having a dimension as shown by the x and y arrows. This device 200 does not take into account the cabling and mechanical structures to drive, power and cool components, and the mechanical footprint may be further minimized by introducing a flex cable into the device 200. The minimum footprint for such a device 200 may also be referred to as a mechanical envelope 210 having a dimension as shown by the M:x and M:y arrows. This device 200 is for illustration purposes only and custom electronics designs may further decrease the mechanical envelope overhead, but in almost all cases may not be the exact size of the active area of the device. In an embodiment, this device 200 illustrates the dependency of electronics as it relates to active image area 220 for a micro OLED, DLP chip or LCD panel, or any other technology with the purpose of image illumination.

In some embodiments, it may also be possible to consider other projection technologies to aggregate multiple images onto a larger overall display. However, this may come at the cost of greater complexity for throw distance, minimum focus, optical quality, uniform field resolution, chromatic aberration, thermal properties, calibration, alignment, additional size or form factor. For most practical applications, hosting tens or hundreds of these projection sources 200 may result in a design that is much larger with less reliability.

For exemplary purposes only, assuming energy devices with an energy location density of 3840×2160 sites, one may determine the number of individual energy devices (e.g., device 100) desired for an energy surface, given:

$$\text{Devices } H = \frac{\text{Total Resolution } H}{\text{Device Resolution } H}$$

$$\text{Devices } V = \frac{\text{Total Resolution } V}{\text{Device Resolution } V}$$

Given the above resolution considerations, approximately 105×105 devices similar to those shown in FIG. 2 may be desired. It should be noted that many devices comprise of various pixel structures that may or may not map to a regular grid. In the event that there are additional sub-pixels or locations within each full pixel, these may be exploited to generate additional resolution or angular density. Additional signal processing may be used to determine how to convert the light field into the correct (u,v) coordinates depending on the specified location of the pixel structure(s) and can be an explicit characteristic of each device that is known and calibrated. Further, other energy domains may involve a different handling of these ratios and device structures, and those skilled in the art will understand the direct intrinsic relationship between each of the desired frequency domains. This will be shown and discussed in more detail in subsequent disclosure.

The resulting calculation may be used to understand how many of these individual devices may be desired to produce a full resolution energy surface. In this case, approximately 105×105 or approximately 11,080 devices may be desired to achieve the visual acuity threshold. The challenge and novelty exists within the fabrication of a seamless energy surface from these available energy locations for sufficient sensory holographic propagation.

Summary of Seamless Energy Surfaces:
Configurations and Designs for Arrays of Energy
Relays

In some embodiments, approaches are disclosed to address the challenge of generating high energy location

US 10,488,584 B2

9

density from an array of individual devices without seams due to the limitation of mechanical structure for the devices. In an embodiment, an energy propagating relay system may allow for an increase the effective size of the active device area to meet or exceed the mechanical dimensions to configure an array of relays and form a singular seamless energy surface.

FIG. **3** illustrates an embodiment of such an energy relay system **300**. As shown, the relay system **300** may include a device **310** mounted to a mechanical envelope **320**, with an energy relay element **330** propagating energy from the device **310**. The relay element **330** may be configured to provide the ability to mitigate any gaps **340** that may be produced when multiple mechanical envelopes **320** of the device are placed into an array of multiple devices **310**.

For example, if a device's active area **310** is 20 mm×10 mm and the mechanical envelope **320** is 40 mm×20 mm, an energy relay element **330** may be designed with a magnification of 2:1 to produce a tapered form that is approximately 20 mm×10 mm on a minified end (arrow A) and 40 mm×20 mm on a magnified end (arrow B), providing the ability to align an array of these elements **330** together seamlessly without altering or colliding with the mechanical envelope **320** of each device **310**. Mechanically, the relay elements **330** may be bonded or fused together to align and polish ensuring minimal seam gap **340** between devices **310**. In one such embodiment, it is possible to achieve a seam gap **340** smaller than the visual acuity limit of the eye.

FIG. **4** illustrates an example of a base structure **400** having energy relay elements **410** formed together and securely fastened to an additional mechanical structure **430**. The mechanical structure of the seamless energy surface **420** provides the ability to couple multiple energy relay elements **410**, **450** in series to the same base structure through bonding or other mechanical processes to mount relay elements **410**, **450**. In some embodiments, each relay element **410** may be fused, bonded, adhered, pressure fit, aligned or otherwise attached together to form the resultant seamless energy surface **420**. In some embodiments, a device **480** may be mounted to the rear of the relay element **410** and aligned passively or actively to ensure appropriate energy location alignment within the determined tolerance is maintained.

In an embodiment, the seamless energy surface comprises one or more energy locations and one or more energy relay element stacks comprise a first and second side and each energy relay element stack is arranged to form a singular seamless display surface directing energy along propagation paths extending between one or more energy locations and the seamless display surface, and where the separation between the edges of any two adjacent second surfaces of the terminal energy relay elements is less than the minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/100 vision at a distance greater than the width of the singular seamless display surface.

In an embodiment, each of the seamless energy surfaces comprise one or more energy relay elements each with one or more structures forming a first and second surface with a transverse and longitudinal orientation. The first relay surface has an area different than the second resulting in positive or negative magnification and configured with explicit surface contours for both the first and second surfaces passing energy through the second relay surface to substantially fill a +/−10 degree angle with respect to the normal of the surface contour across the entire second relay surface.

10

In an embodiment, multiple energy domains may be configured within a single, or between multiple energy relays to direct one or more sensory holographic energy propagation paths including visual, acoustic, tactile or other energy domains.

In an embodiment, the seamless energy surface is configured with energy relays that comprise two or more first sides for each second side to both receive and emit one or more energy domains simultaneously to provide bidirectional energy propagation throughout the system.

In an embodiment, the energy relays are provided as loose coherent elements.

Introduction to Component Engineered Structures:
Disclosed Advances in Transverse Anderson
Localization Energy Relays

The properties of energy relays may be significantly optimized according to the principles disclosed herein for energy relay elements that induce Transverse Anderson Localization. Transverse Anderson Localization is the propagation of a ray transported through a transversely disordered but longitudinally consistent material.

This implies that the effect of the materials that produce the Anderson Localization phenomena may be less impacted by total internal reflection than by the randomization between multiple-scattering paths where wave interference can completely limit the propagation in the transverse orientation while continuing in the longitudinal orientation.

Of significant additional benefit is the elimination of the cladding of traditional multi-core optical fiber materials. The cladding is to functionally eliminate the scatter of energy between fibers, but simultaneously act as a barrier to rays of energy thereby reducing transmission by at least the core to clad ratio (e.g., a core to clad ratio of 70:30 will transmit at best 70% of received energy transmission) and additionally forms a strong pixelated patterning in the propagated energy.

FIG. **5A** illustrates an end view of an example of one such non-Anderson Localization energy relay **500**, wherein an image is relayed through multi-core optical fibers where pixilation and fiber noise may be exhibited due to the intrinsic properties of the optical fibers. With traditional multi-mode and multi-core optical fibers, relayed images may be intrinsically pixelated due to the properties of total internal reflection of the discrete array of cores where any cross-talk between cores will reduce the modulation transfer function and increase blurring. The resulting imagery produced with traditional multi-core optical fiber tends to have a residual fixed noise fiber pattern similar to those shown in FIG. **3**.

FIG. **5B**, illustrates an example of the same relayed image **550** through an energy relay comprising materials that exhibit the properties of Transverse Anderson Localization, where the relayed pattern has a greater density grain structures as compared to the fixed fiber pattern from FIG. **5A**. In an embodiment, relays comprising randomized microscopic component engineered structures induce Transverse Anderson Localization and transport light more efficiently with higher propagation of resolvable resolution than commercially available multi-mode glass optical fibers.

There is significant advantage to the Transverse Anderson Localization material properties in terms of both cost and weight, where a similar optical grade glass material, may cost and weigh upwards of 10 to 100-fold more than the cost for the same material generated within an embodiment, wherein disclosed systems and methods comprise randomized microscopic component engineered structures demon-

US 10,488,584 B2

11

12

strating significant opportunities to improve both cost and quality over other technologies known in the art.

In an embodiment, a relay element exhibiting Transverse Anderson Localization may comprise a plurality of at least two different component engineered structures in each of three orthogonal planes arranged in a dimensional lattice and the plurality of structures form randomized distributions of material wave propagation properties in a transverse plane within the dimensional lattice and channels of similar values of material wave propagation properties in a longitudinal plane within the dimensional lattice, wherein localized energy waves propagating through the energy relay have higher transport efficiency in the longitudinal orientation versus the transverse orientation.

In an embodiment, multiple energy domains may be configured within a single, or between multiple Transverse Anderson Localization energy relays to direct one or more sensory holographic energy propagation paths including visual, acoustic, tactile or other energy domains.

In an embodiment, the seamless energy surface is configured with Transverse Anderson Localization energy relays that comprise two or more first sides for each second side to both receive and emit one or more energy domains simultaneously to provide bidirectional energy propagation throughout the system.

In an embodiment, the Transverse Anderson Localization energy relays are configured as loose coherent or flexible energy relay elements.

Considerations for 4D Plenoptic Functions:
Selective Propagation of Energy through
Holographic Waveguide Arrays

As discussed above and herein throughout, a light field display system generally includes an energy source (e.g., illumination source) and a seamless energy surface configured with sufficient energy location density as articulated in the above discussion. A plurality of relay elements may be used to relay energy from the energy devices to the seamless energy surface. Once energy has been delivered to the seamless energy surface with the requisite energy location density, the energy can be propagated in accordance with a 4D plenoptic function through a disclosed energy waveguide system. As will be appreciated by one of ordinary skill in the art, a 4D plenoptic function is well known in the art and will not be elaborated further herein.

The energy waveguide system selectively propagates energy through a plurality of energy locations along the seamless energy surface representing the spatial coordinate of the 4D plenoptic function with a structure configured to alter an angular direction of the energy waves passing through representing the angular component of the 4D plenoptic function, wherein the energy waves propagated may converge in space in accordance with a plurality of propagation paths directed by the 4D plenoptic function.

Reference is now made to FIG. 6 illustrating an example of light field energy surface in 4D image space in accordance with a 4D plenoptic function. The figure shows ray traces of an energy surface 600 to a viewer 620 in describing how the rays of energy converge in space 630 from various positions within the viewing volume. As shown, each waveguide element 610 defines four dimensions of information describing energy propagation 640 through the energy surface 600. Two spatial dimensions (herein referred to as x and y) are the physical plurality of energy locations that can be viewed in image space, and the angular components theta and phi (herein referred to as u and v), which is viewed in virtual space when projected through the energy waveguide array. In general and in accordance with a 4D plenoptic function, the plurality of waveguides (e.g., lenslets) are able to direct an energy location from the x, y dimension to a unique location in virtual space, along a direction defined by the u, v angular component, forming the holographic or light field system described herein.

However, one skilled in the art will understand that a significant challenge to light field and holographic display technologies arises from uncontrolled propagation of energy due to designs that have not accurately accounted for any of diffraction, scatter, diffusion, angular direction, calibration, focus, collimation, curvature, uniformity, element cross-talk, as well as a multitude of other parameters that contribute to decreased effective resolution as well as an inability to accurately converge energy with sufficient fidelity.

In an embodiment, an approach to selective energy propagation for addressing challenges associated with holographic display may include energy inhibiting elements and substantially filling waveguide apertures with near-collimated energy into an environment defined by a 4D plenoptic function.

In an embodiment, an array of energy waveguides may define a plurality of energy propagation paths for each waveguide element configured to extend through and substantially fill the waveguide element's effective aperture in unique directions defined by a prescribed 4D function to a plurality of energy locations along a seamless energy surface inhibited by one or more elements positioned to limit propagation of each energy location to only pass through a single waveguide element.

In an embodiment, multiple energy domains may be configured within a single, or between multiple energy waveguides to direct one or more sensory holographic energy propagations including visual, acoustic, tactile or other energy domains.

In an embodiment, the energy waveguides and seamless energy surface are configured to both receive and emit one or more energy domains to provide bidirectional energy propagation throughout the system.

In an embodiment, the energy waveguides are configured to propagate non-linear or non-regular distributions of energy, including non-transmitting void regions, leveraging digitally encoded, diffractive, refractive, reflective, grin, holographic, Fresnel, or the like waveguide configurations for any seamless energy surface orientation including wall, table, floor, ceiling, room, or other geometry based environments. In an additional embodiment, an energy waveguide element may be configured to produce various geometries that provide any surface profile and/or tabletop viewing allowing users to view holographic imagery from all around the energy surface in a 360-degree configuration.

In an embodiment, the energy waveguide array elements may be reflective surfaces and the arrangement of the elements may be hexagonal, square, irregular, semi-regular, curved, non-planar, spherical, cylindrical, tilted regular, tilted irregular, spatially varying and/or multi-layered.

For any component within the seamless energy surface, waveguide, or relay components may include, but not limited to, optical fiber, silicon, glass, polymer, optical relays, diffractive, holographic, refractive, or reflective elements, optical face plates, energy combiners, beam splitters, prisms, polarization elements, spatial light modulators, active pixels, liquid crystal cells, transparent displays, or any similar materials exhibiting Anderson localization or total internal reflection.

US 10,488,584 B2

13

Realizing the Holodeck: Aggregation of Seamless
Energy Surface Systems to Stimulate Human
Sensory Receptors Within Holographic
Environments

It is possible to construct large-scale environments of
seamless energy surface systems by tiling, fusing, bonding,
attaching, and/or stitching multiple seamless energy surfaces
together forming arbitrary sizes, shapes, contours or form-
factors including entire rooms. Each energy surface system
may comprise an assembly having a base structure, energy
surface, relays, waveguide, devices, and electronics, collec-
tively configured for bidirectional holographic energy
propagation, emission, reflection, or sensing.

In an embodiment, an environment of tiled seamless
energy systems are aggregated to form large seamless planar
or curved walls including installations comprising up to all
surfaces in a given environment, and configured as any
combination of seamless, discontinuous planar, faceted,
curved, cylindrical, spherical, geometric, or non-regular
geometries.

In an embodiment, aggregated tiles of planar surfaces
form wall-sized systems for theatrical or venue-based holo-
graphic entertainment. In an embodiment, aggregated tiles
of planar surfaces cover a room with four to six walls
including both ceiling and floor for cave-based holographic
installations. In an embodiment, aggregated tiles of curved
surfaces produce a cylindrical seamless environment for
immersive holographic installations. In an embodiment,
aggregated tiles of seamless spherical surfaces form a holo-
graphic dome for immersive Holodeck-based experiences.

In an embodiment, aggregate tiles of seamless curved
energy waveguides provide mechanical edges following the
precise pattern along the boundary of energy inhibiting
elements within the energy waveguide structure to bond,
align, or fuse the adjacent tiled mechanical edges of the
adjacent waveguide surfaces, resulting in a modular and
seamless energy waveguide system.

In a further embodiment of an aggregated tiled environ-
ment, energy is propagated bidirectionally for multiple
simultaneous energy domains. In an additional embodiment,
the energy surface provides the ability to both display and
capture simultaneously from the same energy surface with
waveguides designed such that light field data may be
projected by an illumination source through the waveguide
and simultaneously received through the same energy sur-
face. In an additional embodiment, additional depth sensing
and active scanning technologies may be leveraged to allow
for the interaction between the energy propagation and the
viewer in correct world coordinates. In an additional
embodiment, the energy surface and waveguide are operable
to emit, reflect or converge frequencies to induce tactile
sensation or volumetric haptic feedback. In some embodi-
ments, any combination of bidirectional energy propagation
and aggregated surfaces are possible.

In an embodiment, the system comprises an energy wave-
guide capable of bidirectional emission and sensing of
energy through the energy surface with one or more energy
devices independently paired with two-or-more-path energy
combiners to pair at least two energy devices to the same
portion of the seamless energy surface, or one or more
energy devices are secured behind the energy surface, proxi-
mate to an additional component secured to the base struc-
ture, or to a location in front and outside of the FOV of the
waveguide for off-axis direct or reflective projection or
sensing, and the resulting energy surface provides for bidi-
rectional transmission of energy allowing the waveguide to

14

converge energy, a first device to emit energy and a second
device to sense energy, and where the information is pro-
cessed to perform computer vision related tasks including,
but not limited to, 4D plenoptic eye and retinal tracking or
sensing of interference within propagated energy patterns,
depth estimation, proximity, motion tracking, image, color,
or sound formation, or other energy frequency analysis. In
an additional embodiment, the tracked positions actively
calculate and modify positions of energy based upon the
interference between the bidirectional captured data and
projection information.

In some embodiments, a plurality of combinations of
three energy devices comprising an ultrasonic sensor, a
visible electromagnetic display, and an ultrasonic emitting
device are configured together for each of three first relay
surfaces propagating energy combined into a single second
energy relay surface with each of the three first surfaces
comprising engineered properties specific to each device's
energy domain, and two engineered waveguide elements
configured for ultrasonic and electromagnetic energy respec-
tively to provide the ability to direct and converge each
device's energy independently and substantially unaffected
by the other waveguide elements that are configured for a
separate energy domain.

In some embodiments, disclosed is a calibration proce-
dure to enable efficient manufacturing to remove system
artifacts and produce a geometric mapping of the resultant
energy surface for use with encoding/decoding technologies
as well as dedicated integrated systems for the conversion of
data into calibrated information appropriate for energy
propagation based upon the calibrated configuration files.

In some embodiments, additional energy waveguides in
series and one or more energy devices may be integrated into
a system to produce opaque holographic pixels.

In some embodiments, additional waveguide elements
may be integrated comprising energy inhibiting elements,
beam-splitters, prisms, active parallax barriers or polariza-
tion technologies in order to provide spatial and/or angular
resolutions greater than the diameter of the waveguide or for
other super-resolution purposes.

In some embodiments, the disclosed energy system may
also be configured as a wearable bidirectional device, such
as virtual reality (VR) or augmented reality (AR). In other
embodiments, the energy system may include adjustment
optical element(s) that cause the displayed or received
energy to be focused proximate to a determined plane in
space for a viewer. In some embodiments, the waveguide
array may be incorporated to holographic head-mounted-
display. In other embodiments, the system may include
multiple optical paths to allow for the viewer to see both the
energy system and a real-world environment (e.g., transpar-
ent holographic display). In these instances, the system may
be presented as near field in addition to other methods.

In some embodiments, the transmission of data comprises
encoding processes with selectable or variable compression
ratios that receive an arbitrary dataset of information and
metadata; analyze said dataset and receive or assign material
properties, vectors, surface IDs, new pixel data forming a
more sparse dataset, and wherein the received data may
comprise: 2D, stereoscopic, multi-view, metadata, light
field, holographic, geometry, vectors or vectorized metadata,
and an encoder/decoder may provide the ability to convert
the data in real-time or off-line comprising image processing
for: 2D; 2D plus depth, metadata or other vectorized infor-
mation; stereoscopic; stereoscopic plus depth, metadata or
other vectorized information; multi-view; multi-view plus
depth, metadata or other vectorized information; holo-

15

graphic; or light field content; through depth estimation algorithms, with or without depth metadata; and an inverse ray tracing methodology appropriately maps the resulting converted data produced by inverse ray tracing from the various 2D, stereoscopic, multi-view, volumetric, light field or holographic data into real world coordinates through a characterized 4D plenoptic function. In these embodiments, the total data transmission desired may be multiple orders of magnitudes less transmitted information than the raw light field dataset.

High Density Energy Directing Device

In an embodiment, an energy directing device may comprise one or more energy locations and one or more energy relay elements, each of the one or more energy relay elements further comprising a first surface and a second surface. The second surfaces of each energy relay element may be arranged to form a singular seamless energy surface.

In embodiments of the present disclosure, the one or more energy locations may comprise a display technology including any of:

a) LCD, LED, laser, CRT, OLED, AMOLED, TOLED, pico projector, single chip, 3-chip, LCoS, DLP, Quantum Dots, monochrome, color, projection, backlit, directly emissive, reflective, transparent, opaque, coherent, incoherent, diffuse, direct, or any other illumination source sufficient to produce the desired pixel density; and

b) wherein any reflective display technology may be directly bonded to the optical relay to provide an outdoor or ambient illumination display, and further, combined with other materials allows for the interaction of light with the relayed content for both 2D and light field applications; and

c) a series of beamsplitters, prisms, or polarized elements and arranging each of the above devices within the optical system to provide a virtual energy surface that aggregates to include a completely seamless integration of all of the active area between the one or more devices even in consideration of the mechanical envelopes; and

d) a series of parallel, converged, optically offset parallel and converged, on-axis, off-axis, radial, aligned or otherwise reflective or projection systems, each including a specified resolution and mechanical envelope but projecting onto a surface that is in aggregate smaller than the side-by-side footprint of all of the one or more reflective or projection systems combined.

In an embodiment, a separation between edges of any two adjacent second surfaces of the singular seamless energy surface may be less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface, from the singular seamless energy surface.

Creating a seamless energy surface from a plurality of separate independent energy sources presents a problem of significant seams between the active areas of the energy sources.

For example, for visible electromagnetic energy, FIG. 7 represents an example of the minimum separation possible between identical independent displays when mounted on flex cables. FIG. 7 illustrates a side view of three display devices 700, which each comprise an active display area dimension 702 and a mechanical envelope 706. Minimum

16

gaps 708 highlight the minimum possible space between any two active imaging surfaces 702 of display devices 700. In the event that the active image to mechanical envelope ratio is less than 2:1 (e.g. the active area is 20 mm×10 mm and the mechanical envelope is less than 40 mm×10 mm), it is possible to use beam splitters or other similar optical and reflective materials to interleave two image surfaces to form one single contiguous plane.

FIG. 8 is a side view illustration which describes one such implementation of this methodology. FIG. 8 features five display devices 800 which each comprise active display areas 802 and mechanical envelopes 804. Beam splitter 806 combines image light 808 produced by display devices 800 into a seamless image presentation 810, which effectively masks the mechanical envelopes 804 of the display devices 800. It should be noted that a highly non-reflective dark surface is preferable at or near the display to mask out the non-image areas in order to avoid reflection of the electronics and other non-display regions.

FIG. 9 is a side view illustration of a second methodology where 3 beam splitters are leveraged to accommodate a mechanical envelope that is a 4:1 ratio. FIG. 9 features eight display devices 900 which each comprise active display areas 902 and mechanical envelopes 904. Three beam splitters 906, 908, and 910 combine image light 912 produced by the eight display devices 900 into a seamless image presentation 914, which effectively masks the mechanical envelopes 904 of the display devices 900.

It should be noted that while these methods can work, the mechanical accuracy may preferably be near perfect to avoid incorrect angular viewing of each overlapping display plane and the overall viewed brightness will decrease by the amount of light that is absorbed by the beam splitter in order to redirect the rays of light to each discreet reflected plane. In FIG. 9, the brightness of image light 912 will only transmit at best 25% of actual display peak potential from display devices 900 due to the loss of light from the overall system. Additionally, it should be noted that the size of the physical apparatus with multiple reflections becomes quite large very quickly depending on the size of the desired image surface.

It is also possible to consider projection technologies to aggregate multiple images into a larger overall display, however, this comes at the cost of great complexity for throw distance, minimum focus, optical quality, thermal consistency considerations over a temperature gradient over time, as well as image blending, alignment, size and form factor. For most practical applications, hosting tens or hundreds of these projection sources results in a design that is much larger and less reliable. With all of the above risks noted, all of the descriptions contained herein may also apply to any form of projection technology in addition to the disclosed panel methodologies.

An alternative methodology involves using many projectors in a tiled fashion to produce a seamless image surface in combination with a rear projection surface. This surface may include screens, diffusers, and optical relays in planar or non-planar surfaces. The regions between each individually addressed tile should ideally overlap slightly and blend the transition between each tile appropriately, although not explicitly required. The same concept of image area to mechanical envelope applies with some added complexity. We now introduce the concepts of maximum optical offset along image surface position which can be controlled by moving the optics of the projection system independently from that of the image source resulting in a non-keystoned shift of the image to the energy surface. High quality optics

US 10,488,584 B2

17
18

are desired for this to be successful and is often limited to less than the width of the projected image.

Additionally, when not using orthographic or collimated designs, we now have the challenge of minimum focus of the optics contained within the projection system. This can be addressed by increasing the overall projected image size per tile at the consequence of increasing the viewed distance to provide the desired pixel density as notated above.

FIG. 10 highlights this relationship between the mechanical envelope ratio, the minimum focus distance and the maximum image offset as well as the percent of overlap between individual tiled images. FIG. 11 illustrates a top view of an embodiment with three projection devices: one centered projection device 1000, and two off-centered projection devises 1001, 1003. The mechanical envelope of each projection device 1000, 1001, 1003 creates a display offset which invites adjustment of the projection angle 1004 of each off-centered projection device 1001, 1003. FIG. 10 highlights the use of off-axis projection optics, where the display panel 1014 is displaced from the optical axis of the display lens 1016 by an amount 1002 in proportion to the display panel distance from the center of the array, allowing for the overlap of each of these images while maintaining a parallel array structure, and additionally avoid a keystone image correction. Image light projected from the projection devices 1000, 1001, 1003 forms a display image 1006 at image plane 1008. Image light from off-centered projection device 1001, 1003 will have an image offset 1010 and a fractional overlap 1012 at the image plane 1008.

In an embodiment, the singular seamless energy surface may be planar, faceted, or curved. It is also possible to form an arc of projectors at the expense of requiring keystone correction optically or computationally to form the singular energy surface. In an embodiment, three projection devices may be arranged in an arc. The projection devices may produce image light which propagates through a planar image plane. The image light may experience keystone effects.

Alternatively, non-planar surfaces may be designed in order to place each projector directly behind the corresponding tile of viewed energy surface. FIG. 11 is a top view illustration of an embodiment with three projection devices 1100 arranged in an arc. The projection devices 1100 produce image light 1102 which propagates through non-planar surface 1104. Image light 1102 may experience keystone effects that the embodiment of FIG. 10 avoids. For both of these approaches, the projectors do not necessarily need to be in a physically stacked configuration and may leverage reflectors or other optical methodologies in order to provide application specific mechanical designs.

Any combination of these approaches may be employed where both beam splitters and projection technologies can be leveraged simultaneously.

An additional embodiment of the system makes use of recent breakthroughs in energy relay technologies.

Tapered Energy Relays

In order to further solve the challenge of generating high resolution from an array of individual energy wave sources containing extended mechanical envelopes, the use of tapered energy relays can be employed to increase the effective size of each energy source. An array of tapered energy relays may be stitched together to form a singular contiguous energy surface, circumventing the limitation of mechanical requirements for those energy sources.

In an embodiment, the one or more energy relay elements may be configured to direct energy along propagation paths which extend between the one or more energy locations and the singular seamless energy surface.

For example, if an energy wave source's active area is 20 mm×10 mm and the mechanical envelope is 40 mm×20 mm, a tapered energy relay may be designed with a magnification of 2:1 to produce a taper that is 20 mm×10 mm (when cut) on the minified end and 40 mm×20 mm (when cut) on the magnified end, providing the ability to align an array of these tapers together seamlessly without altering or violating the mechanical envelope of each energy wave source.

FIG. 12 illustrates an orthogonal view of one such tapered energy relay mosaic arrangement 1210, in accordance with one embodiment of the present disclosure. In FIG. 12, the relay device 1210 may include two or more relay elements 1220, each relay element 1220 formed of one or more structures, each relay element 1220 having a first surface 1240, a second surface 1260, a transverse orientation (generally parallel to the surfaces 1240, 1260) and a longitudinal orientation (generally perpendicular to the surfaces 1240, 1260). The surface area of the first surface 1240 may be different than the surface area of the second surface 1260. For relay element 1220, the surface area of the first surface 1240 is less than the surface area of the second surface 1260. In another embodiment, the surface area of the first surface 1240 may be the same or greater than the surface area of the second surface 1260. Energy waves can pass from the first surface 1240 to the second surface 1260, or vice versa.

In FIG. 12, the relay element 1220 of the relay element device 1210 includes a sloped profile portion 1280 between the first surface 1240 and the second surface 1260. In operation, energy waves propagating between the first surface 1240 and the second surface 1260 may have a higher transport efficiency in the longitudinal orientation than in the transverse orientation, and energy waves passing through the relay element 1220 may result in spatial magnification or spatial de-magnification. In other words, energy waves passing through the relay element 1220 of the relay element device 1210 may experience increased magnification or decreased magnification. In an embodiment, energy may be directed through the one or more energy relay elements with zero magnification. In some embodiments, the one or more structures for forming relay element devices may include glass, carbon, optical fiber, optical film, plastic, polymer, or mixtures thereof.

In one embodiment, the energy waves passing through the first surface have a first resolution, while the energy waves passing through the second surface have a second resolution, and the second resolution is no less than about 50% of the first resolution. In another embodiment, the energy waves, while having a uniform profile when presented to the first surface, may pass through the second surface radiating in every direction with an energy density in the forward direction that substantially fills a cone with an opening angle of +/−10 degrees relative to the normal to the second surface, irrespective of location on the second relay surface.

In some embodiments, the first surface may be configured to receive energy from an energy wave source, the energy wave source including a mechanical envelope having a width different than the width of at least one of the first surface and the second surface.

In an embodiment, energy may be transported between first and second surfaces which defines the longitudinal orientation, the first and second surfaces of each of the relays extends generally along a transverse orientation defined by the first and second directions, where the longitudinal ori-

US 10,488,584 B2

19

20

entation is substantially normal to the transverse orientation. In an embodiment, energy waves propagating through the plurality of relays have higher transport efficiency in the longitudinal orientation than in the transverse orientation and are spatially localized in the transverse plane due to randomized refractive index variability in the transverse orientation coupled with minimal refractive index variation in the longitudinal orientation via the principle of Transverse Anderson Localization. In some embodiments, where each relay is constructed of multicore fiber, the energy waves propagating within each relay element may travel in the longitudinal orientation determined by the alignment of fibers in this orientation.

Mechanically, these tapered energy relays are cut and polished to a high degree of accuracy before being bonded or fused together in order to align them and ensure the smallest possible seam gap between the relays. The seamless surface formed by the second surfaces of energy relays is polished after the relays are bonded. In one such embodiment, using an epoxy that is thermally matched to the taper material, it is possible to achieve a maximum seam gap of 50 μm. In another embodiment, a manufacturing process that places the taper array under compression and/or heat provides the ability to fuse the elements together. In another embodiment, the use of plastic tapers can be more easily chemically fused or heat-treated to create the bond without additional bonding. For the avoidance of doubt, any methodology may be used to bond the array together, to explicitly include no bond other than gravity and/or force.

In an embodiment, a separation between the edges of any two adjacent second surfaces of the terminal energy relay elements may be less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance from the seamless energy surface that is greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface.

A mechanical structure may be preferable in order to hold the multiple components in a fashion that meets a certain tolerance specification. In some embodiments, the first and second surfaces of tapered energy relay elements can have any polygonal shapes including without limitation circular, elliptical, oval, triangular, square, rectangle, parallelogram, trapezoidal, diamond, pentagon, hexagon, and so forth. In some examples, for non-square tapers, such as rectangular tapers for example, the relay elements may be rotated to have the minimum taper dimension parallel to the largest dimensions of the overall energy source. This approach allows for the optimization of the energy source to exhibit the lowest rejection of rays of light due to the acceptance cone of the magnified relay element as when viewed from center point of the energy source. For example, if the desired energy source size is 100 mm by 60 mm and each tapered energy relay is 20 mm by 10 mm, the relay elements may be aligned and rotated such that an array of 3 by 10 taper energy relay elements may be combined to produce the desired energy source size. Nothing here should suggest that an array with an alternative configuration of an array of 6 by 5 matrix, among other combinations, could not be utilized. The array comprising of a 3×10 layout generally will perform better than the alternative 6×5 layout.

Energy Relay Element Stacks

While the most simplistic formation of an energy source system comprises of an energy source bonded to a single tapered energy relay element, multiple relay elements may be coupled to form a single energy source module with increased quality or flexibility. One such embodiment includes a first tapered energy relay with the minified end attached to the energy source, and a second tapered energy relay connected to the first relay element, with the minified end of the second optical taper in contact with the magnified end of the first relay element, generating a total magnification equal to the product of the two individual taper magnifications. This is an example of an energy relay element stack comprising of a sequence of two or more energy relay elements, with each energy relay element comprising a first side and a second side, the stack relaying energy from the first surface of the first element to the second surface of the last element in the sequence, also named the terminal surface. Each energy relay element may be configured to direct energy therethrough.

In an embodiment, an energy directing device comprises one or more energy locations and one or more energy relay element stacks. Each energy relay element stack comprises one or more energy relay elements, with each energy relay element comprising a first surface and a second surface. Each energy relay element may be configured to direct energy therethrough. In an embodiment, the second surfaces of terminal energy relay elements of each energy relay element stack may be arranged to form a singular seamless display surface. In an embodiment, the one or more energy relay element stacks may be configured to direct energy along energy propagation paths which extend between the one or more energy locations and the singular seamless display surfaces.

FIG. 13 illustrates a side view of an energy relay element stack 1300 consisting of two compound optical relay tapers 1322, 1324 in series, both tapers with minified ends facing an energy source surface 1326, in accordance with an embodiment of the present disclosure. In FIG. 13, the input numerical aperture (NA) is 1.0 for the input of taper 1324, but only about 0.16 for the output of taper 1322. Notice that the output numerical aperture gets divided by the total magnification of 6, which is the product of 2 for taper 1324, and 3 for taper 1322. One advantage of this approach is the ability to customize the first energy wave relay element to account for various dimensions of energy source without alteration of the second energy wave relay element. It additionally provides the flexibility to alter the size of the output energy surface without changing the design of the energy source or the first relay element. Also shown in FIG. 13 is the energy source 1326 and the mechanical envelope 1328 containing the energy source drive electronics.

In an embodiment, the first surface may be configured to receive waves from an energy source unit (e.g., 1326), the energy source unit including a mechanical envelope having a width different than the width of at least one of the first surface and the second surface. In one embodiment, the energy waves passing through the first surface may have a first resolution, while the energy waves passing through the second surface may have a second resolution, such that the second resolution is no less than about 50% of the first resolution. In another embodiment, the energy waves, while having a uniform profile when presented to the first surface, may pass through the second surface radiating in every direction with an energy density in the forward direction that substantially fills a cone with an opening angle of +/−10 degrees relative to the normal to the second surface, irrespective of location on the second relay surface.

In one embodiment, the plurality of energy relay elements in the stacked configuration may include a plurality of faceplates (relays with unity magnification). In some

US 10,488,584 B2

21                                                    22

embodiments, the plurality of faceplates may have different lengths or are loose coherent optical relays. In other embodiments, the plurality of elements may have sloped profile portions similar to that of FIG. 12, where the sloped profile portions may be angled, linear, curved, tapered, faceted or aligned at a non-perpendicular angle relative to a normal axis of the relay element. In yet another embodiment, energy waves propagating through the plurality of relay elements have higher transport efficiency in the longitudinal orientation than in the transverse orientation and are spatially localized in the transverse orientation due to randomized refractive index variability in the transverse orientation coupled with minimal refractive index variation in the longitudinal orientation. In embodiments where each energy relay is constructed of multicore fiber, the energy waves propagating within each relay element may travel in the longitudinal orientation determined by the alignment of fibers in this orientation.

Energy Directing Device

FIG. 14 illustrates a perspective view of an embodiment 1400 of an energy directing device where energy relay element stacks are arranged in an 8×4 array to form a singular seamless energy directing surface 1410 with the shortest dimension of the terminal surface of each tapered energy relay element stack parallel to the longest dimension of the energy surface 1410. The energy originates from 32 separate energy sources 1450, each bonded or otherwise attached to the first element of the energy relay element stacks.

In an embodiment, a separation between the edges of any two adjacent second surfaces of the terminal energy relay elements may be less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/100 vision at a distance, greater than the lesser of a height of the singular seamless display surface or a width of the singular seamless display surface, from the singular seamless display surface.

FIG. 15 contains an illustration 1500 of the following views of embodiment 1400: a front view 1510, a top view 1520, a side view 1530, and a close-up side view 1540.

FIG. 16 is the close-up view 1600 of the side view 1540 of the energy directing device 1400, consisting of a repeating structure comprised of energy relay element stacks 1630 arranged along a transverse orientation defined by first and second directions, used to propagate energy waves from the plurality of energy units 1450 to a single common seamless energy surface 1680 formed by the second surface of the energy relay element stacks. Each energy unit 1450 is composed of an energy source 1610 as well as the mechanical enclosure 1650 which houses the drive electronics. Each relay stack is composed of a faceplate 1640 with no magnification directly bonded to an energy source 1610 on one side, and a tapered energy relay 1620 on the other side, where the taper spatially magnifies the energy wave from the faceplate 1640 while propagating the energy to the seamless energy surface 1680. In one embodiment, the magnification of the tapered energy relay is 2:1. In one embodiment, tapered energy relays 1620 are held in place by a common base structure 1660, and each of these tapers are bonded to a faceplate 1640, which in turn is bonded to the energy unit 1450. Neighboring tapers 1620 are bonded or fused together at seam 1670 in order to ensure that the smallest possible seam gap is realized. All the tapered energy relays in the full 8×4 array are arranged in a seamless mosaic such that the second surface for each tapered energy relay forms a single contiguous energy surface 1680, which is polished during assembly to ensure flatness. In one embodiment, surface 1680 is polished to within 10 waves of flatness. Face plate 1685 has dimensions slightly larger than the dimensions of the surface 1680, and is placed in direct contact with surface 1680 in order to extend the field of view of the tapered energy surface 1680. The second surface of the faceplate forms the output energy surface 1410 for the energy directing device 1400.

In this embodiment of 1400, energy is propagated from each energy source 1610, through the relay stack 1630, and then substantially normal to the faceplate, defining the longitudinal direction, the first and second surfaces of each of the relay stacks extends generally along a transverse orientation defined by the first and second directions, where the longitudinal orientation is substantially normal to the transverse orientation. In one embodiment, energy waves propagating through at least one of the relay elements faceplate 1640, taper 1620, and faceplate 1685, have higher transport efficiency in the longitudinal orientation than in the transverse orientation and are localized in the transverse orientation due to randomized refractive index variability in the transverse orientation coupled with minimal refractive index variation in the longitudinal orientation. In some embodiments at least one of the relay elements faceplate 1640, taper 1620, and faceplate 1685 may be constructed of multicore fiber, with energy waves propagating within each relay element traveling in the longitudinal orientation determined by the alignment of fibers in this orientation.

In one embodiment, the energy waves passing through the first surface of 1640 have a first spatial resolution, while the energy waves passing through the second surface of tapered energy relay 1620 and through the face plate have a second resolution, and the second resolution is no less than about 50% of the first resolution. In another embodiment, the energy waves, while having a uniform profile at the first surface of the faceplate 1640, may pass through the seamless energy surfaces 1680 and 1410 radiating in every direction with an energy density in the forward direction that substantially fills a cone with an opening angle of +/−10 degrees relative to the normal to the seamless energy surface 1410, irrespective of location on this surface 1410.

In an embodiment, an energy directing device comprises one or more energy sources and one or more energy relay element stacks.

In an embodiment, each energy relay element of an energy directing device may comprise at least one of:

a) one or more optical elements exhibiting transverse Anderson Localization;

b) a plurality of optical fibers;

c) loose coherent optical fibers;

d) image combiners;

e) one or more gradient index optical elements;

f) one or more beam splitters;

g) one or more prisms;

h) one or more polarized optical elements;

i) one or more multiple size or length optical elements for mechanical offset;

j) one or more waveguides;

k) one or more diffractive, refractive, reflective, holographic, lithographic, or transmissive elements; and

l) one or more retroreflectors.

In an embodiment, a quantity of the one or more energy relay elements and a quantity of the one or more energy locations may define a mechanical dimension of the energy directing device. The quantity of optical relay elements incorporated into the system is unlimited and only con-

23                                                      24

strained by mechanical considerations and the resultant seamless energy surface includes a plurality of lower resolution energy sources producing an infinite resolution energy surface only limited by the resolving power and image quality of the components included within the display device.

A mechanical structure may be preferable in order to hold the multiple relay components in a fashion that meets a certain tolerance specification. Mechanically, the energy relays that contain a second surface that forms the seamless energy surface are cut and polished to a high degree of accuracy before being bonded or fused together in order to align them and ensure that the smallest possible seam gap between the energy relays is possible. The seamless surface **1680** is polished after the relays **1620** are bonded together. In one such embodiment, using an epoxy that is thermally matched to the tapered energy relay material, it is possible to achieve a maximum seam gap of 50 μm. In another embodiment, a manufacturing process that places the taper array under compression and/or heat provides the ability to fuse the elements together. In another embodiment, the use of plastic tapers can be more easily chemically fused or heat-treated to create the bond without additional bonding. For the avoidance of doubt, any methodology may be used to bond the array together, to explicitly include no bond other than gravity and/or force.

The energy surface may be polished individually and/or as a singular energy surface and may be any surface shape, including planar, spherical, cylindrical, conical, faceted, tiled, regular, non-regular, convex, concave, slanted, or any other geometric shape for a specified application. The optical elements may be mechanically mounted such that the optical axes are parallel, non-parallel and/or arranged with energy surface normal oriented in a specified way.

The ability to create various shapes outside of the active display area provides the ability to couple multiple optical elements in series to the same base structure through clamping structures, bonding processes, or any other mechanical means desired to hold one or more relay elements in place. The various shapes may be formed out of optical materials or bonded with additional appropriate materials. The mechanical structure leveraged to hold the resultant shape may be of the same form to fit over top of said structure. In one embodiment, an energy relay is designed with a square shape with a side that is equal to 10% of the total length of the energy relay, but 25% greater than the active area of the energy source in width and height. This energy relay is clamped with the matched mechanical structure and may leverage refractive index matching oil, refractive index matched epoxy, or the like. In the case of electromagnetic energy sources, the process to place any two optical elements in series may include mechanical or active alignment wherein visual feedback is provided to ensure that the appropriate tolerance of image alignment is performed. Typically, a display is mounted to the rear surface of the optical element prior to alignment, but this may or may not be desired depending on application.

In an embodiment, the second sides of terminal energy relay elements of each energy relay element stack may be arranged to form a singular seamless energy surface.

In an embodiment, the singular seamless energy surface formed by a mosaic of energy relay element stacks may be extended by placing a faceplate layer in direct contact with the surface, using a bonding agent, index matching oil, pressure, or gravity to adhere it to the energy surface. In one embodiment, the faceplate layer may be composed of a single piece of energy relay material, while in others it is

composed of two or more pieces of energy relay material bonded or fused together. In one embodiment, the extension of a faceplate may increase the angle of emission of the energy waves relative to the normal to the seamless energy surface.

In an embodiment, the one or more energy relay element stacks may be configured to direct energy along propagation paths which extend between the one or more energy locations and the singular seamless energy surfaces.

In an embodiment, a separation between the edges of any two adjacent second surfaces of the terminal energy relay elements may be less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface, from the singular seamless energy surface.

In an embodiment, the energy relay elements of each energy relay element stack are arranged in an end-to-end configuration.

In an embodiment, energy may be directed through the one or more energy relay element stacks with zero magnification, non-zero magnification, or non-zero minification.

In an embodiment, any of the energy relay elements of the one or more energy relay element stacks may comprise an element exhibiting Transverse Anderson Localization, an optical fiber, a beam splitter, an image combiner, an element configured to alter an angular direction of energy passing therethrough, etc.

In an embodiment, energy directed along energy propagation paths may be electromagnetic energy defined by a wavelength, the wavelength belonging to a regime of the electromagnetic spectrum such as visible light, ultraviolet, infrared, x-ray, etc. In an embodiment, energy directed along energy propagation paths may be mechanical energy such as acoustic sound, tactile pressure, etc. A volumetric sound environment is a technology that effectively aspires to achieve holographic sound or similar technology. A dimensional tactile device produces an array of transducers, air emitters, or the like to generate a sensation of touching objects floating in midair that may be directly coupled to the visuals displayed in a light field display. Any other technologies that support interactive or immersive media may additionally be explored in conjunction with this holographic display. For the use of the energy directing device as a display surface, the electronics may be mounted directly to the pins of the individual displays, attached to the electronics with a socket such as a zero-insertion force (ZIF) connector, or by using an interposer and/or the like, to provide simplified installation and maintenance of the system. In one embodiment, display electronic components including display boards, FPGAs, ASICs, IO devices or similarly desired components preferable for the use of said display, may be mounted or tethered on flex or flexi-rigid cables in order to produce an offset between the display mounting plane and the location of the physical electronic package. Additional mechanical structures are provided to mount the electronics as desired for the device. This provides the ability to increase density of the optical elements, thereby reducing the optical magnification for any tapered optical relays and decreasing overall display size and/or weight.

Cooling structures may be designed to maintain system performance within a specified temperature range, wherein all mechanical structures may include additional copper or other similar material tubing to provide a liquid cooling system with a solid state liquid cooling system providing sufficient pressure on a thermostat regulator. Additional

US 10,488,584 B2

25

26

embodiments may include Peltier units or heat syncs and/or the like to maintain consistent system performance for the electronics, displays and/or any other components sensitive to temperature changes during operation or that may produce excess heat.

FIG. **17** illustrates a top view of an embodiment **1700** where energy relay element stacks composed of elements **1702** and **1703** are angled inward to a known point in space **1704**, directing energy to propagate from multiple sources **1708** through the seamless energy surface **1701**. The base structure **1706** directly supports the tapered energy relays **1702**, where each taper is in turn bonded to relay **1703**. For an embodiment where the energy directing device **1700** is a display, tapered optical relay elements **1702** are angled inward to point the taper optical axes towards a fixed point in space **1704**. The energy sources **1708** comprise of individual displays, with display electronics contained with the display mechanical envelope **1707**.

In an embodiment, the optical relay may comprise loose coherent optical relays. Flexible optical elements, image conduits, and the like may additionally be leveraged in order to further offset display and display electronics from the seamless energy surface. In this fashion, it is possible to form an optical relay bundle including multiple loose coherent optical relays or other similar optical technology to connect two separate structures, with a first structure containing the seamless energy surface, and the second structure containing the display and display electronics.

One or more additional optical elements may be mounted in front of, or behind the ends of each loose coherent optical relay. These additional elements may be mounted with epoxies, pressure, mechanical structures, or other methods known in the art.

FIG. **18** is a top view illustration of an embodiment **1800** where the seamless energy surface **1802** is a display formed by tapered optical relays **1804**, while the display devices **1806** and the mechanical envelopes for the display electronics **1808** are located a distance away from the tapered relays **1804**. Relaying light from display devices **1806** to the tapered optical relays **1804** are loose coherent optical relays **1810** each with end caps **1812** at either end. Embodiment **1800** allows the display devices **1806** to be disposed at the remote locations of **1808** away from the energy surface **1802** to ensure that a mechanical envelope of the display devices **1806** does not interfere with the positioning of energy surface **1802**.

Optical elements may exhibit differing lengths to provide offset electronics as desired when formed in an alternating structure and provide the ability to increase density by the difference between the width of the electronic envelope minus the width of the optical element. In one such embodiment, a 5×5 optical relay mosaic contains two alternating optical relay lengths. In another embodiment, a 5×5 optical relay mosaic may contain 5 different optical relay lengths producing a pyramid-like structure, with the longest length at the center of the array, producing higher overall density for the resultant optical relay mosaic.

FIG. **19** is a side view illustration of an embodiment **1900** wherein a seamless display surface **1908** is formed by nine tapered optical relays **1902**, each associated with a display device **1904** through an optical face plate with one of five offset lengths 1, 2, 3, 4, or 5, such that no two adjacent display devices **1904** are connected to a face plate with the same offset length, providing sufficient clearance **1906** for respective mechanical envelopes **1905** for the display electronics.

Energy Combiner

In an embodiment, it is possible to use an energy combiner to leverage both projection based display as well as panel based display simultaneously, to leverage a self-illuminated display and a reflective display at the same time, or to leverage image projection and image sensing simultaneously.

FIG. **20** is a top view illustration of an embodiment **2000** where a single projection source **2002** and a single display panel source **2004** are merged with an image combiner **2006**. This may additionally be configured in any array or any such desired ratio of panel to projection technologies where the combination of only projection sources or panel based sources may also be implemented. Image combiner **2006** relays energy from first surfaces **2008**, **2010** to combined display surface **2012**, where the energy may propagate along propagation paths **2014**.

A further embodiment where an energy combiner is leveraged and a first self-illuminated display is provided on one or more of the image combiner legs, and a second reflective display is provided on one or more of the image combiner legs, producing a virtual image that includes both the inherent data from the illuminated display in addition to any specific response and lighting changes as imposed upon by an external source of light simultaneously. The reflective surface may be considered a 'reflection pass' and contain differing imaging information as optimized for the displayed content.

In another embodiment, one leg of an image combiner may have a self-illuminated display, while the other leg may be connected to an imaging sensor. Through this approach, it is possible to optically scan in real time with a high degree of accuracy a finger print(s) or any other object that touches the surface of the display like papers, documents, etc. Through an inverse calibration process, it is possible to correct for all optical artifacts and generate extremely high-quality resolution. In another embodiment, this methodology for image capture with the image combiner provides the ability to generate an extremely accurate "white board" or artistic surface that can respond extremely accurately to location and interactively draw or perform any number of other display based functions.

In an embodiment, the singular seamless energy surface may be a virtual surface.

In an embodiment, an energy directing device may be an energy system, and the energy locations may comprise one or more energy devices, and the energy relay elements may comprise one or more energy components each made from elements that induce transverse Anderson Localization of energy transport therethrough, and each energy component further comprising a first energy surface and a second energy surface.

In an embodiment, the one or more components include: optical fiber, silicon, glass, polymer, optical relays, diffractive elements, holographic optical elements, refractive elements, reflective elements, optical face plates, optical combiners, beam splitters, prisms, polarization components, spatial light modulators, active pixels, liquid crystal cells, transparent displays, or any similar materials having Anderson localization or total internal reflection properties for forming the electromagnetic surface.

In an embodiment, the singular seamless energy surface may be any combination of the one or more components that are formed to accommodate any surface shape, including planar, spherical, cylindrical, conical, faceted, tiled, regular,

27

28

non-regular, convex, concave, slanted, or any other geometric shape for a specified application.

In an embodiment, the energy surface is operable to guide localized light transmission to within four or less wavelengths of visible light.

In an embodiment, the energy device may include at least one of:

a) illumination sources emitting focused light, and wherein the focused light includes emissive, projection, or reflective display technologies, leveraging visible, IR, UV, coherent, laser, infrared, polarized or any other electromagnetic illumination source;

b) audible, ultrasonic, or other acoustic emitting devices provide immersive audio or volumetric tactile sensation from an acoustic field integrated directly into the energy system;

c) sensors for capturing or recording any energy in the electromagnetic spectrum, including structured, coherent, collimated, visible light, IR, UV, microwaves, radio waves, or other forms of electromagnetic radiation; or

d) acoustic receiving devices configured to provide sensory feedback or audible controls over an interactive system.

While various embodiments in accordance with the principles disclosed herein have been described above, it should be understood that they have been presented by way of example only, and are not limiting. Thus, the breadth and scope of the invention(s) should not be limited by any of the above-described exemplary embodiments, but should be defined only in accordance with the claims and their equivalents issuing from this disclosure. Furthermore, the above advantages and features are provided in described embodiments, but shall not limit the application of such issued claims to processes and structures accomplishing any or all of the above advantages.

It will be understood that the principal features of this disclosure can be employed in various embodiments without departing from the scope of the disclosure. Those skilled in the art will recognize, or be able to ascertain using no more than routine experimentation, numerous equivalents to the specific procedures described herein. Such equivalents are considered to be within the scope of this disclosure and are covered by the claims.

Additionally, the section headings herein are provided for consistency with the suggestions under 37 CFR 1.77 or otherwise to provide organizational cues. These headings shall not limit or characterize the invention(s) set out in any claims that may issue from this disclosure. Specifically, and by way of example, although the headings refer to a "Field of Invention," such claims should not be limited by the language under this heading to describe the so-called technical field. Further, a description of technology in the "Background of the Invention" section is not to be construed as an admission that technology is prior art to any invention(s) in this disclosure. Neither is the "Summary" to be considered a characterization of the invention(s) set forth in issued claims. Furthermore, any reference in this disclosure to "invention" in the singular should not be used to argue that there is only a single point of novelty in this disclosure. Multiple inventions may be set forth according to the limitations of the multiple claims issuing from this disclosure, and such claims accordingly define the invention(s), and their equivalents, that are protected thereby. In all instances, the scope of such claims shall be considered on their own merits in light of this disclosure, but should not be constrained by the headings set forth herein.

The use of the word "a" or "an" when used in conjunction with the term "comprising" in the claims and/or the specification may mean "one," but it is also consistent with the meaning of "one or more," "at least one," and "one or more than one." The use of the term "or" in the claims is used to mean "and/or" unless explicitly indicated to refer to alternatives only or the alternatives are mutually exclusive, although the disclosure supports a definition that refers to only alternatives and "and/or." Throughout this application, the term "about" is used to indicate that a value includes the inherent variation of error for the device, the method being employed to determine the value, or the variation that exists among the study subjects. In general, but subject to the preceding discussion, a numerical value herein that is modified by a word of approximation such as "about" may vary from the stated value by at least $\pm 1$, 2, 3, 4, 5, 6, 7, 10, 12 or 15%.

As used in this specification and claim(s), the words "comprising" (and any form of comprising, such as "comprise" and "comprises"), "having" (and any form of having, such as "have" and "has"), "including" (and any form of including, such as "includes" and "include") or "containing" (and any form of containing, such as "contains" and "contain") are inclusive or open-ended and do not exclude additional, unrecited elements or method steps.

Words of comparison, measurement, and timing such as "at the time," "equivalent," "during," "complete," and the like should be understood to mean "substantially at the time," "substantially equivalent," "substantially during," "substantially complete," etc., where "substantially" means that such comparisons, measurements, and timings are practicable to accomplish the implicitly or expressly stated desired result. Words relating to relative position of elements such as "near," "proximate to," and "adjacent to" shall mean sufficiently close to have a material effect upon the respective system element interactions. Other words of approximation similarly refer to a condition that when so modified is understood to not necessarily be absolute or perfect but would be considered close enough to those of ordinary skill in the art to warrant designating the condition as being present. The extent to which the description may vary will depend on how great a change can be instituted and still have one of ordinary skilled in the art recognize the modified feature as still having the desired characteristics and capabilities of the unmodified feature.

The term "or combinations thereof" as used herein refers to all permutations and combinations of the listed items preceding the term. For example, "A, B, C, or combinations thereof" is intended to include at least one of: A, B, C, AB, AC, BC, or ABC, and if order is important in a particular context, also BA, CA, CB, CBA, BCA, ACB, BAC, or CAB. Continuing with this example, expressly included are combinations that contain repeats of one or more item or term, such as BB, AAA, AB, BBC, AAABCCCC, CBBAAA, CABABB, and so forth. The skilled artisan will understand that typically there is no limit on the number of items or terms in any combination, unless otherwise apparent from the context.

All of the compositions and/or methods disclosed and claimed herein can be made and executed without undue experimentation in light of the present disclosure. While the compositions and methods of this disclosure have been described in terms of preferred embodiments, it will be apparent to those of skill in the art that variations may be applied to the compositions and/or methods and in the steps or in the sequence of steps of the method described herein without departing from the concept, spirit and scope of the

US 10,488,584 B2

29

disclosure. All such similar substitutes and modifications apparent to those skilled in the art are deemed to be within the spirit, scope and concept of the disclosure as defined by the appended claims.

What is claimed is:

1. An energy directing device comprising:
one or more energy locations;
one or more energy relay elements, each further comprising a first surface and a second surface;
wherein the second surfaces of each energy relay element are arranged to form a singular seamless energy surface;
wherein a separation between edges of any two adjacent second surfaces of the singular seamless energy surface is less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface, from the singular seamless energy surface;
wherein the one or more energy relay elements are configured to direct energy along energy propagation paths which extend between the one or more energy locations and the singular seamless energy surface.

2. The energy directing device of claim 1, wherein the singular seamless energy surface is a virtual surface.

3. The energy directing device of claim 1, wherein each energy relay element of the one or more energy relay elements comprises an element selected from a group consisting of:
a) an optical element exhibiting transverse Anderson Localization;
b) an optical fiber;
c) an image combiner;
d) a beam splitter; and
e) an element configured to alter an angular direction of energy passing therethrough.

4. The energy directing device of claim 3, wherein the optical fiber comprises loose coherent optical fibers.

5. The energy directing device of claim 1, wherein energy is directed through the one or more energy relay elements with zero magnification.

6. The energy directing device of claim 1, wherein energy is directed through the one or more energy relay elements with non-zero magnification.

7. The energy directing device of claim 1, wherein energy is directed through the one or more energy relay elements with non-zero minification.

8. The energy directing device of claim 1, wherein the singular seamless energy surface is planar.

9. The energy directing device of claim 1, wherein the singular seamless energy surface is faceted.

10. The energy directing device of claim 1, wherein the singular seamless energy surface is curved.

11. The energy directing device of claim 1, wherein a quantity of the one or more energy relay elements and a quantity of the one or more energy locations define a mechanical dimension of the energy directing device.

12. The energy directing device of claim 1, wherein the one or more energy locations comprise a display selected from a group consisting of:
a) a liquid crystal display;
b) an organic light emitting diode display;
c) a cathode ray tube display; and
d) a projector.

13. The energy directing device of claim 1, wherein the one or more energy relay elements are configured to relay

30

accepted focused light, the accepted focused light having a first resolution, while retaining a relayed resolution of the accepted focused light no less than 50% of the first resolution.

14. The energy directing device of claim 1, wherein energy directed along energy propagation paths is electromagnetic energy defined by a wavelength, the wavelength belonging to a regime selected from a group consisting of:
a) visible light;
b) ultraviolet;
c) infrared; and
d) x-ray.

15. The energy directing device of claim 1, wherein energy directed along energy propagation paths is a mechanical energy selected from a group consisting of:
a) acoustic sound; and
b) tactile pressure.

16. The energy directing device of claim 1, wherein the singular seamless energy surface is extended by placing a faceplate layer in direct contact with the surface, using a bonding agent, index matching oil, pressure, or gravity to adhere it to the energy relay element stack, and;
wherein the faceplate layer is composed of a single piece of energy relay material, or composed of two or more pieces of energy relay material bonded or fused together.

17. The energy directing device of claim 1, where the addition of the faceplate increases the angle of emission of the energy waves leaving the energy surface of the second seamless energy relative the normal to the second surface.

18. An energy directing device comprising:
one or more energy locations; and
one or more energy relay element stacks;
wherein each energy relay element stack comprises one or more energy relay elements, each energy relay element comprising a first side and a second side, and each energy relay element being configured to direct energy therethrough;
wherein the second sides of terminal energy relay elements of each energy relay element stack are arranged to form a singular seamless energy surface;
wherein the one or more energy relay element stacks are configured to direct energy along energy propagation paths which extend between the one or more energy locations and the singular seamless energy surfaces;
wherein a separation between the edges of any two adjacent second surfaces of the terminal energy relay elements is less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface, from the singular seamless energy surface.

19. The energy directing device of claim 18, wherein the singular seamless energy surface is a virtual surface.

20. The energy directing device of claim 18, wherein the energy relay elements of each energy relay element stack are arranged in an end-to-end configuration.

21. The energy directing device of claim 18, wherein any of the energy relay elements of the one or more energy relay element stacks comprise an element selected from a group consisting of:
a) an energy element exhibiting transverse Anderson Localization;
b) an optical fiber;
c) a beam splitter;
d) an image combiner; and

US 10,488,584 B2

31

32

e) an element configured to alter an angular direction of energy passing therethrough.

**22**. The energy directing device of claim **18**, wherein energy is directed through the one or more energy relay elements with zero magnification.

**23**. The energy directing device of claim **18**, wherein energy is directed through the one or more energy relay elements with non-zero magnification.

**24**. The energy directing device of claim **18**, wherein energy is directed through the one or more energy relay elements with non-zero minification.

**25**. The energy directing device of claim **18**, wherein the singular seamless energy surface is planar.

**26**. The energy directing device of claim **18**, wherein the singular seamless energy surface is faceted.

**27**. The energy directing device of claim **18**, wherein the singular seamless energy surface is curved.

**28**. The energy directing device of claim **18**, wherein energy directed along energy propagation paths is electromagnetic energy defined by a wavelength, the wavelength belonging to a regime selected from a group consisting of:

a) visible light;
b) ultraviolet;
c) infrared; and
d) x-ray.

**29**. The energy directing device of claim **18**, wherein energy directed along energy propagation paths is mechanical energy selected from a group consisting of:

a) acoustic sound; and
b) tactile pressure.

**30**. The energy element of claim **18**, wherein the singular seamless energy surface is extended by placing a faceplate layer in direct contact with the surface, using a bonding agent, index matching oil, pressure, or gravity to adhere it to the energy relay element stack, and;

wherein the faceplate layer is composed of a single piece of energy relay material, or composed of two or more pieces of energy relay material bonded or fused together.

**31**. The energy element of claim **30**, where the addition of the faceplate increases the angle of emission of the energy waves leaving the energy surface of the second seamless energy relative the normal to the second surface.

\* \* \* \* \*

US010565734B2

(12) **United States Patent**
Bevensee et al.

(10) Patent No.: **US 10,565,734 B2**
(45) Date of Patent: **Feb. 18, 2020**

(54) **VIDEO CAPTURE, PROCESSING, CALIBRATION, COMPUTATIONAL FIBER ARTIFACT REMOVAL, AND LIGHT-FIELD PIPELINE**

(71) Applicant: **GOOGLE LLC**, Mountain View, CA (US)

(72) Inventors: **Brendan Bevensee**, San Jose, CA (US); **Tingfang Du**, San Jose, CA (US); **Jon Karafin**, Morgan Hill, CA (US); **Joel Merritt**, Sunnyvale, CA (US); **Duane Petrovich**, San Francisco, CA (US); **Gareth Spor**, San Francisco, CA (US)

(73) Assignee: **GOOGLE LLC**, Mountain View, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 137 days.

(21) Appl. No.: **15/451,831**

(22) Filed: **Mar. 7, 2017**

(65) **Prior Publication Data**

US 2017/0243373 A1    Aug. 24, 2017

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 15/098,674, filed on Apr. 14, 2016, now abandoned.

(Continued)

(51) **Int. Cl.**
*G06T 7/80* (2017.01)
*H04N 5/225* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .............. *G06T 7/80* (2017.01); *G01S 7/4817* (2013.01); *G01S 17/023* (2013.01); *G01S 17/08* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .......... H04N 5/2258; H04N 5/23293–232939; H04N 13/239; H04N 13/243;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 725,567 A | 4/1903 | Ives | |
| 4,383,170 A | 5/1983 | Takagi et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 101226292 | 7/2008 | |
| CN | 101309359 | 11/2008 | |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 15/967,076, filed Apr. 30, 2018 listing Jiantao Kuang et al. as inventors, entitled "Automatic Lens Flare Detection and Correction for Light-Field Images".

(Continued)

*Primary Examiner* — Paul M Berardesca

(57) **ABSTRACT**

An image capture system includes a plurality of image sensors arranged in a pattern such that gaps exist between adjacent image sensors of the plurality of image sensors. Each of the image sensors may be configured to capture sensor image data. The image capture system may also have a main lens configured to direct incoming light along an optical path, a microlens array positioned within the optical path, and a plurality of tapered fiber optic bundles. Each tapered fiber optic bundle may have a leading end positioned within the optical path, and a trailing end positioned proximate one of the image sensors. The leading end may have a larger cross-sectional area than the trailing end. Sensor data from the image sensors may be combined to generate a single light-field image that is substantially unaffected by the gaps.

**43 Claims, 98 Drawing Sheets**



US 10,565,734 B2

Page 2

## Related U.S. Application Data

(60) Provisional application No. 62/305,917, filed on Mar. 9, 2016, provisional application No. 62/200,804, filed on Aug. 4, 2015, provisional application No. 62/148,055, filed on Apr. 15, 2015.

(51) **Int. Cl.**

| | |
|---|---|
| *G06T 7/557* | (2017.01) |
| *G06T 5/50* | (2006.01) |
| *H04N 17/00* | (2006.01) |
| *G02B 6/08* | (2006.01) |
| *H04N 13/282* | (2018.01) |
| *G06T 7/13* | (2017.01) |
| *G06T 7/521* | (2017.01) |
| *G01S 17/08* | (2006.01) |
| *G01S 17/02* | (2006.01) |
| *G01S 7/481* | (2006.01) |

(52) **U.S. Cl.**
CPC ................. *G02B 6/08* (2013.01); *G06T 5/50* (2013.01); *G06T 7/13* (2017.01); *G06T 7/521* (2017.01); *G06T 7/557* (2017.01); *H04N 5/2258* (2013.01); *H04N 13/282* (2018.05); *H04N 17/002* (2013.01); *G06T 2207/10052* (2013.01)

(58) **Field of Classification Search**
CPC ...... H04N 13/282; H04N 13/25; H04N 5/247; H04N 9/09–097; G02B 6/04–08
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,661,986 | A | 4/1987 | Adelson |
| 4,694,185 | A | 9/1987 | Weiss |
| 4,920,419 | A | 4/1990 | Easterly |
| 5,076,687 | A | 12/1991 | Adelson |
| 5,077,810 | A | 12/1991 | D'Luna |
| 5,157,465 | A | 10/1992 | Kronberg |
| 5,251,019 | A | 10/1993 | Moorman et al. |
| 5,282,045 | A | 1/1994 | Mimura et al. |
| 5,499,069 | A | 3/1996 | Griffith |
| 5,572,034 | A | * 11/1996 | Karellas ................ G01T 1/2018 |
| | | | 250/367 |
| 5,610,390 | A | 3/1997 | Miyano |
| 5,748,371 | A | 5/1998 | Cathey, Jr. et al. |
| 5,757,423 | A | 5/1998 | Tanaka et al. |
| 5,818,525 | A | 10/1998 | Elabd |
| 5,835,267 | A | 11/1998 | Mason et al. |
| 5,907,619 | A | 5/1999 | Davis |
| 5,949,433 | A | 9/1999 | Klotz |
| 5,974,215 | A | 10/1999 | Bilbro et al. |
| 6,005,936 | A | 12/1999 | Shimizu et al. |
| 6,021,241 | A | 2/2000 | Bilbro et al. |
| 6,023,523 | A | 2/2000 | Cohen et al. |
| 6,028,606 | A | 2/2000 | Kolb et al. |
| 6,034,690 | A | 3/2000 | Gallery et al. |
| 6,061,083 | A | 5/2000 | Aritake et al. |
| 6,061,400 | A | 5/2000 | Pearlstein et al. |
| 6,069,565 | A | 5/2000 | Stern et al. |
| 6,075,889 | A | 6/2000 | Hamilton, Jr. et al. |
| 6,091,860 | A | 7/2000 | Dimitri |
| 6,097,394 | A | 8/2000 | Levoy et al. |
| 6,115,556 | A | 9/2000 | Reddington |
| 6,137,100 | A | 10/2000 | Fossum et al. |
| 6,169,285 | B1 | 1/2001 | Pertrillo et al. |
| 6,201,899 | B1 | 3/2001 | Bergen |
| 6,221,687 | B1 | 4/2001 | Abramovich |
| 6,320,979 | B1 | 11/2001 | Melen |
| 6,424,351 | B1 | 7/2002 | Bishop et al. |
| 6,448,544 | B1 | 9/2002 | Stanton et al. |
| 6,466,207 | B1 | 10/2002 | Gortler et al. |

| | | | |
|---|---|---|---|
| 6,476,805 | B1 | 11/2002 | Shum et al. |
| 6,479,827 | B1 | 11/2002 | Hamamoto et al. |
| 6,483,535 | B1 | 11/2002 | Tamburrino et al. |
| 6,529,265 | B1 | 3/2003 | Henningsen |
| 6,577,342 | B1 | 6/2003 | Webster |
| 6,587,147 | B1 | 7/2003 | Li |
| 6,597,859 | B1 | 7/2003 | Leinhardt et al. |
| 6,606,099 | B2 | 8/2003 | Yamada |
| 6,658,168 | B1 | 12/2003 | Kim |
| 6,674,430 | B1 | 1/2004 | Kaufman et al. |
| 6,687,419 | B1 | 2/2004 | Atkin |
| 6,768,980 | B1 | 7/2004 | Meyer et al. |
| 6,785,667 | B2 | 8/2004 | Orbanes et al. |
| 6,833,865 | B1 | 12/2004 | Fuller et al. |
| 6,842,297 | B2 | 1/2005 | Dowski, Jr. et al. |
| 6,900,841 | B1 | 5/2005 | Mihara |
| 6,924,841 | B2 | 8/2005 | Jones |
| 6,927,922 | B2 | 8/2005 | George et al. |
| 7,015,954 | B1 | 3/2006 | Foote et al. |
| 7,025,515 | B2 | 4/2006 | Woods |
| 7,034,866 | B1 | 4/2006 | Colmenarez et al. |
| 7,079,698 | B2 | 7/2006 | Kobayashi |
| 7,102,666 | B2 | 9/2006 | Kanade et al. |
| 7,164,807 | B2 | 1/2007 | Morton |
| 7,206,022 | B2 | 4/2007 | Miller et al. |
| 7,239,345 | B1 | 7/2007 | Rogina |
| 7,286,295 | B1 | 10/2007 | Sweatt et al. |
| 7,304,670 | B1 | 12/2007 | Hussey et al. |
| 7,329,856 | B2 | 2/2008 | Ma et al. |
| 7,336,430 | B2 | 2/2008 | George |
| 7,417,670 | B1 | 8/2008 | Linzer et al. |
| 7,469,381 | B2 | 12/2008 | Ording |
| 7,477,304 | B2 | 1/2009 | Hu |
| 7,587,109 | B1 | 9/2009 | Reininger |
| 7,620,309 | B2 | 11/2009 | Georgiev |
| 7,623,726 | B1 | 11/2009 | Georgiev |
| 7,633,513 | B2 | 12/2009 | Kondo et al. |
| 7,683,951 | B2 | 3/2010 | Aotsuka |
| 7,687,757 | B1 | 3/2010 | Tseng et al. |
| 7,723,662 | B2 | 5/2010 | Levoy et al. |
| 7,724,952 | B2 | 5/2010 | Shum et al. |
| 7,748,022 | B1 | 6/2010 | Frazier |
| 7,847,825 | B2 | 12/2010 | Aoki et al. |
| 7,936,377 | B2 | 5/2011 | Friedhoff et al. |
| 7,936,392 | B2 | 5/2011 | Ng et al. |
| 7,941,634 | B2 | 5/2011 | Georgi |
| 7,945,653 | B2 | 5/2011 | Zuckerberg et al. |
| 7,949,252 | B1 | 5/2011 | Georgiev |
| 7,982,776 | B2 | 7/2011 | Dunki-Jacobs et al. |
| 8,013,904 | B2 | 9/2011 | Tan et al. |
| 8,085,391 | B2 | 12/2011 | Machida et al. |
| 8,106,856 | B2 | 1/2012 | Matas et al. |
| 8,115,814 | B2 | 2/2012 | Iwase et al. |
| 8,155,456 | B2 | 4/2012 | Babacan |
| 8,155,478 | B2 | 4/2012 | Vitsnudel et al. |
| 8,189,089 | B1 | 5/2012 | Georgiev et al. |
| 8,228,417 | B1 | 7/2012 | Georgiev et al. |
| 8,248,515 | B2 | 8/2012 | Ng et al. |
| 8,259,198 | B2 | 9/2012 | Cote et al. |
| 8,264,546 | B2 | 9/2012 | Witt |
| 8,279,325 | B2 | 10/2012 | Pitts et al. |
| 8,289,440 | B2 | 10/2012 | Knight et al. |
| 8,290,358 | B1 | 10/2012 | Georgiev |
| 8,310,554 | B2 | 11/2012 | Aggarwal et al. |
| 8,315,476 | B1 | 11/2012 | Georgiev et al. |
| 8,345,144 | B1 | 1/2013 | Georgiev et al. |
| 8,400,533 | B1 | 3/2013 | Szedo |
| 8,400,555 | B1 | 3/2013 | Georgiev et al. |
| 8,427,548 | B2 | 4/2013 | Lim et al. |
| 8,442,397 | B2 | 5/2013 | Kang et al. |
| 8,446,516 | B2 | 5/2013 | Pitts et al. |
| 8,494,304 | B2 | 7/2013 | Venable et al. |
| 8,531,581 | B2 | 9/2013 | Shroff |
| 8,542,933 | B2 | 9/2013 | Venkataraman et al. |
| 8,559,705 | B2 | 10/2013 | Ng |
| 8,570,426 | B2 | 10/2013 | Pitts et al. |
| 8,577,216 | B2 | 11/2013 | Li et al. |
| 8,581,998 | B2 | 11/2013 | Ohno |
| 8,589,374 | B2 | 11/2013 | Chaudhri |

**US 10,565,734 B2**

Page 3

(56)　　　　　　**References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,593,564 | B2 | 11/2013 | Border et al. |
| 8,605,199 | B2 | 12/2013 | Imai |
| 8,614,764 | B2 | 12/2013 | Pitts et al. |
| 8,619,082 | B1 | 12/2013 | Ciurea et al. |
| 8,629,930 | B2 | 1/2014 | Brueckner et al. |
| 8,665,440 | B1 | 3/2014 | Kompaniets et al. |
| 8,675,073 | B2 | 3/2014 | Aagaard et al. |
| 8,724,014 | B2 | 5/2014 | Ng et al. |
| 8,736,710 | B2 | 5/2014 | Spielberg |
| 8,736,751 | B2 | 5/2014 | Yun |
| 8,749,620 | B1 | 6/2014 | Pitts et al. |
| 8,750,509 | B2 | 6/2014 | Renkis |
| 8,754,829 | B2 | 6/2014 | Lapstun |
| 8,760,566 | B2 | 6/2014 | Pitts et al. |
| 8,768,102 | B1 | 7/2014 | Ng et al. |
| 8,797,321 | B1 | 8/2014 | Bertolami et al. |
| 8,811,769 | B1 | 8/2014 | Pitts et al. |
| 8,831,377 | B2 | 9/2014 | Pitts et al. |
| 8,860,856 | B2 | 10/2014 | Wetzstein et al. |
| 8,879,901 | B2 | 11/2014 | Caldwell et al. |
| 8,903,232 | B1 | 12/2014 | Caldwell |
| 8,908,058 | B2 | 12/2014 | Akeley et al. |
| 8,948,545 | B2 | 2/2015 | Akeley et al. |
| 8,953,882 | B2 | 2/2015 | Lim et al. |
| 8,971,625 | B2 | 3/2015 | Pitts et al. |
| 8,976,288 | B2 | 3/2015 | Ng et al. |
| 8,988,317 | B1 | 3/2015 | Liang et al. |
| 8,995,785 | B2 | 3/2015 | Knight et al. |
| 8,997,021 | B2 | 3/2015 | Liang et al. |
| 9,001,226 | B1 | 4/2015 | Ng et al. |
| 9,013,611 | B1 | 4/2015 | Szedo |
| 9,106,914 | B2 | 8/2015 | Doser |
| 9,184,199 | B2 | 11/2015 | Pitts et al. |
| 9,201,193 | B1 | 12/2015 | Smith |
| 9,210,391 | B1 | 12/2015 | Mills |
| 9,214,013 | B2 | 12/2015 | Venkataraman et al. |
| 9,294,662 | B2 | 3/2016 | Vondran, Jr. et al. |
| 9,300,932 | B2 | 3/2016 | Knight et al. |
| 9,305,375 | B2 | 4/2016 | Akeley |
| 9,305,956 | B2 | 4/2016 | Pittes et al. |
| 9,386,288 | B2 | 7/2016 | Akeley et al. |
| 9,392,153 | B2 | 7/2016 | Myhre et al. |
| 9,419,049 | B2 | 8/2016 | Pitts et al. |
| 9,467,607 | B2 | 10/2016 | Ng et al. |
| 9,497,380 | B1 | 11/2016 | Jannard et al. |
| 9,607,424 | B2 | 3/2017 | Ng et al. |
| 9,628,684 | B2 | 4/2017 | Liang et al. |
| 9,635,332 | B2 | 4/2017 | Carroll et al. |
| 9,639,945 | B2 | 5/2017 | Oberheu et al. |
| 9,647,150 | B2 | 5/2017 | Blasco Claret |
| 9,681,069 | B2 | 6/2017 | Ei-Ghoroury et al. |
| 9,774,800 | B2 | 9/2017 | Ei-Ghoroury et al. |
| 9,858,649 | B2 | 1/2018 | Liang et al. |
| 9,866,810 | B2 | 1/2018 | Knight et al. |
| 9,900,510 | B1 | 2/2018 | Karafin et al. |
| 9,979,909 | B2 | 5/2018 | Kuang et al. |
| 2001/0048968 | A1 | 12/2001 | Cox et al. |
| 2001/0053202 | A1 | 12/2001 | Mazess et al. |
| 2002/0001395 | A1 | 1/2002 | Davis et al. |
| 2002/0015048 | A1 | 2/2002 | Nister |
| 2002/0061131 | A1 | 5/2002 | Sawhney |
| 2002/0109783 | A1 | 8/2002 | Hayashi et al. |
| 2002/0159030 | A1 | 10/2002 | Frey et al. |
| 2002/0199106 | A1 | 12/2002 | Hayashi |
| 2003/0081145 | A1 | 5/2003 | Seaman et al. |
| 2003/0103670 | A1 | 6/2003 | Schoelkopf et al. |
| 2003/0117511 | A1 | 6/2003 | Belz et al. |
| 2003/0123700 | A1 | 7/2003 | Wakao |
| 2003/0133018 | A1 | 7/2003 | Ziemkowski |
| 2003/0147252 | A1 | 8/2003 | Fioravanti |
| 2003/0156077 | A1 | 8/2003 | Balogh |
| 2004/0002179 | A1 | 1/2004 | Barton et al. |
| 2004/0012688 | A1 | 1/2004 | Tinnerino et al. |
| 2004/0012689 | A1 | 1/2004 | Tinnerino et al. |
| 2004/0101166 | A1 | 5/2004 | Williams et al. |
| 2004/0114176 | A1 | 6/2004 | Bodin et al. |
| 2004/0135780 | A1 | 7/2004 | Nims |
| 2004/0189686 | A1 | 9/2004 | Tanguay et al. |
| 2004/0257360 | A1 | 12/2004 | Sieckmann |
| 2005/0031203 | A1 | 2/2005 | Fukuda |
| 2005/0049500 | A1 | 3/2005 | Babu et al. |
| 2005/0052543 | A1 | 3/2005 | Li et al. |
| 2005/0080602 | A1 | 4/2005 | Snyder et al. |
| 2005/0162540 | A1 | 7/2005 | Yata |
| 2005/0212918 | A1 | 9/2005 | Serra et al. |
| 2005/0276441 | A1 | 12/2005 | Debevec |
| 2006/0023066 | A1 | 2/2006 | Li et al. |
| 2006/0050170 | A1 | 3/2006 | Tanaka |
| 2006/0056040 | A1 | 3/2006 | Lan |
| 2006/0056604 | A1 | 3/2006 | Sylthe et al. |
| 2006/0072175 | A1 | 4/2006 | Oshino |
| 2006/0082879 | A1 | 4/2006 | Miyoshi et al. |
| 2006/0130017 | A1 | 6/2006 | Cohen et al. |
| 2006/0208259 | A1 | 9/2006 | Jeon |
| 2006/0248348 | A1 | 11/2006 | Wakao et al. |
| 2006/0256226 | A1 | 11/2006 | Alon et al. |
| 2006/0274210 | A1 | 12/2006 | Kim |
| 2006/0285741 | A1 | 12/2006 | Subbarao |
| 2007/0008317 | A1 | 1/2007 | Lundstrom |
| 2007/0019883 | A1 | 1/2007 | Wong et al. |
| 2007/0030357 | A1 | 2/2007 | Levien et al. |
| 2007/0033588 | A1 | 2/2007 | Landsman |
| 2007/0052810 | A1 | 3/2007 | Monroe |
| 2007/0071316 | A1 | 3/2007 | Kubo |
| 2007/0081081 | A1 | 4/2007 | Cheng |
| 2007/0097206 | A1 | 5/2007 | Houvener |
| 2007/0103558 | A1 | 5/2007 | Cai et al. |
| 2007/0113198 | A1 | 5/2007 | Robertson et al. |
| 2007/0140676 | A1 | 6/2007 | Nakahara |
| 2007/0188613 | A1 | 8/2007 | Norbori et al. |
| 2007/0201853 | A1 | 8/2007 | Petschnigg |
| 2007/0229653 | A1 | 10/2007 | Matusik et al. |
| 2007/0230944 | A1 | 10/2007 | Georgiev |
| 2007/0269108 | A1 | 11/2007 | Steinberg et al. |
| 2008/0007626 | A1 | 1/2008 | Wernersson |
| 2008/0012988 | A1 | 1/2008 | Baharav et al. |
| 2008/0018668 | A1 | 1/2008 | Yamauchi |
| 2008/0031537 | A1 | 2/2008 | Gutkowicz-Krusin et al. |
| 2008/0049113 | A1 | 2/2008 | Hirai |
| 2008/0056569 | A1 | 3/2008 | Williams et al. |
| 2008/0122940 | A1 | 5/2008 | Mori |
| 2008/0129728 | A1 | 6/2008 | Satoshi |
| 2008/0144952 | A1 | 6/2008 | Chen et al. |
| 2008/0152215 | A1 | 6/2008 | Horie et al. |
| 2008/0168404 | A1 | 7/2008 | Ording |
| 2008/0180792 | A1 | 7/2008 | Georgiev |
| 2008/0187305 | A1 | 8/2008 | Raskar et al. |
| 2008/0193026 | A1 | 8/2008 | Horie et al. |
| 2008/0205871 | A1 | 8/2008 | Utagawa |
| 2008/0226274 | A1 | 9/2008 | Spielberg |
| 2008/0232680 | A1 | 9/2008 | Berestov et al. |
| 2008/0253652 | A1 | 10/2008 | Gupta et al. |
| 2008/0260291 | A1 | 10/2008 | Alakarhu et al. |
| 2008/0266688 | A1 | 10/2008 | Errando Smet et al. |
| 2008/0277566 | A1 | 11/2008 | Utagawa |
| 2008/0309813 | A1 | 12/2008 | Watanabe |
| 2008/0316301 | A1 | 12/2008 | Givon |
| 2009/0027542 | A1 | 1/2009 | Yamamoto et al. |
| 2009/0041381 | A1 | 2/2009 | Georgiev et al. |
| 2009/0041448 | A1 | 2/2009 | Georgiev et al. |
| 2009/0070710 | A1 | 3/2009 | Kagaya |
| 2009/0128658 | A1 | 5/2009 | Hayasaka et al. |
| 2009/0128669 | A1 | 5/2009 | Ng et al. |
| 2009/0135258 | A1 | 5/2009 | Nozaki |
| 2009/0140131 | A1 | 6/2009 | Utagawa |
| 2009/0102956 | A1 | 7/2009 | Georgiev |
| 2009/0185051 | A1 | 7/2009 | Sano |
| 2009/0185801 | A1 | 7/2009 | Georgiev et al. |
| 2009/0190022 | A1 | 7/2009 | Ichimura |
| 2009/0190024 | A1 | 7/2009 | Hayasaka et al. |
| 2009/0195680 | A1 | 8/2009 | Hwang et al. |
| 2009/0202235 | A1 | 8/2009 | Li et al. |
| 2009/0204813 | A1 | 8/2009 | Kwan |
| 2009/0273843 | A1 | 11/2009 | Raskar et al. |

**US 10,565,734 B2**

Page 4

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2009/0295829 A1 | 12/2009 | Georgiev et al. | |
| 2009/0309973 A1 | 12/2009 | Kogane | |
| 2009/0310885 A1 | 12/2009 | Tamaru | |
| 2009/0321861 A1 | 12/2009 | Oliver et al. | |
| 2010/0003024 A1 | 1/2010 | Agrawal et al. | |
| 2010/0021001 A1 | 1/2010 | Honsinger et al. | |
| 2010/0026852 A1 | 2/2010 | Ng et al. | |
| 2010/0050120 A1 | 2/2010 | Ohazama et al. | |
| 2010/0060727 A1 | 3/2010 | Steinberg et al. | |
| 2010/0097444 A1 | 4/2010 | Lablans | |
| 2010/0103311 A1 | 4/2010 | Makii | |
| 2010/0107068 A1 | 4/2010 | Butcher et al. | |
| 2010/0111489 A1 | 5/2010 | Presler | |
| 2010/0123784 A1 | 5/2010 | Ding et al. | |
| 2010/0141780 A1 | 6/2010 | Tan et al. | |
| 2010/0142839 A1 | 6/2010 | Lakus-Becker | |
| 2010/0201789 A1 | 8/2010 | Yahagi | |
| 2010/0253782 A1 | 10/2010 | Elazary | |
| 2010/0265385 A1 | 10/2010 | Knight et al. | |
| 2010/0277617 A1 | 11/2010 | Hollinger | |
| 2010/0277629 A1 | 11/2010 | Tanaka | |
| 2010/0303288 A1 | 12/2010 | Malone | |
| 2010/0328485 A1 | 12/2010 | Imamura et al. | |
| 2011/0018903 A1 | 1/2011 | Lapstun et al. | |
| 2011/0019056 A1 | 1/2011 | Hirsch et al. | |
| 2011/0025827 A1 | 2/2011 | Shpunt et al. | |
| 2011/0050864 A1 | 3/2011 | Bond | |
| 2011/0050909 A1 | 3/2011 | Ellenby | |
| 2011/0069175 A1 | 3/2011 | Mistretta et al. | |
| 2011/0075729 A1 | 3/2011 | Dane et al. | |
| 2011/0090255 A1 | 4/2011 | Wilson et al. | |
| 2011/0123183 A1 | 5/2011 | Adelsberger et al. | |
| 2011/0129120 A1 | 6/2011 | Chan | |
| 2011/0129165 A1 | 6/2011 | Lim et al. | |
| 2011/0148764 A1 | 6/2011 | Gao | |
| 2011/0149074 A1 | 6/2011 | Lee et al. | |
| 2011/0169994 A1 | 7/2011 | DiFrancesco et al. | |
| 2011/0205384 A1 | 8/2011 | Zamowski et al. | |
| 2011/0221947 A1 | 9/2011 | Awazu | |
| 2011/0242334 A1 | 10/2011 | Wilburn et al. | |
| 2011/0242352 A1 | 10/2011 | Hikosaka | |
| 2011/0261164 A1 | 10/2011 | Olesen et al. | |
| 2011/0261205 A1 | 10/2011 | Sun | |
| 2011/0267263 A1 | 11/2011 | Hinckley | |
| 2011/0273466 A1 | 11/2011 | Imai et al. | |
| 2011/0133649 A1 | 12/2011 | Bales et al. | |
| 2011/02922258 A1 | 12/2011 | Adler | |
| 2011/0298960 A1 | 12/2011 | Tan et al. | |
| 2011/0304745 A1 | 12/2011 | Wang et al. | |
| 2011/0311046 A1 | 12/2011 | Oka | |
| 2011/0316968 A1 | 12/2011 | Taguchi et al. | |
| 2012/0014837 A1 | 1/2012 | Fehr et al. | |
| 2012/0050562 A1 | 3/2012 | Perwass et al. | |
| 2012/0056889 A1 | 3/2012 | Carter et al. | |
| 2012/0057040 A1 | 3/2012 | Park et al. | |
| 2012/0057806 A1 | 3/2012 | Backlund et al. | |
| 2012/0062755 A1 | 3/2012 | Takahashi et al. | |
| 2012/0132803 A1 | 5/2012 | Hirato et al. | |
| 2012/0133746 A1 | 5/2012 | Bigioi et al. | |
| 2012/0147205 A1 | 6/2012 | Lelescu et al. | |
| 2012/0176481 A1 | 7/2012 | Lukk et al. | |
| 2012/0188344 A1 | 7/2012 | Imai | |
| 2012/0201475 A1 | 8/2012 | Carmel et al. | |
| 2012/0206574 A1 | 8/2012 | Shikata et al. | |
| 2012/0218463 A1 | 8/2012 | Benezra et al. | |
| 2012/0224787 A1 | 9/2012 | Imai | |
| 2012/0229691 A1 | 9/2012 | Hiasa et al. | |
| 2012/0249529 A1 | 10/2012 | Matsumoto | |
| 2012/0249550 A1 | 10/2012 | Akeley | |
| 2012/0249819 A1 | 10/2012 | Imai | |
| 2012/0251131 A1 | 10/2012 | Henderson et al. | |
| 2012/0257065 A1 | 10/2012 | Velarde et al. | |
| 2012/0257795 A1 | 10/2012 | Kim et al. | |
| 2012/0271115 A1 | 10/2012 | Buerk | |
| 2012/0272271 A1 | 10/2012 | Nishizawa et al. | |
| 2012/0287246 A1 | 11/2012 | Katayama | |
| 2012/0287296 A1 | 11/2012 | Fukui | |
| 2012/0287329 A1 | 11/2012 | Yahata | |
| 2012/0293075 A1 | 11/2012 | Engelen et al. | |
| 2012/0300091 A1 | 11/2012 | Shroff et al. | |
| 2012/0237222 A9 | 12/2012 | Ng et al. | |
| 2013/0002902 A1 | 1/2013 | Ito | |
| 2013/0002936 A1 | 1/2013 | Hirama et al. | |
| 2013/0021486 A1 | 1/2013 | Richardson | |
| 2013/0038696 A1 | 2/2013 | Ding et al. | |
| 2013/0041215 A1 | 2/2013 | McDowall | |
| 2013/0044290 A1 | 2/2013 | Kawamura | |
| 2013/0050546 A1 | 2/2013 | Kano | |
| 2013/0064453 A1 | 3/2013 | Nagasaka et al. | |
| 2013/0064532 A1 | 3/2013 | Caldwell et al. | |
| 2013/0070059 A1 | 3/2013 | Kushida | |
| 2013/0070060 A1 | 3/2013 | Chatterjee et al. | |
| 2013/0077880 A1 | 3/2013 | Venkataraman et al. | |
| 2013/0082905 A1 | 4/2013 | Ranieri et al. | |
| 2013/0088616 A1 | 4/2013 | Ingrassia, Jr. | |
| 2013/0093844 A1 | 4/2013 | Shuto | |
| 2013/0093859 A1 | 4/2013 | Nakamura | |
| 2013/0094101 A1 | 4/2013 | Oguchi | |
| 2013/0107685 A1 | 5/2013 | Ng et al. | |
| 2013/0113981 A1 | 5/2013 | Knight et al. | |
| 2013/0120356 A1 | 5/2013 | Georgiev et al. | |
| 2013/0120605 A1 | 5/2013 | Georgiev et al. | |
| 2013/0120636 A1 | 5/2013 | Baer | |
| 2013/0127901 A1 | 5/2013 | Georgiev et al. | |
| 2013/0128052 A1 | 5/2013 | Catrein et al. | |
| 2013/0128081 A1 | 5/2013 | Georgiev et al. | |
| 2013/0128087 A1 | 5/2013 | Georgiev et al. | |
| 2013/0135448 A1 | 5/2013 | Nagumo et al. | |
| 2013/0176481 A1 | 7/2013 | Holmes et al. | |
| 2013/0188068 A1 | 7/2013 | Said | |
| 2013/0215108 A1 | 8/2013 | McMahon et al. | |
| 2013/0215226 A1 | 8/2013 | Chauvier et al. | |
| 2013/0222606 A1* | 8/2013 | Pitts ...................... H04N 5/2254 |
| | | | 348/187 |
| 2013/0222656 A1 | 8/2013 | Kaneko | |
| 2013/0234935 A1 | 9/2013 | Griffith | |
| 2013/0242137 A1 | 9/2013 | Kirkland | |
| 2013/0258451 A1 | 10/2013 | El-Ghoroury et al. | |
| 2013/0262511 A1 | 10/2013 | Kuffner et al. | |
| 2013/0286236 A1 | 10/2013 | Mankowski | |
| 2013/0321574 A1 | 12/2013 | Zhang et al. | |
| 2013/0321581 A1 | 12/2013 | El-Ghoroury | |
| 2013/0321677 A1 | 12/2013 | Cote et al. | |
| 2013/0329107 A1 | 12/2013 | Burley et al. | |
| 2013/0329132 A1 | 12/2013 | Tico et al. | |
| 2013/0335596 A1 | 12/2013 | Demandoix et al. | |
| 2013/0342700 A1 | 12/2013 | Kass | |
| 2014/0002502 A1 | 1/2014 | Han | |
| 2014/0002699 A1 | 1/2014 | Guan | |
| 2014/0003719 A1 | 1/2014 | Bai et al. | |
| 2014/0013273 A1 | 1/2014 | Ng | |
| 2014/0035959 A1 | 2/2014 | Lapstun | |
| 2014/0037280 A1 | 2/2014 | Shirakawa | |
| 2014/0049663 A1 | 2/2014 | Ng et al. | |
| 2014/0059462 A1 | 2/2014 | Wernersson | |
| 2014/0085282 A1 | 3/2014 | Luebke et al. | |
| 2014/0092424 A1 | 4/2014 | Grosz | |
| 2014/0098191 A1 | 4/2014 | Rime et al. | |
| 2014/0132741 A1 | 5/2014 | Aagaard et al. | |
| 2014/0133749 A1 | 5/2014 | Kuo et al. | |
| 2014/0139538 A1 | 5/2014 | Barber et al. | |
| 2014/0167196 A1 | 6/2014 | Heimgartner et al. | |
| 2014/0176540 A1 | 6/2014 | Tosic et al. | |
| 2014/0176592 A1 | 6/2014 | Wilburn et al. | |
| 2014/0176710 A1 | 6/2014 | Brady | |
| 2014/0177905 A1 | 6/2014 | Grefalda | |
| 2014/0184885 A1 | 7/2014 | Tanaka et al. | |
| 2014/0192208 A1 | 7/2014 | Okincha | |
| 2014/0193047 A1 | 7/2014 | Grosz | |
| 2014/0195921 A1 | 7/2014 | Grosz | |
| 2014/0204411 A1 | 7/2014 | Vaidyanathan et al. | |
| 2014/0211077 A1 | 7/2014 | Ng et al. | |
| 2014/0218540 A1 | 8/2014 | Geiss et al. | |
| 2014/0226038 A1 | 8/2014 | Kimura | |

## US 10,565,734 B2
Page 5

(56)     **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2014/0240463 | A1 | 8/2014 | Pitts et al. |
| 2014/0240578 | A1 | 8/2014 | Fishman et al. |
| 2014/0267243 | A1 | 9/2014 | Venkataraman et al. |
| 2014/0267639 | A1 | 9/2014 | Tatsuta |
| 2014/0300753 | A1 | 10/2014 | Yin |
| 2014/0313350 | A1 | 10/2014 | Keelan |
| 2014/0313375 | A1 | 10/2014 | Milnar |
| 2014/0340390 | A1 | 11/2014 | Lanman et al. |
| 2014/0347540 | A1 | 11/2014 | Kang |
| 2014/0354863 | A1 | 12/2014 | Ahn et al. |
| 2014/0368494 | A1 | 12/2014 | Sakharnykh et al. |
| 2014/0368640 | A1 | 12/2014 | Strandemar et al. |
| 2015/0029386 | A1 | 1/2015 | Pitts et al. |
| 2015/0062178 | A1 | 3/2015 | Matas et al. |
| 2015/0062386 | A1 | 3/2015 | Sugawara |
| 2015/0092071 | A1 | 4/2015 | Meng et al. |
| 2015/0097985 | A1 | 4/2015 | Akeley |
| 2015/0146051 | A1* | 5/2015 | Abe ..................... H04N 5/2254 |
| | | | 348/262 |
| 2015/0193937 | A1 | 7/2015 | Georgiev et al. |
| 2015/0206340 | A1 | 7/2015 | Munkberg et al. |
| 2015/0207990 | A1 | 7/2015 | Ford et al. |
| 2015/0237273 | A1 | 8/2015 | Sawadaishi |
| 2015/0104101 | A1 | 10/2015 | Bryant et al. |
| 2015/0310592 | A1 | 10/2015 | Kano |
| 2015/0312553 | A1 | 10/2015 | Ng et al. |
| 2015/0312593 | A1 | 10/2015 | Akeley et al. |
| 2015/0370011 | A1 | 12/2015 | Ishihara |
| 2015/0370012 | A1 | 12/2015 | Ishihara |
| 2016/0029017 | A1 | 1/2016 | Liang |
| 2016/0142615 | A1 | 5/2016 | Liang |
| 2016/0155215 | A1 | 6/2016 | Suzuki |
| 2016/0165206 | A1 | 6/2016 | Huang et al. |
| 2016/0173844 | A1 | 6/2016 | Knight |
| 2016/0191823 | A1 | 6/2016 | El-Ghoroury |
| 2016/0253837 | A1 | 9/2016 | Zhu et al. |
| 2016/0269620 | A1 | 9/2016 | Romanenko et al. |
| 2016/0307368 | A1 | 10/2016 | Akeley |
| 2016/0307372 | A1 | 10/2016 | Pitts et al. |
| 2016/0309065 | A1 | 10/2016 | Karafin et al. |
| 2016/0353026 | A1 | 12/2016 | Blonde et al. |
| 2016/0381348 | A1 | 12/2016 | Hayasaka |
| 2017/0059305 | A1 | 3/2017 | Nonn et al. |
| 2017/0067832 | A1 | 3/2017 | Ferrara, Jr. et al. |
| 2017/0094906 | A1 | 3/2017 | Liang et al. |
| 2017/0134639 | A1 | 5/2017 | Pitts et al. |
| 2017/0139131 | A1 | 5/2017 | Karafin et al. |
| 2017/0237971 | A1 | 8/2017 | Pitts et al. |
| 2017/0244948 | A1 | 8/2017 | Pang et al. |
| 2017/0256036 | A1 | 9/2017 | Song et al. |
| 2017/0263012 | A1 | 9/2017 | Sabater et al. |
| 2017/0302903 | A1 | 10/2017 | Ng et al. |
| 2017/0358092 | A1 | 12/2017 | Bleibel et al. |
| 2017/0365068 | A1 | 12/2017 | Tan et al. |
| 2018/0012397 | A1 | 1/2018 | Carothers |
| 2018/0020204 | A1 | 1/2018 | Pang et al. |
| 2018/0033209 | A1 | 2/2018 | Akeley et al. |
| 2018/0034134 | A1 | 2/2018 | Pang et al. |
| 2018/0070066 | A1 | 3/2018 | Knight et al. |
| 2018/0070067 | A1 | 3/2018 | Knight et al. |
| 2018/0082405 | A1 | 3/2018 | Liang |
| 2018/0089903 | A1 | 3/2018 | Pang et al. |
| 2018/0097867 | A1 | 4/2018 | Pang et al. |
| 2018/0158198 | A1 | 6/2018 | Kamad |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 19624421 | 1/1997 |
| JP | 2010020100 | 1/2010 |
| JP | 2011135170 | 7/2011 |
| WO | 2003052465 | 6/2003 |
| WO | 2006039486 | 4/2006 |
| WO | 2007092545 | 8/2007 |
| WO | 2007092581 | 8/2007 |
| WO | 2011010234 | 3/2011 |
| WO | 2011029209 | 3/2011 |
| WO | 2011081187 | 7/2011 |

OTHER PUBLICATIONS

U.S. Appl. No. 15/666,298, filed Aug. 1, 2017 listing Yonggang Ha et al. as inventors, entitled "Focal Reducer With Controlled Optical Properties for Interchangeable Lens Light-Field Camera".

U.S. Appl. No. 15/590,808, filed May 9, 2017 listing Alex Song et al. as inventors, entitled "Adaptive Control for Immersive Experience Delivery".

U.S. Appl. No. 15/864,938, filed Jan. 8, 2018 listing Jon Karafin et al. as inventors, entitled "Motion Blur for Light-Field Images".

U.S. Appl. No. 15/703,553, filed Sep. 13, 2017 listing Jon Karafin et al. as inventors, entitled "4D Camera Tracking and Optical Stabilization".

U.S. Appl. No. 15/590,841, filed May 9, 2017 listing Kurt Akeley et al. as inventors, entitled "Vantage Generation and Interactive Playback".

U.S. Appl. No. 15/590,951, filed May 9, 2017 listing Alex Song et al. as inventors, entitled "Wedge-Based Light-Field Video Capture".

U.S. Appl. No. 15/944,551, filed Apr. 3, 2018 listing Zejing Wang et al. as inventors, entitled "Generating Dolly Zoom Effect Using Light Field Image Data".

U.S. Appl. No. 15/874,723, filed Jan. 18, 2018 listing Mark Weir et al. as inventors, entitled "Multi-Camera Navigation Interface".

U.S. Appl. No. 15/897,994, filed Feb. 15, 2018 listing Trevor Carothers et al. as inventors, entitled "Generation of Virtual Reality With 6 Degrees of Freeedom From Limited Viewer Data".

U.S. Appl. No. 15/605,037, filed May 25, 2017 listing Zejing Wang et al. as inventors, entitled "Multi-View Back-Projection to a Light-Field".

U.S. Appl. No. 15/897,836, filed Feb. 15, 2018 listing Francois Bleibel et al. as inventors, entitled "Multiview Contour Tracking".

U.S. Appl. No. 15/897,942, filed Feb. 15, 2018 listing Francois Bleibel et al. as inventors, entitled "Multi-View Contour Tracking With Grabcut".

Adelsberger, R. et al., "Spatially Adaptive Photographic Flash," ETH Zurich, Department of Computer Science, Technical Report 612, 2008, pp. 1-12.

Adelson et al., "Single Lens Stereo with a Plenoptic Camera" IEEE Translation on Pattern Analysis and Machine Intelligence, Feb. 1992. vol. 14, No. 2, pp. 99-106.

Adelson, E. H., and Bergen, J. R. 1991. The plenoptic function and the elements of early vision. In Computational Models of Visual Processing, edited by Michael S. Landy and J. Anthony Movshon. Cambridge, Mass.: mit Press.

Adobe Systems Inc, "XMP Specification", Sep. 2005.

Adobe, "Photoshop CS6 / in depth: Digital Negative (DNG)", http://www.adobe.com/products/photoshop/extend.displayTab2html. Retrieved Jan. 2013.

Agarwala, A., et al., "Interactive Digital Photomontage", ACM Transactions on Graphics, Proceedings of SIGGRAPH 2004, vol. 32, No. 3, 2004.

Andreas Observatory, Spectrograph Manual: IV. Flat-Field Correction, Jul. 2006.

Apple, "Apple iPad: Photo Features on the iPad", Retrieved Jan. 2013.

Bae, S., et al., "Defocus Magnification", Computer Graphics Forum, vol. 26, Issue 3 (Proc. of Eurographics 2007), pp. 1-9.

Belhumeur, Peter et al., "The Bas-Relief Ambiguity", International Journal of Computer Vision, 1997, pp. 1060-1066.

Belhumeur, Peter, et al., "The Bas-Relief Ambiguity", International Journal of Computer Vision, 1999, pp. 33-44, revised version.

Bhat, P. et al. "GradientShop: A Gradient-Domain Optimization Framework for Image and Video Filtering," SIGGRAPH 2010; 14 pages.

Bolles, R., et al., "Epipolar-Plane Image Analysis: An Approach to Determining Structure from Motion", International Journal of Computer Vision, 1, 7-55 (1987).

US 10,565,734 B2

Page 6

(56)        References Cited

OTHER PUBLICATIONS

Bourke, Paul, "Image filtering in the Frequency Domain," pp. 1-9, Jun. 1998.
Canon, Canon Speedlite wireless flash system, User manual for Model 550EX, Sep. 1998.
Chai, Jin-Xang et al., "Plenoptic Sampling", ACM SIGGRAPH 2000, Annual Conference Series, 2000, pp. 307-318.
Chen, S. et al., "A CMOS Image Sensor with On-Chip Image Compression Based on Predictive Boundary Adaptation and Memoryless QTD Algorithm," Very Large Scalee Integration (VLSI) Systems, IEEE Transactions, vol. 19, Issue 4; Apr. 2011.
Chen, W., et al., "Light Field mapping: Efficient representation and hardware rendering of surface light fields", ACM Transactions on Graphics 21, 3, 447-456, 2002.
Cohen, Noy et al., "Enhancing the performance of the light field microscope using wavefront coding," Optics Express, vol. 22, issue 20; 2014.
Daly, D., "Microlens Arrays" Retrieved Jan. 2013.
Debevec, et al, "A Lighting Reproduction Approach to Live-Action Compositing" Proceedings SIGGRAPH 2002.
Debevec, P., et al., "Acquiring the reflectance field of a human face", SIGGRAPH 2000.
Debevec, P., et al., "Recovering high dynamic radiance maps from photographs", SIGGRAPH 1997, 369-378.
Design of the xl3ox menu. Retrieved Jan. 2013.
Digital Photography Review, "Sony Announce new RGBE CCD," Jul. 2003.
Dorsey, J., et al., "Design and simulation of opera light and projection effects", in Computer Graphics (Proceedings of SIGGRAPH 91), vol. 25, 41-50.
Dorsey, J., et al., "Interactive design of complex time dependent lighting", IEEE Computer Graphics and Applications 15, 2 (Mar. 1995), 26-36.
Dowski et al., "Wavefront coding: a modern method of achieving high performance and/or low cost imaging systems" SPIE Proceedings, vol. 3779, Jul. 1999, pp. 137-145.
Dowski, Jr. "Extended Depth of Field Through Wave-Front Coding," Applied Optics, vol. 34, No. 11, Apr. 10, 1995; pp. 1859-1866.
Duparre, J. et al., "Micro-Optical Artificial Compound Eyes," Institute of Physics Publishing, Apr. 2006.
Eisemann, Elmar, et al., "Flash Photography Enhancement via Intrinsic Relighting", SIGGRAPH 2004.
Fattal, Raanan, et al., "Multiscale Shape and Detail Enhancement from Multi-light Image Collections", SIGGRAPH 2007.
Fernando, Randima, "Depth of Field—A Survey of Techniques," GPU Gems. Boston, MA; Addison-Wesley, 2004.
Fitzpatrick, Brad, "Camlistore", Feb. 1, 2011.
Fujifilm, Super CCD EXR Sensor by Fujifilm, brochure reference No. EB-807E, 2008.
Georgiev, T. et al., "Reducing Plenoptic Camera Artifacts," Computer Graphics Forum, vol. 29, No. 6, pp. 1955-1968; 2010.
Georgiev, T., et al., "Spatio-Angular Resolution Tradeoff in Integral Photography," Proceedings of Eurographics Symposium on Rendering, 2006.
Wikipedia—Extensible Metadata Platform: http://en.wikipedia.org/wiki/Extensible_Metadata_Platform. Retrieved Jan. 2013.
Wikipedia—Key framing for video animation: http://en.wikipedia.org/wiki/Key_frame. Retrieved Jan. 2013.
Wikipedia—Lazy loading of image data: http://en.wikipedia.org/wiki/Lazy_loading. Retrieved Jan. 2013.
Wikipedia—Methods of Variable Bitrate Encoding: http://en.wikipedia.org/wiki/Variable_bitrate#Methods_of_VBR_encoding. Retrieved Jan. 2013.
Wikipedia—Portable Network Graphics format: http://en.wikipedia.org/wiki/Portable_Network_Graphics. Retrieved Jan. 2013.
Wikipedia—Unsharp Mask Technique: https://en.wikipedia.org/wiki/Unsharp_masking. Retrieved May 3, 2016.
Wilburn et al., "High Performance Imaging using Large Camera Arrays", ACM Transactions on Graphics (TOG), vol. 24, Issue 3 (Jul. 2005), Proceedings of ACM SIGGRAPH 2005, pp. 765-776.

Wilburn, Bennett, et al., "High Speed Video Using a Dense Camera Array", 2004.
Wilburn, Bennett, et al., "The Light Field Video Camera", Proceedings of Media Processors 2002.
Williams, L. "Pyramidal Parametrics," Computer Graphic (1983).
Winnemoller, H., et al., "Light Waving: Estimating Light Positions From Photographs Alone", Eurographics 2005.
Wippermann, F. "Chirped Refractive Microlens Array," Dissertation 2007.
Wuu, S., et al., "A Manufacturable Back-Side Illumination Technology Using Bulk Si Substrate for Advanced CMOS Image Sensors", 2009 International Image Sensor Workshop, Bergen, Norway.
Wuu, S., et al., "BSI Technology with Bulk Si Wafer", 2009 International Image Sensor Workshop, Bergen, Norway.
Xiao, Z. et al., "Aliasing Detection and Reduction in Plenoptic Imaging," IEEE Conference on Computer Vision and Pattern Recognition; 2014.
Xu, Yang et al., "Robust Automatic Focus Algorithm for Low Contrast Images Using a New Contrast Measure," Sensors 2011; 14 pages.
Zheng, C. et al., "Parallax Photography: Creating 3D Cinematic Effects from Stills", Proceedings of Graphic Interface, 2009.
Zitnick, L. et al., "High-Quality Video View Interpolation Using a Layered Representation," Aug. 2004; ACM Transactions on Graphics (TOG), Proceedings of ACM SIGGRAPH 2004; vol. 23, Issue 3; pp. 600-608.
Zoberbier, M., et al., "Wafer Cameras—Novel Fabrication and Packaging Technologies", 2009 International Image Senor Workshop, Bergen, Norway, 5 pages.
Nimeroff, J., et al., "Efficient rendering of naturally illuminated environments" in Fifth Eurographics Workshop on Rendering, 359-373, 1994.
Nokia, "City Lens," May 2012.
Ogden, J., "Pyramid-Based Computer Graphics", 1985.
Okano et al., "Three-dimensional video system based on integral photography" Optical Engineering, Jun. 1999. vol. 38, No. 6, pp. 1072-1077.
Orzan, Alexandrina, et al., "Diffusion Curves: A Vector Representation for Smooth-Shaded Images," ACM Transactions on Graphics—Proceedings of SIGGRAPH 2008; vol. 27; 2008.
Pain, B., "Back-Side Illumination Technology for SOI-CMOS Image Sensors", 2009.
Perez, Patrick et al., "Poisson Image Editing," ACM Transactions on Graphics—Proceedings of ACM SIGGRAPH 2003; vol. 22, Issue 3; Jul. 2003; pp. 313-318.
Petschnigg, George, et al., "Digial Photography with Flash and No-Flash Image Pairs", SIGGRAPH 2004.
Primesense, "The Primesense 3D Awareness Sensor", 2007.
Ramamoorthi, R., et al, "Frequency space environment map rendering" ACM Transactions on Graphics (SIGGRAPH 2002 proceedings) 21, 3, 517-526.
Ramamoorthi, R., et al., "An efficient representation for irradiance environment maps", in Proceedings of SIGGRAPH 2001, 497-500.
Raskar, Ramesh et al., "Glare Aware Photography: 4D Ray Sampling for Reducing Glare Effects of Camera Lenses," ACM Transactions on Graphics—Proceedings of ACM SIGGRAPH, Aug. 2008; vol. 27, Issue 3; pp. 1-10.
Raskar, Ramesh et al., "Non-photorealistic Camera: Depth Edge Detection and Stylized Rendering using Multi-Flash Imaging", SIGGRAPH 2004.
Raytrix, "Raytrix Lightfield Camera", Raytrix GmbH, Germany 2012, pp. 1-35.
Scharstein, Daniel, et al., "High-Accuracy Stereo Depth Maps Using Structured Light," CVPR'03 Proceedings of the 2003 IEEE Computer Society, pp. 195-202.
Schirmacher, H. et al., "High-Quality Interactive Lumigraph Rendering Through Warping," May 2000, Graphics Interface 2000.
Shade, Jonathan, et al., "Layered Depth Images," SIGGRAPH 98, pp. 1-2.
Shreiner, OpenGL Programming Guide, 7th edition, Chapter 8, 2010.
Simpleviewer, "Tiltview", http://simpleviewer.net/tiltviewer. Retrieved Jan. 2013.

**US 10,565,734 B2**

Page 7

(56)     **References Cited**

OTHER PUBLICATIONS

Skodras, A. et al., "The JPEG 2000 Still Image Compression Standard," Sep. 2001, IEEE Signal Processing Magazine, pp. 36-58.

Sloan, P., et al., "Precomputed radiance transfer for real-time rendering in dynamic, low-frequency lighting environments", ACM Transactions on Graphics 21, 3, 527-536, 2002.

Snavely, Noah, et al., "Photo-tourism: Exploring Photo collections in 3D", ACM Transactions on Graphics(SIGGRAPH Proceedings), 2006.

Sokolov, "Autostereoscopy and Integral Photography by Professor Lippmann's Method" , 1911, pp. 23-29.

Sony Corp, "Interchangeable Lens Digital Camera Handbook", 2011.

Stensvold, M., "Hybrid AF: A New Approach to Autofocus is Emerging for both Still and Video", Digital Photo Magazine, Nov. 13, 2012.

Story, D., "The Future of Photography", Optics Electronics, Oct. 2008.

Sun, Jian, et al., "Stereo Matching Using Belief Propagation", 2002.

Tagging photos on Flickr, Facebook and other online photo sharing sites (see, for example, http://support.gnip.com/customer/portal/articles/809309-flickr-geo-photos-tag-search). Retrieved Jan. 2013.

Takahashi, Keita, et al., "All in-focus View Synthesis from Under-Sampled Light Fields", ICAT 2003, Tokyo, Japan.

Tanida et al., "Thin observation module by bound optics (TOMBO): concept and experimental verification" Applied Optics 40, 11 (Apr. 10, 2001), pp. 1806-1813.

Tao, Michael, et al., "Depth from Combining Defocus and Correspondence Using Light-Field Cameras", Dec. 2013.

Techcrunch, "Coolinis", Retrieved Jan. 2013.

Teo, P., et al., "Efficient linear rendering for interactive light design", Tech. Rep. STAN-CS-TN-97-60, 1998, Stanford University.

Teranishi, N. "Evolution of Optical Structure in Images Sensors," Electron Devices Meeting (IEDM) 2012 IEEE International; Dec. 10-13, 2012.

Vaish et al., "Using plane + parallax for calibrating dense camera arrays", In Proceedings CVPR 2004, pp. 2-9.

Vaish, V., et al., "Synthetic Aperture Focusing Using a Shear-Warp Factorization of the Viewing Transform," Workshop on Advanced 3D Imaging for Safety and Security (in conjunction with CVPR 2005), 2005.

VR Playhouse, "The Surrogate," http://www.vrplayhouse.com/the-surrogate.

Wanner, S. et al., "Globally Consistent Depth Labeling of 4D Light Fields," IEEE Conference on Computer Vision and Pattern Recognition, 2012.

Wanner, S. et al., "Variational Light Field Analysis for Disparity Estimation and Super-Resolution," IEEE Transacations on Pattern Analysis and Machine Intelligence, 2013.

Wenger et al., "Performance Relighting and Reflectance Transformation with Time-Multiplexed Illumination", Institute for Creative Technologies, SIGGRAPH 2005.

Wetzstein, Gordon, et al., "Sensor Saturation in Fourier Multiplexed Imaging", IEEE Conference on Computer Vision and Pattern Recognition (2010).

Wikipedia—Adaptive Optics: http://en.wikipedia.org/wiki/adaptive_optics. Retrieved Feb. 2014.

Wikipedia—Autofocus systems and methods: http://en.wikipedia.org/wiki/Autofocus. Retrieved Jan. 2013.

Wikipedia—Bayer Filter: http://en.wikipedia.org/wiki/Bayer_filter. Retrieved Jun. 20, 2013.

Wikipedia—Color Image Pipeline: http://en.wikipedia.org/wiki/color_image_pipeline. Retrieved Jan. 15, 2014.

Wikipedia—Compression standard JPEG XR: http://en.wikipedia.org/wiki/JPEG_XR. Retrieved Jan. 2013.

Wikipedia—CYGM Filter: http://en.wikipedia.org/wiki/CYGM_filter. Retrieved Jun. 20, 2013.

Wikipedia—Data overlay techniques for real-time visual feed. For example, heads-up displays: http://en.wikipedia.org/wiki/Head-up_display. Retrieved Jan. 2013.

Wikipedia—Exchangeable image file format: http://en.wikipedia.org/wiki/Exchangeable_image_file_format. Retrieved Jan. 2013.

Wikipedia—Expeed: http://en.wikipedia.org/wiki/Expeed. Retrieved Jan. 15, 2014.

Georgiev, T., et al., "Suppersolution with Plenoptic 2.0 Cameras," Optical Society of America 2009; pp. 1-3.

Georgiev, T., et al., "Unified Frequency Domain Analysis of Lightfield Cameras" (2008).

Georgiev, T., et al., Plenoptic Camera 2.0 (2008).

Girod, B., "Mobile Visual Search", IEEE Signal Processing Magazine, Jul. 2011.

Gortler et al., "The lumigraph" SIGGRAPH 96, pp. 43-54.

Groen et al., "A Comparison of Different Focus Functions for Use in Autofocus Algorithms," Cytometry 6:81-91, 1985.

Haeberli, Paul "A Multifocus Method for Controlling Depth of Field" GRAPHICA Obscura, 1994, pp. 1-3.

Heide, F. et al., "High-Quality Computational Imaging Through Simple Lenses," ACM Transactions on Graphics, SIGGRAPH 2013; pp. 1-7.

Heidelberg Collaboratory for Image Processing, "Consistent Depth Estimation in a 4D Light Field," May 2013.

Hirigoyen, F., et al., "1.1 um Backside Imager vs. Frontside Image: an optics-dedicated FDTID approach", IEEE 2009 International Image Sensor Workshop.

Huang, Fu-Chung et al., "Eyeglasses-free Display: Towards Correcting Visual Aberrations with Computational Light Field Displays," ACM Transaction on Graphics, Aug. 2014, pp. 1-12.

Isaksen, A., et al., "Dynamically Reparameterized Light Fields," SIGGRAPH 2000, pp. 297-306.

Ives H., "Optical properties of a Lippman lenticulated sheet," J. Opt. Soc. Am. 21, 171 (1931).

Ives, H. "Parallax Panoramagrams Made with a Large Diameter Lens", Journal of the Optical Society of America; 1930.

Jackson et al., "Selection of a Convolution Function for Fourier Inversion Using Gridding" IEEE Transactions on Medical Imaging, Sep. 1991, vol. 10, No. 3, pp. 473-478.

Kautz, J., et al., "Fast arbitrary BRDF shading for low-frequency lighting using spherical harmonics", in Eurographic Rendering Workshop 2002, 291-296.

Koltun, et al., "Virtual Occluders: An Efficient Interediate PVS Representation", Rendering Techniques 2000: Proc. 11th Eurographics Workshop Rendering, pp. 59-70, Jun. 2000.

Kopf, J., et al., Deep Photo: Model-Based Photograph Enhancement and Viewing, SIGGRAPH Asia 2008.

Lehtinen, J., et al. "Matrix radiance transfer", in Symposium on Interactive 3D Graphics, 59-64, 2003.

Lesser, Michael, "Back-Side Illumination", 2009.

Levin, A. et al., "Image and Depth from a Conventional Camera with a Coded Aperture", SIGGRAPH 2007, pp. 1-9.

Levoy et al., "Light Field Rendering" SIGGRAPH 96 Proceeding, 1996. pp. 31-42.

Levoy, "Light Fields and Computational Imaging" IEEE Computer Society, Aug. 2006, pp. 46-55.

Levoy, M. "Light Field Photography and Videography," Oct. 18, 2005.

Levoy, M. "Stanford Light Field Microscope Project," 2008; http://graphics.stanford.edu/projects/lfmicroscope/, 4 pages.

Levoy, M., "Autofocus: Contrast Detection", http://graphics.stanford.edu/courses/cs178/applets/autofocusPD.html, pp. 1-3, 2010.

Levoy, M., "Autofocus: Phase Detection", http://graphics.stanford.edu/courses/cs178/applets/autofocusPD.html, pp. 1-3, 2010.

Levoy, M., et al., "Light Field Microscopy," ACM Transactions on Graphics, vol. 25, No. 3, Proceedings SIGGRAPH 2006.

Liang, Chia-Kai, et al. "Programmable Aperture Photography: Multiplexed Light Field Acquisition", ACM SIGGRAPH, 2008.

Lippmann, "Reversible Prints", Communication at the French Society of Physics, Journal of Physics, 7 , Mar. 4, 1908, pp. 821-825.

Lumsdaine et al., "Full Resolution Lightfield Rendering" Adobe Technical Report Jan. 2008, pp. 1-12.

US 10,565,734 B2

Page 8

(56)         **References Cited**

OTHER PUBLICATIONS

Maeda, Y. et al., "A CMOS Image Sensor with Pseudorandom Pixel Placement for Clear Imaging," 2009 International Symposium on Intelligent Signal Processing and Communication Systems, Dec. 2009.

Magnor, M. et al., "Model-Aided Coding of Multi-Viewpoint Image Data," Proceedings IEEE Conference on Image Processing, ICIP-2000, Vancouver, Canada, Sep. 2000. https://graphics.tu-bs.de/static/people/magnor/publications/icip00.pdf.

Mallat, Stephane, "A Wavelet Tour of Signal Processing", Academic Press 1998.

Malzbender, et al., "Polynomial Texture Maps", Proceedings SIG-GRAPH 2001.

Marshall, Richard J. et al., "Improving Depth Estimation from a Plenoptic Camera by Patterned Illumination," Proc. of SPIE, vol. 9528, 2015, pp. 1-6.

Masselus, Vincent, et al., "Relighting with 4D Incident Light Fields", SIGGRAPH 2003.

Meynants, G., et al., "Pixel Binning in CMOS Image Sensors," Frontiers in Electronic Imaging Conference, 2009.

Moreno-Noguer, F. et al., "Active Refocusing of Images and Videos," ACM Transactions on Graphics, Aug. 2007; pp. 1-9.

Munkberg, J. et al., "Layered Reconstruction for Defocus and Motion Blur" EGSR 2014, pp. 1-12.

Naemura et al., "3-D Computer Graphics based on Integral Photography" Optics Express, Feb. 12, 2001. vol. 8, No. 2, pp. 255-262.

Nakamura, J., "Image Sensors and Signal Processing for Digital Still Cameras" (Optical Science and Engineering), 2005.

National Instruments, "Anatomy of a Camera," pp. 1-5, Sep. 6, 2006.

Nayar, Shree, et al., "Shape from Focus", IEEE Transactions on Pattern Analysis and Machine Intelligence, vol. 16, No. 8, pp. 824-831, Aug. 1994.

Ng, R., et al. "Light Field Photography with a Hand-held Plenoptic Camera," Stanford Technical Report, CSTR 2005-2, 2005.

Ng, R., et al., "All-Frequency Shadows Using Non-linear Wavelet Lighting Approximation. ACM Transactions on Graphics," ACM Transactions on Graphics; Proceedings of SIGGRAPH 2003.

Ng, R., et al., "Triple Product Wavelet Integrals for All-Frequency Relighting", ACM Transactions on Graphics (Proceedings of SIG-GRAPH 2004).

Ng, R., "Fourier Slice Photography," Doctoral Thesis, Standford University, Jun. 2006; 203 pages.

Ng., R., "Fourier Slice Photography," ACM Transactions on Graphics, Proceedings of SIGGRAPH 2005, vol. 24, No. 3, 2005, pp. 735-744.

Nguyen, Hubert. "Practical Post-Process Depth of Field." GPU Gems 3. Upper Saddle River, NJ: Addison-Wesley, 2008.

Roper Scientific Germany, "Fiber Optics," 2012.

Sony's First Curved Sensor Photo: http://www.engadget.com. Jul. 2014.

* cited by examiner



FIG. 1

FIG. 2

FIG. 3



FIG. 4a

FIG. 4b

FIG. 5



FIG. 6



FIG. 7



Note: Not to Scale

FIG. 8a


850

| Parameter | Spec | Notes |
|---|---|---|
| Diameter (large end) | >= 75.0 mm | Final part is >= 60.0 mm x 45.0 mm, rect |
| Diameter (small end) | 28.1 mm | Final part is 22.5 x 16.9 mm, rect |
| Magnification | 2.67 | |
| Fiber size (small end) | <= 3.0 um | |
| NA (small end) | 1.0 | |
| Transmission spectrum | 450 – 750nm | Visible spectrum for CMOS imager |
| Transmission% (in fiber) | >80% | Across transmission spectrum |
| Transmission% (total, e to e) | >50% | Across transmission spectrum |
| Distortion | <2% | |
| AR coating | Yes | |
| Length | Any | |

FIG. 8b



Note: Not to Scale

FIG. 9



FIG. 10



FIG. 11



FIG. 12



FIG. 13

FIG. 14

Design:



Optically Stitched Image Plane

FIG. 15



FIG. 16



**FIG. 17**



**FIG. 18**



FIG. 19



FIG. 20



FIG. 21



FIG. 22a



FIG. 22b



FIG. 23



FIG. 24



FIG. 25a



FIG. 25b



FIG. 26



FIG. 27



FIG. 28



Measured at maximum peak to valley across entire fused surface

FIG. 29



FIG. 30a



FIG. 30b



FIG. 31

FIG. 32

FIG. 33

3400



3410

3410

FIG. 34



3400

3400

Detail C

3410

3400

3410

3410

3410

3410

3400

3410

3410

3410

3400

3400

3400

C

3410

3410

B

B

3400

3400

View B-B

FIG. 35



FIG. 36



FIG. 37



FIG. 38

FIG. 39



FIG. 40



FIG. 41



FIG. 42a



FIG. 42b



FIG. 43a



FIG. 43b



FIG. 43c



FIG. 44

FIG. 45

FIG. 46a



Single MLA



4640

or

Tiled MLA



4642

FIG. 46b



FIG. 46c



FIG. 46d



FIG. 46e



FIG. 46f



FIG. 46g



FIG. 46h



FIG. 47a



FIG. 47b



FIG. 47c



FIG. 47d



FIG. 47e



FIG. 48



Retro Reflector
Material Checker
Boarded Inbetween
Fiber Taper

4820

4800

4800

4820

4900

4810 ← Preview Sensor/Lens

FIG. 49



4820

4810 → Preview Sensor/Lens

5000

90/10
Beam
Splitter

4900

4820

FIG. 50



FIG. 51



FIG. 52



FIG. 53



FIG. 54a



FIG. 54b



FIG. 54c



FIG. 54d



FIG. 54e



FIG. 54f



FIG. 54g

5460



5462

FIG. 54h



5470     5460     5480





FIG. 54j



FIG. 55a



FIG. 55b



FIG. 55c



FIG. 55d



FIG. 55e



FIG. 55f

Computational Focal
Length:  Crop / Zoom



FIG. 56

Computational Focal Length:  Data
Management, Limited Crop / Zoom



FIG. 57



5801

5802

FIG. 58

Camera 5900





FIG. 59



FIG. 60



FIG. 61



FIG. 62A

FIG. 62B

FIG. 62C

FIG. 62D



FIG. 63A



FIG. 63B



FIG. 63C



FIG. 64A



FIG. 64B

FIG. 64C



FIG. 65

Side View



FIG. 66

3D View
Conic Design



6700

6730

6710

LiDAR Unit

Mirrors

FIG. 67A

3D View
Pyramid Design



6750

6730

6760

LiDAR Unit

Mirrors

FIG. 67B

6700

## Cone Reflector



6730

6710

420mm

FIG. 68A

6750

## Flat (Pyramid) Reflector



6730

6760

420mm

FIG. 68B

Cone Reflector



VLP-16

6900

Cone
Reflector

Analysis
Plane

FIG. 69A

Flat (Pyramid) Reflector



VLP-16

6900

Flat
Reflector

Analysis
Plane

FIG. 69B



FIG. 70





Output confined to 30 deg (+/-15 deg) circular emission.  Note: extremes of laser (1, -1, 15, -15 deg) traced. Laser rotated through 360 degrees.

FIG.  71



7200

FIG. 72





Output: 90 deg x 60 deg (+/-45 x +/-30).

FIG. 73A

7350



~30$^0$

~30$^0$

FIG. 73B

7400



FIG. 74



FIG. 75



7600

7630

7620

7610

7640

FIG. 76



FIG. 77

7800



FIG.  78

7900



FIG. 79



FIG. 80



FIG. 81



FIG. 82

8300



FIG. 83

8400



FIG. 84

8400



FIG. 85

8600



FIG. 86

8700



FIG. 87

8700



FIG. 88



8900

+Y

(0,0)

+X

FIG. 89

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 251 of 810

9000



FIG. 90

9100



FIG. 91

9100



FIG. 92

9300



FIG. 93

9300



FIG. 94



FIG. 95

9600



FIG. 96

9700

9710



FIG. 97



FIG. 98

US 10,565,734 B2

1

# VIDEO CAPTURE, PROCESSING, CALIBRATION, COMPUTATIONAL FIBER ARTIFACT REMOVAL, AND LIGHT-FIELD PIPELINE

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application claims the benefit of U.S. Provisional Patent Application Ser. No. 62/305,917 for "Video Capture, Processing, Calibration, Computational Fiber Artifact Removal, and Light-field Pipeline," filed Mar. 9, 2016, the disclosure of which is incorporated herein by reference in its entirety.

The present application is also a continuation-in-part of U.S. patent application Ser. No. 15/098,674 for "Light Guided Image Plane Tiled Arrays with Dense Fiber Optic Bundles for Light-Field and High Resolution Image Acquisition," filed Apr. 14, 2016, the disclosure of which is incorporated herein by reference in its entirety.

U.S. patent application Ser. No. 15/098,674 claims the benefit of U.S. Provisional Application Ser. No. 62/148,055 for "Light Guided Image Plane Tiled Arrays with Dense Fiber Optic Bundles for Light-Field and High Resolution Image Acquisition", filed Apr. 15, 2015, the disclosure of which is incorporated herein by reference in its entirety.

U.S. patent application Ser. No. 15/098,674 also claims the benefit of U.S. Provisional Application Ser. No. 62/200,804 for "Light Guided Image Plane Tiled Arrays with Dense Fiber Optic Bundles for Light-Field Display", filed Aug. 4, 2015, the disclosure of which is incorporated herein by reference in its entirety.

U.S. patent application Ser. No. 15/098,674 also claims the benefit of U.S. Provisional Application Ser. No. 62/305,917 for "Video Capture, Processing, Calibration, Computational Fiber Artifact Removal, and Light-field Pipeline," filed Mar. 9, 2016, the disclosure of which is incorporated herein by reference in its entirety.

## TECHNICAL FIELD

The present document relates to various techniques for improving image capture from a high-resolution light guided image plane tiled array system leveraging dense fiber optic bundles.

## BACKGROUND

CMOS, CCD and other image acquisition technologies are traditionally manufactured based upon 2D, industrial and/or other traditionally (potentially) mass-produced consumer requirements. This results in the need for custom silicon, sensors, electronics, and the like for niche markets, including light-field and ultra-high-resolution image acquisition.

The digital imaging industry continues to push the boundaries of bleeding edge acquisition technologies, with particular focus on higher resolutions, higher dynamic range, and a wider gamut of still and video capture formats. Accordingly, it is becoming increasingly challenging to achieve the imaging requirements for sensor pixel density, sensitivity, pixel counts, electronics, pixel pitch, data throughput, bandwidth, and the like. Some of these requirements, when used with traditional optical pathways, would require extremely complex custom silicon advances and other electronic developments that are typically beyond the current capabilities of manufacturing. Such solutions, when

2

they are attainable with current technology, are typically expensive and time-consuming to implement.

The limitation to sensor array density involves the package and electronics size of each imaging/sensor device. Generally, these packages represent more than half of the size of the active imaging area of the individual sensor. Thus, these sensors cannot be arrayed without causing large gaps between images produced by the sensors, or overly complex and problematic optical systems to compensate for the presence of these gaps. Further, this problem is exacerbated by the electronics requirements for the interface and processing boards required to capture or transmit the data to a storage device. These gaps present a challenge that has not been successfully addressed by prior art attempts to provide higher-resolution digital image capture.

## SUMMARY

According to various embodiments, the system and method described herein provide an image capture device with a plurality of image sensors and a plurality of tapered fiber optic bundles. The tapered fiber optic bundles may convey light to the image sensors in a manner that minimizes or negates the effects of gaps between the image sensors.

In order to generate high frame rate capture from a high-resolution light guided image plane tiled array system leveraging dense fiber optic bundles, a complex architectural system in combination with a computational fiber artifact removal process can be used. In at least one embodiment, a high performance data management and processing system can be implemented in support of such an architecture. Various calibration techniques may be performed on the individual image sensors before and after positioning of the microlens array. The described system can be used with state-of-the-art image processing techniques in order to achieve compelling high resolution still, video, and light-field content.

According to one embodiment, an image capture system may include a plurality of image sensors arranged in a pattern such that gaps exist between adjacent image sensors of the plurality of image sensors. Each of the image sensors may be configured to capture sensor image data. The image capture system may also have a main lens configured to direct incoming light along an optical path, a microlens array positioned within the optical path, and a plurality of tapered fiber optic bundles. Each tapered fiber optic bundle may have a leading end positioned within the optical path, and a trailing end positioned proximate one of the image sensors. The leading end may have a larger cross-sectional area than the trailing end.

According to one exemplary method, sensor data from the image sensors may be combined to generate a single light-field image that is substantially unaffected by the gaps. In some embodiments, some of the incoming light may be directed to a preview camera, which may generate a preview image representative of the single light-field image. The image capture device and/or the preview camera may be calibrated in various ways prior to image capture. The image sensor data may be transmitted to a plurality of servers for processing to generate the single light-field image. Various image processing steps may be applied to facilitate generation of the single light-field image.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings illustrate several embodiments. Together with the description, they serve to explain

3

the principles of the embodiments. One skilled in the art will recognize that the particular embodiments illustrated in the drawings are merely exemplary, and are not intended to limit scope.

FIG. 1 is a perspective view depicting an example of an image sensor, according to one embodiment.

FIG. 2 is a perspective view depicting an example of a machine vision camera module, or module, that may be used in an array configuration, according to one embodiment.

FIG. 3 is a front view of the module of FIG. 2, according to one embodiment.

FIG. 4A is a front view of multiple modules stacked side-by-side, according to one embodiment.

FIG. 4B is a side view depicting an example configuration in which modules are arranged into a first array and a second array, including a beam splitter, according to one embodiment.

FIG. 5 is a front view depicting the arrangement of active areas and packaging that results from use of the beam splitter as shown in FIG. 4B, according to one embodiment.

FIG. 6 is a perspective view depicting an example of an individual camera module with the narrow end of a tapered fiber optic bundle attached to the active area of the sensor, and the wide end of the tapered optical fiber bundle dimensioned to be the same width as the camera module, according to one embodiment.

FIG. 7 is a front view depicting a 3×1 array of modules and fiber optic bundles, according to one embodiment.

FIG. 8A includes a side view of the module and the fiber optic bundle 600 of FIG. 6, and front and rear views of the fiber optic bundle in isolation, according to one embodiment.

FIG. 8B is a table illustrating exemplary parameters and specifications that may be used in the construction of a camera with multiple image sensors and fiber optic bundles, according to certain embodiments.

FIG. 9 includes a side view and a front view, depicting exemplary arrangements of modules and fiber optic bundles, according to certain embodiments.

FIG. 10 is a side view depicting a single fiber within a tapered fiber optic bundle, such as the fiber optic bundle of FIG. 6.

FIG. 11 includes front and side views depicting an array of image sensors, or modules, and tapered fiber optic bundles, or fiber optic bundles, according to one embodiment.

FIG. 12 includes a side view and a front view depicting a configuration that uses a beam splitter in conjunction with modules that receive light through tapered fiber optic bundles, or fiber optic bundles, according to one embodiment.

FIG. 13 is a perspective view depicting an example of a configuration for the modules and fiber optic bundles of the first plane of FIG. 12, according to one embodiment.

FIG. 14 is a perspective view depicting an example of a configuration for the modules and fiber optic bundles of the second plane of FIG. 12, according to one embodiment.

FIG. 15 is a perspective view depicting how the first plane and the second plane may be aligned with each other, according to one embodiment.

FIG. 16 is a side view depicting an example configuration of tapered fiber optic bundles, or fiber optic bundles, that may be used to direct light to image sensors (not shown), according to another embodiment.

FIG. 17 is a virtual view depicting a tiled imaging plane according to one embodiment.

4

FIG. 18 is a front view depicting an example of strips for mounting micro lens optics to the rows or columns of fiber optic bundles and sensors, according to one embodiment.

FIG. 19 is a side view depicting an example of a multi-length tapered fiber optic bundle solution, according to one embodiment.

FIG. 20 is a perspective, wireframe view from the rear of the tiered approach of FIG. 19.

FIG. 21 is a top view depicting a cylindrically faceted approach, wherein the image sensors and/or fiber optic bundles are arced about the optical center of the main lens, according to one embodiment.

FIG. 22A is a top view depicting a cylindrically faceted approach, according to another embodiment.

FIG. 22B is a side view illustrating an arrangement of fiber optic bundles that have been bonded together and polished to provide a polished fiber face plate surface, according to one embodiment.

FIG. 23 is a side view depicting a single column of the faceted cylindrical imaging surface, which may be a section of a spherical imaging surface, according to one embodiment.

FIG. 24 is a front view depicting an example of trapezoidal faceted fiber taper surfaces that result when generating a spherical faceted surface, according to one embodiment.

FIG. 25A is a front view depicting the use of a polished fiber faceplate to provide a generally spherical concave surface on the imaging side, according to one embodiment.

FIG. 25B is a side, section view depicting the use of the polished fiber faceplate of FIG. 25B.

FIG. 26 is a perspective, wireframe view depicting exemplary asymmetrical stacking of modules and fiber optic bundles, according to one embodiment.

FIG. 27 is a side view depicting an example of a fiber optic bundle bonding configuration with a faceplate bonded on one side to the sensor and on the other side to the narrow end of a tapered fiber optic bundle, with an MLA bonded to the wide end of the tapered fiber optic bundle, according to one embodiment.

FIG. 28 is a front view depicting an example of bondline tolerances between the leading ends of two exemplary fiber optic bundles separated by a bondline, according to one embodiment.

FIG. 29 is a top view depicting an exemplary technique for measurement of tolerance for image plane flatness between the leading ends of two exemplary fiber optic bundles, according to one embodiment.

FIG. 30A is a perspective view depicting a camera using multiple modules and fiber optic bundles as described herein, according to one embodiment.

FIG. 30B is a perspective view depicting an example of an internal mechanical design of an array of fiber optic bundles and modules, according to one embodiment.

FIG. 31 is a perspective view depicting a camera according to one embodiment.

FIG. 32 is an exploded view of a portion of the camera of FIG. 31.

FIG. 33 is a perspective view depicting the division of fiber optic bundle into four fiber optic bundles, according to one embodiment.

FIG. 34 is a perspective view depicting an example of a tapered fiber optic bundle with cut and polished edges, according to one embodiment.

FIG. 35 is a series of views depicting two of the tapered fiber optic bundles of FIG. 34, arranged in a 2×1 array, according to one embodiment.

US 10,565,734 B2

5 | 6

FIG. **36** is a side view depicting an example of an alternative structure utilizing a transmissive surface, according to one embodiment.

FIG. **37** is a top view depicting an example of inclusion of a tapered fiber optic bundle that magnifies light to the imaging sensor, according to one embodiment.

FIG. **38** is a top view depicting exemplary use of a scanline imager imaging the entire area according to one embodiment.

FIG. **39** is a front view depicting an example of 10% tolerance on an imaging sensor, plus pre-distortion correction from a fiber taper, according to one embodiment.

FIG. **40** depicts examples of inward and outward facing MLA's, according to certain embodiments.

FIG. **41** is a series of side views depicting examples of different configurations of the microlens array, according to certain embodiments.

FIG. **42**A is a side view depicting an example in which the MLA has tilted structures angled towards the optical center of the main lens across the entire imaging area, according to one embodiment.

FIG. **42**B is a side view depicting an example of an optimized MLA for a large chief ray angle (CFA) with tilted lenslets, according to one embodiment.

FIG. **43**A is a side view depicting MLA structures secured to the trailing ends of fiber optic bundles, according to certain embodiments.

FIG. **43**B is a side view depicting the MLA structures of FIG. **43**A secured to the trailing ends, and an MLA structure secured to the leading ends, of the fiber optic bundles and MLA, according to certain embodiments.

FIG. **43**C is a side view depicting a fiber optic bundle with an integrated MLA, according to one embodiment.

FIGS. **44** and **45** are side views depicting examples of a dual-layered MLA configuration, according to certain embodiments.

FIG. **46**A is a side view depicting an example of a dual-layered MLA that can be used to increase off-axis performance using two polymer layers and one glass surface, according to one embodiment.

FIG. **46**B is a top-down view depicting an MLA as a single sheet, and an MLA as a tiled, planar array, according to certain embodiments.

FIG. **46**C is a top view depicting a plurality of MLA strips positioned at various orientations to face a main lens, according to one embodiment.

FIG. **46**D is a top view depicting a spherical MLA mapped to a spherical surface, according to one embodiment.

FIG. **46**E is a perspective view depicting an MLA that has been formed in a trapezoidal shape, according to one embodiment.

FIG. **46**F is a top-down view depicting an MLA with square lenslets, according to one embodiment.

FIG. **46**G is a side view depicting an example of a main lens that is movable relative to an MLA, according to one embodiment.

FIG. **46**H includes a series of side views of examples depicting various ways in which a beam splitter may be used to divide incoming light between image sensors, according to one embodiment.

FIG. **47**A is a side view depicting an example of refocusable ranges with a sequential exposure system as the distances decrease to camera with exponentially decreasing range, according to one embodiment.

FIG. **47**B is a side view depicting the use of optical folds, according to one embodiment.

FIG. **47**C is a side view depicting an example in which a plurality of main lenses are used in conjunction with polarized filters, according to one embodiment.

FIG. **47**D is a side view depicting the use of an active barrier/variable mask to provide sequential capture of image data, according to one embodiment.

FIG. **47**E is a side view depicting the use of modules, tapered fiber optic bundles, and MLA's positioned at variable displacements from a main lens, according to one embodiment.

FIG. **48** is a front view depicting an exemplary arrangement of a main array with beam splitter (not shown) and retro-reflector at gaps designed to facilitate implementation of a preview sensor, according to one embodiment.

FIG. **49** is a side view illustrating how the preview sensor of FIG. **48** is able to re-photograph the larger imaging surface.

FIG. **50** is a top view depicting the use of a secondary beam splitter to redirect a small portion of light from the larger image plane in order to direct the light to a preview sensor, according to one embodiment.

FIG. **51** is a top view depicting an example of a range finder configuration in which a completely separate lens/sensor system is leveraged to increase main sensor system light efficiency, according to one embodiment.

FIG. **52** is a side view depicting an example of an architecture employing a first parabolic reflector and a second parabolic reflector, according to one embodiment.

FIG. **53** is a side view depicting an example of architecture employing a first parabolic reflector and a second parabolic reflector, according to another embodiment.

FIG. **54**A is a side view depicting an example of a bottom-up configuration, with a first parabolic reflector and a second parabolic reflector, according to another embodiment.

FIG. **54**B is a side view depicting a camera with a depth sensing sensor separate from a visible light sensor, according to one embodiment.

FIG. **54**C is a side view illustrating a rotating reflector that may be used for sequential capture of image data, according to one embodiment.

FIG. **54**D is a top-down view depicting an example of a structure to generate a mesh of reflective surfaces, according to one embodiment.

FIG. **54**E is a side view depicting an example of a structure including several modifications, according to one embodiment.

FIG. **54**F is a side view depicting an example of a structure including a panoramic annular lens, or PAL, according to one embodiment.

FIG. **54**G is a side, cross-section view depicting the PAL of FIG. **54**F, along with a cylindrical field of view, transfer optics, and an image sensor, according to one embodiment.

FIG. **54**H is a conceptual diagram depicting a subaperture reducer for a light-field camera with a disk image diameter of five pixels, according to one embodiment.

FIG. **54**J is a side view depicting placement of the subaperture reducer, relative to a simplified schematic of the complete system, according to one embodiment.

FIG. **55**A is a side view depicting an example of a structure that provides a 360° scan of an environment, according to one embodiment.

FIG. **55**B is side view depicting an example of a structure that captures a complete 360° spherical capture environment through the use of a rotating reflector, according to one embodiment.

7

FIG. 55C is a side view depicting an example of a structure having a reflector with an irregular shape, according to one embodiment.

FIG. 55D is a side view depicting an example of a structure in which a spherical lens is used to image an environment, according to one embodiment.

FIG. 55E is a side view depicting an example of a structure in which a fiber optic bundle is used to convey light from a secondary lens to an image sensor, according to one embodiment.

FIG. 55F is a side view depicting the use of a combined tapered fiber optic bundle and microlens array, or combined structure, according to one embodiment.

FIG. 56 is an image diagram depicting an example of how the imaging plane can be divided into multiple FOV segments, according to one embodiment.

FIG. 57 is an image diagram depicting an example of an alternative approach for dividing an imaging plane into FOV segments, according to one embodiment.

FIG. 58 depicts a portion of a light-field image.

FIG. 59 depicts an example of an architecture for implementing the methods of the present disclosure in a light-field capture device, according to one embodiment.

FIG. 60 depicts an example of an architecture for implementing the methods of the present disclosure in a post-processing system communicatively coupled to a light-field capture device, according to one embodiment.

FIG. 61 depicts an example of an architecture for a light-field camera for implementing the methods of the present disclosure according to one embodiment.

FIGS. 62A through 62D depict various systems that use shaped mirrors, according to certain embodiments.

FIGS. 63A through 63C depict various systems that use redirecting optical elements with other configurations, according to certain embodiments.

FIGS. 64A through 64C depict various systems that use a variety of mechanically movable optical elements in order to capture a large field-of-view, according to certain embodiments.

FIG. 65 depicts a system having a coherent fiber array comprising many optical fibers, according to one embodiment.

FIG. 66 depicts a side view of a scanning device placed between two mirrors placed at a 90° angle relative to one another, with the scanning device centered between them, projecting light beams radially such that the light beams are reflected by the mirrors, according to one embodiment.

FIGS. 67A and 67B depict two different mirror reflector designs with a reflective surface that is, respectively, cone-shaped on the inside, with a circular opening, and pyramidal with four mirrors placed in a pyramid formation with a square opening, according to certain embodiments.

FIGS. 68A and 68B depict the dimension of the opening for the reflected beams of light from, respectively, a scanning device utilizing the cone-shaped mirror reflector of FIG. 67A, and a scanning device using the pyramidal mirror reflector of FIG. 67B, according to certain embodiments.

FIGS. 69A and 69B depict laser beams from a LiDAR VLP-16 centered in, respectively, the cone-shaped mirror reflector of FIG. 67A, and a scanning device using the pyramidal mirror reflector of FIG. 67B, according to certain embodiments.

FIG. 70 depicts the sampling points in an imaging plane perpendicular to the axis of rotation of a Velodyne VLP-16 LiDAR device and a conical mirror reflector design such as the cone-shaped mirror reflector of FIG. 67A, in which the sampling points form a group of 16 concentric circles, with

8

the LiDAR laser beams projected into a field-of-view of 30°, according to one embodiment.

FIG. 71 depicts a polar plot for the projected energy vs. angle distribution, in units of watts/steradians (W/sr), for a Velodyne VLP-16 LiDAR device used with a conical mirror reflector design such as the cone-shaped mirror reflector of FIG. 67A, according to one embodiment.

FIG. 72 depicts the sampling points in an imaging plane perpendicular to the axis of rotation of a Velodyne VLP-16 LiDAR device and a pyramidal mirror reflector design such as the pyramidal mirror reflector of FIG. 67B, in which the sampling points form two rectangular grids, with the LiDAR laser beams projected into a total field-of-view that is approximately 90° in each dimension, with the overlap between vertical and horizontal scans contained within an approximately 30° field of view, according to one embodiment.

FIG. 73A depicts a polar plot for the projected energy vs. angle distribution, in units of watts/steradians (W/sr) for a Velodyne VLP-16 LiDAR device used with a pyramidal mirror reflector design such as the pyramidal mirror reflector of FIG. 67B in which the opening is slightly rectangular, according to one embodiment.

FIG. 73B depicts the sampling points in an imaging plane perpendicular to the axis of rotation of a Velodyne VLP-16 LiDAR device placed within a pyramid reflector design with 13 mirrors and a 13-sided regular polygon opening (tridecagon), in which the LiDAR laser beams are projected into a dense sampling pattern that is mostly contained within a field-of-view that is approximately 30° in each dimension, according to one embodiment.

FIG. 74 depicts an image of a soldier with spots that represent LiDAR sampling measurement points, with the black spots designating an intersection of the scanning beam with the foreground object (the soldier), and the white spots designating the intersection of the scanning beam with the plane in the background, according to one embodiment.

FIG. 75 is a block diagram of a system depicting primary components for data capture, according to one embodiment.

FIG. 76 is a diagram depicting an example of a tapered fiber optic bundle bonded to a fiber face plate and further bonded to an image sensor and camera electronics, according to one embodiment.

FIG. 77 is a diagram depicting one of the servers, according to one embodiment.

FIG. 78 is a diagram depicting an example of hexagonal fiber artifacts and fiber noise, according to one embodiment.

FIG. 79 is a diagram depicting an example of fault line discontinuity, according to one embodiment.

FIG. 80 is a diagram depicting the primary processing steps for a single frame of light-field video, according to one embodiment.

FIG. 81 is a diagram depicting an image processing architecture according to one embodiment.

FIG. 82 is a diagram depicting an example of an architecture for the servers shown in FIG. 81, according to one embodiment.

FIG. 83 is a diagram depicting an example of a visualization of source image vs. auto detection for an actual target grid pattern, according to one embodiment.

FIG. 84 is a diagram depicting an example of a grid before correction, according to one embodiment.

FIG. 85 is a diagram depicting an example of the grid after distortion correction has been applied, according to one embodiment.

US 10,565,734 B2

9

FIG. **86** is a diagram depicting an example of a fault line artifact, also referred to as a sheer or discontinuity, according to one embodiment.

FIG. **87** is a diagram depicting an example of a line chart before fault line correction, according to one embodiment.

FIG. **88** is a diagram depicting an example of a line chart after application of the automated fault line correction process, according to one embodiment.

FIG. **89** is a diagram depicting an example of a coordinate system for a fiber mosaic array, according to one embodiment.

FIG. **90** is a diagram depicting a checkerboard chart according to one embodiment.

FIG. **91** is an example of a light-field image before lens shading is applied, according to one embodiment.

FIG. **92** is an example of a light-field image after lens shading is applied, according to one embodiment.

FIG. **93** is an example of a light-field image before standardization, after lens shading has been applied, according to one embodiment.

FIG. **94** is an example of a light-field image after standardization, according to one embodiment.

FIG. **95** is an example of tiles before a merge operation, according to one embodiment.

FIG. **96** is an example of tiles after a merge operation to define a single image, according to one embodiment.

FIG. **97** is a diagram depicting an exemplary close-up view of an influence map, according to one embodiment.

FIG. **98** is a diagram depicting exemplary disk-centers, according to one embodiment.

## DEFINITIONS

For purposes of the description provided herein, the following definitions are used:

Active area: the portion of a module that receives light to be provided as image data by the module

Beam splitter: an optical component that divides incoming light into at least two portions emitted along different vectors.

Conventional image: an image in which the pixel values are not, collectively or individually, indicative of the angle of incidence at which light is received by a camera.

Cylindrical shape: a shape resembling either the outward-facing (convex) shape of a cylinder, or the inward-facing (concave) shape of a cylindrical hole.

Cylindrical pattern: a pattern of surfaces arranged in a cylindrical shape.

Depth: a representation of distance between an object and/or corresponding image sample and a microlens array of a camera.

Disk: a region in a light-field image that is illuminated by light passing through a single microlens; may be circular or any other suitable shape.

Fiber optic bundle: a set of aligned optical fibers capable of transmitting light.

Image: a two-dimensional array of pixel values, or pixels, each specifying a color.

Input device: any device that receives input from a user.

Leading end: the end of a fiber optic bundle that receives light.

Light-field camera: any camera capable of capturing light-field images.

Light-field data: data indicative of the angle of incidence at which light is received by a camera.

10

Light-field image: an image that contains a representation of light-field data captured at the sensor.

Main lens: a lens or set of lenses that directs light from a scene toward an image sensor.

Microlens: a small lens, typically one in an array of similar microlenses.

Microlens array: an array of microlenses arranged in a predetermined pattern.

Module: an image sensor, including packaging.

Optical path: the pathway followed by light after entry into an image capture device.

Packaging: The housing, electronics, and any other components of an image sensor that reside outside the active area.

Preview lens: a lens capable of directing at least a portion of incoming light to a preview sensor.

Preview sensor: an image sensor capable of gathering image data that can be used to provide a real-time (or small-delay) preview image indicative of an actual image that may be generated based on the incoming light.

Reflector: an object, such as a mirror, that has a surface that is at least partially reflective of light.

Sensor, or "image sensor": a light detector in a camera capable of generating electrical signals based on light received by the sensor.

Sensor image data: the data generated by an individual image sensor in response to capture of incoming light by the image sensor.

Spherical shape: a shape resembling either the outward-facing (convex) shape of a sphere, or the inward-facing (concave) shape of a spherical cavity.

Spherical pattern: a pattern of surfaces arranged in a spherical shape.

Tapered fiber optic bundle, or "taper": a fiber optic bundle that is larger at one end than at the other.

Trailing end: the end of a fiber optic bundle that emits light.

In addition to the foregoing, additional terms will be set forth and defined in the description below. Terms not explicitly defined are to be interpreted, primarily, in a manner consistently with their usage and context herein, and, secondarily, in a manner consistent with their use in the art.

For ease of nomenclature, the term "camera" is used herein to refer to an image capture device or other data acquisition device. Such a data acquisition device can be any device or system for acquiring, recording, measuring, estimating, determining and/or computing data representative of a scene, including but not limited to two-dimensional image data, three-dimensional image data, and/or light-field data. Such a data acquisition device may include optics, sensors, and image processing electronics for acquiring data representative of a scene, using techniques that are well known in the art. One skilled in the art will recognize that many types of data acquisition devices can be used in connection with the present disclosure, and that the disclosure is not limited to cameras. Thus, the use of the term "camera" herein is intended to be illustrative and exemplary, but should not be considered to limit the scope of the disclosure. Specifically, any use of such term herein should be considered to refer to any suitable device for acquiring image data.

In the following description, several techniques and methods for processing light-field images are described. One skilled in the art will recognize that these various techniques and methods can be performed singly and/or in any suitable combination with one another. Further, many of the configurations and techniques described herein are applicable to

US 10,565,734 B2

11

conventional imaging as well as light-field imaging. Thus, although the following description focuses on light-field imaging, all of the following systems and methods may additionally or alternatively be used in connection with conventional digital imaging systems. In some cases, the needed modification is as simple as removing the microlens array from the configuration described for light-field imaging to convert the example into a configuration for conventional image capture.

Architecture

In at least one embodiment, the system and method described herein can be implemented in connection with light-field images captured by light-field capture devices including but not limited to those described in Ng et al., Light-field photography with a hand-held plenoptic capture device, Technical Report CSTR 2005-02, Stanford Computer Science. Referring now to FIG. **59**, there is shown a block diagram depicting an architecture for implementing the method of the present disclosure in a light-field capture device such as a camera **5900**. Referring now also to FIG. **60**, there is shown a block diagram depicting an architecture for implementing the method of the present disclosure in a post-processing system **6000** communicatively coupled to a light-field capture device such as a camera **5900**, according to one embodiment. One skilled in the art will recognize that the particular configurations shown in FIGS. **59** and **60** are merely exemplary, and that other architectures are possible for camera **5900**. One skilled in the art will further recognize that several of the components shown in the configurations of FIGS. **59** and **60** are optional, and may be omitted or reconfigured.

In at least one embodiment, camera **5900** may be a light-field camera that includes light-field image data acquisition device **5909** having optics **5901**, image sensor **5903** (including a plurality of individual sensors for capturing pixels), and microlens array **5902**. Optics **5901** may include, for example, aperture **5912** for allowing a selectable amount of light into camera **5900**, and main lens **5913** for focusing light toward microlens array **5902**. In at least one embodiment, microlens array **5902** may be disposed and/or incorporated in the optical path of camera **5900** (between main lens **5913** and image sensor **5903**) so as to facilitate acquisition, capture, sampling of, recording, and/or obtaining light-field image data via image sensor **5903**. Referring now also to FIG. **61**, there is shown an example of an architecture for a light-field camera, or camera **5900**, for implementing the method of the present disclosure according to one embodiment. The Fig. is not shown to scale. FIG. **61** shows, in conceptual form, the relationship between aperture **5912**, main lens **5913**, microlens array **5902**, and image sensor **5903**, as such components interact to capture light-field data for one or more objects, represented by an object **6101**, which may be part of a scene **6102**.

In at least one embodiment, camera **5900** may also include a user interface **5905** for allowing a user to provide input for controlling the operation of camera **5900** for capturing, acquiring, storing, and/or processing image data. The user interface **5905** may receive user input from the user via an input device **5906**, which may include any one or more user input mechanisms known in the art. For example, the input device **5906** may include one or more buttons, switches, touch screens, gesture interpretation devices, pointing devices, and/or the like.

Similarly, in at least one embodiment, post-processing system **6000** may include a user interface **6005** that allows the user to provide input to switch image capture modes, as will be set forth subsequently. The user interface **6005** may

12

additionally or alternatively facilitate the receipt of user input from the user to establish one or more other image capture parameters.

In at least one embodiment, camera **5900** may also include control circuitry **5910** for facilitating acquisition, sampling, recording, and/or obtaining light-field image data. The control circuitry **5910** may, in particular, be used to switch image capture configurations in response to receipt of the corresponding user input. For example, control circuitry **5910** may manage and/or control (automatically or in response to user input) the acquisition timing, rate of acquisition, sampling, capturing, recording, and/or obtaining of light-field image data.

In at least one embodiment, camera **5900** may include memory **5911** for storing image data, such as output by image sensor **5903**. Such memory **5911** can include external and/or internal memory. In at least one embodiment, memory **5911** can be provided at a separate device and/or location from camera **5900**.

For example, when camera **5900** is in a light-field image capture configuration, camera **5900** may store raw light-field image data, as output by image sensor **5903**, and/or a representation thereof, such as a compressed image data file. In addition, when camera **5900** is in a conventional image capture configuration, camera **5900** may store conventional image data, which may also be stored as raw, processed, and/or compressed output by the image sensor **5903**.

In at least one embodiment, captured image data is provided to post-processing circuitry **5904**. The post-processing circuitry **5904** may be disposed in or integrated into light-field image data acquisition device **5909**, as shown in FIG. **59**, or it may be in a separate component external to light-field image data acquisition device **5909**, as shown in FIG. **60**. Such separate component may be local or remote with respect to light-field image data acquisition device **5909**. Any suitable wired or wireless protocol can be used for transmitting image data **5921** to circuitry **5904**; for example, the camera **5900** can transmit image data **5921** and/or other data via the Internet, a cellular data network, a Wi-Fi network, a Bluetooth communication protocol, and/or any other suitable means.

Such a separate component may include any of a wide variety of computing devices, including but not limited to computers, smartphones, tablets, cameras, and/or any other device that processes digital information. Such a separate component may include additional features such as a user input **5915** and/or a display screen **5916**. If desired, light-field image data may be displayed for the user on the display screen **5916**.

Overview

Light-field images often include a plurality of projections (which may be circular or of other shapes) of aperture **5912** of camera **5900**, each projection taken from a different vantage point on the camera's focal plane. The light-field image may be captured on image sensor **5903**. The interposition of microlens array **5902** between main lens **5913** and image sensor **5903** causes images of aperture **5912** to be formed on image sensor **5903**, each microlens in microlens array **5902** projecting a small image of main-lens aperture **5912** onto image sensor **5903**. These aperture-shaped projections are referred to herein as disks, although they need not be circular in shape. The term "disk" is not intended to be limited to a circular region, but can refer to a region of any shape.

Light-field images include four dimensions of information describing light rays impinging on the focal plane of camera **5900** (or other capture device). Two spatial dimen-

US 10,565,734 B2

13

sions (herein referred to as x and y) are represented by the disks themselves. For example, the spatial resolution of a light-field image with 120,000 disks, arranged in a Cartesian pattern 400 wide and 300 high, is 400×300. Two angular dimensions (herein referred to as u and v) are represented as the pixels within an individual disk. For example, the angular resolution of a light-field image with 100 pixels within each disk, arranged as a 10×10 Cartesian pattern, is 10×10. This light-field image has a 4-D (x,y,u,v) resolution of (400,300,10,10). Referring now to FIG. 58, there is shown an example of a 2-disk by 2-disk portion of such a light-field image, including depictions of disks 5802 and individual pixels 5801; for illustrative purposes, each disk 5802 is ten pixels 5801 across.

In at least one embodiment, the 4-D light-field representation may be reduced to a 2-D image through a process of projection and reconstruction. As described in more detail in related U.S. Utility application Ser. No. 13/774,971 for "Compensating for Variation in Microlens Position During Light-Field Image Processing," filed Feb. 22, 2013, the disclosure of which is incorporated herein by reference in its entirety, a virtual surface of projection may be introduced, and the intersections of representative rays with the virtual surface can be computed. The color of each representative ray may be taken to be equal to the color of its corresponding pixel.

Image Sensors and Packaging

The image sensor 5903 of a light-field camera, such as the camera 5900, may be of any known type. According to some embodiments, the image sensor 5903 may be of a type commonly used for digital imaging, in both light-field and conventional imaging devices. In alternative embodiments, the image sensor 5903 may be specifically designed for use in a light-field camera.

FIG. 1 is a perspective view depicting an example of an image sensor 100, according to one embodiment. The image sensor 100 has an active area 110 encircled by packaging 120. As shown, the active area 110 may be much smaller than the overall minimum size of the packaging 120.

FIG. 2 is a perspective view depicting an example of a machine vision camera module, or module 200, that may be used in an array configuration, according to one embodiment. The module 200 may have an active area 210 and packaging 220. The module 200 has a relatively small form factor that may provide a favorable ratio of package-to-active-area sizing, as indicated by the exemplary width 230 of the active area and width 240 of the package.

FIG. 3 is a front view of the module 200 of FIG. 2, according to one embodiment. FIG. 3 depicts the width 230 and the width 240 to illustrate the footprint of the active area 210 and that of the packaging 220, which may define a sensor enclosure around the active area 210.

FIG. 4A is a front view of multiple modules 200 stacked side-by-side, according to one embodiment. FIG. 4A illustrates the evident challenge of simply stacking sensors next to each other. The result of such stacking is the presence of gaps 400 between the active areas 210 of adjacent modules 200. Such gaps 400, if not accounted for, may cause the captured image to show corresponding discontinuities, and may also result in the inefficient capture of light, as some of the light received would not be captured by an active area 210, but would instead impinge against the package 220 of one of the modules 200.

FIG. 4B is a side view depicting an example configuration in which modules 200 are arranged into a first array 450 and a second array 460, including a beam splitter 470, according to one embodiment. The first array 450 and the second array

14

460 may each be generally planar, with the planes angled at 90° relative to each other. The beam splitter 470 may be positioned to divide incoming light 480 into a first beam 490 directed toward the first array 450 and a second beam 495 directed toward the second array 460.

FIG. 5 is a front view depicting the arrangement of active areas 210 and packaging 220 that results from use of the beam splitter 470 as shown in FIG. 4B, according to one embodiment. The beam splitter 470 may increase the density of the active areas 210 receiving light by a factor of two. FIG. 5 illustrates the virtual imaging plane that would result, although the two planes would be separated on two or more separate axes. Gaps 500 still remain between the active areas 210. Gaps 500 are smaller than the gap 400 of FIG. 4A, but may still cause the resulting image to have discontinuities.

Additional beam splitters can be added, at the expense of light efficiency. In the particular configuration depicted in FIG. 5, approximately twelve to sixteen beam split image surfaces could be used, which could correspond to six to eight beam splitters, depending on mechanical configuration, to result in a virtually contiguous image surface. However, in such a configuration, only approximately 10% of the available light would hit each pixel, which may have a detrimental effect on efficiency and image quality.

Tapered Fiber Optic Bundles

In at least one embodiment, the described system makes use of recent breakthroughs in fiber optic technologies that allow extremely dense fiber bundles to be manufactured efficiently and enable light to be rerouted and/or focused over the distance of the fiber bundle with more than 50% and, possibly even 80% or more, light transmission with very low image distortion. In particular, by modifying how these fiber bundles are manufactured, compelling advances for light-field computational imaging may be achieved. Such advances may have particular utility for video applications.

Further, in at least one embodiment, a fiber bundle manufacturing process can be used that allows for magnification or demagnification by stretching the fibers through a heat process, resulting in the ability to create an image plane at the 'magnified' end of a fiber bundle that is physically larger than the active area of a coupled image sensor at the opposite end of the fiber bundle. The image sensor may be directly mounted to the compressed and demagnified end of the fiber bundle. Each fiber can have a dimension smaller than the size of a pixel, resulting in a highly accurate averaging of light at the opposite end of the bundle, and further resulting in highly accurate light collection at the pixel level of the sensor. Further, the demagnification process may maintain an exact fiber-for-fiber alignment between the fibers at the compressed side and at the unmodified side. In this manner, the image may be magnified or demagnified with a little warping but virtually no loss of content.

In at least one embodiment, the system is implemented by optically stitching the active area of each individual image sensor so as to scale each pixel to a ratio equivalent to the required increase in active area size that is large enough to meet or exceed the minimum dimensions of the packaging. As a result, the gaps caused by image sensor packaging may be negated so that multiple image sensors may cooperate to capture an image without any optical seams (within a predetermined tolerance) between each of the discrete image sensors.

FIG. 6 is a perspective view depicting an example of an individual image sensor, or module 200, with an active area 210 and packaging 220, according to one embodiment. A tapered fiber optic bundle 600, such as a bonded fiber bundle, may direct light into the active area 210. The fiber

15

optic bundle **600** may have approximately 3× magnification along an optical axis. Thus, the fiber optic bundle **600** may have a leading end **610** that dimensionally matches the width **240** of the package **220**, and a trailing end **620** that dimensionally matches the width **230** of the active area **210**.

FIG. **7** is a front view depicting a 3×1 array of modules **200** and tapered fiber optic bundles **600**, according to one embodiment. The magnified end (i.e., the leading end **610**) of each fiber optic bundle may have a width equal to or greater than the width **240** of the package **220** of each of the modules **200**. The leading ends **610** of the tapered fiber optic bundles **600** may cooperate to define a single, seamless surface at the image plane. As a result, the modules **200** may cooperate to capture a single, seamless image.

FIG. **8**A includes a side view of the module **200** and the tapered fiber optic bundle **600** of FIG. **6**, and front and rear views of the fiber optic bundle **600** in isolation, according to one embodiment. The dimensions and other values shown in FIG. **8** are merely exemplary. The "large end" may be the leading end **610** of the fiber optic bundle **600**, while the "tapered end" may be the trailing end **620**.

FIG. **8**B is a table **850** illustrating exemplary parameters and specifications that may be used in the construction of a camera with multiple image sensors and fiber optic bundles, according to certain embodiments. The values shown in the table **850** are merely exemplary; many other configurations may be used within the scope of the present disclosure.

FIG. **9** includes a side view and a front view, depicting exemplary arrangements of modules **200** and fiber optic bundles **600**, according to certain embodiments. A 3×1 configuration and a 3×2 configuration are illustrated. These particular configurations are merely exemplary; other configurations are possible to provide a wide variety of image resolutions and aspect ratios. For example, a 5×11 configuration may be used in one alternative configuration (not shown). In any case, the example shown in FIG. **9** can be used to illustrate how the modules **200** can be effectively stitched by aligning the leading ends **610** of the corresponding fiber optic bundles **600** to provide a larger overall imaging plane.

The systems and methods described herein may provide a way to use light-field customized dense fiber bundle technologies to couple multiple image sensors of existing types and sensor technologies together. These techniques may thus avoid problems with seams that may otherwise be present in the final image due to sensor package size and electronics footprint. Further, these techniques may avoid the limitations that can otherwise exist when light splitting is used to optically seam arrays together, which can reduce light transmission to a level that adds significant noise.

Further, the systems and methods described herein can improve data throughput capabilities for video applications so that they exceed the transmission capabilities of most commercially available interfaces. The ability to receive image data from multiple image sensors, in parallel, may provide such enhanced throughput rates. The system can thereby transfer and store data from array segments independently, in a manner that is beneficial and efficient from a manufacturing standpoint.

Additionally, the ability to stack professionally leveraged image sensors to form sensor arrays may allow for higher quality imaging without the need of custom silicon fabrication. The system can thereby avoid the need for a large imaging plane that could otherwise exceed full frame formats.

The described system and method may provide the ability to mount commercially available image sensors, including

16

dies, packaging, electronics, interfaces, and/or the like, at the compressed end of the fiber bundle element. Such an arrangement may provide a virtually unlimited pixel count as well as an extremely large and seamless highly efficient imaging plane through the use of an array of fiber optic bundles and sensors, as described previously. No custom image sensor fabrication is required.

Additionally, the cost of materials for the fiber optic bundles may be very low. Process costs can be reduced by constructing a dedicated manufacturing pipeline and process by which tapered fiber optic bundles can be rapidly and inexpensively manufactured.

Various embodiments include additional enhancements. One such enhancement relates to the fact that light may exit a tapered fiber optic bundle with an increased angle, relative to the angle at which the light entered the tapered fiber optic bundle. The ratio of exit angle to entry angle may be proportional to the ratio of magnification provided by the tapered fiber optic bundle. For example, if light enters the fiber at an angle of 10 degrees relative to the axis of the fiber, and the magnification of the fiber is approximately 3:1, the angle of exit will be approximately 30 degrees.

FIG. **10** is a side view depicting a single fiber **1000** within a tapered fiber optic bundle, such as the fiber optic bundle **600** of FIG. **6**. The angles at which the light reflects within the interior of the fiber **1000** provide an angle of exit **1020** that is approximately three times an angle of entry **1010**, demonstrating how light exits at a potentially increased exit angle. The angle of entry **1010** and the angle of exit **1020** are exaggerated in FIG. **10** to illustrate the change.

This change in angle of incidence of the light can have a beneficial effect on image sensor efficiency. Certain image sensors respond best when receiving more collimated light, such as light entering the sensor at an angle of about 15°. Accordingly, in at least one embodiment, the system redirects light entering the camera such that the light impinges on the active area of each image sensor at an angle that optimizes the light collection efficiency of the system. Various aspects of the camera, such as the length and magnification of the tapered fiber optic bundles, may be configured in a manner that optimizes the light collection efficiency.

In at least one embodiment, the active area of one or more of each image sensor may not be square. The magnification of each of the tapered fiber optic bundles may be limited to have a magnified dimension that is greater than or equal to the largest mechanical dimension for the larger active sensor area dimension. For example, if the packaging of each module is 60 mm×60 mm, and the sensor is 20 mm×15 mm, the magnified end (i.e., the leading end) of the optical fiber bundle may be configured to be at least 60 mm, resulting in an approximate magnification factor of 3×, and an imaging area of approximately 60 mm×45 mm. The imaging area can be split multiple times to allow for decreased magnification factors per tapered fiber optic bundle, at the expense of decreased light transmission and increased overall system size, but with decreased angular magnification of each fiber.

In the architecture described herein, there are two ends of each fiber optic bundle: a large, leading end (magnified, used at the imaging plane) and a small, trailing end (minimized, used at the sensor). In at least one embodiment, the leading end of the tapered fiber optic bundle is magnified so that its minimum dimension is at least as large as the maximum dimension of the packaging of the corresponding image sensor. In this manner, when incorporating the packaging behind the tapered fiber optic bundle, there is more than

US 10,565,734 B2

17                                                                         18

sufficient mechanical spacing without the need to stagger the fiber optic bundles and/or the image sensors to increase density.

For example, suppose the packaging of each module is 60 mm×60 mm, and the sensor is 20 mm×15 mm. A magnification factor of 4 may be applied, so that the smallest dimension of the sensor (15 mm) is magnified to include the maximum dimension of the enclosure (60 mm). The aspect ratio is preserved, so that the leading end of the tapered fiber optic bundle is 80 mm×60 mm in size.

As another example, if the packaging of each module is 60 mm×60 mm, and the sensor is 20 mm×15 mm, the leading end of each fiber optic bundle can be about 80 mm×60 mm, resulting in the ability to stitch all packaging without any staggering or beam splitters (or the like), at the expense of an increased taper in the fiber optic bundles, and thus a larger overall imaging plane.

FIG. 11 includes front, top, and side views depicting an array of image sensors, or modules 200, and tapered fiber optic bundles, or fiber optic bundles 600, according to one embodiment. The leading end 610 of each tapered fiber optic bundle 600 may be wider than the width 240, the largest side of the packaging 220 of the corresponding module 200. This may result in increased magnification and imaging area without the need to stagger the electronics. Such an approach may facilitate the use of a beam splitter (or multiple beam splitters, depending on the system configuration) and configuration of each of the rows of modules 200 into two aligned imaging planes. The top view illustrates the presence of gaps 1100 between the modules 200. In the side view, the modules 200 may be positioned to abut each other such that no gaps are present.

FIG. 12 includes a side view and a front view depicting a configuration that uses a beam splitter in conjunction with modules 200 that receive light through tapered fiber optic bundles, or fiber optic bundles, 600, according to one embodiment. The left side of the FIG. 12 depicts a side view, wherein the design for the beam splitter 470 can be seen dividing the optical path into a first plane 1210 and a second plane 1220, allowing for additional package spacing. The right side of the FIG. 12 depicts a front view, wherein the rows of the modules 200 can be seen; the virtual imaging plane that results from the combination of the top and bottom paths intersecting with one another may result in a contiguous imaging surface. Any suitable arrangement can be used that allows for increased electronics dimensions through the use of scaled pixels with tapered fiber optic bundles, including for example a horizontal arrangement, a vertical arrangement, a checkerboard arrangement, and/or the like.

Use of the beam splitter 470 may allow further increased resolution by capturing light at surfaces displaced from each other by 90° (or in alternative embodiments, a different angle). Some light transmission may be sacrificed due to the fact that each surface may only receive about half of the incoming light received through the aperture. However, greater mechanical configuration flexibility may be obtained by rotation of the planes.

In alternative embodiments, any other optical method can be used for directing light in multiple optical paths. Thus, reference herein to a "beam splitter" can be considered to include any such alternatives, including for example, but not limited to, polarizers, birefringent materials, prisms, various optical coatings, mirrors, and/or the like.

FIG. 13 is a perspective view depicting an example of a configuration for the modules 200 and fiber optic bundles 600 of the first plane 1210 of FIG. 12, according to one embodiment. The first plane 1210 may receive light from along a first path. The modules 200 may be arranged in nine vertically-oriented columns 1300 of eight modules 200 each, for a total of seventy-two modules 200. A gap 1310 may be present between each adjacent pair of the columns 1300.

FIG. 14 is a perspective view depicting an example of a configuration for the modules 200 and fiber optic bundles 600 of the second plane 1220 of FIG. 12, according to one embodiment. The second plane 1220 may receive light from along a second path. The modules 200 may be arranged in eight vertically-oriented columns 1400 of eight modules 200 each, for a total of sixty-four modules 200. A gap 1410 may be present between each adjacent pair of the columns 1400.

FIG. 15 is a perspective view depicting how the first plane 1210 and the second plane 1220 may be aligned with each other, according to one embodiment. As shown, the columns 1300 of the first plane 1210 may be staggered relative to the columns 1400 of the second plane 1220, such that the light received by the modules 200 of the second plane 1220 negates the gaps 1310 between the columns 1300, and the light received by the modules of the first plane 1210 negates the gaps 1410 between the columns 1400.

FIG. 16 is a side view depicting an example configuration of tapered fiber optic bundles, or fiber optic bundles 600, that may be used to direct light to image sensors (not shown), according to another embodiment. A beam splitter 470 may again be used to direct light from a main lens 1600 to fiber optic bundles 600 arranged along a first plane 1610 and a second plane 1620.

FIG. 17 is a virtual view depicting a tiled imaging plane 1700 according to one embodiment. The leading ends 610 of fiber optic bundles 600 may be tiled to define the imaging plane 1700. The various values and numerical labels in FIG. 17 are merely exemplary; other dimensions and numbers of modules 200 and fiber optic bundles 600 may be used.

The above-described configurations may provide additional benefits. For example, such configurations may allow for a spherically curved imaging plane without the requirement of trapezoidal fiber customizations, as discussed in more detail below. In addition, these configurations provide the ability to orient each row or column independently, and/or to install custom rows and/or columns of the microlens array in strips without seams when viewed as the virtual complete sensor. Furthermore, these configurations may facilitate improved mechanical design.

FIG. 18 is a front view depicting an example of strips 1800 for mounting micro lens optics to the rows or columns of fiber optic bundles and sensors, according to one embodiment. In various embodiments, the microlens array may be positioned in any of various locations, including but not limited to between the module 200 and the fiber optic bundle 600, and between the main lens 1600 and the fiber optic bundle 600. The microlens array may be divided into strips 1800 and secured to the fiber optic bundles 600 and/or modules 200 of the columns, as shown in FIG. 18, providing additional mechanical clearance for other adjustments and design.

In at least one embodiment, in order to allow for increased sensor density without the use of multiple imaging planes (or in combination with other applications such as HDR, depth, and/or the like), a multi-length face plate approach may be employed. By mounting two or more faceplates with offsets between them, or by incorporating fiber tapers at different lengths, and staggering at a minimum of every other row and/or column, it is possible to allow for increased

US 10,565,734 B2

19

package size with increased sensor density, while gaining increased light transmission efficiency by eliminating additional beam splitter paths.

FIG. 19 is a top view depicting an example of a multi-length tapered fiber optic bundle solution, according to one embodiment. By staggering the lengths of multiple tapered fiber optic bundles, the mechanical spacing required along X and Y (from the front) may decrease to the minimum dimension of the packaging 220 of each module 200. This may achieve a continuous imaging plane without the necessity of a beam splitter. a A fiber optic faceplate may be used to attach each camera module to each tapered fiber optic bundle 600, where one side of the faceplate is bonded to the small trailing end of the tapered fiber optic bundle, and the other side of the faceplate is bonded to the sensor module. A continuous imaging plane may be achieved by using an arrangement of equal-length tapers with staggered face plate lengths, staggered-length tapers with equal-length faceplates, or a combination of staggered taper lengths and staggered face place lengths. As mentioned previously, in the architecture described herein, there are two ends of each tapered fiber optic bundle, or fiber optic bundle 600: a large, leading end 610 (magnified, used at the imaging plane) and a small, trailing end 620 (minimized, used at the module). In at least one embodiment, the leading end 610 of the fiber optic bundle 600 is magnified so that the largest dimension of the leading end 610 is at least as large as the maximum dimension of the packaging 220 of the module 200.

For example, suppose the electronics/enclosure of each module 200 is 60 mm×60 mm, and the active area 210 is 20 mm×15 mm. A magnification factor of 3 is applied, so that the largest dimension of the active area 210 (20 mm) is magnified to include the maximum dimension of the packaging 220 (60 mm). The aspect ratio is preserved, so that the resulting leading end 610 becomes 60 mm×45 mm.

In this manner, when incorporating the packaging 220 behind the fiber optic bundle 600, in at least one embodiment, the lengths of the faceplates/fiber optic bundles 600 are staggered to provide an overlap between the packaging 220 of the modules 200. In the example described above, an overlap of 15 mm is provided in one dimension, with no overlap in the other dimension (since the large dimension of the leading end 610 is matched to the largest side of the packaging 220). Staggering the lengths of the fiber optic bundles 600 in this manner may provide increased mechanical density and decreased active imaging area. Further, such staggering may provide higher light transmission by enabling the use of a lower magnification ratio in the fiber optic bundles.

Such a configuration may allow for any number of staggered tiers, given certain mechanical requirements to include two or more lengths. For example, in one embodiment, five to seven tiers can be provided for five to seven tiers of modules 200 that are staggered from each other.

FIG. 20 is a perspective, wireframe view from the rear of the tiered approach of FIG. 19. In this example, the arrangement produces a contiguous imaging plane with two lengths of tapered fiber optic bundles 600. The leading ends 610 of the fiber optic bundles 600 may be aligned and positioned coplanar to each other to define the imaging plane.

In at least one embodiment 9 μm fiber pitch optics can be used at the leading ends 610 of the fiber optic bundles 600, and an approximately 3× magnification ratio/factor can be used to provide an approximately 3 μm pitch fiber at the trailing end 620. However, any suitable size of optical fibers can be used. In other embodiments, other fiber technologies

20

can be used as well as any statistical or interstitial EMA design, and/or any material, refractive index, numerical aperture, and/or the like.

In at least one embodiment, the modules 200 are tiled, faceted, or stepped (terms that may be used interchangeably) in a cylindrical fashion, angling the normal of the leading end 610 of each fiber optic bundle 600 to be perpendicular to the chief ray angle. In at least one embodiment, this approach may be modified to increase or decrease this angle depending on certain optical system components or mechanical design considerations. The fiber optic bundle 600 in this approach may be polished at the required angle to allow for simplified mechanical design, and/or an enclosure can be provided to accommodate these angles. Similar techniques can be used for the beam splitter or other optically splitting solution.

FIG. 21 is a top view depicting a cylindrically faceted approach, wherein the image sensors and/or fiber optic bundles 600 are arced about the optical center 2110 of the main lens 2100, according to one embodiment. The center of the imaging surface may thus be kept perpendicular to the corresponding ray 2120 leading to the optical center 2110. In at least one embodiment, this arrangement may be constructed on a variable approach, where the ability to curve these tiles or return to a flat imaging plane is possible. This may allow the optical center of the main lens to drift depending on the requirements for focal length, focus, and/or calibration. This may result in a single axis exhibiting a cylindrical form (with step functions at each image sensor). Illumination and aberration may become more computationally intensive without a contiguous cylindrical surface.

In at least one embodiment, an additional fiber face plate is added with a single surface that matches the faceted function of the leading end 610 of each fiber optic bundle 600, with a polished exterior surface. This design may eliminate the face plate. This surface may be directly polished in this configuration with each fiber optic bundle individually or as a whole mechanical apparatus.

FIG. 22A is a top view depicting a cylindrically faceted approach, according to another embodiment. A polished fiber face plate 2200 may be added to match the faceted surface of the leading ends 610 of the fiber optic bundles. The polished fiber face plate 2200 may be manufactured to include an accurately cylindrical surface 2210.

In at least one embodiment, these fibers, and all of the components in the system that are bonded to or between additional fibers, are bonded using a matched refractive indexed epoxy, UV cure or other appropriate adhesive. Alternatively, these bonds may be made in a temporary fashion (such as by mechanical bonds and gaskets) or with other adhesives that may be removable. Such attachment methods are not limited to the embodiment of FIG. 22A, but may be used to facilitate the attachment of any combination of fiber structures, faceplates, and/or other optical components, including but not limited to those in the other embodiments set forth in this disclosure.

In at least one embodiment, a polished fiber face plate surface may additionally or alternatively be fabricated by bonding the fiber surfaces together, and then directly polishing the surface into the desired cylindrical or spherical shape without orienting the centers of each respective leading end 610 to be perpendicular to the optical center. Alternatively, some hybrid of the two options can be used, blending the partially angled and partially polished approaches.

US 10,565,734 B2

21

FIG. **22**B is a side view illustrating an arrangement of fiber optic bundles **2250** that have been bonded together and polished to provide a polished fiber face plate surface **2260**, according to one embodiment. The fiber face plate surface may thus be formed from the fibers of the fiber optic bundles **2250**, rather than from the attachment of an additional element to the fiber optic bundles **2250**.

With the cylindrical surface approach, it is possible that the alternate axis (for example, cylindrical along x, the alternate axis being y) will exceed the ideal angles for entry and exit. Thus, in at least one embodiment, a cylindrical (stepped) approach is used, wherein an additional faceplate is added to a spherical imager in a stepped or smooth approach. The cylindrical (x axis) may remain stepped with either approach. This is beneficial as all shapes may remain linear, and thus may not require trapezoidal distortion. The above description is merely exemplary; for example, x and y can be interchanged as the dominant axis (so that cylindrical would be along y instead of x). This may be directly manufactured into the leading ends of the fiber optic bundles as in FIG. **22**B, without the attachment of separate face plates as mentioned in the previous cylindrical face plate section.

FIG. **23** is a side view depicting a single column **2300** of the faceted cylindrical imaging surface, which may be a section of a spherical imaging surface, according to one embodiment. The faceted cylindrical imaging surface may appear to be completely flat from the side view, although from the top it may appear cylindrical. Additional face plates are manufactured to include faceted surfaces **2310** and/or or smooth/polished surfaces **2320** along the opposite dimension, causing the resulting shape to be faceted or polished spherical.

In at least one embodiment (not shown), fiber optic bundles may be formed with trapezoidal shapes for greater accuracy in configuring the tiled spherical shape. In this design, the center of the leading end of each fiber optic bundle, including any offset from the flat surface, may be perpendicular to the optical center **2110** of the main lens **2100**, as in FIG. **21**.

FIG. **24** is a front view depicting an example of trapezoidal faceted fiber taper surfaces that result when generating a spherical faceted surface, according to one embodiment. As shown, leading ends **2410**, **2420**, **2430**, **2440**, **2450**, **2460**, **2470**, **2480**, and **2490** of tapered fiber optic bundles may be angled and arranged to define a generally spherical, concave shape.

In another embodiment, fiber surfaces may be bonded together, and then a spherical surface may be directly polished into the adjoining leading ends of the fiber optic bundles that define the resulting fiber structure, without orienting each leading end to be perpendicular to the optical center. In yet another embodiment, some hybrid solution may be performed that combines the angled and polished approaches.

In at least one embodiment, as a further advance, a polished fiber faceplate is bonded or otherwise secured to the leading ends of the fiber optic bundles. The polished fiber faceplate may have the tile shape on the side adjoining the leading ends, and a spherical surface on the alternate (imaging) side.

FIG. **25**A is a front view depicting the use of a polished fiber faceplate **2500** to provide a generally spherical concave surface on the imaging side, according to one embodiment. The leading ends **2510**, **2520**, **2530**, **2540**, **2550**, **2560**, **2570**, **2580**, and **2590** of the fiber optic bundles **600** may be covered by the polished fiber faceplate **2500**, which may be

22

shaped, at its trailing end, to match the profile of the combined leading ends **2510**, **2520**, **2530**, **2540**, **2550**, **2560**, **2570**, **2580**, and **2590**. Such an approach may additionally provide the ability to produce non-trapezoidal fiber optic bundles (resulting in gaps between the fiber optic bundles themselves) with the added trapezoidal and tapered polished faceplates to fill in the gaps and produce the desired spherical surface.

FIG. **25**B is a side, section view depicting the use of the polished fiber faceplate **2500** of FIG. **25**B. As shown, the fiber optic bundles **600** may have non-trapezoidal shapes. The trailing end of the polished fiber faceplate **2500** may provide interfacing shapes **2592**, and may have a spherical surface **2594** at its leading end.

In at least one embodiment, the modules **200** and fiber optic bundles **600** are mounted in a configuration wherein each of the modules **200** is angled, with a commensurate angle to the cut and polish of the trailing end **620** of the fiber optic bundle **600**. This may provide additional mechanical flexibility and/or alternative design options.

FIG. **26** is a perspective, wireframe view depicting exemplary asymmetrical stacking of modules **200** and fiber optic bundles **2600**, according to one embodiment. The leading ends **2610** of the fiber optic bundles **2600** may be arranged asymmetrically, and the fiber optic bundles **2600** may be angled to provide for mounting of the modules **200** at various orientations.

In any of the described configurations, the image sensors may be bonded to a fiber face plate or taper, and/or temporarily bonded without an adhesive via a pressure mounted system. This may be done with or without removing the sensor's CFA or pixel MLA (not referring to plenoptic MLA), with the cover glass removed. For example, the image sensor, including the active area, can be mounted to a structural plate, the fiber can be attached to a second structural plate, a gasket can be placed between the two plates, and then the plates can be machine-screwed together to form a semi-permanent bond between the components. The tapered fiber optic bundles may or may not be bonded to a faceplate between the fiber optic bundle and image sensor.

FIG. **27** is a side view depicting an example of a fiber optic bundle bonding configuration with a faceplate **2700** between the microlens array, or MLA **2710**, fiber optic bundle **600**, and image sensor, or module **200**, according to one embodiment. Bonds **2720**, **2730**, and **2740** may be formed between the MLA **2710** and the fiber optic bundle **600**, between the fiber optic bundle **600** and the faceplate **2700**, and between the faceplate **2700** and the module **200**, respectively. The bond **2720** between the MLA **2710** and the fiber optic bundle **600** may be replaced with an air-gap, depending on the configuration of the MLA **2710**.

Tolerances and Mechanical Design

In at least one embodiment, each module in the array is mounted with a permanent mechanical alignment stage, or with a temporary mechanical alignment mechanism that is calibrated and then removed after initial manufacture. Any suitable mechanism can be used to ensure that tolerances are maintained for appropriate alignment and reconstruction of the larger imaging plane.

FIG. **28** is a front view depicting an example of bondline tolerances between the leading ends **610** of two exemplary fiber optic bundles **600** separated by a bondline **2800**, according to one embodiment. The bondline **2800** may advantageously be as thin as possible to prevent seams from appearing in the final image. In at least one embodiment, the tolerance in the bondline **2800** is a maximum of 30 μm.

23

24

FIG. **29** is a top view depicting an exemplary technique for measurement of tolerance for image plane flatness between the leading ends **610** of two exemplary fiber optic bundles **600**, according to one embodiment. The design specification in this embodiment may have the leading ends **610** coplanar; however, manufacturing limitations may cause the presence of a departure **2900** from coplanarity. In at least one embodiment, the tolerance for this departure **2900** is a maximum of 100 µm.

FIG. **30A** is a perspective view depicting a camera **3000** using multiple modules **200** and fiber optic bundles **600** as described herein, according to one embodiment. The camera **3000** may have a main lens **3010** through which light is directed into the interior of the camera **3000** to the leading ends **610** of the fiber optic bundles **600** (not shown in FIG. **30A**).

FIG. **30B** is a perspective view depicting an example of an internal mechanical design of an array of fiber optic bundles **3020** and modules **3030**, according to one embodiment. In this example, five face plate lengths are included. A grid **3040** may retain the leading ends (not shown) of the fiber optic bundles **3020**.

With either focal length and imaging plane dimensions, in at least one embodiment, the main lens may not require any internally moving parts for focus. Rather, the lens may move on a bellows system to provide accurate focus and a less complex, yet higher optical quality, lens design. Further, removal of the aperture blade requirements may have additional cost reduction benefits. The lens movement system may be motorized for additional efficiencies.

FIG. **31** is a perspective view depicting a camera **3100** according to one embodiment. The top panel of the enclosure of the camera **3100** has been removed to expose internal parts. A main lens **3010** may be similar to that of FIG. **30A**. In this configuration, there is a cylindrically curved (step function) fiber image plane **3110**, with two staggered image sensor layers **3120**, **3130**, with a heat sink **3140** on the rear.

FIG. **32** is an exploded view of a portion of the camera **3100** of FIG. **31**. Many of the internal components of the camera **3100** are shown, including the fiber image plane **3110**, which may be defined by the leading ends of the fiber optic bundles **3200**. The fiber image plane **3110** is depicted as a cylindrical surface in this example, although it can be planar, spherical, and/or faceted. The fiber optic bundles **3200** may have fiber faceplates with two separate lengths to convey image data to the modules **3210** of the image sensor layers **3120**, **3130**. Mechanical design of the fiber optic bundles **3200**, the fiber face plate, modules **3210**, and module mounting systems is also shown for each of the image sensor layers **3120**, **3130**, along with the heat sink **3140**. The depicted architecture is merely an example; many other variants can be constructed.

The heat sink **3140** may serve to cool the array. In at least one embodiment, further cooling of a dense array system may be provided, for example through the use of Peltier units (thermo-electric coolers) at each image sensor. Other approaches can be used, including for example alternative heat sinks, fans, liquid cooling systems, and/or the like.

A dense fiber array structure may provide the ability to scale the product design for any number of markets/products with the same components. For example, the architecture can be implemented in any suitable dimensions, such as a 2×5 array or a 200×500 array. Depending on the dimensions, certain components may be changed, such as the main lens and mechanical design to accommodate the larger system. The physical sensor parts can be stacked together in a manner similar to Lego blocks.

In at least one embodiment, each sensor in the system may be attached to the electronics with a socket such as a zero-insertion force (ZIF) connector, to provide simplified installation and maintenance of the system. In at least one embodiment, certain electronic components within the system can be mounted or tethered on flexible or flexi-rigid cable technologies (such as for PCI boards or other cables to/from servers/storage, and/or the like), and/or any other methodology that provides the ability to stack the electronics and/or mechanical requirements as deeply as desired.

In another implementation, where only four fiber optic bundles and image sensors are used, a single tapered fiber optic bundle can be cut vertically into four equal quadrants. Each quadrant can be rotated and rearranged to provide a continuous image plane at the magnified end with almost no loss of data at the seam boundaries, and four offset demagnified sensor planes with increased mechanical separation as depicted in FIG. **33**.

FIG. **33** is a perspective view depicting the division of fiber optic bundle **3300** into four fiber optic bundles, according to one embodiment. The left-hand side depicts the fiber optic bundle **3300**, which may have a leading end **3310** and a trailing end **3320**. On the right-hand side, the fiber optic bundle **3300** is rotated along the y-axis and reconfigured for mechanical separation at the trailing end **3320**. The arrow on the right-hand side points to a bonding point for an image sensor to the corresponding portion of the divided trailing end **3320**. The image sensor and electronics can be bonded to the associated portions of the trailing end **3320**. The leading end **3310** may remain undivided, providing a single planar imaging plane.

In this configuration, a single, larger, tapered fiber optic bundle may be divided into four (or more) equal sections. Those sections may then be used to mount the required modules, including packaging, with appropriate mechanical spacing. To allow for the required mechanical spacing, it may be advantageous not to put the four (or more) segments back together in the same fashion as originally produced prior to the cut. Each segment may have its own distinct shape, and may include a specific inward angle. For example, in the depicted example, the top-right quadrant may minimize inward scaling by the magnification factor into the center of the trailing end **3320**. If this quadrant taper is turned up-side-down and repositioned in the location of the top-left quadrant, the resulting trailing end may then be positioned at the furthest location away from the center of the original fiber optic bundle **3300**, not positioned at the top left of the large end of the segment, as shown in FIG. **33**. If this is performed for all of the segments respectively, the resulting shape may provide a near-seamless imaging plane at the leading end **3310** and simultaneously provide the maximum mechanical spacing for the packaging of the image sensors through the production and division of a single tapered fiber optic bundle.

Such a design may provide significant cost reductions for the tapered fiber optic bundle manufacturing process. Production of only a single fiber optic bundle (in an embodiment that only requires four image sensors) may be less expensive than the production of four separate fiber optic bundles. In other embodiments, the configuration described above can be leveraged in configurations with multiple fiber optic bundles to provide light to more than four image sensors. This may facilitate the implementation of higher resolution and/or custom configurations.

In the above-described embodiments, it is assumed that the fiber optic bundles are cut and polished at angles that are viable for the mechanical design, including cubed edges at

US 10,565,734 B2

25                                                                          26

the image plane (at the leading end) as well as the sensor (minimized) end, so as to ensure that fiber optic bundles can be bonded together with sufficient surface area. In an alternative embodiment, the system can be implemented using a mechanical design that eliminates the bonding process. In at least one embodiment, the shape of the fiber optic bundle is made broad enough to cover an installation or process for optical image plane stitching.

FIG. 34 is a perspective view depicting an example of a tapered fiber optic bundle 3400 with cut and polished edges 3410, according to one embodiment. When multiple tapered fiber optic bundles are bonded together, the polished edges 3410 may provide the surfaces required for the bonding process.

FIG. 35 is a series of views depicting two of the tapered fiber optic bundles 3400 of FIG. 34, arranged in a 2×1 array, according to one embodiment. The polished edges 3410 of adjoining tapered fiber optic bundles 3400 may be secured together.

Advantages

Use of the tapered fiber optic bundles described herein may have many advantages. These advantages may include more flexibility and compactness in system geometry, which may result in greatly increased accuracy of depth estimation from a computational imaging standpoint. Further, obtaining high optical quality and/or a high F-number may be accomplished at a comparatively smaller cost.

For example, a system leveraging a 35 mm optical format can have an F/2 lens and a 50 mm focal length. This system may provide, assuming 1 GP resolution requirements, about a 0.9 μm pixel pitch and a 25 mm entrance pupil (EP). Increased entrance pupil size provides increased parallax, and therefore (generally speaking) more accuracy for all aspects of depth computation, motion/vector tracking, and computational imaging.

In general, a 0.9 μm pixel pitch and 25 mm EP is a very challenging design, requiring greater than state-of-the-art optical design in order to achieve 550 pixels/mm, not to mention the increased QE of small pixel design (due to less physical area for photon collection), decreased photons available at video rates per pixel (due to potentially less integration time), scatter of wavelengths of light in silicon (particularly red, about a 7.6 μm diffusion potential) and diffraction limitations (due to the airy disc as determined by the lens parameters and resulting pixel size requirements), all resulting in significant reduced image quality for a light-field imaging system, as well as for any standard 2D imaging system.

For the above-described 0.9 μm pixel system, the diffraction limitations would suggest a lens of less than F/0.5 design to help avoid diffraction limitations, although the color diffusion in silicon may continue to exist and other aberrations or distortions may occur due to such a challenging lens design. Using conventional techniques, designing such a lens with high quality imaging is extremely challenging, if not impossible. For example, if a 100 mm focal length is desired with an F/0.5 design, the theoretical entrance pupil required may exceed 400 mm, which is an extraordinarily large optical apparatus with huge potential cost, size, and weight implications, and a significant mechanical challenge.

The approach described herein may address such limitations of existing systems. One may leverage existing pixels used for existing professional applications (e.g. 5.5 μm) with a 3:1 magnification fiber taper ratio to allow for electronics/ mechanical design, resulting in an approximate 16.5 μm virtual pixel. This pixel size may provide a significantly

increased photon collection area (even in exchange for the transmission loss through the fiber bundles), with nearly 0 pixels of color diffusion. Further, this pixel size may be well below diffraction limitations, even at larger F-numbers (i.e., smaller apertures).

Using the techniques described herein, a system may be designed with an imaging plane greater than about 600 mm in width, as opposed to a 35 mm wide imaging plane as mentioned above, to result in the same pixel resolution, with a lens producing an equivalent field of view (FOV) as a standard 50 mm lens (approximately a 900 mm lens) with an F/9. The result may be a 100 mm entrance pupil with a readily available optical design. The imaging qualities of such a system are vastly superior to conventional designs.

In another embodiment, geared at the same increase in system geometry but requiring an increase in system transmission and/or where mechanical enclosure requirements are potentially larger, the system can be implemented in a manner wherein the main lens projects an image onto the MLA (micro lens array), followed by a single or tiled fiber faceplate (or other transmissive surface). This may result in a viewed image at the rear of the fiber face plate, with high transmission as the fiber elements have very high efficiency when used as a relay alone. The image may appear similar to viewing an image on ground glass, yet may retain higher overall MTF/image quality.

In at least one embodiment, behind this arrangement, N/resolution cameras can be arranged in an array to re-photograph the image as projected onto the fiber face plate surface. Each sensor may use a focal length that is matched across the array and to the corresponding FOV of required coverage. Some overlap may be desirable as well. The lenses may have extremely wide F numbers (such as 0.5, for example), as the total range of depth-of field (DOF) to be captured per lens is very shallow. However, the overall FOV acquired through the computational system may be extremely wide. One advantage to this approach may be simplified system design.

Use of a non-planar surface for imaging, as described above, may help to reduce the effects of aberrations in the main lens of a camera. Known methods often utilize software correction efforts and/or extensive calibration routines to correct for lens aberration. Such aberration effects may not be as apparent in the image derived from a non-planar surface such as a cylindrical or spherical surface, as described herein.

Alternative Sensors and Transmissive Surfaces

FIG. 36 is a side view depicting an example of an alternative structure utilizing a transmissive surface 3600 as described above, according to one embodiment. A main lens 3610 may transmit images onto the microlens array, or MLA 3620, followed by the transmissive surface 3600. The transmissive surface 3600 may be a fiber face plate, ground glass, or the like. The image may be re-imaged by a series of image sensors, or modules 3630, and lenses with or without overlapping fields of view. The image may be conveyed from the transmissive surface 3600 to the modules 3630 by tapered fiber optic bundles 3640.

In at least one embodiment, between the MLA 3620 and the tapered fiber optic bundles 3640 and/or face plate, an additional fiber plate may be interjected to further diffuse the transmission of light and provide increased angular sensitivity or altered directionality to the modules 3630. With a demagnification of the image plane to the modules 3630 (such as an arrangement wherein the plane behind the MLA 3620 is at 1×, and the sensor side is 3× magnified), the angles of exit may be ⅓ the angles of entry, which may produce

US 10,565,734 B2

27

increased sensitivity for the modules **3630**, and provide the ability to use extremely large apertures (e.g. F/0.5 on a <APS-C system) without decreased sensitivity at the high incident angles of entry. Such an approach can applied in many different architectures and applications, not limited to light-field capture, such as for example traditional capture as well as projection technologies.

FIG. **37** is a top view depicting an example of inclusion of a tapered fiber optic bundle **3700** that magnifies light to the imaging sensor, according to one embodiment. Such magnification may reduce the angles of exit from the MLA **3620** to the image sensor, or module **3710** (or in the alternative, modules), according to one embodiment.

In at least one embodiment, the module **3710** may be replaced with one or more scanline sensors for non-moving or other forms of imagery. Scanline sensors, including flatbed scanners, are conveniently available and may be used behind the main lens **3610** and MLA **3620**, with or without the fiber bundle technologies and/or with or without the beam splitting technologies described herein. For volume capture applications, the use of the scanline illumination system may be left active if desired.

FIG. **38** is a top view depicting exemplary use of a scanline imager **3800** imaging the entire area according to one embodiment. The scanline imager **3800** may be of any known type, and may be used in conjunction with other components described previously, including but not limited to the main lens **3610** and MLA **3620**. As shown in FIG. **38**, the scanline imager **3800** may have a scanline sensor **3810**, which may move along a linear pathway indicated by the arrows **3820**.

In at least one embodiment, global shutters can be used. Alternatively, mechanical shutters plus a rolling shutter may be used. As yet another alternative, rolling shutters can be used alone.

System Calibration

In at least one embodiment, each sensor and microlens is carefully calibrated and aligned, so as to ensure high quality imaging and reconstruction of the light-field. In at least one embodiment, the process to perform such calibration includes, in no particular order, two-dimensional calibration steps/processes as well as light-field calibration.

Such calibrations can be performed in hardware/manufacturing or in software, or in any combination thereof. In at least one embodiment, calibration is performed in hardware as close to the ideal specifications as possible, and further corrections are made in software as needed. In some environments, a combination of hardware and software calibration processes can be used. In further refinement of the technology into mass-production markets, the software calibration process can, in some cases, be a higher percentage of the calibration process due to more lax tolerances for lower price point markets.

Two-dimensional calibrations may include, but are not limited to, standard image sensor optimization and calibration. This may include, but is not limited to, hot spot removal, dead pixel removal, ADC optimizations, dark time/noise calibration, and/or the like. Array calibrations may include, but are not limited to, standardization of all image sensors in the array to an ideal state. Additionally or alternatively, image sensors may be adjusted to match an average or single image sensor within the array to ensure continuity and consistency between each of the imaging elements. Light-field calibrations may include, for example, alignment of each microlens and the standardization of the pixels captured within the light-field, as well as computa-

28

tional adjustments for lens distortion, vignetting, and/or other aberrations produced within the optical system.

In some cases, use of fiber optic technologies can produce additional static noise artifacts that can be described as fixed noise patterns, "chicken wire" artifacts, seam gap distortions, and/or other artifacts arising from use of the fiber optic bundles. Other calibrations can be performed to alleviate these artifacts, including but not limited to static fiber noise removal and seam gap removal.

In at least one embodiment, within the current tolerances provided in the image plane reconstruction, given the large magnified pixel structures, the seam gap accounts for approximately one pixel per image sensor. A gap of this magnitude may easily be accounted for within light-field image reconstruction so that the resulting image does not display any visible seams.

FIG. **39** is a front view depicting an example **3900** of 10% tolerance on an imaging sensor, plus pre-distortion correction from a fiber taper, according to one embodiment. The black pixels represent the area where no light is present due to the alignment of the active fiber surface. In at least one embodiment, the system achieves 1% tolerance of lost pixels, although the exact tolerances are determined by the calibration and alignment process.

MLA Considerations and Design

In at least one embodiment, the MLA (micro lens array) is directly mounted (with appropriate spacing, focal length (FL), and/or the like) to the leading end of each fiber optic bundle. In various embodiments, the MLA may be front-facing with thick glass/substrate bonded directly to the fiber surface or with an included air-gap, or rear-facing (lenslets facing the fiber vs. facing the lens) with an air gap and manufactured onto a substrate for structure.

FIG. **40** depicts examples of inward and outward facing MLA's **4000** and **4010**, respectively, according to certain embodiments. In various embodiments, the MLA may be an identical structure throughout the array, or may vary in focal length per lenslet or per region.

FIG. **41** is a series of side views depicting examples of different configurations of the microlens array, according to certain embodiments. These configurations may include one in which the MLA **4100** is an identical structure, one in which the MLA **4110** varies by region, and one in which the MLA **4120** varies in an alternating or random fashion. In at least one embodiment, the MLA may be constructed in such a way that every lenslet has separate parameters in order to optimize the imaging capability of the system.

FIG. **42A** is a side view depicting an example in which the MLA **4200** has tilted structures angled towards the optical center of the main lens **4210** across the entire imaging area, according to one embodiment. If desired, the microlenses of the MLA **4200** may have variable tilt so that each microlens is oriented toward the optical center.

FIG. **42B** is a side view depicting an example of an optimized MLA **4250** for a large chief ray angle (CFA) with tilted lenslets, according to one embodiment. The lenslets may be tilted such that each lenslet is oriented generally toward the optical center of the main lens **4260**.

In at least one embodiment, the MLA may be constructed at the demagnified (i.e., trailing) end of the fiber optic bundles to help compensate for the increased exit angles. An example is shown in FIG. **43A**.

FIG. **43A** is a side view depicting MLA structures **4300**, **4310** secured to the trailing ends of fiber optic bundles **600**, according to certain embodiments. The MLA structure **4300** provides convex microlenses, while the MLA structure **4310** provides convex microlenses.

US 10,565,734 B2

29

In at least one embodiment, MLA structures (and/or other optical structures) may be used at both the entrance and exit of the tapered fiber optic bundle, with or without air gaps, and with or without manufacturing the MLA's on a substrate. An example is shown in FIG. 43B.

FIG. 43B is a side view depicting the MLA structures 4300, 4310 of FIG. 43A secured to the trailing ends, and an MLA structure 4340 secured to the leading ends, of the of fiber optic bundles 600 and MLA, according to certain embodiments. An air gap may or may not be present between the fiber optic bundle 600 and the MLA structure 4300, the MLA structure 4310, or the MLA structure 4340.

In at least one embodiment, the MLA structure(s) may be manufactured into the surface of the fiber optic materials directly, with or without additional optics, and with or without a tapered design. An example is shown in FIG. 43C.

FIG. 43C is a side view depicting a fiber optic bundle 4350 with an integrated MLA 4360, according to one embodiment. The MLA 4360 may be formed into the leading end of the fiber optic bundle 4350. Additionally or alternatively, an MLA (not shown) may be formed into the trailing end of the fiber optic bundle 4350.

In at least one embodiment, the MLA design may be multi-layered in order to provide more optimized structure for imaging. Such an approach may be used independently, or in combination with any of the other approaches.

FIGS. 44 and 45 are side views depicting examples 4400, 4500, respectively, of a dual-layered MLA configuration, according to certain embodiments. A dual-layered MLA configuration may be used to increase off-axis performance and provide good collimation with a dual substrate approach (such as glass and polymer).

In some embodiments, the leading ends of fiber optic bundles may be combined to form a very wide fiber optic plane, for example, having a width of 10 cm, or even 1 m or larger. A microlens array may be secured to or formed on the leading ends. A set of cameras may be positioned to receive image data from the fiber optic bundles to image based on the resolution of the microlenses and the image sensor itself. A wide variety of alternative configurations may alternatively be used, as follows.

FIG. 46A is a side view depicting an example 4600 of a dual-layered MLA that can be used to increase off-axis performance using two polymer layers and one glass surface 4610, according to one embodiment. MLA's 4620 and 4630 may be formed in the polymer layers on either side of the glass surface 4610. In various embodiments, the MLA may be a single sheet, or tiled in a planar array.

FIG. 46B is a top-down view depicting an MLA 4640 as a single sheet and an MLA 4642 as a tiled, planar array, according to certain embodiments. The MLA 4642 has four components, but may have more or fewer in other embodiments. If desired, each component of the MLA 4642 may consist of only a single microlens.

In at least one embodiment, if a beam splitter or other optically splitting element is used, the MLA may be provided in strips, with the active imaging area being aligned to either over-scan the lens/scene or lined with precision to avoid overlap. See, for example, FIGS. 15 and 18. In at least one embodiment, these strips in this configuration may be angled to optimize the transmission of light for a specified optical system. FIG. 46C depicts an example.

FIG. 46C is a top view depicting a plurality of MLA strips 4650 positioned at various orientations to face a main lens 4652, according to one embodiment. The MLA strips 4650 may be secured to fiber optic bundles and/or other components.

30

In at least one embodiment wherein a spherical or cylindrical surface is used, the MLA may be "slumped" to map to this exact shape, or may be manufactured directly in this form. FIG. 46D depicts an example.

FIG. 46D is a top view depicting a spherical MLA 4660 mapped to a spherical surface 4662, according to one embodiment. The MLA 4660 may be manufactured in a spherical form, or may be manufactured in planar form or in a different shape, and subsequently processed to provide the curvature of FIG. 46D. For a spherical surface, the MLA can be distorted such that the XY dimensions, when imaged, retain a rectilinear pixel structure (as the taper is trapezoidal). FIG. 46E depicts an example.

FIG. 46E is a perspective view depicting an MLA 4670 that has been formed in a trapezoidal shape, according to one embodiment. The trapezoidal shape may help provide a rectilinear pixel structure when mapped to a spherical surface.

In at least one embodiment wherein tiles are used for the MLA, square lenslets may be used to provide higher seaming accuracy. This may allow the lenslets to be tiled together. FIG. 46F depicts an example.

FIG. 46F is a top-down view depicting an MLA 4680 with square lenslets 4682, according to one embodiment. The square lenslets 4682 may be tiled together at seams 4684.

In another embodiment, an MLA can be created with a high-speed mechanical translation stage to provide alignment, or time-sequential focus sweeps during capture. In yet another embodiment, a variable lens structure can be created via liquid lenses, birefringent materials, polarized optics, and/or the like, so as to provide the ability to electronically vary focal length in a time-sequential method, or for alignment purposes. FIG. 46G depicts an example.

FIG. 46G is a side view depicting an example of a main lens 4686 that is movable relative to an MLA 4688, according to one embodiment. In addition or in the alternative, the MLA 4688 may translate relative to the main lens 4686. Motion of the main lens 4686 may additionally or alternatively be replaced with other mechanisms for altering main lens optics, such as liquid lenses, birefringent materials, polarized optics, and/or the like.

In another embodiment, multiple optical paths, which may include beam splitters, prisms, etc., are provided behind the main lens in order to generate multiple imaging planes that may be configured at identical focal distances from the main lens for the purposes of noise reduction. Alternatively or additionally, identical focal distances can be used with an XY sub-pixel offset for the purposes of noise reduction and super resolution. Alternatively or additionally, varied focus distances can be used so as to increase the refocusable range and decrease the "zero lambda" refocus issue. Any combination of the above-described strategies can be used, as depicted for example in FIG. 46H.

FIG. 46H includes a series of side views of examples 4690, 4692, 4694, and 4696 depicting various ways in which a beam splitter 4698 may be used to divide incoming light between image sensors 4699, according to one embodiment. The image sensors 4699 may be offset relative to each other, toward or away from the beam splitter 4698 and/or in a direction perpendicular to that of the approaching light, as shown.

Main Lens

In at least one embodiment, the main lens of the system is able to generate an image circle at or greater than the maximum dimensions of the image plane diameter. This lens may be fixed, or combined with a focus modification system including liquid lenses, birefringent materials, polarized

US 10,565,734 B2

31

optics, and/or the like, to provide the ability to electronically and/or mechanically vary focal length in a time-sequential manner (or for alignment purposes). By capturing light-field "focus sweeps" in a time-sequential manner, one is free to reconstruct the light-field with drastically increased refocusable range.

FIG. 47A is a side view depicting an example 4700 of refocusable ranges with a sequential exposure system as the distances decrease to camera with exponentially decreasing range, according to one embodiment. Through computational processing, it is possible to reconstruct the desired focus plane with increased range of depth-of-field. The depicted example shows an architecture in which four exposures are considered; in other embodiments, any number of exposures can be considered.

In consideration of a desired 24 frame-per-second (FPS) output after computational processing, a repeating 5× exposure system may be ideal to produce 120 FPS capture, which may allow for reconstruction of 24, 30, 48 and 60 FPS playback. This additionally may provide the ability to generate synthetic shutter reconstruction, motion blur reconstruction, and/or increased depth estimation accuracy as well as increased motion vector accuracy to benefit the entire computational imaging ecosystem, at the expense of increased data rates. The FPS for actual capture may vary depending on application and may exceed 360 FPS for as long as any desired single exposure requires.

Data may be acquired at any bit depth and/or color space. In at least one embodiment, data is acquired at 10 bits at these higher frame rates and may be converted to log color space to increase color accuracy at these lower bit depths. Other implementations can provide 16 bit log or linear capture capabilities.

In at least one embodiment, any suitable additional technologies can be used to perform the functions described. Such additional technologies may include, but are not limited to: liquid lenses, birefringent and polarization technologies, acoustic/standing wave optical technologies, mechanical methods (such as moving the lens at high speeds), and/or any other technology that provides the ability to refocus the main lens, or refocus the MLA in any fashion to sequentially capture multiple focus positions to generate light-field acquisition.

In at least one embodiment, the system can also provide square wave control. In this manner, an interval can be provided between frames that is less than a predetermined threshold time value, with minimal or no variation in between the switching time to provide the highest quality exposure per frame.

In at least one embodiment, one or more optical folds can be added to the main lens/optical system in order to reduce the overall footprint of the imaging system. FIG. 47B depicts an example.

FIG. 47B is a side view depicting the use of optical folds 4710, according to one embodiment. The optical pathway between the main lens 4720 and the image sensor 4730 may thus be compacted to reduce the footprint of the camera in which it is implemented.

In at least one embodiment, a camera may include multiple main lenses with varied focal lengths (static, variable, and/or electronically switching) with polarization techniques used in the image sensors and within the lens design to temporally allow for sequential switching between multiple focal lengths and perspectives. The image sensors, depending on polarization state, may only see a certain lens (or different lens simultaneously depending on the polarization state of a particular image sensor or region of the

32

imaging plane), resulting in the sequential capture of light-field data from the lenses. Polarization states may be switched electronically, or may be a static pattern. Alternatively, active barriers and/or variable masks may be implemented with or without polarization or other mechanical means, in order to selectively block light from lenses. FIG. 47C depicts an example.

FIG. 47C is a side view depicting an example in which a plurality of main lenses 4740, 4742, 4744, and 4746 are used in conjunction with polarized filters 4750, according to one embodiment. Each of the polarized filters 4750 may have a distinct polarization setting. A polarizing switch 4752 may be positioned between the MLA 4754 and the image sensor 4756. The polarizing switch 4752 may optionally be set to align with the polarity of any of the polarized filters 4750 in order to determine which of the main lenses 4740, 4742, 4744, and 4746 is able to convey light through the MLA 4754 to the image sensor 4756.

In alternative embodiments, steps may be taken to remove the MLA, modify the MLA, combine the MLA design with that of another component, or completely remove the MLA at the sensor plane. For example, the MLA may be replaced with a sequential aperture apparatus. Alternatively, the MLA may be combined with a variable mask at the aperture stop, optical center, or some other location within the optical system. The effective aperture size can be set at the equivalent of the main lens F/number×the desired N number. The apparatus can be configured to electrically switch in position around the aperture and record image data sequentially on the image sensor. At high speeds, such an approach can be virtually seamless. In at least one embodiment, such an approach can be combined with a larger MLA and/or lower individual exposure resolution in exchange for temporal resolution as compared with a single image captured only per switching state within the aperture. FIG. 47D depicts an example.

FIG. 47D is a side view depicting the use of an active barrier/variable mask 4760 to provide sequential capture of image data, according to one embodiment. The active barrier/variable mask 4760 may be positioned in the optical pathway between the main lens 4762 and the image sensor 4764.

In at least one embodiment, a method is implemented to allow the imaging plane tiles to exist at different distances from the main lens to produce interwoven varied focal lengths/focus positions within a single image. FIG. 47E depicts an example.

FIG. 47E is a side view depicting the use of modules 200, tapered fiber optic bundles 600, and MLA's 4770 positioned at variable displacements from a main lens 4780, according to one embodiment. The result may be the presence of multiple focal lengths and/or focus positions within a single captured image.

In at least one embodiment, a method is implemented to embed multiple focal lengths optically into a single lens and mask off regions to capture sequential or simultaneous multiple focus/focal length positions for the purposes of light-field imaging. Again, the captured image may have multiple focal lengths and/or focus positions.

Advantages

The systems and methods described herein may provide a number of advantages over known camera designs for conventional and/or light-field imaging. These advantages may include, but are not limited to:

High dynamic range;
Wide gamut;
Shutter reconstruction;

US 10,565,734 B2

33

Motion blur reconstruction;

Automated 3D camera tracking; and/or

Post-capture optical stabilization.

In at least one embodiment, the system provides extremely high frame rates (such as 120 frames per second or more), so as to minimize total motion blur. This may result in increased accuracy for depth and motion blur analysis.

In at least one embodiment, the system uses light-field computation so as to provide an approximate effective aperture size of N (diameter of pixels behind each lenslet)× main lens F/number, resulting in extremely wide DOF. This can reduce or eliminate focal blur in the image for computational processing.

The addition of the high frame rate information in combination with the light-field array of information and wide depth of field may provide significant benefits. These benefits may include significantly increased accuracy for all motion vectors, photogrammetry, depth analysis, and numerous other computational processes.

In at least one embodiment, the system is implemented as a post-capture process performed on light-field imaging data, which may only include 2D capture at high frame rates. Such a process may be performed as follows, for example:

Compute wide depth of field image from light-field capture;

Compute multiple perspectives/rays of information from within the main lens exit pupil;

Compute disparity/depth vector triangulated correlations (spatial analysis, which may include additional temporal frames compared with motion vectors for statistical accuracy calculations);

Compute motion vector tracked correlations (temporal analysis, which may include two or more frames);

Analyze image; and

Average error from all calculated vectors and statistically calculate the highest accuracy between all calculated data points.

One skilled in the art will recognize that other approaches are possible in other implementations of the image processing technology. Such approaches may follow different logic.

With the dense and accurate collection of image analysis enabled by the systems and methods described herein, many features can be derived providing unprecedented post-acquisition image control. These features may include, but are not limited to:

Infinite refocus: Post-capture refocus that allows multiple focus positions to be retargeted to match a single temporal position and seamlessly move among all possible focus positions contained in the scene.

Variable frame rate: With the high frame rate information and known rays of angular entrance into the optical system, the exact integration time can be computed and reconstructed.

Live action "deep imaging": Deep imaging is a 3D image format traditionally used for computer generated materials. It is a format that allows a single XY pixel coordinate to store multiple RGBAZ pixels to project very complex scenes, including things like particle clouds. With the increased imaging data and vectors available, it is possible to generate live action deep image files where color and alpha are processed per pixel to generate a final image output with multiple RGBAZ pixels per XY coordinate.

34

"Bullet-Time" Effects: Multiple light-field units may be used with aligned entrance pupils to produce a seamless array of perspectives by virtue of the light-field imaging data.

Volumetrically Aware Effects: With the RGB, RGBZ, or RGBAZ computationally calculated pixels, it is possible to modify portions of the image selectively based upon volume. This additionally applies to green screen removal where traditional color keys (or screens in general) are no longer necessary with volumetric information.

Automated 3D Camera Tracking: With the computational analysis data and a known "zero" frame, an extremely accurate real-world camera representation of the camera's movement may be produced.

Automated Segmentation and Rotoscope: With accurate motion vectors, perspective data, and high quality imaging analysis, it may be possible to segment an image in much more accurate methods than those used for state-of-the-art segmentation algorithms. Further, if a user defines an object, the outline or splines can be automatically propagated throughout a clip as the vectors and perspective analysis retain high correlation to the objects contained within a scene. This can additionally apply to motion capture applications, and potentially remove the necessity of tracking markers from these technologies. Such features may be computed in real time.

Computational Lens Flare Removal: The lenslet structure may facilitate automation of removal of lens flares. Artistic tools can be leveraged to generate photo-real lens flares with much higher quality imagery than when a flare hits the lens/sensor.

Extreme Low Light Capture: Due to the fixed aperture design and multiple perspectives of imaging data involved, in exchange for decreased refocusable range, it is possible to increase sensitivity of the resulting output pixels and increase the signal-to-noise ratio (SNR) of a single perspective and focus position at extremely low light conditions by averaging and/or adding retargeted perspective information to a single viewpoint to statistically decrease noise while retaining extremely high dynamic range.

Artistic Lens Flavor: Due to the ability to understand the physics of light involved in the captured scene given the multiple vector analysis performed, it may be possible to characterize any other existing lens and reproject the rays of light as acquired through the light-field system to generate a near exact reconstruction of the characterized lens while simultaneously providing additional artistic controls over these parameters.

In addition, the system described herein can be combined with other features and tools for a light-field video system. Such combination may enable the implementation of other features, methods, and/or advantages.

Through a mechanism that produces a pattern of various integration time exposures repeating or randomized beyond a single integration time, it is possible to generate drastically increased dynamic range given the high frame rate capture and use of the disparity and motion vectors generated. This can be a repeating pattern of any value greater than one. For example, in at least one embodiment, a repeating pattern of three to five exposures is provided, wherein the exposures are retargeted to each frame center (retarget −2, −1, +1, +2 frames in reference to frame 0) to generate the centered frame with significantly increased dynamic range. Due to

US 10,565,734 B2

35

the high frame rates, edge error may be statistically low and can be weighted based upon error tolerances.

In the same fashion, other color filtration methodologies may be leveraged sequentially from any point within the optical system that provides sequential wide color gamut capabilities. This may be done in combination with the above-described vector analysis to provide the ability to increase color gamut dramatically for each frame of a sequence.

In at least one embodiment, a dynamic filter such as a polarized filter may be added to the system. Such a filter may dynamically increase or decrease the ND filtration percentage. Additionally or alternatively, a static ND filter may be added to the described system.

Other Sensor Modifications

In at least one embodiment, an ND mask can be added on a per-pixel or per-region basis, or in a random pattern, to increase dynamic range system potential, thereby increasing pixel resolution. In at least one embodiment, the mask can be computationally reconstructed based upon the known pattern of exposure per pixel to generate increased dynamic range with no loss of pixel resolution.

In at least one embodiment, the effective exposure of regions of pixels, individual pixels, and/or random patterns of pixels can be actively switched in a sequential manner. Further, in at least one embodiment, static per-pixel or per-region color filters can be provided to increase overall system color gamut. Yet further, in at least one embodiment, color filters may be actively switched in a sequential manner to allow for increased overall system color gamut.

Preview Lens/Mode

In at least one embodiment, an additional preview lens system can be included to allow users the ability to have visual feedback for the image they are producing. Any of a number of different implementations are possible, four of which are described below.

Retro Reflector Design with Internal Beam Splitter for the MLA

In at least one embodiment, the empty mechanical space between each of the strips of sensors is fitted with a retro reflector, producing an image that can be re-photographed with a separate image sensor. Further, in at least one embodiment, the lens and sensor of this preview lens are matched such that the photographed FOV and the captured DOF closely, if not identically, match what should be anticipated through the computational process of the light-field image processing results.

FIG. 48 is a front view depicting an exemplary arrangement of a main array with beam splitter (not shown) and retro-reflector at gaps 4800 design to facilitate implementation of a preview sensor 4810, according to one embodiment. The gaps 4800 may reside between the fiber optic bundles 4820 of the array.

FIG. 49 is a side view illustrating how the preview sensor 4810 of FIG. 48 is able to re-photograph the larger imaging surface. The preview sensor 4810 may receive light from the beam splitter 4900 in conjunction with the retro-reflector design of FIG. 48.

In an alternative embodiment, a retro reflector can be included only at one of the two optical paths (such as at the top). A separate lens/image sensor may image that single plane alone. Alternatively, the system can leverage one of the two paths (such as the top), without a separate lens/ sensor, and image both planes with varied image/optical parameters.

It should be noted that this structure can also be used for other image processing applications and is not necessarily

36

specific to the preview lens concept. For example, the addition of this optical path can be used to increase dynamic range though unique change of different integration time or increase color gamut through different color filters.

Internal Beam Splitter

In at least one embodiment, an internal beam splitter is used to split off a small percentage of light to an additional sensor. This may not require the use of a beam splitter for the main image sensor below.

FIG. 50 is a top view depicting the use of a secondary beam splitter 5000 to redirect a small portion of light from the larger image plane in order to direct the light to a preview sensor 4810, according to one embodiment. The preview sensor 4810 may then be used to display a real-time result of an exemplary set of lens/sensor variables. The secondary beam splitter 5000 may optionally be used on conjunction with a primary beam splitter such as the beam splitter 4900 of FIG. 49, as shown.

Range Finder Solution with an Offset Imager

In at least one embodiment, a range finder solution can be used with an offset imager and display windows commensurate with other electronic viewfinder or range finder technologies. Any known electronic viewfinder and/or range finder technology may be used.

FIG. 51 is a top view depicting an example of a range finder configuration in which a completely separate lens/ sensor system is leveraged to increase main sensor system light efficiency, according to one embodiment. Specifically, a rangefinder preview sensor 5100 may be used to retain light efficiency of a main image sensor, while still enabling production of a preview of the computational image.

Real-Time Processing or Sub-Sampling

In at least one embodiment, real-time processing or sub-sampling of the complete light-field can be provided. The result may be displayed for a given set of parameters. This can be saved as an image or as metadata for further processing.

In any of the above variations, the lens/sensor configurations used for the preview can be saved as an image sequence or video file for immediate review of the captured scene. Additionally or alternatively, the parameters can be saved as a metadata stream to be used and then possibly modified for the complete light-field processing/reconstruction. The rate of key frame/data points for this process can be the same as the frame rate of the capture system, or can be increased for additional smoothness/accuracy, or can be reduced for lower sampling and algorithmic curve control/ analysis/reconstruction. Further, all data points may be reanalyzed through algorithmic processing and/or manual intervention.

Model/Volume Generation

In at least one embodiment, a high resolution light-field capture technology, such as those set forth herein, can be used to produce extremely high resolution images. With such imaging capability, customized mirrors and/or other optics may be used to capture up to a 360° view of an object.

In some embodiments, this may be done by orienting reflectors in a fashion that effectively redirects all rays of light to a central region of volume. The reflectors can be parabolic, or can be shaped according to any custom curve, surface shape, or the like, depending on the resolution requirements, or desired ray directionality of coverage. Flat mirror surfaces and/or other angled surfaces can be used. Any suitable number of facets can be used. Various methods and degrees of capture may be used, depending on the applicable scanning requirements.

US 10,565,734 B2

37                                                                                                      38

Such a scheme may provide a single lens and single image capture technology solution for modeling, virtual reality (VR), and augmented reality (AR), as well as many other applications.

In at least one embodiment, each system is calibrated to determine the known directionality and positioning for each pixel's coordinate position in space. In one top-down approach, the system may include the main lens and optical technologies discussed above, and may include additional optics to redirect captured rays to a central volumetric region in which a first parabolic reflector has a focal length positioned at the optical center of the main lens, and second parabolic reflector has a different focal point at a distance that is predetermined based upon the size and shape of the object.

With this approach, the rays that pass through the optical center (the center sub-aperture) may reflect parallel to the lens. Rays that pass through other positions of the aperture may converge at differing locations to provide full volumetric coverage (parallax and/or depth).

As the focal point increases, the amount of captured volume may increase in width, but may also decreases in density per cubic mm. However, as the focal point decreases, the region of captured volume may decrease as well, as the density of acquired pixels increases.

In at least one embodiment, the system described herein provides a mechanism for using light-field data to ascertain physical volume, rather than just obtaining a single two-dimensional image. Light-field acquisition may provide the ability to computationally calculate the exact coordinates of a ray as it travels through space and strikes a surface. Every photon in this configuration must eventually terminate upon a surface and multiple reflections can be computationally interpreted.

FIG. **52** is a side view depicting an example of an architecture employing a first parabolic reflector **5200** and a second parabolic reflector **5210**, according to one embodiment. Parabolic and/or non-parabolic reflector structures may be used. In FIG. **52**, the first parabolic reflector **5200** and the second parabolic reflector **5210** may each have a single focal point. The system may include faceted reflective structures and/or smooth parabolic forms. If a faceted structure is used, the center of each facet may be aimed at the respective angle as defined by the reflector curve.

In another embodiment, the system may alternatively include multiple focal lengths within the second reflector. The first reflector may maintain the same focus position at the optical center of the main lens. Each reflector may be broken into R regions, and each R may have its own focus position with the volumetric captured region. These regions can be considered similar (but inverse) to the N number of light-field capture where the larger region produces an increased volumetric scanning area for a single region focus point at higher potential resolution. Smaller and more varied regions with more focus positions may provide greater volumetric scanning potential with decreased resolution per focus region. The regions can be radial and/or faceted.

FIG. **53** is a side view depicting an example of architecture employing a first parabolic reflector **5300** and a second parabolic reflector **5310**, according to another embodiment. The first parabolic reflector **5300** may have a single focus position at the optical center of the main lens. The second parabolic reflector **5310** may have multiple focus positions that may facilitate proper focus on various portions of an object positioned in the space between the first parabolic reflector **5300** and the second parabolic reflector **5310**. In this disclosure, "parabolic" refers to shapes that are gener-ally paraboloid, but may include shapes that are not precisely parabolic (for example, due to the provision of multiple focal points on the reflector).

In another embodiment, the light-field capture system may be placed in a bottom-up configuration, wherein the first reflector contains a focus point matched to the optical center of the main lens and the second reflector may or may not include multiple regions and varied focal lengths. If the second reflector includes multiple focal lengths, they may be directed to capture rays above and below the object to allow for a complete captured environment including below the object itself. In at least one embodiment, a glass surface is provided on which the object rests, in order to allow the rays to pass through the surface of the floor of the environment.

FIG. **54**A is a side view depicting an example of a bottom-up configuration, with a first parabolic reflector **5400** and a second parabolic reflector **5410**, according to another embodiment. The first parabolic reflector **5400** may have a focal length matched to that of the main lens optical center, and the second parabolic reflector **5410** have multiple focus positions to capture rays around the entire surface of the object.

In general, the focus point of a parabolic reflector can be matched to the main lens optical center for additional volumetric capture flexibility. However, in some configurations, other focal points can be used, as in FIGS. **53** and **54**A. In at least one embodiment, the field of view for the above-described embodiments can be matched to the widest desired and/or widest possible rays that can be directed within the volumetric captured shape.

In at least one embodiment, lighting may be introduced around the lens, from within the apparatus, and/or from just outside of the pair of reflectors at the seams as noted above. The resolution of the image sensors may be decreased at any position within the volumetric captured regions in order to optimize the captured object and reduce bandwidth when possible.

In at least one embodiment, structured light, infrared (IR), laser, time-of-flight, and/or other depth sensing technologies can be added to emit light along the same optical path as the image sensor, along a split optical path, and/or along an intentionally off-axis path. This depth sensing light may optionally be produced sequentially from the same optical path and same image sensor with the coupling of an active filter that switches between accepting visible light and rejecting IR and/or other depth sensing frequencies, and a second state that accepts IR and/or other depth sensing frequencies and rejects visible light. The resulting light-field image can be captured, including light-field data for the volume alone and/or light-field data including imaging data as previously discussed. FIG. **54**B depicts an example.

FIG. **54**B is a side view depicting a camera with a depth sensing sensor **5420** separate from a visible light sensor **5422**, according to one embodiment. A beam splitter **5424** may direct IR or other depth sensing light to the depth sensing sensor **5420**, and direct visible light to be imaged to the visible light sensor **5422**.

In at least one embodiment, N value may or may not be decreased, and a time sequential capture system can be implemented, where the reflectors rotate over time to decrease the resolution requirement per slice. This may increase resolution per facet and decrease volume resolution. The sequential capture and rotating facets may provide the same, if not higher, theoretical resolution as the same system with infinite N and extremely high single system resolution. FIG. **54**C depicts an example.

US 10,565,734 B2

39                                                                        40

FIG. **54**C is a side view illustrating a rotating reflector **5430** that may be used for sequential capture of image data, according to one embodiment. The rotating reflector may transmit light through a main lens **5432** and an MLA **5434** to an image sensor **5436**.

The particular arrangements described and depicted herein are merely exemplary. In other embodiments, any suitable single lens and single image capture schemes can be included to produce point projections, models, meshes, depth maps, volume measurements, and/or the like for a given object.

In at least one embodiment, these environments may be extremely large. For example, the imaging environment may be large enough to cover a sound stage, or even a stadium. Multiple objects may be positioned within and imaged within the environment.

In at least one embodiment, the facets of each parabolic reflector are produced with square tiled reflectors. In at least one embodiment, the facets are produced with round, square, hexagonal, or other polygonal packed reflectors. Yet further, in at least one embodiment, these facets are manufactured onto a flexible material such that the resulting surface becomes like a malleable reflective fabric to form to any structural design requirements and allow for simplified setup containing complex configurations. These structures may be magnetic, and may be permanently or temporarily adhered to a secondary mechanical design/interface (magnetically or via another attachment mechanism) for appropriate alignment, configuration, and construction.

FIG. **54**D is a top-down view depicting an example of a structure **5438** to generate a mesh of reflective surfaces, according to one embodiment. The circles may be reflectors connected together by flexible connectors such as fabric or mesh patches. The smaller each facet is within a regular pattern, the more parabolic the resulting shape becomes while retaining the flexibility to alter focus and/or angular curvature of the surface.

In at least one embodiment, these facets are built onto a motorized structure that provides the ability to dynamically alter the respective focus position of each reflective surface, either individually or as part of a fabric or other flexible surface. Further, in at least one embodiment, there are gaps between the two parabolic reflectors to provide clearance for lighting and/or other production required materials.

In at least one embodiment, there are gaps between the sound stage and the reflectors in order to allow for eye contact between the production team and the sound stage. This space may additionally be used to provide additional equipment space and/or additional lighting. Gaps may exist at any point within the volume. The sound stage may be elevated above the reflective surface to provide adequate spacing for the production team to work. Further, in at least one embodiment, the sound stage is elevated above the reflectors to ensure that there is no direct vibration introduced between the sound stage and the mirrors. Yet further, in at least one embodiment, there are gaps between the main lens and the reflectors in order to allow for additional equipment space and/or additional lighting. Gaps may exist at any position within the volume.

In at least one embodiment, one or more additional reflectors are positioned on the perimeter of the sound stage, or just around the sound stage (or around the gap) to focus rays of light in desired configurations (for example, from underneath an actor or from very low angles). These reflectors may have parabolic or other shapes, and may also contain multiple facets and/or focal points as disclosed in above previous statements. The additional reflectors may exist at any position within the volume, including below, above and/or anywhere that additional angular information and/or lighting is desired and/or required. In at least one embodiment, a "door" may be introduced by segmenting the reflective surfaces into a separate region to allow for mechanical separation and ease of entry/exit into and out of the volume.

FIG. **54**E is a side view depicting an example of a structure **5440** including several modifications, according to one embodiment. Many of the above-described concepts are shown in combination with one another.

FIG. **54**F is a side view depicting an example of a structure including a panoramic annular lens, or PAL **5450**, according to one embodiment. Dark lines represent reflective surfaces. A PAL may have one or more glass elements and two or more reflective surfaces, which may produce a flat disk-shaped image of the entire 360° that surround the optical axis. A virtual disk-shaped image of the surroundings may be formed inside the lens.

FIG. **54**G is a side, cross-section view depicting the PAL **5450** of FIG. **54**F, along with a cylindrical field of view **5452**, transfer optics **5454**, and an image sensor **5456**, according to one embodiment. The transfer optics **5454** may transfer the virtual disk-shaped image of the surroundings from the PAL **5450** to the sensor plane imaged by the image sensor **5456**.

In at least one embodiment, the reflector surface of a PAL may be replaced with a panoramic annular lens. Any or all variations of panoramic optics may be used in addition to or in place of a PAL.

In at least one embodiment, a subaperture reducer is used. A subaperture reducer may increase the depth-of-field (DOF) of each subaperture image captured by the light-field camera system.

FIG. **54**H is a conceptual diagram depicting a subaperture reducer **5460** for a light-field camera with a disk image diameter of five pixels, according to one embodiment. The subaperture reducer **5460** may be placed at or near the aperture plane, and may reduce the diameter of each subaperture while maintaining approximately the overall dimensions of the complete aperture. For a light-field camera with N pixels across a disk image, the subaperture reducer may have N evenly-spaced transmissive areas **5462** across the diameter of its surface. The circular shape is arbitrary; any other shape may alternatively be used.

FIG. **54**J is a side view depicting placement of the subaperture reducer **5460**, relative to a simplified schematic of the complete system, according to one embodiment. The subaperture reducer **5460** may be positioned in an aperture **5470**, which may, in turn, reside in the lens array of a main lens **5480**.

Environment Generation

In at least one embodiment, the stitched capture technology described herein is used to produce images of extremely high resolution. This may result in the ability, with customized mirrors and/or other optical elements, to capture up to a 360° view of an environment.

Any or all of the variations described above in connection with model generation can be used in connection with environment generation, including for example N facet values, computational engine, and sequential capture. In at least one embodiment, the system is implemented in an outward-facing fashion, wherein reflectors are provided on the outside of the surface as opposed to the inside. As described, reflectors can be of any suitable shape.

As indicated previously, "parabolic" does not require adherence to a precise, mathematical parabolic shape. This

US 10,565,734 B2

41                                                              42

description references parabolic reflectors in many instances in which other reflector shapes may be used, as needed for the particular application.

In at least one embodiment, the system includes additional optics positioned to capture vertically above the capture system. This may facilitate the capture of up to a 360° effective field-of-view.

FIG. 55A is a side view depicting an example of a structure 5500 that provides a 360° scan of an environment, according to one embodiment. The structure 5500 may leverage a reflector 5510 and secondary lens 5520 with an upward facing light-field capture system.

In at least one embodiment, the system is able to employ image processing technology to generate high resolution environments from a light-field image captured through a single lens, or from a series of sequentially-captured light-field images. In at least one embodiment, as depicted in FIG. 55B, one or more rotating optical elements may be used.

FIG. 55B is side view depicting an example of a structure 5530 that captures a complete 360° spherical capture environment through the use of a rotating reflector 5532, according to one embodiment. The rotating reflector 5532 may be positioned above the main lens 5534. The rotating reflector 5532 may or may not be planar depending on the angles of coverage desired. The rotating reflector 5532 may have a cylindrical, spherical, or parabolic shape.

In other embodiments, the surface of a stationary or rotating reflector can be any shape. Optical compression can be employed by providing additional rays to regions of interest. For example, if overhead resolution is of less importance, more rays can be acquired between +45° and −45° by altering the reflective surface shape to optimize the imaging of such an environment. FIG. 55C depicts an example.

FIG. 55C is a side view depicting an example of a structure 5540 having a reflector 5542 with an irregular shape, according to one embodiment. The reflector 5542 may have relatively flat portions 5544 that optimize direction of light from between +45° and −45° into a main lens 5546. The resulting image may thus have more detail in these areas. Alternative reflector shapes may be used to alter the direction along which the most detail is captured.

In at least one embodiment, line scanners can be used to capture a high resolution scene using a system designed for environment capture. Such an embodiment may utilize any type of scanners, including for example flatbed scanners, which may optionally be combined with any of the environment capture optics disclosed herein.

In at least one embodiment, a spherical, semispherical, oblong, egg-shaped, or other unconventional lens, may be used. Such a lens may be made of any optical materials, and may be positioned above a main lens to image an environment. FIG. 55D depicts an example.

FIG. 55D is a side view depicting an example of a structure 5550 in which a spherical lens 5552 is used to image an environment, according to one embodiment. The spherical lens 5552 may be positioned above a main lens 5554, and may gather and direct light from the environment to the main lens 5554.

In at least one embodiment, the reflector includes multiple facets. Additionally or alternatively, in at least one embodiment, a system may be configured to use multiple light-field capture devices distributed inward (facing into a volume), outward (from a central location), or both simultaneously, so as to generate the required rays to define a particular object or space.

In at least one embodiment, the additional optical elements introduced into such an environment capture design may leverage dense fiber optic bundles to relay light from a secondary lens directly to an image sensor. FIG. 55E depicts an example.

FIG. 55E is a side view depicting an example of a structure 5560 in which a fiber optic bundle 5562 is used to convey light from a secondary lens 5564 to an image sensor 5566, according to one embodiment. The light may be collected in the secondary lens 5564 via a reflector 5568, and may pass through the main lens 5570 and a microlens array, or MLA 5572, en route to the image sensor 5566.

In at least one embodiment, the MLA is placed at the front of a tapered fiber optic bundle arrangement that includes a polished round surface and an array of lenslets in a 360-degree capture configuration. In this manner, light may be relayed directly to the sensor without a separate main lens or other MLA structures. FIG. 55F depicts an example.

FIG. 55F is a side view depicting the use of a combined tapered fiber optic bundle and microlens array, or combined structure 5578, according to one embodiment. The combined structure 5578 may have a polished round surface 5580 on which an array of lenslets 5590 are arranged. The lenslets 5590 may cooperate to act as a microlens array (MLA) by directing light into the remainder of the combined structure 5578 in a manner that preserves vector information regarding the origin of light entering the lenslets 5590. The vector information, along with color and intensity information, may be encoded on a sensor 5592. The lenslets 5590 may be integrally formed into the fiber structure of the combined structure 5578, or formed separately and attached.

Non-Planar Imaging Planes

Traditionally, the shape of the imaging plane of a camera is matched to that of the image sensor. The configuration of the image sensor may be limited by the planar processes used in silicon wafer fabrication. Accordingly, imaging planes have traditionally been planar as well. However, in some instances, it may be advantageous to have a non-planar continuous imaging surface.

The use of fiber optic bundles may facilitate the use of non-planar imaging planes. In at least one embodiment, one or more fiber optic bundles may be machined or otherwise formed into the desired imaging plane shape. For example, the leading end(s) of one or more fiber optic bundles may be machined into a cylindrical, spherical, faceted, elliptical, parabolic, or other shape. The light gathered from the non-planar imaging plane may be conducted by the fiber optic bundle(s) to one or more planar image sensors of any known type. The imaging plane may have any concave, convex, or concave/convex shape. Thus, the shape of the imaging plane may be decoupled from that of the image sensor.

Use of a non-planar imaging plane may be applied to cameras employing only a single image sensor. The shape of the imaging plane may be controlled in a manner that modifies the resulting image to resolves and/or obviate various software processing steps that may otherwise need to be performed on the light-field data.

Back-End Systems Design

In at least one embodiment, the system described herein uses existing interfaces and technologies. For example, 1 GP capture at 300 fps 10 bit requires approximately 350 GB/s. Such a data transfer rate may be challenging to obtain with existing technologies. However, with the tiled technologies proposed herein, handling 1/30th or 1/100th of the resolution (or any percentage depending on configuration) may be significantly easier on a per-module basis.

US 10,565,734 B2

43

In at least one embodiment, the system is fragmented into multiple tiled streams for simplified data management, and the data streams from the individual image sensors are multiplexed or further fragmented. For example, four individual modules can be connected into a single stream, or a single module can be further broken down into four separate streams, depending on available bandwidth. In addition, the resulting captured data can be multiplexed into a single image from multiple individual files or streams. Alternatively, a single image file can be generated to include multiplexing, for example, as one tile from four tiles or one tile from all tiles. The larger image (or whatever portion has been tiled or presented) can then be refragmented for image processing requirements and/or display.

In at least one embodiment, raw light-field data can be taken in either a single or single image form. The raw light-field data may be distributed across a networked rendering (processor) infrastructure to further increase (wall-clock) render time speeds.

In at least one embodiment, pre-rendered aspects of the process can be automated, for example by allowing a user to identify captured sequences to pre-process, which are then automatically processed in the background. Pre-processing can be performed based on the computational requirements for the light-field excluding the final desired render. In at least one embodiment, the two-dimensional output and/or all other processing requirements may be performed in an automated fashion, or precomputed for model generation. This can additionally include automation of camera tracking and vector analysis as noted in the feature discussions.

In at least one embodiment, fiber optic transceivers can be included in order to extend the length of separation between the camera head and the back end systems. Further, in at least one embodiment, on-board storage can be provided for each device. Stationary and/or removable storage or any other storage method can be used, to tether a portable storage array in the same fashion as disclosed above for the back-end systems. Any storage mechanism can be used in connection with the described system, including for example, RAM-based storage, flash memory, solid-state drives, magnetic drives, optical drives, spinning disc arrays, and/or the like.

In at least one embodiment, the system can store the preview lens capture in any file/video format and or save a real-time computational preview of the captured image. Further, the system can store metadata in any form, including the choices made with the preview lens during capture and/or any other capture decisions made that would benefit from storage as a metadata stream.

In at least one embodiment, the system also implements a process to compress the file size of light-field data. Such compression may use any suitable compression technologies. Compression can also be based upon further analysis of the vectors in the scene and more intelligent light-field temporal compression technologies. Any suitable method can be used to compress the light-field data, including through the use of spatial and/or temporal algorithms.

Computational Focal Length and Data Management

In at least one embodiment, the system can use lossless digital ("computational") zoom and focal length (FL) automation, with an increase in overall system resolution by the ratio of the zoom factor (e.g. 2× zoom=4× resolution increase (2×W and 2×H=4×), where pixel density at the center of the fiber stack is greater (with commensurate MLA structure) and every array ring around a given center array stack can provide decreased resolution. The capture mechanism may reduce the pixel density recorded appropriately

44

such that the center array stack captures at the same angular and pixel resolution, and the same consideration for each ring about this N+1 ring, where FL adjustments may be performed with no loss in captured resolution as the FL is adjusted. The image plane may increase in size and pixel density may scale accordingly in such fashion that the transmitted data is the same given that the pixel pitch scales to compensate for the FL digital zoom.

FIG. 56 is an image diagram depicting an example 5600 of how the imaging plane can be divided into multiple FOV segments, according to one embodiment. At full resolution (meaning no decrease in image sensor pixel density and no reduction of pixels), the system may provide the ability to freely look around the image with the additional crop factors, which results in the ability to alter the computational focal length.

FIG. 57 is an image diagram depicting an example 5700 of an alternative approach for dividing an imaging plane in to FOV segments, according to one embodiment. The sample rectangles designate examples of how the sensors may decrease in pixel density, or maintain the same density with a smaller imaging area and increase the magnification factor of the tapered fiber optic bundles by the respective factor required to maintain the same area. For example, 4× resolution reduction may require a 4× magnification increase to the existing magnification at the center of the array; if the center has a 3× magnification factor, this may result in a 12× magnification requirement. Alternatively, the system can maintain full resolution at the sensor level and perform data reduction depending on the final output desired resolution for the purpose of providing the capability of computational focal length adjustments with a single lens.

The particular rectangles and methods of FIGS. 56 and 57 are examples only. The techniques described above may be applied in different ways, or a variety of other focal length and/or data management techniques may be used.

In some alternative embodiments, identical pixel structures can be provided throughout the array to provide the ability to compress the raw data losslessly based upon a predetermined final output resolution requirement, where the entire FOV imaged will exceed the actual imaging requirements. In at least one embodiment, this may additionally be performed in a non-region based approach. For example, this compression may be applied in a radial fashion where each pixel sampled increases in pitch the further it is located from the center of the image sensor, across the imaging plane. The significance of this is that a single prime lens with extremely wide angle of view (AOV) and high resolution at the center image of the lens may allow all focal length (FL) functions to be performed digitally, with no loss in recorded resolution or modulation transfer function (MTF).

Variations in Redirecting Optical Elements

In at least one embodiment, a system according to the present disclosure may use a mirror in order to provide a larger effective field-of-view, in a manner similar to that of FIG. 55A. Such a mirror may serve as a redirecting optical element, and may have any of a wide variety of shapes, including but not limited to spherical, elliptical, hyperbolic, and conical shapes. Such mirrors may provide a field-of-view that extends substantially full-circle about an axis.

Referring to FIGS. 62A through 62D, various systems depict the use of shaped mirrors, as mentioned above. These embodiments are merely exemplary; in other embodiments, different redirecting optical elements and/or configurations may be used.

US 10,565,734 B2

45

FIG. **62**A depicts a system **6200** with a spherical mirror **6210**. By leveraging an entrance pupil of a certain diameter and a microlens array (not shown), the spherical mirror **6210** may be placed at a specified distance from the field-of-view of the main lens **6215** to distribute the rays captured by the light-field subapertures to capture an effective field-of-view greater than 180°. The system **6200** may optionally have a second (or greater) optical path that passes through the surface of the spherical mirror **6210** in order to capture greater fields-of-view. This may be done, for example, by making the surface of the spherical mirror **6210** partially reflective, and partially transparent. Thus, light from behind the spherical mirror **6210** may be received by the main lens **6215** and imaged by the system **6200**.

FIG. **62**B depicts a system **6220** with an elliptical mirror **6230**. FIG. **62**C depicts a system **6240** with a hyperbolic mirror **6250**. FIG. **62**D depicts a system **6260** with a conical mirror **6270**.

Referring to FIGS. **63**A through **63**C, various systems depict the use of redirecting optical elements with other configurations. Such configurations may include panoramic annular, catadioptric, and multiple fisheye elements, which are also merely exemplary.

FIG. **63**A depicts a system **6300** with a panoramic annular element **6310**. The panoramic annular element **6310** may have an optical design consisting of up to a singular piece of glass with spherically reflecting surfaces to produce a 360° annular virtual image of the environment about the optical axis of the system **6300**. With these optics and a microlens array (not shown) with an EP with a diameter D, the subapertures of the light-field can reconstruct a greater field of view for immersive content.

FIG. **63**B depicts a system **6320** with a catadioptric element **6330**, which may include a curved mirror **6332** and a fisheye lens **6334**. The combination of reflective and refractive optics may form high angle of view capture. Leveraging this approach with a microlens array (not shown) and an EP with a diameter D, the subapertures of the light-field can reconstruct greater fields of view.

FIG. **63**C depicts a system **6340** with multiple fisheye elements **6350**. The system **6340** may have multiple light-field sensors and wide angle optics in the form of the fisheye elements **6350**. The system **6340** may leverage these components to produce wide subaperture angles of coverage for full 360° light-field reconstruction.

Mechanical Scanning

In some embodiments, one or more optical elements may be moved during the image capture process to provide a large effective field-of-view. Various combinations of optical elements may be used in connection with linear and/or rotary motion.

By leveraging a smaller field-of-view optical system, with and without a microlens array, one can trade off temporal resolution with spatial resolution (perspective/area). With high frame rate capture, one or more mechanical, optical, or opto-mechanical devices may be coupled to increase the effective field-of-view without the tradeoff of size of optics. This approach may include, but is not limited to, singular rotational mirrors, multi-stage rotational mirrors, rotational prisms, and other optical elements that alter the imaged field-of-view from the overall area in which capture is desired.

Referring to FIGS. **64**A through **64**C, various systems may use a variety of mechanically movable optical elements in order to capture a large field-of-view. The optical elements may include mirrors, Risley prisms, and/or wedge prisms, by way of example.

46

FIG. **64**A depicts a system **6400** with mirrors **6410** that are rotated by motors **6420**. The mirrors **6410** and motors **6420** may be used in conjunction with an incident laser **6422**, one or more beam expanders **6424**, and/or anf-theta lens **6426**.

FIG. **64**B depicts a system **6430** with Risley prisms **6440** that are rotated by one or more motors (not shown). The Risley prisms **6440** may be rotated in opposite directions, as indicated by the arrows.

FIG. **64**C depicts a system **6460** with a spin mirror **6470** and a rotating wedge prism **6480**. The spin mirror **6470** and the rotating wedge prism **6480** may rotate about an axis **6490** as shown to provide an effectively large field-of-view, which may extend substantially full-circle around the axis **6490**.

Coherent Fiber Arrays

In some embodiments, coherent fiber arrays may be used to provide a larger field-of-view. In some embodiments, conventional imaging, rather than light-field imaging, may be used in connection with coherent fiber arrays.

By leveraging dense or flexible fiber optic elements, it is possible to accurately mechanically align coherent fiber surfaces to capture an external image that is relayed to a single or multiple offset imaging sensors. With this approach, the optical elements for focusing light (for example, the leading ends of optical fibers or fiber optic bundles) may be placed on the external surface of the outer sphere, or any desired shape for area capture. These shapes may include planar, conical, cylindrical, and/or any geometric or irregular shape/surface for desired applications.

The trailing ends of the optical fibers or bundles may be attached to the silicon and/or imaging surface, and may accurately map to a specified angle in space depending on the lenses used. The lenses may be mechanically aligned though a calibration process to ensure that angles of light are captured with accuracy. Additionally or alternatively, such a system may be calibrated though the use of a software imaging process. With flexible optical elements, it may also be possible to change the size and/or shape of the mechanical apparatus dynamically to provide multiple capture options depending on the desired area coverage. For example, the leading ends of the optical fibers may be secured to a flexible sheet, which may be movable between different shapes to provide different fields-of-view.

Referring to FIG. **65**, a system **6500** may have a coherent fiber array **6510** comprising many optical fibers, each of which has a leading end **6520** and a trailing end **6530**. The leading ends **6520** may be secured to a spherical shape **6540**, and the trailing ends **6530** may be secured to an image sensor **6550**. The system **6500** may provide a wide field-of-view, which may be semispherical in shape.

LiDAR

Scanning devices can be used to measure the depth profile of objects that are close by. Their use can add to the accuracy of the depth measurement derived from a light-field camera. This is especially true for imaging regions that are monochromatic and featureless. The scanning device can help add detail to the depth map generated by the light-field camera alone. One example of a scanning device is the LiDAR (light detector and ranging) scanning device, which uses a beam of light and time-of-flight timing information to measure distance to objects.

Many commercially available scanning devices make measurements over a field-of-view (FOV) that is much larger than a typical field-of-view for a light-field camera. For example, the Velodyne VLP-16 device scans with sixteen lasers in a circular 360° field-of-view in the plane of rotation (the "azimuthal coordinate") of the device, and

US 10,565,734 B2

47                                                                48

+/−15° in the plane perpendicular to the plane of rotation (the "polar coordinate"). The field-of-view for the fiber taper sensor used in a light-field camera with a 560 mm by 316 mm sensor and a 1210 mm focal length lens may only be about 26° in the horizontal direction, and 15° in the vertical direction.

To measure depth of objects from a camera, it is advantageous to reflect the beams of light from a scanning device so that they are projected into a smaller angular region that more closely matches the field-of-view of the camera. This technique may be used to avoid projecting the beams of light into places the camera cannot image, and instead redirect them to be more concentrated so the spatial sampling of the scanning device within the field-of-view of the camera is increased.

FIG. 66 shows a side view of a scanning device 6600 placed between two mirrors 6610. The two mirrors 6610 may be placed at a 90° angle relative to one another, with the scanning device 6600 centered between them, projecting light beams 6620 radially. In at least one embodiment, the scanning device 6600 may be a Velodyne VLP-16 LiDAR disk that projects 16 lasers radially with various angles (for example, −15°, −13°, −11°, −9°, −7°, −5°, −3°, −1°, 1°, 3°, 5°, 7°, 9°, 11°, 13°, and 15°) relative to the plane of rotation. In this configuration, all the light beams projected from the LiDAR may be reflected by the mirrors into the opening defined by these mirrors. The light beams may be projected with an angular spread that can overlap with the camera's field-of-view.

In three dimensions, it may be advantageous for the mirrored surfaces of the reflector to be arranged so they surround the scanning device in such a way as to reflect all the beams from the scanning device toward the opening in those mirrors. As shown in FIGS. 67A and 67B, two basic designs for a reflector for a scanning device may include conical and pyramidal reflectors. In FIG. 67A, a cone-shaped reflector 6700 has a surface that is cone-shaped on the inside, with a circular opening 6710. In FIG. 67B, a square pyramidal reflector 6750 may have four mirrors placed in a pyramid formation with a square opening 6760. The square pyramidal reflector 6750 may be composed of three or more mirrored sides, with an opening that has the shape of a regular or irregular polygon.

In at least one embodiment, the non-mirrored opening 6710 in the cone-shaped reflector 6700 has a diameter of 420 mm, as shown in FIG. 68A. Further, in at least one embodiment, the non-mirrored opening 6760 in the square pyramidal reflector 6750 is a square with a side 420 mm in length, as shown in FIG. 68B. Further, in at least one embodiment, the non-mirrored opening 6760 is a regular 13-sided polygon called a tridecagon, and the design contains 13 mirrors.

Centered between the mirrors in either the pyramid or conical configuration, the scanning device 6730 may project rays 6900 that are reflected by the walls of the mirror cavity and focused onto a plane perpendicular to the axis of rotation of the scanning device 6730 as shown in FIGS. 69A and 69B, for the cone-shaped reflector 6700 and the square pyramidal reflector 6750, respectively. This plane perpendicular to axis of rotation of the scanning device 6730 may advantageously correspond to the field-of-view of the light-field camera with which the scanning device 6730 is to be used.

The pattern of sampling points gathered by the scanning device 6730 may be dependent on the mirror configuration. In at least one embodiment, corresponding to a conical mirror reflector design, and using the Velodyne VLP-16 LiDAR device, the sampling points in an imaging plane

perpendicular to the axis of rotation of the LiDAR form a group 7000 of sixteen concentric circles 7010, as shown in FIG. 70. The LiDAR laser beams may be projected into a field-of-view of 30°. A polar plot 7100 showing the resulting projected energy vs. angle distribution, in units of watts/steradians (W/sr), is shown in FIG. 71.

In at least one other embodiment, corresponding to a pyramidal mirror reflector design in which the non-mirrored opening is slightly rectangular in shape and using the Velodyne VLP-16 LiDAR device, the sampling points in an imaging plane perpendicular to the axis of rotation of the LiDAR may form a grid 7200 with a field-of-view of 90° in one direction and 30° in the orthogonal direction, as shown in FIG. 72. A polar plot 7300 showing the resulting projected energy vs. angle distribution, in units of watts/steradians (W/sr), is shown in FIG. 73A.

In at least one other embodiment, corresponding to a regular 13-sided tridecagon pyramidal mirror reflector design, containing 13 mirrors, and using the Velodyne VLP-16 LiDAR device, the sampling points in an imaging plane perpendicular to the axis of rotation of the LiDAR may form a grid A00 with a field-of-view of 30° in the orthogonal direction. The sampling pattern from the tridecagon pyramidal configuration is shown in a polar plot 7350 in FIG. 73B.

One advantage of using a configuration with a number of mirrors that is much higher than 4 is that the pattern of sampling points is more evenly distributed across a field of view that is more narrow (in the case of the 13-sided mirror design, the field-of-view is 30° as compared with a 90° field-of-view for the 4-sided mirror design). This narrow field of view may better match the camera field of view, and result in more samples for objects that appear in the captured image.

An example of the LiDAR measurement points for objects in an imaging plane is shown in an image 7400 in FIG. 74, in which the spots 7410 and the spots 7420 on the image 7400 of the soldier represent LiDAR sampling measurement points. Each of the black spots 7410 may designate an intersection of the scanning beam with the foreground object (the soldier), while each of the white spots 7420 may designate the intersection of the scanning beam with the plane in the background.

Network Architecture

The capture, processing, and/or storage of high-resolution light-field data can strain the limits of conventional systems. Accordingly, various improvements to the hardware and software used to capture, process, and/or store high-resolution light-field data are proposed herein. In at least one embodiment, capture and processing of data are carried out on the same data network.

FIG. 75 is a block diagram of a system 7500 depicting primary components for data capture, according to one embodiment. The architecture shown in FIG. 75 represents one possible infrastructure for file management of high frame rate and/or high resolution data capture. The values and structures provided in FIG. 75 are merely exemplary. According to the block diagram, the system 7500 may include a main camera 7510, a preview camera 7520, a data manager 7530, servers 7540, and networked storage 7550. These components will be described, in exemplary form, as follows.

Main Camera

The main camera 7510 may include an array of image sensors as set forth previously, and may also use tapered fiber optic bundles to achieve high resolution through simul-

US 10,565,734 B2

49

taneous image capture in all of the sensors. Thus, for example, the main camera **7510** may include 60 cameras **7512** as shown in FIG. **75**.

In at least one embodiment, the main camera includes a main lens **7514**, which is an ultra large format lens with an image circle that covers the entire imaging surface with sufficient image quality. Other arrangements are possible. In at least one embodiment, the aperture of the main lens **7514** is adjusted to f/n=14, although other values can be used. In at least one embodiment, the focus position **7516** of the main lens **7514** is fed back to the data manager **7530**.

The main camera can also include a microlens array (MLA, as shown and described previously). The MLA may have calibration geometry, in the image plane, that changes as a function of the focus position **7516** of the main lens **7514**. Accordingly, in at least one embodiment, reference calibration data can be stored for a number of focus positions **7516** of the main lens **7514**.

In at least one embodiment, the aperture of the main lens **7514** is controlled by a mechanical system such as a hardware trigger **7518** to provide a constant effective f/n based upon the focus position **7516**. For example, the aperture can be automatically increased in size to compensate for relative f/n at close focus. In at least one embodiment, focus is controlled by mechanical systems and/or with a metadata recording system that tracks data such as lens position, aperture size, and focal length. Thus, data **7519** such as focus and f-stop may be transmitted by the main camera **7510** to the data manager **7530**.

In at least one embodiment, the cameras **7512** include 12 MP CMOS sensors such as, for example, part # CMV12000 provided by CMOSIS. These may be read out using high-speed PCI Express cameras, such as, for example, model CB120CG-CM provided by Ximea.

In at least one embodiment, the cameras **7512** can be implemented with a 4-lane Gent interface, although in other embodiments, a Gen3 PCIE interface or other non-PCIE interface can be used. In at least one embodiment, the interface is used to achieve at least 120 frames per second (fps) capture rate for a 10-bit readout. In at least one embodiment, images may be cropped to increase fps and to compensate for regions of the imaging plane where the fibers do not relay light. Higher or lower frame rates and higher or lower bit depths can be achieved.

As mentioned previously, in order to use multiple sensors for the image plane with full optical coverage, the signal may be routed from the image plane to the sensors using fiber optics such as tapered fiber optic bundles. Each sensor may be bonded to a straight fiber optic bundle (face plate), and then a tapered fiber optic bundle that serves to compress the image between the image plane and the sensor. This may enable the sensors to have gaps between them, and may also effectively magnify the image plane by a ratio of, for example, 3:1.

Referring to FIG. **76**, there is shown an example **7600** of a tapered fiber optic bundle **7610** bonded to a fiber face plate **7620** and further bonded to an image sensor and camera electronics **7630**, according to one embodiment. The Image data may be received in the tapered fiber optic bundle at an image plane **7640**, and then conveyed to the sensor and camera electronics **7630** via the tapered fiber optic bundle **7610** and the fiber face plate **7620**.

Preview Camera

In at least one embodiment, live feedback can be provided to the camera operator during a video shoot. Either of the following approaches can be used:

50

Preview Camera—A preview camera **7520** such as a standard rangefinder camera can be included, which acts as viewfinder for the scene. The cinematographer may use the preview camera **7520** to frame the scene, set the f-stop, and/or adjust the focus of the main lens **7514** of the main camera **7510**. The focus of the main lens **7514** may or may not change while an entire scene is filmed. The lens parameters, sensor image data, and the metadata from the preview camera may all be recorded by the data manager **7530**; after processing of the images, the scene may be rendered according to the lens settings on the preview camera **7520**.

Live View—In another embodiment, fast feedback can be provided via live view by downsampling the images front the main camera **7510**, aggregating the results from multiple servers, and displaying them for the cinematographer in real time. In such embodiments, the preview camera **7520** may be omitted.

Data Manager

The data manager **7530** may act as the control center for the capture of images. In at least one embodiment, it includes the following components:

User Interface **7532**: this may be used by the user (cinematographer) for the following:

Start and stop recording;

Monitor the signal from the Preview Camera **7520** to adjust focus and f-stop real time or monitor live view, as applicable;

Preview a recording after it is made; and/or

Decide whether to save the recording from memory or disk or discard it by previewing the recording. In at least one embodiment all images from a recording are kept in RAM until the cinematographer has made this decision.

Camera Trigger **7534**: In at least one embodiment, frame capture for all cameras **7512** is coordinated using a common global synchronization trigger for all the sensors in the system **7500**.

Preview Playback **7536**: After image capture, the cinematographer can preview the images. In at least one embodiment, the data manager **7530** provides functionality for viewing the images from the main camera **7510**.

Servers

Referring to FIG. **77**, there is shown one of the servers **7540**, according to one embodiment. FIG. **77** depicts an example of PCIe architecture on data/processing servers, with exemplary values as shown. In at least one embodiment, each server **7540** may be an enterprise grade server that can be used for camera readout. Exemplary specifications for each of the servers **7540** are as follows:

4 CPU's **7710**, each with 15 cores;

At least two dedicated Gen3 PCI Express slots **7720** for each CPU **7710**, at least one of which has 16 lanes;

3 TB of DDR3 RAM **7730**; and

Optical interconnects **7740** for a remote storage network such as the networked storage **7550**, which may be shared by other servers **7540**.

In at least one embodiment, each server **7540** supports at least ten cameras **7512**. Performance of the cameras **7512** can be optimized, for example, by adjusting any or all of following parameters:

Maximum packet payload size (MPS). A PCI Express system may transfer data in the payload of Transaction Layer Packets (TLP's). In at least one embodiment, the software is configured to ensure that each packet does not exceed the maximum payload size parameter of any

US 10,565,734 B2

51                                                        52

system element along the packet's path. For example an MPS of 256 or 512 bytes can be used, although any suitable value can instead be used.

Optimization of camera readout software and/or processor affinity. In at least one embodiment, the camera readout application can be assigned to run on the processor that corresponds to the PCIE slots attached to that processor.

Networked Storage

In at least one embodiment, the networked storage **7550** may be network-attached storage (NAS) that can be shared on a network to serve as a temporary location for down-sampled images used for scene previews or live view. The networked storage **7550** can also be used for storage of images once the cinematographer elects to save a video recording. The networked storage **7550** may be replaced with direct attached storage or a storage area network (SAN).

Optical Calibration

Sensor Calibration

In at least one embodiment, the cameras **7512** of the main camera **7510** may be calibrated by performing the following steps:

Apply a uniform gain setting to yield a uniform response to light across the cameras **7512**;

Characterize dark current as a function of exposure, clock speed, and temperature; and

Record lists of defective pixels for further processing.

Calibration for Fiber Defects

As depicted in FIG. **76**, in some embodiments, each sensor and camera electronics **7630** may be bonded to a straight fiber bundle (fiber face plate **7620**) and to a tapered fiber optic bundle **7610**, which may serve to compress the image from the image plane **7640** at the tapered fiber optic bundle to the sensor and camera electronics **7630** by any suitable ratio, such as for example 3:1. In many cases, the tapered fiber optic bundle **7610** and the fiber face plate **7620** both contain hex-pattern artifacts by virtue of the fiber optic manufacturing process. These hex patterns may arise from smaller bundles of fiber that are incorporated into the tapered fiber optic bundle **7610** or fiber face plate **7620**. Two types of artifacts may appear:

Hex and fiber wise patterns can arise from smaller bundles of fiber that compose the tapered fiber optic bundle **7610** and the fiber face plate **7620** or from fiber non-uniformity. FIG. **78** depicts an example **7800** of hexagonal fiber artifacts and fiber noise, according to one embodiment, shown before artifact removal.

Fault line defects can arise where the fibers shift along their bundled boundaries. FIG. **79** depicts an example **7900** of fault line discontinuity, according to one embodiment, shown before artifact removal.

In at least one embodiment, the calibration for the fiber tapers is performed using the following steps:

1. Remove dark regions by imaging a uniformly-lit planar light source. Determine a per-pixel gain map to apply to the image in order to normalize the response across each taper image plane. Generate a mask of the pixels that are directly attached to the fiber, as opposed to boundary sensor pixels that do not receive light.

2. Map large dark regions that are completely occluded by defects, and perform interpolation from neighboring pixels.

3. Remove optical warping caused by fiber optic deformation by imaging an optical chart with a rectilinear reference grid that forms a reference pattern over the entire imaging surface of the taper array. Unwarp each image to match the reference grid.

4. Remove fiber fault line artifacts for all tapers by imaging a Ronchi ruling. Record a series of images in which this Ronchi ruling is offset at regular intervals spaced by a subpixel or greater. This is done both for horizontal lines offset in the vertical direction, and vertical lines offset in the horizontal direction. Adjust each image to match the reference Ronchi ruling, and aggregate the required displacements together to produce one vector displacement map to apply to the original image.

5. Use the rectilinear grid pattern image to align adjacent tapers and determine their relative and global positioning in the array, forming a singular image.

6. Apply all of the above processing steps to the mask generated in Step 1. When aligned in Step 5, the mask forms a map of seam boundaries between adjacent tapered fiber optic bundles. These seams are used for further processing.

7. Record images using multiple color transparencies with varying color coordinates placed in front of a uniform planar light source. Assign one taper to be the master, and determine the color correction required for each of the other tapers to match the master using a 3-D lookup table. Apply this correction to form a uniform response between all tapers.

In at least one embodiment, calibration is performed in a manner that depends on the focus position of the main lens. Additionally or alternatively, it may be illuminant dependent. Accordingly, calibration may be carried out across multiple focus positions and/or illuminants.

Single Frame Image Processing

Referring to FIG. **80**, a flow diagram **8000** depicts the primary processing steps for a single frame of light-field video, according to one embodiment. In at least one embodiment, at the start of processing, the images **8010** for each individual sensor have been saved into a hard disk. These may be assembled into a single image at some point in the pipeline. A tiled approach to processing through Standardize LF process **8020** is possible if small (roughly 15-20 pixel) boundaries are included with the tiles. This may involve the use of calculation data **8030**, and may result in the generation of a light-field **8040**. However, in at least one embodiment, the entire image is kept in memory so as to enable efficient depth map generation. Depth map generation **8050** may be applied to the light-field **8040** to generate a depth map **8060**. The light-field **8040** and/or the depth map **8060** may be saved, in a save process **8070**, to a file that can be read for playback and/or editing. A blended refocus procedure **8080** may optionally be carried out to further modify the light-field **8040** and/or the depth map **8060**.

The techniques depicted herein may provide several differences from conventional light-field processing. Such differences may include, but are not limited to:

Standardized light-field data is modified to use already-computed disk geometry values appropriate for the focus position of the main lens;

After depth map generation, there is no Extended Depth-of-Field (EDOF) generation; and

The RGB values of the light-field are saved along with the depth map, so that the playback software can perform projection using the blended refocus method as fast as computationally possible.

Image Sequence Processing—Render Farm Architecture

Referring to FIG. **81**, a flow diagram **8100** depicts an image processing architecture according to one embodi-

US 10,565,734 B2

53 54

ment. Six servers **8110** may be used, as depicted in FIG. **81**, although one skilled in the art will recognize that any number of servers **8110** can be used. In at least one embodiment, the servers **8110** are used to capture video, and are also used as worker servers within a render farm management system. The raw data from the sensors (for example, the cameras **7512** of the system **7500** of FIG. **75**) may be distributed across the servers **8110** and combined to form a full image.

A supervisor workstation **8120** may point at the raw images on disk and may initiate processing of the images. Software may be used for video playback and editing. In at least one embodiment, the supervisor workstation **8120** may be the same computer as the data manager **7530** used for image capture in FIG. **75**; alternatively, it may be implemented as a separate component.

Referring to FIG. **82**, a flow diagram **8200** depicts an example of an architecture for the servers **8110** shown in FIG. **81**, according to one embodiment. In at least one embodiment, all tiles are assembled before processing begins for the full image. In at least one embodiment, output data may be written to a NAS such as the networked storage **7550** of the system **7500** of FIG. **75**.

Camera Calibration Procedure
Calibration for the Full Array, Before MLA Attachment

Various types of calibration can be used for the full array of cameras **7512**, either singly or in any suitable combination. Examples of such calibration are set forth below.

ISO Calibration

In at least one embodiment, ISO calibration is performed using an image from a uniform planar light source, to ensure that each camera **7512** is matched with its neighbors. This may compensate for vignetting from the main lens **7514** on the main camera **7510**. In at least one embodiment, the fiber+sensor response is non-linear.

Sensor Dark Current

In at least one embodiment, the sensor dark current can be represented as a single number that can be recorded at the beginning and/or at the end of capture. Some systems, such as Ximea, include such a calibration. In at least one embodiment, the system **7500** performs further verification that there is no significant fixed pattern noise, so that such calibration will be effective.

Dark Fiber Artifact Removal Calibration

In at least one embodiment, this calibration is performed using a white image. It may be dependent on the illuminant. In at least one embodiment, this calibration is performed as a function of the focus setting of the main lens **7514**.

Sensor Crop

In at least one embodiment, the intersection of the tapered fiber optic bundle **7610** and/or the fiber face plate **7620** with the sensor portion of the sensor and camera electronics **7630** may have an area of approximately 90% of the total active area of the sensor. For example, unused areas may include 100 rows on the top and bottom of a sensor of height **3072**, and 100 columns on the right and left of a sensor of width **4096**. In at least one embodiment, to achieve the fastest frame rate, this crop for each of the 60 sensors is stored as configuration data, and the system **7500** may then capture cropped frames.

Grid Warp Calibration

In at least one embodiment, this calibration is performed using a checkerboard chart. The chart can include, for example, 30×24 blocks per sensor.

Fault Line Artifact Removal

In at least one embodiment, this calibration is performed using two charts with closely spaced horizontal and vertical

lines. Any suitable line spacing can be used. Examples include, but are not limited to:

Horizontal line spacing: 130 lines per tapered fiber optic bundle height, with line thickness of about 20 pixels; and

Vertical line spacing: 170 lines per tapered fiber optic bundle width, with a line thickness of about 20 pixels.

Preview Camera ISO vs. Main Camera ISO

In at least one embodiment, if the DP (director of photography) selects a low ISO for the feed from the preview camera **7520**, the settings of the main camera **7510** may follows this ISO setting. Other settings of the preview camera **7520** may also be automatically followed by the main camera **7510**.

A variable neutral density (ND) filter can be used between the lens and the sensor of the preview camera **7520** to help ensure that the same amount of light reaches the sensor of the preview camera **7520** and the sensors of the main camera **7510**. In at least one embodiment, this ND filter is adjusted to attenuate more light as the aperture on the lens of the preview camera **7520** is made larger, while the aperture on the main lens **7514** of the main camera **7510** remains constant. Appropriate calibration can be performed, for example, by checking that the histograms match for the preview camera **7520** and the main camera **7510**. In at least one embodiment, the range of the ND filter is 1.6 to 8 stops of light.

Preview Camera Focus and Zoom vs. Main Camera Focus

In at least one embodiment, a calibration is performed to ensure that, if the lens focus setting of the preview camera **7520** is adjusted, then the main lens **7514** follows this focus. In at least one embodiment, it is possible to display the refocus range of the main camera **7510**, and allow the cinematographer to select the location of this refocus range relative to the focus position of the lens of the preview camera **7520**. For example, it is possible to set the front, middle, or back of the refocus range of the main lens **7514** to correspond to the focus of the lens of the preview camera **7520**.

Preview Camera Crop

In at least one embodiment, the image generated by the preview camera **7520** is cropped in size to represent the field of view that the main camera **7510** is capturing. This crop can change for a number of reasons. For example, it can change along the Y-axis depending on where the lens of the preview camera **7520** is focused, given that the lens of the preview camera **7520** is located a short distance away from the main lens **7514** of the main camera **7510** and has an angled line of convergence with the main lens **7514**. A keystone correction to the image from the preview lens may be performed.

Calibration for the Full Camera, after MLA Attach

Various types of calibration can be used for the full camera, either singly or in any suitable combination. Examples of such calibration are set forth below.

Main Lens Aperture vs. Focal Length

In at least one embodiment, to illuminate the area of the sensor under each MLA lens in an optimal way, the system **7500** adjusts the aperture of the main lens **7514** of the main camera **7510** as the focal length is adjusted, using motors to do so. For objects at infinity, the main lens **7514** is closest to the sensor, and its aperture is adjusted so that the F-Number of the main lens **7514** is slightly higher than that of the MLA (for example, an F-Number of 14 for the main lens vs. 13 for the MLA). To focus on closer objects, the main lens **7514** moves away from the sensor, and the

US 10,565,734 B2

55

aperture opens in order to keep the effective F-Number constant so that the disk sizes under each MLA remain unchanged.

In at least one embodiment, both the aperture and the focus of the main lens **7514** are controlled by servo motors, although stepper motors can also work. Calibration can be performed using a table of aperture step vs. focus step.
Modulation Images

This calibration can be performed using a white image captured for the purpose of demodulation. The white image may be averaged over some number of frames, such as 16 frames, for example.
2D Geometry Distortion Correction

In at least one embodiment, the system performs 2D geometry distortion correction. For various reasons, captured images may include several types of geometry distortion. Each of these will be described in turn.
Optical Distortion Correction Method 1

Distortion is any deviation from rectilinear projection (a projection in which straight lines in a scene remain straight in an image). Such distortion can be introduced by 1) main lens distortion and/or 2) distortion caused by fiber optic deformation.

In at least one embodiment, the system **7500** models optical distortion as follows:

Input: 2D RGB image array with checkerboard pattern; and

Output: A 2D per-pixel correction map (or UV map).

In at least one embodiment, calibration is performed as follows:

1. Define input parameters. These may include, for example, block size, grid rotation, and top left corner offset. These parameters are used as initial guesses for the grid fitting routine.
2. Run corner detection algorithm. Checkerboard corners are detected.
3. Run grid fitting algorithm. A global optimization routine is applied to find a set of parameters which defines a reference grid that fits the detected corners best. The output of this tool is a set of positional vectors that maps each corner point in the undistorted image coordinates to the corresponding corner point in the distorted image coordinates.
4. Manual Adjustment. Mismatched corner points can be adjusted.
5. Save Correction Map.

In at least one embodiment, the system uses a test chart such as a checkerboard pattern with ~130×130 block size in captured images. Initially, the system may ignore fault line artifacts, which may be corrected by fault line artifact removal techniques, as described in more detail below.

Referring to FIG. **83**, there is shown an example of a visualization **8300** of source image vs. auto detection for an actual target grid pattern, according to one embodiment. Referring to FIG. **84**, there is shown an example of a grid **8400** before correction, according to one embodiment. Referring to FIG. **85**, there is shown an example of the grid **8400** after distortion correction has been applied, according to one embodiment.
Optical Distortion Correction Method 2

In addition to or in the alternative to the foregoing, test charts containing horizontal and vertical Ronchi ruling lines can be used to perform 2D distortion correction. In at least one embodiment, the system **7500** uses test charts such as the following:

56

A chart with 65 horizontal line pairs per individual tapered fiber optic bundle height, with about 20 pixel widths for each line.

A chart with 85 vertical line pairs per individual tapered fiber optic bundle height, with about 20 pixel widths for each line.

Alternatively, different line spacings and thicknesses can be used. Calibration may then be performed, for example, through the use of the following steps:

1. For each chart, take a series of images (for example, ten images, such that N=10) in which all the line patterns in the image plane are shifted by ~5 pixels vertically/horizontally. In at least one embodiment, the data can be captured by moving the line charts sequentially, which can be programmed by fine stepper motor controllers.
2. Multiple images can be formed by performing a pixel-by-pixel multiplication of one vertical line image and one horizontal line image recorded in the previous step. These are called product images. If N vertical line and M horizontal line images are recorded, then there are N×M possible product images. These product images will each contain a grid pattern of white box-shaped areas, surrounded by dark borders formed by the vertical and horizontal lines in the source images.
3. For each of the product images, the center-of-mass of each of the light box-shaped areas can be calculated. This forms a grid.
4. For each of the product image grids, a global optimization routine is applied to find a set of parameters which defines a reference grid that fits the observed grid best. The output of this tool is to generate a set of positional vectors that map between each of the white box center points in the undistorted image coordinates and to the corresponding white box center point in the distorted image coordinates. This forms a correction map for each product image.
5. The set of all of the correction maps from the product images can be combined to achieve a high-density correction map, which is then saved.

Fault Line Artifact Removal

Referring to FIG. **86**, there is shown an example of a fault line artifact **8600**, also referred to as a sheer or discontinuity, according to one embodiment. In this example, there are some unnatural non-smooth pixels in areas between '2' and '3'. Such artifacts can occur along the edges between hexagonal patterns.

In at least one embodiment, the system **7500** models fault line artifacts as follows:

Input: 2D RGB image array. In at least one embodiment, these images are taken with no MLA pattern, but after applying noise artifact removal to remove noise, hexagon patterns, and dark spots.

Output: A 2D correction map array.

In at least one embodiment, such artifacts are removed by applying an algorithm that generates a projection in which straight lines from a Ronchi ruling chart remain straight in an image. A sampled straight line pattern is used as the test chart. If any kind of warping or discontinuity is detected, these points are fit to a straight-line model.

In at least one embodiment, the system **7500** uses test charts such the following:

A chart with 65 horizontal ti e pairs per individual tapered fiber optic bundle height, with about 20 pixel widths for each line.

US 10,565,734 B2

57

A chart with 85 vertical line pairs per individual tapered fiber optic bundle height, with about 20 pixel widths for each line.

Alternatively, different line thickness can be used in both charts. The system 7500 may assume that the line patterns are straight in the real world. Calibration may be performed by performing the following steps:

1. Data Capture. For each chart, take a series of images (for example, forty images, such that N=40) in which all the line patterns in the image plane are shifted by ~1 pixel vertically/horizontally. In at least one embodiment, the data can be captured by moving the line charts sequentially, which can be programmed by fine stepper motor controllers.

2. Line Detection. Given N line chart images taken from different phases (1 pixel offset in either horizontal or vertical), find all of the distorted line patterns. Ideally, the system 7500 finds all of line patterns in the chart, which requires that the straight line separation is larger than the largest fault line separation.

3. Coarse Straight Line Fitting. For all points in Line i, fit them into $Ai*x+Bi*y+Ci=0$.

4. Fine Straight Line Fitting. For each line, fit it into $A*x+y+Ci=0$ (horizontal), $x+B*y+Ci=0$ (vertical), where $Ci=C0+i*delta(C)$, $delta(C)=C1-C0=C2-C1=\ldots=Cn-Cn-1$. In at least one embodiment, even spacing line patterns can be used. Both of the two steps can be modeled as non-linear optimization problems.

5. Calculate Correction Map. An offset vector can be formed by calculating the distance between a point on the detected line and its correspondence on the fitted line model. The offset vectors are splatted and aggregated in order to generate a per-pixel correction map.

6. Post Processing. To fill in some gaps due to extremely bad fault line artifacts or missing samples, a hole-filling routine can be applied.

In at least one embodiment, backward mapping may be used to apply the correction map. This can be combined with correction maps created in the grid warp routine.

Referring to FIG. 87, there is shown an example of a line chart 8700 before fault line correction, according to one embodiment. Referring to FIG. 88, there is shown an example of line chart 8700 after application of the automated fault line correction process, according to one embodiment.

Tapered Fiber Optic Bundle Array Image Alignment

In at least one embodiment, the system 7500 performs tapered fiber optic bundle image alignment to generate geometry transform data. The geometry transform data may be used to stitch images from different individual tapered fiber optic bundles into one single image.

Referring to FIG. 89, there is shown an example of a coordinate system 8900 for a fiber mosaic array, according to one embodiment. The tapered fiber optic bundle coordinates are shown in X, Y space as viewed from behind the lens.

Method

In at least one embodiment, an offline method is applied. First, camera calibration may be performed. Then, a checkerboard chart may be used. The checkerboard chart may be placed perpendicular to the optical axis of the lens, parallel to the sensor plane. The checkerboard chart may be assumed to be flat. FIG. 90 depicts a checkerboard chart 9000 according to one embodiment.

The calibration process may take a set of checkerboard images as input, wherein the image from each of the cameras

58

7512 is a subset of the checkerboard chart. For each image, the following steps may be performed:

1. Identify the active area. This may be done manually or automatically.

2. Each checkerboard pattern image may be processed using calibration steps 1-4 described above. Then, a global reference grid may be used to determine the global positioning in the array, in which the transform is represented as a 2D rotation matrix and translation vector for the image from each of the cameras 7512.

Image Seam Removal

In at least one embodiment, a seam removal method is applied to detect and remove seams between two adjacent cameras 7512. Masks generated from the calibration technique described above may be aligned using the data from alignment of the tapered fiber optic bundles. The seams may be detected by finding the center lines of each overlapped sub region between masks of two adjacent tapers. In at least one embodiment, the pixels around the seams are then blended with appropriate weights, which are assigned according to the spatial distance between the pixel and the seam.

Light-Field Video Pipeline

In at least one embodiment, each camera 7512 of the multi-camera array provides a raw-Bayer tile of the light-field that has been distorted by the optical fiber and the main lens. The current light-field video pipeline may process the data from each camera 7512 independently up to a "merge" stage, where each tile (i.e., the light-field data provided by each of the cameras 7512) is un-distorted and the images are combined into one large light-field. Subsequent processing steps (e.g., depth map and projection) can then use the single, large light-field as input and remain unchanged from the single-camera pipeline. Raw pipeline processing may also be performed, including removing black-level, lens-shading, white-balance, demosaic, and/or the like.

In at least one embodiment, a micro lens array (MLA) is used on the surface of the tapered fiber optic bundles 7610 to perform the following operations:

1. Subtract Black Frame. Each camera 7512 may have its own dark current characteristics; accordingly, a separate dark frame calibration may be used for each camera 7512. Each camera 7512, along with the corresponding tapered fiber optic bundle 7610 and/or fiber face plate 7620, may be processed independently. Input and output may both be raw-Bayer data.

2. Carry Out Lens Shading. Each camera 7512 may have its own PRNU (photo-response non-uniformity); accordingly, a separate flat-field calibration may be used for each camera 7512. This flat-field correction may include the effect of both the MLA pattern and the fiber artifacts. Each camera 7512, along with the corresponding tapered fiber optic bundle 7610 and/or fiber face plate 7620, may be processed independently. Input and output may both be raw-Bayer data. FIG. 91 depicts an example of a light-field image 9100 before lens shading is applied, according to one embodiment. FIG. 92 depicts an example of the light-field image 9100 after lens shading is applied, according to one embodiment.

3. Balance Cameras. Each camera 7512, along with the corresponding tapered fiber optic bundle 7610 and/or fiber face plate 7620, may respond to light slightly differently than the others. This step attempts to correct for the differences, and map all cameras 7512 to one reference camera. In at least one embodiment, this can be performed using a Bayer channel gain and offset;

US 10,565,734 B2

59

60

additionally or alternatively, other techniques can be used. In at least one embodiment, each camera **7512**, along with the corresponding tapered fiber optic bundle **7610** and/or fiber face plate **7620**, may be processed independently. Input and output may both be raw-Bayer data.

4. Standardize. This step includes, for example, white-balance, demosaicing, chroma-suppression, and other operations that are known in Light-Field Engine (LFE) processing. In at least one embodiment, each camera **7512**, along with the corresponding tapered fiber optic bundle **7610** and/or fiber face plate **7620**, may be processed independently. Input and output may both be raw-Bayer data. FIG. **93** depicts an example of a light-field image **9300** before standardization, after lens shading has been applied, according to one embodiment. FIG. **94** is an example of the light-field image **9300** after standardization, according to one embodiment.

5. Merge (Fiber artifact removal). This step may take all of the tiles generated by the cameras **7512** and merge them to one large image. The mapping table may include (1) the lens warp+grid warp+fault-line warp, and (2) tapered fiber optic bundle alignment warp, which can be collapsed into one lookup table mapping. This process is described in the above sections describing fiber artifact removal. The multiple tiles are considered the "source" (input) and the merged image is considered the "destination" (output).

6. Blend camera images. For each pixel of the destination, the system **7500** may keep track of which camera **7512** to sample from and the x,y index and the x,y index of the location to sample at. By using a lookup table per camera **7512**, the system **7500** may be able to blend the data from the cameras **7512**; for example, for a given pixel of the destination image, the system **7500** may take a weighted average of the data from all cameras **7512**. This can help in the seam-region, which is often noisy and unreliable. With this approach, there are multiple mapping tables (one for each camera **7512**) and each table may include an x,y index and weight. FIG. **95** is an example depicting tiles **9500** and **9550** before the merge operation, according to one embodiment. FIG. **96** is an example depicting tiles **9500** and **9550** after the merge operation to define a single image **9600**, according to one embodiment.

7. Apply Influence (Seam artifact removal). In at least one embodiment, each pixel is given a weight that is used in projection. In this stage, that weight is pre-multiplied. Each pixel can be weighted according to its associated demodulation value (more specifically, 1/demodValue^2). In order to perform such weighting, in at least one embodiment, a second flat-field image (non-MLA) is applied to the flat-field image (MLA) used in step #2 (lens shading) above, in order to remove the effects of the optical fiber. This is done for the flat-field image generated by each of the cameras **7512**. Then, these multiple flat-field images are merged into one large image to yield one large influence map. A per-pixel "confidence map" can also be used to set any unreliable pixels to zero weight. FIG. **97** depicts an exemplary close-up view **9700** of the influence map, according to one embodiment. Note that interstitials receive low weight (as expected), and the seam **9710** between two cameras **7512** receives gets zero weight.

8. Create light-field. In at least one embodiment, the system **7500** pairs the merged image along with the

appropriate geometry model, so that it can be treated as one large light-field that can be used for projection. The geometry may consist of a global model and a local per-pixel LUT for geometry correction. FIG. **98** depicts an example **9800** showing a set of disk-centers **9810**, according to one embodiment. Dots are shown in the disk-centers **9810**, with one set of dots from the global model only, and another set, distinct from those of the global model, using geometry correction.

9. Estimate depth and reconstruct. In at least one embodiment, for the final 2D reconstruction from the light-field, depth and projection may be processed according to known light-field image processing techniques.

The above description and referenced drawings set forth particular details with respect to possible embodiments. Those of skill in the art will appreciate that the techniques described herein may be practiced in other embodiments. First, the particular naming of the components, capitalization of terms, the attributes, data structures, or any other programming or structural aspect is not mandatory or significant, and the mechanisms that implement the techniques described herein may have different names, formats, or protocols. Further, the system may be implemented via a combination of hardware and software, as described, or entirely in hardware elements, or entirely in software elements. Also, the particular division of functionality between the various system components described herein is merely exemplary, and not mandatory; functions performed by a single system component may instead be performed by multiple components, and functions performed by multiple components may instead be performed by a single component.

Reference in the specification to "one embodiment" or to "an embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiments is included in at least one embodiment. The appearances of the phrase "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment.

Some embodiments may include a system or a method for performing the above-described techniques, either singly or in any combination. Other embodiments may include a computer program product comprising a non-transitory computer-readable storage medium and computer program code, encoded on the medium, for causing a processor in a computing device or other electronic device to perform the above-described techniques.

Some portions of the above are presented in terms of algorithms and symbolic representations of operations on data bits within a memory of a computing device. These algorithmic descriptions and representations are the means used by those skilled in the data processing arts to most effectively convey the substance of their work to others skilled in the art. An algorithm is here, and generally, conceived to be a self-consistent sequence of steps (instructions) leading to a desired result. The steps are those requiring physical manipulations of physical quantities. Usually, though not necessarily, these quantities take the form of electrical, magnetic or optical signals capable of being stored, transferred, combined, compared and otherwise manipulated. It is convenient at times, principally for reasons of common usage, to refer to these signals as bits, values, elements, symbols, characters, terms, numbers, or the like. Furthermore, it is also convenient at times, to refer to certain arrangements of steps requiring physical manipulations of physical quantities as modules or code devices, without loss of generality.

US 10,565,734 B2

61

It should be borne in mind, however, that all of these and similar terms are to be associated with the appropriate physical quantities and are merely convenient labels applied to these quantities. Unless specifically stated otherwise as apparent from the following discussion, it is appreciated that throughout the description, discussions utilizing terms such as "processing" or "computing" or "calculating" or "displaying" or "determining" or the like, refer to the action and processes of a computer system, or similar electronic computing module and/or device, that manipulates and transforms data represented as physical (electronic) quantities within the computer system memories or registers or other such information storage, transmission or display devices.

Certain aspects include process steps and instructions described herein in the form of an algorithm. It should be noted that the process steps and instructions of described herein can be embodied in software, firmware and/or hardware, and when embodied in software, can be downloaded to reside on and be operated from different platforms used by a variety of operating systems.

Some embodiments relate to an apparatus for performing the operations described herein. This apparatus may be specially constructed for the required purposes, or it may comprise a general-purpose computing device selectively activated or reconfigured by a computer program stored in the computing device. Such a computer program may be stored in a computer readable storage medium, such as, but is not limited to, any type of disk including floppy disks, optical disks, CD-ROMs, magnetic-optical disks, read-only memories (ROMs), random access memories (RAMs), EPROMs, EEPROMs, flash memory, solid state drives, magnetic or optical cards, application specific integrated circuits (ASICs), and/or any type of media suitable for storing electronic instructions, and each coupled to a computer system bus. Further, the computing devices referred to herein may include a single processor or may be architectures employing multiple processor designs for increased computing capability.

The algorithms and displays presented herein are not inherently related to any particular computing device, virtualized system, or other apparatus. Various general-purpose systems may also be used with programs in accordance with the teachings herein, or it may prove convenient to construct more specialized apparatus to perform the required method steps. The required structure for a variety of these systems will be apparent from the description provided herein. In addition, the techniques set forth herein are not described with reference to any particular programming language. It will be appreciated that a variety of programming languages may be used to implement the techniques described herein, and any references above to specific languages are provided for illustrative purposes only.

Accordingly, in various embodiments, the techniques described herein can be implemented as software, hardware, and/or other elements for controlling a computer system, computing device, or other electronic device, or any combination or plurality thereof. Such an electronic device can include, for example, a processor, an input device (such as a keyboard, mouse, touchpad, trackpad, joystick, trackball, microphone, and/or any combination thereof), an output device (such as a screen, speaker, and/or the like), memory, long-term storage (such as magnetic storage, optical storage, and/or the like), and/or network connectivity, according to techniques that are well known in the art. Such an electronic device may be portable or nonportable. Examples of electronic devices that may be used for implementing the techniques described herein include: a mobile phone, per-

62

sonal digital assistant, smartphone, kiosk, server computer, enterprise computing device, desktop computer, laptop computer, tablet computer, consumer electronic device, television, set-top box, or the like. An electronic device for implementing the techniques described herein may use any operating system such as, for example: Linux; Microsoft Windows, available from Microsoft Corporation of Redmond, Wash.; Mac OS X, available from Apple Inc. of Cupertino, Calif.; iOS, available from Apple Inc. of Cupertino, Calif.; Android, available from Google, Inc. of Mountain View, Calif.; and/or any other operating system that is adapted for use on the device.

In various embodiments, the techniques described herein can be implemented in a distributed processing environment, networked computing environment, or web-based computing environment. Elements can be implemented on client computing devices, servers, routers, and/or other network or non-network components. In some embodiments, the techniques described herein are implemented using a client/server architecture, wherein some components are implemented on one or more client computing devices and other components are implemented on one or more servers. In one embodiment, in the course of implementing the techniques of the present disclosure, client(s) request content from server(s), and server(s) return content in response to the requests. A browser may be installed at the client computing device for enabling such requests and responses, and for providing a user interface by which the user can initiate and control such interactions and view the presented content.

Any or all of the network components for implementing the described technology may, in some embodiments, be communicatively coupled with one another using any suitable electronic network, whether wired or wireless or any combination thereof, and using any suitable protocols for enabling such communication. One example of such a network is the Internet, although the techniques described herein can be implemented using other networks as well.

While a limited number of embodiments has been described herein, those skilled in the art, having benefit of the above description, will appreciate that other embodiments may be devised which do not depart from the scope of the claims. In addition, it should be noted that the language used in the specification has been principally selected for readability and instructional purposes, and may not have been selected to delineate or circumscribe the inventive subject matter. Accordingly, the disclosure is intended to be illustrative, but not limiting.

What is claimed is:

1. A method for capturing and processing image data, the method comprising:

receiving incoming light along an optical path in an image capture device, the image capture device comprising:

a plurality of image sensors arranged in a pattern such that gaps exist between adjacent image sensors of the plurality of image sensors, wherein the plurality of image sensors includes a first image sensor and a second image sensor;

a main lens;

a microlens array;

a plurality of tapered fiber optic bundles, each of which comprises a leading end positioned within the optical path, and a trailing end positioned proximate one of the plurality of image sensors, the leading end having a larger cross-sectional area than the trailing end, wherein the plurality of tapered fiber optic bundles includes:

US 10,565,734 B2

63

a first tapered fiber optic bundle of a first length positioned proximate the first image sensor;

a second tapered fiber optic bundle of a second length longer than the first length positioned proximate the second image sensor; and

a beam splitter to direct light from the main lens to the plurality of tapered fiber optic bundles, and wherein the tapered fiber optic bundles are arranged along a first plane and a second plane;

with the main lens, directing the incoming light along the optical path;

directing the incoming light through the microlens array;

directing at least some of the incoming light through the tapered fiber optic bundles including the first and second tapered fiber optic bundles to the image sensors;

with the image sensors including the first and second image sensors, receiving the incoming light to generate image sensor data; and

combining the image sensor data generated by the image sensors including the first and second image sensors to define a single light-field image such that the single light-field image is substantially unaffected by the gaps.

**2.** The method of claim **1,** further comprising:

directing some of the incoming light to a preview camera; and:

with the preview camera, generating a preview image representative of the single light-field image.

**3.** The method of claim **2,** further comprising, prior to directing the incoming light along the optical path, calibrating at least one of the image capture device and the preview camera to align an attribute of the preview camera with a corresponding attribute of the image capture device, wherein the attribute is selected from:

an ISO setting;

a focus setting;

a zoom setting; and

an image crop setting.

**4.** The method of claim **1,** further comprising, prior to directing the incoming light along the optical path, calibrating the image capture device to mitigate differences in sensitivity between the image sensors.

**5.** The method of claim **1,** further comprising, prior to directing the incoming light along the optical path, calibrating the image capture device to mitigate at least one of:

hex noise patterns existing within the tapered fiber optic bundles;

fiber noise patterns existing within the tapered fiber optic bundles; and

fault line defects existing within the tapered fiber optic bundles.

**6.** The method of claim **1,** further comprising, prior to combining the image sensor data to define the single light-field image, transmitting the image sensor data to a plurality of servers;

wherein combining the image sensor data to define the single light-field image comprises combining the image sensor data at the plurality of servers.

**7.** The method of claim **1,** further comprising, after combining the image sensor data to define the single light-field image, performing one or more light-field image processing steps on the single light-field image.

**8.** The method of claim **1,** further comprising, prior to directing the incoming light along the optical path:

calibrating the image capture device to perform at least one of:

ISO calibration;

sensor dark current calibration;

64

dark fiber artifact removal;

sensor cropping;

grid warp calibration;

fault line artifact removal; and

after calibration of the image capture device, securing the microlens array relative to the image sensors.

**9.** The method of claim **1,** further comprising, prior to directing the incoming light along the optical path, calibrating the image capture device to perform at least one of:

calibrating an aperture versus a focal length of the main lens; and

capturing a white image for demodulation.

**10.** The method of claim **1,** further comprising, prior to directing the incoming light along the optical path, calibrating the image capture device to perform 2D geometry distortion correction by:

with the image capture device, capturing a calibration image of a checkerboard;

running a corner detection algorithm to detect corners of the checkerboard in the calibration image; and

running a grid fitting algorithm to define a reference grid fitted to the corners to generate vectors that can be used to generate an undistorted image from a distorted image.

**11.** The method of claim **1,** further comprising, prior to directing the incoming light along the optical path, calibrating the image capture device to perform 2D geometry distortion correction by:

with the image capture device, capturing a plurality of calibration images of a checkerboard, with the checkerboard incrementally offset in each successive image;

generating a plurality of product images by performing a pixel-by-pixel multiplication of one vertical line image and one horizontal line on each of the plurality of calibration images;

for each of the product images, calculating a center-of-mass of each of a plurality of box-shaped areas to generate a grid; and

for each of the grids, applying a global optimization routine to identify a reference grid that fits the grid to generate vectors that can be used to generate an undistorted image from a distorted image.

**12.** The method of claim **1,** further comprising, prior to directing the incoming light along the optical path, calibrating the image capture device by carrying out fault line artifact removal.

**13.** The method of claim **1,** further comprising, prior to directing the incoming light along the optical path, calibrating the image capture device by performing tapered fiber optic bundle image alignment to generate geometry transform data;

wherein combining the image sensor data generated by the image sensors to define the single light-field image comprises using the geometry transform data to stitch images of the image sensor data together.

**14.** The method of claim **1,** further comprising, prior to directing the incoming light along the optical path, calibrating the image capture device by generating a plurality of masks;

wherein combining the image sensor data generated by the image sensors to define the single light-field image comprises:

detecting seams between images of the image sensor data by finding center lines of each overlapping subregion between masks of adjacent image sensors; and

blending pixels proximate the seams.

US 10,565,734 B2

65 66

**15**. The method of claim **1**, further comprising, prior to directing the incoming light along the optical path, calibrating the image capture device by performing dark frame calibration for each of the image sensors.

**16**. The method of claim **1**, further comprising, prior to directing the incoming light along the optical path, calibrating the image capture device by performing flat-field calibration for each of the image sensors.

**17**. The method of claim **1**, further comprising, prior to combining the image sensor data generated by the image sensors to define the single light-field image, processing the image sensor data by applying at least one of white balancing, demosaicing, and chroma suppression.

**18**. The method of claim **1**, wherein combining the image sensor data generated by the image sensors to define the single light-field image comprises carrying out fiber artifact removal on the image sensor data.

**19**. The method of claim **1**, wherein combining the image sensor data generated by the image sensors to define the single light-field image comprises blending images of the sensor image data together.

**20**. The method of claim **1**, wherein combining the image sensor data generated by the image sensors to define the single light-field image comprises conducting seams artifact removal on the image sensor data.

**21**. The method of claim **1**, wherein combining the image sensor data generated by the image sensors to define the single light-field image comprises:

using the image sensor data to generate a single light-field; and

projecting the single light-field to generate the single light-field image.

**22**. The method of claim **1**, wherein combining the image sensor data generated by the image sensors to define the single light-field image comprises processing depth and projection.

**23**. A non-transitory computer-readable medium with instructions for capturing and processing image data through use of an image capture device configured to receive incoming light, the image capture device comprising:

a plurality of image sensors arranged in a pattern such that gaps exist between adjacent image sensors of the plurality of image sensors, wherein the plurality of image sensors includes a first image sensor and a second image sensor;

a main lens configured to direct incoming light along an optical path;

a microlens array positioned in the optical path to receive the incoming light;

a plurality of tapered fiber optic bundles configured to direct at least some of the incoming light to the plurality of image sensors, each tapered fiber optic bundle comprising a leading end positioned within the optical path, and a trailing end positioned proximate one of the plurality of image sensors, the leading end having a larger cross-sectional area than the trailing end, wherein the plurality of tapered fiber optic bundles includes:

a first tapered fiber optic bundle of a first length positioned proximate the first image sensor; and

a second tapered fiber optic bundle of a second length longer than the first length positioned proximate the second image sensor; and

a beam splitter to direct light from the main lens to the plurality of tapered fiber optic bundles, and wherein the tapered fiber optic bundles are arranged along a first plane and a second plane;

wherein the image sensors are configured to receive, through at least the first and second tapered fiber optic bundles, the incoming light to generate image sensor data; and

wherein the non-transitory computer-readable medium comprises instructions stored thereon, that when executed by a processor, combine the image sensor data generated by the image sensors including the first and second image sensors to define a single light-field image such that the single light-field image is substantially unaffected by the gaps.

**24**. The non-transitory computer-readable medium of claim **23**, wherein the image capture device further comprises a preview camera into which some of the incoming light is directed;

wherein the preview camera generates a preview image representative of the single light-field image;

and wherein the non-transitory computer-readable medium further comprises instructions stored thereon, that when executed by a processor, prior to directing the incoming light along the optical path, calibrate at least one of the image capture device and the preview camera to align an attribute of the preview camera with a corresponding attribute of the image capture device, wherein the attribute is selected from:

an ISO setting;

a focus setting;

a zoom setting; and

an image crop setting.

**25**. The non-transitory computer-readable medium of claim **23**, further comprising instructions stored thereon, that when executed by a processor, prior to directing the incoming light along the optical path, perform at least one of:

calibrating the image capture device to mitigate differences in sensitivity between the image sensors; and

calibrating the image capture device to mitigate at least one of:

hex noise patterns existing within the tapered fiber optic bundles;

fiber noise patterns existing within the tapered fiber optic bundles; and

fault line defects existing within the tapered fiber optic bundles.

**26**. The non-transitory computer-readable medium of claim **23**, further comprising instructions stored thereon, that when executed by a processor, prior to directing the incoming light along the optical path and prior to securing the microlens array relative to the image sensors, calibrate the image capture device to perform at least one of:

ISO calibration;

sensor dark current calibration;

dark fiber artifact removal;

sensor cropping;

grid warp calibration; and

fault line artifact removal.

**27**. The non-transitory computer-readable medium of claim **23**, further comprising instructions stored thereon, that when executed by a processor, prior to directing the incoming light along the optical path, calibrate the image capture device to perform at least one of:

calibrating an aperture versus a focal length of the main lens; and

capturing a white image for demodulation.

**28**. The non-transitory computer-readable medium of claim **23**, further comprising instructions stored thereon, that when executed by a processor, prior to directing the incom-

US 10,565,734 B2

67

ing light along the optical path, calibrate the image capture device to perform 2D geometry distortion correction by:

with the image capture device, capturing a calibration image of a checkerboard;

running a corner detection algorithm to detect corners of the checkerboard in the calibration image; and

running a grid fitting algorithm to define a reference grid fitted to the corners to generate vectors that can be used to generate an undistorted image from a distorted image.

**29**. The non-transitory computer-readable medium of claim **23**, further comprising instructions stored thereon, that when executed by a processor, prior to directing the incoming light along the optical path, calibrate the image capture device to perform 2D geometry distortion correction by:

with the image capture device, capturing a plurality of calibration images of a checkerboard, with the checkerboard incrementally offset in each successive image;

generating a plurality of product images by performing a pixel-by-pixel multiplication of one vertical line image and one horizontal line on each of the plurality of calibration images;

for each of the product images, calculating a center-of-mass of each of a plurality of box-shaped areas to generate a grid; and

for each of the grids, applying a global optimization routine to identify a reference grid that fits the grid to generate vectors that can be used to generate an undistorted image from a distorted image.

**30**. The non-transitory computer-readable medium of claim **23**, further comprising instructions stored thereon, that when executed by a processor, prior to directing the incoming light along the optical path, calibrate the image capture device by carrying out fault line artifact removal.

**31**. The non-transitory computer-readable medium of claim **23**, further comprising instructions stored thereon, that when executed by a processor, prior to directing the incoming light along the optical path, calibrate the image capture device by performing tapered fiber optic bundle image alignment to generate geometry transform data;

wherein combining the image sensor data generated by the image sensors to define the single light-field image comprises using the geometry transform data to stitch images of the image sensor data together.

**32**. The non-transitory computer-readable medium of claim **23**, further comprising instructions stored thereon, that when executed by a processor, prior to directing the incoming light along the optical path, calibrate the image capture device by generating a plurality of masks;

wherein combining the image sensor data generated by the image sensors to define the single light-field image comprises:

detecting seams between images of the image sensor data by finding center lines of each overlapping subregion between masks of adjacent image sensors; and

blending pixels proximate the seams.

**33**. The non-transitory computer-readable medium of claim **23**, further comprising instructions stored thereon, that when executed by a processor, prior to directing the incoming light along the optical path, calibrate the image capture device by performing at least one of:

dark frame calibration for each of the image sensors; and

flat-field calibration for each of the image sensors.

**34**. The non-transitory computer-readable medium of claim **23**, further comprising instructions stored thereon, that when executed by a processor, prior to combining the image

68

sensor data generated by the image sensors to define the single light-field image, process the image sensor data by applying at least one of white balancing, demosaicing, and chroma suppression.

**35**. The non-transitory computer-readable medium of claim **23**, wherein combining the image sensor data generated by the image sensors to define the single light-field image comprises at least one of:

carrying out fiber artifact removal on the image sensor data;

blending images of the sensor image data together; and

conducting seams artifact removal on the image sensor data.

**36**. The non-transitory computer-readable medium of claim **23**, wherein combining the image sensor data generated by the image sensors to define the single light-field image comprises:

using the image sensor data to generate a single light-field; and

projecting the single light-field to generate the single light-field image.

**37**. The method of claim **1**, wherein the image capture device further comprises a face plate having a first face plate length and a second face plate length different from the first face plate length, and wherein a leading end of the first tapered fiber optic bundle is positioned proximate a portion of the face plate having the first face plate length and a leading end of the second tapered fiber optic bundle is positioned proximate a portion of the face plate having the second face plate length.

**38**. The method of claim **1**, wherein the microlens array is divided into at least two strips and is secured relative to the plurality of tapered fiber optic bundles.

**39**. The method of claim **1**, wherein the tapered fiber optic bundles are bonded together and polished to provide a polished fiber face plate surface.

**40**. A device for capturing and processing image data, the device comprising:

a plurality of image sensors arranged in a pattern such that gaps exist between adjacent image sensors of the plurality of image sensors, wherein the plurality of image sensors includes a first image sensor and a second image sensor;

a main lens;

a microlens array;

a plurality of tapered fiber optic bundles, each of which includes a leading end positioned within an optical path, and a trailing end positioned proximate one of the plurality of image sensors, the leading end having a larger cross-sectional area than the trailing end, wherein the plurality of tapered fiber optic bundles includes:

a first tapered fiber optic bundle of a first length positioned proximate the first image sensor;

a second tapered fiber optic bundle of a second length longer than the first length positioned proximate the second image sensor; and

a beam splitter to direct light from the main lens to the plurality of tapered fiber optic bundles, and wherein the tapered fiber optic bundles are arranged along a first plane and a second plane; and

wherein:

the main lens directs incoming light along the optical path through the microlens array and through the tapered fiber optic bundles including the first and second tapered fiber optic bundles to the image sensors;

US 10,565,734 B2

69          70

the first image sensor and the second image sensor generate image sensor data; and

the device combines the image sensor data generated by the first and second image sensors to define a single light-field image such that the single light-field image is substantially unaffected by the gaps between adjacent image sensors.

41. The device of claim **40**, wherein combining the image sensor data generated by the first and second image sensors includes carrying out fiber artifact removal on the image sensor data.

42. The device of claim **40**, wherein combining the image sensor data generated by the first and second image sensors includes blending images of the sensor image data together.

43. The device of claim **40**, wherein combining the image sensor data generated by the first and second image sensors includes conducting seams artifact removal on the image sensor data.

* * * * *

EXHIBIT D

**Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.
**From:** alan@jones.how
**Date:** 2/27/2026, 4:53 PM
**To:** Light Field Lab <lightfieldlab@cmbginc.com>
**CC:** Light Field Lab <lightfieldlab@cmbginc.com>,Mathew Sakhai <mathew@cmbginc.com>

Hi Tanya,

Just following up — I've now sent through the individual requests I mentioned. Each one is in a separate email to make it straightforward for your team to track and respond to independently.

One small note — I noticed the reference to "the patent" in your last message. As the documents I filed make clear, the issues raised affect nearly the entire patent portfolio, not a single patent. The provisional applications at the foundation of the portfolio were filed while the inventors were employed at Lytro, and the material omissions to the USPTO flow through to the family of patents that followed. So this will need to be addressed more broadly than a single patent. I just want to make sure there's no misunderstanding on the scope before Mathew gets too far into his review.

The documents themselves cover this in detail, but if anything is unclear, I'm happy to address specific questions in writing.

Cheers,

Alan


Feb 27, 2026, 16:20 by alan@jones.how:

Hi Tanya,

Thank you for the update. I'm glad to hear Mathew has been reviewing the documents and is hoping to provide a resolution.

Given the number of distinct topics involved, I think these are best addressed in writing so that both sides have a clear record and nothing gets lost. A call covering this many items would be difficult to track accurately, and written responses will allow me to review each point carefully and respond appropriately.

To that end, and to help with the requests I've already made in this thread regarding the Fee Agreement, fee letter, and other information I'm entitled to as a creditor and equity holder, I'll be sending through specific and independent requests for each item separately. My hope is that this makes it easier for your team to track, assign, and respond to each one individually rather than having everything bundled together.

I look forward to receiving Mathew's written responses and any documentation he's able

to provide.

Cheers,

Alan

Feb 27, 2026, 16:15 by lightfieldlab@cmbginc.com:

> Hi Alan,
>
> Yes, Mathew was looking over the documents and wanted to address each one of your claims and requests + talk about what next steps would look like on the patent you mentioned, so it would likely be easier to chat live with Stephen and Mathew together so that any documentation for the patent can be handled in an efficient manner as there will be paperwork involved. There were many requests in the documents you sent over, and Mathew is hoping to provide a resolution.
>
> Please let us know your availability to discuss.
>
>
>
> Tanya Davis
> CMBG FBC-Light Field Lab LLC
> CMBG Advisors, Inc.
> Restructuring Officer
> 3019 Wilshire Blvd, Suite 142
> Santa Monica, CA 90403
> P: (310) 933-3310
> F: (310) 402-2929
> E: lightfieldlab@cmbginc.com
>
> For the latest updates, visit [Assignment Landing Page](Assignment Landing Page)
>
> _____
>
> **From:** Alan Jones <alan@jones.how>
> **Sent:** Thursday, February 26, 2026 1:41 PM
> **To:** Light Field Lab <lightfieldlab@cmbginc.com>
> **Cc:** Light Field Lab <lightfieldlab@cmbginc.com>; Mathew Sakhai <mathew@cmbginc.com>
> **Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.
>
> Hi Tanya,
>
> Could Mathew please prepare an agenda and any open questions. I don't know of any concerns on my end, the claims are well covered in the documents.

I'm not sure there's enough to warrant my spending on legal counsel and I'm not comfortable doing so without a clear understanding of what issues you have.

Documents covering your concerns and proposals for various options you'd like considered for moving forward would assist me greatly in determining what's appropriate and ensuring any information you need is available.

Also, I've not yet received a copy of the Free Agreement or fee letter. Could you please provide those?

Cheers,

Alan


Feb 26, 2026, 13:35 by lightfieldlab@cmbginc.com:

> Hi Alan,
>
> The call would be between you, Stephen Henry and Mathew Sakhai, who is copied. The plan is to address any questions or concerns you have, discuss the patents, next steps, and how best to move forward.
>
> Thank you,
>
> Tanya Davis
> CMBG FBC-Light Field Lab LLC
> CMBG Advisors, Inc.
> Restructuring Officer
> 3019 Wilshire Blvd, Suite 142
> Santa Monica, CA 90403
> P: (310) 933-3310
> F: (310) 402-2929
> E: lightfieldlab@cmbginc.com
>
> For the latest updates, visit Assignment Landing Page
>
> _____
>
> **From:** Alan Jones <alan@jones.how>
> **Sent:** Thursday, February 26, 2026 1:12 PM
> **To:** Light Field Lab <lightfieldlab@cmbginc.com>
> **Cc:** Light Field Lab <lightfieldlab@cmbginc.com>; Mathew Sakhai <mathew@cmbginc.com>
> **Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Hi Tanya,

Thanks, I've been handling the claims myself. Though if you could provide me some notes so that I can chat with Stephen, then organize a time for your counsel to meet with him.

Who should I be having him reach out to for handing this? Would that be James Baer as in house legal counsel?

Cheers,

Alan

Feb 26, 2026, 13:09 by lightfieldlab@cmbginc.com:

> Hi Alan,
>
> Our office began reviewing the documents you submitted. I understand you are represented by Stephen Henry in this matter, so I think it would be productive if you and your attorney hopped on a call with our in-house counsel to talk through next steps and how we can best address the situation. If you would like to provide some times that you and Stephen are available, we'll get something on the books at a mutually available time.
>
> Thank you,
>
> Tanya Davis
> CMBG FBC-Light Field Lab LLC
> CMBG Advisors, Inc.
> Restructuring Officer
> 3019 Wilshire Blvd, Suite 142
> Santa Monica, CA 90403
> P: (310) 933-3310
> F: (310) 402-2929
> E: lightfieldlab@cmbginc.com
>
> For the latest updates, visit Assignment Landing Page

**From:** Alan Jones <alan@jones.how>
**Sent:** Wednesday, February 25, 2026 7:56 PM
**To:** Light Field Lab <lightfieldlab@cmbginc.com>
**Cc:** Light Field Lab <lightfieldlab@cmbginc.com>; Mathew Sakhai <mathew@cmbginc.com>
**Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Hi Tanya,

Most appreciated. Section 2 of the General Assignment also referenced a Fee Agreement which was has not been disclosed to me yet. It is also referenced as the "Fee Letter". As I am an equity holder, could you please provide me a copy of said letter and agreement.

Please also provide any other documents I am entitled to which have not yet been disclosed.

Cheers,

Alan


Feb 23, 2026, 11:25 by lightfieldlab@cmbginc.com:

> Hi Alan,
>
> Please be advised that your claims are still under legal review and may require additional information prior to approval.
>
> The claim numbers are listed below:
>
> Proof of Interest - #11322616436
> Proof of Claim #1 - #11322616376
> Proof of Claim #2 - #11322632845
> Proof of Claim #3 - #11322616557
>
> Thank you,
>
> Tanya Davis
> CMBG FBC-Light Field Lab LLC
> CMBG Advisors, Inc.
> Restructuring Officer
> 3019 Wilshire Blvd, Suite 142
> Santa Monica, CA 90403

P: (310) 933-3310
F: (310) 402-2929
E: lightfieldlab@cmbginc.com

For the latest updates, visit [Assignment Landing Page](#)

---

**From:** Alan Jones <alan@jones.how>
**Sent:** Friday, February 20, 2026 5:39 PM
**To:** Light Field Lab <lightfieldlab@cmbginc.com>
**Cc:** Light Field Lab <lightfieldlab@cmbginc.com>; Mathew Sakhai <mathew@cmbginc.com>
**Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Hi Tanya,

Most appreciated. Happy to answer any questions. Could you please provide claim numbers for them.

Cheers,

Alan

Feb 20, 2026, 13:50 by lightfieldlab@cmbginc.com:

> Hi Alan,
>
> We have received your claim forms and are currently reviewing them. We will reach out with any additional questions.
>
> Thank you,
>
> Tanya Davis
> CMBG FBC-Light Field Lab LLC
> CMBG Advisors, Inc.
> Restructuring Officer
> 3019 Wilshire Blvd, Suite 142
> Santa Monica, CA 90403
> P: (310) 933-3310
> F: (310) 402-2929

E: lightfieldlab@cmbginc.com

For the latest updates, visit Assignment Landing Page

---

**From:** Alan Jones <alan@jones.how>
**Sent:** Wednesday, February 18, 2026 9:09 AM
**To:** Light Field Lab <lightfieldlab@cmbginc.com>
**Subject:** Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Hi James,

Please find attached my claims, proof of interest, and formal notices in connection with the Assignment for the Benefit of Creditors of Light Field Lab, Inc. (Date of Assignment: August 15, 2025).

The following documents are attached to this email:

**Claims and Statements:**
- Cover Letter
- Proof of Claim #1 -- Crime Victim Claim (Form + Statement)
- Proof of Claim #2 -- Wrongful Termination (Form + Statement)
- Proof of Claim #3 -- Source Code / IP Reclamation (Form + Statement)
- Proof of Interest -- Equity Claim (Form + Statement)

**Formal Notices:**
- Notice A -- Fraud-Tainted Patent Portfolio
- Notice B -- Constructive Trust Over Source Code / IP
- Notice C -- Reserve Funds / Pending Litigation

**Supporting Documentation:**
- Stock Certificates CS-13, CS-14, and CS-15
- First Amended Complaint, Jones v. Light Field Lab Inc., Case No. 3:25-cv-05118-MMC (N.D. Cal.)
- LinkedIn profiles for Jon Karafin and Brendan Bevensee

The cover letter also references two full patents as supporting documentation (US10488584 and US10565734). These are not attached to this email due to file size. A complete copy of all documents including the patents is available at:

https://www.dropbox.com/scl/fi/ueqe19z9ugn8fderjg2vz/LightFieldLab-Claims-AlanJones.zip?rlkey=g0hs7ch1yp21dzh1u9m5a2jwy&dl=0

Alternatively, I can provide instructions for obtaining these patents directly from the USPTO if preferred.

Please acknowledge receipt of this filing promptly.

Regards,

Alan Jones
318-759-7497
alan@jones.how

EXHIBIT E

# Formal Demand – Fee Agreement and Fee Letter

### Alan Jones, Creditor – Assignment for Benefit of Creditors of Light Field Lab, Inc.

February 2026

**FROM:** Alan Jones
16406 270th Pl NE
Duvall, WA 98019
318-759-7497
alan@jones.how

**TO:** CMBG FBC-Light Field Lab LLC
Assignee for the Benefit of Creditors of Light Field Lab, Inc.
3019 Wilshire Blvd Suite 142
Santa Monica, CA 90403
Email: lightfieldlab@cmbginc.com

**DATE:** February 27, 2026

**RE:** Assignment for the Benefit of Creditors of Light Field Lab, Inc. (Date of Assignment: August 15, 2025)

---

This communication is without prejudice and nothing herein constitutes a waiver of any rights or claims.

---

To the Assignee, CMBG FBC-Light Field Lab LLC:

I am writing as a creditor of Light Field Lab, Inc. to formally demand production of the Fee Agreement and any associated fee letter(s) between CMBG FBC-Light Field Lab LLC (the "Assignee") and Light Field Lab, Inc. (the "Assignor"), or any other party, governing the Assignee's compensation in this assignment proceeding.

## Basis for This Demand

The Assignee serves as a fiduciary to the creditors of the estate. The fee arrangement directly affects the value available for distribution to creditors. Creditors are entitled to understand the terms under which estate assets are being used to compensate the fiduciary administering those assets on their behalf.

## Documents Requested

1. The complete, unredacted Fee Agreement between the Assignee and the Assignor (or any other party) governing the Assignee's engagement in this proceeding.

2. Any fee letter, engagement letter, retainer agreement, or side letter that supplements, modifies, or relates to the Assignee's compensation.

3. Any amendments or modifications to the fee arrangement made since the execution of the Assignment Agreement on August 15, 2025.

4. A current accounting of all fees and expenses charged by the Assignee to date, including the basis for each charge.

## Prior Requests

I requested a copy of the Fee Agreement and Fee Letter on February 25, 2026, and again on February 26, 2026. Neither request has been addressed. I am now making this demand as a standalone formal request to ensure it receives a direct and timely response.

## Response Requested

Please provide the requested documents within seven (7) days. If you believe any portion of this request is not appropriate, please identify the specific document or category and the specific basis for your position so that I may respond.

Regards,

Alan Jones
alan@jones.how

# Formal Demand – Complete Asset Inventory and Disposition Report

## Alan Jones, Creditor – Assignment for Benefit of Creditors of Light Field Lab, Inc.

February 2026

**FROM:** Alan Jones
16406 270th Pl NE
Duvall, WA 98019
318-759-7497
alan@jones.how

**TO:** CMBG FBC-Light Field Lab LLC
Assignee for the Benefit of Creditors of Light Field Lab, Inc.
3019 Wilshire Blvd Suite 142
Santa Monica, CA 90403
Email: lightfieldlab@cmbginc.com

**DATE:** February 27, 2026

**RE:** Assignment for the Benefit of Creditors of Light Field Lab, Inc. (Date of Assignment: August 15, 2025)

---

This communication is without prejudice and nothing herein constitutes a waiver of any rights or claims.

---

To the Assignee, CMBG FBC-Light Field Lab LLC:

I am writing as a creditor of Light Field Lab, Inc. to formally demand a complete accounting of the assets of the estate and their disposition.

## Basis for This Demand

The Assignee is a fiduciary to the creditors of the estate with a duty to administer the assigned assets fairly and transparently. The status updates published at sites.google.com/view/abc-light-field-lab/status-updates indicate that the Assignee has conducted multiple sales of estate assets through individual sales and an auction process, with final sale documents reportedly nearing completion as of January 14, 2026. As a creditor with substantial claims against the estate, I am entitled to understand what assets were held, what has been sold, for how much, and what remains.

## Information Requested

1. **Complete Asset Inventory:** A detailed list of every asset transferred to the Assignee under the Assignment Agreement, including but not limited to: tangible property, equipment, inventory, intellectual property (patents, trade secrets, source code, software, proprietary technology), accounts receivable, contract rights, and any other property of any kind.

2. **Disposition Report:** For every asset that has been sold, transferred, licensed, abandoned, or otherwise disposed of, the following:

- Description of the asset
- Identity of the purchaser or transferee (full legal name and principal address)
- Date of sale or transfer
- Sale price or other consideration received
- Method of sale (auction, private sale, negotiated transaction, or other)

3. **Remaining Assets:** A list of any assets that remain unsold or undisposed of as of the date of response.

4. **Total Proceeds:** The total gross proceeds realized from all asset sales to date, and the current cash balance of the estate after deducting the Assignee's fees and expenses.

5. **Valuation:** Any appraisals, valuations, or assessments obtained by the Assignee in connection with the marketing or sale of estate assets.

## Prior Requests

On February 25, 2026, I requested that the Assignee provide all documents I am entitled to as an equity holder and creditor which had not yet been disclosed. This demand provides specific detail regarding the information encompassed by that request, and formalizes it as a standalone demand for clarity and ease of response.

## Response Requested

Please provide the requested information within seven (7) days. If you believe any portion of this request is not appropriate, please identify the specific item and the specific basis for your position.

Regards,

Alan Jones
alan@jones.how

# Formal Demand – Identity of All Purchasers and Affiliated Party Disclosure

Alan Jones, Creditor – Assignment for Benefit of Creditors of Light Field Lab, Inc.

February 2026

**FROM:** Alan Jones
16406 270th Pl NE
Duvall, WA 98019
318-759-7497
alan@jones.how

**TO:** CMBG FBC-Light Field Lab LLC
Assignee for the Benefit of Creditors of Light Field Lab, Inc.
3019 Wilshire Blvd Suite 142
Santa Monica, CA 90403
Email: lightfieldlab@cmbginc.com

**DATE:** February 27, 2026

**RE:** Assignment for the Benefit of Creditors of Light Field Lab, Inc. (Date of Assignment: August 15, 2025)

---

This communication is without prejudice and nothing herein constitutes a waiver of any rights or claims.

---

To the Assignee, CMBG FBC-Light Field Lab LLC:

I am writing as a creditor of Light Field Lab, Inc. to formally demand disclosure of the identity of all purchasers of estate assets and any affiliations those purchasers may have with the Assignor's principals.

## Basis for This Demand

The Assignee owes a fiduciary duty to creditors that includes conducting asset sales in a commercially reasonable manner and avoiding self-dealing or transactions that favor insiders at the expense of creditors. Where estate assets are sold to persons or entities affiliated with the Assignor's officers, directors, shareholders, investors, or counsel, the integrity of the sale process is called into question. Creditors are entitled to evaluate whether any such conflicts exist.

My claims filed in this proceeding include allegations that the Assignor's core intellectual property assets were obtained through fraud. Sales of those assets to affiliated parties would raise serious concerns about the propriety of the transactions and the Assignee's discharge of its fiduciary obligations.

## Information Requested

For every entity or individual that has purchased, licensed, or otherwise acquired any asset from the estate:

1. The full legal name, principal business address, and state of formation or residence.

2. The name(s) of the principal owners, officers, directors, or managing members of the purchasing entity.

3. Whether, to the Assignee's knowledge, any purchaser is affiliated with, controlled by, managed by, or has any business, employment, investment, or familial relationship with any of the following:

   - Any current or former officer or director of Light Field Lab, Inc., including but not limited to Jon Karafin, Brendan Bevensee, or Ed Ibe
   - Any current or former employee of Light Field Lab, Inc.
   - Any shareholder, investor, or venture capital firm that held equity in Light Field Lab, Inc.
   - Any counsel who has represented Light Field Lab, Inc. in any capacity

4. Whether any purchaser was identified or introduced to the Assignee by any officer, director, shareholder, investor, or counsel of Light Field Lab, Inc.

5. Whether any purchaser had any pre-existing relationship or communications with Light Field Lab, Inc. or its principals prior to the commencement of the ABC proceeding.

## Prior Requests

On February 25, 2026, I requested that the Assignee provide all documents I am entitled to as an equity holder and creditor which had not yet been disclosed. This demand provides specific detail regarding the information encompassed by that request, and formalizes it as a standalone demand for clarity and ease of response.

## Response Requested

Please provide the requested information within seven (7) days. If you believe any portion of this request is not appropriate, please identify the specific item and the specific basis for your position.

Regards,

Alan Jones
alan@jones.how

# Formal Demand – Intellectual Property Asset Disposition

## Alan Jones, Creditor – Assignment for Benefit of Creditors of Light Field Lab, Inc.

### February 2026

**FROM:** Alan Jones
16406 270th Pl NE
Duvall, WA 98019
318-759-7497
alan@jones.how

**TO:** CMBG FBC-Light Field Lab LLC
Assignee for the Benefit of Creditors of Light Field Lab, Inc.
3019 Wilshire Blvd Suite 142
Santa Monica, CA 90403
Email: lightfieldlab@cmbginc.com

**DATE:** February 27, 2026

**RE:** Assignment for the Benefit of Creditors of Light Field Lab, Inc. (Date of Assignment: August 15, 2025)

---

This communication is without prejudice and nothing herein constitutes a waiver of any rights or claims.

---

To the Assignee, CMBG FBC-Light Field Lab LLC:

I am writing as a creditor of Light Field Lab, Inc. to formally demand a specific accounting of the disposition of all intellectual property assets of the estate.

## Basis for This Demand

My claims filed in this proceeding include detailed allegations, supported by evidence, that material patents in Light Field Lab's portfolio were obtained through inequitable conduct before the United States Patent and Trademark Office. Specifically, the claims allege that patent applications were filed with material omissions of prior art — including the inventors' own substantially identical work filed while employed at Lytro, Inc. — in violation of the duty of candor under 37 C.F.R. § 1.56. These allegations bear directly on the value, validity, and rightful ownership of the IP assets that constitute a significant portion of the estate.

The Assignee has a fiduciary duty to creditors that includes properly investigating claims against estate assets before disposing of them, particularly where a creditor has provided specific evidence that those assets may be encumbered, invalid, or subject to third-party ownership claims.

## Information Requested

1. **Patent Portfolio:** A complete list of every patent and patent application transferred to the Assignee, identified by patent number or application number, title, and named inventors. For each, please identify whether it has been sold, licensed, abandoned, or remains held by the estate, and if sold or licensed, the identity of the purchaser or licensee and the consideration received.

2. **Trade Secrets and Proprietary Technology:** A description of any trade secret materials, proprietary technology, technical documentation, research data, prototypes, or similar assets transferred to the Assignee, and their current disposition.

3. **Source Code and Software:** An inventory of all source code, software, firmware, and related materials transferred to the Assignee, including version control repositories, development tools, and associated documentation. For each, the current disposition and the identity of any purchaser or licensee.

4. **Licensing Agreements:** Copies of, or a summary of the material terms of, any license agreements entered into by the Assignee with respect to any intellectual property of the estate, whether granted to or received from third parties.

5. **IP Valuation:** Any appraisals, valuations, or assessments of the intellectual property portfolio obtained by the Assignee, including the identity of any appraiser or expert engaged.

6. **Notice of Claims:** Whether the Assignee disclosed my claims, or the substance of the allegations regarding patent validity, to any purchaser or licensee of the IP assets prior to completing the sale or license.

## Relevance to Creditor Claims

If any IP assets were sold without disclosure to the purchaser that a creditor had filed claims alleging the underlying patents were obtained through fraud, this raises questions about the Assignee's discharge of its fiduciary duty and the commercial reasonableness of the transactions. Purchasers who acquired patents without knowledge of the fraud allegations may have claims of their own against the estate, further complicating distributions.

## Prior Requests

On February 25, 2026, I requested that the Assignee provide all documents I am entitled to as an equity holder and creditor which had not yet been disclosed. This demand provides specific detail regarding the information encompassed by that request, and formalizes it as a standalone demand for clarity and ease of response.

## Response Requested

Please provide the requested information within seven (7) days. If you believe any portion of this request is not appropriate, please identify the specific item and the specific basis for your position.

Regards,

Alan Jones
alan@jones.how

# Formal Demand – Communications with Light Field Lab Principals Regarding Disposition of Assets

Alan Jones, Creditor – Assignment for Benefit of Creditors of Light Field Lab, Inc.

February 2026

**FROM:** Alan Jones
16406 270th Pl NE
Duvall, WA 98019
318-759-7497
alan@jones.how

**TO:** CMBG FBC-Light Field Lab LLC
Assignee for the Benefit of Creditors of Light Field Lab, Inc.
3019 Wilshire Blvd Suite 142
Santa Monica, CA 90403
Email: lightfieldlab@cmbginc.com

**DATE:** February 27, 2026

**RE:** Assignment for the Benefit of Creditors of Light Field Lab, Inc. (Date of Assignment: August 15, 2025)

---

This communication is without prejudice and nothing herein constitutes a waiver of any rights or claims.

---

To the Assignee, CMBG FBC-Light Field Lab LLC:

I am writing as a creditor of Light Field Lab, Inc. to formally demand disclosure of communications between the Assignee and the principals or counsel of Light Field Lab, Inc. concerning my claims or the disposition of intellectual property assets.

## Basis for This Demand

The Assignee is a fiduciary to the creditors of the estate — not to the Assignor or its principals. While the Assignee may reasonably communicate with the Assignor's officers, directors, and counsel for purposes of administering the estate, those communications must not result in the Assignor's principals influencing the adjudication of creditor claims or the disposition of estate assets in a manner that favors their own interests over those of creditors.

My claims allege that the Assignor's principals engaged in patent fraud and related misconduct. Those same principals have a direct personal interest in how the Assignee handles these claims and in the disposition of the IP assets at the center of the allegations. Transparency regarding these communications is essential to ensuring the Assignee's independence.

## Information Requested

1. Whether the Assignee, or any person acting on behalf of the Assignee (including James Baer or Mathew Sakhai), has communicated with any of the following individuals or their representatives regarding my claims, the substance of my allegations, or any proposed resolution or disposition related to my claims:

   - Jon Karafin (CEO)
   - Brendan Bevensee (CTO)
   - Ed Ibe (COO)
   - Any member of the Board of Directors of Light Field Lab, Inc.
   - Sara Moore or any attorney at Gordon Rees Scully Mansukhani LLP
   - Patricia Peden or any attorney involved in Light Field Lab's patent prosecution
   - Any investor or representative of any venture capital firm that held equity in Light Field Lab, Inc.

2. If any such communications occurred, the dates, participants, and general subject matter of each communication.

3. Whether any officer, director, counsel, or investor of Light Field Lab, Inc. provided input, recommendations, or direction to the Assignee regarding:

   - The evaluation, acceptance, or rejection of my claims
   - The sale or licensing of intellectual property assets
   - The proposed call or any other engagement with me
   - Any proposed resolution, settlement, or disposition of my claims

4. Whether the Assignee has shared my claims, notices, or any correspondence from me with any officer, director, counsel, or investor of Light Field Lab, Inc., and if so, with whom and on what dates.

## Why This Matters

If the Assignor's principals — who are personally named defendants in the related litigation and who have a direct personal interest in suppressing my claims — are influencing the Assignee's handling of those claims, this would constitute a fundamental conflict of interest and a breach of the Assignee's fiduciary duty to the creditor body.

## Prior Requests

On February 25, 2026, I requested that the Assignee provide all documents I am entitled to as an equity holder and creditor which had not yet been disclosed. This demand provides specific detail regarding the information encompassed by that request, and formalizes it as a standalone demand for clarity and ease of response.

## Response Requested

Please provide the requested information within seven (7) days. If you believe any portion of this request is not appropriate, please identify the specific item and the specific basis for your position.

Regards,

Alan Jones
alan@jones.how

**Subject:** Formal Demand -- Asset Inventory and Disposition Report -- Alan Jones -- ABC of Light Field Lab, Inc.
**From:** alan@jones.how
**Date:** 2/27/2026, 4:46 PM
**To:** James K. Baer <lightfieldlab@cmbginc.com>

Dear Assignee:

Please find attached a formal demand for a complete asset inventory and disposition report for the estate.

This is one of several individual demand letters, each addressing a distinct category of information. Separating these requests is intended to facilitate organized tracking and response on both sides.

This demand requests a response within seven (7) days. If you have any questions regarding this request, please do not hesitate to reach out.

Regards,

Alan Jones
318-759-7497
alan@jones.how

---

Attachments:

Demand_2_Asset_Inventory.pdf                                      0 bytes

**Subject:** Formal Demand -- Communications with LFL Principals Regarding Disposition of Assets -- Alan Jones -- ABC of Light Field Lab, Inc.
**From:** alan@jones.how
**Date:** 2/27/2026, 4:47 PM
**To:** James K. Baer <lightfieldlab@cmbginc.com>

Dear Assignee:

Please find attached a formal demand for disclosure of communications between the Assignee and the principals or counsel of Light Field Lab, Inc. concerning the disposition of estate assets and the handling of my claims.

This is one of several individual demand letters. Each addresses a distinct category of information and is separated to allow for independent tracking and response.

This demand requests a response within seven (7) days. If you have any questions regarding this request, please do not hesitate to reach out.

Regards,

Alan Jones
318-759-7497
alan@jones.how

---

Attachments:

Demand_5_Communications.pdf                                          0 bytes

**Subject:** Formal Demand -- Fee Agreement and Fee Letter -- Alan Jones -- ABC of Light Field Lab, Inc.
**From:** alan@jones.how
**Date:** 2/27/2026, 4:45 PM
**To:** James K. Baer <lightfieldlab@cmbginc.com>

Dear Assignee:

Please find attached a formal demand for production of the Fee Agreement and fee letter governing the Assignee's compensation in this proceeding.

I have separated my outstanding requests into individual demand letters so that each may be tracked and responded to independently. Each addresses a distinct category of information to which I believe I am entitled as a creditor and equity holder of the estate.

This demand requests a response within seven (7) days. If you have any questions regarding this request, please do not hesitate to reach out.

Regards,

Alan Jones
318-759-7497
alan@jones.how

---

Attachments:

Demand_1_Fee_Agreement.pdf                                    0 bytes

**Subject:** Formal Demand -- Intellectual Property Asset Disposition -- Alan Jones -- ABC of Light Field Lab, Inc.
**From:** alan@jones.how
**Date:** 2/27/2026, 4:47 PM
**To:** James K. Baer <lightfieldlab@cmbginc.com>

Dear Assignee:

Please find attached a formal demand for a specific accounting of the disposition of all intellectual property assets of the estate, including the patent portfolio, trade secrets, source code, and related materials.

This is one of several individual demand letters. Each addresses a distinct category of information and is separated to allow for independent tracking and response.

This demand requests a response within seven (7) days. If you have any questions regarding this request, please do not hesitate to reach out.

Regards,

Alan Jones
318-759-7497
alan@jones.how

---

Attachments:

Demand_4_IP_Disposition.pdf                                          0 bytes

**Subject:** Formal Demand -- Purchaser Identity and Affiliated Party Disclosure -- Alan Jones -- ABC of Light Field Lab, Inc.
**From:** alan@jones.how
**Date:** 2/27/2026, 4:46 PM
**To:** James K. Baer <lightfieldlab@cmbginc.com>

Dear Assignee:

Please find attached a formal demand for disclosure of the identity of all purchasers of estate assets and any affiliations those purchasers may have with the Assignor's principals.

This is one of several individual demand letters. Each addresses a distinct category of information and is separated to allow for independent tracking and response.

This demand requests a response within seven (7) days. If you have any questions regarding this request, please do not hesitate to reach out.

Regards,

Alan Jones
318-759-7497
alan@jones.how

---

Attachments:

Demand_3_Purchaser_Identity.pdf                                    0 bytes

EXHIBIT F

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC      Document 52-1      Filed 03/11/26      Page 321 of 810

**Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.
**From:** Mathew Sakhai <mathew@cmbginc.com>
**Date:** 3/5/2026, 4:16 PM
**To:** Alan Jones <alan@jones.how>, Light Field Lab <lightfieldlab@cmbginc.com>

Hi Alan,

It's a pleasure to meet you via email. I received permission from your attorney Stephen to speak directly with you, which was necessary because as Tanya mentioned I am counsel as well, so thank you for your patience while we crossed our T's and dotted our I's.

I spoke with Stephen back in October 2025 following our office's receipt of his letter regarding notice of the ABC that commenced. The letter referenced two patents and noted that an additional patent was going to be added to your complaint against the former officers of Light Field Lab Inc. As I noted to Stephen, it appeared that the two WO patents were not listed on the asset list that was transferred to the Assignee, but the US patent referenced (US10488584) (the "US Patent") was, so we would not dispose of it without touching base with him. The letter we received from Stephen asked us only to not dispose of the patents referenced in the letter, which I relayed we intended to (and did) comply with.

As part of the Assignee's fiduciary duties, the Assignee made great effort to liquidate the assets, and the LFL patent portfolio was an asset that needed to be liquidated. Our team looked into the US Patent referenced in Stephen's letter and determined it was not tied to the core LFL technology, so we marketed the patent portfolio (as we were required to do) without the US Patent included. The two WO patents were not on the assigned asset list, so they would not have been marketed with the portfolio anyway. The patent portfolio was transferred pursuant to a sale approved by the senior secured creditor who had a first-priority lien on all LFL assets. The US Patent was carved out and not included in the sale.

It is my understanding that you still have pending litigation against the former LFL officers, which I believe is your main concern, and we are not standing in the way of that. The Assignee does not have any independent knowledge about what went on between you and the former LFL officers as I believe your claims arose long before the Assignee came into the picture, so we will let you resolve any matter you have with the former officers directly with them. I'd like to stick to the relevant matters with your claim that we can help with, so because the US Patent remains in the ABC estate, and was not included in the patent portfolio sale, if it would be helpful to you, the Assignee would be willing to transfer whatever rights it may hold in the US Patent to you pursuant to a customary patent assignment and release agreement. My effort here is to resolve the relevant matters that we can actually help with and move this forward in a productive manner, so if that is something you are interested in pursuing, I would be happy to coordinate the documentation.

Thank you,

_____

**Mathew Sakhai**
**CMBG ADVISORS, INC.**
3019 Wilshire Blvd., Suite 142
Santa Monica, CA 90403

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC     Document 52-1     Filed 03/11/26     Page 322 of 810

**D:** (310) 860-6375 | **F:** (310) 402-2929

**E:** mathew@cmbginc.com | www.cmbginc.com



Confidentiality Notice: The information contained in this electronic e-mail and any accompanying attachment(s) is intended only for the use of the intended recipient and may be confidential and/or privileged. If any reader of this communication is not the intended recipient, unauthorized use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error, please immediately notify the sender by return e-mail, and delete the original message and all copies from your system. Thank you.

---

**From:** Alan Jones <alan@jones.how>
**Sent:** Friday, February 27, 2026 4:53 PM
**To:** Light Field Lab <lightfieldlab@cmbginc.com>
**Cc:** Light Field Lab <lightfieldlab@cmbginc.com>; Mathew Sakhai <mathew@cmbginc.com>
**Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Hi Tanya,

Just following up — I've now sent through the individual requests I mentioned. Each one is in a separate email to make it straightforward for your team to track and respond to independently.

One small note — I noticed the reference to "the patent" in your last message. As the documents I filed make clear, the issues raised affect nearly the entire patent portfolio, not a single patent. The provisional applications at the foundation of the portfolio were filed while the inventors were employed at Lytro, and the material omissions to the USPTO flow through to the family of patents that followed. So this will need to be addressed more broadly than a single patent. I just want to make sure there's no misunderstanding on the scope before Mathew gets too far into his review.

The documents themselves cover this in detail, but if anything is unclear, I'm happy to address specific questions in writing.

Cheers,

Alan


Feb 27, 2026, 16:20 by alan@jones.how:

Hi Tanya,

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 323 of 810

Thank you for the update. I'm glad to hear Mathew has been reviewing the documents and is hoping to provide a resolution.

Given the number of distinct topics involved, I think these are best addressed in writing so that both sides have a clear record and nothing gets lost. A call covering this many items would be difficult to track accurately, and written responses will allow me to review each point carefully and respond appropriately.

To that end, and to help with the requests I've already made in this thread regarding the Fee Agreement, fee letter, and other information I'm entitled to as a creditor and equity holder, I'll be sending through specific and independent requests for each item separately. My hope is that this makes it easier for your team to track, assign, and respond to each one individually rather than having everything bundled together.

I look forward to receiving Mathew's written responses and any documentation he's able to provide.

Cheers,

Alan

Feb 27, 2026, 16:15 by lightfieldlab@cmbginc.com:

> Hi Alan,
>
> Yes, Mathew was looking over the documents and wanted to address each one of your claims and requests + talk about what next steps would look like on the patent you mentioned, so it would likely be easier to chat live with Stephen and Mathew together so that any documentation for the patent can be handled in an efficient manner as there will be paperwork involved. There were many requests in the documents you sent over, and Mathew is hoping to provide a resolution.
>
> Please let us know your availability to discuss.
>
>
> Tanya Davis
> CMBG FBC-Light Field Lab LLC
> CMBG Advisors, Inc.
> Restructuring Officer
> 3019 Wilshire Blvd, Suite 142
> Santa Monica, CA 90403
> P: (310) 933-3310
> F: (310) 402-2929
> E: lightfieldlab@cmbginc.com
>
> For the latest updates, visit Assignment Landing Page

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC     Document 52-1     Filed 03/11/26     Page 324 of 810

**From:** Alan Jones <alan@jones.how>
**Sent:** Thursday, February 26, 2026 1:41 PM
**To:** Light Field Lab <lightfieldlab@cmbginc.com>
**Cc:** Light Field Lab <lightfieldlab@cmbginc.com>; Mathew Sakhai <mathew@cmbginc.com>
**Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Hi Tanya,

Could Mathew please prepare an agenda and any open questions. I don't know of any concerns on my end, the claims are well covered in the documents.

I'm not sure there's enough to warrant my spending on legal counsel and I'm not comfortable doing so without a clear understanding of what issues you have.

Documents covering your concerns and proposals for various options you'd like considered for moving forward would assist me greatly in determining what's appropriate and ensuring any information you need is available.

Also, I've not yet received a copy of the Free Agreement or fee letter. Could you please provide those?

Cheers,

Alan


Feb 26, 2026, 13:35 by lightfieldlab@cmbginc.com:

> Hi Alan,
>
> The call would be between you, Stephen Henry and Mathew Sakhai, who is copied. The plan is to address any questions or concerns you have, discuss the patents, next steps, and how best to move forward.
>
> Thank you,
>
> Tanya Davis
> CMBG FBC-Light Field Lab LLC
> CMBG Advisors, Inc.
> Restructuring Officer
> 3019 Wilshire Blvd, Suite 142
> Santa Monica, CA 90403
> P: (310) 933-3310
> F: (310) 402-2929
> E: lightfieldlab@cmbginc.com

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 325 of 810

For the latest updates, visit [Assignment Landing Page](#)

---

**From:** Alan Jones <alan@jones.how>
**Sent:** Thursday, February 26, 2026 1:12 PM
**To:** Light Field Lab <lightfieldlab@cmbginc.com>
**Cc:** Light Field Lab <lightfieldlab@cmbginc.com>; Mathew Sakhai <mathew@cmbginc.com>
**Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Hi Tanya,

Thanks, I've been handling the claims myself. Though if you could provide me some notes so that I can chat with Stephen, then organize a time for your counsel to meet with him.

Who should I be having him reach out to for handing this? Would that be James Baer as in house legal counsel?

Cheers,

Alan

Feb 26, 2026, 13:09 by lightfieldlab@cmbginc.com:

> Hi Alan,
>
> Our office began reviewing the documents you submitted. I understand you are represented by Stephen Henry in this matter, so I think it would be productive if you and your attorney hopped on a call with our in-house counsel to talk through next steps and how we can best address the situation. If you would like to provide some times that you and Stephen are available, we'll get something on the books at a mutually available time.
>
> Thank you,
>
>
> Tanya Davis
> CMBG FBC-Light Field Lab LLC
> CMBG Advisors, Inc.
> Restructuring Officer
> 3019 Wilshire Blvd, Suite 142

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC      Document 52-1      Filed 03/11/26      Page 326 of 810

Santa Monica, CA 90403
P: (310) 933-3310
F: (310) 402-2929
E: lightfieldlab@cmbginc.com

For the latest updates, visit Assignment Landing Page

---

**From:** Alan Jones <alan@jones.how>
**Sent:** Wednesday, February 25, 2026 7:56 PM
**To:** Light Field Lab <lightfieldlab@cmbginc.com>
**Cc:** Light Field Lab <lightfieldlab@cmbginc.com>; Mathew Sakhai
<mathew@cmbginc.com>
**Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for
the Benefit of Creditors of Light Field Lab, Inc.

Hi Tanya,

Most appreciated. Section 2 of the General Assignment also
referenced a Fee Agreement which was has not been disclosed to me
yet. It is also referenced as the "Fee Letter". As I am an equity holder,
could you please provide me a copy of said letter and agreement.

Please also provide any other documents I am entitled to which have
not yet been disclosed.

Cheers,

Alan

Feb 23, 2026, 11:25 by lightfieldlab@cmbginc.com:

> Hi Alan,
>
> Please be advised that your claims are still under legal review and
> may require additional information prior to approval.
>
> The claim numbers are listed below:
>
> Proof of Interest - #11322616436
> Proof of Claim #1 - #11322616376
> Proof of Claim #2 - #11322632845

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 327 of 810

Proof of Claim #3 - #11322616557

Thank you,

Tanya Davis
CMBG FBC-Light Field Lab LLC
CMBG Advisors, Inc.
Restructuring Officer
3019 Wilshire Blvd, Suite 142
Santa Monica, CA 90403
P: (310) 933-3310
F: (310) 402-2929
E: lightfieldlab@cmbginc.com

For the latest updates, visit Assignment Landing Page

———————————————————————

**From:** Alan Jones <alan@jones.how>
**Sent:** Friday, February 20, 2026 5:39 PM
**To:** Light Field Lab <lightfieldlab@cmbginc.com>
**Cc:** Light Field Lab <lightfieldlab@cmbginc.com>; Mathew Sakhai <mathew@cmbginc.com>
**Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Hi Tanya,

Most appreciated. Happy to answer any questions. Could you please provide claim numbers for them.

Cheers,

Alan

Feb 20, 2026, 13:50 by lightfieldlab@cmbginc.com:

> Hi Alan,
>
> We have received your claim forms and are currently reviewing them. We will reach out with any additional questions.

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 328 of 810

Thank you,

Tanya Davis
CMBG FBC-Light Field Lab LLC
CMBG Advisors, Inc.
Restructuring Officer
3019 Wilshire Blvd, Suite 142
Santa Monica, CA 90403
P: (310) 933-3310
F: (310) 402-2929
E: lightfieldlab@cmbginc.com

For the latest updates, visit Assignment Landing Page

---

**From:** Alan Jones <alan@jones.how>
**Sent:** Wednesday, February 18, 2026 9:09 AM
**To:** Light Field Lab <lightfieldlab@cmbginc.com>
**Subject:** Claims, Interest, and Formal Notices -- Alan Jones --
Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Hi James,

Please find attached my claims, proof of interest, and
formal notices in connection with the Assignment for
the Benefit of Creditors of Light Field Lab, Inc. (Date
of Assignment: August 15, 2025).

The following documents are attached to this email:

**Claims and Statements:**
- Cover Letter
- Proof of Claim #1 -- Crime Victim Claim (Form +
Statement)
- Proof of Claim #2 -- Wrongful Termination (Form +
Statement)
- Proof of Claim #3 -- Source Code / IP Reclamation
(Form + Statement)
- Proof of Interest -- Equity Claim (Form + Statement)

**Formal Notices:**

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 329 of 810

- Notice A -- Fraud-Tainted Patent Portfolio
- Notice B -- Constructive Trust Over Source Code / IP
- Notice C -- Reserve Funds / Pending Litigation

**Supporting Documentation:**
- Stock Certificates CS-13, CS-14, and CS-15
- First Amended Complaint, Jones v. Light Field Lab Inc., Case No. 3:25-cv-05118-MMC (N.D. Cal.)
- LinkedIn profiles for Jon Karafin and Brendan Bevensee

The cover letter also references two full patents as supporting documentation (US10488584 and US10565734). These are not attached to this email due to file size. A complete copy of all documents including the patents is available at:

https://www.dropbox.com/scl/fi/ueqe19z9ugn8fderjg2vz/LightFieldLab-Claims-AlanJones.zip?rlkey=g0hs7ch1yp21dzh1u9m5a2jwy&dl=0

Alternatively, I can provide instructions for obtaining these patents directly from the USPTO if preferred.

Please acknowledge receipt of this filing promptly.

Regards,

Alan Jones
318-759-7497
alan@jones.how

EXHIBIT G

**Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.
**From:** alan@jones.how
**Date:** 3/5/2026, 6:52 PM
**To:** Mathew Sakhai <mathew@cmbginc.com>
**CC:** Light Field Lab <lightfieldlab@cmbginc.com>,Stephen Henry <shenry@henrylacey.com>

Dear Mathew,

Thank you for your email of March 5, 2026, and for confirming that I may communicate directly with the Assignee in connection with my creditor claims. I appreciate the direct line of communication.

However, I must address several significant concerns with the substance of your email before we can discuss any path forward. Your email materially mischaracterizes the scope of the August 29, 2025 notice from my counsel, omits critical issues that notice raised, and describes a patent portfolio sale that appears to have been conducted in violation of the demands in that notice.

# 1. The Henry Lacey Notice Was Not Limited to "Two Patents"

Your email states that the August 29, 2025 letter from Stephen Henry "referenced two patents" and that the letter "asked us only to not dispose of the patents referenced in the letter." This characterization is materially inaccurate.

I am attaching the complete notice for your reference. The notice's subject line alone reads: **"Re: Immediate Cessation of Disposition of Fraudulently Obtained Intellectual-Property Assets -- Alan Jones' Source Code & Light Field Lab Patent Portfolio."** The notice demanded -- in clear, specific terms -- the following:

**Immediately upon receipt:**

1. Cease any sale, licensing, transfer, encumbrance, or other disposition of (a) any patents where I should be listed as inventor, AND (b) all source code, software, and related technical documentation created by me.
2. Preserve assets including:
   - Maintaining physical and electronic copies of any patents/applications where I should be listed as inventor
   - Securing all source-code repositories, version-control logs, and development environments created by me
   - Preserving all employment records, communications, and documentation related to my employment, work product, and termination
   - Implementing a litigation-hold notice to all employees, contractors, and third-party service providers

**Within 10 business days (by September 12, 2025):**

3. Provide an inventory of all intellectual-property assets transferred to the Assignee.
4. Cooperate fully, including:
   - Disclosing all communications, emails, and documents relating to the acquisition and handling of my source code
   - Allowing inspection of assets and related records
   - Refraining from any settlement negotiations with third-party purchasers without my prior written consent

The notice also demanded written confirmation of compliance by September 9, 2025. To my knowledge, no written confirmation was ever provided.

To characterize this as a letter about "two patents" is to disregard the plain text of the notice. The notice demanded preservation of all source code, all employment records, all communications, and a complete inventory of all IP assets -- and it explicitly prohibited settlement with third-party purchasers without my consent.

# 2. The Patent Portfolio Sale

Your email reveals that the Assignee sold the entire patent portfolio (except US10488584) pursuant to a sale approved by the "senior secured creditor." This raises several serious concerns.

## A. Violation of the Henry Lacey Notice

The notice explicitly demanded that the Assignee cease any sale, licensing, transfer, encumbrance, or other disposition of the patents and source code and refrain from any settlement negotiations with third-party purchasers without my prior written consent. No consent was sought. No consent was given. The sale was conducted in direct contravention of the demands in the notice.

## B. Priority of Jones's Claims Over the Secured Creditor's Lien

The Assignee was provided with a copy of my federal complaint along with the August 29, 2025 notice. That complaint includes causes of action under Cal. Penal Code sections 484 and 496 -- alleging that I am a victim of crime -- as well as a constructive trust claim under Cal. Civ. Code section 2224, alleging that intellectual property obtained through fraud was never validly LFL's property.

On what basis did the Assignee conclude that the senior secured creditor's lien took priority over these claims? Specifically:

- **Constructive trust (Cal. Civ. Code section 2224):** Property held in constructive trust was never part of the estate. It cannot be subject to any creditor's lien because it was never the debtor's property to pledge as collateral. A secured creditor's lien attaches only to property the debtor actually owned. If these patents were procured through fraud -- as my complaint alleges and the notice put the Assignee on actual notice of -- then the senior secured creditor's lien may not have validly attached to them at all.

- **Crime victim restitution (Cal. Penal Code section 496(c)):** Crime victims are entitled to treble damages and restitution, with constitutional protections under Marsy's Law (Cal. Const. Art. I, Sec. 28(b)).

The Assignee had a fiduciary duty to investigate these claims before disposing of the assets. The complaint the Assignee received put it on actual notice of these claims. I am asking directly: What investigation did the Assignee conduct into the crime victim and constructive trust claims before concluding the secured creditor had priority? Was the secured creditor informed of my claims, including the crime victim allegations, before approving the sale?

## C. Disclosure to the Purchaser

As a fiduciary, the Assignee had a duty to disclose known defects to any potential buyer. Did the Assignee inform the purchaser of:

- The fraud allegations in the federal complaint the Assignee received?

- The UVTA challenge to the ABC transfer itself?
- My constructive trust claim over IP created during my employment?
- The pending federal litigation (*Jones v. Light Field Lab*, Case No. 3:25-cv-05118-MMC)?

If the Assignee failed to disclose these matters, that is itself a breach of fiduciary duty and may expose the Assignee to liability to the purchaser as well.

# 3. The Characterization of US10488584 Is Incorrect

Your email states that the Assignee's team "looked into the US Patent referenced in Stephen's letter and determined it was not tied to the core LFL technology." This conclusion is wrong on two independent grounds.

**First, US10488584 IS core LFL technology.** It derives from the same provisional applications as most of LFL's other patents and covers the fundamental technology enabling their light field display -- constructing a seamless energy surface at arbitrary sizes and placing a series of waveguides and lenslets atop it. This is the core of what LFL built.

**Second, it also demonstrates the alleged fraud.** US10488584 is the patent that most clearly shows the systematic one-for-one terminology alteration from Lytro's US10565734 -- six components renamed in direct correspondence. This is why it was specifically referenced in Stephen's notice and revealed in particularity in the amended complaint.

I have several questions about this "investigation":

- Who conducted it? What are their qualifications in patent law?
- What specifically was examined? The patent itself? Its prosecution history? The prior art relationship to Lytro patents?
- How was the conclusion that US10488584 is "not tied to the core LFL technology" reached, given that it plainly is?
- Did the Assignee investigate any of the other approximately 120+ patents in the portfolio for the same fraud indicators described in the complaint?
- The complaint alleged systematic fraud across the entire portfolio, not just one patent. What investigation was performed on the broader portfolio before selling it?
- Did the Assignee engage independent patent counsel -- not anyone previously retained by LFL -- to conduct this investigation, as fiduciary duty required?
- What written analysis or report was produced? As a creditor, I am entitled to review it.

# 4. The WO Patents and the Scope of the Assignment

Your email states that the two WO patents "were not listed on the asset list that was transferred to the Assignee." This statement raises a fundamental question about the ABC itself -- one that the Assignee should be able to answer clearly.

Under Cal. Code Civ. Proc. section 493.010(a), a general assignment for the benefit of creditors requires transfer of **all** of the assignor's assets that are transferable and not exempt from enforcement of a money judgment. The asset schedule attached to the assignment instrument is an administrative document -- it does not define the scope of the transfer. When an assignment instrument uses language such as "all right, title, and interest," title to all non-exempt, transferable assets vests in the assignee by operation of law upon execution of the assignment. The schedule is a disclosure tool for the assignee's administration, not a limitation on what transferred.

If LFL held rights in the WO patents at the time of the assignment, those rights transferred to the Assignee regardless of whether they appeared on any list. Omission from the schedule is a disclosure failure by the assignor, not a limitation on the assignment's scope. This is consistent with established principles in both assignment and bankruptcy law -- under 11 U.S.C. section 541, for example, unscheduled assets are still property of the estate, and ABC assignees are functionally analogous to bankruptcy trustees in this regard.

The Assignee was aware these patents existed -- your email acknowledges as much. Given that awareness, I have several questions:

- What investigation did the Assignee undertake to determine why these assets were omitted from the asset list?
- What rights did LFL hold in the WO patents, and what determination was made regarding those rights?
- Was the omission an oversight by the assignor, or intentional concealment? What steps were taken to find out?
- Given that the asset list was demonstrably incomplete as to these patents, what investigation was conducted to determine whether LFL held any other undisclosed assets?
- Who conducted this investigation, and what were its findings?

If no investigation was conducted despite awareness that known assets were missing from the schedule, that itself raises serious questions about the adequacy of the Assignee's administration. A fiduciary who knows that the assignor's asset disclosure is incomplete and takes no steps to investigate is not fulfilling its duty to creditors. Under Cal. Civ. Code section 3439.07, the assignee has standing to pursue fraudulent transfer actions -- a power that implies a corresponding duty to investigate asset completeness, not to simply accept an incomplete schedule at face value.

Alternatively, if the assignment instrument was limited to only specifically enumerated assets rather than "all assets," then it may not qualify as a "general assignment for the benefit of creditors" under CCP section 493.010 at all -- with significant implications for the validity and legal character of the proceeding.

# 5. Source Code -- The Critical Omission

The Henry Lacey notice specifically and prominently demanded preservation of all source code, software, and related technical documentation created by me, as well as all source-code repositories, version-control logs, and development environments. Your email does not mention source code at all.

I need immediate written answers to the following:

- What is the current status of all source code repositories formerly held by LFL?
- Have any source code repositories been sold, transferred, destroyed, or otherwise disposed of?
- If sold or transferred: to whom, when, and on what terms?
- If destroyed: when, by whom, and on what basis, given the preservation demands in the August 2025 notice?

# 6. Litigation Hold and Preservation

- Was a litigation hold implemented in response to the August 2025 notice?
- If so, when was it implemented and what is its scope?
- If not, why not, given that the notice specifically demanded implementation of a litigation hold?
- Have any records responsive to the August 2025 notice been destroyed, lost, or become unavailable since that date?

# 7. Outstanding Demands 1-5

Your email discusses the patent portfolio sale but does not address or respond to any of the specific demands I sent last Friday (February 27, 2026). Those demands -- for the fee agreement (Demand 1), asset inventory (Demand 2), purchaser identity (Demand 3), IP disposition (Demand 4), and communications with LFL principals (Demand 5) -- each requested a response within seven days.

When will responses to Demands 1 through 5 be provided, together with the associated documentation?

# 8. Purchaser Identity and Sale Details

The identity of the purchaser of the patent portfolio, the purchase price and terms, and the identity of the "senior secured creditor" who approved the sale have already been formally demanded in Demands 2, 3, and 4. As a creditor who has filed proofs of claim, I am entitled under the Assignee's fiduciary obligations to know:

- The identity of the purchaser of the patent portfolio
- The purchase price and all terms of the sale
- The identity of the "senior secured creditor" who approved the sale, including any affiliation between the senior secured creditor and LFL's board of directors, officers, or major shareholders
- Whether the purchaser has any relationship to LFL's former officers, directors, board members, or investors
- Whether the purchaser was informed of my claims, the pending federal litigation, and the fraud allegations
- What other assets have been sold or are pending sale, and to whom
- A complete accounting of all proceeds received and their disposition

These are not optional disclosures. They are fiduciary obligations to creditors, and they have been formally demanded. The Assignee's summary description of the sale in your email does not satisfy these demands.

**To be direct:** the identity of the purchaser and the identity of the senior secured creditor must be disclosed. I am entitled to this information as a creditor, and it has been formally demanded. This is a threshold issue -- the Assignee cannot discuss resolution while withholding the identity of the parties involved in the disposition of estate assets.

# 9. Demand 6 -- Personnel Records

Despite it already being demanded in the August 29 2025 demand letter we've already discussed, I have also attached a demand for production of my complete employment records and personnel file. That demand sets out in detail the multiple independent legal bases for production -- Labor Code sections 1198.5, 226, and 432; the Assignee's fiduciary obligations; pending federal litigation; and the UVTA avoidance action. It also addresses why the section 1198.5(n) litigation stay does not apply. The seven-day compliance deadline runs from receipt.

# 10. Clarification of Stephen Henry's Role

Stephen Henry represents me in the federal lawsuit (*Jones v. Light Field Lab*, Case No. 3:25-cv-05118-MMC). I asked Stephen to inform the Assignee of the litigation and the UVTA implications, which he did via the August 29, 2025 notice. However, at this stage, I have not retained Stephen to represent me in the ABC claims process. I am handling my ABC claims directly as a creditor.

This is relevant because:

- ABC-related communications regarding my creditor claims should be directed to me, not routed exclusively through Stephen.
- The demands (1 through 6) are from me directly as a creditor, not through litigation counsel.
- The August 29 notice should not be narrowly construed as the full extent of my rights or demands. It was litigation counsel fulfilling a notification function -- not the totality of my creditor claims or entitlements.

I am copying Stephen on this email for his awareness given his role in the federal case.

# 11. The Proposed "Release Agreement"

Your email offers to transfer US10488584 via a "customary patent assignment and release agreement." I cannot evaluate any proposed resolution without seeing the proposed terms. Please provide a copy of the proposed agreement so I can review its terms independently. Receiving and reviewing the proposed terms does not constitute agreement or negotiation -- it is simply evaluating what is being offered. I need to understand the scope of any proposed release before determining whether it is something that could even be considered.

# 12. Path Forward

I am open to discussing an appropriate resolution, but that discussion can only happen after I have been provided all relevant information. The sequence is as follows:

1. The Assignee provides full responses to Demands 1 through 5 (sent February 27, 2026) together with the associated documentation.
2. The Assignee complies with Demand 6 (personnel records), attached.
3. The Assignee provides written answers to the questions raised in this letter regarding the patent portfolio sale, source code, litigation hold, and investigation.
4. Once I have received all requested information, reviewed it, and determined whether it reveals any further relevant matters, I will be in a position to discuss an appropriate resolution.

Asking me to agree to a resolution while withholding the very information I need to evaluate my position is putting the cart before the horse.

# 13. Reservation of Rights

I expressly reserve all rights regarding the patent portfolio sale and any other asset dispositions, including without limitation rights under the California Uniform Voidable Transactions Act (Cal. Civ. Code sections 3439.01-3439.12), rights to seek recovery from the purchaser under section 3439.08, rights to seek an injunction under section 3439.07(a)(3), and all claims for breach of fiduciary duty. Nothing in this letter constitutes a waiver of any claim or right.

Regards,

Alan Jones.


Mar 5, 2026, 16:16 by mathew@cmbginc.com:

Hi Alan,

It's a pleasure to meet you via email. I received permission from your attorney Stephen to speak directly with you, which was necessary because as Tanya mentioned I am counsel as well, so thank you for your patience while we crossed our T's and dotted our I's.

I spoke with Stephen back in October 2025 following our office's receipt of his letter regarding notice of the ABC that commenced. The letter referenced two patents and noted that an additional patent was going to be added to your complaint against the former officers of Light Field Lab Inc. As I noted to Stephen, it appeared that the two WO patents were not listed on the asset list that was transferred to the Assignee, but the US patent referenced (US10488584) (the "US Patent") was, so we would not dispose of it without touching base with him. The letter we received from Stephen asked us only to not dispose of the patents referenced in the letter, which I relayed we intended to (and did) comply with.

As part of the Assignee's fiduciary duties, the Assignee made great effort to liquidate the assets, and the LFL patent portfolio was an asset that needed to be liquidated. Our team looked into the US Patent referenced in Stephen's letter and determined it was not tied to the core LFL technology, so we marketed the patent portfolio (as we were required to do) without the US Patent included. The two WO patents were not on the assigned asset list, so they would not have been marketed with the portfolio anyway. The patent portfolio was transferred pursuant to a sale approved by the senior secured creditor who had a first-priority lien on all LFL assets. The US Patent was carved out and not included in the sale.

It is my understanding that you still have pending litigation against the former LFL officers, which I believe is your main concern, and we are not standing in the way of that. The Assignee does not have any independent knowledge about what went on between you and the former LFL officers as I believe your claims arose long before the Assignee came into the picture, so we will let you resolve any matter you have with the former officers directly with them. I'd like to stick to the relevant matters with your claim that we can help with, so because the US Patent remains in the ABC estate, and was not included in the patent portfolio sale, if it would be helpful to you, the Assignee would be willing to transfer whatever rights it may hold in the US Patent to you pursuant to a customary patent assignment and release agreement. My effort here is to resolve the relevant matters that we can actually help with and move this forward in a productive manner, so if that is something you are interested in pursuing, I would be happy to coordinate the documentation.

Thank you,

---

**Mathew Sakhai**
**CMBG ADVISORS, INC.**
3019 Wilshire Blvd., Suite 142
Santa Monica, CA 90403
**D:** (310) 860-6375 | **F:** (310) 402-2929
**E:** mathew@cmbginc.com | www.cmbginc.com

Confidentiality Notice: The information contained in this electronic e-mail and any accompanying attachment(s) is intended only for the use of the intended recipient and may be confidential and/or privileged. If any reader of this communication is not the intended recipient, unauthorized use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error, please immediately notify the sender by return e-mail, and delete the original message and all copies from your system. Thank you.

---

**From:** Alan Jones <alan@jones.how>
**Sent:** Friday, February 27, 2026 4:53 PM
**To:** Light Field Lab <lightfieldlab@cmbginc.com>
**Cc:** Light Field Lab <lightfieldlab@cmbginc.com>; Mathew Sakhai <mathew@cmbginc.com>
**Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Hi Tanya,

Just following up — I've now sent through the individual requests I mentioned. Each one is in a separate email to make it straightforward for your team to track and respond to independently.

One small note — I noticed the reference to "the patent" in your last message. As the documents I filed make clear, the issues raised affect nearly the entire patent portfolio, not a single patent. The provisional applications at the foundation of the portfolio were filed while the inventors were employed at Lytro, and the material omissions to the USPTO flow through to the family of patents that followed. So this will need to be addressed more broadly than a single patent. I just want to make sure there's no misunderstanding on the scope before Mathew gets too far into his review.

The documents themselves cover this in detail, but if anything is unclear, I'm happy to address specific questions in writing.

Cheers,

Alan


Feb 27, 2026, 16:20 by alan@jones.how:

> Hi Tanya,
>
> Thank you for the update. I'm glad to hear Mathew has been reviewing the documents and is hoping to provide a resolution.

Given the number of distinct topics involved, I think these are best addressed in writing so that both sides have a clear record and nothing gets lost. A call covering this many items would be difficult to track accurately, and written responses will allow me to review each point carefully and respond appropriately.

To that end, and to help with the requests I've already made in this thread regarding the Fee Agreement, fee letter, and other information I'm entitled to as a creditor and equity holder, I'll be sending through specific and independent requests for each item separately. My hope is that this makes it easier for your team to track, assign, and respond to each one individually rather than having everything bundled together.

I look forward to receiving Mathew's written responses and any documentation he's able to provide.

Cheers,

Alan

Feb 27, 2026, 16:15 by lightfieldlab@cmbginc.com:

> Hi Alan,
>
> Yes, Mathew was looking over the documents and wanted to address each one of your claims and requests + talk about what next steps would look like on the patent you mentioned, so it would likely be easier to chat live with Stephen and Mathew together so that any documentation for the patent can be handled in an efficient manner as there will be paperwork involved. There were many requests in the documents you sent over, and Mathew is hoping to provide a resolution.
>
> Please let us know your availability to discuss.
>
>
> Tanya Davis
> CMBG FBC-Light Field Lab LLC
> CMBG Advisors, Inc.
> Restructuring Officer
> 3019 Wilshire Blvd, Suite 142
> Santa Monica, CA 90403
> P: (310) 933-3310
> F: (310) 402-2929
> E: lightfieldlab@cmbginc.com
>
> For the latest updates, visit Assignment Landing Page

**From:** Alan Jones <alan@jones.how>
**Sent:** Thursday, February 26, 2026 1:41 PM
**To:** Light Field Lab <lightfieldlab@cmbginc.com>
**Cc:** Light Field Lab <lightfieldlab@cmbginc.com>; Mathew Sakhai
<mathew@cmbginc.com>
**Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the
Benefit of Creditors of Light Field Lab, Inc.

Hi Tanya,

Could Mathew please prepare an agenda and any open questions. I don't
know of any concerns on my end, the claims are well covered in the
documents.

I'm not sure there's enough to warrant my spending on legal counsel and
I'm not comfortable doing so without a clear understanding of what issues
you have.

Documents covering your concerns and proposals for various options
you'd like considered for moving forward would assist me greatly in
determining what's appropriate and ensuring any information you need is
available.

Also, I've not yet received a copy of the Free Agreement or fee letter.
Could you please provide those?

Cheers,

Alan


Feb 26, 2026, 13:35 by lightfieldlab@cmbginc.com:

> Hi Alan,
>
> The call would be between you, Stephen Henry and Mathew Sakhai,
> who is copied. The plan is to address any questions or concerns you
> have, discuss the patents, next steps, and how best to move forward.
>
> Thank you,
>
> Tanya Davis
> CMBG FBC-Light Field Lab LLC
> CMBG Advisors, Inc.
> Restructuring Officer
> 3019 Wilshire Blvd, Suite 142
> Santa Monica, CA 90403

P: (310) 933-3310
F: (310) 402-2929
E: lightfieldlab@cmbginc.com

For the latest updates, visit **Assignment Landing Page**

_____

**From:** Alan Jones <alan@jones.how>
**Sent:** Thursday, February 26, 2026 1:12 PM
**To:** Light Field Lab <lightfieldlab@cmbginc.com>
**Cc:** Light Field Lab <lightfieldlab@cmbginc.com>; Mathew Sakhai
<mathew@cmbginc.com>
**Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment
for the Benefit of Creditors of Light Field Lab, Inc.

Hi Tanya,

Thanks, I've been handling the claims myself. Though if you could
provide me some notes so that I can chat with Stephen, then
organize a time for your counsel to meet with him.

Who should I be having him reach out to for handing this? Would
that be James Baer as in house legal counsel?

Cheers,

Alan

Feb 26, 2026, 13:09 by lightfieldlab@cmbginc.com:

> Hi Alan,
>
> Our office began reviewing the documents you submitted. I
> understand you are represented by Stephen Henry in this
> matter, so I think it would be productive if you and your
> attorney hopped on a call with our in-house counsel to talk
> through next steps and how we can best address the
> situation. If you would like to provide some times that you
> and Stephen are available, we'll get something on the books
> at a mutually available time.
>
> Thank you,

Tanya Davis
CMBG FBC-Light Field Lab LLC
CMBG Advisors, Inc.
Restructuring Officer
3019 Wilshire Blvd, Suite 142
Santa Monica, CA 90403
P: (310) 933-3310
F: (310) 402-2929
E: lightfieldlab@cmbginc.com

For the latest updates, visit [Assignment Landing Page](Assignment Landing Page)

---

**From:** Alan Jones <alan@jones.how>
**Sent:** Wednesday, February 25, 2026 7:56 PM
**To:** Light Field Lab <lightfieldlab@cmbginc.com>
**Cc:** Light Field Lab <lightfieldlab@cmbginc.com>; Mathew Sakhai <mathew@cmbginc.com>
**Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Hi Tanya,

Most appreciated. Section 2 of the General Assignment also referenced a Fee Agreement which was has not been disclosed to me yet. It is also referenced as the "Fee Letter". As I am an equity holder, could you please provide me a copy of said letter and agreement.

Please also provide any other documents I am entitled to which have not yet been disclosed.

Cheers,

Alan

Feb 23, 2026, 11:25 by lightfieldlab@cmbginc.com:

Hi Alan,

Please be advised that your claims are still under legal review and may require additional information

prior to approval.

The claim numbers are listed below:

Proof of Interest - #11322616436
Proof of Claim #1 - #11322616376
Proof of Claim #2 - #11322632845
Proof of Claim #3 - #11322616557

Thank you,

Tanya Davis
CMBG FBC-Light Field Lab LLC
CMBG Advisors, Inc.
Restructuring Officer
3019 Wilshire Blvd, Suite 142
Santa Monica, CA 90403
P: (310) 933-3310
F: (310) 402-2929
E: lightfieldlab@cmbginc.com

For the latest updates, visit Assignment Landing Page

---

**From:** Alan Jones <alan@jones.how>
**Sent:** Friday, February 20, 2026 5:39 PM
**To:** Light Field Lab <lightfieldlab@cmbginc.com>
**Cc:** Light Field Lab <lightfieldlab@cmbginc.com>; Mathew Sakhai <mathew@cmbginc.com>
**Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Hi Tanya,

Most appreciated. Happy to answer any questions. Could you please provide claim numbers for them.

Cheers,

Alan

Feb 20, 2026, 13:50 by
lightfieldlab@cmbginc.com:

> Hi Alan,
>
> We have received your claim forms and are
> currently reviewing them. We will reach out
> with any additional questions.
>
> Thank you,
>
> Tanya Davis
> CMBG FBC-Light Field Lab LLC
> CMBG Advisors, Inc.
> Restructuring Officer
> 3019 Wilshire Blvd, Suite 142
> Santa Monica, CA 90403
> P: (310) 933-3310
> F: (310) 402-2929
> E: lightfieldlab@cmbginc.com
>
> For the latest updates, visit [Assignment
> Landing Page](#)
>
> _____
>
> **From:** Alan Jones <alan@jones.how>
> **Sent:** Wednesday, February 18, 2026 9:09 AM
> **To:** Light Field Lab <lightfieldlab@cmbginc.com>
> **Subject:** Claims, Interest, and Formal Notices --
> Alan Jones -- Assignment for the Benefit of
> Creditors of Light Field Lab, Inc.
>
> Hi James,
>
> Please find attached my claims, proof of
> interest, and formal notices in connection
> with the Assignment for the Benefit of
> Creditors of Light Field Lab, Inc. (Date of
> Assignment: August 15, 2025).
>
> The following documents are attached to

this email:

**Claims and Statements:**
- Cover Letter
- Proof of Claim #1 -- Crime Victim Claim (Form + Statement)
- Proof of Claim #2 -- Wrongful Termination (Form + Statement)
- Proof of Claim #3 -- Source Code / IP Reclamation (Form + Statement)
- Proof of Interest -- Equity Claim (Form + Statement)

**Formal Notices:**
- Notice A -- Fraud-Tainted Patent Portfolio
- Notice B -- Constructive Trust Over Source Code / IP
- Notice C -- Reserve Funds / Pending Litigation

**Supporting Documentation:**
- Stock Certificates CS-13, CS-14, and CS-15
- First Amended Complaint, Jones v. Light Field Lab Inc., Case No. 3:25-cv-05118-MMC (N.D. Cal.)
- LinkedIn profiles for Jon Karafin and Brendan Bevensee

The cover letter also references two full patents as supporting documentation (US10488584 and US10565734). These are not attached to this email due to file size. A complete copy of all documents including the patents is available at:

https://www.dropbox.com/scl/fi/ueqe19z9ugn8fderjg2vz/LightFieldLab-Claims-AlanJones.zip?rlkey=g0hs7ch1yp21dzh1u9m5a2jwy&dl=0

Alternatively, I can provide instructions for obtaining these patents directly from the USPTO if preferred.

Please acknowledge receipt of this filing promptly.

Regards,

Alan Jones
318-759-7497
alan@jones.how

Attachments:

| | |
|---|---|
| 2025 08 29 Assignee Fraudulent Transfer Notice Letter.pdf | 0 bytes |
| Demand_6_PersonnelRecords.pdf | 0 bytes |

# EXHIBIT H

# Formal Demand – Employment Records and Personnel File

## Alan Jones, Creditor – Assignment for Benefit of Creditors of Light Field Lab, Inc.

March 5, 2026

**FROM:** Alan Jones
16406 270th Pl NE
Duvall, WA 98019
318-759-7497
alan@jones.how

**TO:** CMBG FBC-Light Field Lab LLC
Assignee for the Benefit of Creditors of Light Field Lab, Inc.
3019 Wilshire Blvd Suite 142
Santa Monica, CA 90403
Email: lightfieldlab@cmbginc.com

**DATE:** March 5, 2026

**RE:** Assignment for the Benefit of Creditors of Light Field Lab, Inc. (Date of Assignment: August 15, 2025)

---

This communication is without prejudice and nothing herein constitutes a waiver of any rights or claims.

---

To the Assignee, CMBG FBC-Light Field Lab LLC:

I am writing to you in your capacity as Assignee for the benefit of creditors of Light Field Lab, Inc. ("LFL"). As you are aware, I am both a former employee of LFL and a creditor who has timely filed proofs of claim and a proof of interest in the assignment proceeding. I also have pending federal litigation against LFL in *Jones v. Light Field Lab, Inc.*, Case No. 3:25-cv-05118-MMC, in the United States District Court for the Northern District of California.

This letter constitutes a formal demand for the production of my complete employment records and related documents, as described below. This demand is made on multiple independent legal bases, each of which independently compels production.

**1. As a former employee under three independent California Labor Code frameworks.** California Labor Code §§ 1198.5, 226, and 432 each impose separate and independently enforceable obligations to maintain and produce employment records. These are not a single statutory scheme — they are three distinct statutes in different parts of the Labor Code, each with its own enforcement mechanism and penalty structure. Section 1198.5 governs personnel files generally; § 226 governs payroll records with its own 21-day compliance deadline and penalty provisions under § 226(f); and § 432 governs signed employment documents with criminal penalties under § 433 for noncompliance. As the entity now in custody and control of all LFL corporate records — which include records the law requires to be maintained and produced — the Assignee has assumed the custodial obligation to comply with outstanding statutory duties attendant to those records. The statutory retention period has not expired.

**2. As a creditor to whom the Assignee owes fiduciary duties.** As a creditor and beneficiary of the estate who has filed proofs of claim, I have an independent, non-stayed, and non-waivable right to inspect the books and records of the estate. The records demanded are directly relevant to the evaluation of my filed creditor claims — which include claims for wrongful termination, patent fraud, employment discrimination, and related causes of action worth millions of dollars. Refusing access to estate records bearing directly on filed creditor claims constitutes a breach of the Assignee's fiduciary duty. This right exists entirely outside the employment-law framework and cannot be circumvented by any procedural mechanism within it.

**3. In connection with pending federal litigation.** LFL is a party to pending federal litigation in which the documents demanded are directly relevant. LFL was a party at the time of the ABC transfer, and the records in the Assignee's custody bear directly on the claims at issue in that proceeding.

**4. As a creditor who has provided actual notice of fraudulent transfer under the UVTA.** On August 29, 2025, my counsel provided the Assignee with formal notice under the California Uniform Voidable Transactions Act (Cal. Civ. Code §§ 3439.01–3439.12) that the ABC includes a transfer of property fraudulently obtained from me — specifically, intellectual property and source code procured through void IP assignment agreements. That notice demanded, among other things, that the Assignee preserve all employment records and communications related to my employment and cooperate with inspection of assets and related records. The Assignee's good-faith defense under § 3439.08(a) is unavailable because it has had actual notice of the fraud since August 2025. I have an independent right to access records necessary to identify, trace, and recover fraudulently transferred property.

## The Section 1198.5(n) Litigation Stay Does Not Apply

To the extent the Assignee may attempt to invoke the litigation stay provision of Labor Code § 1198.5(n) as a basis for refusing production, that provision does not shield the Assignee from the obligations set forth in this demand. The stay is inapplicable on multiple independent grounds.

### A. The Stay Is Textually Limited to Section 1198.5

Section 1198.5(n) stays only the right to records requested "under this section." This is self-limiting statutory language that, by its plain terms, applies only to requests made pursuant to § 1198.5 itself. It does not — and cannot — extend to obligations arising under independent statutory frameworks.

**Labor Code § 226 (payroll records)** is an independent statute located in a different part of the Labor Code, with its own penalty scheme (§ 226(f)), its own compliance deadline (21 days from request), and its own enforcement mechanism. It contains no litigation stay provision.

**Labor Code § 432 (signed employment documents)** is likewise an independent statute with its own criminal penalty provision — § 433 provides that "[a]ny person violating this article is guilty of a misdemeanor." The obligation under § 432 is immediate upon request. It contains no litigation stay provision.

The Legislature placed a litigation stay in § 1198.5 and chose not to place one in §§ 226 or 432. Under the standard canon of statutory construction — *expressio unius est exclusio alterius* — this omission is intentional and dispositive. The inclusion of a stay in one statute and its absence from two others in the same code reflects a deliberate legislative choice that the obligations under §§ 226 and 432 are not subject to any litigation stay. Any attempt to extend the § 1198.5(n) stay to these independent statutory obligations is legally unsupported.

### B. The Assignee's Fiduciary Duty Is an Independent Obligation Not Subject to a Procedural Employment-Law Stay

Even as to records that might fall within § 1198.5's scope, the Assignee's common-law fiduciary duty to creditors provides an independent basis for production that is not subject to a procedural stay in an employment statute.

The Assignee holds estate property — including all records — as a fiduciary trustee for the benefit of creditors. A creditor who has filed proofs of claim has an independent right to inspect the books and records

of the estate. This fiduciary obligation exists entirely outside the employment-law framework and cannot be eliminated or suspended by a procedural mechanism within that framework. A stay designed to protect employers during employment litigation does not — and was never intended to — override a fiduciary's duty to provide creditors access to estate records.

### C. The Assignee's Standing to Invoke the Stay Is Independently Questionable

Moreover, even if the stay could theoretically apply beyond § 1198.5's own scope — which it cannot — the Assignee lacks standing to invoke it. Section 1198.5(n) stays records during a lawsuit between an "employee" and "their employer." There was never an employer-employee relationship between me and the Assignee. The Assignee is a neutral third-party fiduciary appointed to administer the estate — not the entity that employed me.

The stay was designed to protect employers from being compelled to produce personnel files while simultaneously defending employment litigation — a concern that does not apply to a neutral assignee holding estate records for the benefit of creditors. The Assignee cannot selectively assume employer status to invoke a defensive stay while disclaiming employer status for all other purposes, including liability for LFL's Labor Code violations.

Invoking § 1198.5(n) as a blanket refusal to produce records is legally unsupported on each of these independent grounds. Doing so would itself constitute evidence of bad faith in the administration of the estate.

## Prior Requests and Bad Faith Evasion

During my employment and following my termination, I made multiple requests to LFL for my personnel file and related records. LFL delayed production and ultimately provided a file that was grossly deficient under California law.

The file LFL eventually produced contained essentially only onboarding paperwork: the offer letter, copies of identification documents, blank forms, a job description, the termination notice, and a stock option grant. It contained no performance evaluations, no records of my work product or contributions, no disciplinary records, no attendance records, no employment-related communications, no training records, no promotion or compensation records, and no records of my inventions or technical contributions.

Critically, for numerous documents relating to the obtaining or holding of employment, LFL provided blank, unsigned forms rather than signed copies. These include: two blank employment application forms, a blank disclosure regarding background investigation, a blank acknowledgment and authorization for background check, a blank background information form, an unsigned offer of employment, and an unsigned job description with no identifying information linking it to me. LFL also included clean, blank duplicates of the arbitration agreement and the confidentiality and proprietary rights agreement — despite also providing signed copies of those same agreements — for no apparent purpose.

Labor Code § 432 requires the employer to provide copies of all documents the employee signed relating to obtaining or holding employment. Providing blank forms where signed originals exist does not satisfy this obligation — it is a calculated substitution designed to create the appearance of production while withholding the actual documents. This is not a good-faith attempt at compliance. It is a willful violation of § 432, which constitutes a **misdemeanor** under **§ 433** — a criminal offense distinct from and more serious than the infraction penalties under § 1198.5. To the extent LFL claims these documents were never signed, that is flatly inconsistent with LFL's representations in the pending federal litigation that various employment agreements were entered into. The Assignee is on notice of this bad faith evasion and has an independent duty to investigate and correct it.

The broader production was independently deficient under Labor Code §§ 1198.5 and 226. The file contained no performance evaluations, no records of my work product or contributions, no disciplinary records, no attendance records, no employment-related communications, no training records, no promotion or compensation records, and no records of my inventions or technical contributions.

I am separately aware that LFL provided some form of personnel file or employment records to the Equal Employment Opportunity Commission, including in connection with Charge No. 551-2024-02497 and any other charges, investigations, or proceedings involving me. The discrepancy between what LFL provided to the EEOC — a federal enforcement agency before which LFL was under a duty of candor — and what LFL provided to me is direct evidence of selective, deliberate concealment. The contents of those productions and any differences between them are relevant to demonstrating the willful and bad-faith nature of LFL's obstruction.

Separately, on August 29, 2025 — two weeks after the date of the assignment — my counsel, Stephen F. Henry of Henry | Lacey PC, served the Assignee with a formal notice under the California Uniform Voidable Transactions Act. That notice demanded, among other things, that the Assignee: (1) preserve all employment records, communications, and documentation related to my employment, work product, and termination; (2) implement a litigation-hold notice to all employees, contractors, and third-party service providers; (3) disclose all communications relating to the acquisition and handling of my source code and intellectual property; and (4) allow inspection of assets and related records. The notice requested written confirmation of compliance by September 9, 2025.

As of the date of this letter, the Assignee has not provided any of the information requested in the August 2025 notice. It has been six months. I request an explanation for this lack of compliance. The Assignee's silence in the face of a formal demand from counsel — served within weeks of the assignment and accompanied by the federal complaint detailing allegations of fraud, criminal theft, and racketeering — raises serious questions about the Assignee's good-faith administration of the estate. The records demanded in this letter overlap substantially with those demanded in August 2025 and should already be preserved and readily accessible. Any suggestion that these records require significant time to locate or produce is difficult to reconcile with the fact that the Assignee has had six months' notice that they would be required.

## Documents Demanded

I demand production of the following documents. This demand encompasses records required under all four independent legal bases set forth above — Labor Code §§ 1198.5, 226, and 432; the Assignee's fiduciary obligations to creditors; pending federal litigation; and the UVTA avoidance action.

### A. Complete Personnel File

All records maintained by LFL relating to my employment, performance, or any grievance concerning me, without limitation, including but not limited to:

- Performance evaluations, reviews, and assessments
- Records of my work product, technical contributions, and inventions
- Disciplinary records and warnings
- Attendance and time records
- Training and education records
- Promotion, compensation, and bonus records
- Records of any complaints made by or about me
- Any and all employment-related communications referencing me
- All documents I signed relating to obtaining or holding employment (per Labor Code § 432), including but not limited to the offer of employment, employment applications, job description, disclosure regarding background investigation, acknowledgment and authorization for background check, and background information form — **the actual signed documents, not the blank unsigned forms that were previously provided in their place**
- All payroll records (per Labor Code § 226)

This request is not limited to the contents of any physical "personnel file" folder. It encompasses all records maintained anywhere within LFL's systems — including email, shared drives, project management tools, HR systems, and any other repositories — that relate to my employment, performance, work product, contributions, or the circumstances of my termination.

## B. Records Previously Provided to the EEOC

All employment records, personnel documents, and any other materials concerning me that LFL provided to the EEOC in connection with any charge or investigation involving me, to the extent not already encompassed by Section A above.

## C. Communications Regarding Personnel File Requests and EEOC Production

All internal and external communications — including emails, messages, memoranda, and notes — discussing, concerning, or relating to:

- Any request by me for my personnel file or employment records
- Decisions regarding what to include in or exclude from my personnel file or any production of records concerning me
- The preparation, compilation, or review of any records provided to me or to the EEOC concerning my employment
- Any discussions about the adequacy or completeness of records maintained or produced regarding my employment
- Any communications with LFL's Directors & Officers (D&O) insurance carriers regarding these records, my personnel file requests, or the production of employment records concerning me

## D. Communications Regarding Patents

All communications — including emails, messages, memoranda, and notes — discussing, concerning, or relating to my contributions to, involvement with, or inventorship of any patents or patent applications filed by or on behalf of LFL, including specifically the patents identified in my First Amended Complaint in *Jones v. Light Field Lab, Inc.*, Case No. 3:25-cv-05118-MMC.

## E. Communications Regarding My Termination, Work Product, and Performance

All communications — including emails, messages, memoranda, and notes — discussing, concerning, or relating to:

- The decision to terminate my employment, including any discussions preceding, during, or following that decision
- My work product, technical contributions, or job performance at any point during my employment
- Any evaluation or assessment of my role, contributions, or performance

# Creditor's Independent Right to Inspect Estate Records

Independent of the statutory obligations set forth above, the Assignee has a fiduciary duty to provide creditors access to the books and records of the estate.

In an assignment for the benefit of creditors, the Assignee holds all estate property — including all corporate records — as a fiduciary trustee for the benefit of creditors. As a creditor who has filed proofs of claim, I am a beneficiary of this trust. I have an independent, common-law right to inspect the books and records of the estate to verify my claims and evaluate the estate's assets and liabilities.

This right exists entirely outside the employment-records statutory framework and is not subject to any employment-law stay. The communications demanded in Sections C, D, and E above — particularly those relating to patent inventorship, intellectual property disposition, and the handling of my claims — are estate records bearing directly on the valuation of creditor claims worth millions of dollars. These records go to the core of whether LFL committed patent fraud, misappropriated my inventions, and concealed evidence — matters that affect not only my claims but the integrity of the estate administration itself.

Refusing a creditor access to records directly relevant to filed claims is a breach of fiduciary duty. By refusing production, the Assignee is not "protecting the litigation process" — it is obstructing a creditor's right to

verify the estate's assets. If those records contain evidence of patent fraud or asset concealment, the Assignee is shielding estate property from the very creditors it is duty-bound to serve.

The Assignee cannot use a procedural stay in an employment statute as an end run around its fiduciary obligations to creditors. The fiduciary duty is paramount.

This obligation is reinforced by the UVTA notice served on the Assignee in August 2025. Under Cal. Civ. Code § 3439.07, a creditor may recover the full value of fraudulently transferred property, interest, and reasonable attorney's fees. The Assignee's good-faith defense under § 3439.08(a) is unavailable because it received actual notice of the fraud. By continuing to withhold records that would enable me to trace and recover fraudulently transferred intellectual property — including my own source code and inventions — the Assignee is not merely breaching its fiduciary duty; it is potentially furthering the conversion of property it knows to be fraudulently obtained.

## Attorney-Client Privilege and Crime-Fraud Exception

As Assignee, you now control LFL's attorney-client privilege over pre-assignment communications. See *CFTC v. Weintraub*, 471 U.S. 343 (1985); Cal. Evid. Code § 953(d). To the extent any responsive documents were withheld by prior management on privilege grounds, I note that the crime-fraud exception applies where communications were made in furtherance of criminal activity — including patent fraud, deliberate concealment of employment records in violation of California criminal statutes (§ 433), and obstruction of regulatory proceedings.

Where the privilege was invoked by prior management to conceal evidence of patent fraud, wrongful termination, or criminal violations of the Labor Code, the crime-fraud exception strips the privilege entirely. The Assignee's fiduciary duties require independent evaluation and investigation of prior privilege assertions — not reflexive adoption of prior management's positions, particularly where those assertions may have been used to conceal evidence of the very fraud that underlies my creditor claims. Rubber-stamping prior management's privilege claims without investigation is itself a breach of the Assignee's fiduciary duty.

The Assignee has had the federal complaint in hand since August 29, 2025. That complaint alleges, among other causes of action, criminal theft under Penal Code §§ 484 and 496, civil RICO under 18 U.S.C. § 1962(c), fraud and deceit, and seeks rescission of the very IP assignment agreements through which LFL obtained my intellectual property. These are not speculative allegations — they are pled causes of action in a filed federal case. Any privilege assertion over communications relating to patent inventorship, IP assignment, my termination, or the disposition of my work product must be evaluated in light of these specific criminal and fraud allegations. The crime-fraud exception is not a theoretical possibility here — the factual predicate has been laid out in detail in a complaint the Assignee has possessed for six months.

## Privilege Log Requirement

To the extent the Assignee or prior management withholds or redacts any responsive documents on the basis of attorney-client privilege or the work product doctrine, I demand that a privilege log be provided identifying, for each document or communication withheld:

- The date of the communication
- The identity and title of the author and all recipients, including any individuals copied or blind-copied
- A description of the subject matter sufficient to permit assessment of the privilege claim without revealing the protected information itself
- The specific legal basis for withholding (e.g., Cal. Evid. Code § 954, work product doctrine under Cal. Civ. Proc. Code § 2018.030)

Blanket assertions of privilege over categories of documents are legally insufficient and will be treated as a **waiver** of the privilege claims so asserted. Each withheld document must be individually identified and the basis for its withholding specifically stated. Failure to produce a compliant privilege log constitutes waiver of all privilege claims over the documents at issue.

Any privilege claim over patent-related communications or employment records is subject to heightened scrutiny given the documented pattern of selective production and deliberate concealment. As Assignee and fiduciary to the creditors of the estate, you have an affirmative duty to independently evaluate whether privilege claims asserted by prior management are valid, rather than reflexively adopting them. This obligation is particularly acute where the crime-fraud exception may vitiate the privilege — the Assignee cannot permit prior management's misconduct to be shielded by a privilege that the Assignee now controls.

## Retaliation and Interference with Protected Rights

I place the Assignee on notice that withholding records required to be produced under §§ 226 and 432 — statutes that contain no litigation stay — on the basis that litigation is pending constitutes retaliation against the exercise of protected statutory rights.

An employee's right to request payroll records and signed employment documents is protected by the California Labor Code. That right does not terminate upon the filing of a lawsuit — it is a freestanding statutory entitlement with its own enforcement mechanism and its own penalties for noncompliance. Using the existence of litigation as a pretext to withhold non-stayed statutory records is a form of interference with protected rights that the Legislature has chosen to enforce through criminal sanctions.

Any refusal to comply with non-stayed statutory obligations will be documented and preserved for presentation to the California Labor Commissioner and, as appropriate, brought to the attention of the Court in the pending federal action.

## Compliance and Consequences of Non-Compliance

The deadlines for compliance are as follows:

- **Labor Code § 226 (payroll records):** 21 calendar days from receipt of this demand.
- **Labor Code § 432 (signed employment documents):** Immediate. This obligation has been outstanding since the original request and is long overdue.
- **All remaining records (§ 1198.5, fiduciary obligations, and UVTA):** 7 calendar days from receipt of this demand. The Assignee has had actual notice since August 29, 2025 that these records would be required, and was specifically asked to preserve and produce them at that time. Six months is more than sufficient to have located and organized responsive documents.

**Preservation and Spoliation.** The Assignee's preservation obligations with respect to these records were triggered no later than **August 29, 2025**, when my counsel served formal notice demanding preservation of all employment records, communications, and documentation related to my employment and implementation of a litigation hold. Any destruction of responsive records after that date — not the date of this demand — constitutes spoliation with actual notice. I demand a written disclosure addressing: (a) whether a litigation hold was implemented in response to the August 2025 notice, and if so, its scope and the date of implementation; (b) whether any responsive records have been destroyed, lost, or become unavailable since August 29, 2025; and (c) the current preservation status of the records demanded herein. Any failure to account for these records will be brought to the attention of the Court.

Failure to comply will be treated as a continuation of the pattern of obstruction and bad faith evasion initiated by LFL's prior management. The Assignee's independent fiduciary obligations to creditors do not permit the perpetuation of prior management's unlawful concealment of records. Continued withholding of these documents may expose the Assignee to claims for breach of fiduciary duty and personal liability, and I will pursue all available remedies — including motions in the pending federal action, complaints to the California Labor Commissioner, and referral to the appropriate criminal enforcement authorities regarding willful violations of § 433. The Assignee is further reminded that its exposure under the UVTA — including recovery of the full value of fraudulently transferred property, interest, and reasonable attorney's fees under Cal. Civ. Code § 3439.07, as well as potential conversion and restitution claims under § 3439.08 — is implicated by any failure to cooperate with legitimate creditor requests for records bearing on the identification and recovery of fraudulently obtained intellectual property.

I am willing to discuss reasonable accommodations regarding the format or logistics of production. I request that all documents be provided in electronic format.

Regards,

Alan Jones
alan@jones.how

EXHIBIT I

# Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Important Dates:

Assignment Date: August 15, 2025

Bar Date: February 26, 2026

## Updates by Month

### January 2026

01/14/2026 - Final sale documents are about to be completed. Creditors will be notified at the end of February, beginning of March as to the status of their claim.

### December 2025

12/08/25 - No changes in the status at this time.



# November 2025

11/03/25 - CMBG FBC- Light Field Lab LLC, has completed severals sales of the remaining of the assets of Light Field Lab Inc., through individual sales and an auction process. The ABC anticipates finalizing the sale process in December.

# October 2025

10/03/25 - CMBG FBC- Light Field Lab LLC, is in the process of selling the remaining of the assets of Light Field Lab Inc., through individual sales and an auction process. The ABC anticipates finalizing the sale process in December.

# September 2025

09/02/25 - CMBG FBC- Light Field Lab LLC, has commenced notification to potential creditors of Light Field Lab Inc., and a close out of the operations of the company. In addition, the ABC is in the process of starting sales of the remaining assets.

# August 2025

08/15/25 - Light Field Lab, Inc., enters into an Assignment for the Benefit of Creditors appointing CMBG FBC- Light Field Lab LLC to as as the Assignee in the insolvency proceeding.

ⓘ

# EXHIBIT J

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC     Document 52-1     Filed 03/11/26     Page 360 of 810

**Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.
**From:** Mathew Sakhai <mathew@cmbginc.com>
**Date:** 3/6/2026, 3:48 PM
**To:** Alan Jones <alan@jones.how>
**CC:** Light Field Lab <lightfieldlab@cmbginc.com>, Jim Baer - CMBG Advisors <jim@cmbginc.com>

Hi Alan,

We acknowledge receipt of your recent correspondence.

As you are currently involved in ongoing litigation concerning these matters, and because the issues you have raised involve complex legal questions, those matters are most appropriately addressed through your counsel. As you know, our prior communications regarding the matter were made with the permission of your attorney, Stephen, and we continue to believe that any further discussions of legal issues should be coordinated through counsel. Some of the issues raised in your recent correspondence appear inconsistent with the position reflected in the prior letter from your counsel that we have on file. To the extent there is any discrepancy, we recommend that you address that directly with your attorney.

The Assignee has reviewed the submissions and questions you have provided. To the extent they relate to the administration of the ABC estate, we have responded to the matters we are able to address. Many of the additional requests and questions you have raised appear to relate to issues that are the subject of your litigation against the former LFL officers or otherwise involve legal determinations outside the Assignee's role in administering the estate. Those issues will ultimately depend on the outcome of that litigation.

As fiduciaries for the creditors of the estate, the Assignee must administer the ABC in an efficient and cost-effective manner and cannot expend estate resources addressing speculative issues while litigation remains pending. Accordingly, we will continue to keep your correspondence on file and will act as appropriate in the event a final judgment or other binding determination affects assets assigned to the estate.

In the meantime, if you wish to pursue a transfer of the three patents referenced, we would be willing to coordinate any such discussion and documentation through your counsel.

Otherwise, we do not anticipate further correspondence on these issues while your litigation remains pending.

Best regards,

_____

**Mathew Sakhai**
**CMBG ADVISORS, INC.**
3019 Wilshire Blvd., Suite 142
Santa Monica, CA 90403
**D:** (310) 860-6375 | **F:** (310) 402-2929
**E:** mathew@cmbginc.com | www.cmbginc.com



Confidentiality Notice: The information contained in this electronic e-mail and any accompanying attachment(s) is intended only for the use of the intended recipient and may be confidential and/or privileged. If any reader of this communication is not the intended recipient, unauthorized use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error, please immediately notify the sender by return e-mail, and delete the original message and all copies from your system. Thank you.

---

**From:** Alan Jones <alan@jones.how>
**Sent:** Friday, March 6, 2026 11:09 AM
**To:** Mathew Sakhai <mathew@cmbginc.com>
**Cc:** Light Field Lab <lightfieldlab@cmbginc.com>
**Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Just a quick split of the thread, so Stephen is off, as he was just included to be informed of the status clarification I gave.

Cheers,

Alan


Mar 6, 2026, 09:24 by alan@jones.how:

> Hi all,
>
> Stephen informed me the previous copy came through with challenging readability (seems the document format I used to draft outside my email had colored the text due to dark mode).
>
> Please find it below again, hopefully much more readable.
>
> Cheers,
>
> Alan.
>
> Dear Mathew,
>
> Thank you for your email of March 5, 2026, and for confirming that I may communicate directly with the Assignee in connection with my creditor claims. I appreciate the direct line of communication.

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 362 of 810

However, I must address several significant concerns with the substance of your email before we can discuss any path forward. Your email materially mischaracterizes the scope of the August 29, 2025 notice from my counsel, omits critical issues that notice raised, and describes a patent portfolio sale that appears to have been conducted in violation of the demands in that notice.

**1. The Henry Lacey Notice Was Not Limited to "Two Patents"**

Your email states that the August 29, 2025 letter from Stephen Henry "referenced two patents" and that the letter "asked us only to not dispose of the patents referenced in the letter." This characterization is materially inaccurate.

I am attaching the complete notice for your reference. The notice's subject line alone reads: **"Re: Immediate Cessation of Disposition of Fraudulently Obtained Intellectual-Property Assets -- Alan Jones' Source Code & Light Field Lab Patent Portfolio."** The notice demanded -- in clear, specific terms -- the following:

**Immediately upon receipt:**

1. Cease any sale, licensing, transfer, encumbrance, or other disposition of (a) any patents where I should be listed as inventor, AND (b) all source code, software, and related technical documentation created by me.
2. Preserve assets including:
    - Maintaining physical and electronic copies of any patents/applications where I should be listed as inventor
    - Securing all source-code repositories, version-control logs, and development environments created by me
    - Preserving all employment records, communications, and documentation related to my employment, work product, and termination
    - Implementing a litigation-hold notice to all employees, contractors, and third-party service providers

**Within 10 business days (by September 12, 2025):**

3. Provide an inventory of all intellectual-property assets transferred to the Assignee.
4. Cooperate fully, including:
    - Disclosing all communications, emails, and documents relating to the acquisition and handling of my source code
    - Allowing inspection of assets and related records
    - Refraining from any settlement negotiations with third-party purchasers without my prior written consent

The notice also demanded written confirmation of compliance by September 9, 2025. To my knowledge, no written confirmation was ever provided.

To characterize this as a letter about "two patents" is to disregard the plain text of the notice. The notice demanded preservation of all source code, all employment records, all

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 363 of 810

communications, and a complete inventory of all IP assets -- and it explicitly prohibited settlement with third-party purchasers without my consent.

**2. The Patent Portfolio Sale**

Your email reveals that the Assignee sold the entire patent portfolio (except US10488584) pursuant to a sale approved by the "senior secured creditor." This raises several serious concerns.

**A. Violation of the Henry Lacey Notice**

The notice explicitly demanded that the Assignee cease any sale, licensing, transfer, encumbrance, or other disposition of the patents and source code and refrain from any settlement negotiations with third-party purchasers without my prior written consent. No consent was sought. No consent was given. The sale was conducted in direct contravention of the demands in the notice.

**B. Priority of Jones's Claims Over the Secured Creditor's Lien**

The Assignee was provided with a copy of my federal complaint along with the August 29, 2025 notice. That complaint includes causes of action under Cal. Penal Code sections 484 and 496 -- alleging that I am a victim of crime -- as well as a constructive trust claim under Cal. Civ. Code section 2224, alleging that intellectual property obtained through fraud was never validly LFL's property.

On what basis did the Assignee conclude that the senior secured creditor's lien took priority over these claims? Specifically:

- **Constructive trust (Cal. Civ. Code section 2224):** Property held in constructive trust was never part of the estate. It cannot be subject to any creditor's lien because it was never the debtor's property to pledge as collateral. A secured creditor's lien attaches only to property the debtor actually owned. If these patents were procured through fraud -- as my complaint alleges and the notice put the Assignee on actual notice of -- then the senior secured creditor's lien may not have validly attached to them at all.
- **Crime victim restitution (Cal. Penal Code section 496(c)):** Crime victims are entitled to treble damages and restitution, with constitutional protections under Marsy's Law (Cal. Const. Art. I, Sec. 28(b)).

The Assignee had a fiduciary duty to investigate these claims before disposing of the assets. The complaint the Assignee received put it on actual notice of these claims. I am asking directly: What investigation did the Assignee conduct into the crime victim and constructive trust claims before concluding the secured creditor had priority? Was the secured creditor informed of my claims, including the crime victim allegations, before approving the sale?

**C. Disclosure to the Purchaser**

As a fiduciary, the Assignee had a duty to disclose known defects to any potential buyer. Did the Assignee inform the purchaser of:

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC     Document 52-1     Filed 03/11/26     Page 364 of 810

- The fraud allegations in the federal complaint the Assignee received?
- The UVTA challenge to the ABC transfer itself?
- My constructive trust claim over IP created during my employment?
- The pending federal litigation (*Jones v. Light Field Lab*, Case No. 3:25-cv-05118-MMC)?

If the Assignee failed to disclose these matters, that is itself a breach of fiduciary duty and may expose the Assignee to liability to the purchaser as well.

## 3. The Characterization of US10488584 Is Incorrect

Your email states that the Assignee's team "looked into the US Patent referenced in Stephen's letter and determined it was not tied to the core LFL technology." This conclusion is wrong on two independent grounds.

**First, US10488584 IS core LFL technology.** It derives from the same provisional applications as most of LFL's other patents and covers the fundamental technology enabling their light field display -- constructing a seamless energy surface at arbitrary sizes and placing a series of waveguides and lenslets atop it. This is the core of what LFL built.

**Second, it also demonstrates the alleged fraud.** US10488584 is the patent that most clearly shows the systematic one-for-one terminology alteration from Lytro's US10565734 -- six components renamed in direct correspondence. This is why it was specifically referenced in Stephen's notice and revealed in particularity in the amended complaint.

I have several questions about this "investigation":

- Who conducted it? What are their qualifications in patent law?
- What specifically was examined? The patent itself? Its prosecution history? The prior art relationship to Lytro patents?
- How was the conclusion that US10488584 is "not tied to the core LFL technology" reached, given that it plainly is?
- Did the Assignee investigate any of the other approximately 120+ patents in the portfolio for the same fraud indicators described in the complaint?
- The complaint alleged systematic fraud across the entire portfolio, not just one patent. What investigation was performed on the broader portfolio before selling it?
- Did the Assignee engage independent patent counsel -- not anyone previously retained by LFL -- to conduct this investigation, as fiduciary duty required?
- What written analysis or report was produced? As a creditor, I am entitled to review it.

## 4. The WO Patents and the Scope of the Assignment

Your email states that the two WO patents "were not listed on the asset list that was transferred to the Assignee." This statement raises a fundamental question about the ABC itself -- one that the Assignee should be able to answer clearly.

Under Cal. Code Civ. Proc. section 493.010(a), a general assignment for the benefit of creditors requires transfer of **all** of the assignor's assets that are transferable and not exempt

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC     Document 52-1     Filed 03/11/26     Page 365 of 810

from enforcement of a money judgment. The asset schedule attached to the assignment instrument is an administrative document -- it does not define the scope of the transfer. When an assignment instrument uses language such as "all right, title, and interest," title to all non-exempt, transferable assets vests in the assignee by operation of law upon execution of the assignment. The schedule is a disclosure tool for the assignee's administration, not a limitation on what transferred.

If LFL held rights in the WO patents at the time of the assignment, those rights transferred to the Assignee regardless of whether they appeared on any list. Omission from the schedule is a disclosure failure by the assignor, not a limitation on the assignment's scope. This is consistent with established principles in both assignment and bankruptcy law -- under 11 U.S.C. section 541, for example, unscheduled assets are still property of the estate, and ABC assignees are functionally analogous to bankruptcy trustees in this regard.

The Assignee was aware these patents existed -- your email acknowledges as much. Given that awareness, I have several questions:

- What investigation did the Assignee undertake to determine why these assets were omitted from the asset list?
- What rights did LFL hold in the WO patents, and what determination was made regarding those rights?
- Was the omission an oversight by the assignor, or intentional concealment? What steps were taken to find out?
- Given that the asset list was demonstrably incomplete as to these patents, what investigation was conducted to determine whether LFL held any other undisclosed assets?
- Who conducted this investigation, and what were its findings?

If no investigation was conducted despite awareness that known assets were missing from the schedule, that itself raises serious questions about the adequacy of the Assignee's administration. A fiduciary who knows that the assignor's asset disclosure is incomplete and takes no steps to investigate is not fulfilling its duty to creditors. Under Cal. Civ. Code section 3439.07, the assignee has standing to pursue fraudulent transfer actions -- a power that implies a corresponding duty to investigate asset completeness, not to simply accept an incomplete schedule at face value.

Alternatively, if the assignment instrument was limited to only specifically enumerated assets rather than "all assets," then it may not qualify as a "general assignment for the benefit of creditors" under CCP section 493.010 at all -- with significant implications for the validity and legal character of the proceeding.

## 5. Source Code -- The Critical Omission

The Henry Lacey notice specifically and prominently demanded preservation of all source code, software, and related technical documentation created by me, as well as all source-code repositories, version-control logs, and development environments. Your email does not mention source code at all.

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 366 of 810

I need immediate written answers to the following:

- What is the current status of all source code repositories formerly held by LFL?
- Have any source code repositories been sold, transferred, destroyed, or otherwise disposed of?
- If sold or transferred: to whom, when, and on what terms?
- If destroyed: when, by whom, and on what basis, given the preservation demands in the August 2025 notice?

## 6. Litigation Hold and Preservation

- Was a litigation hold implemented in response to the August 2025 notice?
- If so, when was it implemented and what is its scope?
- If not, why not, given that the notice specifically demanded implementation of a litigation hold?
- Have any records responsive to the August 2025 notice been destroyed, lost, or become unavailable since that date?

## 7. Outstanding Demands 1-5

Your email discusses the patent portfolio sale but does not address or respond to any of the specific demands I sent last Friday (February 27, 2026). Those demands -- for the fee agreement (Demand 1), asset inventory (Demand 2), purchaser identity (Demand 3), IP disposition (Demand 4), and communications with LFL principals (Demand 5) -- each requested a response within seven days.

When will responses to Demands 1 through 5 be provided, together with the associated documentation?

## 8. Purchaser Identity and Sale Details

The identity of the purchaser of the patent portfolio, the purchase price and terms, and the identity of the "senior secured creditor" who approved the sale have already been formally demanded in Demands 2, 3, and 4. As a creditor who has filed proofs of claim, I am entitled under the Assignee's fiduciary obligations to know:

- The identity of the purchaser of the patent portfolio
- The purchase price and all terms of the sale
- The identity of the "senior secured creditor" who approved the sale, including any affiliation between the senior secured creditor and LFL's board of directors, officers, or major shareholders
- Whether the purchaser has any relationship to LFL's former officers, directors, board members, or investors
- Whether the purchaser was informed of my claims, the pending federal litigation, and the fraud allegations
- What other assets have been sold or are pending sale, and to whom
- A complete accounting of all proceeds received and their disposition

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC     Document 52-1     Filed 03/11/26     Page 367 of 810

These are not optional disclosures. They are fiduciary obligations to creditors, and they have been formally demanded. The Assignee's summary description of the sale in your email does not satisfy these demands.

**To be direct:** the identity of the purchaser and the identity of the senior secured creditor must be disclosed. I am entitled to this information as a creditor, and it has been formally demanded. This is a threshold issue -- the Assignee cannot discuss resolution while withholding the identity of the parties involved in the disposition of estate assets.

### 9. Demand 6 -- Personnel Records

Despite it already being demanded in the August 29 2025 demand letter we've already discussed, I have also attached a demand for production of my complete employment records and personnel file. That demand sets out in detail the multiple independent legal bases for production -- Labor Code sections 1198.5, 226, and 432; the Assignee's fiduciary obligations; pending federal litigation; and the UVTA avoidance action. It also addresses why the section 1198.5(n) litigation stay does not apply. The seven-day compliance deadline runs from receipt.

### 10. Clarification of Stephen Henry's Role

Stephen Henry represents me in the federal lawsuit (*Jones v. Light Field Lab*, Case No. 3:25-cv-05118-MMC). I asked Stephen to inform the Assignee of the litigation and the UVTA implications, which he did via the August 29, 2025 notice. However, at this stage, I have not retained Stephen to represent me in the ABC claims process. I am handling my ABC claims directly as a creditor.

This is relevant because:

- ABC-related communications regarding my creditor claims should be directed to me, not routed exclusively through Stephen.
- The demands (1 through 6) are from me directly as a creditor, not through litigation counsel.
- The August 29 notice should not be narrowly construed as the full extent of my rights or demands. It was litigation counsel fulfilling a notification function -- not the totality of my creditor claims or entitlements.

I am copying Stephen on this email for his awareness given his role in the federal case.

### 11. The Proposed "Release Agreement"

Your email offers to transfer US10488584 via a "customary patent assignment and release agreement." I cannot evaluate any proposed resolution without seeing the proposed terms. Please provide a copy of the proposed agreement so I can review its terms independently. Receiving and reviewing the proposed terms does not constitute agreement or negotiation -- it is simply evaluating what is being offered. I need to understand the scope of any proposed release before determining whether it is something that could even be considered.

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC     Document 52-1     Filed 03/11/26     Page 368 of 810

## 12. Path Forward

I am open to discussing an appropriate resolution, but that discussion can only happen after I have been provided all relevant information. The sequence is as follows:

1. The Assignee provides full responses to Demands 1 through 5 (sent February 27, 2026) together with the associated documentation.
2. The Assignee complies with Demand 6 (personnel records), attached.
3. The Assignee provides written answers to the questions raised in this letter regarding the patent portfolio sale, source code, litigation hold, and investigation.
4. Once I have received all requested information, reviewed it, and determined whether it reveals any further relevant matters, I will be in a position to discuss an appropriate resolution.

Asking me to agree to a resolution while withholding the very information I need to evaluate my position is putting the cart before the horse.

## 13. Reservation of Rights

I expressly reserve all rights regarding the patent portfolio sale and any other asset dispositions, including without limitation rights under the California Uniform Voidable Transactions Act (Cal. Civ. Code sections 3439.01-3439.12), rights to seek recovery from the purchaser under section 3439.08, rights to seek an injunction under section 3439.07(a)(3), and all claims for breach of fiduciary duty. Nothing in this letter constitutes a waiver of any claim or right.

Regards,

Alan


Mar 5, 2026, 18:52 by alan@jones.how:

> Dear Mathew,
>
> Thank you for your email of March 5, 2026, and for confirming that I may communicate directly with the Assignee in connection with my creditor claims. I appreciate the direct line of communication.
>
> However, I must address several significant concerns with the substance of your email before we can discuss any path forward. Your email materially mischaracterizes the scope of the August 29, 2025 notice from my counsel, omits critical issues that notice raised, and describes a patent portfolio sale that appears to have been conducted in violation of the demands in that notice.
>
> # 1. The Henry Lacey Notice Was Not Limited to "Two Patents"

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 369 of 810

Your email states that the August 29, 2025 letter from Stephen Henry "referenced two patents" and that the letter "asked us only to not dispose of the patents referenced in the letter." This characterization is materially inaccurate.

I am attaching the complete notice for your reference. The notice's subject line alone reads: **"Re: Immediate Cessation of Disposition of Fraudulently Obtained Intellectual-Property Assets -- Alan Jones' Source Code & Light Field Lab Patent Portfolio."** The notice demanded -- in clear, specific terms -- the following:

**Immediately upon receipt:**

1. Cease any sale, licensing, transfer, encumbrance, or other disposition of (a) any patents where I should be listed as inventor, AND (b) all source code, software, and related technical documentation created by me.
2. Preserve assets including:
   - Maintaining physical and electronic copies of any patents/applications where I should be listed as inventor
   - Securing all source-code repositories, version-control logs, and development environments created by me
   - Preserving all employment records, communications, and documentation related to my employment, work product, and termination
   - Implementing a litigation-hold notice to all employees, contractors, and third-party service providers

**Within 10 business days (by September 12, 2025):**

3. Provide an inventory of all intellectual-property assets transferred to the Assignee.
4. Cooperate fully, including:
   - Disclosing all communications, emails, and documents relating to the acquisition and handling of my source code
   - Allowing inspection of assets and related records
   - Refraining from any settlement negotiations with third-party purchasers without my prior written consent

The notice also demanded written confirmation of compliance by September 9, 2025. To my knowledge, no written confirmation was ever provided.

To characterize this as a letter about "two patents" is to disregard the plain text of the notice. The notice demanded preservation of all source code, all employment records, all communications, and a complete inventory of all IP assets -- and it explicitly prohibited settlement with third-party purchasers without my consent.

## 2. The Patent Portfolio Sale

Your email reveals that the Assignee sold the entire patent portfolio (except US10488584) pursuant to a sale approved by the "senior secured creditor." This raises several serious concerns.

### A. Violation of the Henry Lacey Notice

The notice explicitly demanded that the Assignee cease any sale, licensing, transfer,

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 370 of 810

encumbrance, or other disposition of the patents and source code and refrain from any settlement negotiations with third-party purchasers without my prior written consent. No consent was sought. No consent was given. The sale was conducted in direct contravention of the demands in the notice.

## B. Priority of Jones's Claims Over the Secured Creditor's Lien

The Assignee was provided with a copy of my federal complaint along with the August 29, 2025 notice. That complaint includes causes of action under Cal. Penal Code sections 484 and 496 -- alleging that I am a victim of crime -- as well as a constructive trust claim under Cal. Civ. Code section 2224, alleging that intellectual property obtained through fraud was never validly LFL's property.

On what basis did the Assignee conclude that the senior secured creditor's lien took priority over these claims? Specifically:

- **Constructive trust (Cal. Civ. Code section 2224):** Property held in constructive trust was never part of the estate. It cannot be subject to any creditor's lien because it was never the debtor's property to pledge as collateral. A secured creditor's lien attaches only to property the debtor actually owned. If these patents were procured through fraud -- as my complaint alleges and the notice put the Assignee on actual notice of -- then the senior secured creditor's lien may not have validly attached to them at all.

- **Crime victim restitution (Cal. Penal Code section 496(c)):** Crime victims are entitled to treble damages and restitution, with constitutional protections under Marsy's Law (Cal. Const. Art. I, Sec. 28(b)).

The Assignee had a fiduciary duty to investigate these claims before disposing of the assets. The complaint the Assignee received put it on actual notice of these claims. I am asking directly: What investigation did the Assignee conduct into the crime victim and constructive trust claims before concluding the secured creditor had priority? Was the secured creditor informed of my claims, including the crime victim allegations, before approving the sale?

## C. Disclosure to the Purchaser

As a fiduciary, the Assignee had a duty to disclose known defects to any potential buyer. Did the Assignee inform the purchaser of:

- The fraud allegations in the federal complaint the Assignee received?
- The UVTA challenge to the ABC transfer itself?
- My constructive trust claim over IP created during my employment?
- The pending federal litigation (*Jones v. Light Field Lab*, Case No. 3:25-cv-05118-MMC)?

If the Assignee failed to disclose these matters, that is itself a breach of fiduciary duty and may expose the Assignee to liability to the purchaser as well.

## 3. The Characterization of US10488584 Is Incorrect

Your email states that the Assignee's team "looked into the US Patent referenced in Stephen's letter and determined it was not tied to the core LFL technology." This conclusion is wrong on

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC     Document 52-1     Filed 03/11/26     Page 371 of 810

two independent grounds.

**First, US10488584 IS core LFL technology.** It derives from the same provisional applications as most of LFL's other patents and covers the fundamental technology enabling their light field display -- constructing a seamless energy surface at arbitrary sizes and placing a series of waveguides and lenslets atop it. This is the core of what LFL built.

**Second, it also demonstrates the alleged fraud.** US10488584 is the patent that most clearly shows the systematic one-for-one terminology alteration from Lytro's US10565734 -- six components renamed in direct correspondence. This is why it was specifically referenced in Stephen's notice and revealed in particularity in the amended complaint.

I have several questions about this "investigation":

- Who conducted it? What are their qualifications in patent law?
- What specifically was examined? The patent itself? Its prosecution history? The prior art relationship to Lytro patents?
- How was the conclusion that US10488584 is "not tied to the core LFL technology" reached, given that it plainly is?
- Did the Assignee investigate any of the other approximately 120+ patents in the portfolio for the same fraud indicators described in the complaint?
- The complaint alleged systematic fraud across the entire portfolio, not just one patent. What investigation was performed on the broader portfolio before selling it?
- Did the Assignee engage independent patent counsel -- not anyone previously retained by LFL -- to conduct this investigation, as fiduciary duty required?
- What written analysis or report was produced? As a creditor, I am entitled to review it.

# 4. The WO Patents and the Scope of the Assignment

Your email states that the two WO patents "were not listed on the asset list that was transferred to the Assignee." This statement raises a fundamental question about the ABC itself -- one that the Assignee should be able to answer clearly.

Under Cal. Code Civ. Proc. section 493.010(a), a general assignment for the benefit of creditors requires transfer of **all** of the assignor's assets that are transferable and not exempt from enforcement of a money judgment. The asset schedule attached to the assignment instrument is an administrative document -- it does not define the scope of the transfer. When an assignment instrument uses language such as "all right, title, and interest," title to all non-exempt, transferable assets vests in the assignee by operation of law upon execution of the assignment. The schedule is a disclosure tool for the assignee's administration, not a limitation on what transferred.

If LFL held rights in the WO patents at the time of the assignment, those rights transferred to the Assignee regardless of whether they appeared on any list. Omission from the schedule is a disclosure failure by the assignor, not a limitation on the assignment's scope. This is consistent with established principles in both assignment and bankruptcy law -- under 11 U.S.C. section 541, for example, unscheduled assets are still property of the estate, and ABC assignees are functionally analogous to bankruptcy trustees in this regard.

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 372 of 810

The Assignee was aware these patents existed -- your email acknowledges as much. Given that awareness, I have several questions:

- What investigation did the Assignee undertake to determine why these assets were omitted from the asset list?
- What rights did LFL hold in the WO patents, and what determination was made regarding those rights?
- Was the omission an oversight by the assignor, or intentional concealment? What steps were taken to find out?
- Given that the asset list was demonstrably incomplete as to these patents, what investigation was conducted to determine whether LFL held any other undisclosed assets?
- Who conducted this investigation, and what were its findings?

If no investigation was conducted despite awareness that known assets were missing from the schedule, that itself raises serious questions about the adequacy of the Assignee's administration. A fiduciary who knows that the assignor's asset disclosure is incomplete and takes no steps to investigate is not fulfilling its duty to creditors. Under Cal. Civ. Code section 3439.07, the assignee has standing to pursue fraudulent transfer actions -- a power that implies a corresponding duty to investigate asset completeness, not to simply accept an incomplete schedule at face value.

Alternatively, if the assignment instrument was limited to only specifically enumerated assets rather than "all assets," then it may not qualify as a "general assignment for the benefit of creditors" under CCP section 493.010 at all -- with significant implications for the validity and legal character of the proceeding.

# 5. Source Code -- The Critical Omission

The Henry Lacey notice specifically and prominently demanded preservation of all source code, software, and related technical documentation created by me, as well as all source-code repositories, version-control logs, and development environments. Your email does not mention source code at all.

I need immediate written answers to the following:

- What is the current status of all source code repositories formerly held by LFL?
- Have any source code repositories been sold, transferred, destroyed, or otherwise disposed of?
- If sold or transferred: to whom, when, and on what terms?
- If destroyed: when, by whom, and on what basis, given the preservation demands in the August 2025 notice?

# 6. Litigation Hold and Preservation

- Was a litigation hold implemented in response to the August 2025 notice?
- If so, when was it implemented and what is its scope?
- If not, why not, given that the notice specifically demanded implementation of a litigation hold?

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 373 of 810

- Have any records responsive to the August 2025 notice been destroyed, lost, or become unavailable since that date?

# 7. Outstanding Demands 1-5

Your email discusses the patent portfolio sale but does not address or respond to any of the specific demands I sent last Friday (February 27, 2026). Those demands -- for the fee agreement (Demand 1), asset inventory (Demand 2), purchaser identity (Demand 3), IP disposition (Demand 4), and communications with LFL principals (Demand 5) -- each requested a response within seven days.

When will responses to Demands 1 through 5 be provided, together with the associated documentation?

# 8. Purchaser Identity and Sale Details

The identity of the purchaser of the patent portfolio, the purchase price and terms, and the identity of the "senior secured creditor" who approved the sale have already been formally demanded in Demands 2, 3, and 4. As a creditor who has filed proofs of claim, I am entitled under the Assignee's fiduciary obligations to know:

- The identity of the purchaser of the patent portfolio
- The purchase price and all terms of the sale
- The identity of the "senior secured creditor" who approved the sale, including any affiliation between the senior secured creditor and LFL's board of directors, officers, or major shareholders
- Whether the purchaser has any relationship to LFL's former officers, directors, board members, or investors
- Whether the purchaser was informed of my claims, the pending federal litigation, and the fraud allegations
- What other assets have been sold or are pending sale, and to whom
- A complete accounting of all proceeds received and their disposition

These are not optional disclosures. They are fiduciary obligations to creditors, and they have been formally demanded. The Assignee's summary description of the sale in your email does not satisfy these demands.

**To be direct:** the identity of the purchaser and the identity of the senior secured creditor must be disclosed. I am entitled to this information as a creditor, and it has been formally demanded. This is a threshold issue -- the Assignee cannot discuss resolution while withholding the identity of the parties involved in the disposition of estate assets.

# 9. Demand 6 -- Personnel Records

Despite it already being demanded in the August 29 2025 demand letter we've already discussed, I have also attached a demand for production of my complete employment records and personnel file. That demand sets out in detail the multiple independent legal bases for production -- Labor Code sections 1198.5, 226, and 432; the Assignee's fiduciary obligations;

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 374 of 810

pending federal litigation; and the UVTA avoidance action. It also addresses why the section 1198.5(n) litigation stay does not apply. The seven-day compliance deadline runs from receipt.

# 10. Clarification of Stephen Henry's Role

Stephen Henry represents me in the federal lawsuit (*Jones v. Light Field Lab*, Case No. 3:25-cv-05118-MMC). I asked Stephen to inform the Assignee of the litigation and the UVTA implications, which he did via the August 29, 2025 notice. However, at this stage, I have not retained Stephen to represent me in the ABC claims process. I am handling my ABC claims directly as a creditor.

This is relevant because:

- ABC-related communications regarding my creditor claims should be directed to me, not routed exclusively through Stephen.
- The demands (1 through 6) are from me directly as a creditor, not through litigation counsel.
- The August 29 notice should not be narrowly construed as the full extent of my rights or demands. It was litigation counsel fulfilling a notification function -- not the totality of my creditor claims or entitlements.

I am copying Stephen on this email for his awareness given his role in the federal case.

# 11. The Proposed "Release Agreement"

Your email offers to transfer US10488584 via a "customary patent assignment and release agreement." I cannot evaluate any proposed resolution without seeing the proposed terms. Please provide a copy of the proposed agreement so I can review its terms independently. Receiving and reviewing the proposed terms does not constitute agreement or negotiation -- it is simply evaluating what is being offered. I need to understand the scope of any proposed release before determining whether it is something that could even be considered.

# 12. Path Forward

I am open to discussing an appropriate resolution, but that discussion can only happen after I have been provided all relevant information. The sequence is as follows:

1. The Assignee provides full responses to Demands 1 through 5 (sent February 27, 2026) together with the associated documentation.
2. The Assignee complies with Demand 6 (personnel records), attached.
3. The Assignee provides written answers to the questions raised in this letter regarding the patent portfolio sale, source code, litigation hold, and investigation.
4. Once I have received all requested information, reviewed it, and determined whether it reveals any further relevant matters, I will be in a position to discuss an appropriate resolution.

Asking me to agree to a resolution while withholding the very information I need to evaluate my position is putting the cart before the horse.

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 375 of 810

# 13. Reservation of Rights

I expressly reserve all rights regarding the patent portfolio sale and any other asset dispositions, including without limitation rights under the California Uniform Voidable Transactions Act (Cal. Civ. Code sections 3439.01-3439.12), rights to seek recovery from the purchaser under section 3439.08, rights to seek an injunction under section 3439.07(a)(3), and all claims for breach of fiduciary duty. Nothing in this letter constitutes a waiver of any claim or right.

Regards,

Alan Jones.

Mar 5, 2026, 16:16 by mathew@cmbginc.com:

> Hi Alan,
>
> It's a pleasure to meet you via email. I received permission from your attorney Stephen to speak directly with you, which was necessary because as Tanya mentioned I am counsel as well, so thank you for your patience while we crossed our T's and dotted our I's.
>
> I spoke with Stephen back in October 2025 following our office's receipt of his letter regarding notice of the ABC that commenced. The letter referenced two patents and noted that an additional patent was going to be added to your complaint against the former officers of Light Field Lab Inc. As I noted to Stephen, it appeared that the two WO patents were not listed on the asset list that was transferred to the Assignee, but the US patent referenced (US10488584) (the "US Patent") was, so we would not dispose of it without touching base with him. The letter we received from Stephen asked us only to not dispose of the patents referenced in the letter, which I relayed we intended to (and did) comply with.
>
> As part of the Assignee's fiduciary duties, the Assignee made great effort to liquidate the assets, and the LFL patent portfolio was an asset that needed to be liquidated. Our team looked into the US Patent referenced in Stephen's letter and determined it was not tied to the core LFL technology, so we marketed the patent portfolio (as we were required to do) without the US Patent included. The two WO patents were not on the assigned asset list, so they would not have been marketed with the portfolio anyway. The patent portfolio was transferred pursuant to a sale approved by the senior secured creditor who had a first-priority lien on all LFL assets. The US Patent was carved out and not included in the sale.
>
> It is my understanding that you still have pending litigation against the former LFL officers, which I believe is your main concern, and we are not standing in the way of that. The Assignee does not have any independent knowledge about what went

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 376 of 810

on between you and the former LFL officers as I believe your claims arose long before the Assignee came into the picture, so we will let you resolve any matter you have with the former officers directly with them. I'd like to stick to the relevant matters with your claim that we can help with, so because the US Patent remains in the ABC estate, and was not included in the patent portfolio sale, if it would be helpful to you, the Assignee would be willing to transfer whatever rights it may hold in the US Patent to you pursuant to a customary patent assignment and release agreement. My effort here is to resolve the relevant matters that we can actually help with and move this forward in a productive manner, so if that is something you are interested in pursuing, I would be happy to coordinate the documentation.

Thank you,

**Mathew Sakhai**
**CMBG ADVISORS, INC.**
3019 Wilshire Blvd., Suite 142
Santa Monica, CA 90403
**D:** (310) 860-6375 | **F:** (310) 402-2929
**E:** mathew@cmbginc.com | www.cmbginc.com

Confidentiality Notice: The information contained in this electronic e-mail and any accompanying attachment(s) is intended only for the use of the intended recipient and may be confidential and/or privileged. If any reader of this communication is not the intended recipient, unauthorized use, disclosure or copying is strictly prohibited, and may be unlawful. If you have received this communication in error, please immediately notify the sender by return e-mail, and delete the original message and all copies from your system. Thank you.

---

**From:** Alan Jones <alan@jones.how>
**Sent:** Friday, February 27, 2026 4:53 PM
**To:** Light Field Lab <lightfieldlab@cmbginc.com>
**Cc:** Light Field Lab <lightfieldlab@cmbginc.com>; Mathew Sakhai <mathew@cmbginc.com>
**Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Hi Tanya,

Just following up — I've now sent through the individual requests I mentioned. Each one is in a separate email to make it straightforward for your team to track and respond to independently.

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 377 of 810

One small note — I noticed the reference to "the patent" in your last message. As the documents I filed make clear, the issues raised affect nearly the entire patent portfolio, not a single patent. The provisional applications at the foundation of the portfolio were filed while the inventors were employed at Lytro, and the material omissions to the USPTO flow through to the family of patents that followed. So this will need to be addressed more broadly than a single patent. I just want to make sure there's no misunderstanding on the scope before Mathew gets too far into his review.

The documents themselves cover this in detail, but if anything is unclear, I'm happy to address specific questions in writing.

Cheers,

Alan


Feb 27, 2026, 16:20 by alan@jones.how:

> Hi Tanya,
>
> Thank you for the update. I'm glad to hear Mathew has been reviewing the documents and is hoping to provide a resolution.
>
> Given the number of distinct topics involved, I think these are best addressed in writing so that both sides have a clear record and nothing gets lost. A call covering this many items would be difficult to track accurately, and written responses will allow me to review each point carefully and respond appropriately.
>
> To that end, and to help with the requests I've already made in this thread regarding the Fee Agreement, fee letter, and other information I'm entitled to as a creditor and equity holder, I'll be sending through specific and independent requests for each item separately. My hope is that this makes it easier for your team to track, assign, and respond to each one individually rather than having everything bundled together.
>
> I look forward to receiving Mathew's written responses and any documentation he's able to provide.
>
> Cheers,
>
> Alan
>
> Feb 27, 2026, 16:15 by lightfieldlab@cmbginc.com:

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 378 of 810

Hi Alan,

Yes, Mathew was looking over the documents and wanted to address each one of your claims and requests + talk about what next steps would look like on the patent you mentioned, so it would likely be easier to chat live with Stephen and Mathew together so that any documentation for the patent can be handled in an efficient manner as there will be paperwork involved. There were many requests in the documents you sent over, and Mathew is hoping to provide a resolution.

Please let us know your availability to discuss.

Tanya Davis
CMBG FBC-Light Field Lab LLC
CMBG Advisors, Inc.
Restructuring Officer
3019 Wilshire Blvd, Suite 142
Santa Monica, CA 90403
P: (310) 933-3310
F: (310) 402-2929
E: lightfieldlab@cmbginc.com

For the latest updates, visit Assignment Landing Page

---

**From:** Alan Jones <alan@jones.how>
**Sent:** Thursday, February 26, 2026 1:41 PM
**To:** Light Field Lab <lightfieldlab@cmbginc.com>
**Cc:** Light Field Lab <lightfieldlab@cmbginc.com>; Mathew Sakhai <mathew@cmbginc.com>
**Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Hi Tanya,

Could Mathew please prepare an agenda and any open questions. I don't know of any concerns on my end, the claims are well covered in the documents.

I'm not sure there's enough to warrant my spending on legal counsel and I'm not comfortable doing so without a clear understanding of what issues you have.

Documents covering your concerns and proposals for various options you'd like considered for moving forward would

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 379 of 810

assist me greatly in determining what's appropriate and ensuring any information you need is available.

Also, I've not yet received a copy of the Free Agreement or fee letter. Could you please provide those?

Cheers,

Alan


Feb 26, 2026, 13:35 by lightfieldlab@cmbginc.com:

> Hi Alan,
>
> The call would be between you, Stephen Henry and Mathew Sakhai, who is copied. The plan is to address any questions or concerns you have, discuss the patents, next steps, and how best to move forward.
>
> Thank you,
>
> Tanya Davis
> CMBG FBC-Light Field Lab LLC
> CMBG Advisors, Inc.
> Restructuring Officer
> 3019 Wilshire Blvd, Suite 142
> Santa Monica, CA 90403
> P: (310) 933-3310
> F: (310) 402-2929
> E: lightfieldlab@cmbginc.com
>
> For the latest updates, visit [Assignment Landing Page](#)
>
> _____
>
> **From:** Alan Jones <alan@jones.how>
> **Sent:** Thursday, February 26, 2026 1:12 PM
> **To:** Light Field Lab <lightfieldlab@cmbginc.com>
> **Cc:** Light Field Lab <lightfieldlab@cmbginc.com>; Mathew Sakhai <mathew@cmbginc.com>
> **Subject:** Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.
>
> Hi Tanya,
>
> Thanks, I've been handling the claims myself. Though

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 380 of 810

if you could provide me some notes so that I can chat with Stephen, then organize a time for your counsel to meet with him.

Who should I be having him reach out to for handing this? Would that be James Baer as in house legal counsel?

Cheers,

Alan

Feb 26, 2026, 13:09 by lightfieldlab@cmbginc.com:

> Hi Alan,
>
> Our office began reviewing the documents you submitted. I understand you are represented by Stephen Henry in this matter, so I think it would be productive if you and your attorney hopped on a call with our in-house counsel to talk through next steps and how we can best address the situation. If you would like to provide some times that you and Stephen are available, we'll get something on the books at a mutually available time.
>
> Thank you,
>
>
> Tanya Davis
> CMBG FBC-Light Field Lab LLC
> CMBG Advisors, Inc.
> Restructuring Officer
> 3019 Wilshire Blvd, Suite 142
> Santa Monica, CA 90403
> P: (310) 933-3310
> F: (310) 402-2929
> E: lightfieldlab@cmbginc.com
>
> For the latest updates, visit Assignment Landing Page

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 381 of 810

---

**From:** Alan Jones <alan@jones.how>
**Sent:** Wednesday, February 25, 2026 7:56 PM
**To:** Light Field Lab <lightfieldlab@cmbginc.com>
**Cc:** Light Field Lab <lightfieldlab@cmbginc.com>;
Mathew Sakhai <mathew@cmbginc.com>
**Subject:** Re: Claims, Interest, and Formal Notices --
Alan Jones -- Assignment for the Benefit of Creditors
of Light Field Lab, Inc.

Hi Tanya,

Most appreciated. Section 2 of the General
Assignment also referenced a Fee Agreement
which was has not been disclosed to me yet.
It is also referenced as the "Fee Letter". As I
am an equity holder, could you please
provide me a copy of said letter and
agreement.

Please also provide any other documents I
am entitled to which have not yet been
disclosed.

Cheers,

Alan

Feb 23, 2026, 11:25 by
lightfieldlab@cmbginc.com:

> Hi Alan,
>
> Please be advised that your claims are
> still under legal review and may require
> additional information prior to
> approval.
>
> The claim numbers are listed below:
>
> Proof of Interest - #11322616436
> Proof of Claim #1 - #11322616376
> Proof of Claim #2 - #11322632845
> Proof of Claim #3 - #11322616557

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC     Document 52-1     Filed 03/11/26     Page 382 of 810

Thank you,

Tanya Davis
CMBG FBC-Light Field Lab LLC
CMBG Advisors, Inc.
Restructuring Officer
3019 Wilshire Blvd, Suite 142
Santa Monica, CA 90403
P: (310) 933-3310
F: (310) 402-2929
E: lightfieldlab@cmbginc.com

For the latest updates, visit Assignment
Landing Page

---

**From:** Alan Jones <alan@jones.how>
**Sent:** Friday, February 20, 2026 5:39 PM
**To:** Light Field Lab
<lightfieldlab@cmbginc.com>
**Cc:** Light Field Lab
<lightfieldlab@cmbginc.com>; Mathew
Sakhai <mathew@cmbginc.com>
**Subject:** Re: Claims, Interest, and Formal
Notices -- Alan Jones -- Assignment for the
Benefit of Creditors of Light Field Lab, Inc.

Hi Tanya,

Most appreciated. Happy to answer
any questions. Could you please
provide claim numbers for them.

Cheers,

Alan

Feb 20, 2026, 13:50 by
lightfieldlab@cmbginc.com:

Hi Alan,

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 383 of 810

We have received your claim forms and are currently reviewing them. We will reach out with any additional questions.

Thank you,

Tanya Davis
CMBG FBC-Light Field Lab LLC
CMBG Advisors, Inc.
Restructuring Officer
3019 Wilshire Blvd, Suite 142
Santa Monica, CA 90403
P: (310) 933-3310
F: (310) 402-2929
E: lightfieldlab@cmbginc.com

For the latest updates, visit
Assignment Landing Page

---

**From:** Alan Jones <alan@jones.how>
**Sent:** Wednesday, February 18, 2026 9:09 AM
**To:** Light Field Lab <lightfieldlab@cmbginc.com>
**Subject:** Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Hi James,

Please find attached my claims, proof of interest, and formal notices in connection with the Assignment for the Benefit of Creditors of Light Field Lab, Inc. (Date of

Assignment: August 15, 2025).

The following documents are attached to this email:

**Claims and Statements:**
- Cover Letter
- Proof of Claim #1 -- Crime Victim Claim (Form + Statement)
- Proof of Claim #2 -- Wrongful Termination (Form + Statement)
- Proof of Claim #3 -- Source Code / IP Reclamation (Form + Statement)
- Proof of Interest -- Equity Claim (Form + Statement)

**Formal Notices:**
- Notice A -- Fraud-Tainted Patent Portfolio
- Notice B -- Constructive Trust Over Source Code / IP
- Notice C -- Reserve Funds / Pending Litigation

**Supporting Documentation:**
- Stock Certificates CS-13, CS-14, and CS-15
- First Amended Complaint, Jones v. Light Field Lab Inc., Case No. 3:25-cv-05118-MMC (N.D. Cal.)
- LinkedIn profiles for Jon Karafin and Brendan Bevensee

The cover letter also references two full patents as supporting documentation (US10488584 and US10565734). These are not attached to this email due to file size. A complete copy of

Re: Claims, Interest, and Formal Notices -- Alan Jones -- Assignment for the Benefit of Creditors of Light Field Lab, Inc.

Case 3:25-cv-05118-MMC    Document 52-1    Filed 03/11/26    Page 385 of 810

all documents including the
patents is available at:

https://www.dropbox.com/
scl/fi/
ueqe19z9ugn8fderjg2vz/
LightFieldLab-Claims-
AlanJones.zip?
rlkey=g0hs7ch1yp21dzh1u9m5a2jwy&dl=0

Alternatively, I can provide
instructions for obtaining
these patents directly from
the USPTO if preferred.

Please acknowledge receipt
of this filing promptly.

Regards,

Alan Jones
318-759-7497
alan@jones.how

# EXHIBIT K

## PowerBI CTAPP COMPLIANCE HISTORY REPORT

### Bar Number

| 109516 | ⌄ |

### Attorney Name
James Kaufmann Baer

**Current Status**
Not Eligible

### Billing Year

| 2023 | 2024 | 2025 | › |

### Screening Question

| Year | Trust Account Responsibilities |
|------|-------------------------------|

### Initial Response

| Year | IOLTA | non-IOLTA |
|------|-------|-----------|
| 2023 | Yes   | No        |

### No Registered Accounts Statement

| Year | Reported by |
|------|-------------|

### Trust Accounts

| Year | Bank | Account | Routing # | Account # | Balance | Firm Name | Open Date | Close Date |
|------|------|---------|-----------|-----------|---------|-----------|-----------|------------|
| 2023 | ▮▮▮▮▮ | CA IOLTA | ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮▮ | | |

### Self-Assessment Questions

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|------|---|---|---|---|---|---|---|---|---|----|----|----|
| 2023 |  |

### Certification of Compliance

| Year ▲ | Certification | Compliance Date |
|--------|---------------|-----------------|
| 2023 | In Compliance | 3/30/2023 |

### Non-Compliance Explanations

| Year ▲ | Explanation |
|--------|-------------|

### Annual Declaration

| Year ▲ | Declaration Exists | Declaration Date |
|--------|--------------------|------------------|
| 2023 | True | 3/30/2023 |

## Screening Question

| Year | First Screening Question Text |
|------|-------------------------------|

## Screening Question Response

| Year | Response |
|------|----------|

## Initial Response Text

| Year | Questions Seen |
|------|----------------|
| ⊟ **2023** | |
| IOLTA | For the reporting period of January 1, 2022 – December 31, 2022, did you maintain any common interest-bearing client trust accounts, also known as an Interest of Lawyer's Trust Account (IOLTA)? Select all that apply.<br>• Yes, I maintained an IOLTA.<br>• Yes, a firm or organization maintained an IOLTA on my behalf. I am currently employed by or in practice with the firm/organization.<br>• Yes, a firm or organization maintained an IOLTA on my behalf. However, I am no longer employed by or in practice with the firm/organization.<br>• No, I did not maintain an IOLTA, and no firm or organization maintained an IOLTA on my behalf. |
| Non-IOLTA | For the reporting period of January 1, 2022 – December 31, 2022, did you maintain any individual interest-bearing client trust accounts (CTAs)? Select all that apply.<br>• Yes, I maintained an individual interest-bearing CTA.<br>• Yes, a firm or organization maintained an individual interest-bearing CTA on my behalf. I am currently employed by or in practice with the firm/organization.<br>• Yes, a firm or organization maintained an individual interest-bearing CTA on my behalf. However, I am no longer employed by or in practice with the firm/organization.<br>• No, I did not maintain an individual interest-bearing CTA and no firm or organization maintained an IOLTA on my behalf. |

## Initial Responses

| Year | IOLTA Response | Non-IOLTA Reponse |
|------|----------------|-------------------|
| 2023 | Yes, I maintained an IOLTA. | No, I did not maintain an individual interest-bearing CTA and no firm or organization maintained an IOLTA on my behalf. |

| Year | Self-Assessment Text |
|------|----------------------|
| ⊟ **2023** | |
| 1 | I affirm that any funds held in an IOLTA account are maintained in an IOLTA-eligible institution.<br>References for consideration in providing responses: (1) California Business and Professions Code sections 6091.2, 6211, 6212, and 6213; (2) State Bar Rules, Title 2, Division 5, Chapter 1, rules 2.100, 2.110 and 2.117 |
| 2 | I affirm that the registration of client trust account information is updated annually in the manner prescribed by the State Bar.<br>References for consideration in providing response: (1) California Rules of Court, rule 9.8.5; (2) State Bar Rules, Title 2, Division 1, rule 2.5 |
| 3 | I affirm that all client funds or funds entrusted by others to me or to my firm or organization under the provisions of rule 1.15 of the Rules of Professional Conduct are held in one or more accounts labeled as a "Trust Account," or similar designation, and are maintained separate from any accounts held by me, by other individual attorneys in my firm/organization, or by the firm/organization that primarily hold personal or business funds.<br>References for consideration in providing response: (1) Business and Professions Code sections 6210 et seq.; (2) Rule of Professional Conduct 1.15(a) and (c) |
| 4 | For each client trust account maintained by me or my firm, I affirm that the following records are maintained:<br>- Client Ledger<br>- Account Journal<br>- Bank Statements<br>- Cancelled Checks<br>- Written Monthly Reconciliations<br>References for consideration in providing response: (1 Rule of Professional Conduct 1.15(d)(3); (2) Recordkeeping standards adopted by the Board of Trustees pursuant to Rule of Professional Conduct 1.15(e); (3) 2023 Handbook on Client Trust Accounting for California Attorneys, Sections VII-VIII |
| 5 | I affirm that a written, monthly reconciliation of the bank statement, client ledger, and account journal are completed for each client trust account.<br>References for consideration in providing response: (1) Rule of Professional Conduct 1.15(d) and (e); (2) Recordkeeping standards adopted by the Board of Trustees pursuant to Rule of Professional Conduct 1.15(e); (3) 2023 Handbook on Client Trust Accounting for California Attorneys, Section VIII |
| 6 | I affirm that timely reports are provided to clients or other persons accounting for funds, securities, or other property held in their name, including deposits, withdrawals, and other transactions.<br>Reference for consideration in providing response: Rule of Professional Conduct 1.15(d)(4) |
| 7 | If a fee agreement involves advances for costs, expenses, or fees, such funds are held in a client trust account prior to being expensed or earned, unless subject to an exception.<br>Reference for consideration in providing response: Rule of Professional Conduct 1.15(a), (b), and (c); Comment [2] |
| 8 | I affirm that fees are withdrawn from client trust accounts at the earliest reasonable time once the fees, or a portion thereof, become fixed and earned.<br>Reference for consideration in providing response: Rule of Professional Conduct 1.15(c)(2) |
| 9 | I affirm, that absent good cause, clients or other persons with an interest in the funds, securities, or other property received are notified about the receipt of the funds, securities, or other property no later than 14 days after receipt.<br>Reference for consideration in providing response: Rule of Professional Conduct 1.15(d)(1) |
| 10 | I affirm that client funds are NOT used to pay for bank charges or service fees and sufficient funds belonging to me or the law firm are deposited in the client trust account for this purpose or other steps are taken so client funds are not used to pay for bank charges.<br>Reference for consideration in providing response: Rule of Professional Conduct 1.15(c)(1) |
| 11 | If a dispute arises as to rights to any funds I hold in trust for clients, I affirm that the disputed portion of these funds are not withdrawn until the dispute is resolved.<br>Reference for consideration in providing response: Rule of Professional Conduct 1.15(c)(2) |
| 12 | I affirm that policies and procedures, such as training and supervision practices, are in place and are followed to ensure that client trust accounts are managed consistent with the California Rules of Professional Conduct.<br>References for consideration in providing response: (1) In the Matter of Respondent E (Rev. Dept. 1991) 1 Cal. State Bar Ct. Rptr. 716; (2) Palomo v. State Bar (1984) 36 Cal.3d 785; (3) Rule of Professional Conduct 1.15; (4) 2023 Handbook on Client Trust Accounting for California Attorneys. |

## No Registered Accounts Statement

| Condensed Statement | Full Statement Text |
|---|---|
| Reported by firm | My firm or organization administrator informed me that the IOLTA and/or Non-IOLTA trust account details will be registered by my firm or organization on my behalf through the State Bar's Agency Billing application. I understand that it is my responsibility to ensure that my CTAPP reporting is complete including that my firm or organization registers any account details maintained on my behalf. |
| Other: (see free-response below) | Other |

## No Registered Accounts Statement: Other Free-Response

| BillingYear | FirmReportingResponseText |
|---|---|

## Certificate of Compliance

| Year | Certification of Compliance Text |
|---|---|
| 2023 | I certify that I am knowledgeable about, and in compliance with, applicable rules and statutes governing client trust accounts and the safekeeping of funds entrusted by clients and others, including rules 1.4, 1.5, and 1.15 of the Rules of Professional Conduct, and Bus. & Prof. Code sec. 6210, et seq. |
| | I am not in compliance with the applicable rules and statutes governing client trust accounts and the safekeeping of funds entrusted by clients and others. Please explain in the box below how your trust accounting practices are not in compliance with the applicable rule and statutes governing client trust accounts and the safekeeping of funds entrusted by clients and others. |

| Year | Noncompliance Explanation |
|---|---|
| 2023 | |

## Annual Declaration

| Year | Declaration Text |
|---|---|
| 2023 | I am _____ and I declare under penalty of perjury under the laws of the State of California that the information I provided in response to the Annual Client Trust Account Reporting, Account Registration (if applicable), Client Trust Account Annual Self-Assessment (if applicable), and Client Trust Account Annual Certification of Compliance is true and correct. |

**CERTIFICATE OF MAILING**

**IN THE MATTER OF THE ADMINISTRATIVE INACTIVE STATUS ENROLLMENT OF**    109516
**LICENSEE NUMBER:**

I, Steven Moawad, am over the age of eighteen (18) years and employed in the county where the mailing took place. My business address and place of employment is the State Bar of California, 180 Howard Street, San Francisco, CA 94105. I certify that:

On the date shown below, a true copy of the within document(s) entitled CTAPP Noncompliance Final Notice was processed and placed for collection and mailing with the United States Postal Service following our ordinary business practices.

1. I am readily familiar with the State Bar of California's practice for processing and collection of correspondence for mailing with the United States Postal Service.
2. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.
3. The name and address of the person served as shown on the envelope is as follows:

| Licensee and State Bar Number | Address of Record |
|---|---|
| James Kaufmann Baer<br>SBN: 109516 | James K Baer Esq.<br>11840 Dorothy St<br>Apt 301<br>Los Angeles, CA 90049-7902 |

4. After processing and following ordinary business practices, the envelope was sealed and placed for collection and mailing on the date below.

I certify that the foregoing is true and correct.

DATE: _____ May 22, 2024 _____     SIGNED: _____ Steven J. Moawad _____
                                                                                Steven Moawad

**The State Bar of California**

**DIVISION OF REGULATION**

180 Howard Street, San Francisco, CA 94105                    888-800-3400

May 22, 2024                                        **CTAPP NONCOMPLIANCE FINAL NOTICE**

109516
James Kaufmann Baer
James K Baer Esq.
11840 Dorothy St
Apt 301
Los Angeles, CA 90049-7902

Dear James Kaufmann Baer:

State Bar of California records indicate that, as of May 15, 2024, you are noncompliant with the Client Trust Account Protection Program (CTAPP) reporting requirements (State Bar Rules, rule 2.5 All licensees who were on active status **at any point** during calendar year 2023 must complete the annual CTAPP reporting requirements. You are noncompliant due to the following:

- CTAPP reporting not completed.
- CTAPP noncompliance fee unpaid.

Please log in to your My State Bar Profile to complete your CTAPP reporting requirements and/or submit payment of the noncompliance late fee (or any balance owed thereof) by **July 1, 2024**. (To pay any outstanding fees, go the "State Bar Fees" section in your profile, and then use the "Calculate and Pay My 2024 Fees" link.)

Failure to address this noncompliance by **July 1, 2024**, will result in your enrollment on administrative inactive status ('Not Eligible to Practice') effective July 2, 2024. If you are placed on 'Not Eligible' status, reinstatement will require completion of the CTAPP reporting requirements and payment of the late fee as well as an additional reinstatement fee.

To avoid 'Not Eligible to Practice' status and maintain your ability to practice law in California, please submit payment by July 1, 2024.

Division of Regulation

**Last Updated:**

### PowerBI CTAPP COMPLIANCE HISTORY REPORT

3/5/2026

## Bar Number

| 109516 | ∨ |

## Attorney Name

James Kaufmann Baer

**Current Status**

Not Eligible

## Billing Year

| 2023 | **2024** | 2025 | › |

### Screening Question

| Year | Trust Account Responsibilities |
|------|-------------------------------|

### Initial Response

| Year | IOLTA | non-IOLTA |
|------|-------|-----------|
| 2024 | Yes | No |

### No Registered Accounts Statement

| Year | Reported by |
|------|-------------|

### Trust Accounts

| Year | Bank | Account | Routing # | Account # | Balance | Firm Name | Open Date | Close Date |
|------|------|---------|-----------|-----------|---------|-----------|-----------|------------|
| 2024 | ▮▮▮▮▮ | CA IOLTA | ▮▮▮ | ▮▮▮ | | ▮▮▮▮▮. | 8/16/2022 | 1/10/2024 |

### Self-Assessment Questions

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|------|---|---|---|---|---|---|---|---|---|----|----|----|
| 2024 |  | | | | | | | | | | | |

### Certification of Compliance

| Year ▲ | Certification | Compliance Date |
|--------|---------------|-----------------|
| 2024 | In Compliance | 5/28/2024 |

### Non-Compliance Explanations

| Year ▲ | Explanation |
|--------|-------------|

### Annual Declaration

| Year ▲ | Declaration Exists | Declaration Date |
|--------|--------------------|------------------|
| 2024 | True | 5/28/2024 |

## Screening Question

| Year | First Screening Question Text |
|------|-------------------------------|

## Screening Question Response

| Year | Response |
|------|----------|

## Initial Response Text

| Year | | Questions Seen |
|------|---|----------------|
| ☐ **2024** | | |
| | IOLTA | At any point during the reporting period of January 1, 2023 – December 31, 2023, or the reportable time period required under rule 2.5(A)(5) of the Rules of the State Bar of California, did you maintain any trust accounts under Business and Professions Code section 6211, subdivision (a) where the interest is paid to the State Bar, also known as an Interest of Lawyer's Trust Account (IOLTA)? (Select all that apply)<br>• Yes, I maintained an IOLTA.<br>• Yes, a firm or organization maintained an IOLTA on my behalf. I am currently employed by or in practice with the firm/organization.<br>• Yes, a firm or organization maintained an IOLTA on my behalf. However, I am no longer employed by or in practice with the firm/organization.<br>• No, I did not maintain an IOLTA, and no firm or organization maintained an IOLTA on my behalf. |
| | Non-IOLTA | At any point during the reporting period of January 1, 2023 – December 31, 2023, or the reportable time period required under rule 2.5(A)(5) of the Rules of the State Bar of California, did you maintain any accounts under Business and Professions Code section 6211, subdivision (b) where the interest is payable to a client or other person, also known as non-IOLTA trust accounts? (Select all that apply)<br>• Yes, I maintained a non-IOLTA.<br>• Yes, a firm or organization maintained a non-IOLTA on my behalf. I am currently employed by or in practice with the firm/organization.<br>• Yes, a firm or organization maintained a non-IOLTA on my behalf. However, I am no longer employed by or in practice with the firm/organization.<br>• No, I did not maintain a non-IOLTA and no firm or organization maintained a non-IOLTA on my behalf. |

## Initial Responses

| Year | IOLTA Response | Non-IOLTA Reponse |
|------|----------------|-------------------|
| 2024 | Yes, a firm or organization maintained an IOLTA on my behalf. However, I am no longer employed by or in practice with the firm/organization. | No, I did not maintain a non-IOLTA and no firm or organization maintained a non-IOLTA on my behalf. |

| Year | Self-Assessment Text |
|---|---|
| ⊟ **2024** | |
| 1 | I affirm that any funds held in a California IOLTA account are maintained in an IOLTA-eligible institution identified on the State Bar of California's website. California Business and Professions Code sections 6091.2, 6211, 6212, and 6213 State Bar Rules, Title 2, Division 5, Chapter 1, rules 2.100, 2.110 and 2.117 |
| 2 | I affirm that the registration of client trust account information is updated annually in the manner prescribed by the State Bar. References for consideration in providing response: (1) California Rules of Court, rule 9.8.5; (2) State Bar Rules, Title 2, Division 1, rule 2.5 |
| 3 | I affirm that all client funds or funds entrusted by others to me or to my firm or organization under the provisions of rule 1.15 of the Rules of Professional Conduct are held in one or more accounts labeled as a "Trust Account," or similar designation, and are maintained separate from any accounts held by me, by other individual attorneys in my firm/organization, or by the firm/organization that primarily hold personal or business funds. References for consideration in providing response: (1) Business and Professions Code sections 6210 et seq.; (2) Rule of Professional Conduct 1.15(a) and (c) |
| 4 | For each client trust account maintained by me or my firm, I affirm that the following records are maintained:<br>- Client Ledger<br>- Account Journal<br>- Bank Statements<br>- Cancelled Checks<br>- Written Monthly Reconciliations<br>References for consideration in providing response: (1 Rule of Professional Conduct 1.15(d)(3); (2) Recordkeeping standards adopted by the Board of Trustees pursuant to Rule of Professional Conduct 1.15(e); (3) 2023 Handbook on Client Trust Accounting for California Attorneys, Sections VII-VIII |
| 5 | I affirm that a written, monthly reconciliation of the bank statement, client ledgers, and account journal are completed for each client trust account. References for consideration in providing response: (1) Rule of Professional Conduct 1.15(d) and (e); (2) Recordkeeping standards adopted by the Board of Trustees pursuant to Rule of Professional Conduct 1.15(e); (3) 2023 Handbook on Client Trust Accounting for California Attorneys, Section VIII |
| 6 | I affirm that timely reports are provided to clients or other persons accounting for funds, securities, or other property held in their name, including deposits, withdrawals, and other transactions. Reference for consideration in providing response: Rule of Professional Conduct 1.15(d)(4) |
| 7 | If a fee agreement involves advances for costs, expenses, or fees, such funds are held in a client trust account prior to being expensed or earned, unless subject to an exception. Reference for consideration in providing response: Rule of Professional Conduct 1.15(a), (b), and (c); Comment [2] |
| 8 | I affirm that fees are withdrawn from client trust accounts at the earliest reasonable time once the fees, or a portion thereof, become fixed and earned. Reference for consideration in providing response: Rule of Professional Conduct 1.15(c)(2) |
| 9 | I affirm, that absent good cause, clients or other persons with an interest in the funds, securities, or other property received are notified about the receipt of the funds, securities, or other property no later than 14 days after receipt. Reference for consideration in providing response: Rule of Professional Conduct 1.15(d)(1) |
| 10 | I affirm that client funds are NOT used to pay for bank charges or service fees and sufficient funds belonging to me or the law firm are deposited in the client trust account for this purpose or other steps are taken so client funds are not used to pay for bank charges. Reference for consideration in providing response: Rule of Professional Conduct 1.15(c)(1) |
| 11 | If a dispute arises as to rights to any funds I hold in trust for clients, I affirm that the disputed portion of these funds are not withdrawn until the dispute is resolved. Reference for consideration in providing response: Rule of Professional Conduct 1.15(c)(2) |
| 12 | I affirm that policies and procedures, such as training and supervision practices, are in place and are followed to ensure that client trust accounts are managed consistent with the California Rules of Professional Conduct. References for consideration in providing response: (1) In the Matter of Respondent E (Rev. Dept. 1991) 1 Cal. State Bar Ct. Rptr. 716; (2) Palomo v. State Bar (1984) 36 Cal.3d 785; (3) Rule of Professional Conduct 1.15; (4) 2023 Handbook on Client Trust Accounting for California Attorneys. |

## No Registered Accounts Statement

| Condensed Statement | Full Statement Text |
|---|---|
| Reported by firm | My firm or organization administrator informed me that the IOLTA and/or Non-IOLTA trust account details will be registered by my firm or organization on my behalf through the State Bar's Agency Billing application. I understand that it is my responsibility to ensure that my CTAPP reporting is complete including that my firm or organization registers any account details maintained on my behalf. |
| Other: (see free-response below) | Other |

## No Registered Accounts Statement: Other Free-Response

| BillingYear | FirmReportingResponseText |
|---|---|

## Certificate of Compliance

| Year | Certification of Compliance Text |
|---|---|
| 2024 | I certify that I am knowledgeable about, and in compliance with, applicable rules and statutes governing client trust accounts and the safekeeping of funds entrusted by clients and others, including rules 1.4, 1.5, and 1.15 of the Rules of Professional Conduct, and Bus. & Prof. Code sec. 6210, et seq.<br><br>I am not in compliance with the applicable rules and statutes governing client trust accounts and the safekeeping of funds entrusted by clients and others. Please explain in the box below how your trust accounting practices are not in compliance with the applicable rule and statutes governing client trust accounts and the safekeeping of funds entrusted by clients and others. |

| Year | Noncompliance Explanation |
|---|---|
| 2024 | |

## Annual Declaration

| Year | Declaration Text |
|---|---|
| 2024 | I am _____ and I declare under penalty of perjury under the laws of the State of California that the information I provided in response to the Annual Client Trust Account Reporting, Account Registration (if applicable), Client Trust Account Annual Self-Assessment (if applicable), and Client Trust Account Annual Certification of Compliance is true and correct. |

## December 21, 2023 Email Reminder

**December 21, 2023**
**CTAPP Reminder Email**
**Category: Inactive attorneys, Not Started**

Subject: CTAPP Reporting Requirements Reminder for State Bar of California Bar No.

Dear <Attorney>,

This is a reminder that all licensees who were on active status **at any point** during the reportable period of January 1, 2023 - December 31, 2023, must complete the Client Trust Account Protection Program (CTAPP) reporting requirements.

This email confirms that although you are currently inactive, our records indicate that you were on active status during the reporting period. As such, you are required to comply with the CTAPP reporting requirements. CTAPP reporting includes answering the question of whether ***or not***, at any time during the reportable time period, you were responsible for client funds and funds entrusted by others under the provisions of rule 1.15 of the Rules of Professional Conduct.

As of December 20, 2023, our records indicate that you are not compliant with the CTAPP reporting requirement. To avoid assessment of a late penalty please complete your CTAPP reporting requirements online through your My State Bar Profile by **February 1, 2024**.

Continue reading below for information on completing your CTAPP reporting requirements.

**Complete your CTAPP reporting requirements**
To complete your CTAPP reporting requirements, you must:
- Report whether ***or not***, at any time during the reportable time period, you (1) acted as a signatory on a trust account, exercised managerial or primary administrative oversight for a trust account – even if there was no money in the account, or (2) were responsible for client funds and funds entrusted by others under the provisions of rule 1.15 of the Rules of Professional Conduct, and, if so,
  - Register any IOLTA and/or non-IOLTA accounts maintained, either individually or through your firm or organization, during the reporting period of January 1, 2023 - December 31, 2023. This includes providing the ending balance **as of December 31, 2023**, for any account registered,
  - Complete an annual self-assessment of client trust account management practices, and
  - Certify with the State Bar that you understand and comply with requirements and prohibitions applicable to the safekeeping of funds and property of clients and other persons in rule 1.15 of the Rules of Professional Conduct.

2

As you complete your CTAPP reporting in your My State Bar Profile, take note that you may save your progress on each page. This will allow you to easily come back later and finalize your reporting requirement after gathering all the essential information.

**Do not maintain a trust account?**
**If you do not need a trust account** because you are not required to hold funds in trust and not responsible for complying with any of the requirements or prohibitions in rule 1.15 of the Rules of Professional Conduct, **you can answer "no"** to the CTAPP Step 1: Annual Client Trust Account Reporting questions as to whether you maintain any IOLTA and/or non-IOLTA accounts. After submitting that response and declaring the information is true, your annual compliance with CTAPP would then be deemed complete.

**Firm maintains account**
If your firm or organization maintains trust accounts on your behalf, you may indicate that your firm will register the required account information on your behalf. Next, your firm can register the required account information on your behalf through the State Bar's Agency Billing application.

Nonetheless, it remains your responsibility to ensure that your firm or organization registers the required account information on your behalf by **February 1, 2024**.

**Resources available to you**
To assist licensees in completing their CTAPP reporting obligations, the State Bar is offering the following resources:
- Questions? View the CTAPP FAQs.
- Learn about the CTAPP reporting requirements and access training videos.
- View a guide for how to complete your CTAPP reporting requirements online through your My State Bar Profile.

For further assistance, please reply to this email with any questions.

Division of Regulation
CTAPP@calbar.ca.gov

**December 21, 2023**
**CTAPP Reminder Email**
**Category: Active attorneys, Not Started**

Subject: CTAPP Reporting Requirements Reminder for State Bar of California Bar No.

Dear <Attorney>,

This is a reminder that all licensees who were on active status **at any point** during the reportable period of January 1, 2023 - December 31, 2023, must complete the Client Trust Account Protection Program (CTAPP) reporting requirements.

As of December 20, 2023, our records indicate that you are not compliant with the CTAPP reporting requirement. To avoid assessment of a late penalty please complete your CTAPP reporting requirements online through your My State Bar Profile by **February 1, 2024**.

Continue reading below for information on completing your CTAPP reporting requirements.

**Complete your CTAPP reporting requirements**
To complete your CTAPP reporting requirements, you must:
- Report whether **or not**, at any time during the reportable time period, you (1) acted as a signatory on a trust account, exercised managerial or primary administrative oversight for a trust account – even if there was no money in the account, or (2) were responsible for client funds and funds entrusted by others under the provisions of rule 1.15 of the Rules of Professional Conduct, and, if so,
  - Register any IOLTA and/or non-IOLTA accounts maintained, either individually or through your firm or organization, during the reporting period of January 1, 2023 - December 31, 2023. This includes providing the ending balance **as of December 31, 2023**, for any account registered,
  - Complete an annual self-assessment of client trust account management practices, and
  - Certify with the State Bar that you understand and comply with requirements and prohibitions applicable to the safekeeping of funds and property of clients and other persons in rule 1.15 of the Rules of Professional Conduct.

As you complete your CTAPP reporting in your My State Bar Profile, take note that you may save your progress on each page. This will allow you to easily come back later and finalize your reporting requirement after gathering all the essential information.

**Do not maintain a trust account?**
**If you do not need a trust account** because you are not required to hold funds in trust and not responsible for complying with any of the requirements or prohibitions in rule 1.15 of the Rules of Professional Conduct, **you can answer "no"** to the CTAPP Step 1: Annual Client Trust Account Reporting questions as to whether you maintain any IOLTA and/or non-IOLTA

accounts. After submitting that response and declaring the information is true, your annual compliance with CTAPP would then be deemed complete.

**Firm maintains account**

If your firm or organization maintains trust accounts on your behalf, you may indicate that your firm will register the required account information on your behalf. Next, your firm can register the required account information on your behalf through the State Bar's Agency Billing application.

Nonetheless, it remains your responsibility to ensure that your firm or organization registers the required account information on your behalf by **February 1, 2024**.

**Resources available to you**

To assist licensees in completing their CTAPP reporting obligations, the State Bar is offering the following resources:

- Questions? View the CTAPP FAQs.
- Learn about the CTAPP reporting requirements and access training videos.
- View a guide for how to complete your CTAPP reporting requirements online through your My State Bar Profile.

For further assistance, please reply to this email with any questions.

Division of Regulation
CTAPP@calbar.ca.gov

## January 11, 2024 Email Reminder

**January 11, 2024**
**CTAPP Reminder Email**
**Category: Inactive attorneys, Started and Not Started**

Subject: Action Required - CTAPP Reporting Requirements Reminder for State Bar of California Bar No.

Dear <Attorney>,

This is a reminder that the deadline to complete your annual Client Trust Account Protection Program (CTAPP) reporting requirements is **February 1, 2024**.

All licensees who were on active status **at any point** during the reportable period of January 1, 2023 - December 31, 2023, must complete the annual CTAPP reporting requirements.

This email confirms that although you are currently inactive, our records indicate that you were on active status during the reporting period. As such, you are required to comply with the CTAPP reporting requirements. CTAPP reporting includes answering the question of whether *or not*, at any time during the reportable time period, you were responsible for client funds and funds entrusted by others under the provisions of rule 1.15 of the Rules of Professional Conduct.

To avoid assessment of a late penalty please complete your CTAPP reporting requirements online through your My State Bar Profile by **February 1, 2024**. Please note that you will be required to verify the details in your attorney record upon your initial login to your My State Bar Profile before you can access other sections. **Additionally, if you have not reported your practice sector and law firm size information or other required attorney record information is missing, you will be required to update your attorney record. You must also add an effective date for your practice sector and law firm size.** View a guide on how to confirm your attorney record information.

Continue reading below for information on completing your CTAPP reporting requirements.

**Complete your CTAPP reporting requirements**

To complete your CTAPP reporting requirements, you must:

- Report whether **or not**, at any time during the reportable time period, you (1) acted as a signatory on a trust account, exercised managerial or primary administrative oversight for a trust account – even if there was no money in the account, or (2) were responsible for client funds and funds entrusted by others under the provisions of rule 1.15 of the Rules of Professional Conduct, and, if so,

  - Register any IOLTA and/or non-IOLTA accounts maintained, either individually or through your firm or organization, during the reporting period of January 1, 2023 - December 31, 2023. This includes providing the ending balance **as of December 31, 2023**, for any account registered,

  - Complete an annual self-assessment of client trust account management practices, and

  - Certify with the State Bar that you understand and comply with requirements and prohibitions applicable to the safekeeping of funds and property of clients and other persons in rule 1.15 of the Rules of Professional Conduct.

As you complete your CTAPP reporting in your My State Bar Profile, take note that you may save your progress on each page. This will allow you to easily come back later and finalize your reporting requirement after gathering all the essential information.

**Do not maintain a trust account?**

**If you do not need a trust account** because you are not required to hold funds in trust and not responsible for complying with any of the requirements or prohibitions in rule 1.15 of the Rules of Professional Conduct, **you can answer "no"** to the CTAPP Step 1: Annual Client Trust Account Reporting questions as to whether you maintain any IOLTA and/or non-IOLTA accounts. After submitting that response and declaring the information is true, your annual compliance with CTAPP would then be deemed complete.

**Firm maintains account**

If your firm or organization maintains trust accounts on your behalf, you may indicate that your firm will register the required account information on your behalf. Next, your firm can register the required account information on your behalf through the State Bar's Agency Billing application.

Nonetheless, it remains your responsibility to ensure that your firm or organization registers the required account information on your behalf by **February 1, 2024**.

**Resources available to you**

To assist licensees in completing their CTAPP reporting obligations, the State Bar is offering the following resources:

- Questions? View the CTAPP FAQs.

- Learn about the CTAPP reporting requirements and access training videos.

- View a guide for how to complete your CTAPP reporting requirements online through your My State Bar Profile.

For further assistance, please reply to this email with any questions.

Division of Regulation
CTAPP@calbar.ca.gov

**January 11, 2024**
**CTAPP Reminder Email**
**Category: Active attorneys, Started and Not Started**

Subject: Action Required - CTAPP Reporting Requirements Reminder for State Bar of California Bar No.

Dear <Attorney>,

This is a reminder that the deadline to complete your annual Client Trust Account Protection Program (CTAPP) reporting requirements is **February 1, 2024**.

All licensees who were on active status **at any point** during the reportable period of January 1, 2023 - December 31, 2023, must complete the annual CTAPP reporting requirements.

To avoid assessment of a late penalty please complete your CTAPP reporting requirements online through your My State Bar Profile by **February 1, 2024**. Please note that you will be required to verify the details in your attorney record upon your initial login to your My State Bar Profile before you can access other sections. **Additionally, if you have not reported your practice sector and law firm size information or other required attorney record information is missing, you will be required to update your attorney record. You must also add an effective date for your practice sector and law firm size.** View a guide on how to confirm your attorney record information.

Continue reading below for information on completing your CTAPP reporting requirements.

**Complete your CTAPP reporting requirements**

To complete your CTAPP reporting requirements, you must:

- Report whether *or not*, at any time during the reportable time period, you (1) acted as a signatory on a trust account, exercised managerial or primary administrative oversight for a trust account – even if there was no money in the account, or (2) were responsible for client funds and funds entrusted by others under the provisions of rule 1.15 of the Rules of Professional Conduct, and, if so,

  - Register any IOLTA and/or non-IOLTA accounts maintained, either individually or through your firm or organization, during the reporting period of January 1, 2023 - December 31, 2023. This includes providing the ending balance **as of December 31, 2023**, for any account registered,

    o   Complete an annual self-assessment of client trust account management practices, and

    o   Certify with the State Bar that you understand and comply with requirements and prohibitions applicable to the safekeeping of funds and property of clients and other persons in rule 1.15 of the Rules of Professional Conduct.

As you complete your CTAPP reporting in your My State Bar Profile, take note that you may save your progress on each page. This will allow you to easily come back later and finalize your reporting requirement after gathering all the essential information.

**Do not maintain a trust account?**

**If you do not need a trust account** because you are not required to hold funds in trust and not responsible for complying with any of the requirements or prohibitions in rule 1.15 of the Rules of Professional Conduct, **you can answer "no"** to the CTAPP Step 1: Annual Client Trust Account Reporting questions as to whether you maintain any IOLTA and/or non-IOLTA accounts. After submitting that response and declaring the information is true, your annual compliance with CTAPP would then be deemed complete.

**Firm maintains account**

If your firm or organization maintains trust accounts on your behalf, you may indicate that your firm will register the required account information on your behalf. Next, your firm can register the required account information on your behalf through the State Bar's Agency Billing application.

Nonetheless, it remains your responsibility to ensure that your firm or organization registers the required account information on your behalf by **February 1, 2024**.

**Resources available to you**

To assist licensees in completing their CTAPP reporting obligations, the State Bar is offering the following resources:

- Questions? View the CTAPP FAQs.

- Learn about the CTAPP reporting requirements and access training videos.

- View a guide for how to complete your CTAPP reporting requirements online through your My State Bar Profile.

For further assistance, please reply to this email with any questions.

Division of Regulation
CTAPP@calbar.ca.gov

## March 5, 2024 Email Reminder

**March 5, 2024**
**CTAPP Reminder Email**
**Category: Active and inactive attorneys, Compliance status is started/not started and late fee is outstanding**

Subject: [Action Required] CTAPP Noncompliance Fee Reminder for State Bar of California Bar No.

Dear <Attorney>,

The deadline to complete your annual Client Trust Account Protection Program (CTAPP) reporting requirements was February 1, 2024, and late penalties were assessed if your CTAPP reporting requirements were not completed by February 23, 2024. Our records indicate that you still have not completed your CTAPP reporting requirements or paid the late penalty incurred for noncompliance.

All licensees who were on active status **at any point** during the reportable period of January 1, 2023 - December 31, 2023, must complete the annual CTAPP reporting requirements. The final deadline to complete your CTAPP reporting requirements is **July 1, 2024**.

**Complete your CTAPP reporting requirements**
To complete your CTAPP reporting requirements, you must:
- Report whether **or not**, at any time during the reportable time period, you (1) acted as a signatory on a trust account, exercised managerial or primary administrative oversight for a trust account – even if there was no money in the account, or (2) were responsible for client funds and funds entrusted by others under the provisions of rule 1.15 of the Rules of Professional Conduct, and, if so,
  - Register any IOLTA and/or non-IOLTA accounts maintained, either individually or through your firm or organization, during the reporting period of January 1, 2023 - December 31, 2023. This includes providing the ending balance **as of December 31, 2023**, for any account registered,
  - Complete an annual self-assessment of client trust account management practices, and
  - Certify with the State Bar that you understand and comply with requirements and prohibitions applicable to the safekeeping of funds and property of clients and other persons.

**Do not maintain a trust account?**
**If you do not need a trust account** because you are not required to hold funds in trust and not responsible for complying with any of the requirements or prohibitions in rule 1.15 of the Rules of Professional Conduct, **you can answer "no"** to the CTAPP Step 1: Annual Client Trust Account Reporting questions as to whether you maintain any IOLTA and/or non-IOLTA

12

accounts. After submitting that response and declaring the information is true, your annual compliance with CTAPP would then be deemed complete.

**Firm maintains account**

If your firm or organization maintains trust accounts on your behalf and you know your firm or organization is going to register the trust account details on your behalf using the State Bar's Agency Billing application, in Step 2: Account Registration, you may check the box next to the statement "My firm or organization administrator informed me that the IOLTA and/or Non-IOLTA trust account details will be registered by my firm or organization on my behalf through the State Bar's Agency Billing application. I understand that it is my responsibility to ensure that my CTAPP reporting is complete, including that my firm or organization registers any account details maintained on my behalf."

Nonetheless, it remains your responsibility to ensure that your firm or organization registers the required account information on your behalf.

**Resources available to you**

To assist licensees in completing their CTAPP reporting obligations, the State Bar is offering the following resources:

- Questions? View the CTAPP FAQs.
- Learn about the CTAPP reporting requirements and access training videos.
- View a guide for how to complete your CTAPP reporting requirements online through your My State Bar Profile.

For further assistance, please reply to this email with any questions.

Division of Regulation
CTAPP@calbar.ca.gov

**March 5, 2024**
**CTAPP Reminder Email**
**Category: Active and inactive attorneys, Compliance status is started/not started and late fee is paid**

Subject: [Action Required] CTAPP Noncompliance Fee Reminder for State Bar of California Bar No.

Dear <Attorney>,

The deadline to complete your annual Client Trust Account Protection Program (CTAPP) reporting requirements was February 1, 2024, and late penalties were assessed if your CTAPP reporting requirements were not completed by February 23, 2024. Our records indicate that while you have paid the CTAPP late compliance penalty, you still have not completed your CTAPP reporting requirements.

All licensees who were on active status **at any point** during the reportable period of January 1, 2023 - December 31, 2023, must complete the annual CTAPP reporting requirements. The final deadline to complete your CTAPP reporting requirements is **July 1, 2024**.

**Complete your CTAPP reporting requirements**
To complete your CTAPP reporting requirements, you must:
- Report whether *or not*, at any time during the reportable time period, you (1) acted as a signatory on a trust account, exercised managerial or primary administrative oversight for a trust account – even if there was no money in the account, or (2) were responsible for client funds and funds entrusted by others under the provisions of rule 1.15 of the Rules of Professional Conduct, and, if so,
  - Register any IOLTA and/or non-IOLTA accounts maintained, either individually or through your firm or organization, during the reporting period of January 1, 2023 - December 31, 2023. This includes providing the ending balance **as of December 31, 2023**, for any account registered,
  - Complete an annual self-assessment of client trust account management practices, and
  - Certify with the State Bar that you understand and comply with requirements and prohibitions applicable to the safekeeping of funds and property of clients and other persons.

**Do not maintain a trust account?**
**If you do not need a trust account** because you are not required to hold funds in trust and not responsible for complying with any of the requirements or prohibitions in rule 1.15 of the Rules of Professional Conduct, **you can answer "no"** to the CTAPP Step 1: Annual Client Trust Account Reporting questions as to whether you maintain any IOLTA and/or non-IOLTA accounts. After submitting that response and declaring the information is true, your annual compliance with CTAPP would then be deemed complete.

**Firm maintains account**

If your firm or organization maintains trust accounts on your behalf and you know your firm or organization is going to register the trust account details on your behalf using the State Bar's Agency Billing application, in Step 2: Account Registration, you may check the box next to the statement "My firm or organization administrator informed me that the IOLTA and/or Non-IOLTA trust account details will be registered by my firm or organization on my behalf through the State Bar's Agency Billing application. I understand that it is my responsibility to ensure that my CTAPP reporting is complete, including that my firm or organization registers any account details maintained on my behalf."

Nonetheless, it remains your responsibility to ensure that your firm or organization registers the required account information on your behalf.

**Resources available to you**

To assist licensees in completing their CTAPP reporting obligations, the State Bar is offering the following resources:

- Questions? View the CTAPP FAQs.
- Learn about the CTAPP reporting requirements and access training videos.
- View a guide for how to complete your CTAPP reporting requirements online through your My State Bar Profile.

For further assistance, please reply to this email with any questions.

Division of Regulation
CTAPP@calbar.ca.gov

**March 5, 2024**
**CTAPP Reminder Email**
**Category: Active and inactive attorneys, Compliance status is compliant and late fee is outstanding**

Subject: [Action Required] CTAPP Noncompliance Fee Reminder for State Bar of California Bar No.

Dear <Attorney>,

The deadline to complete your annual Client Trust Account Protection Program (CTAPP) reporting requirements was February 1, 2024, and late penalties were assessed if your CTAPP reporting requirements were not completed by February 23, 2024. Our records indicate that while you have now completed your CTAPP reporting, we have not received payment of the noncompliance fee.

Please note, CTAPP compliance requires completion of both the reporting requirements **and** payment of any noncompliance penalty. The final deadline to pay your CTAPP noncompliance penalty is **July 1, 2024**.

Go to your My State Bar Profile to calculate and pay your 2024 annual fees, penalties, and/or costs.

Need help paying online? View a guide on how to complete a payment online through your My State Bar Profile.

For further assistance, please reply to this email with any questions.

Division of Regulation
CTAPP@calbar.ca.gov

## April 24, 2024 Email Reminder

**April 24, 2024**
**CTAPP Reminder Email**
**Category: Active and inactive attorneys, Compliance not started and penalty outstanding**

Subject: [Action Required] CTAPP Noncompliance 60-Day Notice for State Bar of California Bar No.

1 min. 9 sec. read | 274 words

Dear <Attorney>,

Our records indicate that as of April 23, 2024, you are noncompliant with the Client Trust Account Protection Program (CTAPP) reporting requirements (State Bar Rules, rule 2.5) for the reporting period January 1, 2023 - December 31, 2023.

All licensees who were on active status **at any point** during calendar year 2023 must complete the annual CTAPP reporting requirements.

You are not in compliance for the following reasons:

- CTAPP reporting not completed.
- CTAPP noncompliance fee unpaid.

Please log in to your My State Bar Profile to complete your CTAPP reporting and submit payment of the noncompliance fee. Note, to pay any outstanding fee, go to the "State Bar Fees" section in your profile, and then use the "Calculate and Pay My 2024 Fees" link.

If you did not require a trust account or if your firm managed trust accounts on your behalf, please refer to the CTAPP FAQs for further clarification.

Failure to address this noncompliance by **July 1, 2024**, will result in your enrollment on administrative inactive status ('Not Eligible to Practice') effective July 2, 2024. If you are placed on 'Not Eligible' status, reinstatement will require completion of the CTAPP reporting requirements and payment of the late fee as well as an additional reinstatement fee.

To avoid 'Not Eligible to Practice' status and maintain your ability to practice law in California, please complete your CTAPP reporting and submit payment by July 1, 2024.

## Resources

- [CTAPP FAQs](#)
- [Learn about the CTAPP reporting requirements and access training videos](#)
- [Step-by-step guide for CTAPP compliance using My State Bar Profile](#)

For further assistance, you may reply to this email with any questions.

Division of Regulation
[CTAPP@calbar.ca.gov](mailto:CTAPP@calbar.ca.gov)

**April 24, 2024**
**CTAPP Reminder Email**
**Category: Active and inactive attorneys, Compliance not started and penalty not outstanding**

Subject: [Action Required] CTAPP Noncompliance 60-Day Notice for State Bar of California Bar No.

1 min. read | 232 words

Dear <Attorney>,

Our records indicate that as of April 23, 2024, you are noncompliant with the Client Trust Account Protection Program (CTAPP) reporting requirements (State Bar Rules, rule 2.5) for the reporting period January 1, 2023 - December 31, 2023.

All licensees who were on active status **at any point** during calendar year 2023 must complete the annual CTAPP reporting requirements.

You are not in compliance for the following reasons:

- CTAPP reporting not completed.

Please log in to your My State Bar Profile to complete your CTAPP reporting.

If you did not require a trust account or if your firm managed trust accounts on your behalf, please refer to the CTAPP FAQs for further clarification.

Failure to address this noncompliance by **July 1, 2024**, will result in your enrollment on administrative inactive status ('Not Eligible to Practice') effective July 2, 2024. If you are placed on 'Not Eligible' status, reinstatement will require completion of the CTAPP reporting requirements and payment of the late fee as well as an additional reinstatement fee.

To avoid 'Not Eligible to Practice' status and maintain your ability to practice law in California, please complete your CTAPP reporting by July 1, 2024.

## Resources

- CTAPP FAQs

- [Learn about the CTAPP reporting requirements and access training videos](#)
- [Step-by-step guide for CTAPP compliance using My State Bar Profile](#)

For further assistance, you may reply to this email with any questions.

Division of Regulation
[CTAPP@calbar.ca.gov](mailto:CTAPP@calbar.ca.gov)

**April 24, 2024**
**CTAPP Reminder Email**
**Category: Active and inactive attorneys, Compliance started and penalty outstanding**

Subject: [Action Required] CTAPP Noncompliance 60-Day Notice for State Bar of California Bar No.

1 min. 7 sec. read | 264 words

Dear <Attorney>,

Our records indicate that as of April 23, 2024, you are noncompliant with the Client Trust Account Protection Program (CTAPP) reporting requirements (State Bar Rules, rule 2.5) for the reporting period January 1, 2023 - December 31, 2023.

All licensees who were on active status **at any point** during calendar year 2023 must complete the annual CTAPP reporting requirements.

You are not in compliance for the following reasons:

- Although you have started the reporting process, you have yet to complete your CTAPP reporting.
- CTAPP noncompliance fee unpaid.

Please log in to your My State Bar Profile to complete your CTAPP reporting and submit payment of the noncompliance fee. Note, to pay any outstanding fee, go to the "State Bar Fees" section in your profile, and then use the "Calculate and Pay My 2024 Fees" link.

If you did not require a trust account or if your firm managed trust accounts on your behalf, please refer to the CTAPP FAQs for further clarification.

Failure to address this noncompliance by **July 1, 2024**, will result in your enrollment on administrative inactive status ('Not Eligible to Practice') effective July 2, 2024. If you are placed on 'Not Eligible' status, reinstatement will require completion of the CTAPP reporting requirements and payment of the late fee as well as an additional reinstatement fee.

To avoid 'Not Eligible to Practice' status and maintain your ability to practice law in California, please complete your CTAPP reporting and submit payment by July 1, 2024.

21

## Resources

- CTAPP FAQs
- Learn about the CTAPP reporting requirements and access training videos
- Step-by-step guide for CTAPP compliance using My State Bar Profile

For further assistance, you may reply to this email with any questions.

Division of Regulation
CTAPP@calbar.ca.gov

**April 24, 2024**
**CTAPP Reminder Email**
**Category: Active and inactive attorneys, Compliance started and penalty not outstanding**

Subject: [Action Required] CTAPP Noncompliance 60-Day Notice for State Bar of California Bar No.

1 min. read | 222 words

Dear <Attorney>,

Our records indicate that as of April 23, 2024, you are noncompliant with the Client Trust Account Protection Program (CTAPP) reporting requirements (State Bar Rules, rule 2.5) for the reporting period January 1, 2023 - December 31, 2023.

All licensees who were on active status **at any point** during calendar year 2023 must complete the annual CTAPP reporting requirements.

You are not in compliance for the following reasons:

- Although you have started the reporting process, you have yet to complete your CTAPP reporting.

Please log in to your My State Bar Profile to complete your CTAPP reporting.

If you did not require a trust account or if your firm managed trust accounts on your behalf, please refer to the CTAPP FAQs for further clarification.

Failure to address this noncompliance by **July 1, 2024**, will result in your enrollment on administrative inactive status ('Not Eligible to Practice') effective July 2, 2024. If you are placed on 'Not Eligible' status, reinstatement will require completion of the CTAPP reporting requirements and payment of the late fee as well as an additional reinstatement fee.

To avoid 'Not Eligible to Practice' status and maintain your ability to practice law in California, please complete your CTAPP reporting by July 1, 2024.

## Resources

- CTAPP FAQs
- Learn about the CTAPP reporting requirements and access training videos
- Step-by-step guide for CTAPP compliance using My State Bar Profile

For further assistance, you may reply to this email with any questions.

Division of Regulation
CTAPP@calbar.ca.gov

**April 24, 2024**
**CTAPP Reminder Email**
**Category: Active and inactive attorneys, Compliant and penalty outstanding**

Subject: [Action Required] CTAPP Noncompliance 60-Day Notice for State Bar of California Bar No.

1 min. read | 234 words

Dear <Attorney>,

Our records indicate that as of April 23, 2024, you are noncompliant with the Client Trust Account Protection Program (CTAPP) reporting requirements (State Bar Rules, rule 2.5) for the reporting period January 1, 2023 - December 31, 2023.

The deadline to complete your annual CTAPP reporting requirements was February 1, 2024, and late penalties were assessed if your reporting requirements were not completed by February 23, 2024.

You are not in compliance for the following reasons:

- Although you have since completed your CTAPP reporting, you owe a late penalty fee.

Please log in to your My State Bar Profile to submit payment of the noncompliance fee. Note, to pay any outstanding fee, go to the "State Bar Fees" section in your profile, and then use the "Calculate and Pay My 2024 Fees" link.

Failure to address this noncompliance by **July 1, 2024**, will result in your enrollment on administrative inactive status ('Not Eligible to Practice') effective July 2, 2024. If you are placed on 'Not Eligible' status, reinstatement will require completion of the CTAPP reporting requirements and payment of the late fee as well as an additional reinstatement fee.

To avoid 'Not Eligible to Practice' status and maintain your ability to practice law in California, please submit payment by July 1, 2024.

For further assistance, you may reply to this email with any questions.

25

Division of Regulation
CTAPP@calbar.ca.gov

## May 22, 2024 Email Reminder

**May 22, 2024**
**CTAPP Reminder Email**
**Category: Active and inactive attorneys, Compliance not started and penalty outstanding**

Subject: [Action Required] CTAPP Noncompliance 30-Day Notice for State Bar of California Bar No.

1 min. 17 sec. read | 307 words

Dear <Attorney>,

Today, May 22, 2024, notices confirming **July 1, 2024**, as the final deadline to avoid enrollment on administrative inactive status ('Not Eligible to Practice') were mailed via USPS to licensees noncompliant with the Client Trust Account Protection Program (CTAPP).

Our records indicate that as of May 21, 2024, you are noncompliant with the CTAPP reporting requirements (State Bar Rules, rule 2.5) for the reporting period January 1, 2023 - December 31, 2023.

All licensees who were on active status **at any point** during calendar year 2023 must complete the annual CTAPP reporting requirements.

You are not in compliance for the following reasons:

- CTAPP reporting not completed.
- CTAPP noncompliance fee unpaid.

Please log in to your My State Bar Profile to complete your CTAPP reporting and submit payment of the noncompliance fee. Note, to pay any outstanding fee, go to the "State Bar Fees" section in your profile, and then use the "Calculate and Pay My 2024 Fees" link.

If you did not require a trust account or if your firm managed trust accounts on your behalf, please refer to the CTAPP FAQs for further clarification.

Failure to address this noncompliance by **July 1, 2024**, will result in your enrollment on administrative inactive status ('Not Eligible to Practice') effective July 2, 2024. If you are

placed on 'Not Eligible' status, reinstatement will require completion of the CTAPP reporting requirements and payment of the late fee as well as an additional reinstatement fee.

To avoid 'Not Eligible to Practice' status and maintain your ability to practice law in California, please complete your CTAPP reporting and submit payment by July 1, 2024.

## Resources

- CTAPP FAQs
- Learn about the CTAPP reporting requirements and access training videos
- Step-by-step guide for CTAPP compliance using My State Bar Profile

For further assistance, you may reply to this email with any questions.

Division of Regulation
CTAPP@calbar.ca.gov

**May 22, 2024**
**CTAPP Reminder Email**
**Category: Active and inactive attorneys, Compliance not started and penalty not outstanding**

Subject: [Action Required] CTAPP Noncompliance 30-Day Notice for State Bar of California Bar No.

1 min. 7 sec. read | 265 words

Dear <Attorney>,

Today, May 22, 2024, notices confirming **July 1, 2024**, as the final deadline to avoid enrollment on administrative inactive status ('Not Eligible to Practice') were mailed via USPS to licensees noncompliant with the Client Trust Account Protection Program (CTAPP).

Our records indicate that as of May 21, 2024, you are noncompliant with the CTAPP reporting requirements (State Bar Rules, rule 2.5) for the reporting period January 1, 2023 - December 31, 2023.

All licensees who were on active status **at any point** during calendar year 2023 must complete the annual CTAPP reporting requirements.

You are not in compliance for the following reasons:

- CTAPP reporting not completed.

Please log in to your My State Bar Profile to complete your CTAPP reporting.

If you did not require a trust account or if your firm managed trust accounts on your behalf, please refer to the CTAPP FAQs for further clarification.

Failure to address this noncompliance by **July 1, 2024**, will result in your enrollment on administrative inactive status ('Not Eligible to Practice') effective July 2, 2024. If you are placed on 'Not Eligible' status, reinstatement will require completion of the CTAPP reporting requirements and payment of a reinstatement fee.

To avoid 'Not Eligible to Practice' status and maintain your ability to practice law in California, please complete your CTAPP reporting by July 1, 2024.

## Resources

- CTAPP FAQs
- Learn about the CTAPP reporting requirements and access training videos
- Step-by-step guide for CTAPP compliance using My State Bar Profile

For further assistance, you may reply to this email with any questions.

Division of Regulation
CTAPP@calbar.ca.gov

**May 22, 2024**
**CTAPP Reminder Email**
**Category: Active and inactive attorneys, Compliance started and penalty outstanding**

Subject: [Action Required] CTAPP Noncompliance 30-Day Notice for State Bar of California Bar No.

1 min. 15 sec. read | 297 words

Dear <Attorney>,

Today May 22, 2024, notices confirming **July 1, 2024**, as the final deadline to avoid enrollment on administrative inactive status ('Not Eligible to Practice') were mailed via USPS to licensees noncompliant with the Client Trust Account Protection Program (CTAPP).

Our records indicate that as of May 21, 2024, you are noncompliant with the CTAPP reporting requirements (State Bar Rules, rule 2.5) for the reporting period January 1, 2023 - December 31, 2023.

All licensees who were on active status **at any point** during calendar year 2023 must complete the annual CTAPP reporting requirements.

You are not in compliance for the following reasons:

- Although you have started the reporting process, you have yet to complete your CTAPP reporting.
- CTAPP noncompliance fee unpaid.

Please log in to your My State Bar Profile to complete your CTAPP reporting and submit payment of the noncompliance fee. Note, to pay any outstanding fee, go to the "State Bar Fees" section in your profile, and then use the "Calculate and Pay My 2024 Fees" link.

If you did not require a trust account or if your firm managed trust accounts on your behalf, please refer to the CTAPP FAQs for further clarification.

Failure to address this noncompliance by **July 1, 2024**, will result in your enrollment on administrative inactive status ('Not Eligible to Practice') effective July 2, 2024. If you are

placed on 'Not Eligible' status, reinstatement will require completion of the CTAPP reporting requirements and payment of the late fee as well as an additional reinstatement fee.

To avoid 'Not Eligible to Practice' status and maintain your ability to practice law in California, please complete your CTAPP reporting and submit payment by July 1, 2024.

## Resources

- CTAPP FAQs
- Learn about the CTAPP reporting requirements and access training videos
- Step-by-step guide for CTAPP compliance using My State Bar Profile

For further assistance, you may reply to this email with any questions.

Division of Regulation
CTAPP@calbar.ca.gov

**May 22, 2024**
**CTAPP Reminder Email**
**Category: Active and inactive attorneys, Compliance started and penalty not outstanding**

Subject: [Action Required] CTAPP Noncompliance 30-Day Notice for State Bar of California Bar No.

1 min. 4 sec. read | 255 words

Dear <Attorney>,

Today, May 22, 2024, notices confirming **July 1, 2024**, as the final deadline to avoid enrollment on administrative inactive status ('Not Eligible to Practice') were mailed via USPS to licensees noncompliant with the Client Trust Account Protection Program (CTAPP).

Our records indicate that as of May 21, 2024, you are noncompliant with the CTAPP reporting requirements (State Bar Rules, rule 2.5) for the reporting period January 1, 2023 - December 31, 2023.

All licensees who were on active status **at any point** during calendar year 2023 must complete the annual CTAPP reporting requirements.

You are not in compliance for the following reasons:

- Although you have started the reporting process, you have yet to complete your CTAPP reporting.

Please log in to your My State Bar Profile to complete your CTAPP reporting.

If you did not require a trust account or if your firm managed trust accounts on your behalf, please refer to the CTAPP FAQs for further clarification.

Failure to address this noncompliance by **July 1, 2024**, will result in your enrollment on administrative inactive status ('Not Eligible to Practice') effective July 2, 2024. If you are placed on 'Not Eligible' status, reinstatement will require completion of the CTAPP reporting requirements and payment of a reinstatement fee.

To avoid 'Not Eligible to Practice' status and maintain your ability to practice law in California, please complete your CTAPP reporting by July 1, 2024.

## Resources

- CTAPP FAQs
- Learn about the CTAPP reporting requirements and access training videos
- Step-by-step guide for CTAPP compliance using My State Bar Profile

For further assistance, you may reply to this email with any questions.

Division of Regulation
CTAPP@calbar.ca.gov

**May 22, 2024**
**CTAPP Reminder Email**
**Category: Active and inactive attorneys, Compliant and penalty outstanding**

Subject: [Action Required] CTAPP Noncompliance 30-Day Notice for State Bar of California Bar No.

1 min. 5 sec. read | 257 words

Dear <Attorney>,

Today, May 22, 2024, notices confirming **July 1, 2024**, as the final deadline to avoid enrollment on administrative inactive status ('Not Eligible to Practice') were mailed via USPS to licensees noncompliant with the Client Trust Account Protection Program (CTAPP).

Our records indicate that as of May 21, 2024, you are noncompliant with the Client Trust Account Protection Program (CTAPP) reporting requirements (State Bar Rules, rule 2.5) for the reporting period January 1, 2023 - December 31, 2023.

The deadline to complete your annual CTAPP reporting requirements was February 1, 2024, and late penalties were assessed if your reporting requirements were not completed by February 23, 2024.

You are not in compliance for the following reasons:

- Although you have since completed your CTAPP reporting, you owe a late penalty fee.

Please log in to your My State Bar Profile to submit payment of the noncompliance fee. Note, to pay any outstanding fee, go to the "State Bar Fees" section in your profile, and then use the "Calculate and Pay My 2024 Fees" link.

Failure to address this noncompliance by **July 1, 2024**, will result in your enrollment on administrative inactive status ('Not Eligible to Practice') effective July 2, 2024. If you are placed on 'Not Eligible' status, reinstatement will require completion of the CTAPP reporting requirements and payment of the late fee as well as an additional reinstatement fee.

To avoid 'Not Eligible to Practice' status and maintain your ability to practice law in California, please submit payment by July 1, 2024.

For further assistance, you may reply to this email with any questions.

Division of Regulation
[CTAPP@calbar.ca.gov](mailto:CTAPP@calbar.ca.gov)

Last Updated:

## PowerBI CTAPP COMPLIANCE HISTORY REPORT

3/5/2026

| Bar Number | Attorney Name | Billing Year |
|---|---|---|
| 109516 ⌄ | James Kaufmann Baer | 2023  2024  **2025**  › |

**Current Status**

Not Eligible

| Screening Question | Initial Response | No Registered Accounts Statement |
|---|---|---|
| Year  Trust Account Responsibilities | Year  IOLTA  non-IOLTA | Year  Reported by |
| 2025  No | | |

### Trust Accounts

| Year | Bank | Account | Routing # | Account # | Balance | Firm Name | Open Date | Close Date |
|---|---|---|---|---|---|---|---|---|
| 2025 | ▮▮▮▮▮ | CA IOLTA | ▮▮▮ | ▮▮▮ | ▮ | ▮▮▮▮ | 8/16/2022 | 1/10/2024 |

### Self-Assessment Questions

Year

### Certification of Compliance

| Year ▲ | Certification | Compliance Date |
|---|---|---|

### Non-Compliance Explanations

| Year ▲ | Explanation |
|---|---|

### Annual Declaration

| Year ▲ | Declaration Exists | Declaration Date |
|---|---|---|
| 2025 | True | 5/1/2025 |

## Screening Question

**Year    First Screening Question Text**

2025    At any point during the reporting period of January 1, 2024 – December 31, 2024, or, if you are a new licensee who must pay your initial license fees pursuant to rule 2.12 of the Rules of the State Bar, from your date of admission though the following December 31, 2024, or the due date for payment of fees, whichever is earlier, were you responsible for complying with any of the requirements or prohibitions governing the safekeeping of funds of clients and other persons under rule 1.15 of the California Rules of Professional Conduct?
• Yes
• No

## Screening Question Response

**Year    Response**

2025    No

## Initial Response Text

| Year ▲ | | Questions Seen |
|---|---|---|
| ⊟ **2025** | | |
| | IOLTA | To comply with the requirements or prohibitions governing the safekeeping of funds of clients and other persons in rule 1.15 of the California Rules of Professional Conduct, did you, at any time during the relevant reporting period, maintain any trust accounts under Business and Professions Code section 6211, subdivision (a) where the interest is paid to the State Bar, also known as an Interest of Lawyer's Trust Account (IOLTA), or a similar pooled trust account in another jurisdiction? [Select all that apply]<br>• Yes, I will provide or update all account information, including the balance as of December 31, 2024.<br>• Yes, a firm or organization I am currently employed by or in practice with will provide or update the account information via Agency Billing, including the balance as of December 31, 2024.<br>• Yes, however, I am no longer employed by or in practice with the firm or organization. I understand that I am not required to register trust accounts that are maintained by a firm or organization that I am no longer employed by or in practice with as of December 31, 2024.<br>• No, I did not maintain an IOLTA or similar pooled trust account in another jurisdiction, and no firm maintained one on my behalf, but I did maintain a non-IOLTA trust account or a non-IOLTA trust account was maintained on my behalf. |
| | Non-IOLTA | To comply with the requirements or prohibitions governing the safekeeping of funds of clients and other persons in rule 1.15 of the California Rules of Professional Conduct, did you, at any time during the relevant reporting period, maintain any accounts under Business and Professions Code section 6211, subdivision (b) where the interest is payable to a client or other person, also known as non-IOLTA trust accounts, or a similar trust account in another jurisdiction where the interest or dividend earned is paid to the clients? [Select all that apply]<br>• Yes, I will provide or update all account information via My State Bar Profile, including the balance as of December 31, 2024.<br>• Yes, a firm or organization I am currently employed by or in practice with will provide or update the account information via Agency Billing.<br>• Yes, however, I am no longer employed by or in practice with the firm or organization. I understand that I am not required to register trust accounts that are maintained by a firm or organization that I am no longer employed by or in practice with as of December 31, 2024.<br>• No, I did not maintain a non-IOLTA or similar trust account in another jurisdiction, and no firm maintained one on my behalf, but I did maintain an IOLTA or an IOLTA was maintained on my behalf. |

## Initial Responses

| Year | IOLTA Response | Non-IOLTA Reponse |
|---|---|---|

| Year | Self-Assessment Text |
|------|----------------------|
| ⊟ **2025** | |
| 1 | I affirm that entrusted funds are deposited in trust accounts maintained in the State of California unless there is a substantial relationship between the client or the client's business and the other jurisdiction and the client agrees in writing, or that the rules and laws of another jurisdiction apply.<br>References for consideration in providing responses: Rule of Professional Conduct 1.15(a); Rule of Professional Conduct 8.5 |
| 2 | I affirm that any funds held in a California IOLTA account are maintained in an IOLTAeligible institution identified on the State Bar of California's website.<br>References for consideration in providing response: California Business and Professions Code sections 6091.2, 6211, 6212, and 6213; State Bar Rules, Title 2, Division 5, Chapter 1, rules 2.100, 2.110 and 2.117 |
| 3 | I affirm that all client trust account information is reported and registered annually and all changes to trust account information are reported to the State Bar within 30 days in the manner prescribed by the State Bar.<br>References for consideration in providing response: California Rules of Court, rule 9.8.5; State Bar Rules, Title 2, Division 1, rule 2.5; State Bar Rules, Title 2, Division 1, rule 2.2(B)(8) and (C); State Bar Rules, Title 2, Division 5, rule 2.114; 2024 Handbook on Client Trust Accounting for California Attorneys, footnote 2 |
| 4 | I affirm that all client funds or funds entrusted by others to me or to my firm or organization are held in one or more accounts labeled as a "Trust Account," or similar designation, and are maintained separate from any accounts held by me, by other individual attorneys in my firm/organization, or by the firm/organization that primarily hold personal or business funds.<br>References for consideration in providing response: Business and Professions Code sections 6210 et seq.; Rule of Professional Conduct 1.15(a) and (c) |
| 5 | For each client trust account maintained by me or my firm or organization all the following records are maintained:<br>• Client Ledger<br>• Account Journal<br>• Bank Statements<br>• Cancelled Checks<br>References for consideration in providing response: Rule of Professional Conduct 1.15(d)(3); Recordkeeping standards adopted by the Board of Trustees pursuant to Rule of Professional Conduct 1.15(e); 2024 Handbook on Client Trust Accounting for California Attorneys, Sections VII-VIII |
| 6 | I affirm that a written, monthly reconciliation of the bank statement, client ledgers, and account journal are completed and maintained for each client trust account.<br>Reference for consideration in providing response: Rule of Professional Conduct 1.15(d) and (e); Recordkeeping standards adopted by the Board of Trustees pursuant to Rule of Professional Conduct 1.15(e); 2024 Handbook on Client Trust Accounting for California Attorneys, Section VIII |
| 7 | I affirm that timely reports are provided to clients or other persons accounting for funds, securities, or other property held in their name, including deposits, withdrawals, and other transactions.<br>Reference for consideration in providing response: Rule of Professional Conduct 1.15(d)(4) |
| 8 | If a fee agreement involves advances for costs, expenses, or fees, including flat fees, such funds are held in a client trust account prior to being expensed or earned, unless subject to an exception.<br>Reference for consideration in providing response: Rule of Professional Conduct 1.15(a), (b), and (c); Comment [2] |
| 9 | I affirm that, absent an exception, funds belonging to me or my law firm or organization are withdrawn from client trust accounts at the earliest reasonable time once the fees, or a portion thereof, become fixed and earned.<br>Reference for consideration in providing response: Rule of Professional Conduct 1.15(c)(1); Rule of Professional Conduct 1.15(c)(2) |
| 10 | I affirm that funds belonging to me or my firm or organization that are held in the client trust account are funds that are no more than reasonably sufficient to pay bank charges or service fees (e.g., monthly account fees, fees to purchase checks), and other undisputed funds belonging to me or my firm or organization are withdrawn at the earliest reasonable time under rule 1.15(c)(2).<br>Reference for consideration in providing response: Rule of Professional Conduct 1.15(c)(2) |
| 11 | I affirm that client funds are NOT used to pay for bank charges or service fees in a California IOLTA.<br>Reference for consideration in providing response: Rule of Professional Conduct 1.15(c)(1) |
| 12 | I affirm that absent good cause, clients or other persons with an interest in the funds, securities, or other property received are notified about the receipt of the funds, securities, or other property no later than 14 days after receipt.<br>References for consideration in providing response: Rule of Professional Conduct 1.15(d)(1) |
| 13 | If a dispute arises as to rights to any funds I hold in trust for clients or other persons, I affirm that the disputed portion of these funds are not withdrawn until the dispute is resolved.<br>References for consideration in providing response: Rule of Professional Conduct 1.15(c)(2) |
| 14 | I affirm that policies and procedures, including training and supervision practices, are in place and are followed to ensure that client trust accounts are maintained consistent with the California Rules of Professional Conduct and applicable law as required by my responsibilities as a managerial, supervisory, or subordinate lawyer, and those policies CTAPP Reporting Requirements Page 10 and procedures apply to all lawyers and any nonlawyer assistants.<br>References for consideration in providing response:<br>In the Matter of Respondent E (Rev. Dept. 1991) 1 Cal. State Bar Ct. Rptr. 716; Palomo v. State Bar (1984) 36 Cal.3d 785; Rule of Professional Conduct 1.15 Rule of Professional Conduct 5.1; Rule of Professional Conduct 5.2 Rule of Professional Conduct 5.3; 2024 Handbook on Client Trust Accounting for California Attorneys. |

## No Registered Accounts Statement

| Condensed Statement | Full Statement Text |
|---|---|
| Reported by firm | My firm or organization administrator informed me that the IOLTA and/or Non-IOLTA trust account details will be registered by my firm or organization on my behalf through the State Bar's Agency Billing application. I understand that it is my responsibility to ensure that my CTAPP reporting is complete including that my firm or organization registers any account details maintained on my behalf. |
| Other: (see free-response below) | Other |

## No Registered Accounts Statement: Other Free-Response

| BillingYear ▲ | FirmReportingResponseText |
|---|---|

## Certificate of Compliance

| Year | Certification of Compliance Text |
|---|---|
| 2025 | I certify that I am knowledgeable about, and in compliance with, applicable rules and statutes governing client trust accounts and the safekeeping of funds entrusted by clients and others, including rules 1.4, 1.5, and 1.15 of the Rules of Professional Conduct, and Bus. & Prof. Code sec. 6210, et seq. |
| | I am not in compliance with the applicable rules and statutes governing client trust accounts and the safekeeping of funds entrusted by clients and others. Please explain in the box below how your trust accounting practices are not in compliance with the applicable rules and statutes governing client trust accounts and the safekeeping of funds entrusted by clients and others |

| Year ▲ | Noncompliance Explanation |
|---|---|
| 2025 | |

## Annual Declaration

| Year ▲ | Declaration Text |
|---|---|
| 2025 | I declare under penalty of perjury under the laws of the State of California that I am _____ and that I personally completed the Annual Client Trust Account Reporting, Annual Registration (if applicable), Client Trust Account SelfAssessment (if applicable), and Client Trust Account Annual Certification of Compliance (if applicable). I further declare under penalty of perjury under the laws of the State of California that the information I provided in response to the Annual Client Trust Account Reporting, Account Registration (if applicable), Client Trust Account Annual Self-Assessment (if applicable), and Client Trust Account Annual Certification of Compliance is true and correct. |

 The State Bar
of California

Search

# Attorney Profile

# James Kaufmann Baer #109516

**License Status:** Not Eligible to Practice Law

Address: James K Baer Esq., 11840 Dorothy St, Apt 301, Los Angeles, CA 90049-7902
Phone: 310-266-2237  |  Fax: Not Available
Email: jim@jamesbaer.com  |  Website: Not Available

More about This Attorney ▾

# License Status, Disciplinary and Administrative History

The table below shows an attorney's license status changes, disciplinary actions, and administrative actions. Some administrative suspensions are subject to automatic removal from the attorney profile page pursuant to the State Bar's policy on removal of administrative actions. Administrative suspensions are non-disciplinary actions resulting from noncompliance with administrative requirements, such as the requirement to pay licensing fees or comply with Minimum Continuing Legal Education. Administrative suspensions that meet the criteria in the State Bar's policy on removal of administrative actions would not be displayed below.

| Date | License Status ℹ | Discipline ℹ | Administrative Action ℹ |
|---|---|---|---|
| **Present** | Not eligible to practice law in CA | | |
| 7/2/2024 | Not eligible to practice law in CA | | Admin Inactive/CTAPP noncompliance |
| 6/13/2024 | Inactive | | |
| 6/10/2024 | Active | | |
| 1/10/2024 | Inactive | | |

| Date | License Status ⓘ | Discipline ⓘ | Administrative Action ⓘ |
|------|------------------|--------------|-------------------------|
| **12/12/1983** | Admitted to the State Bar of California | | |

**Additional Information:**

- About the disciplinary system

Start New Search »

Protecting the public & enhancing the administration of justice.

San Francisco (Main Office)
180 Howard St.
San Francisco, CA 94105
415-538-2000

Los Angeles
845 S. Figueroa St.
Los Angeles, CA 90017
213-765-1000

Help Center              Site Feedback

Contact Us               Careers

Public Records           Staff Logins

News                     My State Bar Profile Login

Our Mission

Copyright ©2025 The State Bar of California     User Policies

# New ticket created from form submission #23404796302

**Ticket status**
Closed

**Pipeline**
Regulation

First name: James Kaufmann
Last name: Baer
Email: ██████████████████
Tell us who you are: California licensed
attorney
Attorney No.: 109516
Topic: Attorney license status changes
Issue: How do I reinstate my license from
a nonpayment suspension?
Please provide additional details: I
completed my CTAPP, and my dues are
up to date. Please reinstate my license to
non-active status. Thanks.

**James Kaufmann Baer** ⯤ May 6, 2025 12:30 PM

Our records indicate that you are currently not eligible to practice law for the following:

**Failure to comply with your CTAPP requirements**

For more information regarding CTAPP Compliance, please visit:

[Client Trust Account Protection Program Reinstatement Form](#). - Must be completed

Once you have complied, your status should revert to the original status before noncompliance.

Division of Regulation
The State Bar of California | 180 Howard Street | San Francisco, CA 94105

**OUR VALUES** | Clarity | Investing in Our People | Excellence | Respect | Growth Mindset

***Working to protect the public in support of the mission of the State Bar of California.***
Please consider the environment before printing this email.
[LinkedIn](#) | [Twitter](#) | [Facebook](#) | [Instagram](#)

**Vicky Avila** ✉ May 21, 2025 4:16 PM

# EXHIBIT L

# Exhibit L-1

## Cover Page

Original Page 1

Copy for (RO-US) 37
PCT/US2017/042452
**PATENT COOPERATION TREATY**

# ADVANCE E-MAIL

From the INTERNATIONAL BUREAU

# PCT

NOTIFICATION OF THE RECORDING
OF A CHANGE

(PCT Rule 92*bis*.1 and
Administrative Instructions, Section 422)

| To: |
| --- |
| YANG, John<br>LeClairRyan<br>400 Capitol Mall, Suite 1500<br>Sacramento, California 95814<br>ÉTATS-UNIS D'AMÉRIQUE |

| Date of mailing *(day/month/year)*<br>15 January 2019 (15.01.2019) | |
| --- | --- |
| Applicant's or agent's file reference<br>8821-101WO1 | **IMPORTANT NOTIFICATION** |
| International application No.<br>PCT/US2017/042452 | International filing date *(day/month/year)*<br>17 July 2017 (17.07.2017) |

1. The following indications appeared on record concerning:

☒ the applicant          ☐ the inventor          ☐ the agent          ☐ the common representative

| Name and Address<br>LIGHT FIELD LAB, INC.<br>2280 Bayo Claros Circle<br>Morgan Hill, CA 95037<br>United States of America | State of Nationality<br>US | State of Residence<br>US |
| --- | --- | --- |
| | Telephone No. | |
| | Facsimile No. | |
| | E-mail address | |

2. The International Bureau hereby notifies the applicant that the following change has been recorded concerning:

☐ the person          ☐ the name          ☒ the address          ☐ the nationality          ☐ the residence

| Name and Address<br>LIGHT FIELD LAB, INC.<br>699 E. Brokaw Road<br>San Jose, CA 95112<br>United States of America | State of Nationality<br>US | State of Residence<br>US |
| --- | --- | --- |
| | Telephone No. | |
| | Facsimile No. | |
| | E-mail address<br>☐ Notifications by e-mail authorized | |

3. Further observations, if necessary:

4. A copy of this notification has been sent to:

☒ the receiving Office
☐ the International Searching Authority
☐ the Authority(ies) specified for supplementary search

☐ the International Preliminary Examining Authority
☒ the designated Offices concerned
☐ the elected Offices concerned
☐ other:

| The International Bureau of WIPO<br>34, chemin des Colombettes<br>1211 Geneva 20, Switzerland<br><br>Facsimile No. +41 22 338 90 90 | Authorized officer<br>**Izumi Malbois Yukie**<br>e-mail pct.team7@wipo.int<br>Telephone No. +41 22 338 74 07 |
| --- | --- |

Form PCT/IB/306 (January 2009)

Ex. L-1, p. 1

# Exhibit L-1

## ISA Search Queries

Original Pages 20–25

# PCT Recordation of Search History

Case/PCT Application Number: PCT/US17/42452

CLIN Number/Technical Field of PCT Application: 6

Dates during which the search was conducted: 15 September – 21 September 2017

Date of Completion of Recordation of Search History Form: 21 September 2017

Research Analyst Initials: IID

Search Approval Official Initials: HKP


**Field of Search/Classification Information:**

IPC(8) Classifications: G06F 3/01; G02B 5/32, 27/01; H04N 5/89 (2017.01)

CPC Classifications: G06F 3/011; G02B 5/32, 27/0103, 27/017, 2027/0174; H04N 5/89; G03H 1/268


**Databases Searched (Patent and Non-Patent Literature, Including Sub-Databases and Files Searched) and Search Terms Used:**

PatSeer (US, EP, WO, JP, DE, GB, CN, FR, KR, ES, AU, IN, CA, INPADOC Data); Google; Google Scholar; EBSCO; KEYWORDS: energy directing device energy locations energy relay elements singular seamless energy surface separation edges minimum perceptible contour visual acuity human eye propagation paths

**Database Search String Recordation, Including Dates of Searches:**

**Patent Database Search Strategy/Results:**

### Patseer

| Search Strings | Deduped | Count | Comments | Date |
|---|---|---|---|---|
| TACD:((seam* OR gap* OR separation* OR contour*) AND ((perceiv* OR perceptib* OR imperceptib* OR indiscern* OR discern*) WS (vision* OR eye* OR acuity*)) AND (hologra* OR virtual*)) AND AC:(G06F3/011*) | SFAM(C) | 219 | Allowable Subject Matter | 21-Sep-2017 |
| TACD:((seam* OR gap* OR separation* OR contour*) AND ((perceiv* OR perceptib* OR imperceptib* OR indiscern* OR discern*) WS (vision* OR eye* OR acuity*)) AND (hologra* OR virtual*)) AND AC:(G02B2027/0174*) | SFAM(C) | 58 | Allowable Subject Matter | 21-Sep-2017 |
| TACD:((seam* OR gap* OR separation* OR contour*) AND ((perceiv* OR perceptib* OR imperceptib* OR indiscern* OR discern*) WS (vision* OR eye* OR acuity*)) AND (hologra* OR virtual*)) AND AC:(G02B27/017*) | SFAM(C) | 608 | | 21-Sep-2017 |
| TACD:((seam* OR gap* OR separation* OR contour*) AND ((perceiv* OR perceptib* OR imperceptib* OR indiscern* OR discern*) WS (vision* OR eye* OR acuity*)) AND (hologra* OR virtual*)) AND AC:(G02B27/0103*) | SFAM(C) | 32 | Allowable Subject Matter | 21-Sep-2017 |
| TACD:((seam* OR gap* OR separation* OR contour*) AND ((perceiv* OR perceptib* OR imperceptib* OR indiscern* OR discern*) WS (vision* OR eye* OR acuity*)) AND (hologra* OR virtual*)) AND AC:(G02B5/32*) | SFAM(C) | 154 | Allowable Subject Matter | 21-Sep-2017 |
| TACD:((seam* OR gap* OR separation* OR contour*) AND ((perceiv* OR perceptib* OR imperceptib* OR indiscern* OR discern*) WS (vision* OR eye* OR acuity*)) AND (hologra* OR virtual*)) AND AC:(H04N5/89*) | SFAM(C) | 7 | Allowable Subject Matter | 21-Sep-2017 |
| TACD:((seam* OR gap* OR separation* OR contour*) AND ((perceiv* OR perceptib* OR imperceptib* OR indiscern* OR discern*) WS (vision* OR eye* OR acuity*)) AND (hologra* OR virtual*)) AND AC:(G03H1/268*) | SFAM(C) | 21 | Allowable Subject Matter | 21-Sep-2017 |
| TACD:((seam* OR gap* OR separation* OR contour*) AND ((perceiv* OR perceptib* OR imperceptib* OR indiscern* OR discern*) WS (vision* OR eye* OR acuity*)) AND (hologra* OR virtual*)) | SFAM(C) | 8140 | | 21-Sep-2017 |
| TAC:((seam* OR gap* OR separation* OR contour*) AND (perceiv* OR perceptib* OR imperceptib* OR indiscern* OR discern*) AND (vision* OR eye* OR acuity*) AND (hologra* OR virtual*)) AND AC:(G03H1*) | SFAM(C) | 11 | Allowable Subject Matter | 21-Sep-2017 |

| TAC:((seam* OR gap* OR separation* OR contour*) AND (perceiv* OR perceptib* OR imperceptib* OR indiscern* OR discern*) AND (vision* OR eye* OR acuity*) AND (hologra* OR virtual*)) AND AC:(H04N5*) | SFAM(C) | 15 | Allowable Subject Matter | 21-Sep-2017 |
|---|---|---|---|---|
| TAC:((seam* OR gap* OR separation* OR contour*) AND (perceiv* OR perceptib* OR imperceptib* OR indiscern* OR discern*) AND (vision* OR eye* OR acuity*) AND (hologra* OR virtual*)) AND AC:(G02B27*) | SFAM(C) | 52 | Allowable Subject Matter | 21-Sep-2017 |
| TAC:((seam* OR gap* OR separation* OR contour*) AND (perceiv* OR perceptib* OR imperceptib* OR indiscern* OR discern*) AND (vision* OR eye* OR acuity*) AND (hologra* OR virtual*)) AND AC:(G02B5*) | SFAM(C) | 14 | Allowable Subject Matter | 21-Sep-2017 |
| TAC:((seam* OR gap* OR separation* OR contour*) AND (perceiv* OR perceptib* OR imperceptib* OR indiscern* OR discern*) AND (vision* OR eye* OR acuity*) AND (hologra* OR virtual*)) AND AC:(G06F3*) | SFAM(C) | 26 | Allowable Subject Matter | 21-Sep-2017 |
| TAC:((seam* OR gap* OR separation* OR contour*) AND (perceiv* OR perceptib* OR imperceptib* OR indiscern* OR discern*) AND (vision* OR eye* OR acuity*) AND (hologra* OR virtual*)) | SFAM(C) | 194 | | 21-Sep-2017 |
| TA:((seam* OR gap* OR separation* OR contour*) AND (perceiv* OR perceptib* OR imperceptib* OR indiscern* OR discern*) AND (vision* OR eye* OR acuity*)) | SFAM(C) | 95 | Allowable Subject Matter | 21-Sep-2017 |
| INV:(brendan W2 bevensee) | SFAM(C) | 2 | Allowable Subject Matter | 21-Sep-2017 |
| INV:(jonathan W2 karafin) | SFAM(C) | 2 | Allowable Subject Matter | 21-Sep-2017 |
| AASN:(light field lab) | SFAM(C) | 0 | Allowable Subject Matter | 21-Sep-2017 |
| NLPM(TACD:(gap perceptible contour human eye)) AND AC:(G03H1*) | SFAM(C) | 12 | Allowable Subject Matter | 21-Sep-2017 |
| NLPM(TACD:(gap perceptible contour human eye)) AND AC:(H04N5*) | SFAM(C) | 26 | Allowable Subject Matter | 21-Sep-2017 |
| NLPM(TACD:(gap perceptible contour human eye)) AND AC:(G02B27*) | SFAM(C) | 74 | Allowable Subject Matter | 21-Sep-2017 |

| | | | | |
|---|---|---|---|---|
| NLPM(TACD:(gap perceptible contour human eye)) AND AC:(G02B5*) | SFAM(C) | 33 | Allowable Subject Matter | 21-Sep-2017 |
| NLPM(TACD:(gap perceptible contour human eye)) AND AC:(G06F3*) | SFAM(C) | 62 | Allowable Subject Matter | 21-Sep-2017 |
| NLPM(TACD:(gap perceptible contour human eye)) | SFAM(C) | 661 | | 21-Sep-2017 |
| NLPM(TACD:(seamless imperceptible contour human eye)) | SFAM(C) | 83 | Allowable Subject Matter | 21-Sep-2017 |
| NLPM(TACD:(seamless imperceptible contour acuity human eye)) | SFAM(C) | 176 | Allowable Subject Matter | 21-Sep-2017 |
| NLPM(TACD:(seamless imperceptible contour visual acuity human eye)) | SFAM(C) | 162 | Allowable Subject Matter | 21-Sep-2017 |
| NLPM(TAC:(imperceptible human eye)) AND aC:(G03H1*) | SFAM(C) | 3 | Allowable Subject Matter | 21-Sep-2017 |
| NLPM(TAC:(imperceptible human eye)) AND aC:(H04N5*) | SFAM(C) | 12 | Allowable Subject Matter | 21-Sep-2017 |
| NLPM(TAC:(imperceptible human eye)) AND aC:(G02B27*) | SFAM(C) | 8 | Allowable Subject Matter | 21-Sep-2017 |
| NLPM(TAC:(imperceptible human eye)) AND aC:(G02B5*) | SFAM(C) | 9 | Allowable Subject Matter | 21-Sep-2017 |
| NLPM(TAC:(imperceptible human eye)) AND aC:(G06F3*) | SFAM(C) | 13 | Allowable Subject Matter | 21-Sep-2017 |
| NLPM(TAC:(imperceptible human eye)) | SFAM(C) | 186 | | 21-Sep-2017 |

| | | | | |
|---|---|---|---|---|
| NLPM(TAC:(perceptible visual human eye)) | SFAM(C) | 115 | Allowable Subject Matter | 21-Sep-2017 |
| NLPM(TAC:(perceptible contour human eye)) | SFAM(C) | 15 | Allowable Subject Matter | 21-Sep-2017 |
| NLPM(TA:(imperceptible human eye)) | SFAM(C) | 43 | Allowable Subject Matter | 21-Sep-2017 |
| NLPM(TA:(perceptible human eye)) | SFAM(C) | 79 | Allowable Subject Matter | 21-Sep-2017 |
| NLPM(TA:(perceptible visual human eye)) | SFAM(C) | 17 | Allowable Subject Matter | 21-Sep-2017 |
| NLPM(TA:(perceptible visual acuity human eye)) | SFAM(C) | 1 | Allowable Subject Matter | 21-Sep-2017 |
| NLPM(TAC:(seamless perceptible contour visual acuity human eye)) | SFAM(C) | 0 | Allowable Subject Matter | 21-Sep-2017 |

## Non-Patent Literature Search Strategy/Results: 21 September 2017

Google:

    energy directing device energy locations energy relay elements; energy directing device energy locations energy relay elements singular seamless energy surface separation edges minimum perceptible contour visual acuity human eye; energy directing device energy locations energy relay elements propagation paths

Google Scholar:

    energy directing device energy locations energy relay elements; energy directing device energy locations energy relay elements singular seamless energy surface separation edges minimum perceptible contour visual acuity human eye; energy directing device energy locations energy relay elements propagation paths

EBSCO:

energy directing device energy locations energy relay elements; energy directing device energy locations energy relay elements singular seamless energy surface separation edges minimum perceptible contour visual acuity human eye; energy directing device energy locations energy relay elements propagation paths

Ex. L-1, p. 25

# Exhibit L-1

## Specification

Original Pages 111–146

Docket No. 1019.101

# HIGH DENSITY ENERGY DIRECTING DEVICE

## TECHNICAL FIELD

[0001]    This disclosure is related to energy directing devices, and specifically to energy relays configured to direct high density energy through a mosaic surface with imperceptible seam gaps.

## BACKGROUND

[0002]    The dream of an interactive virtual world within a "holodeck" chamber as popularized by Gene Roddenberry's *Star Trek* and originally envisioned by author Alexander Moszkowski in the early 1900s has been the inspiration for science fiction and technological innovation for nearly a century. However, no compelling implementation of this experience exists outside of literature, media, and the collective imagination of children and adults alike.

## SUMMARY

[0003]    In an embodiment, an energy directing device may comprises one or more energy locations and one or more energy relay elements, each of the one or more energy relay elements further comprising a first surface and a second surface. The second surfaces of each energy relay element may be arranged to form a singular seamless energy surface.

[0004]    In an embodiment, a separation between edges of any two adjacent second surfaces of the singular seamless energy surface may be less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface, from the singular seamless energy surface.

[0005]    In an embodiment, the one or more energy relay elements may be configured to direct energy along energy propagation paths which extend between the one or more energy locations and the singular seamless energy surface.

[0006]    In an embodiment, the singular seamless energy surface may be a virtual surface.

[0007]    In an embodiment, energy may be directed through the one or more energy relay elements with zero magnification, non-zero magnification, or non-zero minification.

[0008]    In an embodiment, the singular seamless energy surface may be planar, faceted, or curved.

1

Ex. L-1, p. 111

Docket No. 1019.101

**[0009]** In an embodiment, a quantity of the one or more energy relay elements and a quantity of the one or more energy locations may define a mechanical dimension of the energy directing device.

**[0010]** In an embodiment, the one or more energy relay elements may be configured to relay accepted focused light, the accepted focused light having a first resolution, while retaining a relayed resolution of the accepted focused light no less than 50% of the first resolution.

**[0011]** In an embodiment, an energy directing device comprises one or more energy locations and one or more energy relay element stacks. Each energy relay element stack comprises one or more energy relay elements, and each energy relay element comprising a first side and a second side. Each energy relay element may be configured to direct energy therethrough.

**[0012]** In an embodiment, the second sides of terminal energy relay elements of each energy relay element stack may be arranged to form a singular seamless energy surface.

**[0013]** In an embodiment, the one or more energy relay element stacks may be configured to direct energy along energy propagation paths which extend between the one or more energy locations and the singular seamless energy surfaces.

**[0014]** In an embodiment, a separation between the edges of any two adjacent second surfaces of the terminal energy relay elements may be less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface, from the singular seamless energy surface.

**[0015]** In an embodiment, the energy relay elements of each energy relay element stack arranged in an end-to-end configuration;

**[0016]** In an embodiment, an energy system comprises one or more energy devices, and one or more energy components each made from elements that induce transverse Anderson Localization of energy transport therethrough, and each energy component further comprising a first energy surface and a second energy surface.

**[0017]** In an embodiment, the second energy surface of each energy component may be arranged to form a singular seamless energy surface.

**[0018]** In an embodiment, the one or more energy devices may be operable to at least emit or receive energy through the singular seamless energy surface.

**[0019]** In an embodiment, a separation between edges of any two adjacent second energy surfaces of the one or more energy components may be less than a minimum perceptible

2

Ex. L-1, p. 112

contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a singular seamless energy surface height or a singular seamless energy surface width, from the singular seamless energy surface.

**[0020]**　　　These and other advantages of the present disclosure will become apparent to those skilled in the art from the following detailed description and the appended claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

**[0021]**　　　FIG. 1 is a schematic diagram illustrating design parameters for an energy directing system;

**[0022]**　　　FIG. 2 is a schematic diagram illustrating an energy system having an active device area with a mechanical envelope;

**[0023]**　　　FIG. 3 is a schematic diagram illustrating an energy relay system;

**[0024]**　　　FIG. 4 is a schematic diagram illustrating an embodiment of energy relay elements adhered together and fastened to a base structure;

**[0025]**　　　FIG. 5A is a schematic diagram illustrating an example of a relayed image through multi-core optical fibers;

**[0026]**　　　FIG. 5B is a schematic diagram illustrating an example of a relayed image through an optical relay that exhibits the properties of the Transverse Anderson Localization principle;

**[0027]**　　　FIG. 6 is a schematic diagram showing rays propagated from an energy surface to a viewer;

**[0028]**　　　FIG. 7 illustrates a side view of three display devices which each comprise an active display area dimension and a mechanical envelope;

**[0029]**　　　FIG. 8 features five display devices which each comprise active display areas and mechanical envelopes, used with a beam splitter;

**[0030]**　　　FIG. 9 is a side view illustration of a methodology where 3 beam splitters are leveraged to accommodate a mechanical envelope;

**[0031]**　　　FIG. 10 highlights this relationship between the mechanical envelope ratio, the minimum focus distance and the maximum image offset as well as the percent of overlap between individual tiled images;

**[0032]**　　　FIG. 11 is a top view illustration of an embodiment with three projection devices arranged in an arc;

**[0033]**　　　FIG. 12 illustrates a tapered energy relay mosaic arrangement;

Ex. L-1, p. 113

**[0034]**    FIG. 13 illustrates a side view of an energy relay element stack comprising of two compound optical relay tapers in series;

**[0035]**    FIG. 14 illustrates a perspective view of an embodiment of an energy directing device where energy relay element stacks are arranged in an 8x4 array to form a singular seamless energy directing surface;

**[0036]**    FIG. 15 contains several views of an energy directing device.

**[0037]**    FIG. 16 contains a close-up view of the side view from FIG. 15 of the energy directing device;

**[0038]**    FIG. 17 illustrates a top view of an embodiment where energy relay element stacks are angled inward to a known point in space;

**[0039]**    FIG. 18 is a top view illustration of an embodiment where the seamless energy surface is a display formed by tapered optical relays, while the display devices and the mechanical envelopes for the display electronics are located a distance away from the tapered relays;

**[0040]**    FIG. 19 is a side view illustration of an embodiment wherein a seamless display surface is composed of nine tapered optical relays;

**[0041]**    FIG. 20 is a top view illustration of an embodiment where a single projection source and a single display panel source are merged with an image combiner.


## DETAILED DESCRIPTION

**[0042]**    An embodiment of a Holodeck (collectively called "Holodeck Design Parameters") provide sufficient energy stimulus to fool the human sensory receptors into believing that received energy impulses within a virtual, social and interactive environment are real, providing: 1) binocular disparity without external accessories, head-mounted eyewear, or other peripherals; 2) accurate motion parallax, occlusion and opacity throughout a viewing volume simultaneously for any number of viewers; 3) visual focus through synchronous convergence, accommodation and miosis of the eye for all perceived rays of light; and 4) converging energy wave propagation of sufficient density and resolution to exceed the human sensory "resolution" for vision, hearing, touch, taste, smell, and/or balance.

**[0043]**    Based upon conventional technology to date, we are decades, if not centuries away from a technology capable of providing for all receptive fields in a compelling way as suggested by the Holodeck Design Parameters including the visual, auditory, somatosensory, gustatory, olfactory, and vestibular systems.

Ex. L-1, p. 114

Docket No. 1019.101

[0044]     In this disclosure, the terms light field and holographic may be used interchangeably to define the energy propagation for stimulation of any sensory receptor response. While initial disclosures may refer to examples of electromagnetic and mechanical energy propagation through energy surfaces for holographic imagery and volumetric haptics, all forms of sensory receptors are envisioned in this disclosure. Furthermore, the principles disclosed herein for energy propagation along propagation paths may be applicable to both energy emission and energy capture.

[0045]     Many technologies exist today that are often unfortunately confused with holograms including lenticular printing, Pepper's Ghost, glasses-free stereoscopic displays, horizontal parallax displays, head-mounted VR and AR displays (HMD), and other such illusions generalized as "fauxlography." These technologies may exhibit some of the desired properties of a true holographic display, however, lack the ability to stimulate the human visual sensory response in any way sufficient to address at least two of the four identified Holodeck Design Parameters.

[0046]     These challenges have not been successfully implemented by conventional technology to produce a seamless energy surface sufficient for holographic energy propagation. There are various approaches to implementing volumetric and direction multiplexed light field displays including parallax barriers, hogels, voxels, diffractive optics, multi-view projection, holographic diffusers, rotational mirrors, multilayered displays, time sequential displays, head mounted display, etc., however, conventional approaches may involve a compromise on image quality, resolution, angular sampling density, size, cost, safety, frame rate, etc., ultimately resulting in an unviable technology.

[0047]     To achieve the Holodeck Design Parameters for the visual, auditory, somatosensory systems, the human acuity of each of the respective systems is studied and understood to propagate energy waves to sufficiently fool the human sensory receptors. The visual system is capable of resolving to approximately 1 arc min, the auditory system may distinguish the difference in placement as little as three degrees, and the somatosensory system at the hands are capable of discerning points separated by 2 - 12mm. While there are various and conflicting ways to measure these acuities, these values are sufficient to understand the systems and methods to stimulate perception of energy propagation.

[0048]     Of the noted sensory receptors, the human visual system is by far the most sensitive given that even a single photon can induce sensation. For this reason, much of this introduction will focus on visual energy wave propagation, and vastly lower resolution energy systems coupled within a disclosed energy waveguide surface may converge appropriate signals to induce

5

Ex. L-1, p. 115

holographic sensory perception. Unless otherwise noted, all disclosures apply to all energy and sensory domains.

[0049]     When calculating for effective design parameters of the energy propagation for the visual system given a viewing volume and viewing distance, a desired energy surface may be designed to include many gigapixels of effective energy location density. For wide viewing volumes, or near field viewing, the design parameters of a desired energy surface may include hundreds of gigapixels or more of effective energy location density. By comparison, a desired energy source may be designed to have 1 to 250 effective megapixels of energy location density for ultrasonic propagation of volumetric haptics or an array of 36 to 3,600 effective energy locations for acoustic propagation of holographic sound depending on input environmental variables. What is important to note is that with a disclosed bidirectional energy surface architecture, all components may be configured to form the appropriate structures for any energy domain to enable holographic propagation.

[0050]     However, the main challenge to enable the Holodeck today involves available visual technologies and electromagnetic device limitations. Acoustic and ultrasonic devices are less challenging given the orders of magnitude difference in desired density based upon sensory acuity in the respective receptive field, although the complexity should not be underestimated. While holographic emulsion exists with resolutions exceeding the desired density to encode interference patterns in static imagery, state-of-the-art display devices are limited by resolution, data throughput and manufacturing feasibility. To date, no singular display device has been able to meaningfully produce a light field having near holographic resolution for visual acuity.

[0051]     Production of a single silicon-based device capable of meeting the desired resolution for a compelling light field display may not practical and may involve extremely complex fabrication processes beyond the current manufacturing capabilities. The limitation to tiling multiple existing display devices together involves the seams and gap formed by the physical size of packaging, electronics, enclosure, optics and a number of other challenges that inevitably result in an unviable technology from an imaging, cost and/or a size standpoint.

[0052]     The embodiments disclosed herein may provide a real-world path to building the Holodeck.

[0053]     Example embodiments will now be described hereinafter with reference to the accompanying drawings, which form a part hereof, and which illustrate example embodiments which may be practiced.  As used in the disclosures and the appended claims, the terms "embodiment", "example embodiment", and "exemplary embodiment" do not necessarily refer to a single embodiment, although they may, and various example embodiments may be readily

6

combined and interchanged, without departing from the scope or spirit of example embodiments. Furthermore, the terminology as used herein is for the purpose of describing example embodiments only and is not intended to be limitations. In this respect, as used herein, the term "in" may include "in" and "on", and the terms "a," "an" and "the" may include singular and plural references. Furthermore, as used herein, the term "by" may also mean "from", depending on the context. Furthermore, as used herein, the term "if" may also mean "when" or "upon," depending on the context. Furthermore, as used herein, the words "and/or" may refer to and encompass any and all possible combinations of one or more of the associated listed items.

### Holographic System Considerations:
#### Overview of Light Field Energy Propagation Resolution

[0054]     Light field and holographic display is the result of a plurality of projections where energy surface locations provide angular, color and intensity information propagated within a viewing volume. The disclosed energy surface provides opportunities for additional information to coexist and propagate through the same surface to induce other sensory system responses. Unlike a stereoscopic display, the viewed position of the converged energy propagation paths in space do not vary as the viewer moves around the viewing volume and any number of viewers may simultaneously see propagated objects in real-world space as if it was truly there. In some embodiments, the propagation of energy may be located in the same energy propagation path but in opposite directions. For example, energy emission and energy capture along an energy propagation path are both possible in some embodiments of the present disclosed.

[0055]     FIG. 1 is a schematic diagram illustrating variables relevant for stimulation of sensory receptor response. These variables may include surface diagonal 101, surface width 102, surface height 103, a determined target seating distance 118, the target seating field of view field of view from the center of the display 104, the number of intermediate samples demonstrated here as samples between the eyes 105, the average adult inter-ocular separation 106, the average resolution of the human eye in arcmin 107, the horizontal field of view formed between the target viewer location and the surface width 108, the vertical field of view formed between the target viewer location and the surface height 109, the resultant horizontal waveguide element resolution, or total number of elements, across the surface 110, the resultant vertical waveguide element resolution, or total number of elements, across the surface 111, the sample distance based upon the inter-ocular spacing between the eyes and the number of intermediate samples for angular projection between the eyes 112, the angular sampling may be based upon the sample distance and the target seating distance 113, the total resolution Horizontal per waveguide element derived from

Ex. L-1, p. 117

the angular sampling desired 114, the total resolution Vertical per waveguide element derived from the angular sampling desired 115, device Horizontal is the count of the determined number of discreet energy sources desired 116, and device Vertical is the count of the determined number of discreet energy sources desired 117.

[0056]    A method to understand the desired minimum resolution may be based upon the following criteria to ensure sufficient stimulation of visual (or other) sensory receptor response: surface size (e.g., 84" diagonal), surface aspect ratio (e.g., 16:9), seating distance (e.g., 128" from the display), seating field of view (e.g., 120 degrees or +/- 60 degrees about the center of the display), desired intermediate samples at a distance (e.g., one additional propagation path between the eyes), the average inter-ocular separation of an adult (approximately 65mm), and the average resolution of the human eye (approximately 1 arcmin). These example values should be considered placeholders depending on the specific application design parameters.

[0057]    Further, each of the values attributed to the visual sensory receptors may be replaced with other systems to determine desired propagation path parameters. For other energy propagation embodiments, one may consider the auditory system's angular sensitivity as low as three degrees, and the somatosensory system's spatial resolution of the hands as small as 2 - 12mm.

[0058]    While there are various and conflicting ways to measure these sensory acuities, these values are sufficient to understand the systems and methods to stimulate perception of virtual energy propagation. There are many ways to consider the design resolution, and the below proposed methodology combines pragmatic product considerations with the biological resolving limits of the sensory systems. As will be appreciated by one of ordinary skill in the art, the following overview is a simplification of any such system design, and should be considered for exemplary purposes only.

[0059]    With the resolution limit of the sensory system understood, the total energy waveguide element density may be calculated such that the receiving sensory system cannot discern a single energy waveguide element from an adjacent element, given:

- Surface Aspect Ratio $= \dfrac{Width\ (W)}{Height\ (H)}$

- $Surface\ Horizontal\ Size = Surface\ Diagonal * (\dfrac{1}{\sqrt{(1 + (\frac{H}{W})^2}})$

- $Surface\ Vertical\ Size = Surface\ Diagonal * (\dfrac{1}{\sqrt{(1 + (\frac{W}{H})^2}})$

- $Horizontal\ Field\ of\ View = 2 * \text{atan}\left(\dfrac{Surface\ Horizontal\ Size}{2 * Seating\ Distance}\right)$

- $Vertical\ Field\ of\ View = 2 * \text{atan}\left(\dfrac{Surface\ Verticle\ Size}{2 * Seating\ Distance}\right)$

8

Ex. L-1, p. 118

- $Horizontal\ Element\ Resolution = \text{Horizontal FoV} * \frac{60}{Eye\ Resolution}$

- $Vertical\ Element\ Resolution = \text{Vertical FoV} * \frac{60}{Eye\ Resolution}$

**[0060]**　　　　The above calculations result in approximately a 32x18° field of view resulting in approximately 1920x1080 (rounded to nearest format) energy waveguide elements being desired. One may also constrain the variables such that the field of view is consistent for both (u, v) to provide a more regular spatial sampling of energy locations (e.g. pixel aspect ratio). The angular sampling of the system assumes a defined target viewing volume location and additional propagated energy paths between two points at the optimized distance, given:

- $Sample\ Distance = \frac{Inter-Ocular\ Distance}{(Number\ of\ Desired\ Intermediate\ Samples+1)}$

- $Angular\ Sampling = \text{atan}(\frac{Sample\ Distance}{Seating\ Distance})$

**[0061]**　　　　In this case, the inter-ocular distance is leveraged to calculate the sample distance although any metric may be leveraged to account for appropriate number of samples as a given distance. With the above variables considered, approximately one ray per 0.57° may be desired and the total system resolution per independent sensory system may be determined, given:

- $Locations\ Per\ Element(N) = \frac{Seating\ FoV}{Angular\ Sampling}$

- $Total\ Resolution\ H = N * Horizontal\ Element\ Resolution$

- $Total\ Resolution\ V = N * Vertical\ Element\ Resolution$

**[0062]**　　　　With the above scenario given the size of energy surface and the angular resolution addressed for the visual acuity system, the resultant energy surface may desirably include approximately 400k x 225k pixels of energy resolution locations, or 90 gigapixels holographic propagation density. These variables provided are for exemplary purposes only and many other sensory and energy metrology considerations should be considered for the optimization of holographic propagation of energy. In an additional embodiment, 1 gigapixel of energy resolution locations may be desired based upon the input variables. In an additional embodiment, 1,000 gigapixels of energy resolution locations may be desired based upon the input variables.

## Current Technology Limitations:

### Active Area, Device Electronics, Packaging, and the Mechanical Envelope

**[0063]**　　　　FIG. 2 illustrates a device 200 having an active area 220 with a certain mechanical form factor. The device 200 may include drivers 230 and electronics 240 for powering and interface to the active area 220, the active area having a dimension as shown by the x and y arrows. This device 200 does not take into account the cabling and mechanical structures to drive, power and

cool components, and the mechanical footprint may be further minimized by introducing a flex cable into the device 200. The minimum footprint for such a device 200 may also be referred to as a mechanical envelope 210 having a dimension as shown by the M:x and M:y arrows. This device 200 is for illustration purposes only and custom electronics designs may further decrease the mechanical envelope overhead, but in almost all cases may not be the exact size of the active area of the device. In an embodiment, this device 200 illustrates the dependency of electronics as it relates to active image area 220 for a micro OLED, DLP chip or LCD panel, or any other technology with the purpose of image illumination.

**[0064]**     In some embodiments, it may also be possible to consider other projection technologies to aggregate multiple images onto a larger overall display.  However, this may come at the cost of greater complexity for throw distance, minimum focus, optical quality, uniform field resolution, chromatic aberration, thermal properties, calibration, alignment, additional size or form factor. For most practical applications, hosting tens or hundreds of these projection sources 200 may result in a design that is much larger with less reliability.

**[0065]**     For exemplary purposes only, assuming energy devices with an energy location density of 3840 x 2160 sites, one may determine the number of individual energy devices (e.g., device 100) desired for an energy surface, given:

- $Devices\ H = \frac{Total\ Resolution\ H}{Device\ Resolution\ H}$
- $Devices\ V = \frac{Total\ Resolution\ V}{Device\ Resolution\ V}$

**[0066]**     Given the above resolution considerations, approximately 105 x 105 devices similar to those shown in FIG. 2 may be desired. It should be noted that many devices comprise of various pixel structures that may or may not map to a regular grid. In the event that there are additional sub-pixels or locations within each full pixel, these may be exploited to generate additional resolution or angular density. Additional signal processing may be used to determine how to convert the light field into the correct (u,v) coordinates depending on the specified location of the pixel structure(s) and can be an explicit characteristic of each device that is known and calibrated.  Further, other energy domains may involve a different handling of these ratios and device structures, and those skilled in the art will understand the direct intrinsic relationship between each of the desired frequency domains. This will be shown and discussed in more detail in subsequent disclosure.

**[0067]**     The resulting calculation may be used to understand how many of these individual devices may be desired to produce a full resolution energy surface. In this case, approximately 105 x 105 or approximately 11,080 devices may be desired to achieve the visual acuity threshold. The

Ex. L-1, p. 120

challenge and novelty exists within the fabrication of a seamless energy surface from these available energy locations for sufficient sensory holographic propagation.

Summary of Seamless Energy Surfaces:

Configurations and Designs for Arrays of Energy Relays

[0068]        In some embodiments, approaches are disclosed to address the challenge of generating high energy location density from an array of individual devices without seams due to the limitation of mechanical structure for the devices.  In an embodiment, an energy propagating relay system may allow for an increase the effective size of the active device area to meet or exceed the mechanical dimensions to configure an array of relays and form a singular seamless energy surface.

[0069]        FIG. 3 illustrates an embodiment of such an energy relay system 300.  As shown, the relay system 300 may include a device 310 mounted to a mechanical envelope 320, with an energy relay element 330 propagating energy from the device 310.  The relay element 330 may be configured to provide the ability to mitigate any gaps 340 that may be produced when multiple mechanical envelopes 320 of the device are placed into an array of multiple devices 310.

[0070]        For example, if a device's active area 310 is 20mm x 10mm and the mechanical envelope 320 is 40mm x 20mm, an energy relay element 330 may be designed with a magnification of 2:1 to produce a tapered form that is approximately 20mm x 10mm on a minified end (arrow A) and 40mm x 20mm on a magnified end (arrow B), providing the ability to align an array of these elements 330 together seamlessly without altering or colliding with the mechanical envelope 320 of each device 310. Mechanically, the relay elements 330 may be bonded or fused together to align and polish ensuring minimal seam gap 340 between devices 310. In one such embodiment, it is possible to achieve a seam gap 340 smaller than the visual acuity limit of the eye.

[0071]        FIG. 4 illustrates an example of a base structure 400 having energy relay elements 410 formed together and securely fastened to an additional mechanical structure 430. The mechanical structure of the seamless energy surface 420 provides the ability to couple multiple energy relay elements 410, 450 in series to the same base structure through bonding or other mechanical processes to mount relay elements 410, 450. In some embodiments, each relay element 410 may be fused, bonded, adhered, pressure fit, aligned or otherwise attached together to form the resultant seamless energy surface 420. In some embodiments, a device 480 may be mounted to the rear of the relay element 410 and aligned passively or actively to ensure appropriate energy location alignment within the determined tolerance is maintained.

Ex. L-1, p. 121

Docket No. 1019.101

**[0072]**    In an embodiment, the seamless energy surface comprises one or more energy locations and one or more energy relay element stacks comprise a first and second side and each energy relay element stack is arranged to form a singular seamless display surface directing energy along propagation paths extending between one or more energy locations and the seamless display surface, and where the separation between the edges of any two adjacent second surfaces of the terminal energy relay elements is less than the minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/100 vision at a distance greater than the width of the singular seamless display surface.

**[0073]**    In an embodiment, each of the seamless energy surfaces comprise one or more energy relay elements each with one or more structures forming a first and second surface with a transverse and longitudinal orientation. The first relay surface has an area different than the second resulting in positive or negative magnification and configured with explicit surface contours for both the first and second surfaces passing energy through the second relay surface to substantially fill a +/- 10 degree angle with respect to the normal of the surface contour across the entire second relay surface.

**[0074]**    In an embodiment, multiple energy domains may be configured within a single, or between multiple energy relays to direct one or more sensory holographic energy propagation paths including visual, acoustic, tactile or other energy domains.

**[0075]**    In an embodiment, the seamless energy surface is configured with energy relays that comprise two or more first sides for each second side to both receive and emit one or more energy domains simultaneously to provide bidirectional energy propagation throughout the system.

**[0076]**    In an embodiment, the energy relays are provided as loose coherent elements.

<u>Introduction to Component Engineered Structures:</u>

<u>Disclosed Advances in Transverse Anderson Localization Energy Relays</u>

**[0077]**    The properties of energy relays may be significantly optimized according to the principles disclosed herein for energy relay elements that induce Transverse Anderson Localization. Transverse Anderson Localization is the propagation of a ray transported through a transversely disordered but longitudinally consistent material.

**[0078]**    This implies that the effect of the materials that produce the Anderson Localization phenomena may be less impacted by total internal reflection than by the randomization between multiple-scattering paths where wave interference can completely limit the propagation in the transverse orientation while continuing in the longitudinal orientation.

Ex. L-1, p. 122

[0079]        Of significant additional benefit is the elimination of the cladding of traditional multi-core optical fiber materials. The cladding is to functionally eliminate the scatter of energy between fibers, but simultaneously act as a barrier to rays of energy thereby reducing transmission by at least the core to clad ratio (e.g., a core to clad ratio of 70:30 will transmit at best 70% of received energy transmission) and additionally forms a strong pixelated patterning in the propagated energy.

[0080]        FIG. 5A illustrates an end view of an example of one such non-Anderson Localization energy relay 500, wherein an image is relayed through multi-core optical fibers where pixilation and fiber noise may be exhibited due to the intrinsic properties of the optical fibers. With traditional multi-mode and multi-core optical fibers, relayed images may be intrinsically pixelated due to the properties of total internal reflection of the discrete array of cores where any cross-talk between cores will reduce the modulation transfer function and increase blurring. The resulting imagery produced with traditional multi-core optical fiber tends to have a residual fixed noise fiber pattern similar to those shown in figure 3.

[0081]        FIG. 5B, illustrates an example of the same relayed image 550 through an energy relay comprising materials that exhibit the properties of Transverse Anderson Localization, where the relayed pattern has a greater density grain structures as compared to the fixed fiber pattern from figure 5A.  In an embodiment, relays comprising randomized microscopic component engineered structures induce Transverse Anderson Localization and transport light more efficiently with higher propagation of resolvable resolution than commercially available multi-mode glass optical fibers.

[0082]        There is significant advantage to the Transverse Anderson Localization material properties in terms of both cost and weight, where a similar optical grade glass material, may cost and weigh upwards of 10 to 100-fold more than the cost for the same material generated within an embodiment, wherein disclosed systems and methods comprise randomized microscopic component engineered structures demonstrating significant opportunities to improve both cost and quality over other technologies known in the art.

[0083]        In an embodiment, a relay element exhibiting Transverse Anderson Localization may comprise a plurality of at least two different component engineered structures in each of three orthogonal planes arranged in a dimensional lattice and the plurality of structures form randomized distributions of material wave propagation properties in a transverse plane within the dimensional lattice and channels of similar values of material wave propagation properties in a longitudinal plane within the dimensional lattice, wherein localized energy waves propagating through the energy relay have higher transport efficiency in the longitudinal orientation versus the transverse orientation.

Ex. L-1, p. 123

[0084]    In an embodiment, multiple energy domains may be configured within a single, or between multiple Transverse Anderson Localization energy relays to direct one or more sensory holographic energy propagation paths including visual, acoustic, tactile or other energy domains.

[0085]    In an embodiment, the seamless energy surface is configured with Transverse Anderson Localization energy relays that comprise two or more first sides for each second side to both receive and emit one or more energy domains simultaneously to provide bidirectional energy propagation throughout the system.

[0086]    In an embodiment, the Transverse Anderson Localization energy relays are configured as loose coherent or flexible energy relay elements.


Considerations for 4D Plenoptic Functions:

Selective Propagation of Energy through Holographic Waveguide Arrays

[0087]    As discussed above and herein throughout, a light field display system generally includes an energy source (e.g., illumination source) and a seamless energy surface configured with sufficient energy location density as articulated in the above discussion. A plurality of relay elements may be used to relay energy from the energy devices to the seamless energy surface. Once energy has been delivered to the seamless energy surface with the requisite energy location density, the energy can be propagated in accordance with a 4D plenoptic function through a disclosed energy waveguide system. As will be appreciated by one of ordinary skill in the art, a 4D plenoptic function is well known in the art and will not be elaborated further herein.

[0088]    The energy waveguide system selectively propagates energy through a plurality of energy locations along the seamless energy surface representing the spatial coordinate of the 4D plenoptic function with a structure configured to alter an angular direction of the energy waves passing through representing the angular component of the 4D plenoptic function, wherein the energy waves propagated may converge in space in accordance with a plurality of propagation paths directed by the 4D plenoptic function.

[0089]    Reference is now made to FIG. 6 illustrating an example of light field energy surface in 4D image space in accordance with a 4D plenoptic function. The figure shows ray traces of an energy surface 600 to a viewer 620 in describing how the rays of energy converge in space 630 from various positions within the viewing volume. As shown, each waveguide element 610 defines four dimensions of information describing energy propagation 640 through the energy surface 600. Two spatial dimensions (herein referred to as x and y) are the physical plurality of energy locations that can be viewed in image space, and the angular components theta and phi (herein referred to as u and v), which is viewed in virtual space when projected through the energy

Ex. L-1, p. 124

Docket No. 1019.101

waveguide array. In general and in accordance with a 4D plenoptic function, the plurality of waveguides (e.g., lenslets) are able to direct an energy location from the x, y dimension to a unique location in virtual space, along a direction defined by the u, v angular component, in forming the holographic or light field system described herein.

**[0090]**     However, one skilled in the art will understand that a significant challenge to light field and holographic display technologies arises from uncontrolled propagation of energy due designs that have not accurately accounted for any of diffraction, scatter, diffusion, angular direction, calibration, focus, collimation, curvature, uniformity, element cross-talk, as well as a multitude of other parameters that contribute to decreased effective resolution as well as an inability to accurately converge energy with sufficient fidelity.

**[0091]**     In an embodiment, an approach to selective energy propagation for addressing challenges associated with holographic display may include energy inhibiting elements and substantially filling waveguide apertures with near-collimated energy into an environment defined by a 4D plenoptic function.

**[0092]**     In an embodiment, an array of energy waveguides may define a plurality of energy propagation paths for each waveguide element configured to extend through and substantially fill the waveguide element's effective aperture in unique directions defined by a prescribed 4D function to a plurality of energy locations along a seamless energy surface inhibited by one or more elements positioned to limit propagation of each energy location to only pass through a single waveguide element.

**[0093]**     In an embodiment, multiple energy domains may be configured within a single, or between multiple energy waveguides to direct one or more sensory holographic energy propagations including visual, acoustic, tactile or other energy domains.

**[0094]**     In an embodiment, the energy waveguides and seamless energy surface are configured to both receive and emit one or more energy domains to provide bidirectional energy propagation throughout the system.

**[0095]**     In an embodiment, the energy waveguides are configured to propagate non-linear or non-regular distributions of energy, including non-transmitting void regions, leveraging digitally encoded, diffractive, refractive, reflective, grin, holographic, Fresnel, or the like waveguide configurations for any seamless energy surface orientation including wall, table, floor, ceiling, room, or other geometry based environments. In an additional embodiment, an energy waveguide element may be configured to produce various geometries that provide any surface profile and/or tabletop viewing allowing users to view holographic imagery from all around the energy surface in a 360-degree configuration.

Ex. L-1, p. 125

[0096]      In an embodiments, the energy waveguide array elements may be reflective surfaces and the arrangement of the elements may be hexagonal, square, irregular, semi-regular, curved, non-planar, spherical, cylindrical, tilted regular, tilted irregular, spatially varying and/or multi-layered.

[0097]      For any component within the seamless energy surface, waveguide, or relay components may include, but not limited to, optical fiber, silicon, glass, polymer, optical relays, diffractive, holographic, refractive, or reflective elements, optical face plates, energy combiners, beam splitters, prisms, polarization elements, spatial light modulators, active pixels, liquid crystal cells, transparent displays, or any similar materials exhibiting Anderson localization or total internal reflection.


<u>Realizing the Holodeck:</u>
<u>Aggregation of Seamless Energy Surface Systems to Stimulate Human Sensory Receptors Within Holographic Environments</u>

[0098]      It is possible to construct large-scale environments of seamless energy surface systems by tiling, fusing, bonding, attaching, and/or stitching multiple seamless energy surfaces together forming arbitrary sizes, shapes, contours or form-factors including entire rooms. Each energy surface system may comprise an assembly having a base structure, energy surface, relays, waveguide, devices, and electronics, collectively configured for bidirectional holographic energy propagation, emission, reflection, or sensing.

[0099]      In an embodiment, an environment of tiled seamless energy systems are aggregated to form large seamless planar or curved walls including installations comprising up to all surfaces in a given environment, and configured as any combination of seamless, discontinuous planar, faceted, curved, cylindrical, spherical, geometric, or non-regular geometries.

[00100]      In an embodiment, aggregated tiles of planar surfaces form wall-sized systems for theatrical or venue-based holographic entertainment. In an embodiment, aggregated tiles of planar surfaces cover a room with four to six walls including both ceiling and floor for cave-based holographic installations. In an embodiment, aggregated tiles of curved surfaces produce a cylindrical seamless environment for immersive holographic installations. In an embodiment, aggregated tiles of seamless spherical surfaces form a holographic dome for immersive Holodeck-based experiences.

[00101]      In an embodiment, aggregates tiles of seamless curved energy waveguides provide mechanical edges following the precise pattern along the boundary of energy inhibiting elements

16

within the energy waveguide structure to bond, align, or fuse the adjacent tiled mechanical edges of the adjacent waveguide surfaces, resulting in a modular and seamless energy waveguide system.

[00102]     In a further embodiment of an aggregated tiled environment, energy is propagated bidirectionally for multiple simultaneous energy domains. In an additional embodiment, the energy surface provides the ability to both display and capture simultaneously from the same energy surface with waveguides designed such that light field data may be projected by an illumination source through the waveguide and simultaneously received through the same energy surface. In an additional embodiment, additional depth sensing and active scanning technologies may be leveraged to allow for the interaction between the energy propagation and the viewer in correct world coordinates. In an additional embodiment, the energy surface and waveguide are operable to emit, reflect or converge frequencies to induce tactile sensation or volumetric haptic feedback. In some embodiments, any combination of bidirectional energy propagation and aggregated surfaces are possible.

[00103]     In an embodiment, the system comprises an energy waveguide capable of bidirectional emission and sensing of energy through the energy surface with one or more energy devices independently paired with two-or-more-path energy combiners to pair at least two energy devices to the same portion of the seamless energy surface, or one or more energy devices are secured behind the energy surface, proximate to an additional component secured to the base structure, or to a location in front and outside of the FOV of the waveguide for off-axis direct or reflective projection or sensing, and the resulting energy surface provides for bidirectional transmission of energy allowing the waveguide to converge energy, a first device to emit energy and a second device to sense energy, and where the information is processed to perform computer vision related tasks including, but not limited to, 4D plenoptic eye and retinal tracking or sensing of interference within propagated energy patterns, depth estimation, proximity, motion tracking, image, color, or sound formation, or other energy frequency analysis. In an additional embodiment, the tracked positions actively calculate and modify positions of energy based upon the interference between the bidirectional captured data and projection information.

[00104]     In some embodiments, a plurality of combinations of three energy devices comprising an ultrasonic sensor, a visible electromagnetic display, and an ultrasonic emitting device are configured together for each of three first relay surfaces propagating energy combined into a single second energy relay surface with each of the three first surfaces comprising engineered properties specific to each device's energy domain, and two engineered waveguide elements configured for ultrasonic and electromagnetic energy respectively to provide the ability to direct

Ex. L-1, p. 127

and converge each device's energy independently and substantially unaffected by the other waveguide elements that are configured for a separate energy domain.

[00105]    In some embodiments, disclosed is a calibration procedure to enable efficient manufacturing to remove system artifacts and produce a geometric mapping of the resultant energy surface for use with encoding/decoding technologies as well as dedicated integrated systems for the conversion of data into calibrated information appropriate for energy propagation based upon the calibrated configuration files.

[00106]    In some embodiments, additional energy waveguides in series and one or more energy devices may be integrated into a system to produce opaque holographic pixels.

[00107]    In some embodiments, additional waveguide elements may be integrated comprising energy inhibiting elements, beam-splitters, prisms, active parallax barriers or polarization technologies in order to provide spatial and/or angular resolutions greater than the diameter of the waveguide or for other super-resolution purposes.

[00108]    In some embodiments, the disclosed energy system may also be configured as a wearable bidirectional device, such as virtual reality (VR) or augmented reality (AR). In other embodiments, the energy system may include adjustment optical element(s) that cause the displayed or received energy to be focused proximate to a determined plane in space for a viewer. In some embodiments, the waveguide array may be incorporated to holographic head-mounted-display. In other embodiments, the system may include multiple optical paths to allow for the viewer to see both the energy system and a real-world environment (e.g., transparent holographic display). In these instances, the system may be presented as near field in addition to other methods.

[00109]    In some embodiments, the transmission of data comprises encoding processes with selectable or variable compression ratios that receive an arbitrary dataset of information and metadata; analyze said dataset and receive or assign material properties, vectors, surface IDs, new pixel data forming a more sparse dataset, and wherein the received data may comprise: 2D, stereoscopic, multi-view, metadata, light field, holographic, geometry, vectors or vectorized metadata, and an encoder/decoder may provide the ability to convert the data in real-time or off-line comprising image processing for: 2D; 2D plus depth, metadata or other vectorized information; stereoscopic, stereoscopic plus depth, metadata or other vectorized information; multi-view; multi-view plus depth, metadata or other vectorized information; holographic; or light field content; through depth estimation algorithms, with or without depth metadata; and an inverse ray tracing methodology appropriately maps the resulting converted data produced by inverse ray tracing from the various 2D, stereoscopic, multi-view, volumetric, light field or holographic data into real world coordinates through a characterized 4D plenoptic function. In these embodiments, the total data

Ex. L-1, p. 128

transmission desired may be multiple orders of magnitudes less transmitted information than the raw light field dataset.

## High Density Energy Directing Device

[00110]    In an embodiment, an energy directing device may comprises one or more energy locations and one or more energy relay elements, each of the one or more energy relay elements further comprising a first surface and a second surface. The second surfaces of each energy relay element may be arranged to form a singular seamless energy surface.

[00111]    In embodiments of the present disclosure, the one or more energy locations may comprise a display technology including any of:

   a) LCD, LED, laser, CRT, OLED, AMOLED, TOLED, pico projector, single chip, 3-chip, LCoS, DLP, Quantum Dots, monochrome, color, projection, backlit, directly emissive, reflective, transparent, opaque, coherent, incoherent, diffuse, direct, or any other illumination source sufficient to produce the desired pixel density; and

   b) wherein any reflective display technology may be directly bonded to the optical relay to provide an outdoor or ambient illumination display, and further, combined with other materials allows for the interaction of light with the relayed content for both 2D and light field applications; and

   c) a series of beamsplitters, prisms, or polarized elements and arranging each of the above devices within the optical system to provide a virtual energy surface that aggregates to include a completely seamless integration of all of the active area between the one or more devices even in consideration of the mechanical envelopes; and

   d) a series of parallel, converged, optically offset parallel and converged, on-axis, off-axis, radial, aligned or otherwise reflective or projection systems, each including a specified resolution and mechanical envelope but projecting onto a surface that is in aggregate smaller than the side-by-side footprint of all of the one or more reflective or projection systems combined.

[00112]    In an embodiment, a separation between edges of any two adjacent second surfaces of the singular seamless energy surface may be less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface, from the singular seamless energy surface.

Ex. L-1, p. 129

[00113]    Creating a seamless energy surface from a plurality of separate independent energy sources presents a problem of significant seams between the active areas of the energy sources.

[00114]    For example, for visible electromagnetic energy, FIG. 7 represents an example of the minimum separation possible between identical independent displays when mounted on flex cables. FIG. 7 illustrates a side view of three display devices 700, which each comprise an active display area dimension 702 and a mechanical envelope 706. Minimum gaps 708 highlight the minimum possible space between any two active imaging surfaces 702 of display devices 700. In the event that the active image to mechanical envelope ratio is less than 2:1 (e.g. the active area is 20mm x 10mm and the mechanical envelope is less than 40mm x 10mm), it is possible to use beam splitters or other similar optical and reflective materials to interleave two image surfaces to form one single contiguous plane.

[00115]    FIG. 8 is a side view illustration which describes one such implementation of this methodology. FIG. 8 features five display devices 800 which each comprise active display areas 802 and mechanical envelopes 804. Beam splitter 806 combines image light 808 produced by display devices 800 into a seamless image presentation 810, which effectively masks the mechanical envelopes 804 of the display devices 800. It should be noted that a highly non-reflective dark surface is preferable at or near the display to mask out the non-image areas in order to avoid reflection of the electronics and other non-display regions.

[00116]    FIG. 9 is a side view illustration of a second methodology where 3 beam splitters are leveraged to accommodate a mechanical envelope that is a 4:1 ratio. FIG. 9 features eight display devices 900 which each comprise active display areas 902 and mechanical envelopes 904. Three beam splitters 906, 908, and 910 combine image light 912 produced by the eight display devices 900 into a seamless image presentation 914, which effectively masks the mechanical envelopes 904 of the display devices 900.

[00117]    It should be noted that while these methods can work, the mechanical accuracy may preferably be near perfect to avoid incorrect angular viewing of each overlapping display plane and the overall viewed brightness will decrease by the amount of light that is absorbed by the beam splitter in order to redirect the rays of light to each discreet reflected plane. In FIG. 9, the brightness of image light 912 will only transmit at best 25% of actual display peak potential from display devices 900 due to the loss of light from the overall system. Additionally, it should be noted that the size of the physical apparatus with multiple reflections becomes quite large very quickly depending on the size of the desired image surface.

[00118]    It is also possible to consider projection technologies to aggregate multiple images into a larger overall display, however, this comes at the cost of great complexity for throw distance,

Ex. L-1, p. 130

minimum focus, optical quality, thermal consistency considerations over a temperature gradient over time, as well as image blending, alignment, size and form factor. For most practical applications, hosting tens or hundreds of these projection sources results in a design that is much larger and less reliable. With all of the above risks noted, all of the descriptions contained herein may also apply to any form of projection technology in addition to the disclosed panel methodologies.

[00119]    An alternative methodology involves using many projectors in a tiled fashion to produce a seamless image surface in combination with a rear projection surface. This surface may include screens, diffusers, and optical relays in planar or non-planar surfaces. The regions between each individually addressed tile should ideally overlap slightly and blend the transition between each tile appropriately, although not explicitly required. The same concept of image area to mechanical envelope applies with some added complexity. We now introduce the concepts of maximum optical offset along image surface position which can be controlled by moving the optics of the projection system independently from that of the image source resulting in a non-keystoned shift of the image to the energy surface. High quality optics are desired for this to be successful and is often limited to less than the width of the projected image.

[00120]    Additionally, when not using orthographic or collimated designs, we now have the challenge of minimum focus of the optics contained within the projection system. This can be addressed by increasing the overall projected image size per tile at the consequence of increasing the viewed distance to provide the desired pixel density as notated above.

[00121]    FIG. 10 highlights this relationship between the mechanical envelope ratio, the minimum focus distance and the maximum image offset as well as the percent of overlap between individual tiled images. FIG. 10 illustrates a top view of an embodiment with three projection devices: one centered projection device 1000, and two off-centered projection devises 1001, 1003. The mechanical envelope of each projection device 1000, 1001, 1003 creates a display offset which invites adjustment of the projection angle 1004 of each off-centered projection device 1001, 1003. FIG. 10 highlights the use of off-axis projection optics, where the display panel 1014 is displaced from the optical axis of the display lens 1016 by an amount 1002 in proportion to the display panel distance from the center of the array, allowing for the overlap of each of these images while maintaining a parallel array structure, and additionally avoid a keystone image correction. Image light projected from the projection devices 1000, 1001, 1003 forms a display image 1006 at image plane 1008. Image light from off-centered projection device 1001, 1003 will have an image offset 1010 and a fractional overlap 1012 at the image plane 1008.

Ex. L-1, p. 131

**[00122]**     In an embodiment, the singular seamless energy surface may be planar, faceted, or curved. It is also possible to form an arc of projectors at the expense of requiring keystone correction optically or computationally to form the singular energy surface. In an embodiment, three projection devices may be arranged in an arc. The projection devices may produce image light which propagates through a planar image plane. The image light may experience keystone effects.

**[00123]**     Alternatively, non-planar surfaces may be designed in order to place each projector directly behind the corresponding tile of viewed energy surface. FIG. 11 is a top view illustration of an embodiment with three projection devices 1100 arranged in an arc. The projection devices 1100 produce image light 1102 which propagates through non-planar surface 1104. Image light 1102 may experience keystone effects that the embodiment of FIG. 10 avoids. For both of these approaches, the projectors do not necessarily need to be in a physically stacked configuration and may leverage reflectors or other optical methodologies in order to provide application specific mechanical designs.

**[00124]**     Any combination of these approaches may be employed where both beam splitters and projection technologies can be leveraged simultaneously.

**[00125]**     An additional embodiment of the system makes use of recent breakthroughs in energy relay technologies.


Tapered Energy Relays

**[00126]**     In order to further solve the challenge of generating high resolution from an array of individual energy wave sources containing extended mechanical envelopes, the use of tapered energy relays can be employed to increase the effective size of each energy source. An array of tapered energy relays can be stitched together to form a singular contiguous energy surface, circumventing the limitation of mechanical requirements for those energy sources.

**[00127]**     In an embodiment, the one or more energy relay elements may be configured to direct energy along propagation paths which extend between the one or more energy locations and the singular seamless energy surface.

**[00128]**     For example, if an energy wave source's active area is 20mm x 10mm and the mechanical envelope is 40mm x 20mm, a tapered energy relay may be designed with a magnification of 2:1 to produce a taper that is 20mm x 10mm (when cut) on the minified end and 40mm x 20mm (when cut) on the magnified end, providing the ability to align an array of these tapers together seamlessly without altering or violating the mechanical envelope of each energy wave source.

Ex. L-1, p. 132

Docket No. 1019.101

[00129]    FIG. 12 illustrates an orthogonal view of one such tapered energy relay mosaic arrangement 1210, in accordance with one embodiment of the present disclosure. In FIG. 12, the relay device 1210 may include two or more relay elements 1220, each relay element 1220 formed of one or more structures, each relay element 1220 having a first surface 1240, a second surface 1260, a transverse orientation (generally parallel to the surfaces 1240, 1260) and a longitudinal orientation (generally perpendicular to the surfaces 1240, 1260). The surface area of the first surface 1240 may be different than the surface area of the second surface 1260. For relay element 1220, the surface area of the first surface 1240 is less than the surface area of the second surface 1260. In another embodiment, the surface area of the first surface 1240 may be the same or greater than the surface area of the second surface 1260. Energy waves can pass from the first surface 1240 to the second surface 1260, or vice versa.

[00130]    In FIG. 12, the relay element 1220 of the relay element device 1210 includes a sloped profile portion 1280 between the first surface 1240 and the second surface 1260. In operation, energy waves propagating between the first surface 1240 and the second surface 1260 may have a higher transport efficiency in the longitudinal orientation than in the transverse orientation, and energy waves passing through the relay element 1220 may result in spatial magnification or spatial de-magnification. In other words, energy waves passing through the relay element 1220 of the relay element device 1210 may experience increased magnification or decreased magnification. In an embodiment, energy may be directed through the one or more energy relay elements with zero magnification. In some embodiments, the one or more structures for forming relay element devices may include glass, carbon, optical fiber, optical film, plastic, polymer, or mixtures thereof.

[00131]    In one embodiment, the energy waves passing through the first surface have a first resolution, while the energy waves passing through the second surface have a second resolution, and the second resolution is no less than about 50 % of the first resolution. In another embodiment, the energy waves, while having a uniform profile when presented to the first surface, may pass through the second surface radiating in every direction with an energy density in the forward direction that substantially fills a cone with an opening angle of +/- 10 degrees relative to the normal to the second surface, irrespective of location on the second relay surface.

[00132]    In some embodiments, the first surface may be configured to receive energy from an energy wave source, the energy wave source including a mechanical envelope having a width different than the width of at least one of the first surface and the second surface.

[00133]    In an embodiment, energy may be transported between first and second surfaces which defines the longitudinal orientation, the first and second surfaces of each of the relays extends generally along a transverse orientation defined by the first and second directions, where the

Ex. L-1, p. 133

longitudinal orientation is substantially normal to the transverse orientation. In an embodiment, energy waves propagating through the plurality of relays have higher transport efficiency in the longitudinal orientation than in the transverse orientation and are spatially localized in the transverse plane due to randomized refractive index variability in the transverse orientation coupled with minimal refractive index variation in the longitudinal orientation via the principle of Transverse Anderson Localization. In some embodiments where each relay is constructed of multicore fiber, the energy waves propagating within each relay element may travel in the longitudinal orientation determined by the alignment of fibers in this orientation.

[00134]    Mechanically, these tapered energy relays are cut and polished to a high degree of accuracy before being bonded or fused together in order to align them and ensure that the smallest possible seam gap between the relays. The seamless surface formed by the second surfaces of energy relays is polished after the relays are bonded. In one such embodiment, using an epoxy that is thermally matched to the taper material, it is possible to achieve a maximum seam gap of 50um. In another embodiment, a manufacturing process that places the taper array under compression and / or heat provides the ability to fuse the elements together. In another embodiment, the use of plastic tapers can be more easily chemically fused or heat-treated to create the bond without additional bonding. For the avoidance of doubt, any methodology may be used to bond the array together, to explicitly include no bond other than gravity and/ or force.

[00135]    In an embodiment, a separation between the edges of any two adjacent second surfaces of the terminal energy relay elements may be less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance from the seamless energy surface that is greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface.

[00136]    A mechanical structure may be preferable in order to hold the multiple components in a fashion that meets a certain tolerance specification. In some embodiments, the first and second surfaces of tapered relay elements can have any polygonal shapes including without limitation circular, elliptical, oval, triangular, square, rectangle, parallelogram, trapezoidal, diamond, pentagon, hexagon, and so forth. In some examples, for non-square tapers, such as rectangular tapers for example, the relay elements may be rotated to have the minimum taper dimension parallel to the largest dimensions of the overall energy source. This approach allows for the optimization of the energy source to exhibit the lowest rejection of rays of light due to the acceptance cone of the magnified relay element as when viewed from center point of the energy source. For example, if the desired energy source size is 100 mm by 60 mm and each tapered energy relay is 20 mm by 10 mm, the relay elements may be aligned and rotated such that an array of 3 by 10 taper energy

Ex. L-1, p. 134

relay elements may be combined to produce the desired energy source size. Nothing here should suggest that an array with an alternative configuration of an array of 6 by 5 matrix, among other combinations, could not be utilized. The array comprising of a 3x10 layout generally will perform better than the alternative 6x5 layout.

<u>Energy Relay Element Stacks</u>

**[00137]**     While the most simplistic formation of an energy source system comprises of an energy source bonded to a single tapered energy relay element, multiple relay elements may be coupled to form a single energy source module with increased quality or flexibility. One such embodiment includes a first tapered energy relay with the minified end attached to the energy source, and a second tapered energy relay connected to the first relay element, with the minified end of the second optical taper in contact with the magnified end of the first relay element, generating a total magnification equal to the product of the two individual taper magnifications. This is an example of an energy relay element stack comprising of a sequence of two or more energy relay elements, with each energy relay element comprising a first side and a second side, the stack relaying energy from the first surface of the first element to the second surface of the last element in the sequence, also named the terminal surface. Each energy relay element may be configured to direct energy therethrough.

**[00138]**     In an embodiment, an energy directing device comprises one or more energy locations and one or more energy relay element stacks. Each energy relay element stack comprises one or more energy relay elements, with each energy relay element comprising a first surface and a second surface. Each energy relay element may be configured to direct energy therethrough. In an embodiment, the second surfaces of terminal energy relay elements of each energy relay element stack may be arranged to form a singular seamless display surface. In an embodiment, the one or more energy relay element stacks may be configured to direct energy along energy propagation paths which extend between the one or more energy locations and the singular seamless display surfaces.

**[00139]**     FIG. 13 illustrates a side view of an energy relay element stack 1300 consisting of two compound optical relay tapers 1322, 1324 in series, both tapers with minified ends facing an energy source surface 1326, in accordance with an embodiment of the present disclosure. In FIG. 13, the input numerical aperture (NA) is 1.0 for the input of taper 1324, but only about 0.16 for the output of taper 1322. Notice that the output numerical aperture gets divided by the total magnification of 6, which is the product of 2 for taper 1324, and 3 for taper 1322. One advantage of this approach is the ability to customize the first energy wave relay element to account for various

25

Ex. L-1, p. 135

dimensions of energy source without alteration of the second energy wave relay element. It additionally provides the flexibility to alter the size of the output energy surface without changing the design of the energy source or the first relay element. Also shown in FIG. 13 is the energy source 1326 and the mechanical envelope 1328 containing the energy source drive electronics.

[00140]      In an embodiment, the first surface may be configured to receive energy waves from an energy source unit (e.g., 1326), the energy source unit including a mechanical envelope having a width different than the width of at least one of the first surface and the second surface. In one embodiment, the energy waves passing through the first surface may have a first resolution, while the energy waves passing through the second surface may have a second resolution, such that the second resolution is no less than about 50 % of the first resolution. In another embodiment, the energy waves, while having a uniform profile when presented to the first surface, may pass through the second surface radiating in every direction with an energy density in the forward direction that substantially fills a cone with an opening angle of +/- 10 degrees relative to the normal to the second surface, irrespective of location on the second relay surface.

[00141]      In one embodiment, the plurality of energy relay elements in the stacked configuration may include a plurality of faceplates (relays with unity magnification).  In some embodiments, the plurality of faceplates may have different lengths or are loose coherent optical relays. In other embodiments, the plurality of elements may have sloped profile portions similar to that of FIG. 12, where the sloped profile portions may be angled, linear, curved, tapered, faceted or aligned at a non-perpendicular angle relative to a normal axis of the relay element. In yet another embodiment, energy waves propagating through the plurality of relay elements have higher transport efficiency in the longitudinal orientation than in the transverse orientation and are spatially localized in the transverse orientation due to randomized refractive index variability in the transverse orientation coupled with minimal refractive index variation in the longitudinal orientation. In embodiments where each energy relay is constructed of multicore fiber, the energy waves propagating within each relay element may travel in the longitudinal orientation determined by the alignment of fibers in this orientation.

## Energy Directing Device

[00142]      FIG. 14 illustrates a perspective view of an embodiment 1400 of an energy directing device where energy relay element stacks are arranged in an 8x4 array to form a singular seamless energy directing surface 1410 with the shortest dimension of the terminal surface of each tapered energy relay element stack parallel to the longest dimension of the energy surface 1410.

Ex. L-1, p. 136

The energy originates from 32 separate energy sources 1450, each bonded or otherwise attached to the first element of the energy relay element stacks.

[00143]    In an embodiment, a separation between the edges of any two adjacent second surfaces of the terminal energy relay elements may be less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/100 vision at a distance, greater than the lesser of a height of the singular seamless display surface or a width of the singular seamless display surface, from the singular seamless display surface.

[00144]    FIG. 15 contains the following views of embodiment A00: a front view 1510, a top view 1520, a side view 1530, and a close-up side view 1540.

[00145]    FIG. 16 is the close-up view of the side view 1540 of the energy directing device 1400, consisting of a repeating structure comprised of energy relay element stacks 1630 arranged along a transverse orientation defined by first and second directions, used to propagate energy waves from the plurality of energy units 1450 to a single common seamless energy surface 1680 formed by the second surface of the energy relay element stacks. Each energy unit 1450 is composed of an energy source 1610 as well as the mechanical enclosure 1650 which houses the drive electronics. Each relay stack is composed of a faceplate 1640 with no magnification directly bonded to an energy source 1610 on one side, and a tapered energy relay on the other side, where the taper spatially magnifies the energy wave from the faceplate while propagating the energy to the seamless energy surface 1680.  In one embodiment, the magnification of the tapered energy relay is 2:1. In one embodiment, tapered energy relays 1620 are held in place by a common base structure 1660, and each of these tapers are bonded to a faceplate 1640, which in turn is bonded to the energy unit 1450. Neighboring tapers 1620 are bonded or fused together at seam 1670 in order to ensure that the smallest possible seam gap is realized. All the tapered energy relays in the full 8x4 array are arranged in a seamless mosaic such that the second surface for each tapered energy relay forms a single contiguous energy surface 1680, which is polished during assembly to ensure flatness.  In one embodiment, surface 1680 is polished to within 10 waves of flatness. Face plate 1685 has dimensions slightly larger than the dimensions of the surface 1680, and is placed in direct contact with surface 1680 in order to extend the field of view of the tapered energy surface 1680. The second surface of the faceplate forms the output energy surface 1410 for the energy directing device 1400.

[00146]    In this embodiment of 1400, energy is propagated from each energy source 1610, through the relay stack 1630, and then substantially normal to the faceplate, defining the longitudinal direction, the first and second surfaces of each of the relay stacks extends generally along a transverse orientation defined by the first and second directions, where the longitudinal

Ex. L-1, p. 137

orientation is substantially normal to the transverse orientation. In one embodiment, energy waves propagating through at least one of the relay elements faceplate 1640, taper 1620, and faceplate 1685, have higher transport efficiency in the longitudinal orientation than in the transverse orientation and are localized in the transverse orientation due to randomized refractive index variability in the transverse orientation coupled with minimal refractive index variation in the longitudinal orientation. In some embodiments at least one of the relay elements faceplate 1640, taper 1620, and faceplate 1685 may be constructed of multicore fiber, with energy waves propagating within each relay element traveling in the longitudinal orientation determined by the alignment of fibers in this orientation.

[00147]     In one embodiment, the energy waves passing through the first surface of 1640 have a first spatial resolution, while the energy waves passing through the second surface of tapered energy relay 1620 and through the face plate have a second resolution, and the second resolution is no less than about 50 % of the first resolution. In another embodiment, the energy waves, while having a uniform profile at the first surface of the faceplate 1640, may pass through the seamless energy surfaces 1680 and 1410 radiating in every direction with an energy density in the forward direction that substantially fills a cone with an opening angle of +/- 10 degrees relative to the normal to the seamless energy surface 1410, irrespective of location on this surface 1410.

[00148]     In an embodiment, an energy directing device comprises one or more energy sources and one or more energy relay element stacks.

[00149]     In an embodiment, each energy relay element of an energy directing device may comprise at least one of:

   a)  one or more optical elements exhibiting transverse Anderson Localization;

   b)  a plurality of optical fibers;

   c)  loose coherent optical fibers;

   d)  image combiners;

   e)  one or more gradient index optical elements;

   f)  one or more beam splitters;

   g)  one or more prisms;

   h)  one or more polarized optical elements;

   i)  one or more multiple size or length optical elements for mechanical offset;

   j)  one or more waveguides;

   k)  one or more diffractive, refractive, reflective, holographic, lithographic, or transmissive elements; and

Ex. L-1, p. 138

l)    one or more retroreflectors.

[00150]    In an embodiment, a quantity of the one or more energy relay elements and a quantity of the one or more energy locations may define a mechanical dimension of the energy directing device. The quantity of optical relay elements incorporated into the system is unlimited and only constrained by mechanical considerations and the resultant seamless energy surface includes a plurality of lower resolution energy sources producing an infinite resolution energy surface only limited by the resolving power and image quality of the components included within the display device.

[00151]    A mechanical structure may be preferable in order to hold the multiple relay components in a fashion that meets a certain tolerance specification. Mechanically, the energy relays that contain a second surface that forms the seamless energy surface are cut and polished to a high degree of accuracy before being bonded or fused together in order to align them and ensure that the smallest possible seam gap between the energy relays is possible. The seamless surface 1680 is polished after the relays 1620 are bonded together. In one such embodiment, using an epoxy that is thermally matched to the tapered energy relay material, it is possible to achieve a maximum seam gap of 50um. In another embodiment, a manufacturing process that places the taper array under compression and / or heat provides the ability to fuse the elements together. In another embodiment, the use of plastic tapers can be more easily chemically fused or heat-treated to create the bond without additional bonding. For the avoidance of doubt, any methodology may be used to bond the array together, to explicitly include no bond other than gravity and/ or force.

[00152]    The energy surface may be polished individually and/or as a singular energy surface and may be any surface shape, including planar, spherical, cylindrical, conical, faceted, tiled, regular, non-regular, convex, concave, slanted, or any other geometric shape for a specified application. The optical elements may be mechanically mounted such that the optical axes are parallel, non-parallel and / or arranged with energy surface normal oriented in a specified way.

[00153]    The ability to create various shapes outside of the active display area provides the ability to couple multiple optical elements in series to the same base structure through clamping structures, bonding processes, or any other mechanical means desired to hold one or more relay elements in place. The various shapes may be formed out of optical materials or bonded with additional appropriate materials. The mechanical structure leveraged to hold the resultant shape may be of the same form to fit over top of said structure. In one embodiment, an energy relay is designed with a square shape with a side that is equal to 10% of the total length of the energy relay, but 25% greater than the active area of the energy source in width and height. This energy relay is

Ex. L-1, p. 139

clamped with the matched mechanical structure and may leverage refractive index matching oil, refractive index matched epoxy, or the like. In the case of electromagnetic energy sources, the process to place any two optical elements in series may include mechanical or active alignment wherein visual feedback is provided to ensure that the appropriate tolerance of image alignment is performed. Typically, a display is mounted to the rear surface of the optical element prior to alignment, but this may or may not be desired depending on application.

[00154]        In an embodiment, the second sides of terminal energy relay elements of each energy relay element stack may be arranged to form a singular seamless energy surface.

[00155]        In an embodiment, the singular seamless energy surface formed by a mosaic of energy relay element stacks may be extended by placing a faceplate layer in direct contact with the surface, using a bonding agent, index matching oil, pressure, or gravity to adhere it to the energy surface. In one embodiment, the faceplate layer may be composed of a single piece of energy relay material, while in others it is composed of two or more pieces of energy relay material bonded or fused together. In one embodiment, the extension of a faceplate may increase the angle of emission of the energy waves relative to the normal to the seamless energy surface.

[00156]        In an embodiment, the one or more energy relay element stacks may be configured to direct energy along propagation paths which extend between the one or more energy locations and the singular seamless energy surfaces.

[00157]        In an embodiment, a separation between the edges of any two adjacent second surfaces of the terminal energy relay elements may be less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface, from the singular seamless energy surface.

[00158]        In an embodiment, the energy relay elements of each energy relay element stack are arranged in an end-to-end configuration.

[00159]        In an embodiment, energy may be directed through the one or more energy relay element stacks with zero magnification, non-zero magnification, or non-zero minification.

[00160]        In an embodiment, any of the energy relay elements of the one or more energy relay element stacks may comprise an element exhibiting Transverse Anderson Localization, an optical fiber, a beam splitter, an image combiner, an element configured to alter an angular direction of energy passing therethrough, etc.

[00161]        In an embodiment, energy directed along energy propagation paths may be electromagnetic energy defined by a wavelength, the wavelength belonging to a regime of the electromagnetic spectrum such as visible light, ultraviolet, infrared, x-ray, etc. In an embodiment,

Ex. L-1, p. 140

energy directed along energy propagation paths may be mechanical energy such as acoustic sound, tactile pressure, etc. A volumetric sound environment is a technology that effectively aspires to achieve holographic sound or similar technology. A dimensional tactile device produces an array of transducers, air emitters, or the like to generate a sensation of touching objects floating in midair that may be directly coupled to the visuals displayed in a light field display. Any other technologies that support interactive or immersive media may additionally be explored in conjunction with this holographic display. For the use of the energy directing device as a display surface, the electronics may be mounted directly to the pins of the individual displays, attached to the electronics with a socket such as a zero-insertion force (ZIF) connector, or by using an interposer and/or the like, to provide simplified installation and maintenance of the system. In one embodiment, display electronic components including display boards, FPGAs, ASICs, IO devices or similarly desired components preferable for the use of said display, may be mounted or tethered on flex or flexi-rigid cables in order to produce an offset between the display mounting plane and the location of the physical electronic package. Additional mechanical structures are provided to mount the electronics as desired for the device. This provides the ability to increase density of the optical elements, thereby reducing the optical magnification for any tapered optical relays and decreasing overall display size and/or weight.

[00162]    Cooling structures may be designed to maintain system performance within a specified temperature range, wherein all mechanical structures may include additional copper or other similar material tubing to provide a liquid cooling system with a solid state liquid cooling system providing sufficient pressure on a thermostat regulator. Additional embodiments may include Peltier units or heat syncs and/or the like to maintain consistent system performance for the electronics, displays and/or any other components sensitive to temperature changes during operation or that may produce excess heat.

[00163]    FIG. 17 illustrates a top view of an embodiment 1700 where energy relay element stacks composed of elements 1702 and 1703 are angled inward to a known point in space 1704, directing energy to propagate from multiple sources 1708 through the seamless energy surface 1701. The base structure 1706 directly supports the tapered energy relays 1702, where each taper is in turn bonded to relay 1703. For an embodiment where the energy directing device 1700 is a display, tapered optical relay elements 1702 are angled inward to point the taper optical axes towards a fixed point in space 1704. The energy sources 1708 comprise of individual displays, with display electronics contained with the display mechanical envelope 1707.

[00164]    In an embodiment, the optical relay may comprise loose coherent optical relays. Flexible optical elements, image conduits, and the like may additionally be leveraged in order to

Ex. L-1, p. 141

further offset display and display electronics from the seamless energy surface. In this fashion, it is possible to form an optical relay bundle including multiple loose coherent optical relays or other similar optical technology to connect two separate structures, with a first structure containing the seamless energy surface, and the second structure containing the display and display electronics.

[00165]    One or more additional optical elements may be mounted in front of, or behind the ends of each loose coherent optical relay. These additional elements may be mounted with epoxies, pressure, mechanical structures, or other methods known in the art.

[00166]    FIG. 18 is a top view illustration of an embodiment 1800 where the seamless energy surface 1802 is a display formed by tapered optical relays 1804, while the display devices 1806 and the mechanical envelopes for the display electronics 1808 are located a distance away from the tapered relays 1804. Relaying light from display devices 1806 to the tapered optical relays 1804 are loose coherent optical relays 1810 each with end caps 1812 at either end. Embodiment 1800 allows the display devices 1806 to be disposed at the remote locations of 1808 away from the energy surface 1802 to ensure that a mechanical envelope of the display devices 1806 does not interfere with the positioning of energy surface 1802.

[00167]    Optical elements may exhibit differing lengths to provide offset electronics as desired when formed in an alternating structure and provide the ability to increase density by the difference between the width of the electronic envelope minus the width of the optical element. In one such embodiment, a 5x5 optical relay mosaic contains two alternating optical relay lengths. In another embodiment, a 5x5 optical relay mosaic may contain 5 different optical relay lengths producing a pyramid-like structure, with the longest length at the center of the array, producing higher overall density for the resultant optical relay mosaic.

[00168]    FIG. 19 is a side view illustration of an embodiment 1900 wherein a seamless display surface 1908 is formed by nine tapered optical relays 1902, each associated with a display device 1904 through an optical face plate with one of five offset lengths 1,2,3,4, or 5, such that no two adjacent display devices 1904 are connected to a face plate with the same offset length, providing sufficient clearance 1906 for respective mechanical envelopes 1905 for the display electronics.


## Energy Combiner

[00169]    In an embodiment, it is possible to use an energy combiner in to leverage both projection based display as well as panel based display simultaneously, to leverage a self-illuminated display and a reflective display at the same time, or to leverage image projection and image sensing simultaneously.

Ex. L-1, p. 142

Docket No. 1019.101

**[00170]**     FIG. 20 is a top view illustration of an embodiment 2000 where a single projection source 2002 and a single display panel source 2004 are merged with an image combiner 2006. This may additionally be configured in any array or any such desired ratio of panel to projection technologies where the combination of only projection sources or panel based sources may also be implemented. Image combiner 2006 relays energy from first surfaces 2008, 2010 to combined display surface 2012, where the energy may propagate along more tele centric propagation paths 2014.

**[00171]**     A further embodiment where an energy combiner is leveraged and a first self-illuminated display is provided on one or more of the image combiner legs, and a second reflective display is provided on one or more of the image combiner legs, producing a virtual image that includes both the inherent data from the illuminated display in addition to any specific response and lighting changes as imposed upon by an external source of light simultaneously. The reflective surface may be considered a 'reflection pass' and contain differing imaging information as optimized for the displayed content.

**[00172]**     In another embodiment, one leg of an image combiner may have a self-illuminated display, while the other leg may be connected to an imaging sensor.  Through this approach, it is possible to optically scan in real time with a high degree of accuracy a finger print(s) or any other object that touches the surface of the display like papers, documents, etc. Through an inverse calibration process, it is possible to correct for all optical artifacts and generate extremely high-quality resolution.  In another embodiment, this methodology for image capture with the image combiner provides the ability to generate an extremely accurate "white board" or artistic surface that can respond extremely accurately to location and interactively draw or perform any number of other display based functions.

**[00173]**     In an embodiment, the singular seamless energy surface may be a virtual surface.

**[00174]**     In an embodiment, an energy directing device may be an energy system, and the energy locations may comprise one or more energy devices, and the energy relay elements may comprise one or more energy components each made from elements that induce transverse Anderson Localization of energy transport therethrough, and each energy component further comprising a first energy surface and a second energy surface.

**[00175]**     In an embodiment,  the one or more components include: optical fiber, silicon, glass, polymer, optical relays, diffractive elements, holographic optical elements, refractive elements, reflective elements, optical face plates, optical combiners, beam splitters, prisms, polarization components, spatial light modulators, active pixels, liquid crystal cells, transparent

33

Ex. L-1, p. 143

Docket No. 1019.101

displays, or any similar materials having Anderson localization or total internal reflection properties for forming the electromagnetic surface.

**[00176]**    In an embodiment, the singular seamless energy surface may be any combination of the one or more components are formed to accommodate any surface shape, including planar, spherical, cylindrical, conical, faceted, tiled, regular, non-regular, convex, concave, slanted, or any other geometric shape for a specified application.

**[00177]**    In an embodiment, the energy surface is operable to guide localized light transmission to within four or less wavelengths of visible light.

**[00178]**    In an embodiment, the energy device may include at least one of:

   a)  illumination sources emitting focused light, and wherein the focused light includes emissive, projection, or reflective display technologies, leveraging visible, IR, UV, coherent, laser, infrared, polarized or any other electromagnetic illumination source;

   b)  audible, ultrasonic, or other acoustic emitting devices provide immersive audio or volumetric tactile sensation from an acoustic field integrated directly into the energy system;

   c)  sensors for capturing or recording any energy in the electromagnetic spectrum, including structured, coherent, collimated, visible light, IR, UV, microwaves, radio waves, or other forms of electromagnetic radiation; or

   d)  acoustic receiving devices configured to provide sensory feedback or audible controls over an interactive system.

**[00179]**    While various embodiments in accordance with the principles disclosed herein have been described above, it should be understood that they have been presented by way of example only, and are not limiting.  Thus, the breadth and scope of the invention(s) should not be limited by any of the above-described exemplary embodiments, but should be defined only in accordance with the claims and their equivalents issuing from this disclosure. Furthermore, the above advantages and features are provided in described embodiments, but shall not limit the application of such issued claims to processes and structures accomplishing any or all of the above advantages.

**[00180]**    It will be understood that the principal features of this disclosure can be employed in various embodiments without departing from the scope of the disclosure.  Those skilled in the art will recognize, or be able to ascertain using no more than routine experimentation, numerous

Ex. L-1, p. 144

equivalents to the specific procedures described herein. Such equivalents are considered to be within the scope of this disclosure and are covered by the claims.

[00181]    Additionally, the section headings herein are provided for consistency with the suggestions under 37 CFR 1.77 or otherwise to provide organizational cues. These headings shall not limit or characterize the invention(s) set out in any claims that may issue from this disclosure. Specifically, and by way of example, although the headings refer to a "Field of Invention," such claims should not be limited by the language under this heading to describe the so-called technical field. Further, a description of technology in the "Background of the Invention" section is not to be construed as an admission that technology is prior art to any invention(s) in this disclosure. Neither is the "Summary" to be considered a characterization of the invention(s) set forth in issued claims. Furthermore, any reference in this disclosure to "invention" in the singular should not be used to argue that there is only a single point of novelty in this disclosure. Multiple inventions may be set forth according to the limitations of the multiple claims issuing from this disclosure, and such claims accordingly define the invention(s), and their equivalents, that are protected thereby. In all instances, the scope of such claims shall be considered on their own merits in light of this disclosure, but should not be constrained by the headings set forth herein.

[00182]    The use of the word "a" or "an" when used in conjunction with the term "comprising" in the claims and/or the specification may mean "one," but it is also consistent with the meaning of "one or more," "at least one," and "one or more than one." The use of the term "or" in the claims is used to mean "and/or" unless explicitly indicated to refer to alternatives only or the alternatives are mutually exclusive, although the disclosure supports a definition that refers to only alternatives and "and/or." Throughout this application, the term "about" is used to indicate that a value includes the inherent variation of error for the device, the method being employed to determine the value, or the variation that exists among the study subjects. In general, but subject to the preceding discussion, a numerical value herein that is modified by a word of approximation such as "about" may vary from the stated value by at least $\pm 1, 2, 3, 4, 5, 6, 7, 10, 12$ or $15\%$.

[00183]    As used in this specification and claim(s), the words "comprising" (and any form of comprising, such as "comprise" and "comprises"), "having" (and any form of having, such as "have" and "has"), "including" (and any form of including, such as "includes" and "include") or "containing" (and any form of containing, such as "contains" and "contain") are inclusive or open-ended and do not exclude additional, unrecited elements or method steps.

[00184]    Words of comparison, measurement, and timing such as "at the time," "equivalent," "during," "complete," and the like should be understood to mean "substantially at the time," "substantially equivalent," "substantially during," "substantially complete," etc., where

Ex. L-1, p. 145

"substantially" means that such comparisons, measurements, and timings are practicable to accomplish the implicitly or expressly stated desired result. Words relating to relative position of elements such as "near," "proximate to," and "adjacent to" shall mean sufficiently close to have a material effect upon the respective system element interactions. Other words of approximation similarly refer to a condition that when so modified is understood to not necessarily be absolute or perfect but would be considered close enough to those of ordinary skill in the art to warrant designating the condition as being present. The extent to which the description may vary will depend on how great a change can be instituted and still have one of ordinary skilled in the art recognize the modified feature as still having the desired characteristics and capabilities of the unmodified feature.

[00185]    The term "or combinations thereof" as used herein refers to all permutations and combinations of the listed items preceding the term. For example, "A, B, C, or combinations thereof is intended to include at least one of: A, B, C, AB, AC, BC, or ABC, and if order is important in a particular context, also BA, CA, CB, CBA, BCA, ACB, BAC, or CAB. Continuing with this example, expressly included are combinations that contain repeats of one or more item or term, such as BB, AAA, AB, BBC, AAABCCCC, CBBAAA, CABABB, and so forth. The skilled artisan will understand that typically there is no limit on the number of items or terms in any combination, unless otherwise apparent from the context.

[00186]    All of the compositions and/or methods disclosed and claimed herein can be made and executed without undue experimentation in light of the present disclosure. While the compositions and methods of this disclosure have been described in terms of preferred embodiments, it will be apparent to those of skill in the art that variations may be applied to the compositions and/or methods and in the steps or in the sequence of steps of the method described herein without departing from the concept, spirit and scope of the disclosure. All such similar substitutes and modifications apparent to those skilled in the art are deemed to be within the spirit, scope and concept of the disclosure as defined by the appended claims.

Ex. L-1, p. 146

# Exhibit L-1

## Claims

Original Pages 147–153

Docket No. 1019.101

**What is claimed is:**

1.      An energy directing device comprising:

        one or more energy locations;

        one or more energy relay elements, each further comprising a first surface and a second surface;

        wherein the second surfaces of each energy relay element are arranged to form a singular seamless energy surface;

        wherein a separation between edges of any two adjacent second surfaces of the singular seamless energy surface is less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface, from the singular seamless energy surface;

        wherein the one or more energy relay elements are configured to direct energy along energy propagation paths which extend between the one or more energy locations and the singular seamless energy surface.

2.      The energy directing device of claim 1, wherein the singular seamless energy surface is a virtual surface.

3.      The energy directing device of claim 1, wherein each energy relay element of the one or more energy relay elements comprises an element selected from a group consisting of:

    a)  an optical element exhibiting transverse Anderson Localization;

    b)  an optical fiber;

    c)  an image combiner;

    d)  a beam splitter; and

    e)  an element configured to alter an angular direction of energy passing therethrough.

4.      The energy directing device of claim 3, wherein the optical fiber comprises loose coherent optical fibers.

5.      The energy directing device of claim 1, wherein energy is directed through the one or more energy relay elements with zero magnification;

Ex. L-1, p. 147

6.      The energy directing device of claim 1, wherein energy is directed through the one or more energy relay elements with non-zero magnification;

7.      The energy directing device of claim 1, wherein energy is directed through the one or more energy relay elements with non-zero minification;

8.      The energy directing device of claim 1, wherein the singular seamless energy surface is planar.

9.      The energy directing device of claim 1, wherein the singular seamless energy surface is faceted.

10.     The energy directing device of claim 1, wherein the singular seamless energy surface is curved.

11.     The energy directing device of claim 1, wherein a quantity of the one or more energy relay elements and a quantity of the one or more energy locations define a mechanical dimension of the energy directing device.

12.     The energy directing device of claim 1, wherein the one or more energy locations comprise a display selected from a group consisting of:
    a)   a liquid crystal display;
    b)   an organic light emitting diode display;
    c)   a cathode ray tube display; and
    d)   a projector.

13.     The energy directing device of claim 1, wherein the one or more energy relay elements are configured to relay accepted focused light, the accepted focused light having a first resolution, while retaining a relayed resolution of the accepted focused light no less than 50% of the first resolution.

Ex. L-1, p. 148

Docket No. 1019.101

14.     The energy directing device of claim 1, wherein energy directed along energy
        propagation paths is electromagnetic energy defined by a wavelength, the wavelength
        belonging to a regime selected from a group consisting of:

    a)  visible light;

    b)  ultraviolet;

    c)  infrared; and

    d)  x-ray.

15.     The energy directing device of claim 1, wherein energy directed along energy
        propagation paths is a mechanical energy selected from a group consisting of:

    a)  acoustic sound; and

    b)  tactile pressure.

16.     The energy directing device of claim 1, wherein the singular seamless energy surface is
        extended by placing a faceplate layer in direct contact with the surface, using a bonding
        agent, index matching oil, pressure, or gravity to adhere it to the energy relay element
        stack, and;

            wherein the faceplate layer is composed of a single piece of energy relay
        material, or composed of two or more pieces of energy relay material bonded or fused
        together.

17.     The energy directing device of claim 17,  where the addition of the faceplate increases the
        angle of emission of the energy waves leaving the energy surface of the second seamless
        energy relative the normal to the second surface.

18.     An energy directing device comprising:

            one or more energy locations; and

            one or more energy relay element stacks;

            wherein each energy relay element stack comprises one or more energy relay
        elements, each energy relay element comprising a first side and a second side, and each
        energy relay element being configured to direct energy therethrough;

            wherein the second sides of terminal energy relay elements of each energy relay
        element stack are arranged to form a singular seamless energy surface;

Ex. L-1, p. 149

Docket No. 1019.101

wherein the one or more energy relay element stacks are configured to direct energy along energy propagation paths which extend between the one or more energy locations and the singular seamless energy surfaces;

wherein a separation between the edges of any two adjacent second surfaces of the terminal energy relay elements is less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface, from the singular seamless energy surface;

19.    The energy directing device of claim 18, wherein the singular seamless energy surface is a virtual surface.

20.    The energy directing device of claim 18, wherein the energy relay elements of each energy relay element stack are arranged in an end-to-end configuration;

21.    The energy directing device of claim 18, wherein any of the energy relay elements of the one or more energy relay element stacks comprise an element selected from a group consisting of:

    a)  an energy element exhibiting transverse Anderson Localization;

    b)  an optical fiber;

    c)  a beam splitter;

    d)  an image combiner; and

    e)  an element configured to alter an angular direction of energy passing therethrough.

22.    The energy directing device of claim 18, wherein energy is directed through the one or more energy relay elements with zero magnification;

23.    The energy directing device of claim 18, wherein energy is directed through the one or more energy relay elements with non-zero magnification;

24.    The energy directing device of claim 18, wherein energy is directed through the one or more energy relay elements with non-zero minification;

Ex. L-1, p. 150

25.    The energy directing device of claim 18, wherein the singular seamless energy surface is planar.

26.    The energy directing device of claim 18, wherein the singular seamless energy surface is faceted.

27.    The energy directing device of claim 18, wherein the singular seamless energy surface is curved.

28.    The energy directing device of claim 18, wherein energy directed along energy propagation paths is electromagnetic energy defined by a wavelength, the wavelength belonging to a regime selected from a group consisting of:

    a)   visible light;

    b)   ultraviolet;

    c)   infrared; and

    d)   x-ray.

29.    The energy directing device of claim 18, wherein energy directed along energy propagation paths is mechanical energy selected from a group consisting of:

    a)   acoustic sound; and

    b)   tactile pressure.

30.    The energy element of claim 18, wherein the singular seamless energy surface is extended by placing a faceplate layer in direct contact with the surface, using a bonding agent, index matching oil, pressure, or gravity to adhere it to the energy relay element stack, and;

        wherein the faceplate layer is composed of a single piece of energy relay material, or composed of two or more pieces of energy relay material bonded or fused together.

31.    The energy element of claim 30,  where the addition of the faceplate increases the angle of emission of the energy waves leaving the energy surface of the second seamless energy relative the normal to the second surface.

Ex. L-1, p. 151

Docket No. 1019.101

32.   An energy system comprising:

      one or more energy devices, and

      one or more energy relay components each made from elements that induce transverse Anderson Localization of energy transport therethrough, each further comprising a first energy surface and a second energy surface;

      wherein the second energy surface of each energy relay component are arranged to form a singular seamless energy surface;

      wherein the one or more energy devices are operable to at least emit or receive energy through the singular seamless energy surface.

      wherein a separation between edges of any two adjacent second energy relay surfaces of the one or more energy relay components is less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a singular seamless energy surface height or a singular seamless energy surface width, from the singular seamless energy surface;

33.   The energy system of claim 32, wherein the singular seamless energy surface is a virtual surface.

34.   The energy system of claim 32, wherein the one or more energy relay components comprise an element selected from a group consisting of:

    a) an energy element exhibiting transverse Anderson Localization;

    b) an optical fiber;

    c) a beam splitter;

    d) an image combiner; and

    e) an element configured to alter an angular direction of energy passing therethrough.

35.   The energy system of claim 32, wherein the singular seamless energy surface is planar.

36.   The energy system of claim 32, wherein the singular seamless energy surface is faceted.

37.   The energy system of claim 32, wherein the singular seamless energy surface is curved.

Ex. L-1, p. 152

38.     The energy system of claim 32, wherein the one or more energy devices comprise an element selected from a group consisting of:

    a) an illumination source emitting focused light;

    b) an acoustic emitting device configured to provide immersive audio or volumetric tactile sensation from an acoustic field integrated into the energy system;

    c) a sensor for capturing energy in the energy spectrum; and

    d) an acoustic receiving device configured to provide sensory feedback to the energy system.

39.     The energy system of claim 32, wherein energy emitted or received by the one or more energy devices is electromagnetic energy defined by a wavelength, the wavelength belonging to a regime selected from a group consisting of:

    a) visible light;

    b) ultraviolet;

    c) infrared; and

    d) x-ray.

40.     The energy system of claim 32, wherein energy emitted or received by the one or more energy devices is mechanical energy selected from a group consisting of:

    a) acoustic sound; and

    b) tactile pressure.

41.     The energy system of claim 32, wherein the singular seamless energy surface is extended by placing a faceplate layer in direct contact with the surface, using a bonding agent, index matching oil, pressure, or gravity to adhere it to the energy relay element stack, and;

        wherein the faceplate layer is composed of a single piece of energy relay material, or composed of two or more pieces of energy relay material bonded or fused together.

42.     The energy system of claim 41,  where the addition of the faceplate may increase the angle of emission of the energy waves leaving the energy surface of the second seamless energy relative the normal to the second surface.

43

# Exhibit L-2

Cover Page

Original Page 1

PTO/SB/123 (04-15)
Approved for use through 03/31/2021. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| CHANGE OF CORRESPONDENCE ADDRESS *Patent* | Patent Number | 10,488,584 |
|---|---|---|
| | Issue Date | 11-26-2019 |
| Address to: Mail Stop Post Issue Commissioner for Patents P.O. Box 1450 Alexandria, VA 22313-1450 | Application Number | 16/064,204 |
| | Filing Date | 06-20-2018 |
| | First Named Inventor | Jonathan Sean Karafin |
| | Attorney Docket Number | 101US2 |

Please change the Correspondence Address for the above-identified patent to:

☒ The address associated with Customer Number: **174520**

*OR*

☐ Firm *or* Individual Name

| Address | | |
|---|---|---|
| **City** | **State** | **ZIP** |
| **Country** | | |
| **Telephone** | **Email** | |

This form cannot be used to change the data associated with a Customer Number. To change the data associated with an existing Customer Number use "Request for Customer Number Data Change" (PTO/SB/124).

This form will not affect any "fee address" provided for the above-identified patent. To change a "fee address" use the "Fee Address Indication Form" (PTO/SB/47).

I am the:

☐ Patentee.

☐ Assignee of record of the entire interest. See 37 CFR 3.71. Statement under 37 CFR 3.73(b) is enclosed. (Form PTO/SB/96).

☒ Attorney or agent of record. Registration Number ___**62059**___.

| Signature | /Charles Yang/ | |
|---|---|---|
| Typed or Printed Name | Charles Yang | |
| Date | September 30, 2020 | Telephone 408-564-0727 |

NOTE: Signatures of all the inventors or assignees of record of the entire interest or their representative(s) are required. Submit multiple forms if more than one signature is required, see below*.

☑ *Total of __1__ forms are submitted.

This collection of information is required by 37 CFR 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Mail Stop Post Issue, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Ex. L-2, p. 1

# Exhibit L-2

## IDS Filing #5

Original Pages 20–23

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (03-15)
Approved for use through 07/31/2016. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( Not for submission under 37 CFR 1.99)

| | |
|---|---|
| Application Number | 16064204 |
| Filing Date | 2018-06-20 |
| First Named Inventor | Jonathan Sean Karafin |
| Art Unit | 2881 |
| Examiner Name | CHANG, HANWAY |
| Attorney Docket Number | 07726.1011 |

## U.S.PATENTS                                                        Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button.    Add

## U.S.PATENT APPLICATION PUBLICATIONS                                Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | | | | | |

If you wish to add additional U.S. Published Application citation information please click the Add button.    Add

## FOREIGN PATENT DOCUMENTS                                           Remove

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button    Add

## NON-PATENT LITERATURE DOCUMENTS                                    Remove

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |
|---|---|---|---|

EFS Web 2.1.17

Ex. L-2, p. 20

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 16064204 |
|---|---|---|
| | Filing Date | 2018-06-20 |
| | First Named Inventor | Jonathan Sean Karafin |
| | Art Unit | 2881 |
| | Examiner Name | CHANG, HANWAY |
| | Attorney Docket Number | 07726.1011 |

| | 1 | NZ-743822 Further Examination Report dated 11 June 2019. |
|---|---|---|
| | 2 | AU-2018256628 Examination Report No. 1 dated 1 July 2019. |
| | 3 | NZ-743820 Further Examination Report dated 9 July 2019. |

If you wish to add additional non-patent literature document citation information please click the Add button | Add |

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through a citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

Ex. L-2, p. 21

| | |
|---|---|
| | Application Number | 16064204 |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Filing Date | 2018-06-20 |
| | First Named Inventor | Jonathan Sean Karafin |
| | Art Unit | 2881 |
| | Examiner Name | CHANG, HANWAY |
| | Attorney Docket Number | 07726.1011 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

[X] That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

[ ] That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

[X] The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Charles Yang, Reg No. 62059/ | Date (YYYY-MM-DD) | 2019-08-28 |
|---|---|---|---|
| Name/Print | Charles Yang | Registration Number | 62059 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

Ex. L-2, p. 22

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

Ex. L-2, p. 23

# Exhibit L-2

## IDS Filing #3

Original Pages 73–80

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (03-15)
Approved for use through 07/31/2016. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**
( Not for submission under 37 CFR 1.99)

| Application Number | 16064204 |
|---|---|
| Filing Date | 2018-06-20 |
| First Named Inventor | Jonathan Sean Karafin |
| Art Unit | 2881 |
| Examiner Name | CHANG, HANWAY |
| Attorney Docket Number | 59630.1011 |

| | | U.S.PATENTS | | | | Remove |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | 4143234 | | 1979-03-06 | JOHNSON, et al | |
| | 2 | RE39864 | E | 2007-10-02 | ATHALE, et al | |
| | 3 | 5004335 | | 1991-04-02 | MONTES | |
| | 4 | 5822125 | | 1998-10-13 | MEYERS | |
| | 5 | 7653279 | B1 | 2010-01-26 | JACOBSEN | |

If you wish to add additional U.S. Patent citation information please click the Add button. | Add |

| | | U.S.PATENT APPLICATION PUBLICATIONS | | | | Remove |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | 20150247976 | A1 | 2015-09-03 | MAGIC LEAP, INC. | |

EFS Web 2.1.17

Ex. L-2, p. 73

| | INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) |
|---|---|

| | |
|---|---|
| Application Number | 16064204 |
| Filing Date | 2018-06-20 |
| First Named Inventor | Jonathan Sean Karafin |
| Art Unit | 2881 |
| Examiner Name | CHANG, HANWAY |
| Attorney Docket Number | 59630.1011 |

| | | | | |
|---|---|---|---|---|
| 2 | 20100278480 | A1 | 2010-11-04 | VASYLYEV |
| 3 | 20130140916 | A1 | 2013-06-13 | DUNLAP, et al |
| 4 | 20160209657 | A1 | 2016-07-21 | POPOVICH, et al |
| 5 | 20110114831 | A1 | 2011-05-19 | Grier |
| 6 | 20060256415 | A1 | 2006-11-16 | HOLMES, et al |
| 7 | 20111015718 | A1 | 2011-06-30 | BURGER, et al |
| 8 | 20160103419 | A1 | 2016-04-14 | APPLIED PRESCRIPTION TECHNOLOGIES, LLC |
| 9 | 20160042501 | A1 | 2016-02-11 | REGENTS OF THE UNIVERSITY OF CALIFORNIA |
| 10 | 20170347874 | A1 | 2017-12-07 | EYEKON ERD LTD |
| 11 | 20150288063 | A1 | 2015-10-08 | JOHNSON, et al. |
| 12 | 20140104665 | A1 | 2014-04-17 | POPOVICH, et al |

Ex. L-2, p. 74

| | | | | | |
|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99** ) | | | Application Number | 16064204 | |
| | | | Filing Date | 2018-06-20 | |
| | | | First Named Inventor | Jonathan Sean Karafin | |
| | | | Art Unit | 2881 | |
| | | | Examiner Name | CHANG, HANWAY | |
| | | | Attorney Docket Number | 59630.1011 | |

| | | | | | |
|---|---|---|---|---|---|
| | 13 | 20150015773 | A1 | 2015-01-15 | SAMSUNG ELECTRONICS CO., LTD. |
| | 14 | 20150227112 | A1 | 2015-08-13 | SHENZHEN CLOUD CUBE INFORMATION TECH CO., LTD. |
| | 15 | 20150002840 | A1 | 2015-01-01 | HEXAGON TECHNOLOGY CENTER GMBH |
| | 16 | 20080144174 | A1 | 2008-06-19 | LUCENTE, et al |
| | 17 | 20010028485 | A1 | 2001-10-11 | KREMEN |
| | 18 | 20020001128 | A1 | 2002-01-03 | MOSELEY, et al |
| | 19 | 20160282808 | A1 | 2016-09-29 | BRIGHAM YOUNG UNIVERSITY |
| | 20 | 20080170293 | A1 | 2008-07-17 | LUCENTE, et at |
| | 21 | 20090225380 | A1 | 2009-09-10 | SCHWERDTNER, et al. |
| | 22 | 20160291328 | A1 | 2016-10-06 | ROCKWELL COLLINS, INC. |
| | 23 | 20020047893 | A1 | 2002-04-25 | KREMEN |

Ex. L-2, p. 75

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | 16064204 | |
| Filing Date | 2018-06-20 | |
| First Named Inventor | Jonathan Sean Karafin | |
| Art Unit | 2881 | |
| Examiner Name | CHANG, HANWAY | |
| Attorney Docket Number | 59630.1011 | |

| | 24 | 20100125356 | A1 | 2010-05-20 | SHKOLNIK, et al |
|---|---|---|---|---|---|
| | 25 | 20150197062 | A1 | 2015-07-16 | SHINAR, et al |
| | 26 | 20160301430 | A1 | 2016-10-13 | MOHAMADI |

If you wish to add additional U.S. Published Application citation information please click the Add button. **Add**

### FOREIGN PATENT DOCUMENTS   **Remove**

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2017127897 | WO | A1 | 2017-08-03 | LAPSTUN | | |
| | 2 | 104837003 | CN | A | 2015-08-12 | SHENZHEN ESTAR DISPLAYTECH CO | | |
| | 3 | 2018014010 | WO | A1 | 2018-01-18 | LIGHT FIELD LABS, INC. | | |
| | 4 | 2015071903 | WO | A1 | 2015-05-21 | YISSUM RESEARCH DEVELOPMENT CO. OF THE HEBREW UNIV | | |
| | 5 | 205185315 | CN | U | 2016-04-27 | BEIJING UNIVERSITY OF TECHNOLOGY | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button **Add**

### NON-PATENT LITERATURE DOCUMENTS   **Remove**

Ex. L-2, p. 76

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | 16064204 |
| Filing Date | | 2018-06-20 |
| First Named Inventor | | Jonathan Sean Karafin |
| Art Unit | | 2881 |
| Examiner Name | | CHANG, HANWAY |
| Attorney Docket Number | | 59630.1011 |

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|
| | 1 | International Search Report and Written Opinion of PCT/US2019/013310 dated May 13, 2019. | |
| | 2 | International Search Report and Written Opinion of PCT/US2019/013552 dated May 2, 2019. | |
| | 3 | International Search Report and Written Opinion of PCT/US2019/013410 dated April 1, 2019. | |
| | 4 | International Search Report and Written Opinion of PCT/US2019/013539 dated March 22, 2019. | |
| | 5 | International Search Report and Written Opinion of PCT/US2019/013554 dated March 28, 2019. | |
| | 6 | International Search Report and Written Opinion of PCT/US2019/013408 dated April 23, 2019. | |
| | 7 | International Search Report and Written Opinion of PCT/US2019/013556 dated April 18, 2019. | |
| | 8 | International Search Report and Written Opinion of PCT/US2019/013409 dated April 24, 2019. | |

| If you wish to add additional non-patent literature document citation information please click the Add button | Add |
|---|---|

| EXAMINER SIGNATURE | | |
|---|---|---|
| Examiner Signature | | Date Considered | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

Ex. L-2, p. 77

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 16064204 |
| | Filing Date | 2018-06-20 |
| | First Named Inventor | Jonathan Sean Karafin |
| | Art Unit | 2881 |
| | Examiner Name | CHANG, HANWAY |
| | Attorney Docket Number | 59630.1011 |

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

Ex. L-2, p. 78

| | |
|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number | 16064204 |
| | Filing Date | 2018-06-20 |
| | First Named Inventor | Jonathan Sean Karafin |
| | Art Unit | 2881 |
| | Examiner Name | CHANG, HANWAY |
| | Attorney Docket Number | 59630.1011 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

[X] That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

[ ] That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Charles Yang/ | Date (YYYY-MM-DD) | 2019-06-20 |
|---|---|---|---|
| Name/Print | Charles Yang | Registration Number | 62059 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

Ex. L-2, p. 80

# Exhibit L-2

## IDS Filing #4

Original Pages 612–623

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (02-18)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | |
|---|---|
| Application Number | 16064204 |
| Filing Date | 2018-06-20 |
| First Named Inventor | Jonathan Sean Karafin |
| Art Unit | 2881 |
| Examiner Name | Hanway Chang |
| Attorney Docket Number | 59630.1011 |

| U.S.PATENTS | | | | | Remove |
|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code¹ | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |

| Examiner Initial* | Cite No | Patent Number | Kind Code¹ | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 6680761 | | 2004-01-20 | Greene et al. | |
| | 2 | 5374976 | | 1994-12-20 | Spannenburg | |
| | 3 | 8743466 | | 2014-06-03 | Yamamoto | |
| | 4 | 7329982 | | 2008-02-12 | Conner et al. | |
| | 5 | 5481385 | | 1996-01-02 | Zimmerman et al. | |
| | 6 | 5374976 | | 1994-12-20 | Spannenburg | |
| | 7 | 6680761 | | 2004-01-20 | Greene et al. | |
| | 8 | 5374976 | | 1994-12-20 | Spannenburg | |

Ex. L-2, p. 612

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( Not for submission under 37 CFR 1.99)

| | |
|---|---|
| Application Number | 16064204 |
| Filing Date | 2018-06-20 |
| First Named Inventor | Jonathan Sean Karafin |
| Art Unit | 2881 |
| Examiner Name | Hanway Chang |
| Attorney Docket Number | 59630.1011 |

| | | | | |
|---|---|---|---|---|
| 9 | 9411511 | 2016-08-09 | Sivertsen | |
| 10 | 8369546 | 2013-02-05 | Pompei | |
| 11 | 8879766 | 2014-11-04 | Zhang | |
| 12 | 9411511 | 2016-08-09 | Sivertsen | |
| 13 | 8369546 | 2013-02-05 | Pompei | |
| 14 | 8879766 | 2014-11-04 | Zhang | |
| 15 | 8369546 | 2013-02-05 | Pompei | |
| 16 | 9411511 | 2016-08-09 | Sivertsen | |
| 17 | 8369546 | 2013-02-05 | Pompei | |
| 18 | 8879766 | 2014-11-04 | Zhang | |
| 19 | 9411511 | 2016-08-09 | Sivertsen | |

Ex. L-2, p. 613

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 16064204 |
|---|---|---|
| | Filing Date | 2018-06-20 |
| | First Named Inventor | Jonathan Sean Karafin |
| | Art Unit | 2881 |
| | Examiner Name | Hanway Chang |
| | Attorney Docket  Number | 59630.1011 |

| 20 | 8369546 | | 2013-02-05 | Pompei | |
|---|---|---|---|---|---|

If you wish to add additional U.S. Patent citation information please click the Add button.    [Add]

### U.S.PATENT APPLICATION PUBLICATIONS    [Remove]

| Examiner Initial* | Cite No | Publication Number | Kind Code¹ | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20140132694 | | 2014-05-15 | Shacham et al. | |
| | 2 | 20120268950 | | 2012-10-25 | Parkyn et al. | |
| | 3 | 20130195410 | | 2013-08-01 | Karbasivalashani et al. | |
| | 4 | 20150219940 | | 2015-08-06 | Samsung Display Co. | |
| | 5 | 20040108806 | | 2004-10-06 | Cok et al. | |
| | 6 | 20120206726 | | 2012-08-16 | Pervez et al. | |
| | 7 | 20160205394 | | 2016-07-14 | Lingfei Meng et al. | |
| | 8 | 20100278480 | | 2010-11-04 | Vasylyev | |

Ex. L-2, p. 614

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 16064204 |
|---|---|---|
| | Filing Date | 2018-06-20 |
| | First Named Inventor | Jonathan Sean Karafin |
| | Art Unit | 2881 |
| | Examiner Name | Hanway Chang |
| | Attorney Docket Number | 59630.1011 |

| | | | | |
|---|---|---|---|---|
| 9 | 20130265485 | 2013-10-10 | Samsung Electronics Co., Ltd. | |
| 10 | 20130163089 | 2013-06-27 | Bohn | |
| 11 | 20140132694 | 2014-05-15 | Shacham | |
| 12 | 20060191566 | 2006-08-31 | Schaffsma | |
| 13 | 20130195410 | 2013-08-01 | Karbasivalashani et al. | |
| 14 | 20160070059 | 2016-03-10 | Chen et al. | |
| 15 | 20140371353 | 2014-12-18 | Mitchel et al. | |
| 16 | 20140126322 | 2014-05-08 | Cipolla et al. | |
| 17 | 20080192313 | 2008-08-14 | Matsumura et al. | |
| 18 | 20120300044 | 2012-11-29 | Thomas et al. | |
| 19 | 20160180511 | 2016-06-23 | Cyberoptics Corporation | |

Ex. L-2, p. 615

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | Application Number | 16064204 |
|---|---|---|---|
| | | Filing Date | 2018-06-20 |
| | | First Named Inventor | Jonathan Sean Karafin |
| | | Art Unit | 2881 |
| | | Examiner Name | Hanway Chang |
| | | Attorney Docket Number | 59630.1011 |

| | | | | |
|---|---|---|---|---|
| 20 | 20040135100 | 2004-07-15 | Menon et al. | |
| 21 | 20030030912 | 2003-02-13 | Gleckman et al. | |
| 22 | 20140132694 | 2014-05-15 | Shacham et al. | |
| 23 | 20070091638 | 2007-04-26 | Ijzerman et al. | |
| 24 | 20140043370 | 2014-02-13 | Payne et al. | |
| 25 | 20120206390 | 2012-08-16 | Ueno et al. | |
| 26 | 20050119575 | 2005-06-02 | Ladabaum et al. | |
| 27 | 20080035834 | 2008-02-14 | Gleckler | |
| 28 | 20090273575 | 2009-11-05 | Pryor | |
| 29 | 20150022754 | 2015-01-22 | Jepsen | |
| 30 | 20150192995 | 2015-07-09 | Subramanian | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 16064204 |
|---|---|---|
| | Filing Date | 2018-06-20 |
| | First Named Inventor | Jonathan Sean Karafin |
| | Art Unit | 2881 |
| | Examiner Name | Hanway Chang |
| | Attorney Docket Number | 59630.1011 |

| | | | | |
|---|---|---|---|---|
| 31 | 20100245824 | 2010-09-30 | Schwarz | |
| 32 | 20140253613 | 2014-09-11 | Gilbert | |
| 33 | 20140072141 | 2014-03-13 | Cohen | |
| 34 | 20130127832 | 2013-05-23 | Lee | |
| 35 | 20150277378 | 2015-10-01 | Smithwick | |
| 36 | 20090247305 | 2009-10-01 | Kanekal | |
| 37 | 20160223988 | 2016-08-04 | Bove | |
| 38 | 20150007025 | 2015-01-01 | Sassi | |
| 39 | 20150185841 | 2015-07-02 | Levesque | |
| 40 | 20090235750 | 2009-09-24 | Chang | |
| 41 | 20150022754 | 2015-01-22 | Jepsen | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| Application Number | | 16064204 |
| Filing Date | | 2018-06-20 |
| First Named Inventor | | Jonathan Sean Karafin |
| Art Unit | | 2881 |
| Examiner Name | | Hanway Chang |
| Attorney Docket  Number | | 59630.1011 |

| | | | | |
|---|---|---|---|---|
| 42 | 20150192995 | 2015-07-09 | Subramanian | |
| 43 | 20100245824 | 2010-09-30 | Schwarz | |
| 44 | 20140253613 | 2014-09-11 | Gilbert | |
| 45 | 20140072141 | 2014-03-13 | Cohen | |
| 46 | 20130127832 | 2013-05-23 | Lee | |
| 47 | 20150277378 | 2015-10-01 | Smithwick | |
| 48 | 20090247305 | 2009-10-01 | Kanekal | |
| 49 | 20150007025 | 2015-01-01 | Sassi | |
| 50 | 20150022754 | 2015-01-22 | Jepsen | |
| 51 | 20150192995 | 2015-07-09 | Subramanian | |
| 52 | 20100245824 | 2010-09-30 | Schwarz | |

Ex. L-2, p. 618

| | |
|---|---|
| Application Number | 16064204 |
| Filing Date | 2018-06-20 |
| First Named Inventor | Jonathan Sean Karafin |
| Art Unit | 2881 |
| Examiner Name | Hanway Chang |
| Attorney Docket Number | 59630.1011 |

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**
( Not for submission under 37 CFR 1.99)

| | 53 | 20140253613 | 2014-09-11 | Gilbert | |
|---|---|---|---|---|---|
| | 54 | 20140072141 | 2014-03-13 | Cohen | |
| | 55 | 20130127832 | 2013-05-23 | Lee | |
| | 56 | 20150022754 | 2015-01-22 | Jepsen | |
| | 57 | 20150192995 | 2015-07-09 | Subramanian | |
| | 58 | 20100245824 | 2010-09-30 | Schwarz | |
| | 59 | 20140253613 | 2014-09-11 | Gilbert | |
| | 60 | 20140072141 | 2014-03-13 | Cohen | |

If you wish to add additional U.S. Published Application citation information please click the Add button. [Add]

**FOREIGN PATENT DOCUMENTS**    [Remove]

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2]i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2014188149 | WO | | 2014-11-27 | Milan Popovich et al. | | |

Ex. L-2, p. 619

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( Not for submission under 37 CFR 1.99)

| | |
|---|---|
| Application Number | 16064204 |
| Filing Date | 2018-06-20 |
| First Named Inventor | Jonathan Sean Karafin |
| Art Unit | 2881 |
| Examiner Name | Hanway Chang |
| Attorney Docket Number | 59630.1011 |

| 2 | 2016046514 | WO | 2016-03-31 | Kimberly Sun Lokovic et al. | |
| 3 | | | | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button | Add

Remove

## NON-PATENT LITERATURE DOCUMENTS

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|
| | 1 | International Search Report and Written Opinion of PCT/US17/42452 dated November 17, 2017. | |
| | 2 | International Search Report and Written Opinion of PCT/US17/42275 dated December 4, 2017. | |
| | 3 | International Search Report and Written Opinion of PCT/US17/42468 dated November 27, 2017. | |
| | 4 | International Search Report and Written Opinion of PCT/US17/42470 dated December 28, 2017. | |
| | 5 | International Search Report and Written Opinion of PCT/US17/42418 dated December 20, 2017. | |
| | 6 | International Search Report and Written Opinion of PCT/US17/42467 dated December 27, 2017. | |
| | 7 | International Search Report and Written Opinion of PCT/US2017/042466 dated November 28, 2017. | |

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 16064204 |
| | Filing Date | 2018-06-20 |
| | First Named Inventor | Jonathan Sean Karafin |
| | Art Unit | 2881 |
| | Examiner Name | Hanway Chang |
| | Attorney Docket Number | 59630.1011 |

| 8 | International Search Report and Written Opinion of PCT/US2016/23753 dated July 15, 2016. |

If you wish to add additional non-patent literature document citation information please click the Add button   | Add |

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04. [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3). [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [5] Applicant is to place a check mark here if English language translation is attached.

| | |
|---|---|
| Application Number | 16064204 |
| Filing Date | 2018-06-20 |
| First Named Inventor | Jonathan Sean Karafin |
| Art Unit | 2881 |
| Examiner Name | Hanway Chang |
| Attorney Docket Number | 59630.1011 |

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**
( Not for submission under 37 CFR 1.99)

---

**CERTIFICATION STATEMENT**

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

    That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐    That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

    See attached certification statement.

    The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

✗    A certification statement is not submitted herewith.

**SIGNATURE**

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Charles Yang, Reg. No. 62059/ | Date (YYYY-MM-DD) | 2019-06-20 |
|---|---|---|---|
| Name/Print | Charles Yang | Registration Number | 62059 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

# Exhibit L-2

## RCE

Original Pages 624–626

Doc code: RCEX

Doc description: Request for Continued Examination (RCE)

PTO/SB/30EFS (02-18)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

# REQUEST FOR CONTINUED EXAMINATION(RCE)TRANSMITTAL
## (Submitted Only via EFS-Web)

| Application Number | 16064204 | Filing Date | 2018-06-20 | Docket Number (if applicable) | 59630.1011 | Art Unit | 2881 |
| First Named Inventor | Jonathan Sean Karafin | | | Examiner Name | CHANG, HANWAY | | |

This is a **Request for Continued Examination (RCE)** under 37 CFR 1.114 of the above-identified application.

Request for Continued Examination (RCE) practice under 37 CFR 1.114 does not apply to any utility or plant application filed prior to June 8, 1995, or to any design application. The Instruction Sheet for this form is located at WWW.USPTO.GOV

## SUBMISSION REQUIRED UNDER 37 CFR 1.114

Note: If the RCE is proper, any previously filed unentered amendments and amendments enclosed with the RCE will be entered in the order in which they were filed unless applicant instructs otherwise. If applicant does not wish to have any previously filed unentered amendment(s) entered, applicant must request non-entry of such amendment(s).

- [ ] Previously submitted. If a final Office action is outstanding, any amendments filed after the final Office action may be considered as a submission even if this box is not checked.

  - [ ] Consider the arguments in the Appeal Brief or Reply Brief previously filed on _____

  - [ ] Other _____

- [x] Enclosed

  - [ ] Amendment/Reply

  - [x] Information Disclosure Statement (IDS)

  - [ ] Affidavit(s)/ Declaration(s)

  - [ ] Other

## MISCELLANEOUS

- [ ] Suspension of action on the above-identified application is requested under 37 CFR 1.103(c) for a period of months (Period of suspension shall not exceed 3 months; Fee under 37 CFR 1.17(i) required) _____

- [ ] Other _____

## FEES

- [x] **The RCE fee under 37 CFR 1.17(e) is required by 37 CFR 1.114 when the RCE is filed.**
  The Director is hereby authorized to charge any underpayment of fees, or credit any overpayments, to Deposit Account No | 506658 |

## SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT REQUIRED

| X | Patent Practitioner Signature |
| | Applicant Signature |

Ex. L-2, p. 624

Doc code: RCEX
Doc description: Request for Continued Examination (RCE)

PTO/SB/30EFS (02-18)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Signature of Registered U.S. Patent Practitioner | | | |
|---|---|---|---|
| Signature | /Charles Yang/ | Date (YYYY-MM-DD) | 2019-06-20 |
| Name | Charles Yang | Registration Number | 62059 |

This collection of information is required by 37 CFR 1.114.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Ex. L-2, p. 625

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.      The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2.      A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.      A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.      A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.      A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.      A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.      A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.      A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.      A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

Ex. L-2, p. 626

# Exhibit L-2

M327 Non-Compliance Flag

Original Page 632



U̲NITED S̲TATES P̲ATENT AND T̲RADEMARK O̲FFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/064,204 | 06/20/2018 | Jonathan Sean Karafin | 59630.1011 | 3644 |

7590   05/01/2019
LeClairRyan
Charles C. Yang
400 Capitol Mall, Suite 1500
Sacramento, CA 95814

| EXAMINER |
|---|
| CHANG, HANWAY |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2881 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 05/01/2019 | ELECTRONIC |

## NOTICE OF NON-COMPLIANT INFORMATION DISCLOSURE STATEMENT

An Information Disclosure Statement (IDS) filed 04.17.2019 in the above-identified application fails to meet the requirements of 37 CFR 1.97(d) for the reason(s) specified below. Accordingly, the IDS will be placed in the file, but the information referred to therein has not been considered.

The IDS is not compliant with 37 CFR 1.97(d) because:

☒ The IDS lacks a statement as specified in 37 CFR 1.97(e).

☐ The IDS lacks the fee set forth in 37 CFR 1.17(p).

☐ The IDS was filed after the issue fee was paid. Applicant may wish to consider filing a petition to withdraw the application from issue under 37 CFR 1.313(c) to have the IDS considered. See MPEP 1308.

*Bernice Crittenden*
571-272-4200 or 1-888-786-0101
Application Assistance Unit
Office of Data Management

FORM PTOM327-B (Rev. 02/08)

Ex. L-2, p. 632

# Exhibit L-2

## IDS Filing #2

Original Pages 633–644

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (02-18)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 16064204 |
| --- | --- | --- |
| | Filing Date | 2018-06-20 |
| | First Named Inventor | Jonathan Sean Karafin |
| | Art Unit | 2881 |
| | Examiner Name | Hanway Chang |
| | Attorney Docket Number | 59630.1011 |

| U.S.PATENTS | | | | | | Remove |
| --- | --- | --- | --- | --- | --- | --- |
| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | 6680761 | | 2004-01-20 | Greene et al. | |
| | 2 | 5374976 | | 1994-12-20 | Spannenburg | |
| | 3 | 8743466 | | 2014-06-03 | Yamamoto | |
| | 4 | 7329982 | | 2008-02-12 | Conner et al. | |
| | 5 | 5481385 | | 1996-01-02 | Zimmerman et al. | |
| | 6 | 5374976 | | 1994-12-20 | Spannenburg | |
| | 7 | 6680761 | | 2004-01-20 | Greene et al. | |
| | 8 | 5374976 | | 1994-12-20 | Spannenburg | |

EFS Web 2.1.18

| | | INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | |
|---|---|---|---|

| Application Number | 16064204 |
|---|---|
| Filing Date | 2018-06-20 |
| First Named Inventor | Jonathan Sean Karafin |
| Art Unit | 2881 |
| Examiner Name | Hanway Chang |
| Attorney Docket Number | 59630.1011 |

| | | | | |
|---|---|---|---|---|
| 9 | 9411511 | 2016-08-09 | Sivertsen | |
| 10 | 8369546 | 2013-02-05 | Pompei | |
| 11 | 8879766 | 2014-11-04 | Zhang | |
| 12 | 9411511 | 2016-08-09 | Sivertsen | |
| 13 | 8369546 | 2013-02-05 | Pompei | |
| 14 | 8879766 | 2014-11-04 | Zhang | |
| 15 | 8369546 | 2013-02-05 | Pompei | |
| 16 | 9411511 | 2016-08-09 | Sivertsen | |
| 17 | 8369546 | 2013-02-05 | Pompei | |
| 18 | 8879766 | 2014-11-04 | Zhang | |
| 19 | 9411511 | 2016-08-09 | Sivertsen | |

Ex. L-2, p. 634

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 16064204 |
|---|---|---|
| | Filing Date | 2018-06-20 |
| | First Named Inventor | Jonathan Sean Karafin |
| | Art Unit | 2881 |
| | Examiner Name | Hanway Chang |
| | Attorney Docket Number | 59630.1011 |

| | 20 | 8369546 | | 2013-02-05 | Pompei | |
|---|---|---|---|---|---|---|

If you wish to add additional U.S. Patent citation information please click the Add button.    | Add |

**U.S.PATENT APPLICATION PUBLICATIONS**    | Remove |

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20140132694 | | 2014-05-15 | Shacham et al. | |
| | 2 | 20120268950 | | 2012-10-25 | Parkyn et al. | |
| | 3 | 20130195410 | | 2013-08-01 | Karbasivalashani et al. | |
| | 4 | 20150219940 | | 2015-08-06 | Samsung Display Co. | |
| | 5 | 20040108806 | | 2004-10-06 | Cok et al. | |
| | 6 | 20120206726 | | 2012-08-16 | Pervez et al. | |
| | 7 | 20160205394 | | 2016-07-14 | Lingfei Meng et al. | |
| | 8 | 20100278480 | | 2010-11-04 | Vasylyev | |

| | INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|---|
| | Application Number | | 16064204 |
| | Filing Date | | 2018-06-20 |
| | First Named Inventor | | Jonathan Sean Karafin |
| | Art Unit | | 2881 |
| | Examiner Name | | Hanway Chang |
| | Attorney Docket Number | | 59630.1011 |

| | | | | |
|---|---|---|---|---|
| 9 | 20130265485 | 2013-10-10 | Samsung Electronics Co., Ltd. | |
| 10 | 20130163089 | 2013-06-27 | Bohn | |
| 11 | 20140132694 | 2014-05-15 | Shacham | |
| 12 | 20060191566 | 2006-08-31 | Schaffsma | |
| 13 | 20130195410 | 2013-08-01 | Karbasivalashani et al. | |
| 14 | 20160070059 | 2016-03-10 | Chen et al. | |
| 15 | 20140371353 | 2014-12-18 | Mitchel et al. | |
| 16 | 20140126322 | 2014-05-08 | Cipolla et al. | |
| 17 | 20080192313 | 2008-08-14 | Matsumura et al. | |
| 18 | 20120300044 | 2012-11-29 | Thomas et al. | |
| 19 | 20160180511 | 2016-06-23 | Cyberoptics Corporation | |

Ex. L-2, p. 636

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( **Not for submission under 37 CFR 1.99**) | Application Number | 16064204 |
| --- | --- | --- |
| | Filing Date | 2018-06-20 |
| | First Named Inventor | Jonathan Sean Karafin |
| | Art Unit | 2881 |
| | Examiner Name | Hanway Chang |
| | Attorney Docket Number | 59630.1011 |

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| | 20 | 20040135100 | 2004-07-15 | Menon et al. | |
| | 21 | 20030030912 | 2003-02-13 | Gleckman et al. | |
| | 22 | 20140132694 | 2014-05-15 | Shacham et al. | |
| | 23 | 20070091638 | 2007-04-26 | Ijzerman et al. | |
| | 24 | 20140043370 | 2014-02-13 | Payne et al. | |
| | 25 | 20120206390 | 2012-08-16 | Ueno et al. | |
| | 26 | 20050119575 | 2005-06-02 | Ladabaum et al. | |
| | 27 | 20080035834 | 2008-02-14 | Gleckler | |
| | 28 | 20090273575 | 2009-11-05 | Pryor | |
| | 29 | 20150022754 | 2015-01-22 | Jepsen | |
| | 30 | 20150192995 | 2015-07-09 | Subramanian | |

Ex. L-2, p. 637

| | | | | Application Number | 16064204 |
|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99**) | | | | Filing Date | 2018-06-20 |
| | | | | First Named Inventor | Jonathan Sean Karafin |
| | | | | Art Unit | 2881 |
| | | | | Examiner Name | Hanway Chang |
| | | | | Attorney Docket Number | 59630.1011 |

| | | | | |
|---|---|---|---|---|
| 31 | 20100245824 | 2010-09-30 | Schwarz | |
| 32 | 20140253613 | 2014-09-11 | Gilbert | |
| 33 | 20140072141 | 2014-03-13 | Cohen | |
| 34 | 20130127832 | 2013-05-23 | Lee | |
| 35 | 20150277378 | 2015-10-01 | Smithwick | |
| 36 | 20090247305 | 2009-10-01 | Kanekal | |
| 37 | 20160223988 | 2016-08-04 | Bove | |
| 38 | 20150007025 | 2015-01-01 | Sassi | |
| 39 | 20150185841 | 2015-07-02 | Levesque | |
| 40 | 20090235750 | 2009-09-24 | Chang | |
| 41 | 20150022754 | 2015-01-22 | Jepsen | |

Ex. L-2, p. 638

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( **Not for submission under 37 CFR 1.99**) | | |
|---|---|---|
| Application Number | 16064204 | |
| Filing Date | 2018-06-20 | |
| First Named Inventor | Jonathan Sean Karafin | |
| Art Unit | 2881 | |
| Examiner Name | Hanway Chang | |
| Attorney Docket Number | 59630.1011 | |

| | | | | | |
|---|---|---|---|---|---|
| | 42 | 20150192995 | 2015-07-09 | Subramanian | |
| | 43 | 20100245824 | 2010-09-30 | Schwarz | |
| | 44 | 20140253613 | 2014-09-11 | Gilbert | |
| | 45 | 20140072141 | 2014-03-13 | Cohen | |
| | 46 | 20130127832 | 2013-05-23 | Lee | |
| | 47 | 20150277378 | 2015-10-01 | Smithwick | |
| | 48 | 20090247305 | 2009-10-01 | Kanekal | |
| | 49 | 20150007025 | 2015-01-01 | Sassi | |
| | 50 | 20150022754 | 2015-01-22 | Jepsen | |
| | 51 | 20150192995 | 2015-07-09 | Subramanian | |
| | 52 | 20100245824 | 2010-09-30 | Schwarz | |

Ex. L-2, p. 639

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 16064204 |
|---|---|---|
| | Filing Date | 2018-06-20 |
| | First Named Inventor | Jonathan Sean Karafin |
| | Art Unit | 2881 |
| | Examiner Name | Hanway Chang |
| | Attorney Docket Number | 59630.1011 |

| | 53 | 20140253613 | 2014-09-11 | Gilbert | |
|---|---|---|---|---|---|
| | 54 | 20140072141 | 2014-03-13 | Cohen | |
| | 55 | 20130127832 | 2013-05-23 | Lee | |
| | 56 | 20150022754 | 2015-01-22 | Jepsen | |
| | 57 | 20150192995 | 2015-07-09 | Subramanian | |
| | 58 | 20100245824 | 2010-09-30 | Schwarz | |
| | 59 | 20140253613 | 2014-09-11 | Gilbert | |
| | 60 | 20140072141 | 2014-03-13 | Cohen | |

If you wish to add additional U.S. Published Application citation information please click the Add button. | Add |

**FOREIGN PATENT DOCUMENTS** | Remove |

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2014188149 | WO | | 2014-11-27 | Milan Popovich et al. | | |

Ex. L-2, p. 640

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | Application Number | | 16064204 | |
| | | | Filing Date | | 2018-06-20 | |
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | | First Named Inventor | | Jonathan Sean Karafin | |
| | | | Art Unit | | 2881 | |
| | | | Examiner Name | | Hanway Chang | |
| | | | Attorney Docket Number | | 59630.1011 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 2 | 2016046514 | WO | 2016-03-31 | Kimberly Sun Lokovic et al. | |
| | 3 | | | | | |

If you wish to add additional Foreign Patent Document citation information please click the Add button  | Add |

Remove

### NON-PATENT LITERATURE DOCUMENTS

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T⁵ |
|---|---|---|---|
| | 1 | International Search Report and Written Opinion of PCT/US17/42452 dated November 17, 2017. | |
| | 2 | International Search Report and Written Opinion of PCT/US17/42275 dated December 4, 2017. | |
| | 3 | International Search Report and Written Opinion of PCT/US17/42468 dated November 27, 2017. | |
| | 4 | International Search Report and Written Opinion of PCT/US17/42470 dated December 28, 2017. | |
| | 5 | International Search Report and Written Opinion of PCT/US17/42418 dated December 20, 2017. | |
| | 6 | International Search Report and Written Opinion of PCT/US17/42467 dated December 27, 2017. | |
| | 7 | International Search Report and Written Opinion of PCT/US2017/042466 dated November 28, 2017. | |

Ex. L-2, p. 641

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 16064204 |
|---|---|---|
| | Filing Date | 2018-06-20 |
| | First Named Inventor | Jonathan Sean Karafin |
| | Art Unit | 2881 |
| | Examiner Name | Hanway Chang |
| | Attorney Docket Number | 59630.1011 |

| | 8 | International Search Report and Written Opinion of PCT/US2016/23753 dated July 15, 2016. |
|---|---|---|

If you wish to add additional non-patent literature document citation information please click the Add button    Add

## EXAMINER SIGNATURE

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through a citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

Ex. L-2, p. 642

| | |
|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | Application Number — 16064204 |
| | Filing Date — 2018-06-20 |
| | First Named Inventor — Jonathan Sean Karafin |
| | Art Unit — 2881 |
| | Examiner Name — Hanway Chang |
| | Attorney Docket Number — 59630.1011 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

✕ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

✕ A certification statement is not submitted herewith.

### SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Charles Yang, Reg. No. 62059/ | Date (YYYY-MM-DD) | 2019-04-17 |
|---|---|---|---|
| Name/Print | Charles Yang | Registration Number | 62059 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

Ex. L-2, p. 643

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

Ex. L-2, p. 644

# Exhibit L-2

First-Action Allowance

Original Pages 870–877



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

120663      7590      03/20/2019

LeClairRyan
Charles C. Yang
400 Capitol Mall, Suite 1500
Sacramento, CA 95814

| EXAMINER |
|---|
| CHANG, HANWAY |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2881 | |

DATE MAILED: 03/20/2019

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/064,204 | 06/20/2018 | Jonathan Sean Karafin | 59630.1011 | 3644 |

TITLE OF INVENTION: HIGH DENSITY ENERGY DIRECTING DEVICE

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | SMALL | $500 | $0.00 | $0.00 | $500 | 06/20/2019 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED.** SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Maintenance fees are due in utility patents issuing on applications filed on or after Dec. 12, 1980. It is patentee's responsibility to ensure timely payment of maintenance fees when due. More information is available at www.uspto.gov/PatentMaintenanceFees.**

PTOL-85 (Rev. 02/11)

Ex. L-2, p. 870

**PART B - FEE(S) TRANSMITTAL**

Complete and send this form, together with applicable fee(s), by mail or fax, or via EFS-Web.

| By mail, send to: | Mail Stop ISSUE FEE | By fax, send to: | (571)-273-2885 |
| | Commissioner for Patents | | |
| | P.O. Box 1450 | | |
| | Alexandria, Virginia 22313-1450 | | |

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

120663          7590          03/20/2019

LeClairRyan
Charles C. Yang
400 Capitol Mall, Suite 1500
Sacramento, CA 95814

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being transmitted to the USPTO via EFS-Web or by facsimile to (571) 273-2885, on the date below.

_____ (Typed or printed name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/064,204 | 06/20/2018 | Jonathan Sean Karafin | 59630.1011 | 3644 |

TITLE OF INVENTION: HIGH DENSITY ENERGY DIRECTING DEVICE

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | SMALL | $500 | $0.00 | $0.00 | $500 | 06/20/2019 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| CHANG, HANWAY | 2881 | 250-505100 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-09 or more recent) attached. **Use of a Customer Number is required.**

**2. For printing on the patent front page, list**
(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,
(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT** (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document must have been previously recorded, or filed for recordation, as set forth in 37 CFR 3.11 and 37 CFR 3.81(a). Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE          (B) RESIDENCE: (CITY and STATE or COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) : ☐ Individual  ☐ Corporation or other private group entity  ☐ Government

4a. Fees submitted: ☐ Issue Fee  ☐ Publication Fee (if required)  ☐ Advance Order - # of Copies _____

4b. Method of Payment: *(Please first reapply any previously paid fee shown above)*

☐ Electronic Payment via EFS-Web   ☐ Enclosed check   ☐ Non-electronic payment by credit card (Attach form PTO-2038)

☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment to Deposit Account No. _____

**5. Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.
NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.
NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____     Date _____

Typed or printed name _____     Registration No. _____

PTOL-85 Part B (08-18) Approved for use through 01/31/2020     OMB 0651-0033     U.S. Patent and Trademark Office; U.S. DEPARTMENT

Ex. L-2, p. 871



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/064,204 | 06/20/2018 | Jonathan Sean Karafin | 59630.1011 | 3644 |

| | |
|---|---|
| 120663        7590        03/20/2019 | EXAMINER |
| LeClairRyan | CHANG, HANWAY |
| Charles C. Yang | |
| 400 Capitol Mall, Suite 1500 | ART UNIT |  PAPER NUMBER |
| Sacramento, CA 95814 | 2881 | |

DATE MAILED: 03/20/2019

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

Ex. L-2, p. 872

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b) (2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the individual pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

Ex. L-2, p. 873

| *Notice of Allowability* | Application No.<br>16/064,204 | Applicant(s)<br>Karafin et al. | |
|---|---|---|---|
| | Examiner<br>HANWAY CHANG | Art Unit<br>2881 | AIA (FITF) Status<br>Yes |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**
All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☐ This communication is responsive to _____.
    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☑ The allowed claim(s) is/are <u>1-31</u>. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see **http://www.uspto.gov/patents/init_events/pph/index.jsp** or send an inquiry to **PPHfeedback@uspto.gov.**

4. ☑ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    **Certified copies:**
    a) ☑All    b) ☐ Some    *c) ☐ None of the:
        1. ☑ Certified copies of the priority documents have been received.
        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
    * Certified copies not received: _____ .

    Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file areply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
    **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS (as "replacement sheets") must be submitted.
    ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .
    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☐ Notice of References Cited (PTO-892)
2. ☑ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date <u>6/25/2018</u>.
3. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material _____ .
4. ☐ Interview Summary (PTO-413), Paper No./Mail Date. _____ .
5. ☐ Examiner's Amendment/Comment
6. ☑ Examiner's Statement of Reasons for Allowance
7. ☐ Other _____ .

| /HC/<br>Examiner, Art Unit 2881 | /NICOLE M IPPOLITO/<br>Primary Examiner, Art Unit 2881 |
|---|---|

U.S. Patent and Trademark Office
PTOL-37 (Rev. 08-13)          **Notice of Allowability**          Part of Paper No./Mail Date 20190314

Ex. L-2, p. 874

## DETAILED ACTION

### *Allowable Subject Matter*

Claims 1-31 are allowed.

The following is an examiner's statement of reasons for allowance:

Regarding claims 1, and 18, the prior art of record, either singularly or in combination, does not disclose or suggest the combination of limitations including, the prior art of record, either singularly or in combination, does not disclose or suggest the combination of limitations including, wherein a separation between edges of any two adjacent second surfaces of the singular seamless energy surface is less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface, from the singular seamless energy surface; wherein the one or more energy relay elements are configured to direct energy along energy propagation paths which extend between the one or more energy locations and the singular seamless energy surface.

Claims 2-17, and 29-31 are allowed due to being dependent from allowable independent claims 1 and 18, respectively.

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee.  Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."

Ex. L-2, p. 875

*Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to HANWAY CHANG whose telephone number is (571)270-5766.  The examiner can normally be reached on Monday - Friday 7:30 AM - 4:00 PM EST.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Robert Kim can be reached on (571)272-2293.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

Application/Control Number: 16/064,204                                                    Page 4
Art Unit: 2881

Hanway Chang
March 14, 2019
/HC/
Examiner, Art Unit 2881

/NICOLE M IPPOLITO/
Primary Examiner, Art Unit 2881

Ex. L-2, p. 877

# Exhibit L-2

## PPH Decision

Original Pages 903–907

Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Pᴀᴛᴇɴᴛ ᴀɴᴅ Tʀᴀᴅᴇᴍᴀʀᴋ Oғғɪᴄᴇ

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/064,204 | | Jonathan Sean Karafin | 8821.101US2 | 3644 |

| | |
|---|---|
| 120663        7590        08/27/2018 | EXAMINER |
| LeClairRyan | |
| Charles C. Yang | |
| 400 Capitol Mall, Suite 1500 | |
| Sacramento, CA 95814 | |

| ART UNIT | PAPER NUMBER |
|---|---|

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 08/27/2018 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

docket@ntellectlaw.com
eofficeaction@appcoll.com

PTOL-90A (Rev. 04/07)

Ex. L-2, p. 903



UNITED STATES PATENT AND TRADEMARK OFFICE

.................................................................................................

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

| | |
|---|---|
| In re Application of | : DECISION ON REQUEST TO |
| KARAFIN, JONATHAN SEAN, et al. | : PARTICIPATE IN THE PATENT |
| Application No.: 16/064,204 | : PROSECUTION HIGHWAY |
| Filed: June 20, 2018 | : PROGRAM AND PETITION |
| Attorney Docket No.: 8821.101US2 | : TO MAKE SPECIAL UNDER |
|  For: HIGH DENSITY ENERGY | : 37 CFR 1.102(a) |
| DIRECTING DEVICE | |

This is a decision on the request to participate in the Patent Prosecution Highway (PPH) program and the petition under 37 CFR 1.102(a), filed June 25, 2018, to make the above-identified application special.

The request and petition are **GRANTED**.

<u>**DISCUSSION**</u>

A grantable request to participate in the PPH pilot program and petition to make special require:

    1. The U.S. application for which participation in the Global/IP5 PPH pilot program is requested must have the same earliest date, whether this is the priority date or filing date, as that of a corresponding national or regional application filed with another Global/IP5 PPH participating office or a corresponding PCT international application for which one of the Global/IP5 PPH participating offices was the International Searching Authority (ISA) or the International Preliminary Examining Authority (IPEA).

    2.  Applicant must:

        a.  Ensure all the claims in the U.S. application must sufficiently correspond or be amended to sufficiently correspond to the allowable/patentable claim(s) in the corresponding Office of Earlier Examination (OEE) application and
        b.  Submit a claims correspondence table in English;

    3.  Examination of the U.S. application has <u>not</u> begun;

    4.  Applicant must submit:

Ex. L-2, p. 904

Application/Control Number: 16/064,204                                      Page 2
Art Unit: OPET

    a.  Documentation of prior office action:
        i.  a copy of the office action(s) just prior to the "Decision to Grant a Patent" from each of the Global/IP5 PPH participating office application(s) containing the allowable/patentable claim(s) or
        ii.  if the allowable/patentable claims(s) are from a "Notification of Reasons for Refusal" then the Notification of Reasons for Refusal or
        iii.  if the Global/IP5 PPH participating office application is a first action allowance then no office action from the Global/IP5 PPH participating office is necessary should be indicated on the request/petition form or
        iv.  the latest work product in the international phase of the OEE PCT application;
    b.  An English language translation of the Global/IP5 PPH participating office action or work product from (4)(a)(i)-(ii) or (iv) above;

5.  Applicant must submit:

    a.  An IDS listing the documents cited by the Global/IP5 PPH participating office examiner in the Global/IP5 PPH participating office action or work product (unless already submitted in this application);
    b.  Copies of the documents except U.S. patents or U.S. patent application publications (unless already submitted in this application).

The request to participate in the PPH pilot program and petition comply with the above requirements. Accordingly, the above-identified application has been accorded "special" status.

Telephone inquiries concerning this decision should be directed to Dale Hall at (571)272-3586.

All other inquiries concerning the examination or status of the application is accessible in the PAIR system at http://portal.uspto.gov.

This application will be forwarded to the examiner for action on the merits commensurate with this decision once this application's formality reviews have been completed.

/Dale Hall/
Dale Hall
Paralegal Specialist
Office of Petitions

Ex. L-2, p. 905

| Office of Petitions: Decision Count Sheet | Mailing Month | 8 |

**Application No.**

16064204

\* 1 6 0 6 4 2 0 4 \*

For US serial numbers: enter number only, no slashes or commas.  Ex: 10123456
For PCT: enter "51+single digit of year of filing+last 5 numbers", Ex. for PCT/US05/12345, enter 51512345

**Deciding Official:** Hall, Dale

**Count (1) - Palm Credit**     16064204

Decision: **GRANT**

FINANCE WORK NEEDED
☐ Select Check Box for YES

\* G R A N T \*

Decision Type: 652 - Petition to make special-PPH

\* 6 5 2 \*

Notes:

**Count (2)**

Decision: n/a

FINANCE WORK NEEDED
☐ Select Check Box for YES

Decision Type: NONE

Notes:

**Count (3)**

Decision: n/a

FINANCE WORK NEEDED
☐ Select Check Box for YES

Decision Type: NONE

Notes:

Initials of Approving Official (if required)

If more than 3 decisions, attach
2nd count sheet & mark this box ☐

Printed on:     8/14/2018

Office of Petitions Internal Document - Ver. 5.0

Ex. L-2, p. 906

# Office of Petitions:  Routing Sheet



**4 7 0 0**

**Application No.**  16064204

**This application is being forwarded to your office for further processing.  A decision has been rendered on a petition filed in this application, as indicated below. For details of this decision, please see the document PET.OP.DEC filed on the same date as this document.**

**X GRANTED**

**DISMISSED**

**DENIED**

# Exhibit L-2

## PPH Petition

Original Pages 908–910

Doc Code: PPH.PCT.692
Document Description: Petition to make special under Patent Pros Hwy

PTO/SB/20GLBL (04-15)
Approved for use through 04/30/2018. OMB 0651-0058
U.S. Patent and Trademark Office; U.S DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# REQUEST FOR PARTICIPATION IN THE GLOBAL/IP5
# PATENT PROSECUTION HIGHWAY (PPH) PILOT PROGRAM IN THE USPTO

| Application No.: | 16064204 | First Named Inventor: | Jonathan Sean Karafin |
|---|---|---|---|
| Filing Date: | June 20, 2018 | Attorney Docket No.: | 8821.101US2 |
| Title of the Invention: | HIGH DENSITY ENERGY DIRECTING DEVICE | | |

THIS REQUEST FOR PARTICIPATION IN THE PPH PILOT PROGRAM ALONG WITH THE REQUIRED DOCUMENTS MUST BE SUBMITTED VIA EFS-WEB. INFORMATION REGARDING EFS-WEB IS AVAILABLE AT HTTP://WWW.USPTO.GOV/PATENTS-APPLICATION-PROCESS/FILING-ONLINE/ABOUT-EFS-WEB.

APPLICANT HEREBY REQUESTS PARTICIPATION IN THE PATENT PROSECUTION HIGHWAY (PPH) PILOT PROGRAM AND PETITIONS TO MAKE THE ABOVE-IDENTIFIED APPLICATION SPECIAL UNDER THE PPH PILOT PROGRAM.

**Office of earlier examination (OEE):** United States (United States Patent and Trademark Office)

**OEE application number:** PCT/US2017/042452

**Both the OEE application and the above-identified U.S. application have the following earliest date (filing or priority date):** July 15, 2016

**Type of OEE work product relied upon:** Written Opinion of the International Searching Authority (WO/ISA)

**Mailing date of OEE work product:** November 17, 2017

## Supporting Documents

One or more of the required documents below may be available electronically from the Dossier Access System or PATENTSCOPE (see https://www.jpo.go.jp/ppph-portal/filewrapper.htm). If the applicant requests the USPTO to attempt to obtain a document electronically and such attempt is unsuccessful, the applicant will be required to supply the document. Accordingly, to avoid dismissal of the initial PPH request and potential denial of participation in the PPH program, the applicant should verify that the document is actually available via the Dossier Access System or PATENTSCOPE before requesting retrieval. If the applicant is unable to verify availability, then the applicant should submit the document with the PPH request.

## 1. OEE Work Product and Translation
A copy of the OEE work product and translation if not already in English:

[x] Attached    [ ] Previously submitted    [ ] Not required because the decision to grant a patent was the first office action

[ ] Applicant requests the USPTO to attempt to obtain the document(s) from the Dossier Access System or PATENTSCOPE

## 2. References Cited in OEE Work Product
A listing of references cited in the OEE work product and document copies (except U.S. patents and U.S. published patent applications):

[x] Attached    [ ] Previously Submitted    [ ] Not required because no references were cited in the OEE work product

[ ] Applicant requests the USPTO to attempt to obtain the document(s) from the Dossier Access System or PATENTSCOPE

[Page 1 of 2]

This collection of information is required by 35 U.S.C. 119, 37 CFR 1.55, and 37 CFR 1.102(d). The information is required to obtain or retain a benefit by the public, which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS.

Ex. L-2, p. 908

PTO/SB/20GLBL (04-15)
Approved for use through 04/30/2018. OMB 0651-0058
U.S. Patent and Trademark Office; U.S DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

### REQUEST FOR PARTICIPATION IN THE GLOBAL/IP5 PPH PILOT PROGRAM IN THE USPTO
(continued)

| Application No.: | 16064204 | First Named Inventor: | Jonathan Sean Karafin |
|---|---|---|---|

**3. Claims Correspondence Certification Statement**

All of the claims in this application sufficiently correspond to the patentable/allowable claims in the OEE application.

**4. Claims Correspondence Table**

| Claims in US Application | Patentable Claims in OEE Application | Explanation regarding the correspondence |
|---|---|---|
| 1-31 | 1-31 | Claims are the same. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| Signature | /Charles Yang, Reg. No. 62059/ | Date | June 25, 2018 |
|---|---|---|---|
| Name (Print/Typed) | Charles Yang | Registration Number | 62059 |

[Page 2 of 2]

Ex. L-2, p. 909

Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

# Exhibit L-2

## IDS Filing #1

Original Pages 911–914

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (03-15)
Approved for use through 07/31/2016. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**
( Not for submission under 37 CFR 1.99)

| Application Number | 16064204 |
|---|---|
| Filing Date | 2018-06-20 |
| First Named Inventor | Jonathan Sean Karafin |
| Art Unit | |
| Examiner Name | |
| Attorney Docket Number | 8821.101US2 |

## U.S.PATENTS   Remove

| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 6680761 | | 2004-01-20 | Greene et al. | |
| | 2 | 5374976 | | 1994-12-20 | Spannenburg | |
| | 3 | | | | | |

If you wish to add additional U.S. Patent citation information please click the Add button.   Add

## U.S.PATENT APPLICATION PUBLICATIONS   Remove

| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|---|
| | 1 | 20140132694 | | 2014-05-15 | Shacham et al. | |

If you wish to add additional U.S. Published Application citation information please click the Add button.   Add

## FOREIGN PATENT DOCUMENTS   Remove

| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
|---|---|---|---|---|---|---|---|---|
| | 1 | | | | | | | |

EFS Web 2.1.17

Ex. L-2, p. 911

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 16064204 |
| | Filing Date | 2018-06-20 |
| | First Named Inventor | Jonathan Sean Karafin |
| | Art Unit | |
| | Examiner Name | |
| | Attorney Docket Number | 8821.101US2 |

| If you wish to add additional Foreign Patent Document citation information please click the Add button | Add |

| NON-PATENT LITERATURE DOCUMENTS | Remove |

| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T5 |
|---|---|---|---|
| | 1 | International Search Report and Written Opinion dated November 17, 2017 in International Patent Application No PCT/US17/42452. | |

If you wish to add additional non-patent literature document citation information please click the Add button    Add

**EXAMINER SIGNATURE**

| Examiner Signature | | Date Considered | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through a citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

Ex. L-2, p. 912

| | |
|---|---|
| Application Number | 16064204 |
| Filing Date | 2018-06-20 |
| First Named Inventor | Jonathan Sean Karafin |
| Art Unit | |
| Examiner Name | |
| Attorney Docket Number | 8821.101US2 |

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**
( Not for submission under 37 CFR 1.99)

---

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

See attached certification statement.

The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☒ A certification statement is not submitted herewith.

### SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Charles Yang, Reg. No. 62059/ | Date (YYYY-MM-DD) | 2018-06-25 |
|---|---|---|---|
| Name/Print | Charles Yang | Registration Number | 62059 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

Ex. L-2, p. 913

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

Ex. L-2, p. 914

# Exhibit L-2

ISA Written Opinion

Original Pages 920–925

PATENT COOPERATION TREATY

From the
INTERNATIONAL SEARCHING AUTHORITY

To: John Yang
Niellect Law, P.C.
930 9th St., Suite 2380
Sacramento, CA 95814
United States of America

**PCT**

WRITTEN OPINION OF THE
INTERNATIONAL SEARCHING AUTHORITY

(PCT Rule 43bis.1)

| | |
|---|---|
| Date of mailing (day/month/year) | 17 NOV 2017 |

| Applicant's or agent's file reference | FOR FURTHER ACTION |
|---|---|
| 1018.101PCT | See paragraph 2 below |

| International application No. | International filing date (day/month/year) | Priority date (day/month/year) |
|---|---|---|
| PCT/US17/42452 | 17 July 2017 (17.07.2017) | 15 July 2016 (15.07.2016) |

International Patent Classification (IPC) or both national classification and IPC
IPC   -   G06F 3/01; G02B 5/32, 27/01; H04N 5/89 (2017.01)
CPC   -
         G06F 3/011; G02B 5/32, 27/0103, 27/017; H04N 5/89; G03H 1/268

Applicant   LIGHT FIELD LAB, INC.

1.   This opinion contains indications relating to the following items:

   ☒   Box No. I     Basis of the opinion

   ☐   Box No. II    Priority

   ☐   Box No. III   Non-establishment of opinion with regard to novelty, inventive step and industrial applicability

   ☒   Box No. IV    Lack of unity of invention

   ☒   Box No. V     Reasoned statement under Rule 43bis.1(a)(i) with regard to novelty, inventive step and industrial applicability; citations and explanations supporting such statement

   ☐   Box No. VI    Certain documents cited

   ☒   Box No. VII   Certain defects in the international application

   ☐   Box No. VIII  Certain observations on the international application

2.   **FURTHER ACTION**

   If a demand for international preliminary examination is made, this opinion will be considered to be a written opinion of the International Preliminary Examining Authority ("IPEA") except that this does not apply where the applicant chooses an Authority other than this one to be the IPEA and the chosen IPEA has notified the International Bureau under Rule 66.1bis(b) that written opinions of this International Searching Authority will not be so considered.

   If this opinion is, as provided above, considered to be a written opinion of the IPEA, the applicant is invited to submit to the IPEA a written reply together, where appropriate, with amendments, before the expiration of 3 months from the date of mailing of Form PCT/ISA/220 or before the expiration of 22 months from the priority date, whichever expires later.

   For further options, see Form PCT/ISA/220.

| Name and mailing address of the ISA/US | Date of completion of this opinion | Authorized officer |
|---|---|---|
| Mail Stop PCT, Attn: ISA/US
Commissioner for Patents
P.O. Box 1450, Alexandria, Virginia 22313-1450
Facsimile No.   571-273-8300 | 21 September 2017 (21.09.2017) | Shane Thomas
PCT Helpdesk: 571-272-4300
PCT OSP: 571-272-7774 |

Form PCT/ISA/237 (cover sheet) (January 2015)

Ex. L-2, p. 920

WRITTEN OPINION OF THE
INTERNATIONAL SEARCHING AUTHORITY

| International application No |
|---|
| PCT/US17/42492 |

Box No. I     Basis of this opinion

1.  With regard to the language, this opinion has been established on the basis of:

☒ the international application in the language in which it was filed.

☐ a translation of the international application into _____ which is the language of a translation furnished for the purposes of international search (Rules 12.3(a) and 23.1(b)).

2. ☐ This opinion has been established taking into account the rectification of an obvious mistake authorized by or notified to this Authority under Rule 91 (Rule 43bis.1(a)).

3. ☐ With regard to any **nucleotide and/or amino acid sequence** disclosed in the international application, this opinion has been established on the basis of a sequence listing:

a. ☐ forming part of the international application as filed:

☐ in the form of an Annex C/ST.25 text file.

☐ on paper or in the form of an image file.

b. ☐ furnished together with the international application under PCT Rule 13ter.1(a) for the purposes of international search only in the form of an Annex C/ST.25 text file.

c. ☐ furnished subsequent to the international filing date for the purposes of international search only:

☐ in the form of an Annex C/ST.25 text file (Rule 13ter.1(a)).

☐ on paper or in the form of an image file (Rule 13ter.1(b) and Administrative Instructions, Section 713).

4. ☐ In addition, in the case that more than one version or copy of a sequence listing has been filed or furnished, the required statements that the information in the subsequent or additional copies is identical to that forming part of the application as filed or does not go beyond the application as filed, as appropriate, were furnished.

5.  Additional comments:

Form PCT/ISA/237 (Box No. I) (January 2015)

Ex. L-2, p. 921

WRITTEN OPINION OF THE
INTERNATIONAL SEARCHING AUTHORITY

International application No.

PCT/US17/42452

Box No. IV    Lack of unity of invention

1. ☒  In response to the invitation (Form PCT/ISA/206) to pay additional fees the applicant has, within the applicable time limit:

   ☐  paid additional fees.

   ☐  paid additional fees under protest and, where applicable, the protest fee.

   ☐  paid additional fees under protest but the applicable protest fee was not paid.

   ☒  not paid additional fees.

2. ☐  This Authority found that the requirement of unity of invention is not complied with and chose not to invite the applicant to pay additional fees.

3.  This Authority considers that the requirement of unity of invention in accordance with Rule 13.1, 13.2 and 13.3 is

   ☐  complied with.

   ☒  not complied with for the following reasons:

The application contains the following inventions or groups of inventions which are not so linked as to form a single general inventive concept under PCT Rule 13.1. In order for all inventions to be examined, the appropriate additional examination fee must be paid.

Group I: Claims 1-31 are directed towards an energy directing device comprising: energy propagation paths which extend between the one or more energy locations.

Group II: Claims 32-42 are directed towards an energy system comprising: elements that induce transverse Anderson Localization of energy transport.

The inventions listed as Groups I and II do not relate to a single general inventive concept under PCT Rule 13.2, they lack the same or corresponding special technical features. Group I has at least energy propagation paths which extend between the one or more energy locations that Group II does not have. Group II has at least elements that induce transverse Anderson Localization of energy transport that Group I does not have.

The common technical features of Groups I and II are one or more energy relay components; a singular seamless energy surface; a separation between edges; a minimum perceptible contour; and a human eye.

These common features are disclosed by US 5,673,151 A to Rallison, R. (hereinafter "Rallison") which discloses one or more energy relay components (relay lenses; column 4, lines 25-41); a singular seamless energy surface (LCD display surface mounted above user eye; column 4, lines 25-41); a separation between edges (separation between edges of lens 28 and image surface 10 as shown; figure 1; column 4, lines 25-41; column 8, lines 8-22); a minimum perceptible contour (fiber optic contour level to allow eye to see image; column 4, lines 25-41); and a human eye (eye of user; column 4, lines 25-41).

Since the common technical features are previously disclosed by the Rallison reference, these common features are not special and so Groups I and II lack unity.

4.  Consequently, this opinion has been established in respect of the following parts of the international application:

   ☐  all parts.

   ☒  the parts relating to claims Nos.  1-31

Ex. L-2, p. 922

WRITTEN OPINION OF THE
INTERNATIONAL SEARCHING AUTHORITY

International application No.
PCT/US17/42452

| Box No. V | Reasoned statement under Rule 43bis.1(a)(i) with regard to novelty, inventive step and industrial applicability; citations and explanations supporting such statement | | | | |
|---|---|---|---|---|---|

1.  Statement

| | | | | |
|---|---|---|---|---|
| Novelty (N) | Claims | 1-31 | | YES |
| | Claims | NONE | | NO |
| Inventive step (IS) | Claims | 1-31 | | YES |
| | Claims | NONE | | NO |
| Industrial applicability (IA) | Claims | 1-31 | | YES |
| | Claims | NONE | | NO |

2.   Citations and explanations:

Claim 1 meets the criteria set out in PCT Article 33(2)-(3), because the prior art does not teach or fairly suggest wherein a separation between edges of any two adjacent second surfaces of the singular seamless energy surface is less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface, from the singular seamless energy surface.

US 6,680,761 B1 to GREENE, R. et al. (hereinafter "Greene") discloses an energy directing device (tiled lightvalve assembly 154 of flat panel display device; abstract; figure 6; column 4, line 61 to column 5, line 9; column 6, lines 22-39) comprising: one or more energy locations (array of sub-pixel apertures 17 (one or more energy locations) form image source plane of flat panel display; figure 1; column 4, line 61 to column 5, line 9; column 6, lines 22-39); one or more energy relay elements, each further comprising a first surface and a second surface (flat panel display comprises array of tiles 19 (one or more energy relay elements) having rear first surface and forward second surface as shown; figure 6; column 4, line 61 to column 5, line 9; column 6, lines 22-39); wherein the second surfaces of each energy relay element are arranged to form a singular seamless energy surface (forward surfaces of each tile 19 are collectively arranged to have a seam 8 therebetween that is visually imperceptible and therefore seamless to the human eye as shown; abstract; figure 1; column 4, line 61 to column 5, line 9; column 6, lines 22-39); wherein a separation between edges of any two adjacent second surfaces of the singular seamless energy surface is less than a minimum perceptible contour as defined by the visual acuity of a human eye (forward surfaces are collectively arranged to have a seam 8 (separation between edges) therebetween that is visually imperceptible and therefore seamless (less than a minimum perceptible contour) to the human eye as shown; abstract; figure 1; column 4, line 61 to column 5, line 9; column 6, lines 22-39); wherein the one or more energy relay elements are configured to direct energy along energy propagation paths which extend through the one or more energy locations and the singular seamless energy surface (tiles 19 are configured to direct light energy through array of sub-pixel apertures 17 as shown; figure 6; column 4, line 61 to column 5, line 9; column 6, lines 22-39).

US 6,574,376 A to SPANNENBURG, S. (hereinafter "Spannenburg") discloses a separation between contour of the seamless surface is less than a minimum perceptible contour as defined by the visual acuity of a human eye at a normal distance of assessment (deformations within printed image elements are imperceptible to human visual system at a normal distance of assessment; abstract; claim 2 of Spannenburg).

US 2014/0152694 A1 to SHACHAM, O. et al. (hereinafter "Shacham") discloses a separation between regions is less than a minimum perceptible contour as defined by the visual acuity of a naked human eye at a distance (first and second regions 12, 14 of a security image 10 are printed such that they are imperceptible to a naked human eye at normal viewing distances; figure 1A; paragraph [0020]).

However, Greene, Spannenburg, Shacham and the references of record fail to disclose, teach or suggest an energy directing device comprising: one or more energy locations; one or more energy relay elements, each further comprising a first surface and a second surface; wherein the second surfaces of each energy relay element are arranged to form a singular seamless energy surface; wherein a separation between edges of any two adjacent second surfaces of the singular seamless energy surface is less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface, from the singular seamless energy surface; wherein the one or more energy relay elements are configured to direct energy along energy propagation paths which extend between the one or more energy locations and the singular seamless energy surface. It would not have been obvious to one of ordinary skill in the art at the time the invention was made to have employed this device, because the references taken solely, or in combination, fail to provide the required limitations, and modification of any complementary combination of the references of record would be impermissible and not provide any advantages over the present application. Further, the instant claim requires a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface, from the singular seamless energy surface which collectively appears to narrow the scope of the instant claim to a degree that no meaningful combination can be made between one or more of the references uncovered. Specifically, Greene discloses the majority of the instant claim which is rather well known in the art. However, defining a specific visual acuity relative a dimension of the relay elements does not appear to provide an obvious motivation and further is not contemplated in the art, let alone relevant art, as evidenced by Spannenburg and Shacham.

Claims 2-17 meet the criteria set out in PCT Article 33(2)-(3), because they depend from claim 1.

-***-Continued Within the Next Supplemental Box-***-

Form PCT/ISA/237 (Box No. V) (January 2015)

Ex. L-2, p. 923

WRITTEN OPINION OF THE
INTERNATIONAL SEARCHING AUTHORITY

International application No.

PCT/US17/42452

Box No. VII    Certain defects in the international application

The following defects in the form or contents of the international application have been noted:

Claim 5-7, 17, 18, 20, & 22-24 are objected to under PCT Rule 66.2(a)(v) as containing the following defects in the form or contents thereof.

Claims 5-7, 18, 20, & 22-24 contain a typo in that they fail to end with a period. For the purposes of this opinion, claims 5-7, 18, 20, & 22-24 shall be interpreted to end with a period in accordance with PCT Rules regarding claim clarity and proper grammar.

Claim 17 is written as dependent upon itself. For the purposes of this opinion, claim 17 will be interpreted so as to depend upon claim 16, to restore proper antecedent basis and clarity to the claim.

Form PCT/ISA/237 (Box No. VIII) (January 2015)

Ex. L-2, p. 924

WRITTEN OPINION OF THE
INTERNATIONAL SEARCHING AUTHORITY

International application No.

PCT/US17/42452

Supplemental Box

In case the space in any of the preceding boxes is not sufficient.
Continuation of:

-"""-Continued from Box V: Citations and Explanations-"""-.

Claim 18 meets the criteria set out in PCT Article 33(2)-(3), because the prior art does not teach or fairly suggest wherein a separation between edges of any two adjacent second surfaces of the singular seamless energy surface is less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface, from the singular seamless energy surface.

Greene discloses an energy directing device (tiled lightvalve assembly 154 of flat panel display device; abstract; figure 6; column 4, line 61 to column 5, line 9; column 6, lines 22-39) comprising: one or more energy locations (array of sub-pixel apertures 17 (one or more energy locations) form image source plane of flat panel display; figure 1; column 4, line 61 to column 5, line 9; column 6, lines 22-39); one or more energy relay elements, each further comprising a first surface and a second surface (flat panel display comprises array of tiles 19 (one or more energy relay elements) having rear first surface and forward second surface as shown; figure 6; column 4, line 61 to column 5, line 9; column 6, lines 22-39); wherein the second surfaces of each energy relay element are arranged to form a singular seamless energy surface (forward surfaces of each tile 19 are collectively arranged to have a seam 8 therebetween that is visually imperceptible and therefore seamless to the human eye as shown; abstract; figure 1; column 4, line 61 to column 5, line 9; column 6, lines 22-39); wherein a separation between edges of any two adjacent second surfaces of the singular seamless energy surface is less than a minimum perceptible contour as defined by the visual acuity of a human eye (forward surfaces are collectively arranged to have a seam 8 (separation between edges) therebetween that is visually imperceptible and therefore seamless (less than a minimum perceptible contour) to the human eye as shown; abstract; figure 1; column 4, line 61 to column 5, line 9; column 6, lines 22-39); wherein the one or more energy relay elements are configured to direct energy along energy propagation paths which extend through the one or more energy locations and the singular seamless energy surface (tiles 19 are configured to direct light energy through array of sub-pixel apertures 17 as shown; figure 6; column 4, line 61 to column 5, line 9; column 6, lines 22-39).

Spannenburg discloses a separation between contour of the seamless surface is less than a minimum perceptible contour as defined by the visual acuity of a human eye at a normal distance of assessment (deformations within printed image elements are imperceptible to human visual system at a normal distance of assessment; abstract; claim 2 of Spannenburg).

Shacham discloses a separation between regions is less than a minimum perceptible contour as defined by the visual acuity of a naked human eye at a distance (first and second regions 12, 14 of a security image 10 are printed such that they are imperceptible to a naked human eye at normal viewing distances; figure 1A; paragraph [0020]).

However, Greene, Spannenburg, Shacham and the references of record fail to disclose, teach or suggest an energy directing device comprising: one or more energy locations; one or more energy relay elements, each further comprising a first surface and a second surface; wherein the second surfaces of each energy relay element are arranged to form a singular seamless energy surface; wherein a separation between edges of any two adjacent second surfaces of the singular seamless energy surface is less than a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface, from the singular seamless energy surface; wherein the one or more energy relay elements are configured to direct energy along energy propagation paths which extend between the one or more energy locations and the singular seamless energy surface. It would not have been obvious to one of ordinary skill in the art at the time the invention was made to have employed this device, because the references taken alone, or in combination, fail to provide the required limitations, and modification of any complementary combination of the references of record would be impermissible and not provide any advantages over the present application. Further, the instant claim requires a minimum perceptible contour as defined by the visual acuity of a human eye having better than 20/40 vision at a distance, greater than the lesser of a height of the singular seamless energy surface or a width of the singular seamless energy surface, from the singular seamless energy surface which collectively appears to narrow the scope of the instant claim to a degree that no meaningful combination can be made between one or more of the references uncovered. Specifically, Greene discloses the majority of the instant claim which is rather well known in the art. However, defining a specific visual acuity relative a dimension of the relay elements does not appear to provide an obvious motivation and further is not contemplated in the art, let alone relevant art, as evidenced by Spannenburg and Shacham.

Claims 19-31 meet the criteria set out in PCT Article 33(2)-(3), because they depend from claim 18.

Claims 1-31 have industrial applicability as defined by PCT Article 33(4) because the subject matter can be made or used in industry.

Form PCT/ISA/237 (Supplemental Box) (January 2015)

# Exhibit L-2

US National Stage Application

Original Pages 935–938

PTO-1390 (01-18)
Approved for use through 8/31/2019. OMB 0651-0021
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| TRANSMITTAL LETTER TO THE UNITED STATES DESIGNATED/ELECTED OFFICE (DO/EO/US) CONCERNING A SUBMISSION UNDER 35 U.S.C. 371 | Attorney Docket No. 8821.101US2 |
|---|---|
| | U.S. Application No. (if known, see 37 CFR 1.5) |

| International Application No. PCT/US2017/042452 | International Filing Date July 17, 2017 | Priority Date Claimed July 15, 2016 |
|---|---|---|

**Title of Invention**
HIGH DENSITY ENERGY DIRECTING DEVICE

**First Named Inventor**
Jonathan Sean Karafin

**Applicant herewith submits to the United States Designated/Elected Office (DO/EO/US) the following items and other information.**

1. ☒ This is an express request to begin national examination procedures (35 U.S.C. 371(f)). NOTE: The express request under 35 U.S.C. 371(f) will not be effective unless the requirements under 35 U.S.C. 371(c)(1), (2), and (4) for payment of the basic national fee, copy of the International Application and English translation thereof (if required), and the oath or declaration of the inventor(s) have been received.

2. ☐ A copy of the International Application (35 U.S.C. 371(c)(2)) is attached hereto (not required if the International Application was previously communicated by the International Bureau or was filed in the United States Receiving Office (RO/US)).

3. An English language translation of the International Application (35 U.S.C. 371(c)(2))
   a. ☐ is attached hereto.
   b. ☐ has been previously submitted under 35 U.S.C. 154(d)(4).

4. An oath or declaration of the inventor(s) (35 U.S.C. 371(c)(4))
   a. ☒ is attached.
   b. ☐ was previously filed in the international phase under PCT Rule 4.17(iv).

**Items 5 to 8 below concern amendments made in the international phase.**

PCT Article 19 and 34 amendments

5. ☐ Amendments to the claims under PCT Article 19 are attached (not required if communicated by the International Bureau) (35 U.S.C. 371(c)(3)).

6. ☐ English translation of the PCT Article 19 amendment is attached (35 U.S.C. 371(c)(3)).

7. ☐ English translation of annexes (Article 19 and/or 34 amendments only) of the International Preliminary Examination Report is attached (35 U.S.C. 371(c)(5)).

Cancellation of amendments made in the international phase

8a. ☐ Do not enter the amendment made in the international phase under PCT Article 19.

8b. ☐ Do not enter the amendment made in the international phase under PCT Article 34.

NOTE: A proper amendment made in English under Article 19 or 34 will be entered in the U.S. national phase application absent a clear instruction from applicant not to enter the amendment(s).

**The following items 9 to 17 concern a document(s) or information included.**

9. ☐ An Information Disclosure Statement under 37 CFR 1.97 and 1.98.

10. ☒ A preliminary amendment.

11. ☒ An Application Data Sheet under 37 CFR 1.76.

12. ☒ A substitute specification. NOTE: A substitute specification cannot include claims. See 37 CFR 1.125(b).

13. ☐ A power of attorney and/or change of address letter.

14. ☐ A computer-readable form of the sequence listing in accordance with PCT Rule 13ter.3 and 37 CFR 1.821-1.825 (not required if sequence listing in text format was indicated on the PCT Request as part of the International Application and the sequence listing was published as part of the international application).

15. ☒ Assignment papers (cover sheet and document(s)). Name of Assignee: LIGHT FIELD LAB, INC.

16. ☒ 37 CFR 3.73(c) Statement (when there is an Assignee).

This collection of information is required by 37 CFR 1.414 and 1.491-1.492. The information is required to obtain or retain a benefit by the public, which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 15 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Mail Stop PCT, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

Ex. L-2, p. 935

PTO-1390 (01-18)
Approved for use through 8/31/2019. OMB 0651-0021
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| U.S. APPLN. No. (if known – see 37 CFR 1.5) | INTERNATIONAL APPLICATION No. **PCT/US2017/042452** | ATTORNEY DOCKET No. **8821.101US2** |
|---|---|---|

**17.** ☐ Other items or information:

| The following fees have been submitted. | CALCULATIONS |
|---|---|
| **18.** ■ Basic national fee (37 CFR 1.492(a)) ................................................................ **$300** | $ 300 |
| **19.** ■ Examination fee (37 CFR 1.492(c))<br>• If the written opinion prepared by ISA/US or the international preliminary examination report prepared by IPEA/US indicates all claims satisfy provisions of PCT Article 33(1)-(4)............. **$0**<br>• All other situations ................................................................................................. **$760** | $ 0 |
| **20.** ■ Search fee (37 CFR 1.492(b))<br>• If the written opinion prepared by ISA/US or the international preliminary examination report prepared by IPEA/US indicates all claims satisfy provisions of PCT Article 33(1)-(4)............. **$0**<br>• Search fee (37 CFR 1.445(a)(2)) has been paid on the international application to the USPTO as an International Searching Authority .......................................................................... **$140**<br>• International Search Report prepared by an ISA other than the US and provided to the Office or previously communicated to the US by the IB............................................................... **$520**<br>• All other situations ................................................................................................. **$660** | 0<br><br>$ |

| | | | **TOTAL OF 18, 19, and 20 =** | $ 300 |
|---|---|---|---|---|

☐ Additional fee for specification and drawings filed in paper over 100 sheets (excluding sequence listing in compliance with 37 CFR 1.821(c) or (e) in an electronic medium or computer program listing in an electronic medium) (37 CFR 1.492(j)).

Fee for each additional 50 sheets of paper or fraction thereof ............................................. **$400**

| Total Sheets | Extra Sheets | Number of each additional 50 or fraction thereof (round **up** to a whole number) | RATE | |
|---|---|---|---|---|
| - 100 = | / 50 = | | x $400 | $ |

| Surcharge for furnishing any of the search fee, examination fee, or the oath or declaration after the date of commencement of the national stage (37 CFR 1.492(h)).................................................**$140** | $ |
|---|---|

| CLAIMS | NUMBER FILED | NUMBER EXTRA | RATE | |
|---|---|---|---|---|
| Total claims | 31 - 20 = | 11 | x $100 | $ 1100 |
| Independent claims | 3 - 3 = | 0 | x $460 | $ |
| MULTIPLE DEPENDENT CLAIM(S) (if applicable) | | + $820 | | $ |

| Fee for submission of Sequence Listing text file of 300 MB to 800 MB (37 CFR 1.21(o)(1))..................**$1,000** | $ |
|---|---|
| Fee for submission of Sequence Listing text file of more than 800 MB (37 CFR 1.21(o)(2))..................**$10,000** | $ |
| Processing fee for furnishing the English translation later than 30 months from the earliest claimed priority date (37 CFR 1.492(i))...................................................................................**$140  +** | $ |

| | **TOTAL OF ABOVE CALCULATIONS =** | $ 1400 |
|---|---|---|

| ■ **Applicant asserts small entity status.** See 37 CFR 1.27. Fees above are reduced by ½. |
|---|
| ☐ **Applicant certifies micro entity status.** See 37 CFR 1.29. Fees above are reduced by ¾.<br>Applicant must attach form PTO/SB/15A or B or equivalent. |

| | **TOTAL NATIONAL FEE =** | $ 700 |
|---|---|---|

| Fee for recording the enclosed assignment (37 CFR 1.21(h)). The assignment must be accompanied by an appropriate cover sheet (37 CFR 3.28, 3.31).........................................................**$50.00** per property   **+** | $ |
|---|---|

| | **TOTAL FEES ENCLOSED =** | $ 700 |
|---|---|---|

[Page 2 of 3]

Ex. L-2, p. 936

PTO-1390 (01-18)
Approved for use through 8/31/2019. OMB 0651-0021
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

a. ☐ A check in the amount of $_____ to cover the above fees is enclosed.

b. ☐ Please charge my Deposit Account No. _____ in the amount of $_____ to cover the above fees.

c. ☑ The Director is hereby authorized to charge additional fees which may be required, or credit any overpayment, to Deposit Account No. 50-6658 _____ as follows:

   i. ☑ any required fee.

   ii. ☐ any required fee except for excess claims fees required under 37 CFR 1.492(d) and (e) and multiple dependent claim fee required under 37 CFR 1.492(f).

d. ☑ Fees are to be charged to a credit card. **WARNING:** Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038. The PTO-2038 should only be mailed or faxed to the USPTO. However, when paying the basic national fee, the PTO-2038 may NOT be faxed to the USPTO.

   **ADVISORY:** If filing by EFS-Web, do **NOT** attach the PTO-2038 form as a PDF along with your EFS-Web submission. Please be advised that this is **not** recommended and by doing so your **credit card information may be displayed** via PAIR. To protect your information, it is recommended to pay fees online by using the electronic payment method.

**NOTE: Where an appropriate time limit under 37 CFR 1.495 has not been met, a petition to revive (37 CFR 1.137(a) or (b)) must be filed and granted to restore the International Application to pending status.**

---

**Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications**

☐ This application (1) claims priority to or the benefit of an application filed before March 16, 2013, and (2) also contains, or contained at any time, a claim to a claimed invention that has an effective filing date on or after March 16, 2013.

**NOTE 1:** By providing this statement under 37 CFR 1.55 or 1.78, **this application, with a filing date on or after March 16, 2013, will be examined under the first inventor to file provisions of the AIA.**

**NOTE 2:** A U.S. national stage application may not claim priority to the international application of which it is the national phase. The filing date of a U.S. national stage application is the international filing date. See 35 U.S.C. 363.

---

**Correspondence Address**

☑ The address associated with Customer Number: 120663   **OR**   ☐ Correspondence address below

| Name | |
| --- | --- |
| Address | |

| City | | State | | Zip Code | |
| --- | --- | --- | --- | --- | --- |
| Country | | Telephone | | | |
| Email | | | | | |

| Signature | /Charles Yang, Reg. No. 62059/ | Date | June 20, 2018 |
| --- | --- | --- | --- |
| Name (Print/Type) | Charles Yang | Registration No. (Attorney/Agent) | 62059 |

[Page 3 of 3]

Ex. L-2, p. 937

Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.  The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2.  A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3.  A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4.  A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5.  A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6.  A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7.  A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8.  A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9.  A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

# Exhibit L-2

## Inventor's Oaths

Original Pages 1011–1014

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| Title of Invention | HIGH DENSITY ENERGY DIRECTING DEVICE |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:

☒ The attached application, or

☐ United States application or PCT international application number _____

filed on _____.

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor: Brendan Elwood Bevensee    Date (Optional) : _____

Signature: _____

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed. Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

Ex. L-2, p. 1011

# Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant ( i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office, U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| Title of Invention | HIGH DENSITY ENERGY DIRECTING DEVICE |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:  ☒ The attached application, or

☐ United States application or PCT international application number _____

filed on _____

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor: Jonathan Sean Karafin                     Date (Optional) : _____

Signature: _____

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed. Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

Ex. L-2, p. 1013

Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant ( i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

# Exhibit L-2

LFL Patent Assignment

Original Pages 1018–1020

8821.101US2

## ASSIGNMENT

WHEREAS, I, the undersigned inventor of residence as listed, have invented certain new and useful improvements as below entitled, for which an application for United States Letters Patent is made, said applications having been designated as set forth below and filed on or about the date set forth below; and

WHEREAS, **LIGHT FIELD LAB, INC.** (hereinafter referred to as "Assignee"),

with an address of:         699 E. Brokaw Road
                            San Jose, CA 95112

desires to acquire the entire right, title and interest in and to the inventions, and in and to the said application and any Letters Patent(s) that may issue thereon;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, I assign to Assignee, all right, title and interest in and to said inventions and in and to said applications and all patents which may be granted therefore, and all divisions, reissues, continuations, continuations-in-part and extensions thereof; and I authorize and request the Commissioner of Patents and Trademarks to issue all patents for said inventions, or patents resulting therefrom, insofar as our interest is concerned, to Assignee.

I also assign to Assignee, all right, title and interest in and to the invention disclosed in said applications throughout the world, including the right to file applications and obtain patents, utility models, industrial models and designs for said invention in its own name throughout the world, including all rights to publish cautionary notices reserving ownership of said invention and all rights to register said invention in appropriate registries; and I further agree to execute any and all powers of attorney, applications, assignments, declarations, affidavits, and any other papers in connection therewith necessary to perfect such right, title and interest in Assignee.

8821.101US2

I will communicate to Assignee any known facts respecting any improvements; and, at the expense of Assignee, I will testify in any legal proceedings, sign all lawful papers, execute all divisional, continuation, continuation-in-part, reissue and substitute applications, make lawful oaths and declarations, and generally do everything possible to vest title in Assignee and to aid Assignee to obtain and enforce proper protection for said invention in all countries.

This Assignment shall be binding on the parties' successors, assigns and legal representatives.

| Atty. Docket Number | Application Serial No. | Filing Date | Invention Title |
|---|---|---|---|
| 8821.101US2 | | | HIGH DENSITY ENERGY DIRECTING DEVICE |

I hereby grant CHARLES C. YANG, Registration No. 62,059 and JOHN YANG, Registration No. 60384, and all practitioners with the customer number 120663 with an office at 555 University Ave., Suite 280, Sacramento, CA 95825, the power to insert on this Assignment any further identification which may be necessary or desirable in order to comply with the rules of the United States Patent and Trademark Office for recordation of this document.

The undersigned further declares that all statements made herein of his/her own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such wilful and false statements may jeopardize the validity of the application or any patent issued thereon.

8821.101US2

Signature of Inventor: _____

Inventor(s) Name:    Jonathan Sean Karafin

Residence (city/state/country): _____

Date: _____5/4/18_____


Signature of Inventor: _____

Inventor(s) Name:    Brendan Elwood Bevensee

Residence (city/state/country): ___San Jose, CA, USA___

Date: _____6/4/2018_____

Ex. L-2, p. 1020

# Exhibit L-3

Cover Page

Original Page 1

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | ISSUE DATE | PATENT NO. | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 15/451,831 | 02/18/2020 | 10565734 | LYT233-US | 5268 |

125070          7590          01/29/2020

Google LLC
c/o Davidson Sheehan LLP
6836 Austin Center Blvd.
Suite 320
Austin, TX 78731

# ISSUE NOTIFICATION

The projected patent number and issue date are specified above.

### Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment is 137 day(s). Any patent to issue from the above-identified application will include an indication of the adjustment on the front page.

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Application Assistance Unit (AAU) of the Office of Data Management (ODM) at (571)-272-4200.

APPLICANT(s) (Please see PAIR WEB site http://pair.uspto.gov for additional applicants):

Brendan Bevensee, San Jose, CA;
Google LLC, Mountain View, CA
Tingfang Du, San Jose, CA;
Jon Karafin, Morgan Hill, CA;
Joel Merritt, Sunnyvale, CA;
Duane Petrovich, San Francisco, CA;
Gareth Spor, San Francisco, CA;

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The USA offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to encourage and facilitate business investment. To learn more about why the USA is the best country in the world to develop technology, manufacture products, and grow your business, visit <u>SelectUSA.gov</u>.

IR103 (Rev. 10/09)

Ex. L-3, p. 1

# Exhibit L-3

Application Publication Date

Original Page 1101



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 15/451,831 | 03/07/2017 | Brendan Bevensee | LYT233 |

**CONFIRMATION NO. 5268**

48384
RAUBVOGEL LAW OFFICE
820 LAKEVIEW WAY
REDWOOD CITY, CA 94062

**PUBLICATION NOTICE**

*OC000000093667338*

---

**Title:** VIDEO CAPTURE, PROCESSING, CALIBRATION, COMPUTATIONAL FIBER ARTIFACT REMOVAL, AND LIGHT-FIELD PIPELINE

**Publication No.** US-2017-0243373-A1
**Publication Date:** 08/24/2017

## NOTICE OF PUBLICATION OF APPLICATION

The above-identified application will be electronically published as a patent application publication pursuant to 37 CFR 1.211, et seq. The patent application publication number and publication date are set forth above.

The publication may be accessed through the USPTO's publically available Searchable Databases via the Internet at www.uspto.gov. The direct link to access the publication is currently http://www.uspto.gov/patft/.

The publication process established by the Office does not provide for mailing a copy of the publication to applicant. A copy of the publication may be obtained from the Office upon payment of the appropriate fee set forth in 37 CFR 1.19(a)(1). Orders for copies of patent application publications are handled by the USPTO's Public Records Division. The Public Records Division can be reached by telephone at (571) 272-3150 or (800) 972-6382, by facsimile at (571) 273-3250, by mail addressed to the United States Patent and Trademark Office, Public Records Division, Alexandria, VA 22313-1450 or via the Internet.

In addition, information on the status of the application, including the mailing date of Office actions and the dates of receipt of correspondence filed in the Office, may also be accessed via the Internet through the Patent Electronic Business Center at www.uspto.gov using the public side of the Patent Application Information and Retrieval (PAIR) system. The direct link to access this status information is currently https://portal.uspto.gov/pair/PublicPair. Prior to publication, such status information is confidential and may only be obtained by applicant using the private side of PAIR.

Further assistance in electronically accessing the publication, or about PAIR, is available by calling the Patent Electronic Business Center at 1-866-217-9197.

---

Office of Data Managment, Application Assistance Unit (571) 272-4000, or (571) 272-4200, or 1-888-786-0101

Ex. L-3, p. 1101

# Exhibit L-3

Lytro Assignment Agreement

Original Pages 1116–1131

PATENT

## ASSIGNMENT

For good and valuable consideration, the receipt of which is hereby acknowledged, the person(s) named below (referred to as "INVENTOR" whether singular or plural) has sold, assigned, and transferred and does hereby sell, assign, and transfer to **Lytro, Inc.**, a **Delaware** corporation having a place of business at **1300 Terra Bella Avenue, Mountain View, CA 94043**, ("ASSIGNEE"), for itself and its successors, transferees, and assignees, the following:

1.    The entire worldwide right, title, and interest in all inventions and improvements ("SUBJECT MATTER") that are disclosed in the provisional application filed under 35 U.S.C. §111(b) or non-provisional application filed under 35 U.S.C. §111(a) and entitled **VIDEO CAPTURE, PROCESSING, CALIBRATION, COMPUTATIONAL FIBER ARTIFACT REMOVAL, AND LIGHT-FIELD PIPELINE** ("APPLICATION"), which:

☐ is to be filed herewith

☒ was filed on _____March 7, 2017_____
   now bearing U.S. application number _____15/451,831_____ and

2.    The entire worldwide right, title, and interest in and to:
(a) the APPLICATION; (b) all applications claiming priority from the APPLICATION; (c) all utility, divisional, continuation, substitute, renewal, reissue, and other applications related thereto which have been or may be filed in the United States or elsewhere in the world; (d) all patents (including reissues and re-examinations) which may be granted on the applications set forth in (a), (b), and (c); and (e) all right of priority in the APPLICATION, together with all rights to recover damages for infringement of provisional rights.

INVENTOR agrees that ASSIGNEE may apply for and receive patents for SUBJECT MATTER in ASSIGNEE's own name.

INVENTOR agrees to do the following, when requested, and without further consideration, in order to carry out the intent of this Assignment: (1) execute all oaths, assignments, powers of attorney, applications, and other papers necessary or desirable to fully secure to ASSIGNEE the rights, titles and interests herein conveyed; (2) communicate to ASSIGNEE all known facts relating to the SUBJECT MATTER; and (3) generally do all lawful acts that ASSIGNEE shall consider desirable for securing, maintaining, and enforcing worldwide patent protection relating to the SUBJECT MATTER and for vesting in ASSIGNEE the rights, titles, and interests herein conveyed. INVENTOR further agrees to provide any successor, assign, or legal representative of ASSIGNEE with the benefits and assistance provided to ASSIGNEE hereunder.

INVENTOR represents that INVENTOR has the rights, titles, and interests to convey as set forth herein, and covenants with ASSIGNEE that the INVENTOR has not made and will not hereafter make any assignment, grant, mortgage, license, or other agreement affecting the rights, titles, and interests herein conveyed.

INVENTOR grants the attorney of record the power to insert on this Assignment any further identification that may be necessary or desirable in order to comply with the rules of the United States Patent and Trademark Office for recordation of this document.

This Assignment may be executed in one or more counterparts, each of which shall be deemed an original and all of which may be taken together as one and the same Assignment.

_____     ___4/4/2017___
Brendan Bevensee                    Date

*Case LYT233*                        *1 of 2*

Ex. L-3, p. 1116

Title of Document: **ASSIGNMENT**

Re:
Title:          VIDEO CAPTURE, PROCESSING, CALIBRATION, COMPUTATIONAL FIBER
                ARTIFACT REMOVAL, AND LIGHT-FIELD PIPELINE
Filed:          March 7, 2017
Serial No.:     15/451,831

_____     _____
Tingfang Du                   Date

_____     _____
Jon Karafin                   Date    4/4/17

_____     _____
Joel Merritt                  Date

_____     _____
Duane Petrovich               Date

_____     _____
Gareth Spor                   Date

Ex. L-3, p. 1117

Title of Document: **ASSIGNMENT**

Re:
Title:        VIDEO CAPTURE, PROCESSING, CALIBRATION, COMPUTATIONAL FIBER
              ARTIFACT REMOVAL, AND LIGHT-FIELD PIPELINE
Filed:        · March 7, 2017
Serial No.:    15/451,831

---

| | |
|---|---|
| Tingfang Du | Date |
| Jon Karafin | Date |
| Joel Merritt | Date |
| Duane Petrovich | 4/9/2017 Date |
| Gareth Spor | Date |

Ex. L-3, p. 1118

Title of Document: **ASSIGNMENT**

Re:
Title:          **VIDEO CAPTURE, PROCESSING, CALIBRATION, COMPUTATIONAL FIBER**
                **ARTIFACT REMOVAL, AND LIGHT-FIELD PIPELINE**
Filed:          **March 7, 2017**
Serial No.:     **15/451,831**

_____          4/25/17
Tingfang Du                              Date

_____          _____
Jon Karafin                              Date

_____          _____
Joel Merritt                             Date

_____          _____
Duane Petrovich                          Date

_____          4/5/17
Gareth Spor                              Date

Ex. L-3, p. 1119

**AT WILL EMPLOYMENT, CONFIDENTIAL INFORMATION,
INVENTION ASSIGNMENT AND ARBITRATION AGREEMENT**

**LYTRO, INC.**

As a condition of my employment with Lytro, Inc., its subsidiaries, affiliates, successors or assigns (together the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following:

**1.     At-Will Employment.**

I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR AN UNSPECIFIED DURATION AND CONSTITUTES "AT-WILL" EMPLOYMENT.   I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS OBTAINED IN WRITING AND SIGNED BY AN AUTHORIZED OFFICER OF THE COMPANY.  I ACKNOWLEDGE THAT THIS EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT THE OPTION EITHER OF THE COMPANY OR MYSELF, WITH OR WITHOUT PRIOR NOTICE. For the avoidance of doubt, nothing in this Section 1 is intended to interfere with rights to engage in protected concerted organizing activity under Section 7 of the National Labor Relations Act.

**2.     Confidential Information.**

*A.     Company Information.*  I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Company, any Confidential Information of the Company, except under a non-disclosure agreement duly authorized and executed by the Company and the third party to whom disclosure will be made.  I understand that "Confidential Information" means any non-public information that relates to the actual or anticipated business or research and development of the Company, technical data, trade secrets or know-how, including, but not limited to, research, product plans or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information.  I further understand that Confidential Information does not include any of the foregoing items which have become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved or improvements or new versions thereof.

*B.     Former Employer Information.*  I agree that I will not, during my employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

*C.     Third Party Information.*  I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes.  I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

**3.     Inventions.**

A.    *Inventions Retained and Licensed.*  I have attached hereto, as <u>Exhibit A</u>, a list describing all inventions, original works of authorship, developments, improvements, and trade secrets which were made by me prior to my employment with the Company (collectively referred to as "<u>Prior Inventions</u>"), which belong to me, which relate to the Company's proposed business, products or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Prior Inventions. If in the course of my employment with the Company, I incorporate into a Company product, process or service a Prior Invention owned by me or in which I have an interest, I hereby grant to the Company a nonexclusive, royalty-free, fully paid-up, irrevocable, perpetual, worldwide license to make, have made, modify, use and sell such Prior Invention as part of or in connection with such product, process or service, and to practice any method related thereto.

B.    *Assignment of Inventions.*  I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the employ of the Company (collectively referred to as "<u>Inventions</u>"), except as provided in Section 3.F below.  I further acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act.  I understand and agree that the decision whether or not to commercialize or market any invention developed by me solely or jointly with others is within the Company's sole discretion and for the Company's sole benefit and that no royalty will be due to me as a result of the Company's efforts to commercialize or market any such invention.

C.    *Inventions Assigned to the United States.*  I agree to assign to the United States government all my right, title, and interest in and to any and all Inventions whenever such full title is required to be in the United States by a contract between the Company and the United States or any of its agencies.

D.    *Maintenance of Records.*  I agree to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company.  The records will be in the form of notes, sketches, drawings, and any other format that may be specified by the Company.  The records will be available to and remain the sole property of the Company at all times.

E.    *Patent and Copyright Registrations.*  I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto.  I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement.  If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Inventions or original works of authorship assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by me.

F.    *Exception to Assignments.*  I understand that the provisions of this Agreement requiring assignment of Inventions to the Company do not apply to any invention which qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as <u>Exhibit B</u>).  I will advise the Company promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and not otherwise disclosed on <u>Exhibit A</u>.

Ex. L-3, p. 1121

**4.**     **Use of Name & Likeness.**  I hereby authorize the Company to use, reuse, and to grant others the right to use and reuse, my name, photograph, video, likeness (including caricature) and voice, and any reproduction or simulation thereof, in any form of media or technology now known or hereafter developed, both during and after my employment, for any purposes related to the Company's business, such as marketing, advertising, credits, and presentations.

**5.**     **Social Media Accounts.**  I agree to follow the Company's policies and procedures in creating, using and closing social media accounts for Company purposes. I agree that all social media accounts that I create or use for Company purposes will be owned by the Company, and I will cooperate with the Company in granting the Company access or control to such accounts and in assisting the Company with perfecting or vesting its rights in such accounts.

**6.**     **Returning Company Documents.**  I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its successors or assigns, including, without limitation, those records maintained pursuant to paragraph 3.D.  In the event of the termination of my employment, I agree to sign and deliver the "Termination Certification" attached hereto as <u>Exhibit C</u>.

**7.**     **Notification of New Employer.**  In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my rights and obligations under this Agreement.

**8.**     **Solicitation of Employees.**  I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees or consultants to leave their employment or consulting relationship with the Company, or take away such employees or consultants, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for any other person or entity.

**9.**     **Conflict of Interest Guidelines.**  I agree to diligently adhere to the Conflict of Interest Guidelines attached as <u>Exhibit D</u> hereto.

**10.**    **Representations.**  I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement.  I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company.  I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

**11.**    **Arbitration and Equitable Relief.**

         *A.*     *Arbitration.*  IN CONSIDERATION OF MY EMPLOYMENT WITH THE COMPANY, ITS PROMISE TO ARBITRATE ALL EMPLOYMENT-RELATED DISPUTES AND MY RECEIPT OF THE COMPENSATION, PAY RAISES AND OTHER BENEFITS PAID TO ME BY THE COMPANY, AT PRESENT AND IN THE FUTURE, I AGREE THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER OR BENEFIT PLAN OF THE COMPANY IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO, OR RESULTING FROM MY EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF MY EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES SET FORTH IN CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1280 THROUGH 1294.2, INCLUDING SECTION 1283.05 (THE "<u>CALIFORNIA RULES</u>") AND PURSUANT TO CALIFORNIA LAW. DISPUTES WHICH I AGREE TO ARBITRATE, AND THEREBY AGREE TO WAIVE ANY RIGHT TO A

Ex. L-3, p. 1122

TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER STATE OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, THE FAMILY AND MEDICAL LEAVE ACT, THE CALIFORNIA FAMILY RIGHTS ACT, THE CALIFORNIA LABOR CODE, CLAIMS OF HARASSMENT, DISCRIMINATION OR WRONGFUL TERMINATION AND ANY STATUTORY CLAIMS. I FURTHER UNDERSTAND THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT THE COMPANY MAY HAVE WITH ME.

        *B.*    *Procedure.* I AGREE THAT ANY ARBITRATION WILL BE ADMINISTERED BY JAMS AND THAT THE NEUTRAL ARBITRATOR WILL BE SELECTED IN A MANNER CONSISTENT WITH ITS EMPLOYMENT ARBITRATION RULES & PROCEDURES ("JAMS RULES"). THE JAMS RULES MAY BE FOUND AND REVIEWED AT http://www.jamsadr.com/rules-employment-arbitration. IF I AM UNABLE TO ACCESS THESE RULES, I WILL NOTIFY THE COMPANY AND THE COMPANY AGREES THAT IT WILL PROVIDE ME WITH A HARDCOPY. I AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION AND MOTIONS TO DISMISS AND DEMURRERS, PRIOR TO ANY ARBITRATION HEARING. I ALSO AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES, INCLUDING ATTORNEYS' FEES AND COSTS, AVAILABLE UNDER APPLICABLE LAW. I UNDERSTAND THAT THE COMPANY WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR JAMS EXCEPT THAT I SHALL PAY THE FIRST $125.00 OF ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION I INITIATE. I AGREE THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN A MANNER CONSISTENT WITH THE JAMS RULES AND TO THE EXTENT THAT THE AND THE JAMS RULES CONFLICT WITH THE CALIFORNIA RULES, THE CALIFORNIA RULES SHALL TAKE PRECEDENCE. I AGREE THAT THE DECISION OF THE ARBITRATOR SHALL BE IN WRITING.

        *C.*    *Remedy.* EXCEPT AS PROVIDED BY THE CALIFORNIA RULES AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN ME AND THE COMPANY. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE CALIFORNIA RULES AND THIS AGREEMENT, NEITHER I NOR THE COMPANY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION. NOTWITHSTANDING, THE ARBITRATOR WILL NOT HAVE THE AUTHORITY TO DISREGARD OR REFUSE TO ENFORCE ANY LAWFUL COMPANY POLICY, AND THE ARBITRATOR SHALL NOT ORDER OR REQUIRE THE COMPANY TO ADOPT A POLICY NOT OTHERWISE REQUIRED BY LAW WHICH THE COMPANY HAS NOT ADOPTED.

        *D.*    *Availability of Injunctive Relief.* BOTH PARTIES AGREE THAT ANY PARTY MAY PETITION A COURT FOR INJUNCTIVE RELIEF AS PERMITTED BY THE CALIFORNIA RULES INCLUDING, BUT NOT LIMITED TO, WHERE EITHER PARTY ALLEGES OR CLAIMS A VIOLATION OF THE AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT AND ARBITRATION AGREEMENT BETWEEN ME AND THE COMPANY OR ANY OTHER AGREEMENT REGARDING TRADE SECRETS, CONFIDENTIAL INFORMATION, NONSOLICITATION OR LABOR CODE §2870. BOTH PARTIES UNDERSTAND THAT ANY BREACH OR THREATENED BREACH OF SUCH AN AGREEMENT WILL CAUSE IRREPARABLE INJURY AND THAT MONEY DAMAGES WILL NOT PROVIDE AN ADEQUATE REMEDY THEREFOR AND BOTH PARTIES HEREBY CONSENT TO THE ISSUANCE OF AN INJUNCTION.

        *E.*    *Administrative Relief.* I UNDERSTAND THAT THIS AGREEMENT DOES NOT PROHIBIT ME FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE OR FEDERAL ADMINISTRATIVE BODY SUCH AS THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION OR THE WORKERS' COMPENSATION BOARD WHERE, AS A MATTER OF LAW, THE PARTIES MAY NOT RESTRICT THE EMPLOYEE'S ABILITY TO

4

Ex. L-3, p. 1123

FILE SUCH CLAIMS.  HOWEVER, THE PARTIES AGREE THAT, TO THE FULLEST EXTENT PERMITTED BY LAW, ARBITRATION SHALL BE THE EXCLUSIVE REMEDY FOR THE SUBJECT MATTER OF SUCH ADMINISTRATIVE CLAIMS.

        *F.*     *Voluntary Nature of Agreement.*  I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE.  I FURTHER ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT ***I AM WAIVING MY RIGHT TO A JURY TRIAL***.  FINALLY, I AGREE THAT I HAVE BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

    **12.**    **General Provisions.**

        *A.*     *Governing Law; Consent to Personal Jurisdiction.*  This Agreement will be governed by the laws of the State of California.  I hereby expressly consent to the personal jurisdiction of the arbitration forum, and/or state and federal courts located in California for any arbitration and/or other legal proceeding filed there against me by the Company arising from or relating to this Agreement.

        *B.*     *Entire Agreement.*  This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and supersedes all prior discussions or representations between us including, but not limited to, any representations made during my interview(s) or relocation negotiations, whether written or oral.  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the President of the Company and me.  Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

        *C.*     *Severability.*  If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

        [Agreement concludes on next page.]

Ex. L-3, p. 1124

        D.     *Successors and Assigns.*  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

Date: Nov 9, 2015 _____

_____
Signature

Joel E. Merritt
_____
Name of Employee (typed or printed)

6

Ex. L-3, p. 1125

**Exhibit A**

**LIST OF PRIOR INVENTIONS**
**AND ORIGINAL WORKS OF AUTHORSHIP**

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

0
___ No inventions or improvements

1
___ Additional Sheets Attached

Signature of Employee: _Joel E. Merritt (Nov 9, 2015)_

Print Name of Employee: Joel E. Merritt

Date: Nov 9, 2015

Ex. L-3, p. 1126

**Joel Merritt**

**Exhibit A**
**List of Prior Inventions**
**and Original Works of Authorship**

**Introduction**

Per the e-mail received from Allison Ewing, I understand that Lytro is concerned only with light-field imaging technologies as part of its business, so I will focus my disclosure there, and only give broad outlines of other areas. Please let me know if you would like any further details on these items. It should also be noted that some of these are merely ideas that have not actually been implemented.

**Light-field Camera and Pipeline Improvements**

These are various general ideas I've had while pondering light-fields over the past few weeks. They may already be obvious to people working with light-fields. None have been implemented or published. No patents have been filed.

As a general rule it seems that many artist-driven visual effects image processes could be extended to a light-field by interpolating between various light-field views. The user would set up the rotospline, etc. in various views of the light-field volume and the software would interpolate the rotospline, etc. for the in-between views.

Use a light-field camera on a light stage to capture a still object's light field under any lighting condition.

Light-fields might be used as inputs in a machine learning system to train it to reproduce a light field or 3d object given an image.

**Computer Graphics / Visual Effects**

1990 - Present. Texture blending.

1990 - Present. Photogrammetry — GUI to build objects from multiple images.

2009? - Present. Structured light for image depth extraction experimentation.

2013 - 2015. Camera track solving software.

1999 - Present. Serene — A computer graphics / visual effects foundation library in C, including support for vectors, matrices, image formats, morphing, geometry, and a global illumination renderer.

2011? - Present. Graphical functional programming language (early implementation).

**Virtual Reality**

Ex. L-3, p. 1127

2014-2015. Embodied cinematic virtual reality (conceived, not implemented).

**Visual Effects Pipeline Tools**

circa 1997 - present — various ad-hoc tools for visual effects pipelines.

**Career IP**

1990. Volumetric data compression. Masters project at the University of Illinois at Chicago.

1986 - Present. Every professional position that I've had since graduating from college has involved the creation of intellectual property as a work for hire. See my resume.

**Miscellaneous**

Spec screenplays have been written or attempted, none have been optioned or produced.

2012 - Present. Interactive educational software (early implementation).

Amateur films made before 1997.

Personal email, letters, etc.

Writings about non-technical topics, current events, etc.

**Exhibit B**

**CALIFORNIA LABOR CODE SECTION 2870**
**INVENTION ON OWN TIME-EXEMPTION FROM AGREEMENT**

"(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

                (1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

                (2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."

**Exhibit C**

**LYTRO, INC.**

**TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to Lytro, Inc., its subsidiaries, affiliates, successors or assigns (together, the "Company").

I further certify that I have complied with all the terms of the Company's At Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement signed by me, including the reporting of any inventions and original works of authorship (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement.

I further agree that, in compliance with the At Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months from this date, I will not solicit, induce, recruit or encourage any of the Company's employees or consultants to leave their employment.

**[TO BE COMPLETED AT TIME OF TERMINATION OF EMPLOYMENT.]**

Date: _____

_____
(Employee's Signature)

_____
(Type/Print Employee's Name)

**Exhibit D**

**LYTRO, INC.**

**CONFLICT OF INTEREST GUIDELINES**

It is the policy of Lytro, Inc. to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees and independent contractors must avoid activities which are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations which must be avoided. Any exceptions must be reported to the President of the Company and written approval for continuation must be obtained.

1.      Revealing confidential information to outsiders without a binding non-disclosure agreement in place, or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended. (The At Will Employment, Confidential Information, Invention Assignment and Arbitration Agreement elaborates on this principle and is a binding agreement.)

2.      Accepting or offering substantial gifts, excessive entertainment, favors or payments which may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3.      Participating in civic or professional organizations that might involve divulging confidential information of the Company.

4.      Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.

5.      Initiating or approving any form of prohibited harassment of employees in violation of Company policy.

6.      Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

7.      Borrowing from or lending to employees, customers or suppliers without approval of the Board of Directors of the Company.

8.      Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

9.      Unlawfully discussing prices, costs, customers, sales or markets with competing companies or their employees.

10.      Making any unlawful agreement with distributors with respect to prices.

11.      Improperly using or authorizing the use of any inventions which are the subject of patent claims of any other person or entity.

12.      Engaging in any conduct which is not in the best interest of the Company.

Each officer, employee and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning.

# Exhibit L-3

## Inventor's Oaths

Original Pages 1140–1144

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014.  OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| Title of Invention | VIDEO CAPTURE, PROCESSING, CALIBRATION, COMPUTATIONAL FIBER ARTIFACT REMOVAL, AND LIGHT-FIELD PIPELINE |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:

☐ The attached application, or

☒ United States application or PCT international application number 15/451,831

filed on March 7, 2017

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

## WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft.  Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application.  If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents submitted to them  to the USPTO.  Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent.  Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14).  Checks and credit card  authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not  publicly available.

LEGAL NAME OF INVENTOR

Inventor: Duane Petrovich

Date (Optional) : _____

Signature: _____

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed.  Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Ex. L-3, p. 1140

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| Title of Invention | VIDEO CAPTURE, PROCESSING, CALIBRATION, COMPUTATIONAL FIBER ARTIFACT REMOVAL, AND LIGHT-FIELD PIPELINE |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:

☐ The attached application, or

☒ United States application or PCT international application number **15/451,831**

filed on **March 7, 2017**.

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor: **Jon Karafin**     Date (Optional) : _____

Signature: _____

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed. Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

Ex. L-3, p. 1141

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| Title of Invention | VIDEO CAPTURE, PROCESSING, CALIBRATION, COMPUTATIONAL FIBER ARTIFACT REMOVAL, AND LIGHT-FIELD PIPELINE |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:

☐ The attached application, or

☒ United States application or PCT international application number 15/451,831

filed on March 7, 2017 .

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

## WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor: Brendan Bevensee     Date (Optional): 4 April 2017

Signature: _[signature]_

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed. Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| Title of Invention | VIDEO CAPTURE, PROCESSING, CALIBRATION, COMPUTATIONAL FIBER ARTIFACT REMOVAL, AND LIGHT-FIELD PIPELINE |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:

☐ The attached application, or

☒ United States application or PCT international application number 15/451,831

filed on March 7, 2017

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor: Tingfang Du                    Date (Optional) : _____

Signature: _____

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed. Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

Ex. L-3, p. 1143

PTO/AIA/01 (06-12)
Approved for use through 01/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## DECLARATION (37 CFR 1.63) FOR UTILITY OR DESIGN APPLICATION USING AN APPLICATION DATA SHEET (37 CFR 1.76)

| Title of Invention | VIDEO CAPTURE, PROCESSING, CALIBRATION, COMPUTATIONAL FIBER ARTIFACT REMOVAL, AND LIGHT-FIELD PIPELINE |
|---|---|

As the below named inventor, I hereby declare that:

This declaration is directed to:

☐ The attached application, or

☒ United States application or PCT international application number  15/451,831

filed on  March 7, 2017

The above-identified application was made or authorized to be made by me.

I believe that I am the original inventor or an original joint inventor of a claimed invention in the application.

I hereby acknowledge that any willful false statement made in this declaration is punishable under 18 U.S.C. 1001 by fine or imprisonment of not more than five (5) years, or both.

### WARNING:

Petitioner/applicant is cautioned to avoid submitting personal information in documents filed in a patent application that may contribute to identity theft. Personal information such as social security numbers, bank account numbers, or credit card numbers (other than a check or credit card authorization form PTO-2038 submitted for payment purposes) is never required by the USPTO to support a petition or an application. If this type of personal information is included in documents submitted to the USPTO, petitioners/applicants should consider redacting such personal information from the documents before submitting them to the USPTO. Petitioner/applicant is advised that the record of a patent application is available to the public after publication of the application (unless a non-publication request in compliance with 37 CFR 1.213(a) is made in the application) or issuance of a patent. Furthermore, the record from an abandoned application may also be available to the public if the application is referenced in a published application or an issued patent (see 37 CFR 1.14). Checks and credit card authorization forms PTO-2038 submitted for payment purposes are not retained in the application file and therefore are not publicly available.

LEGAL NAME OF INVENTOR

Inventor: Gareth Spor

Date (Optional) : _____

Signature: _____

Note: An application data sheet (PTO/SB/14 or equivalent), including naming the entire inventive entity, must accompany this form or must have been previously filed. Use an additional PTO/AIA/01 form for each additional inventor.

This collection of information is required by 35 U.S.C. 115 and 37 CFR 1.63. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 1 minute to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.

# EXHIBIT M



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 10009597

Generated on Fri Mar 06 2026 14:27:07 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| MULTISCOPIC IMAGE CAPTURE SYSTEM | 10009597 | 15418637 | 20170237970 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jon Karafin , Miller Schuck H., Douglas McKnight J, Mrityunjay Kumar , Wilhelm Taylor | Jun 26, 2018 | **Filing date** Jan 27, 2017 | **Publication date** Aug 17, 2017 | N/A |

## Assignment 1

**Reel/ Frame**
44706 /0028

**Pages**
9

**Conveyance**
NUNC PRO TUNC ASSIGNMENT

**Documents**
View documents

**Recorded**
Jan 23, 2018

**Assignors & execution date**

KARAFIN, JON
Sep 21, 2016

SCHUCK, MILLER H.
Sep 7, 2016

MCKNIGHT, DOUGLAS J.
Oct 28, 2016

### View more

**Assignee**

REALD INC.
100 N. CRESCENT DRIVE
SUITE 200
BEVERLY HILLS
CALIFORNIA, UNITED STATES
90210

**Correspondent**
KRISTAL VELIZ

5700 FLATIRON PARKWAY
BOULDER, CO 80301

**Attorney docket number**
364001

## Assignment 2

**Reel/ Frame**
45554 /0291

**Pages**
6

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 16, 2018

**Assignors & execution date**

REALD INC.
Mar 10, 2018

**Assignee**

LIGHT FIELD LAB, INC.
2280 BAYO CLAROS CIRCLE
MORGAN HILL
CALIFORNIA, UNITED STATES
95037

**Correspondent**
KRISTAL VELIZ

555 UNIVERSITY
AVE., SUITE 280
SACRAMENTO, CA 95825

**Attorney docket number**
N/A



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Patent #: 10488584

Generated on Fri Mar 06 2026 14:31:55 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| HIGH DENSITY ENERGY DIRECTING DEVICE | 10488584 | 16064204 | 20180356591 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | Nov 26, 2019 | | | N/A |
| | | **Filing date** | **Publication date** | |
| | | Jun 20, 2018 | Dec 13, 2018 | |

## Assignment 1

**Reel/ Frame**

46151/0011

**Pages**

4

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Jun 20, 2018

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jun 4, 2018

BEVENSEE, BRENDAN ELWOOD

Jun 4, 2018

**Assignee**

LIGHT FIELD LAB, INC.
555 UNIVERSITY AVE., SUITE 280
SACRAMENTO
CALIFORNIA, UNITED STATES
95825

**Correspondent**

FISHER BROYLES LLP

555 UNIVERSITY AVE., SUITE 280

SACRAMENTO, CA 95825

**Attorney docket number**

8821.101US2



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 10551628

Generated on Fri Mar 06 2026 14:08:24 GMT-0800 (Pacific Standard Time)

---

| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
|---|---|---|---|---|
| HIGH-DENSITY ENERGY DIRECTING DEVICES FOR TWO-DIMENSIONAL, STEREOSCOPIC, LIGHT FIELD AND HOLOGRAPHIC HEAD-MOUNTED | 10551628 | 16063976 | 20190361253 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| | Feb 4, 2020 | **Filing date** | **Publication date** | **International number** |
| **Inventors** | | Jun 19, 2018 | Nov 28, 2019 | N/A |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | | | |

---

## Assignment 1

| **Reel/ Frame** | **Assignors & execution date** | **Correspondent** |
|---|---|---|
| 46133/0877 | KARAFIN, JONATHAN SEAN | FISHER BROYLES, LLP CHARLES C. YANG |
| **Pages** | Jun 4, 2018 | |
| 4 | | 555 UNIVERSITY AVE., SUITE 280 |
| | BEVENSEE, BRENDAN ELWOOD | SACRAMENTO, CA 95825 |
| **Conveyance** | Jun 4, 2018 | |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | **Assignee** | **Attorney docket number** |
| | LIGHT FIELD LAB, INC. | 8821.108US2 |
| **Documents** | 699 E. BROKAW ROAD | |
| View documents | SAN JOSE | |
| | CALIFORNIA, UNITED STATES | |
| **Recorded** | 95112 | |
| Jun 19, 2018 | | |

**uspto**

UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 10591869

Generated on Fri Mar 06 2026 14:44:54 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| TILEABLE, COPLANAR, FLAT-PANEL 3-D DISPLAY WITH TACTILE AND AUDIO INTERFACES | 10591869 | 15077839 | 20160282808 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | Mar 17, 2020 | **Filing date** | **Publication date** | **International number** |
| Daniel Smalley | | Mar 22, 2016 | Sep 29, 2016 | N/A |

## Assignment 1

**Reel/ Frame**

47713/0207

**Pages**

3

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Dec 3, 2018

**Assignors & execution date**

SMALLEY, DANIEL

Oct 11, 2018

**Assignee**

BRIGHAM YOUNG UNIVERSITY
TECHNOLOGY TRANSFER OFFICE
3760 HBLL BRIGHAM YOUNG UNIVERSITY
PROVO
UTAH, UNITED STATES
84602

**Correspondent**

LECLAIR RYAN

400 CAPITOL MALL, SUITE 1500
SACRAMENTO, CA 84602

**Attorney docket number**

59630.1291

## Assignment 2

**Reel/ Frame**

47658 /0335

**Assignors & execution date**

BRIGHAM YOUNG UNIVERSITY

**Correspondent**

LECLAIR RYAN

**Pages**

4

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Dec 3, 2018

Oct 26 , 2018

**Assignee**

LIGHT FIELD LAB, INC.

699 E. BROKAW ROAD

SAN JOSE

CALIFORNIA, UNITED STATES

95112

400 CAPITOL

MALL , SUITE 1500

SACRAMENTO, CA 95814

**Attorney docket number**

59630.1291



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Patent #: 10663657

Generated on Fri Mar 06 2026 13:59:42 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| SELECTIVE PROPAGATION OF ENERGY IN LIGHT FIELD AND HOLOGRAPHIC WAVEGUIDE ARRAYS | 10663657 | 16064178 | 20180372926 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| | May 26, 2020 | | | **International number** |
| **Inventors** | | **Filing date** | **Publication date** | N/A |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | Jun 20, 2018 | Dec 27, 2018 | |

## Assignment 1

**Reel/ Frame**
46151/0139

**Pages**
4

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jun 20, 2018

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jun 4, 2018

BEVENSEE, BRENDAN ELWOOD
Jun 4, 2018

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

FISHER BROYLES LLP

555 UNIVERSITY AVE., SUITE 280
SACRAMENTO, CA 95825

**Attorney docket number**
8821.104US2



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 10877210

Generated on Fri Mar 06 2026 14:39:17 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| ENERGY PROPAGATION AND TRANSVERSE ANDERSON LOCALIZATION WITH TWO-DIMENSIONAL, LIGHT FIELD AND HOLOGRAPHIC RELAYS | 10877210 | 16063513 | 20190064435 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| | Dec 29, 2020 | | | **International number** |
| **Inventors** | | **Filing date** | **Publication date** | N/A |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | Jun 18, 2018 | Feb 28, 2019 | |

## Assignment 1

| | | |
|---|---|---|
| **Reel/ Frame** | **Assignors & execution date** | **Correspondent** |
| 46123/0265 | KARAFIN, JONATHAN SEAN | FISHER BROYLES LLP |
| **Pages** | Jun 4, 2018 | 555 UNIVERSITY AVE., SUITE 280 |
| 4 | BEVENSEE, BRENDAN ELWOOD | SACRAMENTO, CA 95825 |
| **Conveyance** | Jun 4, 2018 | **Attorney docket number** |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | **Assignee** | 8821.102US2 |
| **Documents** | LIGHT FIELD LAB, INC. | |
| View documents | 555 UNIVERSITY AVE., SUITE 280 | |
| **Recorded** | SACRAMENTO | |
| Jun 18, 2018 | CALIFORNIA, UNITED STATES | |
| | 95825 | |



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Patent #: 10884251

Generated on Fri Mar 06 2026 14:36:22 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** SYSTEMS AND METHODS FOR DIRECTING MULTIPLE 4D ENERGY FIELDS | **Patent number** 10884251 | **Application number** 16634121 | **Publication number** 20200209634 | **PCT number** N/A  N/A |
| | **Issue date** Jan 5, 2021 | View in PPUBS | View in PPUBS | **International number** N/A |
| **Inventors** Jonathan Karafin Sean, Brendan Bevensee Elwood | | **Filing date** Jan 24, 2020 | **Publication date** Jul 2, 2020 | |

## Assignment 1

**Reel/ Frame**
51689/0845

**Pages**
4

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jan 31, 2020

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Dec 6, 2019

BEVENSEE, BRENDAN ELWOOD
Dec 6, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

BURKE, WILLIAMS & SORENSEN

1901 HARRISON STREET, SUITE 900
OAKLAND, CA 94612

**Attorney docket number**
07726.1191



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 10898818

Generated on Fri Mar 06 2026 14:39:38 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY SYSTEM BASED AMUSEMENT PARK ATTRACTION | 10898818 | 16635920 | 20200384371 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | Jan 26, 2021 | **Filing date** | **Publication date** | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood , John Dohm | | Jan 31, 2020 | Dec 10, 2020 | N/A |

## Assignment 1

**Reel/ Frame**

53591 /0795

**Pages**

3

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Aug 25 , 2020

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Sep 2, 2019

BEVENSEE, BRENDAN ELWOOD

Jul 30 , 2019

DOHM, JOHN

Sep 4, 2019

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

BRIANA WOBBE

FENWICK & WEST LLP

801 CALIFORNIA STREET

MOUNTAIN VIEW, CA 94041

**Attorney docket number**

35173 -43682 /US

**UNITED STATES
PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Patent #: 10901231

Generated on Fri Mar 06 2026 14:06:14 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| SYSTEM FOR SIMULATION OF ENVIRONMENTAL ENERGY | 10901231 | 16634132 | 20200233230 | N/A |
| | | | | N/A |
| **Inventors** | **Issue date** | View in PPUBS | View in PPUBS | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | Jan 26, 2021 | **Filing date** | **Publication date** | N/A |
| | | Jan 24, 2020 | Jul 23, 2020 | |

## Assignment 1

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 51689/0943 | KARAFIN, JONATHAN SEAN | BURKE, WILLIAMS & SORENSEN |
| **Pages** | Dec 6, 2019 | |
| 4 | | 1901 HARRISON STREET, SUITE 900 |
| **Conveyance** | **Assignee** | OAKLAND, CA 94612 |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | LIGHT FIELD LAB, INC. | **Attorney docket number** |
| | 699 E. BROKAW ROAD | 07726.1221 |
| **Documents** | SAN JOSE | |
| View documents | CALIFORNIA, UNITED STATES | |
| | 95112 | |
| **Recorded** | | |
| Jan 31, 2020 | | |

## Assignment 2

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 54700 /0236 | KARAFIN, JONATHAN SEAN | LIGHT FIELD LAB, INC. |

**Pages**

7

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Dec 18, 2020

Dec 18, 2020

BEVENSEE
BRENDAN ELWOOD

Dec 18, 2020

**Assignee**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE

CALIFORNIA, UNITED STATES

95112

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

122US & PCT



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 10904479

Generated on Fri Mar 06 2026 14:28:01 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| VIDEO COMMUNICATION INCLUDING HOLOGRAPHIC CONTENT | 10904479 | 16351015 | 20200296327 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | Jan 26, 2021 | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | **Filing date** | **Publication date** | N/A |
| | | Mar 12, 2019 | Sep 17, 2020 | |

## Assignment 1

**Reel/ Frame**
50656 /0855

**Pages**
3

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Oct 8, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Sep 13, 2019

BEVENSEE, BRENDAN ELWOOD

Oct 4, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

JOHN E. KIND

FENWICK & WEST LLP

801 CALIFORNIA STREET

MOUNTAIN VIEW, CA 94041

**Attorney docket number**

35173-41311/US

**uspto** UNITED STATES PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 10967565

Generated on Fri Mar 06 2026 14:26:36 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title**<br>ENERGYFIELD THREE-DIMENSIONAL PRINTING SYSTEM | **Patent number**<br>10967565 | **Application number**<br>16635153 | **Publication number**<br>20200384684 | **PCT number**<br>N/A<br><br>N/A |
| | **Issue date**<br>Apr 6, 2021 | View in PPUBS | View in PPUBS | **International number**<br>N/A |
| **Inventors**<br>Jonathan Karafin Sean, Brendan Bevensee Elwood | | **Filing date**<br>Jan 29, 2020 | **Publication date**<br>Dec 10, 2020 | |

## Assignment 1

**Reel/ Frame**
51690/0024

**Pages**
4

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jan 31, 2020

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Dec 6, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

BURKE, WILLIAMS & SORENSEN

1901 HARRISON STREET, SUITE 900
OAKLAND, CA 94612

**Attorney docket number**
07726.1261

## Assignment 2

**Reel/ Frame**
54908 /0772

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

**Correspondent**

CHARLES YANG

**Pages**
5

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jan 13, 2021

Jan 13, 2021

BEVENSEE
BRENDAN ELWOOD
Jan 13, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER RD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

1920 ZANKER RD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
126US2

**uspto** | UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 10981046

Generated on Fri Mar 06 2026 14:06:40 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| Light Field Display System for Sporting Events | 10981046 | 16630258 | 20210060405 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | Apr 20, 2021 | **Filing date** | **Publication date** | N/A |
| | | Jan 10, 2020 | Mar 4, 2021 | |

## Assignment 1

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 54049 /0499 | KARAFIN, JONATHAN SEAN | CHRISTOPHER CORBET |
| **Pages** | Oct 1, 2019 | FENWICK & WEST LLP |
| 3 | | 801 CALIFORNIA STREET |
| **Conveyance** | BEVENSEE BRENDAN ELWOOD | MOUNTAIN VIEW, CA 94041 |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | Oct 1, 2019 | **Attorney docket number** |
| **Documents** | **Assignee** | 35173-41265/US |
| View documents | LIGHT FIELD LAB, INC. | |
| **Recorded** | 1920 ZANKER ROAD | |
| Oct 14, 2020 | BUILDING 10 | |
| | SAN JOSE | |
| | CALIFORNIA, UNITED STATES | |
| | 95112 | |

## Assignment 2

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|

54584 /0167

**Pages**
6

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Dec 8, 2020

KARAFIN, JONATHAN SEAN
Dec 8, 2020

BEVENSEE,
BRENDAN ELWOOD
Dec 8, 2020

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
301,303,305,308,309  & 310



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 10989869

Generated on Fri Mar 06 2026 14:38:50 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| HIGH-DENSITY ENERGY DIRECTING DEVICES FOR TWO-DIMENSIONAL, STEREOSCOPIC LIGHT FIELD AND HOLOGRAPHIC HEAD-MOUNTED DISPLAYS | 10989869 | 16713846 | 20200117021 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| | **Issue date** | | | **International number** |
| | Apr 27, 2021 | | | |
| **Inventors** | | **Filing date** | **Publication date** | N/A |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | Dec 13, 2019 | Apr 16, 2020 | |

## Assignment 1

**Reel/ Frame**

55612/0597

**Pages**

5

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Mar 16, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Mar 16, 2021

BEVENSEE, BRENDAN ELWOOD

Mar 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

108US3



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 10996393

Generated on Fri Mar 06 2026 14:44:02 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| HIGH DENSITY ENERGY DIRECTING DEVICE | 10996393 | 16694772 | 20200088938 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | May 4, 2021 | **Filing date** Nov 25, 2019 | **Publication date** Mar 19, 2020 | N/A |

## Assignment 1

**Reel/ Frame**

54618/0561

**Pages**

5

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Dec 11, 2020

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jun 4, 2018

BEVENSEE, BRENDAN ELWOOD

Jun 4, 2018

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

101US3



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Patent #: 11073657

Generated on Fri Mar 06 2026 14:33:23 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** HOLOGRAPHIC SUPERIMPOSITION OF REAL WORLD PLENOPTIC OPACITY MODULATION THROUGH TRANSPARENT WAVEGUIDE ARRAYS FOR LIGHT FIELD, VIRTUAL AND AUGMENTED REALITY | **Patent number** 11073657 **Issue date** Jul 27, 2021 | **Application number** 16064375 View in PPUBS **Filing date** Jun 20, 2018 | **Publication number** 20190004319 View in PPUBS **Publication date** Jan 3, 2019 | **PCT number** N/A N/A **International number** N/A |

**Inventors**

Jonathan KARAFIN Sean, Brendan BEVENSEE Elwood

## Assignment 1

**Reel/ Frame**

46151/0211

**Pages**

4

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Jun 20, 2018

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jun 4, 2018

BEVENSEE BRENDAN ELWOOD

Jun 4, 2018

**Assignee**

LIGHT FIELD LAB, INC.

699 E. BROKAW ROAD

SAN JOSE

CALIFORNIA, UNITED STATES

95112

**Correspondent**

FISHER BROYLES LLP

555 UNIVERSITY AVE., SUITE 280

SACRAMENTO, CA 95825

**Attorney docket number**

8821.109US2



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Patent #: 11092930

Generated on Fri Mar 06 2026 14:46:01 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| HOLOGRAPHIC AND DIFFRACTIVE OPTICAL ENCODING SYSTEMS | 11092930 | 16635159 | 20200379407 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | Aug 17, 2021 | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | **Filing date** | **Publication date** | N/A |
| | | Jan 29, 2020 | Dec 3, 2020 | |

## Assignment 1

**Reel/ Frame**
51690/0042

**Pages**
4

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jan 31, 2020

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Dec 6, 2019

BEVENSEE, BRENDAN ELWOOD
Dec 6, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

BURKE, WILLIAMS & SORENSEN

1901 HARRISON STREET, SUITE 900
OAKLAND, CA 94612

**Attorney docket number**
07726.1271

**USPTO**

UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11156771

Generated on Fri Mar 06 2026 14:33:53 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| METHOD OF CALIBRATION FOR HOLOGRAPHIC ENERGY DIRECTING SYSTEMS | 11156771 | 16064300 | 20190004228 | N/A |
| | | | | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | **International number** |
| **Inventors** | Oct 26, 2021 | **Filing date** | **Publication date** | N/A |
| Brendan BEVENSEE Elwood , Jonathan KARAFIN Sean | | Jun 20, 2018 | Jan 3, 2019 | |

## Assignment 1

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 46151/0179 | KARAFIN, JONATHAN SEAN | FISHER BROYLES LLP |
| | Jun 4, 2018 | |
| **Pages** | | 555 UNIVERSITY AVE., SUITE 280 |
| 4 | BEVENSEE BRENDAN ELWOOD | SACRAMENTO, CA 95825 |
| **Conveyance** | Jun 4, 2018 | |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | **Assignee** | **Attorney docket number** |
| | FISHER BROYLES LLP | 8821.107US2 |
| **Documents** | 555 UNIVERSITY AVE., SUITE 280 | |
| View documents | SACRAMENTO CALIFORNIA, UNITED STATES 95825 | |
| **Recorded** | | |
| Jun 20, 2018 | | |

## Assignment 2

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|

68807 /0602

LIGHT FIELD LAB INC.

**Pages**

6

**Conveyance**

CORRECTIVEASSIGNMENT TO
CORRECTTHE CORRECTTHE
RECEIVINGPARTIES
PREVIOUSLYRECORDEDAT
REEL: 46151 FRAME: 179.
ASSIGNOR(S) HEREBY
CONFIRMS THE ASSIGNMENT.

**Documents**

View documents

**Recorded**

Aug 29, 2024

KARAFIN, JONATHAN SEAN

Jun 4, 2018

BEVENSEE
BRENDAN ELWOOD

Jun 4, 2018

**Assignee**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE

CALIFORNIA, UNITED STATES

95112

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

107US2

**UNITED STATES
PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Patent #: 11163176

Generated on Fri Mar 06 2026 14:22:20 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD VISION-CORRECTIONDEVICE | 11163176 | 16634533 | 20200174277 | N/A |
| | | | | N/A |
| | | View in PPUBS | View in PPUBS | |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | Nov 2, 2021 | | | N/A |
| | | **Filing date** | **Publication date** | |
| | | Jan 27, 2020 | Jun 4, 2020 | |

## Assignment 1

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 51689/0896 | KARAFIN, JONATHAN SEAN | BURKE, WILLIAMS & SORENSEN |
| **Pages** | Dec 6, 2019 | |
| 4 | | 1901 HARRISON STREET, SUITE 900 |
| **Conveyance** | **Assignee** | OAKLAND, CA 94612 |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | LIGHT FIELD LAB, INC. | |
| | 699 E. BROKAW ROAD | **Attorney docket number** |
| **Documents** | SAN JOSE | 07726.1211 |
| View documents | CALIFORNIA, UNITED STATES | |
| | 95112 | |
| **Recorded** | | |
| Jan 31, 2020 | | |

## Assignment 2

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 56491/0800 | KARAFIN, JONATHAN SEAN | LIGHT FIELD LAB, INC. |

**Pages**
5

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jun 9, 2021

Jun 8, 2021

BEVENSEE
BRENDAN ELWOOD
Jun 8, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
121US2



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Patent #: 11166007

Generated on Fri Mar 06 2026 14:45:17 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| MULTISCOPIC IMAGE CAPTURE SYSTEM | 11166007 | 16019236 | 20180376132 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Miller Schuck H., Douglas McKnight J, Mrityunjay Kumar, Wilhelm Taylor | Nov 2, 2021 | **Filing date** Jun 26, 2018 | **Publication date** Dec 27, 2018 | N/A |

## Assignment 1

**Reel/ Frame**
49011/0132

**Pages**
9

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 26, 2019

**Assignors & execution date**

KARAFIN, JON
Sep 21, 2016

SCHUCK, MILLER
Sep 7, 2016

MCKNIGHT, DOUGLAS J
Oct 28, 2016

**View more**

**Assignee**

REALD INC.
100 N. CRESCENT DR., SUITE 200
BEVERLY HILLS
CALIFORNIA, UNITED STATES
90210

**Correspondent**

LECLAIRRYAN

400 CAPITOL MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**

59630.2011

## Assignment 2

**Reel/ Frame**

49011/0152

**Pages**

6

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Apr 26, 2019

**Assignors & execution date**

REALD INC.

Mar 10, 2018

**Assignee**

LIGHT FIELD LAB, INC.

699 E. BROKAW ROAD

SAN JOSE

CALIFORNIA, UNITED STATES

95112

**Correspondent**

LECLAIRRYAN

400 CAPITOL

MALL, SUITE 1500

BEVERLYHILLS, CA 90210

**Attorney docket number**

59630.2011



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11181749

Generated on Fri Mar 06 2026 14:32:40 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| SYSTEMS AND METHODS FOR TRANSVERSE ENERGYLOCALIZATION IN ENERGYRELAYS USING ORDEREDSTRUCTURES | 11181749 | 16634061 | 20210124114 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | Nov 23, 2021 | **Filing date** | **Publication date** | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | Jan 24, 2020 | Apr 29, 2021 | N/A |

## Assignment 1

| | | |
|---|---|---|
| **Reel/ Frame** | **Assignors & execution date** | **Correspondent** |
| 51689/0751 | KARAFIN, JONATHAN SEAN | BURKE, WILLIAMS & SORENSEN |
| **Pages** | Dec 6, 2019 | |
| 4 | BEVENSEE, BRENDAN ELWOOD | 1901 HARRISON STREET, SUITE 900 |
| **Conveyance** | Dec 6, 2019 | OAKLAND, CA 94612 |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | **Assignee** | **Attorney docket number** |
| **Documents** | LIGHT FIELD LAB, INC. | 07726.1161 |
| View documents | 699 E. BROKAW ROAD | |
| **Recorded** | SAN JOSE | |
| Jan 31, 2020 | CALIFORNIA, UNITED STATES 95112 | |



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Patent #: 11212514

Generated on Fri Mar 06 2026 14:42:08 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** <br> LIGHT FIELD DISPLAY SYSTEM FOR CINEMAS | **Patent number** <br> 11212514 | **Application number** <br> 16362993 <br> View in PPUBS | **Publication number** <br> 20200314415 <br> View in PPUBS | **PCT number** <br> N/A <br> N/A |
| **Inventors** <br> Jonathan Karafin Sean, Brendan Bevensee Elwood, John Dohm | **Issue date** <br> Dec 28, 2021 | **Filing date** <br> Mar 25, 2019 | **Publication date** <br> Oct 1, 2020 | **International number** <br> N/A |

## Assignment 1

**Reel/ Frame**
49600 /0188

**Pages**
3

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jun 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jun 17, 2019

BEVENSEE, BRENDAN ELWOOD
May 10, 2019

DOHM, JOHN
Jun 19, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

CHARLES CATHEY

FENWICK & WEST LLP

801 CALIFORNIA STREET

MOUNTAIN VIEW, CA 94041

**Attorney docket number**

35173-41266/US



# Patent Assignment Abstract of Title

Search results for Patent #: 11221670

Generated on Fri Mar 06 2026 14:30:01 GMT-0800 (Pacific Standard Time)

---

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| SYSTEM AND METHODS FOR REALIZING TRANSVERSE ANDERSON LOCALIZATION IN ENERGYRELAYS USING COMPONENT ENGINEEREDSTRUCTURES | 11221670 | 16063832 | 20180372958 | N/A |

**Invention title**
SYSTEM AND METHODS FOR
REALIZING TRANSVERSE
ANDERSON LOCALIZATION
IN ENERGYRELAYS
USING COMPONENT
ENGINEEREDSTRUCTURES

**Inventors**
Jonathan KARAFIN Sean,
Brendan BEVENSEE Elwood

**Patent number**
11221670

**Issue date**
Jan 11, 2022

**Application number**
16063832

View in PPUBS

**Filing date**
Jun 19, 2018

**Publication number**
20180372958

View in PPUBS

**Publication date**
Dec 27, 2018

**PCT number**
N/A

N/A

**International number**
N/A

---

## Assignment 1

**Reel/ Frame**
46129/0413

**Pages**
4

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jun 19, 2018

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jun 4, 2016

BEVENSEE,
BRENDAN ELWOOD
Jun 4, 2018

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

FISHER BROYLES, LLP
CHARLES C. YANG

555 UNIVERSITY
AVE., SUITE 280
SACRAMENTO, CA 95825

**Attorney docket number**
8821.106US2



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11237307

Generated on Fri Mar 06 2026 14:11:19 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| SYSTEMS AND METHODS FOR FORMING ENERGY RELAYS WITH TRANSVERSE ENERGY LOCALIZATION | 11237307 | 16634088 | 20200301142 | N/A N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | **International number** |
| **Inventors** | Feb 1, 2022 | **Filing date** | **Publication date** | N/A |
| Jonathan Karafin Sean, Brendan Bevensee Elwood, Ed Ibe, Jared Perez, Xudong Chen, Joseph Rickwalder W. | | Jan 24, 2020 | Sep 24, 2020 | |

## Assignment 1

**Reel/ Frame**

51689 / 0823

**Pages**

6

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Jan 31, 2020

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Dec 6, 2019

BEVENSEE, BRENDAN ELWOOD

Dec 6, 2019

IBE, ED

Dec 6, 2019

**View more**

**Assignee**

LIGHT FIELD LAB, INC.

699 E. BROKAW ROAD

SAN JOSE

CALIFORNIA, UNITED STATES

95112

**Correspondent**

BURKE, WILLIAMS & SORENSEN

1901 HARRISON STREET, SUITE 900

OAKLAND, CA 94612

**Attorney docket number**

07726.1171



# Patent Assignment Abstract of Title

Search results for Patent #: 11280940

Generated on Fri Mar 06 2026 14:43:22 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| SYSTEMS AND METHODS FOR DIRECTING MULTIPLE 4D ENERGY FIELDS | 11280940 | 17141133 | 20210157155 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | Mar 22, 2022 | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | **Filing date** | **Publication date** | N/A |
| | | Jan 4, 2021 | May 27, 2021 | |

## Assignment 1

**Reel/ Frame**
57185/0409

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Aug 13, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jul 16, 2021

BEVENSEE, BRENDAN ELWOOD
Jul 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

119US3

**uspto**

UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11327437

Generated on Fri Mar 06 2026 14:41:14 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| TILEABLE, COPLANAR, FLAT-PANEL 3-D DISPLAY WITH TACTILE AND AUDIO INTERFACES | 11327437 | 16816877 | 20210003966 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | May 10, 2022 | | | **International number** |
| Daniel Smalley | | **Filing date** | **Publication date** | N/A |
| | | Mar 12, 2020 | Jan 7, 2021 | |

## Assignment 1

**Reel/ Frame**

61083/0424

**Pages**

3

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Sep 2, 2022

**Assignors & execution date**

SMALLEY, DANIEL

Oct 11 2018

**Assignee**

BRIGHAM YOUNG UNIVERSITY TECHNOLOGY TRANSFER OFFICE

3760 HBLL - BRIGHAM YOUNG UNIVERSITY

PROVO

UTAH, UNITED STATES

84602

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

129US2 & 129US3

## Assignment 2

**Reel/ Frame**

60483 /0281

**Assignors & execution date**

BRIGHAM YOUNG UNIVERSITY

**Correspondent**

LIGHT FIELD LAB, INC.

**Pages**

4

**Conveyance**

NUNC PRO TUNC ASSIGNMENT

**Documents**

View documents

**Recorded**

Jul 12, 2022

Oct 26 , 2018

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

129US2 & 129US3



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11381775

Generated on Fri Mar 06 2026 14:32:59 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| A light field display system for video communication including holographic content | 11381775 | 17156411 | 20210218931 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | Jul 5, 2022 | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | **Filing date** | **Publication date** | N/A |
| | | Jan 22, 2021 | Jul 15, 2021 | |

## Assignment 1

**Reel/ Frame**
57169/0861

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Aug 13, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jul 16, 2021

BEVENSEE, BRENDAN ELWOOD
Jul 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

310US2



**UNITED STATES
PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Patent #: 11428933

Generated on Fri Mar 06 2026 14:47:22 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY SYSTEM FOR PERFORMANCE EVENTS | 11428933 | 16411004 | 20200363636 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | **Filing date** | **Publication date** | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood , John Dohm | Aug 30 , 2022 | May 13, 2019 | Nov 19, 2020 | N/A |

## Assignment 1

**Reel/ Frame**
49367 /0054

**Pages**
3

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jun 4, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jun 1, 2019

BEVENSEE, BRENDAN ELWOOD
May 21, 2019

DOHM, JOHN
May 21, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

ROBERT A. HULSE

FENWICK & WEST LLP

801 CALIFORNIA STREET

MOUNTAIN VIEW, CA 94041

**Attorney docket number**

35173 -41264



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11452945

Generated on Fri Mar 06 2026 14:40:51 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| Light Field Display System Based Amusement Park Attraction | 11452945 | 17156419 | 20210220749 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | Sep 27, 2022 | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood , John Dohm | | **Filing date** Jan 22, 2021 | **Publication date** Jul 22, 2021 | N/A |

## Assignment 1

**Reel/ Frame**
56945 /0804

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jul 22, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jul 16, 2021

BEVENSEE, BRENDAN ELWOOD

Jul 16, 2021

DOHM, JOHN

Jul 19, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

312US2



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11474370

Generated on Fri Mar 06 2026 14:12:11GMT-0800 (Pacific Standard Time)

---

| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
|---|---|---|---|---|
| HOLOGRAPHIC OBJECT RELAY FOR LIGHT FIELD DISPLAY | 11474370 | 17280777 | 20220043277 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | Oct 18, 2022 | **Filing date** | **Publication date** | N/A |
| | | Mar 26, 2021 | Feb 10, 2022 | |

---

## Assignment 1

| **Reel/ Frame** | **Assignors & execution date** | **Correspondent** |
|---|---|---|
| 55937 /0198 | KARAFIN, JONATHAN SEAN | LIGHT FIELD LAB, INC. |
| **Pages** | Mar 30, 2021 | 1920 ZANKER ROAD, SUITE 10 |
| 6 | | SAN JOSE, CA 95112 |
| **Conveyance** | BEVENSEE, BRENDAN ELWOOD | |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | Mar 29, 2021 | **Attorney docket number** |
| | **Assignee** | 130 |
| **Documents** | LIGHT FIELD LAB, INC. | |
| View documents | 1920 ZANKER ROAD, SUITE 10 | |
| **Recorded** | SAN JOSE | |
| Apr 15, 2021 | CALIFORNIA, UNITED STATES | |
| | 95112 | |



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Patent #: 11556015

Generated on Fri Mar 06 2026 14:29:14 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** LIGHT FIELD VISION-CORRECTIONDEVICE | **Patent number** 11556015 | **Application number** 17391454 View in PPUBS | **Publication number** 20220026733 View in PPUBS | **PCT number** N/A N/A |
| **Inventors** Jonathan Karafin Sean, Brendan Bevensee Elwood | **Issue date** Jan 17, 2023 | **Filing date** Aug 2, 2021 | **Publication date** Jan 27, 2022 | **International number** N/A |

## Assignment 1

**Reel/ Frame**
58416 /0486

**Pages**
6

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Dec 17, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Dec 16, 2021

BEVENSEE,
BRENDAN ELWOOD
Dec 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

106,107,116,121,132,134



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11558600

Generated on Fri Mar 06 2026 14:43:42 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| MULTISCOPIC IMAGE CAPTURE SYSTEM | 11558600 | 17103596 | 20210314552 | N/A |
| | | | | N/A |
| | Issue date | View in PPUBS | View in PPUBS | International number |
| Inventors | Jan 17, 2023 | | | |
| Jonathan Karafin Sean, Miller Schuck H., Douglas McKnight J, Mrityunjay Kumar, Wilhelm Taylor | | Filing date | Publication date | N/A |
| | | Nov 24, 2020 | Oct 7, 2021 | |

## Assignment 1

**Reel/ Frame**
56945 /0768

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jul 22, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jul 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

201US3



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11579465

Generated on Fri Mar 06 2026 14:38:28 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| FOUR DIMENSIONAL ENERGY-FIELD PACKAGE ASSEMBLY | 11579465 | 16962188 | 20210063965 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | Feb 14, 2023 | **Filing date** Jul 14, 2020 | **Publication date** Mar 4, 2021 | N/A |

## Assignment 1

**Reel/ Frame**
57168/0955

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Aug 13, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jul 16, 2021

BEVENSEE, BRENDAN ELWOOD
Jul 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
124US2



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11650354

Generated on Fri Mar 06 2026 14:03:27 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| SYSTEMS AND METHODS FOR RENDERING DATA FROM A 3D ENVIRONMENT | 11650354 | 16635136 | 20200380762 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | May 16, 2023 | | | **International number** |
| Jonathan Karafin Sean | | **Filing date** | **Publication date** | N/A |
| | | Jan 29, 2020 | Dec 3, 2020 | |

## Assignment 1

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 51689/0990 | KARAFIN, JONATHAN SEAN | BURKE, WILLIAMS & SORENSEN |
| **Pages** | Dec 6, 2019 | |
| 4 | | 1901 HARRISON STREET, SUITE 900 |
| **Conveyance** | BEVENSEE, BRENDAN ELWOOD | OAKLAND, CA 94612 |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | Dec 6, 2019 | **Attorney docket number** |
| **Documents** | **Assignee** | 07726.1231 |
| View documents | LIGHT FIELD LAB, INC. | |
| **Recorded** | 699 E. BROKAW ROAD | |
| Jan 31, 2020 | SAN JOSE | |
| | CALIFORNIA, UNITED STATES | |
| | 95112 | |

## Assignment 2

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 57320/0507 | | |

**Pages**

5

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Jun 8, 2021

KARAFIN, JONATHAN SEAN

Jun 7, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10

SAN JOSE

CALIFORNIA, UNITED STATES
95112

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

123US2



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11668869

Generated on Fri Mar 06 2026 14:07:47 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** HOLOGRAPHIC SUPERIMPOSITION OF REAL WORLD PLENOPTIC OPACITY MODULATION THROUGH TRANSPARENT WAVEGUIDE ARRAYS FOR LIGHT FIELD, VIRTUAL AND AUGMENTED REALITY | **Patent number** 11668869 **Issue date** Jun 6, 2023 | **Application number** 17345693 View in PPUBS **Filing date** Jun 11, 2021 | **Publication number** 20210373231 View in PPUBS **Publication date** Dec 2, 2021 | **PCT number** N/A N/A **International number** N/A |

**Inventors**

Jonathan Karafin Sean, Brendan Bevensee Elwood

## Assignment 1

**Reel/ Frame**

57170/0057

**Pages**

5

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Aug 13, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jul 16, 2021

BEVENSEE, BRENDAN ELWOOD

Jul 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

109US3

 UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11681091

Generated on Fri Mar 06 2026 14:45:40 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| HIGH DENSITY ENERGY DIRECTING DEVICE | 11681091 | 17246485 | 20210349259 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | Jun 20, 2023 | **Filing date** | **Publication date** | N/A |
| | | Apr 30, 2021 | Nov 11, 2021 | |

## Assignment 1

**Reel/ Frame**
57170/0018

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Aug 13, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jul 16, 2021

BEVENSEE, BRENDAN ELWOOD

Jul 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

101US4



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11681092

Generated on Fri Mar 06 2026 14:04:58 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| SELECTIVE PROPAGATION OF ENERGY IN LIGHT FIELD AND HOLOGRAPHIC WAVEGUIDE ARRAYS | 11681092 | 16882422 | 20210080645 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | Jun 20, 2023 | **Filing date** | **Publication date** | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | May 22, 2020 | Mar 18, 2021 | N/A |

## Assignment 1

**Reel/ Frame**
55842 /0386

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 6, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Mar 30, 2021

BEVENSEE, BRENDAN ELWOOD
Mar 29, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**
104US3


UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11691066

Generated on Fri Mar 06 2026 14:31:16 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| Light Field Display System for Sporting Events | 11691066 | 17193824 | 20210299541 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | Jul 4, 2023 | **Filing date** | **Publication number** | N/A |
| | | Mar 5, 2021 | **Publication date** | |
| | | | Sep 30, 2021 | |

## Assignment 1

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 57169/0946 | KARAFIN, JONATHAN SEAN | LIGHT FIELD LAB, INC. |
| | Jul 16, 2021 | 1920 ZANKER ROAD, SUITE 10 |
| **Pages** | | SAN JOSE, CA 95112 |
| 5 | BEVENSEE, BRENDAN ELWOOD | |
| **Conveyance** | Jul 16, 2021 | **Attorney docket number** |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | **Assignee** | 303US2 |
| **Documents** | LIGHT FIELD LAB, INC. | |
| View documents | 1920 ZANKER ROAD, SUITE 10 | |
| **Recorded** | SAN JOSE | |
| Aug 13, 2021 | CALIFORNIA, UNITED STATES | |
| | 95112 | |



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11719864

Generated on Fri Mar 06 2026 14:32:15 GMT-0800 (Pacific Standard Time)

| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
|---|---|---|---|---|
| ORDERED GEOMETRIES FOR OPTOMIZED HOLOGRAPHIC PROJECTION | 11719864 | 16962193 | 20210063766 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | Aug 8, 2023 | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | **Filing date** | **Publication date** | N/A |
| | | Jul 14, 2020 | Mar 4, 2021 | |

## Assignment 1

**Reel/ Frame**
57169/0034

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Aug 13, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jul 16, 2021

BEVENSEE, BRENDAN ELWOOD

Jul 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

125US2



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11719955

Generated on Fri Mar 06 2026 14:04:14 GMT-0800 (Pacific Standard Time)

| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
|---|---|---|---|---|
| SYSTEM FOR SIMULATION OF ENVIRONMENTAL ENERGY | 11719955 | 17156432 | 20210255475 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | Aug 8, 2023 | **Filing date** | **Publication date** | N/A |
| | | Jan 22, 2021 | Aug 19, 2021 | |

## Assignment 1

**Reel/ Frame**
57169/0910

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Aug 13, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jul 16, 2021

BEVENSEE, BRENDAN ELWOOD

Jul 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

122US3



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11726256

Generated on Fri Mar 06 2026 14:36:51 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| HIGH-DENSITY ENERGY DIRECTING DEVICES FOR TWO-DIMENSIONAL, STEREOSCOPIC, LIGHT FIELD AND HOLOGRAPHIC DISPLAYS | 11726256 | 17239918 | 20210302648 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| | Aug 15, 2023 | **Filing date** | **Publication date** | **International number** |
| **Inventors** | | Apr 26, 2021 | Sep 30, 2021 | N/A |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | | | |

## Assignment 1

**Reel/ Frame**
56626 /0247

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jun 22, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Apr 26, 2021

BEVENSEE, BRENDAN ELWOOD
Apr 26, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
108US4



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11733448

Generated on Fri Mar 06 2026 14:28:22 GMT-0800 (Pacific Standard Time)

| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
|---|---|---|---|---|
| SYSTEM AND METHODS FOR REALIZING TRANSVERSE ANDERSON LOCALIZATION IN ENERGYRELAYS USING COMPONENT ENGINEEREDSTRUCTURES | 11733448 | 17549043 | 20220206570 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| | Aug 22, 2023 | | | **International number** |
| **Inventors** | | **Filing date** | **Publication date** | N/A |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | Dec 13, 2021 | Jun 30, 2022 | |

## Assignment 1

**Reel/ Frame**

58416/0486

**Pages**

6

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Dec 17, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Dec 16, 2021

BEVENSEE, BRENDAN ELWOOD

Dec 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

106,107,116,121,132,134



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11740402

Generated on Fri Mar 06 2026 14:40:08 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title**<br>ENERGYRELAYS<br>WITH TRAVERSE<br>ENERGYLOCALIZATION | **Patent number**<br>11740402 | **Application number**<br>17135952 | **Publication number**<br>20210149108 | **PCT number**<br>N/A<br>N/A |
| | **Issue date**<br>Aug 29, 2023 | View in<br>PPUBS | View in<br>PPUBS | **International number**<br>N/A |
| **Inventors**<br>Jonathan Karafin Sean,<br>Brendan Bevensee Elwood | | **Filing date**<br>Dec 28, 2020 | **Publication date**<br>May 20, 2021 | |

## Assignment 1

**Reel/ Frame**
57169/0766

**Pages**
5

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Aug 13, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jul 16, 2021

BEVENSEE,
BRENDAN ELWOOD

Jul 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

102US3



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11754974

Generated on Fri Mar 06 2026 14:25:39 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title**<br>RELAY SYSTEMS | **Patent number**<br>11754974 | **Application number**<br>17776130<br>View in PPUBS | **Publication number**<br>20220397862<br>View in PPUBS | **PCT number**<br>N/A<br>N/A |
| **Inventors**<br>Jonathan Karafin Sean,<br>Brendan Bevensee Elwood | **Issue date**<br>Sep 12, 2023<br><br>**Filing date**<br>May 11, 2022 | | **Publication date**<br>Dec 15, 2022 | **International number**<br>N/A |

## Assignment 1

**Reel/ Frame**
60950 /0799

**Pages**
6

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Aug 31, 2022

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Aug 29, 2022

BEVENSEE,
BRENDAN ELWOOD

Aug 29, 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

136,310,130



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11789288

Generated on Fri Mar 06 2026 14:26:02 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title**<br>LIGHT FIELD VISION-CORRECTIONDEVICE | **Patent number**<br>11789288 | **Application number**<br>18075696<br><br>View in PPUBS | **Publication number**<br>20230176395<br><br>View in PPUBS | **PCT number**<br>N/A<br>N/A |
| **Inventors**<br>Jonathan Karafin Sean, Brendan Bevensee Elwood | **Issue date**<br>Oct 17, 2023 | **Filing date**<br>Dec 6, 2022 | **Publication date**<br>Jun 8, 2023 | **International number**<br>N/A |

## Assignment 1

**Reel/ Frame**
63553 /0279

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
May 5, 2023

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

May 4, 2023

BEVENSEE, BRENDAN ELWOOD

Apr 19, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

121US4



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Patent #: 11796733

Generated on Fri Mar 06 2026 14:35:02 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| ENERGY RELAY AND TRANSVERSE ANDERSON LOCALIZATION FOR PROPAGATION OF TWO-DIMENSIONAL, LIGHT FIELD AND HOLOGRAPHIC ENERGY | 11796733 | 16063675 | 20200301164 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| | Oct 24, 2023 | **Filing date** | **Publication date** | **International number** |
| **Inventors** | | Jun 18, 2018 | Sep 24, 2020 | N/A |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | | | |

## Assignment 1

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 46123/0242 | KARAFIN, JONATHAN SEAN | FISHER BROYLES, LLP |
| | Jun 4, 2018 | CHARLES C. YANG |
| **Pages** | | |
| 4 | BEVENSEE, BRENDAN ELWOOD | 555 UNIVERSITY AVE., SUITE 280 |
| | Jun 4, 2018 | SACRAMENTO, CA 95825 |
| **Conveyance** | | |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | **Assignee** | **Attorney docket number** |
| | LIGHT FIELD LAB, INC. | 8821.105US2 |
| **Documents** | 699 E. BROKAW ROAD | |
| View documents | SAN JOSE | |
| | CALIFORNIA, UNITED STATES | |
| **Recorded** | 95112 | |
| Jun 18, 2018 | | |



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11874479

Generated on Fri Mar 06 2026 14:30:25 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** ENERGYFIELD THREE-DIMENSIONAL PRINTING SYSTEM | **Patent number** 11874479 | **Application number** 17207555 | **Publication number** 20210294114 | **PCT number** N/A N/A |
| **Inventors** Jonathan Karafin Sean, Brendan Bevensee Elwood | **Issue date** Jan 16, 2024 | View in PPUBS **Filing date** Mar 19, 2021 | View in PPUBS **Publication date** Sep 23, 2021 | **International number** N/A |

## Assignment 1

**Reel/ Frame**
56554 /0388

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jun 15, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Mar 30, 2021

BEVENSEE, BRENDAN ELWOOD

Mar 30, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

126US3



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11874493

Generated on Fri Mar 06 2026 14:31:36 GMT-0800 (Pacific Standard Time)

| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
|---|---|---|---|---|
| SYSTEM AND METHODS OF UNIVERSAL PARAMETERIZATION OF HOLOGRAPHIC SENSORY DATA GENERATION, MANIPULATION AND TRANSPORT | 11874493 | 16063994 | 20190011621 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| | Jan 16, 2024 | **Filing date** | **Publication date** | **International number** |
| **Inventors** | | Jun 19, 2018 | Jan 10, 2019 | N/A |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | | | |

## Assignment 1

| **Reel/ Frame** | **Assignors & execution date** | **Correspondent** |
|---|---|---|
| 46134/0684 | KARAFIN, JONATHAN SEAN | FISHER BROYLES, LLP CHARLES C. YANG |
| **Pages** | Jun 4, 2018 | |
| 4 | BEVENSEE, BRENDAN ELWOOD | 555 UNIVERSITY AVE., SUITE 280 |
| **Conveyance** | Jun 4, 2018 | SACRAMENTO, CA 95825 |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | **Assignee** | **Attorney docket number** |
| **Documents** | LIGHT FIELD LAB, INC. | 8821.110US2 |
| View documents | 699 E. BROKAW ROAD | |
| | SAN JOSE | |
| **Recorded** | CALIFORNIA, UNITED STATES | |
| Jun 19, 2018 | 95112 | |



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11885988

Generated on Fri Mar 06 2026 14:07:13 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| SYSTEMS AND METHODS FOR FORMING ENERGY RELAYS WITH TRANSVERSE ENERGY LOCALIZATION | 11885988 | 17552712 | 20220179133 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | Jan 30, 2024 | **Filing date** | **Publication date** | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood, Ed Ibe, Jared Perez, Xudong Chen, Joseph Rickwalder W. | | Dec 16, 2021 | Jun 9, 2022 | N/A |

## Assignment 1

| | | |
|---|---|---|
| **Reel/ Frame** | **Assignors & execution date** | **Correspondent** |
| 59841 /0599 | IBE, ED | LIGHT FIELD LAB, INC. |
| **Pages** | Dec 6, 2019 | 1920 ZANKER ROAD, SUITE 10 |
| 7 | PEREZ JARED | SAN JOSE, CA 95112 |
| **Conveyance** | Dec 6, 2019 | **Attorney docket number** |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | CHEN, XUDONG | 117US3 |
| **Documents** | Dec 6, 2019 | |
| View documents | **View more** | |
| **Recorded** | **Assignee** | |
| May 6, 2022 | LIGHT FIELD LAB, INC. | |
| | 1920 ZANKER ROAD, SUITE 10 | |
| | SAN JOSE | |
| | CALIFORNIA, UNITED STATES | |
| | 95112 | |



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11902500

Generated on Fri Mar 06 2026 14:40:29 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| Light Field Display System Based Digital Signage System | 11902500 | 16638093 | 20210044795 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood , John Dohm | Feb 13, 2024 | | | N/A |
| | | **Filing date** | **Publication date** | |
| | | Feb 10, 2020 | Feb 11, 2021 | |

## Assignment 1

**Reel/ Frame**
54584 /0136

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Dec 8, 2020

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Dec 8, 2020

BEVENSEE, BRENDAN ELWOOD

Dec 8, 2020

DOHM, JOHN

Dec 8, 2020

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

300 , 302 , 306 & 307



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11921317

Generated on Fri Mar 06 2026 14:28:47 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** METHOD OF CALIBRATION FOR HOLOGRAPHIC ENERGY DIRECTING SYSTEMS | **Patent number** 11921317 | **Application number** 17486242 | **Publication number** 20220083135 | **PCT number** N/A N/A |
| | **Issue date** Mar 5, 2024 | View in PPUBS | View in PPUBS | **International number** |
| **Inventors** Brendan Bevensee Elwood , Jonathan Karafin Sean | | **Filing date** Sep 27, 2021 | **Publication date** Mar 17, 2022 | N/A |

## Assignment 1

**Reel/ Frame**
58416 /0486

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Dec 17, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Dec 16, 2021

BEVENSEE, BRENDAN ELWOOD

Dec 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

106,107,116,121,132,134



**UNITED STATES
PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Patent #: 11927915

Generated on Fri Mar 06 2026 14:44:22 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| ENERGYMODULATION SYSTEMS FOR DIFFRACTION BASED HOLOGRAPHIC DISPLAYS | 11927915 | 17990258 | 20230185237 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | Mar 12, 2024 | **Filing date** | **Publication date** | **International number** |
| Jonathan Karafin Sean, Charles Yang C., Brendan Bevensee Elwood | | Nov 18, 2022 | Jun 15, 2023 | N/A |

## Assignment 1

**Reel/ Frame**
64358 /0649

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jul 24 , 2023

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jul 11, 2023

BEVENSEE, BRENDAN ELWOOD
Jul 11, 2023

YANG, CHARLES C.
Jul 11, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

138



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Patent #: 11938398

Generated on Fri Mar 06 2026 14:21:56 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY SYSTEM FOR VIDEO GAMES AND ELECTRONIC SPORTS | 11938398 | 17781130 | 20220409995 | N/A |

**Invention title**
LIGHT FIELD DISPLAY SYSTEM FOR VIDEO GAMES AND ELECTRONIC SPORTS

**Inventors**
Brendan Bevensee Elwood , Trevor Berninger , Jonathan Karafin Sean

**Patent number**
11938398

**Issue date**
Mar 26 , 2024

**Application number**
17781130

View in PPUBS

**Filing date**
May 31, 2022

**Publication number**
20220409995

View in PPUBS

**Publication date**
Dec 29 , 2022

**PCT number**
N/A

N/A

**International number**
N/A

## Assignment 1

**Reel/ Frame**
60950 /0671

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Aug 31, 2022

**Assignors & execution date**

BEVENSEE, BRENDAN ELWOOD
Aug 29 , 2022

BERNINGER, TREVOR
Aug 25 , 2022

KARAFIN, JONATHAN SEAN
Aug 29 , 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
311



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 11938410

Generated on Fri Mar 06 2026 14:43:01 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| Light Field Display System Based Amusement Park Attraction | 11938410 | 17891416 | 20230201729 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | Mar 26, 2024 | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood, John Dohm | | **Filing date** Aug 19, 2022 | **Publication date** Jun 29, 2023 | N/A |

## Assignment 1

**Reel/ Frame**

60950 /0425

**Pages**

6

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Aug 31, 2022

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Aug 29, 2022

BEVENSEE, BRENDAN ELWOOD

Aug 29, 2022

DOHM, JOHN

Aug 29, 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

302, 312



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 12022053

Generated on Fri Mar 06 2026 14:11:41 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY SYSTEM FOR CINEMAS | 12022053 | 17548906 | 20220210395 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood , John Dohm | Jun 25 , 2024 | **Filing date** | **Publication date** | N/A |
| | | Dec 13, 2021 | Jun 30 , 2022 | |

## Assignment 1

| **Reel/ Frame** | **Assignors & execution date** | **Correspondent** |
|---|---|---|
| 59872 /0730 | KARAFIN, JONATHAN SEAN | LIGHT FIELD LAB, INC. |
| **Pages** | May 6, 2022 | 1920 ZANKER ROAD, SUITE 10 |
| 6 | | SAN JOSE, CA 95112 |
| **Conveyance** | BEVENSEE, BRENDAN ELWOOD | |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | May 6, 2022 | **Attorney docket number** |
| | | 304US2 & 306US2 |
| **Documents** | DOHM, JOHN | |
| View documents | May 6, 2022 | |
| **Recorded** | **Assignee** | |
| May 9, 2022 | LIGHT FIELD LAB, INC. | |
| | 1920 ZANKER ROAD, SUITE 10 | |
| | SAN JOSE | |
| | CALIFORNIA, UNITED STATES | |
| | 95112 | |



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 12032180

Generated on Fri Mar 06 2026 14:37:54 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| ENERGY WAVEGUIDE SYSTEM WITH VOLUMETRIC STRUCTURE OPERABLE TO TESSELLATE IN THREE DIMENSIONS | 12032180 | 18212465 | 20230408737 | N/A |
| | | | | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | **International number** |
| **Inventors** | Jul 9, 2024 | | | N/A |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | **Filing date** | **Publication date** | |
| | | Jun 21, 2023 | Dec 21, 2023 | |

## Assignment 1

**Reel/ Frame**
64185/0385

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jul 7, 2023

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jul 6, 2023

BEVENSEE, BRENDAN ELWOOD
Jul 6, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

125US3


**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Patent #: 12061356

Generated on Fri Mar 06 2026 14:35:59 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| HIGH DENSITY ENERGY DIRECTING DEVICE | 12061356 | 18199483 | 20240061166 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | Aug 13, 2024 | | | N/A |
| | | **Filing date** | **Publication date** | |
| | | May 19, 2023 | Feb 22, 2024 | |

## Assignment 1

**Reel/ Frame**
64185/0824

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jul 7, 2023

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jul 6, 2023

BEVENSEE, BRENDAN ELWOOD
Jul 6, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

101US5



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Patent #: 12111615

Generated on Fri Mar 06 2026 14:21:34 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| HOLOGRAPHIC AND DIFFRACTIVE OPTICAL ENCODING SYSTEMS | 12111615 | 17375609 | 20220035311 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | Oct 8, 2024 | **Filing date** | **Publication date** | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | Jul 14, 2021 | Feb 3, 2022 | N/A |

## Assignment 1

**Reel/ Frame**
57170/0129

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Aug 13, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jul 16, 2021

BEVENSEE, BRENDAN ELWOOD
Jul 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

127US3



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Patent #: 12130955

Generated on Fri Mar 06 2026 14:05:49 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY FOR MOBILE DEVICES | 12130955 | 17640081 | 20220326760 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | Oct 29, 2024 | **Filing date** | **Publication date** | N/A |
| | | Mar 3, 2022 | Oct 13, 2022 | |

## Assignment 1

**Reel/ Frame**
59842 /0809

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
May 6, 2022

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
May 5, 2022

BEVENSEE, BRENDAN ELWOOD
May 5, 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
LFL MULTIPLE ASSIGNMENTS



## Patent Assignment Abstract of Title

Search results for Patent #: 12169275

Generated on Fri Mar 06 2026 14:42:34 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY SYSTEM FOR PERFORMANCE EVENTS | 12169275 | 17884719 | 20230070130 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood , John Dohm | Dec 17, 2024 | **Filing date**<br>Aug 10, 2022 | **Publication date**<br>Mar 9, 2023 | N/A |

## Assignment 1

**Reel/ Frame**
60950 /0425

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Aug 31, 2022

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Aug 29, 2022

BEVENSEE, BRENDAN ELWOOD
Aug 29, 2022

DOHM, JOHN
Aug 29, 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

302 , 312



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 12189144

Generated on Fri Mar 06 2026 14:27:29 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| SYSTEM FOR SIMULATION OF ENVIRONMENTAL ENERGY | 12189144 | 18207892 | 20240012267 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | Jan 7, 2025 | **Filing date** | **Publication date** | N/A |
| | | Jun 9, 2023 | Jan 11, 2024 | |

## Assignment 1

**Reel/ Frame**

64185 /0547

**Pages**

5

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Jul 7, 2023

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jul 6, 2023

BEVENSEE, BRENDAN ELWOOD

Jul 6, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

122US4



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 12204093

Generated on Fri Mar 06 2026 14:29:37 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| SYSTEMS FOR DIRECTING ENERGY WITH ENERGY DIRECTING SURFACE WITH NON-ZERO DEFLECTION ANGLE | 12204093 | 17439371 | 20220155583 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| | Jan 21, 2025 | | | **International number** |
| **Inventors** | | **Filing date** | **Publication date** | N/A |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | Sep 14, 2021 | May 19, 2022 | |

## Assignment 1

| | | |
|---|---|---|
| **Reel/ Frame** | **Assignors & execution date** | **Correspondent** |
| 58416/0486 | KARAFIN, JONATHAN SEAN | LIGHT FIELD LAB, INC. |
| **Pages** | Dec 16, 2021 | 1920 ZANKER ROAD, SUITE 10 |
| 6 | | SAN JOSE, CA 95112 |
| **Conveyance** | BEVENSEE, BRENDAN ELWOOD | |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | Dec 16, 2021 | **Attorney docket number** |
| | **Assignee** | 106,107,116,121,132,134 |
| **Documents** | LIGHT FIELD LAB, INC. | |
| View documents | 1920 ZANKER ROAD, SUITE 10 | |
| **Recorded** | SAN JOSE | |
| Dec 17, 2021 | CALIFORNIA, UNITED STATES | |
| | 95112 | |

**USPTO**

UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 12210318

Generated on Fri Mar 06 2026 14:41:41 GMT-0800 (Pacific Standard Time)

| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
|---|---|---|---|---|
| TILEABLE, COPLANAR, FLAT-PANEL 3-D DISPLAY WITH TACTILE AND AUDIO INTERFACES | 12210318 | 17724815 | 20220373969 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | Jan 28, 2025 | | | **International number** |
| Daniel Smalley | | **Filing date** | **Publication date** | N/A |
| | | Apr 20, 2022 | Nov 24, 2022 | |

## Assignment 1

**Reel/ Frame**

61083/0424

**Pages**

3

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Sep 2, 2022

**Assignors & execution date**

SMALLEY, DANIEL

Oct 11 2018

**Assignee**

BRIGHAM YOUNG UNIVERSITY
TECHNOLOGY TRANSFER OFFICE

3760 HBLL - BRIGHAM YOUNG UNIVERSITY

PROVO

UTAH, UNITED STATES

84602

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

129US2 & 129US3

## Assignment 2

**Reel/ Frame**

60483 /0281

**Assignors & execution date**

BRIGHAM YOUNG UNIVERSITY

**Correspondent**

LIGHT FIELD LAB, INC.

**Pages**
4

**Conveyance**
NUNC PRO TUNC ASSIGNMENT

**Documents**
View documents

**Recorded**
Jul 12, 2022

Oct 26, 2018

**Assignee**
LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
129US2 & 129US3

 UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 12210723

Generated on Fri Mar 06 2026 14:05:25 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| Light Field Display System for Consumer Devices | 12210723 | 17636549 | 20220300143 | N/A |
| | | | | N/A |
| | Issue date | View in PPUBS | View in PPUBS | International number |
| Inventors | | | | |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | Jan 28, 2025 | Filing date | Publication date | N/A |
| | | Feb 18, 2022 | Sep 22, 2022 | |

## Assignment 1

**Reel/ Frame**
59842 /0809

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
May 6, 2022

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
May 5, 2022

BEVENSEE, BRENDAN ELWOOD
May 5, 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
LFL MULTIPLE ASSIGNMENTS



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Patent #: 12228766

Generated on Fri Mar 06 2026 14:46:23 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| ENERGY RELAYS WITH TRAVERSE ENERGY LOCALIZATION | 12228766 | 18212446 | 20230408758 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | Feb 18, 2025 | **Filing date** | **Publication date** | N/A |
| | | Jun 21, 2023 | Dec 21, 2023 | |

## Assignment 1

**Reel/ Frame**

64185/0468

**Pages**

5

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Jul 7, 2023

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jul 6, 2023

BEVENSEE, BRENDAN ELWOOD

Jul 6, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

102US4

**uspto** UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Application #: 18865327

Generated on Fri Mar 06 2026 15:11:57 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| HAPTIC DEVICES | N/A | 18865327 | N/A | N/A |
| | | View in PPUBS | | N/A |
| **Inventors** | **Issue date** | | **Publication date** | **International number** |
| Daniel Smalley , Annie Laughlin , Elias Guanuna, Keaton Shurilla , Luke Johnson, Kyle Schvaneveldt , Jonathan Karafin Sean, Brendan Bevensee Elwood | N/A | | N/A | N/A |

## Assignment 1

**Reel/ Frame**
70366 /0840

**Pages**
4

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Feb 28 , 2025

**Assignors & execution date**
BRIGHAM YOUNG UNIVERSITY
May 12, 2022

**Assignee**
LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**
LIGHT FIELD LAB INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
140

## Assignment 2

**Reel/ Frame**
70364 /0278

**Assignors & execution date**
SMALLEY, DANIEL

**Correspondent**
LIGHT FIELD LAB INC.

**Pages**
10

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Feb 28 , 2025

Jun 29, 2022

LAUGHLIN, EMILY

Jun 15, 2022

GUANUNA, ELIAS

Jun 16, 2022

**View more**

**Assignee**

BRIGHAM YOUNG UNIVERSITY
TECHNOLOGY
TRANSFER OFFICE

3760 HBLL - BRIGHAM
YOUNG UNIVERSITY

PROVO

CALIFORNIA, UNITED STATES

95112

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

140

## Assignment 3

**Reel/ Frame**
70364 /0653

**Pages**
5

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Feb 28 , 2025

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jun 30 , 2022

BEVENSEE,
BRENDAN ELWOOD

Jun 30, 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

140



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Application #: 62056366

Generated on Fri Mar 06 2026 15:11:33 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| Image Capture System | N/A | 62056366 | N/A | N/A |
| | | View in PPUBS | | N/A |
| **Inventors** | | | | |
| Jon Karafin , Miller Schuck H., Douglas McKnight J., Mrityunjay Kumar , Wilhelm Taylor | **Issue date** N/A | | **Publication date** N/A | **International number** N/A |
| | | **Filing date** Sep 26 , 2014 | | |

## Assignment 1

**Reel/ Frame**
44721/0794

**Pages**
9

**Conveyance**
NUNC PRO TUNC ASSIGNMENT

**Documents**
View documents

**Recorded**
Jan 24 , 2018

**Assignors & execution date**

KARAFIN, JON
Sep 21, 2016

SCHUCK, MILLER H.
Sep 7, 2016

MCKNIGHT, DOUGLAS J.
Oct 28 , 2016

### View more

**Assignee**

REALD INC.
100 N. CRESCENT DRIVE
SUITE 200
BEVERLY HILLS
CALIFORNIA, UNITED STATES
90210

**Correspondent**

KRISTAL VELIZ

5700 FLATIRON PARKWAY
BOULDER, CO 80301

**Attorney docket number**
364000,364002

## Assignment 2

**Reel/ Frame**
45554 /0291

**Pages**
6

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 16, 2018

**Assignors & execution date**

REALD INC.

Mar 10, 2018

**Assignee**

LIGHT FIELD LAB, INC.
2280 BAYO CLAROS CIRCLE
MORGAN HILL
CALIFORNIA, UNITED STATES
95037

**Correspondent**

KRISTAL VELIZ

555 UNIVERSITY
AVE., SUITE 280
SACRAMENTO, CA 95825

**Attorney docket number**
N/A



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Application #: 62366076

Generated on Fri Mar 06 2026 15:13:26 GMT-0800 (Pacific Standard Time)

| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
|---|---|---|---|---|
| INFINITE RESOLUTION DISPLAY AND MEDIA ECOSYSTEM THROUGH OPTICAL FIBER IMAGE RELAY AND TRANSVERSE ANDERSON LOCALIZATION FOR TWO-DIMENSIONAL, LIGHT FIELD AND HOLOGRAPHIC VIDEO DISPLAY | N/A | 62366076 | N/A | N/A |
| | | View in PPUBS | | N/A |
| | **Issue date** | | **Publication date** | **International number** |
| | N/A | **Filing date** | N/A | N/A |
| | | Jul 24, 2016 | | |

**Inventors**

Jonathan Karafin Sean

## Assignment 1

| **Reel/ Frame** | **Assignors & execution date** | **Correspondent** |
|---|---|---|
| 49007 /0452 | KARAFIN, JONATHAN SEAN | LECLAIRRYAN |
| **Pages** | Apr 26, 2019 | 400 CAPITOL MALL, SUITE 1500 |
| 5 | **Assignee** | SACRAMENTO, CA 95814 |
| **Conveyance** | LIGHT FIELD LAB, INC. | **Attorney docket number** |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | 699 E. BROKAW ROAD | 59630.0001 |
| **Documents** | SAN JOSE | |
| View documents | CALIFORNIA, UNITED STATES | |
| | 95112 | |
| **Recorded** | | |
| Apr 26, 2019 | | |



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Application #: 62507500

Generated on Fri Mar 06 2026 15:12:56 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| INFINITE RESOLUTION DISPLAY AND MEDIA ECOSYSTEM THROUGH OPTICAL FIBER IMAGE RELAY AND TRANSVERSE ANDERSON LOCALIZATION FOR TWO-DIMENSIONAL, LIGHT FIELD AND HOLOGRAPHIC VIDEO DISPLAY | N/A | 62507500  View in PPUBS | N/A | N/A  N/A |
| | **Issue date**  N/A | **Filing date**  May 17, 2017 | **Publication date**  N/A | **International number**  N/A |

**Inventors**

Jonathan Karafin

## Assignment 1

**Reel/ Frame**

49007 /0452

**Pages**

5

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Apr 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Apr 26, 2019

**Assignee**

LIGHT FIELD LAB, INC.

699 E. BROKAW ROAD

SAN JOSE

CALIFORNIA, UNITED STATES

95112

**Correspondent**

LECLAIRRYAN

400 CAPITOL
MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**

59630.0001



# Patent Assignment Abstract of Title

Search results for Application #: 62617284

Generated on Fri Mar 06 2026 15:09:29 GMT-0800 (Pacific Standard Time)

---

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| Holographic and Diffractive Optical Encoding Systems | N/A | 62617284 | N/A | N/A |
| | | View in PPUBS | | N/A |
| **Inventors** | **Issue date** | | **Publication date** | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | N/A | **Filing date** | N/A | N/A |
| | | Jan 14, 2018 | | |

---

## Assignment 1

| | | |
|---|---|---|
| **Reel/ Frame** | **Assignors & execution date** | **Correspondent** |
| 49007 /0190 | KARAFIN, JONATHAN SEAN | LECLAIRRYAN |
| **Pages** | Apr 26, 2019 | 400 CAPITOL |
| 6 | | MALL , SUITE 1500 |
| | BENENSEE, BRENDAN ELWOOD | SACRAMENTO, CA 95814 |
| **Conveyance** | Apr 26, 2019 | **Attorney docket number** |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | **Assignee** | 59630.0001 |
| **Documents** | LIGHT FIELD LAB, INC. | |
| View documents | 699 E. BROKAW ROAD | |
| | SAN JOSE | |
| **Recorded** | CALIFORNIA, UNITED STATES | |
| Apr 26, 2019 | 95112 | |


UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Application #: 62617286

Generated on Fri Mar 06 2026 15:14:53 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| SYSTEM AND METHOD FOR RENDERING HOLOGRAPHIC SENSORY DATA | N/A | 62617286 View in PPUBS | N/A | N/A N/A |
| **Inventors** | **Issue date** | | **Publication date** | **International number** |
| Jonathan Karafin Sean | N/A | **Filing date** Jan 14, 2018 | N/A | N/A |

## Assignment 1

**Reel/ Frame**
49007 /0452

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Apr 26, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LECLAIRRYAN

400 CAPITOL
MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**
59630.0001

**uspto** | UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Application #: 62617288

Generated on Fri Mar 06 2026 15:12:33 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| SYSTEM AND METHODS FOR TRANSVERSE ENERGY LOCALIZATION IN ENERGY RELAYS USING ORDERED STRUCTURES | N/A | 62617288 | N/A | N/A |
| | | View in PPUBS | | N/A |
| **Issue date** | | | **Publication date** | **International number** |
| **Inventors** | N/A | **Filing date** | N/A | N/A |
| Jonathan Karafin Sean | | Jan 14, 2018 | | |

---

## Assignment 1

| **Reel/ Frame** | **Assignors & execution date** | **Correspondent** |
|---|---|---|
| 49007 /0452 | KARAFIN, JONATHAN SEAN | LECLAIRRYAN |
| **Pages** | Apr 26, 2019 | |
| 5 | **Assignee** | 400 CAPITOL MALL, SUITE 1500 SACRAMENTO, CA 95814 |
| **Conveyance** | LIGHT FIELD LAB, INC. | |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | 699 E. BROKAW ROAD SAN JOSE | **Attorney docket number** |
| **Documents** | CALIFORNIA, UNITED STATES 95112 | 59630.0001 |
| View documents | | |
| **Recorded** | | |
| Apr 26, 2019 | | |

---

## Assignment 2

| **Reel/ Frame** | **Assignors & execution date** | **Correspondent** |
|---|---|---|
| 57169 /0034 | KARAFIN, JONATHAN SEAN | LIGHT FIELD LAB, INC. |

**Pages**
6

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Aug 13, 2021

Jul 16, 2021

BEVENSEE
BRENDAN ELWOOD
Jul 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
125US2

**UNITED STATES
PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Application #: 62617293

Generated on Fri Mar 06 2026 15:13:49 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| NOVEL APPLICATIONS OF HOLOGRAPHIC AND LIGHT FIELD TECHNOLOGY | N/A | 62617293 | N/A | N/A |
| | **Issue date** | View in PPUBS | | N/A |
| **Inventors** | N/A | | **Publication date** | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | **Filing date** Jan 14, 2018 | N/A | N/A |

## Assignment 1

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 49007 /0452 | KARAFIN, JONATHAN SEAN | LECLAIRRYAN |
| **Pages** 5 | Apr 26, 2019 | 400 CAPITOL MALL, SUITE 1500 SACRAMENTO, CA 95814 |
| **Conveyance** ASSIGNMENT OF ASSIGNOR'S INTEREST | **Assignee** | **Attorney docket number** |
| **Documents** View documents | LIGHT FIELD LAB, INC. 699 E. BROKAW ROAD SAN JOSE CALIFORNIA, UNITED STATES 95112 | 59630.0001 |
| **Recorded** Apr 26, 2019 | | |

## Assignment 2

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 57168 /0955 | KARAFIN, JONATHAN SEAN | LIGHT FIELD LAB, INC. |
| **Pages** | Jul 16, 2021 | 1920 ZANKER ROAD, SUITE 10 |

6

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Aug 13, 2021

BEVENSEE,
BRENDAN ELWOOD

Jul 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

SAN JOSE, CA 95112

**Attorney docket number**

124US2


UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Application #: 62703410

Generated on Fri Mar 06 2026 15:19:02 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title**<br>LIGHT FIELD DISPLAY SYSTEM BASED AMUSEMENT PARK ATTRACTION | **Patent number**<br>N/A | **Application number**<br>62703410<br>View in PPUBS | **Publication number**<br>N/A | **PCT number**<br>N/A<br>N/A |
| **Inventors**<br>Jonathan Karafin Sean, Brendan Bevensee E., John Dohm | **Issue date**<br>N/A | **Filing date**<br>Jul 25, 2018 | **Publication date**<br>N/A | **International number**<br>N/A |

## Assignment 1

**Reel/ Frame**
46611/0138

**Pages**
3

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Aug 10, 2018

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jul 29, 2018

BEVENSEE, BRENDAN E.
Jul 26, 2018

DOHM, JOHN
Jul 26, 2018

**Assignee**

LIGHT FIELD LAB, INC.
699 E BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

CHARLES D. CATHEY

FENWICK & WEST LLP

801 CALIFORNIA STREET

MOUNTAIN VIEW, CA 94041

**Attorney docket number**

35173-41030/US

**uspto** UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Application #: 62739000

Generated on Fri Mar 06 2026 15:08:58 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| HOLOGRAPHIC OBJECT RELAY FOR LIGHT FIELD DISPLAY | N/A | 62739000 | N/A | N/A |
| | | View in PPUBS | | N/A |
| Inventors | Issue date | | Publication date | International number |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | N/A | | N/A | N/A |
| | | Filing date | | |
| | | Sep 28, 2018 | | |

## Assignment 1

| Reel/Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 49007 /0190 | KARAFIN, JONATHAN SEAN | LECLAIRRYAN |
| **Pages** | Apr 26, 2019 | |
| 6 | | 400 CAPITOL MALL, SUITE 1500 SACRAMENTO, CA 95814 |
| **Conveyance** | BENENSEE, BRENDAN ELWOOD | |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | Apr 26, 2019 | **Attorney docket number** |
| | **Assignee** | 59630.0001 |
| **Documents** | LIGHT FIELD LAB, INC. | |
| View documents | 699 E. BROKAW ROAD | |
| | SAN JOSE | |
| **Recorded** | CALIFORNIA, UNITED STATES | |
| Apr 26, 2019 | 95112 | |

## Assignment 2

| Reel/Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 55937 /0198 | KARAFIN, JONATHAN SEAN | LIGHT FIELD LAB, INC. |

**Pages**

6

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Apr 15, 2021

Mar 30, 2021

BEVENSEE
BRENDAN ELWOOD

Mar 29, 2021

**Assignee**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE

CALIFORNIA, UNITED STATES

95112

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

130



# UNITED STATES
# PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Application #: 62818553

Generated on Fri Mar 06 2026 15:10:45 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| SYSTEMS FOR DIRECTING ENERGY FIELDS FROM SURFACES AT MULTIPLE ANGLES | N/A | 62818553 | N/A | N/A |
| | **Issue date** | View in PPUBS | | N/A |
| **Inventors** | N/A | | **Publication date** | **International number** |
| Jonathan Karafin , Brendan Bevensee | | **Filing date** Mar 14, 2019 | N/A | N/A |

## Assignment 1

| | | |
|---|---|---|
| **Reel/ Frame** 49007 /0190 | **Assignors & execution date** KARAFIN, JONATHAN SEAN Apr 26, 2019 | **Correspondent** LECLAIRRYAN |
| **Pages** 6 | BENENSEE, BRENDAN ELWOOD Apr 26, 2019 | 400 CAPITOL MALL , SUITE 1500 SACRAMENTO, CA 95814 |
| **Conveyance** ASSIGNMENT OF ASSIGNOR'S INTEREST | **Assignee** | **Attorney docket number** 59630.0001 |
| **Documents** View documents | LIGHT FIELD LAB, INC. 699 E. BROKAW ROAD SAN JOSE CALIFORNIA, UNITED STATES 95112 | |
| **Recorded** Apr 26, 2019 | | |



# Patent Assignment Abstract of Title

Search results for Application #: 62828390

Generated on Fri Mar 06 2026 15:11:08 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| 4D ENERGY DIRECTING SYSTEMS WITH BEAM-STEERING DEVICES | N/A | 62828390 | N/A | N/A |
| | | View in PPUBS | | N/A |
| **Inventors** | **Issue date** | | **Publication date** | **International number** |
| Brendan Bevensee Elwood, Jonathan Karafin Sean | N/A | **Filing date** Apr 2, 2019 | N/A | N/A |

## Assignment 1

| **Reel/ Frame** 49007 /0190 | **Assignors & execution date** KARAFIN, JONATHAN SEAN Apr 26, 2019 | **Correspondent** LECLAIRRYAN |
|---|---|---|
| **Pages** 6 | BENENSEE, BRENDAN ELWOOD Apr 26, 2019 | 400 CAPITOL MALL, SUITE 1500 SACRAMENTO, CA 95814 |
| **Conveyance** ASSIGNMENT OF ASSIGNOR'S INTEREST | **Assignee** | **Attorney docket number** 59630.0001 |
| **Documents** View documents | LIGHT FIELD LAB, INC. 699 E. BROKAW ROAD SAN JOSE CALIFORNIA, UNITED STATES 95112 | |
| **Recorded** Apr 26, 2019 | | |



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Application #: 62934353

Generated on Fri Mar 06 2026 15:16:31 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| HOLOGRAPHIC OBJECT RELAY FOR LIGHT FIELD DISPLAY | N/A | 62934353 | N/A | N/A |
| | | View in PPUBS | | N/A |
| **Inventors** | **Issue date** | | **Publication date** | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | N/A | **Filing date** | N/A | N/A |
| | | Nov 12, 2019 | | |

## Assignment 1

**Reel/ Frame**
57169/0736

**Pages**
5

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Aug 13, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jul 16, 2021

BEVENSEE,
BRENDAN ELWOOD

Jul 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

136PV1

**USPTO**
UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Application #: 63125951

Generated on Fri Mar 06 2026 15:08:15 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| ENERGY RELAYS WITH ENERGY PROPAGATION HAVING PREDETERMINED ORIENTATIONS | N/A | 63125951 View in PPUBS | N/A | N/A N/A |
| **Inventors** | **Issue date** | **Filing date** | **Publication date** | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | N/A | Dec 15, 2020 | N/A | N/A |

## Assignment 1

| Reel/Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 56945 /0713 | KARAFIN, JONATHAN SEAN | LIGHT FIELD LAB, INC. |
| **Pages** | Jul 16, 2021 | 1920 ZANKER ROAD, SUITE 10 |
| 5 | **Assignee** | SAN JOSE, CA 95112 |
| **Conveyance** | LIGHT FIELD LAB, INC. | **Attorney docket number** |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | 1920 ZANKER ROAD, SUITE 10 SAN JOSE CALIFORNIA, UNITED STATES 95112 | 137PV1 |
| **Documents** | | |
| View documents | | |
| **Recorded** | | |
| Jul 22, 2021 | | |

## Assignment 2

| Reel/Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 63945 /0849 | KARAFIN, JONATHAN SEAN | LIGHT FIELD LAB, INC. |

**Pages**
5

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jun 14, 2023

Jun 13, 2023

BEVENSEE
BRENDAN ELWOOD
Jun 13, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
137



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Application #: 63249571

Generated on Fri Mar 06 2026 16:37:48 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| Relay Systems | N/A | 63249571 | N/A | N/A |
| | | | | N/A |
| **Inventors** | **Issue date** | View in PPUBS | **Publication date** | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | N/A | | N/A | N/A |
| | **Filing date** | | | |
| | Sep 28, 2021 | | | |

## Assignment 1

**Reel/ Frame**
59842 /0809

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
May 6, 2022

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
May 5, 2022

BEVENSEE, BRENDAN ELWOOD
May 5, 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
LFL MULTIPLE ASSIGNMENTS



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Application #: 63341169

Generated on Fri Mar 06 2026 15:15:15 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| HAPTIC DEVICES | N/A | 63341169 | N/A | N/A |
| | | View in PPUBS | | N/A |
| **Inventors** | **Issue date** | | **Publication date** | **International number** |
| Daniel Smalley , Emily Laughlin , Elias Guanuna, Keaton Shurilla , Luke Johnson, Kyle Schvaneveldt , Jonathan Karafin Sean, Brendan Bevensee Elwood | N/A | **Filing date**<br>May 12, 2022 | N/A | N/A |

## Assignment 1

**Reel/ Frame**
60521/0348

**Pages**
10

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jul 15, 2022

**Assignors & execution date**

SMALLEY, DANIEL
Jun 29 , 2022

LAUGHLIN, EMILY
Jun 15, 2022

GUANUNA, ELIAS
Jun 16, 2022

**View more**

**Assignee**

BRIGHAM YOUNG UNIVERSITY
TECHNOLOGY
TRANSFER OFFICE
3760 HBLL - BRIGHAM
YOUNG UNIVERSITY
PROVO
UTAH, UNITED STATES
84602

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
140PV1- INVS TO BYU

## Assignment 2

**Reel/ Frame**
60520 /0744

**Pages**
5

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jul 15, 2022

**Assignors & execution date**

BRIGHAM YOUNG UNIVERSITY

Jun 30 , 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
140PV1 BYU TO LFL

## Assignment 3

**Reel/ Frame**
60521/0441

**Pages**
5

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jul 15, 2022

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jun 30 , 2022

BEVENSEE,
BRENDAN ELWOOD

Jun 30 , 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
140PV1 - INVS TO LFL


UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Application #: 63458938

Generated on Fri Mar 06 2026 15:19:25 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| SYSTEM AND METHODS FOR RENDERING DATA SET BASED ON A SAMPLING OF A WAVEFRONT | N/A | 63458938 | N/A | N/A |
| | | View in PPUBS | | N/A |
| **Inventors** | **Issue date** | | **Publication date** | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | N/A | **Filing date** Apr 13, 2023 | N/A | N/A |

## Assignment 1

| **Reel/ Frame** | **Assignors & execution date** | **Correspondent** |
|---|---|---|
| 63946 /0691 | KARAFIN, JONATHAN SEAN | LIGHT FIELD LAB, INC. |
| **Pages** | Jun 13, 2023 | 1920 ZANKER ROAD, SUITE 10 |
| 5 | BEVENSEE, BRENDAN ELWOOD | SAN JOSE, CA 95112 |
| **Conveyance** | Jun 13, 2023 | **Attorney docket number** |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | **Assignee** | 143PV1 |
| **Documents** | LIGHT FIELD LAB, INC. | |
| View documents | 1920 ZANKER ROAD, SUITE 10 | |
| **Recorded** | SAN JOSE | |
| Jun 14, 2023 | CALIFORNIA, UNITED STATES | |
| | 95112 | |



# UNITED STATES
# PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Application #: 63523028

Generated on Fri Mar 06 2026 15:22:08 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| Wavefront Sampling and Modulation | N/A | 63523028 | N/A | N/A |
| | | View in PPUBS | | N/A |
| **Inventors** | **Issue date** | | **Publication date** | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | N/A | **Filing date** | N/A | N/A |
| | | Jun 23, 2023 | | |

## Assignment 1

**Reel/ Frame**
64185/0165

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jul 7, 2023

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jul 6, 2023

BEVENSEE, BRENDAN ELWOOD
Jul 6, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

145PV1, PV2, PV3



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US15/00118

Generated on Fri Mar 06 2026 16:04:03 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| MULTISCOPIC IMAGE CAPTURE SYSTEM | N/A | N/A | N/A | PCT/US15/00118 PCT/US2015/00011 |

| Inventors | Issue date | Filing date | Publication date | International number |
|---|---|---|---|---|
| DOUGLAS MCKNIGHT J., JON KARAFIN, MILLER SCHUCK H., MRITYUNJAY KUMAR, WILHELM TAYLOR | N/A | Sep 29, 2015 | N/A | N/A |

## Assignment 1

**Reel/ Frame**
44721/0794

**Pages**
9

**Conveyance**
NUNC PRO TUNC ASSIGNMENT

**Documents**
View documents

**Recorded**
Jan 24, 2018

**Assignors & execution date**

KARAFIN, JON
Sep 21, 2016

SCHUCK, MILLER H.
Sep 7, 2016

MCKNIGHT, DOUGLAS J.
Oct 28, 2016

**View more**

**Assignee**

REALD INC.
100 N. CRESCENT DRIVE
SUITE 200
BEVERLY HILLS
CALIFORNIA, UNITED STATES
90210

**Correspondent**

KRISTAL VELIZ

5700 FLATIRON PARKWAY
BOULDER, CO 80301

**Attorney docket number**
364000,364002

## Assignment 2

**Reel/ Frame**

45554 /0291

**Pages**

6

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Apr 16, 2018

**Assignors & execution date**

REALD INC.

Mar 10, 2018

**Assignee**

LIGHT FIELD LAB, INC.
2280 BAYO CLAROS CIRCLE
MORGAN HILL
CALIFORNIA, UNITED STATES
95037

**Correspondent**

KRISTAL VELIZ

555 UNIVERSITY
AVE., SUITE 280
SACRAMENTO, CA 95825

**Attorney docket number**

N/A



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US16/23753

Generated on Fri Mar 06 2026 16:18:12 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| TILEABLE, COPLANAR, FLAT-PANEL 3-D DISPLAY WITH TACTILE AND AUDIO INTERFACES | N/A | N/A | N/A | PCT/US16/23753 PCT/US2016/02375 |
| | **Issue date** | **Filing date** | **Publication date** | **International number** |
| **Inventors** | N/A | Mar 23, 2016 | N/A | N/A |
| DANIEL SMALLEY | | | | |

## Assignment 1

| | | |
|---|---|---|
| **Reel/ Frame** | **Assignors & execution date** | **Correspondent** |
| 47713/0207 | SMALLEY, DANIEL | LECLAIR RYAN |
| **Pages** | Oct 11, 2018 | 400 CAPITOL MALL, SUITE 1500 SACRAMENTO, CA 84602 |
| 3 | **Assignee** | |
| **Conveyance** | BRIGHAM YOUNG UNIVERSITY | **Attorney docket number** |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | TECHNOLOGY TRANSFER OFFICE | 59630.1291 |
| **Documents** | 3760 HBLL BRIGHAM YOUNG UNIVERSITY | |
| View documents | PROVO | |
| **Recorded** | UTAH, UNITED STATES | |
| Dec 3, 2018 | 84602 | |

## Assignment 2

| | | |
|---|---|---|
| **Reel/ Frame** | **Assignors & execution date** | **Correspondent** |
| 47658 /0335 | BRIGHAM YOUNG UNIVERSITY | LECLAIR RYAN |
| **Pages** | Oct 26, 2018 | 400 CAPITOL |

4

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Dec 3, 2018

**Assignee**

LIGHT FIELD LAB, INC.

699 E. BROKAW ROAD

SAN JOSE

CALIFORNIA, UNITED STATES

95112

MALL, SUITE 1500

SACRAMENTO, CA 95814

**Attorney docket number**

59630.1291



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US17/42275

Generated on Fri Mar 06 2026 15:58:11GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| ENERGY PROPAGATION AND TRANSVERSE ANDERSON LOCALIZATION WITH TWO-DIMENSIONAL, LIGHT FIELD AND HOLOGRAPHIC RELAYS | N/A | N/A | N/A | PCT/US17/42275 PCT/US2017/04227 |
| | **Issue date** | **Filing date** | **Publication date** | **International number** |
| | N/A | Jul 14, 2017 | N/A | N/A |
| **Inventors** | | | | |
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN | | | | |

## Assignment 1

**Reel/ Frame**
49007 /0190

**Pages**
6

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Apr 26, 2019

BENENSEE,
BRENDAN ELWOOD
Apr 26, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LECLAIRRYAN

400 CAPITOL
MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**
59630.0001



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US17/42276

Generated on Fri Mar 06 2026 15:59:14 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| SELECTIVE PROPAGATION OF ENERGY IN LIGHT FIELD AND HOLOGRAPHIC WAVEGUIDE ARRAYS | N/A | N/A | N/A | PCT/US17/42276 PCT/US2017/04227 |
| | **Issue date** | **Filing date** | **Publication date** | **International number** |
| | N/A | Jul 14, 2017 | N/A | N/A |

**Inventors**

BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN

## Assignment 1

**Reel/ Frame**

49007 /0190

**Pages**

6

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Apr 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Apr 26, 2019

BENENSEE, BRENDAN ELWOOD

Apr 26, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LECLAIRRYAN

400 CAPITOL
MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**

59630.0001



# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US17/42418

Generated on Fri Mar 06 2026 16:00:16 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| SYSTEM AND METHODS FOR REALIZING TRANSVERSE ANDERSON LOCALIZATION IN ENERGYRELAYS USING COMPONENT ENGINEEREDSTRUCTURES | N/A | N/A | N/A | PCT/US17/42418 PCT/US2017/04241 |
| | **Issue date** | **Filing date** | **Publication date** | **International number** |
| | N/A | Jul 17, 2017 | N/A | N/A |

**Inventors**

BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN

## Assignment 1

**Reel/ Frame**

49007 /0190

**Pages**

6

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Apr 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Apr 26, 2019

BENENSEE, BRENDAN ELWOOD

Apr 26, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LECLAIRRYAN

400 CAPITOL
MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**

59630.0001



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US17/42452

Generated on Fri Mar 06 2026 15:57:44 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| HIGH DENSITY ENERGY DIRECTING DEVICE | N/A | N/A | N/A | PCT/US17/42452 PCT/US2017/04245 |

| Inventors | Issue date | Filing date | Publication date | International number |
|---|---|---|---|---|
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN | N/A | Jul 17, 2017 | N/A | N/A |

## Assignment 1

**Reel/ Frame**
49007 /0190

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Apr 26, 2019

BENENSEE, BRENDAN ELWOOD
Apr 26, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LECLAIRRYAN

400 CAPITOL MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**
59630.0001



**UNITED STATES
PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US17/42462

Generated on Fri Mar 06 2026 16:02:24 GMT-0800 (Pacific Standard Time)

| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
|---|---|---|---|---|
| HOLOGRAPHIC SUPERIMPOSITION OF REAL WORLD PLENOPTIC OPACITY MODULATION THROUGH TRANSPARENT WAVEGUIDE ARRAYS FOR LIGHT FIELD, VIRTUAL AND AUGMENTED REALITY | N/A | N/A | N/A | PCT/US17/42462  PCT/US2017/04246 |
| | **Issue date** | **Filing date** | **Publication date** | **International number** |
| | N/A | Jul 17, 2017 | N/A | N/A |

**Inventors**

BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN

---

## Assignment 1

**Reel/ Frame**

49007 /0190

**Pages**

6

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Apr 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Apr 26, 2019

BENENSEE, BRENDAN ELWOOD

Apr 26, 2019

**Assignee**

LIGHT FIELD LAB, INC.

699 E. BROKAW ROAD

SAN JOSE

CALIFORNIA, UNITED STATES

95112

**Correspondent**

LECLAIRRYAN

400 CAPITOL MALL, SUITE 1500

SACRAMENTO, CA 95814

**Attorney docket number**

59630.0001

 UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US17/42466

Generated on Fri Mar 06 2026 16:01:53 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| HIGH-DENSITY ENERGY DIRECTING DEVICES FOR TWO-DIMENSIONAL, STEREOSCOPIC, LIGHT FIELD AND HOLOGRAPHIC HEAD-MOUNTED DISPLAYS | N/A | N/A | N/A | PCT/US17/42466 PCT/US2017/04246 |
| | **Issue date** | **Filing date** | **Publication date** | **International number** |
| | N/A | Jul 17, 2017 | N/A | N/A |

**Inventors**

BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN

## Assignment 1

**Reel/ Frame**

49007 /0190

**Pages**

6

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Apr 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Apr 26, 2019

BENENSEE, BRENDAN ELWOOD

Apr 26, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LECLAIRRYAN

400 CAPITOL
MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**

59630.0001



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US17/42467

Generated on Fri Mar 06 2026 16:00:46 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| METHOD OF CALIBRATION FOR HOLOGRAPHIC ENERGY DIRECTING SYSTEMS | N/A | N/A | N/A | PCT/US17/42467 PCT/US2017/04246 |
| | **Issue date** | **Filing date** | **Publication date** | **International number** |
| **Inventors** | N/A | Aug 10, 2017 | N/A | N/A |
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN | | | | |

## Assignment 1

**Reel/ Frame**
49007 /0190

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Apr 26, 2019

BENENSEE, BRENDAN ELWOOD

Apr 26, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LECLAIRRYAN

400 CAPITOL MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**
59630.0001



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US17/42468

Generated on Fri Mar 06 2026 15:58:46 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| ENCODED ENERGY WAVEGUIDES FOR HOLOGRAPHIC SUPER RESOLUTION | N/A | N/A | N/A | PCT/US17/42468 PCT/US2017/04246 |
| | **Issue date** | **Filing date** | **Publication date** | **International number** |
| | N/A | Jul 17, 2017 | N/A | N/A |
| **Inventors** | | | | |
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN | | | | |

## Assignment 1

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 49007 /0190 | KARAFIN, JONATHAN SEAN | LECLAIRRYAN |
| **Pages** | Apr 26, 2019 | 400 CAPITOL |
| 6 | | MALL, SUITE 1500 |
| **Conveyance** | BENENSEE, BRENDAN ELWOOD | SACRAMENTO, CA 95814 |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | Apr 26, 2019 | **Attorney docket number** |
| **Documents** | **Assignee** | 59630.0001 |
| View documents | LIGHT FIELD LAB, INC. | |
| **Recorded** | 699 E. BROKAW ROAD | |
| Apr 26, 2019 | SAN JOSE | |
| | CALIFORNIA, UNITED STATES | |
| | 95112 | |



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US17/42469

Generated on Fri Mar 06 2026 16:03:31 GMT-0800 (Pacific Standard Time)

| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
|---|---|---|---|---|
| SYSTEM AND METHODS OF UNIVERSAL PARAMETERIZATION OF HOLOGRAPHIC SENSORY DATA GENERATION, MANIPULATION AND TRANSPORT | N/A | N/A | N/A | PCT/US17/42469 PCT/US2017/04246 |
| **Issue date** | **Filing date** | **Publication date** | **International number** | |
| N/A | Jul 17, 2017 | N/A | N/A | |

**Inventors**

BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN

## Assignment 1

**Reel/ Frame**

49007 /0190

**Pages**

6

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Apr 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Apr 26, 2019

BENENSEE, BRENDAN ELWOOD

Apr 26, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LECLAIRRYAN

400 CAPITOL
MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**

59630.0001



# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US17/42470

Generated on Fri Mar 06 2026 15:59:42 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| FOUR-DIMENSIONAL (4D) PLENOPTIC ENERGY SYSTEMS | N/A | N/A | N/A | PCT/US17/42470 PCT/US2017/04247 |

| Inventors | Issue date | Filing date | Publication date | International number |
|---|---|---|---|---|
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN | N/A | Jul 17, 2017 | N/A | N/A |

## Assignment 1

**Reel/ Frame**
49007 /0190

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Apr 26, 2019

BENENSEE, BRENDAN ELWOOD
Apr 26, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**
LECLAIRRYAN

400 CAPITOL MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**
59630.0001



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US17/42679

Generated on Fri Mar 06 2026 16:01:27 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| METHOD FOR CALIBRATION FOR HOLOGRAPHIC ENERGY DIRECTING SYSTEMS | N/A | N/A | N/A | PCT/US17/42679 PCT/US2017/04267 |
| | Issue date | Filing date | Publication date | International number |
| Inventors | N/A | Jul 18, 2017 | N/A | N/A |
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN | | | | |

## Assignment 1

**Reel/ Frame**
49007 /0190

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Apr 26, 2019

BENENSEE, BRENDAN ELWOOD

Apr 26, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LECLAIRRYAN

400 CAPITOL MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**
59630.0001



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/13310

Generated on Fri Mar 06 2026 15:40:03 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| SYSTEMS AND METHODS FOR TRANSVERSE ENERGY LOCALIZATION IN ENERGY RELAYS USING ORDERED STRUCTURES | N/A | N/A | N/A | PCT/US19/13310 PCT/US2019/01331 |
| | **Issue date** | **Filing date** | **Publication date** | **International number** |
| | N/A | Jan 11, 2019 | N/A | N/A |

**Inventors**

BRENDAN BEVENSEE ELWOOD,
JONATHAN KARAFIN SEAN

## Assignment 1

**Reel/ Frame**

49007 /0190

**Pages**

6

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Apr 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Apr 26, 2019

BENENSEE,
BRENDAN ELWOOD

Apr 26, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LECLAIRRYAN

400 CAPITOL
MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**

59630.0001



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/13399

Generated on Fri Mar 06 2026 16:18:44 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| SYSTEMS AND METHODS FOR FORMING ENERGY RELAYS WITH TRANSVERSE ENERGY LOCALIZATION | N/A | N/A | N/A | PCT/US19/13399 PCT/US2019/01339 |

| Issue date | Filing date | Publication date | International number |
|---|---|---|---|
| N/A | Jan 12, 2019 | N/A | N/A |

**Inventors**

BRENDAN BEVENSEE ELWOOD, ED IBE, JARED PEREZ, JONATHAN KARAFIN SEAN, JOSEPH RICKWALDER W., XUDONG CHEN

## Assignment 1

**Reel/ Frame**

49163/0570

**Pages**

6

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

May 13, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Apr 26, 2019

BEVENSEE
BRENDAN ELWOOD
Apr 26, 2019

IBE, ED
Apr 26, 2019

View more

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA,     UNITED STATES

**Correspondent**

LECLAIRRYAN

400 CAPITOL
MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**

59630.1172

95112



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/13408

Generated on Fri Mar 06 2026 16:08:11GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| FOUR DIMENSIONAL ENERGY-FIELD PACKAGE ASSEMBLY | N/A | N/A | N/A | PCT/US19/13408 PCT/US2019/01340 |

| Inventors | Issue date | Filing date | Publication date | International number |
|---|---|---|---|---|
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARIFIN SEAN | N/A | Jan 13, 2019 | N/A | N/A |

## Assignment 1

**Reel/ Frame**
49007 /0452

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 26, 2019

**Assignors & execution date**
KARAFIN, JONATHAN SEAN
Apr 26, 2019

**Assignee**
LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**
LECLAIRRYAN

400 CAPITOL
MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**
59630.0001

## Assignment 2

**Reel/ Frame**
57168 /0955

**Pages**
6

**Assignors & execution date**
KARAFIN, JONATHAN SEAN
Jul 16, 2021

**Correspondent**
LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Aug 13, 2021

BEVENSEE
BRENDAN ELWOOD

Jul 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10

SAN JOSE

CALIFORNIA, UNITED STATES
95112

SAN JOSE, CA 95112

**Attorney docket number**

124US2



**UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/13409

Generated on Fri Mar 06 2026 15:39:17 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| ENERGYFIELD THREE-DIMENSIONAL PRINTING SYSTEM | N/A | N/A | N/A | PCT/US19/13409 PCT/US2019/01340 |
| | **Issue date** | **Filing date** | **Publication date** | **International number** |
| **Inventors** | N/A | Jan 13, 2019 | N/A | N/A |
| JONATHAN KARAFIN SEAN | | | | |

## Assignment 1

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 49007 /0452 | KARAFIN, JONATHAN SEAN | LECLAIRRYAN |
| **Pages** | Apr 26, 2019 | 400 CAPITOL MALL, SUITE 1500 |
| 5 | **Assignee** | SACRAMENTO, CA 95814 |
| **Conveyance** | LIGHT FIELD LAB, INC. | **Attorney docket number** |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | 699 E. BROKAW ROAD SAN JOSE | 59630.0001 |
| **Documents** | CALIFORNIA, UNITED STATES | |
| View documents | 95112 | |
| **Recorded** | | |
| Apr 26, 2019 | | |

## Assignment 2

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 54908 /0772 | KARAFIN, JONATHAN SEAN | CHARLES YANG |
| **Pages** | Jan 13, 2021 | 1920 ZANKER RD, SUITE 10 |
| 5 | | |

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Jan 13, 2021

BEVENSEE

BRENDAN ELWOOD

Jan 13, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER RD, SUITE 10

SAN JOSE

CALIFORNIA, UNITED STATES
95112

SAN JOSE, CA 95112

**Attorney docket number**

126US2



**UNITED STATES
PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/13410

Generated on Fri Mar 06 2026 16:07:00 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD VISION-CORRECTIONDEVICE | N/A | N/A | N/A | PCT/US19/13410 PCT/US2019/01341 |

| Inventors | Issue date | Filing date | Publication date | International number |
|---|---|---|---|---|
| JONATHAN KARAFIN SEAN | N/A | Jan 13, 2019 | N/A | N/A |

## Assignment 1

**Reel/ Frame**
49007 /0452

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Apr 26, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LECLAIRRYAN

400 CAPITOL
MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**
59630.0001


**UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/13523

Generated on Fri Mar 06 2026 15:57:15 GMT-0800 (Pacific Standard Time)

---

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| HOLOGRAPHIC AND DIFFRACTIVE OPTICAL ENCODING SYSTEMS | N/A | N/A | N/A | PCT/US19/13523 PCT/US2019/01352 |
| | **Issue date** | **Filing date** | **Publication date** | **International number** |
| **Inventors** | N/A | Jan 14, 2019 | N/A | N/A |
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN | | | | |

---

## Assignment 1

**Reel/ Frame**
49007 /0190

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Apr 26, 2019

BENENSEE, BRENDAN ELWOOD
Apr 26, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LECLAIRRYAN

400 CAPITOL
MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**
59630.0001



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/13539

Generated on Fri Mar 06 2026 15:25:23 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| SYSTEM FOR SIMULATION OF ENVIRONMENTAL ENERGY | N/A | N/A | N/A | PCT/US19/13539 PCT/US2019/01353 |

| Inventors | Issue date | Filing date | Publication date | International number |
|---|---|---|---|---|
| BRENDAN ELWOOD BEVENSEE, JONATHAN KARAFIN SEAN | N/A | Jan 14, 2019 | N/A | N/A |

## Assignment 1

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 49007 /0452 | KARAFIN, JONATHAN SEAN | LECLAIRRYAN |
| **Pages** | Apr 26, 2019 | 400 CAPITOL |
| 5 | **Assignee** | MALL, SUITE 1500 |
| **Conveyance** | LIGHT FIELD LAB, INC. | SACRAMENTO, CA 95814 |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | 699 E. BROKAW ROAD | **Attorney docket number** |
| **Documents** | SAN JOSE | 59630.0001 |
| View documents | CALIFORNIA, UNITED STATES | |
| | 95112 | |
| **Recorded** | | |
| Apr 26, 2019 | | |

## Assignment 2

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 54700 /0236 | KARAFIN, JONATHAN SEAN | LIGHT FIELD LAB, INC. |
| **Pages** | Dec 18, 2020 | 1920 ZANKER ROAD, SUITE 10 |
| 7 | | |

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Dec 18, 2020

BEVENSEE

BRENDAN ELWOOD

Dec 18, 2020

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10

SAN JOSE

CALIFORNIA, UNITED STATES
95112

SAN JOSE, CA 95112

**Attorney docket number**

122US & PCT



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/13552

Generated on Fri Mar 06 2026 15:30:30 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| SYSTEMS AND METHODS FOR DIRECTING MULTIPLE 4D ENERGY FIELDS | N/A | N/A | N/A | PCT/US19/13552 PCT/US2019/01355 |
| | **Issue date** | **Filing date** | **Publication date** | **International number** |
| **Inventors** | N/A | Jan 14, 2019 | N/A | N/A |
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN | | | | |

## Assignment 1

**Reel/ Frame**
49007 /0190

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Apr 26, 2019

BENENSEE, BRENDAN ELWOOD
Apr 26, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LECLAIRRYAN

400 CAPITOL
MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**
59630.0001

## Assignment 2

**Reel/ Frame**
69204 /0859

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

**Correspondent**

LIGHT FIELD LAB INC.

**Pages**
5

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Nov 11, 2024

May 5, 2022

BEVENSEE
BRENDAN ELWOOD
May 5, 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
119PCT



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/13554

Generated on Fri Mar 06 2026 15:41:23 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| SYSTEMS AND METHODS FOR RENDERING DATA FROM A 3D ENVIRONMENT | N/A | N/A | N/A | PCT/US19/13554 PCT/US2019/01355 |
| | Issue date | Filing date | Publication date | International number |
| Inventors | N/A | Jan 14, 2019 | N/A | N/A |
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN | | | | |

## Assignment 1

**Reel/ Frame**
49007 /0190

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Apr 26, 2019

BENENSEE, BRENDAN ELWOOD

Apr 26, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LECLAIRRYAN

400 CAPITOL MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**
59630.0001



**UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/13556

Generated on Fri Mar 06 2026 15:56:45 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| ORDEREDGEOMETRIES FOR OPTOMIZED HOLOGRAPHIC PROJECTION | N/A | N/A | N/A | PCT/US19/13556 PCT/US2019/01355 |

| Inventors | Issue date | Filing date | Publication date | International number |
|---|---|---|---|---|
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN | N/A | Jan 14, 2019 | N/A | N/A |

## Assignment 1

**Reel/ Frame**
49007 /0190

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Apr 26, 2019

BENENSEE, BRENDAN ELWOOD
Apr 26, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LECLAIRRYAN

400 CAPITOL
MALL, SUITE 1500
SACRAMENTO, CA 95814

**Attorney docket number**
59630.0001

## Assignment 2

**Reel/ Frame**
57169 /0034

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

**Correspondent**

LIGHT FIELD LAB, INC.

**Pages**
6

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Aug 13, 2021

Jul 16, 2021

BEVENSEE
BRENDAN ELWOOD
Jul 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
125US2



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/43293

Generated on Fri Mar 06 2026 16:14:30 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY SYSTEM BASED AMUSEMENT PARK ATTRACTION | N/A | N/A | N/A | PCT/US19/43293 PCT/US2019/04329 |
| | Issue date | Filing date | Publication date | International number |
| Inventors | N/A | Jul 24, 2019 | N/A | N/A |
| BRENDAN BEVENSEE ELWOOD, JOHN DOHM, JONATHAN KARAFIN SEAN | | | | |

## Assignment 1

**Reel/ Frame**
50984 /0885

**Pages**
3

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Nov 12, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Sep 2, 2019

BEVENSEE,
BRENDAN ELWOOD
Jul 30, 2019

DOHM, JOHN
Sep 4, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

BRIANA WOBBE

FENWICK & WEST LLP
801 CALIFORNIA STREET
MOUNTAIN VIEW, CA 94041

**Attorney docket number**
35173-43682 /WO



**UNITED STATES
PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/46030

Generated on Fri Mar 06 2026 15:37:46 GMT-0800 (Pacific Standard Time)

---

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| LIGHT FIELD DISPLAY SYSTEM BASED DIGITAL SIGNAGE SYSTEM | N/A | N/A | N/A | PCT/US19/46030 PCT/US2019/04603 |
| | **Issue date** | **Filing date** | **Publication date** | **International number** |
| **Inventors** | N/A | Aug 9, 2019 | N/A | N/A |
| BRENDAN BEVENSEE ELWOOD, JOHN DOHM, JONATHAN KARAFIN SEAN | | | | |

---

## Assignment 1

**Reel/ Frame**
50984 /0931

**Pages**
3

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Nov 12, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Sep 2, 2019

BEVENSEE, BRENDAN ELWOOD
Sep 2, 2019

DOHM, JOHN
Sep 2, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

BRIANA WOBBE

FENWICK & WEST LLP
801 CALIFORNIA STREET
MOUNTAIN VIEW, CA 94041

**Attorney docket number**
35173-41296/WO

## Assignment 2

**Reel/ Frame**

54584 /0136

**Pages**

6

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Dec 8, 2020

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Dec 8, 2020

BEVENSEE,
BRENDAN ELWOOD

Dec 8, 2020

DOHM, JOHN

Dec 8, 2020

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

300 , 302 , 306 & 307



# UNITED STATES
# PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/47107

Generated on Fri Mar 06 2026 15:36:23 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY FOR CONSUMER DEVICES | N/A | N/A | N/A | PCT/US19/47107 PCT/US2019/04710 |

| Inventors | Issue date | Filing date | Publication date | International number |
|---|---|---|---|---|
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN | N/A | Aug 19, 2019 | N/A | N/A |

## Assignment 1

**Reel/ Frame**
50508 /0203

**Pages**
3

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Sep 26, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Sep 2, 2019

BEVENSEE BRENDAN ELWOOD
Sep 2, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

POORNIMA BALASUBRAMANYAM

FENWICK & WEST LLP
801 CALIFORNIA STREET
MOUNTAIN VIEW, CA 94041

**Attorney docket number**
35173-41298

## Assignment 2

**Reel/ Frame**
54584 /0167

**Pages**

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Dec 8, 2020

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

6

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Dec 8, 2020

BEVENSEE,
BRENDAN ELWOOD

Dec 8, 2020

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

SAN JOSE, CA 95112

**Attorney docket number**

301,303,305,308,309   & 310



**UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/48143

Generated on Fri Mar 06 2026 15:31:39 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY SYSTEM FOR SPORTING EVENTS | N/A | N/A | N/A | PCT/US19/48143 PCT/US2019/04814 |

| Inventors | Issue date | Filing date | Publication date | International number |
|---|---|---|---|---|
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN | N/A | Aug 26, 2019 | N/A | N/A |

## Assignment 1

**Reel/ Frame**
51008/0347

**Pages**
3

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Nov 14, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Oct 1, 2019

BEVENSEE
BRENDAN ELWOOD
Oct 1, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

CHARLES D. CATHEY

FENWICK & WEST LLP

801 CALIFORNIA STREET

MOUNTAIN VIEW, CA 94041

**Attorney docket number**

35173-41265/WO

## Assignment 2

**Reel/ Frame**
54584 /0167

**Pages**

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Dec 8, 2020

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

6

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Dec 8, 2020

BEVENSEE,
BRENDAN ELWOOD

Dec 8, 2020

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

SAN JOSE, CA 95112

**Attorney docket number**

301,303,305,308,309   & 310



## UNITED STATES
## PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/49379

Generated on Fri Mar 06 2026 15:29:55 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY FOR MOBILE DEVICES | N/A | N/A | N/A | PCT/US19/49379 PCT/US2019/04937 |

| Inventors | Issue date | Filing date | Publication date | International number |
|---|---|---|---|---|
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN | N/A | Sep 3, 2019 | N/A | N/A |

## Assignment 1

**Reel/ Frame**
50976 /0031

**Pages**
3

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Nov 11, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Oct 1, 2019

BEVENSEE BRENDAN ELWOOD
Nov 11, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**
POORNIMA BALASUBRAMANYAM

FENWICK & WEST LLP
801 CALIFORNIA STREET
MOUNTAIN VIEW, CA 94041

**Attorney docket number**
N/A

## Assignment 2

**Reel/ Frame**
54584 /0167

**Pages**

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Dec 8, 2020

**Correspondent**
LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

6

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Dec 8, 2020

BEVENSEE,
BRENDAN ELWOOD

Dec 8, 2020

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

SAN JOSE, CA 95112

**Attorney docket number**

301,303,305,308,309   & 310



**UNITED STATES
PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/49399

Generated on Fri Mar 06 2026 15:33:22 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY SYSTEM FOR GAMING ENVIRONMENTS | N/A | N/A | N/A | PCT/US19/49399 PCT/US2019/04939 |

| Inventors | Issue date | Filing date | Publication date | International number |
|---|---|---|---|---|
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN | N/A | Sep 3, 2019 | N/A | N/A |

## Assignment 1

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 50985 /0309 | KARAFIN, JONATHAN SEAN | JONATHAN W. BINGHAM |
| | Oct 1, 2019 | |
| **Pages** | | FENWICK & WEST LLP |
| 3 | BEVENSEE BRENDAN ELWOOD | 801 CALIFORNIA STREET |
| | Oct 1, 2019 | MOUNTAIN VIEW, CA 94041 |
| **Conveyance** | **Assignee** | |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | | **Attorney docket number** |
| | LIGHT FIELD LAB, INC. | 35173-41294/WO |
| **Documents** | 699 E BROKAW ROAD | |
| View documents | SAN JOSE | |
| | CALIFORNIA, UNITED STATES | |
| **Recorded** | 95112 | |
| Nov 12, 2019 | | |

## Assignment 2

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 54584 /0167 | KARAFIN, JONATHAN SEAN | LIGHT FIELD LAB, INC. |
| | Dec 8, 2020 | |
| **Pages** | | 1920 ZANKER ROAD, SUITE 10 |

6

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Dec 8, 2020

BEVENSEE,
BRENDAN ELWOOD

Dec 8, 2020

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

SAN JOSE, CA 95112

**Attorney docket number**

301,303,305,308,309  & 310



# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/51178

Generated on Fri Mar 06 2026 16:10:22 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY SYSTEM FOR ADULT APPLICATIONS | N/A | N/A | N/A | PCT/US19/51178 PCT/US2019/05117 |

| Inventors | Issue date | Filing date | Publication date | International number |
|---|---|---|---|---|
| BRENDAN BEVENSEE ELWOOD, JOHN DOHM, JONATHAN KARAFIN SEAN | N/A | Sep 13, 2019 | N/A | N/A |

## Assignment 1

**Reel/ Frame**
51007/0581

**Pages**
3

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Nov 14, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Oct 1, 2019

BEVENSEE, BRENDAN ELWOOD
Oct 1, 2019

DOHM, JOHN
Oct 1, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

JONATHAN W. BINGHAM

FENWICK & WEST LLP
801 CALIFORNIA STREET
MOUNTAIN VIEW, CA 94041

**Attorney docket number**
35173-41295/WO

## Assignment 2

**Reel/ Frame**

54584 /0136

**Pages**
6

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**
Dec 8, 2020

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Dec 8, 2020

BEVENSEE,
BRENDAN ELWOOD

Dec 8, 2020

DOHM, JOHN

Dec 8, 2020

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

300 , 302 , 306  & 307



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/53918

Generated on Fri Mar 06 2026 15:38:46 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| HOLOGRAPHIC OBJECT RELAY FOR LIGHT FIELD DISPLAY | N/A | N/A | N/A | PCT/US19/53918 PCT/US2019/05391 |

| Inventors | Issue date | Filing date | Publication date | International number |
|---|---|---|---|---|
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN | N/A | Sep 30, 2019 | N/A | N/A |

## Assignment 1

**Reel/ Frame**
55937 /0198

**Pages**
6

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 15, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Mar 30, 2021

BEVENSEE
BRENDAN ELWOOD

Mar 29, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

130



**UNITED STATES
PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/64268

Generated on Fri Mar 06 2026 15:29:18 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY SYSTEM FOR VIDEO GAMES AND ELECTRONIC SPORTS | N/A | N/A | N/A | PCT/US19/64268 PCT/US2019/06426 |
| | Issue date | Filing date | Publication date | International number |
| | N/A | Dec 3, 2019 | N/A | N/A |
| Inventors | | | | |
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN, TREVOR BERNINGER | | | | |

## Assignment 1

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 52856 /0690 | BEVENSEE BRENDAN ELWOOD | CHRISTOPHER M. CORBET |
| **Pages** | Apr 16, 2020 | FENWICK & WEST LLP |
| 4 | | 801 CALIFORNIA STREET |
| **Conveyance** | BERNINGER, TREVOR | MOUNTAIN VIEW, CA 94041 |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | Apr 23, 2020 | **Attorney docket number** |
| **Documents** | KARAFIN, JONATHAN SEAN | 35173-41312/WO |
| View documents | Apr 22, 2020 | |
| **Recorded** | **Assignee** | |
| Jun 5, 2020 | LIGHT FIELD LAB, INC. 1920 ZANKER ROAD, SUITE 10 SAN JOSE CALIFORNIA, UNITED STATES 95112 | |

## Assignment 2

**Reel/ Frame**

55082 /0049

**Pages**

5

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Jan 29, 2021

**Assignors & execution date**

BEVENSEE,
BRENDAN ELWOOD

Dec 8, 2020

BERNINGER, TREVOR

Dec 8, 2020

KARAFIN, JONATHAN SEAN

Dec 8, 2020

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10

SAN JOSE

CALIFORNIA, UNITED STATES

95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

311PCT



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US19/67433

Generated on Fri Mar 06 2026 16:15:01 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY SYSTEM FOR VEHICLE AUGMENTATION | N/A | N/A | N/A | PCT/US19/67433 PCT/US2019/06743 |

| Inventors | Issue date | Filing date | Publication date | International number |
|---|---|---|---|---|
| BRENDAN BEVENSEE ELWOOD, JOHN DOHM, JONATHAN KARAFIN SEAN | N/A | Dec 19, 2019 | N/A | N/A |

## Assignment 1

**Reel/ Frame**
54584 /0136

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Dec 8, 2020

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Dec 8, 2020

BEVENSEE, BRENDAN ELWOOD

Dec 8, 2020

DOHM, JOHN

Dec 8, 2020

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

300 , 302 , 306 & 307



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US20/15276

Generated on Fri Mar 06 2026 15:36:54 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| VIDEO COMMUNICATION INCLUDING HOLOGRAPHIC CONTENT | N/A | N/A | N/A | PCT/US20/15276 PCT/US2020/01527 |
| | Issue date | Filing date | Publication date | International number |
| Inventors | N/A | Jan 27, 2020 | N/A | N/A |
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN | | | | |

## Assignment 1

**Reel/ Frame**
54584 /0167

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Dec 8, 2020

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Dec 8, 2020

BEVENSEE, BRENDAN ELWOOD

Dec 8, 2020

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

301,303,305,308,309 & 310



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US20/21998

Generated on Fri Mar 06 2026 15:38:20 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title**<br>LIGHT FIELD DISPLAY SYSTEM FOR CINEMAS | **Patent number**<br>N/A | **Application number**<br>N/A | **Publication number**<br>N/A | **PCT number**<br>PCT/US20/21998<br>PCT/US2020/02199 |
| **Inventors**<br>BRENDAN BEVENSEE ELWOOD, JOHN DOHM, JONATHAN KARAFIN SEAN | **Issue date**<br>N/A | **Filing date**<br>Mar 11, 2020 | **Publication date**<br>N/A | **International number**<br>N/A |

## Assignment 1

**Reel/ Frame**
52856 /0744

**Pages**
4

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jun 5, 2020

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Apr 22, 2020

BEVENSEE, BRENDAN ELWOOD
Apr 16, 2020

DOHM, JOHN
Apr 22, 2020

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

CHRISTOPHER M. CORBET

FENWICK & WEST LLP
801 CALIFORNIA STREET
MOUNTAIN VIEW, CA 94041

**Attorney docket number**
3517-41266/WO



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US20/30761

Generated on Fri Mar 06 2026 16:15:31 GMT-0800 (Pacific Standard Time)

---

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY SYSTEM FOR PERFORMANCE EVENTS | N/A | N/A | N/A | PCT/US20/30761<br>PCT/US2020/03076 |

| Inventors | Issue date | Filing date | Publication date | International number |
|---|---|---|---|---|
| BRENDAN BEVENSEE ELWOOD, JOHN DOHM, JONATHAN KARAFIN SEAN | N/A | Apr 30, 2020 | N/A | N/A |

---

## Assignment 1

**Reel/ Frame**
54584 /0136

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Dec 8, 2020

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Dec 8, 2020

BEVENSEE, BRENDAN ELWOOD

Dec 8, 2020

DOHM, JOHN

Dec 8, 2020

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

300, 302, 306 & 307


**UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US20/31915

Generated on Fri Mar 06 2026 15:55:24 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY SYSTEM BASED COMMERCIAL SYSTEM | N/A | N/A | N/A | PCT/US20/31915 PCT/US2020/03191 |

| Inventors | Issue date | Filing date | Publication date | International number |
|---|---|---|---|---|
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN | N/A | May 7, 2020 | N/A | N/A |

## Assignment 1

**Reel/ Frame**
54584 /0167

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Dec 8, 2020

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Dec 8, 2020

BEVENSEE
BRENDAN ELWOOD
Dec 8, 2020

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

301,303,305,308,309   & 310


UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US21/10055

Generated on Fri Mar 06 2026 15:28:27 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| ENERGY RELAYS WITH ENERGY PROPAGATION HAVING PREDETERMINED ORIENTATIONS | N/A | N/A | N/A | PCT/US21/10055 PCT/US2021/01005 |
| | **Issue date** | **Filing date** | **Publication date** | **International number** |
| **Inventors** | N/A | Dec 15, 2021 | N/A | N/A |
| BRENDAN BEVENSEE ELWOOD, JONATHAN KARAFIN SEAN | | | | |

## Assignment 1

**Reel/ Frame**
63945 /0849

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jun 14, 2023

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jun 13, 2023

BEVENSEE, BRENDAN ELWOOD
Jun 13, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

137

 UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US21/58499

Generated on Fri Mar 06 2026 16:17:42 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| ENERGY MODULATION SYSTEMS FOR DIFFRACTION BASED HOLOGRAPHIC DISPLAYS | N/A | N/A | N/A | PCT/US21/58499 PCT/US2021/05849 |
| | **Issue date** | **Filing date** | **Publication date** | **International number** |
| **Inventors** | N/A | Nov 9, 2021 | N/A | N/A |
| BRENDAN BEVENSEE ELWOOD, CHARLES YANG C., JONATHAN KARAFIN SEAN | | | | |

## Assignment 1

**Reel/ Frame**
64358 /0649

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jul 24 , 2023

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jul 11, 2023

BEVENSEE, BRENDAN ELWOOD
Jul 11, 2023

YANG, CHARLES C.
Jul 11, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
138

**uspto** UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for PCT #: PCT/US23/22149

Generated on Fri Mar 06 2026 16:04:38 GMT-0800 (Pacific Standard Time)

| | | | |
|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| HAPTIC DEVICES | N/A | N/A | N/A | PCT/US23/22149 |
| | | | | PCT/US2023/02214 |
| **Inventors** | | | | |
| BRENDAN BEVENSEE ELWOOD, | **Issue date** | **Filing date** | **Publication date** | **International number** |
| DANIEL SMALLEY , ELIAS | N/A | May 12, 2023 | | |
| GUANUNA , EMILY LAUGHLIN | | | N/A | N/A |
| , JONATHAN KARAFIN SEAN, | | | | |
| KEATON SHURILLA , KYLE | | | | |
| SCHVANEVELDT , LUKE | | | | |
| JOHNSON | | | | |

## Assignment 1

**Reel/ Frame**
70366 /0840

**Pages**
4

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Feb 28 , 2025

**Assignors & execution date**
BRIGHAM YOUNG UNIVERSITY
May 12, 2022

**Assignee**
LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**
LIGHT FIELD LAB INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
140

## Assignment 2

**Reel/ Frame**

**Assignors & execution date**

**Correspondent**

70364 /0278

**Pages**
10

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Feb 28 , 2025

SMALLEY, DANIEL
Jun 29 , 2022

LAUGHLIN, EMILY
Jun 15 , 2022

GUANUNA, ELIAS
Jun 16 , 2022

**View more**

**Assignee**

BRIGHAM YOUNG UNIVERSITY
TECHNOLOGY
TRANSFER OFFICE
3760 HBLL - BRIGHAM
YOUNG UNIVERSITY
PROVO
CALIFORNIA, UNITED STATES
95112

LIGHT FIELD LAB INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
140

---

## Assignment 3

**Reel/ Frame**
70364 /0653

**Pages**
5

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Feb 28 , 2025

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jun 30 , 2022

BEVENSEE,
BRENDAN ELWOOD
Jun 30 , 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
140



**UNITED STATES
PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Publication #: 20190004326

Generated on Fri Mar 06 2026 15:03:01 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| ENCODED ENERGY WAVEGUIDES FOR HOLOGRAPHIC SUPER RESOLUTION | N/A | 16064145 | 20190004326 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | N/A | **Filing date** Jun 20, 2018 | **Publication date** Jan 3, 2019 | N/A |

## Assignment 1

**Reel/ Frame**
46151/0089

**Pages**
4

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jun 20, 2018

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jun 4, 2018

BEVENSEE BRENDAN ELWOOD
Jun 4, 2018

**Assignee**

LIGHT FIELD LAB, INC.
699 E. BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

FISHER BROYLES LLP

555 UNIVERSITY AVE., SUITE 280
SACRAMENTO, CA 95825

**Attorney docket number**

8821.103US2



**UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Publication #: 20200290513

Generated on Fri Mar 06 2026 15:05:25 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY SYSTEM FOR VEHICLE AUGMENTATION | N/A | 16352695 | 20200290513 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood , John Dohm | N/A | **Filing date** | **Publication date** | N/A |
| | | Mar 13, 2019 | Sep 17, 2020 | |

## Assignment 1

**Reel/ Frame**
48909 /0805

**Pages**
3

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 17, 2019

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Mar 14, 2019

BEVENSEE, BRENDAN ELWOOD
Apr 16, 2019

DOHM, JOHN
Mar 14, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

CHARLES CATHEY

FENWICK & WEST LLP

801 CALIFORNIA STREET

MOUNTAIN VIEW, CA 94041

**Attorney docket number**

35173-41238/US



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20200371472

Generated on Fri Mar 06 2026 15:02:38 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| Light Field Display System Based Commercial System | N/A | 16418237 | 20200371472 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | N/A | **Filing date** | **Publication date** | N/A |
| | | May 21, 2019 | Nov 26, 2020 | |

## Assignment 1

**Reel/ Frame**

52308 /0155

**Pages**

3

**Conveyance**

ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Apr 3, 2020

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Sep 2, 2019

BEVENSEE,
BRENDAN ELWOOD

Sep 16, 2019

**Assignee**

LIGHT FIELD LAB, INC.
699 E BROKAW ROAD
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

MATTHEW LEM

FENWICK & WEST LLP

801 CALIFORNIA STREET

MOUNTAIN VIEW, CA 94041

**Attorney docket number**

35173-41239/US



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20220107446

Generated on Fri Mar 06 2026 14:59:49 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| SYSTEMS AND METHODS FOR TRANSVERSE ENERGY LOCALIZATION IN ENERGY RELAYS USING ORDERED STRUCTURES | N/A | 17502684 | 20220107446 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | N/A | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | **Filing date** Oct 15, 2021 | **Publication date** Apr 7, 2022 | N/A |

## Assignment 1

**Reel/ Frame**
58416/0486

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Dec 17, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Dec 16, 2021

BEVENSEE, BRENDAN ELWOOD

Dec 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

106,107,116,121,132,134

 UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20220179193

Generated on Fri Mar 06 2026 15:00:12 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| FOUR-DIMENSIONAL ENERGY DIRECTING SYSTEMS AND METHODS | N/A | 17600825 | 20220179193 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Issue date** | | | | **International** |
| **Inventors** | N/A | **Filing date** | **Publication date** | **number** |
| Brendan Bevensee Elwood, Jonathan Karafin Sean | | Oct 1, 2021 | Jun 9, 2022 | N/A |

## Assignment 1

**Reel/ Frame**
58416/0486

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Dec 17, 2021

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Dec 16, 2021

BEVENSEE, BRENDAN ELWOOD

Dec 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

106,107,116,121,132,134



**UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Publication #: 20220277684

Generated on Fri Mar 06 2026 15:04:16 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| SCAN LINE REFRESH FOR MODULAR DISPLAY SYSTEMS | N/A | 17612887 | 20220277684 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Trevor Berninger , Brendan Bevensee Elwood | N/A | **Filing date** Dec 13, 2021 | **Publication date** Sep 1, 2022 | N/A |

## Assignment 1

**Reel/ Frame**
59872 /0594

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
May 9, 2022

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
May 6, 2022

BERNINGER TREVOR
May 6, 2022

BEVENSEE BRENDAN ELWOOD
May 6, 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
135US2



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20220308359

Generated on Fri Mar 06 2026 14:54:11GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY SYSTEM FOR GAMING ENVIRONMENTS | N/A | 17640053 | 20220308359 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | N/A | | | N/A |
| | | **Filing date** | **Publication date** | |
| | | Mar 3, 2022 | Sep 29, 2022 | |

## Assignment 1

**Reel/ Frame**
59842 /0809

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
May 6, 2022

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
May 5, 2022

BEVENSEE, BRENDAN ELWOOD
May 5, 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

LFL MULTIPLE ASSIGNMENTS



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20220329917

Generated on Fri Mar 06 2026 14:56:47 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| Light Field Display System for Adult Applications | N/A | 17642350 | 20220329917 | N/A |
| | | | | N/A |
| | | View in PPUBS | View in PPUBS | International number |
| Inventors | Issue date | | | |
| Jonathan Karafin Sean, Brendan Bevensee Elwood , John Dohm | N/A | | Publication number | N/A |
| | | Filing date | Publication date | |
| | | Mar 11, 2022 | Oct 13, 2022 | |

## Assignment 1

**Reel/ Frame**
59872 /0730

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
May 9, 2022

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
May 6, 2022

BEVENSEE, BRENDAN ELWOOD
May 6, 2022

DOHM, JOHN
May 6, 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
304US2 & 306US2



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20220368854

Generated on Fri Mar 06 2026 14:58:59 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| VIDEO COMMUNICATION INCLUDING HOLOGRAPHIC CONTENT | N/A | 17828390 | 20220368854 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | N/A | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | **Filing date** May 31, 2022 | **Publication date** Nov 17, 2022 | N/A |

## Assignment 1

**Reel/ Frame**
60950 /0799

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Aug 31, 2022

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Aug 29, 2022

BEVENSEE, BRENDAN ELWOOD
Aug 29, 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

136,310,130



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20230040123

Generated on Fri Mar 06 2026 14:54:37 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| SYSTEMS AND METHODS FOR DIRECTING MULTIPLE 4D ENERGY FIELDS | N/A | 17674394 | 20230040123 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | N/A | **Filing date** Feb 17, 2022 | **Publication date** Feb 9, 2023 | N/A |

## Assignment 1

**Reel/ Frame**
59842 /0809

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
May 6, 2022

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
May 5, 2022

BEVENSEE, BRENDAN ELWOOD
May 5, 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**
LFL MULTIPLE ASSIGNMENTS



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Publication #: 20230185106

Generated on Fri Mar 06 2026 15:06:18 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| FOUR DIMENSIONAL ENERGY-FIELD PACKAGE ASSEMBLY | N/A | 18081253 | 20230185106 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | N/A | **Filing date** | **Publication date** | N/A |
| | | Dec 14, 2022 | Jun 15, 2023 | |

## Assignment 1

**Reel/ Frame**
63371/0086

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 19, 2023

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Mar 8, 2023

BEVENSEE, BRENDAN ELWOOD
Mar 8, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

124US3



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20230188698

Generated on Fri Mar 06 2026 14:52:13 GMT-0800 (Pacific Standard Time)

| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
|---|---|---|---|---|
| MULTISCOPIC IMAGE CAPTURE SYSTEM | N/A | 18081171 | 20230188698 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Miller Schuck H., Douglas McKnight J, Mrityunjay Kumar, Wilhelm Taylor | N/A | **Filing date** Dec 14, 2022 | **Publication date** Jun 15, 2023 | N/A |

## Assignment 1

**Reel/ Frame**
63370 /0961

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Apr 19, 2023

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Mar 8, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

201US4



# Patent Assignment Abstract of Title

Search results for Publication #: 20230194889

Generated on Fri Mar 06 2026 14:59:20 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title**<br>HOLOGRAPHIC OBJECT RELAY FOR LIGHT FIELD DISPLAY | **Patent number**<br>N/A | **Application number**<br>17889731<br><br>View in PPUBS | **Publication number**<br>20230194889<br><br>View in PPUBS | **PCT number**<br>N/A<br><br>N/A |
| **Inventors**<br>Jonathan Karafin Sean, Brendan Bevensee Elwood | **Issue date**<br>N/A | **Filing date**<br>Aug 17, 2022 | **Publication date**<br>Jun 22, 2023 | **International number**<br>N/A |

## Assignment 1

**Reel/ Frame**
60950 /0799

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Aug 31, 2022

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Aug 29, 2022

BEVENSEE, BRENDAN ELWOOD

Aug 29, 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

136,310,130



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20230333310

Generated on Fri Mar 06 2026 15:04:37 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** HOLOGRAPHIC SUPERIMPOSITION OF REAL WORLD PLENOPTIC OPACITY MODULATION THROUGH TRANSPARENT WAVEGUIDE ARRAYS FOR LIGHT FIELD, VIRTUAL AND AUGMENTED REALITY | **Patent number** N/A **Issue date** N/A | **Application number** 18137586 **View in PPUBS** **Filing date** Apr 21, 2023 | **Publication number** 20230333310 **View in PPUBS** **Publication date** Oct 19, 2023 | **PCT number** N/A N/A **International number** N/A |

**Inventors**

Jonathan Karafin Sean, Brendan Bevensee Elwood

---

## Assignment 1

**Reel/ Frame**
64185/0918

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jul 7, 2023

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jul 6, 2023

BEVENSEE, BRENDAN ELWOOD

Jul 6, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

109US4



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20230341592

Generated on Fri Mar 06 2026 15:05:46 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** SYSTEMS AND METHODS FOR RENDERING DATA FROM A 3D ENVIRONMENT | **Patent number** N/A | **Application number** 18136959 | **Publication number** 20230341592 | **PCT number** N/A |
| | **Issue date** N/A | View in PPUBS | View in PPUBS | N/A |
| **Inventors** Jonathan Karafin Sean | | | | **International number** |
| | | **Filing date** Apr 20, 2023 | **Publication date** Oct 26, 2023 | N/A |

## Assignment 1

**Reel/ Frame**
64186/0030

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jul 7, 2023

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jul 6, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

123US3



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20230408757

Generated on Fri Mar 06 2026 15:03:51 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| HIGH-DENSITY ENERGY DIRECTING DEVICES FOR TWO-DIMENSIONAL, STEREOSCOPIC, LIGHT FIELD AND HOLOGRAPHIC DISPLAYS | N/A | 18211826 | 20230408757 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | **Publication date** | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | N/A | **Filing date** Jun 20, 2023 | Dec 21, 2023 | N/A |

## Assignment 1

**Reel/ Frame**
67689 /0536

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jun 11, 2024

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Apr 26, 2021

BEVENSEE, BRENDAN ELWOOD
Apr 26, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
108US5



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Publication #: 20230415021

Generated on Fri Mar 06 2026 14:56:24 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title**<br>Light Field Display System for Sporting Events | **Patent number**<br>N/A | **Application number**<br>18201910<br><br>View in PPUBS | **Publication number**<br>20230415021<br><br>View in PPUBS | **PCT number**<br>N/A<br><br>N/A |
| **Inventors**<br>Jonathan Karafin Sean, Brendan Bevensee Elwood | **Issue date**<br>N/A | **Filing date**<br>May 25, 2023 | **Publication date**<br>Dec 28, 2023 | **International number**<br>N/A |

## Assignment 1

**Reel/Frame**
64185/0635

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jul 7, 2023

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jul 6, 2023

BEVENSEE, BRENDAN ELWOOD
Jul 6, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

303US3



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20230417981

Generated on Fri Mar 06 2026 14:57:10 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| SYSTEM AND METHODS FOR REALIZING TRANSVERSE ANDERSON LOCALIZATION IN ENERGY RELAYS USING COMPONENT ENGINEERED STRUCTURES | N/A | 18212933 | 20230417981 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| | N/A | **Filing date** | **Publication date** | **International number** |
| | | Jun 22, 2023 | Dec 28, 2023 | N/A |

**Inventors**

Jonathan Karafin Sean, Brendan Bevensee Elwood

## Assignment 1

**Reel/ Frame**

64185/0266

**Pages**

5

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Jul 7, 2023

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jul 6, 2023

BEVENSEE, BRENDAN ELWOOD

Jul 6, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

106US4



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20240027677

Generated on Fri Mar 06 2026 15:01:09 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| SELECTIVE PROPAGATION OF ENERGY IN LIGHT FIELD AND HOLOGRAPHIC WAVEGUIDE ARRAYS | N/A | 18199505 | 20240027677 | N/A |

**Inventors**

Jonathan Karafin Sean, Brendan Bevensee Elwood

**Patent number**: N/A

**Issue date**: N/A

**Application number**: 18199505

View in PPUBS

**Filing date**: May 19, 2023

**Publication number**: 20240027677

View in PPUBS

**Publication date**: Jan 25, 2024

**PCT number**: N/A

N/A

**International number**: N/A

## Assignment 1

**Reel/ Frame**

64185/0698

**Pages**

5

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Jul 7, 2023

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jul 6, 2023

BEVENSEE, BRENDAN ELWOOD

Jul 6, 2023

**Assignee**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE

CALIFORNIA, UNITED STATES

95112

**Correspondent**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

104US4



# Patent Assignment Abstract of Title

Search results for Publication #: 20240045377

Generated on Fri Mar 06 2026 15:07:06 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title**<br>RELAY SYSTEMS | **Patent number**<br>N/A | **Application number**<br>18235864 | **Publication number**<br>20240045377 | **PCT number**<br>N/A |
| **Inventors**<br>Jonathan Karafin Sean,<br>Brendan Bevensee Elwood | **Issue date**<br>N/A | View in PPUBS | View in PPUBS | N/A |
| | | | **International number** | |
| | **Filing date**<br>Aug 20, 2023 | **Publication date**<br>Feb 8, 2024 | N/A | |

## Assignment 1

**Reel/ Frame**
67689 /0805

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jun 11, 2024

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Aug 29, 2022

BEVENSEE, BRENDAN ELWOOD

Aug 29, 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

136US3



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20240077668

Generated on Fri Mar 06 2026 14:58:12 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| METHOD OF CALIBRATION FOR HOLOGRAPHIC ENERGY DIRECTING SYSTEMS | N/A | 18368520 | 20240077668 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | N/A | | | **International number** |
| Brendan Bevensee Elwood , Jonathan Karafin Sean | | **Filing date** | **Publication date** | N/A |
| | | Sep 14, 2023 | Mar 7, 2024 | |

## Assignment 1

| Reel/ Frame | Assignors & execution date | Correspondent |
|---|---|---|
| 67707 /0694 | KARAFIN, JONATHAN SEAN | LIGHT FIELD LAB INC. |
| **Pages** | Dec 16, 2021 | 1920 ZANKER ROAD, SUITE 10 |
| 5 | | SAN JOSE, CA 95112 |
| **Conveyance** | BEVENSEE, BRENDAN ELWOOD | |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | Dec 16, 2021 | **Attorney docket number** |
| | **Assignee** | 107US4 |
| **Documents** | | |
| View documents | LIGHT FIELD LAB, INC. | |
| | 1920 ZANKER ROAD, SUITE 10 | |
| **Recorded** | SAN JOSE | |
| Jun 12, 2024 | CALIFORNIA, UNITED STATES | |
| | 95112 | |



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20240077746

Generated on Fri Mar 06 2026 14:52:49 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title**<br>LIGHT FIELD VISION-CORRECTIONDEVICE | **Patent number**<br>N/A | **Application number**<br>18244724<br><br>View in PPUBS | **Publication number**<br>20240077746<br><br>View in PPUBS | **PCT number**<br>N/A<br><br>N/A |
| **Inventors**<br>Jonathan Karafin Sean, Brendan Bevensee Elwood | **Issue date**<br>N/A | **Filing date**<br>Sep 11, 2023 | **Publication date**<br>Mar 7, 2024 | **International number**<br>N/A |

## Assignment 1

**Reel/ Frame**
67689 /0888

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jun 11, 2024

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

May 4, 2023

BEVENSEE, BRENDAN ELWOOD

Apr 19, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
121US5



# Patent Assignment Abstract of Title

Search results for Publication #: 20240085617

Generated on Fri Mar 06 2026 14:57:33 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| ENERGY RELAY AND TRANSVERSE ANDERSON LOCALIZATION FOR PROPAGATION OF TWO-DIMENSIONAL, LIGHT FIELD AND HOLOGRAPHIC ENERGY | N/A | 18368487 | 20240085617 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| | N/A | **Filing date** | **Publication date** | **International number** |
| **Inventors** | | Sep 14, 2023 | Mar 14, 2024 | N/A |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | | | |

## Assignment 1

**Reel/ Frame**
70355 /0584

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Feb 27, 2025

**Assignors & execution date**
KARAFIN, JONATHAN SEAN
Jun 4, 2018

BEVENSEE, BRENDAN ELWOOD
Jun 4, 2018

**Assignee**
LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**
LIGHT FIELD LAB INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
105US3



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20240118558

Generated on Fri Mar 06 2026 14:53:17 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title**<br>ENERGYFIELD THREE-DIMENSIONAL PRINTING SYSTEM | **Patent number**<br>N/A | **Application number**<br>18540424 | **Publication number**<br>20240118558 | **PCT number**<br>N/A<br><br>N/A |
| | **Issue date**<br>N/A | View in PPUBS | View in PPUBS | **International number**<br>N/A |
| **Inventors**<br>Jonathan Karafin Sean, Brendan Bevensee Elwood | | **Filing date**<br>Dec 14, 2023 | **Publication date**<br>Apr 11, 2024 | |

## Assignment 1

**Reel/ Frame**
67707 /0744

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jun 12, 2024

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Mar 30, 2021

BEVENSEE, BRENDAN ELWOOD
Mar 29, 2021

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
126US4


UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20240134092

Generated on Fri Mar 06 2026 16:47:47 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** SYSTEMS AND METHODS FOR FORMING ENERGY RELAYS WITH TRANSVERSE ENERGY LOCALIZATION | **Patent number** N/A | **Application number** 18393173 View in PPUBS | **Publication number** 20240134092 View in PPUBS | **PCT number** N/A N/A |
| **Inventors** Jonathan Karafin Sean, Brendan Bevensee Elwood, Ed Ibe, Jared Perez, Xudong Chen, Joseph Rickwalder W. | **Issue date** N/A | **Filing date** Dec 21, 2023 | **Publication date** Apr 25, 2024 | **International number** N/A |

## Assignment 1

**Reel/ Frame**
70355 /0001

**Pages**
7

**Conveyance**
ASSIGNMENT OF
ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Feb 27, 2025

**Assignors & execution date**

IBE, ED
Dec 6, 2019

PEREZ JARED
Dec 6, 2019

CHEN, XUDONG
Dec 6, 2019

View more

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

N/A



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20240151896

Generated on Fri Mar 06 2026 15:06:42 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| SYSTEM AND METHODS OF UNIVERSAL PARAMETERIZATION OF HOLOGRAPHIC SENSORY DATA GENERATION, MANIPULATION AND TRANSPORT | N/A | 18544093 | 20240151896 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | N/A | **Filing date** | **Publication date** | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | Dec 18, 2023 | May 9, 2024 | N/A |

## Assignment 1

**Reel/ Frame**
70356 /0386

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Feb 27, 2025

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jun 4, 2018

BEVENSEE, BRENDAN ELWOOD
Jun 4, 2018

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
110US3



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Publication #: 20240155101

Generated on Fri Mar 06 2026 14:55:37 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| Light Field Display System Based Digital Signage System | N/A | 18394753 | 20240155101 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood , John Dohm | N/A | **Filing date** | **Publication date** | N/A |
| | | Dec 22, 2023 | May 9, 2024 | |

## Assignment 1

**Reel/ Frame**

67717/0633

**Pages**

6

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Jun 13, 2024

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Dec 8, 2020

BEVENSEE, BRENDAN ELWOOD

Dec 8, 2020

DOHM, JOHN

Dec 8, 2020

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

307US2



# Patent Assignment Abstract of Title

Search results for Publication #: 20240226723

Generated on Fri Mar 06 2026 14:53:42 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| Light Field Display System for Video Games and Electronic Sports | N/A | 18583310 | 20240226723 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | **Filing date** | **Publication date** | **International number** |
| Brendan Bevensee Elwood , Trevor Berninger , Jonathan Karafin Sean | N/A | Feb 21, 2024 | Jul 11, 2024 | N/A |

## Assignment 1

| | | |
|---|---|---|
| **Reel/ Frame** | **Assignors & execution date** | **Correspondent** |
| 67717/0348 | BEVENSEE, BRENDAN ELWOOD | LIGHT FIELD LAB INC. |
| **Pages** | Aug 29, 2022 | 1920 ZANKER ROAD, SUITE 10 |
| 6 | | SAN JOSE, CA 95112 |
| **Conveyance** | BERNINGER, TREVOR | **Attorney docket number** |
| ASSIGNMENT OF ASSIGNOR'S INTEREST | Aug 25, 2022 | 311US3 |
| **Documents** | KARAFIN, JONATHAN SEAN | |
| View documents | Aug 29, 2022 | |
| **Recorded** | **Assignee** | |
| Jun 13, 2024 | LIGHT FIELD LAB, INC. | |
| | 1920 ZANKER ROAD, SUITE 10 | |
| | SAN JOSE | |
| | CALIFORNIA, UNITED STATES | |
| | 95112 | |


UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20240286052

Generated on Fri Mar 06 2026 15:02:11GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| Light Field Display System Based Amusement Park Attraction | N/A | 18434408 | 20240286052 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood , John Dohm | N/A | **Filing date** | **Publication date** | N/A |
| | | Feb 6, 2024 | Aug 29, 2024 | |

## Assignment 1

**Reel/ Frame**
67708 /0563

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jun 12, 2024

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Aug 29, 2022

BEVENSEE, BRENDAN ELWOOD
Aug 29, 2022

DOHM, JOHN
Aug 29, 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

312US4



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20240319669

Generated on Fri Mar 06 2026 14:58:37 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** <br> ENERGY MODULATION SYSTEMS FOR DIFFRACTION BASED HOLOGRAPHIC DISPLAYS | **Patent number** <br> N/A | **Application number** <br> 18585722 | **Publication number** <br> 20240319669 | **PCT number** <br> N/A <br> N/A |
| **Inventors** <br> Jonathan Karafin Sean, Charles Yang C., Brendan Bevensee Elwood | **Issue date** <br> N/A | View in PPUBS <br><br> **Filing date** <br> Feb 23, 2024 | View in PPUBS <br><br> **Publication date** <br> Sep 26, 2024 | **International number** <br> N/A |

## Assignment 1

**Reel/ Frame**
67717/0444

**Pages**
6

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jun 13, 2024

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Jul 11, 2023

YANG, CHARLES C.
Jul 11, 2023

BEVENSEE BRENDAN ELWOOD
Jul 11, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

138US3



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20240402402

Generated on Fri Mar 06 2026 14:55:59 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title**<br>ORDERED GEOMETRIES FOR OPTIMIZED HOLOGRAPHIC PROJECTION USING A TESSELLATED WAVEGUIDE ARRAY<br><br>**Inventors**<br>Jonathan Karafin Sean, Brendan Bevensee Elwood | **Patent number**<br>N/A<br><br>**Issue date**<br>N/A | **Application number**<br>18678585<br><br>View in PPUBS<br><br>**Filing date**<br>May 30, 2024 | **Publication number**<br>20240402402<br><br>View in PPUBS<br><br>**Publication date**<br>Dec 5, 2024 | **PCT number**<br>N/A<br><br>N/A<br><br>**International number**<br>N/A |

## Assignment 1

**Reel/ Frame**
67717/0810

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Jun 13, 2024

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jul 6, 2023

BEVENSEE, BRENDAN ELWOOD

Jul 6, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

125US4



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20240406370

Generated on Fri Mar 06 2026 15:01:37 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY SYSTEM FOR CINEMAS | N/A | 18737022 | 20240406370 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood , John Dohm | N/A | **Filing date** Jun 7, 2024 | **Publication date** Dec 5, 2024 | N/A |

## Assignment 1

**Reel/ Frame**

67718/0026

**Pages**

6

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Jun 13, 2024

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

May 6, 2022

BEVENSEE, BRENDAN ELWOOD

May 6, 2022

DOHM, JOHN

May 6, 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

304US3



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20250004294

Generated on Fri Mar 06 2026 15:03:24 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title**<br>RELAY SYSTEMS | **Patent number**<br>N/A | **Application number**<br>18696340 | **Publication number**<br>20250004294 | **PCT number**<br>N/A<br>N/A |
| **Inventors**<br>Jonathan Karafin Sean, Brendan Bevensee Elwood | **Issue date**<br>N/A | View in PPUBS | View in PPUBS | **International number**<br>N/A |
| | | **Filing date**<br>Mar 27, 2024 | **Publication date**<br>Jan 2, 2025 | |

## Assignment 1

**Reel/ Frame**
70363 /0473

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Feb 28, 2025

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Feb 28, 2025

BEVENSEE, BRENDAN ELWOOD
Feb 28, 2025

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
139US2

 UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20250012967

Generated on Fri Mar 06 2026 14:55:04 GMT-0800 (Pacific Standard Time)

| | | | | |
|---|---|---|---|---|
| **Invention title** | **Patent number** | **Application number** | **Publication number** | **PCT number** |
| HIGH DENSITY ENERGY DIRECTING DEVICE | N/A | 18768681 | 20250012967 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | N/A | **Filing date** | **Publication date** | N/A |
| | | Jul 10, 2024 | Jan 9, 2025 | |

## Assignment 1

**Reel/ Frame**
70356 /0499

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Feb 27, 2025

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jul 6, 2023

BEVENSEE, BRENDAN ELWOOD

Jul 6, 2023

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**
101US6



UNITED STATES
PATENT AND TRADEMARK OFFICE

# Patent Assignment Abstract of Title

Search results for Publication #: 20250044590

Generated on Fri Mar 06 2026 15:05:04 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| LIGHT FIELD DISPLAY SYSTEM FOR PERFORMANCE EVENTS | N/A | 18796719 | 20250044590 | N/A |
| | | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | **Issue date** | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood , John Dohm | N/A | **Filing date** | **Publication date** | N/A |
| | | Aug 7, 2024 | Feb 6, 2025 | |

## Assignment 1

**Reel/ Frame**
70355 /0275

**Pages**
5

**Conveyance**
ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**
View documents

**Recorded**
Feb 27, 2025

**Assignors & execution date**

KARAFIN, JONATHAN SEAN
Aug 29, 2022

BEVENSEE, BRENDAN ELWOOD
Aug 29, 2022

DOHM, JOHN
Aug 29, 2022

**Assignee**

LIGHT FIELD LAB, INC.
1920 ZANKER ROAD, SUITE 10
SAN JOSE
CALIFORNIA, UNITED STATES
95112

**Correspondent**

LIGHT FIELD LAB INC.

1920 ZANKER ROAD, SUITE 10
SAN JOSE, CA 95112

**Attorney docket number**

N/A



**UNITED STATES PATENT AND TRADEMARK OFFICE**

# Patent Assignment Abstract of Title

Search results for Publication #: 20250068124

Generated on Fri Mar 06 2026 15:00:35 GMT-0800 (Pacific Standard Time)

| Invention title | Patent number | Application number | Publication number | PCT number |
|---|---|---|---|---|
| HOLOGRAPHIC AND DIFFRACTIVE OPTICAL ENCODING SYSTEMS | N/A | 18825370 | 20250068124 | N/A |
| | **Issue date** | View in PPUBS | View in PPUBS | N/A |
| **Inventors** | N/A | | | **International number** |
| Jonathan Karafin Sean, Brendan Bevensee Elwood | | **Filing date** | **Publication date** | N/A |
| | | Sep 5, 2024 | Feb 27, 2025 | |

## Assignment 1

**Reel/ Frame**

70356 /0533

**Pages**

5

**Conveyance**

ASSIGNMENT OF ASSIGNOR'S INTEREST

**Documents**

View documents

**Recorded**

Feb 27, 2025

**Assignors & execution date**

KARAFIN, JONATHAN SEAN

Jul 16, 2021

BEVENSEE, BRENDAN ELWOOD

Jul 16, 2021

**Assignee**

LIGHT FIELD LAB, INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE

CALIFORNIA, UNITED STATES

95112

**Correspondent**

LIGHT FIELD LAB INC.

1920 ZANKER ROAD, SUITE 10

SAN JOSE, CA 95112

**Attorney docket number**

127US4