**STEPHEN F. HENRY, ESQ.**
**HENRY | LACEY PC**
STATE BAR # 142336
2625 Alcatraz Avenue, # 615
Berkeley, California 94705
Telephone: (510) 898-1883
Facsimile (510) 295-2516
shenry@HenryLacey.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALAN JONES,<br><br>                    Plaintiff,<br><br>          vs.<br><br>LIGHT FIELD LAB, INC., JON KARAFIN,<br>BRENDAN BEVENSEE, and Does 1 to 10,<br><br>                    Defendant, | ) Case No.: 3:25-cv-5118 MMC<br>) **PLAINTIFF'S SECOND AMENDED**<br>) **COMPLAINT FOR DAMAGES**<br>)<br>) 1. RETALIATORY TERMINATION (Cal. Lab.<br>) Code § 1102.5)<br>) 2. WRONGFUL TERMINATION IN<br>) VIOLATION OF PUBLIC POLICY<br>) 3. FRAUD AND DECEIT<br>) 4. MISAPPROPRIATION OF TRADE SECRETS<br>) (Cal. Civ. Code § 3426 et seq.; 18 U.S.C. § 1836);<br>) AND CONVERSION<br>) 5. CIVIL RICO (18 U.S.C. §§ 1962(c) and (d))<br>) 6. BREACH OF FIDUCIARY DUTY<br>) 7. VIOLATION OF THE UNIFORM<br>) VOIDABLE TRANSACTIONS ACT (Cal. Civ.<br>) Code § 3439.04(a)(1))<br><br><br><br>**Complaint Filed: June 17, 2025**<br>**Am. Complaint Filed: Sept. 3, 2025**<br>**Second Am. Complaint Filed: July 6, 2026** |

Plaintiff Alan Jones ("Plaintiff" or "Jones") alleges the following against Defendants Light Field

Lab, Inc. ("LFL"), Jon Karafin, Brendan Bevensee, and Does 1 through 10 (collectively "Defendants"):

1

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

**PARTIES AND GENERAL ALLEGATIONS**

1. Plaintiff Alan Jones is an individual who is, and at the time this action was commenced was, a citizen of the State of Washington. Mr. Jones resided in Washington when Light Field Lab recruited and induced him to accept employment in 2019. He then worked in person at Light Field Lab's offices in San Jose, California, from September 30, 2019 through March 7, 2020, and performed his duties remotely from his Washington residence thereafter, as alleged below.

2. Defendant Light Field Lab, Inc. is a corporation organized under the laws of the State of Delaware that, at all relevant times, maintained its principal place of business and operated in San Jose, California.

3. Defendant Jon Karafin is an individual who, at all relevant times, was a co-founder, the Chief Executive Officer, and President of Light Field Lab, and who, on information and belief, resides in California. Karafin is subject to the jurisdiction of this Court because the acts and omissions alleged herein were undertaken in, and directed at, California.

4. Defendant Brendan Bevensee is an individual who, at all relevant times, was a co-founder, the Chief Technology Officer, and Secretary of Light Field Lab, and who, on information and belief, resides in California. Bevensee is subject to the jurisdiction of this Court because the acts and omissions alleged herein were undertaken in, and directed at, California.

5. In addition to the Defendants named above, Plaintiff sues fictitiously Defendants Does 1 through 10, inclusive. Plaintiff is informed and believes, and on that basis alleges, that the persons and entities so designated include, without limitation: (a) executives, officers, and members of the Board of Directors of Light Field Lab with knowledge, actual or constructive, of the matters alleged below; (b) professionals and agents who participated in the preparation, filing, or prosecution of Light Field Lab's patent applications, or in the curation of the prior-art and inventorship disclosures made in connection with them; (c) persons and entities that participated in the General Assignment for the Benefit of Creditors described below, or in the administration, marketing, or disposition of Light Field Lab's assets; and (d) the transferees, acquirers, secured creditors, and insiders that received, financed, approved, or now hold those assets or interests in them. The true names, capacities, status, or facts showing the liability of these Doe defendants are not presently known to Plaintiff, and several of them

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

— including the identity of the purchaser of Light Field Lab's assets and of the senior secured creditor that approved the sale — have been withheld from Plaintiff notwithstanding his formal demands, as alleged below. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants designated herein as Does 1 through 10 is responsible in some manner for the occurrences and happenings herein alleged, and that Plaintiff's damages, as herein alleged, were and are the direct and proximate result of the action of said Defendants, and each of them. Plaintiff will amend this complaint to show their true names and capacities, together with appropriate charging language, when such information has been ascertained.

6. Plaintiff further alleges that Defendants and Does 1–10, inclusive, are, and at all relevant times were, agents of one another and acting within the course and scope of said agency.

7. Plaintiff reserves the right to amend his charges to plead agency between Defendants and Does 1–10, inclusive, and any of them, at any time that he ascertains facts supporting agency between such Defendants.

**JURISDICTION AND VENUE**

8. Plaintiff incorporates by reference each of the allegations contained in paragraphs 1 through 7 above. Plaintiff's investigation is continuing, and he reserves the right to amend as additional facts are ascertained through discovery.

9. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises in part under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968, and under 28 U.S.C. § 1367(a) over the related state-law claims, which form part of the same case or controversy. In the alternative, the Court has jurisdiction under 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States: Plaintiff is a citizen of Washington; Defendant Light Field Lab, Inc., at the time this action was commenced, was a corporation organized under the laws of the State of Delaware that maintained its principal place of business in California, and was therefore at that time a citizen of both Delaware and California; and the individual Defendants are citizens of California. This Court has personal jurisdiction over each Defendant because Light Field Lab, at all relevant times, maintained its principal place of business and operated within the jurisdictional limits of the Northern

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

District of California, and each of the individual Defendants resides in, and/or transacted business and committed the acts and omissions complained of within, the jurisdictional limits of the Northern District of California.

10. Venue is proper because the employment relationship between Plaintiff and defendants, and each of them, that gave rise to some of the claims in this litigation existed within this judicial district and most or all of the acts and omissions complained of in this litigation took place here. Venue is also proper because most or all of the acts and omissions that occurred outside of the above employment relationship and are complained of in this litigation took place within this judicial district.

### FACTS COMMON TO MORE THAN ONE CAUSE OF ACTION

11. Mr. Jones was employed by LFL from September 30, 2019, through June 23, 2023. His employment had no specified term and was at all times at-will within the meaning of Labor Code section 2922; his status as an employee of Light Field Lab arose from his hiring, his service, and the Company's payment of wages, and not from any written instrument. Mr. Jones initially worked as a Senior Pipeline Software Engineer and was promoted to Principal Engineer on July 27, 2020.

<u>Karafin and Bevensee's Prior Employment at Lytro and the Origins of Light Field Lab's Patent Portfolio</u>

12. The facts set forth in this section are alleged because they are relevant to the claims pleaded, including fraudulent inducement — to establish the circumstances in which Mr. Jones was recruited and induced to accept and continue employment, the materiality of the facts concealed from him, his reliance, and Defendants' knowledge. The inclusion of any statement or representation in this background is not, by itself, an allegation that the statement was a false representation. The specific representations and concealments on which Mr. Jones's claims rest are identified in connection with the causes of action below.

13. The materiality of the patent-related facts alleged below does not depend on any determination that a Light Field Lab patent is invalid, and Mr. Jones does not seek to be named as an inventor on any patent. While Mr. Jones contends that the foundational patents are invalid and that Light Field Lab's title to them is defective, his claims do not require that contention to be adjudicated. What is material — and what is established beyond serious dispute by the public prosecution record set forth

below — is that the circumstances of these patents' origin and prosecution raise substantial questions as to their provenance, validity, and enforceability. The existence of such questions, by itself, materially impairs the defensibility and valuation of the patent portfolio, and therefore the value of the equity and other consideration Light Field Lab offered Mr. Jones to induce and retain his employment. It is that impairment — not the ultimate resolution of any patent's validity — on which the materiality of these facts rests.

14. These same facts were independently material to Mr. Jones's decision to entrust his own source code, inventions, and trade secrets to Light Field Lab under an assignment agreement. A reasonable person who knew that Karafin and Bevensee had taken the work of a prior employer, concealed its origins through the systematic substitution of terminology, withheld material prior art from the United States Patent and Trademark Office (the "Patent Office"), and assigned away rights they had covenanted not to assign, would necessarily question how his own intellectual property would be treated — whether it, too, would be appropriated, stripped of attribution, recharacterized to obscure its source, or have its value impaired by entanglement with a portfolio of doubtful provenance and enforceability. That question went to the core of what Mr. Jones was being asked to give up. As alleged below, the risk was not hypothetical: Light Field Lab did to Mr. Jones's own work precisely what Karafin and Bevensee had done before — filing applications on his source code and trade secrets, concealing his authorship, and attaching that work to the same Lytro-derived foundation, as set forth at ¶¶ 36–39.

15. Before founding Light Field Lab, Defendants Karafin and Bevensee were senior technologists at Lytro, Inc., a light-field technology company. By their own accounts, Karafin was Lytro's "Head of Light Field Video," and Bevensee was its "Lead Engineer, Light Field Video," who led the team that built "Lytro Cinema" — described as the world's highest-resolution light-field video camera. Both were therefore intimately familiar with Lytro's light-field technology and intellectual property. Karafin's and Bevensee's own professional profiles describing these Lytro roles are in the record at Dkt. 52-1 (pp. 115, 67). Lytro's patents, described below, were later assigned to Google LLC when it acquired Lytro's assets after Lytro ceased operations; they are identified herein by their Lytro origin.

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

16. While employed at Lytro, Karafin and Bevensee were named inventors on Lytro patent filings directed to light-field display technology. Lytro filed U.S. Provisional Application No. 62/200,804, titled "Light Guided Image Plane Tiled Arrays with Dense Fiber Optic Bundles for Light-Field Display," on August 4, 2015 (U.S. Patent No. 10,565,734 at col. 1 ll. 27–32; Dkt. 52-1 at p. 260), and Karafin and Bevensee are named inventors on Lytro's U.S. Patent No. 10,565,734 (cover; Dkt. 52-1 at p. 154), which claims the benefit of that provisional application.

17. While still employed at Lytro, Karafin and Bevensee filed two provisional applications for the benefit of Light Field Lab: No. 62/362,602, filed July 15, 2016, and No. 62/366,076, filed July 24, 2016. They incorporated Light Field Lab in Delaware on November 22, 2016 — while still employed at Lytro — and departed Lytro on or about March 2017. (Dkt. 63 at p. 4; Dkt. 52-1 at pp. 67, 115.) Light Field Lab's U.S. Patent No. 10,488,584 claims the benefit of those two provisional applications. (U.S. Patent No. 10,488,584, cover, field (60); Dkt. 52-1 at p. 120.)

18. U.S. Patent No. 10,488,584 (Light Field Lab; named inventors Karafin and Bevensee) and U.S. Patent No. 10,565,734 (Lytro; named inventors Karafin and Bevensee) describe the same light-field architecture in systematically substituted terminology. In its summary, the Light Field Lab patent renames, component for component, what the Lytro patent's summary had already described: it calls "energy locations" what the Lytro patent calls "image sensors"; "energy relay elements" what the Lytro patent calls "tapered fiber optic bundles"; the relay's "first surface" and "second surface" what the Lytro patent calls the bundle's "leading end" and "trailing end"; a "singular seamless energy surface" what the Lytro patent calls a "single light-field image" that is "substantially unaffected by the gaps"; "energy propagation paths" what the Lytro patent calls the "optical path"; and "energy waveguides" what the Lytro patent calls a "microlens array." (U.S. Patent No. 10,488,584 at col. 1 ll. 24–41 & col. 12 ll. 24–27; Dkt. 52-1 at p. 138; U.S. Patent No. 10,565,734 at col. 2 ll. 20–53; Dkt. 52-1 at p. 260; the substituted terms recur throughout both patents, passim.) Mr. Jones has searched Light Field Lab's patent filings for the Lytro vocabulary and has not found it in them, while the Light Field Lab vocabulary appears consistently throughout. On information and belief, this one-for-one substitution was deliberate — adopted so that the derivation of Light Field Lab's foundational technology from Lytro's would not be apparent on the face of the documents — because Karafin and Bevensee were named

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

inventors on both; because, while Mr. Jones was employed at Light Field Lab, they themselves alternated between the two vocabularies (most notably "waveguides" versus "lenslets") in a way that served no apparent purpose at the time; and because maintaining two separate vocabularies for the same components serves no legitimate technical purpose.

19. These foundational provisional applications are not isolated filings; Light Field Lab's patent portfolio is built upon them. Of Light Field Lab's 64 granted United States patents (Dkt. 38-2 ¶ 4): (a) 20 trace, by priority, to the provisional applications 62/362,602 and/or 62/366,076 that Karafin and Bevensee filed while still employed at Lytro — 9 of them by direct claim of priority to those provisionals, and 11 more through continuation chains — as the public Patent Office continuity records establish; (b) a further 12 patents, while they do not claim that priority, cite one or more of the foundational patents (or their published applications) as prior art in their own prosecution, so that 32 of the 64 are tied to the foundation by priority or by their own citations of record (and three of the priority-traced patents additionally incorporate a foundational application by reference); (c) 6 of the 64 derive from independent provisional applications that predate, and are unrelated to, the Lytro-derived foundation — the RealD "Multiscopic Image Capture System" family (three patents; priority 2014, naming Karafin as one of five co-inventors, from pre-Lytro work at RealD, Inc.) and Daniel Smalley's flat-panel-display family (three patents; priority 2015, acquired from Brigham Young University); and (d) the remaining 26 are other Light Field Lab patents that employ the same "energy surface" and waveguide terminology but do not, on the public record, claim priority to or cite the foundational patents. Although these patents repeatedly cite one another and the foundational patents, none of the 64 discloses or cites Lytro's U.S. Patent No. 10,565,734 or its published application (U.S. Patent Application Publication No. 2017/0243373); that Lytro patent claims priority to provisional applications filed in 2015 — more than a year before Light Field Lab's foundational provisionals — and is directed to the same energy-relay architecture under Lytro's original terminology, so that, as earlier-filed prior art directed to the same subject matter, it was information a reasonable examiner would have considered important to the patentability of Light Field Lab's claims. Yet Karafin and Bevensee, who were named inventors on it and aware of it, did not disclose it to the Patent Office. Sixty-one of the 64 granted patents name Karafin and/or Bevensee as inventors, and fifty-eight of those arose from Karafin and

Bevensee's own holographic patent filings, begun in 2016 while they were still employed at Lytro. Each prosecuted upon a 37 C.F.R. § 1.63 inventor's oath Karafin and Bevensee signed under penalty of perjury and subject to 18 U.S.C. § 1001 (Dkt. 52-1, Ex. L-2 at pp. 580–583 (orig. pp. 1011–1014)), bearing the 37 C.F.R. § 1.56 duty to disclose all information material to patentability. Having withheld from the Patent Office their own earlier Lytro patent — directed to the same subject matter — throughout the prosecution of those patents (in U.S. Patent No. 10,488,584 alone, across five information-disclosure statements spanning 183 references, they did not disclose Lytro's then-published application, as detailed below), Karafin and Bevensee thereby placed substantial questions over the provenance, defensibility, and valuation of those 58 scheme-era patents. The only patents naming Karafin or Bevensee that stand apart from those circumstances are the three in the acquired RealD family, which originate in pre-Lytro work at RealD that predates the Lytro foundation.

20. In April 2017, Karafin and Bevensee assigned their light-field inventions to Lytro under a written assignment agreement — filed with the Patent Office and publicly available — by which they expressly covenanted that they "had not made and would not hereafter make any assignment, grant, mortgage, license, or other agreement affecting the rights, titles, and interests herein conveyed." Approximately fourteen months later, they assigned the same or substantially the same technology to Light Field Lab — the very thing they had covenanted to Lytro they would not do; the recorded patent assignments name Karafin and Bevensee as the assignors. That breach left a defect in Light Field Lab's title to the patents derived from those inventions: Light Field Lab's claimed ownership of its foundational portfolio rested on a conveyance Karafin and Bevensee had already covenanted away. The Lytro assignment and its covenant, and the later assignment to Light Field Lab, are in the record at Dkt. 52-1, Ex. L-3 at pp. 593–608 and Ex. L-2 at pp. 585–587 (orig. pp. 1116–1131 and 1018–1020) and are reflected in the recorded patent-assignment abstracts.

21. As named inventors, Karafin and Bevensee each bore a personal duty under 37 C.F.R. § 1.56 to disclose to the Patent Office all information material to patentability. Lytro's co-pending and materially similar application had published as U.S. Patent Application Publication No. 2017/0243373 A1 on August 24, 2017 (cover; Dkt. 52-1, Ex. L-3 at p. 591 (orig. p. 1101)) — well before Light Field Lab's application entered the U.S. national stage on June 20, 2018, and throughout the prosecution of

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

the application that issued as U.S. Patent No. 10,488,584 on November 26, 2019 — and Karafin and Bevensee, who were named inventors on the Lytro application, had personal knowledge of it. That knowledge was not merely presumed; it was a sworn precondition of their own patents. To obtain U.S. Patent No. 10,565,734 — the patent whose application published as the withheld Publication No. 2017/0243373 A1 — Karafin and Bevensee each executed the inventor's oath under 37 C.F.R. § 1.63, declaring under penalty of perjury, subject to the criminal sanction of 18 U.S.C. § 1001, his belief that he was "the original inventor or an original joint inventor of a claimed invention in the application." Neither, moreover, could lawfully execute that oath "unless that person has reviewed and understands the contents of the application, including the claims, and is aware of the duty to disclose to the Office all information known to the person to be material to patentability as defined in § 1.56." 37 C.F.R. § 1.63(c). Karafin and Bevensee thus did not merely happen to know of the Lytro disclosure: each had sworn to its inventorship and, as a condition of doing so, had reviewed and understood the very claims it contained. They then executed a second § 1.63 oath, in the same terms, to obtain U.S. Patent No. 10,488,584, directed to the same light-field architecture. The signed oaths are in the record — the Lytro oaths at Dkt. 52-1, Ex. L-3 at pp. 610–614 (orig. pp. 1140–1144), and the Light Field Lab oaths at Dkt. 52-1, Ex. L-2 at pp. 580–583 (orig. pp. 1011–1014).

22. In prosecuting their own application, Light Field Lab disclosed a great deal of prior art — 183 prior-art references across five separate Information Disclosure Statements, filed June 25, 2018, April 17, 2019, June 20, 2019 (twice), and August 28, 2019 — yet never once disclosed the Lytro application. (Dkt. 52-1, Ex. L-2 at pp. 498–501, 503–510, 512–523, 531–542, 563–566 (orig. pp. 20–23, 73–80, 612–623, 633–644, 911–914).) Three of those statements were filed in 2019, during the very period Karafin and Bevensee were recruiting Mr. Jones — one of them on August 28, 2019, the day of his interviews (¶¶ 27–28) — so that even as they induced him with representations about Light Field Lab's patent coverage, they were actively curating what the Patent Office saw while withholding their own materially similar Lytro application. Having disclosed so many other references while withholding that application, of which they were aware as its named inventors, Karafin and Bevensee omitted it knowingly and deliberately. U.S. Patent No. 10,488,584 issued on November 26, 2019 without ever citing Lytro's patent or its published application as prior art. (cover; Dkt. 52-1 at pp. 120–121.)

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

23. Karafin and Bevensee were named inventors not only on U.S. Patent No. 10,488,584 but across the broader family of Light Field Lab applications directed to the same light-field and holographic subject matter — many of which also claim priority to the same foundational provisional applications; each such application carried the same duty of candor and implicated the same most-material prior art — Karafin and Bevensee's own Lytro filings. The omission described above was therefore not confined to a single patent: the same material prior art was withheld, by the same two individuals, minimally across the related family of applications descending from the foundational provisionals, and arguably across every Light Field Lab application describing technology similar to that disclosed in the foundational patents. Because the same material art was withheld by the same two inventors — on sworn § 1.63 oaths — across this related family of applications, the circumstances of the portfolio's origin cast substantial doubt over its provenance, defensibility, and valuation, and therefore over the value of the equity and other consideration Light Field Lab offered Mr. Jones. The priority and citation relationships among these patents are set forth in paragraph 19 above.

24. On information and belief, Light Field Lab raised approximately $85 million from investors, including Khosla Ventures, Bosch, Samsung, LG, and Comcast, on the strength of the patent portfolio and a business model premised on comprehensive patent coverage of the holographic space — the same portfolio and the same business model that Karafin would describe to Mr. Jones to induce his employment, as alleged below.

25. Each of the patent-related facts set forth in this section is established by the public Patent Office record — the issued patents themselves, the recorded assignments, the signed inventor declarations, and the prosecution histories — and not by Mr. Jones's characterization of them.

Representations and Concealment to Induce Initial and Continued Employment

26. Mr. Jones did not seek out Light Field Lab; the Company approached him in 2019 while he was attending the SIGGRAPH conference, through an introduction by Jeff Barnes, a former colleague. It was Light Field Lab that initiated the recruitment that led to the representations that follow. In an August 12, 2019 recruitment email, Karafin described the role to Mr. Jones as "contributing across many of [Light Field Lab's] software development efforts, primarily focusing on the development of pipeline, workflow, tools, shaders, algorithms, calibration," with "opportunities to technically lead areas of

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

development and work with customers." (Mr. Karafin's August 12, 2019 recruitment email at p. 2.) Mr. Bevensee, Light Field Lab's co-founder and Chief Technology Officer, personally participated in recruiting Mr. Jones alongside Mr. Karafin: he corresponded directly with Mr. Jones during the recruitment — including by arranging and holding a recruitment telephone call with him in early September 2019, and welcoming his decision to join (the September 2019 recruitment correspondence at pp. 1-7) — and during Mr. Jones' August 28 and 29, 2019 interviews he personally demonstrated Light Field Lab's display to Mr. Jones and personally interviewed him. On September 9, 2019, Mr. Jones conveyed his decision to accept in a single email addressed to Mr. Karafin and Mr. Bevensee (and Mr. Barnes), explaining that his decision turned on "the character of the people involved," which was "the most important factor," and "boiled down to do I choose to trust your team." (the September 2019 recruitment correspondence at p. 6.) Mr. Bevensee personally replied that this was "fantastic news" and that "the team will be very excited," confirming both his participation in recruiting Mr. Jones and that he was among the "team" whose character Mr. Jones relied upon in deciding to leave his secure position at Microsoft and join Light Field Lab. (the September 2019 recruitment correspondence at p. 7.) As a named inventor on both the Lytro and the Light Field Lab applications, Mr. Bevensee shared Mr. Karafin's knowledge of the portfolio's Lytro provenance.

27. As part of Mr. Jones' interviews on August 28 and 29, 2019, Karafin stated that the company had hundreds of patents and that, in addition to manufacturing displays, their business model relied heavily on comprehensive patent coverage of the holographic space, allowing them to both manufacture displays and license the technology. In moving to dismiss, Karafin and Bevensee did not dispute that Karafin made this representation; they defended it as a true description of Light Field Lab's patents — that is, as a statement of fact, not opinion. (Dkt. 38 at 12:2-6.)

28. On August 28 and 29, 2019, Karafin also stated that Light Field Lab had a large theme park customer, ultimately revealed to be Universal Studios. Karafin stated that Light Field Lab would have the displays out to market the following year (2020) and that it would be in the theme park in that timeframe or soon after. Subsequently, there was no further discussion of Universal Studios as a customer and no product was delivered to Universal Studios.

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

29. These statements of alleged but untrue facts regarding the company's intellectual property and customers were intended to provide, and justifiably led to, the conclusion that LFL was much closer to delivery of the product than it actually was and that an early exercise of options was expected. In reliance on these statements, Mr. Jones gave up Microsoft stock that was vesting in order to join LFL — the very inducement these statements were intended to, and did, achieve. Mr. Jones's contemporaneous analysis confirms that the base pay was not the draw: he found Light Field Lab's base compensation so low relative to Bay-Area cost of living that, even setting aside his existing bonus and stock and comparing base salary alone, he would be "worse off financially on base." What drew him to Light Field Lab was instead the equity participation in the growth of its innovative technology that Karafin had represented. (Mr. Jones's August 18, 2019 recruitment email at p. 1.) Defendants have themselves characterized these statements as non-actionable "puffery" and "promotional" statements (Dkt. 46 at 7:14-19, 9:3-9; Dkt. 47 at 10:6-7) — that is, statements made to induce action — confirming that inducing intent. Whether Defendants also knew these statements concerning Light Field Lab's commercial readiness and customers to be untrue when made, while relevant, is not something Mr. Jones must independently establish; the scienter for his fraudulent-inducement claim is established by Defendants' patent-filing conduct alleged above.

30. During the discussions on August 28 and 29, 2019, Karafin also discussed an options double-trigger event on which all options would vest if the company was publicly listed or acquired. When Mr. Jones inquired into the total number of Light Field Lab's shares — the figure he needed in order to determine what fraction of the Company, and thus what value, his option grant represented — Karafin refused to disclose it, asserting that the information was highly confidential; yet a corporation's authorized capital is stated in its certificate of incorporation, a public record on file with the Delaware Secretary of State, while the outstanding-share figure that fixed the value of his grant was information peculiarly within the Company's knowledge that Mr. Jones had no other means to obtain. Karafin's August 12, 2019 recruitment email had separately characterized that equity. Addressing whether the equity was "non-dilutable," Karafin wrote: "Yes, full time employees are provided with equity in Light Field Lab to allow you to financially participate in our continued growth. The term non-dilutable can mean a lot of things, and each round of investment provides dilution for our investors every time the

value of the company increases. Every time the valuation of the company increases, the value of your options grant also increase to allow you to participate in Light Field Lab's continued success." (Mr. Karafin's August 12, 2019 recruitment email at p. 3.) By that assurance Karafin represented, as a present fact, that Mr. Jones's option grant would rise in value with each increase in the Company's valuation — that the dilution he acknowledged each financing round imposed fell on the Company's "investors" and not on Mr. Jones's grant. That representation was false. Mr. Jones's grant was an ordinary employee stock option that carried no protection against dilution: Light Field Lab's 2017 Stock Incentive Plan, which governed the grant, adjusts an award only for stock splits, recapitalizations, and similar events, and expressly provides that "[e]xcept as expressly provided herein, no issuance by the Company of shares of stock of any class … shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of Shares subject to an Award" (Dkt. 30-2 at p. 84) — so that the grant was diluted, not protected, by the very financing rounds Karafin invoked. Whether an option is protected against such dilution turns on the specific terms of the company's plan and grant — terms Karafin undertook to characterize but which Mr. Jones had no means to verify, the Plan not having been furnished to him until January 2, 2020, months after the August 2019 representations had induced him to resign from Microsoft and irreversibly forgo his vesting Microsoft equity (¶67).

31. Mr. Jones questioned the lack of disclosure of important information about Light Field Lab's stock and stock options during hiring negotiations, as it made it very difficult for Mr. Jones to determine the potential value of the options, but was refused. The information withheld from Mr. Jones during these negotiations was not limited to the number and value of his options. Light Field Lab also did not disclose — and its offer letter, by its own terms, excluded — that the equity it was using to recruit him would be made subject to a repurchase and forfeiture right on termination, to transfer restrictions, to a voting agreement and a right-of-first-refusal and co-sale agreement, and to a purported waiver of his statutory right to inspect the company's records (the Company's 2019 offer letter § 8). Light Field Lab first revealed those restrictions only after it had secured his employment, his irreversible surrender of his secure position at Microsoft, and the assignment of his work; and, as to the voting agreement and the right-of-first-refusal and co-sale agreement, it never disclosed their terms to him at all (¶¶66-71, 75).

32. Subsequently, after Mr. Jones became an owner of shares of Light Field Lab, Mr. Jones was entitled to review books and records to assess his holdings, but when he asked Jon Karafin in March 2023, in the context of a financial discussion about the company, "… is there any additional information I'm entitled or required to be given access to as a shareholder?" Karafin responded "Understood and appreciated. There are no current problems to be aware of (e.g., equity ownership and payroll) and can keep you posted. Again, not a political response, just the facts." (Dkt. 38-4 at p. 3.) Books and records would classify as additional (financial) information Mr. Jones was entitled to be given access to as a shareholder. Mr. Karafin continued to refuse to provide, and concealed, the information from Mr. Jones, a stockholder.

33. As part of his onboarding, on September 9, 2019, Mr. Jones signed a Confidentiality and Proprietary Rights Agreement that purported to grant rights to patents and other works for hire to LFL. This Agreement (Dkt. 46-3) was signed without knowledge of the misrepresented and concealed facts, unknown to Mr. Jones at the time, but which, if known, would have dissuaded him from joining Light Field Lab, providing his source code and other knowledge, and signing the agreements.

34. Mr. Jones did not know, and had no reason to know, of the facts set forth in the preceding section when he accepted employment in 2019, when he signed the Confidentiality and Proprietary Rights Agreement, or when he exercised his stock options. The relationship between Light Field Lab's patents and Lytro's was not public knowledge; it was known to Karafin and Bevensee, who had personally filed both sets of applications, and was concealed by the deliberate substitution of terminology and the withholding of the Lytro prior art described above. Mr. Jones — a rendering-software engineer, not a patent attorney — had no reason to audit the prosecution histories, prior-art disclosures, or recorded assignments of his employer's patent portfolio, and no reason even to be aware of Lytro's patents in order to compare them. Identifying the concealment required exactly the comparison the renaming was designed to defeat. The facts so concealed — that Karafin and Bevensee had taken a prior employer's work and obscured its provenance — went to the very "character of the people involved" that Mr. Jones had identified as "the most important factor" in his decision to join (¶26; the September 2019 recruitment correspondence at p. 6).

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

35. In or about May 2025, reflecting on the originality and value of the work he had performed at Light Field Lab and on the central importance Light Field Lab placed on its patent portfolio, Mr. Jones began to wonder whether Light Field Lab had obtained patents covering his own work. He began reviewing Light Field Lab's published patent filings and identified two international patent applications, WO2024216300A2 and WO2025042476A1, each naming only Karafin and Bevensee as inventors and neither crediting Mr. Jones — the latter, WO2025042476A1, claiming priority to an application filed June 23, 2023, the day of his termination (WO 2024/216300 A2, cover, field (72) (Karafin and Bevensee only); WO 2025/042476 A1, cover, fields (72) & (30) (priority appl. 63/523,028, filed June 23, 2023)). Reasoning that it was unlikely Karafin and Bevensee would have begun such conduct only with his work, and mindful of their prior employment at Lytro, in or about June 2025 Mr. Jones began reviewing Lytro's patents to determine whether any overlapped with Light Field Lab's. By August 2025, he had identified the specific overlapping inventions in the Lytro and Light Field Lab patents — and the systematic substitution of terminology between them — alleged in the preceding section. Through reasonable diligence Mr. Jones could not have discovered these facts earlier: the two applications capturing his work did not become public until they published on October 17, 2024 and February 27, 2025, and the Lytro derivation had been affirmatively concealed, was within Defendants' exclusive knowledge, and could not be recognized from Light Field Lab's patents alone.

These concealed facts were material to Mr. Jones' decision to accept employment and to execute comprehensive IP-assignment agreements. Had Mr. Jones been aware of these material facts, he would not have joined the Company, nor would he have transferred his own source code and related inventions. These concealed facts were also material to Mr. Jones' decision to exercise stock options, expending money to do so.

Jones's Intellectual Property, Source Code, and Trade Secrets

36. Throughout his employment, Mr. Jones authored a substantial body of original source code, rendering software, shaders, technical designs, documentation, and related work product that became central to Light Field Lab's rendering pipeline. On information and belief, after Light Field Lab adopted Mr. Jones's light-field generation algorithms, almost all of its rendered content is generated using, and derived from, his work. This work product, and the trade secrets embodied in it, are the property whose

15

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

taking and retention underlie Mr. Jones's claims. Consistent with the preceding section, Mr. Jones does not seek to be named as an inventor on any patent; he seeks the return of, and compensation for, his own work.

37. Mr. Jones's original work included, without limitation: (a) a viewer-dependent light-field rendering method, which renders each portion of the display for the image a viewer should perceive from a given viewing position and distance — treating each waveguide aperture as a small window onto the scene — rather than by simulating the exact physical propagation of light through the display's optics, so as to present a clear, anti-aliased image of the intended content; (b) software Mr. Jones called "Acuity," which increases the clarity of the perceived light-field image by precisely modeling the display's unavoidable optical imperfections — including diffraction and the aberrations introduced by its waveguide elements — and then iteratively adjusting the rendered light field to pre-compensate for them, so that the image the viewer actually perceives more closely matches the intended image; in operation it identifies the display pixels that contribute light to each point in the viewer's perceived image, measures the difference between the perceived and the intended result, and propagates corrections back to the contributing pixels until that error converges; (c) a reusable light-field ray-generation library; (d) shader libraries for industry-standard renderers, including Arnold and V-Ray; (e) optical-simulation techniques and algorithms for modeling the propagation and behavior of light; and (f) additional proprietary rendering, optical-simulation, and shader methods, algorithms, and techniques that Mr. Jones developed and implemented in the course of his work. Mr. Jones does not purport to catalog every such method here; the complete body of his proprietary methods and techniques is embodied in the source code and work product that Light Field Lab took and has refused to return, and will be identified with further particularity as that material is produced. Mr. Jones developed this work during his employment and committed it — his implementation, with substantial in-code comments — to Light Field Lab's own source-control system, to which Karafin and Bevensee had access, beginning at the outset of his employment in September 2019 and continuing in the years before the patent applications described below.

38. On April 9, 2023, in a written communication to Mr. Karafin, Mr. Bevensee, his supervisor Mr. Berninger, and Light Field Lab's human-resources representative (Mr. Jones's April 9, 2023 written

complaint to management and human resources at pp. 1, 3, 5-6), Mr. Jones drew the recipients' attention to this work, describing it in his own words — including his ray-generation library, the shaders he had authored, and his prior work on Acuity — and articulated the viewer-dependent light-field concept. In that same communication, Mr. Jones explained that Mr. Karafin's prescribed interference-masking methodology "can only harm holographic image quality and cannot improve it," and that he had already "provided a proposed solution to improve image quality" for which his prior work on Acuity "provided evidence which supported the possibility of [his] proposal being successful." That communication, sent to the very individuals later named as inventors on the applications described below, contemporaneously documented that the work was Mr. Jones's and that it predated those applications.

39. With this work already residing in Light Field Lab's own source control, and with Mr. Jones having just drawn Karafin and Bevensee's attention to it, Light Field Lab filed two provisional applications naming only Karafin and Bevensee as inventors, with Mr. Jones uncredited: Application No. 63/458,938, filed April 13, 2023 — just four days after that written communication — (published as international application WO2024216300A2); and Application No. 63/523,028, filed June 23, 2023 — the day Mr. Jones's employment was terminated — (published as international application WO2025042476A1). Mr. Jones has reviewed both published applications and identifies them as describing his own methods. Both applications describe the viewer-dependent rendering method Mr. Jones authored (¶37) — rendering each portion of the display for the image a viewer should perceive from a given position, treating each aperture as a window onto the scene (WO2024216300A2 ¶¶ [0391], [0394]; WO2025042476A1 ¶¶ [0315], [0318]) — and both describe the perceived-image-optimization approach of his "Acuity" software (¶37) (WO2024216300A2 ¶¶ [0147], [0465]; WO2025042476A1 ¶¶ [0174], [0486]), combined with energy-modulation hardware drawn from Light Field Lab's foundational patents. Both applications employ renamed terminology paralleling the substitution described above — for example, "relative positioning reference surface" for the viewer's position (WO2024216300A2 ¶ [0443]; WO2025042476A1 ¶ [0367]), and "aggregated angular sampling range" for the cone-based antialiasing of Mr. Jones's method (WO2024216300A2 ¶ [0445]; WO2025042476A1 ¶ [0369]).

40. Given that Mr. Jones authored these methods, committed them to Light Field Lab's source control before these filings, and had just drawn Karafin's and Bevensee's attention to them, the only

17

reasonable inference is that Light Field Lab built these applications on his work; the precise extent to which his source code was copied is known to Defendants and to those into whose possession his source code has since passed, and is alleged on information and belief. Both applications incorporate by reference commonly-owned Light Field Lab filings; WO2025042476A1 in particular incorporates by reference two of Light Field Lab's patents — U.S. Patent No. 11,156,771 (WO2025042476A1 ¶ [0329]) and U.S. Patent No. 10,663,657 (id. ¶ [0461]) — together with a separate, now-abandoned Light Field Lab application, Application No. 16/064,145 (id. ¶ [0461]). Both of those patents belong to the same holographic-energy patent family that traces, through their respective international (PCT) applications, to the foundational provisional applications alleged above. In this manner, the applications built on Mr. Jones's work were bolted onto the same Lytro-derived foundation alleged above.

41. The Confidentiality and Proprietary Rights Agreement through which Light Field Lab claims to have obtained Mr. Jones's work product was procured by the same concealment alleged above; Mr. Jones contends it is void and of no effect as to that work. That overreach was not an improvisation at the moment of termination. The same onboarding agreement, in its "Exit Obligations" provision, purported from the outset to require Mr. Jones — upon termination or upon "the Employer's request at any time" — to "provide or return to the Employer any and all Employer Group property," expressly including his "work product" and any materials he "created … in connection with [his] employment," and to "delete or destroy all copies." (Dkt. 46-3 § 3(b).) Light Field Lab thus embedded in the very agreements it fraudulently induced Mr. Jones to sign the mechanism by which it would later claim his own source code and work product as the Company's — the same claim it pressed when it terminated him. Light Field Lab's own June 23, 2023 letter terminating Mr. Jones demanded that he return "any and all work product, files, data, source code, programs, tools, notes, reports, memoranda, records …" that he "received or prepared or helped to prepare in connection with [his] employment," which the letter defined as "Company Property" (Light Field Lab's June 23, 2023 termination letter at pp. 1-2) — an acknowledgment that Light Field Lab possessed Mr. Jones's source code and work product, which it had obtained through the fraudulently induced assignment. Light Field Lab pressed the same characterization in the separation agreement it presented to Mr. Jones that same day, which demanded that he surrender his work product and source code as the Company's property and treated that material

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

as the Company's confidential information that he could not use even on his own behalf, enforceable by injunction — Light Field Lab thereby claiming as its own the very work that, as alleged above, was never validly assigned to it and remained Mr. Jones's. (the Confidential Separation Agreement and General Release § 9 at p. 5.)

Employment, Failure to Accommodate, and Mr. Jones's Complaint

42. Throughout his tenure at LFL, Mr. Jones consistently received positive feedback regarding his job performance, a merit pay increase when he was promoted to Principal Engineer, and periodic incentive pay bonuses. He maintained positive personal relationships with his coworkers and management.

43. Mr. Jones was instrumental in the development of LFL's SolidLight holographic display platform. Mr. Jones worked out of LFL's office from September 30, 2019, through March 7, 2020, and thereafter he worked remotely from his residence in Seattle, WA.

44. Mr. Jones is a Type I Diabetic and suffers from a compromised immune system. (Mr. Karafin's August 12, 2019 recruitment email at p. 3.) Accordingly, Mr. Jones would be susceptible to severe illness and/or death if he were to contract COVID-19.

45. When LFL management announced that all of its employees would be required to return to in-office work by May 24, 2021, Mr. Jones requested that he be permitted to continue working remotely as an accommodation of his compromised immune system, which is a disability under federal and state law. At recruitment, after Mr. Jones had disclosed his health condition, Karafin had assured him that "[t]aking care of our employees is extremely important to us" and that "[y]our health is extremely important, and we wouldn't want you to do anything that puts that at risk." (Mr. Karafin's August 12, 2019 recruitment email at pp. 3-4.)

46. Although there does not appear to have been a formal accommodation process, LFL allowed Mr. Jones to continue working remotely and LFL management continued to provide Mr. Jones with positive feedback regarding his job performance. At no time did anyone in LFL management indicate that in-office work was an essential function of Mr. Jones' job duties.

47. In December 2022–January 2023, Mr. Jones' supervisor, Mr. Trevor Berninger, Director of Software, began having discussions with Mr. Jones to stop working remotely and return to in-office

work at LFL. Mr. Jones was surprised because he had been working remotely since March 7, 2020, and there had been no complaints about his job performance.

48. When Mr. Jones asked if there were performance issues that would give rise to the request that he return to in-office work, Mr. Berninger indicated that LFL did not have any issues with his job performance. When asked if there was a particular reason as to why LFL wanted him to return to in-office work, Mr. Berninger was very vague and unspecific and indicated that "it would just be better." Again, at no time did anyone at LFL indicate that working in-office was an essential job function of Mr. Jones' position.

49. Although Mr. Jones was open for discussion as to what would be reasonable accommodations for his return to in-office work, LFL did not engage in an interactive dialogue in this regard. In fact, Mr. Jones made repeated suggestions regarding masking protocol, testing protocol, social distancing, and ventilation, but LFL did not engage with Mr. Jones' suggestions.

50. Mr. Jones understandably began to feel very marginalized by LFL management. He understood that LFL management wanted him to return to in-office work, but management was unwilling to implement a reasonable protocol to minimize his risk of exposure to COVID-19. Mr. Jones sensed that his relationships with LFL management were becoming strained, when he had previously enjoyed very positive relationships with leadership.

51. In January 2023, Mr. Jones was assigned to work on masking interference for Wavetracing Optics to improve image quality. Mr. Jones was working closely with LFL's CEO, Mr. Jon Karafin, who was the subject matter expert in this area; Mr. Karafin defined the scope of work and methodology of the work. In March 2023, Mr. Jones advised Mr. Karafin that the methodology was unworkable and was unlikely to result in improved image quality. Mr. Jones suggested a number of alternative approaches to improve image quality, but Mr. Karafin insisted that Mr. Jones continue with the methodology he himself had prescribed. (Mr. Jones's April 9, 2023 written complaint to management and human resources at p. 3.)

52. The matter came to a head on April 6, 2023, when Mr. Karafin made disparaging remarks regarding Mr. Jones' work on the Wavetracing Optics during a software team meeting attended by approximately 10 people. Mr. Karafin stated that it had been nearly six months and that Mr. Jones had

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

failed to generate an image and indicated that it was unlikely that Mr. Jones' work would result in improved image quality. (Mr. Jones's April 9, 2023 written complaint to management and human resources at p. 2.)

53. Mr. Jones was dismayed that Mr. Karafin would publicly trivialize and disparage his work in such an aggressive manner in front of his coworkers. First, Mr. Karafin's statement was untrue; Mr. Jones had in fact generated images in January 2023. (Mr. Jones's April 9, 2023 written complaint to management and human resources at p. 2.) It was Mr. Karafin's own methodology that was unworkable, and Mr. Jones had advised Mr. Karafin that the methodology was unlikely to result in substantial image improvement in early March 2023. Despite Mr. Karafin's knowledge that the methodology he prescribed was unworkable, he refused to change course. Instead, he scapegoated Mr. Jones and implied that the lack of progress in image improvement was due to Mr. Jones' work performance, when he was well aware that the lack of progress was due to the fact that his own methodology had proved to be unworkable. On April 9, 2023, Mr. Jones submitted — by email to Light Field Lab's chief executive officer Mr. Karafin, to Mr. Bevensee, to his supervisor Mr. Berninger, and to Mr. Barnes, each a member of Light Field Lab management with authority over him — a written rebuttal of Mr. Karafin's disparaging comments and a complaint of hostile work environment, connecting Mr. Karafin's conduct to his disability (his Type I diabetes and resulting immunocompromised condition) and his disability-driven remote work. (Mr. Jones's April 9, 2023 written complaint to management and human resources at p. 1.) Mr. Jones observed that he had proven a viable solution to the problem described above — the same work that Light Field Lab incorporated, days later, into the patent applications described above (¶¶ 37-39), naming only Karafin and Bevensee and crediting Mr. Jones nowhere.

54. LFL retained an outside investigator to conduct an investigation of Mr. Jones' hostile work environment complaint. When Mr. Jones was interviewed by the investigator, he explained that he believed that Mr. Karafin's animosity towards him was due to the fact that he was working remotely because of his disability. Mr. Jones also explained that he had been under increased pressure from LFL to return to in-office work, despite his disability.

55. Mr. Jones continued working on interference masking on the Wavetracing Optics and, upon implementation of Mr. Karafin's methodology, it became apparent to LFL that the methodology did not

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

result in substantial image improvement and, in fact, resulted in a substantial reduction in the field of view. The technical concerns that Mr. Jones outlined in his complaint of April 9, 2023, were substantiated.

56. On or about June 16, 2023, Mr. Jones received an email indicating that the investigation had been concluded and that his claim of illegal hostile work environment based on disability had not been substantiated.

Termination

57. On June 23, 2023, Mr. Jones' employment was terminated. During the conference call it was indicated that "things aren't working out" and that, with the conclusion of the investigation, LFL was terminating Mr. Jones' employment. No one on the call stated, or otherwise indicated, that Mr. Jones was being terminated for poor performance or unprofessional behavior. Only later that same day did LFL assert those reasons, and then for the first time and in writing (see ¶58; Light Field Lab's June 23, 2023 termination letter at p. 1). Rather, LFL was terminating Mr. Jones for requesting accommodation and then making a complaint about illegal retaliation related to that request.

58. Later in the day on June 23, 2023, Mr. Jones received a written notice of termination, signed by Light Field Lab's Chief Operating Officer, John Dohm, stating that his employment was terminated "due to below-expectation performance and unprofessional behavior." The letter asserted that, "[b]ecause of these reasons, [the] Company had been preparing to terminate [his] employment," but that "after [he] made a complaint on April 9, 2023 against Jon Karafin, the Company put the termination process on hold" to allow the investigation, and that, "after the conclusion of the investigation, the Company resumed the termination process." (Light Field Lab's June 23, 2023 termination letter at p. 1.) During his nearly four-year tenure at Light Field Lab, no one had ever complained to Mr. Jones about poor performance or unprofessional behavior; and Light Field Lab's assertion that the decision to terminate had been made before his April 9, 2023 complaint was false and unsupported by any contemporaneous record.

59. Mr. Jones reported conduct that he reasonably believed was motivated by unlawful discrimination. LFL concluded its investigation of that complaint on or about June 16, 2023, and terminated Mr. Jones' employment on June 23, 2023, approximately one week later.

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

60. LFL's claim that it made a decision to terminate Mr. Jones' employment prior to the submission of his hostile work environment claim of April 9, 2023, is unsupported by any evidence.

61. LFL management never brought any job performance concerns to Mr. Jones, either orally or in writing, until April 6, 2023. In fact, Mr. Berninger advised Mr. Jones in December 2022 that LFL had no problems with Mr. Jones' job performance.

Concealment of the Applications Built on Mr. Jones's Work

62. Mr. Jones did not learn during his employment that Light Field Lab had filed the applications described above capturing his work. Karafin and Bevensee did not disclose those filings to him, and did not credit him in them. Consistent with the allegations above, Mr. Jones does not seek to be named an inventor on any patent or application; he alleges this non-disclosure and non-attribution as further evidence that Defendants took his work and concealed that they had done so.

The Stock Options, Mr. Jones's Exercises, and the Continuing Concealment

63. On December 9, 2019, Light Field Lab granted Mr. Jones a stock option (grant ES-25), issued by Light Field Lab from its 2017 Stock Incentive Plan, to purchase 215,000 shares of its common stock (the Company's 2019 offer letter § 3). The option was issued on Light Field Lab's behalf by Karafin and vested over the course of Mr. Jones's employment. (Dkt. 20-1 at p. 12 ["Issued by Light Field Lab"; "Issued from 2017 Stock Incentive Plan"]; p. 16 [grant "Signed by Jon Karafin"].) Light Field Lab later granted Mr. Jones a second option, dated October 31, 2022, to purchase 85,000 shares; none of those shares had vested at his termination, and all were cancelled.

64. Mr. Jones exercised that option on three separate occasions, each time paying Light Field Lab by electronic (ACH) funds transfer, at the exercise price of $0.70 per share, for shares of its common stock: (a) on December 10, 2020 — 10,000 shares (Stock Certificate CS-13), for $7,000; (b) on December 28, 2020 — 20,000 shares (Stock Certificate CS-14), for $14,000; and (c) on April 29, 2021 — 50,625 shares (Stock Certificate CS-15), for $35,437.50. In total, Mr. Jones acquired 80,625 shares of Light Field Lab common stock and paid the Company $56,437.50 to do so. Each such payment was a separate interstate transfer, processed through Carta, from Mr. Jones in Washington to Light Field Lab in California, whose operating account was held at Silicon Valley Bank (Dkt. 38-4 at p. 2), and settled on December 22, 2020 ($7,000), January 4, 2021 ($14,000), and May 6, 2021 ($35,437.50). Each

23

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

resulting certificate was approved and signed by Karafin as President and by Bevensee as Secretary, on separate dates. These facts are documented in records Light Field Lab has itself repeatedly placed before the Court — its 2017 Stock Incentive Plan, the Option and Exercise Agreements, and the Carta report of the grant and its three exercises (Dkt. 20-1 at pp. 12 [grant], 15–16 [the exercises creating Stock Certificates CS-13, CS-14, and CS-15, each transferred via ACH]; accord Dkt. 20-2 at pp. 13, 16, and Dkt. 30-2 at pp. 65, 68; the same records previously filed in the related action *Light Field Lab, Inc. v. Jones*, No. 4:23-cv-05344-YGR) — and the per-exercise share counts and amounts in Stock Certificates CS-13, CS-14, and CS-15 (Dkt. 52-1 at pp. 51–52, 75–93).

65. Each exercise was a separate decision by Mr. Jones to commit additional money to Light Field Lab, the value of which depended on the patent portfolio and business model Karafin had described to him. Until he exercised, Mr. Jones's options were contractual rights to acquire stock, and upon his first exercise — as of the December 10, 2020 issue date of Stock Certificate CS-13 (Dkt. 52-1 at pp. 71, 76) — he became a stockholder, increasing his holdings with each subsequent exercise. As a stockholder, Mr. Jones was owed the fiduciary duties that Light Field Lab's directors and officers — including Karafin and Bevensee — owe to a stockholder. Light Field Lab dealt with Mr. Jones in its own securities throughout — granting and administering the option, and selling him its stock upon each exercise — and Karafin and Bevensee approved and executed those transactions while in possession of the undisclosed facts concerning the portfolio's Lytro origin set forth above. At no point, whether while Mr. Jones held vested options or after he became a stockholder, did they disclose those facts to him. The facts were material to each exercise for the same reasons they were material to his decision to accept and continue employment; had he known them, he would not have exercised his options or paid the Company to do so.

66. To exercise the option, Mr. Jones was required to accept Light Field Lab's form Exercise Agreement through the company's Carta platform; by entering his name, his signature was applied to that form, which he was presented with no means or opportunity to negotiate, and which carried the restrictive terms whose nondisclosure during his recruitment is alleged at ¶31. (Dkt. 20-1 at p. 12 [grant-acceptance "Documents" list], pp. 15–16 [exercise document list].)

67. The 2019 offer letter that induced Mr. Jones's employment referenced the 2017 Stock Incentive Plan by name but did not provide it, and by its own terms defined the parties' agreement as comprising only that letter, the Confidentiality and Proprietary Rights Agreement, and an arbitration agreement (the Company's 2019 offer letter § 3 [naming the 2017 Stock Incentive Plan without providing it]; § 8 [Entire Agreement]); Light Field Lab first presented the Plan and the form Option Agreement to Mr. Jones on January 2, 2020, months after he had begun work and assigned his inventions to the company. (Dkt. 20-1 at p. 13.) That form imposed terms never disclosed to Mr. Jones during the procurement of his employment — including when Light Field Lab made the August 2019 equity representations that induced him to forgo his vesting Microsoft equity, and when he signed his onboarding agreements, among them the Confidentiality and Proprietary Rights Agreement (¶33) — comprising a repurchase and forfeiture right on termination, restrictions on transfer, required adherence to a voting agreement and a right-of-first-refusal and co-sale agreement, and the waiver described below (Dkt. 20-1 at pp. 29 [repurchase and forfeiture right], 48–50 [exercise-agreement terms]; Dkt. 20-2 at p. 45 [non-transferability, right of first refusal, and voting]).

68. On Mr. Jones's termination, Light Field Lab exercised that forfeiture: his unvested options were cancelled and the grant marked "Forfeited." (Dkt. 20-1 at p. 12; Dkt. 20-2 at p. 13.)

69. The form documents further purported to bind Mr. Jones to the terms of agreements that Light Field Lab never provided to him. The Option Agreement purported to make it a condition precedent that Mr. Jones "become a party to" both a "Voting Agreement" and a "Right of First Refusal and Co-Sale Agreement" — by "executing an adoption agreement or counterpart signature page agreeing to be bound by and subject to" their terms as a "Key Holder" and "Stockholder" — and the form Exercise Agreement recited that his shares would be "subject to … the transfer restrictions set forth in the Voting Agreement [and] the ROFR and Co-Sale Agreement." Light Field Lab never furnished either the Voting Agreement or the Right of First Refusal and Co-Sale Agreement to Mr. Jones — not when it made the August 2019 equity representations, not in his hiring packet, and not in the equity exhibits it has filed in this action — so that he could not have known or negotiated their terms. (Dkt. 20-1 at p. 44 [Option Agreement § 6(b)–(c)]; Dkt. 30-2 at p. 101 [Exercise Agreement § 3].)

25

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

70. Independently of that concealment, and without conceding that any of these instruments — imposed only after Light Field Lab had secured Mr. Jones's employment and the assignment of his work, and procured by the same nondisclosure alleged above — is valid or enforceable against him, Mr. Jones never became a party to either the Voting Agreement or the Right of First Refusal and Co-Sale Agreement even on the instruments' own terms. The Option Agreement provided that he would become a party only "at the request of the Company" and only "by executing an adoption agreement or counterpart signature page" agreeing to be bound as a "Key Holder" or "Stockholder" — a separate instrument that was never requested, presented, or executed, and that appears nowhere in the record. The equity documents Mr. Jones did sign were the form Option Agreement, at grant, and the form Exercise Agreement, upon each exercise; neither the Voting Agreement nor the Right of First Refusal and Co-Sale Agreement was among them. The form Exercise Agreement is not such an adoption agreement or counterpart signature page: it recites only that the shares are "subject to" the transfer restrictions of those agreements, not that Mr. Jones became a party to or agreed to be bound by their terms. (Dkt. 20-1 at p. 12 [grant-acceptance "Documents" list], pp. 15–16 [exercise document list], p. 44 [Option Agreement § 6(b)–(c)]; Dkt. 30-2 at p. 101 [Exercise Agreement § 3].)

71. Section 7 of that form Exercise Agreement, captioned "Waiver of Statutory Information Rights," purported to have Mr. Jones "unconditionally and irrevocably waive[]" his rights under Section 220 of the Delaware General Corporation Law to inspect Light Field Lab's stock ledger, stockholder list, and books and records, "until the first sale of Common Stock of the Company to the general public." (Dkt. 30-2 at pp. 103–104.) Light Field Lab never disclosed, during the procurement of his employment — including when it made the August 2019 representations that induced him to give up his Microsoft equity — that access to the very equity it had promised would later be conditioned on surrendering the statutory right to inspect the company's stock ledger, stockholder list, and books and records — a right whose exercise might have aided him in discovering the facts alleged above. By the time the form was placed before him, Light Field Lab had already obtained from Mr. Jones the benefits it sought — his employment and the assignment of his work — and Mr. Jones had already, and irreversibly, given up his vesting Microsoft equity in reliance on the equity Light Field Lab had promised him. That forfeiture became irreversible the moment Mr. Jones gave Microsoft notice of his

resignation in September 2019, before he had even begun work at Light Field Lab, and more than a year before Light Field Lab presented him with the form Exercise Agreement when he exercised the option. The form's terms were thus presented as an undisclosed precondition to Mr. Jones's receiving that promised equity: accepting them was his only means of realizing it, and refusing or objecting would not have restored what he had given up but only forfeited the equity Light Field Lab had promised him. For that reason — there being nothing to negotiate and nothing to be gained — Mr. Jones did not read the form Exercise Agreement, including the Section 7 waiver, when he accepted it through Carta.

<u>The Retaliatory Action Against Mr. Jones</u>

72. After Mr. Jones's counsel, in pre-litigation correspondence, stated that Mr. Jones had claims for disability discrimination, retaliation, wrongful termination, and defamation, and advised on October 12, 2023 that Mr. Jones would proceed with his administrative filings on those employment claims absent a response by October 18, 2023 (No. 4:23-cv-05344-YGR, Dkt. 33-2 at p. 2 (Buerger demand letter asserting "strong claims" for "defamation/false light, disability discrimination, and retaliation"); id., Dkt. 33-3 at pp. 46–47 (the parties' ensuing settlement emails, in which counsel set the October 18, 2023 response deadline); id., Dkt. 39 ¶ 4 (declaration of Alan Jones establishing the October 12, 2023 notice and the October 18, 2023 deadline)), Light Field Lab sued Mr. Jones the next day — on October 19, 2023 — in this District: *Light Field Lab, Inc. v. Jones*, No. 4:23-cv-05344-YGR (the "Declaratory-Judgment Action"). (See id., Dkt. 1 (declaratory-judgment complaint, filed October 19, 2023); id., Dkt. 55 at 4:22-25 (court's order reciting the same sequence — the October 18 deadline and Light Field Lab's next-day, October 19, 2023 filing).)

73. The Declaratory-Judgment Action pleaded a single claim — for a declaration that Mr. Jones had no rights to Light Field Lab's stock or to the value of his stock options under the company's 2017 Plan. Light Field Lab framed the action as a "contractual dispute" and alleged that "Jones breached the agreements," although, as the court later observed, the complaint "allege[d] no facts … that either party breached any of the Plan's terms." Light Field Lab knew, when it filed, that the parties' dispute concerned Mr. Jones's employment rather than any contract. In the pre-suit settlement correspondence its own counsel had described the matter as "a single plaintiff wrongful termination claim," and on September 27, 2023 its counsel had asked Mr. Jones's counsel point-blank whether he was claiming a

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

breach of contract: "Do you allege a breach of the Light Field Lab 2017 Stock Incentive Plan? … I understand your position to be that the value of the stock options are part [of] Alan's wages. Please confirm." Mr. Jones's counsel declined to assert any breach of the Plan: confirming, the next day, that Mr. Jones claimed "equity loss as part of Alan's wages," and expressly stating that "a discussion on damage characterization is premature at this point." Those communications are part of the record of the Declaratory-Judgment Action and were considered by the court. (No. 4:23-cv-05344-YGR, Dkt. 1 ¶¶ 3, 29; id., Dkt. 33-3 at pp. 27, 42, 45; id., Dkt. 55 at 4:14-21, 10 n.6.) Light Field Lab filed and maintained the action as a contract dispute notwithstanding. Having sued, Light Field Lab then offered to dismiss: in or about December 2023 it sent Mr. Jones a proposed "Release and Covenant Not to Sue" providing that, "[i]n consideration of Light Field Lab's agreement to dismiss its declaratory judgment complaint," Mr. Jones would release every claim relating to the Plan and covenant never to sue upon any such claim. While reciting that Mr. Jones could still bring his employment claims, the proposed release simultaneously required him to "release[] any damages based in any way on the Plan as compensation in connection with his Employment Claims" — that is, to surrender the value of the options he had lost, the principal economic component of those employment claims — and to represent that he entered the release "free of duress, undue influence or coercion." (No. 4:23-cv-05344-YGR, Dkt. 33-6 at pp. 2-3, 5.)

74. On May 8, 2024, the court dismissed the Declaratory-Judgment Action for lack of subject-matter jurisdiction, finding no actual case or controversy. The court found that Mr. Jones had "demanded the value of options (i.e., cash), as opposed to options, shares, or other equity interests," whereas Light Field Lab's claim was "premised on [his] having demanded equity interests, not cash." The claims Mr. Jones had actually threatened were employment claims; Light Field Lab had recast his demand for the cash value of his options as a demand for equity, manufacturing a contractual controversy that did not exist. (No. 4:23-cv-05344-YGR, Dkt. 55 at 13:1-4; id., Dkt. 58 at 2:6-9.) The court's dismissal rested on undisputed facts about the origin of the action: the court found it "undisputed that the claims that [Mr. Jones] threatened to bring against [Light Field Lab] before th[e] litigation began were employment claims (wrongful termination, employment retaliation and discrimination, and defamation/false light)," and that "the parties' dispute and discussions before the filing of th[e] lawsuit were about [Mr. Jones's] allegations of employment discrimination and retaliation and wrongful

termination" — the very employment claims Mr. Jones was pursuing when Light Field Lab sued him the next day (¶72). (Id., Dkt. 55 at 11:1-4, 12:1-3.) Rather than attempt to cure the defect, Light Field Lab abandoned the action, advising the court that it "no longer need[ed]" a declaratory judgment and had "elected not to amend." (Id., Dkt. 56 at 2:3-4.) At the time, Mr. Jones — who knew nothing of the patent applications Light Field Lab had filed on his work — understood the declaratory-judgment action as an effort to interfere with the wrongful-termination and discrimination claims he was pursuing. Light Field Lab, however, had filed those applications months earlier, in April and June 2023, naming only Karafin and Bevensee. Those filings were known to Light Field Lab and to Karafin and Bevensee, but not to Mr. Jones; and Light Field Lab, Karafin, and Bevensee were aware that, in any litigation of Mr. Jones's employment claims, the internal documents and communications concerning his work — and the applications filed on that work — would be subject to discovery. Neither application, moreover, was published until after the action had been dismissed — WO2024216300A2 (cover, field (43)) on October 17, 2024, and WO2025042476A1 (cover, field (43)) on February 27, 2025 — and Mr. Jones did not discover them until 2025.

Obstruction of Mr. Jones's Records Demands

75. Light Field Lab also withheld from Mr. Jones records he was entitled to inspect. Mr. Jones first sought his personnel file through his counsel in July 2023, and Light Field Lab never produced it. On June 3, 2024, Mr. Jones renewed the request in writing, expressly invoking California Labor Code section 1198.5. After Mr. Jones confirmed delivery, Light Field Lab's Chief Operating Officer, John Dohm, replied on June 7, 2024 that he was "[c]hecking to see if there is anything not previously provided" — although, as Mr. Jones reminded him, nothing had ever been provided. Hearing nothing further, Mr. Jones wrote again on June 27, 2024 to confirm he had received nothing and to state that Light Field Lab was "out of compliance" on both his 2023 and 2024 requests. Only then, that evening, did Light Field Lab produce a file — which Mr. Dohm presented as the company's "response … includ[ing] a copy of your personnel file." (Mr. Dohm's June 27, 2024 email producing Mr. Jones's personnel file at p. 2; the personnel file Light Field Lab produced at pp. 1-124.) The file was materially incomplete. It contained no payroll or wage records, no signed employment agreement (only blank copies), no completed onboarding or background-authorization forms, none of the equity agreements

governing the stock options Light Field Lab had granted him, and no internal communications concerning Mr. Jones of any kind — nothing as to his job performance, his promotion, or the decision to terminate him — even though Light Field Lab had told Mr. Jones it was terminating him for performance. Mr. Jones identified the deficiency the same evening; Light Field Lab did not cure it, responding only that Mr. Jones should direct any further inquiries about his statutory request to the company's outside litigation counsel.

76. Light Field Lab likewise refused Mr. Jones's demands, as a shareholder, to inspect its books and records. Mr. Jones had been a shareholder since his first option exercise in December 2020. Beginning on September 9, 2024, he requested access to the company's capitalization records; on December 11, 2024 he demanded in writing that Light Field Lab honor his shareholder rights, including his right to inspect the company's books and records — stating that he had "never had [his shareholder rights] fulfilled by Light Field Lab within the past four years" and that, as he understood it, "regulatory filings would require [the company] to have declared those as fulfilled" (Mr. Jones's December 11, 2024 shareholder-rights demand at p. 1); and he followed up on December 19, 2024 and again on February 25, 2025. Light Field Lab did not respond substantively. On August 1, 2025, Mr. Jones served a formal written demand under oath, pursuant to Section 220 of the Delaware General Corporation Law (8 Del. C. § 220) and Section 1601 of the California Corporations Code, to inspect Light Field Lab's books and records, delivered by certified mail (Mr. Jones's August 1, 2025 books-and-records demand letter at pp. 1-3; the returned certified-mail envelope at pp. 1-2; the USPS tracking record at pp. 1-3). Light Field Lab did not produce the records. Mr. Dohm responded that he had "been directed to limit responses" because Mr. Jones had "retained counsel at several points in the past," and the company's Director of Legal Affairs, Charles Yang, declined to communicate with Mr. Jones and referred the matter to Light Field Lab's outside litigation counsel. The books and records Mr. Jones demanded on August 1, 2025 are the same records the form Exercise Agreement had purported to make him waive (¶71). That waiver was contained in agreements procured by the same concealment alleged above and is, like the Confidentiality and Proprietary Rights Agreement (¶¶33, 41), void as to Mr. Jones; and by its own terms it reached only his rights as a stockholder, expired upon a public offering that never occurred, and did not reach his right, as a creditor of the insolvent estate, to inspect the company's records.

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

The Assignment for the Benefit of Creditors

77. Fourteen days after refusing Mr. Jones's Section 220 demand, and while Mr. Jones's lawsuit against it was pending, Light Field Lab executed, on August 15, 2025, a General Assignment for the Benefit of Creditors, transferring its assets to CMBG FBC-Light Field Lab, LLC (the "Assignee"). (the Assignee's Notice of Assignment for the Benefit of Creditors.) By the Assignee's own notice, Light Field Lab "closed in insolvency, electing to wind down and liquidate its business pursuant to an Assignment for the Benefit of Creditors"; the Assignee "was retained to act as Assignee in the insolvency proceedings" and "will be working to sell off any remaining company assets." Light Field Lab did not notify Mr. Jones — by then a creditor and claimant — until August 21, 2025, six days after the assignment was executed. Light Field Lab itself placed the Assignee's notice in the record of this action (Dkt. 30-2 at p. 188), and the assignment and its administration are documented at Dkt. 52-1, Ex. I, at pp. 357–358. A general assignment for the benefit of creditors is a private liquidation in which the debtor selects its own assignee, rather than a court appointing an independent trustee, and the assets are sold without court supervision, court approval, or the mandatory disclosure a bankruptcy would require. Light Field Lab elected that route in lieu of a federal bankruptcy, and itself selected the Assignee. (See Cal. Code Civ. Proc. § 493.010 et seq.; Dkt. 30 at 13:24-25.)

78. A general assignment for the benefit of creditors transfers all of the assignor's non-exempt assets by operation of law; the asset schedule is an administrative disclosure tool, not a limit on what passes. By the Assignment, Light Field Lab thus transferred all of its assets to the Assignee — including, but not limited to, its patent portfolio. The complete inventory of what was transferred is not known to Mr. Jones, because the Assignee has refused, despite Jones' repeated formal demands as a creditor, to provide a complete asset inventory and disposition report (Dkt. 52-1 at pp. 308, 312, 315, 335, 366, 373). The patent portfolio is, for the reasons alleged above, of clouded and materially impaired value, because the provenance and enforceability of those patents are clouded by the matters alleged above and because they embody the appropriation of others' work. The conduct of those who have controlled the portfolio since this action was filed confirms as much. As its patents and applications reached the deadlines for the modest maintenance, renewal, and issue fees required to keep them in force, those fees were paid on only a handful, while the great majority of those coming due were

allowed to lapse or go abandoned for nonpayment — many among them are patents tied to the very terminology and Lytro-derived origins alleged above. The assignee for the benefit of creditors did not pay the modest fees to keep these patents in force as they expired during its administration — a failure that was either a breach of its fiduciary duty to preserve the value of the estate, or a judgment, by a fiduciary charged with maximizing that value, that the patents were worth less than the fees. The purchaser that acquired the portfolio has done the same: it paid, late and with a surcharge, to preserve a small number while letting the great majority lapse — sparing the few it chose to keep and abandoning the rest. A party that believed the portfolio to be as valuable as it had been portrayed would have paid the small sums needed to preserve it. The source code and other intellectual property that were Mr. Jones's, by contrast, retained their value; the clouded condition of the patents does not diminish the value of that property or of the estate's other tangible assets. The assets of value for satisfying a judgment are therefore the other assets Light Field Lab owned and transferred to the Assignee — including its display prototypes, multiple pieces of manufacturing equipment, computer hardware such as servers and monitors, office equipment and furnishings, and its remaining cash and liquid assets — which the Assignee has sold but has not disclosed or accounted for, despite Mr. Jones's repeated demands as a creditor.

79. Through the Assignment, and then through the Assignee, Light Field Lab's assets were sold off. Under the Assignment, Light Field Lab transferred to the Assignee "all [of Light Field Lab's] rights in tangible and intangible assets," including its patent portfolio; the Assignee in turn represented that it conducted "multiple sales" of those assets. (the Assignee's March 17, 2026 Notice of Assignment Status at p. 1.) The disposition of Light Field Lab's patent estate is documented in two executed instruments later filed with the Patent Office. By the August 15, 2025 General Assignment, signed for Light Field Lab by Jon Karafin as its Chief Executive Officer, Light Field Lab conveyed to the Assignee all of its property and assets of every kind. By a Patent Assignment Agreement made effective January 15, 2026, the Assignee in turn conveyed Light Field Lab's worldwide patent estate — the patents and applications identified on a schedule to that agreement — to the purchaser, Pacific Light & Hologram, Inc. The Patent Assignment Agreement recites that the conveyance was made pursuant to an Asset Purchase Agreement, and that the assets were transferred "as is where is," with the Assignee making "no

representations or warranties whatsoever." (Patent Assignment Agreement at p. 3.) The conveyance was thus a sale of the patent estate to the purchaser for consideration, the amount and adequacy of which the Assignee has not disclosed. The identity of the purchaser did not appear in the patent assignment records at all: as alleged below, the Patent Office's assignment index continued to show Light Field Lab as the recorded owner of every patent (¶81). It appeared only on the face of the transfer instruments themselves (the Patent Assignment Agreement at pp. 1, 3), which were lodged with the Patent Office in early March 2026 but, as of June 21, 2026, have yet to be recorded in the assignment index. The Assignee, which owed Mr. Jones a fiduciary duty as a creditor of the estate, refused to disclose the purchaser's identity to him even then: Mr. Jones formally demanded it on February 27, 2026, renewed the demand on March 5, 2026, and on March 6, 2026 — after the transfer instruments had been lodged with the Patent Office — the Assignee told Mr. Jones it would not respond further while his litigation remained pending. Mr. Jones thus learned who the purchaser was not from the Assignee, and not from any record of patent ownership, but only by digging it out of the Patent Office's application full prosecution record himself. Despite Mr. Jones's repeated formal demands as a creditor, the Assignee has not disclosed what the other assets were, what they sold for, or to whom; nor has it disclosed, as to any sale, the consideration received or its value beyond its representation that warrants in one buyer formed part of the consideration for one sale (the Assignee's March 17, 2026 Notice of Assignment Status at p. 1). (Dkt. 52-1 at pp. 308, 312, 315, 335, 366, 373.) Because of that non-disclosure, Mr. Jones does not know the value of the consideration the Assignee received for any of the transferred assets, or whether it was adequate.

80. The Assignee has represented only that the sales were "approved by the senior secured creditor [who had] a first-priority lien on all [Light Field Lab] assets," without disclosing who that secured creditor is or whether it is affiliated with Light Field Lab's officers, directors, or controlling shareholders. (Dkt. 52-1 ¶ 8; the Assignee's March 19, 2026 status-update email at p. 1.) John Dohm, Light Field Lab's former Chief Operating Officer, told Mr. Jones in telephone calls on November 19, 20, 22, and 24, 2025 — after this action had been filed and after the Assignment — that a majority shareholder had voted to approve the Assignment and that the company's board members had all resigned beforehand.

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

81. As of the dates Mr. Jones obtained the Patent Office's assignment records, neither transfer was yet reflected in that Office's assignment index. On March 6, 2026, Mr. Jones obtained the Patent Office's assignment transaction history for Light Field Lab's patents; it showed that the assignment index still recorded Light Field Lab, Inc. as the owner of every patent and reflected no recorded conveyance to the Assignee or to the purchaser. (Dkt. 52-1 ¶ 12 (Jones Decl.) & Dkt. 52-1, Ex. M (Patent Assignment Abstracts of Title; e.g., id. at p. 619).) The Statement under 37 C.F.R. § 3.73(c) accompanying the Patent Assignment Agreement recites that the conveyance was submitted to the Office's Assignment Branch for recordation on March 4, 2026, and that no reel or frame number had yet been assigned. (the Patent Assignment Agreement at pp. 1-2.) In the records of the Patent Office that govern patent title, Light Field Lab therefore continued to appear, and as of June 21, 2026 still appears, as the owner of the very patents it had purported to assign.

82. Notwithstanding the August 15, 2025 Assignment that purported to transfer all of Light Field Lab's assets, including the patent portfolio, Light Field Lab and its agents have, after that date, repeatedly asserted in this action that Light Field Lab presently owns the portfolio. On November 18, 2025 — more than three months after the Assignment — the Defendants submitted a declaration from Charles Yang, who declared under oath that he had served as Light Field Lab's Director of Legal Affairs and had been responsible for managing the company's patent portfolio, and that a Patent Office assignment search showed Light Field Lab "owns 17 provisional patent applications and 13 PCT international patent applications" and "is the listed applicant on 355 patent applications globally." (Dkt. 38-2 ¶¶ 1, 2, 5, 7.) In their motions to dismiss and reply filed after the Assignment, the Defendants likewise represented to this Court that Light Field Lab presently owns the portfolio — that "LFL does own the patents," which the Patent Office "has issued … to LFL," and that "Light Field Lab, Inc. … would still maintain ownership of the patents." (Dkt. 38 at 11:1-5, 5:8-9 (filed November 18, 2025).) Thus, after a transfer that purported to convey the portfolio away, the pleaded Defendants continued to assert in this action that Light Field Lab presently owns it, even as the Patent Office's record of title still showed Light Field Lab as owner (¶81). That Light Field Lab and its agents have continued to assert ownership of, and to ascribe value to, a portfolio of hundreds of patents and applications cannot be reconciled with the conduct of those who have controlled that portfolio, who have allowed much of it to

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

lapse and go abandoned for nonpayment of the modest fees required to keep it in force (¶78). By these allegations Mr. Jones does not, in this action, seek to be adjudged the owner of, or to obtain title to, any patent or patent application, nor does he ask this Court to correct the inventorship of record; these facts are pleaded solely to establish the circumstances of the transfer.

83. Mr. Jones's own intellectual property — his source code, his trade secrets, and the other work product embodying his inventions — was not Light Field Lab's to assign. As alleged above, the agreement by which Light Field Lab purported to acquire that work was procured by the concealment alleged above and is void; the work never validly passed to Light Field Lab and was therefore not its property to transfer. The General Assignment nonetheless expressly swept into the estate, among Light Field Lab's assets, its "source codes, software, and related documentation" and its "choses in action." (the General Assignment § 1(a).) In that same instrument, Light Field Lab expressly represented and warranted that no asset — including its intellectual property, which it acknowledged "may be subject to restrictions on the use or transfer" — had been "transferred, used, or removed … in a manner that interferes with the rights and interests of a third part[y]" or that "may constitute a breach of any contract with such third part[y]." (the General Assignment § 4.) That warranty was false: the source code and work product swept into the estate were Mr. Jones's, taken from him as alleged above, so that Light Field Lab conveyed into the estate — and warranted as free of any third party's claim — the very property of Mr. Jones it had no right to assign. Light Field Lab gave that warranty knowing of Mr. Jones's claim to the very property it was warranting free of any third-party claim: when it executed the General Assignment on August 15, 2025, it had been a named defendant for nearly two months in this action, which Mr. Jones had filed on June 17, 2025 and which asserts his claim to that source code and work product. Light Field Lab thus warranted the estate free of any third party's interfering claim at the very time it was defending such a claim, brought by Mr. Jones, in this Court. Mr. Karafin, who signed that assignment for Light Field Lab, thereby purported to convey beyond Mr. Jones's reach the very source code and work product that, as alleged above, were never Light Field Lab's to assign. Mr. Jones repeatedly put the Assignee on notice of his claim to that property: on August 29, 2025, days after learning of the Assignment, his counsel served a formal demand on the Assignee for the immediate cessation of any sale, licensing, transfer, or disposition of the patents and source code, and for the

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

preservation of all source-code repositories, version-control logs, and development environments (Dkt. 52-1, Ex. A, at pp. 6–7). Mr. Jones thereafter filed proofs of claim and a proof of interest in the assignment proceeding. (Dkt. 52-1 at pp. 28, 50-51.) Notwithstanding his preservation demand, the Assignee did not account for Mr. Jones's source code and proceeded with the disposition of the estate's assets. The Assignee later offered Mr. Jones a single patent it had carved out of the sale in exchange for a release of his claims. (Dkt. 52-1 at p. 376.) The Assignee's representation that this one foundational patent was not included in the portfolio sale is borne out by the transfer instruments themselves: that patent does not appear on the schedule by which the balance of the estate's patents was conveyed to the purchaser, even though the continuation patents that descend from it were conveyed. (the Patent Assignment Agreement at pp. 6-32.) The holders thus peeled a single foundational patent off the sale while selling its descendants.

84. The General Assignment itself required the Assignee to reserve for disputed claims. Section 5(i)(vi) provides that "[n]o payment shall be made to any creditor whose claim is otherwise disputed until such time as that creditor's claim is resolved," and that the disputed creditor's "otherwise pro-rata share of such distribution shall be fully reserved for by the Assignee until such time as the dispute is resolved." (the General Assignment § 5(i)(vi); see also Dkt. 52-1 at p. 60 (Mr. Jones's reserve demand).) Mr. Jones's claims are disputed and are the subject of this pending action. On February 18, 2026, Mr. Jones served a formal written demand that the Assignee reserve for his claims under Section 5(i)(vi). The Assignee did not reserve for, account for, or segregate Mr. Jones's claims or his source code. It stated that it "cannot expend estate resources addressing speculative issues while litigation remains pending" and that it "do[es] not anticipate further correspondence on these issues while your litigation remains pending" (Dkt. 52-1 at p. 360), and it proceeded to complete the liquidation and wind up its administration, holding nothing for Mr. Jones.

85. On information and belief, the senior secured creditor that approved the sales, the purchaser of the transferred assets, and the majority shareholder who approved the Assignment are affiliated with Light Field Lab's officers, directors, or controlling shareholders, or are one and the same person, persons, entity, or entities. That belief rests on (a) the Assignee's refusal, despite Mr. Jones's repeated demands, to disclose the identity of the purchaser or of the secured creditor, which is itself probative of

their affiliation with Light Field Lab's principals (¶¶79-80); (b) Mr. Dohm's account that the Assignment was approved by a controlling shareholder after the board had resigned (¶80); (c) the ordinary structure of venture-backed startup financing, in which a first-priority security interest in all of a company's assets is commonly held by the company's lead seed- or Series A-round investor, who frequently requires a seat on the board as a condition of its investment; and (d) the Assignee's course of conduct described above — its withholding of the identity of the purchaser and the secured creditor even after Mr. Jones's written demands (¶¶79-80); its sale of the estate's assets after Mr. Jones's written demand that it cease any disposition and preserve them (¶83); its refusal to reserve for Mr. Jones's disputed claim as Section 5(i)(vi) of the Assignment required (¶84); its offer of a single carved-out patent in exchange for a release of his claims (¶83); and its refusal of further correspondence "while [his] litigation remains pending" (¶84) — every step of which, so far as is apparent to Mr. Jones, has run in the same direction, favoring those persons and disfavoring Mr. Jones and the estate's other creditors, several of those steps exposing the Assignee to liability rather than advancing the orderly, lowest-cost liquidation for which an assignee is ordinarily retained, and none of them explained by the legitimate administration of the estate or by any compensation the Assignee has disclosed, the Assignee having refused to produce its fee agreement.

86. In this manner, while this action — which Mr. Jones had filed on June 17, 2025 — was pending, Light Field Lab transferred substantially all of its assets — the patent portfolio it claimed to own, conveyed onward by the Assignee to Pacific Light & Hologram, Inc., whose identity as the purchaser the Assignee never disclosed to Mr. Jones, who had to uncover it for himself from the prosecution records of Light Field Lab's hundreds of patents and applications, the assignment index all the while still showing Light Field Lab as the owner of every patent (¶¶79, 81), and the source code and other intellectual property that were Mr. Jones's, swept into the estate — through a private assignment, leaving the purchaser or purchasers of the estate's remaining assets, the consideration received for any of the sales, and the approving secured creditor undisclosed, and doing so outside any bankruptcy proceeding subject to court supervision. Having conveyed away everything of value, Light Field Lab was left a corporation with no disclosed assets from which a judgment in Mr. Jones's favor could be satisfied. By a Notice of Status dated March 17, 2026, the Assignee declared that it had completed

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

multiple sales and the administration of the estate; that, as a component of the consideration for one sale, it had obtained warrants in the buyer, which it represented are speculative and have no current determinable value; that the estate remained encumbered by a secured creditor's lien that the sale proceeds were insufficient to satisfy; and that no creditor — priority or unsecured — and no equity holder received any distribution, the estate having no funds remaining to distribute to its creditors or investors. (the Assignee's March 17, 2026 Notice of Assignment Status at p. 1; the Assignee's March 19, 2026 status-update email at p. 1.) The Assignee thus represented that the undisclosed secured creditor absorbed the available proceeds and that Mr. Jones, like every other creditor and equity holder, received nothing. That the Assignee took, for one of the sales, warrants — a right to acquire equity — in the buyer rather than cash is significant. Cash is a closed, one-time payment: had the sale been for cash, that cash, once received and applied — even toward the approving secured creditor — would have ended any continuing connection between Light Field Lab, its former officers, directors, and controlling shareholders, and the assets conveyed away. Warrants operate differently. Equity in the buyer — equity whose value, by the terms of the sale, flows to the same secured creditor that approved the sale — is not a closed payment but an open-ended, continuing stake in the buyer's enterprise, and it created a means by which those persons or entities, if (as alleged above, ¶85) they stand behind the buyer or that secured creditor, could retain an interest in, and a measure of control over, the acquiring entity that now holds those assets, even though Light Field Lab itself transferred the assets away and retains nothing. On information and belief, the arrangement thus preserves for those persons or entities a continuing financial stake in the value of the assets Light Field Lab conveyed away — not the assets themselves, nor any divided share of them, but an undivided equity interest in the acquiring entity, which holds the transferred assets among its own other assets — while Mr. Jones and the estate's other creditors receive nothing. The extent of that interest, the degree to which its value tracks the transferred assets in particular rather than the acquiring entity's enterprise as a whole, and whether and through what intermediate entities those persons or entities hold it, are among the matters the Assignee has refused to disclose (¶79).

Light Field Lab's Void Corporate Status

87. Light Field Lab is no longer a corporation in good standing. According to the records of the Delaware Division of Corporations (File No. 6225868), Light Field Lab's registered agent resigned on January 13, 2026; Light Field Lab did not appoint a replacement; and on February 12, 2026 the State of Delaware forfeited Light Field Lab's charter on that ground (see Del. Code Ann. tit. 8, § 136). As of that record, Light Field Lab also owed $194,330.40 in unpaid Delaware franchise tax and had no registered agent of record. Mr. Jones has asked the Court to take judicial notice of the Delaware entity-status record (Dkt. 63 at 2:7-16 & p. 4.)

88. Light Field Lab is thus a void and forfeited Delaware corporation. Under Delaware law, a corporation whose charter has been forfeited or declared void is not dissolved and is not afforded the statutory winding-up period that 8 Del. C. § 278 provides for dissolved corporations; rather, its powers are rendered inoperative, including the power to dissolve, wind up, sue and be sued. Such a corporation has ceased to exist and has lost any standing to sue, be sued, or be heard, even if represented by counsel. A corporation's capacity to sue and be sued is determined by the law of the State under which it is organized. Fed. R. Civ. P. 17(b)(2). Having transferred away its assets through the Assignment described above and then forfeited its charter, Light Field Lab is an entity without assets, without a registered agent, and without the corporate capacity to act. The indicia of ownership Light Field Lab retained in the property it purported to assign — the unchanged Patent Office record of title and its own assertions of present ownership (¶¶81–82) — existed as of and after the August 15, 2025 Assignment, whereas Light Field Lab's loss of corporate capacity dates only from its February 12, 2026 charter forfeiture; the two are not inconsistent.

A Continuing Course of Conduct

89. The matters set forth above describe a single, continuous course of conduct rather than isolated events. Its method took shape before Mr. Jones was ever recruited. While still employed at Lytro, Karafin and Bevensee filed the foundational provisional applications for the benefit of Light Field Lab in July 2016, incorporated Light Field Lab that November while still at Lytro, and departed Lytro the following spring; Light Field Lab then built its patent portfolio upon those provisionals, re-labeling under new terminology the light-field architecture they had described at Lytro and withholding the

earlier Lytro prior art from the Patent Office, so that the derivation of that work would not be apparent on the face of the documents. The pattern was thus already in motion — to obtain and retain the benefit of work that was not theirs, and to conceal how they had obtained it — and its objects, at that stage, were others' work and the Patent Office, not Mr. Jones. When Light Field Lab recruited Mr. Jones in 2019, it turned that same method on his work. From that recruitment to the present, Light Field Lab and its principals acted repeatedly to the same end: they induced Mr. Jones's employment and his intellectual-property assignments through the representations and omissions alleged above; they filed patent applications on his work without crediting him; they withheld the personnel and corporate records he was entitled to inspect, records bearing on his claims and on their patent-filing activity; and then, while this action was pending and days after refusing his demand to inspect those records, they placed the company's assets beyond his reach — assigning them, through a private assignment for the benefit of creditors outside any court-supervised proceeding, to an assignee who sold the patent portfolio onward to a purchaser whose identity the Assignee withheld and that Mr. Jones could learn only by extracting it himself from the Patent Office's prosecution records (¶¶79, 81), leaving the purchaser or purchasers of the estate's remaining assets, the consideration for any of the sales, and the approving secured creditor undisclosed; the property so transferred included Mr. Jones's own work, which was not Light Field Lab's to convey, and the patents the assignment purported to sweep away, as to which Light Field Lab remained the recorded owner in the Patent Office even as it asserted in this action that it still owned them; and the company then forfeited its corporate existence, leaving an entity without disclosed assets from which a judgment could be satisfied. From the foundational filings in 2016 through Mr. Jones's recruitment in 2019 to the transfer and forfeiture of 2025 and 2026, each step advanced or protected the same objective. That course of conduct has not ended. The source code and trade secrets taken from Mr. Jones, and the patent portfolio built on concealed work, continue to be held and exploited — the patents by the purchaser identified only in the Patent Office's record, and the source code and trade secrets by a holder that remains undisclosed — while the purchaser or purchasers of the estate's other assets, the approving secured creditor, and the persons who stand behind them remain concealed. On information and belief, and as alleged at ¶¶85–86, the same persons who owned and controlled Light Field Lab continue to control and benefit from those assets through that entity, so that

40

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

the concealment, and the exploitation of property taken from Mr. Jones, are ongoing and, absent the disclosure he seeks, threaten to continue.

**CAUSES OF ACTION**

<u>FIRST CAUSE OF ACTION</u>

*(Retaliatory Termination — Cal. Lab. Code § 1102.5) (Against Light Field Lab)*

90. Mr. Jones incorporates by reference paragraphs 1 through 11 and 42 through 71 above as though fully set forth herein.

91. At all relevant times, Light Field Lab was Mr. Jones's employer within the meaning of California Labor Code section 1102.5, and Mr. Jones was its employee. This cause of action is brought against Light Field Lab only.

92. Mr. Jones engaged in activity protected by California Labor Code section 1102.5(b). On April 9, 2023, he submitted to Light Field Lab — to its chief executive officer Mr. Karafin, to Mr. Bevensee, and to his supervisor Mr. Berninger, among others, each a person with authority over him — a written complaint of a hostile work environment connecting Mr. Karafin's conduct to his disability and disability-driven remote work (¶53). During Light Field Lab's ensuing investigation, he further disclosed that he believed Mr. Karafin's animosity toward him, and Light Field Lab's pressure on him to return to in-office work, were because he worked remotely on account of his disability (¶54). Through these disclosures, Mr. Jones disclosed, to persons with authority over him, information that he had reasonable cause to believe evidenced a violation of the California Fair Employment and Housing Act's prohibitions against disability discrimination, disability-based harassment, and failure to accommodate (California Government Code section 12940), as alleged at paragraphs 44 through 50, 53, 54, and 56. That Mr. Jones directed his complaint in part to Mr. Karafin himself, whose conduct it concerned, does not deprive the disclosure of protection.

93. In the alternative and independently, Mr. Jones disclosed information that he had reasonable cause to believe evidenced a violation of a workplace health-and-safety rule or regulation (e.g., Cal. Code Regs. tit. 8, §§ 3203, 3205): he repeatedly requested that Light Field Lab adopt masking, testing, social-distancing, and ventilation measures to protect him — a known immunocompromised employee

41

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

— from exposure to COVID-19, and Light Field Lab refused to respond to or implement any such measure (¶¶44, 49–50).

94. Mr. Jones had reasonable cause to believe that the conduct he disclosed was unlawful (¶59). Section 1102.5(b) protects such a disclosure whether or not the conduct disclosed in fact constituted a violation; an actual violation need not be proved, and Light Field Lab's determination that his complaint was "not substantiated" (¶56) does not defeat his protected activity. The disclosures were protected even though made internally to Light Field Lab and its investigator rather than to a government agency, and Mr. Jones was not required to exhaust any administrative remedy before bringing this claim (California Labor Code section 244(a)).

95. Light Field Lab subjected Mr. Jones to an adverse employment action by terminating his employment on June 23, 2023 (¶¶57–58).

96. Mr. Jones's protected activity was a contributing factor in his termination. Light Field Lab terminated him on June 23, 2023, around one week after it concluded, on or about June 16, 2023, its investigation of the very complaint at issue (¶¶56, 59) — a temporal proximity supporting an inference of retaliatory intent.

97. Light Field Lab's stated reasons for the termination are pretextual and shifting. On the termination call, Light Field Lab said only that "things aren't working out" and tied the decision to the conclusion of the investigation, stating no performance reason (¶57); only later that day did its letter assert "below-expectation performance and unprofessional behavior" (Light Field Lab's June 23, 2023 termination letter at p. 1) for the first time, and falsely state that the decision to terminate had been made before Mr. Jones's April 9, 2023 complaint (¶58). That assertion is unsupported by any evidence (¶60); no performance concern had ever been raised before April 6, 2023; and Mr. Berninger had confirmed in December 2022 that Light Field Lab had "no problems" with Mr. Jones's job performance (¶¶47–48, 61).

98. Under California Labor Code section 1102.6, because Mr. Jones's protected activity was a contributing factor in his termination, Light Field Lab can avoid liability only by proving, by clear and convincing evidence, that it would have terminated him for legitimate, independent reasons even had he not engaged in the protected activity. That same-decision showing is Light Field Lab's affirmative

burden, not an element of Mr. Jones's claim, and it cannot be resolved on the pleadings; on the facts alleged, Light Field Lab cannot carry it.

99. As a direct and proximate result of Light Field Lab's retaliation, Mr. Jones has suffered, and continues to suffer, damages. The principal component of his economic loss is the value of the stock options and equity that were a central part of his compensation and that he lost as a result of the termination — a loss his subsequent employment has not replaced; the record reflects that Mr. Jones claimed the lost value of that equity as part of his wages (¶¶63–71, 73–74). He has also suffered loss of wages and benefits, including during periods of unemployment, and other economic and consequential losses, all in amounts to be proven at trial.

100. As further evidence of Light Field Lab's retaliatory intent, after the termination — when Mr. Jones's counsel gave notice that Mr. Jones would pursue his employment claims — Light Field Lab filed a declaratory-judgment action against him the day after counsel's stated deadline passed, which a federal court later dismissed for lack of subject-matter jurisdiction, coupled with a proposed release seeking his surrender of the equity value at the heart of those claims (¶¶72–74). These facts are alleged solely as evidence of Light Field Lab's retaliatory intent, and not as an independent cause of action.

101. Mr. Jones is entitled to recover his damages, together with the civil penalty and attorney's fees authorized by California Labor Code section 1102.5.

SECOND CAUSE OF ACTION

*(Wrongful Termination in Violation of Public Policy) (Against Light Field Lab)*

102. Mr. Jones incorporates by reference paragraphs 1 through 11 and 42 through 71 above as though fully set forth herein.

103. At all relevant times, Light Field Lab was Mr. Jones's employer and Mr. Jones was its employee (¶11, ¶¶42–43). This cause of action is brought against Light Field Lab only.

104. California has a fundamental, substantial, and well-established public policy — embodied in the California Fair Employment and Housing Act, California Government Code section 12940(a), (m), and (n) — against discriminating against employees because of disability, against refusing to provide them reasonable accommodation, and against failing to engage in a timely, good-faith interactive process. That policy inures to the benefit of the public at large, and was well established long

Case No. : 3:25-cv-5118 MMC

Second Amended Complaint

before June 2023. Light Field Lab violated that policy: it knew Mr. Jones was a person with a disability, refused to engage with his requests for accommodation of his immunocompromised condition, and marginalized him (¶¶44–50, 54). Light Field Lab further violated that policy by terminating Mr. Jones because of his disability and his disability-driven remote work, and because he had requested accommodation of his immunocompromised condition (California Government Code section 12940(a), (m)). Mr. Karafin's animosity toward Mr. Jones arose because Mr. Jones worked remotely on account of his disability (¶¶53–54); Light Field Lab pressed him to abandon that accommodation and return to in-office work despite his disability (¶¶47–50, 54); and it then terminated him in a decision in which his disability, his disability-driven remote work, and his requests for accommodation were each a substantial motivating reason (see ¶¶53–54, 57).

105. That same fundamental public policy forbids retaliation against an employee for opposing disability discrimination, for requesting reasonable accommodation, or for complaining of a disability-based hostile work environment (California Government Code section 12940(h), (m)). Light Field Lab cannot invoke the Act's administrative scheme as an exclusive remedy; the public policy against disability discrimination and retaliation that the Act embodies independently supports a common-law action for wrongful termination in violation of public policy. Light Field Lab also violated that policy by terminating Mr. Jones after, and because of, his April 9, 2023 complaint and his disclosures during the ensuing investigation (¶¶53–54, 56–59).

106. Independently and in the alternative, the termination violated the fundamental public policies embodied in California Labor Code section 1102.5, which protects employees who disclose conduct they reasonably believe to be unlawful (as alleged in the First Cause of Action), and in California's workplace health-and-safety policy, embodied in California Labor Code section 6310 and the regulations adopted thereunder, which protects employees who seek protection from workplace hazards. Mr. Jones, a known immunocompromised employee, repeatedly sought masking, testing, social-distancing, and ventilation measures against exposure to COVID-19, and Light Field Lab refused (¶¶44, 49–50, 53–54, 59). Each of these policies is fundamental, substantial, well established, and public, and any one of them independently supports this cause of action.

107. Light Field Lab terminated Mr. Jones's employment on June 23, 2023 (Light Field Lab's June 23, 2023 termination letter at p. 1; ¶¶57–58).

108. Each of Mr. Jones's disability, his disability-driven remote work, and his requests to accommodate his condition was a substantial motivating reason for the termination (California Government Code section 12940(a), (m)); and, independently, his April 9, 2023 complaint and his investigation disclosures were a contributing factor in, and a motivating reason for, the termination (California Government Code section 12940(h); California Labor Code sections 1102.5, 1102.6). Light Field Lab terminated him around one week after it concluded, its investigation of that complaint (¶¶56, 59). Light Field Lab's stated reasons are pretextual and shifting: on the termination call it stated no performance reason and tied the decision to the conclusion of the investigation (¶57); only later that day did its letter assert "below-expectation performance and unprofessional behavior" (Light Field Lab's June 23, 2023 termination letter at p. 1) for the first time, and falsely state that the decision to terminate had been made before Mr. Jones's April 9, 2023 complaint (¶58); no performance concern had ever been raised before April 6, 2023; and Mr. Berninger had confirmed in December 2022 that Light Field Lab had "no problems" with Mr. Jones's job performance (¶¶47–48, 60–61).

109. As a direct and proximate result of the termination, Mr. Jones has suffered and continues to suffer damages. The principal component of his economic loss is the value of the stock options and equity that were a central part of the compensation for which he was hired and that he lost as a result of the termination — a loss his subsequent employment has not replaced. He has also suffered loss of wages and benefits, including during periods of unemployment; emotional and mental distress, humiliation, and anguish; and other economic and consequential losses, all in amounts to be proven at trial.

110. Light Field Lab acted with malice and oppression — that is, with a willful and conscious disregard of Mr. Jones's rights — in terminating a known-disabled employee because he complained of disability discrimination, and in fabricating a false written justification asserting that the decision to terminate had been made before his complaint (¶¶44, 58, 60–61). That malice and oppression were the conduct of Light Field Lab's officers, directors, and managing agents, or were authorized or ratified by them, including Mr. Karafin, its co-founder, Chief Executive Officer and President, and a director (¶3),

and Mr. Dohm, its Chief Operating Officer, who signed the termination letter (¶58). Mr. Jones is therefore entitled to exemplary and punitive damages under California Civil Code section 3294.

111. As further evidence of Light Field Lab's retaliatory intent, after the termination — when Mr. Jones's counsel gave notice that Mr. Jones would pursue his employment claims — Light Field Lab filed a declaratory-judgment action against him the day after counsel's stated deadline passed. The action was premised on a contractual controversy that did not exist: Light Field Lab recast Mr. Jones's demand for the cash value of his options as a demand for equity in order to manufacture a contract dispute, and pleaded a breach unsupported by any facts. The court so found, dismissing the action for lack of subject-matter jurisdiction because there was no actual case or controversy, whereupon Light Field Lab abandoned it rather than cure — all while pressing a proposed release seeking Mr. Jones's surrender of the value of the options at the heart of his employment claims (¶¶72–74). In serving that action, Light Field Lab — acting through an agent for whose conduct it is responsible as principal — bypassed Mr. Jones's offer to waive personal service and instead dispatched a process server who, while wearing body armor and a firearm, trespassed onto Mr. Jones's property at night — including into areas at the back of the home reachable only by trespassing — shined lights into the residence, banged on its windows, and kept the home under surveillance, directing that conduct at a former employee it knew to be immunocompromised, in the very residence his condition required him to treat as a place of safety. Mr. Jones documented that conduct contemporaneously, within weeks of its occurrence, in his filings in that action (Light Field Lab v. Jones, No. 4:23-cv-05344-YGR (N.D. Cal.), Dkt. 9 at p. 1 (filed Nov. 13, 2023) and Dkt. 23 at 5:19-28 (filed Dec. 18, 2023)). That service-related conduct was noncommunicative and independently tortious — an independent wrongful act whose gravamen is the tort itself, not any litigation communication — and is therefore not within the litigation privilege. The foregoing is alleged solely as evidence of Light Field Lab's retaliatory intent, malice, and conscious disregard of Mr. Jones's rights, and not as an independent cause of action.

112. Mr. Jones is entitled to recover his compensatory damages, together with exemplary and punitive damages under California Civil Code section 3294.

THIRD CAUSE OF ACTION

*(Fraud and Deceit — Cal. Civ. Code §§ 1709, 1710, 1572) (Against Light Field Lab, Jon Karafin, Brendan Bevensee, and Does 1 through 10)*

113. Mr. Jones incorporates by reference paragraphs 1 through 41, 62 through 71, and 77 through 86 above as though fully set forth herein. This cause of action is brought against Light Field Lab, Mr. Karafin, Mr. Bevensee, and Does 1 through 10. Mr. Jones does not seek to invalidate any patent or to be named an inventor on any patent (¶¶13, 121); he seeks relief only for the fraud practiced on him. This claim is independently actionable notwithstanding that the fraud arose in the course of the parties' employment and equity relationship, because its elements are established independently of any contract and the concealment exposed Mr. Jones to harm beyond the parties' contractual contemplation.

114. At all relevant times, the facts concerning the origin and provenance of Light Field Lab's patent portfolio — that its foundational applications derived from light-field inventions Mr. Karafin and Mr. Bevensee had contributed to, as among the named inventors, at Lytro, that the governing terminology had been changed one-for-one so that the derivation would not be apparent on the face of the documents, and that the single most material Lytro reference had been withheld from the Patent Office across five information-disclosure statements — were known or accessible only to Defendants, and Defendants knew those facts were not known to, and were not reasonably discoverable by, Mr. Jones (¶¶15–23, 34–35). Although the underlying patent filings were public, the derivation was not apparent on their face and, regardless, could not be recognized from Light Field Lab's patents alone (¶¶18, 35). The same was true of the restrictions encumbering the equity Mr. Jones was offered (¶¶31, 67, 69–71): the governing Voting Agreement and Right of First Refusal and Co-Sale Agreement were never furnished to him at all, so their terms were literally inaccessible. Because Defendants possessed material facts known or accessible only to them, and knew those facts were not reasonably discoverable by Mr. Jones, they had a duty to disclose them to him.

115. Defendants also had a duty to disclose because they actively concealed those facts and because, having spoken, they were bound to speak the whole truth. Defendants engineered the concealment into the public record itself, substituting the terminology one-for-one so the derivation would not be apparent (¶18) and curating the disclosures to the Patent Office — disclosing 183

references while knowingly and deliberately withholding the one most-material Lytro application (¶22) — and the equity restrictions they did disclose were disclosed only after they had secured Mr. Jones's employment, his irreversible surrender of his secure position at Microsoft, and the assignment of his work (¶31), while the governing equity agreements were never furnished to him at all (¶¶67, 69). Independently, having affirmatively represented that the Company held hundreds of patents on which its business model relied heavily (¶27), and having assured Mr. Jones that he would participate in the company's growth and that his options' value would rise as the company's valuation rose (¶¶29–30), Defendants were bound to disclose the facts that materially qualified those statements — the cloud on the portfolio's provenance and enforceability, and the forfeiture, transfer, voting, and inspection-waiver terms that in fact encumbered the equity (¶¶13, 19–23, 31, 69–71).

116. A duty to disclose arises from the relationship and transactions between the parties, and each existed here several times over: the employer–employee relationship into which Light Field Lab recruited and hired Mr. Jones (¶¶11, 26–33); the option grant and each of the three stock-purchase transactions by which Light Field Lab sold Mr. Jones its own securities (¶¶63–66); and the assignment of Mr. Jones's work under the Confidentiality and Proprietary Rights Agreement (¶33). Light Field Lab dealt with Mr. Jones in its own securities throughout — granting and administering the option and selling him its stock upon each exercise, with Mr. Karafin and Mr. Bevensee approving and executing those transactions while in possession of the undisclosed facts (¶65) — and each such sale of its securities to Mr. Jones was a transaction between the parties giving rise to a duty to disclose the material facts affecting the value of what was sold. None of these grounds depends on a fiduciary relationship.

117. Mr. Karafin and Mr. Bevensee knew the facts alleged in paragraphs 15 through 23, having been named inventors on, and having sworn the inventor declarations for, those applications (¶21). Plaintiff is informed and believes, and on that basis alleges, that one or more of Does 1 through 10 — officers and directors of Light Field Lab who, by virtue of their offices and their responsibility for and access to the Company's patent-prosecution files, intellectual-property due-diligence materials, and the investor and financing communications by which the Company raised approximately $85 million on the strength of the portfolio (¶24) — likewise had a duty to disclose those facts and knew, or in conscious disregard of their responsibility for the Company's central intellectual-property asset were reckless in

not knowing, them. The basis for this belief is the centrality of the patent portfolio to the Company's business model and to its fundraising (¶¶24, 27); the inventorship and prosecution history of the foundational patents — including the inventor declarations and the information-disclosure statements in which the most material Lytro reference was withheld (¶¶18–23) — which are of public record and which the Company holds in its own files as those patents' owner; and the fact that those applications were filed, and the Company incorporated, while Mr. Karafin and Mr. Bevensee were still employed at Lytro (¶17) — a matter of patent record that officers and directors responsible for the Company's central asset were charged to know, and that called for inquiry into the portfolio's provenance. That filing history showed only the timing of the applications, not the derivation of the Company's technology from Lytro's, which had been concealed by the one-for-one substitution of terminology and the withholding of the Lytro reference and could be recognized only through the very comparison the renaming was designed to defeat (¶¶18, 34); what these Defendants were charged by their offices to investigate, and had the access to learn, Mr. Jones — a rendering-software engineer with no responsibility for, and no access to, the Company's prosecution records — had no reason and no means to discover (¶34). Plaintiff does not, by this Count, attribute any specific representation or omission to any Doe defendant, and reserves the right to allege the particular acts of each, and to add appropriate charging language, when their identities are ascertained.

118. Defendants concealed and suppressed from Mr. Jones the material facts concerning the Lytro provenance of the portfolio and the withheld prior art (¶¶15–23) — a deceit within the meaning of Civil Code section 1710, subdivision (c), and Civil Code section 1572, subdivision (3). Each was a material fact; Defendants had a duty to disclose it (¶¶114–117); Defendants concealed it intentionally, and with intent to induce Mr. Jones to accept and continue employment, to assign his work, and to exercise his options (¶¶18, 22); Mr. Jones was unaware of the concealed facts and would have acted differently had he known them — he would not have joined Light Field Lab, nor transferred his own source code to it, had the provenance of the portfolio been disclosed (¶¶34–35); and he was thereby damaged.

119. Defendants likewise concealed and suppressed the terms that encumbered the equity for which Mr. Jones was recruited — the repurchase and forfeiture right, the transfer restrictions, the voting

agreement, the right of first refusal and co-sale, and the waiver of his statutory right to inspect the Company's books and records (¶¶31, 66–71). Each was material; Defendants had a duty to disclose it (¶¶114–116); they suppressed it intentionally, disclosing the restrictions they did reveal only after they had secured Mr. Jones's employment, his irreversible surrender of his secure position at Microsoft, and the assignment of his work (¶31), and never furnishing two of the governing agreements at all (¶¶69–70); had Mr. Jones known of these terms he would not have forgone the Microsoft equity, accepted the position, or paid the Company to exercise his options (¶65); and he was thereby damaged.

120. As a further and independent wrong, Light Field Lab and Mr. Karafin affirmatively misrepresented an existing material fact. During Mr. Jones's recruitment, Mr. Karafin represented that the Company had hundreds of patents and that its business model relied heavily on comprehensive patent coverage of the holographic space (¶27). Karafin and Bevensee have themselves asserted, in this action, that that patent representation states a fact and is true — not opinion: they argued that "[t]he statement … that Light Field Lab has hundreds of patents — is true" and that "the patent records alone prove the statement true" (Dkt. 38 at 12:2-6), and they submitted a declaration averring under penalty of perjury that "Light Field Lab is the listed applicant on 355 patent applications" (Yang Decl., Dkt. 38-2, ¶¶ 4, 7). That representation nonetheless misrepresented the value and security of the portfolio, because its provenance and enforceability were clouded by the matters alleged in paragraphs 13 and 19 through 23. Mr. Jones alleges the cloud on the portfolio's provenance, validity, and ownership — its derivation from Lytro's light-field inventions, the one-for-one renaming that concealed that derivation, and the withholding of the most material Lytro reference (¶¶13, 19–23) — as facts, and as the very truth that Defendants' representation concealed; but he does not, by this Count, seek to invalidate any patent, to be declared the owner of or named an inventor on any patent, or to have the Court adjudicate any question of patent validity, ownership, or inventorship. He alleges only that the portfolio was represented as something more secure and more valuable than, to Defendants' knowledge, it was, and he seeks relief only for the fraud thereby practiced on him. That representation — that the Company held hundreds of patents and that its business model relied heavily on comprehensive patent coverage — was one of existing fact, not opinion, and Mr. Jones maintains that it is, as Karafin and Bevensee themselves have insisted in this action. Even if any part of it were treated as one of opinion, however — which it is not,

and which Karafin and Bevensee, having represented to this Court that the representation states a fact and is true, may not now be heard to contend — it would remain actionable: Mr. Karafin held himself out as the Company's chief executive specially qualified to speak to the portfolio he and Mr. Bevensee had built and prosecuted, so that Mr. Jones was situated to and did reasonably rely on that superior knowledge, and the representation stated as fact, or implied the existence of facts justifying, a belief in the comprehensiveness, value, and security of the portfolio that Defendants knew to be unwarranted. Because this Count seeks redress only for the fraud practiced on Mr. Jones and does not necessarily depend on the resolution of any substantial, disputed question of patent validity, ownership, or inventorship, it neither arises under the patent laws within the meaning of 28 U.S.C. § 1338(a) nor is preempted by federal patent law; the patent-related facts are incidental, material only to the value and security of what Mr. Jones was induced to surrender.

121. Further, Mr. Karafin affirmatively misrepresented how Mr. Jones's equity would respond to the Company's dilutive financing. He represented that "each round of investment provides dilution for our investors," and that "every time the valuation of the company increases, the value of your options grant also increase[s]" (¶30) — representing, that is, that Mr. Jones's options would rise in value through the very financing rounds that diluted the Company's investors. That representation was false: Mr. Jones's grant was an ordinary employee stock option that Light Field Lab's own 2017 Stock Incentive Plan left unprotected against dilution from new share issuances (¶30; Dkt. 30-2 at p. 84), so that it was diluted, and its value reduced, by the very rounds Karafin invoked, rather than rising "every time" the valuation did. The representation concerned how the equity then functioned — a present, existing fact — not a prediction of future value. Had Mr. Jones known that his grant was an ordinary, dilutable option rather than the value-tracking instrument Mr. Karafin represented, he would not have forgone his vesting Microsoft equity to join the Company (¶¶29–30). In any event, because Mr. Karafin was the Company's chief executive and held himself out as specially informed about its equity and financing, his representation was actionable even if cast as one of opinion.

122. The circumstances of the foregoing misrepresentations and concealments are alleged with particularity above: Mr. Karafin's representations during Mr. Jones's interviews on August 28 and 29, 2019 that the Company had hundreds of patents and that its business model relied heavily on

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

comprehensive patent coverage (¶27), and his representation in his August 12, 2019 recruitment email (Mr. Karafin's August 12, 2019 recruitment email at p. 3), made in addressing whether Mr. Jones's equity was "non-dilutable," that his options would rise in value through the very dilutive investment rounds (¶¶30, 121); the inventor declarations sworn under 37 C.F.R. § 1.63 (¶21); the curated information-disclosure statements (¶22); the never-furnished Voting and Right of First Refusal and Co-Sale Agreements (¶¶69–70); the form Exercise Agreement and its Section 7 waiver, executed through the Company's equity platform (¶¶66, 71); and the Confidentiality and Proprietary Rights Agreement signed September 9, 2019 (¶33). As to matters peculiarly within Defendants' knowledge, Plaintiff alleges on information and belief, stating the bases for that belief as set forth above.

123. Each of Mr. Karafin and Mr. Bevensee was a named inventor who bore a personal duty under 37 C.F.R. § 1.56 to disclose to the Patent Office all information material to patentability; and under 37 C.F.R. § 1.63(c) neither could lawfully execute the inventor's declaration he signed for the application without having reviewed and understood it and being aware of that duty (¶21). They therefore knew the Lytro art and knew that it was withheld. Defendants' withholding of that reference from the Patent Office, in breach of their duty of candor, is alleged solely as evidence of their knowledge and intent, and of the manner in which they concealed the portfolio's provenance from Mr. Jones; Mr. Jones does not, by this Count, assert any claim for that conduct or seek any relief on account of it, and he does not seek to invalidate any patent or to be named an inventor on any patent. The fraud for which he does seek relief was practiced on him: by concealing the portfolio's provenance, Defendants misrepresented the value and security of the equity and patent portfolio for which Mr. Jones was recruited, and thereby induced him to give up his secure position at Microsoft and to entrust and assign his own work in reliance on the concealment. The materiality of the patent-related facts lies in their effect on the value of what Mr. Jones was given and relied upon (¶13).

124. Mr. Jones justifiably and actually relied on Defendants' misrepresentations and on the state of affairs their concealment created. In reliance, he forwent the vesting Microsoft equity that was the financial premise of his move and resigned his Microsoft employment, a forfeiture that became irreversible in September 2019 (¶¶29, 71); he entrusted his original source code and inventions to Light Field Lab under the Confidentiality and Proprietary Rights Agreement (¶¶14, 33); and he paid the

Company to exercise his options on three separate occasions (¶¶64–65). His reliance on Defendants' honesty was express and outcome-determinative: before joining, Mr. Jones had told Defendants that his decision turned on "the character of the people involved," which was "the most important factor" and "boiled down to do I choose to trust your team," and Mr. Bevensee personally embraced that condition as "fantastic news" (¶26; the September 2019 recruitment correspondence at p. 7) — so that Defendants' truthfulness about the very matters they were concealing was, by Mr. Jones's own stated and accepted criterion, material to his decision, independent of the effect of the concealed facts on the value of what he was promised (¶13). His reliance was justifiable: a rendering-software engineer, he had no reason to audit the Company's patent-prosecution histories — much less to know to obtain and examine Lytro's separate patent family and compare it against Light Field Lab's — and identifying the concealment would have required precisely that cross-family comparison, which the one-for-one renaming was designed to defeat (¶34).

125. The source code, trade secrets, and work product Mr. Jones was induced to assign were and remained his property, and title to them did not validly pass to Light Field Lab. As to the equity instruments — the very nature of which was misrepresented and the governing terms of which were never furnished to Mr. Jones, depriving him of any reasonable opportunity to learn them (¶¶66–71) — the instruments are void ab initio, such that title never passed. As to the Confidentiality and Proprietary Rights Agreement, that agreement is void as to that work and title never passed; in the alternative, if voidable rather than void, Mr. Jones rescinded it for fraud in its inducement (Civil Code section 1689(b)(1)) by his original complaint in this action, filed June 17, 2025 (Dkt. 1 ¶¶ 100–104), which sought rescission of that agreement; the filing of that complaint constituted notice of rescission under Civil Code section 1691, and Mr. Jones reaffirms that rescission here. Upon rescission the agreement is avoided from its inception as between the parties, with title deemed never to have passed; and Defendants, and any transferee that did not take in good faith, for value, and without notice of Mr. Jones's claim, hold subject to his restored title.

126. Because the work was never Light Field Lab's to convey, Light Field Lab could not pass it to its assignee or to any subsequent holder, and the assignee's and any acquirer's continued exploitation of it is a continuing wrong, not a protected purchase. To the extent the work or its proceeds passed to

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

others, Defendants and those who received the fraudulently obtained property hold it as involuntary and constructive trustees for Mr. Jones (Civil Code sections 2223 and 2224), and that trust follows the property and its traceable proceeds into the hands of every holder who did not take in good faith, for value, and without notice (see Cal. Civ. Code § 3439.08(a)). The assignee did not take in good faith, for value, and without notice of Mr. Jones's claim. The General Assignment was executed on August 15, 2025 (the General Assignment at p. 15) — after this action, which seeks rescission and the return of Mr. Jones's property, had been pending since June 17, 2025 — and an assignee for the benefit of creditors takes the assignor's assets subject to the assignor's equities and is charged with notice of the claims and litigation pending against the assignor; the assignee thus had notice of Mr. Jones's claim from the inception of the assignment. Mr. Jones, moreover, gave the assignee formal written notice of his claim and demanded preservation of his work and a reserve for his claim (¶¶83–84); and no value was given for his work in particular. No Defendant may take advantage of its own wrong, and the wrong of inducing the assignment of Mr. Jones's work cannot be perfected by the further transfer of that work; Mr. Jones is entitled to a constructive trust over the work and its traceable proceeds, and his right to recover his damages is in any event independent of where the work was ultimately sent.

127. As a direct and proximate result of the fraud, Mr. Jones has suffered detriment for which he is entitled to complete relief. First, because the source code, trade secrets, and work product he was induced to assign were and remained his property, title to which never validly passed to Light Field Lab (¶¶125–126), Mr. Jones's primary remedy is the return of that work in specie — by the avoidance of the assignment, the constructive trust, and the injunctive relief sought below (¶129) — rather than payment of its value, which Defendants' own conduct rendered nearly impossible to ascertain by sweeping the work into a general assignment, building undisclosed applications upon it, and declining to record or separately account for it; and no Defendant may take advantage of its own wrong (Civil Code section 3517). Second, Mr. Jones is entitled to recover, as all the detriment proximately caused by the fraud under California Civil Code section 3333, and, as authorized by California Civil Code section 1692, together with the rescissionary relief sought below: (a) the $56,437.50 he paid the Company to exercise his options (¶64), recoverable as restitution upon rescission of the equity instruments or, alternatively, as out-of-pocket damages, but not twice; (b) the value of the secure position he gave up at Microsoft in

reliance on Defendants' inducements — including forgone equity, grants he would have received, the growth of his salary, bonuses, advancement, and benefits he would have earned but for being induced to resign — net of his earnings from other employment, in an amount according to proof; (c) general damages for the emotional distress proximately caused him by Defendants' intentional fraud, which — distinct from any distress arising from his later termination — flowed from his being deceived into surrendering a secure career and entrusting and assigning his own work, and from his discovery of Defendants' concealment and appropriation, a distress aggravated by his known immunocompromised condition; such damages for mental suffering being recoverable in an action of intentional deceit; and (d) the permanent diminution in the value of Mr. Jones's source code, trade secrets, and work product caused by Defendants' disclosure and publication of that work. By building undisclosed applications upon Mr. Jones's work and causing them to be published (¶¶35, 39), Defendants publicly disclosed that work, destroying its secrecy and the trade-secret protection it enjoyed and creating prior art that forecloses the protection and exclusive commercial exploitation, whether by patent or otherwise, that his work would otherwise have been capable of, and permanently diminishing its value — a loss the return of the work cannot cure, because the work's value as a confidential and exclusive asset cannot be restored once it has been publicly disclosed. Mr. Jones does not by this allegation claim any patent, seek to be named an inventor on any application, or ask the Court to determine the patentability, validity, or inventorship of any application; he alleges only that Defendants destroyed the value and exclusivity of his own work. Because the misrepresentation and concealment alleged above were intentional and were undertaken to deceive Mr. Jones, they constitute fraud within the meaning of California Civil Code section 3294, entitling Mr. Jones to exemplary and punitive damages.

128. Mr. Jones did not discover, and could not reasonably have discovered, the fraud until 2025. The applications built on his work did not become public until they were published on October 17, 2024 and February 27, 2025, and the Lytro derivation had been affirmatively concealed, was within Defendants' exclusive knowledge, and could not be recognized from Light Field Lab's patents alone; it was only upon reviewing the Company's filings in May 2025, and, beginning in June 2025, the Lytro patents, that Mr. Jones identified the overlaps and the terminology substitution, in August 2025 (¶¶34–35). The very concealment alleged above — the deliberate one-for-one substitution of terminology and

the knowing withholding of the most material Lytro reference — was designed to, and did, prevent Mr. Jones from discovering the fraud (¶¶18, 22, 34). A defendant who fraudulently conceals the facts constituting a claim cannot charge the plaintiff with a failure to discover what the concealment was designed to hide. Mr. Jones's earlier efforts to obtain his employment and corporate records (¶¶75–76) were directed at his compensation and shareholder records, not at the provenance of the patent portfolio; neither put him on notice of, nor could have revealed, the fraud alleged here, which required comparing two separate patent families and recognizing a deliberate substitution of terminology.

129. Mr. Jones seeks complete relief, and his claim for damages is not inconsistent with his claim for relief based upon rescission: under California Civil Code section 1692, a party defrauded into a contract may rescind and, in the same action, recover restitution and the consequential damages to which he is entitled. Mr. Jones therefore seeks, concurrently: (i) rescission, for fraud in their inducement (Civil Code section 1689(b)(1)), of all of the agreements he was induced to enter into with Light Field Lab — including the Confidentiality and Proprietary Rights Agreement, the offer letter and the agreements governing his employment, the stock-option, exercise, voting, and right-of-first-refusal and co-sale agreements and the related waiver of his inspection rights, any equity-incentive-plan document, and any arbitration agreement, and each other agreement by which Light Field Lab claims he is bound. Mr. Jones gave notice of rescission of the assignment by his original complaint in this action, filed June 17, 2025 (Dkt. 1 ¶¶ 100–104), which sought that rescission (Civil Code section 1691); he reaffirms that rescission and rescinds each of the foregoing agreements by this complaint, which constitutes his notice of rescission as to each under Civil Code section 1691; upon rescission each is avoided from its inception as between the parties, with title to his work deemed never to have passed to Light Field Lab. The rescission sought here is directed at the written instruments by which Light Field Lab claims Mr. Jones is bound. It is not directed at, and does not negate, the fact or the at-will character of his employment. Mr. Jones's status as Light Field Lab's employee, and his termination on June 23, 2023, arose from the parties' conduct — his hiring, his service, and the Company's payment of wages (Labor Code section 2922) — independent of any written contract. That status and that termination, on which the First and Second Causes of Action rest, stand regardless of the rescission of the written agreements. Mr. Jones further seeks: (ii) restitution of the $56,437.50 he paid to exercise his options, a constructive

trust over his source code, trade secrets, and work product and their traceable proceeds, and an injunction requiring the return and delivery of that work and the cessation of its use and the destruction of Defendants' copies, all returning that property to him; (iii) his consequential and reliance damages under Civil Code section 3333 for the secure position he was fraudulently induced to give up at Microsoft and for the emotional distress proximately caused him by the fraud, as alleged in paragraph 127; and (iv) exemplary and punitive damages under Civil Code section 3294.

FOURTH CAUSE OF ACTION

*(Misappropriation of Trade Secrets — Cal. Civ. Code § 3426 et seq.; and 18 U.S.C. § 1836; and, in the Alternative, Conversion) (Against Light Field Lab, Jon Karafin, Brendan Bevensee, and Does 1 through 10)*

130. Mr. Jones incorporates by reference paragraphs 1 through 41, 62, 77 through 86, and 129 above as though fully set forth herein. This cause of action is brought against Light Field Lab, Mr. Karafin, Mr. Bevensee, and Does 1 through 10. The property at issue is Mr. Jones's own source code and the proprietary methods embodied in it. Consistent with the preceding allegations, Mr. Jones does not by this Count seek to be adjudged an inventor, to be named on any patent or application, or to invalidate, correct the inventorship of, or have the Court adjudicate the validity, ownership, or inventorship of any patent or application (¶¶13, 82); he seeks the return of his own source code and trade secrets, and compensation for Defendants' misappropriation of them.

131. Throughout his employment Mr. Jones authored, and maintained as confidential, a body of trade secrets consisting of his original source code and the proprietary methods, techniques, and algorithms embodied in it — including, without limitation, the viewer-dependent light-field rendering method, the perceived-image optimization software he called "Acuity," his light-field ray-generation library, his shader libraries for industry-standard renderers, and his optical-simulation techniques and algorithms (¶¶36–37). These trade secrets are identified by category and example here and in paragraphs 36 and 37; their complete contents are embodied in the source code and work product that Light Field Lab took and has refused to return, and will be identified with further particularity, including as provided by California Code of Civil Procedure section 2019.210, as that material is produced.

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

132. These trade secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who could obtain economic value from their disclosure or use: on information and belief, after Light Field Lab adopted Mr. Jones's methods, almost all of its rendered content is generated using, and derived from, his work (¶36). Mr. Jones took reasonable measures to maintain their secrecy: he committed his work only to the company's access-controlled source-control system and did not disclose his methods or source code outside that environment. Light Field Lab itself defined such work as confidential information of "great competitive importance and commercial value," to be kept strictly confidential and disclosed only on a need-to-know basis (Dkt. 46-3 § 1(a)–(b), at pp. 2–3; ¶¶37, 41).

133. Light Field Lab acquired and used Mr. Jones's trade secrets by improper means and without his consent. From the outset of his employment in September 2019, his work resided in Light Field Lab's source control, to which Mr. Karafin and Mr. Bevensee had access (¶37); and after Mr. Jones drew their attention to that work on April 9, 2023 (¶38), Light Field Lab built upon it the applications described above, incorporating his viewer-dependent rendering method and his "Acuity" optimization approach (¶¶39–40). The precise extent to which his source code was copied is known to Defendants and to the entity that acquired the code (¶40).

134. Light Field Lab disclosed Mr. Jones's trade secrets without his consent by causing the applications built on his work to be published — international application WO2024216300A2 on October 17, 2024, and WO2025042476A1 on February 27, 2025 (cover (field (43)); ¶¶35, 39). That publication permanently extinguished the secrecy of the methods it disclosed and destroyed the trade-secret protection they had enjoyed. The destruction of that secrecy — which is the whole of a trade secret's value — is irreversible and cannot be undone by any return of the code.

135. Light Field Lab further misappropriated Mr. Jones's trade secrets by retaining and continuing to use them without his consent. Its own June 23, 2023 letter terminating Mr. Jones demanded the return of "any and all work product, files, data, source code, programs, tools, notes, reports, memoranda, records …" prepared in connection with his employment, which it defined as "Company Property" (¶41, Light Field Lab's June 23, 2023 termination letter at pp. 1-2) — executing the same "Exit Obligations" Light Field Lab had embedded in his onboarding agreement at hire (Dkt.

46-3 § 3(b)), and confirming that it possessed, and intended from the outset to retain, his source code and work product. While this action was pending, Light Field Lab transferred substantially all of its assets — including the source code and other intellectual property that were Mr. Jones's — through the August 15, 2025 assignment for the benefit of creditors to an undisclosed purchaser, through whom that work continues to be exploited (¶¶83, 86).

136. Mr. Jones never validly consented to Light Field Lab's acquisition, use, or disclosure of his trade secrets. The Confidentiality and Proprietary Rights Agreement through which Light Field Lab claims to have obtained his work product was procured by the concealment alleged above and is void and of no effect as to that work; title to his source code and trade secrets therefore never validly passed to Light Field Lab (¶¶41, 83). In the alternative, if that agreement was voidable rather than void, Mr. Jones has rescinded it (¶129), and the rescission relates back to restore his title as of the assignment. And independently, Mr. Jones authored the work, so that ownership originated in him.

137. Because the source code and trade secrets are Mr. Jones's and title never validly passed to Light Field Lab (¶136), his primary remedy is their return. He is entitled to injunctive relief under California Civil Code section 3426.2 requiring Defendants to return and deliver his source code and work product, to cease all use, reproduction, exploitation, and disclosure of it, and to destroy every copy in their possession or control, and to the imposition of a constructive trust over that work and the proceeds traceable to it, in whosoever's hands it is found. Mr. Jones does not seek, and does not consent to, any compulsory license of his work. He is further entitled under California Civil Code section 3426.3 to recover his actual loss caused by the misappropriation — including the permanent loss of the secrecy and exclusive value of his methods through their publication (¶140), which their return cannot restore — and Defendants' unjust enrichment from their unauthorized use of his work to the extent not included in that loss; and, because the misappropriation was willful and malicious, exemplary damages of up to twice that amount under section 3426.3(c) and his reasonable attorney's fees under section 3426.4.

138. Mr. Jones's trade secrets relate to a product intended for use in interstate and foreign commerce — the rendering pipeline at the core of Light Field Lab's commercial light-field display products, which the company developed and held out for commercial deployment to customers within and beyond the United States, and for which it sought patent protection through the international

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

applications identified above (¶¶36, 39–40). Defendants misappropriated those trade secrets within the meaning of 18 U.S.C. § 1839(5)–(6): they acquired Mr. Jones's source code by improper means and used it beginning no later than 2019 and continuing thereafter, filed the applications built upon it on April 13, 2023, and June 23, 2023, caused those applications to be published on October 17, 2024, and February 27, 2025, and, on August 15, 2025, transferred his source code through the assignment for the benefit of creditors (¶¶83, 86).

139. Mr. Jones is likewise entitled under the Defend Trade Secrets Act to injunctive relief under 18 U.S.C. § 1836(b)(3)(A) — including an order requiring the return and destruction of the misappropriated material and prohibiting its further use or disclosure — and to damages under section 1836(b)(3)(B) for his actual loss and for Defendants' unjust enrichment; and, because the misappropriation was willful and malicious, to exemplary damages and reasonable attorney's fees under section 1836(b)(3)(D).

140. Mr. Jones has thus suffered two permanent deprivations of his property: the irreversible destruction of the secrecy and value of his methods through their publication, and the continuing dispossession of the source code and work product that Light Field Lab retained, transferred, and refused to return. The return of the code cannot restore the exclusivity that the publication destroyed; both injuries are alleged.

141. In the alternative, and only to the extent any portion of the retained source code, files, and tangible work product — the physical files, media, and repositories themselves — does not qualify as a trade secret, Mr. Jones alleges conversion. That work product was Mr. Jones's property and he was entitled to its possession (¶¶36, 41, 83); Light Field Lab wrongfully exercised dominion over it by retaining it as claimed "Company Property" after his employment ended and by transferring it through the August 15, 2025 assignment (¶¶41, 83, 86). This claim does not depend on the trade-secret status of any method, has a basis independent of any misappropriation of a trade secret, and is pleaded without prejudice to the trade-secret claims above.

142. As a result of that conversion, Mr. Jones is entitled to the return of his property and to the imposition of a constructive trust over it and the proceeds traceable to it, in whosoever's hands they are found.

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

143. Light Field Lab took, used, retained, and transferred Mr. Jones's source code and trade secrets, and Mr. Karafin and Mr. Bevensee each personally participated in that misappropriation. Mr. Karafin, as Light Field Lab's chief executive, directed the company's exploitation of Mr. Jones's work, including the decision to file the applications built upon it within days of the April 9, 2023 communication in which Mr. Jones identified that work to them as his own and authored by him (¶¶37–38). Mr. Bevensee, who worked alongside Mr. Jones and had access to the source control in which his work resided, used Mr. Jones's methods by incorporating them into those applications, on which he is named (¶¶37–40). Does 1 through 10 are persons or entities whose identities are presently unknown to Mr. Jones and whose roles in the misappropriation, or in the present holding of his source code, Mr. Jones will allege when ascertained (¶86). Each Defendant is liable for the misappropriation alleged, and Light Field Lab is liable for the conversion alleged in paragraphs 141 and 142.

144. Defendants' misappropriation was willful and malicious: they took and used work they knew to be Mr. Jones's — work he had committed to their own source control and expressly identified to them as his own work, authored by him (¶¶37–38) — and built their applications upon it while renaming his concepts so that the derivation would not be apparent (¶39), then demanded and retained his code after his employment ended (¶41). This conduct warrants the exemplary damages and attorney's fees authorized by California Civil Code sections 3426.3(c) and 3426.4 and by 18 U.S.C. § 1836(b)(3).

145. Mr. Jones's claims are timely. He could not have discovered the misappropriation earlier through reasonable diligence: the applications built on his work did not become public until they published on October 17, 2024, and February 27, 2025, and the derivation of those applications from his work had been concealed and was within Defendants' exclusive knowledge (¶¶35, 62). Reflecting in or about May 2025 on the originality of his work, Mr. Jones reviewed Light Field Lab's published filings and identified the two applications, and by August 2025 had identified the specific manner in which they drew upon his methods (¶35). Mr. Jones's earlier efforts to obtain his employment and corporate records concerned his compensation and shareholder rights, not the provenance of his source code, and did not put him on notice of the misappropriation alleged here. This action was filed on June 17, 2025 (Dkt. 1),

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

and the claims alleged in this Count are brought within three years of Mr. Jones's discovery of the facts constituting the misappropriation.

146. Mr. Jones's right to relief under this Count rests on the taking, use, and destruction of his own source code and trade secrets — wrongs whose proof requires the existence of, and Defendants' improper use of, his secret methods, elements different from and additional to any question of patent inventorship or validity. The publication of the applications is alleged only as the mechanism by which the secrecy of his property was destroyed. Mr. Jones does not by this Count seek to invalidate, correct the inventorship of, or establish ownership of any patent or application, or to recover for any fraud on the Patent Office; he seeks relief only for the misappropriation and conversion of his own work (¶¶13, 82).

FIFTH CAUSE OF ACTION

*(Civil RICO — 18 U.S.C. §§ 1962(c) and (d)) (Against Light Field Lab, Jon Karafin, Brendan Bevensee, and Does 1 through 10)*

147. Mr. Jones incorporates by reference paragraphs 1 through 41, 57 through 58, 62 through 65, 75 through 89, and 129 above as though fully set forth herein. This cause of action is brought against Light Field Lab, Mr. Karafin, Mr. Bevensee, and Does 1 through 10. By this Count Mr. Jones seeks recovery for the deprivation of his own money and property through a pattern of racketeering activity carried out by fraud. The money of which he was deprived is the $56,437.50 he was fraudulently induced and lulled into paying out of his own pocket to exercise his stock option (¶¶64–65, 152, 162) — a loss complete in itself and independent of any question of who owns his work. The property of which he was deprived is his own — his source code, trade secrets, and confidential inventive concepts — and not any interest of the Patent Office; the deception by which Defendants converted that property, including their false representations to the Patent Office and the international patent authority that they, and not Mr. Jones, owned and had invented his work, is charged as the means by which his property was taken, and not as a fraud upon the Patent Office of its own property. Mr. Jones does not seek to be adjudged an inventor, to be named on or to correct the inventorship of any patent or application, or to have any patent declared invalid or unenforceable; he does not allege that the Patent Office was deprived of property of its own; and he does not rely on any false statement to the Patent Office as itself a

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

predicate act except insofar as a Defendant's false representation of ownership of Mr. Jones's property was a wire transmitted in furtherance of the scheme to obtain that property (¶¶13, 82).

148. Light Field Lab is an enterprise within the meaning of 18 U.S.C. § 1961(4) — a corporation engaged in, and whose activities affect, interstate and foreign commerce; it manufactured and held out for commercial deployment light-field display products to customers within and beyond the United States and sought patent protection for them through international applications (¶¶27, 39, 64). Mr. Karafin and Mr. Bevensee are "persons" within the meaning of section 1961(3), each distinct from Light Field Lab, the enterprise through which and by means of which they conducted the pattern of racketeering activity alleged below.

149. Additionally, and in the further alternative — without abandoning the allegation that Light Field Lab is itself the enterprise — Light Field Lab, Mr. Karafin, Mr. Bevensee, the assignee that received Light Field Lab's assets (¶77), and Does 1 through 10 together also constitute an association-in-fact enterprise within the meaning of section 1961(4): they shared the common purpose of acquiring, exploiting, and monetizing misappropriated intellectual property while concealing its origin; they were related through their respective roles in that endeavor; and their association possessed sufficient longevity to pursue that purpose, persisting from 2016 through 2026 (¶89) — the purpose, relationships, and longevity an association-in-fact enterprise requires. This enterprise included the persons and entities that effected and received the August 15, 2025 assignment and the subsequent sale (¶¶77, 79, 85).

150. Mr. Karafin and Mr. Bevensee conducted and participated in the conduct of the enterprise's affairs, having some part in directing them. As Light Field Lab's chief executive and its chief technology officer and Secretary, respectively, they directed the conduct alleged below: Mr. Karafin made, and Mr. Bevensee joined in, the representations by which Mr. Jones was recruited (¶¶26–27, 30); Mr. Karafin and Mr. Bevensee approved and consummated his option exercises (¶64); and they caused the applications built on his work to be prepared and filed (¶¶39–40).

151. Defendants engaged in a pattern of racketeering activity consisting of the predicate acts that follow, each committed in furtherance of a single scheme to obtain Mr. Jones's money and property by fraud. The first are acts of wire fraud, in violation of 18 U.S.C. § 1343, by which Defendants induced Mr. Jones's employment and his assignment of his work. In August 2019, Mr. Karafin sent Mr. Jones

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

interstate recruitment communications, including the August 12, 2019 recruitment email and the representations made during his August 28 and 29, 2019 interviews, that assured Mr. Jones the patent portfolio he was being recruited to build upon was comprehensive and sound, while concealing that its foundation was derived from undisclosed Lytro work, encumbered, and exposed to prior art that had been withheld. The soundness of that portfolio was material to Mr. Jones's decision to leave his existing employment, to commit his own money to the venture, and to contribute and assign his own work to it; the concealment of its true, Lytro-derived and prior-art-tainted provenance was the deceptive content of these wires, by which Defendants induced that decision (¶¶26–27, 30, 34–35). Mr. Jones had, moreover, made Defendants' honesty an outcome-determinative condition of that decision, having told them that his choice turned on "the character of the people involved" and "boiled down to do I choose to trust your team," to which Mr. Bevensee replied that this was "fantastic news" (¶26; the September 2019 recruitment correspondence at p. 7); the provenance Defendants concealed went to that very character, so that their concealment was material by Mr. Jones's own stated and accepted criterion. Mr. Bevensee joined in that recruitment, himself interviewing and corresponding directly with Mr. Jones, and — as a former senior Lytro technologist and a named inventor on both the Lytro and the Light Field Lab applications — shared, and likewise concealed from Mr. Jones, the knowledge of the portfolio's Lytro provenance that made those communications false; and during Mr. Jones's August 28 and 29, 2019 interviews he personally demonstrated Light Field Lab's display to Mr. Jones and personally interviewed him, presenting that technology as Light Field Lab's own without disclosing the Lytro provenance he uniquely knew (¶¶15–17, 26). On September 9, 2019, Light Field Lab transmitted to Mr. Jones by interstate wire the offer package and the Confidentiality and Proprietary Rights Agreement for electronic execution, and Mr. Jones executed and returned them by the same means, consummating the fraudulently induced assignment (¶33). Confidential business information and trade secrets in the hands of their owner are property for purposes of the wire-fraud statute, and these wires effected and furthered the scheme to deprive Mr. Jones of that property and his money.

152. The second are further acts of wire fraud that furthered the scheme and lulled Mr. Jones into continued participation. On three occasions Mr. Jones exercised his stock option, each time transmitting payment by a separate interstate electronic funds transfer from Washington to Light Field Lab's account

in California — $7,000 settling December 22, 2020, $14,000 settling January 4, 2021, and $35,437.50 settling May 6, 2021, for a total of $56,437.50 out of pocket — which Mr. Karafin, as president, and Mr. Bevensee, as Secretary, approved and consummated by signing the resulting stock certificates, all while continuing to conceal from him the facts described above (¶¶64–65). Mr. Jones committed that money in continued reliance on the same concealed picture of the portfolio on which he had been recruited, and would not have done so had its provenance been disclosed (¶65). A wire that furthers a scheme or lulls its victim need not itself contain a false statement.

153. The third is the theft of trade secrets in violation of 18 U.S.C. § 1832(a), an offense enumerated as racketeering activity by 18 U.S.C. § 1961(1). Mr. Jones's source code and the proprietary methods embodied in it — including his viewer-dependent light-field rendering method and the perceived-image optimization software he called "Acuity" — are trade secrets — which Mr. Jones and Light Field Lab maintained as secret through written confidentiality obligations, restricted source-control access, and the confidentiality legends applied to the very materials at issue (¶¶131, 155) — that relate to a product intended for use in interstate and foreign commerce, namely the rendering pipeline at the core of Light Field Lab's commercial light-field display products, for which Light Field Lab sought protection through the international patent applications identified below (¶¶36–37, 39). With intent to convert those trade secrets to the economic benefit of Light Field Lab and themselves, and knowing that their conduct would injure Mr. Jones — who, four days before the first application was filed, had identified the work to them as his own and authored by him (¶¶37–38) — Mr. Karafin and Mr. Bevensee took and used those trade secrets without his consent and caused them to be embodied in the applications described below, renaming his concepts so that their derivation from his work would not be apparent (¶39). The acts of taking, copying, renaming, and embedding that work were committed in the United States, through Light Field Lab's California operations and the source control it maintained there.

154. The fourth are further acts of wire fraud by which Defendants asserted ownership of Mr. Jones's property and so furthered its conversion. To obtain patent protection over the methods embodied in Mr. Jones's work, Light Field Lab, acting through Mr. Karafin and Mr. Bevensee, caused to be prepared, signed, and transmitted by interstate and foreign wire to the Patent Office and the international

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

patent authority a series of formal declarations representing that Mr. Karafin and Mr. Bevensee — and not Mr. Jones — were the inventors of that subject matter, and that Light Field Lab owned the entire right, title, and interest in it: in each international application, a declaration that the named inventor "is the inventor of the subject matter for which protection is sought," a declaration that Light Field Lab "is entitled to apply for and be granted a patent," and a statement that Light Field Lab was the assignee "of the entire right, title, and interest" (¶¶39–40). Because Mr. Jones authored the work those declarations describe (¶¶37–39), each was a knowing and material misrepresentation, transmitted by wire, of the ownership and authorship of Mr. Jones's property, made to vest in Light Field Lab exclusive rights over that property and to enable its public disclosure. These wires are alleged as predicate acts of wire fraud in violation of 18 U.S.C. § 1343, by which Defendants pursued the object of the scheme — Mr. Jones's property — and not as any allegation that the Patent Office was deprived of property of its own (¶147).

155. The fifth are further acts of wire fraud completing the scheme's object. Before publication, Defendants removed from the application figures the legends marking them "confidential" and proprietary to Light Field Lab, and then caused the applications built on Mr. Jones's work to be published as international applications WO2024216300A2 on October 17, 2024, and WO2025042476A1 on February 27, 2025 (cover (field (43)); ¶¶35, 39) — interstate and foreign wire transmissions by which the scheme attained its object as to these filings — the capture of Mr. Jones's methods, vested in Light Field Lab's own applications and held out for its monetization — and worked upon Mr. Jones the deprivation that was at once the means and the necessary consequence of that capture: the permanent destruction of the secrecy and exclusivity in which the entire value of those methods consisted, a deprivation complete upon publication and independent of, and antecedent to, the issuance of any patent. That Defendants had marked the same material as their own confidential, proprietary information, and stripped those markings in order to disclose it, confirms that they knew the material to be a protected secret and disclosed it deliberately. No patent issued from either application. After Mr. Jones sued and demanded that his property be preserved, Defendants allowed both applications to lapse without entering any national phase, even as a few of Light Field Lab's commercial applications were selectively maintained while the great majority of its portfolio, including its foundational families, was likewise left to lapse (¶78). That Defendants abandoned these two

applications once Mr. Jones had identified the underlying work as his own and put his claim before this Court is consistent with their awareness that the applications were built on his misappropriated work and could not be prosecuted without exposing that fact. These publications are alleged as wire-fraud predicates and, in the alternative, as overt acts in furtherance of the scheme.

156. The sixth is a further act of wire fraud in furtherance of the scheme. On August 15, 2025, while this action was pending and after Mr. Jones had demanded the preservation of his property, Mr. Karafin signed for Light Field Lab, and caused to be executed and transmitted by interstate electronic wire, the General Assignment that swept Mr. Jones's source code, the misappropriated work, and Light Field Lab's choses in action into the assignment estate (¶¶79, 83). Because the object of the scheme — depriving Mr. Jones of his property — was not complete while he could still recover that property, the transmission that purported to convey it beyond his reach was a step in furtherance of the same scheme, and need not itself have contained a false statement. This wire is alleged as a predicate act of wire fraud in violation of 18 U.S.C. § 1343 and, in the alternative, as an overt act in furtherance of the scheme.

157. In furtherance of the same scheme, and as evidence of its continuity, Defendants also committed the following acts, alleged as overt acts rather than as separately charged predicates: the December 9, 2019 option grant (¶63); employment-period communications continuing the concealment, including but not limited to the transfers identified above (¶65); the interstate transmission of Mr. Jones's misappropriated work to patent counsel and the international patent authority, alleged on information and belief (¶40); the prolonged withholding of the employment and corporate records Mr. Jones was entitled to inspect (¶¶75–76); and the subsequent concealed sale of the misappropriated patent estate to the purchaser (¶¶79–86).

158. These predicate acts are not isolated; they are the repeated execution of a single scheme by a single enterprise. Before Mr. Jones was ever recruited, Karafin and Bevensee had developed a method of building Light Field Lab's business on work that was not originally their own and concealing its provenance: they re-labeled under new terminology the light-field architecture they had developed at Lytro, withheld the earlier Lytro prior art from the Patent Office, and so obscured the derivation of Light Field Lab's foundational technology (¶¶15–23). At that stage that method was not, and could not have been, directed at Mr. Jones, whose work did not yet exist within the company; its objects were others'

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

work and the Patent Office. The concealment of that Lytro-derived provenance was, however, the very content whose non-disclosure induced Mr. Jones to join Light Field Lab and to assign his work (¶151): he was told the portfolio was comprehensive and sound, and not told that its foundation was derived, encumbered, and exposed. Defendants then turned the same method on Mr. Jones. They took the viewer-dependent rendering method and "Acuity" software he had authored, re-labeled his concepts under substituted terminology so their origin would not be apparent, and filed patent applications on that work without crediting him — applications they built by welding his rendering material onto the same Lytro-derived foundational disclosure (¶¶39–40). The taking of Mr. Jones's work was thus not a new or separate venture but the continuation of an established course of conduct — the same method of taking others' work, relabeling it, and concealing its origin, practiced first as to the foundational technology and then as to Mr. Jones (¶89). The foregoing allegations concerning the foundational technology are pleaded to show that method, that knowledge, and that continuity, and not as predicate acts or as the property of which Mr. Jones was deprived; the particularized predicate acts charged in this Count, and the scheme on which the Count is founded, are the taking of Mr. Jones's money and property, and are one and the same. Because the predicate acts charged against Mr. Jones were the application to him of this same established method — and because his work was welded onto, and thereafter carried forward with, the same foundational estate that method had built (¶¶39–40) — those predicates are related to, and continuous with, a scheme whose method and infrastructure the enterprise had been operating since 2016, as further alleged at paragraph 159.

159. The predicate acts were both related and continuous. They shared the common purpose of obtaining and exploiting Mr. Jones's money and property, the same participants — Mr. Karafin and Mr. Bevensee, acting through and with the enterprise — the same victim, and the same distinctive method of commission: taking work that was not the Defendants' own, relabeling it under substituted terminology, and concealing its provenance. That method was not devised for Mr. Jones. It was the enterprise's established and ongoing way of doing business, practiced since at least 2016, when Mr. Karafin and Mr. Bevensee first carried the foundational light-field technology from their prior employment, relabeled it, and concealed its derivation (¶¶15–23, 149, 157). The predicate acts charged in this Count are the application of that same pre-existing method to Mr. Jones: the misappropriation of

his work was not a discrete or isolated act, but the continuation onto him of a course of conduct the enterprise had pursued since 2016, into which his work was then absorbed — his rendering material welded onto the same Lytro-derived foundational disclosure (¶¶39–40, 158), so that his property was drawn into, and thereafter traveled with, an established and continuing patent-monetization apparatus that pre-dated his recruitment and persisted after his employment ended. The predicate acts charged in this Count span at least six and one-half years — from the August 2019 inducement, through the 2020–2021 option exercises, the 2023 misappropriation and applications, and the October 2024 and February 2025 publications, to the August 2025 assignment and the subsequent sale (¶¶26, 64, 39, 35, 77, 79). At least four of those acts — the two publications, the assignment, and the sale — occurred after Mr. Jones's employment ended on June 23, 2023 (¶57), so the scheme did not end with his employment. The enterprise and the method by which these predicates were committed reach further still: they originated in 2016 and have persisted through the 2025–2026 transfer and concealment of the misappropriated assets (¶¶77–86, 149, 160). The pattern alleged here is therefore not a single, self-terminating fraud upon a single victim, but the repeated execution, against Mr. Jones, of an enterprise's regular and continuing way of doing business. These allegations of the scheme's origin, method, and breadth are pleaded to establish the relatedness and continuity of the pattern — that Mr. Jones's predicates share the purpose, participants, method, and infrastructure of an ongoing scheme reaching back to 2016 and forward into 2026 — and not to charge any foundational or pre-2019 conduct as a predicate act, to assert any claim on behalf of or any injury to any person other than Mr. Jones, or to allege that Mr. Jones was injured before August 2019. Mr. Jones's own money and property are the sole object of the predicate acts charged and the sole measure of the recovery sought, and his injury arose no earlier than his August–September 2019 reliance (¶¶151, 162).

160. The scheme also threatens to continue. The August 15, 2025 General Assignment, which swept Mr. Jones's source code and the misappropriated work into the assignment estate, and the January 15, 2026 sale of the patent estate to the purchaser — both undertaken after Mr. Jones demanded preservation of his property, and continuing the disposition of the misappropriated assets into 2026 — show that the fraudulent monetization and concealment of misappropriated intellectual property is the enterprise's regular way of doing business — a course of conduct the enterprise had followed since at

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

least 2016, first as to the foundational technology and then as to Mr. Jones's work (¶¶149, 158–159) — that by its nature projects into the future and that, as alleged, has not ended (¶¶77–86, 89).

161. Each individual Defendant committed at least two of the predicate acts. Mr. Karafin made and directed the recruitment misrepresentations (¶¶26–27), approved and executed each of the three option exercises as Light Field Lab's president (¶64), and directed the misappropriation and filing of Mr. Jones's work (¶¶39–40). He also signed, and caused to be transmitted by interstate electronic wire, the August 15, 2025 General Assignment that swept Mr. Jones's source code and the misappropriated work into the assignment estate and beyond his reach while this action was pending (¶¶79, 83) — a transmission in furtherance of the scheme, charged as a wire-fraud predicate and, in the alternative, as an overt act (¶156). Mr. Bevensee personally demonstrated Light Field Lab's display to Mr. Jones and interviewed him during the August 28 and 29, 2019 interviews, and joined in the recruitment communications, in each instance concealing the portfolio's Lytro provenance he uniquely knew (¶¶15–17, 26); and — having worked alongside Mr. Jones with access to the source control in which his work resided — he personally took and incorporated Mr. Jones's viewer-dependent rendering and "Acuity" methods into the applications on which he is named as an inventor, after Mr. Jones had identified that work to him as his own and authored by him (¶¶37–38). He also approved each of the three option exercises as Light Field Lab's Secretary and signed the resulting stock certificates to consummate them (¶64).

162. Mr. Jones was injured in his business and property by reason of these violations. He paid $56,437.50 out of pocket to exercise his option, a direct loss proximately caused by the concealment that induced and lulled him (¶64); and he was deprived of his trade secrets and source code, whose secrecy the publications irreversibly destroyed — a permanent loss of value that the return of the work cannot cure — and whose tangible embodiment Light Field Lab retained and transferred (¶¶41, 83). That injury does not depend on the validity of the assignment: because Mr. Jones's assent to the Confidentiality and Proprietary Rights Agreement was fraudulently induced, the agreement was void and no title to his work validly passed, so the work remained his when it was taken; and in the alternative he has rescinded that agreement (¶¶34–35, 129).

70

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

163. The wrongs alleged in this Count run to Mr. Jones's own money and property, not to any interest of the Patent Office, and they are governed by the federal wire-fraud and trade-secret statutes as construed by the Supreme Court and the Court of Appeals for the Ninth Circuit, whose law supplies the rule of decision for sections 1341 and 1343 in this District. To the extent Defendants contend that this Count is in substance a claim of fraud on the Patent Office or of patent invalidity, it is not. Confidential business information and trade secrets in the hands of their private owner are property within the meaning of sections 1341 and 1343, and the thing of which Mr. Jones was deprived was property in his own hands before it was taken — unlike the unissued application held not to be the Patent Office's property in a prior federal decision, whose only victim was the Patent Office. The international patent filings are alleged as the instrumentality by which Defendants asserted ownership of, converted, and disclosed Mr. Jones's property, and not as a fraud upon the Patent Office; the necessary elements of the wrongs charged — the misappropriation and disclosure of Mr. Jones's pre-existing property — lie in the marketplace and not in any defense of inequitable conduct, so that the separate, state-law preemption holding does not reach the federal predicates charged here. No patent issued from the applications built on Mr. Jones's work, and Mr. Jones neither seeks nor needs any ruling correcting inventorship or adjudging any patent invalid or unenforceable. The object of the scheme alleged here was Mr. Jones's money (his option payments) and his property (his work), charged under sections 1343 and 1832, and not control over governmental action or the unauthorized use of any tangible article under any other statute. Independently, the theft of Mr. Jones's trade secrets is charged under 18 U.S.C. § 1832, an offense Congress expressly enumerated as a racketeering activity, 18 U.S.C. § 1961(1), to which the property analysis of that prior federal decision does not apply.

164. The allegations concerning Defendants' foundational patent filings, their representations and omissions to the Patent Office regarding that foundational technology, and the inventor declarations executed in connection with those filings (¶¶15–23) are pleaded as evidence of Defendants' knowledge and intent, their method of operation, and the impaired value of the consideration Mr. Jones received — and not as predicate acts or as the property of which Mr. Jones was deprived. Defendants' concealment of those same foundational facts from Mr. Jones, transmitted by the recruitment and employment wires to induce his employment, his option payments, and the assignment of his work, is charged as the

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

deceptive content of the wire-fraud predicates identified above (¶¶151–152), and not as any fraud upon the Patent Office. This Count does not charge any false statement to the Patent Office as itself a predicate act, except the wire transmissions, identified above, by which Defendants represented that they owned and had invented Mr. Jones's property in order to convert it (¶154).

165. By the conduct alleged above, Defendants violated 18 U.S.C. § 1962(c). They further violated section 1962(d) by conspiring to do so: each Defendant agreed that he, or another member of the enterprise, would commit at least two of the predicate acts in furtherance of the scheme. A Defendant who did not personally commit two predicate acts is liable for having agreed that a co-conspirator would, and this conspiracy included the persons and entities, named as Does 1 through 10, who participated in the 2025 assignment and the subsequent sale (¶¶77, 85).

166. By reason of these violations, Mr. Jones is entitled under 18 U.S.C. § 1964(c) to recover threefold the damages he has sustained, together with the cost of the suit and a reasonable attorney's fee. Those damages are the $56,437.50 he paid out of pocket and the loss in the value of his trade secrets and source code caused by the predicate acts — including the permanent destruction of their secrecy by the publications — that the return of his property cannot cure, in an amount according to proof. To the extent his trade secrets and source code cannot be returned to him, Mr. Jones seeks in the alternative threefold their full value, also according to proof. To the extent the August 15, 2025 General Assignment and the subsequent sale (¶¶156–157) placed Mr. Jones's property, and its value, beyond his reach, and that loss cannot be cured by the return of his property, the value so placed beyond his reach is part of the injury he sustained by reason of the violations charged in this Count and is recoverable threefold under 18 U.S.C. § 1964(c); Mr. Jones seeks no recovery under this Count for the value of any patent or of the patent estate, which is not his and which he alleges is without realizable value (¶¶78, 83). The return of his property in specie and the imposition of a constructive trust are sought under the Third, Fourth, and Seventh Causes of Action and not under this Count. Mr. Jones pleads these remedies in the alternative under Fed. R. Civ. P. 8(d) and will elect before judgment: he seeks either the return of his property in specie, or a constructive trust upon and the single value of that property, under those Causes of Action, or threefold that same economic loss under this Count — and not both as to the same loss; and he seeks no equitable relief under this Count.

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

SIXTH CAUSE OF ACTION

*(Breach of Fiduciary Duty) (Against Jon Karafin and Brendan Bevensee)*

167. Mr. Jones incorporates by reference paragraphs 1 through 41, 62 through 71, and 75 through 88 above as though fully set forth herein. This cause of action is brought against Mr. Karafin and Mr. Bevensee. As elsewhere in this Complaint, Mr. Jones does not seek to invalidate any patent or to be named an inventor on any patent (¶¶ 13, 36); he seeks relief only for the breaches of fiduciary duty practiced on him as a stockholder.

168. Light Field Lab is incorporated under the laws of the State of Delaware (¶ 2). Under the internal-affairs doctrine, the fiduciary duties that Light Field Lab's directors and officers owe to its stockholders are governed by the law of the State of incorporation — here, Delaware. To the extent any duty arising from Light Field Lab's sale of its own stock to Mr. Jones is instead governed by the law of California — the place of the parties' dealings and of Mr. Jones's performance — Mr. Jones pleads the same breaches under California law in the alternative. Any non-fiduciary duty of disclosure arising from Light Field Lab's sale of its own stock — whether statutory or sounding in fraud — is pleaded under the Third and Fifth Causes of Action; this Count rests on the fiduciary duties Light Field Lab's officers and director owed Mr. Jones once he held its stock.

169. Mr. Jones was a stockholder of Light Field Lab. Until he exercised his options, Mr. Jones held only contractual rights to acquire stock, and as the holder of such rights he was owed no fiduciary duty. Upon his first exercise — as of the December 10, 2020 issue date of Stock Certificate CS-13 (¶¶ 64–65) — Mr. Jones became a stockholder of Light Field Lab, and he increased his holdings with each subsequent exercise, ultimately acquiring and holding 80,625 shares of Light Field Lab common stock (¶ 64). Mr. Jones held those shares from his first exercise until they were cancelled and extinguished on July 13, 2025, in and following Light Field Lab's assignment for the benefit of creditors — a total loss of his equity (¶¶ 77–86).

170. From December 10, 2020 through the cancellation of his shares, as officers and a director of the Delaware corporation in which Mr. Jones held stock, Mr. Karafin — its co-founder, Chief Executive Officer, President, and a director (¶ 3) — and Mr. Bevensee — its co-founder, Chief Technology Officer, and Secretary (¶ 4) — each owed Mr. Jones the fiduciary duties of loyalty, care, good faith, and

candor that a corporation's fiduciaries owe to its stockholders. Officers owe the same fiduciary duties as the corporation's directors. Those duties include the duty to deal honestly with stockholders and, when communicating with a stockholder in connection with a stockholder's investment decision, to disclose fully and fairly the material facts within the fiduciaries' knowledge bearing on that decision.

171. Each of Mr. Jones's exercises of his options was an investment decision in which Light Field Lab sold Mr. Jones its own stock and committed his money to the corporation. On three separate occasions — settling on December 22, 2020, January 4, 2021, and May 6, 2021 — Mr. Jones paid Light Field Lab a total of $56,437.50 to acquire its stock, through the corporation's own Carta platform and on the corporation's form Exercise Agreement, and Mr. Karafin, as the Company's President, and Mr. Bevensee, as its Secretary, each approved and executed those transactions (¶¶ 64–66). His first exercise was the transaction by which he became a stockholder. The fiduciary duties pleaded here did not govern his earlier decision, made while he held only the option, to make that first exercise — that is so under Delaware law, which governs these duties under the internal-affairs doctrine, and equally under California law to the extent it applies in the alternative — and his claim for the inducement of that first exercise is pleaded under the Third and Fifth Causes of Action. His second and third exercises, by contrast, on which Light Field Lab sold him additional stock, were made while he was already a stockholder to whom the fiduciary duties described above were owed; in selling him additional stock and accepting his further investment in the corporation's own stock — transactions they themselves administered and executed — the fiduciaries were bound to deal honestly with him about the value of what he was buying. These were not informal communications; they were formal equity transactions between the corporation and its stockholder, administered by its fiduciaries, in which Mr. Jones committed money in reliance on the value of what he was buying.

172. The material facts within the fiduciaries' knowledge included the facts alleged above concerning the origin, provenance, and encumbrance of Light Field Lab's foundational patent portfolio — that the portfolio derived from light-field inventions Mr. Karafin and Mr. Bevensee had contributed to at Lytro; that the governing terminology had been changed one-for-one so that the derivation would not be apparent on the face of the documents; that the single most material Lytro reference had been withheld from the Patent Office; and that those circumstances clouded the portfolio's provenance,

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

defensibility, and valuation (¶¶ 13, 15–23) — together with the facts alleged above concerning Light Field Lab's taking of Mr. Jones's own source code and work product and its filing of patent applications on that work without crediting him (¶¶ 36–40). Mr. Karafin and Mr. Bevensee were each named inventors on the foundational Light Field Lab and Lytro filings (¶¶ 15–21) and so had personal knowledge of those facts. These facts bore directly on the value of the stock Mr. Jones was buying and holding, and they were known to the Company's fiduciaries and not known to, or reasonably discoverable by, Mr. Jones (¶¶ 34–35).

173. Mr. Karafin and Mr. Bevensee breached their fiduciary duties to Mr. Jones. In recruiting Mr. Jones and throughout his stockholding, they had held Light Field Lab's patent portfolio out to him as comprehensive, valuable, and sound (¶¶ 26–30) — a picture they knew to be false, having concealed its derived and encumbered Lytro provenance and their taking of his own work (¶ 172). Having chosen to speak to Mr. Jones about the very portfolio whose value determined what his stock was worth, the fiduciaries were bound to speak honestly and not to mislead him by half-truth; instead, as he made his second and third exercises and committed further money to acquire the Company's stock, and throughout his stockholding as he continued to hold the shares he had acquired, they allowed that false picture to stand and concealed the material facts that would have corrected it (¶ 172). To the extent their duty further required affirmative disclosure of those facts in connection with Mr. Jones's investment in the corporation's own stock, they breached that duty as well; they disclosed none of them.

174. From the time Mr. Jones became a stockholder, the fiduciaries' continuing concealment of the material facts described above induced him not only to make his further investments in the Company's stock but also to retain the shares he held. Had those facts been disclosed, Mr. Jones would have disposed of his shares rather than continue to hold them to their extinguishment; his retention, in reliance on the fiduciaries' continuing silence, of the 80,625 shares he was induced to hold is a loss for which they are answerable (¶¶ 35, 65; and see the Third Cause of Action).

175. Mr. Jones reasonably relied on his fiduciaries' silence. Had Mr. Karafin and Mr. Bevensee disclosed the material facts described above, Mr. Jones would not have made his second and third exercises or paid the Company the $49,437.50 those exercises cost, and he would not have retained the 80,625 shares he was induced to hold (¶¶ 35, 65) — shares that were later cancelled and extinguished in

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

Light Field Lab's assignment for the benefit of creditors. The harm Mr. Jones suffered is personal to him — the loss of his own money and of the equity he was induced to acquire and hold, since extinguished — and is distinct from any injury to the corporation; Mr. Jones brings this claim directly, in his individual capacity.

176. Mr. Jones did not discover, and through reasonable diligence could not have discovered, the concealed facts on which these breaches rest until in or about August 2025, for the reasons and on the timeline alleged above (¶¶ 34–35): the derivation had been affirmatively concealed by the one-for-one substitution of terminology designed to defeat the very comparison that would reveal it, was within Defendants' exclusive knowledge, and could not be recognized from Light Field Lab's patents alone; and the applications capturing Mr. Jones's own work did not become public until October 17, 2024 and February 27, 2025.

177. As a direct and proximate result of Mr. Karafin's and Mr. Bevensee's breaches of fiduciary duty, Mr. Jones has been damaged in an amount according to proof, including the $49,437.50 he paid on his second and third option exercises — each made while he was already a stockholder to whom the fiduciary duties were owed — and the lost value of the 80,625 shares he was induced to acquire and to retain, which were cancelled and extinguished in Light Field Lab's assignment for the benefit of creditors — a total loss of his equity. Because the breaches were committed knowingly and in bad faith, Mr. Jones is further entitled to exemplary damages, and to rescissory damages restoring what the breaches cost him — the consideration he paid on those exercises and the value of the equity he was induced to acquire and hold. The $7,000 he paid on his first option exercise, the decision to make which he reached before he became a stockholder (¶¶ 169, 171), is not sought under this Count; it, together with the loss described above, is recoverable under the Third Cause of Action (which does not depend on the existence of a fiduciary relationship) or, threefold, under the Fifth Cause of Action pursuant to 18 U.S.C. § 1964(c). Consistent with the election pleaded at ¶ 166, and pursuant to Fed. R. Civ. P. 8(d), Mr. Jones will elect before judgment and seeks no double recovery as to the same loss.

SEVENTH CAUSE OF ACTION

*(Violation of the Uniform Voidable Transactions Act — Cal. Civ. Code § 3439.04(a)(1)) (Against Light Field Lab and Does 1 through 10)*

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

178. Mr. Jones incorporates by reference paragraphs 1 through 41 and 75 through 88 above as though fully set forth herein. This cause of action is brought against Light Field Lab, the debtor that made the challenged transfers, and against Does 1 through 10, comprising the undisclosed purchaser or purchasers of Light Field Lab's non-patent assets, the undisclosed senior secured creditor that approved the sales and absorbed their proceeds, the persons who stand behind those purchasers and that secured creditor and who are affiliated with, or in control of, Light Field Lab's officers, directors, or controlling shareholders, or are one and the same with them (¶¶79–80, 85), and any entity through which any of them holds, or to which any of them has conveyed, the transferred assets or their proceeds. By this Count Mr. Jones does not seek to invalidate any patent, to be adjudged the owner of any patent, or to correct the inventorship of record (¶¶13, 82); he seeks the avoidance of the transfers of Light Field Lab's assets, and the return of his own property, to the extent necessary to satisfy his claims.

179. Mr. Jones is a creditor of Light Field Lab within the meaning of Cal. Civ. Code § 3439.01. His claims in this action — for unpaid compensation, for fraud, for the conversion of his property, for civil RICO, and the others pleaded above — are each a right to payment and therefore a "claim" under section 3439.01(b), whether or not that right has been reduced to judgment and whether it is liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, legal or equitable, secured or unsecured. Mr. Jones need not first reduce his claims to judgment to avoid a transfer made to defeat them. His claims arose before the transfers challenged below: he filed this action on June 17, 2025, and Light Field Lab executed the General Assignment on August 15, 2025 (¶¶77, 86).

180. Light Field Lab made transfers of its assets, within the meaning of Cal. Civ. Code § 3439.01(a) and (m). By the August 15, 2025 General Assignment for the Benefit of Creditors, signed for Light Field Lab by Mr. Karafin as its Chief Executive Officer, Light Field Lab conveyed all of its non-exempt property and assets of every kind — including its patent portfolio; its display prototypes, manufacturing equipment, computer hardware, and other tangible assets; its remaining cash and liquid assets; its "source codes, software, and related documentation"; and its choses in action — to the Assignee (the General Assignment § 1(a); ¶¶78, 83). The estate's patent portfolio was then conveyed onward, by a Patent Assignment Agreement made effective January 15, 2026, to the purchaser (¶79). Each of these is a transfer of an asset of Light Field Lab subject to the Act, and each was made while

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

this action was pending (¶86). That a transfer is effected through an assignment for the benefit of creditors does not place it beyond the Act's reach.

181. Light Field Lab made these transfers with actual intent to hinder, delay, or defraud Mr. Jones, a creditor, in violation of Cal. Civ. Code § 3439.04(a)(1). That intent is shown by the following facts, among others, several of which are badges of fraud the Act identifies in section 3439.04(b):

(a) Light Field Lab executed the General Assignment while this action was pending, having been sued by Mr. Jones, and only fourteen days after it refused his statutory demand to inspect its books and records (¶¶76–77). Cf. § 3439.04(b)(4), (b)(10).

(b) The General Assignment transferred substantially all of Light Field Lab's assets, leaving it a corporation with no disclosed assets from which a judgment in Mr. Jones's favor could be satisfied (¶¶78, 86). Cf. § 3439.04(b)(5).

(c) On information and belief, the transfers were made to or for the benefit of insiders: the purchaser of the assets, the senior secured creditor that approved the sales and absorbed the proceeds, and the majority shareholder who approved the Assignment are affiliated with Light Field Lab's officers, directors, or controlling shareholders, or are one and the same, on the bases pleaded above (¶85). Cf. § 3439.04(b)(1), (b)(11).

(d) The transfers were concealed. Light Field Lab did not notify Mr. Jones, a creditor, until six days after the Assignment (¶77); the Assignee refused, despite Mr. Jones's repeated formal demands as a creditor, to disclose the purchaser, the consideration, or the secured creditor, so that Mr. Jones had to learn the identity of the patent portfolio's purchaser for himself from the Patent Office's prosecution record, while the purchasers of the estate's other assets, and the disposition of his own source code, remain undisclosed (¶79); and neither transfer was recorded in the Patent Office's assignment index, which continued to show Light Field Lab as the owner of every patent it had purported to assign (¶81). Cf. § 3439.04(b)(2), (b)(3).

(e) The patents withheld from the sale were precisely those Mr. Jones had identified by number, in this action, as tied to his claims — one issued patent the Assignee carved out

78

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

and offered to him in exchange for a release of his claims, and two published applications it did not list among the assets it conveyed — while the continuation patents descending from the carved-out patent, and the broader foundational families Mr. Jones had likewise pleaded were built on the same misappropriated work, were conveyed to the purchaser (¶83). The holders thus removed from the sale the very patents Mr. Jones had singled out, while selling the broader portfolio he had pleaded was tainted — a selective disposition reflecting their awareness of his claims and their purpose to extinguish rather than satisfy them.

(f) Light Field Lab routed the transfers through a private assignment for the benefit of creditors, outside any bankruptcy subject to court supervision, in which it selected its own assignee and the assets were sold without court approval or the disclosure a bankruptcy would require (¶77); it closed in insolvency; and the Assignee declared that no distribution would be made to any priority creditor, unsecured creditor, or equity holder, so that Mr. Jones received nothing (¶86). Cf. § 3439.04(b)(9).

(g) Light Field Lab swept Mr. Jones's source code and work product into the estate while expressly warranting in the General Assignment that no asset had been transferred or used in a manner interfering with the rights of any third party — a warranty false as to Mr. Jones's property, and one Light Field Lab gave knowing of Mr. Jones's claim to that property, having been a defendant in this action since June 17, 2025 when it executed the Assignment on August 15, 2025 (¶83; the General Assignment § 4). Cf. § 3439.04(b)(4).

182. Each of these steps, so far as is apparent to Mr. Jones, ran in the same direction — favoring Light Field Lab's principals and the persons standing behind the purchaser and the secured creditor, and disfavoring Mr. Jones and the estate's other creditors — and none is explained by the legitimate, lowest-cost administration of an insolvent estate (¶85). Taken together, the single most reasonable inference is that Light Field Lab made the transfers with actual intent to place its assets, and Mr. Jones's own property, beyond his reach as a creditor pursuing them in this action.

183. The Patent Assignment Agreement recites that the conveyance of the patent estate was made pursuant to an Asset Purchase Agreement, and the conveyance was therefore a sale of the patent estate for consideration (¶79). The amount of that consideration, however, and whether it was

reasonably equivalent to the value of what was transferred, have not been disclosed; the Assignee has refused, despite Mr. Jones's repeated formal demands as a creditor, to disclose what the assets were, what they sold for, or to whom, and for at least one sale it took warrants of no current determinable value rather than cash (¶¶79, 86). A transfer made for valuable consideration is nonetheless voidable under section 3439.04(a)(1) where, as alleged, it was made with actual intent to hinder, delay, or defraud a creditor. In the alternative, and to the extent the transfers were made for less than a reasonably equivalent value, they are voidable as constructive fraudulent transfers under Cal. Civ. Code §§ 3439.04(a)(2) and 3439.05, Light Field Lab having closed in insolvency or having been rendered insolvent by the transfers (¶¶77, 86). These alternative theories are pleaded under Fed. R. Civ. P. 8(d).

184. The General Assignment also swept into the estate, and purported to transfer, Mr. Jones's own source code, trade secrets, and work product. That property was never Light Field Lab's to assign: the agreement by which Light Field Lab purported to acquire it was procured by the concealment alleged above and is void, so the work never validly passed to Light Field Lab (¶83). To the extent the General Assignment transferred Mr. Jones's property, that transfer is likewise voidable under section 3439.04(a)(1), and Mr. Jones's property — wherever and in whosever hands it is found — is subject to a constructive trust in his favor (Cal. Civ. Code § 3439.07(a)(3)(C); id. §§ 2223–2224). Mr. Jones seeks the return of that property, not its value. (This allegation is pleaded in the alternative to, and without abandoning, his allegation that the property was never Light Field Lab's and so never validly entered the estate.)

185. Mr. Jones is entitled to the relief the Act affords under Cal. Civ. Code § 3439.07, to the extent necessary to satisfy his claims, including: avoidance of the General Assignment and of the transfers it effected, to the extent necessary to satisfy his claims; attachment of the transferred assets, of the proceeds traceable to them, or of other property of the transferees; an injunction restraining the transferees, the secured creditor that absorbed the proceeds, and any person acting in concert with them from making any further transfer or disposition of the transferred assets or of the proceeds traceable to them; the appointment of a receiver to take charge of the transferred assets and of the proceeds traceable to them; a constructive trust over the transferred assets and over the proceeds traceable to them, in whosever hands they are found; and, where an asset or its proceeds can no longer be recovered, a

judgment for its value against the first transferee, any subsequent transferee, or the person for whose benefit the transfer was made, under Cal. Civ. Code § 3439.08(b). Because Light Field Lab's patent portfolio is, as alleged, of no realizable value (¶¶83, 181), the relief Mr. Jones seeks reaches the transfers of his own property and of the value-bearing assets whose proceeds the secured creditor absorbed, and not the recovery of any patent, the invalidation of any patent, or any adjudication of inventorship (¶¶13, 82, 178). The senior secured creditor's lien — its existence, validity, amount, perfection, and priority — has never been disclosed or verified, and, on information and belief, that creditor is an insider affiliate of Light Field Lab's principals (¶85); the value it absorbed therefore remains reachable, and the exclusion from the definition of an "asset" of property "to the extent it is encumbered by a valid lien" (Cal. Civ. Code § 3439.01(a)(1)) is not established on the pleadings. The transfers are challenged within the four-year period that Cal. Civ. Code § 3439.09 allows: the General Assignment was made on August 15, 2025 and the sale of estate assets on January 15, 2026, and this action was pending throughout.

186. Mr. Jones's election to seek avoidance and the recovery of value under Cal. Civ. Code § 3439.08 against Light Field Lab and the Doe transferees does not waive, and Mr. Jones expressly reserves, any claim in damages against any person who, though neither a transferee nor a person for whose benefit the transfers were made, conspired to make, effect, or conceal the transfers. *See* the General Assignment § 6 (reserving the creditors' right to sue third parties or persons who may be liable). Mr. Jones will seek leave to assert any such claim if discovery establishes the requisite participation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1. For general damages according to proof;

2. For special and compensatory damages, including but not limited to loss of wages, salary, benefits, back pay, front pay, future lost income and benefits, and other economic losses, in an amount according to proof at trial;

3. On the Fifth Cause of Action (Civil RICO), for threefold the damages Plaintiff has sustained, together with the costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c);

4. For an award of punitive damages, according to proof;

5. For attorneys' fees and costs of suit;

6. For rescission, for fraud in their inducement, of all of the agreements between Plaintiff and Light Field Lab, including the Confidentiality and Proprietary Rights Agreement, the offer letter and the agreements governing his employment, the equity instruments and any equity-incentive-plan document, and any arbitration agreement, and each other agreement by which Light Field Lab claims he is bound;

7. For a right of attachment;

8. For declaratory relief;

9. For injunctive relief;

10. For pre-judgment and post-judgment interest pursuant to Civil Code Sections 3287 and 3289, Code of Civil Procedure Section 685.010, and pursuant to any other provision of law providing for interest;

11. For the imposition of a constructive trust over Plaintiff's source code, trade secrets, and work product, and over the proceeds traceable thereto, in whosoever's hands they are found, and for an injunction requiring Defendants and those acting in concert with them to return and deliver that work to Plaintiff, to cease all use, exploitation, reproduction, and disclosure of it, and to destroy or surrender every copy in their possession or control;

12. For an accounting of all profits, gains, and benefits Defendants derived from their acquisition, use, disclosure, retention, and transfer of Plaintiff's source code, trade secrets, and work product, to determine the disgorgement of Defendants' unjust enrichment recoverable under Civil Code Section 3426.3 and 18 U.S.C. § 1836(b)(3)(B), and to quantify the proceeds subject to the constructive trust prayed for above, as against Defendants on the Third and Fourth Causes of Action, and not under the Fifth Cause of Action, under which Plaintiff seeks no equitable relief;

13. For restitution;

14. For such other and further relief that the Court may deem just and proper.

Dated: July 6, 2026

HENRY | LACEY PC

By /s/ Stephen Henry_____
STEPHEN F. HENRY
Attorney for Plaintiff

82

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury in this action.

Dated: July 6, 2026

HENRY | LACEY PC

By /s/ Stephen Henry_____
STEPHEN F. HENRY
Attorney for Plaintiff

**Case No. : 3:25-cv-5118 MMC**

Second Amended Complaint