SARA A. MOORE (SBN: 294255)
SARAH B. ABSHEAR (SBN: 270947)
NIKAYLA JOHNSON (SBN: 347157)
GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111
Telephone: (415) 986-5900
Facsimile: (415) 986-8054
smoore@grsm.com
sabshear@grsm.com
njohnson@grsm.com

Attorneys for Defendant
LIGHT FIELD LAB, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALAN JONES, an individual

Plaintiff,

vs.

LIGHT FIELD LAB, INC., JON KARAFIN, BRENDAN BEVENSEE, and Does 1 to 10,

Defendants.

CASE NO. 3:25-cv-05118-MMC

**DEFENDANT LIGHT FIELD LAB, INC.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

Date: September 18, 2026
Time: 9:00 a.m.
Judge: Hon. Maxine M. Chesney
Courtroom: 7

**<u>Accompanying Papers</u>:**
Notice of Motion and Motion;
Declaration of Sara A. Moore;
Proposed Order

Complaint Filed: June 17, 2025
Am. Complaint Filed: Sept. 3, 2025
Sec Am. Complaint Filed: July 6, 2026

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

## I. REQUEST FOR JUDICIAL NOTICE

Defendant LIGHT FIELD LAB, INC. ("Defendant" or "LFL"), by and through their attorneys, hereby request that the Court take judicial notice of the following documents pursuant to Federal Rule of Evidence 201:

1. The following pleadings in this matter, attached to this Request for Judicial Notice ("RJN") for the Court's ease of reference: ECF No. 67, Court Order Granting Defendant's Motion to Dismiss, attached hereto as **Exhibit 1**; ECF No. 68, Plaintiff's Second Amended Complaint, attached hereto as **Exhibit 2**; ECF No. 1, Plaintiff's Complaint for Damages, attached hereto as **Exhibit 3**; ECF No. 20, Defendant's First Motion to Dismiss, attached hereto as **Exhibit 4**; ECF No. 25, Plaintiff's Amended Complaint for Damages, attached hereto as **Exhibit 5**; ECF No. 30, Defendant's Second Motion to Dismiss, attached hereto as **Exhibit 6**; and ECF No. 69, Individual Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, attached hereto as **Exhibit 7**. *See* Declaration of Sara A. Moore, ¶ 2 ("Moore Decl.") (authenticating documents attached to RJN).

2. Excerpts from Patent No. 10,488,584, retrieved from the United States Patent and Trademark Office ("USPTO") website in October 2025, located through the search function, including a print-off of the results of the search to demonstrate the publicly available nature of the patents. Only the first page of the patent is included, attached hereto as **Exhibit 8**. *See* Moore Decl., ¶ 3. If the Court wishes to view the full version, it may access the patent at https://ppubs.uspto.gov/pubwebapp/static/pages/ppubsbasic.html. The Court previously took judicial notice of the patent. *See supra*, RJN, Exh. 1, p. 11, n.8.

## II. MEMORANDUM OF POINTS AND AUTHORITIES

It is well-settled that certain materials, including "documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice," may be considered as evidence in ruling on a 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment. *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). In addition, the Court may take judicial notice of matters that are "not subject to reasonable dispute" and "(1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. "Proper subjects of judicial notice when ruling on a motion to dismiss include court documents already in the public record and documents filed in other courts and publicly accessible websites." *Mangaoang v. Special Default Services, Inc.*, 427 F.Supp.3d 1195, 1204 (N.D. Cal. 2019), citing *Holder v. Holder*, 305 F.3d 854, 866 (9th Cir. 2002); *Caldwell v. Caldwell*, No. C 05-4166 PJH, 2006 WL 618511, *4 (N.D. Cal. Mar. 13, 2006). **Exhibits 1-7** are court records in this case attached for the convenience of the Court.

A court may also take judicial notice of "[p]ublic records and government documents available from reliable sources on the Internet," such as websites run by governmental agencies. *See Hansen Beverage Co. v. Innovation Ventures, LLC*, No. 08-CV-1166-IEG, 2009 WL 6597891, *1 (S.D. Cal. Dec. 23, 2009), citing *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999). "Materials in the online files of the USPTO and other matters of public record are proper subjects of judicial notice." *Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 145–46 (N.D. Cal. 2020), citing *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record." (citation omitted)) and *Caiz v. Roberts*, 382 F. Supp. 3d 942, 947 (C.D. Cal. 2019) (taking judicial notice of "File History" downloaded from USPTO website). The patents attached as **Exhibit 8** were retrieved from the USPTO website and are therefore judicially noticeable. *See* Moore Decl., ¶ 3.

## III. <u>CONCLUSION</u>

Based on the foregoing, Defendant respectfully requests that the Court grant Defendant's Request for Judicial Notice.

Dated: August 14, 2026

GORDON REES SCULLY MANSUKHANI, LLP

By: */S/ Sara A. Moore*
Sara A. Moore
Sarah B. Abshear
Nikayla Johnson
Attorneys for Defendant
Light Field Lab, Inc.

# EXHIBIT 1

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALAN JONES,<br>Plaintiff,<br>v.<br>LIGHT FIELD LAB INC., et al.,<br>Defendants. | Case No. 25-cv-05118-MMC<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS; DENYING MOTION TO STRIKE** |

Before the Court are defendant Light Field Lab, Inc.'s ("LFL") Motion, filed October 10, 2025, "to Dismiss Plaintiff's Amended Complaint for Damages," and defendants Jon Karafin ("Karafin") and Brendan Bevensee's ("Bevensee") (collectively, "Individual Defendants") "Motion to Dismiss Amended Complaint for Damages" and "Motion to Strike," both filed November 18, 2025. Plaintiff Alan Jones ("Jones") has filed opposition to each motion, to which defendants have filed separate replies. The Court, having read and considered the papers filed in support of and in opposition to the motions, hereby rules as follows.[1]

**BACKGROUND**[2]

Defendant LFL is a Delaware corporation in the business of creating holographic displays. (See Doc. No. 25 ("FAC") ¶¶ 2, 21.) "[F]rom September 30, 2019, through June 23, 2023," plaintiff Alan Jones "was employed by LFL" (see id. ¶ 11), during which time Karafin and Bevensee were employed as officers of LFL (see id. ¶¶ 3-4; Doc. No. 41

---

[1] By prior order, the Court took the matters under submission. (See Doc. No. 51.)

[2] Unless otherwise stated, the below facts are taken from the FAC.

(“Opp. to Individual Defendants’ Mot.”) at 2:11-12).

In August 2019, prior to accepting LFL’s offer of employment, Jones interviewed for the position (see FAC ¶ 12), and, “[a]s part of his onboarding,” signed, on September 9, 2019, “a Confidentiality and Proprietary Rights Agreement” that “grant[ed] rights to patents and other works for hire to [Light Field Lab]” (see id. ¶ 18).

Jones worked in-person at LFL’s offices in California “from September 30, 2019, through March 7, 2020,” and, after the COVID-19 pandemic, Jones, who is a diabetic with a compromised immune system, “worked remotely from his residence in Seattle.” (See id. ¶¶ 21, 22.) Between December 2022 and January 2023, however, Jones’ supervisor “began having discussions with [him] to stop working remotely and return to in-office work.” (See id. ¶ 25.)

In January 2023, “Jones was assigned to work on masking interference for Wavetracing Optics to improve image quality,” and “work[ed] closely with LFL’s CEO,” Jon Karafin. (See id. ¶ 29.) In March 2023, Jones told Karafin “that the methodology was unworkable and was unlikely to result in improved image quality,” but “Karafin insisted that…Jones continue with the methodology.” (See id.) Nevertheless, at a Software Team Meeting conducted on April 6, 2023, Karafin “scapegoated” Jones (see id. ¶ 31), stating “Jones had failed to generate an image and indicat[ing] that it was unlikely that…Jones’ work would result in improved image quality” (see id. ¶ 30). Several days later, Jones filed “a complaint of hostile work environment” regarding Karafin’s comments (see id. ¶ 31), and, during LFL’s investigation of his complaint, Jones explained to the investigator that “he believed that…Karafin’s animosity towards him was due to the fact that he was working remotely because of his disability” (see id. ¶ 32).

On June 23, 2023, “Jones’ employment was terminated,” LFL stating “things aren’t working out.” (See id. ¶ 35.) Later that same day, however, “Jones received a letter of termination which stated that his employment was being terminated for poor performance and unprofessional behavior,” and “that the decision to terminate…Jones’ employment was made prior to the initiation of his hostile work environment complaint.” (See id. ¶ 36.)

United States District Court
Northern District of California

Jones alleges he signed the above-referenced Confidentiality and Proprietary Rights Agreement in reliance on misrepresentations made to him by Karafin during the interview process (see id. ¶ 35), and that, subsequently, during the course of his employment, Karafin breached his fiduciary duty to Jones by not apprising him of his rights to inspect the company's financials (see id. 17). Jones further alleges that LFL improperly failed to list him as an inventor on its applications for two patents that were "fully derived from [his] work" (see id. ¶ 40), and that LFL "terminat[ed] [him] for requesting [disability] accommodation and then making a complaint about illegal retaliation related to that request" (see id. ¶ 35).

Based on the above, Jones asserts the following Seven Causes of Action: (1) Retaliatory Termination under "California Labor Code § 1102.5" (see id. ¶¶ 41-46); (2) "Wrongful Termination In Violation Of Public Policy" (see id. ¶¶ 47-52); (3) "Fraud and Deceit" (see id. ¶¶ 53-69); (4) "Violation of Penal Code Sections 484 and 496" (see id. ¶¶ 70-77); (6) "Civil RICO" (see id. ¶¶ 78-85); (6) "Breach of Fiduciary Duty" (see id. ¶¶ 86-90); and (7) "Violation of Uniform Fraudulent Transfer Act" (see id. ¶¶ 91-99).

By the instant motion, LFL seeks dismissal of the Third, Fourth, Fifth, Sixth, and Seventh Causes of Action, each pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the asserted ground of failure to state a claim. (See Doc. No. 30 ("Light Field Mot.") at 9:5-8.) By the instant motions, the Individual Defendants seek, pursuant to Rule 12(b)(6), dismissal of the First, Third, Fourth, Fifth, and Sixth Causes of Action (see Doc. No. 38 ("Individual Defendants' Mot.") at 1:13-14), as well as an order striking portions of the Third Cause of Action and the Fourth Cause of Action in its entirety pursuant to California's anti-SLAPP statute (see Doc. No. 39 ("Motion to Strike") at 6:4-6).

**LEGAL STANDARD**

**I. Rule 12(b)(6)**

Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged

under a cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). Rule 8(a)(2), however, "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). Consequently, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." Id. Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than . . . a formulaic recitation of the elements of a cause of action." Id. (internal quotation, citation, and alteration omitted).

In analyzing a motion to dismiss, a district court must accept as true all material allegations in the complaint and construe them in the light most favorable to the nonmoving party. See NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). "To survive a motion to dismiss," however, "a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "Factual allegations must be enough to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation," Iqbal, 556 U.S. at 678 (internal quotation and citation omitted).

Generally, a district court, in ruling on a Rule 12(b)(6) motion, may not consider any material beyond the complaint. See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). Documents whose contents are alleged in the complaint, and whose authenticity no party questions, but which are not physically attached to the pleading, however, may be considered. See Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994). In addition, a district court may consider any document "the authenticity of which is not contested, and upon which the plaintiff's complaint necessarily

United States District Court
Northern District of California

relies," regardless of whether the document is referenced in the complaint. Parrino v. FHP, Inc., 146 F.3d 699, 706 (9th Cir. 1998). Finally, the Court may consider matters that are subject to judicial notice. See Mack v. South Bay Beer Distribs., Inc., 798 F.2d 1279, 1282 (9th Cir. 1986).

**II. Anti-SLAPP Law**

Section 425.16 of the California Code of Civil Procedure, California's "anti-SLAPP"[3] statute, is intended "to protect individuals from meritless, harassing lawsuits whose purpose is to chill protected expression." See Metabolife, 264 F.3d at 837 n.7. The statute, in relevant part, provides as follows:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

See Cal. Code Civ. Proc. § 425.16(b)(1).

To prevail on an anti-SLAPP motion, the defendant "must first make a prima facie showing that the plaintiff's suit arises from an act by the defendant made in connection with a public issue in furtherance of the defendant's right to free speech under the United States or California Constitution." See Sarver v. Chartier, 813 F.3d 891, 901 (9th Cir. 2016) (internal quotation and citation omitted). "The burden then shifts to the plaintiff…to establish a reasonable probability that it will prevail on its claim in order for that claim to survive dismissal." See Makaeff v. Trump Univ., LLC, 715 F.3d 254, 261 (9th Cir. 2013).

---

[3] "Anti-SLAPP" is an acronym for "Anti-Strategic Lawsuit Against Public Participation." See Metabolife Intern., Inc. v. Wornick, 264 F.3d 832, 837 n.7 (9th Cir. 2001).

United States District Court
Northern District of California

DISCUSSION

I. First Cause of Action – Retaliatory Termination

The First Cause of Action, brought against all defendants, alleges a violation of California Labor Code § 1102.5. Jones alleges that, during the course of his employment with LFL (see FAC ¶¶ 42, 43), he "complained to [LFL's] officers, directors, and/or managing agents that certain of [LFL's] activities violated the law" (see id. ¶ 43), and that "[d]efendants Light Field Lab, Karafin and Bevensee terminated [Jones], substantially motivated by [Jones'] complaints" (see id. ¶ 44).

The Individual Defendants argue that the First Cause of Action, to the extent brought against them, is subject to dismissal "because claims under [§ 1102.5] can only be brought against employers" and not against individual officers and employees. (See Individual Defendants' Mot. at 2:17-21.)[4] In response, Jones argues "there is a split of authority on this issue,[5] with the better reasoned decisions finding that such liability is supported." (See Opp. to Individual Defendants' Mot. at 3:27-28.)

The Court, having reviewed the cases cited by the parties, agrees with those district courts that have found § 1102.5 only authorizes actions against the employer itself. See, e.g., Friedman v. Jenkins, 2024 WL 1182878, at *6 (N.D. Cal. March 19, 2024) (holding "the California Supreme Court would not permit Section 1102.5 claims to proceed against nonemployer individuals"; collecting cases); see also Dawson v. Caregard Warranty Service, Inc., 2024 WL 661198, at *1-2 (C.D. Cal. Jan. 12, 2024) (analyzing issue in detail and listing as relevant factors "statutory language," decisions

---

[4] As noted, LFL does not move to dismiss the First Cause of Action. (See Light Field Mot. at 9:5-6; 9:20-21.)

[5] To the extent Jones characterizes the current state of the law as a "split," it is a very uneven one, Jones having cited only two cases denying the employees' Rule 12(b)(6) motions, see Turner v. City and County of San Francisco, 892 F.Supp.2d 1188 (N.D. Cal. 2012); Cordell v. PICC Lines Plus LLC, 2016 WL 4702654 (N.D. Cal. Sept. 8, 2016), and with the judge in the former changing his mind in a later case, see Mewawalla v. Middleman, 601 F.Supp.3d 574, 608 (N.D. Cal. 2022) (holding "section 1102.5 does not impose individual liability"; collecting cases).

interpreting "analogous" law, "policy arguments against imposing liability [on] supervisors," and "legislative history"; noting "[t]he overwhelming majority of district courts addressing the merits have found that…§ 1102.5 does not impose individual liability on non-employers").

Accordingly, to the extent the First Cause of Action is asserted against the Individual Defendants, such claim is subject to dismissal.

## II. Second Cause of Action – Wrongful Termination in Violation of Public Policy

As noted, no defendant moves to dismiss the Second Cause of Action.

## III. Third Cause of Action – Fraud and Deceit

The Third Cause of Action, brought against all defendants, alleges "[d]efendants made false representations" (see FAC ¶ 53) regarding the "commercial viability" of LFL's products (see id. ¶ 57), the company's "financial stability" (see id. ¶ 58), the "value of [Jones'] stock" (see id. ¶ 59), and the company's "ownership of patents" (see id. ¶ 60).

### A. Preclusion

At the outset, LFL argues the Third Cause of Action is barred by claim preclusion, issue preclusion, and judicial estoppel. (See Light Field Mot. at 18:10-22.)

As to claim preclusion and issue preclusion, LFL's argument fails, for the reason that the prior judgment on which LFL relies, a dismissal of a declaratory relief action brought by LFL, was a dismissal for lack of subject matter jurisdiction (see Doc. No. 30-2 ("Request for Judicial Notice") Ex. 5 at 1:21; Ex. 6 at 2:7-8),[6] and a dismissal for lack of subject matter jurisdiction does not qualify as a final judgment on the merits, see In re Brooks-Hamilton, 271 Fed.Appx. 654, 657 (9th Cir. 2008) (holding "dismissal for lack of

[6] The Court hereby GRANTS LFL's unopposed Request for Judicial Notice of the following documents filed in the prior federal civil action between LFL and Jones: "Order Denying Motions to Dismiss as Moot; Tentatively Granting Motion to Dismiss for Lack of Subject Matter Jurisdiction" (Request for Judicial Notice Ex. 5); "Order Granting Motion to Dismiss for Lack of Subject Matter Jurisdiction" (Request for Judicial Notice Ex. 6). See Lee v. City of Los Angeles, 250 F.3d 668, 690 (9th Cir. 2001) (holding federal courts may "take judicial notice of undisputed matters of public record") (emphasis omitted).

subject matter jurisdiction is not a final judgment on the merits”); see also Olivas-Motta v. Whitaker, 910 F.3d 1271, 1280 (9th Cir. 2018) (holding “[c]laim preclusion requires a final judgment on the merits”); Skilstaf, Inc. v. CVS Caremark Corp., 669 F.3d 1005, 1021 (9th Cir. 2012) (holding “[i]ssue preclusion” requires that “the first proceeding ended with a final judgment on the merits”) (internal quotation and citation omitted).

To the extent LFL relies on judicial estoppel, its argument likewise fails. In particular, LFL argues, Jones’ current claim is based in part on an alleged contractual “right to vested and unvested stock options in LFL’s stocks” (see Light Field Lab Mot. at 18:14-15), whereas in the earlier action he asserted “there is and never was a stand-alone contractual claim for the lost stock options pursuant to the stock incentive plan” (see id. at 20:10-11). As Jones points out, the FAC does not include a claim based on “a contractual right to own stocks or exercise stock options following his termination.” (See Opp to Light Field Mot at 11:19-20.) Rather, Jones claims he “purchase[d] stock options to his detriment” based on defendants’ “concealment and misrepresentations.” (See FAC ¶ 60.) Such position is not “clearly inconsistent with [his] earlier position.” See New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001) (setting forth requirements for judicial estoppel) (internal quotation and citation omitted).

In sum, Jones’ Third Cause of Action is not subject to dismissal on grounds of claim preclusion, issue preclusion, or judicial estoppel.[7] The Court next considers the alleged false representations.

**B. Alleged Misrepresentations**

Under California law, the “necessary elements of fraud are: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage.” See Alliance Mortgage Co. v. Rothwell, 10 Cal.4th 1226, 1239 (1995) (internal

[7] To the extent LFL argues the Sixth and Seventh Causes of Action are also precluded on these three same grounds (see Light Field Mot. at 18:10-22), such argument, for the reasons discussed above, likewise is unavailing.

United States District Court
Northern District of California

quotation and citation omitted). Additionally, allegations of fraud are subject to Rule 9(b)'s heightened pleading standard. See Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103 (9th Cir. 2003) (holding, to meet Rule 9(b)'s particularity requirement, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged").

**1. Statements Regarding LFL's Anticipated Product Launch and Theme Park Customer**

Jones alleges Karafin made "false representations as to the commercial application and viability of [Light Field Lab's] product." (See FAC ¶ 53.)

In particular, Jones alleges that during his job interviews with LFL on August 28, 2019, and August 29, 2019, Karafin "stated that Light Field Lab had a large theme park customer, ultimately revealed to be Universal Studios" and "that Light Field Lab would have [its] displays out to market the following year (2020) and it would be in the theme park in that timeframe or soon after" (see id. ¶ 13), whereas, according to Jones, after he joined the company, "there was no further discussion of Universal Studios as a customer and no product was delivered to Universal Studios" (see id. ¶ 14).

Jones fails, however, to allege facts sufficient to support a finding that Karafin's representation that Universal Studios was a customer of LFL was false at the time the statement was made to him. Moreover, Karafin's alleged representation that LFL, at some point in the future, would have a display product out to market and in a Universal Studios theme park is a prediction or opinion, and, as "a general rule,…a representation, to constitute fraud, must relate to a past or existing fact, and not to the future." See Daniels v. Oldenburg, 100 Cal.App.2d 724, 727 (1950). Although the general rule is "subject to qualifications," e.g., where the speaker "has knowledge of facts[] not warranting the opinion," see id.; see also Richard P. v. Vista Del Mar Child Care Service, 106 Cal.App.3d 860, 865-66 (1980) (holding same), Jones has not alleged that at the time the above statements were made Karafin did not anticipate LFL's products launching in a Universal Studios theme park in the future, or that Karafin had knowledge

of facts that would not warrant such prediction.

Accordingly, to the extent the Third Cause of Action is based on the above-referenced statements regarding LFL's anticipated product launch and theme park customer, said claim is subject to dismissal.

**2. Statements Regarding Vesting of Stock Options Upon LFL's Public Listing or Acquisition**

Jones alleges "information regarding the value of [his] stock was concealed." (See FAC ¶ 57.)

In particular, Jones alleges that during his interviews, Karafin "discussed an options double trigger event on which all options would vest if the company was publicly listed or acquired," whereas, according to Jones, "[u]pon…[his] inquiry about the number and value of the options at issue, Karafin concealed that information on the basis that it was highly confidential." (See id. ¶ 15.)

Under California law, "[t]he required elements for fraudulent concealment are (1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would have acted differently if the concealed or suppressed fact was known; and (5) plaintiff sustained damage as a result of the concealment or suppression of the material fact." See Rattagan v. Uber Technologies, Inc., 17 Cal.5th 1, 40 (2024).

Here, Jones fails to allege facts sufficient to support a finding that Karafin, during Jones' job interview, had a duty to disclose the specific "number and value of" LFL's stock options that would vest upon the company's potential public listing or acquisition, or that Jones would have acted differently had he known such information, let alone that he suffered any injury on account of the allegedly concealed information.

Accordingly, to the extent the Third Cause of Action is based on the above-referenced statement regarding the vesting of LFL's stock options upon the company's public listing or acquisition, said claim is subject to dismissal.

### 3. Statements Regarding LFL's Patent Portfolio

Jones alleges "[d]efendants made representations…regarding ownership of the patents on which the business was reliant and concealed the true ownership of those patents." (See FAC ¶ 54.)

In particular, Jones alleges that, during his job interviews with LFL, "Karafin stated that the company had hundreds of patents" and that its "business model relied heavily on comprehensive patent coverage of the holographic space" (see id. ¶ 12), whereas, "[s]ubsequently, in August 2025,…Jones learned that Light Field Lab's foundational patents had been developed while Karafin and Bevensee worked for a prior employer, Lytro, and were not valid patents held by Light Field Lab but, in fact, were the property of Lytro" (see id. ¶ 19). In support thereof, however, only one such patent is identified in the FAC, "US10488584" (see id.), and, contrary to the FAC, that patent was issued to LFL, not to Lytro (see Request for Judicial Notice Ex. 9 at 191-92).[8] Under such circumstances, Jones fails to allege facts sufficient to support a finding that Karafin made a fraudulent statement as to LFL's patents.

Accordingly, to the extent the Third Cause of Action is based on the above-referenced statement regarding LFL's patents, said claim is subject to dismissal.

### 4. Statements Regarding LFL's Financial Books and Records

Jones alleges "the specific value of [his] stock was concealed." (See FAC ¶ 59.)

In that regard, Jones alleges that, during a March 2023 text message exchange with Karafin, "in the context of a financial discussion about the company," Jones asked Karafin whether there was "any additional information [he was] entitled [to] or required to be given access to as a shareholder," and that Karafin responded as follows: "Understood and appreciated. There are no current problems to be aware of (e.g., equity

---

[8] The Court hereby GRANTS LFL's unopposed Request for Judicial Notice of patent number 10,488,584. See, e.g., Threshold Enterprises Ltd. v. Pressed Juicery, Inc., 445 F.Supp.3d 139, 145 (N.D. Cal. 2020) (holding "[m]aterials in the online files of the USPTO and other matters of public record are proper subjects of judicial notice").

ownership and payroll) and can keep you posted. Again, not a political response, just the facts." (See id. ¶ 17.) According to Jones, LFL's "[b]ooks and records would classify as additional (financial) information [he] was entitled to be given access to" and that Karafin had a duty to disclose such right under Delaware law, that his text message to Karafin was a direct invocation of his inspection rights, and that Karafin's above-quoted remarks constituted a "refus[al] to provide, and conceal[ing], [such] information." (See id.; see Opp. to Individual Defendants' MTD at 13:27-28.)

Section 220 of the Delaware General Corporation Law, however, sets forth specific formalities and procedural requirements that a shareholder must observe in order to invoke their inspection rights, none of which were satisfied by Jones' text message to Karafin. See 8 Del. C. § 220(b)(1) (providing "any stockholder…shall, upon written demand under oath, have the right during the usual hours for business to inspect…books and records") (emphasis added); see also Central Laborers Pension Fund v. News Corp., 45 A.3d 139, 144 (Del. 2012) (holding [a]bsent…procedural compliance [with Section 220], the stockholder has not properly invoked the statutory right to seek inspection, and consequently, the corporation has no obligation to respond").

Moreover, to the extent Jones contends Karafin was bound by a fiduciary duty to affirmatively disclose the existence of Jones' right under Section 220 of the Delaware General Corporation Law (see Opp. to Individual Defendants' Mot. at 13:6-23), such claim fails because, under Delaware law, a corporate officer's affirmative duty to disclose information to a shareholder only applies in the context of a corporate fiduciary's "communication associated with a request for stockholder action," such as "approving corporate transactions…and making investment decisions," not informal text message communications such as the text message exchange alleged here, see Dohmen v. Goodman, 234 A.3d 1161, 1168 (Del. 2020); see also Malone v. Brincat, 722 A.2d 5, 10 (Del. 1998) (holding "duty of disclosure obligates directors to provide the stockholders with accurate and complete information material to a transaction or other corporate event that is being presented to them for action").

Accordingly, to the extent the Third Cause of Action is based on the above-referenced statement regarding LFL's financial books and records, said claim is subject to dismissal.

**IV. Fourth Cause of Action – California Penal Code §§ 484, 496**

The Fourth Cause of Action, brought against all defendants, alleges violations of California Penal Code Sections 484 and 496. In particular, Jones asserts "[d]efendants' misrepresentations to [Jones]…regarding inventorship of [p]atent WO2025042476A1 and WO2024216300A2…constituted theft of personal property, in the form of [Jones'] right to inventorship of those patents." (See FAC ¶ 70.)

At the outset, the Court notes that to the extent the Fourth Cause of Action is brought under California Penal Code § 484, the claim is subject to dismissal because § 484 does not authorize a private right of action. See Durand v. U.S. Customs, 163 Fed.App'x 542, 545-46 (9th Cir. 2006) (finding plaintiffs "did [not]…have a private cause of action" under § 484); see also Quigley v. Yelp, Inc., 2018 WL 7204066, at *5 nn. 3-4 (N.D. Cal. Jan. 22, 2018) (holding § 484 "do[es] not provide for a private right of action"; collecting cases). The Court thus turns to the alleged violation of Penal Code § 496.

"[T]he elements required to show a violation of [§ 496] are simply that (i) property was stolen or obtained in a manner constituting theft, (ii) the defendant knew the property was so stolen or obtained, and (iii) the defendant received or had possession of the stolen property." Siry Investment, L.P. v. Farkhondehpour, 13 Cal.5th 333, 354-55 (2022) (internal quotation and citation omitted).

Defendants argue the Fourth Cause of Action is preempted by federal patent law because Jones seeks to use a state law cause of action to raise a challenge as to patent inventorship, and, consequently, "[f]ederal [p]atent [p]reemption requires [Jones] to seek redress under the Patent Act, not under state law." (See Light Field Mot. at 16:21-17:26; see also Individual Defendants' Mot. at 7:25-9:11). In response, Jones contends the Fourth Cause of Action is not preempted by federal patent law because, according to Jones, he "seeks remedies not covered by the Patent Act, and[,] in particular, invalidation

United States District Court
Northern District of California

of the Confidential Information and Inventions Assignment Agreement," and that the damages he claims "can be determined without resort to patent law as they hinge on the tortious conduct committed by [defendants], not patent validity or ownership." (See Doc. No. 32 ("Opp. to Light Field Mot.") at 9:19-10:8.)

"Federal Circuit law governs whether federal patent law preempts a state law claim," Ultra-Precision Mfg., Ltd. v. Ford Motor Co., 411 F.3d 1369, 1376 (Fed. Cir. 2005), and "federal patent law preempts any state law that purports to define rights based on inventorship," see University of Colorado Foundation, Inc. v. American Cyanamid Co., 196 F.3d 1366, 1372 (Fed. Cir. 1999).

Here, the Fourth Cause of Action, as currently pled, is entirely predicated on Jones' asserted inventorship of two patents for which he was not listed as an inventor. (See FAC ¶ 70 (alleging "theft of personal property,…in the form of [Jones]' right to inventorship of [two] patents); id. ¶ 72 (alleging "Light Field Lab has retained ownership and Karafin and Bevensee have retained inventorship of Patent WO2025042476A1 and WO2024216300A2 that should have been provided to [Jones]"); id. ¶ 73 (alleging "Light Field Lab ha[s] knowingly received and deliberately withheld patent rights from [Jones]… and that said patent rights have been stolen from [Jones]"); id. ¶ 74 (alleging "[Jones] has suffered and continues to suffer a loss of the value of his inventorship"); id. ¶ 76 (alleging "[Jones] is entitled to…invalidate [patents] WO2025042476A1 and WO2024216300A2).)

Given Jones' allegations, the Fourth Cause of Action is preempted by federal patent law. See BearBox LLC v. Lancium LLC, 125 F.4th 1101, 1112-13 (Fed. Cir. 2025) (holding "conversion claim [was] preempted" where it was "replete with 'patent-like' language typically invoked when a party asserts inventorship"); see also Brown v. Brown, 2013 WL 5947032, at *7 (N.D. Cal. Nov. 5, 2013) (finding state tort claim "based on [plaintiff's] contention that he was improperly omitted as an inventor on the…patent application… is preempted").[9]

---

[9] To the extent Jones' Third Cause of Action is predicated on his allegation that he was fraudulently omitted as an inventor of the above-referenced patents (see FAC ¶¶ 40,

Accordingly, the Fourth Cause of Action is subject to dismissal.

**V. Fifth Cause of Action – Civil RICO**

The Fifth Cause of Action, brought against all defendants, alleges a violation of 18 U.S.C. § 1962(c), which section makes it "unlawful for any person employed by or associated with any enterprise…to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." See 18 U.S.C. § 1962(c).

"The elements of a civil RICO claim are as follows: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'" Living Designs, Inc. v. E.I. Dupont de Nemours and Co., 431 F.3d 353, 361 (9th Cir. 2005) (internal quotation and citation omitted). Additionally, allegations of predicate acts based on fraud must satisfy Rule 9(b). See Edwards v. Marin Park, Inc., 356 F.3d 1058, 1065-66 (9th Cir. 2004) (holding "Rule 9(b)'s requirement that [i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity applies to civil RICO fraud claims") (internal quotation and citation omitted).

Here, Jones alleges that "Light Field Lab is an enterprise" (see FAC ¶ 78), and that Karafin and Bevensee "conducted and participated, directly and indirectly, in the conduct of the affairs of said enterprise through a pattern of racketeering activity" (see id. ¶¶ 79, 80).

The specified criminal acts that satisfy the "racketeering activity" element are described in 18 U.S.C. § 1961(1), and encompass "mail fraud" in violation of 18 U.S.C.

---

55), such claim is, for the reasons discussed above, likewise preempted by federal patent law.

United States District Court
Northern District of California

§ 1341 and "wire fraud" in violation of § 1343, see 18 U.S.C. § 1961(1), which activity, Jones alleges, Karafin and Bevensee engaged in by "multiple fraudulent communications regarding Patent WO2025042476A1 and WO2024216300A2 using means of interstate communication, including electronic filing, mail and email" (see id. ¶ 81). The FAC, however, does not meet the requirements of Rule 9(b), as it does not include any factual elaboration as to the alleged "multiple fraudulent communications," such as the content of any such communication, what each defendant allegedly said, when such statements were made, or to whom such statements were made.[10]

Further, without the requisite specificity, Jones is unable to satisfy the continuity requirement of the "pattern" element, which requires plaintiffs to "prove either a series of related predicates extending over a substantial period of time, i.e., closed-ended continuity, or past conduct that by its nature projects into the future with a threat of repetition, i.e., open-ended continuity." See Howard v. America Online Inc., 208 F.3d 741, 750 (9th Cir. 2000) (internal quotation and citation omitted).

Accordingly, the Fifth Cause of Action is subject to dismissal.

## VI. Sixth Cause of Action – Breach of Fiduciary Duty

The Sixth Cause of Action, brought against defendants LFL and Karafin, alleges a breach of fiduciary duty by said defendants. In particular, Jones alleges, LFL and Karafin "improperly failed and refused to provide necessary information to [Jones] as a shareholder" (see FAC ¶ 87), and that Jones "was prevented from gaining the knowledge necessary to convert and sell his owned shares" (see id. ¶ 88).

To the extent Jones' breach of fiduciary duty claim is brought against LFL, such

[10] To the extent Jones argues the predicate acts are alleged with the requisite detail in paragraph 19 of the FAC (see Opp. to Light Field Lab Mot. at 15:11-16:9; Opp. to Individual Defendants' Mot. at 20:15-17), such argument is unpersuasive, as those acts concern patents that have nothing to do with the patents on which he bases his RICO claim (compare FAC ¶ 19, with FAC ¶ 81).

claim fails because, under Delaware law[11], subject to a limited number of exceptions not applicable here, an "issuing corporation does not owe fiduciary duties to its stockholders," see A.W. Financial Services, S.A. v. Empire Resources, Inc., 981 A.2d 1114, 1127 n.36 (Del. 2009) (holding "[u]nder Delaware law, the issuing corporation does not owe fiduciary duties to its stockholders"), and, consequently, cannot be held liable for breach of any such duty, see Buttonwood Tree Value Partners, L.P. v. R.L Polk & Co., Inc., 2014 WL 3954987, at *4 (Del. Aug. 7, 2014) (dismissing breach of fiduciary duty claim asserted against corporation; holding, under Delaware Law, "a corporation does not owe fiduciary duties to its stockholders"); see also Miele v. Franklin Resources, Inc., 2015 WL 4934071, at *16 (N.D. Cal. Aug. 18, 2025) (holding, under Delaware law, "a corporation[] owes no fiduciary duty to…[a]shareholder of that corporation"; collecting cases).

Next, as to Karafin, to the extent Jones' breach of fiduciary duty claim is premised on allegations of acts committed prior to Jones' employment at LFL, namely, statements made by Karafin during Jones' interviews (see FAC ¶¶ 15-16), such claim fails because Jones cannot predicate a breach of fiduciary duty claim on conduct that occurred when he was not a shareholder of LFL, i.e., when he and LFL were not in a fiduciary relationship. See Omnicare, Inc. v. NCS Healthcare, Inc., 809 A.2d 1163, 1169 (Del. Ch. 2002) (holding, "under established Delaware law, a breach of fiduciary duty claim must be based on an actual, existing fiduciary relationship between the plaintiff and the defendant[] at the time of the alleged breach").

Lastly, to the extent Jones' breach of fiduciary duty claim is based on the above-discussed text message exchange between Jones and Karafin in March 2023, during which Jones allegedly asked Karafin whether there was "any additional information [Jones was] entitled [to] or required to be given access to as a shareholder" (see FAC

[11] The Court applies Delaware law with respect to plaintiffs' breach of fiduciary duty claim, as "[c]laims involving…breach of fiduciary duties…are subject to the laws of the state of incorporation." See Davis & Cox v. Summa Corp., 751 F.2d 1507, 1527 (9th Cir. 1985).

United States District Court
Northern District of California

¶ 17), the allegations fail. In particular, under Delaware law, where, as here, a plaintiff asserts a claim of breach of fiduciary duty predicated on communications that occur outside "a request for stockholder action" such as "approving corporate transactions (mergers, sale of assets, or charter amendments) and making investment decisions," see Dohmen, 234 A.3d at 1168, the "fiduciary duty of disclosure does not apply," see id. at 1169. Although officers and directors "must still deal honestly with stockholders,…to state a claim for breach of fiduciary duty in this context, [they] must have knowingly disclosed false information." See id. Here, there is no allegation that Karafin, in the above-referenced text message exchange, knowingly provided Jones with false information.

Accordingly, the Sixth Cause of Action is subject to dismissal.

**VII. Seventh Cause of Action – Uniform Fraudulent Transfer Act**

The Seventh Cause of Action, brought against defendant LFL, alleges a fraudulent transfer in violation of California's Uniform Fraudulent Transfer Act, California Civil Code § 3439.04(a)(1).

The Uniform Fraudulent Transfer Act provides, in relevant part, as follows:

> "A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation… [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor."

See Cal. Civ. Code § 3439.04(a)(1).

Section 3439.04 "lists eleven nonexclusive factors that historically… have been regarded as circumstantial 'badges of fraud' that are probative of intent." See In re Beverly, 374 B.R. 221, 235 (B.A.P. 9th Cir. 2007). Here, Jones alleges, defendants violated § 3439.04 because, according to Jones, LFL "transferred the assets of Light Field Lab to CMBG FBC-Light Field Lab LLC, Assignee for the Benefit of Creditors of Light Field Lab, Inc. at a time when [Light Field Lab] had been threatened with [Jones'] lawsuit and had in fact been sued by [Jones]" (see FAC ¶ 93), LFL "retained use and control of the assets…after the transfer" (see id. ¶ 94), and "[a]t the time of the transfer,

[LFL] knew it may be obligated to pay [Jones] a debt as well as turn over certain intellectual property at issue in this lawsuit" (see id. ¶ 95).[12]

Rule 9(b)'s heightened pleading standard applies to claims under § 3439.04(a)(1). See Hale Bros. Investment Co., LLC v. StudentsFirst Institute, 2017 WL 590255, at *3-4 (E.D. Cal. Feb. 14, 2017) (holding Rule 9(b)'s heightened pleading standard applies to "allegations made against the transferor" for claims under Uniform Fraudulent Transfer Act); see also Lachapelle v. Kim, 2015 WL 7753235, at *5 (N.D. Cal. Dec. 2, 2015) (holding, as to fraudulent transfer claims against a corporation, "[t]he requirement of specificity…requires the plaintiff to allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written") (internal quotation and citation omitted).

Here, however, Jones fails to allege facts sufficient to support a finding that LFL made a transfer "[w]ith actual intent to hinder, delay, or defraud any creditor" in violation of the Uniform Fraudulent Transfer Act. See Cal. Civ. Code § 3439.04(a)(1). In that regard, Jones fails to plead with the requisite particularity when such transfer was made (see FAC ¶ 93 (alleging LFL transferred assets "at a time when [d]efendant had been threatened with [Jones]' lawsuit and had in fact been sued by [Jones]"), what particular assets were transferred (see id. (alleging "Light Field Lab transferred the assets of Light Field Lab"); see also id. ¶ 96 (alleging "[t]he intellectual property transferred [was] [d]efendant's principal asset")), or the manner in which LFL has "retained possession or

[12] Although LFL argues "[p]laintiff does not cite any law, nor is LFL aware of any, that would suggest that an [Assignment for the Benefit of Creditors]…can be a violation of the Uniform Fraudulent Transfer Act" (see Light Field Lab Mot. at 30:18-20), LFL cites no authority holding to the contrary, and at least two cases have denied motions to dismiss such fraudulent transfer claims where the defendants therein likewise failed to cite to any such authority. See, e.g., Lachapelle v. Kim, 2015 WL 5461542, at *5-6 (N.D. Cal. Sept. 16, 2015) (evaluating "claim for fraudulent transfer premised on an assignment for the benefit of creditors"); Tatung Co., Ltd. v. Shu Tze Hsu, 43 F.Supp.3d 1036, 1069 (C.D. Cal. 2014) (noting "[t]he Court finds no…authority or basis in the statutory text to hold that the Uniform Fraudulent Transfer Act is inapplicable to assignments for the benefit of creditors").



United States District Court
Northern District of California

control of the property transferred after the transfer" (see id. ¶ 94 (alleging LFL "retained use and control of the assets, including but not limited to the intellectual property at issue in this lawsuit, after the transfer"). Such conclusory allegations are insufficient to state a claim for fraudulent transfer under § 3439.04.

Accordingly, the Seventh Cause of Action is subject to dismissal.

**VIII. Motion to Strike**

In addition to moving to dismiss the Third and Fourth Causes of Action, the Individual Defendants move, pursuant to California's Anti-SLAPP statute, to strike Jones' Third Cause of Action, to the extent it is based on allegations related to said defendants' patent filings, and the Fourth Cause of Action in its entirety. (See Motion to Strike at 6:4-5.)

In support of their claim thereunder, the Individual Defendants contend "[t]he gravamen of [p]laintiff's third…and fourth…causes of action…is [d]efendants' filing, prosecution, and communications with the U.S. Patent and Trademark Office" (see id. at 2:21-25), and that such conduct "is protected petitioning activity under California's anti-SLAPP statute" (see id. at 4:19-21).

Although the Third and Fourth Causes of Action are, as discussed above, subject to dismissal, the Court, given the early stage of the proceedings, will afford Jones leave to amend those claims, and, under such circumstances, the Court will deny the Motion to Strike, without prejudice. See, e.g., Ramachandran v. City of Los Altos, 359 F.Supp.3d 801, 820-21 (N.D. Cal. 2019) (denying without prejudice defendants' Anti-SLAPP motion in light of plaintiff's opportunity to file amended complaint; holding "striking claims…without leave to amend …would directly collide with Rule 15's liberal amendment policy") (internal quotation and citation omitted); Wynn v. Chanos, 75 F.Supp.3d 1228, 1231 n.1 (N.D. Cal. 2014) (denying without prejudice motion to strike brought pursuant to California's Anti-SLAPP statute where complaint was dismissed with leave to amend).

Accordingly, the Individual Defendants' Motion to Strike will be denied.

//

United States District Court
Northern District of California

**CONCLUSION**

For the reasons stated above, defendants' motions are hereby GRANTED IN PART and DENIED IN PART as follows:

1. As to the Individual Defendants' Motion to Dismiss the First Cause of Action, the motion is hereby GRANTED, and said claim is hereby DISMISSED without leave to amend.
2. As to LFL's and the Individual Defendants' Motions to Dismiss the Third through Seventh Causes of Action, the motions are hereby GRANTED, and said claims are hereby DISMISSED with leave to amend.
3. The Individual Defendants' Motion to Strike is hereby DENIED without prejudice.
4. If Jones elects to amend, his Second Amended Complaint shall be filed no later than July 6, 2026.

**IT IS SO ORDERED.**

Dated: June 9, 2026

MAXINE M. CHESNEY
United States District Judge

# EXHIBIT 2

**STEPHEN F. HENRY, ESQ.**
**HENRY | LACEY PC**
STATE BAR # 142336
2625 Alcatraz Avenue, # 615
Berkeley, California 94705
Telephone: (510) 898-1883
Facsimile (510) 295-2516
shenry@HenryLacey.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALAN JONES,<br><br>Plaintiff,<br><br>vs.<br><br>LIGHT FIELD LAB, INC., JON KARAFIN, BRENDAN BEVENSEE, and Does 1 to 10,<br><br>Defendant, | Case No.: 3:25-cv-5118 MMC<br>**PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES**<br><br>1. RETALIATORY TERMINATION (Cal. Lab. Code § 1102.5)<br>2. WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY<br>3. FRAUD AND DECEIT<br>4. MISAPPROPRIATION OF TRADE SECRETS (Cal. Civ. Code § 3426 et seq.; 18 U.S.C. § 1836); AND CONVERSION<br>5. CIVIL RICO (18 U.S.C. §§ 1962(c) and (d))<br>6. BREACH OF FIDUCIARY DUTY<br>7. VIOLATION OF THE UNIFORM VOIDABLE TRANSACTIONS ACT (Cal. Civ. Code § 3439.04(a)(1))<br><br>**Complaint Filed: June 17, 2025**<br>**Am. Complaint Filed: Sept. 3, 2025**<br>**Second Am. Complaint Filed: July 6, 2026** |

Plaintiff Alan Jones ("Plaintiff" or "Jones") alleges the following against Defendants Light Field Lab, Inc. ("LFL"), Jon Karafin, Brendan Bevensee, and Does 1 through 10 (collectively "Defendants"):

**PARTIES AND GENERAL ALLEGATIONS**

1. Plaintiff Alan Jones is an individual who is, and at the time this action was commenced was, a citizen of the State of Washington. Mr. Jones resided in Washington when Light Field Lab recruited and induced him to accept employment in 2019. He then worked in person at Light Field Lab's offices in San Jose, California, from September 30, 2019 through March 7, 2020, and performed his duties remotely from his Washington residence thereafter, as alleged below.

2. Defendant Light Field Lab, Inc. is a corporation organized under the laws of the State of Delaware that, at all relevant times, maintained its principal place of business and operated in San Jose, California.

3. Defendant Jon Karafin is an individual who, at all relevant times, was a co-founder, the Chief Executive Officer, and President of Light Field Lab, and who, on information and belief, resides in California. Karafin is subject to the jurisdiction of this Court because the acts and omissions alleged herein were undertaken in, and directed at, California.

4. Defendant Brendan Bevensee is an individual who, at all relevant times, was a co-founder, the Chief Technology Officer, and Secretary of Light Field Lab, and who, on information and belief, resides in California. Bevensee is subject to the jurisdiction of this Court because the acts and omissions alleged herein were undertaken in, and directed at, California.

5. In addition to the Defendants named above, Plaintiff sues fictitiously Defendants Does 1 through 10, inclusive. Plaintiff is informed and believes, and on that basis alleges, that the persons and entities so designated include, without limitation: (a) executives, officers, and members of the Board of Directors of Light Field Lab with knowledge, actual or constructive, of the matters alleged below; (b) professionals and agents who participated in the preparation, filing, or prosecution of Light Field Lab's patent applications, or in the curation of the prior-art and inventorship disclosures made in connection with them; (c) persons and entities that participated in the General Assignment for the Benefit of Creditors described below, or in the administration, marketing, or disposition of Light Field Lab's assets; and (d) the transferees, acquirers, secured creditors, and insiders that received, financed, approved, or now hold those assets or interests in them. The true names, capacities, status, or facts showing the liability of these Doe defendants are not presently known to Plaintiff, and several of them

— including the identity of the purchaser of Light Field Lab's assets and of the senior secured creditor that approved the sale — have been withheld from Plaintiff notwithstanding his formal demands, as alleged below. Plaintiff is informed and believes, and thereon alleges, that each of the Defendants designated herein as Does 1 through 10 is responsible in some manner for the occurrences and happenings herein alleged, and that Plaintiff's damages, as herein alleged, were and are the direct and proximate result of the action of said Defendants, and each of them. Plaintiff will amend this complaint to show their true names and capacities, together with appropriate charging language, when such information has been ascertained.

6. Plaintiff further alleges that Defendants and Does 1–10, inclusive, are, and at all relevant times were, agents of one another and acting within the course and scope of said agency.

7. Plaintiff reserves the right to amend his charges to plead agency between Defendants and Does 1–10, inclusive, and any of them, at any time that he ascertains facts supporting agency between such Defendants.

**JURISDICTION AND VENUE**

8. Plaintiff incorporates by reference each of the allegations contained in paragraphs 1 through 7 above. Plaintiff's investigation is continuing, and he reserves the right to amend as additional facts are ascertained through discovery.

9. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises in part under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968, and under 28 U.S.C. § 1367(a) over the related state-law claims, which form part of the same case or controversy. In the alternative, the Court has jurisdiction under 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States: Plaintiff is a citizen of Washington; Defendant Light Field Lab, Inc., at the time this action was commenced, was a corporation organized under the laws of the State of Delaware that maintained its principal place of business in California, and was therefore at that time a citizen of both Delaware and California; and the individual Defendants are citizens of California. This Court has personal jurisdiction over each Defendant because Light Field Lab, at all relevant times, maintained its principal place of business and operated within the jurisdictional limits of the Northern

District of California, and each of the individual Defendants resides in, and/or transacted business and committed the acts and omissions complained of within, the jurisdictional limits of the Northern District of California.

10. Venue is proper because the employment relationship between Plaintiff and defendants, and each of them, that gave rise to some of the claims in this litigation existed within this judicial district and most or all of the acts and omissions complained of in this litigation took place here. Venue is also proper because most or all of the acts and omissions that occurred outside of the above employment relationship and are complained of in this litigation took place within this judicial district.

**FACTS COMMON TO MORE THAN ONE CAUSE OF ACTION**

11. Mr. Jones was employed by LFL from September 30, 2019, through June 23, 2023. His employment had no specified term and was at all times at-will within the meaning of Labor Code section 2922; his status as an employee of Light Field Lab arose from his hiring, his service, and the Company's payment of wages, and not from any written instrument. Mr. Jones initially worked as a Senior Pipeline Software Engineer and was promoted to Principal Engineer on July 27, 2020.

Karafin and Bevensee's Prior Employment at Lytro and the Origins of Light Field Lab's Patent Portfolio

12. The facts set forth in this section are alleged because they are relevant to the claims pleaded, including fraudulent inducement — to establish the circumstances in which Mr. Jones was recruited and induced to accept and continue employment, the materiality of the facts concealed from him, his reliance, and Defendants' knowledge. The inclusion of any statement or representation in this background is not, by itself, an allegation that the statement was a false representation. The specific representations and concealments on which Mr. Jones's claims rest are identified in connection with the causes of action below.

13. The materiality of the patent-related facts alleged below does not depend on any determination that a Light Field Lab patent is invalid, and Mr. Jones does not seek to be named as an inventor on any patent. While Mr. Jones contends that the foundational patents are invalid and that Light Field Lab's title to them is defective, his claims do not require that contention to be adjudicated. What is material — and what is established beyond serious dispute by the public prosecution record set forth

below — is that the circumstances of these patents' origin and prosecution raise substantial questions as to their provenance, validity, and enforceability. The existence of such questions, by itself, materially impairs the defensibility and valuation of the patent portfolio, and therefore the value of the equity and other consideration Light Field Lab offered Mr. Jones to induce and retain his employment. It is that impairment — not the ultimate resolution of any patent's validity — on which the materiality of these facts rests.

14. These same facts were independently material to Mr. Jones's decision to entrust his own source code, inventions, and trade secrets to Light Field Lab under an assignment agreement. A reasonable person who knew that Karafin and Bevensee had taken the work of a prior employer, concealed its origins through the systematic substitution of terminology, withheld material prior art from the United States Patent and Trademark Office (the "Patent Office"), and assigned away rights they had covenanted not to assign, would necessarily question how his own intellectual property would be treated — whether it, too, would be appropriated, stripped of attribution, recharacterized to obscure its source, or have its value impaired by entanglement with a portfolio of doubtful provenance and enforceability. That question went to the core of what Mr. Jones was being asked to give up. As alleged below, the risk was not hypothetical: Light Field Lab did to Mr. Jones's own work precisely what Karafin and Bevensee had done before — filing applications on his source code and trade secrets, concealing his authorship, and attaching that work to the same Lytro-derived foundation, as set forth at ¶¶ 36–39.

15. Before founding Light Field Lab, Defendants Karafin and Bevensee were senior technologists at Lytro, Inc., a light-field technology company. By their own accounts, Karafin was Lytro's "Head of Light Field Video," and Bevensee was its "Lead Engineer, Light Field Video," who led the team that built "Lytro Cinema" — described as the world's highest-resolution light-field video camera. Both were therefore intimately familiar with Lytro's light-field technology and intellectual property. Karafin's and Bevensee's own professional profiles describing these Lytro roles are in the record at Dkt. 52-1 (pp. 115, 67). Lytro's patents, described below, were later assigned to Google LLC when it acquired Lytro's assets after Lytro ceased operations; they are identified herein by their Lytro origin.

16. While employed at Lytro, Karafin and Bevensee were named inventors on Lytro patent filings directed to light-field display technology. Lytro filed U.S. Provisional Application No. 62/200,804, titled "Light Guided Image Plane Tiled Arrays with Dense Fiber Optic Bundles for Light-Field Display," on August 4, 2015 (U.S. Patent No. 10,565,734 at col. 1 ll. 27–32; Dkt. 52-1 at p. 260), and Karafin and Bevensee are named inventors on Lytro's U.S. Patent No. 10,565,734 (cover; Dkt. 52-1 at p. 154), which claims the benefit of that provisional application.

17. While still employed at Lytro, Karafin and Bevensee filed two provisional applications for the benefit of Light Field Lab: No. 62/362,602, filed July 15, 2016, and No. 62/366,076, filed July 24, 2016. They incorporated Light Field Lab in Delaware on November 22, 2016 — while still employed at Lytro — and departed Lytro on or about March 2017. (Dkt. 63 at p. 4; Dkt. 52-1 at pp. 67, 115.) Light Field Lab's U.S. Patent No. 10,488,584 claims the benefit of those two provisional applications. (U.S. Patent No. 10,488,584, cover, field (60); Dkt. 52-1 at p. 120.)

18. U.S. Patent No. 10,488,584 (Light Field Lab; named inventors Karafin and Bevensee) and U.S. Patent No. 10,565,734 (Lytro; named inventors Karafin and Bevensee) describe the same light-field architecture in systematically substituted terminology. In its summary, the Light Field Lab patent renames, component for component, what the Lytro patent's summary had already described: it calls "energy locations" what the Lytro patent calls "image sensors"; "energy relay elements" what the Lytro patent calls "tapered fiber optic bundles"; the relay's "first surface" and "second surface" what the Lytro patent calls the bundle's "leading end" and "trailing end"; a "singular seamless energy surface" what the Lytro patent calls a "single light-field image" that is "substantially unaffected by the gaps"; "energy propagation paths" what the Lytro patent calls the "optical path"; and "energy waveguides" what the Lytro patent calls a "microlens array." (U.S. Patent No. 10,488,584 at col. 1 ll. 24–41 & col. 12 ll. 24–27; Dkt. 52-1 at p. 138; U.S. Patent No. 10,565,734 at col. 2 ll. 20–53; Dkt. 52-1 at p. 260; the substituted terms recur throughout both patents, passim.) Mr. Jones has searched Light Field Lab's patent filings for the Lytro vocabulary and has not found it in them, while the Light Field Lab vocabulary appears consistently throughout. On information and belief, this one-for-one substitution was deliberate — adopted so that the derivation of Light Field Lab's foundational technology from Lytro's would not be apparent on the face of the documents — because Karafin and Bevensee were named

inventors on both; because, while Mr. Jones was employed at Light Field Lab, they themselves alternated between the two vocabularies (most notably "waveguides" versus "lenslets") in a way that served no apparent purpose at the time; and because maintaining two separate vocabularies for the same components serves no legitimate technical purpose.

19. These foundational provisional applications are not isolated filings; Light Field Lab's patent portfolio is built upon them. Of Light Field Lab's 64 granted United States patents (Dkt. 38-2 ¶ 4): (a) 20 trace, by priority, to the provisional applications 62/362,602 and/or 62/366,076 that Karafin and Bevensee filed while still employed at Lytro — 9 of them by direct claim of priority to those provisionals, and 11 more through continuation chains — as the public Patent Office continuity records establish; (b) a further 12 patents, while they do not claim that priority, cite one or more of the foundational patents (or their published applications) as prior art in their own prosecution, so that 32 of the 64 are tied to the foundation by priority or by their own citations of record (and three of the priority-traced patents additionally incorporate a foundational application by reference); (c) 6 of the 64 derive from independent provisional applications that predate, and are unrelated to, the Lytro-derived foundation — the RealD "Multiscopic Image Capture System" family (three patents; priority 2014, naming Karafin as one of five co-inventors, from pre-Lytro work at RealD, Inc.) and Daniel Smalley's flat-panel-display family (three patents; priority 2015, acquired from Brigham Young University); and (d) the remaining 26 are other Light Field Lab patents that employ the same "energy surface" and waveguide terminology but do not, on the public record, claim priority to or cite the foundational patents. Although these patents repeatedly cite one another and the foundational patents, none of the 64 discloses or cites Lytro's U.S. Patent No. 10,565,734 or its published application (U.S. Patent Application Publication No. 2017/0243373); that Lytro patent claims priority to provisional applications filed in 2015 — more than a year before Light Field Lab's foundational provisionals — and is directed to the same energy-relay architecture under Lytro's original terminology, so that, as earlier-filed prior art directed to the same subject matter, it was information a reasonable examiner would have considered important to the patentability of Light Field Lab's claims. Yet Karafin and Bevensee, who were named inventors on it and aware of it, did not disclose it to the Patent Office. Sixty-one of the 64 granted patents name Karafin and/or Bevensee as inventors, and fifty-eight of those arose from Karafin and

Bevensee's own holographic patent filings, begun in 2016 while they were still employed at Lytro. Each prosecuted upon a 37 C.F.R. § 1.63 inventor's oath Karafin and Bevensee signed under penalty of perjury and subject to 18 U.S.C. § 1001 (Dkt. 52-1, Ex. L-2 at pp. 580–583 (orig. pp. 1011–1014)), bearing the 37 C.F.R. § 1.56 duty to disclose all information material to patentability. Having withheld from the Patent Office their own earlier Lytro patent — directed to the same subject matter — throughout the prosecution of those patents (in U.S. Patent No. 10,488,584 alone, across five information-disclosure statements spanning 183 references, they did not disclose Lytro's then-published application, as detailed below), Karafin and Bevensee thereby placed substantial questions over the provenance, defensibility, and valuation of those 58 scheme-era patents. The only patents naming Karafin or Bevensee that stand apart from those circumstances are the three in the acquired RealD family, which originate in pre-Lytro work at RealD that predates the Lytro foundation.

20. In April 2017, Karafin and Bevensee assigned their light-field inventions to Lytro under a written assignment agreement — filed with the Patent Office and publicly available — by which they expressly covenanted that they "had not made and would not hereafter make any assignment, grant, mortgage, license, or other agreement affecting the rights, titles, and interests herein conveyed." Approximately fourteen months later, they assigned the same or substantially the same technology to Light Field Lab — the very thing they had covenanted to Lytro they would not do; the recorded patent assignments name Karafin and Bevensee as the assignors. That breach left a defect in Light Field Lab's title to the patents derived from those inventions: Light Field Lab's claimed ownership of its foundational portfolio rested on a conveyance Karafin and Bevensee had already covenanted away. The Lytro assignment and its covenant, and the later assignment to Light Field Lab, are in the record at Dkt. 52-1, Ex. L-3 at pp. 593–608 and Ex. L-2 at pp. 585–587 (orig. pp. 1116–1131 and 1018–1020) and are reflected in the recorded patent-assignment abstracts.

21. As named inventors, Karafin and Bevensee each bore a personal duty under 37 C.F.R. § 1.56 to disclose to the Patent Office all information material to patentability. Lytro's co-pending and materially similar application had published as U.S. Patent Application Publication No. 2017/0243373 A1 on August 24, 2017 (cover; Dkt. 52-1, Ex. L-3 at p. 591 (orig. p. 1101)) — well before Light Field Lab's application entered the U.S. national stage on June 20, 2018, and throughout the prosecution of

the application that issued as U.S. Patent No. 10,488,584 on November 26, 2019 — and Karafin and Bevensee, who were named inventors on the Lytro application, had personal knowledge of it. That knowledge was not merely presumed; it was a sworn precondition of their own patents. To obtain U.S. Patent No. 10,565,734 — the patent whose application published as the withheld Publication No. 2017/0243373 A1 — Karafin and Bevensee each executed the inventor's oath under 37 C.F.R. § 1.63, declaring under penalty of perjury, subject to the criminal sanction of 18 U.S.C. § 1001, his belief that he was "the original inventor or an original joint inventor of a claimed invention in the application." Neither, moreover, could lawfully execute that oath "unless that person has reviewed and understands the contents of the application, including the claims, and is aware of the duty to disclose to the Office all information known to the person to be material to patentability as defined in § 1.56." 37 C.F.R. § 1.63(c). Karafin and Bevensee thus did not merely happen to know of the Lytro disclosure: each had sworn to its inventorship and, as a condition of doing so, had reviewed and understood the very claims it contained. They then executed a second § 1.63 oath, in the same terms, to obtain U.S. Patent No. 10,488,584, directed to the same light-field architecture. The signed oaths are in the record — the Lytro oaths at Dkt. 52-1, Ex. L-3 at pp. 610–614 (orig. pp. 1140–1144), and the Light Field Lab oaths at Dkt. 52-1, Ex. L-2 at pp. 580–583 (orig. pp. 1011–1014).

22. In prosecuting their own application, Light Field Lab disclosed a great deal of prior art — 183 prior-art references across five separate Information Disclosure Statements, filed June 25, 2018, April 17, 2019, June 20, 2019 (twice), and August 28, 2019 — yet never once disclosed the Lytro application. (Dkt. 52-1, Ex. L-2 at pp. 498–501, 503–510, 512–523, 531–542, 563–566 (orig. pp. 20–23, 73–80, 612–623, 633–644, 911–914).) Three of those statements were filed in 2019, during the very period Karafin and Bevensee were recruiting Mr. Jones — one of them on August 28, 2019, the day of his interviews (¶¶ 27–28) — so that even as they induced him with representations about Light Field Lab's patent coverage, they were actively curating what the Patent Office saw while withholding their own materially similar Lytro application. Having disclosed so many other references while withholding that application, of which they were aware as its named inventors, Karafin and Bevensee omitted it knowingly and deliberately. U.S. Patent No. 10,488,584 issued on November 26, 2019 without ever citing Lytro's patent or its published application as prior art. (cover; Dkt. 52-1 at pp. 120–121.)

23. Karafin and Bevensee were named inventors not only on U.S. Patent No. 10,488,584 but across the broader family of Light Field Lab applications directed to the same light-field and holographic subject matter — many of which also claim priority to the same foundational provisional applications; each such application carried the same duty of candor and implicated the same most-material prior art — Karafin and Bevensee's own Lytro filings. The omission described above was therefore not confined to a single patent: the same material prior art was withheld, by the same two individuals, minimally across the related family of applications descending from the foundational provisionals, and arguably across every Light Field Lab application describing technology similar to that disclosed in the foundational patents. Because the same material art was withheld by the same two inventors — on sworn § 1.63 oaths — across this related family of applications, the circumstances of the portfolio's origin cast substantial doubt over its provenance, defensibility, and valuation, and therefore over the value of the equity and other consideration Light Field Lab offered Mr. Jones. The priority and citation relationships among these patents are set forth in paragraph 19 above.

24. On information and belief, Light Field Lab raised approximately $85 million from investors, including Khosla Ventures, Bosch, Samsung, LG, and Comcast, on the strength of the patent portfolio and a business model premised on comprehensive patent coverage of the holographic space — the same portfolio and the same business model that Karafin would describe to Mr. Jones to induce his employment, as alleged below.

25. Each of the patent-related facts set forth in this section is established by the public Patent Office record — the issued patents themselves, the recorded assignments, the signed inventor declarations, and the prosecution histories — and not by Mr. Jones's characterization of them.

Representations and Concealment to Induce Initial and Continued Employment

26. Mr. Jones did not seek out Light Field Lab; the Company approached him in 2019 while he was attending the SIGGRAPH conference, through an introduction by Jeff Barnes, a former colleague. It was Light Field Lab that initiated the recruitment that led to the representations that follow. In an August 12, 2019 recruitment email, Karafin described the role to Mr. Jones as "contributing across many of [Light Field Lab's] software development efforts, primarily focusing on the development of pipeline, workflow, tools, shaders, algorithms, calibration," with "opportunities to technically lead areas of

development and work with customers." (Mr. Karafin's August 12, 2019 recruitment email at p. 2.) Mr. Bevensee, Light Field Lab's co-founder and Chief Technology Officer, personally participated in recruiting Mr. Jones alongside Mr. Karafin: he corresponded directly with Mr. Jones during the recruitment — including by arranging and holding a recruitment telephone call with him in early September 2019, and welcoming his decision to join (the September 2019 recruitment correspondence at pp. 1-7) — and during Mr. Jones' August 28 and 29, 2019 interviews he personally demonstrated Light Field Lab's display to Mr. Jones and personally interviewed him. On September 9, 2019, Mr. Jones conveyed his decision to accept in a single email addressed to Mr. Karafin and Mr. Bevensee (and Mr. Barnes), explaining that his decision turned on "the character of the people involved," which was "the most important factor," and "boiled down to do I choose to trust your team." (the September 2019 recruitment correspondence at p. 6.) Mr. Bevensee personally replied that this was "fantastic news" and that "the team will be very excited," confirming both his participation in recruiting Mr. Jones and that he was among the "team" whose character Mr. Jones relied upon in deciding to leave his secure position at Microsoft and join Light Field Lab. (the September 2019 recruitment correspondence at p. 7.) As a named inventor on both the Lytro and the Light Field Lab applications, Mr. Bevensee shared Mr. Karafin's knowledge of the portfolio's Lytro provenance.

27. As part of Mr. Jones' interviews on August 28 and 29, 2019, Karafin stated that the company had hundreds of patents and that, in addition to manufacturing displays, their business model relied heavily on comprehensive patent coverage of the holographic space, allowing them to both manufacture displays and license the technology. In moving to dismiss, Karafin and Bevensee did not dispute that Karafin made this representation; they defended it as a true description of Light Field Lab's patents — that is, as a statement of fact, not opinion. (Dkt. 38 at 12:2-6.)

28. On August 28 and 29, 2019, Karafin also stated that Light Field Lab had a large theme park customer, ultimately revealed to be Universal Studios. Karafin stated that Light Field Lab would have the displays out to market the following year (2020) and that it would be in the theme park in that timeframe or soon after. Subsequently, there was no further discussion of Universal Studios as a customer and no product was delivered to Universal Studios.

29. These statements of alleged but untrue facts regarding the company's intellectual property and customers were intended to provide, and justifiably led to, the conclusion that LFL was much closer to delivery of the product than it actually was and that an early exercise of options was expected. In reliance on these statements, Mr. Jones gave up Microsoft stock that was vesting in order to join LFL — the very inducement these statements were intended to, and did, achieve. Mr. Jones's contemporaneous analysis confirms that the base pay was not the draw: he found Light Field Lab's base compensation so low relative to Bay-Area cost of living that, even setting aside his existing bonus and stock and comparing base salary alone, he would be "worse off financially on base." What drew him to Light Field Lab was instead the equity participation in the growth of its innovative technology that Karafin had represented. (Mr. Jones's August 18, 2019 recruitment email at p. 1.) Defendants have themselves characterized these statements as non-actionable "puffery" and "promotional" statements (Dkt. 46 at 7:14-19, 9:3-9; Dkt. 47 at 10:6-7) — that is, statements made to induce action — confirming that inducing intent. Whether Defendants also knew these statements concerning Light Field Lab's commercial readiness and customers to be untrue when made, while relevant, is not something Mr. Jones must independently establish; the scienter for his fraudulent-inducement claim is established by Defendants' patent-filing conduct alleged above.

30. During the discussions on August 28 and 29, 2019, Karafin also discussed an options double-trigger event on which all options would vest if the company was publicly listed or acquired. When Mr. Jones inquired into the total number of Light Field Lab's shares — the figure he needed in order to determine what fraction of the Company, and thus what value, his option grant represented — Karafin refused to disclose it, asserting that the information was highly confidential; yet a corporation's authorized capital is stated in its certificate of incorporation, a public record on file with the Delaware Secretary of State, while the outstanding-share figure that fixed the value of his grant was information peculiarly within the Company's knowledge that Mr. Jones had no other means to obtain. Karafin's August 12, 2019 recruitment email had separately characterized that equity. Addressing whether the equity was "non-dilutable," Karafin wrote: "Yes, full time employees are provided with equity in Light Field Lab to allow you to financially participate in our continued growth. The term non-dilutable can mean a lot of things, and each round of investment provides dilution for our investors every time the

value of the company increases. Every time the valuation of the company increases, the value of your options grant also increase to allow you to participate in Light Field Lab's continued success." (Mr. Karafin's August 12, 2019 recruitment email at p. 3.) By that assurance Karafin represented, as a present fact, that Mr. Jones's option grant would rise in value with each increase in the Company's valuation — that the dilution he acknowledged each financing round imposed fell on the Company's "investors" and not on Mr. Jones's grant. That representation was false. Mr. Jones's grant was an ordinary employee stock option that carried no protection against dilution: Light Field Lab's 2017 Stock Incentive Plan, which governed the grant, adjusts an award only for stock splits, recapitalizations, and similar events, and expressly provides that "[e]xcept as expressly provided herein, no issuance by the Company of shares of stock of any class … shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of Shares subject to an Award" (Dkt. 30-2 at p. 84) — so that the grant was diluted, not protected, by the very financing rounds Karafin invoked. Whether an option is protected against such dilution turns on the specific terms of the company's plan and grant — terms Karafin undertook to characterize but which Mr. Jones had no means to verify, the Plan not having been furnished to him until January 2, 2020, months after the August 2019 representations had induced him to resign from Microsoft and irreversibly forgo his vesting Microsoft equity (¶67).

31. Mr. Jones questioned the lack of disclosure of important information about Light Field Lab's stock and stock options during hiring negotiations, as it made it very difficult for Mr. Jones to determine the potential value of the options, but was refused. The information withheld from Mr. Jones during these negotiations was not limited to the number and value of his options. Light Field Lab also did not disclose — and its offer letter, by its own terms, excluded — that the equity it was using to recruit him would be made subject to a repurchase and forfeiture right on termination, to transfer restrictions, to a voting agreement and a right-of-first-refusal and co-sale agreement, and to a purported waiver of his statutory right to inspect the company's records (the Company's 2019 offer letter § 8). Light Field Lab first revealed those restrictions only after it had secured his employment, his irreversible surrender of his secure position at Microsoft, and the assignment of his work; and, as to the voting agreement and the right-of-first-refusal and co-sale agreement, it never disclosed their terms to him at all (¶¶66-71, 75).

32. Subsequently, after Mr. Jones became an owner of shares of Light Field Lab, Mr. Jones was entitled to review books and records to assess his holdings, but when he asked Jon Karafin in March 2023, in the context of a financial discussion about the company, "… is there any additional information I'm entitled or required to be given access to as a shareholder?" Karafin responded "Understood and appreciated. There are no current problems to be aware of (e.g., equity ownership and payroll) and can keep you posted. Again, not a political response, just the facts." (Dkt. 38-4 at p. 3.) Books and records would classify as additional (financial) information Mr. Jones was entitled to be given access to as a shareholder. Mr. Karafin continued to refuse to provide, and concealed, the information from Mr. Jones, a stockholder.

33. As part of his onboarding, on September 9, 2019, Mr. Jones signed a Confidentiality and Proprietary Rights Agreement that purported to grant rights to patents and other works for hire to LFL. This Agreement (Dkt. 46-3) was signed without knowledge of the misrepresented and concealed facts, unknown to Mr. Jones at the time, but which, if known, would have dissuaded him from joining Light Field Lab, providing his source code and other knowledge, and signing the agreements.

34. Mr. Jones did not know, and had no reason to know, of the facts set forth in the preceding section when he accepted employment in 2019, when he signed the Confidentiality and Proprietary Rights Agreement, or when he exercised his stock options. The relationship between Light Field Lab's patents and Lytro's was not public knowledge; it was known to Karafin and Bevensee, who had personally filed both sets of applications, and was concealed by the deliberate substitution of terminology and the withholding of the Lytro prior art described above. Mr. Jones — a rendering-software engineer, not a patent attorney — had no reason to audit the prosecution histories, prior-art disclosures, or recorded assignments of his employer's patent portfolio, and no reason even to be aware of Lytro's patents in order to compare them. Identifying the concealment required exactly the comparison the renaming was designed to defeat. The facts so concealed — that Karafin and Bevensee had taken a prior employer's work and obscured its provenance — went to the very "character of the people involved" that Mr. Jones had identified as "the most important factor" in his decision to join (¶26; the September 2019 recruitment correspondence at p. 6).

35. In or about May 2025, reflecting on the originality and value of the work he had performed at Light Field Lab and on the central importance Light Field Lab placed on its patent portfolio, Mr. Jones began to wonder whether Light Field Lab had obtained patents covering his own work. He began reviewing Light Field Lab's published patent filings and identified two international patent applications, WO2024216300A2 and WO2025042476A1, each naming only Karafin and Bevensee as inventors and neither crediting Mr. Jones — the latter, WO2025042476A1, claiming priority to an application filed June 23, 2023, the day of his termination (WO 2024/216300 A2, cover, field (72) (Karafin and Bevensee only); WO 2025/042476 A1, cover, fields (72) & (30) (priority appl. 63/523,028, filed June 23, 2023)). Reasoning that it was unlikely Karafin and Bevensee would have begun such conduct only with his work, and mindful of their prior employment at Lytro, in or about June 2025 Mr. Jones began reviewing Lytro's patents to determine whether any overlapped with Light Field Lab's. By August 2025, he had identified the specific overlapping inventions in the Lytro and Light Field Lab patents — and the systematic substitution of terminology between them — alleged in the preceding section. Through reasonable diligence Mr. Jones could not have discovered these facts earlier: the two applications capturing his work did not become public until they published on October 17, 2024 and February 27, 2025, and the Lytro derivation had been affirmatively concealed, was within Defendants' exclusive knowledge, and could not be recognized from Light Field Lab's patents alone.

These concealed facts were material to Mr. Jones' decision to accept employment and to execute comprehensive IP-assignment agreements. Had Mr. Jones been aware of these material facts, he would not have joined the Company, nor would he have transferred his own source code and related inventions. These concealed facts were also material to Mr. Jones' decision to exercise stock options, expending money to do so.

Jones's Intellectual Property, Source Code, and Trade Secrets

36. Throughout his employment, Mr. Jones authored a substantial body of original source code, rendering software, shaders, technical designs, documentation, and related work product that became central to Light Field Lab's rendering pipeline. On information and belief, after Light Field Lab adopted Mr. Jones's light-field generation algorithms, almost all of its rendered content is generated using, and derived from, his work. This work product, and the trade secrets embodied in it, are the property whose

taking and retention underlie Mr. Jones's claims. Consistent with the preceding section, Mr. Jones does not seek to be named as an inventor on any patent; he seeks the return of, and compensation for, his own work.

37. Mr. Jones's original work included, without limitation: (a) a viewer-dependent light-field rendering method, which renders each portion of the display for the image a viewer should perceive from a given viewing position and distance — treating each waveguide aperture as a small window onto the scene — rather than by simulating the exact physical propagation of light through the display's optics, so as to present a clear, anti-aliased image of the intended content; (b) software Mr. Jones called "Acuity," which increases the clarity of the perceived light-field image by precisely modeling the display's unavoidable optical imperfections — including diffraction and the aberrations introduced by its waveguide elements — and then iteratively adjusting the rendered light field to pre-compensate for them, so that the image the viewer actually perceives more closely matches the intended image; in operation it identifies the display pixels that contribute light to each point in the viewer's perceived image, measures the difference between the perceived and the intended result, and propagates corrections back to the contributing pixels until that error converges; (c) a reusable light-field ray-generation library; (d) shader libraries for industry-standard renderers, including Arnold and V-Ray; (e) optical-simulation techniques and algorithms for modeling the propagation and behavior of light; and (f) additional proprietary rendering, optical-simulation, and shader methods, algorithms, and techniques that Mr. Jones developed and implemented in the course of his work. Mr. Jones does not purport to catalog every such method here; the complete body of his proprietary methods and techniques is embodied in the source code and work product that Light Field Lab took and has refused to return, and will be identified with further particularity as that material is produced. Mr. Jones developed this work during his employment and committed it — his implementation, with substantial in-code comments — to Light Field Lab's own source-control system, to which Karafin and Bevensee had access, beginning at the outset of his employment in September 2019 and continuing in the years before the patent applications described below.

38. On April 9, 2023, in a written communication to Mr. Karafin, Mr. Bevensee, his supervisor Mr. Berninger, and Light Field Lab's human-resources representative (Mr. Jones's April 9, 2023 written

complaint to management and human resources at pp. 1, 3, 5-6), Mr. Jones drew the recipients' attention to this work, describing it in his own words — including his ray-generation library, the shaders he had authored, and his prior work on Acuity — and articulated the viewer-dependent light-field concept. In that same communication, Mr. Jones explained that Mr. Karafin's prescribed interference-masking methodology "can only harm holographic image quality and cannot improve it," and that he had already "provided a proposed solution to improve image quality" for which his prior work on Acuity "provided evidence which supported the possibility of [his] proposal being successful." That communication, sent to the very individuals later named as inventors on the applications described below, contemporaneously documented that the work was Mr. Jones's and that it predated those applications.

39. With this work already residing in Light Field Lab's own source control, and with Mr. Jones having just drawn Karafin and Bevensee's attention to it, Light Field Lab filed two provisional applications naming only Karafin and Bevensee as inventors, with Mr. Jones uncredited: Application No. 63/458,938, filed April 13, 2023 — just four days after that written communication — (published as international application WO2024216300A2); and Application No. 63/523,028, filed June 23, 2023 — the day Mr. Jones's employment was terminated — (published as international application WO2025042476A1). Mr. Jones has reviewed both published applications and identifies them as describing his own methods. Both applications describe the viewer-dependent rendering method Mr. Jones authored (¶37) — rendering each portion of the display for the image a viewer should perceive from a given position, treating each aperture as a window onto the scene (WO2024216300A2 ¶¶ [0391], [0394]; WO2025042476A1 ¶¶ [0315], [0318]) — and both describe the perceived-image-optimization approach of his "Acuity" software (¶37) (WO2024216300A2 ¶¶ [0147], [0465]; WO2025042476A1 ¶¶ [0174], [0486]), combined with energy-modulation hardware drawn from Light Field Lab's foundational patents. Both applications employ renamed terminology paralleling the substitution described above — for example, "relative positioning reference surface" for the viewer's position (WO2024216300A2 ¶ [0443]; WO2025042476A1 ¶ [0367]), and "aggregated angular sampling range" for the cone-based antialiasing of Mr. Jones's method (WO2024216300A2 ¶ [0445]; WO2025042476A1 ¶ [0369]).

40. Given that Mr. Jones authored these methods, committed them to Light Field Lab's source control before these filings, and had just drawn Karafin's and Bevensee's attention to them, the only

reasonable inference is that Light Field Lab built these applications on his work; the precise extent to which his source code was copied is known to Defendants and to those into whose possession his source code has since passed, and is alleged on information and belief. Both applications incorporate by reference commonly-owned Light Field Lab filings; WO2025042476A1 in particular incorporates by reference two of Light Field Lab's patents — U.S. Patent No. 11,156,771 (WO2025042476A1 ¶ [0329]) and U.S. Patent No. 10,663,657 (id. ¶ [0461]) — together with a separate, now-abandoned Light Field Lab application, Application No. 16/064,145 (id. ¶ [0461]). Both of those patents belong to the same holographic-energy patent family that traces, through their respective international (PCT) applications, to the foundational provisional applications alleged above. In this manner, the applications built on Mr. Jones's work were bolted onto the same Lytro-derived foundation alleged above.

41. The Confidentiality and Proprietary Rights Agreement through which Light Field Lab claims to have obtained Mr. Jones's work product was procured by the same concealment alleged above; Mr. Jones contends it is void and of no effect as to that work. That overreach was not an improvisation at the moment of termination. The same onboarding agreement, in its "Exit Obligations" provision, purported from the outset to require Mr. Jones — upon termination or upon "the Employer's request at any time" — to "provide or return to the Employer any and all Employer Group property," expressly including his "work product" and any materials he "created … in connection with [his] employment," and to "delete or destroy all copies." (Dkt. 46-3 § 3(b).) Light Field Lab thus embedded in the very agreements it fraudulently induced Mr. Jones to sign the mechanism by which it would later claim his own source code and work product as the Company's — the same claim it pressed when it terminated him. Light Field Lab's own June 23, 2023 letter terminating Mr. Jones demanded that he return "any and all work product, files, data, source code, programs, tools, notes, reports, memoranda, records …" that he "received or prepared or helped to prepare in connection with [his] employment," which the letter defined as "Company Property" (Light Field Lab's June 23, 2023 termination letter at pp. 1-2) — an acknowledgment that Light Field Lab possessed Mr. Jones's source code and work product, which it had obtained through the fraudulently induced assignment. Light Field Lab pressed the same characterization in the separation agreement it presented to Mr. Jones that same day, which demanded that he surrender his work product and source code as the Company's property and treated that material

as the Company's confidential information that he could not use even on his own behalf, enforceable by injunction — Light Field Lab thereby claiming as its own the very work that, as alleged above, was never validly assigned to it and remained Mr. Jones's. (the Confidential Separation Agreement and General Release § 9 at p. 5.)

Employment, Failure to Accommodate, and Mr. Jones's Complaint

42. Throughout his tenure at LFL, Mr. Jones consistently received positive feedback regarding his job performance, a merit pay increase when he was promoted to Principal Engineer, and periodic incentive pay bonuses. He maintained positive personal relationships with his coworkers and management.

43. Mr. Jones was instrumental in the development of LFL's SolidLight holographic display platform. Mr. Jones worked out of LFL's office from September 30, 2019, through March 7, 2020, and thereafter he worked remotely from his residence in Seattle, WA.

44. Mr. Jones is a Type I Diabetic and suffers from a compromised immune system. (Mr. Karafin's August 12, 2019 recruitment email at p. 3.) Accordingly, Mr. Jones would be susceptible to severe illness and/or death if he were to contract COVID-19.

45. When LFL management announced that all of its employees would be required to return to in-office work by May 24, 2021, Mr. Jones requested that he be permitted to continue working remotely as an accommodation of his compromised immune system, which is a disability under federal and state law. At recruitment, after Mr. Jones had disclosed his health condition, Karafin had assured him that "[t]aking care of our employees is extremely important to us" and that "[y]our health is extremely important, and we wouldn't want you to do anything that puts that at risk." (Mr. Karafin's August 12, 2019 recruitment email at pp. 3-4.)

46. Although there does not appear to have been a formal accommodation process, LFL allowed Mr. Jones to continue working remotely and LFL management continued to provide Mr. Jones with positive feedback regarding his job performance. At no time did anyone in LFL management indicate that in-office work was an essential function of Mr. Jones' job duties.

47. In December 2022–January 2023, Mr. Jones' supervisor, Mr. Trevor Berninger, Director of Software, began having discussions with Mr. Jones to stop working remotely and return to in-office

work at LFL. Mr. Jones was surprised because he had been working remotely since March 7, 2020, and there had been no complaints about his job performance.

48. When Mr. Jones asked if there were performance issues that would give rise to the request that he return to in-office work, Mr. Berninger indicated that LFL did not have any issues with his job performance. When asked if there was a particular reason as to why LFL wanted him to return to in-office work, Mr. Berninger was very vague and unspecific and indicated that "it would just be better." Again, at no time did anyone at LFL indicate that working in-office was an essential job function of Mr. Jones' position.

49. Although Mr. Jones was open for discussion as to what would be reasonable accommodations for his return to in-office work, LFL did not engage in an interactive dialogue in this regard. In fact, Mr. Jones made repeated suggestions regarding masking protocol, testing protocol, social distancing, and ventilation, but LFL did not engage with Mr. Jones' suggestions.

50. Mr. Jones understandably began to feel very marginalized by LFL management. He understood that LFL management wanted him to return to in-office work, but management was unwilling to implement a reasonable protocol to minimize his risk of exposure to COVID-19. Mr. Jones sensed that his relationships with LFL management were becoming strained, when he had previously enjoyed very positive relationships with leadership.

51. In January 2023, Mr. Jones was assigned to work on masking interference for Wavetracing Optics to improve image quality. Mr. Jones was working closely with LFL's CEO, Mr. Jon Karafin, who was the subject matter expert in this area; Mr. Karafin defined the scope of work and methodology of the work. In March 2023, Mr. Jones advised Mr. Karafin that the methodology was unworkable and was unlikely to result in improved image quality. Mr. Jones suggested a number of alternative approaches to improve image quality, but Mr. Karafin insisted that Mr. Jones continue with the methodology he himself had prescribed. (Mr. Jones's April 9, 2023 written complaint to management and human resources at p. 3.)

52. The matter came to a head on April 6, 2023, when Mr. Karafin made disparaging remarks regarding Mr. Jones' work on the Wavetracing Optics during a software team meeting attended by approximately 10 people. Mr. Karafin stated that it had been nearly six months and that Mr. Jones had

failed to generate an image and indicated that it was unlikely that Mr. Jones' work would result in improved image quality. (Mr. Jones's April 9, 2023 written complaint to management and human resources at p. 2.)

53. Mr. Jones was dismayed that Mr. Karafin would publicly trivialize and disparage his work in such an aggressive manner in front of his coworkers. First, Mr. Karafin's statement was untrue; Mr. Jones had in fact generated images in January 2023. (Mr. Jones's April 9, 2023 written complaint to management and human resources at p. 2.) It was Mr. Karafin's own methodology that was unworkable, and Mr. Jones had advised Mr. Karafin that the methodology was unlikely to result in substantial image improvement in early March 2023. Despite Mr. Karafin's knowledge that the methodology he prescribed was unworkable, he refused to change course. Instead, he scapegoated Mr. Jones and implied that the lack of progress in image improvement was due to Mr. Jones' work performance, when he was well aware that the lack of progress was due to the fact that his own methodology had proved to be unworkable. On April 9, 2023, Mr. Jones submitted — by email to Light Field Lab's chief executive officer Mr. Karafin, to Mr. Bevensee, to his supervisor Mr. Berninger, and to Mr. Barnes, each a member of Light Field Lab management with authority over him — a written rebuttal of Mr. Karafin's disparaging comments and a complaint of hostile work environment, connecting Mr. Karafin's conduct to his disability (his Type I diabetes and resulting immunocompromised condition) and his disability-driven remote work. (Mr. Jones's April 9, 2023 written complaint to management and human resources at p. 1.) Mr. Jones observed that he had proven a viable solution to the problem described above — the same work that Light Field Lab incorporated, days later, into the patent applications described above (¶¶ 37-39), naming only Karafin and Bevensee and crediting Mr. Jones nowhere.

54. LFL retained an outside investigator to conduct an investigation of Mr. Jones' hostile work environment complaint. When Mr. Jones was interviewed by the investigator, he explained that he believed that Mr. Karafin's animosity towards him was due to the fact that he was working remotely because of his disability. Mr. Jones also explained that he had been under increased pressure from LFL to return to in-office work, despite his disability.

55. Mr. Jones continued working on interference masking on the Wavetracing Optics and, upon implementation of Mr. Karafin's methodology, it became apparent to LFL that the methodology did not

result in substantial image improvement and, in fact, resulted in a substantial reduction in the field of view. The technical concerns that Mr. Jones outlined in his complaint of April 9, 2023, were substantiated.

56. On or about June 16, 2023, Mr. Jones received an email indicating that the investigation had been concluded and that his claim of illegal hostile work environment based on disability had not been substantiated.

Termination

57. On June 23, 2023, Mr. Jones' employment was terminated. During the conference call it was indicated that "things aren't working out" and that, with the conclusion of the investigation, LFL was terminating Mr. Jones' employment. No one on the call stated, or otherwise indicated, that Mr. Jones was being terminated for poor performance or unprofessional behavior. Only later that same day did LFL assert those reasons, and then for the first time and in writing (see ¶58; Light Field Lab's June 23, 2023 termination letter at p. 1). Rather, LFL was terminating Mr. Jones for requesting accommodation and then making a complaint about illegal retaliation related to that request.

58. Later in the day on June 23, 2023, Mr. Jones received a written notice of termination, signed by Light Field Lab's Chief Operating Officer, John Dohm, stating that his employment was terminated "due to below-expectation performance and unprofessional behavior." The letter asserted that, "[b]ecause of these reasons, [the] Company had been preparing to terminate [his] employment," but that "after [he] made a complaint on April 9, 2023 against Jon Karafin, the Company put the termination process on hold" to allow the investigation, and that, "after the conclusion of the investigation, the Company resumed the termination process." (Light Field Lab's June 23, 2023 termination letter at p. 1.) During his nearly four-year tenure at Light Field Lab, no one had ever complained to Mr. Jones about poor performance or unprofessional behavior; and Light Field Lab's assertion that the decision to terminate had been made before his April 9, 2023 complaint was false and unsupported by any contemporaneous record.

59. Mr. Jones reported conduct that he reasonably believed was motivated by unlawful discrimination. LFL concluded its investigation of that complaint on or about June 16, 2023, and terminated Mr. Jones' employment on June 23, 2023, approximately one week later.

60. LFL's claim that it made a decision to terminate Mr. Jones' employment prior to the submission of his hostile work environment claim of April 9, 2023, is unsupported by any evidence.

61. LFL management never brought any job performance concerns to Mr. Jones, either orally or in writing, until April 6, 2023. In fact, Mr. Berninger advised Mr. Jones in December 2022 that LFL had no problems with Mr. Jones' job performance.

<u>Concealment of the Applications Built on Mr. Jones's Work</u>

62. Mr. Jones did not learn during his employment that Light Field Lab had filed the applications described above capturing his work. Karafin and Bevensee did not disclose those filings to him, and did not credit him in them. Consistent with the allegations above, Mr. Jones does not seek to be named an inventor on any patent or application; he alleges this non-disclosure and non-attribution as further evidence that Defendants took his work and concealed that they had done so.

<u>The Stock Options, Mr. Jones's Exercises, and the Continuing Concealment</u>

63. On December 9, 2019, Light Field Lab granted Mr. Jones a stock option (grant ES-25), issued by Light Field Lab from its 2017 Stock Incentive Plan, to purchase 215,000 shares of its common stock (the Company's 2019 offer letter § 3). The option was issued on Light Field Lab's behalf by Karafin and vested over the course of Mr. Jones's employment. (Dkt. 20-1 at p. 12 ["Issued by Light Field Lab"; "Issued from 2017 Stock Incentive Plan"]; p. 16 [grant "Signed by Jon Karafin"].) Light Field Lab later granted Mr. Jones a second option, dated October 31, 2022, to purchase 85,000 shares; none of those shares had vested at his termination, and all were cancelled.

64. Mr. Jones exercised that option on three separate occasions, each time paying Light Field Lab by electronic (ACH) funds transfer, at the exercise price of $0.70 per share, for shares of its common stock: (a) on December 10, 2020 — 10,000 shares (Stock Certificate CS-13), for $7,000; (b) on December 28, 2020 — 20,000 shares (Stock Certificate CS-14), for $14,000; and (c) on April 29, 2021 — 50,625 shares (Stock Certificate CS-15), for $35,437.50. In total, Mr. Jones acquired 80,625 shares of Light Field Lab common stock and paid the Company $56,437.50 to do so. Each such payment was a separate interstate transfer, processed through Carta, from Mr. Jones in Washington to Light Field Lab in California, whose operating account was held at Silicon Valley Bank (Dkt. 38-4 at p. 2), and settled on December 22, 2020 ($7,000), January 4, 2021 ($14,000), and May 6, 2021 ($35,437.50). Each

resulting certificate was approved and signed by Karafin as President and by Bevensee as Secretary, on separate dates. These facts are documented in records Light Field Lab has itself repeatedly placed before the Court — its 2017 Stock Incentive Plan, the Option and Exercise Agreements, and the Carta report of the grant and its three exercises (Dkt. 20-1 at pp. 12 [grant], 15–16 [the exercises creating Stock Certificates CS-13, CS-14, and CS-15, each transferred via ACH]; accord Dkt. 20-2 at pp. 13, 16, and Dkt. 30-2 at pp. 65, 68; the same records previously filed in the related action *Light Field Lab, Inc. v. Jones*, No. 4:23-cv-05344-YGR) — and the per-exercise share counts and amounts in Stock Certificates CS-13, CS-14, and CS-15 (Dkt. 52-1 at pp. 51–52, 75–93).

65. Each exercise was a separate decision by Mr. Jones to commit additional money to Light Field Lab, the value of which depended on the patent portfolio and business model Karafin had described to him. Until he exercised, Mr. Jones's options were contractual rights to acquire stock, and upon his first exercise — as of the December 10, 2020 issue date of Stock Certificate CS-13 (Dkt. 52-1 at pp. 71, 76) — he became a stockholder, increasing his holdings with each subsequent exercise. As a stockholder, Mr. Jones was owed the fiduciary duties that Light Field Lab's directors and officers — including Karafin and Bevensee — owe to a stockholder. Light Field Lab dealt with Mr. Jones in its own securities throughout — granting and administering the option, and selling him its stock upon each exercise — and Karafin and Bevensee approved and executed those transactions while in possession of the undisclosed facts concerning the portfolio's Lytro origin set forth above. At no point, whether while Mr. Jones held vested options or after he became a stockholder, did they disclose those facts to him. The facts were material to each exercise for the same reasons they were material to his decision to accept and continue employment; had he known them, he would not have exercised his options or paid the Company to do so.

66. To exercise the option, Mr. Jones was required to accept Light Field Lab's form Exercise Agreement through the company's Carta platform; by entering his name, his signature was applied to that form, which he was presented with no means or opportunity to negotiate, and which carried the restrictive terms whose nondisclosure during his recruitment is alleged at ¶31. (Dkt. 20-1 at p. 12 [grant-acceptance "Documents" list], pp. 15–16 [exercise document list].)

67. The 2019 offer letter that induced Mr. Jones's employment referenced the 2017 Stock Incentive Plan by name but did not provide it, and by its own terms defined the parties' agreement as comprising only that letter, the Confidentiality and Proprietary Rights Agreement, and an arbitration agreement (the Company's 2019 offer letter § 3 [naming the 2017 Stock Incentive Plan without providing it]; § 8 [Entire Agreement]); Light Field Lab first presented the Plan and the form Option Agreement to Mr. Jones on January 2, 2020, months after he had begun work and assigned his inventions to the company. (Dkt. 20-1 at p. 13.) That form imposed terms never disclosed to Mr. Jones during the procurement of his employment — including when Light Field Lab made the August 2019 equity representations that induced him to forgo his vesting Microsoft equity, and when he signed his onboarding agreements, among them the Confidentiality and Proprietary Rights Agreement (¶33) — comprising a repurchase and forfeiture right on termination, restrictions on transfer, required adherence to a voting agreement and a right-of-first-refusal and co-sale agreement, and the waiver described below (Dkt. 20-1 at pp. 29 [repurchase and forfeiture right], 48–50 [exercise-agreement terms]; Dkt. 20-2 at p. 45 [non-transferability, right of first refusal, and voting]).

68. On Mr. Jones's termination, Light Field Lab exercised that forfeiture: his unvested options were cancelled and the grant marked "Forfeited." (Dkt. 20-1 at p. 12; Dkt. 20-2 at p. 13.)

69. The form documents further purported to bind Mr. Jones to the terms of agreements that Light Field Lab never provided to him. The Option Agreement purported to make it a condition precedent that Mr. Jones "become a party to" both a "Voting Agreement" and a "Right of First Refusal and Co-Sale Agreement" — by "executing an adoption agreement or counterpart signature page agreeing to be bound by and subject to" their terms as a "Key Holder" and "Stockholder" — and the form Exercise Agreement recited that his shares would be "subject to … the transfer restrictions set forth in the Voting Agreement [and] the ROFR and Co-Sale Agreement." Light Field Lab never furnished either the Voting Agreement or the Right of First Refusal and Co-Sale Agreement to Mr. Jones — not when it made the August 2019 equity representations, not in his hiring packet, and not in the equity exhibits it has filed in this action — so that he could not have known or negotiated their terms. (Dkt. 20-1 at p. 44 [Option Agreement § 6(b)–(c)]; Dkt. 30-2 at p. 101 [Exercise Agreement § 3].)

70. Independently of that concealment, and without conceding that any of these instruments — imposed only after Light Field Lab had secured Mr. Jones's employment and the assignment of his work, and procured by the same nondisclosure alleged above — is valid or enforceable against him, Mr. Jones never became a party to either the Voting Agreement or the Right of First Refusal and Co-Sale Agreement even on the instruments' own terms. The Option Agreement provided that he would become a party only "at the request of the Company" and only "by executing an adoption agreement or counterpart signature page" agreeing to be bound as a "Key Holder" or "Stockholder" — a separate instrument that was never requested, presented, or executed, and that appears nowhere in the record. The equity documents Mr. Jones did sign were the form Option Agreement, at grant, and the form Exercise Agreement, upon each exercise; neither the Voting Agreement nor the Right of First Refusal and Co-Sale Agreement was among them. The form Exercise Agreement is not such an adoption agreement or counterpart signature page: it recites only that the shares are "subject to" the transfer restrictions of those agreements, not that Mr. Jones became a party to or agreed to be bound by their terms. (Dkt. 20-1 at p. 12 [grant-acceptance "Documents" list], pp. 15–16 [exercise document list], p. 44 [Option Agreement § 6(b)–(c)]; Dkt. 30-2 at p. 101 [Exercise Agreement § 3].)

71. Section 7 of that form Exercise Agreement, captioned "Waiver of Statutory Information Rights," purported to have Mr. Jones "unconditionally and irrevocably waive[]" his rights under Section 220 of the Delaware General Corporation Law to inspect Light Field Lab's stock ledger, stockholder list, and books and records, "until the first sale of Common Stock of the Company to the general public." (Dkt. 30-2 at pp. 103–104.) Light Field Lab never disclosed, during the procurement of his employment — including when it made the August 2019 representations that induced him to give up his Microsoft equity — that access to the very equity it had promised would later be conditioned on surrendering the statutory right to inspect the company's stock ledger, stockholder list, and books and records — a right whose exercise might have aided him in discovering the facts alleged above. By the time the form was placed before him, Light Field Lab had already obtained from Mr. Jones the benefits it sought — his employment and the assignment of his work — and Mr. Jones had already, and irreversibly, given up his vesting Microsoft equity in reliance on the equity Light Field Lab had promised him. That forfeiture became irreversible the moment Mr. Jones gave Microsoft notice of his

resignation in September 2019, before he had even begun work at Light Field Lab, and more than a year before Light Field Lab presented him with the form Exercise Agreement when he exercised the option. The form's terms were thus presented as an undisclosed precondition to Mr. Jones's receiving that promised equity: accepting them was his only means of realizing it, and refusing or objecting would not have restored what he had given up but only forfeited the equity Light Field Lab had promised him. For that reason — there being nothing to negotiate and nothing to be gained — Mr. Jones did not read the form Exercise Agreement, including the Section 7 waiver, when he accepted it through Carta.

The Retaliatory Action Against Mr. Jones

72. After Mr. Jones's counsel, in pre-litigation correspondence, stated that Mr. Jones had claims for disability discrimination, retaliation, wrongful termination, and defamation, and advised on October 12, 2023 that Mr. Jones would proceed with his administrative filings on those employment claims absent a response by October 18, 2023 (No. 4:23-cv-05344-YGR, Dkt. 33-2 at p. 2 (Buerger demand letter asserting "strong claims" for "defamation/false light, disability discrimination, and retaliation"); id., Dkt. 33-3 at pp. 46–47 (the parties' ensuing settlement emails, in which counsel set the October 18, 2023 response deadline); id., Dkt. 39 ¶ 4 (declaration of Alan Jones establishing the October 12, 2023 notice and the October 18, 2023 deadline)), Light Field Lab sued Mr. Jones the next day — on October 19, 2023 — in this District: *Light Field Lab, Inc. v. Jones*, No. 4:23-cv-05344-YGR (the "Declaratory-Judgment Action"). (See id., Dkt. 1 (declaratory-judgment complaint, filed October 19, 2023); id., Dkt. 55 at 4:22-25 (court's order reciting the same sequence — the October 18 deadline and Light Field Lab's next-day, October 19, 2023 filing).)

73. The Declaratory-Judgment Action pleaded a single claim — for a declaration that Mr. Jones had no rights to Light Field Lab's stock or to the value of his stock options under the company's 2017 Plan. Light Field Lab framed the action as a "contractual dispute" and alleged that "Jones breached the agreements," although, as the court later observed, the complaint "allege[d] no facts … that either party breached any of the Plan's terms." Light Field Lab knew, when it filed, that the parties' dispute concerned Mr. Jones's employment rather than any contract. In the pre-suit settlement correspondence its own counsel had described the matter as "a single plaintiff wrongful termination claim," and on September 27, 2023 its counsel had asked Mr. Jones's counsel point-blank whether he was claiming a

breach of contract: "Do you allege a breach of the Light Field Lab 2017 Stock Incentive Plan? … I understand your position to be that the value of the stock options are part [of] Alan's wages. Please confirm." Mr. Jones's counsel declined to assert any breach of the Plan: confirming, the next day, that Mr. Jones claimed "equity loss as part of Alan's wages," and expressly stating that "a discussion on damage characterization is premature at this point." Those communications are part of the record of the Declaratory-Judgment Action and were considered by the court. (No. 4:23-cv-05344-YGR, Dkt. 1 ¶¶ 3, 29; id., Dkt. 33-3 at pp. 27, 42, 45; id., Dkt. 55 at 4:14-21, 10 n.6.) Light Field Lab filed and maintained the action as a contract dispute notwithstanding. Having sued, Light Field Lab then offered to dismiss: in or about December 2023 it sent Mr. Jones a proposed "Release and Covenant Not to Sue" providing that, "[i]n consideration of Light Field Lab's agreement to dismiss its declaratory judgment complaint," Mr. Jones would release every claim relating to the Plan and covenant never to sue upon any such claim. While reciting that Mr. Jones could still bring his employment claims, the proposed release simultaneously required him to "release[] any damages based in any way on the Plan as compensation in connection with his Employment Claims" — that is, to surrender the value of the options he had lost, the principal economic component of those employment claims — and to represent that he entered the release "free of duress, undue influence or coercion." (No. 4:23-cv-05344-YGR, Dkt. 33-6 at pp. 2-3, 5.)

74. On May 8, 2024, the court dismissed the Declaratory-Judgment Action for lack of subject-matter jurisdiction, finding no actual case or controversy. The court found that Mr. Jones had "demanded the value of options (i.e., cash), as opposed to options, shares, or other equity interests," whereas Light Field Lab's claim was "premised on [his] having demanded equity interests, not cash." The claims Mr. Jones had actually threatened were employment claims; Light Field Lab had recast his demand for the cash value of his options as a demand for equity, manufacturing a contractual controversy that did not exist. (No. 4:23-cv-05344-YGR, Dkt. 55 at 13:1-4; id., Dkt. 58 at 2:6-9.) The court's dismissal rested on undisputed facts about the origin of the action: the court found it "undisputed that the claims that [Mr. Jones] threatened to bring against [Light Field Lab] before th[e] litigation began were employment claims (wrongful termination, employment retaliation and discrimination, and defamation/false light)," and that "the parties' dispute and discussions before the filing of th[e] lawsuit were about [Mr. Jones's] allegations of employment discrimination and retaliation and wrongful

termination" — the very employment claims Mr. Jones was pursuing when Light Field Lab sued him the next day (¶72). (Id., Dkt. 55 at 11:1-4, 12:1-3.) Rather than attempt to cure the defect, Light Field Lab abandoned the action, advising the court that it "no longer need[ed]" a declaratory judgment and had "elected not to amend." (Id., Dkt. 56 at 2:3-4.) At the time, Mr. Jones — who knew nothing of the patent applications Light Field Lab had filed on his work — understood the declaratory-judgment action as an effort to interfere with the wrongful-termination and discrimination claims he was pursuing. Light Field Lab, however, had filed those applications months earlier, in April and June 2023, naming only Karafin and Bevensee. Those filings were known to Light Field Lab and to Karafin and Bevensee, but not to Mr. Jones; and Light Field Lab, Karafin, and Bevensee were aware that, in any litigation of Mr. Jones's employment claims, the internal documents and communications concerning his work — and the applications filed on that work — would be subject to discovery. Neither application, moreover, was published until after the action had been dismissed — WO2024216300A2 (cover, field (43)) on October 17, 2024, and WO2025042476A1 (cover, field (43)) on February 27, 2025 — and Mr. Jones did not discover them until 2025.

Obstruction of Mr. Jones's Records Demands

75. Light Field Lab also withheld from Mr. Jones records he was entitled to inspect. Mr. Jones first sought his personnel file through his counsel in July 2023, and Light Field Lab never produced it. On June 3, 2024, Mr. Jones renewed the request in writing, expressly invoking California Labor Code section 1198.5. After Mr. Jones confirmed delivery, Light Field Lab's Chief Operating Officer, John Dohm, replied on June 7, 2024 that he was "[c]hecking to see if there is anything not previously provided" — although, as Mr. Jones reminded him, nothing had ever been provided. Hearing nothing further, Mr. Jones wrote again on June 27, 2024 to confirm he had received nothing and to state that Light Field Lab was "out of compliance" on both his 2023 and 2024 requests. Only then, that evening, did Light Field Lab produce a file — which Mr. Dohm presented as the company's "response … includ[ing] a copy of your personnel file." (Mr. Dohm's June 27, 2024 email producing Mr. Jones's personnel file at p. 2; the personnel file Light Field Lab produced at pp. 1-124.) The file was materially incomplete. It contained no payroll or wage records, no signed employment agreement (only blank copies), no completed onboarding or background-authorization forms, none of the equity agreements

governing the stock options Light Field Lab had granted him, and no internal communications concerning Mr. Jones of any kind — nothing as to his job performance, his promotion, or the decision to terminate him — even though Light Field Lab had told Mr. Jones it was terminating him for performance. Mr. Jones identified the deficiency the same evening; Light Field Lab did not cure it, responding only that Mr. Jones should direct any further inquiries about his statutory request to the company's outside litigation counsel.

76. Light Field Lab likewise refused Mr. Jones's demands, as a shareholder, to inspect its books and records. Mr. Jones had been a shareholder since his first option exercise in December 2020. Beginning on September 9, 2024, he requested access to the company's capitalization records; on December 11, 2024 he demanded in writing that Light Field Lab honor his shareholder rights, including his right to inspect the company's books and records — stating that he had "never had [his shareholder rights] fulfilled by Light Field Lab within the past four years" and that, as he understood it, "regulatory filings would require [the company] to have declared those as fulfilled" (Mr. Jones's December 11, 2024 shareholder-rights demand at p. 1); and he followed up on December 19, 2024 and again on February 25, 2025. Light Field Lab did not respond substantively. On August 1, 2025, Mr. Jones served a formal written demand under oath, pursuant to Section 220 of the Delaware General Corporation Law (8 Del. C. § 220) and Section 1601 of the California Corporations Code, to inspect Light Field Lab's books and records, delivered by certified mail (Mr. Jones's August 1, 2025 books-and-records demand letter at pp. 1-3; the returned certified-mail envelope at pp. 1-2; the USPS tracking record at pp. 1-3). Light Field Lab did not produce the records. Mr. Dohm responded that he had "been directed to limit responses" because Mr. Jones had "retained counsel at several points in the past," and the company's Director of Legal Affairs, Charles Yang, declined to communicate with Mr. Jones and referred the matter to Light Field Lab's outside litigation counsel. The books and records Mr. Jones demanded on August 1, 2025 are the same records the form Exercise Agreement had purported to make him waive (¶71). That waiver was contained in agreements procured by the same concealment alleged above and is, like the Confidentiality and Proprietary Rights Agreement (¶¶33, 41), void as to Mr. Jones; and by its own terms it reached only his rights as a stockholder, expired upon a public offering that never occurred, and did not reach his right, as a creditor of the insolvent estate, to inspect the company's records.

The Assignment for the Benefit of Creditors

77. Fourteen days after refusing Mr. Jones's Section 220 demand, and while Mr. Jones's lawsuit against it was pending, Light Field Lab executed, on August 15, 2025, a General Assignment for the Benefit of Creditors, transferring its assets to CMBG FBC-Light Field Lab, LLC (the "Assignee"). (the Assignee's Notice of Assignment for the Benefit of Creditors.) By the Assignee's own notice, Light Field Lab "closed in insolvency, electing to wind down and liquidate its business pursuant to an Assignment for the Benefit of Creditors"; the Assignee "was retained to act as Assignee in the insolvency proceedings" and "will be working to sell off any remaining company assets." Light Field Lab did not notify Mr. Jones — by then a creditor and claimant — until August 21, 2025, six days after the assignment was executed. Light Field Lab itself placed the Assignee's notice in the record of this action (Dkt. 30-2 at p. 188), and the assignment and its administration are documented at Dkt. 52-1, Ex. I, at pp. 357–358. A general assignment for the benefit of creditors is a private liquidation in which the debtor selects its own assignee, rather than a court appointing an independent trustee, and the assets are sold without court supervision, court approval, or the mandatory disclosure a bankruptcy would require. Light Field Lab elected that route in lieu of a federal bankruptcy, and itself selected the Assignee. (See Cal. Code Civ. Proc. § 493.010 et seq.; Dkt. 30 at 13:24-25.)

78. A general assignment for the benefit of creditors transfers all of the assignor's non-exempt assets by operation of law; the asset schedule is an administrative disclosure tool, not a limit on what passes. By the Assignment, Light Field Lab thus transferred all of its assets to the Assignee — including, but not limited to, its patent portfolio. The complete inventory of what was transferred is not known to Mr. Jones, because the Assignee has refused, despite Jones' repeated formal demands as a creditor, to provide a complete asset inventory and disposition report (Dkt. 52-1 at pp. 308, 312, 315, 335, 366, 373). The patent portfolio is, for the reasons alleged above, of clouded and materially impaired value, because the provenance and enforceability of those patents are clouded by the matters alleged above and because they embody the appropriation of others' work. The conduct of those who have controlled the portfolio since this action was filed confirms as much. As its patents and applications reached the deadlines for the modest maintenance, renewal, and issue fees required to keep them in force, those fees were paid on only a handful, while the great majority of those coming due were

allowed to lapse or go abandoned for nonpayment — many among them are patents tied to the very terminology and Lytro-derived origins alleged above. The assignee for the benefit of creditors did not pay the modest fees to keep these patents in force as they expired during its administration — a failure that was either a breach of its fiduciary duty to preserve the value of the estate, or a judgment, by a fiduciary charged with maximizing that value, that the patents were worth less than the fees. The purchaser that acquired the portfolio has done the same: it paid, late and with a surcharge, to preserve a small number while letting the great majority lapse — sparing the few it chose to keep and abandoning the rest. A party that believed the portfolio to be as valuable as it had been portrayed would have paid the small sums needed to preserve it. The source code and other intellectual property that were Mr. Jones's, by contrast, retained their value; the clouded condition of the patents does not diminish the value of that property or of the estate's other tangible assets. The assets of value for satisfying a judgment are therefore the other assets Light Field Lab owned and transferred to the Assignee — including its display prototypes, multiple pieces of manufacturing equipment, computer hardware such as servers and monitors, office equipment and furnishings, and its remaining cash and liquid assets — which the Assignee has sold but has not disclosed or accounted for, despite Mr. Jones's repeated demands as a creditor.

79. Through the Assignment, and then through the Assignee, Light Field Lab's assets were sold off. Under the Assignment, Light Field Lab transferred to the Assignee "all [of Light Field Lab's] rights in tangible and intangible assets," including its patent portfolio; the Assignee in turn represented that it conducted "multiple sales" of those assets. (the Assignee's March 17, 2026 Notice of Assignment Status at p. 1.) The disposition of Light Field Lab's patent estate is documented in two executed instruments later filed with the Patent Office. By the August 15, 2025 General Assignment, signed for Light Field Lab by Jon Karafin as its Chief Executive Officer, Light Field Lab conveyed to the Assignee all of its property and assets of every kind. By a Patent Assignment Agreement made effective January 15, 2026, the Assignee in turn conveyed Light Field Lab's worldwide patent estate — the patents and applications identified on a schedule to that agreement — to the purchaser, Pacific Light & Hologram, Inc. The Patent Assignment Agreement recites that the conveyance was made pursuant to an Asset Purchase Agreement, and that the assets were transferred "as is where is," with the Assignee making "no

representations or warranties whatsoever." (Patent Assignment Agreement at p. 3.) The conveyance was thus a sale of the patent estate to the purchaser for consideration, the amount and adequacy of which the Assignee has not disclosed. The identity of the purchaser did not appear in the patent assignment records at all: as alleged below, the Patent Office's assignment index continued to show Light Field Lab as the recorded owner of every patent (¶81). It appeared only on the face of the transfer instruments themselves (the Patent Assignment Agreement at pp. 1, 3), which were lodged with the Patent Office in early March 2026 but, as of June 21, 2026, have yet to be recorded in the assignment index. The Assignee, which owed Mr. Jones a fiduciary duty as a creditor of the estate, refused to disclose the purchaser's identity to him even then: Mr. Jones formally demanded it on February 27, 2026, renewed the demand on March 5, 2026, and on March 6, 2026 — after the transfer instruments had been lodged with the Patent Office — the Assignee told Mr. Jones it would not respond further while his litigation remained pending. Mr. Jones thus learned who the purchaser was not from the Assignee, and not from any record of patent ownership, but only by digging it out of the Patent Office's application full prosecution record himself. Despite Mr. Jones's repeated formal demands as a creditor, the Assignee has not disclosed what the other assets were, what they sold for, or to whom; nor has it disclosed, as to any sale, the consideration received or its value beyond its representation that warrants in one buyer formed part of the consideration for one sale (the Assignee's March 17, 2026 Notice of Assignment Status at p. 1). (Dkt. 52-1 at pp. 308, 312, 315, 335, 366, 373.) Because of that non-disclosure, Mr. Jones does not know the value of the consideration the Assignee received for any of the transferred assets, or whether it was adequate.

80. The Assignee has represented only that the sales were "approved by the senior secured creditor [who had] a first-priority lien on all [Light Field Lab] assets," without disclosing who that secured creditor is or whether it is affiliated with Light Field Lab's officers, directors, or controlling shareholders. (Dkt. 52-1 ¶ 8; the Assignee's March 19, 2026 status-update email at p. 1.) John Dohm, Light Field Lab's former Chief Operating Officer, told Mr. Jones in telephone calls on November 19, 20, 22, and 24, 2025 — after this action had been filed and after the Assignment — that a majority shareholder had voted to approve the Assignment and that the company's board members had all resigned beforehand.

81. As of the dates Mr. Jones obtained the Patent Office's assignment records, neither transfer was yet reflected in that Office's assignment index. On March 6, 2026, Mr. Jones obtained the Patent Office's assignment transaction history for Light Field Lab's patents; it showed that the assignment index still recorded Light Field Lab, Inc. as the owner of every patent and reflected no recorded conveyance to the Assignee or to the purchaser. (Dkt. 52-1 ¶ 12 (Jones Decl.) & Dkt. 52-1, Ex. M (Patent Assignment Abstracts of Title; e.g., id. at p. 619).) The Statement under 37 C.F.R. § 3.73(c) accompanying the Patent Assignment Agreement recites that the conveyance was submitted to the Office's Assignment Branch for recordation on March 4, 2026, and that no reel or frame number had yet been assigned. (the Patent Assignment Agreement at pp. 1-2.) In the records of the Patent Office that govern patent title, Light Field Lab therefore continued to appear, and as of June 21, 2026 still appears, as the owner of the very patents it had purported to assign.

82. Notwithstanding the August 15, 2025 Assignment that purported to transfer all of Light Field Lab's assets, including the patent portfolio, Light Field Lab and its agents have, after that date, repeatedly asserted in this action that Light Field Lab presently owns the portfolio. On November 18, 2025 — more than three months after the Assignment — the Defendants submitted a declaration from Charles Yang, who declared under oath that he had served as Light Field Lab's Director of Legal Affairs and had been responsible for managing the company's patent portfolio, and that a Patent Office assignment search showed Light Field Lab "owns 17 provisional patent applications and 13 PCT international patent applications" and "is the listed applicant on 355 patent applications globally." (Dkt. 38-2 ¶¶ 1, 2, 5, 7.) In their motions to dismiss and reply filed after the Assignment, the Defendants likewise represented to this Court that Light Field Lab presently owns the portfolio — that "LFL does own the patents," which the Patent Office "has issued … to LFL," and that "Light Field Lab, Inc. … would still maintain ownership of the patents." (Dkt. 38 at 11:1-5, 5:8-9 (filed November 18, 2025).) Thus, after a transfer that purported to convey the portfolio away, the pleaded Defendants continued to assert in this action that Light Field Lab presently owns it, even as the Patent Office's record of title still showed Light Field Lab as owner (¶81). That Light Field Lab and its agents have continued to assert ownership of, and to ascribe value to, a portfolio of hundreds of patents and applications cannot be reconciled with the conduct of those who have controlled that portfolio, who have allowed much of it to

lapse and go abandoned for nonpayment of the modest fees required to keep it in force (¶78). By these allegations Mr. Jones does not, in this action, seek to be adjudged the owner of, or to obtain title to, any patent or patent application, nor does he ask this Court to correct the inventorship of record; these facts are pleaded solely to establish the circumstances of the transfer.

83. Mr. Jones's own intellectual property — his source code, his trade secrets, and the other work product embodying his inventions — was not Light Field Lab's to assign. As alleged above, the agreement by which Light Field Lab purported to acquire that work was procured by the concealment alleged above and is void; the work never validly passed to Light Field Lab and was therefore not its property to transfer. The General Assignment nonetheless expressly swept into the estate, among Light Field Lab's assets, its "source codes, software, and related documentation" and its "choses in action." (the General Assignment § 1(a).) In that same instrument, Light Field Lab expressly represented and warranted that no asset — including its intellectual property, which it acknowledged "may be subject to restrictions on the use or transfer" — had been "transferred, used, or removed … in a manner that interferes with the rights and interests of a third part[y]" or that "may constitute a breach of any contract with such third part[y]." (the General Assignment § 4.) That warranty was false: the source code and work product swept into the estate were Mr. Jones's, taken from him as alleged above, so that Light Field Lab conveyed into the estate — and warranted as free of any third party's claim — the very property of Mr. Jones it had no right to assign. Light Field Lab gave that warranty knowing of Mr. Jones's claim to the very property it was warranting free of any third-party claim: when it executed the General Assignment on August 15, 2025, it had been a named defendant for nearly two months in this action, which Mr. Jones had filed on June 17, 2025 and which asserts his claim to that source code and work product. Light Field Lab thus warranted the estate free of any third party's interfering claim at the very time it was defending such a claim, brought by Mr. Jones, in this Court. Mr. Karafin, who signed that assignment for Light Field Lab, thereby purported to convey beyond Mr. Jones's reach the very source code and work product that, as alleged above, were never Light Field Lab's to assign. Mr. Jones repeatedly put the Assignee on notice of his claim to that property: on August 29, 2025, days after learning of the Assignment, his counsel served a formal demand on the Assignee for the immediate cessation of any sale, licensing, transfer, or disposition of the patents and source code, and for the

preservation of all source-code repositories, version-control logs, and development environments (Dkt. 52-1, Ex. A, at pp. 6–7). Mr. Jones thereafter filed proofs of claim and a proof of interest in the assignment proceeding. (Dkt. 52-1 at pp. 28, 50-51.) Notwithstanding his preservation demand, the Assignee did not account for Mr. Jones's source code and proceeded with the disposition of the estate's assets. The Assignee later offered Mr. Jones a single patent it had carved out of the sale in exchange for a release of his claims. (Dkt. 52-1 at p. 376.) The Assignee's representation that this one foundational patent was not included in the portfolio sale is borne out by the transfer instruments themselves: that patent does not appear on the schedule by which the balance of the estate's patents was conveyed to the purchaser, even though the continuation patents that descend from it were conveyed. (the Patent Assignment Agreement at pp. 6-32.) The holders thus peeled a single foundational patent off the sale while selling its descendants.

84. The General Assignment itself required the Assignee to reserve for disputed claims. Section 5(i)(vi) provides that "[n]o payment shall be made to any creditor whose claim is otherwise disputed until such time as that creditor's claim is resolved," and that the disputed creditor's "otherwise pro-rata share of such distribution shall be fully reserved for by the Assignee until such time as the dispute is resolved." (the General Assignment § 5(i)(vi); see also Dkt. 52-1 at p. 60 (Mr. Jones's reserve demand).) Mr. Jones's claims are disputed and are the subject of this pending action. On February 18, 2026, Mr. Jones served a formal written demand that the Assignee reserve for his claims under Section 5(i)(vi). The Assignee did not reserve for, account for, or segregate Mr. Jones's claims or his source code. It stated that it "cannot expend estate resources addressing speculative issues while litigation remains pending" and that it "do[es] not anticipate further correspondence on these issues while your litigation remains pending" (Dkt. 52-1 at p. 360), and it proceeded to complete the liquidation and wind up its administration, holding nothing for Mr. Jones.

85. On information and belief, the senior secured creditor that approved the sales, the purchaser of the transferred assets, and the majority shareholder who approved the Assignment are affiliated with Light Field Lab's officers, directors, or controlling shareholders, or are one and the same person, persons, entity, or entities. That belief rests on (a) the Assignee's refusal, despite Mr. Jones's repeated demands, to disclose the identity of the purchaser or of the secured creditor, which is itself probative of

their affiliation with Light Field Lab's principals (¶¶79-80); (b) Mr. Dohm's account that the Assignment was approved by a controlling shareholder after the board had resigned (¶80); (c) the ordinary structure of venture-backed startup financing, in which a first-priority security interest in all of a company's assets is commonly held by the company's lead seed- or Series A-round investor, who frequently requires a seat on the board as a condition of its investment; and (d) the Assignee's course of conduct described above — its withholding of the identity of the purchaser and the secured creditor even after Mr. Jones's written demands (¶¶79-80); its sale of the estate's assets after Mr. Jones's written demand that it cease any disposition and preserve them (¶83); its refusal to reserve for Mr. Jones's disputed claim as Section 5(i)(vi) of the Assignment required (¶84); its offer of a single carved-out patent in exchange for a release of his claims (¶83); and its refusal of further correspondence "while [his] litigation remains pending" (¶84) — every step of which, so far as is apparent to Mr. Jones, has run in the same direction, favoring those persons and disfavoring Mr. Jones and the estate's other creditors, several of those steps exposing the Assignee to liability rather than advancing the orderly, lowest-cost liquidation for which an assignee is ordinarily retained, and none of them explained by the legitimate administration of the estate or by any compensation the Assignee has disclosed, the Assignee having refused to produce its fee agreement.

86. In this manner, while this action — which Mr. Jones had filed on June 17, 2025 — was pending, Light Field Lab transferred substantially all of its assets — the patent portfolio it claimed to own, conveyed onward by the Assignee to Pacific Light & Hologram, Inc., whose identity as the purchaser the Assignee never disclosed to Mr. Jones, who had to uncover it for himself from the prosecution records of Light Field Lab's hundreds of patents and applications, the assignment index all the while still showing Light Field Lab as the owner of every patent (¶¶79, 81), and the source code and other intellectual property that were Mr. Jones's, swept into the estate — through a private assignment, leaving the purchaser or purchasers of the estate's remaining assets, the consideration received for any of the sales, and the approving secured creditor undisclosed, and doing so outside any bankruptcy proceeding subject to court supervision. Having conveyed away everything of value, Light Field Lab was left a corporation with no disclosed assets from which a judgment in Mr. Jones's favor could be satisfied. By a Notice of Status dated March 17, 2026, the Assignee declared that it had completed

multiple sales and the administration of the estate; that, as a component of the consideration for one sale, it had obtained warrants in the buyer, which it represented are speculative and have no current determinable value; that the estate remained encumbered by a secured creditor's lien that the sale proceeds were insufficient to satisfy; and that no creditor — priority or unsecured — and no equity holder received any distribution, the estate having no funds remaining to distribute to its creditors or investors. (the Assignee's March 17, 2026 Notice of Assignment Status at p. 1; the Assignee's March 19, 2026 status-update email at p. 1.) The Assignee thus represented that the undisclosed secured creditor absorbed the available proceeds and that Mr. Jones, like every other creditor and equity holder, received nothing. That the Assignee took, for one of the sales, warrants — a right to acquire equity — in the buyer rather than cash is significant. Cash is a closed, one-time payment: had the sale been for cash, that cash, once received and applied — even toward the approving secured creditor — would have ended any continuing connection between Light Field Lab, its former officers, directors, and controlling shareholders, and the assets conveyed away. Warrants operate differently. Equity in the buyer — equity whose value, by the terms of the sale, flows to the same secured creditor that approved the sale — is not a closed payment but an open-ended, continuing stake in the buyer's enterprise, and it created a means by which those persons or entities, if (as alleged above, ¶85) they stand behind the buyer or that secured creditor, could retain an interest in, and a measure of control over, the acquiring entity that now holds those assets, even though Light Field Lab itself transferred the assets away and retains nothing. On information and belief, the arrangement thus preserves for those persons or entities a continuing financial stake in the value of the assets Light Field Lab conveyed away — not the assets themselves, nor any divided share of them, but an undivided equity interest in the acquiring entity, which holds the transferred assets among its own other assets — while Mr. Jones and the estate's other creditors receive nothing. The extent of that interest, the degree to which its value tracks the transferred assets in particular rather than the acquiring entity's enterprise as a whole, and whether and through what intermediate entities those persons or entities hold it, are among the matters the Assignee has refused to disclose (¶79).

Light Field Lab's Void Corporate Status

87. Light Field Lab is no longer a corporation in good standing. According to the records of the Delaware Division of Corporations (File No. 6225868), Light Field Lab's registered agent resigned on January 13, 2026; Light Field Lab did not appoint a replacement; and on February 12, 2026 the State of Delaware forfeited Light Field Lab's charter on that ground (see Del. Code Ann. tit. 8, § 136). As of that record, Light Field Lab also owed $194,330.40 in unpaid Delaware franchise tax and had no registered agent of record. Mr. Jones has asked the Court to take judicial notice of the Delaware entity-status record (Dkt. 63 at 2:7-16 & p. 4.)

88. Light Field Lab is thus a void and forfeited Delaware corporation. Under Delaware law, a corporation whose charter has been forfeited or declared void is not dissolved and is not afforded the statutory winding-up period that 8 Del. C. § 278 provides for dissolved corporations; rather, its powers are rendered inoperative, including the power to dissolve, wind up, sue and be sued. Such a corporation has ceased to exist and has lost any standing to sue, be sued, or be heard, even if represented by counsel. A corporation's capacity to sue and be sued is determined by the law of the State under which it is organized. Fed. R. Civ. P. 17(b)(2). Having transferred away its assets through the Assignment described above and then forfeited its charter, Light Field Lab is an entity without assets, without a registered agent, and without the corporate capacity to act. The indicia of ownership Light Field Lab retained in the property it purported to assign — the unchanged Patent Office record of title and its own assertions of present ownership (¶¶81–82) — existed as of and after the August 15, 2025 Assignment, whereas Light Field Lab's loss of corporate capacity dates only from its February 12, 2026 charter forfeiture; the two are not inconsistent.

A Continuing Course of Conduct

89. The matters set forth above describe a single, continuous course of conduct rather than isolated events. Its method took shape before Mr. Jones was ever recruited. While still employed at Lytro, Karafin and Bevensee filed the foundational provisional applications for the benefit of Light Field Lab in July 2016, incorporated Light Field Lab that November while still at Lytro, and departed Lytro the following spring; Light Field Lab then built its patent portfolio upon those provisionals, re-labeling under new terminology the light-field architecture they had described at Lytro and withholding the

earlier Lytro prior art from the Patent Office, so that the derivation of that work would not be apparent on the face of the documents. The pattern was thus already in motion — to obtain and retain the benefit of work that was not theirs, and to conceal how they had obtained it — and its objects, at that stage, were others' work and the Patent Office, not Mr. Jones. When Light Field Lab recruited Mr. Jones in 2019, it turned that same method on his work. From that recruitment to the present, Light Field Lab and its principals acted repeatedly to the same end: they induced Mr. Jones's employment and his intellectual-property assignments through the representations and omissions alleged above; they filed patent applications on his work without crediting him; they withheld the personnel and corporate records he was entitled to inspect, records bearing on his claims and on their patent-filing activity; and then, while this action was pending and days after refusing his demand to inspect those records, they placed the company's assets beyond his reach — assigning them, through a private assignment for the benefit of creditors outside any court-supervised proceeding, to an assignee who sold the patent portfolio onward to a purchaser whose identity the Assignee withheld and that Mr. Jones could learn only by extracting it himself from the Patent Office's prosecution records (¶¶79, 81), leaving the purchaser or purchasers of the estate's remaining assets, the consideration for any of the sales, and the approving secured creditor undisclosed; the property so transferred included Mr. Jones's own work, which was not Light Field Lab's to convey, and the patents the assignment purported to sweep away, as to which Light Field Lab remained the recorded owner in the Patent Office even as it asserted in this action that it still owned them; and the company then forfeited its corporate existence, leaving an entity without disclosed assets from which a judgment could be satisfied. From the foundational filings in 2016 through Mr. Jones's recruitment in 2019 to the transfer and forfeiture of 2025 and 2026, each step advanced or protected the same objective. That course of conduct has not ended. The source code and trade secrets taken from Mr. Jones, and the patent portfolio built on concealed work, continue to be held and exploited — the patents by the purchaser identified only in the Patent Office's record, and the source code and trade secrets by a holder that remains undisclosed — while the purchaser or purchasers of the estate's other assets, the approving secured creditor, and the persons who stand behind them remain concealed. On information and belief, and as alleged at ¶¶85–86, the same persons who owned and controlled Light Field Lab continue to control and benefit from those assets through that entity, so that

the concealment, and the exploitation of property taken from Mr. Jones, are ongoing and, absent the disclosure he seeks, threaten to continue.

**CAUSES OF ACTION**

FIRST CAUSE OF ACTION

*(Retaliatory Termination — Cal. Lab. Code § 1102.5) (Against Light Field Lab)*

90. Mr. Jones incorporates by reference paragraphs 1 through 11 and 42 through 71 above as though fully set forth herein.

91. At all relevant times, Light Field Lab was Mr. Jones's employer within the meaning of California Labor Code section 1102.5, and Mr. Jones was its employee. This cause of action is brought against Light Field Lab only.

92. Mr. Jones engaged in activity protected by California Labor Code section 1102.5(b). On April 9, 2023, he submitted to Light Field Lab — to its chief executive officer Mr. Karafin, to Mr. Bevensee, and to his supervisor Mr. Berninger, among others, each a person with authority over him — a written complaint of a hostile work environment connecting Mr. Karafin's conduct to his disability and disability-driven remote work (¶53). During Light Field Lab's ensuing investigation, he further disclosed that he believed Mr. Karafin's animosity toward him, and Light Field Lab's pressure on him to return to in-office work, were because he worked remotely on account of his disability (¶54). Through these disclosures, Mr. Jones disclosed, to persons with authority over him, information that he had reasonable cause to believe evidenced a violation of the California Fair Employment and Housing Act's prohibitions against disability discrimination, disability-based harassment, and failure to accommodate (California Government Code section 12940), as alleged at paragraphs 44 through 50, 53, 54, and 56. That Mr. Jones directed his complaint in part to Mr. Karafin himself, whose conduct it concerned, does not deprive the disclosure of protection.

93. In the alternative and independently, Mr. Jones disclosed information that he had reasonable cause to believe evidenced a violation of a workplace health-and-safety rule or regulation (e.g., Cal. Code Regs. tit. 8, §§ 3203, 3205): he repeatedly requested that Light Field Lab adopt masking, testing, social-distancing, and ventilation measures to protect him — a known immunocompromised employee

— from exposure to COVID-19, and Light Field Lab refused to respond to or implement any such measure (¶¶44, 49–50).

94. Mr. Jones had reasonable cause to believe that the conduct he disclosed was unlawful (¶59). Section 1102.5(b) protects such a disclosure whether or not the conduct disclosed in fact constituted a violation; an actual violation need not be proved, and Light Field Lab's determination that his complaint was "not substantiated" (¶56) does not defeat his protected activity. The disclosures were protected even though made internally to Light Field Lab and its investigator rather than to a government agency, and Mr. Jones was not required to exhaust any administrative remedy before bringing this claim (California Labor Code section 244(a)).

95. Light Field Lab subjected Mr. Jones to an adverse employment action by terminating his employment on June 23, 2023 (¶¶57–58).

96. Mr. Jones's protected activity was a contributing factor in his termination. Light Field Lab terminated him on June 23, 2023, around one week after it concluded, on or about June 16, 2023, its investigation of the very complaint at issue (¶¶56, 59) — a temporal proximity supporting an inference of retaliatory intent.

97. Light Field Lab's stated reasons for the termination are pretextual and shifting. On the termination call, Light Field Lab said only that "things aren't working out" and tied the decision to the conclusion of the investigation, stating no performance reason (¶57); only later that day did its letter assert "below-expectation performance and unprofessional behavior" (Light Field Lab's June 23, 2023 termination letter at p. 1) for the first time, and falsely state that the decision to terminate had been made before Mr. Jones's April 9, 2023 complaint (¶58). That assertion is unsupported by any evidence (¶60); no performance concern had ever been raised before April 6, 2023; and Mr. Berninger had confirmed in December 2022 that Light Field Lab had "no problems" with Mr. Jones's job performance (¶¶47–48, 61).

98. Under California Labor Code section 1102.6, because Mr. Jones's protected activity was a contributing factor in his termination, Light Field Lab can avoid liability only by proving, by clear and convincing evidence, that it would have terminated him for legitimate, independent reasons even had he not engaged in the protected activity. That same-decision showing is Light Field Lab's affirmative

burden, not an element of Mr. Jones's claim, and it cannot be resolved on the pleadings; on the facts alleged, Light Field Lab cannot carry it.

99. As a direct and proximate result of Light Field Lab's retaliation, Mr. Jones has suffered, and continues to suffer, damages. The principal component of his economic loss is the value of the stock options and equity that were a central part of his compensation and that he lost as a result of the termination — a loss his subsequent employment has not replaced; the record reflects that Mr. Jones claimed the lost value of that equity as part of his wages (¶¶63–71, 73–74). He has also suffered loss of wages and benefits, including during periods of unemployment, and other economic and consequential losses, all in amounts to be proven at trial.

100. As further evidence of Light Field Lab's retaliatory intent, after the termination — when Mr. Jones's counsel gave notice that Mr. Jones would pursue his employment claims — Light Field Lab filed a declaratory-judgment action against him the day after counsel's stated deadline passed, which a federal court later dismissed for lack of subject-matter jurisdiction, coupled with a proposed release seeking his surrender of the equity value at the heart of those claims (¶¶72–74). These facts are alleged solely as evidence of Light Field Lab's retaliatory intent, and not as an independent cause of action.

101. Mr. Jones is entitled to recover his damages, together with the civil penalty and attorney's fees authorized by California Labor Code section 1102.5.

<u>SECOND CAUSE OF ACTION</u>

*(Wrongful Termination in Violation of Public Policy) (Against Light Field Lab)*

102. Mr. Jones incorporates by reference paragraphs 1 through 11 and 42 through 71 above as though fully set forth herein.

103. At all relevant times, Light Field Lab was Mr. Jones's employer and Mr. Jones was its employee (¶11, ¶¶42–43). This cause of action is brought against Light Field Lab only.

104. California has a fundamental, substantial, and well-established public policy — embodied in the California Fair Employment and Housing Act, California Government Code section 12940(a), (m), and (n) — against discriminating against employees because of disability, against refusing to provide them reasonable accommodation, and against failing to engage in a timely, good-faith interactive process. That policy inures to the benefit of the public at large, and was well established long

before June 2023. Light Field Lab violated that policy: it knew Mr. Jones was a person with a disability, refused to engage with his requests for accommodation of his immunocompromised condition, and marginalized him (¶¶44–50, 54). Light Field Lab further violated that policy by terminating Mr. Jones because of his disability and his disability-driven remote work, and because he had requested accommodation of his immunocompromised condition (California Government Code section 12940(a), (m)). Mr. Karafin's animosity toward Mr. Jones arose because Mr. Jones worked remotely on account of his disability (¶¶53–54); Light Field Lab pressed him to abandon that accommodation and return to in-office work despite his disability (¶¶47–50, 54); and it then terminated him in a decision in which his disability, his disability-driven remote work, and his requests for accommodation were each a substantial motivating reason (see ¶¶53–54, 57).

105. That same fundamental public policy forbids retaliation against an employee for opposing disability discrimination, for requesting reasonable accommodation, or for complaining of a disability-based hostile work environment (California Government Code section 12940(h), (m)). Light Field Lab cannot invoke the Act's administrative scheme as an exclusive remedy; the public policy against disability discrimination and retaliation that the Act embodies independently supports a common-law action for wrongful termination in violation of public policy. Light Field Lab also violated that policy by terminating Mr. Jones after, and because of, his April 9, 2023 complaint and his disclosures during the ensuing investigation (¶¶53–54, 56–59).

106. Independently and in the alternative, the termination violated the fundamental public policies embodied in California Labor Code section 1102.5, which protects employees who disclose conduct they reasonably believe to be unlawful (as alleged in the First Cause of Action), and in California's workplace health-and-safety policy, embodied in California Labor Code section 6310 and the regulations adopted thereunder, which protects employees who seek protection from workplace hazards. Mr. Jones, a known immunocompromised employee, repeatedly sought masking, testing, social-distancing, and ventilation measures against exposure to COVID-19, and Light Field Lab refused (¶¶44, 49–50, 53–54, 59). Each of these policies is fundamental, substantial, well established, and public, and any one of them independently supports this cause of action.

107. Light Field Lab terminated Mr. Jones's employment on June 23, 2023 (Light Field Lab's June 23, 2023 termination letter at p. 1; ¶¶57–58).

108. Each of Mr. Jones's disability, his disability-driven remote work, and his requests to accommodate his condition was a substantial motivating reason for the termination (California Government Code section 12940(a), (m)); and, independently, his April 9, 2023 complaint and his investigation disclosures were a contributing factor in, and a motivating reason for, the termination (California Government Code section 12940(h); California Labor Code sections 1102.5, 1102.6). Light Field Lab terminated him around one week after it concluded, its investigation of that complaint (¶¶56, 59). Light Field Lab's stated reasons are pretextual and shifting: on the termination call it stated no performance reason and tied the decision to the conclusion of the investigation (¶57); only later that day did its letter assert "below-expectation performance and unprofessional behavior" (Light Field Lab's June 23, 2023 termination letter at p. 1) for the first time, and falsely state that the decision to terminate had been made before Mr. Jones's April 9, 2023 complaint (¶58); no performance concern had ever been raised before April 6, 2023; and Mr. Berninger had confirmed in December 2022 that Light Field Lab had "no problems" with Mr. Jones's job performance (¶¶47–48, 60–61).

109. As a direct and proximate result of the termination, Mr. Jones has suffered and continues to suffer damages. The principal component of his economic loss is the value of the stock options and equity that were a central part of the compensation for which he was hired and that he lost as a result of the termination — a loss his subsequent employment has not replaced. He has also suffered loss of wages and benefits, including during periods of unemployment; emotional and mental distress, humiliation, and anguish; and other economic and consequential losses, all in amounts to be proven at trial.

110. Light Field Lab acted with malice and oppression — that is, with a willful and conscious disregard of Mr. Jones's rights — in terminating a known-disabled employee because he complained of disability discrimination, and in fabricating a false written justification asserting that the decision to terminate had been made before his complaint (¶¶44, 58, 60–61). That malice and oppression were the conduct of Light Field Lab's officers, directors, and managing agents, or were authorized or ratified by them, including Mr. Karafin, its co-founder, Chief Executive Officer and President, and a director (¶3),

and Mr. Dohm, its Chief Operating Officer, who signed the termination letter (¶58). Mr. Jones is therefore entitled to exemplary and punitive damages under California Civil Code section 3294.

111. As further evidence of Light Field Lab's retaliatory intent, after the termination — when Mr. Jones's counsel gave notice that Mr. Jones would pursue his employment claims — Light Field Lab filed a declaratory-judgment action against him the day after counsel's stated deadline passed. The action was premised on a contractual controversy that did not exist: Light Field Lab recast Mr. Jones's demand for the cash value of his options as a demand for equity in order to manufacture a contract dispute, and pleaded a breach unsupported by any facts. The court so found, dismissing the action for lack of subject-matter jurisdiction because there was no actual case or controversy, whereupon Light Field Lab abandoned it rather than cure — all while pressing a proposed release seeking Mr. Jones's surrender of the value of the options at the heart of his employment claims (¶¶72–74). In serving that action, Light Field Lab — acting through an agent for whose conduct it is responsible as principal — bypassed Mr. Jones's offer to waive personal service and instead dispatched a process server who, while wearing body armor and a firearm, trespassed onto Mr. Jones's property at night — including into areas at the back of the home reachable only by trespassing — shined lights into the residence, banged on its windows, and kept the home under surveillance, directing that conduct at a former employee it knew to be immunocompromised, in the very residence his condition required him to treat as a place of safety. Mr. Jones documented that conduct contemporaneously, within weeks of its occurrence, in his filings in that action (Light Field Lab v. Jones, No. 4:23-cv-05344-YGR (N.D. Cal.), Dkt. 9 at p. 1 (filed Nov. 13, 2023) and Dkt. 23 at 5:19-28 (filed Dec. 18, 2023)). That service-related conduct was noncommunicative and independently tortious — an independent wrongful act whose gravamen is the tort itself, not any litigation communication — and is therefore not within the litigation privilege. The foregoing is alleged solely as evidence of Light Field Lab's retaliatory intent, malice, and conscious disregard of Mr. Jones's rights, and not as an independent cause of action.

112. Mr. Jones is entitled to recover his compensatory damages, together with exemplary and punitive damages under California Civil Code section 3294.

<u>THIRD CAUSE OF ACTION</u>

*(Fraud and Deceit — Cal. Civ. Code §§ 1709, 1710, 1572) (Against Light Field Lab, Jon Karafin, Brendan Bevensee, and Does 1 through 10)*

113. Mr. Jones incorporates by reference paragraphs 1 through 41, 62 through 71, and 77 through 86 above as though fully set forth herein. This cause of action is brought against Light Field Lab, Mr. Karafin, Mr. Bevensee, and Does 1 through 10. Mr. Jones does not seek to invalidate any patent or to be named an inventor on any patent (¶¶13, 121); he seeks relief only for the fraud practiced on him. This claim is independently actionable notwithstanding that the fraud arose in the course of the parties' employment and equity relationship, because its elements are established independently of any contract and the concealment exposed Mr. Jones to harm beyond the parties' contractual contemplation.

114. At all relevant times, the facts concerning the origin and provenance of Light Field Lab's patent portfolio — that its foundational applications derived from light-field inventions Mr. Karafin and Mr. Bevensee had contributed to, as among the named inventors, at Lytro, that the governing terminology had been changed one-for-one so that the derivation would not be apparent on the face of the documents, and that the single most material Lytro reference had been withheld from the Patent Office across five information-disclosure statements — were known or accessible only to Defendants, and Defendants knew those facts were not known to, and were not reasonably discoverable by, Mr. Jones (¶¶15–23, 34–35). Although the underlying patent filings were public, the derivation was not apparent on their face and, regardless, could not be recognized from Light Field Lab's patents alone (¶¶18, 35). The same was true of the restrictions encumbering the equity Mr. Jones was offered (¶¶31, 67, 69–71): the governing Voting Agreement and Right of First Refusal and Co-Sale Agreement were never furnished to him at all, so their terms were literally inaccessible. Because Defendants possessed material facts known or accessible only to them, and knew those facts were not reasonably discoverable by Mr. Jones, they had a duty to disclose them to him.

115. Defendants also had a duty to disclose because they actively concealed those facts and because, having spoken, they were bound to speak the whole truth. Defendants engineered the concealment into the public record itself, substituting the terminology one-for-one so the derivation would not be apparent (¶18) and curating the disclosures to the Patent Office — disclosing 183

references while knowingly and deliberately withholding the one most-material Lytro application (¶22) — and the equity restrictions they did disclose were disclosed only after they had secured Mr. Jones's employment, his irreversible surrender of his secure position at Microsoft, and the assignment of his work (¶31), while the governing equity agreements were never furnished to him at all (¶¶67, 69). Independently, having affirmatively represented that the Company held hundreds of patents on which its business model relied heavily (¶27), and having assured Mr. Jones that he would participate in the company's growth and that his options' value would rise as the company's valuation rose (¶¶29–30), Defendants were bound to disclose the facts that materially qualified those statements — the cloud on the portfolio's provenance and enforceability, and the forfeiture, transfer, voting, and inspection-waiver terms that in fact encumbered the equity (¶¶13, 19–23, 31, 69–71).

116. A duty to disclose arises from the relationship and transactions between the parties, and each existed here several times over: the employer–employee relationship into which Light Field Lab recruited and hired Mr. Jones (¶¶11, 26–33); the option grant and each of the three stock-purchase transactions by which Light Field Lab sold Mr. Jones its own securities (¶¶63–66); and the assignment of Mr. Jones's work under the Confidentiality and Proprietary Rights Agreement (¶33). Light Field Lab dealt with Mr. Jones in its own securities throughout — granting and administering the option and selling him its stock upon each exercise, with Mr. Karafin and Mr. Bevensee approving and executing those transactions while in possession of the undisclosed facts (¶65) — and each such sale of its securities to Mr. Jones was a transaction between the parties giving rise to a duty to disclose the material facts affecting the value of what was sold. None of these grounds depends on a fiduciary relationship.

117. Mr. Karafin and Mr. Bevensee knew the facts alleged in paragraphs 15 through 23, having been named inventors on, and having sworn the inventor declarations for, those applications (¶21). Plaintiff is informed and believes, and on that basis alleges, that one or more of Does 1 through 10 — officers and directors of Light Field Lab who, by virtue of their offices and their responsibility for and access to the Company's patent-prosecution files, intellectual-property due-diligence materials, and the investor and financing communications by which the Company raised approximately $85 million on the strength of the portfolio (¶24) — likewise had a duty to disclose those facts and knew, or in conscious disregard of their responsibility for the Company's central intellectual-property asset were reckless in

not knowing, them. The basis for this belief is the centrality of the patent portfolio to the Company's business model and to its fundraising (¶¶24, 27); the inventorship and prosecution history of the foundational patents — including the inventor declarations and the information-disclosure statements in which the most material Lytro reference was withheld (¶¶18–23) — which are of public record and which the Company holds in its own files as those patents' owner; and the fact that those applications were filed, and the Company incorporated, while Mr. Karafin and Mr. Bevensee were still employed at Lytro (¶17) — a matter of patent record that officers and directors responsible for the Company's central asset were charged to know, and that called for inquiry into the portfolio's provenance. That filing history showed only the timing of the applications, not the derivation of the Company's technology from Lytro's, which had been concealed by the one-for-one substitution of terminology and the withholding of the Lytro reference and could be recognized only through the very comparison the renaming was designed to defeat (¶¶18, 34); what these Defendants were charged by their offices to investigate, and had the access to learn, Mr. Jones — a rendering-software engineer with no responsibility for, and no access to, the Company's prosecution records — had no reason and no means to discover (¶34). Plaintiff does not, by this Count, attribute any specific representation or omission to any Doe defendant, and reserves the right to allege the particular acts of each, and to add appropriate charging language, when their identities are ascertained.

118. Defendants concealed and suppressed from Mr. Jones the material facts concerning the Lytro provenance of the portfolio and the withheld prior art (¶¶15–23) — a deceit within the meaning of Civil Code section 1710, subdivision (c), and Civil Code section 1572, subdivision (3). Each was a material fact; Defendants had a duty to disclose it (¶¶114–117); Defendants concealed it intentionally, and with intent to induce Mr. Jones to accept and continue employment, to assign his work, and to exercise his options (¶¶18, 22); Mr. Jones was unaware of the concealed facts and would have acted differently had he known them — he would not have joined Light Field Lab, nor transferred his own source code to it, had the provenance of the portfolio been disclosed (¶¶34–35); and he was thereby damaged.

119. Defendants likewise concealed and suppressed the terms that encumbered the equity for which Mr. Jones was recruited — the repurchase and forfeiture right, the transfer restrictions, the voting

agreement, the right of first refusal and co-sale, and the waiver of his statutory right to inspect the Company's books and records (¶¶31, 66–71). Each was material; Defendants had a duty to disclose it (¶¶114–116); they suppressed it intentionally, disclosing the restrictions they did reveal only after they had secured Mr. Jones's employment, his irreversible surrender of his secure position at Microsoft, and the assignment of his work (¶31), and never furnishing two of the governing agreements at all (¶¶69–70); had Mr. Jones known of these terms he would not have forgone the Microsoft equity, accepted the position, or paid the Company to exercise his options (¶65); and he was thereby damaged.

120. As a further and independent wrong, Light Field Lab and Mr. Karafin affirmatively misrepresented an existing material fact. During Mr. Jones's recruitment, Mr. Karafin represented that the Company had hundreds of patents and that its business model relied heavily on comprehensive patent coverage of the holographic space (¶27). Karafin and Bevensee have themselves asserted, in this action, that that patent representation states a fact and is true — not opinion: they argued that "[t]he statement … that Light Field Lab has hundreds of patents — is true" and that "the patent records alone prove the statement true" (Dkt. 38 at 12:2-6), and they submitted a declaration averring under penalty of perjury that "Light Field Lab is the listed applicant on 355 patent applications" (Yang Decl., Dkt. 38-2, ¶¶ 4, 7). That representation nonetheless misrepresented the value and security of the portfolio, because its provenance and enforceability were clouded by the matters alleged in paragraphs 13 and 19 through 23. Mr. Jones alleges the cloud on the portfolio's provenance, validity, and ownership — its derivation from Lytro's light-field inventions, the one-for-one renaming that concealed that derivation, and the withholding of the most material Lytro reference (¶¶13, 19–23) — as facts, and as the very truth that Defendants' representation concealed; but he does not, by this Count, seek to invalidate any patent, to be declared the owner of or named an inventor on any patent, or to have the Court adjudicate any question of patent validity, ownership, or inventorship. He alleges only that the portfolio was represented as something more secure and more valuable than, to Defendants' knowledge, it was, and he seeks relief only for the fraud thereby practiced on him. That representation — that the Company held hundreds of patents and that its business model relied heavily on comprehensive patent coverage — was one of existing fact, not opinion, and Mr. Jones maintains that it is, as Karafin and Bevensee themselves have insisted in this action. Even if any part of it were treated as one of opinion, however — which it is not,

and which Karafin and Bevensee, having represented to this Court that the representation states a fact and is true, may not now be heard to contend — it would remain actionable: Mr. Karafin held himself out as the Company's chief executive specially qualified to speak to the portfolio he and Mr. Bevensee had built and prosecuted, so that Mr. Jones was situated to and did reasonably rely on that superior knowledge, and the representation stated as fact, or implied the existence of facts justifying, a belief in the comprehensiveness, value, and security of the portfolio that Defendants knew to be unwarranted. Because this Count seeks redress only for the fraud practiced on Mr. Jones and does not necessarily depend on the resolution of any substantial, disputed question of patent validity, ownership, or inventorship, it neither arises under the patent laws within the meaning of 28 U.S.C. § 1338(a) nor is preempted by federal patent law; the patent-related facts are incidental, material only to the value and security of what Mr. Jones was induced to surrender.

121. Further, Mr. Karafin affirmatively misrepresented how Mr. Jones's equity would respond to the Company's dilutive financing. He represented that "each round of investment provides dilution for our investors," and that "every time the valuation of the company increases, the value of your options grant also increase[s]" (¶30) — representing, that is, that Mr. Jones's options would rise in value through the very financing rounds that diluted the Company's investors. That representation was false: Mr. Jones's grant was an ordinary employee stock option that Light Field Lab's own 2017 Stock Incentive Plan left unprotected against dilution from new share issuances (¶30; Dkt. 30-2 at p. 84), so that it was diluted, and its value reduced, by the very rounds Karafin invoked, rather than rising "every time" the valuation did. The representation concerned how the equity then functioned — a present, existing fact — not a prediction of future value. Had Mr. Jones known that his grant was an ordinary, dilutable option rather than the value-tracking instrument Mr. Karafin represented, he would not have forgone his vesting Microsoft equity to join the Company (¶¶29–30). In any event, because Mr. Karafin was the Company's chief executive and held himself out as specially informed about its equity and financing, his representation was actionable even if cast as one of opinion.

122. The circumstances of the foregoing misrepresentations and concealments are alleged with particularity above: Mr. Karafin's representations during Mr. Jones's interviews on August 28 and 29, 2019 that the Company had hundreds of patents and that its business model relied heavily on

comprehensive patent coverage (¶27), and his representation in his August 12, 2019 recruitment email (Mr. Karafin's August 12, 2019 recruitment email at p. 3), made in addressing whether Mr. Jones's equity was "non-dilutable," that his options would rise in value through the very dilutive investment rounds (¶¶30, 121); the inventor declarations sworn under 37 C.F.R. § 1.63 (¶21); the curated information-disclosure statements (¶22); the never-furnished Voting and Right of First Refusal and Co-Sale Agreements (¶¶69–70); the form Exercise Agreement and its Section 7 waiver, executed through the Company's equity platform (¶¶66, 71); and the Confidentiality and Proprietary Rights Agreement signed September 9, 2019 (¶33). As to matters peculiarly within Defendants' knowledge, Plaintiff alleges on information and belief, stating the bases for that belief as set forth above.

123. Each of Mr. Karafin and Mr. Bevensee was a named inventor who bore a personal duty under 37 C.F.R. § 1.56 to disclose to the Patent Office all information material to patentability; and under 37 C.F.R. § 1.63(c) neither could lawfully execute the inventor's declaration he signed for the application without having reviewed and understood it and being aware of that duty (¶21). They therefore knew the Lytro art and knew that it was withheld. Defendants' withholding of that reference from the Patent Office, in breach of their duty of candor, is alleged solely as evidence of their knowledge and intent, and of the manner in which they concealed the portfolio's provenance from Mr. Jones; Mr. Jones does not, by this Count, assert any claim for that conduct or seek any relief on account of it, and he does not seek to invalidate any patent or to be named an inventor on any patent. The fraud for which he does seek relief was practiced on him: by concealing the portfolio's provenance, Defendants misrepresented the value and security of the equity and patent portfolio for which Mr. Jones was recruited, and thereby induced him to give up his secure position at Microsoft and to entrust and assign his own work in reliance on the concealment. The materiality of the patent-related facts lies in their effect on the value of what Mr. Jones was given and relied upon (¶13).

124. Mr. Jones justifiably and actually relied on Defendants' misrepresentations and on the state of affairs their concealment created. In reliance, he forwent the vesting Microsoft equity that was the financial premise of his move and resigned his Microsoft employment, a forfeiture that became irreversible in September 2019 (¶¶29, 71); he entrusted his original source code and inventions to Light Field Lab under the Confidentiality and Proprietary Rights Agreement (¶¶14, 33); and he paid the

Company to exercise his options on three separate occasions (¶¶64–65). His reliance on Defendants' honesty was express and outcome-determinative: before joining, Mr. Jones had told Defendants that his decision turned on "the character of the people involved," which was "the most important factor" and "boiled down to do I choose to trust your team," and Mr. Bevensee personally embraced that condition as "fantastic news" (¶26; the September 2019 recruitment correspondence at p. 7) — so that Defendants' truthfulness about the very matters they were concealing was, by Mr. Jones's own stated and accepted criterion, material to his decision, independent of the effect of the concealed facts on the value of what he was promised (¶13). His reliance was justifiable: a rendering-software engineer, he had no reason to audit the Company's patent-prosecution histories — much less to know to obtain and examine Lytro's separate patent family and compare it against Light Field Lab's — and identifying the concealment would have required precisely that cross-family comparison, which the one-for-one renaming was designed to defeat (¶34).

125. The source code, trade secrets, and work product Mr. Jones was induced to assign were and remained his property, and title to them did not validly pass to Light Field Lab. As to the equity instruments — the very nature of which was misrepresented and the governing terms of which were never furnished to Mr. Jones, depriving him of any reasonable opportunity to learn them (¶¶66–71) — the instruments are void ab initio, such that title never passed. As to the Confidentiality and Proprietary Rights Agreement, that agreement is void as to that work and title never passed; in the alternative, if voidable rather than void, Mr. Jones rescinded it for fraud in its inducement (Civil Code section 1689(b)(1)) by his original complaint in this action, filed June 17, 2025 (Dkt. 1 ¶¶ 100–104), which sought rescission of that agreement; the filing of that complaint constituted notice of rescission under Civil Code section 1691, and Mr. Jones reaffirms that rescission here. Upon rescission the agreement is avoided from its inception as between the parties, with title deemed never to have passed; and Defendants, and any transferee that did not take in good faith, for value, and without notice of Mr. Jones's claim, hold subject to his restored title.

126. Because the work was never Light Field Lab's to convey, Light Field Lab could not pass it to its assignee or to any subsequent holder, and the assignee's and any acquirer's continued exploitation of it is a continuing wrong, not a protected purchase. To the extent the work or its proceeds passed to

others, Defendants and those who received the fraudulently obtained property hold it as involuntary and constructive trustees for Mr. Jones (Civil Code sections 2223 and 2224), and that trust follows the property and its traceable proceeds into the hands of every holder who did not take in good faith, for value, and without notice (see Cal. Civ. Code § 3439.08(a)). The assignee did not take in good faith, for value, and without notice of Mr. Jones's claim. The General Assignment was executed on August 15, 2025 (the General Assignment at p. 15) — after this action, which seeks rescission and the return of Mr. Jones's property, had been pending since June 17, 2025 — and an assignee for the benefit of creditors takes the assignor's assets subject to the assignor's equities and is charged with notice of the claims and litigation pending against the assignor; the assignee thus had notice of Mr. Jones's claim from the inception of the assignment. Mr. Jones, moreover, gave the assignee formal written notice of his claim and demanded preservation of his work and a reserve for his claim (¶¶83–84); and no value was given for his work in particular. No Defendant may take advantage of its own wrong, and the wrong of inducing the assignment of Mr. Jones's work cannot be perfected by the further transfer of that work; Mr. Jones is entitled to a constructive trust over the work and its traceable proceeds, and his right to recover his damages is in any event independent of where the work was ultimately sent.

127. As a direct and proximate result of the fraud, Mr. Jones has suffered detriment for which he is entitled to complete relief. First, because the source code, trade secrets, and work product he was induced to assign were and remained his property, title to which never validly passed to Light Field Lab (¶¶125–126), Mr. Jones's primary remedy is the return of that work in specie — by the avoidance of the assignment, the constructive trust, and the injunctive relief sought below (¶129) — rather than payment of its value, which Defendants' own conduct rendered nearly impossible to ascertain by sweeping the work into a general assignment, building undisclosed applications upon it, and declining to record or separately account for it; and no Defendant may take advantage of its own wrong (Civil Code section 3517). Second, Mr. Jones is entitled to recover, as all the detriment proximately caused by the fraud under California Civil Code section 3333, and, as authorized by California Civil Code section 1692, together with the rescissionary relief sought below: (a) the $56,437.50 he paid the Company to exercise his options (¶64), recoverable as restitution upon rescission of the equity instruments or, alternatively, as out-of-pocket damages, but not twice; (b) the value of the secure position he gave up at Microsoft in

reliance on Defendants' inducements — including forgone equity, grants he would have received, the growth of his salary, bonuses, advancement, and benefits he would have earned but for being induced to resign — net of his earnings from other employment, in an amount according to proof; (c) general damages for the emotional distress proximately caused him by Defendants' intentional fraud, which — distinct from any distress arising from his later termination — flowed from his being deceived into surrendering a secure career and entrusting and assigning his own work, and from his discovery of Defendants' concealment and appropriation, a distress aggravated by his known immunocompromised condition; such damages for mental suffering being recoverable in an action of intentional deceit; and (d) the permanent diminution in the value of Mr. Jones's source code, trade secrets, and work product caused by Defendants' disclosure and publication of that work. By building undisclosed applications upon Mr. Jones's work and causing them to be published (¶¶35, 39), Defendants publicly disclosed that work, destroying its secrecy and the trade-secret protection it enjoyed and creating prior art that forecloses the protection and exclusive commercial exploitation, whether by patent or otherwise, that his work would otherwise have been capable of, and permanently diminishing its value — a loss the return of the work cannot cure, because the work's value as a confidential and exclusive asset cannot be restored once it has been publicly disclosed. Mr. Jones does not by this allegation claim any patent, seek to be named an inventor on any application, or ask the Court to determine the patentability, validity, or inventorship of any application; he alleges only that Defendants destroyed the value and exclusivity of his own work. Because the misrepresentation and concealment alleged above were intentional and were undertaken to deceive Mr. Jones, they constitute fraud within the meaning of California Civil Code section 3294, entitling Mr. Jones to exemplary and punitive damages.

128. Mr. Jones did not discover, and could not reasonably have discovered, the fraud until 2025. The applications built on his work did not become public until they were published on October 17, 2024 and February 27, 2025, and the Lytro derivation had been affirmatively concealed, was within Defendants' exclusive knowledge, and could not be recognized from Light Field Lab's patents alone; it was only upon reviewing the Company's filings in May 2025, and, beginning in June 2025, the Lytro patents, that Mr. Jones identified the overlaps and the terminology substitution, in August 2025 (¶¶34–35). The very concealment alleged above — the deliberate one-for-one substitution of terminology and

the knowing withholding of the most material Lytro reference — was designed to, and did, prevent Mr. Jones from discovering the fraud (¶¶18, 22, 34). A defendant who fraudulently conceals the facts constituting a claim cannot charge the plaintiff with a failure to discover what the concealment was designed to hide. Mr. Jones's earlier efforts to obtain his employment and corporate records (¶¶75–76) were directed at his compensation and shareholder records, not at the provenance of the patent portfolio; neither put him on notice of, nor could have revealed, the fraud alleged here, which required comparing two separate patent families and recognizing a deliberate substitution of terminology.

129. Mr. Jones seeks complete relief, and his claim for damages is not inconsistent with his claim for relief based upon rescission: under California Civil Code section 1692, a party defrauded into a contract may rescind and, in the same action, recover restitution and the consequential damages to which he is entitled. Mr. Jones therefore seeks, concurrently: (i) rescission, for fraud in their inducement (Civil Code section 1689(b)(1)), of all of the agreements he was induced to enter into with Light Field Lab — including the Confidentiality and Proprietary Rights Agreement, the offer letter and the agreements governing his employment, the stock-option, exercise, voting, and right-of-first-refusal and co-sale agreements and the related waiver of his inspection rights, any equity-incentive-plan document, and any arbitration agreement, and each other agreement by which Light Field Lab claims he is bound. Mr. Jones gave notice of rescission of the assignment by his original complaint in this action, filed June 17, 2025 (Dkt. 1 ¶¶ 100–104), which sought that rescission (Civil Code section 1691); he reaffirms that rescission and rescinds each of the foregoing agreements by this complaint, which constitutes his notice of rescission as to each under Civil Code section 1691; upon rescission each is avoided from its inception as between the parties, with title to his work deemed never to have passed to Light Field Lab. The rescission sought here is directed at the written instruments by which Light Field Lab claims Mr. Jones is bound. It is not directed at, and does not negate, the fact or the at-will character of his employment. Mr. Jones's status as Light Field Lab's employee, and his termination on June 23, 2023, arose from the parties' conduct — his hiring, his service, and the Company's payment of wages (Labor Code section 2922) — independent of any written contract. That status and that termination, on which the First and Second Causes of Action rest, stand regardless of the rescission of the written agreements. Mr. Jones further seeks: (ii) restitution of the $56,437.50 he paid to exercise his options, a constructive

trust over his source code, trade secrets, and work product and their traceable proceeds, and an injunction requiring the return and delivery of that work and the cessation of its use and the destruction of Defendants' copies, all returning that property to him; (iii) his consequential and reliance damages under Civil Code section 3333 for the secure position he was fraudulently induced to give up at Microsoft and for the emotional distress proximately caused him by the fraud, as alleged in paragraph 127; and (iv) exemplary and punitive damages under Civil Code section 3294.

FOURTH CAUSE OF ACTION

*(Misappropriation of Trade Secrets — Cal. Civ. Code § 3426 et seq.; and 18 U.S.C. § 1836; and, in the Alternative, Conversion) (Against Light Field Lab, Jon Karafin, Brendan Bevensee, and Does 1 through 10)*

130. Mr. Jones incorporates by reference paragraphs 1 through 41, 62, 77 through 86, and 129 above as though fully set forth herein. This cause of action is brought against Light Field Lab, Mr. Karafin, Mr. Bevensee, and Does 1 through 10. The property at issue is Mr. Jones's own source code and the proprietary methods embodied in it. Consistent with the preceding allegations, Mr. Jones does not by this Count seek to be adjudged an inventor, to be named on any patent or application, or to invalidate, correct the inventorship of, or have the Court adjudicate the validity, ownership, or inventorship of any patent or application (¶¶13, 82); he seeks the return of his own source code and trade secrets, and compensation for Defendants' misappropriation of them.

131. Throughout his employment Mr. Jones authored, and maintained as confidential, a body of trade secrets consisting of his original source code and the proprietary methods, techniques, and algorithms embodied in it — including, without limitation, the viewer-dependent light-field rendering method, the perceived-image optimization software he called "Acuity," his light-field ray-generation library, his shader libraries for industry-standard renderers, and his optical-simulation techniques and algorithms (¶¶36–37). These trade secrets are identified by category and example here and in paragraphs 36 and 37; their complete contents are embodied in the source code and work product that Light Field Lab took and has refused to return, and will be identified with further particularity, including as provided by California Code of Civil Procedure section 2019.210, as that material is produced.

132. These trade secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who could obtain economic value from their disclosure or use: on information and belief, after Light Field Lab adopted Mr. Jones's methods, almost all of its rendered content is generated using, and derived from, his work (¶36). Mr. Jones took reasonable measures to maintain their secrecy: he committed his work only to the company's access-controlled source-control system and did not disclose his methods or source code outside that environment. Light Field Lab itself defined such work as confidential information of "great competitive importance and commercial value," to be kept strictly confidential and disclosed only on a need-to-know basis (Dkt. 46-3 § 1(a)–(b), at pp. 2–3; ¶¶37, 41).

133. Light Field Lab acquired and used Mr. Jones's trade secrets by improper means and without his consent. From the outset of his employment in September 2019, his work resided in Light Field Lab's source control, to which Mr. Karafin and Mr. Bevensee had access (¶37); and after Mr. Jones drew their attention to that work on April 9, 2023 (¶38), Light Field Lab built upon it the applications described above, incorporating his viewer-dependent rendering method and his "Acuity" optimization approach (¶¶39–40). The precise extent to which his source code was copied is known to Defendants and to the entity that acquired the code (¶40).

134. Light Field Lab disclosed Mr. Jones's trade secrets without his consent by causing the applications built on his work to be published — international application WO2024216300A2 on October 17, 2024, and WO2025042476A1 on February 27, 2025 (cover (field (43)); ¶¶35, 39). That publication permanently extinguished the secrecy of the methods it disclosed and destroyed the trade-secret protection they had enjoyed. The destruction of that secrecy — which is the whole of a trade secret's value — is irreversible and cannot be undone by any return of the code.

135. Light Field Lab further misappropriated Mr. Jones's trade secrets by retaining and continuing to use them without his consent. Its own June 23, 2023 letter terminating Mr. Jones demanded the return of "any and all work product, files, data, source code, programs, tools, notes, reports, memoranda, records …" prepared in connection with his employment, which it defined as "Company Property" (¶41, Light Field Lab's June 23, 2023 termination letter at pp. 1-2) — executing the same "Exit Obligations" Light Field Lab had embedded in his onboarding agreement at hire (Dkt.

46-3 § 3(b)), and confirming that it possessed, and intended from the outset to retain, his source code and work product. While this action was pending, Light Field Lab transferred substantially all of its assets — including the source code and other intellectual property that were Mr. Jones's — through the August 15, 2025 assignment for the benefit of creditors to an undisclosed purchaser, through whom that work continues to be exploited (¶¶83, 86).

136. Mr. Jones never validly consented to Light Field Lab's acquisition, use, or disclosure of his trade secrets. The Confidentiality and Proprietary Rights Agreement through which Light Field Lab claims to have obtained his work product was procured by the concealment alleged above and is void and of no effect as to that work; title to his source code and trade secrets therefore never validly passed to Light Field Lab (¶¶41, 83). In the alternative, if that agreement was voidable rather than void, Mr. Jones has rescinded it (¶129), and the rescission relates back to restore his title as of the assignment. And independently, Mr. Jones authored the work, so that ownership originated in him.

137. Because the source code and trade secrets are Mr. Jones's and title never validly passed to Light Field Lab (¶136), his primary remedy is their return. He is entitled to injunctive relief under California Civil Code section 3426.2 requiring Defendants to return and deliver his source code and work product, to cease all use, reproduction, exploitation, and disclosure of it, and to destroy every copy in their possession or control, and to the imposition of a constructive trust over that work and the proceeds traceable to it, in whosoever's hands it is found. Mr. Jones does not seek, and does not consent to, any compulsory license of his work. He is further entitled under California Civil Code section 3426.3 to recover his actual loss caused by the misappropriation — including the permanent loss of the secrecy and exclusive value of his methods through their publication (¶140), which their return cannot restore — and Defendants' unjust enrichment from their unauthorized use of his work to the extent not included in that loss; and, because the misappropriation was willful and malicious, exemplary damages of up to twice that amount under section 3426.3(c) and his reasonable attorney's fees under section 3426.4.

138. Mr. Jones's trade secrets relate to a product intended for use in interstate and foreign commerce — the rendering pipeline at the core of Light Field Lab's commercial light-field display products, which the company developed and held out for commercial deployment to customers within and beyond the United States, and for which it sought patent protection through the international

applications identified above (¶¶36, 39–40). Defendants misappropriated those trade secrets within the meaning of 18 U.S.C. § 1839(5)–(6): they acquired Mr. Jones's source code by improper means and used it beginning no later than 2019 and continuing thereafter, filed the applications built upon it on April 13, 2023, and June 23, 2023, caused those applications to be published on October 17, 2024, and February 27, 2025, and, on August 15, 2025, transferred his source code through the assignment for the benefit of creditors (¶¶83, 86).

139. Mr. Jones is likewise entitled under the Defend Trade Secrets Act to injunctive relief under 18 U.S.C. § 1836(b)(3)(A) — including an order requiring the return and destruction of the misappropriated material and prohibiting its further use or disclosure — and to damages under section 1836(b)(3)(B) for his actual loss and for Defendants' unjust enrichment; and, because the misappropriation was willful and malicious, to exemplary damages and reasonable attorney's fees under section 1836(b)(3)(D).

140. Mr. Jones has thus suffered two permanent deprivations of his property: the irreversible destruction of the secrecy and value of his methods through their publication, and the continuing dispossession of the source code and work product that Light Field Lab retained, transferred, and refused to return. The return of the code cannot restore the exclusivity that the publication destroyed; both injuries are alleged.

141. In the alternative, and only to the extent any portion of the retained source code, files, and tangible work product — the physical files, media, and repositories themselves — does not qualify as a trade secret, Mr. Jones alleges conversion. That work product was Mr. Jones's property and he was entitled to its possession (¶¶36, 41, 83); Light Field Lab wrongfully exercised dominion over it by retaining it as claimed "Company Property" after his employment ended and by transferring it through the August 15, 2025 assignment (¶¶41, 83, 86). This claim does not depend on the trade-secret status of any method, has a basis independent of any misappropriation of a trade secret, and is pleaded without prejudice to the trade-secret claims above.

142. As a result of that conversion, Mr. Jones is entitled to the return of his property and to the imposition of a constructive trust over it and the proceeds traceable to it, in whosoever's hands they are found.

143. Light Field Lab took, used, retained, and transferred Mr. Jones's source code and trade secrets, and Mr. Karafin and Mr. Bevensee each personally participated in that misappropriation. Mr. Karafin, as Light Field Lab's chief executive, directed the company's exploitation of Mr. Jones's work, including the decision to file the applications built upon it within days of the April 9, 2023 communication in which Mr. Jones identified that work to them as his own and authored by him (¶¶37–38). Mr. Bevensee, who worked alongside Mr. Jones and had access to the source control in which his work resided, used Mr. Jones's methods by incorporating them into those applications, on which he is named (¶¶37–40). Does 1 through 10 are persons or entities whose identities are presently unknown to Mr. Jones and whose roles in the misappropriation, or in the present holding of his source code, Mr. Jones will allege when ascertained (¶86). Each Defendant is liable for the misappropriation alleged, and Light Field Lab is liable for the conversion alleged in paragraphs 141 and 142.

144. Defendants' misappropriation was willful and malicious: they took and used work they knew to be Mr. Jones's — work he had committed to their own source control and expressly identified to them as his own work, authored by him (¶¶37–38) — and built their applications upon it while renaming his concepts so that the derivation would not be apparent (¶39), then demanded and retained his code after his employment ended (¶41). This conduct warrants the exemplary damages and attorney's fees authorized by California Civil Code sections 3426.3(c) and 3426.4 and by 18 U.S.C. § 1836(b)(3).

145. Mr. Jones's claims are timely. He could not have discovered the misappropriation earlier through reasonable diligence: the applications built on his work did not become public until they published on October 17, 2024, and February 27, 2025, and the derivation of those applications from his work had been concealed and was within Defendants' exclusive knowledge (¶¶35, 62). Reflecting in or about May 2025 on the originality of his work, Mr. Jones reviewed Light Field Lab's published filings and identified the two applications, and by August 2025 had identified the specific manner in which they drew upon his methods (¶35). Mr. Jones's earlier efforts to obtain his employment and corporate records concerned his compensation and shareholder rights, not the provenance of his source code, and did not put him on notice of the misappropriation alleged here. This action was filed on June 17, 2025 (Dkt. 1),

and the claims alleged in this Count are brought within three years of Mr. Jones's discovery of the facts constituting the misappropriation.

146. Mr. Jones's right to relief under this Count rests on the taking, use, and destruction of his own source code and trade secrets — wrongs whose proof requires the existence of, and Defendants' improper use of, his secret methods, elements different from and additional to any question of patent inventorship or validity. The publication of the applications is alleged only as the mechanism by which the secrecy of his property was destroyed. Mr. Jones does not by this Count seek to invalidate, correct the inventorship of, or establish ownership of any patent or application, or to recover for any fraud on the Patent Office; he seeks relief only for the misappropriation and conversion of his own work (¶¶13, 82).

FIFTH CAUSE OF ACTION

*(Civil RICO — 18 U.S.C. §§ 1962(c) and (d)) (Against Light Field Lab, Jon Karafin, Brendan Bevensee, and Does 1 through 10)*

147. Mr. Jones incorporates by reference paragraphs 1 through 41, 57 through 58, 62 through 65, 75 through 89, and 129 above as though fully set forth herein. This cause of action is brought against Light Field Lab, Mr. Karafin, Mr. Bevensee, and Does 1 through 10. By this Count Mr. Jones seeks recovery for the deprivation of his own money and property through a pattern of racketeering activity carried out by fraud. The money of which he was deprived is the $56,437.50 he was fraudulently induced and lulled into paying out of his own pocket to exercise his stock option (¶¶64–65, 152, 162) — a loss complete in itself and independent of any question of who owns his work. The property of which he was deprived is his own — his source code, trade secrets, and confidential inventive concepts — and not any interest of the Patent Office; the deception by which Defendants converted that property, including their false representations to the Patent Office and the international patent authority that they, and not Mr. Jones, owned and had invented his work, is charged as the means by which his property was taken, and not as a fraud upon the Patent Office of its own property. Mr. Jones does not seek to be adjudged an inventor, to be named on or to correct the inventorship of any patent or application, or to have any patent declared invalid or unenforceable; he does not allege that the Patent Office was deprived of property of its own; and he does not rely on any false statement to the Patent Office as itself a

predicate act except insofar as a Defendant's false representation of ownership of Mr. Jones's property was a wire transmitted in furtherance of the scheme to obtain that property (¶¶13, 82).

148. Light Field Lab is an enterprise within the meaning of 18 U.S.C. § 1961(4) — a corporation engaged in, and whose activities affect, interstate and foreign commerce; it manufactured and held out for commercial deployment light-field display products to customers within and beyond the United States and sought patent protection for them through international applications (¶¶27, 39, 64). Mr. Karafin and Mr. Bevensee are "persons" within the meaning of section 1961(3), each distinct from Light Field Lab, the enterprise through which and by means of which they conducted the pattern of racketeering activity alleged below.

149. Additionally, and in the further alternative — without abandoning the allegation that Light Field Lab is itself the enterprise — Light Field Lab, Mr. Karafin, Mr. Bevensee, the assignee that received Light Field Lab's assets (¶77), and Does 1 through 10 together also constitute an association-in-fact enterprise within the meaning of section 1961(4): they shared the common purpose of acquiring, exploiting, and monetizing misappropriated intellectual property while concealing its origin; they were related through their respective roles in that endeavor; and their association possessed sufficient longevity to pursue that purpose, persisting from 2016 through 2026 (¶89) — the purpose, relationships, and longevity an association-in-fact enterprise requires. This enterprise included the persons and entities that effected and received the August 15, 2025 assignment and the subsequent sale (¶¶77, 79, 85).

150. Mr. Karafin and Mr. Bevensee conducted and participated in the conduct of the enterprise's affairs, having some part in directing them. As Light Field Lab's chief executive and its chief technology officer and Secretary, respectively, they directed the conduct alleged below: Mr. Karafin made, and Mr. Bevensee joined in, the representations by which Mr. Jones was recruited (¶¶26–27, 30); Mr. Karafin and Mr. Bevensee approved and consummated his option exercises (¶64); and they caused the applications built on his work to be prepared and filed (¶¶39–40).

151. Defendants engaged in a pattern of racketeering activity consisting of the predicate acts that follow, each committed in furtherance of a single scheme to obtain Mr. Jones's money and property by fraud. The first are acts of wire fraud, in violation of 18 U.S.C. § 1343, by which Defendants induced Mr. Jones's employment and his assignment of his work. In August 2019, Mr. Karafin sent Mr. Jones

interstate recruitment communications, including the August 12, 2019 recruitment email and the representations made during his August 28 and 29, 2019 interviews, that assured Mr. Jones the patent portfolio he was being recruited to build upon was comprehensive and sound, while concealing that its foundation was derived from undisclosed Lytro work, encumbered, and exposed to prior art that had been withheld. The soundness of that portfolio was material to Mr. Jones's decision to leave his existing employment, to commit his own money to the venture, and to contribute and assign his own work to it; the concealment of its true, Lytro-derived and prior-art-tainted provenance was the deceptive content of these wires, by which Defendants induced that decision (¶¶26–27, 30, 34–35). Mr. Jones had, moreover, made Defendants' honesty an outcome-determinative condition of that decision, having told them that his choice turned on "the character of the people involved" and "boiled down to do I choose to trust your team," to which Mr. Bevensee replied that this was "fantastic news" (¶26; the September 2019 recruitment correspondence at p. 7); the provenance Defendants concealed went to that very character, so that their concealment was material by Mr. Jones's own stated and accepted criterion. Mr. Bevensee joined in that recruitment, himself interviewing and corresponding directly with Mr. Jones, and — as a former senior Lytro technologist and a named inventor on both the Lytro and the Light Field Lab applications — shared, and likewise concealed from Mr. Jones, the knowledge of the portfolio's Lytro provenance that made those communications false; and during Mr. Jones's August 28 and 29, 2019 interviews he personally demonstrated Light Field Lab's display to Mr. Jones and personally interviewed him, presenting that technology as Light Field Lab's own without disclosing the Lytro provenance he uniquely knew (¶¶15–17, 26). On September 9, 2019, Light Field Lab transmitted to Mr. Jones by interstate wire the offer package and the Confidentiality and Proprietary Rights Agreement for electronic execution, and Mr. Jones executed and returned them by the same means, consummating the fraudulently induced assignment (¶33). Confidential business information and trade secrets in the hands of their owner are property for purposes of the wire-fraud statute, and these wires effected and furthered the scheme to deprive Mr. Jones of that property and his money.

152. The second are further acts of wire fraud that furthered the scheme and lulled Mr. Jones into continued participation. On three occasions Mr. Jones exercised his stock option, each time transmitting payment by a separate interstate electronic funds transfer from Washington to Light Field Lab's account

in California — $7,000 settling December 22, 2020, $14,000 settling January 4, 2021, and $35,437.50 settling May 6, 2021, for a total of $56,437.50 out of pocket — which Mr. Karafin, as president, and Mr. Bevensee, as Secretary, approved and consummated by signing the resulting stock certificates, all while continuing to conceal from him the facts described above (¶¶64–65). Mr. Jones committed that money in continued reliance on the same concealed picture of the portfolio on which he had been recruited, and would not have done so had its provenance been disclosed (¶65). A wire that furthers a scheme or lulls its victim need not itself contain a false statement.

153. The third is the theft of trade secrets in violation of 18 U.S.C. § 1832(a), an offense enumerated as racketeering activity by 18 U.S.C. § 1961(1). Mr. Jones's source code and the proprietary methods embodied in it — including his viewer-dependent light-field rendering method and the perceived-image optimization software he called "Acuity" — are trade secrets — which Mr. Jones and Light Field Lab maintained as secret through written confidentiality obligations, restricted source-control access, and the confidentiality legends applied to the very materials at issue (¶¶131, 155) — that relate to a product intended for use in interstate and foreign commerce, namely the rendering pipeline at the core of Light Field Lab's commercial light-field display products, for which Light Field Lab sought protection through the international patent applications identified below (¶¶36–37, 39). With intent to convert those trade secrets to the economic benefit of Light Field Lab and themselves, and knowing that their conduct would injure Mr. Jones — who, four days before the first application was filed, had identified the work to them as his own and authored by him (¶¶37–38) — Mr. Karafin and Mr. Bevensee took and used those trade secrets without his consent and caused them to be embodied in the applications described below, renaming his concepts so that their derivation from his work would not be apparent (¶39). The acts of taking, copying, renaming, and embedding that work were committed in the United States, through Light Field Lab's California operations and the source control it maintained there.

154. The fourth are further acts of wire fraud by which Defendants asserted ownership of Mr. Jones's property and so furthered its conversion. To obtain patent protection over the methods embodied in Mr. Jones's work, Light Field Lab, acting through Mr. Karafin and Mr. Bevensee, caused to be prepared, signed, and transmitted by interstate and foreign wire to the Patent Office and the international

patent authority a series of formal declarations representing that Mr. Karafin and Mr. Bevensee — and not Mr. Jones — were the inventors of that subject matter, and that Light Field Lab owned the entire right, title, and interest in it: in each international application, a declaration that the named inventor "is the inventor of the subject matter for which protection is sought," a declaration that Light Field Lab "is entitled to apply for and be granted a patent," and a statement that Light Field Lab was the assignee "of the entire right, title, and interest" (¶¶39–40). Because Mr. Jones authored the work those declarations describe (¶¶37–39), each was a knowing and material misrepresentation, transmitted by wire, of the ownership and authorship of Mr. Jones's property, made to vest in Light Field Lab exclusive rights over that property and to enable its public disclosure. These wires are alleged as predicate acts of wire fraud in violation of 18 U.S.C. § 1343, by which Defendants pursued the object of the scheme — Mr. Jones's property — and not as any allegation that the Patent Office was deprived of property of its own (¶147).

155. The fifth are further acts of wire fraud completing the scheme's object. Before publication, Defendants removed from the application figures the legends marking them "confidential" and proprietary to Light Field Lab, and then caused the applications built on Mr. Jones's work to be published as international applications WO2024216300A2 on October 17, 2024, and WO2025042476A1 on February 27, 2025 (cover (field (43)); ¶¶35, 39) — interstate and foreign wire transmissions by which the scheme attained its object as to these filings — the capture of Mr. Jones's methods, vested in Light Field Lab's own applications and held out for its monetization — and worked upon Mr. Jones the deprivation that was at once the means and the necessary consequence of that capture: the permanent destruction of the secrecy and exclusivity in which the entire value of those methods consisted, a deprivation complete upon publication and independent of, and antecedent to, the issuance of any patent. That Defendants had marked the same material as their own confidential, proprietary information, and stripped those markings in order to disclose it, confirms that they knew the material to be a protected secret and disclosed it deliberately. No patent issued from either application. After Mr. Jones sued and demanded that his property be preserved, Defendants allowed both applications to lapse without entering any national phase, even as a few of Light Field Lab's commercial applications were selectively maintained while the great majority of its portfolio, including its foundational families, was likewise left to lapse (¶78). That Defendants abandoned these two

applications once Mr. Jones had identified the underlying work as his own and put his claim before this Court is consistent with their awareness that the applications were built on his misappropriated work and could not be prosecuted without exposing that fact. These publications are alleged as wire-fraud predicates and, in the alternative, as overt acts in furtherance of the scheme.

156. The sixth is a further act of wire fraud in furtherance of the scheme. On August 15, 2025, while this action was pending and after Mr. Jones had demanded the preservation of his property, Mr. Karafin signed for Light Field Lab, and caused to be executed and transmitted by interstate electronic wire, the General Assignment that swept Mr. Jones's source code, the misappropriated work, and Light Field Lab's choses in action into the assignment estate (¶¶79, 83). Because the object of the scheme — depriving Mr. Jones of his property — was not complete while he could still recover that property, the transmission that purported to convey it beyond his reach was a step in furtherance of the same scheme, and need not itself have contained a false statement. This wire is alleged as a predicate act of wire fraud in violation of 18 U.S.C. § 1343 and, in the alternative, as an overt act in furtherance of the scheme.

157. In furtherance of the same scheme, and as evidence of its continuity, Defendants also committed the following acts, alleged as overt acts rather than as separately charged predicates: the December 9, 2019 option grant (¶63); employment-period communications continuing the concealment, including but not limited to the transfers identified above (¶65); the interstate transmission of Mr. Jones's misappropriated work to patent counsel and the international patent authority, alleged on information and belief (¶40); the prolonged withholding of the employment and corporate records Mr. Jones was entitled to inspect (¶¶75–76); and the subsequent concealed sale of the misappropriated patent estate to the purchaser (¶¶79–86).

158. These predicate acts are not isolated; they are the repeated execution of a single scheme by a single enterprise. Before Mr. Jones was ever recruited, Karafin and Bevensee had developed a method of building Light Field Lab's business on work that was not originally their own and concealing its provenance: they re-labeled under new terminology the light-field architecture they had developed at Lytro, withheld the earlier Lytro prior art from the Patent Office, and so obscured the derivation of Light Field Lab's foundational technology (¶¶15–23). At that stage that method was not, and could not have been, directed at Mr. Jones, whose work did not yet exist within the company; its objects were others'

work and the Patent Office. The concealment of that Lytro-derived provenance was, however, the very content whose non-disclosure induced Mr. Jones to join Light Field Lab and to assign his work (¶151): he was told the portfolio was comprehensive and sound, and not told that its foundation was derived, encumbered, and exposed. Defendants then turned the same method on Mr. Jones. They took the viewer-dependent rendering method and "Acuity" software he had authored, re-labeled his concepts under substituted terminology so their origin would not be apparent, and filed patent applications on that work without crediting him — applications they built by welding his rendering material onto the same Lytro-derived foundational disclosure (¶¶39–40). The taking of Mr. Jones's work was thus not a new or separate venture but the continuation of an established course of conduct — the same method of taking others' work, relabeling it, and concealing its origin, practiced first as to the foundational technology and then as to Mr. Jones (¶89). The foregoing allegations concerning the foundational technology are pleaded to show that method, that knowledge, and that continuity, and not as predicate acts or as the property of which Mr. Jones was deprived; the particularized predicate acts charged in this Count, and the scheme on which the Count is founded, are the taking of Mr. Jones's money and property, and are one and the same. Because the predicate acts charged against Mr. Jones were the application to him of this same established method — and because his work was welded onto, and thereafter carried forward with, the same foundational estate that method had built (¶¶39–40) — those predicates are related to, and continuous with, a scheme whose method and infrastructure the enterprise had been operating since 2016, as further alleged at paragraph 159.

159. The predicate acts were both related and continuous. They shared the common purpose of obtaining and exploiting Mr. Jones's money and property, the same participants — Mr. Karafin and Mr. Bevensee, acting through and with the enterprise — the same victim, and the same distinctive method of commission: taking work that was not the Defendants' own, relabeling it under substituted terminology, and concealing its provenance. That method was not devised for Mr. Jones. It was the enterprise's established and ongoing way of doing business, practiced since at least 2016, when Mr. Karafin and Mr. Bevensee first carried the foundational light-field technology from their prior employment, relabeled it, and concealed its derivation (¶¶15–23, 149, 157). The predicate acts charged in this Count are the application of that same pre-existing method to Mr. Jones: the misappropriation of

his work was not a discrete or isolated act, but the continuation onto him of a course of conduct the enterprise had pursued since 2016, into which his work was then absorbed — his rendering material welded onto the same Lytro-derived foundational disclosure (¶¶39–40, 158), so that his property was drawn into, and thereafter traveled with, an established and continuing patent-monetization apparatus that pre-dated his recruitment and persisted after his employment ended. The predicate acts charged in this Count span at least six and one-half years — from the August 2019 inducement, through the 2020–2021 option exercises, the 2023 misappropriation and applications, and the October 2024 and February 2025 publications, to the August 2025 assignment and the subsequent sale (¶¶26, 64, 39, 35, 77, 79). At least four of those acts — the two publications, the assignment, and the sale — occurred after Mr. Jones's employment ended on June 23, 2023 (¶57), so the scheme did not end with his employment. The enterprise and the method by which these predicates were committed reach further still: they originated in 2016 and have persisted through the 2025–2026 transfer and concealment of the misappropriated assets (¶¶77–86, 149, 160). The pattern alleged here is therefore not a single, self-terminating fraud upon a single victim, but the repeated execution, against Mr. Jones, of an enterprise's regular and continuing way of doing business. These allegations of the scheme's origin, method, and breadth are pleaded to establish the relatedness and continuity of the pattern — that Mr. Jones's predicates share the purpose, participants, method, and infrastructure of an ongoing scheme reaching back to 2016 and forward into 2026 — and not to charge any foundational or pre-2019 conduct as a predicate act, to assert any claim on behalf of or any injury to any person other than Mr. Jones, or to allege that Mr. Jones was injured before August 2019. Mr. Jones's own money and property are the sole object of the predicate acts charged and the sole measure of the recovery sought, and his injury arose no earlier than his August–September 2019 reliance (¶¶151, 162).

160. The scheme also threatens to continue. The August 15, 2025 General Assignment, which swept Mr. Jones's source code and the misappropriated work into the assignment estate, and the January 15, 2026 sale of the patent estate to the purchaser — both undertaken after Mr. Jones demanded preservation of his property, and continuing the disposition of the misappropriated assets into 2026 — show that the fraudulent monetization and concealment of misappropriated intellectual property is the enterprise's regular way of doing business — a course of conduct the enterprise had followed since at

least 2016, first as to the foundational technology and then as to Mr. Jones's work (¶¶149, 158–159) — that by its nature projects into the future and that, as alleged, has not ended (¶¶77–86, 89).

161. Each individual Defendant committed at least two of the predicate acts. Mr. Karafin made and directed the recruitment misrepresentations (¶¶26–27), approved and executed each of the three option exercises as Light Field Lab's president (¶64), and directed the misappropriation and filing of Mr. Jones's work (¶¶39–40). He also signed, and caused to be transmitted by interstate electronic wire, the August 15, 2025 General Assignment that swept Mr. Jones's source code and the misappropriated work into the assignment estate and beyond his reach while this action was pending (¶¶79, 83) — a transmission in furtherance of the scheme, charged as a wire-fraud predicate and, in the alternative, as an overt act (¶156). Mr. Bevensee personally demonstrated Light Field Lab's display to Mr. Jones and interviewed him during the August 28 and 29, 2019 interviews, and joined in the recruitment communications, in each instance concealing the portfolio's Lytro provenance he uniquely knew (¶¶15–17, 26); and — having worked alongside Mr. Jones with access to the source control in which his work resided — he personally took and incorporated Mr. Jones's viewer-dependent rendering and "Acuity" methods into the applications on which he is named as an inventor, after Mr. Jones had identified that work to him as his own and authored by him (¶¶37–38). He also approved each of the three option exercises as Light Field Lab's Secretary and signed the resulting stock certificates to consummate them (¶64).

162. Mr. Jones was injured in his business and property by reason of these violations. He paid $56,437.50 out of pocket to exercise his option, a direct loss proximately caused by the concealment that induced and lulled him (¶64); and he was deprived of his trade secrets and source code, whose secrecy the publications irreversibly destroyed — a permanent loss of value that the return of the work cannot cure — and whose tangible embodiment Light Field Lab retained and transferred (¶¶41, 83). That injury does not depend on the validity of the assignment: because Mr. Jones's assent to the Confidentiality and Proprietary Rights Agreement was fraudulently induced, the agreement was void and no title to his work validly passed, so the work remained his when it was taken; and in the alternative he has rescinded that agreement (¶¶34–35, 129).

163. The wrongs alleged in this Count run to Mr. Jones's own money and property, not to any interest of the Patent Office, and they are governed by the federal wire-fraud and trade-secret statutes as construed by the Supreme Court and the Court of Appeals for the Ninth Circuit, whose law supplies the rule of decision for sections 1341 and 1343 in this District. To the extent Defendants contend that this Count is in substance a claim of fraud on the Patent Office or of patent invalidity, it is not. Confidential business information and trade secrets in the hands of their private owner are property within the meaning of sections 1341 and 1343, and the thing of which Mr. Jones was deprived was property in his own hands before it was taken — unlike the unissued application held not to be the Patent Office's property in a prior federal decision, whose only victim was the Patent Office. The international patent filings are alleged as the instrumentality by which Defendants asserted ownership of, converted, and disclosed Mr. Jones's property, and not as a fraud upon the Patent Office; the necessary elements of the wrongs charged — the misappropriation and disclosure of Mr. Jones's pre-existing property — lie in the marketplace and not in any defense of inequitable conduct, so that the separate, state-law preemption holding does not reach the federal predicates charged here. No patent issued from the applications built on Mr. Jones's work, and Mr. Jones neither seeks nor needs any ruling correcting inventorship or adjudging any patent invalid or unenforceable. The object of the scheme alleged here was Mr. Jones's money (his option payments) and his property (his work), charged under sections 1343 and 1832, and not control over governmental action or the unauthorized use of any tangible article under any other statute. Independently, the theft of Mr. Jones's trade secrets is charged under 18 U.S.C. § 1832, an offense Congress expressly enumerated as a racketeering activity, 18 U.S.C. § 1961(1), to which the property analysis of that prior federal decision does not apply.

164. The allegations concerning Defendants' foundational patent filings, their representations and omissions to the Patent Office regarding that foundational technology, and the inventor declarations executed in connection with those filings (¶¶15–23) are pleaded as evidence of Defendants' knowledge and intent, their method of operation, and the impaired value of the consideration Mr. Jones received — and not as predicate acts or as the property of which Mr. Jones was deprived. Defendants' concealment of those same foundational facts from Mr. Jones, transmitted by the recruitment and employment wires to induce his employment, his option payments, and the assignment of his work, is charged as the

deceptive content of the wire-fraud predicates identified above (¶¶151–152), and not as any fraud upon the Patent Office. This Count does not charge any false statement to the Patent Office as itself a predicate act, except the wire transmissions, identified above, by which Defendants represented that they owned and had invented Mr. Jones's property in order to convert it (¶154).

165. By the conduct alleged above, Defendants violated 18 U.S.C. § 1962(c). They further violated section 1962(d) by conspiring to do so: each Defendant agreed that he, or another member of the enterprise, would commit at least two of the predicate acts in furtherance of the scheme. A Defendant who did not personally commit two predicate acts is liable for having agreed that a co-conspirator would, and this conspiracy included the persons and entities, named as Does 1 through 10, who participated in the 2025 assignment and the subsequent sale (¶¶77, 85).

166. By reason of these violations, Mr. Jones is entitled under 18 U.S.C. § 1964(c) to recover threefold the damages he has sustained, together with the cost of the suit and a reasonable attorney's fee. Those damages are the $56,437.50 he paid out of pocket and the loss in the value of his trade secrets and source code caused by the predicate acts — including the permanent destruction of their secrecy by the publications — that the return of his property cannot cure, in an amount according to proof. To the extent his trade secrets and source code cannot be returned to him, Mr. Jones seeks in the alternative threefold their full value, also according to proof. To the extent the August 15, 2025 General Assignment and the subsequent sale (¶¶156–157) placed Mr. Jones's property, and its value, beyond his reach, and that loss cannot be cured by the return of his property, the value so placed beyond his reach is part of the injury he sustained by reason of the violations charged in this Count and is recoverable threefold under 18 U.S.C. § 1964(c); Mr. Jones seeks no recovery under this Count for the value of any patent or of the patent estate, which is not his and which he alleges is without realizable value (¶¶78, 83). The return of his property in specie and the imposition of a constructive trust are sought under the Third, Fourth, and Seventh Causes of Action and not under this Count. Mr. Jones pleads these remedies in the alternative under Fed. R. Civ. P. 8(d) and will elect before judgment: he seeks either the return of his property in specie, or a constructive trust upon and the single value of that property, under those Causes of Action, or threefold that same economic loss under this Count — and not both as to the same loss; and he seeks no equitable relief under this Count.

SIXTH CAUSE OF ACTION

*(Breach of Fiduciary Duty) (Against Jon Karafin and Brendan Bevensee)*

167. Mr. Jones incorporates by reference paragraphs 1 through 41, 62 through 71, and 75 through 88 above as though fully set forth herein. This cause of action is brought against Mr. Karafin and Mr. Bevensee. As elsewhere in this Complaint, Mr. Jones does not seek to invalidate any patent or to be named an inventor on any patent (¶¶ 13, 36); he seeks relief only for the breaches of fiduciary duty practiced on him as a stockholder.

168. Light Field Lab is incorporated under the laws of the State of Delaware (¶ 2). Under the internal-affairs doctrine, the fiduciary duties that Light Field Lab's directors and officers owe to its stockholders are governed by the law of the State of incorporation — here, Delaware. To the extent any duty arising from Light Field Lab's sale of its own stock to Mr. Jones is instead governed by the law of California — the place of the parties' dealings and of Mr. Jones's performance — Mr. Jones pleads the same breaches under California law in the alternative. Any non-fiduciary duty of disclosure arising from Light Field Lab's sale of its own stock — whether statutory or sounding in fraud — is pleaded under the Third and Fifth Causes of Action; this Count rests on the fiduciary duties Light Field Lab's officers and director owed Mr. Jones once he held its stock.

169. Mr. Jones was a stockholder of Light Field Lab. Until he exercised his options, Mr. Jones held only contractual rights to acquire stock, and as the holder of such rights he was owed no fiduciary duty. Upon his first exercise — as of the December 10, 2020 issue date of Stock Certificate CS-13 (¶¶ 64–65) — Mr. Jones became a stockholder of Light Field Lab, and he increased his holdings with each subsequent exercise, ultimately acquiring and holding 80,625 shares of Light Field Lab common stock (¶ 64). Mr. Jones held those shares from his first exercise until they were cancelled and extinguished on July 13, 2025, in and following Light Field Lab's assignment for the benefit of creditors — a total loss of his equity (¶¶ 77–86).

170. From December 10, 2020 through the cancellation of his shares, as officers and a director of the Delaware corporation in which Mr. Jones held stock, Mr. Karafin — its co-founder, Chief Executive Officer, President, and a director (¶ 3) — and Mr. Bevensee — its co-founder, Chief Technology Officer, and Secretary (¶ 4) — each owed Mr. Jones the fiduciary duties of loyalty, care, good faith, and

candor that a corporation's fiduciaries owe to its stockholders. Officers owe the same fiduciary duties as the corporation's directors. Those duties include the duty to deal honestly with stockholders and, when communicating with a stockholder in connection with a stockholder's investment decision, to disclose fully and fairly the material facts within the fiduciaries' knowledge bearing on that decision.

171. Each of Mr. Jones's exercises of his options was an investment decision in which Light Field Lab sold Mr. Jones its own stock and committed his money to the corporation. On three separate occasions — settling on December 22, 2020, January 4, 2021, and May 6, 2021 — Mr. Jones paid Light Field Lab a total of $56,437.50 to acquire its stock, through the corporation's own Carta platform and on the corporation's form Exercise Agreement, and Mr. Karafin, as the Company's President, and Mr. Bevensee, as its Secretary, each approved and executed those transactions (¶¶ 64–66). His first exercise was the transaction by which he became a stockholder. The fiduciary duties pleaded here did not govern his earlier decision, made while he held only the option, to make that first exercise — that is so under Delaware law, which governs these duties under the internal-affairs doctrine, and equally under California law to the extent it applies in the alternative — and his claim for the inducement of that first exercise is pleaded under the Third and Fifth Causes of Action. His second and third exercises, by contrast, on which Light Field Lab sold him additional stock, were made while he was already a stockholder to whom the fiduciary duties described above were owed; in selling him additional stock and accepting his further investment in the corporation's own stock — transactions they themselves administered and executed — the fiduciaries were bound to deal honestly with him about the value of what he was buying. These were not informal communications; they were formal equity transactions between the corporation and its stockholder, administered by its fiduciaries, in which Mr. Jones committed money in reliance on the value of what he was buying.

172. The material facts within the fiduciaries' knowledge included the facts alleged above concerning the origin, provenance, and encumbrance of Light Field Lab's foundational patent portfolio — that the portfolio derived from light-field inventions Mr. Karafin and Mr. Bevensee had contributed to at Lytro; that the governing terminology had been changed one-for-one so that the derivation would not be apparent on the face of the documents; that the single most material Lytro reference had been withheld from the Patent Office; and that those circumstances clouded the portfolio's provenance,

defensibility, and valuation (¶¶ 13, 15–23) — together with the facts alleged above concerning Light Field Lab's taking of Mr. Jones's own source code and work product and its filing of patent applications on that work without crediting him (¶¶ 36–40). Mr. Karafin and Mr. Bevensee were each named inventors on the foundational Light Field Lab and Lytro filings (¶¶ 15–21) and so had personal knowledge of those facts. These facts bore directly on the value of the stock Mr. Jones was buying and holding, and they were known to the Company's fiduciaries and not known to, or reasonably discoverable by, Mr. Jones (¶¶ 34–35).

173. Mr. Karafin and Mr. Bevensee breached their fiduciary duties to Mr. Jones. In recruiting Mr. Jones and throughout his stockholding, they had held Light Field Lab's patent portfolio out to him as comprehensive, valuable, and sound (¶¶ 26–30) — a picture they knew to be false, having concealed its derived and encumbered Lytro provenance and their taking of his own work (¶ 172). Having chosen to speak to Mr. Jones about the very portfolio whose value determined what his stock was worth, the fiduciaries were bound to speak honestly and not to mislead him by half-truth; instead, as he made his second and third exercises and committed further money to acquire the Company's stock, and throughout his stockholding as he continued to hold the shares he had acquired, they allowed that false picture to stand and concealed the material facts that would have corrected it (¶ 172). To the extent their duty further required affirmative disclosure of those facts in connection with Mr. Jones's investment in the corporation's own stock, they breached that duty as well; they disclosed none of them.

174. From the time Mr. Jones became a stockholder, the fiduciaries' continuing concealment of the material facts described above induced him not only to make his further investments in the Company's stock but also to retain the shares he held. Had those facts been disclosed, Mr. Jones would have disposed of his shares rather than continue to hold them to their extinguishment; his retention, in reliance on the fiduciaries' continuing silence, of the 80,625 shares he was induced to hold is a loss for which they are answerable (¶¶ 35, 65; and see the Third Cause of Action).

175. Mr. Jones reasonably relied on his fiduciaries' silence. Had Mr. Karafin and Mr. Bevensee disclosed the material facts described above, Mr. Jones would not have made his second and third exercises or paid the Company the $49,437.50 those exercises cost, and he would not have retained the 80,625 shares he was induced to hold (¶¶ 35, 65) — shares that were later cancelled and extinguished in

Light Field Lab's assignment for the benefit of creditors. The harm Mr. Jones suffered is personal to him — the loss of his own money and of the equity he was induced to acquire and hold, since extinguished — and is distinct from any injury to the corporation; Mr. Jones brings this claim directly, in his individual capacity.

176. Mr. Jones did not discover, and through reasonable diligence could not have discovered, the concealed facts on which these breaches rest until in or about August 2025, for the reasons and on the timeline alleged above (¶¶ 34–35): the derivation had been affirmatively concealed by the one-for-one substitution of terminology designed to defeat the very comparison that would reveal it, was within Defendants' exclusive knowledge, and could not be recognized from Light Field Lab's patents alone; and the applications capturing Mr. Jones's own work did not become public until October 17, 2024 and February 27, 2025.

177. As a direct and proximate result of Mr. Karafin's and Mr. Bevensee's breaches of fiduciary duty, Mr. Jones has been damaged in an amount according to proof, including the $49,437.50 he paid on his second and third option exercises — each made while he was already a stockholder to whom the fiduciary duties were owed — and the lost value of the 80,625 shares he was induced to acquire and to retain, which were cancelled and extinguished in Light Field Lab's assignment for the benefit of creditors — a total loss of his equity. Because the breaches were committed knowingly and in bad faith, Mr. Jones is further entitled to exemplary damages, and to rescissory damages restoring what the breaches cost him — the consideration he paid on those exercises and the value of the equity he was induced to acquire and hold. The $7,000 he paid on his first option exercise, the decision to make which he reached before he became a stockholder (¶¶ 169, 171), is not sought under this Count; it, together with the loss described above, is recoverable under the Third Cause of Action (which does not depend on the existence of a fiduciary relationship) or, threefold, under the Fifth Cause of Action pursuant to 18 U.S.C. § 1964(c). Consistent with the election pleaded at ¶ 166, and pursuant to Fed. R. Civ. P. 8(d), Mr. Jones will elect before judgment and seeks no double recovery as to the same loss.

<u>SEVENTH CAUSE OF ACTION</u>

*(Violation of the Uniform Voidable Transactions Act — Cal. Civ. Code § 3439.04(a)(1)) (Against Light Field Lab and Does 1 through 10)*

178. Mr. Jones incorporates by reference paragraphs 1 through 41 and 75 through 88 above as though fully set forth herein. This cause of action is brought against Light Field Lab, the debtor that made the challenged transfers, and against Does 1 through 10, comprising the undisclosed purchaser or purchasers of Light Field Lab's non-patent assets, the undisclosed senior secured creditor that approved the sales and absorbed their proceeds, the persons who stand behind those purchasers and that secured creditor and who are affiliated with, or in control of, Light Field Lab's officers, directors, or controlling shareholders, or are one and the same with them (¶¶79–80, 85), and any entity through which any of them holds, or to which any of them has conveyed, the transferred assets or their proceeds. By this Count Mr. Jones does not seek to invalidate any patent, to be adjudged the owner of any patent, or to correct the inventorship of record (¶¶13, 82); he seeks the avoidance of the transfers of Light Field Lab's assets, and the return of his own property, to the extent necessary to satisfy his claims.

179. Mr. Jones is a creditor of Light Field Lab within the meaning of Cal. Civ. Code § 3439.01. His claims in this action — for unpaid compensation, for fraud, for the conversion of his property, for civil RICO, and the others pleaded above — are each a right to payment and therefore a "claim" under section 3439.01(b), whether or not that right has been reduced to judgment and whether it is liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, legal or equitable, secured or unsecured. Mr. Jones need not first reduce his claims to judgment to avoid a transfer made to defeat them. His claims arose before the transfers challenged below: he filed this action on June 17, 2025, and Light Field Lab executed the General Assignment on August 15, 2025 (¶¶77, 86).

180. Light Field Lab made transfers of its assets, within the meaning of Cal. Civ. Code § 3439.01(a) and (m). By the August 15, 2025 General Assignment for the Benefit of Creditors, signed for Light Field Lab by Mr. Karafin as its Chief Executive Officer, Light Field Lab conveyed all of its non-exempt property and assets of every kind — including its patent portfolio; its display prototypes, manufacturing equipment, computer hardware, and other tangible assets; its remaining cash and liquid assets; its "source codes, software, and related documentation"; and its choses in action — to the Assignee (the General Assignment § 1(a); ¶¶78, 83). The estate's patent portfolio was then conveyed onward, by a Patent Assignment Agreement made effective January 15, 2026, to the purchaser (¶79). Each of these is a transfer of an asset of Light Field Lab subject to the Act, and each was made while

this action was pending (¶86). That a transfer is effected through an assignment for the benefit of creditors does not place it beyond the Act's reach.

181. Light Field Lab made these transfers with actual intent to hinder, delay, or defraud Mr. Jones, a creditor, in violation of Cal. Civ. Code § 3439.04(a)(1). That intent is shown by the following facts, among others, several of which are badges of fraud the Act identifies in section 3439.04(b):

(a) Light Field Lab executed the General Assignment while this action was pending, having been sued by Mr. Jones, and only fourteen days after it refused his statutory demand to inspect its books and records (¶¶76–77). Cf. § 3439.04(b)(4), (b)(10).

(b) The General Assignment transferred substantially all of Light Field Lab's assets, leaving it a corporation with no disclosed assets from which a judgment in Mr. Jones's favor could be satisfied (¶¶78, 86). Cf. § 3439.04(b)(5).

(c) On information and belief, the transfers were made to or for the benefit of insiders: the purchaser of the assets, the senior secured creditor that approved the sales and absorbed the proceeds, and the majority shareholder who approved the Assignment are affiliated with Light Field Lab's officers, directors, or controlling shareholders, or are one and the same, on the bases pleaded above (¶85). Cf. § 3439.04(b)(1), (b)(11).

(d) The transfers were concealed. Light Field Lab did not notify Mr. Jones, a creditor, until six days after the Assignment (¶77); the Assignee refused, despite Mr. Jones's repeated formal demands as a creditor, to disclose the purchaser, the consideration, or the secured creditor, so that Mr. Jones had to learn the identity of the patent portfolio's purchaser for himself from the Patent Office's prosecution record, while the purchasers of the estate's other assets, and the disposition of his own source code, remain undisclosed (¶79); and neither transfer was recorded in the Patent Office's assignment index, which continued to show Light Field Lab as the owner of every patent it had purported to assign (¶81). Cf. § 3439.04(b)(2), (b)(3).

(e) The patents withheld from the sale were precisely those Mr. Jones had identified by number, in this action, as tied to his claims — one issued patent the Assignee carved out

and offered to him in exchange for a release of his claims, and two published applications it did not list among the assets it conveyed — while the continuation patents descending from the carved-out patent, and the broader foundational families Mr. Jones had likewise pleaded were built on the same misappropriated work, were conveyed to the purchaser (¶83). The holders thus removed from the sale the very patents Mr. Jones had singled out, while selling the broader portfolio he had pleaded was tainted — a selective disposition reflecting their awareness of his claims and their purpose to extinguish rather than satisfy them.

(f) Light Field Lab routed the transfers through a private assignment for the benefit of creditors, outside any bankruptcy subject to court supervision, in which it selected its own assignee and the assets were sold without court approval or the disclosure a bankruptcy would require (¶77); it closed in insolvency; and the Assignee declared that no distribution would be made to any priority creditor, unsecured creditor, or equity holder, so that Mr. Jones received nothing (¶86). Cf. § 3439.04(b)(9).

(g) Light Field Lab swept Mr. Jones's source code and work product into the estate while expressly warranting in the General Assignment that no asset had been transferred or used in a manner interfering with the rights of any third party — a warranty false as to Mr. Jones's property, and one Light Field Lab gave knowing of Mr. Jones's claim to that property, having been a defendant in this action since June 17, 2025 when it executed the Assignment on August 15, 2025 (¶83; the General Assignment § 4). Cf. § 3439.04(b)(4).

182. Each of these steps, so far as is apparent to Mr. Jones, ran in the same direction — favoring Light Field Lab's principals and the persons standing behind the purchaser and the secured creditor, and disfavoring Mr. Jones and the estate's other creditors — and none is explained by the legitimate, lowest-cost administration of an insolvent estate (¶85). Taken together, the single most reasonable inference is that Light Field Lab made the transfers with actual intent to place its assets, and Mr. Jones's own property, beyond his reach as a creditor pursuing them in this action.

183. The Patent Assignment Agreement recites that the conveyance of the patent estate was made pursuant to an Asset Purchase Agreement, and the conveyance was therefore a sale of the patent estate for consideration (¶79). The amount of that consideration, however, and whether it was

reasonably equivalent to the value of what was transferred, have not been disclosed; the Assignee has refused, despite Mr. Jones's repeated formal demands as a creditor, to disclose what the assets were, what they sold for, or to whom, and for at least one sale it took warrants of no current determinable value rather than cash (¶¶79, 86). A transfer made for valuable consideration is nonetheless voidable under section 3439.04(a)(1) where, as alleged, it was made with actual intent to hinder, delay, or defraud a creditor. In the alternative, and to the extent the transfers were made for less than a reasonably equivalent value, they are voidable as constructive fraudulent transfers under Cal. Civ. Code §§ 3439.04(a)(2) and 3439.05, Light Field Lab having closed in insolvency or having been rendered insolvent by the transfers (¶¶77, 86). These alternative theories are pleaded under Fed. R. Civ. P. 8(d).

184. The General Assignment also swept into the estate, and purported to transfer, Mr. Jones's own source code, trade secrets, and work product. That property was never Light Field Lab's to assign: the agreement by which Light Field Lab purported to acquire it was procured by the concealment alleged above and is void, so the work never validly passed to Light Field Lab (¶83). To the extent the General Assignment transferred Mr. Jones's property, that transfer is likewise voidable under section 3439.04(a)(1), and Mr. Jones's property — wherever and in whosever hands it is found — is subject to a constructive trust in his favor (Cal. Civ. Code § 3439.07(a)(3)(C); id. §§ 2223–2224). Mr. Jones seeks the return of that property, not its value. (This allegation is pleaded in the alternative to, and without abandoning, his allegation that the property was never Light Field Lab's and so never validly entered the estate.)

185. Mr. Jones is entitled to the relief the Act affords under Cal. Civ. Code § 3439.07, to the extent necessary to satisfy his claims, including: avoidance of the General Assignment and of the transfers it effected, to the extent necessary to satisfy his claims; attachment of the transferred assets, of the proceeds traceable to them, or of other property of the transferees; an injunction restraining the transferees, the secured creditor that absorbed the proceeds, and any person acting in concert with them from making any further transfer or disposition of the transferred assets or of the proceeds traceable to them; the appointment of a receiver to take charge of the transferred assets and of the proceeds traceable to them; a constructive trust over the transferred assets and over the proceeds traceable to them, in whosever hands they are found; and, where an asset or its proceeds can no longer be recovered, a

judgment for its value against the first transferee, any subsequent transferee, or the person for whose benefit the transfer was made, under Cal. Civ. Code § 3439.08(b). Because Light Field Lab's patent portfolio is, as alleged, of no realizable value (¶¶83, 181), the relief Mr. Jones seeks reaches the transfers of his own property and of the value-bearing assets whose proceeds the secured creditor absorbed, and not the recovery of any patent, the invalidation of any patent, or any adjudication of inventorship (¶¶13, 82, 178). The senior secured creditor's lien — its existence, validity, amount, perfection, and priority — has never been disclosed or verified, and, on information and belief, that creditor is an insider affiliate of Light Field Lab's principals (¶85); the value it absorbed therefore remains reachable, and the exclusion from the definition of an "asset" of property "to the extent it is encumbered by a valid lien" (Cal. Civ. Code § 3439.01(a)(1)) is not established on the pleadings. The transfers are challenged within the four-year period that Cal. Civ. Code § 3439.09 allows: the General Assignment was made on August 15, 2025 and the sale of estate assets on January 15, 2026, and this action was pending throughout.

186. Mr. Jones's election to seek avoidance and the recovery of value under Cal. Civ. Code § 3439.08 against Light Field Lab and the Doe transferees does not waive, and Mr. Jones expressly reserves, any claim in damages against any person who, though neither a transferee nor a person for whose benefit the transfers were made, conspired to make, effect, or conceal the transfers. *See* the General Assignment § 6 (reserving the creditors' right to sue third parties or persons who may be liable). Mr. Jones will seek leave to assert any such claim if discovery establishes the requisite participation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1. For general damages according to proof;

2. For special and compensatory damages, including but not limited to loss of wages, salary, benefits, back pay, front pay, future lost income and benefits, and other economic losses, in an amount according to proof at trial;

3. On the Fifth Cause of Action (Civil RICO), for threefold the damages Plaintiff has sustained, together with the costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c);

4. For an award of punitive damages, according to proof;

5. For attorneys' fees and costs of suit;

6. For rescission, for fraud in their inducement, of all of the agreements between Plaintiff and Light Field Lab, including the Confidentiality and Proprietary Rights Agreement, the offer letter and the agreements governing his employment, the equity instruments and any equity-incentive-plan document, and any arbitration agreement, and each other agreement by which Light Field Lab claims he is bound;

7. For a right of attachment;

8. For declaratory relief;

9. For injunctive relief;

10. For pre-judgment and post-judgment interest pursuant to Civil Code Sections 3287 and 3289, Code of Civil Procedure Section 685.010, and pursuant to any other provision of law providing for interest;

11. For the imposition of a constructive trust over Plaintiff's source code, trade secrets, and work product, and over the proceeds traceable thereto, in whosoever's hands they are found, and for an injunction requiring Defendants and those acting in concert with them to return and deliver that work to Plaintiff, to cease all use, exploitation, reproduction, and disclosure of it, and to destroy or surrender every copy in their possession or control;

12. For an accounting of all profits, gains, and benefits Defendants derived from their acquisition, use, disclosure, retention, and transfer of Plaintiff's source code, trade secrets, and work product, to determine the disgorgement of Defendants' unjust enrichment recoverable under Civil Code Section 3426.3 and 18 U.S.C. § 1836(b)(3)(B), and to quantify the proceeds subject to the constructive trust prayed for above, as against Defendants on the Third and Fourth Causes of Action, and not under the Fifth Cause of Action, under which Plaintiff seeks no equitable relief;

13. For restitution;

14. For such other and further relief that the Court may deem just and proper.

Dated: July 6, 2026

HENRY | LACEY PC

By /s/ Stephen Henry_____________
STEPHEN F. HENRY
Attorney for Plaintiff

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury in this action.

Dated: July 6, 2026

HENRY | LACEY PC

By /s/ Stephen Henry_____________
STEPHEN F. HENRY
Attorney for Plaintiff

# EXHIBIT 3

**STEPHEN F. HENRY, ESQ.**
**HENRY | LACEY PC**
STATE BAR # 142336
2625 Alcatraz Avenue, # 615
Berkeley, California 94705
Telephone: (510) 898-1883
Facsimile (510) 295-2516
shenry@HenryLacey.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

ALAN JONES,

Plaintiff,

vs.

LIGHT FIELD LAB, INC., JON KARAFIN, BRENDAN BEVENSEE, and Does 1 to 10,

Defendant,

Case No.: 3:25-cv-5118

**COMPLAINT FOR DAMAGES**

1. **RETALIATORY TERMINATION (Ca. Lab. Code §1102.5)**
2. **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**
3. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
4. **PROMISSORY ESTOPPEL**
5. **FRAUD AND DECEIT**
6. **VIOLATION OF PENAL CODE**
7. **CIVIL RICO**
8. **UNFAIR COMPETITION**
9. **BREACH OF FIDUCIARY DUTY**
10. **RECISSION**

Plaintiff Alan Jones ("Plaintiff") alleges the following against Defendant Light Field Lab Inc. ("LFL"), and Does 1-10 (collectively "Defendants"):

1. Plaintiff is an individual residing at all times mentioned in the Complaint within the State of Washington, the county in which he performed his duties under the employment contract with Defendant.

2. Defendant is a company incorporated in Delaware and at all times mentioned in operated in the State of California.

3. Defendant Jon Karafin is an individual employed by Defendant Light Field Lab in California.

4. Defendant Brendan Bevensee is an individual employed by Defendant Light Field Lab in California.

5. In addition to the Defendants named above, Plaintiff sues fictitiously Defendants Does 1 through 10, inclusive, because their names, capacities, status, or facts showing them to be liable are not presently known. Plaintiff is informed and believes, and thereon alleges that Defendants, and each of them, designated herein as Does 1 through 100, are responsible in some manner for the occurrences and happenings herein alleged, and that Plaintiff's damages, as herein alleged, were and are the direct and proximate result of the action of said Defendants, and each of them. Plaintiff will amend this complaint to show their true names and capacities, together with appropriate charging language, when such information has been ascertained.

6. Plaintiff further alleges that Defendants and Does 1-10, inclusive, are, and at all relevant times were, agents of one another and acting within the course and scope of said agency.

7. Plaintiff reserves the right to amend his/her charges to plead agency between Defendants and Does 1-10, inclusive, and any of them, at any time that he ascertains facts and supporting agency between such Defendants.

JURISDICTION AND VENUE

8. Plaintiff incorporates by reference each of the allegations contained in paragraphs 1 through 7 above, as well as facts currently unknown.

9. Jurisdiction over the defendants, and each of them, exists because each of the defendant entities named in this litigation are present and operating within the jurisdictional limits of the Northern District of California and each of the individual defendants named in this litigation are employed within the jurisdictional limits of the Northern District of California. Subject matter jurisdiction within the United States District Court exists because the amount in dispute exceeds $75,000.

10. Venue is proper because the employment relationship between Plaintiffs and defendants, and each of them, that gave rise to some of the claims in this litigation existed within this judicial district and most or all of the acts and omissions complained of in this litigation took place here. Venue is also proper because most or all of the acts and omissions that occurred outside of the above employment relationship and are complained of in this litigation took place within this judicial district.

**FACTS COMMON TO MORE THAN ONE CAUSE OF ACTION**

11. Mr. Jones was employed by LFL from September 30, 2019, through June 23, 2023. Mr. Jones initially worked as a Senior Pipeline Software Engineer and was promoted to Principal Engineer on July 27, 2020.

12. As part of his onboarding, on September 9, 2019, Mr. Jones signed a Confidentiality and Proprietary Rights Agreement that purported to grant rights to patents and other works for hire to LFL.

13. As part of Mr. Jones' onboarding, and subsequently during his employment, he was informed of the following false statements: During his initial hiring, Jon Karafin informed Mr. Jones about double trigger clauses, whereby on public listing or acquisition all options would instantly vest. Mr. Jones was also informed that the company's product would be delivered to the first theme customer, Universal, for use in a theme park in 2020/2021. This statement was intended to provide the impression that LFL was much closer to delivery of the product than it actually was and that an early exercise of options was expected. In reliance on these statement, Mr. Jones gave up Microsoft stock that was vesting in order to join LFL. Subsequently, there was no further discussion of Universal as a customer and no product was delivered to Universal.

14. Further, during the discussions regarding employment and while Mr. Jones worked for LFL, Jon Karafin also claimed that the number of outstanding shares was highly valuable confidential information and refused to share it with Mr. Jones. Mr. Jones raised the issue during hiring negotiations as it made it very difficult for Mr. Jones to determine the potential value of the options. As a security holder, Mr. Jones was entitled to books and records to assess his holdings but when he asked Jon Karafin in March 2023, in the context of a financial discussion about the company, "Understood, is there any additional information I'm entitled or required to be given access to as a shareholder?" he responded "Understood and appreciated. There are no current problems to be aware of (e-g- equity ownership and payroll) and can keep you posted- Again, not a political response, just the facts." Books and records would classify as additional (financial) information Mr. Jones was entitled to be given access to as a shareholder.

15. Throughout his tenure at LFL, Mr. Jones consistently received positive feedback regarding his job performance, a merit pay increase when he was promoted to Principal Engineer and periodic incentive pay bonuses. He maintained positive personal relationships with his coworkers and management.

16. Mr. Jones was instrumental in the development of LFL's SolidLight holographic display platform. Mr. Jones worked out of LFL's office from September 30, 2019, through March 7, 2020, and thereafter he worked remotely from his residence in Seattle, WA.

17. Mr. Jones is Type I Diabetic and suffers from a compromised immune system. Accordingly, Mr. Jones would be susceptible to severe illness and/or death if he were to contract COVID-19.

18. When LFL management announced that all of its employees would be required to return to in-office work by May 24, 2021, Mr. Jones requested that he be permitted to continue working remotely as an accommodation of his compromised immune system, which is a disability under federal and state law.

19. Although there does not appear to have been a formal accommodation process, LFL allowed Mr. Jones to continue working remotely and LFL management continued to provide Mr.

Jones with positive feedback regarding his job performance. At no time did anyone in LFL management indicate that in-office work was an essential function of Mr. Jones' job duties.

20. In December 2022-January 2023, Mr. Jones' supervisor, Mr. Trevor Berninger, Director of Software, began having discussions with Mr. Jones to stop working remotely and return to in-office work at LFL. Mr. Jones was surprised because he had been working remotely since March 7, 2020, and there had been no complaints about his job performance.

21. When Mr. Jones asked if there were performance issues that would give rise to the request that he return to in-office work, Mr. Berninger indicated that LFL did not have any issues with his job performance. When asked if there was a particular reason as to why LFL wanted him to return to in-office work, Mr. Berninger was very vague and unspecific and indicated that "it would just be better." Again, at no time did anyone at LFL indicate that working in-office was an essential job function of Mr. Jones' position.

22. Although Mr. Jones was open for discussion as to what would be reasonable accommodations for his return to in-office work, LFL did not engage in an interactive dialogue in this regard. In fact, Mr. Jones made repeated suggestions regarding masking protocol, testing protocol, social distancing and ventilation, but LFL did not respond to Mr. Jones' suggestions.

23. Mr. Jones understandably began to feel very marginalized by LFL management. He understood that LFL management wanted him to return to in-office work, but management was unwilling to implement a reasonable protocol to minimize his risk of exposure to COVID-19. Mr. Jones sensed that his relationships with LFL management were becoming strained, when he had previously enjoyed very positive relationships with leadership.

24. In January 2023, Mr. Jones was assigned to work on masking interference for Wavetracing Optics to improve image quality. Mr. Jones was working closely with LFL's CEO Mr. Jon Karafin who was the subject matter expert in this area; Mr. Karafin defined the scope of work and methodology of the work. In March 2023, Mr. Jones advised Mr. Karafin that the methodology was unworkable and was unlikely to result in improved image quality. Mr. Jones suggested a number of alternative approaches to improve image quality, but Mr. Karafin insisted that Mr. Jones continue with the methodology he himself had prescribed.

25. The matter came to a head on April 6, 2023, when Mr. Karafin made disparaging remarks regarding Mr. Jones' work on the Wavetracing Optics during a Software Team meeting that was attended by the entire software team of approximately 10 people. Mr. Karafin stated that it had been nearly six months and that Mr. Jones had failed to generate an image and indicated that it was unlikely that Mr. Jones' work would result in improved image quality.

26. Mr. Jones was absolutely dismayed that Mr. Karafin would publicly trivialize and disparage his work in such an aggressive manner in front of his coworkers. First, Mr. Karafin's statement was untrue; Mr. Jones had in fact generated images in January 2023. It was Mr. Karafin's own methodology that was unworkable, and Mr. Jones had advised Mr. Karafin that the methodology was unlikely to result in substantial image improvement in early March, 2023. Despite Mr. Karafin's knowledge that the methodology he prescribed was unworkable, he refused to change course. Instead, he scapegoated Mr. Jones and implied that the lack of progress in image improvement was due to Mr. Jones work performance, when he was well aware that the lack of progress was due to the fact that his own methodology had proved to be unworkable. On April 9, 2023, Mr. Jones submitted a rebuttal of Mr. Karafin's disparaging comments and a complaint of hostile work environment.

27. LFL conducted an investigation of Mr. Jones' hostile work environment complaint. When Mr. Jones was interviewed by the investigator, he explained that he believed that Mr. Karafin's animosity towards him was due to the fact that he was working remotely because of his disability. Mr. Jones also explained that he had been under increased pressure from LFL to return to in-office work, despite his disability.

28. Mr. Jones continued working on interference masking on the Wavetracing Optics and upon implementation of Mr. Karafin's methodology, it became apparent to LFL that the methodology did not result in substantial image improvement and, in fact resulted in a substantial reduction in the field of view. The technical concerns that Mr. Jones outlined in his complaint of April 9, 2023, were substantiated.

Case 3:25-cv-05118-JMC Document 1 Filed 06/09/25 Page 7 of 13

29. On June 16, 2023, Mr. Jones received an email indicating that the investigation had been concluded and that his claim of illegal hostile work environment based on disability had not been substantiated.

30. On June 23, 2023, Mr. Jones' employment was terminated. During the conference call it was indicated that "things aren't working out" and with the conclusion of the investigation, LFL was terminating Mr. Jones employment. There was no indication in the phone conference that LFL was terminating Mr. Jones for poor performance or unprofessional behavior. Rather, LFL was clearly terminating Mr. Jones for requesting accommodation and then making a complaint about illegal retaliation related to that request.

31. Later in the day on June 23, 2023, Mr. Jones received a letter of termination which stated that his employment was being terminated for poor performance and unprofessional behavior. Mr. Jones was shocked; during his nearly four year tenure at LFL, no one had complained about poor performance or unprofessional behavior. Notably, the termination letter falsely stated that the decision to terminate Mr. Jones' employment was made prior to the initiation of his hostile work environment complaint of April 9, 2023.

32. In this case, Mr. Jones reported conduct that he reasonably believed was motivated by unlawful discrimination. Additionally, the temporal proximity between the conclusion of the investigation on June 16, 2023, and the termination of Mr. Jones' employment a week later on June 23, 2023, indicates that LFL acted with retaliatory intent. The temporal proximity between the conclusion of the investigation and the termination of Mr. Jones employment raises a rebuttable presumption of retaliatory intent.

33. LFL's claim that it made a decision to terminate Mr. Jones' employment prior to the submission of his hostile work environment claim of April 9, 2023 is unsupported by any evidence.

34. LFL management never brought any job performance concerns to Mr. Jones either orally or in writing until April 6, 2023. In fact, Mr. Berninger advised Mr. Jones in December 2022, that LFL had no problems with Mr. Jones' job performance.

35. As a result of the termination based on false representations of poor performance of unprofessional behavior, Mr. Jones was deliberately denied the benefit of vested

and unvested stock options which he had earned as a result of his work for Defendant. Mr. Jones has suffered the loss of 116,458 LFL shares that were vested because he could not afford to exercise those options due to tax liability and the 90-day expiry of his options. Additionally, Mr. Jones suffered the loss of 102,917 unvested shares to which he would have been entitled had LFL not wrongfully terminated his employment.

36. In connection with Mr. Jones' employment, LFL, Jon Karafin, and Brendan Bevensee also engaged in fraud with respect to patent WO2025042476A1 and WO2024216300A2, patents that, regardless of any purported rights gained by LFL as a work for hire or on assignment pursuant to the Confidentiality and Proprietary Rights Agreement**,** should have included Mr. Jones' name as an inventor as they are entirely derived from Mr. Jones' work at LFL prior to his termination.

37. Patent WO2025042476A1 and WO2024216300A2, though fully derived from Mr. Jones' work, did not include Mr. Jones as an inventor, a fact not disclosed to Mr. Jones during or after his employment by LFL.

**FIRST CAUSE OF ACTION**

**(Ca. Lab. Code §1102.5)**

**(Against Defendant Light Field Lab and Does 1 through 10)**

38. Plaintiff repeats and realleges para. 1 through 37, and incorporates them by reference as though fully reproduced in this cause of action.

39. At all relevant time periods, Plaintiff was an employee of Defendant.

40. As alleged above, Plaintiff complained to Defendant's officers, directors, and/or managing agents that certain of Defendant's activities violated the law.

41. Defendant terminated Plaintiff, substantially motivated by Plaintiff's complaints detailed above.

42. As a legal and proximate result of Defendants' actions, Plaintiff has suffered special and general damages in an amount to be proven, but in excess of $1,000,000.

43. Defendants' actions were taken with malice, oppression, and fraud, such that exemplary and punitive damages should be awarded.

**SECOND CAUSE OF ACTION**

**(Wrongful Termination In Violation Of Public Policy)**

**(Against Defendant Light Field Lab)**

Plaintiff incorporates by reference each of the allegations contained in paragraphs 1 through 43 above, as well as facts currently unknown.

44. Plaintiff alleges that Plaintiff's termination was wrongful because it was in violation of the public policy of the State of California and the United States in that Plaintiff's termination was in retaliation for Plaintiff's opposing and reporting illegal activity, as described in preceding allegations.

45. Plaintiff further alleges that Defendant's termination of Plaintiff was in violation of the public policy as expressed in the Fair Employment and Housing Act.

46. Plaintiff further alleges that Defendant's termination of Plaintiff was in violation of the public policy as expressed in laws and regulations prohibiting retaliation against individuals who report violations of the law, including, but not limited to, California Labor Code § 1102.5, and in addition was a violation of said statute.

47. As a direct, foreseeable, and proximate result of defendants' violation of public policy, Plaintiff has suffered and continues to suffer substantial losses in earnings and job benefits, loss of opportunity and advancement, loss of employment prospects, and has suffered and continues to suffer humiliation, embarrassment, mental and emotional distress, and discomfort, all to Plaintiff's damage in an amount in excess of $1,000,000 the precise amount of which will be proven at trial.

48. Plaintiff claims these amounts, together with prejudgment interest pursuant to Civil Code section 3287, Code of Civil Procedure section 685.010 and pursuant to any other provision of law providing for prejudgment interest.

49. Because the acts taken toward Plaintiff were carried out by, condoned by and or ratified by managerial employees or managing agents acting in a deliberate, cold, callous, malicious, oppressive, and intentional manner in order to injure and damage Plaintiff, Plaintiff requests the assessment of punitive damages against Defendant in an amount appropriate to punish and make an example of Defendant.

**THIRD CAUSE OF ACTION**

**(Breach of the Covenant of Good Faith and Fair Dealing)**

**(Against Defendant Light Field Lab)**

Plaintiff hereby incorporates by reference Paragraphs 1 through 49 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

50. As a result of the contractual relationship that existed between Plaintiff and Defendant, the expressed and implied promises made in connection with that relationship, and the acts, conduct and communications resulting in these implied promises, Defendant promised to act in good faith toward and deal fairly with Plaintiff. These implied promises required Defendant to:

a. Give full cooperation to Plaintiff and his performance under the agreements and to refrain from doing any act which would prevent or impede Plaintiff's enjoyment of the fruits of the agreements;

b. Fairly, honestly and reasonably perform the terms and conditions of the agreements which Plaintiff was obliged to perform; and

c. Refrain from engaging in any illegal, unethical or unfair activities such as misrepresentation or the conversion of patents, options, stock and monies to which Plaintiff had an interest.

51. Defendant knowingly breached its agreements with Plaintiff for the purpose of frustrating Plaintiff's enjoyment of the benefits of the agreements. Further, Defendant did not adhere to its express and implied promises, as highlighted above. Accordingly, Defendant breached its implied covenant of good faith and fair dealing.

52. As a direct, foreseeable and proximate result of Defendant's failure to comply with its obligations to Plaintiff, including those outlined above, Plaintiff has suffered and continues to suffer losses in excess of $1,000,000, in an amount to be proven at trial.

53. Plaintiff claims these amounts, together with prejudgment interest pursuant to Civil Code section 3287, Code of Civil Procedure section 685.010 and pursuant to any other provision of law providing for prejudgment interest.

54. Based on Defendant's conduct as alleged herein, Defendant is also liable for Plaintiff's attorneys' fees pursuant to Labor Code section 218.5 and prejudgment interest pursuant to Labor Code section 218.6.

**FOURTH CAUSE OF ACTION**

**(Promissory Estoppel)**

**(Against Defendant Light Field Lab)**

Plaintiff hereby incorporates by reference Paragraphs 1 through 54 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

55. Defendant breached the clear and unambiguous promises described herein.

56. Plaintiff actually, reasonably and foreseeably relied on these promises to his detriment.

57. As a direct, proximate and foreseeable result of Defendant's breach of these promises, Plaintiff has suffered and continues to suffer losses in an amount to be proven at trial.

58. Injustice can only be avoided by enforcement of Defendant's promises.

59. Plaintiff claims these amounts, together with prejudgment interest pursuant to Civil Code section 3287, Code of Civil Procedure section 685.010 and pursuant to any other provision of law providing for prejudgment interest.

**FIFTH CAUSE OF ACTION**

**(Fraud and Deceit)**

**(Against Light Field Lab and Jon Karafin)**

Plaintiff hereby incorporates by reference Paragraphs 1 through 59 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

60. Defendants made representations as described in paragraphs 36 to 37 above including false representations regarding Plaintiff's employment, Plaintiff's stock options, and regarding inventorship of Patent WO2025042476A1 and WO2024216300A2.

61. In connection with Mr. Jones' employment, LFL, Jon Karafin, and Brendan Bevensee engaged in fraud with respect to patent WO2025042476A1 and WO2024216300A2, patents that, regardless of any purported rights gained by LFL as a work for hire or on assignment pursuant to the

Confidentiality and Proprietary Rights Agreement**,** should have included Mr. Jones' name as an inventor as they are entirely derived from Mr. Jones' work at LFL prior to his termination.

62. Patent WO2025042476A1 and WO2024216300A2, though fully derived from Mr. Jones' work, did not include Mr. Jones as an inventor, a fact not disclosed to Mr. Jones during or after his employment by LFL.

63. Further, representations regarding the value of Plaintiff's stock and options were false, and the true information regarding the value of Plaintiff's stock and options was concealed, as identified in paragraphs 13 and 14, Defendants used the misrepresentations to induce Plaintiff to continue his employment, a result Defendants could not have achieved truthfully.

64. Defendants knew said representations to be false and intended to conceal the true facts from Plaintiff to unlawfully persuade Plaintiff, to his detriment.

65. Plaintiff relied upon the misrepresentations made to him, and did not know the true facts concealed from him, to his detriment.

66. Further, Defendants, including Defendant Karafin, had a duty to disclose facts regarding Plaintiff's compensation and possible loss of that compensation as part of the employer employee relationship.

67. Defendants, including Defendant Karafin, had a duty to disclose that while they were providing stock options as compensation for Plaintiff's services, those stock options could be taken away by denying Plaintiff the ability to exercise those options.

68. Instead, Defendants, including Defendant Karafin, concealed facts regarding Plaintiff's compensation and possible loss of that compensation, including denying Plaintiff the ability to exercise his earned stock options.

69. Plaintiff did not discover the fraud and deceit practiced upon him as set forth herein until he started his employment with defendants, attempted to fulfill his responsibilities, continued to provide Defendants with valuable intellectual information (which they kept for themselves), was terminated, and thereby realized that Defendants' representations were false and that Defendants had concealed their true intent, including the intent to misappropriate his intellectual information.

70. As a proximate result of the representations of Defendants to Plaintiff as set forth herein, Plaintiff has suffered and continues to suffer the loss of stock, wages and benefits in an amount to be proven at trial, as well as stock options, the precise amount of which will be proven at trial.

71. As a further direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered extreme anguish, humiliation, and emotional distress, the extent of which will be proven at trial.

72. Because the acts taken toward Plaintiff were carried out by, condoned by and or ratified by managerial employees or managing agents acting in a deliberate, cold, callous, fraudulent, malicious, oppressive, and intentional manner in order to injure and damage Plaintiff, Plaintiff requests the assessment of punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

73. As a result of the facts above, Plaintiff is entitled to injunctive relief to invalidate WO2025042476A1 and WO2024216300A2, prevent Defendants from using his intellectual property, and the transfer of all intellectual property related to WO2025042476A1 and WO2024216300A2 created by Plaintiff to Plaintiff.

74. WHEREFORE, Plaintiff requests relief as hereinafter provided.

**SIXTH CAUSE OF ACTION**

**(Violation of Penal Code Sections 484 & 496)**

**(Against Defendant Light Field Lab, Jon Karafin, Brendan Bevensee, and Does 1 through 10)**

Plaintiff hereby incorporates by reference Paragraphs 1 through 74 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

75. Defendants' misrepresentations to Plaintiff, including fraudulent statements regarding stock options, stock, and inventorship of Patent WO2025042476A1 and WO2024216300A2, constituted theft of personal property, in the form of Plaintiff's right to inventorship of those patents, under Penal Code section 484 insofar as Defendants have "knowingly and designedly, by…false or fraudulent representation or pretense, defraud[ed][Plaintiff] of…personal property."

76. Defendants' misrepresentations to Plaintiff including fraudulent statements regarding stock options, stock, and inventorship of Patent WO2025042476A1 and WO2024216300A2 constituted

theft under Penal Code section 484 insofar as Defendants have "knowingly and designedly, by…false or fraudulent representation or pretense, defraud[ed][Plaintiff] of money…."

77. Defendants have retained stock options that should have been provided to Plaintiff.

78. Defendants have retained inventorship of Patent WO2025042476A1 and WO2024216300A2 that should have been provided to Plaintiff.

79. In so doing, Defendants have knowingly received and deliberately withheld stock options and patent rights from Plaintiff, knowing that Defendants have no right, title, or interest in the stock options or patent rights and that said stock options and patent rights have been stolen from Plaintiff and/or obtained in a manner constituting theft.

80. As a direct, foreseeable, and proximate result of Defendants' theft, Plaintiff has suffered and continues to suffer a loss of the value of his inventorship, the precise amount of which will be proven at trial.

81. Plaintiff has been damaged as a result of the theft of his personal property and is entitled to treble damages pursuant to Penal Code section 496(c).

82. As a result of the acts described above, Plaintiff is entitled to injunctive relief to invalidate WO2025042476A1 and WO2024216300A2, prevent Defendants from using his intellectual property, and the transfer of all intellectual property related to WO2025042476A1 and WO2024216300A2 created by Plaintiff to Plaintiff.

83. WHEREFORE, Plaintiff requests relief as hereinafter provided.

**SEVENTH CAUSE OF ACTION**

**(Civil RICO)**

**(Against Defendants Light Field Lab Jon Karafin, Brendan Bevensee, and Does 1 through 10)**

Plaintiff hereby incorporates by reference Paragraphs 1 through 83 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

84. Defendant Light Field Lab is an enterprise engaged in and the activities of which affect interstate commerce, to wit: a corporation incorporated under the laws of the State of Delaware.

85. Defendant Jon Karafin, as a person within the meaning of 18 U.S.C.A. § 1961(3), and as a person employed by said enterprise, conducted and participated, directly and indirectly, in the conduct

of the affairs of said enterprise through a pattern of racketeering activity in violation of 18 U.S.C.A. § 1962(c).

86. Defendant Brendan Bevensee, as a person within the meaning of 18 U.S.C.A. § 1961(3), and as a person employed by said enterprise, conducted and participated, directly and indirectly, in the conduct of the affairs of said enterprise through a pattern of racketeering activity in violation of 18 U.S.C.A. § 1962(c).

87. The predicate acts which constitute this pattern of racketeering activity are: fraudulent communications regarding Patent WO2025042476A1 and WO2024216300A2 using means of interstate communication, including electronic filing, mail and email.

88. These acts of racketeering, occurring within ten years of one another, constitute a pattern of racketeering activity within the meaning of 18 U.S.C.A. § 1961(5).

89. Plaintiff was injured in his property by reason of this violation of 18 U.S.C.A. § 1962, in that, as a direct and proximate result of Defendant's complained of acts, Plaintiff suffered damages, including loss of money.

90. By reason of the Defendants' violation of 18 U.S.C.A. § 1962, Plaintiff is entitled, pursuant to 18 U.S.C.A. § 1964(c), to threefold the damages sustained, with interest thereof at 10% per annum, and a reasonable attorney's fee in connection herewith.

91. As a result of the acts described above, Plaintiff is entitled to injunctive relief to invalidate WO2025042476A1 and WO2024216300A2, prevent Defendants from using his intellectual property, and the transfer of all intellectual property related to WO2025042476A1 and WO2024216300A2 created by Plaintiff to Plaintiff.

**EIGHTH CAUSE OF ACTION**

**(For Unfair Competition)**

**(Business & Professions Code § 17200 et seq.)**

**(Against Defendant Light Field Lab)**

Plaintiff hereby incorporates by reference Paragraphs 1 through 91 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

92. Defendants' violations of laws and regulations as alleged by this complaint, within the last four years, constitute unfair business practices in violation of the Unfair Competition Law, Business & Professions Code § 17200, et seq.

93. As a result of Defendants' unfair business practices, Defendants have reaped unfair benefits and illegal profits at the expense of Plaintiff, and members of the public. Defendants' utilization of such unfair business practices constitutes unfair competition and provides an unfair advantage over Defendants' competitors. Defendants should be made to disgorge their ill-gotten gains and restore such monies to Plaintiff.

94. Defendants' unfair business practices entitle Plaintiff to seek preliminary and permanent injunctive relief, including but not limited to orders that the Defendants account for, disgorge and restore to Plaintiff the compensation unlawfully withheld from them and for which they were unjustly enriched. As a result of the acts described above, Plaintiff is entitled to injunctive relief to invalidate WO2025042476A1 and WO2024216300A2, prevent Defendants from using his intellectual property, and the transfer of all intellectual property related to WO2025042476A1 and WO2024216300A2 created by Plaintiff to Plaintiff.

**NINTH CAUSE OF ACTION**

**(Breach of Fiduciary Duty)**

**(Against Defendant Light Field Lab)**

Plaintiff hereby incorporates by reference Paragraphs 1 through 94 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

95. Plaintiff is, and at all times relevant to this amended complaint, was a minority option and share holder of Defendant LFL.

96. Defendant LFL improperly failed to provide necessary information to Plaintiff as an option and share holder.

97. As a result of the acts of Defendant LFL, Plaintiff was prevented from converting and selling his shares.

98. As a proximate result of the wrongful acts and omissions of Defendant LFL to Plaintiff as set forth herein, Plaintiff has suffered and continues to suffer the loss of value of his stock, the precise amount of which will be proven at trial.

99. Defendant LFL committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice and in conscious disregard of Plaintiff's rights, justifying the imposition of punitive damages.

**TENTH CAUSE OF ACTION**

**(Rescission)**

**(Against Defendant Light Field Lab)**

Plaintiff hereby incorporates by reference Paragraphs 1 through 94 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

100. Prior to September 9, 2019, Plaintiff and Defendant LFL began negotiations concerning an employment contract. During negotiations, Plaintiff and Defendant LFL agreed that Plaintiff would provide his knowledge and skills to Defendant in return for compensation including equity.

101. On or about September 9, 2019, Plaintiff and Defendant LFL reduced their negotiations to a written agreement which included an assignment of Plaintiff's intellectual property.

102. The assignment of Plaintiff's intellectual property fails to represent the true intentions of Plaintiff and Defendant, including, but not limited to, whether Plaintiff agreed to assignment of all of Plaintiff's intellectual property to Defendant LFL to the extent that he was denied inventorship of Patent WO2025042476A1 and WO2024216300A2.

103. This mistake in the purported agreement was the result of fraudulent statements on the part of Defendant to deny Plaintiff inventorship of Patent WO2025042476A1 and WO2024216300A2, and be fully compensated for his contributions to Defendants.

104. As a result of the mistake in the written agreement, plaintiff is entitled to rescission of the Confidential Agreement and Invention Assignment Agreement.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1. For general damages according to proof;

2. For special and compensatory damages, including put not limited to, loss of wages, salary, benefits, back pay, front pay, future lost income and benefits, and other economic losses, in an amount according to proof at trial;

3. For treble damages;

4. For an award of punitive damages, according to proof;

5. For attorneys' fees and costs of suit;

6. For rescission of a contract;

7. For injunctive relief;

8. For pre-judgment and post-judgment interest pursuant to Civil Code Sections 3287 and 3289, Code of Civil Procedure Section 685.010 and pursuant to any other provision of law providing for interest;

9. For such other and further relief that the Court may deem just and proper.

Dated: June 17, 2025

HENRY | LACEY PC

By /s/ Stephen Henry______________
STEPHEN F. HENRY
Attorney for Plaintiff

Plaintiff demands trial by jury in this action.

Dated: June 17, 2025

HENRY | LACEY PC

By /s/ Stephen Henry______________
STEPHEN F. HENRY
Attorney for Plaintiff

# EXHIBIT 4

SARA A. MOORE (SBN: 294255)
SARAH B. ABSHEAR (SBN: 270947)
GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111
Telephone: (415) 986-5900
Facsimile: (415) 986-8054
smoore@grsm.com
sabshear@grsm.com

Attorneys for Defendants
LIGHT FIELD LAB, INC.

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALAN JONES, an individual<br><br>Plaintiff,<br><br>vs.<br><br>LIGHT FIELD LAB, INC., JON KARAFIN, BRENDAN BEVENSEE, and Does 1 to 10,<br><br>Defendants. | CASE NO. 3:25-cv-05118-MMC<br><br>**DEFENDANT LIGHT FIELD LAB'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR DAMAGES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: October 24, 2025<br>Time: 9 a.m.<br>Judge: The Honorable Maxine M. Chesney<br>Courtroom: 7<br><br>*Accompanying Papers:*<br>*Defendant's Request for Judicial Notice; Declaration of Sara A. Moore; Proposed Order*<br><br>Complaint Filed: June 17, 2025 |

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. RELEVANT ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS ..... 2

A. Plaintiff's Employment with LFL and the Agreements He Entered Into ..... 2

B. Following His Termination, Plaintiff Raises Stock Options Claims and LFL Seeks Declaratory Relief Regarding the Terms of Plaintiff's Contract ..... 3

C. Plaintiff Successfully Moves to Dismiss LFL's Request for Declaratory Relief by Representing There Were No Stock Options Claims ..... 3

D. Plaintiff Files This Action, Pleading Claims Relating to Contracts with LFL and Contractual Disputes About Stock Options and Intellectual Property ..... 4

III. LEGAL STANDARD ..... 5

IV. LEGAL ARGUMENT ..... 6

A. Plaintiff's Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Causes of Action Are Barred by Estoppel Doctrines, the Preemption of the Patent Act, and/or Plaintiff's Lack of Standing ..... 6

1. Plaintiff's Third, Fourth, Fifth, Sixth, Eighth, Ninth, and Tenth Causes of Action Are Barred by the Doctrines of Judicial Estoppel, Claim Preclusion and Issue Preclusion ..... 7

a. Plaintiff's Claims Are Barred by the Doctrine of Judicial Estoppel ..... 7

b. Plaintiff's Claims Are Barred by Claim Preclusion ..... 9

c. Plaintiff's Claims Are Barred by Issue Preclusion ..... 11

2. Plaintiff's Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Tenth Causes of Action Are Preempted By the Patent Act and Plaintiff Lacks Standing to Sue Because He Assigned His Rights to LFL ..... 11

a. Plaintiff's Claims Are Preempted by the Patent Act ..... 12

b. Plaintiff Lacks Standing to Sue Regarding Any Intellectual Property Rights ..... 13

B. Plaintiff's Cause of Action for Breach of the Covenant of Good Faith and Fair Dealing Fails to Identify a Contract or State a Claim ..... 13

C. Plaintiff's Cause of Action for Promissory Estoppel Fails Because of the Express Written Contracts Between the Parties on the Subject Matter ............... 14

D. Plaintiff's Cause of Action for Fraud and Deceit Fails Because It Does Not Meet the Heightened Specificity and Particularity Requirements for Fraud ....... 15

E. Plaintiff's Cause of Action for Violation of Penal Code Sections 484 and 496 Fails Because It Does Not Meet the Heightened Specificity and Particularity Requirements for the Fraud Component of the Relevant Crimes ........................................................................................ 17

F. Plaintiff's Cause of Action for Civil RICO Fails Because It Consists Solely of Conclusory Statements Without Factual Information .......................... 18

G. Plaintiff's Cause of Action for Breach of Fiduciary Duty Fails Because it Plaintiff Fails to Plead Facts Concerning What "Necessary Information" He Was Not Provided ........................................................................ 21

H. Plaintiff's Cause of Action for Rescission is a Remedy and Fails for the Same Reasons as the Underlying Causes of Action Already Discussed ............ 21

I. There Are No Factual Allegations of Wrongdoing Regarding Brendan Bevensee in the Entire Complaint........................................................ 22

V. CONCLUSION ......................................................................................... 22

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Assoc. Gen. Contractors of Calif. v. Calif. State Council of Carpenters*, 459 U.S. 519 (1983)....6

*Balistreri v. Pacifica Police Dept.*, 901 F.2d 696 (9th Cir. 1999)....1

*Banga v. Experian Info. Sols., Inc.*, No. C 09-04867 SBA, 2013 WL 5539690 (N.D. Cal. Sept. 30, 2013)....10, 11

*BearBox LLC v. Lancium LLC*, 125 F.4th 1101 (Fed. Cir. 2025)....12

*Bily v. Arthur Young & Co.*, 3 Cal.4th 370 (1992)....16

*CAA Indus., Ltd. v. Recover Innovations, Inc.*, No. 222-CV-00581-GMN-EJY, 2023 WL 9056823 (D. Nev. Dec. 29, 2023)....12

*Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008)....20

*Certicable Inc. v. Point 2 Point Commc'ns Corp.*, No. 2:23-CV-5322 (NJC) (SIL), 2025 WL 622547 (E.D.N.Y. Feb. 26, 2025)....13

*Chapman v. Skype, Inc.* 220 Cal.App.4th 217 (2013)....16

*Cnty. of Marin v. Deloitte Consulting LLP*, 836 F.Supp.2d 1030 (N.D. Cal. 2011)....19

*Daniels v. Select Portfolio Servicing, Inc.* 246 Cal.App.4th 1150 (2016)....15, 16

*Doan v. Singh*, 617 F.App'x 684 (9th Cir. 2015)....20

*Dorian v. Cmty. Loan Servicing, LLC*, No. 22-CV-04372-DMR, 2022 WL 7620460 (N.D. Cal. Oct. 13, 2022)....7

*Finn v. Sullivan*, 228 F.Supp.3d 972 (N.D. Cal. 2017)....8, 9

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

*Frank v. United Airlines, Inc.*,
216 F.3d 845 (9th Cir. 2000) ....................10

*Gardner v. Starkist Co.*,
418 F. Supp. 3d 443 (N.D. Cal. 2019) ....................19

*Gregory C. James v. J2 Cloud Services Inc.*,
No. 216-CV-05769-CAS-PJWX, 2018 WL 6092461 (C.D. Cal. Nov. 19, 2018) ....................13

*Grimmett v. Brown,*
75 F.3d 506 (9th Cir.1996) ....................19

*Guz v. Bechtel Nat. Inc.*,
24 Cal.4th 317 (2000) ....................14

*Hailey v. California Physicians' Serv.*,
158 Cal.App.4th 452 (2007), *as modified on denial of reh'g* (Jan. 22, 2008) ....................22

*Hamilton v. State Farm Fire & Cas. Co.*,
270 F.3d 778 (9th Cir. 2001) ....................7

*Hinesley v. Oakshade Town Center*,
135 Cal.App.4th 289 (2005) ....................15, 16

*Jennings v. Auto Meter Prods., Inc.*,
495 F.3d 466 (7th Cir. 2007) ....................20

*Kwikset Corp. v. Superior Court*,
51 Cal.4th 310 (2011) ....................16

*Lazar v. Superior Court*
12 Cal.4th 631 (1996) ....................15, 16

*Mangaoang v. Special Default Services, Inc.*,
427 F.Supp.3d 1195 (N.D. Cal. 2019) ....................8

*Manzarek v. St. Paul Fire & Marine Ins. Co.*
(9th Cir. 2008) 519 F.3d 1025 ....................6

*Medallion Television Enters., Inc. v. SelecTV of California, Inc.*,
833 F.2d 1360 (9th Cir. 1987) ....................20

*Methode Elecs. Inc. v. Hewlett-Packard Co.*,
No. C 99-04214 SBA, 2000 WL 1157933 (N.D. Cal. May 4, 2000) ....................12, 13

*Mohebbi v. Khazen*,
50 F. Supp. 3d 1234 (N.D. Cal. 2014) ....................15, 19

*Moore v. Kayport Package Exp., Inc.*,
885 F.2d 531 (9th Cir. 1989) ........................................................................19, 20

*Nakash v. Superior Ct.*,
196 Cal.App.3d 59 (1987) ........................................................................22

*New Hampshire v. Maine*,
532 U.S. 742 (2001)........................................................................7, 8

*OptoLum, Inc. v. Cree, Inc.*,
244 F. Supp. 3d 1005 (D. Ariz. 2017) ........................................................................12

*In re Outlaw Laboratories, LP Litigation*,
352 F.Supp.3d 992 (S.D. Cal. 2018)........................................................................22

*Pac. Recovery Sols. v. United Behav. Health*,
481 F. Supp. 3d 1011 (N.D. Cal. 2020) ........................................................................19

*In re Palmer,*
207 F.3d 566 (9th Cir. 2000) ........................................................................11

*People v. Ashley*,
42 Cal.2d 246 (1954) ........................................................................18

*People v. Lawson*,
215 Cal.App.4th 108 (2013) ........................................................................18

*People v. Williams*,
57 Cal.4th 776 (2013) ........................................................................18

*Powell v. Home Depot U.S.A, Inc.*,
No. 07-80435-CIV, 2010 WL 375796 (S.D. Fla. Jan. 26, 2010)........................................12

*Robertson v. Dean Witter Reynolds, Inc.*,
749 F.2d 530 (9th Cir. 1984) ........................................................................5

*San Remo Hotel L.P. v. San Francisco City and County*,
364 F.3d 1088 (9th Cir. 2004) ........................................................................10

*Sanford v. MemberWorks, Inc.*,
625 F.3d 550 (9th Cir. 2010) ........................................................................20

*Scott v. Hodges*,
No. C 96-01970 EFL, 1996 WL 161774 (N.D. Cal. Mar. 29, 1996)........................................10

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001) ........................................................................6

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ....................6

*Stearns v. Select Comfort Retail Corp.*,
No. 08-2746 JF, 2009 WL 1635931 (N.D. Cal. June 5, 2009) ....................20

*Steckman v. Hart Brewing*,
143 F.3d 1293 (9th Cir. 1998) ....................6

*Taylor v. Sturgell*,
553 U.S. 880 (2008) ....................9

*In re Tobacco II Cases*
46 Cal.4th 298 (2009) ....................16

*Trireme Med., LLC v. AngioScore, Inc.*,
812 F.3d 1050 (Fed. Cir. 2016) ....................13

*Turner v. Cook*,
362 F.3d 1219 (9th Cir. 2004) ....................20

*Univ. of Colo. Found. v. Am. Cyanamid Co.*,
196 F.3d 1366 (Fed. Cir. 1999) ....................12

*Vaughan v. Wardhaugh*,
No. 23-CV-02879-RFL, 2024 WL 2853972 (N.D. Cal. May 10, 2024) ....................19

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) ....................15

*Villarroel v. Recology Inc.*,
775 F.Supp.3d 1050 (N.D. Cal. 2025) ....................20

*Walker v. KFC Corp.*,
728 F.2d 1215 (9th Cir. 1984) ....................15

*Whyte Monkee Prods. LLC v. Netflix, Inc.*,
757 F. Supp. 3d 1025 (N.D. Cal. 2024), *reconsideration denied*, No. 23-CV-03438-PCP, 2025 WL 974940 (N.D. Cal. Apr. 1, 2025) ....................9, 10

*Wong v. Stoler*,
237 Cal. App. 4th 1375, 188 Cal.Rptr.3d 674 (2005), *as modified on denial of reh'g* (June 23, 2015) ....................22

*Youngman v. Nevada Irr. Dist.*,
70 Cal.2d 240 (1969) ....................14

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

**Statutes**

18 U.S.C. § 1962(c) ....................19

Cal. Civ. Code § 1710(1) ....................16

Cal. Civ. Code § 1710(3) ....................16

Cal. Civ. Code § 1710(4) ....................16

Cal. Penal Code § 484 ....................17, 18

**Rules**

Fed. R. Civ. P. 8 ....................7, 21

Fed. R. Civ. P. 8(a)(2) ....................1

Fed. R. Civ. P. 9 ....................19

Fed. R. Civ. P. 9(b) ....................1, 15, 20

Fed. R. Civ. P. 12(b)(6) ....................1, 5, 15

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on October 24, 2025 at 9 a.m., or as soon thereafter as the matter may be heard in the above-entitled court, Defendant LIGHT FIELD LAB, INC. ("Defendant" or "LFL") will and hereby does move the Court for dismissal of Plaintiff ALAN JONES' ("Plaintiff") Complaint for Damages ("Complaint") as to the Third, Fourth, Fifth, Sixth, Eighth, Ninth, and Tenth Causes of Action.

This motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, Federal Rule of Civil Procedure 8(a)(2) for failure to plead facts showing that the pleader is entitled to relief, and Federal Rule of Civil Procedure 9(b) for failure to plead with particularity special matters, i.e., fraud and RICO claims. In addition, dismissal pursuant to Rule 12(b)(6) is proper here due to an "absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1999). Plaintiff's claims should also be dismissed pursuant to the equitable doctrine of judicial estoppel along with claim and issue preclusion, which can be invoked by a court at its discretion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

Plaintiff Alan Jones ("Plaintiff" or "Jones"), a former employee of Defendant Light Field Lab, Inc. ("LFL"), was terminated in June 2023. Plaintiff claims that he was wrongfully terminated and the Complaint alleges wrongful termination claims in counts one and two, not at issue in this motion. In addition to his wrongful termination claims, Plaintiff alleges that he is owed certain stocks and stock options, as well as the rights to two patents he claims he invented while working for LFL. When LFL learned of Jones' contractual claims regarding the stocks and stock options, it promptly took action to protect its other stockholders by bringing a declaratory relief action in this Court. Jones filed a motion to dismiss, disavowing any rights to the stocks and stock options other than as damages for wrongful termination. Jones' concession that he had no contract claims against LFL resulted in the relief he sought: LFL's declaratory relief action

was dismissed.

Now, Plaintiff seeks to assert the very claims he said he would not pursue, claims he is estopped from making now under the doctrines of judicial estoppel, claim preclusion, and issue preclusion. Plaintiff also ignores the fact that he assigned his intellectual property rights to LFL upon his employment, claiming he is nevertheless entitled to the patents. Most damning to Plaintiff is that his claims are preempted by the Patent Act. As a matter of pleading, Plaintiff's claims are not factually supported; they are conclusory and contradicted by Plaintiff's own admissions and the contracts he entered into with LFL. Because Plaintiff's claims fail to state a claim upon relief should be granted, his Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth causes of action should be dismissed as a matter of law, without leave to amend.

## II. RELEVANT ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS[1]

### A. Plaintiff's Employment with LFL and the Agreements He Entered Into

Plaintiff was employed by LFL from September 2019 to June 2023 as a software engineer. Complaint, ¶ 11. In connection with his employment, Plaintiff admits that he entered into one or more contracts with LFL, describing those agreements in multiple ways, including as follows: "an employment contract," an agreement that "Plaintiff would provide his knowledge and skills to Defendant in return for compensation including equity," and/or a "written agreement which included an assignment of Plaintiff's intellectual property." *See, e.g., id.* at ¶¶ 100-104. Plaintiff admits those agreements were entered into on or about September 9, 2019. *Id.* Elsewhere, Plaintiff refers to the written agreement(s) as a "Confidentiality and Proprietary Rights Agreement that purported to grant rights to patents and other works for hire to LFL," a "Confidential Agreement," and an "Invention Assignment Agreement." *Id.* at ¶¶ 12, 100-104.

Plaintiff's employment was terminated in June 2023. *Id.* at ¶ 31.

/ / /

/ / /

[1] Plaintiff's allegations, unless contradicted by judicially noticeable facts, are accepted as true for purposes of this Motion, and Defendants do not admit the truth of those allegations by including them herein.

**B. Following His Termination, Plaintiff Raises Stock Options Claims and LFL Seeks Declaratory Relief Regarding the Terms of Plaintiff's Contract**

Shortly after he was terminated, Plaintiff raised claims related to his stock options and in connection with his termination to LFL. *See* Request for Judicial Notice ("RJN") Exh. 1, Case No. 5:23-cv-05344, ECF No. 1 ("LFL Complaint"). LFL was concerned about the uncertainty Plaintiff's claims introduced into the value of its stocks and stock options, which was Exhibit A to the LFL Complaint. *See* RJN Exh. 1. As a result, on October 19, 2023, LFL filed a request for declaratory relief in this Court, alleging, *inter alia*, that while "Jones threatens to sue to obtain the equity interest" in shares of company stock, "**Jones has no rights under the express terms of the Plan Documents.**" RFJ Exh. 1, LFL Complaint, ¶ 4. The Complaint sought a declaration that "**Jones never earned any right** to Light Field Lab's stock equity interest…and that the alleged vested stock options to Jones expired three months after his employment at Light Field Lab ended." *Id.* at Prayer for Relief, ¶ 1.

**C. Plaintiff Successfully Moves to Dismiss LFL's Request for Declaratory Relief by Representing There Were No Stock Options Claims**

Plaintiff moved to have the LFL Complaint dismissed, arguing that the "framing of the dispute between the parties [as presented in the LFL Complaint] is **a sham**." *See* RJN Exh. 2, Case No. 5:23-cv-05344, ECF No. 32, Jones Motion to Dismiss LFL Complaint ("Jones Motion to Dismiss"), p. 1. Plaintiff accused LFL of "falsely fram[ing] the dispute as a 'contractual' one" and "re-fram[ing] the dispute as a 'contractual dispute,'" when it was really only about wrongful termination. *Id.* at 4. According to Plaintiff, there were no stock options claims, and the stock options were only relevant insofar as they could be "a basis to claim damages arising out of the employment discrimination/retaliation claims JONES held inchoate and as a means for consideration should the parties reach a settlement." *Id.* at 4. Plaintiff asserted that LFL "filed this suit accusing JONES of threatening to **sue over a contractual dispute, a false contention**." *Id.* at 5. Plaintiff even went so far as to factually concede that "**there is and never was a stand-alone contractual claim for the lost stock options** pursuant to the stock incentive plan that

forms the basis for plaintiff's **sham Complaint**." *Id.*

As a result, in an order on April 19, 2024, the Honorable Yvonne Gonzalez Rogers issued an order tentatively dismissing the LFL Complaint. *See* RJN Exh. 3, Case No. 5:23-cv-05344, ECF No. 55, Order Tentatively Granting Motion to Dismiss.[2] The Court relied on Jones' statement to find that the evidence before the Court did "not indicate that [Jones] ever demanded options, shares, or other equity interests in Light Field Lab (**as opposed to the value thereof**), or that [Jones] disputed the terms of the Plan or **the parties' rights and obligations under the Plan**."[3] *Id.* On May 8, 2024, the Court granted the motion to dismiss for the reasons set for the in the tentative ruling. *See* RJN Exh. 4, Case No. 5:23-cv-05344, ECF No. 58, Order Granting Motion to Dismiss, p. 2.

### D. Plaintiff Files This Action, Pleading Claims Relating to Contracts with LFL and Contractual Disputes About Stock Options and Intellectual Property

Plaintiff filed this action on June 17, 2025, more than a year after he convinced the Court to dismiss the LFL DJ Complaint. In it, he alleges, in almost direct contradiction to his factual admissions during the declaratory briefing that "**Defendants have no right, title, or interest in the stock options or patent rights and that said stock options and patent rights have been stolen from Plaintiff and/or obtained in a manner constituting theft**." Complaint, ¶ 79.

Though Plaintiff does not assert a cause of action for "breach of contract," he pleads for Breach of the Implied Covenant of Good Faith and Fair Dealing inherent in the contracts, and contract-based claims. Moreover, the allegations within the Complaint make contract-based allegations, including that LFL "knowingly breached its agreements" with Plaintiff, "breached

---

[2] The order also denied two prior motions to dismiss as moot, as they were filed when Jones was *pro per*. The tentative ruling provided that further briefing was permitted, but LFL chose not to further pursue its request for relief based on the Court's conclusions and Plaintiff's statements about the lack of a contractual dispute.

[3] Jones was represented by one attorney during the discussions the Court's order focuses on, a second attorney during his motion to dismiss (after being *pro per*), and a third in his complaint in this action, meaning that each Plaintiff's counsel's knowledge is necessarily fragmented with regard to all communications that took place with LFL and its counsel. Only certain communications were before the Court when it decided the motion to dismiss.



Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

the clear and unambiguous promises" it allegedly made with Plaintiff, and entered into a "contractual relationship" with Plaintiff that allegedly included "expressed and implied promises." Complaint, ¶¶ 50, 51, 55; *see also supra*, section II.A (describing specific contracts Plaintiff alleges the parties entered into). Plaintiff's alleges that he was "deliberately denied the benefit of vested and unvested stock options which he had earned as a result of his work for Defendant." *Id.* at ¶ 35 (hereinafter referred to as the "stock option claims"). He also alleges that "regardless of any purported rights gained by LFL as a work for hire or on assignment" due to the aforementioned contracts, LFL "should have included Mr. Jones' name as an inventor" on two specific patents, which he claims "are entirely derived from" his own "work at LFL prior to his termination." *Id.* at ¶¶ 36-37 (hereinafter the "patent claims"). Plaintiff also focuses on alleged conduct that led to the formation of the contracts and his continued performance of his contractual duties, asserting that he only entered into the contracts and remained employed with LFL due to certain statements relating to the subjects of the contracts, including the documents referred to in the LFL Complaint as the "Plan Documents." *Id*. at ¶¶ 13, 14, 60, 63, 68. Plaintiff variously characterizes those statements as fraudulent, theft of personal property, acts of racketeering, unfair business practices, a breach of fiduciary duty, and a mistake. *Id*. at ¶¶ 69, 75, 79, 87, 92, 98, 100, 104. Plaintiff also seeks a unique *contractual* remedy, that of recission.[4] *Id*. at ¶¶ 100-104. The Complaint leaves no doubt that Jones' contracts with LFL are the factual foundation for the claims pleaded against LFL.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may make a motion to dismiss for "failure to state a claim upon which relief can be granted." A dismissal pursuant to Rule 12(b)(6) is proper where there is an absence of sufficient facts alleged under a cognizable legal theory. *See Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir. 1984). Moreover, although the Court must construe the facts in the light most favorable to the non-

[4] While the stock options claims are mentioned in the tenth cause of action, for rescission, the paragraph requesting rescission mentions only the patent claims, making it somewhat ambiguous.

moving party, the Court need not accept as true conclusory allegations, legal characterizations, unreasonable inferences, or unwarranted deductions of fact. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (allegations "may not simply recite the elements in a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively"). Nor must the Court assume that a plaintiff can prove facts different from those it has alleged. *Assoc. Gen. Contractors of Calif. v. Calif. State Council of Carpenters*, 459 U.S. 519, 526 (1983). Finally, the Court need not accept as true any allegations in a complaint which are contradicted by matters of judicial notice or by documents referred to in the complaint. *See Manzarek v. St. Paul Fire & Marine Ins. Co.* (9th Cir. 2008) 519 F.3d 1025, 1031; *Sprewell*, 266 F.3d at 988; *Steckman v. Hart Brewing*, 143 F.3d 1293, 1295-96 (9th Cir. 1998) ("we are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint").

## IV. LEGAL ARGUMENT

### A. Plaintiff's Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Causes of Action Are Barred by Estoppel Doctrines, the Preemption of the Patent Act, and/or Plaintiff's Lack of Standing

Only the first two causes of action in Plaintiff's complaint focus on his allegedly retaliatory termination. *See* Complaint, ¶¶ 38-49. Those claims are not at issue in this motion. The remaining *eight* causes of action, while never expressly labeled as breach of contract causes of action, nevertheless revolve around the enforceability (whether due to issues with formation, terms, and/or performance) of the contracts he entered into as part of his employment with LFL. *See id.* at ¶¶ 50-104. The contract-related claims focus on the stock options claims and patent claims discussed *supra*, section II.A. For the reasons set forth below, both types of claims fail – the former because they are barred by the doctrine of judicial estoppel and claim/ issue preclusion, and the latter because they are preempted by the Patent Act and because Plaintiff lacks standing to sue. Plaintiff's last eight causes of action should be dismissed with prejudice on these grounds alone.

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

**1. Plaintiff's Third, Fourth, Fifth, Sixth, Eighth, Ninth, and Tenth Causes of Action Are Barred by the Doctrines of Judicial Estoppel, Claim Preclusion and Issue Preclusion**

Plaintiff asserts the stock options claims, alleging that he has the right to vested and unvested stock options in LFL's stocks despite contractual language to the contrary, as part of the following causes of action: Third (¶¶ 50-53), Fourth (¶¶ 55-58), Fifth (¶¶ 63-68, 70), Sixth (¶¶ 75, 77, 79), and Ninth (¶¶ 97-98). It seems likely that Plaintiff also asserts the stock options claims in the Eighth (¶ 93) and Tenth (¶100) causes of action, though it is somewhat ambiguous due to the lack of specificity in pleading. Because Plaintiff denied he had any stock options claims in response to the LFL Complaint (*see supra*, sections II.B-C), resulting in the Complaint's dismissal, he is barred by the doctrine of judicial estoppel from asserting any such claims in this case. Moreover, because Plaintiff prevailed in having LFL's DJ Complaint dismissed, his claims are barred by the doctrines of claim and issue preclusion.

The lack of specificity is a separate, additional grounds for dismissal. *See infra*, sections IV.B-I. If not dismissed without leave to amend, Jones must replead to plead specific contract terms. See *Dorian v. Cmty. Loan Servicing, LLC,* No. 22-CV-04372-DMR, 2022 WL 7620460, at *6 (N.D. Cal. Oct. 13, 2022) ("A plaintiff fails to sufficiently plead the terms of the contract if he does not allege in the complaint the terms of the contract or attach a copy of the contract to the complaint."). At present, the Complaint fails to satisfy Rule 8. Plaintiff cannot use vagueness to evade pleading facts that will show he is asserting contract claims against LFL.

***a. Plaintiff's Claims Are Barred by the Doctrine of Judicial Estoppel***

A motion to dismiss may be granted where a Court determines a party is equitably barred by the doctrine of judicial estoppel from taking a position contrary to that it took in prior litigation, in order "to protect the integrity of the judicial process." *See New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001). "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has

acquiesced in the position formerly taken by him." *Id.* at 749 [citation omitted]. The doctrine applies not only to bar inconsistent positions in the same litigation, but also incompatible statements in two different cases. *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001). Judicial estoppel applies to "claims" or positions taken in prior lawsuits, which can be factual *or* legal in nature. *Finn v. Sullivan*, 228 F.Supp.3d 972 (N.D. Cal. 2017). Accordingly, the doctrine has been applied in diverse ways. *See New Hampshire*, 532 U.S. at 749 (New Hampshire was equitably barred from asserting, contrary to its position in prior litigation, that a river boundary ran along the shoreline); *Finn*, 228 F.Supp.3d at 979-80 (husband who previously claimed in state court proceedings that all his ownership interests in a winery had transferred to his wife could not now assert in federal action that they had not); *Mangaoang v. Special Default Services, Inc.*, 427 F.Supp.3d 1195 (N.D. Cal. 2019) (by omitting the lawsuit's claims from her mandatory bankruptcy filings, plaintiff represented that no such claims existed and could no longer exert such claims).

In determining whether to invoke judicial estoppel, courts consider the following factors: (1) whether the party's new position is "clearly inconsistent" with its earlier position; (2) whether the party was successful in persuading the earlier court to follow its first position (such that the finding of the earlier court would now be incorrect and one court or the other appears to be misled in a finding); and (3) whether the party asserting inconsistent positions would derive an unfair advantage or impose an unfair detriment if not estopped. *New Hampshire*, 532 U.S. at 750. Because the doctrine of judicial estoppel is equitable, the factors are not inflexible, and there may be other factors the Court should consider. *Id.* at 750-51. Here, all three *New Hampshire* factors clearly weigh in favor of an equitable determination that Plaintiff is barred from making the stock options claims. *First*, Plaintiff's new position is clearly inconsistent with his prior position. Most notably, in prior litigation, Plaintiff explicitly stated that "there is and never was a stand-alone contractual claim for the lost stock options pursuant to the stock incentive plan that forms the basis for plaintiff's sham Complaint." *See Jones Motion to Dismiss*, pp. 4-5. Yet he now alleges that "Defendants have no right, title, or interest in the stock options…and that said

stock options…have been stolen from Plaintiff and/or obtained in a manner constituting theft." Complaint, ¶ 79. In *Finn*, this Court stated, "Either his ownership interests have already been transferred, as [plaintiff] represented in the [prior] proceedings, or they have not, as he represents in this new action." 228 F.Supp.3d at 983. Here, either Plaintiff has some claim of ownership interest in LFL's stocks or stock options, as he now asserts, or he does not, as he represented in prior litigation. *Second,* Plaintiff was successful in persuading the Court in the prior action to adopt his position, suggesting it was misled. "The second *New Hampshire* factor—that one of the courts has been misled—is often dispositive." *Finn*, 228 F.Supp.3d at 983.[5] Because of Plaintiff's prior statements that he had no stock options claims, the Court dismissed LFL's request for a declaratory judgment to clarify the parties' respective rights to the stock options, because the evidence before the Court did "not indicate that [Jones] ever demanded options, shares, or other equity interests in Light Field Lab (as opposed to the value thereof), or that [Jones] disputed the terms of the Plan or the parties' rights and obligations under the Plan." *Request for Judicial Notice*, ECF No. 55 at pp. 4-5; ECF No. 58. The Court would "likely be surprised" that Plaintiff is now doing exactly that. *See Finn*, 228 F.Supp.3d at 984. *Third,* LFL would be harmed if Plaintiff is not estopped, because it "has gone through the time, expense and burden" of another litigation, including multiple motions, relating to Plaintiff's prior premise that he had no stand-alone claim for the stock options. *Id.* at 984. It is accordingly appropriate to dismiss the Third, Fourth, Fifth, Sixth, Eighth, Ninth, and Tenth cases of action to the extent they rely in any way on Plaintiff's stock options claims. *See id.* at 985.

***b. Plaintiff's Claims Are Barred by Claim Preclusion***

"Under the doctrine of claim preclusion, a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'" *Whyte Monkee Prods. LLC v. Netflix, Inc.*, 757 F. Supp. 3d 1025, 1029 (N.D. Cal.

[5] "For a court to be misled, it need not itself adopt the statement; those who induce their opponents to surrender have prevailed as surely as persons who induce the judge to grant summary judgment. What matters is whether Finn derived a benefit from an earlier lawsuit where material inconsistent representations were made, either by Finn or on his behalf." *Finn*, 228 F.Supp.3d 972, 983 (quotations omitted).

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

2024), *reconsideration denied*, No. 23-CV-03438-PCP, 2025 WL 974940 (N.D. Cal. Apr. 1, 2025), citing *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). When a party asserts claim preclusion, courts apply the law of the forum in which the prior court reached final judgment. *Id*. Here, the prior DJ judgment was reached in this Court, and Ninth Circuit law applies. *Id*.

Claim preclusion precludes relitigation of claims that were raised or should have been raised in earlier litigation. See *Banga v. Experian Info. Sols., Inc*., No. C 09-04867 SBA, 2013 WL 5539690, at *13 (N.D. Cal. Sept. 30, 2013), citing *San Remo Hotel L.P. v. San Francisco City and County*, 364 F.3d 1088, 1094 (9th Cir. 2004); *see also Whyte*, 757 F. Supp. 3d at 1029 ("Claim preclusion encompasses 'not only claims that were actually litigated but also those claims that a party could have raised in a prior suit but failed to do so.'").

The elements necessary to establish claim preclusion are: (1) an identity of claims, (2) a final judgment on the merits, and (3) privity between the parties. *See Banga*, 2013 WL 5539690, at *13. All three elements are met here.

*First,* LFL's DJ Complaint arises from the same "transactional nucleus of facts" as the claims alleged in Plaintiff's Complaint. *See Frank v. United Airlines, Inc*., 216 F.3d 845, 851 (9th Cir. 2000) ("The central criterion in determining whether there is an identity of claims between the first and second adjudications is 'whether the two suits arise out of the same transactional nucleus of facts.'"). The transactional facts giving rise to both cases are Plaintiff's employment at LFL, the contracts between the parties, Plaintiff's alleged rights as a shareholder and his claims to stock options.

*Second,* this Court's dismissal of LFL's DJ action is a final judgment for purposes of claim preclusion. *See Scott v. Hodges*, No. C 96-01970 EFL, 1996 WL 161774, at *2 (N.D. Cal. Mar. 29, 1996) ("For purposes of res judicata, judgment entered on a motion to dismiss or for summary judgment is just as binding as a judgment entered after a trial of the facts.").

Third, there is no dispute that there is complete privity – Plaintiff Jones and LFL were both parties to the DJ Action.

*c. Plaintiff's Claims Are Barred by Issue Preclusion*

Issue preclusion forecloses relitigation of factual or legal issues that have been actually and necessarily decided in earlier litigation. *Banga,* 2013 WL 5539690, at *13. Issue preclusion bars relitigation of "an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim. *Id*. The following elements are required: (1) a full and fair opportunity to litigate the issue in the prior action; (2) the issue was actually litigated; (3) a final judgment resulted; and (4) the person against who preclusion is asserted was a party to the prior action. *Id*., citing *In re Palmer,* 207 F.3d 566, 568 (9th Cir. 2000). All four elements are present here.

*First*, Jones had a full and fair opportunity to litigate the terms of his contracts with LFL in the DJ Action. Indeed, Plaintiff's pleading expressly states his intent to bring counterclaims that mirror the counts of his Complaint. See RJN, Exh. 2 and Complaint.

*Second*, that Plaintiff had no contract-based claims was actually litigated and decided in the DJ Action, with the Court concluding there were contract disputes – the entire basis of the Court's decision to dismiss the DJ Action.

*Third*, the Court dismissed the DJ Action, which is a final judgment for purposes of claim and issue preclusion.

*Fourth*, the person against whom preclusion is asserted is Alan Jones, a party to the prior action.

As a matter of issue preclusion, Jones cannot now factually plead breach of his agreements with LFL. Because his Complaint is premised on contractual breaches – though he goes to great lengths in the Complaint to avoid using those words – his Third, Fourth, Fifth, Sixth, Eighth, Ninth, and Tenth Causes of Action are barred.

**2. Plaintiff's Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Tenth Causes of Action Are Preempted By the Patent Act and Plaintiff Lacks Standing to Sue Because He Assigned His Rights to LFL**

Plaintiff claims LFL acted improperly with regard to his patent rights as part of the following causes of action: Third (¶¶ 50-53), Fourth (¶¶ 55-58), Fifth (¶¶ 60-62, 64-65, 69, 70,

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

73), Sixth (¶¶ 75-76, 78-80, 82), Seventh (¶¶ 87-91), Eighth (¶¶ 93-94), and Tenth (¶¶ 100-104). Plaintiff alleges that he has intellectual property rights in two of LFL's patents, including claiming that he should have been named as an inventor on those patents. Essentially, because of certain statements allegedly made by Defendants, and because he was not named as an inventor on the patents, Plaintiff claims the patents should revert entirely to him in spite of the contractual documents he signed to the contrary. *See* section II.A, *supra*.

Importantly and fatal to his claims, Plaintiff admits that he "signed a Confidentiality and Proprietary Rights Agreement that purported to grant rights to patents and other works for hire to LFL." Complaint, ¶ 12.

***a. Plaintiff's Claims Are Preempted by the Patent Act***

To the extent that Plaintiff attempts to use state law to determine that he is the inventor of the two patents mentioned in his complaints, or that he retains any rights in those patents, Plaintiff's claims are preempted by the Patent Act. *See BearBox LLC v. Lancium LLC*, 125 F.4th 1101, 1112 (Fed. Cir. 2025); *Univ. of Colo. Found. v. Am. Cyanamid Co*., 196 F.3d 1366, 1372 (Fed. Cir. 1999) ("[F]ederal patent law preempts any state law that purports to define rights based on inventorship."); *OptoLum, Inc. v. Cree, Inc.*, 244 F. Supp. 3d 1005, 1014 (D. Ariz. 2017) ("Federal patent law, however, 'preempts any state law that purports to define rights based on inventorship.'); *CAA Indus., Ltd. v. Recover Innovations, Inc.*, No. 222-CV-00581-GMN-EJY, 2023 WL 9056823, at *4 (D. Nev. Dec. 29, 2023) ("because plaintiff's claim requires a determination of inventorship, it was preempted by federal law"); *Powell v. Home Depot U.S.A, Inc.*, No. 07-80435-CIV, 2010 WL 375796, at *4 (S.D. Fla. Jan. 26, 2010) ("The central issue in the counterclaims—co-inventorship—is a field that is governed exclusively by federal patent law.").

In *Methode Elecs. Inc. v. Hewlett-Packard Co.*, No. C 99-04214 SBA, 2000 WL 1157933, at *2 (N.D. Cal. May 4, 2000), this Court dismissed a similar complaint where the plaintiff's allegation that Methode should have named Finisar in its patent applications "dominated" each of the three counterclaims at issue. The same factual pattern is present here.

Most of the causes of action in Plaintiff's Complaint depend on his allegation that he should have been named as an inventor. Federal Patent Preemption requires Plaintiff to seek redress under the Patent Act, not under state law. *Id*. Similarly, in *Gregory C. James v. J2 Cloud Services Inc.*, No. 216-CV-05769-CAS-PJWX, 2018 WL 6092461, at *6 (C.D. Cal. Nov. 19, 2018), the plaintiff asserted that he was the sole inventor of the '638 Patent, bringing state claims for the defendants' alleged failure to credit him as the inventor. James filed state law claims for unjust enrichment, conversion, and unfair competition, all premised on his assertion of inventorship of the patent. The court found that these state law claims were preempted by federal patent law because they were fundamentally based on the plaintiff's claim of inventorship, which is exclusively governed by federal law. The law is clear that Plaintiff's claims relating to his rights in the patents must be dismissed with prejudice.

#### b. *Plaintiff Lacks Standing to Sue Regarding Any Intellectual Property Rights*

Furthermore, the terms of the agreement itself belie Plaintiff's claims and make it clear that he lacks standing to sue regarding any intellectual property rights. He admits he assigned all rights in the relevant patents to LFL. Complaint, ¶ 12. This divested Plaintiff of any financial interest in the patents. *Trireme Med., LLC v. AngioScore, Inc.*, 812 F.3d 1050, 1053 (Fed. Cir. 2016) ("When the owner of a patent assigns away all rights to the patent, neither he nor his later assignee has a concrete financial interest in the patent that would support standing in a correction of inventorship action."); *Certicable Inc. v. Point 2 Point Commc'ns Corp.*, No. 2:23-CV-5322 (NJC) (SIL), 2025 WL 622547, at *3 (E.D.N.Y. Feb. 26, 2025).

### B. <u>Plaintiff's Cause of Action for Breach of the Covenant of Good Faith and Fair Dealing Fails to Identify a Contract or State a Claim</u>

Plaintiff fails to plead a breach of contract claim, despite the statements throughout the Complaint that he entered into agreements with LFL. Instead, Plaintiff alleges various quasi-contract and derivative theories, including a "Breach of the Covenant of Good Faith and Fair Dealing" in an *unspecified* contract with LFL. *See* Complaint, ¶¶ 50-53. Plaintiff states that as



Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

result of "the contractual relationship" between the parties, and "the expressed and implied promises made in connection with that relationship," LFL made a broad, general promise to "act in good faith toward and deal fairly with Plaintiff." *Id.* at 50. Plaintiff lists specific obligations Defendant thereby allegedly agreed to as part of the employment relationship. *Id.* This is a misinterpretation of the implied covenant of good faith and fair dealing, which does not apply to an entire *relationship*, but is instead a provision "implied by law in every contract." *See, e.g., Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 349 (2000) (emphasis added). Accordingly, to plead a violation of the covenant of good faith and fair dealing, Plaintiff would need to at minimum specify the contract he alleges was breached, which he fails to do. *See* Complaint, ¶¶ 50-53.

Furthermore, to the extent that he refers to one of the contracts otherwise referenced in the Complaint, the California Supreme Court has rejected the idea, which Plaintiff appears to advance here, that "the implied covenant can impose substantive terms and conditions beyond those to which the contract parties actually agreed." *Guz*, 24 Cal.4th at 349. The covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Id.* at 349-50. Rather, it only exists to ensure the parties do not act to frustrate the express terms of a contract. *Id.* Accordingly, Plaintiff's separate claim for breach of the implied covenant should be dismissed for the same reasons as that asserted in *Guz*—that it is "either inapplicable or superfluous." *Id.* at 348.

### C. **Plaintiff's Cause of Action for Promissory Estoppel Fails Because of the Express Written Contracts Between the Parties on the Subject Matter**

Plaintiff's next attempt to recover without specifically pleading a breach of contract cause of action is a cause of action for promissory estoppel. Yet the purpose of the promissory estoppel doctrine "is to make a promise binding, under certain circumstances, without consideration in the usual sense of something bargained for and given in exchange. If the promisee's performance was requested at the time the promisor made his promise and that performance was bargained for, the doctrine is inapplicable." *Youngman v. Nevada Irr. Dist.*, 70 Cal.2d 240, 249 (1969). In support of his cause of action for promissory estoppel, Plaintiff states: "Defendant breached the

clear and unambiguous promises described herein." Complaint, ¶ 55. Plaintiff does not allege that the promises were separate from the agreements he alleges were breached. The Court must determine whether a party is in breach of contract "or not"; promissory estoppel cannot be used to give a party "a second bite at the apple in the event it fails to prove a breach of contract." *Walker v. KFC Corp.*, 728 F.2d 1215 (9th Cir. 1984). Here, the relevant promises are contained within written agreements between the parties, including, including those discussed in section II.A, supra. Plaintiff states no facts that would suggest that the "clear and unambiguous promises" to which he refers were outside the subject matter of the written agreements he entered into with LFL. Plaintiff fails to explain how he can maintain a cause of action for implied promises when he agreed to the contracts' integrated nature. Plaintiff's cause of action for promissory estoppel should be dismissed.

**D. <u>Plaintiff's Cause of Action for Fraud and Deceit Fails Because It Does Not Meet the Heightened Specificity and Particularity Requirements for Fraud</u>**

The elements of fraud in California are: (a) a misrepresentation (false representation, concealment, or nondisclosure); (b) scienter or knowledge of its falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage. *Hinesley v. Oakshade Town Center*, 135 Cal.App.4th 289, 294 (2005). In a diversity case in federal court, the court will *both* apply the heightened pleading standard of Rule 9(b), requiring particularity when alleging fraud or mistake, and "examine state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003); *see also Mohebbi v. Khazen*, 50 F. Supp. 3d 1234, 1255 (N.D. Cal. 2014). [6]

California law is clear that a cause of action for fraud must be pleaded with specificity. *See Daniels v. Select Portfolio Servicing, Inc.* 246 Cal.App.4th 1150, 1166 (2016). General and conclusory allegations do not suffice. *Lazar v. Superior Court* 12 Cal.4th 631, 641-645 (1996). The specificity requirements mean a plaintiff must "allege facts showing how, when, where, to whom, and by what means the representations were made." *Id.* "The plaintiff must plead that he

[6] Dismissals under Rule 9(b) and Rule 12(b)(6) are treated in the same manner and are functional equivalents. *Vess*, 317 F.3d at 1107-1108.

believed the representations to be true…and that in reliance thereon (or induced thereby) he entered into the transaction." *Id.* at 1167, citing *Chapman v. Skype, Inc.* 220 Cal.App.4th 217, 231-232 (2013). "Because 'reliance is the causal mechanism of fraud,' this requires pleading facts showing actual reliance, that is, that the plaintiff suffered economic injury as a result of his or her reliance on the truth and accuracy of the defendant's representations." *Id.* at 228; citing *In re Tobacco II Cases* 46 Cal.4th 298, 326 (2009); *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 326-327 (2011).

To support an allegation of fraud, Plaintiff must prove that the LFL made (a) a knowingly false representation; (b) concealment or nondisclosure of facts; or (c) a promise made with no intent to perform. Cal. Civ. Code § 1710(1), (3), & (4). The misrepresentation supporting a cause of action for fraud "must be based on a statement of **fact**." *Hinesley,* 35 Cal.App.4th at 295. In addition, the Defendant must *know* the statement is false or act with reckless disregard of its truth or falsity. *Lazar,* 12 Cal.4th at 638; *Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 415 (1992). Where the defendant in a fraud claim is a corporate employer, the plaintiff must allege "the **names** of the persons who made the allegedly fraudulent representations, their **authority** to speak, to whom they spoke, **what** they said or wrote, and when it was said or written." See *Lazar,* 12 Cal.4th at 645.

Plaintiff's Complaint contains numerous vague, non-specific allegations concerning alleged misrepresentations made by "Defendants." Yet Plaintiff fails to provide specific statements of fact that were misrepresentations, or describe how or why specific statements were false or incorrect *based on what the individual knew at the time they were made*. Further, some of the statements do not appear to be "facts," but are mere opinions. Plaintiff alleges the following four examples of alleged fraud or false statements/misrepresentation:

- "During his initial hiring, Jon Karafin informed Mr. Jones about double trigger clauses, whereby on public listing or acquisition all options would instantly vest." Complaint, ¶ 13.
- "Mr. Jones was also informed that the company's product would be delivered to the





Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

first theme customer, Universal, for use in a theme park in 2020/2021. This statement was intended to provide the impression that LFL was much closer to delivery of the product than it actually was and that an early exercise of options was expected… Subsequently, there was no further discussion of Universal as a customer and no product was delivered to Universal." *Id.*

- "In connection with Mr. Jones' employment, LFL, Jon Karafin, and Brendan Bevensee also engaged in fraud with respect to [two patents], patents that, regardless of any purported rights gained by LFL as a work for hire or on assignment pursuant to the Confidentiality and Proprietary Rights Agreement, should have included Mr. Jones' name as an inventor as they are entirely derived from Mr. Jones' work at LFL prior to his termination." *Id.* at ¶ 36.
- "[The two patents], though fully derived from Mr. Jones' work, did not include Mr. Jones as an inventor, a fact not disclosed to Mr. Jones during or after his employment by LFL." *Id.* at ¶ 37.

None of these alleged "misrepresentations" constitute a statement of fact that would support a cause of action for fraud. Even assuming *arguendo* that these statements were made, there is nothing in the Complaint to suggest that they were not truthful at the time they were made, or that the speaker did not believe or have reason to believe they were truthful at the time they were made. Plaintiff has failed to identify even one statement that could support the specificity and particularity requirements needed for a claim of fraud. Furthermore, the very agreement in which Plaintiff assigned his rights in the patent gave up all moral rights, including paternity, which directly contradicts Paragraph 37 of the Complaint.

### E. <u>Plaintiff's Cause of Action for Violation of Penal Code Sections 484 and 496 Fails Because It Does Not Meet the Heightened Specificity and Particularity Requirements for the Fraud Component of the Relevant Crimes</u>

Plaintiff also accuses Defendants of the crime of theft. California Penal Code Section 484, which consolidated the common law crimes of larceny, embezzlement, and false pretenses, provides in relevant part that "[e]very person who shall… **fraudulently appropriate** property

which has been entrusted to him or her, or who shall knowingly and designedly, **by any false or fraudulent representation or pretense**, **defraud** any other person of money, labor, or real or personal property…is guilty of theft." Thus, Section 484 holds an element of *fraud* as a requirement.[7] The California Supreme Court long ago addressed concerns that ordinary commercial transactions could result in criminal prosecution under Section 484 by explaining that "the essence of the offense of obtaining property by false pretenses is (as it has always been) the **fraudulent intent** of the defendant." *People v. Ashley*, 42 Cal.2d 246, 265 (1954). The Court made it clear that "a showing of nonperformance of a promise or falsity of a representation will not suffice." *Id.* Indeed, for a defendant to commit the crime of theft, he must have the requisite mental state required for any crime, either criminal intent (such as to steal or defraud) or criminal negligence, **at the time he commits the criminal act**. *See People v. Lawson*, 215 Cal.App.4th 108, 113-14 (2013). Thus, Plaintiff is required to allege specific facts to show that Defendants had a criminal, fraudulent mental state *at the time they purportedly stole* his property. Plaintiff fails to do so. Instead, Plaintiff claims that it was misrepresentations—which would have predated any Defendants taking possession of property allegedly belonging to Plaintiff—that "constituted theft of personal property." Complaint, ¶ 75. Plaintiff also alleges under this cause of action that Defendants "have retained" stock ownership and "inventorship" of the patents, and "knowingly received and deliberately withheld" the stocks and patents. Complaint, ¶¶ 77-79. These allegations on their face clearly do not constitute theft.

### F. Plaintiff's Cause of Action for Civil RICO Fails Because It Consists Solely of Conclusory Statements Without Factual Information

Plaintiff's allegations under the Civil RICO cause of action consist of conclusory allegations rather than factual statements. For example, the Complaint states: "Defendant Brendan Bevensee…conducted and participated, directly and indirectly, in the conduct of the

[7] We assume that Plaintiff does not mean to allege that Defendants committed the common law crime of larceny, which would require the theft of a tangible object to be carried off. The specific requirements for each common law crime are discussed in more depth in *People v. Williams*, 57 Cal.4th 776, 785-790 (2013).



Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

affairs of said enterprise through a pattern of racketeering activity…" Complaint, ¶¶ 86.

To state a claim under 18 U.S.C. § 1962(c), Jones must plead: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity ("predicate acts") (5) causing injury to his business or property. *Cnty. of Marin v. Deloitte Consulting LLP*, 836 F.Supp.2d 1030, 1037-38 (N.D. Cal. 2011), citing *Grimmett v. Brown,* 75 F.3d 506, 510 (9th Cir.1996). A RICO count must also satisfy the particularity standard of Rule 9. *Id.*; *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 541 (9th Cir. 1989). Here, the complaint utterly lacks factual support, and it certainly does not meet Rule 9's heightened pleading requirement.

The Complaint fails to present facts, or plead them with adequate specificity, to show that Defendants engaged in a "fraudulent enterprise" or to demonstrate "racketeering activity" or "predicate acts." At best, the Complaint currently only alleges that LFL requested employees to agree that inventions developed during company time and at company expense were the property of the company. Though the complaint alleges communications about this policy were "fraudulent," no fraud facts are stated, for the reasons set forth in section IV.D, *supra*. The Complaint pleads nothing more than routine business activity, which is utterly insufficient for a RICO claim. *Gardner v. Starkist Co.*, 418 F. Supp. 3d 443, 461 (N.D. Cal. 2019).

A complaint alleging wire or mail fraud, as Plaintiff does, must specify "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Cnty. of Marin,* 836 F.Supp.2d at 1038. "Plaintiff's mere listing of such alleged crimes, without supporting, particularized factual pleadings as required under Rule 9(b), is not enough to survive a motion to dismiss." *Mohebbi v. Khazen*, 50 F. Supp. 3d 1234, 1255 (N.D. Cal. 2014). Similarly, RICO violations predicated on fraudulent communications, like those in Complaint paragraph 87, require a plaintiff to plead the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Pac. Recovery Sols. v. United Behav. Health*, 481 F. Supp. 3d 1011, 1028 (N.D. Cal. 2020).

Furthermore, the Complaint does not allege the requisite two predicate acts for each

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

defendant. *Vaughan v. Wardhaugh*, No. 23-CV-02879-RFL, 2024 WL 2853972, at *2 (N.D. Cal. May 10, 2024) ("where RICO is asserted against multiple defendants, a plaintiff must allege at least two predicate acts by each defendant."). The complaint must state "what each individual did, when they did it, or how they functioned together as a continuing unit." *Doan v. Singh*, 617 F.App'x 684, 686 (9th Cir. 2015); *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 541 (9th Cir. 1989) (finding that plaintiffs had failed to allege mail fraud with particularity under Rule 9(b) because they "[did] not attribute specific conduct to individual defendants," or "specify either the time or the place of the alleged wrongful conduct"). The alleged fraudulent communications of "electronic filing, mail and email" in paragraph 87 are not pleaded with particularity as Rule 9 demands. *See Sanford v. MemberWorks, Inc*., 625 F.3d 550, 557–58 (9th Cir. 2010) (finding that plaintiff's failure to identify which defendants made certain telephone calls and were parties to the alleged misrepresentations, and allege any specific mailings does not satisfy Rule 9's pleading requirements). The Complaint entirely lacks specific facts demonstrating that Defendants "use[d] interstate wires" in furtherance of a scheme to defraud. *Villarroel v. Recology Inc.*, 775 F.Supp.3d 1050, 1070 (N.D. Cal. 2025). The conclusory statements in paragraph 87 are inadequate to meet these pleading standards.

To establish a RICO claim, the plaintiff must also demonstrate either a "series of related predicates extending over a substantial period of time" or a credible threat of "future criminal conduct." *Turner v. Cook*, 362 F.3d 1219, 1231 (9th Cir. 2004). Plaintiff fails to adequately plead the temporal element essential to meet the definition of racketeering activity. *See Medallion Television Enters., Inc. v. SelecTV of California, Inc.*, 833 F.2d 1360, 1365 (9th Cir. 1987). To the extent the Complaint can be read to infer the time period of patent prosecution, it is insufficient to plead a RICO claim. See *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 474 (7th Cir. 2007). Finally, a cognizable RICO claim requires "a concrete financial loss" and an injury to business or property. *Stearns v. Select Comfort Retail Corp.*, No. 08-2746 JF, 2009 WL 1635931, at *14 (N.D. Cal. June 5, 2009); *Canyon County v. Syngenta Seeds, Inc.,* 519 F.3d 969, 972 (9th Cir. 2008). Plaintiff fails to adequately allege such loss and injury. A RICO claim is not

easily pleaded, and Plaintiff fails to do so here.

**G. Plaintiff's Cause of Action for Breach of Fiduciary Duty Fails Because it Plaintiff Fails to Plead *Facts* Concerning What "Necessary Information" He Was Not Provided**

Plaintiff claims that LFL breached its fiduciary duty to him because it "improperly failed to provide necessary information to Plaintiff as an option and share holder." Complaint, ¶ 96. No facts are provided; LFL is left to guess what is meant by "information." Rule 8 requires facts, innuendo is not sufficient. Within the cause of action, Plaintiff fails to cite any law regarding what "necessary information" he was entitled to, does not state how or when he requested such information, and does not state that he was refused such information. Complaint, ¶¶ 95-99.

However, we assume Plaintiff is also relying on the factual allegations he made in Paragraph 14 of the Complaint. There, Plaintiff asserts that LFL CEO Jon Karafin refused to share the number of LFL's outstanding shares with him and that Plaintiff was entitled to access books and records to assess his holdings. Complaint, ¶ 14. The language quoted by Plaintiff in the Complaint, however, does *not* indicate that LFL refused to provide any books and records. *See id*. Rather, it shows that Plaintiff inquired about *whether he was entitled to or required* to be given certain information during one conversation, and the individual with whom he was speaking expressed a general opinion. Plaintiff *could have* asked to be provided whatever information he wished to see and believed he was entitled to see. Instead, he only asked Mr. Karafin *what* he was entitled to see, and it is not Mr. Karafin's obligation to inform Plaintiff of his legal rights. On these facts, Plaintiff has failed to demonstrate even his own conclusory statements about being denied information to which he was entitled, no less a breach of fiduciary duty by LFL.

**H. Plaintiff's Cause of Action for Rescission is a Remedy and Fails for the Same Reasons as the Underlying Causes of Action Already Discussed**

Under his last cause of action, for rescission, Plaintiff states that after negotiations prior to September 9, 2019, the parties "began negotiations concerning an employment contract" and their negotiations were later reduced to a "written agreement which included an assignment of

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Plaintiff's intellectual property." Complaint, ¶¶ 100-101. Plaintiff alleges there was a "mistake" in the "purported agreement" due to "fraudulent statements," entitling Plaintiff to rescission of "the Confidential Agreement and Invention Assignment Agreement." Complaint, ¶¶ 103-104.

California courts have repeatedly held that "[r]escission is *not* a cause of action; it is a remedy." *Nakash v. Superior Ct.*, 196 Cal.App.3d 59, 70 (1987); *see also Hailey v. California Physicians' Serv.*, 158 Cal.App.4th 452, 468 (2007), *as modified on denial of reh'g* (Jan. 22, 2008) (holding that "rescission ... is an equitable remedy"); *In re Outlaw Laboratories, LP Litigation*, 352 F.Supp.3d 992, 1010 (S.D. Cal. 2018). Indeed, a court "does not rescind contracts but only affords *relief* based on a party's rescission." *Wong v. Stoler*, 237 Cal. App. 4th 1375, 1385–86, 188 Cal.Rptr.3d 674 (2005), *as modified on denial of reh'g* (June 23, 2015). Accordingly, Plaintiff's tenth cause of action is merely duplicative of his other causes of action and fails to state a claim for which relief can be granted. It should be dismissed.

### I. <u>There Are No Factual Allegations of Wrongdoing Regarding Brendan Bevensee in the Entire Complaint</u>

Finally, LFL understands that the individual defendants, Mr. Karafin and Mr. Benensee have not yet been served, and therefore have not yet filed a motion to dismiss. Nonetheless, it is appropriate to highlight for the Court that Plaintiff's entire Complaint only contains four paragraphs regarding individual defendant Mr. Bevensee, none of which are factual statements regarding any wrongdoing whatsoever. *See* Complaint, ¶¶ 4, 36, 61, 86. Accordingly, Mr. Bevensee should be dismissed from this action as a matter of law.

## V. <u>CONCLUSION</u>

Defendants respectfully LFL's Motion and dismiss Plaintiff's Complaint in its entirety with prejudice.

Dated: August 20, 2025

GORDON REES SCULLY MANSUKHANI, LLP

By: [signature]
Sara A. Moore
Attorneys for Defendant
Light Field Lab, Inc.

# EXHIBIT 5

**STEPHEN F. HENRY, ESQ.**
**HENRY | LACEY PC**
STATE BAR # 142336
2625 Alcatraz Avenue, # 615
Berkeley, California 94705
Telephone: (510) 898-1883
Facsimile (510) 295-2516
shenry@HenryLacey.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALAN JONES,<br><br>Plaintiff,<br><br>vs.<br><br>LIGHT FIELD LAB, INC., JON KARAFIN, BRENDAN BEVENSEE, and Does 1 to 10,<br><br>Defendant, | Case No.: 3:25-cv-05118-MMC<br><br>**AMENDED COMPLAINT FOR DAMAGES**<br><br>**1. RETALIATORY TERMINATION (Ca. Lab. Code §1102.5)**<br>**2. WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**<br>**3. FRAUD AND DECEIT**<br>**4. VIOLATION OF PENAL CODE**<br>**5. UNFAIR COMPETITION**<br>**6. BREACH OF FIDUCIARY DUTY** |

Plaintiff Alan Jones ("Plaintiff") alleges the following against Defendant Light Field Lab Inc. ("LFL"), and Does 1-10 (collectively "Defendants"):

1. Plaintiff is an individual residing at all times mentioned in the Complaint within the State of Washington, the county in which he performed his duties under the employment contract with Defendant.

2. Defendant is a company incorporated in Delaware and at all times mentioned in operated in the State of California.

3. Defendant Jon Karafin is an individual employed by Defendant Light Field Lab in California.

4. Defendant Brendan Bevensee is an individual employed by Defendant Light Field Lab in California.

5. In addition to the Defendants named above, Plaintiff sues fictitiously Defendants Does 1 through 10, inclusive, including executives and members of the Board of Directors of Light Field Lab with constructive knowledge of the allegations below, because their names, capacities, status, or facts showing them to be liable are not presently known. Plaintiff is informed and believes, and thereon alleges that Defendants, and each of them, designated herein as Does 1 through 10, are responsible in some manner for the occurrences and happenings herein alleged, and that Plaintiff's damages, as herein alleged, were and are the direct and proximate result of the action of said Defendants, and each of them. Plaintiff will amend this complaint to show their true names and capacities, together with appropriate charging language, when such information has been ascertained.

6. Plaintiff further alleges that Defendants and Does 1-10, inclusive, are, and at all relevant times were, agents of one another and acting within the course and scope of said agency.

7. Plaintiff reserves the right to amend his/her charges to plead agency between Defendants and Does 1-10, inclusive, and any of them, at any time that he ascertains facts and supporting agency between such Defendants.

## JURISDICTION AND VENUE

8. Plaintiff incorporates by reference each of the allegations contained in paragraphs 1 through 7 above, as well as facts currently unknown.

9. Jurisdiction over the defendants, and each of them, exists because each of the defendant entities named in this litigation are present and operating within the jurisdictional limits of the Northern District of California and each of the individual defendants named in this litigation are employed within the jurisdictional limits of the Northern District of California. Subject matter jurisdiction within the United States District Court exists because the amount in dispute exceeds $75,000.

10. Venue is proper because the employment relationship between Plaintiffs and defendants, and each of them, that gave rise to some of the claims in this litigation existed within this judicial district and most or all of the acts and omissions complained of in this litigation took place here. Venue is also proper because most or all of the acts and omissions that occurred outside of the above employment relationship and are complained of in this litigation took place within this judicial district.

## FACTS COMMON TO MORE THAN ONE CAUSE OF ACTION

11. Mr. Jones was employed by LFL from September 30, 2019, through June 23, 2023. Mr. Jones initially worked as a Senior Pipeline Software Engineer and was promoted to Principal Engineer on July 27, 2020.

### REPRESENTATIONS AND CONCEALMENT TO INDUCE INITIAL AND CONTINUED EMPLOYMENT

12. As part of Mr. Jones' interviews on August 28 and 29, 2019. Karafin stated that the company had hundreds of patents and in addition to manufacturing displays their business model relied heavily on comprehensive patent coverage of the holographic space, allowing them to both manufacture displays and license the technology.

13. On August 28th and 29th, Karafin also stated that Light Field Lab had a large theme park customer, ultimately revealed to be Universal Studios. Karafin stated that Light Field Lab

would have the displays out to market the following year (2020) and it would be in the theme park in that timeframe or soon after.

14. These statements of alleged but untrue facts regarding the company's intellectual property and customers were intended to provide, and justifiably led to the conclusion that LFL was much closer to delivery of the product than it actually was and that an early exercise of options was expected. In reliance on these statement, Mr. Jones gave up Microsoft stock that was vesting in order to join LFL. Subsequently, there was no further discussion of Universal Studios as a customer and no product was delivered to Universal Studios.

15. During the discussions on August 28 and 29, 2019, Karafin also discussed an options double trigger event on which all options would vest if the company was publicly listed or acquired. Upon Mr. Jones' inquiry about the number and value of the options at issue, Karafin concealed that information on the basis that it was highly confidential.

16. Mr. Jones questioned the lack of disclosure of important information about Light Field Labs' stock and stock options during hiring negotiations, as it made it very difficult for Mr. Jones to determine the potential value of the options, but was refused.

17. Subsequently, after Mr. Jones became an owner of shares of Light Field Lab, Mr. Jones was entitled to review books and records to assess his holdings but when he asked Jon Karafin in March 2023, in the context of a financial discussion about the company, "… is there any additional information I'm entitled or required to be given access to as a shareholder?" Karafin responded "Understood and appreciated. There are no current problems to be aware of (e-g- equity ownership and payroll) and can keep you posted- Again, not a political response, just the facts." Books and records would classify as additional (financial) information Mr. Jones was entitled to be given access to as a shareholder. Mr. Karafin continued to refuse to provide, and concealed, the information to Mr. Jones, a stock holder.

18. As part of his onboarding, on September 9, 2019, Mr. Jones signed a Confidentiality and Proprietary Rights Agreement that purported to grant rights to patents and other works for hire to LFL. This Agreement was signed without the knowledge of misrepresented and concealed facts,

Case 3:25-cv-05118-MMC Document 77-25 Filed 09/10/25 Page 155 of 193

unknown to Mr. Jones at the time, but which if known, would have dissuaded him from joining Light Filed Lab, providing his source code and other knowledge, and signing the agreements.

19. Subsequently, in August 2025, Mr. Jones learned that Light Field Lab's foundational patents had been developed while Karafin and Bevnensee worked for a prior employer, Lytro, and were not valid patents held by Light Field Lab but, in fact, were the property of Lytro. While employed by Lytro, Inc., Mr. Karafin and Mr. Bevensee concealed their patent filing activities that were material to Jones' employment decision. Specifically:

a. Lytro filed U.S. Provisional Application 62/200,804 for "Light Guided Image Plane Tiled Arrays with Dense Fiber Optic Bundles for Light-Field Display" on August 4, 2015, while Karafin and Bevensee were employed there and are named inventors on Lytro patent US10565734 which references that provisional application;

b. Karafin and Bevensee filed provisional applications for the benefit of Light Field Lab while still employed at Lytro (62/362,602 on July 15, 2016; 62/366,076 on July 24, 2016), which are referenced in Light Field Lab's US10488584 and contained substantially identical inventions to patents they filed for Lytro and on which they are named inventors. Most of Light Field Lab's patent portfolio is tied to these provisional applications either directly or indirectly; and

c. Karafin and Bevensee incorporated Light Field Lab on November 22, 2016, while still employed at Lytro, creating a competing company using technology concepts from patents filed during their Lytro employment.

d. In patent applications for the benefit of Light Field Lab, including those related to US10488584, Karafin and Bevensee omitted relevant prior art of their Lytro patent filing activities from their disclosures to the USPTO.

e. Where identical concepts and components existed in both, throughout Light Field Lab's entire patent portfolio's filings Karafin and Bevensee carefully avoided using the same terminology as in Lytro's filings.

These concealed facts were material to Mr. Jones' decision to accept employment and to execute comprehensive IP-assignment agreements. Had Mr. Jones been aware of these material facts, he

would not have joined the Company, nor would he have transferred his own source-code and related inventions. These concealed facts were also material to Mr. Jones' decision to exercise stock options, expending money to do so.

**EMPLOYMENT, FAILURE TO ACCOMMODATE AND MR. JONES' COMPLAINT**

20. Throughout his tenure at LFL, Mr. Jones consistently received positive feedback regarding his job performance, a merit pay increase when he was promoted to Principal Engineer and periodic incentive pay bonuses. He maintained positive personal relationships with his coworkers and management.

21. Mr. Jones was instrumental in the development of LFL's SolidLight holographic display platform. Mr. Jones worked out of LFL's office from September 30, 2019, through March 7, 2020, and thereafter he worked remotely from his residence in Seattle, WA.

22. Mr. Jones is Type I Diabetic and suffers from a compromised immune system. Accordingly, Mr. Jones would be susceptible to severe illness and/or death if he were to contract COVID-19.

23. When LFL management announced that all of its employees would be required to return to in-office work by May 24, 2021, Mr. Jones requested that he be permitted to continue working remotely as an accommodation of his compromised immune system, which is a disability under federal and state law.

24. Although there does not appear to have been a formal accommodation process, LFL allowed Mr. Jones to continue working remotely and LFL management continued to provide Mr. Jones with positive feedback regarding his job performance. At no time did anyone in LFL management indicate that in-office work was an essential function of Mr. Jones' job duties.

25. In December 2022-January 2023, Mr. Jones' supervisor, Mr. Trevor Berninger, Director of Software, began having discussions with Mr. Jones to stop working remotely and return to in-office work at LFL. Mr. Jones was surprised because he had been working remotely since March 7, 2020, and there had been no complaints about his job performance.

26. When Mr. Jones asked if there were performance issues that would give rise to the request that he return to in-office work, Mr. Berninger indicated that LFL did not have any issues with his job performance. When asked if there was a particular reason as to why LFL wanted him to return to in-office work, Mr. Berninger was very vague and unspecific and indicated that "it would just be better." Again, at no time did anyone at LFL indicate that working in-office was an essential job function of Mr. Jones' position.

27. Although Mr. Jones was open for discussion as to what would be reasonable accommodations for his return to in-office work, LFL did not engage in an interactive dialogue in this regard. In fact, Mr. Jones made repeated suggestions regarding masking protocol, testing protocol, social distancing and ventilation, but LFL did not respond to Mr. Jones' suggestions.

28. Mr. Jones understandably began to feel very marginalized by LFL management. He understood that LFL management wanted him to return to in-office work, but management was unwilling to implement a reasonable protocol to minimize his risk of exposure to COVID-19. Mr. Jones sensed that his relationships with LFL management were becoming strained, when he had previously enjoyed very positive relationships with leadership.

29. In January 2023, Mr. Jones was assigned to work on masking interference for Wavetracing Optics to improve image quality. Mr. Jones was working closely with LFL's CEO Mr. Jon Karafin who was the subject matter expert in this area; Mr. Karafin defined the scope of work and methodology of the work. In March 2023, Mr. Jones advised Mr. Karafin that the methodology was unworkable and was unlikely to result in improved image quality. Mr. Jones suggested a number of alternative approaches to improve image quality, but Mr. Karafin insisted that Mr. Jones continue with the methodology he himself had prescribed.

30. The matter came to a head on April 6, 2023, when Mr. Karafin made disparaging remarks regarding Mr. Jones' work on the Wavetracing Optics during a Software Team meeting that was attended by the entire software team of approximately 10 people. Mr. Karafin stated that it had been nearly six months and that Mr. Jones had failed to generate an image and indicated that it was unlikely that Mr. Jones' work would result in improved image quality.

31. Mr. Jones was absolutely dismayed that Mr. Karafin would publicly trivialize and disparage his work in such an aggressive manner in front of his coworkers. First, Mr. Karafin's statement was untrue; Mr. Jones had in fact generated images in January 2023. It was Mr. Karafin's own methodology that was unworkable, and Mr. Jones had advised Mr. Karafin that the methodology was unlikely to result in substantial image improvement in early March, 2023. Despite Mr. Karafin's knowledge that the methodology he prescribed was unworkable, he refused to change course. Instead, he scapegoated Mr. Jones and implied that the lack of progress in image improvement was due to Mr. Jones work performance, when he was well aware that the lack of progress was due to the fact that his own methodology had proved to be unworkable. On April 9, 2023, Mr. Jones submitted a rebuttal of Mr. Karafin's disparaging comments and a complaint of hostile work environment. Mr. Jones observed that he had proven a viable solution to the problem described above, work which was later used in subsequent patents without his knowledge and without attribution.

32. LFL conducted an investigation of Mr. Jones' hostile work environment complaint. When Mr. Jones was interviewed by the investigator, he explained that he believed that Mr. Karafin's animosity towards him was due to the fact that he was working remotely because of his disability. Mr. Jones also explained that he had been under increased pressure from LFL to return to in-office work, despite his disability.

33. Mr. Jones continued working on interference masking on the Wavetracing Optics and upon implementation of Mr. Karafin's methodology, it became apparent to LFL that the methodology did not result in substantial image improvement and, in fact resulted in a substantial reduction in the field of view. The technical concerns that Mr. Jones outlined in his complaint of April 9, 2023, were substantiated.

34. On June 16, 2023, Mr. Jones received an email indicating that the investigation had been concluded and that his claim of illegal hostile work environment based on disability had not been substantiated.

**TERMINATION**

35. On June 23, 2023, Mr. Jones' employment was terminated. During the conference call it was indicated that "things aren't working out" and with the conclusion of the investigation, LFL was terminating Mr. Jones employment. There was no indication in the phone conference that LFL was terminating Mr. Jones for poor performance or unprofessional behavior. Rather, LFL was clearly terminating Mr. Jones for requesting accommodation and then making a complaint about illegal retaliation related to that request.

36. Later in the day on June 23, 2023, Mr. Jones received a letter of termination which stated that his employment was being terminated for poor performance and unprofessional behavior. Mr. Jones was shocked; during his nearly four year tenure at LFL, no one had complained about poor performance or unprofessional behavior. Notably, the termination letter falsely stated that the decision to terminate Mr. Jones' employment was made prior to the initiation of his hostile work environment complaint of April 9, 2023.

37. In this case, Mr. Jones reported conduct that he reasonably believed was motivated by unlawful discrimination. Additionally, the temporal proximity between the conclusion of the investigation on June 16, 2023, and the termination of Mr. Jones' employment a week later on June 23, 2023, indicates that LFL acted with retaliatory intent. The temporal proximity between the conclusion of the investigation and the termination of Mr. Jones employment raises a rebuttable presumption of retaliatory intent.

38. LFL's claim that it made a decision to terminate Mr. Jones' employment prior to the submission of his hostile work environment claim of April 9, 2023 is unsupported by any evidence.

39. LFL management never brought any job performance concerns to Mr. Jones either orally or in writing until April 6, 2023. In fact, Mr. Berninger advised Mr. Jones in December 2022, that LFL had no problems with Mr. Jones' job performance.

**FAILURE TO NAME JONES AS INVENTOR**

40. Patent WO2025042476A1 and WO2024216300A2, though fully derived from Mr. Jones' work, did not include Mr. Jones as an inventor, a fact not disclosed to, and concealed from, Mr. Jones by Jon Karafin and Brendan Bevensee during his employment by LFL.

**FIRST CAUSE OF ACTION**

**(Ca. Lab. Code §1102.5)**

**(Against Defendant Light Field Lab, Jon Karafin, Brendan Bevensee, and Does 1 through 10)**

41. Plaintiff repeats and realleges para. 1 through 40, and incorporates them by reference as though fully reproduced in this cause of action.

42. At all relevant time periods, Plaintiff was an employee of Defendant Light Field Lab.

43. As alleged above, Plaintiff complained to Defendant's officers, directors, and/or managing agents that certain of Defendant's activities violated the law.

44. Defendants Light Field Lab, Karafin and Bevensee terminated Plaintiff, substantially motivated by Plaintiff's complaints detailed above.

45. As a legal and proximate result of Defendants' actions, Plaintiff has suffered special and general damages in an amount to be proven, but in excess of $1,000,000.

46. Defendants' actions were taken with malice, oppression, and fraud, such that exemplary and punitive damages should be awarded.

**SECOND CAUSE OF ACTION**

**(Wrongful Termination In Violation Of Public Policy)**

**(Against Defendant Light Field Lab)**

Plaintiff incorporates by reference each of the allegations contained in paragraphs 1 through 46 above, as well as facts currently unknown.

47. Plaintiff alleges that Plaintiff's termination was wrongful because it was in violation of the public policy of the State of California and the United States in that Plaintiff's termination was in retaliation for Plaintiff's opposing and reporting illegal activity, as described in preceding allegations.

48. Plaintiff further alleges that Defendant's termination of Plaintiff was in violation of the public policy as expressed in the Fair Employment and Housing Act.

49. Plaintiff further alleges that Defendant's termination of Plaintiff was in violation of the public policy as expressed in laws and regulations prohibiting retaliation against individuals who report violations of the law, including, but not limited to, California Labor Code § 1102.5, and in addition was a violation of said statute.

50. As a direct, foreseeable, and proximate result of defendants' violation of public policy, Plaintiff has suffered and continues to suffer substantial losses in earnings and job benefits, loss of opportunity and advancement, loss of employment prospects, and has suffered and continues to suffer humiliation, embarrassment, mental and emotional distress, and discomfort, all to Plaintiff's damage in an amount in excess of $1,000,000 the precise amount of which will be proven at trial.

51. Plaintiff claims these amounts, together with prejudgment interest pursuant to Civil Code section 3287, Code of Civil Procedure section 685.010 and pursuant to any other provision of law providing for prejudgment interest.

52. Because the acts taken toward Plaintiff were carried out by, condoned by and or ratified by managerial employees or managing agents acting in a deliberate, cold, callous, malicious, oppressive, and intentional manner in order to injure and damage Plaintiff, Plaintiff requests the assessment of punitive damages against Defendant in an amount appropriate to punish and make an example of Defendant.

**THIRD CAUSE OF ACTION**

**(Fraud and Deceit)**

**(Against Light Field Lab, Jon Karafin, and Brendan Bevensee)**

Plaintiff hereby incorporates by reference Paragraphs 1 through 52 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

53. Defendants made representations as described in paragraphs 12 to 19 above including false representations as to the commercial application and viability of Defendant's product and concealed information about the financial viability of Light Field Lab.

54. Defendants made representations as described in paragraphs 12 to 19 regarding ownership of the patents on which the business was reliant and concealed the true ownership of those patents.

55. Defendants concealed information as described in paragraphs 40 above regarding inventorship of Patent WO2025042476A1 and WO2024216300A2. Patent WO2025042476A1 and WO2024216300A2, though fully derived from Mr. Jones' work, did not include Mr. Jones as an inventor, a fact not disclosed to Mr. Jones during or after his employment by LFL.

56. Further, Defendants, including Defendant Karafin, Brendan Bevensee and all corporate officers and board members, though constructive or actual knowledge, had a duty to disclose facts regarding ownership of patents on which the business, and Plaintiff's employment, were based, as part of the employer employee relationship.

57. Representations regarding the commercial viability of Defendants' product were false as identified above, and the true information regarding the value of Plaintiff's stock was concealed, Defendants used the concealment and misrepresentations to induce Plaintiff to accept and continue his employment, a result Defendants could not have achieved truthfully.

58. Further, representations regarding the financial stability of Defendant were false as identified above, and the true information regarding the value of Plaintiff's stock was concealed. Defendants used the concealment and misrepresentations to induce Plaintiff to accept and continue his employment, a result Defendants could not have achieved truthfully.

59. Further, representations regarding the specific value of Plaintiff's stock was concealed as identified above. Defendants used the concealment and misrepresentations to induce Plaintiff to continue his employment to his detriment, a result Defendants could not have achieved truthfully.

60. Further, representations regarding the valid ownership of patents by Light Field Lab was concealed as identified above. Defendants used the concealment and misrepresentations to induce Plaintiff to continue his employment, and to purchase stock options to his detriment, a result Defendants could not have achieved truthfully.

61. Defendants knew said representations to be false and intended to conceal the true facts from Plaintiff to unlawfully persuade Plaintiff to accept and maintain employment with Defendant, to his detriment.

62. Plaintiff justifiably relied upon the misrepresentations made to him, and did not know the true facts concealed from him, to his detriment.

63. Plaintiff did not discover the fraud and deceit practiced upon him as set forth herein until he started his employment with defendants, attempted to fulfill his responsibilities, continued to provide Defendants with valuable intellectual information (which they kept for themselves), was terminated, investigated Defendants' representations and the true fact, and thereby realized that Defendants'

representations were false and that Defendants had concealed their true intent, including the intent to misappropriate his intellectual information.

64. As a proximate result of the concealment and representations of Defendants to Plaintiff as set forth herein, Plaintiff has suffered and continues to suffer the loss of value of owned stock, wages and benefits, as well as stock options from his prior employment with Microsoft in an amount to be proven at trial.

65. As a proximate result of the concealment and representations of Defendants to Plaintiff as set forth herein, Plaintiff has suffered the loss of the cost of stock options, now worthless, in an amount to be proven at trial.

66. As a further direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered extreme anguish, humiliation, and emotional distress, the extent of which will be proven at trial.

67. Because the acts taken toward Plaintiff were carried out by, condoned by and or ratified by managerial employees or managing agents acting in a deliberate, cold, callous, fraudulent, malicious, oppressive, and intentional manner in order to injure and damage Plaintiff, Plaintiff requests the assessment of punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

68. As a result of the facts above, and the fact that Confidential Information and Inventions Assignment Agreement was obtained through fraud, Plaintiff is entitled to injunctive relief to rescind the Confidential Information and Inventions Assignment Agreement and invalidate WO2025042476A1 and WO2024216300A2, prevent Defendants from using his intellectual property, and the transfer of all intellectual property, including but not limited to that related to WO2025042476A1 and WO2024216300A2, created by Plaintiff, or derived from Plaintiff's work product, to Plaintiff.

69. WHEREFORE, Plaintiff requests relief as hereinafter provided.

**FOURTH CAUSE OF ACTION**

**(Violation of Penal Code Sections 484 & 496)**

**(Against Defendant Light Field Lab, Jon Karafin, Brendan Bevensee, and Does 1 through 10)**

Plaintiff hereby incorporates by reference Paragraphs 1 through 68 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

70. Defendants' misrepresentations to Plaintiff, including fraudulent statements regarding inventorship of Patent WO2025042476A1 and WO2024216300A2, constituted theft of personal property, in the form of Plaintiff's right to inventorship of those patents, under Penal Code section 484 insofar as Defendants have "knowingly and designedly, by…false or fraudulent representation or pretense, defraud[ed][Plaintiff] of…personal property."

71. Defendants' misrepresentations to Plaintiff and others regarding the development and invention of the concepts underlying Patent WO2025042476A1 and WO2024216300A2, made at the time that Defendants Karafin and Bevensee applied for the patents, constituted theft under Penal Code section 484 insofar as Defendants have "knowingly and designedly, by…false or fraudulent representation or pretense, defraud[ed][Plaintiff] of" property at the time that property was denied to Plaintiff.

72. Defendant Light Field Lab has retained ownership and Karafin and Bevensee have retained inventorship of Patent WO2025042476A1 and WO2024216300A2 that should have been provided to Plaintiff.

73. In so doing, Defendant Light Field Lab have knowingly received and deliberately withheld patent rights from Plaintiff, knowing that it has no exclusive rights, title, or interest in patent rights and that said patent rights have been stolen from Plaintiff and/or obtained in a manner constituting theft.

74. As a direct, foreseeable, and proximate result of Defendants' theft, Plaintiff has suffered and continues to suffer a loss of the value of his inventorship, as well as a loss of the rights to licensing revenue, the precise amount of which will be proven at trial.

75. Plaintiff has been damaged as a result of the theft of his personal property and is entitled to treble damages pursuant to Penal Code section 496(c).

76. As a result of the facts above, and the fact that Confidential Information and Inventions Assignment Agreement was obtained through fraud, Plaintiff is entitled to injunctive relief to rescind the Confidential Information and Inventions Assignment Agreement and invalidate WO2025042476A1 and WO2024216300A2, prevent Defendants from using his intellectual property, and the transfer of all

intellectual property, including but not limited to that related to WO2025042476A1 and WO2024216300A2, created by Plaintiff, or derived from Plaintiff's work product, to Plaintiff.

77. WHEREFORE, Plaintiff requests relief as hereinafter provided.

**FIFTH CAUSE OF ACTION**

**(Civil RICO)**

**(Against Defendants Light Field Lab Jon Karafin, Brendan Bevensee, and Does 1 through 10)**

Plaintiff hereby incorporates by reference Paragraphs 1 through 76 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

78. Defendant Light Field Lab is an enterprise engaged in and the activities of which affect interstate commerce, to wit: a corporation incorporated under the laws of the State of Delaware.

79. Defendant Jon Karafin, as a person within the meaning of 18 U.S.C.A. § 1961(3), and as a person employed by said enterprise, conducted and participated, directly and indirectly, in the conduct of the affairs of said enterprise through a pattern of racketeering activity in violation of 18 U.S.C.A. § 1962(c).

80. Defendant Brendan Bevensee, as a person within the meaning of 18 U.S.C.A. § 1961(3), and as a person employed by said enterprise, conducted and participated, directly and indirectly, in the conduct of the affairs of said enterprise through a pattern of racketeering activity in violation of 18 U.S.C.A. § 1962(c).

81. The predicate acts which constitute this pattern of racketeering activity are: multiple fraudulent communications regarding Patent WO2025042476A1 and WO2024216300A2 using means of interstate communication, including electronic filing, mail and email.

82. These acts of racketeering, occurring within ten years of one another, constitute a pattern of racketeering activity within the meaning of 18 U.S.C.A. § 1961(5).

83. Plaintiff was injured in his property by reason of this violation of 18 U.S.C.A. § 1962, in that, as a direct and proximate result of Defendant's complained of acts, Plaintiff suffered damages, including loss of money.

Case 3:25-cv-05118-MMC Document 72 Filed 09/04/25 Page 16 of 153

84. By reason of the Defendants' violation of 18 U.S.C.A. § 1962, Plaintiff is entitled, pursuant to 18 U.S.C.A. § 1964(c), to threefold the damages sustained, with interest thereof at 10% per annum, and a reasonable attorney's fee in connection herewith.

85. As a result of the facts above, and the fact that Confidential Information and Inventions Assignment Agreement was obtained through fraud, Plaintiff is entitled to injunctive relief to rescind the Confidential Information and Inventions Assignment Agreement and invalidate WO2025042476A1 and WO2024216300A2, prevent Defendants from using his intellectual property, and the transfer of all intellectual property, including but not limited to that related to WO2025042476A1 and WO2024216300A2, created by Plaintiff, or derived from Plaintiff's work product, to Plaintiff.

**SIXTH CAUSE OF ACTION**

**(Breach of Fiduciary Duty)**

**(Against Defendant Light Field Lab and Jon Karafin)**

Plaintiff hereby incorporates by reference Paragraphs 1 through 85 of this Complaint as is fully set forth herein and for a cause of action alleges as follows:

86. Plaintiff is, and at all times relevant to this amended complaint, was a minority share holder of Defendant LFL.

87. Defendant LFL and Jon Karafin improperly failed and refused to provide necessary information to Plaintiff as a share holder.

88. As a result of the acts of Defendant LFL and Jon Karafin, Plaintiff was prevented from gaining the knowledge necessary to convert and sell his owned shares.

89. As a proximate result of the wrongful acts and omissions of Defendant LFL and Jon Karafin to Plaintiff as set forth herein, Plaintiff has suffered and continues to suffer the loss of value of his owned stock, the precise amount of which will be proven at trial.

90. Defendant LFL committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice and in conscious disregard of Plaintiff's rights, justifying the imposition of punitive damages.

**SEVENTH CAUSE OF ACTION**

**(Violation of Uniform Fraudulent Transfer Act)**

**(Civil Code § 3439.04(a)(1))**

**(Against Light Field Lab and Does 1 to 10)**

91. Plaintiff realleges and incorporates by reference Paragraphs 1 through 90 of Plaintiff's Complaint with the same force and effect as though fully set forth herein.

92. California Civil Code Section 3439.04(a)(1) provides that "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor … if the debtor made the transfer or incurred the obligation … [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor."

93. Defendants, and each of them, violated Section 3439.04(a)(1), inasmuch as Defendant Light Field Lab transferred the assets of Light Field Lab to CMBG FBC-Light Field Lab LLC, Assignee for the Benefit of Creditors of Light Field Lab, Inc. at a time when Defendant had been threatened with Plaintiff's lawsuit and had in fact been sued by Plaintiff.

94. Plaintiff is further informed and believes that Defendant retained use and control of the assets, including but not limited to the intellectual property at issue in this lawsuit, after the transfer and that reasonably equivalent value was not paid for the property.

95. At the time of the transfer, Defendant knew it may be obligated to pay Plaintiff a debt as well as turn over certain intellectual property at issue in this lawsuit. As a result of the transfer, Defendant Light Field Lab was left with insufficient assets to satisfy the potential debt and judgment.

96. The intellectual property transferred Defendant's principal asset.

97. As a result of the foregoing, Plaintiff is entitled to the remedies set forth in Civil Code Section 3439.07, including an order setting aside the transfer of the intellectual property and other assets from Defendant Light Field Lab to CMBG FBC-Light Field Lab LLC, Assignee for the Benefit of Creditors of Light Field Lab, Inc.

98. WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

99. A declaration that the transfer of the intellectual property and other assets is void and will be set aside; in the alternative, a right of attachment or provisional remedy against the intellectual

property and other assets; injunctive relief; and/or for lawful interest according to proof at the time of trial;

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1. For general damages according to proof;
2. For special and compensatory damages, including put not limited to, loss of wages, salary, benefits, back pay, front pay, future lost income and benefits, and other economic losses, in an amount according to proof at trial;
3. For treble damages;
4. For an award of punitive damages, according to proof;
5. For attorneys' fees and costs of suit;
6. For rescission of a contract;
7. For a right of attachment;
8. For declaratory relief;
9. For injunctive relief;
10. For pre-judgment and post-judgment interest pursuant to Civil Code Sections 3287 and 3289, Code of Civil Procedure Section 685.010 and pursuant to any other provision of law providing for interest;
11. For such other and further relief that the Court may deem just and proper.

Dated: September 3, 2025

HENRY | LACEY PC

By /s/ Stephen Henry______________
STEPHEN F. HENRY
Attorney for Plaintiff

Case 3:25-cv-05118-MMC Document 77 Filed 09/03/25 Page 19 of 19

Plaintiff demands trial by jury in this action.

Dated: September 3, 2025

HENRY | LACEY PC

By /s/ Stephen Henry______________
STEPHEN F. HENRY
Attorney for Plaintiff

# EXHIBIT 6

SARA A. MOORE (SBN: 294255)
SARAH B. ABSHEAR (SBN: 270947)
GORDON REES SCULLY MANSUKHANI, LLP
315 Pacific Avenue
San Francisco, CA 94111
Telephone: (415) 986-5900
Facsimile: (415) 986-8054
smoore@grsm.com
sabshear@grsm.com

Attorneys for Defendants
LIGHT FIELD LAB, INC.



UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALAN JONES, an individual

Plaintiff,

vs.

LIGHT FIELD LAB, INC., JON KARAFIN, BRENDAN BEVENSEE, and Does 1 to 10,

Defendants.

CASE NO. 3:25-cv-05118-MMC

**DEFENDANT LIGHT FIELD LAB'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT FOR DAMAGES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Date: December 19, 2025
Time: 9 a.m.
Judge: Hon. Maxine M. Chesney
Courtroom: 7

*Accompanying Papers:*
*Defendant's Request for Judicial Notice; Declaration of Sara A. Moore; Proposed Order*

Complaint Filed: June 17, 2025
Am. Complaint Filed: Sept. 3, 2025

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

# TABLE OF CONTENTS

Page


I. INTRODUCTION .......... 9

II. RELEVANT ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS .......... 11

A. Plaintiff's Employment with LFL and the Agreements He Entered Into .......... 11

B. Following His Termination, Plaintiff Raises Stock Options Claims and LFL Seeks Declaratory Relief Regarding the Terms of Plaintiff's Contract .......... 11

C. Plaintiff Successfully Moves to Dismiss LFL's Request for Declaratory Relief by Representing There Were No Stock Options Claims .......... 12

D. Plaintiff Files This Action, Pleading Claims Relating to Contracts with LFL and Contractual Disputes About Stock Options .......... 13

E. LFL Elects to Utilize California Insolvency Procedure, an Assignment for the Benefit of Creditors .......... 13

F. After LFL Moves to Dismiss His Complaint, Plaintiff Amends His Complaint .......... 14

III. LEGAL STANDARD .......... 15

IV. LEGAL ARGUMENT .......... 15

A. Plaintiff's Third, Fourth, Fifth, Sixth, and Seventh Causes of Action Are Barred by the Patent Act, Plaintiff's Lack of Standing, and/or Estoppel Doctrines .......... 15

1. Plaintiff's Third, Fourth, Fifth, and Seventh Causes of Action Are Preempted By the Patent Act and Plaintiff Lacks Standing to Sue Because He Assigned His Rights to LFL .......... 16

a. Plaintiff's Claims Are Preempted by the Patent Act .......... 16

b. Plaintiff Lacks Standing to Sue Regarding Any Intellectual Property Rights .......... 17

2. Plaintiff's Third, Sixth, and Seventh Causes of Action Are Barred by the Doctrines of Judicial Estoppel, Claim Preclusion and Issue Preclusion .......... 18

a. Plaintiff's Claims Are Barred by the Doctrine of Judicial Estoppel .......... 19

b. Plaintiff's Claims Are Barred by Claim Preclusion .................... 21

c. Plaintiff's Claims Are Barred by Issue Preclusion ..................... 22

B. Plaintiff's Cause of Action for Fraud and Deceit Fails Because It Does Not Meet the Heightened Specificity and Particularity Requirements for Fraud ....... 23

C. Plaintiff's Cause of Action for Violation of Penal Code Sections 484 and 496 Fails Because It Does Not Meet the Heightened Specificity and Particularity Requirements for the Fraud Component of the Relevant Crimes ........ 26

D. Plaintiff's Cause of Action for Civil RICO Fails Because It Consists Solely of Conclusory Statements Without Factual Information .......... 27

E. Plaintiff's Cause of Action for Breach of Fiduciary Duty Fails Because Plaintiff Fails to Plead Facts that Indicate Information Was Concealed ............. 29

F. Plaintiff's Seventh Cause of Action Fails Because LFL Is Entitled to Insolvency Proceedings and Plaintiff Can Exercise His Rights in Them ............ 30

G. There Are No Factual Allegations of Wrongdoing Regarding Brendan Bevensee in the Entire Complaint ........ 31

V. CONCLUSION ........ 31


Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Assoc. Gen. Contractors of Calif. v. Calif. State Council of Carpenters*,
459 U.S. 519 (1983) ..... 15

*Banga v. Experian Info. Sols., Inc.*,
No. C 09-04867 SBA, 2013 WL 5539690 (N.D. Cal. Sept. 30, 2013) ..... 21, 22

*BearBox LLC v. Lancium LLC*,
125 F.4th 1101 (Fed. Cir. 2025) ..... 16

*Bily v. Arthur Young & Co.*,
3 Cal.4th 370 (1992) ..... 24

*CAA Indus., Ltd. v. Recover Innovations, Inc.*,
No. 222-CV-00581-GMN-EJY, 2023 WL 9056823 (D. Nev. Dec. 29, 2023) ..... 17

*Canyon County v. Syngenta Seeds, Inc.*,
519 F.3d 969 (9th Cir. 2008) ..... 29

*Certicable Inc. v. Point 2 Point Commc'ns Corp.*,
No. 2:23-CV-5322 (NJC) (SIL), 2025 WL 622547 (E.D.N.Y. Feb. 26, 2025) ..... 18

*Chapman v. Skype, Inc.*,
220 Cal.App.4th 217 (2013) ..... 24

*Cnty. of Marin v. Deloitte Consulting LLP*,
836 F.Supp.2d 1030 (N.D. Cal. 2011) ..... 27, 28

*Daniels v. Select Portfolio Servicing, Inc.*,
246 Cal.App.4th 1150 (2016) ..... 23, 24

*Doan v. Singh*,
617 F.App'x 684 (9th Cir. 2015) ..... 28

*Dorian v. Cmty. Loan Servicing, LLC*,
No. 22-CV-04372-DMR, 2022 WL 7620460 (N.D. Cal. Oct. 13, 2022) ..... 19

*Finn v. Sullivan*,
228 F.Supp.3d 972 (N.D. Cal. 2017) ..... 19, 20, 21

*Frank v. United Airlines, Inc.*,
216 F.3d 845 (9th Cir. 2000) ..... 22

*Gardner v. Starkist Co.*,
418 F. Supp. 3d 443 (N.D. Cal. 2019) ....................28

*Gregory C. James v. J2 Cloud Services Inc.*,
No. 216-CV-05769-CAS-PJWX, 2018 WL 6092461 (C.D. Cal. Nov. 19, 2018) ....................17

*Grimmett v. Brown*,
75 F.3d 506 (9th Cir.1996) ....................27

*Hamilton v. State Farm Fire & Cas. Co.*,
270 F.3d 778 (9th Cir. 2001) ....................19

*Hinesley v. Oakshade Town Center*,
135 Cal.App.4th 289 (2005) ....................23, 24

*Jennings v. Auto Meter Prods., Inc.*,
495 F.3d 466 (7th Cir. 2007) ....................29

*Kwikset Corp. v. Superior Court*,
51 Cal.4th 310 (2011) ....................24

*Lazar v. Superior Court*,
12 Cal.4th 631 (1996) ....................23, 24

*Mangaoang v. Special Default Services, Inc.*,
427 F.Supp.3d 1195 (N.D. Cal. 2019) ....................19

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008) ....................15

*Medallion Television Enters., Inc. v. SelecTV of California, Inc.*,
833 F.2d 1360 (9th Cir. 1987) ....................29

*Methode Elecs. Inc. v. Hewlett-Packard Co.*,
No. C 99-04214 SBA, 2000 WL 1157933 (N.D. Cal. May 4, 2000) ....................17

*Mohebbi v. Khazen*,
50 F. Supp. 3d 1234 (N.D. Cal. 2014) ....................23, 28

*Moore v. Kayport Package Exp., Inc.*,
885 F.2d 531 (9th Cir. 1989) ....................27, 28

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ....................19, 20

*OptoLum, Inc. v. Cree, Inc.*,
244 F. Supp. 3d 1005 (D. Ariz. 2017) ....................17

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

*Pac. Recovery Sols. v. United Behav. Health*,
481 F. Supp. 3d 1011 (N.D. Cal. 2020) ....................28

*In re Palmer*,
207 F.3d 566 (9th Cir. 2000) ....................22

*People v. Ashley*,
42 Cal.2d 246 (1954) ....................26

*People v. Lawson*,
215 Cal.App.4th 108 (2013) ....................26

*People v. Williams*,
57 Cal.4th 776 (2013) ....................26

*Powell v. Home Depot U.S.A, Inc.*,
No. 07-80435-CIV, 2010 WL 375796 (S.D. Fla. Jan. 26, 2010) ....................17

*Robertson v. Dean Witter Reynolds, Inc.*,
749 F.2d 530 (9th Cir. 1984) ....................15

*San Remo Hotel L.P. v. San Francisco City and County*,
364 F.3d 1088 (9th Cir. 2004) ....................21

*Sanford v. MemberWorks, Inc.*,
625 F.3d 550 (9th Cir. 2010) ....................28

*Scott v. Hodges*,
No. C 96-01970 EFL, 1996 WL 161774 (N.D. Cal. Mar. 29, 1996) ....................22

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001) ....................15

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ....................15

*Stearns v. Select Comfort Retail Corp.*,
No. 08-2746 JF, 2009 WL 1635931 (N.D. Cal. June 5, 2009) ....................29

*Steckman v. Hart Brewing*,
143 F.3d 1293 (9th Cir. 1998) ....................15

*Taylor v. Sturgell*,
553 U.S. 880 (2008) ....................21

*In re Tobacco II Cases*,
46 Cal.4th 298 (2009) ....................24

**Gordon Rees Scully Mansukhani, LLP**
**315 Pacific Avenue**
**San Francisco, CA 94111**

*Trireme Med., LLC v. AngioScore, Inc.*,
812 F.3d 1050 (Fed. Cir. 2016)....18

*Turner v. Cook*,
362 F.3d 1219 (9th Cir. 2004) ....29

*Univ. of Colo. Found. v. Am. Cyanamid Co.*,
196 F.3d 1366 (Fed. Cir. 1999)....16

*Vaughan v. Wardhaugh*,
No. 23-CV-02879-RFL, 2024 WL 2853972 (N.D. Cal. May 10, 2024) ....28

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) ....23

*Villarroel v. Recology Inc.*,
775 F.Supp.3d 1050 (N.D. Cal. 2025) ....28

*Whyte Monkee Prods. LLC v. Netflix, Inc.*,
757 F. Supp. 3d 1025 (N.D. Cal. 2024), *reconsideration denied*, No. 23-CV-03438-PCP, 2025 WL 974940 (N.D. Cal. Apr. 1, 2025)....21

**Statutes**

18 U.S.C. § 1962(c) ....27

Cal. Civ. Code § 1710(1) ....24

Cal. Civ. Code § 1710(3) ....24

Cal. Civ. Code § 1710(4) ....24

Cal. Civ. Code § 3439.04(a)(1)....14

Cal. Civ. Code § 3439.07(d) ....30

Cal. Civ. Proc. Code § 338(d)....26

Cal. Civ. Proc. Code § 493.010 ....14, 30

Cal. Civ. Proc. Code § 1800-1802 ....14, 30

Cal. Penal Code § 484....14, 26

Cal. Penal Code § 496....14, 26

**Rules**

Fed. R. Civ. P. 8 ....19, 29, 30

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Fed. R. Civ. P. 9 ....................27, 28

Fed. R. Civ. P. 9(b) ....................23, 28

Fed. R. Civ. P. 12(b)(6)....................15, 23

USPTO Rules of Professional Conduct, § 11.01 ....................10

**Regulations**

37 C.F.R. 11.7 ....................10

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on December 19, 2025 at 9 a.m., or as soon thereafter as the matter may be heard in the above-entitled court, Defendant LIGHT FIELD LAB, INC. ("Defendant" or "LFL") will and hereby does move the Court for dismissal of Plaintiff ALAN JONES' ("Plaintiff") Amended Complaint for Damages as to the Third, Fourth, Fifth, Sixth, and Seventh Causes of Action.[1] *See* Request for Judicial Notice ("RJN"), Exh. 1, ECF No. 25, Amended Complaint ("FAC").

This motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, Federal Rule of Civil Procedure 8(a)(2) for failure to plead facts showing that the pleader is entitled to relief, and Federal Rule of Civil Procedure 9(b) for failure to plead with particularity special matters, i.e., fraud and RICO claims. In addition, dismissal pursuant to Rule 12(b)(6) is proper here due to an "absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1999). Plaintiff's claims should also be dismissed pursuant to the equitable doctrine of judicial estoppel along with claim and issue preclusion, which can be invoked by a court at its discretion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Plaintiff Alan Jones ("Plaintiff" or "Jones"), a former employee of Defendant Light Field Lab, Inc. ("LFL"), was terminated in June 2023. The FAC alleges wrongful termination claims in counts one and two, not at issue in this motion. In addition to his wrongful termination claims, Plaintiff alleges that he is owed the rights to two patents he claims he invented while working for LFL (despite assigning his intellectual property rights to LFL upon employment), as well as certain stocks and stock options he received while employed by LFL.

The FAC heavily focuses on Plaintiff's claims that he is entitled to ownership of LFL's

[1] Note that the while the FAC lists only six causes of action in the caption, it alleges seven causes of action within the text. On page 17 of the FAC, the seventh cause of action is set forth as a "Violation of Uniform Fraudulent Transfer Act," relying on Civil Code § 3439.04. In addition, the fifth cause of action appears to be mislabeled in the caption as "Unfair Competition." On page 15 of the FAC, the fifth cause of action is set forth as "Civil RICO."

patents. Yet in doing so, Plaintiff demonstrates his ignorance of the most basic tenets of patent law.[2] ***First***, patent ownership is a legal right granted by the United States Patent and Trademark Office ("USPTO") after a rigorous process. A patent does not exist in the absence of a USPTO grant. The owner of a patent, as determined by the USPTO, has the *right* to exclude others from making, using, selling, or importing the invention within the United States. Regardless of whether Plaintiff thinks the USPTO *should have* granted such a right to LFL, it did so. This matter is simply beyond dispute. ***Second***, determinations regarding patent ownership rights, including validity and inventorship, are governed exclusively by *federal* law. It is well established that the Patent Act is Plaintiff's sole recourse to challenge the validity or ownership of the patents, mandating the dismissal of all causes of action involving the patents.

In his original complaint in this lawsuit, Plaintiff asserted several causes of action asserting claims regarding stock options. LFL responded by filing its first motion to dismiss on August 20, 2025 in which it argued, *inter alia*, that Plaintiff was estopped from asserting such causes of action due to Plaintiff's admissions in prior litigation, where he had stated he would not pursue such claims. *See* RJN, Exh. 2, ECF No. 20, Defendant's Motion to Dismiss Plaintiff's Complaint for Damages ("First Motion to Dismiss"). In apparent recognition that LFL's argument had merit, and before the matter could be fully-briefed, Plaintiff opted to file his FAC. Plaintiff's FAC drops two causes of action and appears to limit two others to new patent-related claims. Yet Plaintiff persists with claims that he is entitled to stock options in his third cause of action for fraud and deceit and his sixth cause of action for breach of fiduciary duty. Because these causes of action continue to rely upon allegations contrary to Plaintiff's prior litigation position, he is estopped from making them.

Finally, as a matter of pleading, Plaintiff's claims are not factually supported; they are conclusory and contradicted by Plaintiff's own admissions and the contracts he entered into with LFL. He also makes new allegations about "concealed facts" that he allegedly discovered in

[2] Notably, patent law is considered a complex and specialized field within the legal community, with a separate bar exam for patent attorneys, many of whom have an engineering degree in addition to a law degree. This is reflected in the procedures of the USPTO – to practice before it, attorneys are expected to have *scientific* and *technical* competence. *See, e.g.,* 37 CFR 11.7, USPTO Rules of Professional Conduct, § 11.01.

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

August 2025, more than two years after leaving the company. Plaintiff provides no information regarding how he discovered these alleged facts, making it likely they are based on leaping to conclusions after reviewing information publicly available on LinkedIn, in court documents, and/or on the USPTO website. Because Plaintiff's claims fail to state a claim upon relief should be granted, his Third, Fourth, Fifth, Sixth, and Seventh causes of action should be dismissed as a matter of law, without leave to amend.

## II. RELEVANT ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS[3]

### A. Plaintiff's Employment with LFL and the Agreements He Entered Into

Plaintiff was employed by LFL from September 2019 to June 2023 as a software engineer. FAC, ¶ 11. In connection with his employment, Plaintiff admits that he entered into one or more contracts with LFL, including an "employment contract," a "Confidentiality and Proprietary Rights Agreement," and a "Confidential Information and Inventions Assignment Agreement." *See, e.g., id*. at ¶¶ 1, 18, 19, 68, 76, 85. Plaintiff admits those agreements were entered into on or about September 9, 2019. *Id.* at ¶ 18.

Plaintiff's employment was terminated in June 2023. *Id.* at ¶ 31.

### B. Following His Termination, Plaintiff Raises Stock Options Claims and LFL Seeks Declaratory Relief Regarding the Terms of Plaintiff's Contract

Shortly after he was terminated, Plaintiff raised claims related to his stock options and in connection with his termination to LFL. *See* RJN, Exh. 3, Case No. 5:23-cv-05344, ECF No. 1 ("LFL Complaint"). LFL was concerned about the uncertainty Plaintiff's claims introduced into the value of its stocks and stock options, which was Exhibit A to the LFL Complaint. *See id.* As a result, on October 19, 2023, LFL filed a request for declaratory relief in this Court, alleging, *inter alia*, that while "Jones threatens to sue to obtain the equity interest" in shares of company stock, "**Jones has no rights under the express terms of the Plan Documents.**" *Id.*, ¶ 4. The LFL Complaint sought a declaration that "**Jones never earned any right** to Light Field Lab's stock equity interest…and that the alleged vested stock options to Jones expired three months

[3] Plaintiff's allegations, unless contradicted by judicially noticeable facts, are accepted as true for purposes of this Motion, and Defendants do not admit the truth of those allegations by including them herein.



Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

after his employment at Light Field Lab ended." *Id.* at Prayer for Relief, ¶ 1.

### C. Plaintiff Successfully Moves to Dismiss LFL's Request for Declaratory Relief by Representing There Were No Stock Options Claims

Plaintiff moved to have the LFL Complaint dismissed, arguing that the "framing of the dispute between the parties [as presented in the LFL Complaint] is **a sham**." *See* RJN Exh. 4, Case No. 5:23-cv-05344, ECF No. 32, Jones' Motion to Dismiss LFL Complaint ("Jones' MTD LFL Complaint"), p. 1. Plaintiff accused LFL of "falsely fram[ing] the dispute as a 'contractual' one" and "re-fram[ing] the dispute as a 'contractual dispute,'" when it was really only about wrongful termination. *Id.* at 4. According to Plaintiff, he had no stock options claims, and the stock options were only relevant insofar as they could be "a basis to claim damages arising out of the employment discrimination/retaliation claims JONES held inchoate and as a means for consideration should the parties reach a settlement." *Id.* at 4. Plaintiff asserted that LFL "filed this suit accusing JONES of threatening to **sue over a contractual dispute, a false contention**." *Id.* at 5. Plaintiff even went so far as to factually concede that "**there is and never was a stand-alone contractual claim for the lost stock options** pursuant to the stock incentive plan that forms the basis for plaintiff's **sham Complaint**." *Id.*

As a result, in an order on April 19, 2024, the Honorable Yvonne Gonzalez Rogers issued an order tentatively dismissing the LFL Complaint, effectively dismissing the entire action (the "DJ Action"). *See* RJN Exh. 5, Case No. 5:23-cv-05344, ECF No. 55, Order Tentatively Granting Motion to Dismiss.[4] The Court relied on Jones' statement to find that the evidence before the Court did "not indicate that [Jones] ever demanded options, shares, or other equity interests in Light Field Lab (**as opposed to the value thereof**), or that [Jones] disputed the terms of the Plan or **the parties' rights and obligations under the Plan**."[5] *Id.* On May 8, 2024, the

[4] The order also denied two prior motions to dismiss as moot, as they were filed when Jones was *pro per*. The tentative ruling provided that further briefing was permitted, but LFL chose not to further pursue its request for relief based on the Court's conclusions and Plaintiff's statements about the lack of a contractual dispute.

[5] Jones was represented by one attorney during the discussions the Court's order focuses on, a second attorney during his motion to dismiss (after being *pro per*), and a third in his complaint in this action, meaning that each Plaintiff's counsel's knowledge is necessarily fragmented with regard to all communications that took place with LFL and its counsel. Only certain communications were before the Court when it decided the motion to dismiss.

Court granted the motion to dismiss for the reasons set for the in the tentative ruling. *See* RJN Exh. 6, Case No. 5:23-cv-05344, ECF No. 58, Order Granting Motion to Dismiss, p. 2.

**D. Plaintiff Files This Action, Pleading Claims Relating to Contracts with LFL and Contractual Disputes About Stock Options**

Plaintiff filed this action on June 17, 2025, more than a year after he convinced the Court to dismiss the LFL Complaint. In his original complaint filed in this Action, Plaintiff alleged, in almost direct contradiction to his factual admissions during the declaratory briefing that the stock options "**have been stolen from Plaintiff and/or obtained in a manner constituting theft**." RJN Exh. 7, ECF No. 1, Plaintiff's Complaint for Damages ("Original Complaint"), ¶ 79. He then asserted contractual and quasi-contractual claims, and made many contract-based allegations, including that LFL "knowingly breached its agreements" with Plaintiff, "breached the clear and unambiguous promises" it allegedly made with Plaintiff, and entered into a "contractual relationship" with Plaintiff that allegedly included "expressed and implied promises." *Id.* at ¶¶ 50, 51, 55; *see also supra*, section II.A (describing specific contracts Plaintiff alleges the parties entered into). Plaintiff alleged that he was "deliberately denied the benefit of vested and unvested stock options which he had earned as a result of his work for Defendant." *Id.* at ¶ 35 (hereinafter referred to as the "stock option claims"). Plaintiff also alleged that "regardless of any purported rights gained by LFL as a work for hire or on assignment" due to the aforementioned contracts, LFL "should have included Mr. Jones' name as an inventor" on two specific patents, which he claimed were "entirely derived from" his own "work at LFL prior to his termination." *Id.* at ¶¶ 36-37 (hereinafter the "patent claims").

**E. LFL Elects to Use California Insolvency Procedure, an Assignment for the Benefit of Creditors**

On August 15, 2025, LFL elected to utilize a procedure designed to assist with insolvency in lieu of federal bankruptcy, an Assignment for the Benefit of Creditors ("ABC"); the website for LFL's ABC, which provides all relevant information to creditors, is located at https://sites.google.com/view/abc-light-field-lab/home. *See* RJN, Exh. 8, Notice to Plaintiff of

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

ABC. As a known creditor because of this litigation, Plaintiff was included in the ABC proceedings, about which he was notified. *Id.* As part of the ABC, LFL had to turn over all its assets to an assignee, who is required to divide them up among LFL's creditors according to priorities established by law. *See* Code Civ. Proc., §§ 493.010 *et seq.*, §§ 1800-1802 *et seq*.

**F. <u>After LFL Moves to Dismiss His Complaint, Plaintiff Amends His Complaint</u>**

On August 20, 2025, LFL filed a motion to dismiss the original complaint on several bases, including those briefed in this motion. *See* RJN Exh. 2, First Motion to Dismiss. Plaintiff responded by filing the FAC on September 3, 2025. *See* RJN Exh. 1, FAC. Plaintiff dropped his causes of action for breach of the covenant of good faith and fair dealing, as well as his cause of action for promissory estoppel. *See generally* FAC. In addition, it appears that Plaintiff's cause of action for theft under Penal Code sections 484 and 496, as well as his cause of action for Civil RICO, now rely only on patent-related claims, not stock options claims, though it is somewhat ambiguous whether an expansive reading might include both. *See id.* at ¶¶ 70-85. However, Plaintiff continues to assert causes of action for fraud and deceit, as well as breach of fiduciary duty, claiming that Plaintiff has a right to the stock and stock options. *See id.* at ¶¶ 16-17, 53-69, 86-90. In support of his fraud and deceit cause of action, Plaintiff claims that he only entered into an employment contract with LFL due to fraudulent statements and/or concealment regarding the value of the stock options, which Plaintiff purportedly relied on to his detriment. *Id.* at ¶¶ 16-17, 57-60, 65. He also claims that he lost LFL stock he was entitled to due to a breach of fiduciary duty. *Id.* at ¶ 89.

In addition to eliminating claims, Plaintiff also added a new cause of action for violation of the Uniform Fraudulent Transfer Act, Civil Code § 3439.04(a)(1). *Id.* at ¶¶ 91-99. The cause of action alleges that LFL should not be able to take advantage of California insolvency proceedings, because it chose to do so at a time "when Defendant had been threatened with Plaintiff's lawsuit and had in fact been sued by Plaintiff." *Id.* at ¶ 93. It also states, without providing any facts to explain, that "Plaintiff is further informed and believes that Defendant retained use and control of the assets, including but not limited to the intellectual property at

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

issue in this lawsuit, after the transfer and that reasonably equivalent value was not paid for the property." *Id.* at ¶ 94.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may make a motion to dismiss for "failure to state a claim upon which relief can be granted." A dismissal pursuant to Rule 12(b)(6) is proper where there is an absence of sufficient facts alleged under a cognizable legal theory. *See Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 533-34 (9th Cir. 1984). Moreover, although the Court must construe the facts in the light most favorable to the non-moving party, the Court need not accept as true conclusory allegations, legal characterizations, unreasonable inferences, or unwarranted deductions of fact. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (allegations "may not simply recite the elements in a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively"). Nor must the Court assume that a plaintiff can prove facts different from those it has alleged. *Assoc. Gen. Contractors of Calif. v. Calif. State Council of Carpenters*, 459 U.S. 519, 526 (1983). Finally, the Court need not accept as true any allegations in a complaint which are contradicted by matters of judicial notice or by documents referred to in the complaint. *See Manzarek v. St. Paul Fire & Marine Ins. Co.* (9th Cir. 2008) 519 F.3d 1025, 1031; *Sprewell*, 266 F.3d at 988; *Steckman v. Hart Brewing*, 143 F.3d 1293, 1295-96 (9th Cir. 1998) ("we are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint").

## IV. LEGAL ARGUMENT

### A. Plaintiff's Third, Fourth, Fifth, Sixth, and Seventh Causes of Action Are Barred by the Patent Act, Plaintiff's Lack of Standing, and/or Estoppel Doctrines

Only the first two causes of action in Plaintiff's complaint focus on his allegedly retaliatory termination. *See* FAC, ¶¶ 41-52. Those claims are not at issue in this motion. The remaining *five* causes of action revolve suggest that the contracts Plaintiff entered into regarding

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

patent rights and stock options are not enforceable for a variety of reasons. *See id.* at ¶¶ 53-99. For the reasons set forth below, both types of claims fail – the former because they are preempted by the Patent Act and Plaintiff lacks standing to sue, and the latter because they are barred by the doctrine of judicial estoppel and claim/ issue preclusion. Plaintiff's last five causes of action should be dismissed with prejudice on these grounds alone.

**1. Plaintiff's Third, Fourth, Fifth, and Seventh Causes of Action Are Preempted By the Patent Act and Plaintiff Lacks Standing to Sue Because He Assigned His Rights to LFL**

The FAC focuses on the patent claims even more than the original complaint. Plaintiff specifically claims LFL acted improperly with regard to his patent rights as part of the following causes of action: Third (¶¶ 54, 55, 56, 60-63, 68), Fourth (¶¶ 70-77), Fifth (¶¶ 81, 85), and Seventh (¶¶ 94-95, 97). Plaintiff alleges that he has intellectual property rights in two of LFL's patents, including claiming that he should have been named as an inventor on those patents. *See, e.g.,* FAC, ¶ 40. Essentially, because of certain statements allegedly made by Defendants, and because he was not named as an inventor on the patents, Plaintiff claims the patents should revert entirely to him in spite of the contractual documents he signed to the contrary. *See supra,* section II.A.

Importantly and fatal to his claims, Plaintiff admits that he "signed a Confidentiality and Proprietary Rights Agreement that purported to grant rights to patents and other works for hire to LFL." FAC, ¶ 18.

***a. Plaintiff's Claims Are Preempted by the Patent Act***

If Plaintiff wishes to challenge LFL's rights to its patents,[6] he is required to follow *federal patent law*. To the extent that Plaintiff attempts to use state law to determine that he is the inventor of the two patents mentioned in his complaints, or that he retains any rights in those patents, Plaintiff's claims are preempted by the Patent Act. *See BearBox LLC v. Lancium LLC*, 125 F.4th 1101, 1112 (Fed. Cir. 2025); *Univ. of Colo. Found. v. Am. Cyanamid Co*., 196 F.3d 1366, 1372 (Fed. Cir. 1999) ("[F]ederal patent law preempts any state law that purports to define

[6] The patents are registered to LFL or its assignee. *See* RJN, Exh. 9, LFL patents.

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

rights based on inventorship."); *OptoLum, Inc. v. Cree, Inc.*, 244 F. Supp. 3d 1005, 1014 (D. Ariz. 2017) ("Federal patent law, however, 'preempts any state law that purports to define rights based on inventorship.'); *CAA Indus., Ltd. v. Recover Innovations, Inc.*, No. 222-CV-00581-GMN-EJY, 2023 WL 9056823, at *4 (D. Nev. Dec. 29, 2023) ("because plaintiff's claim requires a determination of inventorship, it was preempted by federal law"); *Powell v. Home Depot U.S.A, Inc.*, No. 07-80435-CIV, 2010 WL 375796, at *4 (S.D. Fla. Jan. 26, 2010) ("The central issue in the counterclaims—co-inventorship—is a field that is governed exclusively by federal patent law.").

In *Methode Elecs. Inc. v. Hewlett-Packard Co.*, No. C 99-04214 SBA, 2000 WL 1157933, at *2 (N.D. Cal. May 4, 2000), this Court dismissed a similar complaint where the plaintiff's allegation that Methode should have named Finisar in its patent applications "dominated" each of the three counterclaims at issue. The same factual pattern is present here. Most of the causes of action in Plaintiff's Complaint depend on his allegation that he should have been named as an inventor. Federal Patent Preemption requires Plaintiff to seek redress under the Patent Act, not under state law. *Id*. Similarly, in *Gregory C. James v. J2 Cloud Services Inc.*, No. 216-CV-05769-CAS-PJWX, 2018 WL 6092461, at *6 (C.D. Cal. Nov. 19, 2018), the plaintiff asserted that he was the sole inventor of the '638 Patent, bringing state claims for the defendants' alleged failure to credit him as the inventor. James filed state law claims for unjust enrichment, conversion, and unfair competition, all premised on his assertion of inventorship of the patent. *Id*. at *1. The court found that these state law claims were preempted by federal patent law because they were fundamentally based on the plaintiff's claim of inventorship. *Id*. at *5-6. As the Court explained, "Claims that are dependent on a determination of patent inventorship or ownership…are generally preempted by federal patent law." Id. at *4 (quotation omitted). Here, Plaintiff's claims are dependent upon a determination that Plaintiff was an inventor and that LFL is not a rightful owner of the patents. The law is clear that Plaintiff's claims relating to his rights in the patents must be dismissed with prejudice.

#### ***b. Plaintiff Lacks Standing to Sue Regarding Any Intellectual Property Rights***

Furthermore, the terms of the agreement itself belie Plaintiff's claims and make it clear that he lacks standing to sue regarding any intellectual property rights. He admits he assigned all rights in the relevant patents to LFL. Complaint, ¶ 18. This divested Plaintiff of any financial interest in the patents.[7] *Trireme Med., LLC v. AngioScore, Inc.*, 812 F.3d 1050, 1053 (Fed. Cir. 2016) ("When the owner of a patent assigns away all rights to the patent, neither he nor his later assignee has a concrete financial interest in the patent that would support standing in a correction of inventorship action."); *Certicable Inc. v. Point 2 Point Commc'ns Corp.*, No. 2:23-CV-5322 (NJC) (SIL), 2025 WL 622547, at *3 (E.D.N.Y. Feb. 26, 2025).

### 2. Plaintiff's Third, Sixth, and Seventh Causes of Action Are Barred by the Doctrines of Judicial Estoppel, Claim Preclusion and Issue Preclusion

In the FAC, Plaintiff makes an effort to circumvent the arguments made in LFL's prior motion to dismiss that he was estopped and precluded from making the stock option claims, dropping two causes of action and various allegations relating to the claims. However, Plaintiff asserts the stock options claims, alleging that he has the right to vested and unvested stock options in LFL's stocks despite contractual language to the contrary, as part of the following causes of action: Third (¶¶ 57-60, 65), Sixth (¶¶ 89), and Seventh (¶¶ 97, 99). It is possible that Plaintiff also asserts the stock options claims in the Fourth (¶ 93) and Fifth (¶100) causes of action, though it is not stated explicitly. Because Plaintiff denied he had any stock options claims in response to the LFL Complaint (*see supra*, sections II.B-D), resulting in the Complaint's dismissal, he is barred by the doctrine of judicial estoppel from asserting any such claims in this case. Moreover, because Plaintiff prevailed in having LFL's DJ Action dismissed, his claims are barred by the doctrines of claim and issue preclusion.

The lack of specificity is a separate, additional grounds for dismissal. *See infra*, sections IV.B-E. If not dismissed without leave to amend, Plaintiff must replead to plead specific contract

[7] Even worse, in the FAC, Plaintiff inserts new allegations claiming that LFL has other patents that belong to *another company*. Even assuming *arguendo* that another company would be successful in challenging those patents, it would only be once it had done so could Plaintiff have suffered any harm due to the lower value of company stock. Ironically, his inclusion of such claims make such harm *more* likely, particularly considering that Plaintiff appears to be the only person to ever espouse such a theory.

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

terms. See *Dorian v. Cmty. Loan Servicing, LLC,* No. 22-CV-04372-DMR, 2022 WL 7620460, at *6 (N.D. Cal. Oct. 13, 2022) ("A plaintiff fails to sufficiently plead the terms of the contract if he does not allege in the complaint the terms of the contract or attach a copy of the contract to the complaint."). At present, the FAC fails to satisfy Rule 8. Plaintiff cannot use vagueness to evade pleading facts that will show he is asserting contract claims against LFL.

***a. Plaintiff's Claims Are Barred by the Doctrine of Judicial Estoppel***

A motion to dismiss may be granted where a Court determines a party is equitably barred by the doctrine of judicial estoppel from taking a position contrary to that it took in prior litigation, in order "to protect the integrity of the judicial process." *See New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001). "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Id.* at 749 [citation omitted]. The doctrine applies not only to bar inconsistent positions in the same litigation, but also incompatible statements in two different cases. *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001). Judicial estoppel applies to "claims" or positions taken in prior lawsuits, which can be factual *or* legal in nature. *Finn v. Sullivan*, 228 F.Supp.3d 972 (N.D. Cal. 2017). Accordingly, the doctrine has been applied in diverse ways. *See New Hampshire*, 532 U.S. at 749 (New Hampshire was equitably barred from asserting, contrary to its position in prior litigation, that a river boundary ran along the shoreline); *Finn*, 228 F.Supp.3d at 979-80 (husband who previously claimed in state court proceedings that all his ownership interests in a winery had transferred to his wife could not now assert in federal action that they had not); *Mangaoang v. Special Default Services, Inc.*, 427 F.Supp.3d 1195 (N.D. Cal. 2019) (by omitting the lawsuit's claims from her mandatory bankruptcy filings, plaintiff represented that no such claims existed and could no longer exert such claims).

In determining whether to invoke judicial estoppel, courts consider the following factors:

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

(1) whether the party's new position is "clearly inconsistent" with its earlier position; (2) whether the party was successful in persuading the earlier court to follow its first position (such that the finding of the earlier court would now be incorrect and one court or the other appears to be misled in a finding); and (3) whether the party asserting inconsistent positions would derive an unfair advantage or impose an unfair detriment if not estopped. *New Hampshire*, 532 U.S. at 750. Because the doctrine of judicial estoppel is equitable, the factors are not inflexible, and there may be other factors the Court should consider. *Id.* at 750-51. Here, all three *New Hampshire* factors clearly weigh in favor of an equitable determination that Plaintiff is barred from making the stock options claims. *First*, Plaintiff's new position is clearly inconsistent with his prior position. Most notably, in prior litigation, Plaintiff explicitly stated that "there is and never was a stand-alone contractual claim for the lost stock options pursuant to the stock incentive plan that forms the basis for plaintiff's sham Complaint." *See* RJN, Exh. 4, Jones' MTD LFL Complaint, pp. 4-5. Plaintiff originally alleged that "Defendants have no right, title, or interest in the stock options…and that said stock options…have been stolen from Plaintiff and/or obtained in a manner constituting theft." RJN, Exh. 7, Original Complaint, ¶ 79. He continues to claim that he was harmed by the loss of the stocks. *See* FAC, ¶¶ 60, 65, 89. In *Finn*, this Court stated, "Either his ownership interests have already been transferred, as [plaintiff] represented in the [prior] proceedings, or they have not, as he represents in this new action." 228 F.Supp.3d at 983. Here, either Plaintiff has some claim of ownership interest in LFL's stocks or stock options, as he now asserts, or he does not, as he represented in prior litigation. *Second,* Plaintiff was successful in persuading the Court in the prior action to adopt his position, suggesting it was misled. "The second *New Hampshire* factor—that one of the courts has been misled—is often dispositive." *Finn*, 228 F.Supp.3d at 983.[8] Because of Plaintiff's prior statements that he had no stock options claims, the Court dismissed LFL's request for a declaratory judgment to clarify the parties' respective rights to the stock options, because the evidence before the Court did "not indicate

[8] "For a court to be misled, it need not itself adopt the statement; those who induce their opponents to surrender have prevailed as surely as persons who induce the judge to grant summary judgment. What matters is whether Finn derived a benefit from an earlier lawsuit where material inconsistent representations were made, either by Finn or on his behalf." *Finn*, 228 F.Supp.3d 972, 983 (quotations omitted).

that [Jones] ever demanded options, shares, or other equity interests in Light Field Lab (as opposed to the value thereof), or that [Jones] disputed the terms of the Plan or the parties' rights and obligations under the Plan." RJN, Exh. 4, Jones' MTD LFL Complaint, pp. 4-5; RJN, Exh. 6, Order. The Court would "likely be surprised" that Plaintiff is now doing exactly that. *See Finn*, 228 F.Supp.3d at 984. *Third,* LFL would be harmed if Plaintiff is not estopped, because it "has gone through the time, expense and burden" of another litigation, including multiple motions, relating to Plaintiff's prior premise that he had no stand-alone claim for the stock options. *Id.* at 984. It is accordingly appropriate to dismiss the Third, Sixth, and Seventh cases of action to the extent they rely in any way on Plaintiff's stock options claims. *See id.* at 985.

***b. Plaintiff's Claims Are Barred by Claim Preclusion***

"Under the doctrine of claim preclusion, a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'" *Whyte Monkee Prods. LLC v. Netflix, Inc.*, 757 F. Supp. 3d 1025, 1029 (N.D. Cal. 2024), *reconsideration denied*, No. 23-CV-03438-PCP, 2025 WL 974940 (N.D. Cal. Apr. 1, 2025), citing *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). When a party asserts claim preclusion, courts apply the law of the forum in which the prior court reached final judgment. *Id.* Here, the prior judgment was reached in this Court, and Ninth Circuit law applies. *Id.*

Claim preclusion precludes relitigation of claims that were raised or should have been raised in earlier litigation. See *Banga v. Experian Info. Sols., Inc.*, No. C 09-04867 SBA, 2013 WL 5539690, at *13 (N.D. Cal. Sept. 30, 2013), citing *San Remo Hotel L.P. v. San Francisco City and County*, 364 F.3d 1088, 1094 (9th Cir. 2004); *see also Whyte*, 757 F. Supp. 3d at 1029 ("Claim preclusion encompasses 'not only claims that were actually litigated but also those claims that a party could have raised in a prior suit but failed to do so.'").

The elements necessary to establish claim preclusion are: (1) an identity of claims, (2) a final judgment on the merits, and (3) privity between the parties. *See Banga*, 2013 WL 5539690, at *13. All three elements are met here.

*First,* LFL's DJ Action arises from the same "transactional nucleus of facts" as the claims

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Case 3:25-cv-05118-MMC Document 7 Filed 08/14/25 Page 22 of 33

alleged in Plaintiff's Complaint. *See Frank v. United Airlines, Inc*., 216 F.3d 845, 851 (9th Cir. 2000) ("The central criterion in determining whether there is an identity of claims between the first and second adjudications is 'whether the two suits arise out of the same transactional nucleus of facts.'"). The transactional facts giving rise to both cases are Plaintiff's employment at LFL, the contracts between the parties, Plaintiff's alleged rights as a shareholder and his claims to stock options.

*Second,* this Court's dismissal of LFL's DJ action is a final judgment for purposes of claim preclusion. *See Scott v. Hodges*, No. C 96-01970 EFL, 1996 WL 161774, at *2 (N.D. Cal. Mar. 29, 1996) ("For purposes of res judicata, judgment entered on a motion to dismiss or for summary judgment is just as binding as a judgment entered after a trial of the facts.").

Third, there is no dispute that there is complete privity – Plaintiff Jones and LFL were both parties to the DJ Action.

### *c. Plaintiff's Claims Are Barred by Issue Preclusion*

Issue preclusion forecloses relitigation of factual or legal issues that have been actually and necessarily decided in earlier litigation. *Banga,* 2013 WL 5539690, at *13. Issue preclusion bars relitigation of "an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim. *Id*. The following elements are required: (1) a full and fair opportunity to litigate the issue in the prior action; (2) the issue was actually litigated; (3) a final judgment resulted; and (4) the person against who preclusion is asserted was a party to the prior action. *Id*., citing *In re Palmer,* 207 F.3d 566, 568 (9th Cir. 2000). All four elements are present here.

*First*, Jones had a full and fair opportunity to litigate the terms of his contracts with LFL in the DJ Action. Indeed, Plaintiff's pleading expressly states his intent to bring counterclaims that mirror the counts of his Complaint. *See* Exh. 1, FAC; RJN, Exh. 4, Jones' MTD LFL Complaint.

*Second*, that Plaintiff had no contract-based claims was actually litigated and decided in the DJ Action, with the Court concluding there were contract disputes – the entire basis of the



Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Court's decision to dismiss the DJ Action.

*Third*, the Court dismissed the DJ Action, which is a final judgment for purposes of claim and issue preclusion.

*Fourth*, the person against whom preclusion is asserted is Alan Jones, a party to the prior action.

As a matter of issue preclusion, Jones cannot now factually plead breach of his agreements with LFL. Because his FAC is premised on being entitled to rights he contracted away – though he goes to great lengths to avoid using that language – his Third, Sixth, and Seventh Causes of Action are barred.

**B. Plaintiff's Cause of Action for Fraud and Deceit Fails Because It Does Not Meet the Heightened Specificity and Particularity Requirements for Fraud**

The elements of fraud in California are: (a) a misrepresentation (false representation, concealment, or nondisclosure); (b) scienter or knowledge of its falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage. *Hinesley v. Oakshade Town Center*, 135 Cal.App.4th 289, 294 (2005). In a diversity case in federal court, the court will *both* apply the heightened pleading standard of Rule 9(b), requiring particularity when alleging fraud or mistake, and "examine state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003); *see also Mohebbi v. Khazen*, 50 F. Supp. 3d 1234, 1255 (N.D. Cal. 2014). [9]

California law is clear that a cause of action for fraud must be pleaded with specificity. *See Daniels v. Select Portfolio Servicing, Inc.* 246 Cal.App.4th 1150, 1166 (2016). General and conclusory allegations do not suffice. *Lazar v. Superior Court* 12 Cal.4th 631, 641-645 (1996). The specificity requirements mean a plaintiff must "allege facts showing how, when, where, to whom, and by what means the representations were made." *Id.* "The plaintiff must plead that he believed the representations to be true…and that in reliance thereon (or induced thereby) he entered into the transaction." *Id*. at 1167, citing *Chapman v. Skype, Inc.* 220 Cal.App.4th 217,

[9] Dismissals under Rule 9(b) and Rule 12(b)(6) are treated in the same manner and are functional equivalents. *Vess*, 317 F.3d at 1107-1108.



Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

231-232 (2013). "Because 'reliance is the causal mechanism of fraud,' this requires pleading facts showing actual reliance, that is, that the plaintiff suffered economic injury as a result of his or her reliance on the truth and accuracy of the defendant's representations." *Id*. at 228; citing *In re Tobacco II Cases* 46 Cal.4th 298, 326 (2009); *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 326-327 (2011).

To support an allegation of fraud, Plaintiff must prove that the LFL made (a) a knowingly false representation; (b) concealment or nondisclosure of facts; or (c) a promise made with no intent to perform. Cal. Civ. Code § 1710(1), (3), & (4). The misrepresentation supporting a cause of action for fraud "must be based on a statement of **fact**." *Hinesley,* 35 Cal.App.4th at 295. In addition, the Defendant must *know* the statement is false or act with reckless disregard of its truth or falsity. *Lazar,* 12 Cal.4th at 638; *Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 415 (1992). Where the defendant in a fraud claim is a corporate employer, the plaintiff must allege "the **names** of the persons who made the allegedly fraudulent representations, their **authority** to speak, to whom they spoke, **what** they said or wrote, and when it was said or written." See *Lazar,* 12 Cal.4th at 645.

The FAC contains numerous vague, non-specific allegations concerning alleged misrepresentations. Yet, Plaintiff fails to provide specific statements of fact that were misrepresentations, or describe how or why specific statements were false or incorrect *based on what the individual knew at the time they were made*. Further, some of the statements do not appear to be "facts," but are mere opinions. Plaintiff alleges the following "facts" regarding alleged fraud or false statements/misrepresentations:

- "Karafin stated that the company had hundreds of patents and in addition to manufacturing displays their business model relied heavily on comprehensive patent coverage of the holographic space, allowing them to both manufacture displays and license the technology." FAC, ¶ 12.
- "On August 28th and 29th, Karafin also stated that Light Field Lab had a large theme park customer, ultimately revealed to be Universal Studios. Karafin stated that Light





Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Field Lab would have the displays out to market the following year (2020) and it would be in the theme park in that timeframe or soon after… Subsequently, there was no further discussion [presumably with Plaintiff] of Universal Studios as a customer and no product was delivered to Universal Studios." FAC, ¶¶ 13, 14.

- "During the discussions on August 28 and 29, 2019, Karafin also discussed an options double trigger event on which all options would vest if the company was publicly listed or acquired… Upon Mr. Jones' inquiry about the number and value of the options at issue, Karafin concealed that information…" FAC, ¶ 15.
- Plaintiff assigned his intellectual property rights "without the knowledge of misrepresented and concealed facts, unknown to Mr. Jones at the time…" FAC, ¶ 18.
- "Subsequently, **in August 2025**, Mr. Jones learned that Light Field Lab's foundational patents…were not valid patents held by Light Field Lab but, in fact, were the property of [another company]." FAC, ¶ 19.
- The two patents "though fully derived from Mr. Jones' work, did not include Mr. Jones as an inventor, a fact not disclosed to, and concealed from, Mr. Jones by Jon Karafin and Brendan Bevensee during his employment by LFL." FAC, ¶ 40.

None of these alleged "misrepresentations" constitute a statement of fact that would support a cause of action for fraud. Even assuming *arguendo* that these statements were made, there is nothing in the Complaint to suggest that they were not truthful at the time they were made, or that the speaker did not believe or have reason to believe they were truthful at the time they were made. Plaintiff has failed to identify even one statement that could support the specificity and particularity requirements needed for a claim of fraud. Furthermore, the very agreement in which Plaintiff assigned his rights in the patent gave up all moral rights, including paternity, which directly contradicts the FAC.

In addition, the statements made at the beginning of Plaintiff's employment are clearly outside the statute of limitations of three years for fraud. Code Civ. Proc., § 338(d). Plaintiff





Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

attempts to save his fraud claims by alleging that in August 2025, he "learned" that LFL's patents were invalid and owned by another company. FAC, ¶ 19. For the reasons already discussed, these purported "facts" are preempted by federal law and the Patent Act, and Plaintiff has no standing to assert them. Even if he were able to do so, however, Plaintiff provides no information about how he purportedly "learned" this information, and the patents are registered to LFL. RJN, Exh. 9, LFL Patents.

### C. Plaintiff's Cause of Action for Violation of Penal Code Sections 484 and 496 Fails Because It Does Not Meet the Heightened Specificity and Particularity Requirements for the Fraud Component of the Relevant Crimes

Plaintiff also accuses Defendants of the crime of theft. California Penal Code Section 484, which consolidated the common law crimes of larceny, embezzlement, and false pretenses, provides in relevant part that "[e]very person who shall… **fraudulently appropriate** property which has been entrusted to him or her, or who shall knowingly and designedly, **by any false or fraudulent representation or pretense**, **defraud** any other person of money, labor, or real or personal property…is guilty of theft." Thus, Section 484 holds an element of *fraud* as a requirement.[10] The California Supreme Court long ago addressed concerns that ordinary commercial transactions could result in criminal prosecution under Section 484 by explaining that "the essence of the offense of obtaining property by false pretenses is (as it has always been) the **fraudulent intent** of the defendant." *People v. Ashley*, 42 Cal.2d 246, 265 (1954). The Court made it clear that "a showing of nonperformance of a promise or falsity of a representation will not suffice." *Id.* Indeed, for a defendant to commit the crime of theft, he must have the requisite mental state required for any crime, either criminal intent (such as to steal or defraud) or criminal negligence, **at the time he commits the criminal act**. *See People v. Lawson*, 215 Cal.App.4th 108, 113-14 (2013). Thus, Plaintiff is required to allege specific facts to show that Defendants had a criminal, fraudulent mental state *at the time they purportedly stole* his property. Plaintiff fails to do so. Instead, Plaintiff claims that it was misrepresentations—which would have

[10] We assume that Plaintiff does not mean to allege that Defendants committed the common law crime of larceny, which would require the theft of a tangible object to be carried off. The specific requirements for each common law crime are discussed in more depth in *People v. Williams*, 57 Cal.4th 776, 785-790 (2013).

predated any Defendants taking possession of property allegedly belonging to Plaintiff—that "constituted theft of personal property." FAC, ¶¶ 70-71. Plaintiff also alleges under this cause of action that Defendants "have retained" stock ownership and "inventorship" of the patents, and "knowingly received and deliberately withheld" the stocks and patents. FAC, ¶¶ 72-73. These allegations on their face clearly do not constitute theft.

### D. <u>Plaintiff's Cause of Action for Civil RICO Fails Because It Consists Solely of Conclusory Statements Without Factual Information</u>

Plaintiff's allegations under the Civil RICO cause of action consist of conclusory allegations rather than factual statements. For example, the FAC states: "Defendant Brendan Bevensee…conducted and participated, directly and indirectly, in the conduct of the affairs of said enterprise through a pattern of racketeering activity…" FAC, ¶ 80.

To state a claim under 18 U.S.C. § 1962(c), Jones must plead: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity ("predicate acts") (5) causing injury to his business or property. *Cnty. of Marin v. Deloitte Consulting LLP*, 836 F.Supp.2d 1030, 1037-38 (N.D. Cal. 2011), citing *Grimmett v. Brown,* 75 F.3d 506, 510 (9th Cir.1996). A RICO count must also satisfy the particularity standard of Rule 9. *Id.*; *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 541 (9th Cir. 1989). Here, the complaint utterly lacks factual support, and it certainly does not meet Rule 9's heightened pleading requirement.

The FAC fails to present facts, or plead them with adequate specificity, to show that Defendants engaged in a "fraudulent enterprise" or to demonstrate "racketeering activity" or "predicate acts." At best, the FAC currently only alleges that LFL requested employees to agree that inventions developed during company time and at company expense were the property of the company. Though the complaint alleges communications about this policy were "fraudulent," no fraud facts are stated, for the reasons set forth in section IV.B, *supra*. The Complaint pleads nothing more than routine business activity, which is utterly insufficient for a RICO claim. *Gardner v. Starkist Co.*, 418 F. Supp. 3d 443, 461 (N.D. Cal. 2019).

A complaint alleging wire or mail fraud, as Plaintiff does, must specify "the time, place,



Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Cnty. of Marin,* 836 F.Supp.2d at 1038. "Plaintiff's mere listing of such alleged crimes, without supporting, particularized factual pleadings as required under Rule 9(b), is not enough to survive a motion to dismiss." *Mohebbi v. Khazen*, 50 F. Supp. 3d 1234, 1255 (N.D. Cal. 2014). Similarly, RICO violations predicated on fraudulent communications, like those in Complaint paragraph 87, require a plaintiff to plead the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Pac. Recovery Sols. v. United Behav. Health*, 481 F. Supp. 3d 1011, 1028 (N.D. Cal. 2020).

Furthermore, the FAC does not allege the requisite two predicate acts for each defendant. *Vaughan v. Wardhaugh*, No. 23-CV-02879-RFL, 2024 WL 2853972, at *2 (N.D. Cal. May 10, 2024) ("where RICO is asserted against multiple defendants, a plaintiff must allege at least two predicate acts by each defendant."). The complaint must state "what each individual did, when they did it, or how they functioned together as a continuing unit." *Doan v. Singh*, 617 F.App'x 684, 686 (9th Cir. 2015); *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 541 (9th Cir. 1989) (finding that plaintiffs had failed to allege mail fraud with particularity under Rule 9(b) because they "[did] not attribute specific conduct to individual defendants," or "specify either the time or the place of the alleged wrongful conduct"). The alleged fraudulent communications of "electronic filing, mail and email" in paragraph 87 are not pleaded with particularity as Rule 9 demands. *See Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 557–58 (9th Cir. 2010) (finding that plaintiff's failure to identify which defendants made certain telephone calls and were parties to the alleged misrepresentations, and allege any specific mailings does not satisfy Rule 9's pleading requirements). The FAC entirely lacks specific facts demonstrating that Defendants "use[d] interstate wires" in furtherance of a scheme to defraud. *Villarroel v. Recology Inc.*, 775 F.Supp.3d 1050, 1070 (N.D. Cal. 2025). The conclusory statements are inadequate to meet these pleading standards.

To establish a RICO claim, the plaintiff must also demonstrate either a "series of related

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

predicates extending over a substantial period of time" or a credible threat of "future criminal conduct." *Turner v. Cook*, 362 F.3d 1219, 1231 (9th Cir. 2004). Plaintiff fails to adequately plead the temporal element essential to meet the definition of racketeering activity. *See Medallion Television Enters., Inc. v. SelecTV of California, Inc.*, 833 F.2d 1360, 1365 (9th Cir. 1987). To the extent the Complaint can be read to infer the time period of patent prosecution, it is insufficient to plead a RICO claim. See *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 474 (7th Cir. 2007). Finally, a cognizable RICO claim requires "a concrete financial loss" and an injury to business or property. *Stearns v. Select Comfort Retail Corp.*, No. 08-2746 JF, 2009 WL 1635931, at *14 (N.D. Cal. June 5, 2009); *Canyon County v. Syngenta Seeds, Inc.,* 519 F.3d 969, 972 (9th Cir. 2008). Plaintiff fails to adequately allege such loss and injury. A RICO claim is not easily pleaded, and Plaintiff fails to do so here.

### E. Plaintiff's Cause of Action for Breach of Fiduciary Duty Fails Because Plaintiff Fails to Plead Facts that Indicate Information Was Concealed

Plaintiff claims that LFL breached its fiduciary duty to him because it "improperly failed to provide necessary information to Plaintiff as a share holder." FAC, ¶ 87. No facts are provided; LFL is left to guess what is meant by "information." Rule 8 requires facts; innuendo is not sufficient. Within the cause of action, Plaintiff fails to cite any law regarding what "necessary information" he was entitled to, does not state how or when he requested such information, and does not state that he was refused such information. FAC, ¶¶ 86-90.

However, we assume Plaintiff is also relying on the factual allegations he made in Paragraphs 15 to 17 of the Complaint. There, Plaintiff asserts that LFL CEO Jon Karafin refused to share certain information with him, including the number and value of options at issue during a "double trigger event" in the event that the company was ever publicly listed or acquired, and failing to *volunteer* books and records in response to a generic question about whether there was "any additional information I'm entitled or required to be given access to as a shareholder?" FAC, ¶¶ 15-17. The language quoted does *not* indicate that LFL refused to provide any books and records. *See id*. Rather, it shows that Plaintiff inquired about *whether he was entitled to or*

*required* to be given certain information during one conversation, and the individual with whom he was speaking expressed a general opinion. Plaintiff *could have* asked to be provided whatever information he wished to see and believed he was entitled to see. Instead, he only asked Mr. Karafin *what* he was entitled to see, and it is not Mr. Karafin's obligation to inform Plaintiff of his legal rights. On these facts, Plaintiff has failed to demonstrate even his own conclusory statements about being denied information to which he was entitled, no less a breach of fiduciary duty by LFL.

**F. <u>Plaintiff's Seventh Cause of Action Fails Because LFL Is Entitled to Insolvency Proceedings and Plaintiff Can Exercise His Rights in Them</u>**

In a novel interpretation of law, Plaintiff alleges that by entering into insolvency proceedings and assigning all its assets to be liquidated for the benefits of *all* of its creditors, LFL has somehow defrauded Plaintiff. FAC, ¶¶ 91-99. Plaintiff therefore asks this Court to override the state court proceedings in which all other creditors are able to make claims on LFL's assets to give Plaintiff preferential treatment. *Id.* Yet California law provides that in an assignment for the benefit of creditors ("ABC"), the assignee (playing essentially the same role as a federal bankruptcy trustee) distributes assets to creditors on the basis to which they are entitled to the assets under law. *See* Code Civ. Proc., § 493.010 *et seq.*; Code Civ. Proc., §§ 1800-1802. Plaintiff does not cite any law, nor is LFL aware of any, that would suggest that an ABC, which is to an assignee who acts *for the benefit* of creditors, can be a violation of the Uniform Fraudulent Transfer Act. Courts frequently address "fraudulent transfers" in ABCs and bankruptcy proceeding, but such transfers are to third parties *prior to* the ABC in an attempt to *circumvent* it. Furthermore, even if Plaintiff were able to use the remedies provided for in the Uniform Fraudulent Transfer Act, his ability would trigger the ability of the assignee to do the same thing for *the other creditors*, effecting essentially the same result as the ABC itself. *See* Civ. Code § 3439.07(d). Accordingly, this Court should dismiss Plaintiff's Seventh Cause of Action and require him to follow the same process as other creditors in the ABC proceedings.

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

Gordon Rees Scully Mansukhani, LLP
315 Pacific Avenue
San Francisco, CA 94111

### G. <u>There Are No Factual Allegations of Wrongdoing Regarding Brendan Bevensee in the Entire Complaint</u>

In LFL's initial motion to dismiss, it pointed out that "Plaintiff's entire Complaint only contains four paragraphs regarding individual defendant Mr. Bevensee, none of which are factual statements regarding any wrongdoing whatsoever." RJN, Exh. 2, First Motion to Dismiss. Plaintiff responded by articulating no additional facts regarding Mr. Bevensee, but simply adding his name to virtually every conclusory statement in the FAC, i.e. many references to "Karafin" were revised to "Karafin and Bevensee." Nevertheless, *not a single particularized fact is provided regarding even one concrete action taken by Mr. Bevensee.* Accordingly, Mr. Bevensee should be dismissed from this action as a matter of law.

## V. <u>CONCLUSION</u>

Defendants respectfully LFL's Motion and dismiss Plaintiff's Complaint as to the Third, Fourth, Fifth, Sixth, and Seventh Causes of Action with prejudice for the foregoing reasons.

Dated: October 10, 2025

GORDON REES SCULLY MANSUKHANI, LLP

By: 
Sara A. Moore
Attorneys for Defendant
Light Field Lab, Inc.

# EXHIBIT 7

Patricia L. Peden (State Bar No. 206440)
Madeline A. Woodall (State Bar No. 351664)
WARREN LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
25-5118@cases.warrenllp.com

*Counsel for Defendants Jon Karafin and Brendan Bevensee*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ALAN JONES,<br><br>Plaintiff,<br><br>v.<br><br>LIGHT FIELD LAB, INC., JON KARAFIN, BRENDAN BEVENSEE, and Does 1 to 10,<br><br>Defendants. | Case No. 3:25-cv-05118-MMC<br><br>**DEFENDANTS JON KARAFIN AND BRENDAN BEVENSEES' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES**<br><br>**Date:** August 28, 2026<br>**Time:** 9:00 a.m.<br>**Courtroom:** 7 |

Case 3:25-cv-05118-MMC Document 77-2 Filed 07/20/26 Page 2 of 16

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 28, 2026, at 9:00 a.m., in Courtroom 7, or as soon thereafter as this matter may be heard, before Judge Maxine M. Chesney of the United States District Court for the Northern District of California, located at the Phillip Burton Federal Building and United States Courthouse, 450 Golden Gate Ave, San Francisco, California, 94102, Defendants Jon Karafin and Brendan Bevensee, by and through their undersigned counsel, will move and hereby do move under the Constitution of the United States, applicable statutes and laws, and the Federal Rules of Civil Procedure including 12(b)(6) for an order dismissing all causes of action in Plaintiff's Second Amended Complaint as pleaded against Defendants Karafin and Bevensee. The Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the concurrently filed Request for Judicial Notice, and all pleadings, papers and oral argument in this action.

Date: July 20, 2026

Respectfully submitted,

Patricia L. Peden (State Bar No. 206440)
Madeline A. Woodall (State Bar No. 351664)
WARREN LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
25-5118@cases.warrenllp.com

*Counsel for Defendants*
*Jon Karafin and Brendan Bevensee*

Case 3:25-cv-05118-MMC Document 77-69 Filed 07/20/26 Page 3 of 36

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES . . . iii

MEMORANDUM OF POINTS AND AUTHORITIES . . . 1

INTRODUCTION. . . . 1

LEGAL STANDARD . . . 1

FACTUAL BACKGROUND . . . 1

LEGAL ARGUMENT . . . 2

I. The Court Should Dismiss Plaintiff's Third Failed Attempt to Plead Fraud . . . 2

A. The Fraud Claim Is Barred by the Statute of Limitations . . . 2

1. Jones's Patent Misconduct Fraud Theory is Time Barred . . . 3

2. Jones's Equity Fraud Theory is Time Barred . . . 3

B. The Fraud Claim Is Preempted . . . 4

C. The Fraud Count Still Fails to Plead Essential Elements . . . 5

1. The SAC Does Not Even Attempt to Plead Plausible Facts Against Bevensee . . . 6

2. The SAC Fails to Plead Misrepresentation or Concealment . . . 6

3. The SAC Fails to Plead Knowledge of Falsity . . . 8

4. The SAC Fails to Plead a Duty to Disclose and the Concealment Claims Fail . . . 9

5. The SAC Fails to Plead Justifiable Reliance or Fraud-Caused Damage . . . 10

D. Dismissal Should Be With Prejudice . . . 12

II. Jones' Trade Secret and Conversion Claims Should Be Dismissed With Prejudice . . . 13

A. Jones Cannot Plead Ownership as the Copyright Act Vests Ownership in LFL . . . 13

B. Jones Post-Termination Efforts To Claim Ownership Fail . . . 14

C. Jones Fails to Allege Required Elements of His Trade Secret Count . . . 15

1. Jones Fails to Allege Specific Acts by the Individual Defendants . . . 16

2. The SAC Fails to Plead Any Statutory Misappropriation . . . 16

3. The SAC Fails to Allege Reasonable Steps to Preserve Secrecy . . . 17

4. Jones Fails to Plead Damages to Support Misappropriation or Conversion . . . 17

**TABLE OF CONTENTS**
*(continued)*

*Page*

D. Jones's Alternative Conversion Claim Fails Because It Is Preempted . . . . . 17

E. Further Amendment Would Be Futile . . . . . 18

III. The RICO Claim Fails as the SAC Fails to Remedy the Two Defects Already Identified . . . . . 18

A. The Predicate Allegations Still Fail . . . . . 19

B. The SAC Still Fails to Plead a RICO Pattern . . . . . 20

C. The RICO Count Should Be Dismissed With Prejudice . . . . . 21

IV. The Breach Of Fiduciary Duty Claim Should Be Dismissed with Prejudice . . . . . 21

A. The Claim Is Barred by the Statute of Limitations . . . . . 22

B. The SAC Fails to Plead Required Elements of the Claim . . . . . 23

1. No Knowing Misrepresentation Is Pleaded . . . . . 23

2. Jones's Admissions Negate Concealment, Reliance, and Injury . . . . . 23

3. Signing Issuance Documents Is Not Actionable . . . . . 24

C. Dismissal Should Be With Prejudice . . . . . 25

CONCLUSION . . . . . 25

# TABLE OF AUTHORITIES

*Cases* — Page

*A.W. Fin. Servs., S.A. v. Empire Res., Inc.*,
981 A.2d 1114 (Del. 2009) . . . . . 25

*Abraxis Bioscience, Inc. v. Navinta LLC*,
625 F.3d 1359 (Fed. Cir. 2010) . . . . . 5, 7

*Alliance Mortgage Co. v. Rothwell*,
10 Cal. 4th 1226 (1995) . . . . . 5, 8, 10, 15

*Alta Devices, Inc. v. LG Elecs., Inc.*,
343 F. Supp. 3d 868 (N.D. Cal. 2018) . . . . . 18

*An v. Cosman*,
No. 23-715, 2025 WL 2180575 (Del. Ch. July 31, 2025) . . . . . 25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) . . . . . 1, 7, 9, 10, 14

*Attia v. Google LLC*,
983 F.3d 420 (9th Cir. 2020) . . . . . 3, 16, 17, 20, 21

*In re Axsome Thers., Inc. Stockholder Derivative Lit.*,
No. 25-1076, 2026 WL 1983269 (Del. Ch. July 9, 2026) . . . . . 23

*Bank of Am. Corp. v. Superior Ct.*,
198 Cal. App. 4th 862 (2011) . . . . . 9, 10

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) . . . . . 1

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*,
489 U.S. 141 (1989) . . . . . 4, 5

*Brown v. Brita Prods. Co.*,
172 F.4th 1113 (9th Cir. 2026) . . . . . 25

*Canyon Cnty. v. Syngenta Seeds, Inc.*,
519 F.3d 969 (9th Cir. 2008) . . . . . 20, 21

*Cheung v. Keyuan Petrochem., Inc.*,
No. 11-9495, 2012 WL 5834894 (C.D. Cal. Nov. 1, 2012) . . . . . 17

*Cisco Sys., Inc. v. Chung*,
No. 19-7562, 2023 WL 2622155 (N.D. Cal. Mar. 22, 2023) . . . . . 13

*Cohen v. Wedbush, Noble, Cooke, Inc.*,
841 F.2d 282 (9th Cir. 1988) . . . . . 11

**TABLE OF AUTHORITIES**
*(continued)*

*Cases* — *Page*

*Comm. for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989) . . . . . . . . . . 13, 14

*Cubic Corp. v. Marty*,
185 Cal. App. 3d 438 (1986) . . . . . . . . . . 14

*Daniels-Hall v. Nat'l Educ. Ass'n*,
629 F.3d 992 (9th Cir. 2010) . . . . . . . . . . 1

*In re Dean Witter P'ship Litig.*,
1998 WL 442456 (Del. Ch. July 17, 1998) . . . . . . . . . . 22

*Dimmick v. N. Calif. Inst. for Rsch. & Educ.*,
No. 04-4965, 2005 WL 2347116 (N.D. Cal. Sept. 26, 2005) . . . . . . . . . . 6

*Dohmen v. Goodman*,
234 A.3d 1161 (Del. 2020) . . . . . . . . . . 21-23

*Edwards v. Marin Park, Inc.*,
356 F.3d 1058, 1065-66 (9th Cir. 2004) . . . . . . . . . . 19

*Ellis v. J.P. Morgan Chase & Co.*,
No. 12-3897, 2016 WL 5815733 (N.D. Cal. Oct. 5, 2016) . . . . . . . . . . 7

*Eurosemillas, S.A. v. PLC Diagnostics, Inc.*,
No. 17-3159, 2019 WL 1960342 (N.D. Cal. May 2, 2019) . . . . . . . . . . 8

*Fox v. Ethicon Endo-Surgery, Inc.*,
35 Cal. 4th 797 (2005) . . . . . . . . . . 2-4, 22

*Frankston v. Aura Sys., Inc.*,
161 F.3d 12 (9th Cir. 1998) . . . . . . . . . . 22

*Fuller v. First Franklin Fin. Corp.*,
216 Cal. App. 4th 955 (2013) . . . . . . . . . . 22

*Gen. Elec. Co. v. Wilkins*,
No. 10-674, 2011 WL 1740420 (E.D. Cal. May 5, 2011). . . . . . . . . . . 14

*Grimmett v. Brown*,
75 F.3d 506 (9th Cir. 1996) . . . . . . . . . . 20, 21

*Gutierrez v. Mofid*,
39 Cal.3d 892 (1985) . . . . . . . . . . 3

*Howard v. Am. Online Inc.*,
208 F.3d 741 (9th Cir. 2000) . . . . . . . . . . 20, 21, 25

**TABLE OF AUTHORITIES**
*(continued)*

*Cases* Page

*Huff Energy Fund, L.P. v. Gershen*, 2016 WL 5462958 (Del. Ch. Sept. 29, 2016) .......... 24

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653 (9th Cir. 2020) .......... 16, 17

*Irish v. FCA US, LLC*, No. 24-2726, 2026 WL 252490 (C.D. Cal. Jan. 16, 2026) .......... 2, 3

*James v. J2 Cloud Servs. Inc.*, No. 16-5769, 2018 WL 6092461 (C.D. Cal. Nov. 19, 2018) .......... 5

*Jozinovich v. JP Morgan Chase Bank, N.A.*, No. 09-3326, 2010 WL 234895 (N.D. Cal. Jan. 14, 2010) .......... 15

*JustMed, Inc. v. Byce*, 600 F.3d 1118 (9th Cir. 2010) .......... 15

*Kanaan v. Yaqub*, 799 F. Supp. 3d 960 (N.D. Cal. 2025) .......... 22

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) .......... 6, 9, 17, 19, 20

*Laine v. Wells Fargo Bank, N.A.*, No. 13-4109, 2014 WL 793546 (N.D. Cal. Feb. 26, 2014) .......... 6

*Latesco, L.P. v. Wayport, Inc.*, No. 4167, 2009 WL 2246793 (Del. Ch. July 24, 2009) .......... 25

*Lazar v. Superior Ct.*, 12 Cal.4th 631 (1996) .......... 8

*Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*, 431 F.3d 353 (9th Cir. 2005) .......... 19

*Maganallez v. Hilltop Lending Corp.*, 505 F. Supp. 2d 594 (N.D. Cal. 2007) .......... 8-9

*Malone v. Brincat*, 722 A.2d 5 (Del. 1998) .......... 23

*Miele v. Franklin Res., Inc.*, No. 15-199, 2015 WL 4934071 (N.D. Cal. Aug. 18, 2015) .......... 22

*Miller v. Yokohama Tire Corp.*, 358 F.3d 616 (9th Cir. 2004) .......... 7

Case 3:25-cv-05118-MMC Document 77-69 Filed 07/20/26 Page 8 of 36

## TABLE OF AUTHORITIES
*(continued)*


*Cases* — Page

*Nemec v. Shrader*,
991 A.2d 1120 (Del. 2010) . . . . . 25

*Norgart v. Upjohn Co.*,
21 Cal. 4th 383 (1999) . . . . . 3, 23

*Oracle Am., Inc. v. Google Inc.*,
750 F.3d 1339 (Fed. Cir. 2014) . . . . . 13

*Palleson v. Bos. Sci. Corp.*,
No. 21-1037, 2021 WL 5633015 (S.D. Cal. Dec. 1, 2021) . . . . . 10, 11

*Parsons v. Tickner*,
31 Cal. App. 4th 1513 (1995) . . . . . 10

*Punian v. Gillette Co.*,
No. 14-5028, 2016 WL 1029607 (N.D. Cal. Mar. 15, 2016) . . . . . 9, 10

*Rattagan v. Uber Techs., Inc.*,
17 Cal. 5th 1 (2024) . . . . . 5-6

*Reilly v. Horn*,
No. 24-654, 2025 WL 2781735 (Del. Ch. Sept. 30, 2025), *aff'd*
2026 WL 1256598 (Del. May 7, 2026) . . . . . 23

*Rochlis v. Walt Disney Co.*,
19 Cal. App. 4th 201 (1993) . . . . . 11, 12, 24

*Rosenthal v. Great W. Fin. Sec. Corp.*,
14 Cal. 4th 394 (1996) . . . . . 14, 15

*Rubinstein v. SAP AG*,
2012 WL 726269 (N.D. Cal. Mar. 1, 2012) . . . . . 12

*Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*,
204 F.3d 1368 (Fed. Cir. 2000) . . . . . 5, 19

*Sikhs for Justice Inc. v. Facebook, Inc.*,
144 F. Supp. 3d 1088 (N.D. Cal. 2015) . . . . . 12, 18, 21, 25

*Silkiss v. Lee*,
No. 18-682, 2018 WL 11471621 (N.D. Cal. Nov. 19, 2018) . . . . . 4, 15

*Silvaco Data Sys. v. Intel Corp.*,
184 Cal. App. 4th 210 (2010) . . . . . 18

Case 3:25-cv-05118-MMC Document 77-69 Filed 07/10/26 Page 9 of 36

## TABLE OF AUTHORITIES
*(continued)*


*Cases* — *Page*

*Sprewell v. Golden State Warriors*, 266 F.3d 97 (9th Cir.), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001) . . . . . 7

*SOS Co. v. E-Collar Techs., Inc.*, No. 16-9667, 2017 WL 5714716 (C.D. Cal. Oct. 17, 2017) . . . . . 2, 3

*Stansfield v. Starkey*, 220 Cal. App. 3d 59 (1990) . . . . . 3, 10

*Swartz v. KPMG LLP*, 476 F.3d 756 (9th Cir. 2007) . . . . . 6, 9

*TextileProds., Inc. v. Mead Corp.*, 134 F.3d 1481 (Fed. Cir. 1998) . . . . . 5

*Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) . . . . . 5

*Turret Labs USA, Inc. v. CargoSprint, LLC*, No. 21-952, 2022 WL 701161 (2d Cir. Mar. 9, 2022) . . . . . 17

*Turner v. Cook*, 362 F.3d 1219 (9th Cir. 2004) . . . . . 21

*Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 411 F.3d 1369 (Fed. Cir. 2005) . . . . . 4, 5

*Vazquez v. DataRobot, Inc.*, No. 22-7619, 2023 WL 6323101 (N.D. Cal. Sept. 28, 2023) . . . . . 12

*Vera v. REL-BC, LLC*, 66 Cal. App. 5th 57 (2021) . . . . . 2

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) . . . . . 6, 8, 16, 19

*Viera v. Bank of Am., N.A.*, No. 15-5590, 2015 WL 12752882 (C.D. Cal. Oct. 28, 2015) . . . . . 4, 11

*Village Northridge Homeowners Ass'n v. State Farm Fire & Cas. Co.*, 50 Cal. 4th 913 (2010) . . . . . 15

*Waymo LLC v. Uber Techs., Inc.*, 256 F. Supp. 3d 1059 (N.D. Cal. 2017) . . . . . 18

*Wong v. Stoler*, 237 Cal. App. 4th 1375 (2015) . . . . . 15

**<u>TABLE OF AUTHORITIES</u>**
*(continued)*

*Cases* — *Page*

*x.AI Corp. v. OpenAI, Inc.*,
821 F. Supp. 3d 1100 (N.D. Cal. 2026) . . . . . 16

*Statutes*

17 U.S.C. § 101 . . . . . 13, 14

17 U.S.C. § 102(a)(1) . . . . . 13

17 U.S.C. § 201(b) . . . . . 13-15

18 U.S.C. § 1832 . . . . . 19

18 U.S.C. § 1839(4) . . . . . 13, 15, 16

35 U.S.C. § 261 . . . . . 5, 7

35 U.S.C. § 281 . . . . . 5

Cal. Code Civ. Proc. § 338(d) . . . . . 2, 3, 22

Cal. Code Civ. Proc. § 1691 . . . . . 15

Cal. Code Civ. Proc. § 3426.1(b) . . . . . 16

Fed. R. Civ. P. 9(b) . . . . . *passim*

Case 3:25-cv-05118-MMC Document 69 Filed 07/20/26 Page 11 of 32

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

The Second Amended Complaint (the "SAC") represents plaintiff Alan Jones's third failed effort to transform a routine workplace disagreement at Light Field Lab Inc. into claims against individual defendants Jon Karafin and Brendan Bevensee. Jones wrongly attempts to characterize his employment grievances as counts for fraud, breach of fiduciary duty, civil RICO, and trade secret misappropriation. This Court previously dismissed all claims against Karafin and Bevensee, permitting amendment to the fraud, RICO, and fiduciary duty theories, but the SAC's expanded length and verbiage does not cure the dispositive defects in those claims. The RICO count still fails because a private employment dispute does not meet the predicate act requirement and does not constitute a racketeering pattern. The newly-minted trade secret misappropriation claim collapses under the SAC's own admissions that Jones developed and assigned the source code to LFL. Finally, the SAC pleads facts showing every count is barred by the statute of limitations. The Court should dismiss all claims against defendants Karafin and Bevensee, this time with prejudice.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must state a claim that is "'plausible on its face'" by pleading "sufficient factual matter." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard requires more than a "sheer possibility" of misconduct, and facts "'merely consistent with'" liability fall short of the plausibility threshold, as the Court need not accept conclusory statements, unreasonable inferences, or allegations contradicted by judicially noticeable matters or incorporated exhibits. *Id.*; *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

## FACTUAL BACKGROUND

In evaluating this motion, the Court's review is confined to the Second Amended Complaint and documents subject to judicial notice, which asserts the Third, Fourth, Fifth, and Sixth Counts against defendants Karafin and Bevensee (collectively, the "Individual Defendants"). The SAC and judicially noticed documents establish the necessary background for this motion, and those alleged facts need not be repeated here. To the extent the pleaded facts are relevant to a particular argument, they are

Case 3:25-cv-05118-MMC Document 76 Filed 01/20/26 Page 12 of 32

addressed in context below.

## LEGAL ARGUMENT

### I. The Court Should Dismiss Plaintiff's Third Failed Attempt to Plead Fraud

This Court previously dismissed Jones's fraud claim against the Individual Defendants in its entirety. Dkt. No. 67 at 7:9 to 13:3. The SAC adds narrative in an attempt to manufacture a viable claim, but fails to cure the defects as the claim rests on the same operative facts as the First Amended Complaint, regrouped into three categories: (1) the interview statement that LFL held "hundreds of patents" and other interview-related statements; (2) a concealment theory recycling Jones' theory built on the LFL portfolio's alleged Lytro "provenance" and withheld prior-art references; and (3) a rephrased equity theory now premised on Karafin's August 2019 email and alleged non-disclosure of terms in the governing Plan documents. SAC ¶¶ 13-24, 27-28, 30-31, 66-71, 119-23. Jones's wordsmithing fails to save his untimely and unactionable fraud claim, and it should be dismissed with prejudice.

#### A. The Fraud Claim Is Barred by the Statute of Limitations

Under California law, "[f]raud claims are subject to a 3-year statute of limitations," and accrue on actual or inquiry notice of "the facts constituting the fraud or mistake." *Irish v. FCA US, LLC.*, No. 24-2726, 2026 WL 252490, at *4 (C.D. Cal. Jan. 16, 2026) (citing Cal. Code Civ. Proc. § 338(d)); *see also Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807-08 (2005). The SAC's allegedly fraudulent statements were made in 2019, and associated with Jones's recruitment and hiring, *see e.g.*, SAC ¶¶ 26-31, 121, 124, and plaintiff's claimed acts of reliance—resignation from Microsoft and exercising options—concluded no later than 2021. *Id.* ¶¶ 64-65. Jones had until 2024 to sue, but did not file until 2025. On the face of the SAC, the fraud claim is untimely and is barred by the statute of limitations. *Irish*, 2026 WL 252490, at *4.[1] As the action is barred, plaintiff has the burden of showing that the discovery rule applies, *SOS Co. v. E-Collar Techs., Inc.*, No. 16-9667, 2017 WL 5714716, at *7 (C.D. Cal. Oct. 17, 2017), and must affirmatively plead facts excusing his delayed discovery. *Vera v. REL-BC, LLC*, 66 Cal. App. 5th 57, 69 (2021). The SAC fails to explain or excuse this negligence,

[1] Jones recycles the same allegation that he was defrauded because Karafin stated in an interview held in August 2019 "that Light Field Lab had a large theme park customer," and anticipated delivery "the following year" that ultimately did not materialize. SAC ¶ 28; FAC ¶ 13. But the Court previously found on these same facts that "Jones fails, however, to allege facts sufficient to support a finding that Karafin's representation that Universal Studios was a customer of LFL was false at the time the statement was made to him." Dkt. No. 67 at 9:17-19.

instead pleading facts showing that Jones cannot rely on the delayed discovery rule. *SOS*, 2017 WL 5714716, at *7; *Irish*, 2026 WL 252490, at *4.

**1. Jones's Patent Misconduct Fraud Theory is Time Barred**

A fraud claim accrues when "complete with all of its elements." *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999); *see also Fox*, 35 Cal. 4th at 806; *Attia v. Google LLC*, 983 F.3d 420, 425-26 (9th Cir. 2020). Jones admits the relevant facts that start the limitations clock: the patents, assignments, inventor declarations, and prosecution histories that were "established by the public Patent Office record" and available from 2017 through 2019. SAC ¶¶ 13, 19, 25. All elements of Jones's fraud claim concerning the value of LFL's patent portfolio were complete by November 26, 2019, when U.S. Patent No. 10,488,584 issued without the allegedly required disclosures. *Id.* ¶¶ 13-14, 20-25, 27, 29. Therefore, the statute of limitations expired on November 26, 2022, and Jones' claims are presumptively untimely. *Irish*, 2026 WL 252490, at *4; *Fox*, 35 Cal. 4th at 808; *Stansfield v. Starkey*, 220 Cal. App. 3d 59, 73-75 (1990); Cal. Code. Civ. Proc. § 338(d).

Under the discovery rule, "plaintiffs are charged with presumptive knowledge of an injury if they have 'information of circumstances to put [them] on inquiry' or if they have 'the opportunity to obtain knowledge from sources open to [their] investigation.'" *Fox*, 35 Cal. 4th at 807-08 (quoting *Gutierrez v. Mofid*, 39 Cal.3d 892, 896-97 (1985)). While Jones pleads that he had no "reason to audit" these records until May 2025, the test is not directed to Jones' motivation to look; it is inquiry notice. *Irish*, 2026 WL 252490, at *4. Jones pleads that LFL's patent portfolio induced him to join the company in 2019; consequently, he had every reason to access this publicly available information. SAC ¶¶ 25, 34-35, 124. Jones affirmatively pleads that the dispositive facts were publicly available and required only a review and comparison of published information, which plaintiff only conducted after "reflecting" upon his contributions after he was fired. *Id.* ¶¶ 35, 145; *Fox*, 35 Cal. 4th at 807-08; *Stansfield*, 220 Cal. App. 3d at 73-75. As no objectively reasonable investigation beyond consulting these public records was needed, the delayed-discovery rule does not apply.

**2. Jones's Equity Fraud Theory is Time Barred**

The SAC's admission that "Light Field Lab first presented the Plan and the form Option Agreement to Mr. Jones on January 2, 2020," is dispositive and forecloses any claim of delayed

discovery on Jones' equity theory of fraud. SAC ¶ 67.[2] The terms that Jones claims were "never disclosed" from him appear in those documents, *id.* ¶¶ 31, 66-71,[3] and to the extent there was any delay, it was only until he received the written Plan on January 2, 2020, which he signed. "[I]t is black letter law that parties are presumed to understand the contents of the documents they execute," *Silkiss v. Lee*, No. 18-682, 2018 WL 11471621, at *3 (N.D. Cal. Nov. 19, 2018), thus Jones had actual, written notice of each equity term, the alleged discrepancy from any earlier oral assurances, and the integration clause which confirm that the Plan "sets forth the entire agreement and understanding of the parties" and "supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written," no later than January 2, 2020, starting the statute of limitations clock. Dkt. No. 30-2, Ex. 3-A, Plan § 13(b); *see id.*, Exercise Agreement § 8(b);[4] *Viera v. Bank of Am., N.A.*, No. 15-5590, 2015 WL 12752882, at *5-7 (C.D. Cal. Oct. 28, 2015) (collecting cases). A plaintiff who possesses the governing written terms cannot defer accrual of a claim that those terms differ from a prior representation—Jones' claim expired in January 2023, rendering it time barred. *See id.*; *Fox*, 35 Cal. 4th at 807-08.

**B. The Fraud Claim Is Preempted**

Federal law preempts any state cause of action that offers "patent-like protection to intellectual creations which would otherwise remain unprotected as a matter of federal law." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 156 (1989). "Federal Circuit law governs whether federal patent law preempts a state law claim." *Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 411 F.3d 1369, 1376 (Fed. Cir. 2005); *see also* Dkt. No. 67 at 14:5-9. This Court has already held that federal patent law preempts state-law claims that purport to define patent rights and dismissed Jones' inventorship-

---

[2] This Court can take judicial notice of this agreement, *see* concurrently-filed Request for Judicial Notice.

[3] *See* The Company's repurchase right on termination (Dkt. No. 30-2, Ex. 3-A, LFL's 2017 Stock Incentive Plan (the "Plan") § 8(b)(i)); the Company's right of first refusal, (*id.* § 16); the mandatory ROFR/Co-Sale and Voting Agreement adherence and resulting transfer restrictions (*id.*, Exercise Agreement §§ 3, 5(b)-(c)); and even the waiver of his Section 220 inspection rights is expressly recited in the agreement. *Id.* § 7. The dilution Jones complains of is likewise disclosed on the face of the Plan, which provides that, except for stock splits and similar events, "'no issuance by the Company of shares of stock of any class . . . shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of Shares subject to an Award.'" SAC ¶ 30 (quoting Ex. 3-A, Plan § 10(a)).

[4] Jones reaffirmed this agreement each time he exercised, through April 29, 2021. Dkt. No. 30-2, Ex. 1-A at 1-5. The specific transactions through which he alleges to have advanced funds in reliance were completed by May 2021, at the latest. SAC ¶¶ 64-65. Even if the claim accrued in May 2021, which it did not, it would remain untimely.

Case 3:25-cv-05118-MMC Document 62 Filed 08/14/26 Page 15 of 32

based fraud allegations on that ground. Dkt. No. 67 at 14:5 to 15:1 & n.9. The SAC requires a reapplication of that ruling. In the SAC, Jones pleads the same inventorship and ownership grievance that was present in the FAC, relabeled as a challenge to "provenance, defensibility, and valuation" of the LFL patents. SAC ¶¶ 13, 23, 25, 36, 113, 121. The words may have changed, but the patent law implications have not, and preemption turns on substance, not labels—a state-law fraud claim resting on patent focused conduct "clashes with the balance struck by Congress" and cannot stand. *Bonito Boats*, 489 U.S. at 152; *Ultra-Precision*, 411 F.3d at 1382. Conduct before the U.S. Patent Office cannot be repackaged as a state-law claim, and "an application that has not yet matured into a patent cannot properly be deemed" property. *Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*, 204 F.3d 1368, 1380 (Fed. Cir. 2000). The SAC focuses on submissions made to the Patent Office, including alleged knowing omissions across "five separate Information Disclosure Statements." SAC ¶ 22; *see id.* ¶¶ 8, 14, 19, 21-22. Stripped of its labels, the substance of Jones's patent-based fraud theory is a charge of inequitable conduct before the Patent Office and is therefore preempted. *See Semiconductor*, 204 F.3d at 1373-78; *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1288-92 (Fed. Cir. 2011); *James v. J2 Cloud Servs. Inc.*, No. 16-5769, 2018 WL 6092461, at *6 (C.D. Cal. Nov. 19, 2018).

The preemption defect is compounded by a standing defect that independently defeats the theory and confirms its impropriety. LFL is the owner of record and is therefore presumed to own the patents. 35 U.S.C. § 261; Dkt. No. 67 at 11:12. The "substantial questions" Jones invokes as the source of the portfolio's supposed impairment, SAC ¶¶ 13, 19, are his alone. No third party, including Lytro, has ever challenged that ownership, and Jones concedes that he does not own the patents. He therefore lacks standing to litigate a stranger's asserted ownership rights. *See, e.g.*, *Abraxis Biosci., Inc. v. Navinta LLC*, 625 F.3d 1359, 1364-67 (Fed. Cir. 2010); *TextileProds., Inc. v. Mead Corp.*, 134 F.3d 1481, 1483 (Fed. Cir. 1998) (citing 35 U.S.C. § 281)). Jones cannot manufacture a fraud injury out of doubts he himself generated, or his own speculation about the merits of the PTO's issuance decisions.

**C. The Fraud Count Still Fails to Plead Essential Elements**

Fraud requires misrepresentation, scienter, intent to induce reliance, justifiable reliance, and resulting damage. *See Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995); Dkt. No. 67 at 8:22-25. Concealment adds the requirement that there be a duty to disclose. *See Rattagan v. Uber*

*Techs., Inc.*, 17 Cal. 5th 1, 40 (2024); *see also* Dkt. No. 67 at 10:14-20. And averments of fraud must satisfy Rule 9(b)'s heightened pleading requirement to identify the "who, what, when, where, and how." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003); *see also* Dkt. No. 67 at 9:3-4. The Third Cause of Action remains deficient on every element.

**1. The SAC Does Not Even Attempt to Plead Plausible Facts Against Bevensee**

Bevensee should be dismissed outright: no actionable misrepresentation or concealment is attributed to him. The "hundreds of patents" and equity statements are attributed to Karafin alone, SAC ¶¶ 27, 30, 120-122, and the allegations as to Bevensee reduce to company recruiting and co-inventor knowledge. *Id.* ¶¶ 19-23, 26, 34-35. Rule 9(b) forbids such group pleading and requires that each defendant's role be pleaded with particularity. *Kearns*, 567 F.3d at 1124-25; *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007). Jones has had "multiple opportunities to attempt to state a claim," and has yet to state a claim against Bevensee; this claim should be dismissed with prejudice. *Dimmick v. N. Calif. Inst. for Rsch. & Educ.*, No. 04-4965, 2005 WL 2347116, at *6 (N.D. Cal. Sept. 26, 2005).

**2. The SAC Fails to Plead Misrepresentation or Concealment**

Jones's first fraud theory is a repeat of the FAC, that Karafin said that LFL had "hundreds of patents." SAC ¶¶ 27, 118, 120, 122. This court has already disposed of this allegation, on the same facts. *See* Dkt. No. 67 at 11:1-17. A true statement cannot be fraud. *See Laine v. Wells Fargo Bank, N.A.*, No. 13-4109, 2014 WL 793546, at *5 (N.D. Cal. Feb. 26, 2014). Nor can Jones revive the theme-park statement (SAC ¶ 28) by recasting it as an inducement with scienter "established by Defendants' patent-filing conduct" (*id.* ¶ 29); on its face it remains a non-actionable prediction about a future product launch. *See* Dkt. No. 67 at 9:6 to 10:7.

For the second theory, the SAC seeks to substitute the dismissed patent-based allegations with averments challenging the "provenance" of LFL's patent portfolio. SAC ¶¶ 13-25, 33-35, 114. "Provenance" here means nothing more than the chain of ownership of the patents. *Id.* ¶ 13 (LFL's "title to them is defective"), *id.* ¶ 20 ("left a defect in Light Field Lab's title"). That is the same patent-ownership grievance the FAC pleaded and the Court already rejected. Dkt. No. 67 at 11:1-17.

In the SAC, Jones adds averments directed to the "comprehensiveness, value and security of the

portfolio." SAC ¶¶ 23-25, 27, 36, 114. This is nothing more than Jones's own opinion, formed years later, about what he infers from the prosecution histories. *Id.* ¶¶ 18, 120. The SAC never alleges that Karafin or Bevensee falsely represented that the portfolio was comprehensive, secure, or free of risk. *See generally id.* Jones's characterization of the patents as having questionable ownership (provenance) or lacking validity is his opinion, not a statement of fact. He points to nothing other than his own opinion for these allegations, and a plaintiff cannot ground a fraud claim on a misrepresentation he supplies himself. *See Ellis v. J.P. Morgan Chase & Co.*, No. 12-3897, 2016 WL 5815733, at *6 (N.D. Cal. Oct. 5, 2016); *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 621 (9th Cir. 2004).

The SAC's relabeling of the patent claims fails for another fundamental reason: the owner of record at the Patent Office is presumed to own the patent, and that presumption forecloses Jones's contrary theory. *See* 35 U.S.C. § 261 (recordation of patent assignments); Dkt. No. 67 at 11:12 (the identified patent "was issued to LFL"). Moreover, Jones cannot ground his fraud claim on speculation of a third party's ownership rights. *See Abraxis*, 625 F.3d at 1364-67. Jones does not claim to own the patents himself-—no third party, including Lytro, has come forward to claim ownership, and there are no such facts in the SAC supporting lack of ownership. Stripped of its label, the SAC pleads only Jones's unsupported opinion that the Patent Office should have vested ownership somewhere other than LFL, a bare conclusion with no supporting facts that the Court need not accept. *Iqbal*, 556 U.S. at 678. The patents are, as a matter of the presumptive public record, owned by LFL.

For his third theory, Jones contends Karafin promised that his shares would not be diluted. But the very quotation on which Jones relies says the opposite—Karafin wrote that "each round of investment ***provides dilution*** for our investors every time the . . . value of the company increases." SAC ¶ 121 (emphasis added). Jones's fraud theory contradicts the document he pleads in the SAC. The document Jones relies on lacks any promise of non dilution, and it contains an integration clause (*see supra* § I.A.2), and acknowledgment that Jones "had an opportunity to consult counsel during the Option terms" (Dkt. No. 30-2, Ex. 3-A § 8). That document, not Jones' litigation-driven pleading, controls. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001) ("The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit.").

Case 3:25-cv-05118-MMC Document 72 Filed 03/14/26 Page 18 of 32

Jones's recycled equity theory is also directly contradicted by the Plan document governing Jones's grant which adjusts an award only for a "stock split, reverse stock split, stock dividend, combination, consolidation, reclassification of the Shares or subdivision of the Shares," and then provides in no uncertain terms: "Except as expressly provided herein, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of Shares subject to an Award." Dkt. No. 30-2, Ex. 3-A § 10(a). Because ordinary share issuances in financing rounds are neither splits, dividends, nor recapitalizations, the Plan confirms that Jones's grant was subject to dilution, the exact opposite of the "non-dilution" promise his fraud theory requires. Though Jones claims not to have received the plan document until January 2020, he has had them for six years, and proceeded to exercise his options three separate times in 2020 and 2021 after receiving the document. *See* Dkt. No. 30-2, Ex. 3-A at 1-5. These facts are fatal to Jones' litigation-driven fraud theory.

**3. The SAC Fails to Plead Knowledge of Falsity**

Even if the SAC pleaded an actionable misrepresentation, it fails at the second element—knowledge of falsity—as to both Individual Defendants. Fraud requires that the speaker knew the representation was false when made, *Alliance*, 10 Cal. 4th at 1239; *Lazar v. Superior Ct.*, 12 Cal. 4th 631, 638 (1996), and Rule 9(b) requires that scienter be pleaded with specific and individualized facts, not through conclusory, group pleadings. *See supra* § I.C; *Vess*, 317 F.3d at 1103; *Eurosemillas, S.A. v. PLC Diagnostics, Inc.*, No. 17-3159, 2019 WL 1960342, at *6 (N.D. Cal. May 2, 2019).

The "hundreds of patents" statement cannot satisfy this element because it was true. The SAC pleads no facts showing Karafin believed otherwise at the time he spoke. SAC ¶ 27; Dkt. No. 67 at 11.[5] The forward-looking theme-park and option-value statements fail for the reason the Court already gave: Jones "has not alleged that at the time the above statements were made Karafin did not anticipate" the predicted outcome or "had knowledge of facts that would not warrant such prediction." Dkt. No. 67 at 9:26 to 10:1; SAC ¶¶ 28, 121; *see Eurosemillas*, 2019 WL 1960342, at 8-9 ("months to market" and similar forecasts not fraudulent absent facts showing falsity when made); *Maganallez v. Hilltop Lending*

//

[5] Bevensee is not alleged to have made this or any other statement to Jones, but is alleged to be a co-inventor who "shared Karafin's knowledge" of the portfolio's provenance. *See* SAC ¶¶ 26, 34-35.

*Corp.,* 505 F. Supp. 2d 594, 606 (N.D. Cal. 2007). The SAC does not cure that gap—it repleads the same predictions without alleging contrary knowledge held when Karafin spoke.

The "theme park" or product readiness statements cannot satisfy this element and the SAC does not even attempt to plead that the Individual Defendants knew these statements were false at the time they were made, recognizing this deficiency. Instead, Jones asserts that whether Mr. Karafin had knowledge of the truth of the statement at the time he made the statement was made is "not something Mr. Jones must independently establish," because "the scienter for his fraudulent-inducement claim is established by Defendants' patent-filing conduct." SAC ¶ 29. This concession is dispositive. Scienter as to a prediction about a customer and a launch date cannot be supplied by borrowing an unrelated theory about prior-art disclosures to the Patent Office, a theory that is itself non-actionable and preempted. *See supra* § I.B. A plaintiff who admits he cannot plead that the speaker disbelieved his own statement has not pleaded scienter; he has pleaded its absence. What remains is the SAC's bare recitation that Defendants "knew" representations "to be false" concerning the patent portfolio. SAC ¶ 124. But this is precisely the formulaic recitation of the elements that Rule 9(b) and *Iqbal* forbid, and fails to attribute scienter to each defendant. 556 U.S. at 678; *Kearns*, 567 F.3d at 1124-25; *Swartz*, 476 F.3d at 764-65; Dkt. No. 67 at 4, 9.

**4. The SAC Fails to Plead a Duty to Disclose and the Concealment Claims Fail**

A duty to disclose arises only from a fiduciary relationship, exclusive knowledge, active concealment, or a partial representation. *See Punian v. Gillette Co.*, No. 14-5028, 2016 WL 1029607, at *9 (N.D. Cal. Mar. 15, 2016). The Court has already applied that framework to this very claim and found no duty, holding that Jones "failed to allege facts sufficient to support a finding that Karafin, during Jones' job interview, had a duty to disclose the information" Jones says was withheld. Dkt. No. 67 at 10. The SAC does not cure that defect; it repleads the same recruitment relationship at greater length, but volume cannot hide the defects. Every concealment the SAC alleges arose during that same recruitment and hiring period. At each relevant point Jones was a prospective, then newly hired, at-will employee, not a shareholder or fiduciary beneficiary. SAC ¶¶ 11, 26 (recruitment began August 2019; Jones accepted September 9, 2019); *see id.* ¶¶ 27-31, 33 (interview and email representations and equity terms during hiring). An arm's-length recruitment imposes no duty on the employer, much less on

individual officers, to volunteer every fact a candidate might find material. *Bank of Am. Corp. v. Superior Ct.*, 198 Cal. App. 4th 862, 870-73 (2011); *Punian*, 2016 WL 1029607, at *9. This Court so held as to the option information, and the identical pre-employment posture defeats the provenance and equity-terms theories alike. Dkt. No. 67 at 10:20-28; SAC ¶¶ 18-25, 30-31.

The remaining three circumstances fare no better. There is no active concealment: the only conduct alleged is the renaming of patent terminology in filings the SAC concedes are part of "the public Patent Office record." *Id.* ¶ 25. Nor is there exclusive knowledge: Jones's own pleading concedes the operative facts are "established by the public Patent Office record." *Id.* ¶¶ 13, 25. A fact of public record cannot be a fact within a defendant's exclusive knowledge, and Jones is charged with knowledge of what those records disclose where he "has 'the opportunity to obtain knowledge from sources open to [his] investigation (such as public records or corporation books).'" *Palleson v. Bos. Sci. Corp.*, No. 21-1037, 2021 WL 5633015, at *3 (S.D. Cal. Dec. 1, 2021) (quoting *Parsons v. Tickner*, 31 Cal. App. 4th 1513, 1525 (1995)); *see Stansfield*, 220 Cal. App. 3d at 73-75. His contrary allegations that the derivation was "not public knowledge" and "affirmatively concealed," SAC ¶¶ 34-35, are bare conclusions contradicted by his own pleading and need not be accepted. *Iqbal*, 556 U.S. at 678; *see* Dkt. No. 67 at 4:15-21.

Jones's contrary allegation makes the contradiction explicit: he pleads that the Lytro derivation "was within Defendants' exclusive knowledge," SAC ¶ 128, while pleading in the same complaint that the operative facts were "established by the public Patent Office record," *id.* ¶¶ 13, 25. An allegation that a fact was within a defendant's "exclusive knowledge" cannot be squared with the plaintiff's own admission that the fact was public, and the Court need not credit the former. *Iqbal*, 556 U.S. at 678; *see* Dkt. No. 67 at 4:15-21. Finally, the fact that Karafin truthfully stated LFL held "hundreds of patents" did not obligate him to volunteer every question about the portfolio's provenance, least of all facts the SAC concedes were of public record. SAC ¶ 25; *see Punian*, 2016 WL 1029607, at *9; Dkt. No. 46 at 11-13. If as Jones pleads, the patent history files were important to his decision to join LFL, it was incumbent upon him to review those records that he admits were available to him.

**5. The SAC Fails to Plead Justifiable Reliance or Fraud-Caused Damage**

Justifiable reliance and resulting damage are separate, essential elements of fraud. *Alliance*, 10 Cal. 4th at 1239; Dkt. No. 67 at 8:24-25. The SAC pleads neither.

Reliance is not justifiable where the facts were public. The SAC admits the provenance facts were "established by the public Patent Office record," SAC ¶ 25, yet simultaneously alleges Jones did not examine that record until 2025, *id.* ¶ 128; the very definition of a reliance theory that refutes itself. A plaintiff cannot claim reliance on the concealment of facts "readily accessible in the public record," least of all a rendering engineer who forgoes a record he concedes was material to him. *Palleson*, 2021 WL 5633015, at *3. That the facts were public is fatal to reliance for the same reason it is fatal to the duty element. *See supra* § I.C.4.

Reliance on predictions—like those alleged during Jones's interview——is not justifiable. The Court has already held that the option-value and product-launch statements were non-actionable predictions, Dkt. No. 67 at 9:6 to 10:4. Furthermore, Jones cannot reasonably rely on an opinion predicting how an equity grant will perform in future financing rounds (SAC ¶¶ 30, 121), as it is common knowledge that equity grants are inherently subject to risk. The equity theory independently fails on falsity: Jones's own pleading quotes Karafin explaining that "each round of investment provides dilution . . . every time the . . . value of the company increases," *id.* ¶ 121, which is the opposite of the non-dilution promise the theory requires. *See supra* § C.2.

Reliance on oral statements is not justifiable in light of an integrated contract. Jones admits Light Field Lab "first presented the Plan and the form Option Agreement to Mr. Jones on January 2, 2020." SAC ¶ 67. The terms he says were concealed are contained in those very documents. *Id.* ¶¶ 31, 66-71; *see supra* § I.A.2. And the Exercise Agreement he accepted confirmed those documents "set forth the entire understanding . . . and supersede all prior agreements, promises and/or representations." Dkt. No. 30-2, Ex. 3-A, Plan § 8(b); *see supra* § I.A.2. A plaintiff cannot justifiably rely on prior oral assurances that a written, integrated agreement he possessed expressly supersedes. *Viera*, 2015 WL 12752882, at *5-7; *Cohen v. Wedbush, Noble, Cooke, Inc.*, 841 F.2d 282, 288 (9th Cir. 1988), *overruled on other grounds by Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931 (9th Cir. 2001). And, importantly, Jones' continued reliance defeats the claim. Jones's own pleading proves he learned the supposedly withheld facts yet stayed the course, negating his claim to justifiable reliance—he possessed the governing equity documents as of January 2, 2020, SAC ¶ 67, continued exercising options and paying the Company through April 29, 2021, *id.* ¶ 64, and remained employed until June 23, 2023. *Id.* ¶ 57; *see, e.g.*, *Rochlis*

*v. Walt Disney Co.*, 19 Cal. App. 4th 201, 216 (1993); *Vazquez v. DataRobot, Inc.*, No. 22-7619, 2023 WL 6323101, at *7-8 (N.D. Cal. Sept. 28, 2023); *Rubinstein v. SAP AG*, No. 11-6134, 2012 WL 726269, at *8 (N.D. Cal. Mar. 1, 2012).

Beyond the reliance failures, the Court expressly found that Jones alleged no facts showing "he suffered any injury on account of the allegedly concealed information." Dkt. No. 67 at 10:24-25. That holding is independently dispositive, and the SAC does not cure this defect. By Jones's own account, his option losses flow not from any 2019 recruitment statement but from intervening, post-termination causes: he alleges he lost his vested shares because he "could not afford to exercise" them "due to tax liability" and the 90-day post-termination expiry, and lost unvested shares that would have vested "had LFL not wrongfully terminated" him. SAC ¶¶ 64-65, 68. Those losses are, on the face of the pleading, the product of his 2023 termination, LFL's acts, and his own inability to fund the exercise. They are not alleged to be the result of reliance on any representation about the theme-park customer, the patent portfolio, or the value of the options. Jones therefore pleads no injury caused by any Individual Defendant's alleged misrepresentation, an independent failure of the causation element as to the very defendants seeking dismissal. Dkt. No. 67 at 10. Because Jones' own allegations trace his losses to a different, independent source, Jones' fraud claim independently fails for this reason.

**D. Dismissal Should Be With Prejudice**

The fraud count should be dismissed with prejudice. This is Jones's third attempt, and the SAC confirms that the deficiencies are legal, not factual: the claim is time-barred on the face of Jones's own pleading (SAC ¶¶ 27, 30, 64-67, 121), the patent-based theory is preempted as a matter of Federal Circuit law (*id.* ¶¶ 13, 19, 21-22), the "hundreds of patents" statement has already been adjudicated as true (Dkt. No. 67 at 11), and the forward-looking statements remain non-actionable predictions (*id.* at 9-10). Because these are legal bars that no additional allegation consistent with Jones's own pleading could overcome, "granting leave to amend would be futile because th[e] claim is barred as a matter of law." *Sikhs for Justice Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1096 (N.D. Cal. 2015). Dismissal should be with prejudice.

//

//

**II. Jones' Trade Secret and Conversion Claims Should Be Dismissed With Prejudice**

For purposes of this motion, the Individual Defendants accept as true every well-pleaded factual allegation in the SAC. So applied, Jones's own allegations require dismissal of the Fourth Cause of Action against Karafin and Bevensee. Count Four recharacterizes Jones's (1) "original source code" and the (2) "methods, techniques, and algorithms embodied in it" as "trade secrets," recycling the identical subject matter pleaded in the FAC's patent claims. SAC ¶¶ 130-31. When accepted as true, Jones's own allegations defeat his claim on every essential element. The SAC confirms that the methods are not secret, that he assigned ownership of the purported secrets to Light Field Lab, and that he failed to implement reasonable measures to protect his work from the Individual Defendants. Jones' claim fundamentally fails because he cannot plead ownership or misappropriation, any claim is expired, and the conversion claim asserted in the alternative is preempted.

**A. Jones Cannot Plead Ownership as the Copyright Act Vests Ownership in LFL**

Ownership is a required element of both a CUTSA and a DTSA claim. The plaintiff must hold "rightful legal or equitable title to, or license in," the trade secret. 18 U.S.C. § 1839(4); *Cisco Sys., Inc. v. Chung*, No. 19-7562, 2023 WL 2622155, at *8-9 (N.D. Cal. Mar. 22, 2023). A trade secret Jones does not own cannot have been misappropriated from him by anyone, including the Individual Defendants.

Ownership of source code is governed by the Copyright Act as a "literary work" fixed in a tangible medium. 17 U.S.C. § 102(a)(1); *Comm. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989); *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1354 (Fed. Cir. 2014). Because a trade-secret plaintiff must own the asserted secret, 18 U.S.C. § 1839(4), the Copyright Act's allocation of ownership controls whether Jones can plead that element as to source code, and confirms that he may not.

Jones's own allegations bring his source code squarely within the Act's "work made for hire" doctrine, under which "the employer or other person for whom the work was prepared is considered the author" and "owns all of the rights comprised in the copyright" unless the parties agree otherwise in a signed writing. 17 U.S.C. §§ 101; 201(b); *Reid*, 490 U.S. at 737. A work is "made for hire" when it is "a work prepared by an employee within the scope of his or her employment." *Reid*, 490 U.S. at 738. Jones pleads exactly that. He alleges that he "authored a substantial body of original source code" "[t]hroughout his employment," SAC ¶ 36; that the work was among "Light Field Lab's software

development efforts" he was hired to perform, *id.* ¶ 26; that he "developed this work during his employment" and "committed" his "implementation . . . to Light Field Lab's own source-control system . . . beginning at the outset of his employment in September 2019," *id.* ¶ 37; and that the code "became central to Light Field Lab's rendering pipeline," *id.* ¶ 36. Those admissions establish each element of the work-for-hire test. 17 U.S.C. §§ 101, 201(b); *Reid*, 490 U.S. at 737-38, 751-52. Jones's execution of the September 9, 2019 Confidentiality and Proprietary Rights Agreement removes any doubt. He concedes he "signed a Confidentiality and Proprietary Rights Agreement that purported to grant rights to patents and other works for hire to LFL," SAC ¶ 33, and that he "entrusted his original source code and inventions to Light Field Lab under" that agreement, *id.* ¶ 124. The Court has already recognized that this agreement "grant[ed] rights to patents and other works for hire to Light Field Lab." Dkt. No. 67 at 2:4-5; *see also* 17 U.S.C. § 201(b).

That Jones does not own the trade secrets also follows from California law governing employee-developed work. Where an employee signs an invention agreement assigning work created within the scope of his employment, the resulting technology belongs to the employer. *Gen. Elec. Co. v. Wilkins*, No. 10-674, 2011 WL 1740420, at *10 (E.D. Cal. May 5, 2011); *Cubic Corp. v. Marty*, 185 Cal. App. 3d 438, 448-52 (1986). Jones alleges precisely that arrangement: that he "authored, and maintained as confidential," the source code "[t]hroughout his employment," committing it "only to the company's access-controlled source-control system." SAC ¶¶ 131-32. On Jones' own allegations, title to the asserted secrets passed to and remains with LFL when he assigned his work.

**B. Jones Post-Termination Efforts To Claim Ownership Fail**

Recognizing the written assignment controls, Jones seeks to invalidate his 2020 assignment. This fails for two reasons. First, even if the assignment agreement were voided, Copyright Law's Work for Hire Doctrine would still vest ownership in LFL. *See supra* § II.A.1. Second, the SAC fails to plausibly plead that the assignment agreement is void or was rescinded for fraud. SAC ¶¶ 125, 136. The SAC's assertions that the assignment is void are legal conclusions this Court need not accept. *Iqbal*, 556 U.S. at 678. And on his own pleaded facts they are wrong: Jones pleads fraud in the inducement, which renders a contract voidable rather than void. *Rosenthal v. Great W. Fin.*, 14 Cal. 4th 394, 420 (1996).

To escape the limits of the assignment, Jones was required to rescind it promptly upon

discovering the fraud and to restore all benefits received. Cal. Code Civ. Proc. § 1691. He never did: the SAC pleads no notice of rescission and no restoration or offer to restore. *See* SAC ¶ 129 (alleging this action gave "notice of rescission"); *Jozinovich v. JP Morgan Chase Bank, N.A.*, No. 09-3326, 2010 WL 234895, at *6 (N.D. Cal. Jan. 14, 2010) (asserting rescission does not automatically void a contract). Jones instead retains all of his employment salary and equity while simultaneously disclaiming the assignment, the "affirm and sue" maneuver California Law strictly forbids. *See Village Northridge Homeowners Ass'n v. State Farm Fire & Cas. Co.*, 50 Cal. 4th 913, 926 (2010).

Nor can Jones rescue the theory by reframing it as fraud in the execution. He pleads that he "did not read the form Exercise Agreement, including the Section 7 waiver." SAC ¶ 71. A party who had the opportunity to read an agreement but neglected to do so cannot avoid it on that basis. *Silkiss*, 2018 WL 11471621, at *3; *Rosenthal*, 14 Cal. 4th at 415, 423.

Finally, fraudulent inducement requires proving the same elements as fraud. *Alliance*, 10 Cal. 4th at 1239; *see Wong v. Stoler*, 237 Cal. App. 4th 1375, 1388 (2015). This Court has already rejected Jones's fraud theory for failure to plead misrepresentation or concealment under Rule 9(b). Dkt. No. 67 at 8-13. Because the fraud claim remains legally infirm and is time-barred, *see supra* § I.A, Jones cannot void the assignment. He remains bound by his original contract and holds no ownership over the trade secrets he now claims were misappropriated. *Wong*, 237 Cal. App. 4th at 1388; *see also JustMed, Inc. v. Byce*, 600 F.3d 1118, 1125-28 (9th Cir. 2010) (holding that source code written for an employer constituted a "work made for hire" owned by the company). Jones's pleading places him in precisely the posture those decisions foreclose: an employee, hired to write software, claiming ownership of the very source code he admits he authored on the job and committed to his employer's systems. SAC ¶¶ 26, 33, 36-37, 124. Because the Copyright Act vests ownership of Jones's employment-created source code in LFL, and because Jones concedes he authored it within the scope of his employment and assigned it in writing, Jones cannot plead the ownership element his trade-secret and conversion claims require. 17 U.S.C. § 201(b); 18 U.S.C. § 1839(4).

### C. Jones Fails to Allege Required Elements of His Trade Secret Count

Jones' trade secret claim independently fails because the SAC does not plead required elements of misappropriation against the individual defendants. Both the Defend Trade Secrets Act ("DTSA")

and California Uniform Trade Secrets Act ("CUTSA") require a plaintiff to allege, with nonconclusory facts, an existing trade secret, reasonable measures to preserve its secrecy, an act of misappropriation by the defendant, and resulting damage. *See InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657-58 (9th Cir. 2020). The SAC satisfies none of these as to the Individual Defendants.

**1. Jones Fails to Allege Specific Acts by the Individual Defendants**

Jones's misappropriation count fails at the threshold because he never alleges a specific act by either Individual Defendant. Rule 9(b) and this Circuit require a plaintiff suing multiple defendants to "differentiate their conduct" and inform each defendant separately of the allegations surrounding his own alleged participation. *Vess*, 317 F.3d at 1106. Instead, the SAC refers throughout to acts by the "individual defendants" collectively, rather than to any act of Karafin or of Bevensee, and claims regarding use do not disclose the "when," "where," or "how." As shown below, Jones fails to plead the required elements of acquisition, disclosure, or use, and reasonable secrecy measures, and, critically, fails to do so as to each defendant individually, providing an independent ground for dismissal of both.

**2. The SAC Fails to Plead Any Statutory Misappropriation**

Both the federal DTSA and California's CUTSA define misappropriation in exactly the same three ways: (1) acquisition by a person who knows or has reason to know the secret was acquired by improper means; (2) disclosure without consent; and (3) use without consent. 18 U.S.C. §§ 1839(5), (6); Cal. Code Civ. Proc. § 3426.1(b); *Attia*, 983 F.3d at 424; *InteliClear*, 978 F.3d at 657-58. At best, the SAC alleges that the individuals possessed or accessed secrets, without facts showing use, which is insufficient, as "mere possession of trade secrets is not sufficient to constitute misappropriation." *x.AI Corp. v. OpenAI, Inc.*, 821 F. Supp. 3d 1100, 1109-10 (N.D. Cal. 2026); *see also Attia*, 983 F.3d at 424.

As to *acquisition*, Jones alleges only that both individuals had "access to" LFL's source control "in the ordinary course" of employment starting in September 2019. SAC ¶¶ 37, 133. Authorized access to material the plaintiff himself placed in the employer's systems is not acquisition by improper means. 18 U.S.C. § 1839(6); *Attia*, 983 F.3d at 425.

As to *disclosure*, Jones' assignment agreement precludes any such claim. He voluntarily gave the "secrets" to LFL, claiming them as his only after he was terminated. *See supra* §§ II.A-B. Jones does not plead any specific facts that either Individual Defendant made any disclosures, only offering the

Case 3:25-cv-05118-MMC Document 69 Filed 07/20/26 Page 27 of 32

unsupported, conclusory statement that Karafin "directed" LFL to file the patent applications. This falls well short of the required "who, what, when, where, and how" of the alleged disclosures. SAC ¶¶ 143, 134, 136, 140; *Kearns*, 567 F.3d at 1124; *see Cheung v. Keyuan Petrochem., Inc.*, No. 11-9495, 2012 WL 5834894, at *6-7 (C.D. Cal. Nov. 1, 2012).

As to *use*, the SAC attributes post-employment use to Light Field Lab, not the individuals: LFL "retain[ed]" the code generated by Jones' work for hire, *see supra* §§ II.A-B, demanded its return as "Company Property," and "transferred" it through the August 15, 2025 assignment. SAC ¶¶ 133, 135.

**3. The SAC Fails to Allege Reasonable Steps to Preserve Secrecy**

A plaintiff must plead nonconclusory facts showing "reasonable measures to keep [trade secret] information secret." 18 U.S.C. § 1839(3)(A); *InteliClear*, 978 F.3d at 657-58; *Attia*, 983 F.3d at 424. Where a plaintiff shares the claimed secret with those given access, the secrecy analysis turns on the importance of confidentiality and nondisclosure agreements to maintaining secrecy. *Id.* Jones pleads no confidentiality or nondisclosure obligation binding Karafin or Bevensee, and no restriction limiting their use of the material to which he gave them access as LFL employees. To the contrary, he affirmatively "[drew] their attention to that work." SAC ¶¶ 37, 132-33. Absent any pleaded obligation of confidentiality constraining these individuals, Jones has not alleged reasonable measures to preserve secrecy as against them. *Turret Labs USA, Inc. v. CargoSprint, LLC*, No. 21-952, 2022 WL 701161, at *2-3 (2d Cir. Mar. 9, 2022) (collecting cases); *InteliClear*, 978 F.3d at 657-58.

**4. Jones Fails to Plead Damages to Support Misappropriation or Conversion**

A misappropriation claim requires a showing that the defendant's conduct caused or threatened damage to the plaintiff. *See InteliClear*, 978 F.3d at 657-58. Jones attributes the destruction of his alleged trade secrets solely to the publications, and he assigns responsibility for those acts of publication, retention, and transfer to LFL rather than to Karafin or Bevensee. SAC ¶¶ 133-35, 166. Because Jones identifies no actionable conduct by either individual that caused him harm, his claims fail.

**D. Jones's Alternative Conversion Claim Fails Because It Is Preempted**

Jones pleads conversion in the alternative to his trade-secret theory. SAC ¶¶ 141-42. That claim fails as a matter of law for three independent reasons, each sufficient on its own.

First, CUTSA supersedes it. CUTSA displaces all common-law claims "based upon

misappropriation of a trade secret," and a conversion claim that rests on the same nucleus of facts here, the same source code, "methods, techniques, and algorithms" underlying the misappropriation count cannot survive alongside it. *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 236-42 (2010) (holding CUTSA supersedes common-law claims premised on the same wrongful taking of information, whether or not the information qualifies as a trade secret), *disapproved on other grounds by Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011); *Waymo LLC v. Uber Techs., Inc.*, 256 F. Supp. 3d 1059, 1062-64 (N.D. Cal. 2017) (CUTSA may supersede non-trade secret common-law claims resting on "the same nucleus of facts as trade secret misappropriation," unless the plaintiff pleads a property right or wrongdoing "materially distinct" from the CUTSA claim). Jones's conversion allegations reach the identical intangible subject matter, SAC ¶¶ 141-42, and are therefore superseded.

Second, the claim fails on the same ownership defect that defeats the misappropriation count. Conversion requires the plaintiff's "ownership or right to possession of the property," but Jones assigned the asserted work to LFL and pleads no facts voiding that assignment. *See supra* § II.B.

Third, even as to any tangible property, the SAC's own allegations locate possession and transfer with Light Field Lab, not the Individual Defendants. Jones alleges LFL "retained" the code and "transferred" it through the August 15, 2025 assignment. SAC ¶¶ 133, 135, 141-42. Jones pleads no act of dominion by Karafin or Bevensee over any property he owned, and thus states no conversion claim.

### E. Further Amendment Would Be Futile

The Trade Secret Count should be dismissed with prejudice. Jones admits he assigned the asserted material to LFL and seeks only to rescind that assignment (SAC ¶¶ 18, 68), asserts methods already established in the public Patent Office record (*id.* ¶¶ 13, 25), and fails to allege any misappropriating act or resulting damage by Karafin or Bevensee, who do not even possess the material. *See Alta Devices, Inc. v. LG Elecs., Inc.*, No. 18-404, 2019 WL 1924992, at *14 (N.D. Cal. Apr. 30, 2019) (denying leave to amend trade secret claims where plaintiff "already filed three complaints"). Because these are legal rather than factual defects, Jones cannot cure them without contradicting his own pleading, rendering further amendment futile. *Sikhs*, 144 F. Supp. 3d at 1096.

## III. The RICO Claim Fails as the SAC Fails to Remedy the Two Defects Already Identified

The SAC does not cure the two defects this Court identified when it dismissed the FAC's RICO

claim. The Court dismissed on two grounds: First, the alleged fraud predicates were not pleaded with Rule 9(b) particularity because Jones did not identify the content of the alleged communications, what each defendant said, when the statements were made, or to whom they were made. Dkt. No. 67 at 15:2 to 16:17 (citing *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005)); *see also Vess*, 317 F.3d at 1106. Second, that without sufficiently pleaded predicates, Jones could not satisfy the continuity component of the pattern element. Dkt. No. 67 at 16:10-16; *see also Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004). The SAC adds new categories, labels, and narrative, but it still does not plead legally sufficient predicates, and it still alleges only a single, concluded dispute between one former employee and his former employer. SAC ¶¶ 147-66.

**A. The Predicate Allegations Still Fail**

The predicate defect remains the same. The SAC now groups the alleged predicates into recruitment and option-exercise wires, publication and assignment wires, and a trade-secret predicate under 18 U.S.C. § 1832. SAC ¶¶ 151-56. But Rule 9(b) requires the "who, what, when, where, and how" of the alleged fraud, and the SAC still does not provide that as to either Karafin or Bevensee. *See Kearns*, 567 F.3d at 1124; *Vess*, 317 F.3d at 1106. The new allegations identify categories of communications and dates, but they still do not identify, for each Individual Defendant, the specific false statement, why it was false when made, or to whom it was directed. SAC ¶¶ 151-56, 158-63. That is the same defect the Court already found fatal. Dkt. No. 67 at 16:10-17.

The SAC's patent-filing predicates are also barred as a matter of law. This Court already observed that Jones's patent-filing allegations "have nothing to do with the patents on which he bases his RICO claim" and cannot supply the pattern. Dkt. No. 67 at 16 n.10. The governing rule is categorical: statements made during the patent application process "before the PTO cannot qualify as an act of mail fraud or wire fraud for purposes of [RICO's] predicate act requirement." *Semiconductor Energy.*, 204 F.3d at 1378-80. Yet the SAC again relies on inventorship declarations and patent-office filings. SAC ¶¶ 154-55. Jones now says he is not alleging "fraud on the Patent Office," but that disclaimer changes nothing. *Id.* ¶¶ 147, 154, 163. Under *Semiconductor Energy*, the rule turns on the nature of the conduct, not on the label Jones places on it after the fact. 204 F.3d at 1378-80. The communications pleaded in SAC ¶ 154 are patent-office submissions, and cannot satisfy this element.

The SAC's new § 1832 theory fares no better. It pleads no act of criminal trade-secret misappropriation by Karafin or Bevensee distinct from LFL. SAC ¶ 153. It does not allege that either Individual Defendant personally took, disclosed, used, or retained Jones's claimed trade secrets. Instead, it alleges that Jones performed the work while employed by LFL, that his work was "welded onto" LFL's patent portfolio, and that LFL later held, sold, and swept the relevant intellectual property into the assignment estate. *Id.* ¶¶ 33, 77, 79, 83, 85, 124, 153, 156, 158-59. The SAC also pleads that Light Field Lab prepared, signed, and transmitted the applications and that LFL was the assignee of "the entire right, title, and interest" in them. *Id.* ¶ 154. That is corporate conduct by LFL, not pleaded misappropriation by the Individual Defendants. That omission matters because a plaintiff must allege each defendant's own conduct in acquiring, disclosing, or using the trade secret; conclusory group allegations do not suffice. *Kearns*, 567 F.3d at 1124-25; *Attia*, 983 F.3d at 427. Here, the SAC affirmatively pleads that LFL—not the individuals—held the property, transferred it, and that LFL no longer exists. SAC ¶¶ 77, 79, 83, 85, 87-88, 156. Once the corporate entity is stripped away, what remains is not a pleaded act of criminal misappropriation by either Individual Defendant. There are no facts directed to the Individual Defendants that can supply a RICO predicate.

**B. The SAC Still Fails to Plead a RICO Pattern**

The continuity defect remains just as plain. Jones still alleges one scheme directed at one victim: himself. The SAC says as much, alleging that the predicates were committed "in furtherance of a single scheme to obtain Mr. Jones's money and property by fraud," and treating the alleged conduct as one integrated course aimed at him alone. SAC ¶¶ 151, 159, 166. A single scheme with a single victim does not establish a RICO pattern. *Grimmett v. Brown*, 75 F.3d 506, 510-12 (9th Cir. 1996); *Howard v. Am. Online Inc.*, 208 F.3d 741, 748 (9th Cir. 2000); *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975-76 (9th Cir. 2008). The pre-2019 Lytro allegations do not change that, because Jones expressly pleads them only as "context" and "evidence of . . . method," not as charged predicates. SAC ¶¶ 158-59, 164. What remains is one localized dispute over Jones's recruitment, his assigned work, and LFL's later treatment of that work, which RICO does not reach. *Canyon Cnty.*, 519 F.3d at 975-76.

Nor can Jones salvage the claim with open-ended continuity. He alleges that the scheme "threatens to continue," SAC ¶ 160, but his own pleading forecloses any plausible threat of repetition.

Case 3:25-cv-05118-MMC Document 72 Filed 07/14/26 Page 21 of 32

The SAC pleads that LFL transferred away substantially all of its assets, including the patent portfolio and the source code and work product Jones claims as his, through the 2025 assignment and later sales. *Id.* ¶¶ 77, 79, 83, 85-86, 156. It further pleads that LFL's Delaware charter was forfeited and that LFL is now "a void and forfeited Delaware corporation" that "has ceased to exist" and lacks "the corporate capacity to act." *Id.* ¶¶ 87-88. A defunct, asset-less enterprise poses no "credible threat of future criminal conduct." *Turner v. Cook*, 362 F.3d 1219, 1231 (9th Cir. 2004); *Howard*, 208 F.3d at 748. Continuity turns on whether the alleged conduct is open-ended or inherently terminable, and the facts as pled are tied to Jones's employment, which ended in June 2023, and to an enterprise the SAC itself alleges is dead. SAC ¶¶ 57, 87-88; *Canyon Cnty.*, 519 F.3d at 975-76; *Grimmett*, 75 F.3d at 510-12.

### C. The RICO Count Should Be Dismissed With Prejudice

Jones has now attempted to plead a civil RICO claim three times—in the original complaint, the FAC, and now the SAC—and the result is the same. Even with the benefit of this Court's June 9 order identifying what the claim lacked, Jones still does not allege the facts necessary to satisfy core RICO elements. Dkt. No. 67 at 15:2 to 16:17. Where factual detail is required, he offers categories, labels, and conclusions. Where continuity is required, he alleges only a single dispute between himself and his former employer. Where individualized racketeering conduct is required, he alleges only corporate conduct by LFL and the former titles of its officers. SAC ¶¶ 33, 77, 79, 83, 85, 87-88, 124, 151-66.

The problem is not a lack of opportunities to amend. It is that the core of Jones's case is an employment dispute over recruitment, compensation, assigned work, and the consequences of LFL's later collapse and asset transfer, and that kind of private, one-employee dispute is not transformed into a RICO violation by repeating the word "scheme" or repackaging the same facts under federal labels. *Canyon Cnty.*, 519 F.3d at 975-76; *Howard*, 208 F.3d at 748, 750. The SAC also continues to plead away any cognizable, direct RICO injury by alleging that the relevant property belonged to and was held by LFL, not Jones or the Individual Defendants. SAC ¶¶ 33, 77, 83, 124, 154, 156; *see e.g.*, *Attia*, 983 F.3d at 427. The SAC confirms that the RICO defects are legal and structural, not factual, and should be dismissed with prejudice. *Howard*, 208 F.3d at 748, 750; *Sikhs*, 144 F. Supp. 3d at 1096.

## IV. The Breach Of Fiduciary Duty Claim Should Be Dismissed with Prejudice

The Court dismissed Jones's breach-of-fiduciary-duty claim, holding that the "informal text

message communications" at issue do not trigger a corporate officer's affirmative duty to disclose information to a shareholder which "only applies in the context of a corporate fiduciary's 'communication associated with a request for stockholder action.'" Dkt. No. 67 at 12:17-28 (quoting *Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020)). The SAC attempts to bypass that ruling by focusing on Jones' 2021 option exercises, but it fails to cure the claim defects. SAC ¶¶ 167-77.

**A. The Claim Is Barred by the Statute of Limitations**

The breach-of-fiduciary-duty claim is time-barred under both Delaware and California law.[6] "It is well-settled under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty." *Miele v. Franklin Res., Inc.*, No. 15-199, 2015 WL 4934071, at *15 (N.D. Cal. Aug. 18, 2015) (citing *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *4 (Del. Ch. July 17, 1998)); *see also* 10 Del. C. § 8106; *Reilly v. Horn*, No. 24-654, 2025 WL 2781735, at *6 (Del. Ch. Sept. 30, 2025), *aff'd*, 2026 WL 1256598 (Del. May 7, 2026). California mandates the same three-year period "for a cause of action for breach of fiduciary duty where the gravamen of the claim is deceit," accruing when a plaintiff has reason to suspect wrongdoing rather than upon learning the specifics of a legal theory. *Kanaan v. Yaqub*, 799 F. Supp. 3d 960, 965 (N.D. Cal. 2025) (quoting *Fuller v. First Franklin Fin. Corp.*, 216 Cal. App. 4th 955, 963 (2013)); *see also* Cal. Code Civ. Proc. § 338(d). Because both jurisdictions operate under a parallel inquiry-notice framework, and because Jones's own admissions place him on notice well outside the limitations window, his claim is untimely. The claim accrued by April 29, 2021, when Jones last exercised his options. SAC ¶¶ 167, 169-71. All other allegations concerning patent and equity representations or recruitment conduct date back to 2019. *Id.* ¶¶ 26-31, 34-35. Consequently, the latest possible wrongful act occurred by May 6, 2021, and the limitation period expired on May 6, 2024, rendering Jones' claim untimely on its face. SAC ¶ 64; *see* Dkt. No. 1; *supra* § I.A.1.[7]

//

---

[6] Delaware law governs Jones's breach of fiduciary duty claim. *See* Dkt. No. 67 at 17 n.11; *see also Frankston v. Aura Sys., Inc.*, 161 F.3d 12, n.1 (9th Cir. 1998).

[7] Jones cannot invoke delayed discovery. First, Jones possessed the governing equity documents by January 2, 2020 (SAC ¶ 67), well before the exercise upon which the claim relies. His assertion that he failed to review the public record until May 2025 (*id.* ¶ 35) is legally irrelevant because the legal test is directed to the availability of facts rather than the plaintiff's subjective choice to ignore them. *Reilly*, 2025 WL 2781735, at *8; *Fox*, 35 Cal. 4th at 808. *See supra* § I.A. The facts were not inherently unknowable and are charged to Jones as a matter of law. *See Reilly*, 2025 WL 2781735, at *7-8.

Jones's "continued holding" theory does not extend accrual. To the extent the SAC alleges that the Individual Defendants' "continuing silence" breached an ongoing duty as Jones held his shares (SAC ¶¶ 174-75), that theory cannot revive his claim. Both Delaware and California measure accrual from the wrongful act, and neither restarts the limitations period based on the mere persistence of an alleged nondisclosure. *In re Axsome Thers., Inc. Stockholder Derivative Lit.*, No. 25-1076, 2026 WL 1983269, at *4 (Del. Ch. July 9, 2026) ("claims accrued at the moment of the alleged 'wrongful act'"); *Norgart*, 21 Cal. 4th at 397. Indeed, passive retention of stock is not a "request for stockholder action" and thus is not itself an actionable event. Dkt. No. 67 at 12:17-28. Because every wrongful act the SAC identifies occurred no later than April 29, 2021, and because Jones's own admissions establish inquiry notice well before that period expired, the claim is time-barred under both Delaware and California law.

**B. The SAC Fails to Plead Required Elements of the Claim**

Even if the claim were timely, it fails on the merits for the same reasons the Court dismissed it before. The SAC concedes the pre-shareholder point addressed in the Court's prior order (SAC ¶¶ 169, 171), then pivots to a silence-based disclosure theory foreclosed under Delaware law, while its own admissions continue to negate concealment, reliance, and injury, and the claim still fails Rule 9(b).

**1. No Knowing Misrepresentation Is Pleaded**

The SAC's disclosure theory regarding option exercises and share retention still fails under Delaware's requirements to bring a fiduciary duty law. *Dohmen*, 234 A.3d at 1168-69. The affirmative fiduciary duty to disclose only arises when directors communicate in connection with a request for stockholder action and requires the knowing disclosure of false information. Dkt. No. 67 at 12:17-28. The SAC, however, relies entirely on silence, which *Dohmen* forecloses. Delaware law imposes no free-floating duty to correct information absent a formal request for stockholder action. 234 A.3d at 1168-69 (duty of disclosure arises when fiduciaries communicate with stockholders in connection with a request for stockholder action and requires knowing false information); *see also Malone v. Brincat*, 722 A.2d 5, at *10-11 (Del. 1998) (same). Because the SAC does not plead a request for stockholder action, this theory fails as a matter of law.

**2. Jones's Admissions Negate Concealment, Reliance, and Injury**

The SAC's concealment premise is refuted by Jones's admission that the "provenance" facts

were "established by the public Patent Office record" and "not by Mr. Jones's characterization of them." SAC ¶¶ 13, 25. A fact of public record cannot be one within a fiduciary's exclusive knowledge, and this Court already treated patents as a matter of public record, taking judicial notice that U.S. Patent No. 10,488,584 "was issued to LFL, not to Lytro." Dkt. No. 67 at 11:12-13, n.8. Jones's contrary SAC allegation, that the derivation was "within Defendants' exclusive knowledge," cannot survive his admission that the operative facts were public and that he had the agreement in January 2, 2020. SAC ¶ 67. Yet, he continued exercising and paying the Company through April 2021 (*id.* ¶¶ 64-65) and remained employed until June 2023 (*id.* ¶ 57). *See supra* § I.C.5; *Rochlis*, 19 Cal. App. 4th at 216.

The Court expressly found that Jones alleged no facts showing "he suffered any injury on account of the allegedly concealed information." Dkt. No. 67 at 10:24-25. The SAC does not cure that holding; it confirms it. By Jones's own account, his option losses flow not from any representation about the portfolio but from the termination, the 90-day post-termination exercise window, and his own inability to fund the exercise. SAC ¶¶ 64-65, 68. Those are LFL's corporate acts, not the conduct of Karafin or Bevensee. *Id.* ¶¶ 64-65, 68. Jones therefore pleads no injury caused by any Individual Defendant, an independent failure of causation.

**3. Signing Issuance Documents Is Not Actionable**

To the extent Jones grounds this claim on the fact that Karafin signed the option grant as President and that Karafin and Bevensee approved and signed the resulting stock certificates as President and Secretary (SAC ¶ 64), that conduct cannot supply the missing element.

A countersignature memorializing a transaction Jones himself initiated by tendering the exercise price conveys no factual assertion—least of all a false one——about the provenance, defensibility, or value of LFL's patent portfolio. This Court has already held that a fiduciary-duty claim in this context requires that the fiduciary "knowingly disclosed false information." Dkt. No. 67 at 12. The Plan and Option Agreement—not the act of signature—defined the parties' rights, and the individual defendants' execution of documents implementing a Plan-authorized grant is a ministerial act that creates no independent fiduciary liability. *See Huff Energy Fund, L.P. v. Gershen*, No. 11116, 2016 WL 5462958, at *6 (Del. Ch. Sept. 29, 2016). Because a contract-governed relationship cannot be repackaged as a fiduciary-duty claim based on the same conduct and relief, the fiduciary theory fails for that additional

reason. Likewise, where a Plan governs the parties' relationship and expressly authorizes the challenged grant mechanics, the fiduciary's compliance with those contractual rights is not a separate breach of fiduciary duty. *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010).

The SAC confirms the point. Jones pleads that "Light Field Lab dealt with Mr. Jones in its own securities" (SAC ¶ 171), and that Karafin and Bevensee only "approved and signed" the certificates "as President" and "as Secretary." *Id.* ¶ 64. The counterparty is the corporation. Under Delaware law, an issuing corporation does not owe fiduciary duties to its stockholders in the sale of its own securities. *See An v. Cosman*, No. 23-715, 2025 WL 2180575, at 12 & n.141 (Del. Ch. July 31, 2025); *see also A.W. Fin. Servs., S.A. v. Empire Res., Inc.*, 981 A.2d 1114, 1127 n.36 (Del. 2009). Nor can silence supply the missing element, and his entitlement claim is weaker than the FAC. Under Delaware law, a plaintiff asserting omission-based fraud must demonstrate a duty to speak or intentional concealment. *Latesco, L.P. v. Wayport, Inc.*, No. 4167, 2009 WL 2246793, at *8 (Del. Ch. July 24, 2009). The SAC's "chose to speak" and "half-truth" labels (SAC ¶¶ 172-73) neither identifies any statement made while Jones was a stockholder, much less a statement that was false or misleading.

### C. Dismissal Should Be With Prejudice

Denial of leave to amend is proper where amendment cannot cure the underlying defects. Jones's fiduciary claim is time-barred and cannot be salvaged by further amendment; his attempts to repackage the facts across complaints confirm that further pleading is futile. *Howard*, 208 F.3d at 748, 750; *Sikhs*, 144 F. Supp. 3d at 1096; *Brown v. Brita Prods. Co.*, 172 F.4th 1113, 1120 (9th Cir. 2026).

## CONCLUSION

For the reasons set forth above, the individual defendants respectfully request that the Court dismiss the SAC in its entirety against them, with prejudice.

Date: July 20, 2026

Respectfully submitted,

Patricia L. Peden

Patricia L. Peden (State Bar No. 206440)
Madeline A. Woodall (State Bar No. 351664)
WARREN LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile

Case 3:25-cv-05118-MMC Document 769 Filed 07/20/26 Page 26 of 32

25-5118@cases.warrenllp.com

*Counsel for Defendants*
*Jon Karafin and Brendan Bevensee*

# EXHIBIT 8

An official website of the United States government Here's how you know

# Patent Public Search Basic (PPUBS Basic)

## Quick lookup

Query building guidance

Patent or Publication number

For example: 0123456 or 20210123456

10488584 Search

OR

## Basic search

Query building guidance

Search: Everything

For:

Operator: AND

Search: Everything

For:

Reset Search

## Search results

Results for query **"(10488584).pn."**

Showing 1 to 1 of 1 records

| Result # | Document/Patent number | Display | Title | Inventor name | Publication date | Pages |
|---|---|---|---|---|---|---|
| 1 | US-10488584-B2 | Preview PDF Text | High density energy directing device | Karafin; Jonathan Sean et al. | 2019-11-26 | 34 |

Page 1 of 1

uspto UNITED STATES PATENT AND TRADEMARK OFFICE

BROWSE BY TOPIC
Patents
Trademarks
Learning & Resources
About the USPTO
Glossary
Jobs
Contact Us

ABOUT THIS SITE
Accessibility
Privacy Policy
Terms of Use
Security
Systems Status
Site Map

USPTO BACKGROUND
Federal Activity Inventory Reform Act (FAIR)
Performance and Planning
Freedom of Information Act
Information Quality Guidelines

FEDERAL GOVERNMENT
Regulations.gov
StopFakes.gov
USA.gov
Department of Commerce
Strategy Targeting Organized Piracy

US010488584B2

(12) **United States Patent**
**Karafin et al.**

(10) **Patent No.: US 10,488,584 B2**
(45) **Date of Patent: Nov. 26, 2019**

(54) **HIGH DENSITY ENERGY DIRECTING DEVICE**

(71) Applicant: **LIGHT FIELD LAB, INC.**, San Jose, CA (US)

(72) Inventors: **Jonathan Sean Karafin**, San Jose, CA (US); **Brendan Elwood Bevensee**, San Jose, CA (US)

(73) Assignee: **LIGHT FIELD LAB, INC.**, San Jose, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/064,204**

(22) PCT Filed: **Jul. 17, 2017**

(86) PCT No.: **PCT/US2017/042452**
§ 371 (c)(1),
(2) Date: **Jun. 20, 2018**

(87) PCT Pub. No.: **WO2018/014036**
PCT Pub. Date: **Jan. 18, 2018**

(65) **Prior Publication Data**
US 2018/0356591 A1 Dec. 13, 2018

**Related U.S. Application Data**

(60) Provisional application No. 62/362,602, filed on Jul. 15, 2016, provisional application No. 62/366,076,
(Continued)

(51) **Int. Cl.**
***G02B 3/00*** (2006.01)
***G02B 3/08*** (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............ ***G02B 6/08*** (2013.01); ***G02B 3/0056*** (2013.01); ***G02B 3/08*** (2013.01); ***G02B 5/32*** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ......... G02B 6/08; G02B 3/0056; G02B 3/08; G02B 5/32; G02B 6/023; G02B 6/04;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,143,234 A 3/1979 Johnson et al.
5,004,335 A 4/1991 Montes
(Continued)

FOREIGN PATENT DOCUMENTS

CN 104837003 A 8/2015
CN 205185315 U 4/2016
(Continued)

OTHER PUBLICATIONS

International Search Report and Written Opinion dated Nov. 17, 2017 in International Patent Application No. PCT/US17/42452.
(Continued)

*Primary Examiner* — Nicole M Ippolito
*Assistant Examiner* — Hanway Chang
(74) *Attorney, Agent, or Firm* — Burke, Williams & Sorensen, LLP

(57) **ABSTRACT**

Disclosed embodiments include an energy directing device having one or more energy relay elements configured to direct energy from one or more energy locations through the device. In an embodiment, surfaces of the one or more energy relay elements may form a singular seamless energy surface where a separation between adjacent energy relay element surfaces is less than a minimum perceptible contour. In disclosed embodiments, energy is produced at energy
(Continued)



An official website of the United States government Here's how you know

# Patent Public Search Basic (PPUBS Basic)

## Quick lookup

Query building guidance

Patent or Publication number

For example: 0123456 or 20210123456

10565734

Search

## OR

## Basic search

Query building guidance

Search

Everything

For

Operator

AND

Search

Everything

For

Reset

Search

# Search results

Results for query **"(10565734).pn."**

Showing 1 to 1 of 1 records

| Result # | Document/Patent number | Display | Title | Inventor name | Publication date | Pages |
|---|---|---|---|---|---|---|
| 1 | US-10565734-B2 | Preview PDF Text | Video capture, processing, calibration, computational fiber artifact removal, and light-field pipeline | Bevensee; Brendan et al. | 2020-02-18 | 141 |

Page 1 of 1

uspto UNITED STATES PATENT AND TRADEMARK OFFICE

BROWSE BY TOPIC

Patents

Trademarks

Learning & Resources

About the USPTO

Glossary

Jobs

Contact Us

ABOUT THIS SITE

Accessibility

Privacy Policy

Terms of Use

Security

Systems Status

Site Map

USPTO BACKGROUND

Federal Activity Inventory Reform Act (FAIR)

Performance and Planning

Freedom of Information Act

Information Quality Guidelines

FEDERAL GOVERNMENT

Regulations.gov

StopFakes.gov

USA.gov

Department of Commerce

Strategy Targeting Organized Piracy

US010565734B2

(12) **United States Patent**
**Bevensee et al.**

(10) **Patent No.: US 10,565,734 B2**
(45) **Date of Patent: Feb. 18, 2020**

(54) **VIDEO CAPTURE, PROCESSING, CALIBRATION, COMPUTATIONAL FIBER ARTIFACT REMOVAL, AND LIGHT-FIELD PIPELINE**

(71) Applicant: **GOOGLE LLC**, Mountain View, CA (US)

(72) Inventors: **Brendan Bevensee**, San Jose, CA (US); **Tingfang Du**, San Jose, CA (US); **Jon Karafin**, Morgan Hill, CA (US); **Joel Merritt**, Sunnyvale, CA (US); **Duane Petrovich**, San Francisco, CA (US); **Gareth Spor**, San Francisco, CA (US)

(73) Assignee: **GOOGLE LLC**, Mountain View, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 137 days.

(21) Appl. No.: **15/451,831**

(22) Filed: **Mar. 7, 2017**

(65) **Prior Publication Data**

US 2017/0243373 A1 Aug. 24, 2017

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 15/098,674, filed on Apr. 14, 2016, now abandoned.

(Continued)

(51) **Int. Cl.**

***G06T 7/80*** (2017.01)
***H04N 5/225*** (2006.01)

(Continued)

(52) **U.S. Cl.**

CPC .............. ***G06T 7/80*** (2017.01); ***G01S 7/4817*** (2013.01); ***G01S 17/023*** (2013.01); ***G01S 17/08*** (2013.01);

(Continued)

(58) **Field of Classification Search**

CPC .......... H04N 5/2258; H04N 5/23293–232939; H04N 13/239; H04N 13/243;

(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 725,567 | A | 4/1903 | Ives |
| 4,383,170 | A | 5/1983 | Takagi et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 101226292 | 7/2008 |
| CN | 101309359 | 11/2008 |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 15/967,076, filed Apr. 30, 2018 listing Jiantao Kuang et al. as inventors, entitled "Automatic Lens Flare Detection and Correction for Light-Field Images".

(Continued)

*Primary Examiner* — Paul M Berardesca

(57) **ABSTRACT**

An image capture system includes a plurality of image sensors arranged in a pattern such that gaps exist between adjacent image sensors of the plurality of image sensors. Each of the image sensors may be configured to capture sensor image data. The image capture system may also have a main lens configured to direct incoming light along an optical path, a microlens array positioned within the optical path, and a plurality of tapered fiber optic bundles. Each tapered fiber optic bundle may have a leading end positioned within the optical path, and a trailing end positioned proximate one of the image sensors. The leading end may have a larger cross-sectional area than the trailing end. Sensor data from the image sensors may be combined to generate a single light-field image that is substantially unaffected by the gaps.

**43 Claims, 98 Drawing Sheets**

